UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | 15 cr 515-1 |
|    v. ) | |
| ) | Judge John Z. Lee |
| ALBERT ROSSINI et al. ) | Magistrate Judge Jeffrey T. Gilbert |
| ) | |
|    Defendants. ) | |

**ROSSINI'S RESPONSE IN OPPOSITION TO
GOVERNMENT'S MOTION TO REVOKE BOND**

NOW COMES Defendant, ALBERT ROSSINI ("Mr. Rossini"), by and through his attorneys, SEIDEN NETZKY LAW GROUP, LLC, responds in opposition to the Government's Motion to Revoke Bond, and in support thereof, states as follows:

**INTRODUCTION**

1.  Mr. Rossini has not violated his bond conditions and has been conducting legal business throughout the time of his release on bond.

2.  The Government's interpretations in its Motion to Revoke, as well as its behavior and conversations with participants to the Cambridge/Capital Real Estate Finance Investment Corporation transaction over recent days only highlight its fundamental lack of understanding of complicated real estate transactions, and its spinning of the facts and conversations to fit its preconceived notions.

3.  Mr. Rossini's signing of the cashier's check after his release on bond was a mere formality to a transaction that had already been completed through Devon Street Realty. Further, Mr. Rossini waited until he had Court permission to spend any of the money disbursed to him on necessaries like rent and food.

1

4. BB did not purchase the note, and refused, through her adding Mr. Rossini as a defendant in her civil case, Mr. Rossini's transfer of the note to her as repayment for the remainder of the balance owed to her for failing to gain title and give her the deed to the property. Mr. Rossini was well within his rights and acted on advice of counsel when he filed the rescission and cancellation of the note transfer. After that filing, he acted in good faith to sell the note, owned by Devon Street Investments, not BB. Mr. Rossini then sold that note to MW in good faith.

5. The further misstatements and twisting interpretations of conversations and events taking place after Mr. Rossini was released on bond are refuted by the very tapes that the Government relies upon. Mr. Rossini has complied with this Court's orders and complied with his conditions of release, while the Government has gone out of its way to misinterpret, willfully or not, the nature of transactions and conversations. This Court should find that the Government has failed to show probable cause to believe that Mr. Rossini has violated his conditions of release and deny its Motion to Revoke outright.

**PROCEDURAL BACKGROUND**

6. On August 20, 2015, an Indictment was filed in this cause wherein Rossini was charged with eleven counts of wire fraud under 18 USC §1343 and three counts of mail fraud under 18 USC §1341.

7. Rossini was released on an Appearance Bond subject to Home Detention monitored by Pretrial Services on August 24, 2015. In the Order Setting Conditions of Release, Mr. Rossini was ordered to report to Pretrial Services the next morning for monitoring, restrict his travel to the Northern District of Illinois, and not to engage in financial transactions over

$100.00, in addition to the standard conditions of release as set forth in the form. (Dkt 10-11; Orders attached hereto as **Exhibit A**.)

## THE BB TRANSACTION

8. Prior to any interactions or agreements with the individual identified as BB in the Government's Motion to Revoke, Devon Street Investments, Ltd., a company owned and operated by Mr. Rossini, purchased the note for the property at 211 N Kilbourn. Mr. Rossini did not foreclose on the note, but rather held it, while the property still belonged to another individual.

9. BB, in October 2011, advanced funds, a total of $140,000.00, for Mr. Rossini to purchase notes, foreclose on the notes, close title, and turn over title to two properties: 211 N Kilbourn and 5531 W Jackson. (Two $70,000 cashier's checks, one for each property, attached hereto as **Exhibit B**.) Each of the cashier's checks was made payable to Attorney Thomas Murphy, who at the time was taking care of the legal and financial end of the transactions for Mr. Rossini. Mr. Rossini believed that Mr. Murphy was appropriately handling the legal and financial side of the transactions, though in retrospect, it appears that he was not.

