UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 515-1 |
| v. | |
| ALBERT ROSSINI | Judge Jeffrey T. Gilbert |

**GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO
GOVERNMENT'S MOTION TO REVOKE BOND**

Now comes the UNITED STATES OF AMERICA, by and through its
attorney, ZACHARY T. FARDON, and respectfully files the foregoing reply to
defendant Albert Rossini's Response to the Government's Motion to Revoke Bond.

The Bail Reform Act provides a clear statutory scheme for determining when
a criminal defendant is to be held in custody pending trial. *See* 18 U.S.C. § 3141, *et.
seq.* In particular, the Act provides for a presumption of detention when there is
probable cause to believe that a criminal defendant who has been released on bond
commits another Federal, State, or local crime while on bond. 18 U.S.C. § 3148(b).
It further provides that bond may be revoked if there is clear and convincing
evidence of any other violation of the terms of release. *Id.* As set forth in the
government's initial motion, and as further detailed below, there is compelling
evidence – more than enough to meet the low probable cause standard – that
defendant consummated a fraud on Individual BB and Individual MW while on
bond. Further, there is clear and convincing evidence, in the form of documents
and recordings, that defendant violated other conditions of release, including

1

violating his financial transaction limit and the Court's prohibition on soliciting monies from individual investors. Under the clear standards of the Bail Reform Act, defendant's bond should be revoked and he should be held in custody pending trial, in light of the Court's original finding that he is a danger to the community.

## I. PROBABLE CAUSE DEFENDANT HAS VIOLATED STATE AND FEDERAL LAW WHILE ON BOND

In his Response, defendant seeks to provide an innocent explanation for taking tens of thousands of dollars from two separate investors for the purported sale of the same mortgage note. But while his unattested factual assertions may preview his theory of defense at trial if he is charged with this conduct, they ignore the fact that the government need only establish probable cause under the Bail Reform Act. Magistrate Judge Cole explained the standards in a similar case in which the government sought to revoke bond due to financial crimes while on bond:

> The standard of proof applicable in bond revocation cases is not a particularly rigorous one. The Government need only demonstrate that there is "probable cause" to believe that a crime has been committed by the defendant while on bond. That requires that the evidence show "a fair probability" that a crime has occurred and that the defendant committed it. *Cf., Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties. *United States v. Bartok, 2012 WL 1034645, 2 (2nd Cir.2012).* "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). And so too are judges.

2012 WL 3262821, at *5 (N.D. Ill. August 9, 2012).

Thus, the question before the Court is not whether defendant can spin the facts presented in support of a probable cause finding. The question is simply whether the evidence presented establishes a "fair probability" that defendant defrauded Individual MW and/or Individual BB by concluding the double-sale of the Kilbourn mortgage note while he was on bond. The government respectfully submits that the evidence presented with the government's original motion (and as further fleshed out below) easily meets this standard.

### A.   Defendant's Unsubstantiated Attempts to Spin the Evidence Do Not Negate Probable Cause.

In his Response, defendant has offered his own take on the evidence presented by the government. Defendant's version of events is in many places nonsensical and is inconsistent with key facts. Several aspects of defendant's account warrant particular scrutiny.

First, defendant repeatedly references the idea that when Individual BB sent her original $70,0000 check, she was "advancing" funds to Rossini to acquire the note. Resp. at 3. But while that is how other transactions occurred, it is patently not what happened with the Kilbourn note. By his own account, defendant actually bought the Kilbourn note on September 1, 2011, which is backed up by the relevant bank records. Resp. at 3; Ex. A at 8.[1] Thus, in October 2011, when defendant agreed to sell the note to Individual BB, defendant already owned the note, and

---

[1] Because many of the government's exhibits to this filing contain names and other potentially sensitive information that would be impractable to fully redact, the government is electronically filing placeholder documents for each exhibit but will provide hard copies of the exhibits to the Court and the defense.

when Individual BB paid for the purchase price for the note, the transaction was complete. There was no reason at that time that defendant could not have simply transferred the note to Individual BB.

