UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 515-1 |
| v. | |
| ALBERT ROSSINI | Judge John Z. Lee |

**GOVERNMENT"S RESPONSE TO DEFENSE MOTION TO WITHDRAW**

Now comes the UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, and respectfully responds to defense counsel's motion to withdraw from the case.

Given defense counsel's involvement in transactions that will be at issue in this case, any potential efficiency in appointing current counsel under Criminal Justice Act is far outweighed by the complications and conflicts that may arise during the pendency of this case due to their potential conflicts of interest, including a significant likelihood that defense counsel may become necessary witnesses at trial. Importantly, defendant's Sixth Amendment right to his counsel of choice is not implicated in this matter. Defense counsel has moved to withdraw, and criminal defendants have no right to choose their appointed counsel. The only issue pending is whether the Court should expend Court resources to allow current counsel to continue in a case where serious potential conflict-of-interest issues are apparent. Defense counsel's motion to withdraw should be granted and new counsel with no potential conflict should be appointed.

1

## I. BACKGROUND

On August 20, 2015, the grand jury indicted defendant on 14 counts of mail and wire fraud. Dkt. No. 1. The indictment alleges that defendant and three co-schemers carried out a Ponzi scheme that defrauded investors of at least three million dollars beginning no later than September 2011 and continuing up until the date of the indictment. *Id.* at 2-7. The charged scheme involved defendant obtaining large payments from investors, ostensibly for the purchase of a variety of real estate-related investments that defendant had no actual right to sell or, where he did have such a right, on which he never delivered, and that defendant further made Ponzi-type payments to investors to convince them the scheme was legitimate and to induce further investments. *Id.* The primary vehicle for the fraud involved defendant and his co-schemers selling investors bogus interests in mortgage notes held on distressed rent-generating properties. *See id.* at 3-5. Another component of the scheme involved defendant obtaining money from certain investors on the false pretense that defendant was brokering the sale of properties from a third party to the investor, when in reality defendant simply took the investors' purchase money, purchased the properties himself, and then used the properties as collateral for loans for defendant's benefit. *See id.* at 6.

On August 26 and 27, 2015, defense counsel Glenn Seiden, Ted Netzky, and Brooke Lewis, all of the firm, the Seiden Netzky Law Group, filed their appearances in this case. Dkt. Nos. 12, 13, and 25. On August 25, 2015, the Court entered the initial pretrial motions schedule in this case. Dkt. No. 9. On September 29, 2015,

December 9, 2015, February 4, 2016, and March 9, 2016, the Court extended the deadline for pretrial motions, which are currently due on May 13, 2016. Dkt. Nos. 75, 105, 124, and 128. To date, neither defendant nor his co-defendants have filed any pretrial motions.

On February 26, 2016, defense counsel filed a motion to withdraw the Seiden Netzky Law Group as counsel for defendant, citing defendant's alleged inability to continue paying defense counsel. Dkt. No. 125. At the March 3, 2016, hearing on the motion to withdraw, defense counsel suggested as an alternative to withdrawal that the Court could appoint the Seiden Netzky Law Group to represent defendant pursuant to the Criminal Justice Act. Dkt. No. 127.

For the reasons stated below, the government believes that this Court should grant defendant's motion and allow counsel to withdraw their representation of defendant. Further, in light of significant questions surrounding potential conflicts of interest held by the Seiden Netzky Law Group, defense counsel's alternative suggestion of appointment under the CJA would be inappropriate. [1]

---

[1] On November 9, 2015, the government advised defense counsel by letter that it was concerned about several areas of potential conflicts of interest, including most of those areas addressed in this filing. To date, the government has received no response from defense counsel. As counsel for the government stated during the March 3, 2016, hearing in this matter, at the time defense counsel filed their motion to withdraw the government had not yet determined how it wished to proceed in light of the potential conflict of interests identified herein. When defense counsel unexpectedly raised the issue of appointment under the CJA, however, the government determined that it was necessary to raise the issues presented in this filing before the Court ruled on the appointment.

