UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 515-1 |
| v. | |
| ALBERT ROSSINI | Judge John Z. Lee |

**GOVERNMENT'S SUR-REPLY AS TO DEFENDANT'S MOTION TO WITHDRAW AND REQUEST FOR CJA APPOINTMENT**

Now comes the UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, and respectfully makes the following sur-reply with respect to defendant's motion to withdraw and request for CJA appointment. Dkt. No. 149.

Counsel's reply misses the point entirely. Rather than clarify or alleviate the concerns raised in the government's response to the motion to withdraw, by essentially putting forth a factual rebuttal to the government's allegations and evidence, counsel have only confirmed their intricate involvement in transactions and communications directly at issue in this case. It is now more clear than ever that they are potential witnesses in this case and that their overall intertwinement with defendant in business dealings of his related to this case make them inappropriate for appointment. Moreover, counsel have provided little by way of any affirmative reason that appointing them would serve the interests of efficiency and fairness to such an extent as to outweigh the myriad concerns raised in the government's Response. A few aspects of counsel's Reply merit specific response.

1

## A.      The Riverdale Properties and Potential Barnett Capital Loan

Despite counsel's bare assertions that the loans they, and Rossini, sought with Barnett Capital ("Barnett") were separate and apart from Rossini's dealing with the Riverdale properties, *see* Dkt. No. 149, ¶¶15-21, the facts simply do not bear this out. The government has attached as Exhibit A a timeline which shows the sequence of events.[1]  As the timeline shows, as early as July 2013, counsel were discussing the Riverdale properties as possible collateral with Barnett at the same time as defendant was promising Victim KK that the properties belonged to her and would be deeded into her family trust.  Likewise, in August 2013, counsel and defendant were proposing the properties as collateral even as defendant advised Victim KK, "Riverdale is ours" and "will be able to send titles at the end of the month."   Ex. A, at 3.  Further, on August 23, 2013, defendant falsely advised Victim KK that the properties had passed inspection, i*d.*, which directly contradicts counsel's assertion in their Reply that defendant told Victim KK the properties could not be transferred to her because they had to pass inspection.  *See* Dkt. No. 149, ¶¶12-13.

The timeline further shows that it was not until late October 2013, after hiring an attorney to investigate defendant's failure to transfer the properties to her, that Victim KK, through her attorney, demanded a return of her money. Within three days, defense counsel, still offering the Riverdale properties as

---

[1] The government has attached as Exhibit B any supporting documents that were not previously submitted in the government's original response.

collateral, advised Barnett that they would work to make sure there were no other claims on the Riverdale properties.   Ex. A, at 5.

In December 2013, as Victim KK continued to demand a refund of her money, counsel continued to seek a loan collateralized by the properties, which they represented were "unencumbered." Ex. A, at 6.  Defense counsel also told Barnett that the properties were deeded to Rockford Commercial Mortgage, which was owned by Rockford CM (II), which was in turn owned jointly by trusts for the benefit of defense counsel and defendant.  *Id.*

Moreover, counsel's factual assertions in their Reply are directly contradicted by Victim KK herself.   After receiving the defense's Reply brief, the FBI re-interviewed Victim KK specifically about the assertions in the Reply.   The government has attached as Exhibit C a Report of Interview of Victim KK conducted after counsel filed their reply.  As shown by the report, Victim KK would testify that nearly every fact asserted in counsel's Reply is untrue.  For example, according to Victim KK, the terms of the deal she reached with Rossini about the Riverdale properties were that defendant was to purchase the Riverdale properties on behalf of Victim KK and title them immediately into her family trust.  Govt. Ex. C, at 2.  There was never any discussion that Rossini would purchase the properties on his own, title them in the name of Rockford Commercial Mortgage Company, and then re-titled them to Victim KK. *Id.*  On the contrary, defendant provided Victim KK with a shifting set of excuses for why the properties had been deeded to Rockford Commercial Mortgage. *Id.* at 1.  Neither was there discussion of the

properties being in such a state of disrepair that transfer to her would not occur until hundreds of thousands of dollars' worth of repairs were made; on the contrary, she was told the price she paid included the cost of making the modest repairs necessary to bring the buildings up to code. *Id.* at 3. All of this is consistent with the emails between Rossini and Victim KK at the time of the purported transaction, as she constantly expressed confusion as to why the properties were not titled in her name in the first place.

