UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 15 CR 515 |
| | ) | Hon. John Z. Lee |
| ALBERT ROSSINI and | ) | |
| ANTHONY KHOSHABE | ) | |

**MOTION OF THE UNITED STATES TO ADMIT EVIDENCE
PURSUANT TO FED.R.EVID. 801(d)(2)(E)**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, moves this Court to admit certain statements against defendants ALBERT ROSSINI and ANTHONY KHOSHABE, pursuant to Fed. R. Evid. 104(a), 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

# I.   **INTRODUCTION**

This submission begins by providing an overview of the conspiracy that will be established at trial. It then discusses the law governing the admissibility of coconspirator statements under Rule 801(d)(2)(E), and outlines some of the evidence establishing the conspiracy in this case. Finally, it summarizes the evidence supporting the admission of coconspirators' statements. Based on the following, the government seeks admission of statements pursuant to Rule 801(d)(2)(E) and requests a pretrial ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978) and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

1

## II.    <u>OVERVIEW OF THE CONSPIRACY UNDERLYING THE CHARGES</u>

The indictment in this case charges 14 counts of mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343. (Dkt. No. 1.) Defendant Albert Rossini ("Rossini") is named in all 14 counts, while defendant Anthony Khoshabe ("Anthony") is named in Counts One through Eight. (*Id.*) Broadly speaking, the indictment alleges that defendants participated in a real estate-related Ponzi scheme that defrauded investors of millions dollars between 2011 and 2015. (*Id.* at 2-7.) Consistent with the allegations in the indictment, the evidence at trial will establish that Rossini and Anthony, along with Babajan Khoshabe ("Babajan") and Thomas Murphy ("Murphy"), conspired to fraudulently obtain and misappropriate millions of dollars from real estate investors.

In sum, in 2011 and 2012, Rossini and Babajan, under the business name Devon Street Investments ("Devon Street") recruited potential investors by word of mouth through social and family networks, primarily in the close-knit communities of two Assyrian churches. Once an investor was identified, Rossini and Babajan told the investor that Devon Street had identified apartment buildings in foreclosure and had negotiated with the banks holding the mortgage notes on those properties to obtain the notes, along with the right to assignment of rents for the apartment buildings, at steeply discounted prices. According to the pitch, Devon Street was making these notes and rent assignments available for purchase. Upon paying Devon Street for a given note, the investor would immediately be entitled to receive the monthly equivalent of the rents being paid by that building's tenants. Additionally,

Devon Street's property management company, which was run by Anthony, would manage the properties and forward the rents to the investors. Meanwhile, Murphy, acting as attorney for Devon Street and the investors, would see the foreclosure process to its conclusion, and once foreclosure was complete, the investor, as holders of the note, would take title to the property free and clear. The investors were also told they could redeem their investment at any time.

The conspirators did not in fact own the notes or otherwise have any interest in them and were not collecting the rental income from, or otherwise managing, the investors' properties. The "rent payments" they forwarded to investors came from the funds the investors originally paid the conspirators, not from tenants in the buildings. Indeed, many of the buildings were vacant. Further, the conspirators only paid investors "rent payments" long enough to convince them the "investment" was legitimate and to persuade them to invest more money and/or refer other potential investors, even paying certain investors "commissions" for bringing in new investors.

When the conspirators stopped paying "rents" and the investors complained and demanded proof of their interest in the notes and/or the return of their money, the conspirators continually promised these things over the course of months and months but never delivered, providing investors false excuses for their continual nonperformance. With very limited exceptions, none of the more than two dozen investors ever received title to any of the buildings, proof of their alleged interest in the notes, or received a refund of their investment. Many of the investors lost much of their life savings. At the same time, the conspirators retained the vast majority of

the investors' funds, totaling at least $3,000,000, and converted those funds to their own benefit.

In order to accomplish the conspiracy's objectives, the conspirators had to exchange information and discuss the activities of the conspiracy. As discussed further below, the government will seek to present testimony of certain categories of statements made by conspirators pursuant to the co-conspirator statement rule.