10. Mr. Rossini and BB signed a Guaranty Agreement associated with BB's $140,000, setting forth that as to each of the properties, either the properties themselves or the notes/mortgages would be acquired, that Mr. Rossini would either deed the property if purchased directly or cause the foreclosure process to be completed and thereafter have the property deeded to BB. The Guaranty Agreement further states that Mr. Rossini may use the funds advanced for unspecified purposes while Mr. Rossini pays BB the monthly equivalent of rentals (not necessarily the rents themselves) on the properties, until closing and conveyance of the deeds to BB. (Exhibit attached hereto as **Exhibit C**.)

11. Starting the next month, in November 2011, Mr. Murphy forwarded funds to BB that he represented were either the rent or rental equivalent on the properties. Each check represented payments for both properties, i.e. $3,300 for 211 N Kilbourn and $3,300 for 5531 W Jackson, totaling a check of $6,600. Starting in 2012, the payments were sent to Reliant Management, a management company set up by Fereidoon "Fred" Khoshabe (BB's brother-in-law and Mr. Rossini's contact person for BB) for Anthony Khoshabe, who took a 10% management fee off the top of each payment by agreement with BB. At no point did Mr. Rossini take any percentage of the amounts to be paid to BB.

| MONTH | DATE OF PAYMENT | TO | AMOUNT | AMOUNT REC'D | FROM |
|---|---|---|---|---|---|
| November 2011 | 12/9/11 | BB | $6,600 | $6,600 | Thomas Murphy |
| December 2011 | 1/4/12 | BB | $6,600 | $6,600 | Thomas Murphy |
| January 2012 | 2/6/12 | Reliant | $6,600 | $5,940 | Thomas Murphy |
| February 2012 | 2/29/12 | BB | $6,600 | $6,600 | Thomas Murphy |
| March 2012 | 3/3/12 | Reliant | $6,600 | $5,940 | Thomas Murphy |
| April 2012 | 4/4/12 | Reliant | $6,600 | $5,940 | Thomas Murphy |

12. In the Spring of 2012, Mr. Murphy began making the payments to Devon Street Management (owned by Mr. Rossini, Fred Khoshabe, and Babajan Khoshabe) for Devon Street to disburse to BB.

4

13. After May 2012, Anthony Khoshabe stopped taking fees and working for the properties under Reliant. After that time, Devon Street Management used the 10% management fee to pay the insurance for the properties, and began paying BB directly.

| MONTH | DATE OF PAYMENT | TO | AMOUNT | AMOUNT REC'D | FROM |
|---|---|---|---|---|---|
| May 2012 | 5/7/12 | Reliant | $6,600 | $5,940 | Devon St |
| June 2012 | 6/16/12 | BB | $5,940 | $5,940 | Devon St |
| July 2012 | 8/13/12 | BB | $5,940 (in two depos.) | $5,940 | Devon St |

14. As of July 2012, Devon Street Management set up direct deposits for BB which were paid to her through, on information and belief, November 2012. The bank account in question was frozen and Mr. Rossini is unable to access the online records. What records he has of the payments remain in his offices, and can be retrieved for presentment to the Court with the Court's permission to travel there, if necessary. (Copies of the records of payment in Mr. Rossini's possession above are attached hereto as **Exhibit D**.)

15. When Mr. Murphy's payments to Devon St for BB started bouncing in November of 2012, Mr. Rossini ran out of money and could no longer continue to make good on the guaranties made for investors where Mr. Murphy had failed to do the work and/or otherwise had taken the money.

16. In total, including the ACH deposits, BB received approximately $79,200, not counting the management fees paid to Reliant/Anthony Khoshabe or the insurance payments made to protect the value of the notes.