Second, defendant emphasizes that Individual BB's check was payable to Thomas Murphy and that Murphy later bounced checks to defendant, thus leaving defendant unable to pay Individual BB. The clear implication is that defendant never saw Individual BB's money and was at the mercy of Murphy to make good on his promises to Individual BB. But in fact bank records show that defendant actually received much of Individual BB's money, and received staggering amounts of other investors' money throughout the scheme alleged in the indictment. Murphy deposited Individual BB's checks for the Kilbourn and Jackson notes on October 24, 2011, at which time the balance in the account was just over $4,000. Ex. A at 10-11. Over the next three days, more than $60,000 was directed to defendant, which, along with payments to co-defendant Anthony Khoshabe and a large cash withdrawal, brought the balance down to a little over $35,000. *Id.* Moreover, the FBI's financial analysis of the bank records shows that from the time that Individual BB paid defendant until the end of 2011, defendant was paid at least $256,104 from the Murphy account in which all of the investors' money was deposited. *See Id.* at 10-13. Additionally, as the government has previously presented, from the end of 2011 through the account's closure in early 2013, despite defendant's claims that he became unable to make his investors whole, defendant was paid at least an additional $936,654 of investor money. *See* Ex. B. As the

4

government has noted several times during previous bond hearings, this money that was paid to defendant remains unaccounted for, and in any event it was not used to repay any of the investors, including Individual BB.

Third, defendant makes much of the "Note Purchase Agreement" regarding Individual BB that he filed with the Recorded of Deeds on April 2, 2013 (five months after he stopped paying Individual BB rents), which he describes as an "attempt[] to help make BB whole by giving her the note." Resp. at 6. Importantly, however, Individual BB has reported to the FBI that she had nothing to do with this supposed "agreement" and was unaware that defendant had filed it. Ex. C. Moreover, this document was meaningless because defendant had already accepted Individual BB's money for the note and agreed to transfer it to her one and a half years earlier. He did not need to "attempt" to make her hole by giving her the note – he could have just given it to her then, or at any point during the previous year and a half.

Fourth, defendant claims that he believed "in good faith" that he could sell note to Individual MW because he had filed a cancellation on the advice of counsel. Resp. at 7. Specifically, defendant states that he "believed that the note belonged to Devon Street Investments, Ltd. *as of the date of the Recission and Cancellation*" and was therefore "an asset that could be sold." *Id.* This claim is contradicted by the sequence of events. Defendant unilaterally filed the cancellation on August 5, 2015, and according to his own submission, spoke to attorneys about it in early August 2015. *See* Resp. Ex. G. Yet defendant sent

5

Individual MW title information on the note and gave Individual MW payment instructions on July 21, 2015, Ex. D; Ex. E, and Individual MW made his first payment on the note on July 24, 2015, Ex. K. Moreover, according to Individual CW, defendant only filed the cancellation after she confronted him about Individual BB. Ex. F at 2-3. It of course bears repeating as well that Individual BB knew nothing about any of the documents defendant filed about the note, including the cancellation.[2]

Fifth, defendant claims that when Individual BB added him to the civil suit (two years after defendant filed the "Note Purchase Agreement"), he "took that as her statement that she did not accept the note in lieu of the remainder of her payments." Resp. at 7. The mental gymnastics required to interpret being sued in this way are staggering, especially given that the Second Amended Complaint specifically alleged that defendant defrauded Individual BB and the other California investors. For example, the Complaint alleged that defendant, Murphy and Murphy's firm "knew these statements regarding securing the notes and deeds and delivering the same to Plaintiffs were false as they either did not secure the

---

[2] Forgetting for a moment, the timeline problem with defendant's account, the attorney affidavits in Exhibit G to defendant's Response are notably vague and unenlightening about what exactly defendant was told. Attorney AK's affidavit states that he does not recall what he told defendant, while Attorney RK's affidavit says only that he advised defendant he should record "a Recission and Cancellation," not that such a document would have legal effect if it was only signed by one of the parties to the transaction. Further, Attorney RK's affidavit cited a "lack of consideration paid" as the reason for the cancellation – even though not even defendant now contests that Individual BB paid him for the note. The government also questions how Attorney RK, having been retained by Individual MW in this same transaction, could ethically advise defendant on a matter that so directly affected Individual MW's interest in the transaction.

notes **or secured the notes and kept the notes in their possession without assigning said notes** to Plaintiffs." Ex. G, at 7-8 (emphasis added).