3

## II.    ARGUMENT

### A.    Facts Related to Potential Conflicts of Interest

The government's investigation in this case has been ongoing since the grand jury's return of the instant indictment.    During this ongoing investigation, investigators have uncovered evidence that Ted Netzky and Glenn Seiden of the Seiden Netzky Law Group, both attorneys of record in this matter, maintained a business relationship with defendant during the timeframe covered by the indictment. This investigation has further uncovered evidence that, through that relationship, one or both counsel were involved in transactions or other conduct of defendant that are intertwined with the charges, and about which evidence will likely be presented at a trial, in this case.

First, there is evidence that Mr. Seiden and Mr. Netzky, along with defendant, share an ownership interest in a company that is specifically named in the indictment as having been used by defendant for the purpose of defrauding investors.  More specifically, there is evidence that Mr. Seiden, Mr. Netzky, and defendant (or trusts for the benefit of their families) own a company called Rockford CM (II), LLC, which in turn owns Rockford Commercial Mortgage, Ltd.  *See* Exhibit A, at 13.  Rockford Commercial Mortgage is named in the indictment and was the recipient of three of the charged wire transfers involving an investor identified in the indictment as Victim KK. Dkt. No. 1, at 2, 6, 16, 18, and 19.   If this matter proceeds to trial, the government expect to prove that Rockford Commercial Mortgage was established in 2013 by defendant, with the assistance of his co-

4

defendant, Thomas Murphy, for the purpose of fraudulently inducing Victim KK to invest money with defendant for the supposed purchase of a mortgage note pool and at least one block of townhomes. The government further expects to prove that, based upon defendant's fraudulent inducement, Victim KK wired a total of more than $800,000 directly into the Rockford Commercial Mortgage bank account.

Second, there is evidence that Mr. Netzky and Mr. Seiden may have been involved with defendant in efforts in 2013 to obtain large business loans collateralized by properties that are directly related to the charges in this case. Most notably, throughout 2013 Mr. Netzky and defendant sought to obtain various large loans, as co-borrowers, from a lender named Barnett Capital. *See id.*, at 1-13. All of these proposed loans involved defendant and Mr. Netzky offering real estate as collateral, and the government expects to prove that many of the properties offered as collateral were either obtained through the fraud alleged in this case or were acquired with fraud proceeds obtained from the victims in this case. Mr. Seiden does not appear to have been named as a co-borrower for these loans, but documents obtained during the investigation reflect that Mr. Seiden was involved in meetings related to these proposed loans and had some awareness about them. *See id.*

In particular, the collateral proposed by Mr. Netzky and defendant included a group of townhomes in Riverdale, Illinois ("the Riverdale Properties"). The government expects to prove that these properties, which were purchased by defendant through Rockford Commercial Mortgage in July 2013, will play an

5

important role in the evidence in this case. The government expects to prove that on July 12, 2013, Victim KK wired funds to defendant, via Rockford Commercial Mortgage (as alleged in Count Twelve), for what defendant claimed to be her purchase of the Riverdale Properties. According to the government's evidence, defendant represented to Victim KK that, upon his receipt of Victim KK's wire, the properties would be deeded into Victim KK's family trust and that defendant, through Rockford Commercial Mortgage, would manage the properties for Victim KK and forward to her the rents he collected. The government expects to prove, however, that when Victim KK transferred the funds into the Rockford Commercial Mortgage bank account, defendant, who did not then own the properties, used Victim KK's money to buy the Riverdale Properties for himself without her knowledge or consent. Defendant later caused the properties to be deeded to Rockford Commercial Mortgage instead of Victim KK's trust. Over the next several months, defendant continued to make false representations to Victim KK about the properties, including assuring her that the deeds would be turned over to her. Not only were the deeds never turned over to Victim KK (nor were her funds ever returned to her), but throughout the remainder of 2013 and early 2014, defendant worked with Mr. Netzky and Mr. Seiden to attempt to use the properties as collateral to obtain business loans. These efforts at collateralizing the Riverdale Properties occurred at the same time that defendant was making false representations to Victim KK about her interest in the properties.