### B. Rockford Commercial Mortgage Company and Defendant's Bankruptcy Petition

In addition to reinforcing the fact that defense counsel were inextricably interwoven with business dealings of defendant directly related to conduct charged in this case, counsel's Reply confirms two additional issues that demonstrate that appointment is inappropriate. First, counsel tries to distance themselves from ownership of Rockford Commercial Mortgage Company by contending there are three similarly named entities the government is conflating. This is wrong, and defense counsel's reply confirms the potential conflict issue here. However many iterations of "Rockford Commercial" may have been established, the indictment specifically names Rockford Commercial Mortgage Company, Ltd., as having been used as part of the fraud in this case. *See* Dkt. No. 1, at 2.[2] Counsel's own reply and Mr. Netzky's December 3, 2013, letter to Barnett specifically stated that the

---

[2] Based on bank records obtained by the government, contrary to the assertions in the Reply, defendant was not uninvolved in "Rockford Commercial, Ltd.." It was the name in which the bank account was held into which Victim KK was directed to deposit her money for the Riverdale properties.

Riverdale properties were owned by Rockford Commercial Mortgage Company, Ltd., and that "Rockford Commercial Mortgage Company, Ltd. is owned by Rockford CM II, LLC, which is owned by trusts for the benefit of the families of Bert Rossini, Glenn Seiden, and Theodore Netsky." Dkt. 134, Ex. A, at 13. Whether or not Rockford CM II, LLC, ever "completed a deal or conducted any transactions," as defendant counsel have stated, there is clear evidence that they share, or at least at one time shared, an at least indirect ownership interest in a company involved in the conduct underlying this case.

Second, in their Reply, defense counsel disavowed the receipt of the lis pendens, notes, and mortgages that Rossini listed in his February 2016 bankruptcy filing as having been transferred to them to secure their fees. According to counsel's reply, defendant "believed" he had transferred these items (in 2014, per his bankruptcy petition) to counsel despite the fact that counsel rejected his tender of these items. Dkt. 149, at 7. While this may mean that defense counsel does not have a proprietary interest in these items, they have now made themselves potential witnesses regarding apparently false claims in defendant's bankruptcy petition, which is yet another layer of complication to their proposed appointment.

## C. Conclusion

It is readily apparent that defense counsel are potential witnesses in this case. They were personally involved in transactions about which evidence will be presented at trial, and they appear to have personal knowledge of aspects of defendant's dealings with at least one of the victims. Defense counsel further

5

appear to have, or have had at one time, a joint proprietary interest with defendant in a company named in the indictment that owned properties at issue in the case. The government respectfully submits that under the circumstances it would be inappropriate to appoint counsel in light of defendant's professed inability to pay them. The analysis might be different if this were a case where retained counsel had worked on the case until the defendant ran out of money a week before trial. But here, it is extremely early in the case, and defense counsel have identified virtually no counterbalancing factors to show that appointing them would be more efficient and fair than simply appointing one of the many other capable CJA attorneys who does not any potential conflict in this case. Further, the government notes that based on the information available to defense counsel dating back to 2013, it should have been apparent that defendant (who has hundreds of thousands of dollars of debt and has tried to declare bankruptcy at least four times) would not likely be able to pay counsel for representation in a complex, long-term federal criminal case.[3] Under these circumstances, it would not be an appropriate use of the CJA system to appoint current counsel.

---

[3] Indeed, the government has learned that defense counsel recently obtained payment for representing Rossini in his state criminal matters through court-ordered forfeiture of the $30,000 bond co-defendant Anthony Khoshabe posted for defendant in 2012, for which, as the government argued during the detention hearings, defendant reimbursed Khoshabe with proceeds of the fraud in this case.

WHEREFORE, the government requests that the Court grant defense counsel's motion to withdraw from the case and deny their oral motion to be appointed under the CJA act.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:     *s/ William Novak*
        WILLIAM NOVAK
        Special Assistant U.S. Attorney
        ERIK HOGSTROM
        Assistant U.S. Attorney
        219 South Dearborn St., Rm. 500
        Chicago, Illinois 60604
        (312) 697-4073

Dated:  May 12, 2016

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served on May 12, 2016 in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.

<u>*s/ William Novak*</u>
WILLIAM NOVAK
Special Assistant U.S. Attorney
ERIK HOGSTROM
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 697-4073

1