## III.  GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

Importantly, statements are admissible as nonhearsay under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge, as long as the

---

[1] No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

requirements of the rule are met. *See, e.g., United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010); *United States v. Moon*, 512 F.3d 359, 363 (7th Cir. 2008). Further, the legal principles governing admissibility of coconspirator statements under Rule 801(d)(2)(E) apply not only to conspiracies but also to joint ventures (such as the [mail/wire fraud] scheme in this case), even though the venture was not formally charged as a conspiracy. *See, e.g., United States v. Jackson*, 540 F.3d 578, 592 (7th Cir. 2008) (applying 801(d)(2)(E) to bank fraud scheme); *United States v. Kelley,* 864 F.2d 569, 573 (7th Cir. 1989).

### 1.    <u>Existence of and Membership in the Conspiracy</u>

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the trial judge must preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: 1) a conspiracy existed; 2) the defendant and declarant were members of the conspiracy; and 3) the statements sought to be admitted were made during and in

furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it

6

may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

Importantly, there is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his

conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## 2. The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

– to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[1]

– to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

– to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

– to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

– as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

---

[1] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

–      to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

–      to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341*,* 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

–      to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

–      to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

–      to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

–      "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility."*).*

11

## IV. THE EVIDENCE REGARDING THE EXISTENCE OF THE CONSPIRACY AND THE DEFENDANTS' PARTICIPATION IN THE CONSPIRACY

The government's evidence will establish that defendants conspired to defraud the Devon Street investors of millions of dollars. More specifically, the objects of the conspiracy included selling investors non-existent real estate interests, giving investors Ponzi payments to induce further investments and recruitment of new investors, dividing up and retaining the stolen investor money, and concealing their misdeeds. The evidence that proves the existence of this conspiracy, and the defendants' membership in it, is strong.[4] The evidence includes:

(1) testimony from numerous investors who lost large portions of their life savings investing with Devon Street;

(2) public records and testimony by property owners and bank representatives establishing that neither Devon Street, Reliant, Rossini, Anthony, Babajan, nor Murphy never owned any of the mortgage notes sold to investors and never managed any of the properties;

(3) insider testimony from Murphy confirming that Rossini and Babajan solicited and received investor funds despite knowing that there were no mortgage

---

[4] The government is not detailing all of its evidence that would go to show the existence of the conspiracy or defendant's and other declarants' participation in it. Rather, this proffer highlights for the Court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of the conspiracy and the roles of the various conspirators. Thus, this proffer does not list all of the government's witnesses, nor does it provide all of the evidence that will be presented by those witnesses who are named.

notes and no rental income, and that Rossini directed the investment funds to be divvied up amongst the co-schemers instead of being used as the investors intended;

(4) testimony from a Devon Street/Reliant employee that Reliant Management did no property management for any of the investors' properties and that Rossini and Anthony both knew that there could not have been rental income for many of the properties because they were vacant;

(5) bank records showing that the investors' funds were never used as the investors intended but were instead divvied up amongst the co-schemers or given back to the investors as Ponzi "rent" payments; and

(6) various financial records establishing that the defendants received millions of dollars of the investors' money that they kept in the face of investor refund demands, concealed in various ways, and ultimately converted to their own benefit.

Altogether, this evidence will establish the following facts, which firmly prove the conspiracy and each defendant's membership in it:

In 2011, Rossini ran a real estate business in Lincolnwood, Illinois. Rossini had a business relationship with Babajan, who had a background in real estate, and with Murphy, who was an attorney with whom Rossini had worked in the past. Sometime in early-mid 2011, Rossini advised Murphy that he and Babajan had come up with a way to make money from distressed rental properties – i.e., multi-unit buildings where the owners were delinquent on their mortgages and were facing foreclosure. Rossini and Babajan would identify distressed rental properties and solicit investors to provide funds that Rossini and Babajan would ostensibly use

either to purchase the properties through short sales or to acquire the mortgage notes on the properties from the banks holding the notes. Rossini sought Murphy's help in incorporating legal entities to be used in the investment program, establishing bank accounts, handling investor funds, and drafting legal documents that would be given to investors. Murphy agreed, and at Rossini's direction he established Devon Street Investments, LLC, ("Devon Street") with the State of Illinois, listing Rossini as the company's president with a business address at Rossini's office address on Devon Street in Lincolnwood.