5

17. In April 2013, Mr. Rossini attempted to help make BB whole by giving her the note for the property at 211 N Kilbourn. Their agreement stated that Mr. Rossini would acquire the notes, foreclose on the notes, close on title, and then (and only then) have the title to the property deeded to BB. However, as this was not possible at this juncture, Mr. Rossini attempted to give her the note to 211 N Kilbourn as a substitute for his remaining payments, as she would then have the ability to go through the foreclosure herself. Rather than asking whether she wanted the note in lieu of payment, Mr. Rossini simply recorded the Note Purchase Agreement and sent it to Fred Khoshabe, her brother-in-law. Fred, as previously stated, had been Mr. Rossini's contact with BB throughout his interactions with her. To his recollection, Mr. Rossini has not ever interacted with BB directly. (Email correspondence, including the note transfer, between Mr. Rossini and Fred Khoshabe attached hereto as **Exhibit E**.)

18. Though Mr. Rossini received an acknowledgement of receipt from Fred Khoshabe, he did not hear anything more regarding BB's acceptance of the note in lieu of the remaining payments owed or her acceptance of the note at all.

19. On or about November 2013, BB, along with others, including Fred Khoshabe, filed a civil suit against Thomas Murphy and his law firm, Berger, Newmark, and Fenchel, P.C. in the Law Division of the Circuit Court of Cook County, under Case Number 2013 L 13464, alleging that Mr. Murphy had defrauded the investors and had not done the legal work required to purchase notes, foreclose, and deliver deeds to the investors.

20. On or about May 1, 2015, the Plaintiffs in the above-captioned suit filed their Second Amended Complaint, which newly named Mr. Rossini as a Defendant as well as an investor.

21. When Mr. Rossini discovered that BB was seeking a return of her investment monies – the Complaint is filed in the Law Division and asks only for money damages, not the notes, deeds, or titles to properties – he took that as her statement that she did not accept the note in lieu of the remainder of her payments. She at no point acted on the recorded Note Purchase Agreement, and her suit for money damages indicated to him that she had not accepted the Note. At that point, he believed in good faith that the recordation of the Note Purchase Agreement was a mistake that needed to be corrected, as she had not accepted it.

22. Mr. Rossini then consulted with two attorneys, Richard Kruse and Anthony Klytta, to discover what he should do and how to deal with the situation. They advised him that he could record a Rescission and Cancellation of the Note Purchase Agreement, which would allow him to clear title and do what he wanted with the note. (Affidavits of Mr. Kruse and Mr. Klytta attached hereto as **Exhibit G.)**

23. Acting on advice of counsel, on or about August 5, 2015, Mr. Rossini then prepared and recorded the Rescission and Cancellation of the note and mortgage assignment made to BB. (Rescission and Cancellation attached hereto as **Exhibit F**.)

24. Once the Rescission and Cancellation was filed, Mr. Rossini believed in good faith that title was clear and the property was available to be sold.

## THE MW TRANSACTION

25. When Mr. Rossini discovered that BB had rejected the note, he began looking for a buyer for the note. As Mr. Rossini believed that the note belonged to Devon Street Investments, Ltd. as of the date of the Rescission and Cancellation, he believed that it was an asset that could be sold, as soon as such rescission was completed and recorded.

26. The individual identified as MW in the Government's Motion to Revoke agreed to purchase the note as an investment, intending to foreclose on the note and gain title to the property, in order to rent it out and make a profit.

27. On information and belief, MW made his initial payment on the note purchase, for $10,000, in late July 2015.

28. On or about August 25, 2015, MW gave the final payment of $15,000 made out to "Devon Street Realty, Ltd." to the individual identified as CW in the Government's Motion to Revoke.

29. On August 25, 2015, Mr. Rossini was arrested in the instant matter and released on bond. Mr. Rossini's conditions of release required him to not to engage in financial transactions over $100.00.

30. Mr. Rossini signed the cashier's check and gave it to CW to cash, believing that this was not a violation of his conditions of release for two reasons. First, the sale of the note to MW was a transaction that was essentially complete and the already accepted payment needed only to be cashed, and second, that as he was signing the check for cashing/deposit on behalf of Devon Street Realty, and not as an individual, it was not a violation of the conditions of release.

31. Individual CW gave Mr. Rossini's wife $9,000, the portion of the payment that was to be paid out to Devon Street Realty. The remaining monies were payment from Devon Street Realty to CW for her work for the company and on the file.