Finally, defendant's version of events regarding the sale to Individual MW leaves out the critical fact that he misled Individual MW about the title history of the Kilbourn note. Individual MW and Individual CW have both stated that, prior to Individual MW agreeing to buy the note, Individual MW was not advised about Individual BB's history with the note. Ex. F at 2; Ex H at 1-2. Indeed, defendant provided an email and a set of documents about the title history that completely omitted any reference to Individual BB. *See* Ex. D; Ex. F; and Ex. H. It wasn't until Individual CW ran her own title search after the first payment that she saw the "Note Purchase Agreement" and confronted defendant about it. Ex. F at 2-3. Defendant then provided two different versions of the story, claiming that Individual BB originally bought the note but then changed her mind but then claiming that defendant gave Individual BB the note because of other investment money she lost. Ex. F at 3.

Likewise, on September 29, 2015, during a recorded meeting with Individual MW, having now been made aware of the title history document relating to Individual BB, Individual MW specifically raised the issue with defendant. Defendant, who was unaware that the conversation was being recorded, blatantly lied to Individual MW:

> MW: The only question – I was asking him [Attorney RK] and he, I just kinda wanted to get a little – Like I say, I'm just going through the chain of title .... [Individual BB]?

Defendant: [Individual BB].

MW: Yeah.

Defendant: ***She was going to buy it at one time*** –

MW: Okay.

Defendant: ***and she didn't.*** So –

MW: So, yeah, what exactly happened? I just wanna make sure that nobody's gonna come back to the (U/I) later.

Defendant: No, nobody, nobody will come back on it and we went ahead and filed a recission.

MW: Okay.

Defendant: So there's a recission on file.

Ex. I at 41 (Time Stamp: 45:03).[3]

Similarly, earlier in this recording, Individual MW was also told by Attorney RK, who could only have gotten the information from defendant, that Individual BB "***didn't pay for it*** [the Kilbourn note]." Further, when Individual MW clarified, "[d]id she not pay everything up front, or…?," Attorney RK said, "Right." *Id.* at 24 (Time Stamp: 29:25). Given that defendant's own filing attached Individual BB's cashier's check for the purchase of the Kilbourn note, defendant's and Attorney RK's

---

[3] The government has provided excerpts of the very rough transcript of this recording as Exhibit F, which were prepared prior to the government's original motion. In preparing this reply, however, the government was able to revise the transcription of this particular snippet of conversation. As such there are some differences between Ex. F and the transcription in the body of this filing. The government believes the transcription herein is the most accurate transcription of this portion of the recording and will provide the underlying recording if the Court believes it necessary.

statements about Individual BB and the note were patently false. It is also worth noting that his conversation with Individual MW occurred within a few months of Individual BB publicly alleging in a lawsuit that defendant had defrauded her with respect to the Kilbourn note. The deception of Individual MW that is apparent from this recorded conversation is in and easily satisfies the probable cause standard.

In sum, the evidence presented by the government, taking into account the numerous problems with defendant's version of events, compels a determination of probable cause:

- In late October 2011, defendant sold the note to Individual BB in exchange for $70,000. At defendant's instruction, Individual BB sent a $70,000 cashier's check to Murphy for the purchase of the note. These funds were not "advanced" so that defendant could acquire the note, since at the time he sold it, defendant owned the note himself. Within a few days of her check being deposited into Murphy's account, more than $60,000 was paid out to defendant. After that date, defendant received nearly one million dollars in additional money from that account. Defendant did not then, or at any time thereafter, transfer the note to Individual BB.

- When defendant supposedly concluded that he could no longer pay rents to Individual BB, despite having receive over a million dollars in investor money, he still did not transfer the note to her so she could foreclose on it. Nor did he foreclose on it himself and thereby obtain to right to collect rents and transfer to her the title to the building.

- Instead, in March 2013, defendant recorded the transfer of the note to himself. Then in April 2013, he unilaterally recorded the "Note Purchase Agreement." This document was meaningless because there was not an "agreement" to sell Individual BB the note – she had already paid for it at a time when it belonged to defendant. Moreover, this "agreement" was signed only by defendant, and Individual BB was unaware of existence.

9

- In November 2013, Individual BB and others sued Murphy over the notes. At that time, defendant still did not transfer the note to Individual BB, repay her, or foreclose on the note for her.

- In August 2014, defendant filed for bankruptcy and listed Individual BB as a creditor. The bankruptcy was dismissed in December 2014 because defendant failed to produce materials requested by the trustee and failed to submit to an examination under oath. *See* Ex. J.