6

Third, there is evidence that Mr. Netzky at least at one time had a personal interest in the Riverdale Properties. On or about October 19, 2015, investigators carried out a consensually recorded telephone call with Individual CW, an associate of defendant, Mr. Netzky, and Mr. Seiden. During this conversation, Individual CW advised the individual to whom she was speaking that she met defendant through Mr. Netzky and that Mr. Netzky had invested money with defendant and had purchased townhomes in Riverdale with defendant (believed to be a reference to the Riverdale Properties), which were generating rental income that Mr. Netzky would direct to Individual CW. *See* Exhibit B.

Finally, it has recently come to the government's attention that defendant filed a bankruptcy petition on or about February 19, 2016, in which he attested that he had transferred to defense counsel alleged assets that appear to be part of the charged fraud scheme. More specifically, according to defendant's petition, in or about August 2014, he transferred "Lis Pendens, Notes, Property" to "Seiden Law Office," at the former address for the Seiden Netzky Law Group. *See In re Albert Michael Rossini, Debtor*, 16-05382, Dkt. No. 1, at 51 (pertinent portion attached hereto as Exhibit C). This transfer was described as "legal fees for criminal case." *Id.* As set forth above, the fraud scheme charged in this case centered primarily around defendant obtaining investor funds related to mortgage notes and properties in which defendant claimed to have an interest. As also referenced above, part of the scheme also involved defendant filing "lis pendens" notices on these properties underlying the mortgage notes involved in this scheme. The government is

7

currently unaware of any mortgage notes, "lis pendens," or real properties with which defendant is involved that do not relate to the scheme charged in this case.

### B.    Legal Standards and Analysis

As a preliminary matter, courts have a duty to take steps to address possible conflicts of interest when alerted to them. *See Wheat v. United States*, 486 U.S. 153, 160 (1988).   In the context of retained – as opposed to appointed – counsel, the Court's task of addressing a possible conflict of interest is complicated by the fact that the Sixth Amendment guarantees a criminal defendant who can afford it the right to counsel of choice. *See United States v. Turner*, 594 F.3d 946, 951 (7th Cir. 2010).   Yet, even in the context of retained counsel, defendant's choice of counsel "may be overridden and counsel may be disqualified where an actual conflict of interest or a serious potential conflict of interest exists." *United States v. Turner,* 651 F.3d 743, 748 (7th Cir. 2011) (citations omitted). This is because "a court has an independent duty to balance the right to counsel of choice with the broader interests of judicial integrity." *United States v. Combs*, 222 F.3d 353, 361 (7th Cir. 2000).

Importantly, the counsel-of-choice complexity is not present in the context of appointed counsel because criminal defendants have no right to choose the attorney appointed to represent them. *See Messino v. United States*, 181 F.3d 826, 831 (7th Cir. 1999) ("[I]mpecunious defendants do not have the right to choose their counsel."). *See also, Wheat*, 486 U.S. at 159 ("[A] defendant may not insist on representation by an attorney he cannot afford.").   Put differently, "a defendant's

8

right to 'retain counsel of his choosing … does not go beyond the individual's right to spend his own money.'" *Messino*, 181 F.3d at 831 (quoting *Caplin & Drysdale*, 491 U.S. 617, 626 (1989)). Thus, it is easier for courts to avoid the myriad potential problems posed by potential conflicts of interest when dealing with appointed counsel. *See United States v. Gaines*, 529 F.2d 1038, 1042 (7th Cir. 1976) (noting, in the context of appointed counsel representing multiple defendants, that "the problems of conflicting interests can usually be avoided if the court, with advice from the prosecutor, carefully examines the available facts in light of the charges before appointing counsel … and appoints separate counsel when there is any possibility of conflict.").