Shortly after Devon Street was established in May 2011, Babajan, who was an Assyrian with family links to two large Assyrian churches in Chicago and San Jose, California, enlisted his brother Fred Khoshabe ("Fred") to help recruit members of the San Jose church to invest with Devon Street. Fred himself invested with Devon Street and also received finder's fees from Devon Street for connecting Babajan and Rossini to new investors. Later in 2011, Babajan solicited investment funds from the senior priest at the Chicago church, as well as from Babajan's brother-in-law, Ibrahim Yousif ("Yousif"), who was also given finder's fees for bringing in other members of the church to invest.

Throughout the scheme, when potential investors were identified, Babajan and Rossini (directly and through Fred or Yousif) told investors that Devon Street had acquired, or could acquire, delinquent mortgage notes held on numerous Chicago-area apartment buildings and was offering the notes for sale to investors. According to the pitch, Devon Street had obtained or could obtain these mortgage notes at a

steep discount from the banks holding the notes and when an investor bought one of the notes from Devon Street, the investor, as the note holder, became the first lienholder. Devon Street, through Murphy acting as its attorney, would then oversee the process of foreclosing on the properties. At the end of this process, which would take 6-12 months, the titles to the properties would be transferred to the investors. Further, the investment came with an "assignment of rents," meaning that during the foreclosure process the monthly rent payments collected from the tenants in the buildings would be given to the investors. Most investors were also told that Devon Street had a management company, Reliant Management, which was run by Babajan's son, Anthony, which was responsible for various property management duties, including maintaining the buildings, paying taxes and upkeep expenses, collecting rent, and forwarding the rents to the investors, minus a small management fee. Investors were further told they could redeem their investment principal at any time before title to the properties was transferred to them.

Unbeknownst to the investors, virtually every part of the Devon Street investment pitch was false. Devon Street had not actually acquired the identified mortgage notes, and neither Rossini, Babajan, or Murphy intended to acquire the mortgage notes. Additionally, Reliant Management was not a real property management company, and Anthony in fact provided no property management services. Further, the defendants intended to convert the investors' money to their own uses and had no intention of keeping sufficient funds to be able to refund the investors' money upon demand.

15

Over several months in 2011 and 2012, the investment pitch successfully convinced more than two dozen members of these churches, as well as the churches themselves, to invest in the Devon Street investment program. As directed by Rossini and Babajan, the investors provided Rossini with cashier's checks for the supposed price of the notes (often in excess of $100,000 per note) made out to Murphy and identifying the property PIN number they were investing in. When Rossini received these investor checks, he delivered them to Murphy, who deposited them not into an attorney trust account but instead into his personal checking account. Rossini then instructed Murphy to divvy up the bulk of the funds amongst Rossini, Babajan, and Anthony (and on several occasions Fred). Rossini would then come pick up these cashier's checks from Murphy and provide them to his co-schemers. Rossini, for his part, typically negotiated these checks at Currency Exchanges, while Anthony and Babajan typically deposited the checks into their personal bank accounts. Murphy was also allowed to use a portion of the funds for his own purposes.

Rossini then gave Murphy instructions to use the remaining investor funds to issue monthly checks, primarily to Reliant Management, but at times to other Devon Street-related entities, that were earmarked as representing the monthly rental income from each investors' property. The amounts of these checks corresponded to the rental income the investors had been told each property generated. Most of these checks were then deposited into the Reliant Management bank account, which was controlled exclusively by Anthony, who then wrote checks from this "management company" account to each investor. Each of these "rent" checks contained a notation

16

indicating that the check was for rents collected from each investors' buildings. Anthony also provided the investors with an invoice showing the amount of "rental income" received from each property, along with a deduction for Anthony's 10% "management fee."