32. Mr. Rossini, complying with the Court's orders to not engage in financial transactions, then held the money without spending it until after the Court granted him permission to pay rent on the Extended Stay hotel, his son's rent, purchase food, and other living expenses.

**FURTHER MW INTERACTIONS AND OTHER GOVERNMENT ALLEGATIONS**

33. After MW's purchase of the note to 211 N Kilbourn, he met with his attorney, who has also worked with Mr. Rossini on a number of matters over the years, and offices in the same building. The attorney is identified in the Government's Motion to Revoke as RK. MW then met with Mr. Rossini, as he was in the same building, to discuss the purchase and ongoing foreclosure and future of the property.

34. Unbeknownst to both RK and Mr. Rossini, the Government had approached MW and was having him record the conversations.

35. The Government's allegations as to what is said on the recordings is patently false and misleading.

36. The Government states that Mr. Rossini lies about BB's interest in the property. BB's lack of interest in the property is fully set forth above.

37. The Government states that Mr. Rossini misled MW into believing that the building had tenants and was generating rental income that would be assigned to MW. This is untrue.

    a. MW has a conversation with RK wherein RK asked MW if there were people living there. Once again, owning a note on a property does not equal owning the deed to the property and does not allow you entry to the building or the right to knowledge about the current state of the building or tenants. In response, MW states that MW drove by the building, that the building looks maintained, that lights are on, that the grass is cut, that there are no broken windows and nothing is boarded up, and that that level of care is unusually nice for that neighborhood.

9

b. Later, when Mr. Rossini is part of the conversation with MW, they discuss the fact that there is a judgment recorded against the property from the owner, as well as a few water bills that have been recorded against the property for failure to pay. They discuss how some/all of that can be dispensed with during the foreclosure.

c. Mr. Rossini calls it "a nice property" when discussing how the current owners will deal with a foreclosure suit. MW agrees, saying that he drove by it and it looks maintained.

d. They discuss a trio of ex-police that Mr. Rossini has worked with in the past as property managers, especially in rougher neighborhoods like this, stating that they, as property managers, will handle everything so that MW doesn't have to put himself in danger by going to the property, including calling cops when there's problems, collecting rents, dealing with the Chicago Housing Authority for Section 8, fixing and general handyman duties, etc.

e. They discuss how no rents can be collected until after the foreclosure is at least filed.

f. Rossini talks about, if at the end of the day the owners don't pay, MW will end up owning three three bedroom rentals, that the property managers discussed earlier could possibly turn into Section 8 housing, which makes it both a lot easier to rent and much easier to collect rent, as it gets paid through the government.

38. At no point in the conversation does Mr. Rossini state that there are current tenants who pay rent. He never states that he's been inside the building or spoken to the owners or knows anything about the operation of the building. He indicates that it looks nice from the outside, which MW also heartily and repeatedly states. Mr. Rossini, by implication, indicates

10

that the property is likely rentable, and were MW to file the foreclosure and file a motion for mortgagee in possession, he could hire property managers to run the property, including collecting rents, renting out empty apartments, keeping the property safe, and all the other things that a property manager does.

39. If anyone was trying to lead the conversation around to indicate that there were renters currently in the property, it was MW, stating over and over that he wants the rents to be assigned, and stating that from the outside it looks like it's in good condition and occupied as lights are on and nothing is boarded up.

40. MW is a mortgage banker at a mortgage lending company, not an innocent Pollyanna who has never been exposed to real estate transactions before. It isn't plausible for a reasonable person in MW's line of work and position to not have a basic understanding that until you are in possession of the property, either by court order or by deed, you don't have control of the property and don't control or keep track of the rents and renters.

41. The Government further complains about "investment properties" that "Rossini did not own, yet was trying to sell." The Court had the opportunity to listen to parts of the recordings in open court, and it is clear from those recordings that Mr. Rossini is merely trying to connect a potential buyer with a seller who has a number of properties that he is willing to sell.