- In May 2015, defendant was added as a defendant in Individual BB's civil case. The complaint explicitly alleged that defendant had defrauded Individual BB and stolen her money. Defendant still did not transfer the note to her, repay her, or foreclose on the property for her. Instead, defendant says he just took the suit as her rejecting his "offer" to give her the note – an "offer" that she did not know about and was meaningless anyway because the sale was complete in October 2011.

- In July 2015, defendant re-sold the note Individual MW. Prior to the sale, defendant and Attorney RK provided a title history that claimed the last transfer was to Devon Street Investments and provided a packet of title documents that did not include anything about Individual BB, not even the "Note Purchase Agreement" on which defendant now relies so heavily. Given the now four-year history with Individual BB and the note, and given that just two months earlier Individual BB had accused defendant of defrauding her in the civil case with respect to the note, it is beyond belief that defendant did not know he was misleading MW about the title history to the note.

- On July 24, 2015, defendant took the first payment from Individual MW of $10,000. At the time he paid defendant, Individual MW continued to be unaware that anyone else had a claim on the note. Sometime between July 24 and August 5, 2015, Individual CW ran a title search of her own and saw the filing on the Recorder of Deeds about Individual BB. Individual CW confronted defendant about it, and defendant provided conflicting statements.

- On August 5, 2015, only after defendant had taken part of Individual MW's money and only after Individual CW confronted defendant about Individual

BB, defendant filed his unilateral recission. Individual BB, who still had pending civil claims against defendant about this note, did not sign this document and was completely unaware that it had been filed.

- On August 25, 2015, defendant was arrested. Individual MW, unaware of the arrest, wrote a check for the remainder of the note purchase.

- On August 26, 2015, subject to Magistrate Judge Rowland's $100 transaction limit and approximately an hour before reporting to Pretrial Services, defendant met with Individual CW and a Currency Exchange owner to arrange for Individual CW to cash the check for defendant. Individual CW in fact cashed the check, and defendant received the rest of Individual MW's money.

- At several points in time in September and October, defendant and Attorney RK met with Individual MW about Individual MW providing even more money to pursue the foreclosure process on the Kilbourn property. During one of these meetings, which was recorded, Individual MW specifically asked about Individual BB's interest in the note. Defendant lied to Individual MW, and Attorney RK also provided false information that he presumably received from defendant.

### B. The Presumption of Detention Can Not Be Rebutted, in light of Defendant's Lengthy History as a Convicted Fraudster and His Conduct While On Bond.

Having established probable cause, the statute requires defendant's detention unless he can rebut the presumption that no combination of conditions can assure the safety of the community. *See* 18 U.S.C. § 3148(b). In light of his now thirty-year history of financial crimes, including several while on bond, and considering his conduct while on bond in this case, this is something he cannot do.

In Court hearings the government has several times made the point that defendant is not starting from a clean slate. He is a thrice-convicted fraudster who

is under indictment in two state cases, in addition to this one. Although there is no way to know when defendant began defrauding people, his first conviction was in 1987 in Johnson County, Kansas. Defendant was convicted of Forgery following a guilty plea and sentenced to 5 years' Probation, which was subsequently revoked and reinstated. Ex. L at 10. In 2000, Probation was ordered extended indefinitely until defendant paid $105,000 in restitution. *Id.*

Next, in 1997, before Judge Manning in this district, defendant pled guilty to Wire Fraud involving a complicated stock manipulation scheme. *Id.* at 11. Defendant cooperated with the government and received a 10.5 month sentence in exchange. Defendant was ordered to pay $200,000 in restitution and only paid approximately $7,000 of it. *Id.* While on bond awaiting sentencing, defendant engaged in the fraud scheme underlying his 2003 conviction, as detailed below. *Id.* at 21.

Then, in 2003, defendant pled guilty in this district before Judge Shadur to Mail Fraud in a disturbing scheme in which he and his wife stole stock belonging to the estate of a deceased family friend, which had been entrusted to defendant's wife, who was then an attorney. *Id.* at 2-4. As part of the scheme, defendant filed an affidavit in a civil suit falsely alleging that the victim had consented to his disposal of the stock and was trying to cover up an extramarital affair. *Id.* at 4.