The facts set forth above reveal at least two broad areas in which defense counsel appear to have a potential for a conflicts of interest. First, based on the information available to the government at this time, there is a substantial likelihood that Mr. Netzky, Mr. Seiden, or both, may become necessary witnesses if this matter proceeds to trial. Second, there is evidence that Mr. Netzky and/or Mr. Seiden, may have a proprietary interest in the subject matter of this case.

### 1. Concerns related to counsel as potential witnesses.

Regarding the first area of concern, the potential for defense counsel to become witnesses in the case, the ABA Model Rules[2] provide, in pertinent part, that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a

---

[2] *See* LR 83.50. ("Applicable disciplinary rules are the Model Rules adopted by the American Bar Association.)

necessary witness unless … the testimony relates to an uncontested issue[,] relates to the nature and value of legal services rendered in the case[,] or disqualification would work a substantial hardship on the client." ABA M.R. 3.7(a). This rule serves to "protect the tribunal" from the trier of fact becoming confused or misled by the combination of roles involved in an advocate-lawyer testifying as a witness. *See* ABA M.R., Comment on Rule 3.7, at ¶ 2. The rule also seeks to avoid the potential conflict of interest that may arise when a lawyer is required to testify in a matter directly related to his or her representation of the client. *See id.*, at ¶ 6.

As detailed above, there are several areas where defense counsel's apparent ongoing business relationship with defendant during the time period of the charged fraud scheme may render counsel necessary witnesses in this case. At this time, the area of most concern relates to the "Riverdale Properties." As referenced above, the government expects to present evidence at trial that during the summer of 2013 defendant solicited money from Victim KK for the purchase of 16 townhomes located in Riverdale, Illinois. Defendant claimed he would be brokering Victim KK's purchase of the townhomes from Individual LC and that, after purchasing the townhomes, Victim KK, who lived in California, would be able to use defendant's purported property management business, Rockford Commercial Mortgage, to manage the properties and collect rent. The government expects its evidence to show that in, July 2013, Victim KK wired approximately $225,000 to Rockford Commercial Mortgage for the purchase, but that rather than purchasing the properties for Victim KK and deeding them to her as promised, defendant instead

10

used her money to purchase the properties himself and deed them in the name of Rockford Commercial Mortgage, a company he controlled and established for this very purpose. Over the next several months, defendant, with the apparent involvement of defense counsel, attempted to use these ill-gotten assets as collateral to obtain further loans. The government expects to show that, at the very time defendant and defense counsel were jointly attempting to collateralize the Riverdale properties, defendant was simultaneously continuing to promise Victim KK that she had in fact purchased the properties and that he was still going to deed the properties to a trust in her name.

Importantly, defendant's and defense counsel's email communications with one lender named Barnett Capital, reveal multiple instances in which defense counsel were directly involved in discussions regarding defendant and defense counsel obtaining a loan from Barnett for which the Riverdale properties were being offered as collateral, at the same time that defendant was promising to deliver the deeds to the Riverdale properties to Victim KK, who had paid for them. For example:

- On April 15, 2013, Mr. Netzky sent an email to an individual at Barnett, copying Mr. Seiden and defendant, attempting to arrange a meeting "to discuss further a future financing relationship." *See* Exhibit A, at 1.

- On July 12, 2013, Victim KK wired $225,000 to defendant via Rockford Commercial Mortgage for the purchase of the Riverdale Properties, and defendant confirmed by email to Victim KK that the Riverdale Properties would be deeded into her family trust. *See* Exhibit D, at 1-2.

11

- On July 15, 2013, defendant used the money that had just been deposited into the Rockford Commercial Mortgage account by Victim KK to write a cashier's check to Individual LC for the purchase of the Riverdale Properties, which were later titled in the name of Rockford Commercial Mortgage.

- On July 26, 2013, defendant advised Victim KK by email that he would send her a Fed Ex containing the 16 deeds to the Riverdale Properties on approximately July 29, 2013, and that rent revenue from the properties would soon be deposited into her bank account. *See id.*, at 3.