When investors began receiving these monthly "rent" checks, which they believed represented a legitimate new income stream from buildings they would soon own, Rossini and Babajan (or in some cases Fred or Yousif) often solicited them to invest in additional properties or to refer others to invest. Convinced of the profitability of the investment program, many investors did agree to "buy" additional notes or bring in friends and family to also invest. Through this process, the number of mortgage notes and properties Devon Street had purportedly sold to investors expanded exponentially. From approximately mid-2011 to approximately mid-2012, investors provided Devon Street dozens of investment checks totaling millions of dollars. During this period investors received monthly purported rent checks, most of which were signed (and sometime delivered) by Anthony, along with one of the bogus invoices.

After several months, the scheme began to fall apart in approximately mid-2012. First, Yousif, who had been asking Rossini and Babajan for proper documentation of the notes he was told he had purchased, to no avail, had become suspicious that things were not as they seemed. After not receiving satisfactory answers, Yousif filed a report on Devon Street with the Lincolnwood Police accusing

Rossini of fraud. Shortly thereafter, Rossini refunded Yousif's investment money and Yousif withdrew his police complaint.

At around the same time, Anthony filed an anonymous, undetailed complaint on the SEC's website in which he alleged that Devon Street was a "Ponzi scheme" and that Rossini had convinced Babajan to get his family members to invest. Shortly thereafter, Anthony sent Rossini and Babajan an email advising that he would no longer work with Devon Street/Reliant because he claimed that they had failed to provide proper documentation to investors. Despite his anonymous SEC complaint and his email purporting to sever his relationship with the investment program, Anthony continued to write checks from the Reliant bank account, including some Ponzi "rent" checks and payments to or for himself.

By June 2012, however, Anthony was no longer issuing rent checks to the investors. As a result, investors began to not receive rent checks on time. During this period, investors began complaining to Rossini and Babajan about the disruption in the rental income. They also began seeking documentation about their mortgage notes and demanding information about when they would receive titles to the buildings, as had been promised. Rossini and Babajan provided investors various explanations, including claiming that they had to switch payment systems because Anthony had found a new job, that tenants in the buildings had stopped paying rent, and that Devon Street's bank account had been frozen because Murphy had given them a bad check. By late 2012, the rent payments simply stopped altogether. By this point, most investors were questioning Rossini and Babajan about why the long-

18

promised titles to their properties that had not been delivered. Many investors also demanded refunds.

Over the course of the next two years, Rossini and Babajan repeatedly promised investors to return their investments or assured them they would still receive titles to their properties and took a variety of actions to attempt to keep investors from taking adverse actions. They told investors, for example, that although Devon Street owned the notes, Murphy had failed to record the notes with the Recorder of Deeds and had failed to turn them over to Devon Street. They further said that Murphy had mismanaged or stolen the investors' funds. Rossini and Babajan eventually filed a sham lawsuit against Murphy and filed liens and unexecuted "Note Purchase Agreements" with the Recorder of Deeds, which they falsely told investors would protect their interests in the properties. On several occasions, Rossini and Babajan expressly told investors they should not claim fraud or speak with the FBI because then they would never get their money back.

Importantly, following the mid-2012 unravelling of the scheme and the investors' demands for repayment, the defendants in fact still retained a large amount of the investors' funds. Instead of returning any of the funds, the defendants used the funds for their own purposes. Rossini, for his part, had personally received approximately $3,000,000 in investor funds, almost all of which he converted into cash or money orders at Currency Exchanges. Although the cash is untraceable, Rossini's money orders reflected expenditures for his personal benefit or that of his family, including payments for his son's college expenses.

Anthony, for his part, had personally received approximately $1.1 million in investor funds that he deposited into several different personal bank accounts, some of which he controlled exclusively and some of which he shared with Babajan. Even after filing his anonymous SEC complaint and ostensibly severing ties with Devon Street, Anthony returned none the funds he had received from the scheme to investors. Instead, Anthony used large amounts of the funds for his own benefit for at least two more years, including to buy two condominiums, an apartment building, and an Audi A5, amongst other personal expenditures.