42. The Government further tries to state that Mr. Rossini "solicited" MW about the purchase of a specific property in Wilmette, stating that the owner of the property has not listed her house for sale and does not know Mr. Rossini. Upon review of the conversation, the actual situation is somewhat different than framed by the Government. Mr. Rossini tells MW about the property, that the owner is the mother of a friend of Mr. Rossini's (not claiming a relationship with her), that the owner has received an offer from a developer for the purchase of her house,

11

which she is considering accepting. Mr. Rossini indicates that his suspicion is that the developer is making a play for both this property and the lot next door, but that the owner may sell for significantly under market if MW could come in with an offer above that of the developer.

43. Lastly, the Government has a brief and vague paragraph alleging that Mr. Rossini has directly solicited Individual JK for property investments while on release and that he has indirectly solicited other individuals through an associate, Individual RA. Neither of these is true.

    a. JK came to Mr. Rossini prior to his arrest and asked him if he knew of properties that she could bring to her overseas investors for purchase. Mr. Rossini gave her, prior to his arrest, the same list of properties, not owned by him, that he gave to MW, indicating that he did not own them but that he knew the owner was willing to sell them, essentially helping potential buyers find a potential seller of property.

    b. Individual RA is an ex-police officer and current property manager who has managed a number of properties over the years for Mr. Rossini. Prior to Mr. Rossini's arrest, potential buyers made an appointment through their broker to view specific property owned by Devon Street. After Mr. Rossini's arrest, Mr. Rossini made it clear to the broker that he likely could not sell the property due to his arrest and the current case, and further told the broker that he certainly couldn't sell the property without court approval.

## CONCLUSION

44. The Government has made every attempt to confuse the issues in this matter, whether through its own misunderstanding of the complexities of some of the transactions or through sheer zeal overwhelming common sense. It attempts to spin people's words and confuse

the facts of this case, and to rephrase conversations that took place both on and off tape to put Mr. Rossini in a more sinister light.

45. It has consistently continued to blur the important legal distinction between owning a property by deed and owning a note or mortgage against the property, including the rights of each.

46. It has, throughout this case, continued to intimidate and harass both individuals identified by initials in the instant motion and individuals named in the potential future transaction that has not yet been brought before the Court in anything other than a draft summary form. Some of those individuals have been forced to educate the Government's agents as to common terminology in real estate transactions even while the agents say that no one should be involved in deals with Mr. Rossini. Others have had to tell the Government's agents to simply talk to their own counsel.

47. The Government's agents have further tried to 'submarine' the potential future transaction, to which they are not privy and which has not been finalized or presented to the Court for approval, by reporting it and Mr. Rossini to the Illinois state authorities as an ongoing fraud.

48. Mr. Rossini has been compliant with this Court's Orders, and has made every effort to check with the Court and with Pretrial Services if a situation arises that may need the Court's interpretation, guidance, or approval. The Government cannot be permitted to prevent Mr. Rossini from doing lawful business that does not conflict with the Court's restrictions, whether through the Court, through harassment, or through intimidation.

WHEREFORE, Defendant, ALBERT ROSSINI, respectfully requests that this Court issue an order denying the Government's Motion to Revoke Bond in full, and for any and such additional relief as this Court deems fair and just.

Dated: November 23, 2015             Respectfully submitted,

                                             /s/ Glenn Seiden
                                             Glenn Seiden 2543761
                                             Brooke L. Lewis #6245195
                                             SEIDEN NETZKY LAW GROUP, LLC
                                             Attorneys for Albert Rossini
                                             115 South LaSalle Street, Suite 2600
                                             Chicago, IL 60603
                                             312.236.3060

*Certificate of Service*

    I, Glenn Seiden, an attorney, do hereby certify under penalties of law that in accordance with Fed.R.Civ.P.5 and the General Order on Electronic Case Filing (ECF), I caused the above document to be served upon the all the named attorneys of record by CM/ECF filing methods on this the November 23, 2015.

                                        /s/ Glenn Seiden
                                        Glenn Seiden