At the sentencing hearing, in addition to the charged conduct, Judge Shadur heard evidence about additional uncharged frauds committed by defendant. These additional schemes involved defendant stealing money from an additional

approximately 8 victims through arranging loans for others and promising assistance in paying a victim's back taxes. Ex. M; 127 Fed.Appx. 890, 893-894 (7th Cir. 2005). Notably these schemes occurred in 2001 and 2002 while on supervised release from his 1997 conviction. Ex. L at 21. After hearing the evidence, Judge Shadur found the defendant responsible for the uncharged conduct and increased defendant's criminal history category because the otherwise applicable category "materially understate[d] the seriousness of the offenses in terms of the likelihood of recidivism." Ex. N at 43.

Throughout the sentencing hearing, Judge Shadur pulled no punches in his evaluation of defendant, calling his conduct "con man activities" that were "blatantly fraudulent," *id. at 25*; "egregious," *id.*; and "corrupt," *id.* at 26. Judge Shadur further went so far as to say, "I may be disparaging a class of crooks that are uniformly and universally talked about as con men by applying that tag to Mr. Rossini." *Id.* at 25.

Judge Shadur further spent significant time addressing his concerns about the likelihood defendant will continue committing fraud offenses. For example, Judge Shadur commented, "[i]t's frankly with some sorrow that I say that nothing seems as I read this to deter Mr. Rossini. The prospect of recidivism is regrettably very high." *Id.* at 26. As another example, when the AUSA offered his view that "there is a near certainty that when he is released from prison he's going to continue defrauding people," *id.* at 63, Judge Shadur gave the following response:

13

> My sense with Mr. Rossini is one that I have already expressed, one that although I am not sure I understand why it is so with someone who obviously has a level of intelligence that doesn't call for this activity, but nonetheless persists in repeatedly engaging in the kinds of activity that I had seen in the presentence investigation report and in the supplemental materials that have been provided, sufficiently so that I have already indicated that I agree with [the AUSA]'s evaluation that whatever the motivation may be, the risks of recidivism, the risks of repeated criminal violations and the continuation of the pattern is so high that I found the motion well taken to increase the Guideline range effectively by moving the criminal history category as I did.

*Id.* at 65.

Defendant then appealed his sentence and lost, with the Seventh Circuit calling his challenge to Judge Shadur's upward departure "frivolous," noting that in 2000, defendant had "conned a woman out of $70,000" and in 2001 and 2002 defendant "bilked eight other victims out of another $180,000. 127 Fed.Appx. at 893-894. Defendant then sought to attack his conviction collaterally through a 2255 petition in which he provided his own version of his past conduct, which Judge Shadur forcefully rejected, stating:

> As Rossini would have it, his 1986 conviction in Kansas for forgery, even though it was based on his guilty pela in that case, really had it wrong; his 1995 stock swindle conviction before this Court's colleague Honorable Blanche Manning, even though that conviction was also based on a guilty plea, had it wrong; his related entry into a 1993 consent decree in a case brought against him by the SEC before another of this Court's colleagues, Honorable John Grady (a decree that Rossini flouted by his criminal activity in this case) had it wrong; the state court civil action brought against Rossini and his wife by the victim of the fraud in this criminal case, which ended with a large judgment (still not fully satisfied) for punitive damages after both defendants had filed scurrilous affidavits that falsely charged the victim with having directed the breach of fiduciary obligations involved in the couple's criminal conduct, had it wrong; and the multiple charges of other swindles relating to Rossini's unfulfilled promises to

obtain mortgage financing, coupled with his retention of large sums paid by the proposed borrowers who were other victims disclosed in the presentence investigation report ("PSR") and in the government's presentation during the sentencing hearing, had it wrong. In Rossini's version of the "facts," in short, everyone had it wrong except Rossini. Although this recidivist confidence man may thus have successfully swindled his many victims, he has not been similarly successful in conning other courts and the SEC, nor has he now succeeded in conning this Court.

04-cv-2800, Dkt. No. 3 at 4-5.

Lo and behold, within just a few short years after being released from imprisonment in the Judge Shadur case, defendant racked up two new indictments for financial crimes. First, on January 11, 2012, defendant was charged in a money laundering scheme involving the false presentation of evidence to a court regarding the source of an alleged drug dealer's funds for bond. As the government has noted in prior proceedings in this case, this arrest occurred during the conduct charged in the instant case, and defendant paid his $30,000 bond with funds taken from the victims in the instant case. Then, on July 18, 2012, while on bond from the money laundering case, defendant was indicted in yet another financial fraud case involving defendant and co-defendant Thomas Murphy.