- On July 31, 2013, Mr. Netzky sent Barnett Capital an email, copying defendant, advising that "Bert [defendant] just found out that we will not have titles to ***our*** last 16 acquisitions until tomorrow." *See* Exhibit A, at 2 (emphasis added).

- On August 1, 2013, Barnett Capital sent Mr. Netzky and defendant a "Term Sheet" proposal for a $3,000,000 loan to Mr. Netzky and defendant, as co-borrowers. The Term Sheet lists collateral for the loan, including the Riverdale Properties. *See id.*, at 3-7.

- On August 8, 2013, defendant sent an email to Barnett Capital, stating, in pertinent part, "I purchased the Riverdale properties from [Individual LC] within the last month. The properties have been paid for in cash…." *See id.*, at 8.

- On October 2, 2013, Mr. Netzky sent Barnett Capital an email stating, "[W]e would like to restructure the loan with an LLC, of which I am the only Managing Member, and my family trusts, Glenn's [Seiden] family trusts and a trust for the benefit of Bert's [defendant] family will be the Members. I am the Trustee of Bert's trust and Glenn is the successor trustee. We will be posting property owned by the LLC as the collateral." *See id.*, at 10.

- On October 28, 2013, Mr. Netzky sent Barnett Capital an email, copying Mr. Seiden and defendant, listing a schedule of assets that included the Riverdale Properties that "***we*** [were] prepared to deposit with Barnett as collateral." [emphasis added] Mr. Netzky further asserted to Barnett, "[T]hey are all unencumbered." *See id.*, at 11-12.

- Between August and December 2013, at the same time defendant and defense counsel were communicating with Barnett, Victim KK, who

had still not received title to the Riverdale Properties, exchanged numerous emails with defendant regarding the properties. In the emails, defendant repeatedly promised to deliver to Victim KK the deeds to the properties. *See* Exhibit D, at 3-6. After Victim KK began demanding return of her money, defendant repeatedly promised her money would be returned. *See* Exhibit D, at 4-11. Notably, on December 3, 2013, Victim KK specifically advised defendant, "You are holding my funds wrongfully at this time." *See* Exhibit D, at 7.

- On December 3, 2013, the same day Victim KK sent the aforementioned email to defendant, Mr. Netzky sent a letter to Barnett Capital requesting a $500,000 loan secured by 18 properties, including the Riverdale Properties, "all of which are unencumbered." The letter further explained that the Riverdale Properties were owned by Rockford Commercial Mortgage, which was in turn "owned by Rockford CM II, LLC, which is owned by trusts for the benefit of the families of Bert Rossini, Glenn Seiden, and Theodore Netsky[sic]." *See* Exhibit A, at 13.

In light of defense counsel's apparently intricate involvement with the Riverdale Properties and their joint efforts with defendant to use those properties as collateral to obtain loans, all while defendant continued to make misrepresentations to Victim KK about the properties, the danger of running afoul of Model Rule 3.7 is evident. Given Mr. Seiden's and Mr. Netzky's apparent awareness of defendant's acquisition of the Riverdale Properties, as well as the fact that defendant apparently made contemporaneous statements at least to Mr. Netzky about the status of the titles to these properties, there is a significant likelihood that at a trial in this case Mr. Netzky, Mr. Seiden, or both, would be necessary witnesses at such a trial. If defendant told defense counsel the truth about Victim KK and the Riverdale properties, then his statements to them would be directly incriminating and extremely relevant to this case. Yet it would also be

13

incriminating and relevant if defendant concealed the truth from defense counsel and/or misled them about the status of the properties.  In either event, defense counsel's testimony about what defendant told them would be incriminating and relevant.  But even without going into defendant's statements to defense counsel,[3] defense counsel are, at a minimum, occurrence witnesses to defendant's efforts to complete his fraud on Victim KK and to attempt to defraud Barnett Capital.