Finally, when Anthony was first interviewed by the FBI in September 2014, he lied to agents about various key aspects of his involvement in the conspiracy. He told agents that he only worked at Devon Street/Reliant for one month, even though he actually wrote bogus rent checks to investors and received a large portion of each investor check for at least six months. Anthony further stated that he himself invested $10,000 or $20,000 with Rossini but never got his money back or received any "rent" payments, even though he actually made hundreds of thousand of dollars and received numerous bogus "rent" payments from Rossini and even wrote some "rent" checks to himself. He additionally claimed that he did not know any of the investors, even though he was related to some of them and personally handed some of them their "rent" checks.

## V.  COCONSPIRATOR STATEMENTS

As set forth above, under Rule 801(d)(2)(E), statements made by co-conspirators in furtherance of the conspiracy are admissible. The proffered evidence

establishes that the charged conspiracy existed and that its members included defendants Albert Rossini and Anthony Khoshabe, as well as co-defendants Babajan Khoshabe and Thomas Murphy. As reflected above, the government expects to offer into evidence testimony about conversations amongst some of the conspirators identified above. As such, statements made during these conversations are admissible against defendants under Rule 801(d)(2)(E) to the extent they were made in furtherance of the conspiracy.[6] Broadly speaking, the statements fall into several categories, all involving the information flow of the conspiracy or concerning subjects that were integral to the conspiracy and its success.[7]

---

[6] Additionally, many of the statements will be admissible for reasons entirely independent of the coconspirator hearsay rule. For example, statements of defendant will be admissible against them pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Further, statements not offered to prove the truth of the matter asserted are not hearsay. For example, statement by a non-coconspirator during a conversation with a conspirator or with defendant could be offered purely to provide context for the other party's statements because the conversations would not be fully comprehensible to the jury if they could only hear the statements of one party. The coconspirator statement rule is further not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a). This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

[7] The government is not detailing each and every proposed coconspirator statement of each witness. Many of the statements that could be offered at trial will arise in the context of witnesses describing conversations that occurred amongst coconspirators. Thus, through this proffer the government seeks to delineate categories of statements it believes are admissible. Of course, the government is committed to establishing the

As detailed above, the categories of coconspirator statements offered at trial will include the following:

–Discussions amongst conspirators reflecting the genesis of the scheme and the steps taken to put it in motion;

–Discussions amongst conspirators about recruitment of new investors or solicitations to existing investors to provide additional funds;

– Discussions amongst conspirators regarding the creation of documents to be shown investors about the scheme properties or about their supposed interests in the properties;

– Discussions amongst conspirators regarding the roles played by other members of the scheme;

– Discussions amongst conspirators regarding the receipt and use of investor funds, including the expected division of funds amongst the conspirators;

–Discussions amongst conspirators regarding investor complaints or steps taken to pacify disgruntled investors or prevent them from taking legal action or turning to law enforcement; and

– Discussions amongst conspirators about concealing the fraudulent nature of the investment program or concerns that individuals outside the scheme may discover it.

---

*Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

As is evident from their description, all statements falling into the above categories and made by coconspirators were made in furtherance of the conspiracy in that they facilitated the operation of the conspiracy and were part of its information flow. Under the case law summarized above, all such statements are properly admissible as coconspirator statements under Fed.R.Evid. 801(d)(2)(E).

## VI.    CONCLUSION

The United States respectfully requests that this Court find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.


Dated: May 18, 2018


                    Respectfully submitted.
                    JOHN R. LAUSCH, JR.
                    United States Attorney

             By:    /s/ Erik Hogstrom
                    ERIK HOGSTROM
                    Assistant United States Attorney
                    WILLIAM NOVAK
                    Special Assistant United States Attorney
                    219 South Dearborn Street
                    Chicago, Illinois 60604
                    (312) 353-5300