Against the backdrop of such a long, consistent, and disturbing history of "con man activities," including on many occasion while under court supervision, it is difficult to imagine what defendant could do to successfully rebut the presumption of detention. And defendant's conduct since being placed on supervision in this case does little to help his cause. As the government has already outlined and further

details below, from almost the moment of being placed on bond, defendant has violated conditions of his release.

## II.     ADDITIONAL VIOLATIONS OF RELEASE CONDITIONS

As noted above, the Bail Reform Act provides as an independent basis for revocation a finding of "clear and convincing evidence" that defendant has violated one or more of his release conditions. *See* 18 U.S.C. § 3148(b). The government's initial motion set forth such evidence with respect to defendant's dealings with Individual MW while on bond, most notably defendant's cashing of Individual MW's $15,000 check despite an unambiguous $100 transaction limit. On that point, defendant's Response claims that he did not violate the transaction limit because the sale was already complete and the cashing of the check was a mere formality. This is laughable – it is the actual transfer of money that matters. Individual MW did not lose that $15,000, and defendant did not obtain the benefit of that $15,000, until the check was cashed. And when Magistrate Judge Rowland very clearly instructed all the defendants that they were not to engage in any financial transactions over $100, defendant did not (then or on a follow-up motion) seek to clarify that her order would permit him to take $15,000 from an investor. Instead, he just went ahead on his own and met Individual CW and the owner of currency exchange at a restaurant at 8:00 a.m. to arrange for her to cash the check for him while he was visiting Pretrial Services.

But the government has also presented clear and convincing evidence in the form of emails and recorded conversation that defendant has flouted this Court's

16

carefully crafted conditions aimed at preventing him from dealing with less sophisticated individuals who have less wherewithal to protect their own interests than institutional players. Although the defense tries to downplay defendant's solicitations to Individual MW, Individual JK, and others as him just "trying to connect a potential buyer with a seller," the fact is that defendant was engaging in these interactions of non-institutional parties with the idea that they would eventually give him money. Indeed, the Court will recall that during the October 16, 2015, recording, after telling Individual MW they would need to move quickly and go to contract the following week, defendant specifically discussed Individual MW putting money into escrow for the property.

Moreover, as reflected in Exhibits O and P, defendant has solicited monies from other individuals while on bond. Individual JK has reported that since 2013, defendant has taken $40,000 from her and $114,000 from other investors without delivering on his promises. Ex. O at 1-2. Specifically with respect to her investment, defendant claimed he was making Individual JK whole by transferring ownership of a property located at 4045 Wilcox in Chicago, but in reality the property was heavily encumbered with water and tax bills, for which Individual JK is now responsible. *Id.* According to Individual JK, she visited defendant on October 6, 2015, (following the Court's individual-investor condition), and he gave her a list of properties to consider for investment purposes. *Id.* at 2. Defendant further told Individual JK that he could only meet with her if his attorney, Attorney RK, was present, which is further concerning because Attorney RK is not one of

17

defendant's criminal defense attorneys, and the Court's September 3 Order specifically required defendant to seek approval to meet with other attorneys. *See* Dkt. No. 54.

With respect to Individual RA, he has advised that defendant is trying to sell three properties and asked Individual RA to meet with the potential buyers on November 3, 2015, to show them the properties. Ex. P at 2. Individual RA specifically noted that one of the properties is the Wilcox property that defendant previously transferred to Individual JK. *Id.* The government also notes that at least one of the other property, located at 5410 W. Fulton in Chicago, is specifically named in the Individual BB civil complaint. *See* Ex. G.

In sum, even without the presumption of detention, there is an independent basis for revoking defendant bond because he has on several occasions violated specific provisions of this Court's release orders.

III.    **CONCLUSION**

WHEREFORE, the government requests that the Court revoke the release order of defendant ALBERT ROSSINI and remand him to the custody of the U.S. Marshals.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    *s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
WILLIAM NOVAK
Special Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 697-4073

Dated: December 4, 2015

19

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on December 4, 2015 in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.


*s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 697-4073

1