Apart from the specific issue of the Riverdale properties, as detailed further below, Rule 3.7 concerns also arise from defense counsel's general intertwinement with defendant's business dealings during the time covered by the indictment, as well as their potential proprietary interests in the subject matter of the litigation. For example, if defendant transferred to defense counsel mortgage notes and properties that were promised to investors as defendant has indicated in his bankruptcy petition, it would be relevant what representations defendant made to counsel regarding his ownership interests in those notes and properties and his right to transfer them to anyone other than his investors.  Likewise, to the extent defense counsel believe defendant had a legitimate ownership interest in any of these items when he transferred them, they could be witnesses on defendant's behalf.

---

[3] In light of the speculative nature of the issue at this point, the government has not done a full analysis of any potential privilege claims surrounding such communications.  The evidence to date does suggest, however, that such communications were likely not made for the purpose of seeking legal advice and in any event were in furtherance of fraud on defendant's part, in either of which case the communications would not be privileged.

14

### 2. Concerns related to defense counsel potentially having a personal interest in property at issue in the case.

Regarding the second area of concern, as set forth above, defense counsel may have a personal interest in companies, properties, or other real estate vehicles. There is evidence that:

- Defense counsel may have an ownership interest in Rockford CM(II), LLC, which in turn owns Rockford Commercial Mortgage, a company that is specifically named in three places in the indictment and that is alleged to have been established for the explicit purposes of carrying out part of the charged fraud scheme and to have received over $800,000 of fraudulently obtained funds from Victim KK. *See* Exhibit A.

- Mr. Netzky has asserted, in communications with Barnett Capital and with Individual CW, that he and defendant share personal interests in the Riverdale properties, which the government alleges that defendant purchased as part of a fraud on Victim KK and entirely with money fraudulently obtained from Victim KK. *See* Exhibits A and B. Additionally, documents reflect that defense counsel may have created one or more entities to hold ownership of the Riverdale Properties in trusts for the benefit of them and defendant. *See* Exhibit A.

- In August 2014, defendant transferred unnamed "Lis Pendens, Notes, and Mortgages" to defense counsel as payment for their legal services. *See* Exhibit C.

Each of these areas is concerning because if counsel has a proprietary interest in the subject matter of the litigation, there is at a minimum an appearance that counsel's own personal interests are at stake in the prosecution and outcome of defendant's case. For example, the indictment contains a forfeiture allegation, including a money judgment in the amount of approximately $2,922,564, Dkt. No. 1, at 21, a figure that includes the more than $800,000 that was paid by Victim KK to Rockford Commercial Mortgage. The facts set forth above raise significant

questions as to what if any interest defense counsel has in Rockford Commercial Mortgage's income stream and whether any of defense counsel's interests related to Rockford Commercial Mortgage are potentially subject to forfeiture. Similarly, if defense counsel has a personal interest in the Riverdale properties, this interest would be directly adverse to that of Victim KK, who paid defendant for the properties but never received title nor had any of her money returned to her. As a further example, if defendant in fact transferred his alleged ownership interest in *lis pendens*, notes, and properties to defense counsel, then defense counsel may have a personal interest directly in conflict with all of the victims in the case, who the government expects to prove were repeatedly promised these notes and properties would be transferred to them.

### 3.    Appointment under the CJA would not be appropriate.

Due to the concerns raised above related to defense counsel potentially becoming necessary witnesses and potentially having proprietary interests in the case, the Court should not appoint them, as has been suggested. Importantly, because defense counsel have moved to withdraw, the Court need not determine whether the above-described conflict scenarios rise to the level of affirmative disqualification.[4] Instead, the Court need only decide whether it is appropriate to appoint the Seiden Netzky Law Group and thereby pay them with court funds, in

---

[4] Due to the posture in which this issue came before the Court (i.e., on defense counsel's motion to withdraw), the government is not taking a position at this time as to whether the conflict concerns identified above would warrant disqualification if counsel continued on as retained counsel.

light of the significant issues discussed herein. Not only is it contrary to the purposes of the CJA to appoint conflicted counsel, it is also wasteful of court time and resources. If counsel is appointed now at this early stage of the case, and the apparent potential conflicts of interest identified above fully ripen in the future, there is a significant risk that the Court will again have to address the question of appointing new counsel, having already spent significant time and court funds. As the case nears trial, for example, the government may determine that it is necessary to call Mr. Netzky or Mr. Seiden as a witness, or the defendant may seek to call one of them as a witness on his own behalf. In light of Model Rule 3.7's prohibition on trial counsel acting as a witness, the Court will have been placed in the predicament of having to either appoint new counsel at that time (and thereby return to square one, wasting a significant amount of time and money in the meantime) or impede the government from presenting its evidence the jury, *see, e.g.*, *Messino*, 181 F.3d at 830-832 (reversing district court's exclusion of proffered government testimony to resolve conflict of interest, while declining to hold that such an exclusion of evidence is *per se* improper). It is wholly unnecessary for the Court to ever have to face such a dilemma in this case, given that able yet conflict-free counsel are available by the ordinary appointment process.

It further bears noting that this case is in its very early stages, and the continuity-of-counsel interests cited by defense counsel in open court are, in the government's view, overstated. First, virtually nothing substantive has happened yet in this case. Although the indictment was returned seven months ago, as the

17

Court is aware, there have been several extensions of the pretrial motions deadlines, and neither defendant nor any of his co-defendants have filed any such motions yet. Additionally, no hearings have been held, no witnesses have been presented, and no witness lists have been tendered. It is true that new defense counsel would need time to review the discovery that current defense counsel is in the process of reviewing, but this is the only aspect of this case that is currently underway.

At the March 3, 2106, hearing, defense counsel indicated that continuity of counsel was important because the Seiden Netzky Law Group has also represented defendant in what counsel described as a "related" case then-pending in state court. Respectfully, this is not accurate. The state case, Case No. 13CR17457, involved allegations that between April 29, 2010, and September 9, 2010, defendant and, Thomas Murphy, who is also a co-defendant in the federal case, stole more than $100,000 but less than $500,000 from an individual victim who is not one of the victims in the instant federal case. *See* Exhibit E. Defendant was also charged with money laundering in a separate state case, Case No. 12CR12822. On March 18, 2016, defendant entered into a global plea agreement with the Cook County State's Attorney's Office where he pled guilty to the money laundering charges in Case No. 12CR12822, and, in exchange, Case No. 13CR17457 was dismissed.

The conduct underlying the instant federal case, by contrast, commenced in 2011, involved two other co-schemers besides Murphy, affected entirely unrelated victims, and related to a complex Ponzi scheme in which defendant, Murphy, and

18

the other two co-defendants solicited millions of dollars in investments primarily related to mortgage notes or the brokerage of pools of properties.  *See* Dkt. No. 1. Apart from the fact that Murphy was involved in both cases, there is almost no factual overlap between the two cases – indeed, the conduct underlying the state case predated the conduct charged in the federal case by more than a year. Additionally, although defense counsel and the government had occasional pre-indictment communications related to the federal case, these conversations were restricted to defense counsel producing materials to the government and attempting to schedule meetings with defendant, none of which meetings actually occurred.

Given the significant risks identified above, and given the early stage of this case, the Court should simply grant defense counsel's request to withdraw and appoint defendant new counsel via the federal defender panel according to the same procedures that are used in every other case in this district.  Additionally, as discussed above, the Court should deny decline counsel's suggestion of  appointment under the Criminal Justice Act.

## III. CONCLUSION

WHEREFORE, the government requests that the Court grant defense counsel's motion to withdraw.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:  *s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
WILLIAM NOVAK
Special Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-8709

Dated: March 30, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served on March 30, 2016, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.


By:     *s/ Erik Hogstrom*
ERIK HOGSTROM
Assistant U.S. Attorney
WILLIAM NOVAK
Special Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 697-4073

1