```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket No. 15 CR 515-1
                                      )
 4                    Plaintiff,      )
                                      )
 5            v.                      )  Chicago, Illinois
                                      )  June 5, 2018
 6   ALBERT ROSSINI,                  )  10:00 o'clock a.m.
                                      )
 7                    Defendant.      )

 8                          VOLUME 1A
              TRANSCRIPT OF PROCEEDINGS - TRIAL
 9        BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10   APPEARANCES:

11   For the Government:         HON. JOHN R. LAUSCH, JR.
                                 United States Attorney, by
12                               MR. ERIK A. HOGSTROM
                                 MR. WILLIAM PATRICK NOVAK
13                               Assistant United States Attorneys
                                 219 South Dearborn Street
14                               Chicago, Illinois 60604

15   For the Defendant:          LAW OFFICES OF JOSHUA B. ADAMS,
                                 P.C., by
16                               MR. JOSHUA B. ADAMS
                                 53 West Jackson Boulevard
17                               Suite 1515
                                 Chicago, Illinois 60604
18
                                 FRANKEL & COHEN, by
19                               MR. SCOTT JAY FRANKEL
                                 53 West Jackson Boulevard
20                               Suite 1615
                                 Chicago, Illinois 60604
21

22                   ALEXANDRA ROTH, CSR, RPR
                       Official Court Reporter
23                   219 South Dearborn Street
                            Room 1224
24                   Chicago, Illinois 60604
                        (312) 408-5038
25
```

```
 1          (The following proceedings were had in open court outside
 2       the presence of the jury:)
 3              THE CLERK:  Case 15 CR 515-1 USA versus Albert
 4     Rossini, for jury trial.
 5              MR. HOGSTROM:  Good morning, your Honor.  Erik
 6     Hogstrom and Bill Novak for the United States.
 7              MR. ADAMS:  Good morning, your Honor.  Joshua Adams
 8     and Scott Frankel for Albert Rossini, who's present at counsel
 9     table.
10              MR. NOVAK:  Good morning, Judge.
11              THE COURT:  Good morning.  Is there anything we need
12     to address before we begin?
13              MR. HOGSTROM:  No, Judge.
14              MR. ADAMS:  Just a motion to exclude witnesses on
15     behalf of Mr. Rossini?
16              THE COURT:  Okay.
17              MR. NOVAK:  Your Honor, I spoke with Mr. Frankel and
18     Mr. Adams.  The only person that I think -- we have Agent Kelly
19     Connors is going to be our summary witness.  I think she is
20     going to be allowed.  They have no objection to her.
21              MR. ADAMS:  That's correct, Judge.  No objection to
22     that.
23              MR. NOVAK:  So okay.
24              THE COURT:  Okay.  Very well.  Otherwise the motion is
25     granted.
```

1     (Jury entered the courtroom.)

2          THE COURT:  Good morning, ladies and gentlemen.

3          Let's talk briefly about the order that our trial will

4     follow.  So in just a few moments, the attorneys for each of

5     the parties will be permitted to address you in turn and make

6     what we call our opening statements.  The government will then

7     go forward with the calling of witnesses and presentation of

8     evidence during what we call the government's case in chief.

9          Once the government finishes, the defendant will have

10    an opportunity to present witnesses and evidence.  Although

11    remember that defendant has no -- is not required, there is no

12    requirement, for him to do so.  If the defendant does present

13    evidence, the government may be permitted to again call

14    witnesses or present evidence during what we call the rebuttal

15    phase of the trial.

16         Once the evidence portion of the trial is complete,

17    the lawyers will then be allowed to address you, provide final

18    arguments, or closing arguments.  After that I will give you

19    the instructions of law to follow.  And at that point in time I

20    will permit you to go to the jury room to begin your

21    deliberation.  So that's the general order of the case.

22         So now we will begin with opening statements.  Please

23    keep in mind, opening statements are not evidence.  The

24    statements are only intended to help you understand the issues

25    in the case broadly and the evidence as it comes in as well as

1    position taken by both sides.

2           All right.  So please give your attention to the

3    attorneys.

4           MR. HOGSTROM:  May I proceed?

5           THE COURT:  You may proceed.

6           OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

7           MR. HOGSTROM:  In 2011 and 2012, two dozen members of

8    two churches entrusted their hard-earned money to the

9    defendant, Albert Rossini.  He claimed that he and his

10   associates could obtain lucrative real estate interests for

11   pennies on the dollar.  He claimed that investors who invested

12   with him would obtain the title in multi-unit properties that

13   would generate rental income for years to come.

14          He claimed that although it would take a period of

15   time to receive the title to these properties, that the way he

16   had structured his investment, the investors would receive

17   income immediately.  He also claimed that all of this was

18   guaranteed, that the investors could get their money back at

19   any time.

20          And when people invested with him, they in fact did

21   start receiving income from him.  And this gave them confidence

22   in the defendant's operation, and it caused many of them to

23   invest more, or to refer other friends or family members to

24   invest with him.

25          The problem is that it was all a lie.  It was a scam

1    orchestrated by the defendant because he actually didn't own

2    any of these property interests that he was selling.  And he

3    didn't use any of the investors' money to go buy those

4    interests and transfer them to the investors.  And the money

5    that they were receiving from him was actually just their own

6    money that he was paying back to them in small amounts.  This

7    is what was known as a Ponzi scheme.

8          And through it, the defendant made millions of dollars

9    off of these people.  He is been charged with two crimes:  Mail

10   and wire fraud.  And at the end of the trial you will hear more

11   argument and instructions about what exactly that means.

12         But what we are going to do now is, I am going to walk

13   through the evidence a little bit with you as sort of a preview

14   of the evidence that we are going to show you that will

15   establish beyond a reasonable doubt that he committed these

16   crimes.

17         So in 2011, the defendant was holding himself out as a

18   businessman who operated in the real estate sector.  He had a

19   small office space in Lincolnwood, Illinois.  And he had an

20   associate named Babajan Khoshabe.  The defendant and Mr.

21   Khoshabe in 2011 hatched this scheme that you are going to hear

22   about.  And this scheme was deliberately complicated and it

23   targeted the vulnerabilities of the victims that they focused

24   on.

25         The scheme they came up with is as follows:  They

1   would tell people, potential investors, that they could obtain

2   or had obtained extremely cheap mortgage notes.  Now, that may

3   not be a term that you heard before.  You probably have heard

4   mortgages.  But what you will learn is that when a person buys

5   a property and takes out a mortgage loan to do so, something

6   called a mortgage note is created.  And that note is something

7   that a person or an entity can own.

8           And whoever owns the note has the right to be repaid

9   by the person who owns the property, who borrowed the money in

10  the first place.  And if the owner of the property fails to pay

11  the mortgage, then the person owning the mortgage note can file

12  a legal action to take possession of the property.  That's

13  called foreclosure.  That's probably something you heard about

14  before.

15          So the defendant and Mr. Khoshabe would tell investors

16  that they had purchased these extremely cheap mortgage notes

17  and that these mortgage notes were for small apartment

18  buildings that generated rental income every month; and that

19  these were apartment buildings where the owners were delinquent

20  in their payments, and that they were facing potential

21  foreclosure.

22          So according to the pitch that the -- Mr. -- the

23  defendant and Mr. Khoshabe would give the investors, an

24  investor who invested with them would become the holder of the

25  note, and they would be in the position to foreclose on the

1    property and eventually take title to it.

2         The defendant also would tell them that because of the

3    way this was structured, because of the way that he had set

4    things up with his lawyer, that they would actually receive

5    rental income immediately upon purchasing the note.  So during

6    the time period where this foreclosure case was being pursued,

7    the rent income, according to the defendant, would be received

8    from the properties and given to the investors.

9         Now, as the defendant and Mr. Khoshabe set up this

10   scheme, they brought in a couple of other people that would

11   help them make it look legitimate.  They brought in one man who

12   is an attorney that the defendant had worked with before.  And

13   his job would be to set up the companies that the defendant

14   would use to deal with the investors.  And we would also create

15   legal documents, or supposedly legal documents, that would help

16   the investors feel secure.

17        Mr. Khoshabe for his part brought in his adult son.

18   And his adult son was supposed to be running a property

19   management company.  They would tell investors that this

20   company would maintain the property and collect the rents from

21   the properties and forward the rents to the investors, as they

22   had been promised.

23        But to get the investors that they needed, they

24   focused specifically on what they saw as a vulnerability.  They

25   targeted the congregations of two Assyrian churches.  Now, you

Hogstrom - opening                          8

1    may or may not heard the term Assyrian before.  But it is an

2    ethnic or religious group that originated from the Middle East.

3    These are Christians who many of whom have fled from the Middle

4    East for fear of religious persecution.

5            You will hear that many of them have established

6    communities here in the United States, especially in Chicago

7    and in San Jose, California.  You will learn a great deal about

8    these communities.  And you will learn that these Assyrian

9    communities tend to be very tight-knit, that the people in the

10   communities tend to trust their own, and they tend to be very

11   involved in their churches.

12           You will learn that Mr. Khoshabe was himself an

13   Assyrian, and that he had relatives who were members of these

14   two churches that you will hear about.  So the defendant and

15   Mr. Khoshabe specifically reached out or recruited these

16   relatives of Mr. Khoshabe and got them to be the first

17   investors, or early investors in any case.

18           And you will learn that when they invested, they in

19   fact started getting what they thought was rental income from

20   the defendant.  And so this seemed like a successful

21   investment.  And as they had experienced success, you will

22   learn that other members of the churches that they were members

23   of saw their success and wanted to get in on it.  You will

24   learn that the defendant and Mr. Khoshabe went so far as to pay

25   finder's fees or commissions to some of these early investors

1    to induce them to bring in more people.

2            You will learn that as the scheme got going, it was

3    wildly successful.  Over a period of not much more than a year,

4    from mid-2011 to mid-2012, the defendant brought in millions of

5    dollars from these people.

6            You will learn that each of these individuals had a

7    very similar experience.  They gave the defendant a large

8    amount of money, sometimes in the tens of thousands, sometimes

9    in the hundreds of thousands.  And you will learn that many of

10   these individuals were not wealthy, that they tacked their

11   retirement funds or they took out home equity loans or pooled

12   money with other investors in order to do this.

13           And you will learn that when they gave the defendant

14   this money, they were told that they would be purchasing these

15   mortgage notes.  And they were told that they would be

16   receiving rent income.  And you will learn that they in fact

17   received rental income for a period of several months, for some

18   of them four months, for some of them eight months.  But in the

19   end, they all received it for a period of time and then it

20   suddenly stopped.

21           And you will learn that when they started asking

22   questions about what was happening to the rent, and where was

23   the title to the building, and where is the proof that I own

24   this mortgage note, all they got from the defendant was excuses

25   and many statements that were made by the defendant that later

Hogstrom - opening                    10

1    proved to be false.  In the end, none of these investors got

2    what they paid for.  And the defendant walked away with almost

3    $3 million of their money.

4          So that's the basic outlines of the facts that you are

5    going to hear in this case.  So what is the evidence that we

6    are going to present that will establish these facts?  There is

7    really four categories of evidence that I'll walk through with

8    you briefly today so that you have a sense of what you are

9    going to be seeing in court.

10         One category of evidence, as you might imagine, is

11   testimony from the investors themselves.  You're going to hear

12   from investor after investor after investor, who's going to get

13   up here and tell you essentially what I just relayed to you,

14   about their experience investing with the defendant, how they

15   were recruited, how they were presented with specific

16   properties, including fact sheets and sometimes photographs of

17   the properties.

18         You will learn that how -- about how they were

19   directed to pay the money to the defendant, which was usually

20   in the form of a cashier's check made payable to the attorney

21   the defendant said was working with the scheme.  You will learn

22   about how they received their rent payments for a period of

23   time, and how the rent payments stopped.

24         And you will hear about their efforts to try and

25   figure out what was going on when things fell apart, and to try

1    to get their money back or to get the title to the properties

2    that they had been promised.  And you will learn about -- from

3    them about how in the end they all lost their money.

4          Second category of evidence you're going to hear about

5    relates to the properties themselves.  Because these were

6    actual properties, real identifiable properties, that the

7    defendant was marketing to these investors, you will hear the

8    evidence about what was actually happening with these

9    properties and be able to contrast it to what the investors

10   were being told by the defendant.

11         Through public records related to real estate,

12   testimony from real estate owners, and other information from

13   the banks that actually owned these mortgage notes, you will

14   learn that the defendant never owned any of these mortgage

15   notes, that he never used any of the investors' money to

16   acquire these mortgage notes.  And you will learn that many of

17   the owners of these properties never even entered into

18   foreclosure.

19         You'll also learn that the owners of the properties

20   and the mortgage holders, the actual banks that held these

21   properties, never had any dealings with the defendant, were

22   never contacted by the defendant, and had never heard of him.

23         Third category of evidence you will hear about is

24   insider testimony.  You are going to hear from the attorney I

25   referenced.  This is a man named Thomas Murphy that the

Hogstrom - opening                    12

1   defendant recruited to work, help him set up and execute this

2   scheme.  You will learn that Mr. Murphy was charged in this

3   case and that he's pled guilty.  You will learn that he is now

4   cooperating with the government, and he is hoping that when all

5   is said and done, his truthful testimony will get him a benefit

6   at sentencing in the form of a reduced sentence.

7          He will explain to you how it is that the defendant

8   told him about this -- this plan in the first place.  He will

9   explain how he set up the legal entities, the companies, that

10  the defendant used to deal with the investors.  He will explain

11  how the defendant brought him check after check after check

12  from the investors, with -- along with instructions about how

13  to deposit the money, and then how to pay the money back to the

14  defendant.

15         You will learn that per the defendant's instructions,

16  Mr. Murphy would deposit the checks into his personal checking

17  account; and that he would then, per the defendant's

18  instructions, take most of that money and direct it right back

19  to the defendant or the other people he was working with in the

20  form of cashier's checks.  You will learn that some of the rest

21  of this money was then used to make payments to the investors

22  that would convince them that these were rents payments.

23         Mr. Murphy will also explain that there never were any

24  rent payments, that no rent money ever came into the account

25  that he was paying the investors out of, and that no money was

Hogstrom - opening                    13

1    ever used to purchase mortgages notes.

2              The final piece of -- or category of evidence you will

3    hear about is financial evidence.  Based on bank records and

4    other documents you will hear detailed financial evidence that

5    will confirm that the defendant simply stole these investors'

6    money.

7              You will learn through this evidence that with one

8    exception every investor who gave their money to the defendant

9    lost their money.  You will learn that no investor made money

10   with the defendant.  You will learn that virtually no investor

11   funds were used for the purchase of mortgage notes.  You will

12   learn that the defendant collected no rental income, and that

13   the funds that were paid to the investors were in fact just the

14   investors' own money.

15             And you will learn that the defendant received nearly

16   $3 million of the investors' money, and that most of this money

17   he took to currency exchanges and converted into cash or money

18   orders that he then spent on himself or for the benefit of his

19   family.

20             Once you heard all of this evidence, ladies and

21   gentlemen, you will see what it is that the investors were

22   unfortunately unable to see when they -- when they were first

23   recruited by the defendant:  That this whole investment program

24   was simply a giant Ponzi scheme.

25             And at the end of this trial we will turn to you, and

Frankel - opening                14

1    we will ask you to find the only verdict that is consistent

2    with the evidence, and that would be a verdict of guilty on all

3    counts.

4              Thank you.

5              THE COURT:  Thank you.

6              Mr. Frankel.

7               OPENING STATEMENT ON BEHALF OF THE DEFENDANT

8              MR. FRANKEL:  Thank you, Judge.

9              Good morning, ladies and gentlemen.  My name is Scott

10   Frankel.  And I along with Josh Adams represent our client,

11   Bert Rossini.

12             Bert Rossini is a businessman and real estate

13   developer.  And you will -- and you know that during the years

14   that we are talking about, 2011 to 2013, there is a huge amount

15   of the volatility in the real estate market.  Any investment in

16   the real estate market during that time was dangerous and

17   risky.

18             Bert is sitting here alone in this courtroom, but

19   you've heard the names of other people who will be mentioned

20   throughout the trial.  So it's important to keep in mind that

21   they had a role to play in the events that we're talking about

22   here during this trial.  And those other people are important

23   and important for you to keep in mind because you are going to

24   hear a lot about them during the trial.

25             One person, his name is Bert Khoshabe.  And the other

1    person, his name is Thomas Murphy.  Okay.  I'm sorry, Babajan

2    Khoshabe.  Babajan Khoshabe, as you already heard, was someone

3    who is connected to this Assyrian religious community.  The

4    people in this community trusted Babajan Khoshabe.  And Bert

5    Rossini trusted Babajan Khoshabe.  Babajan Khoshabe had

6    contacts in the Assyrian community and relationships in

7    Assyrian community and relationships with the churches that

8    you're going to hear testimony about.

9           What -- Bert Rossini was relying on Babajan Khoshabe

10   to communicate with the people in these churches and talk to

11   them about the investments that Bert Rossini was involved in.

12   Bert Rossini wasn't involved in the vast majority of

13   conversations that Babajan Khoshabe had with the investors in

14   the Assyrian community and with the investors who were related

15   to each other as members of these two churches.

16           So Bert Rossini did not know what Khoshabe was telling

17   the investors, and what representations he was making to the

18   investors.  Bert Rossini was not involved in those

19   representations when Khoshabe was having these conversations

20   with the investors.  That's an important detail that you're

21   going to need to remember throughout the course of this trial.

22           The other point to keep in mind as you are listening

23   to the evidence throughout this trial is that the investments

24   involved documentation and legalese and contracts and notes,

25   things like that, guarantees.  Bert Rossini did not have the

1    expertise to draft all these documents on his own.  He did not

2    have the knowledge to understand all of the legal details that

3    were required to effect some of these transactions.

4          And so he relied on a person, an attorney named Thomas

5    Murphy.  And you are going to hear from Thomas Murphy.  You

6    already heard that he is cooperating in this case.  And he is

7    going to testify pursuant to that cooperation deal.  And so you

8    are allowed to listen to his testimony skeptically and with

9    caution because he is getting benefits as a result of his

10   testimony.

11         You're going to hear a lot of shocking things about

12   attorney Thomas Murphy and how he's conducted his career.  At

13   one point Mr. Murphy was in a law firm, a respected law firm.

14   And by all accounts on the surface he looked like a legitimate

15   lawyer.  I don't think there is any other word to describe what

16   he held himself out to be.

17         But you will learn that during the course of his

18   career he lied to a lot of people.  He stole his clients'

19   money, and ultimately he got disbarred.  And you're going to

20   hear that unfortunately Mr. Rossini relied on the things that

21   Thomas Murphy was telling him about the transactions, about the

22   investments and about the documents.  And you'll see that

23   Thomas Murphy was directly involved in stealing the money that

24   we're talking about here, and that Bert Rossini was relying on

25   his representations as a lawyer, as holding himself out as a

Frankel - opening                    17

1    legitimate lawyer.

2            Part of what had to happen here was that these

3    documents, these properties, had to -- they were in legal

4    proceedings.  And Bert relied on Tom Murphy that he was

5    following up on these legal proceedings and to make sure that

6    things were going to be accomplished in the way that Rossini

7    needed them to be accomplished, to successfully complete the

8    process of getting ahold of the properties and making sure that

9    the investments were safe and sound for the people that were

10   contributing to him.

11           Thomas Murphy didn't do any of what he told Rossini he

12   said he was going to do.  He lied to Bert Rossini.  He lied to

13   him just like he lied to many of his other clients during the

14   course of his career, and so much so that he actually lost his

15   law license and was disbarred.  And you're going to hear his

16   testimony about that.

17           So we spent a lot of time asking you questions to make

18   sure that you'd be the kind of jury that would listen to the

19   evidence carefully and with an open mind.  And when I talk

20   about an open mind, you just heard the prosecution's side of

21   what happened.  That's their version of what happened.

22           What really matters is the testimony you're going to

23   hear from the witness stand.  And the testimony -- the

24   witnesses are going to testify under the questioning of the

25   prosecution and also under the questioning of defense

1    attorneys.  And when we're talking about keeping an open mind,

2    it's very important as jurors that you not reach any conclusion

3    about what happened here until you've heard all of the

4    evidence.

5         And you are going to hear a lot of evidence.  A lot of

6    it is going to be boring and technical and complicated.  And

7    it's going to take place over the course of over a week.  So

8    there is going to be a lot for you to remember and keep in

9    order and try to figure out the significance of when you are

10   just getting little bits and pieces in piecemeal.

11        But we are confident that after questioning you and

12   going through the rigmarole of jury selection yesterday, that

13   we picked a jury that's going to be able to pay attention and

14   keep that open mind and not reach a conclusion until you've

15   heard all of the evidence and you've heard all the arguments of

16   counsel, and you've heard all the instructions that the Judge

17   is going to give you at the conclusion of the case.

18        And we're confident that after you heard all of the

19   evidence and kept an open mind, and you've weighed the evidence

20   carefully, you will conclude the only conclusion that Bert

21   Rossini is not guilty of the charges here.

22        Thank you.

23        THE COURT:  Thank you, Mr. Frankel.

24        The government may call its first witness.

25        MR. NOVAK:  Government calls Robert Badalian.

1    (Witness duly sworn.)

2         THE COURT:  Please take a seat.

3         You may proceed.

4         MR. NOVAK:  Thank you, your Honor.

5       ROBERT BADALIAN, GOVERNMENT'S WITNESS, DULY SWORN

6                    DIRECT EXAMINATION

7  BY MR. NOVAK:

8  Q.  Good morning, Mr. Badalian.

9  A.  Good morning.

10 Q.  In a loud, clear voice, can you please state your name and

11 spell your last name for the members of the jury?

12 A.  It's Robert Badalian, B-a-d-a-l-i-a-n.

13 Q.  And where do you live, sir?  What's your city and state?

14 A.  San Jose, California.

15 Q.  How long have you lived in San Jose?

16 A.  Since 1981.

17 Q.  Do you work?

18 A.  Yes, I do.

19 Q.  What do you do?

20 A.  I work in the semiconductor industry.

21 Q.  And generally what sort of work do you do in the semi-

22 conductor industry?

23 A.  Right now I -- my position is business development for a

24 semiconductor company.

25 Q.  And are you originally from the United States?

Badalian - direct                          20

1    A.   No, I am not.

2    Q.   Where are you from originally?

3    A.   From Iran.

4    Q.   And when did you come to the United States from Iran?

5    A.   In 1976.

6    Q.   Why did you come to the United States from Iran?

7    A.   I came to do university studies.  I finished high school

8    and came to United States to study.

9    Q.   Where did you study at?

10   A.   I graduated from University of Illinois in Chicago.

11   Q.   With what kind of degree?

12   A.   Electrical engineering.

13   Q.   And did you then start working?

14   A.   I went to San Jose and I start work there, yes.

15   Q.   Okay.  And that's when you started working in the semi-

16   conductor industry?

17   A.   Correct.

18   Q.   Now, being Iranian, are you originally -- are you also --

19   are you a citizen now, sir?

20   A.   Yes, I am.

21   Q.   Are you part of a specific ethnicity in the -- from the

22   Middle East?

23   A.   Correct.  I am Assyrian, born in Iran.

24   Q.   What is an Assyrian?

25   A.   Well, Assyrian is a group of people, descendent of the old

Badalian - direct                                      21

1   Assyrians, empire, being in Mesopotamia.  And we don't have a

2   country now.  So, you know, people are living in different

3   regions within Middle East.

4   Q.  Okay.  And do you have a specific religious denomination

5   that you belong to?

6   A.  I'm Presbyterian.

7   Q.  Okay.  And are other Assyrians called Assyrian -- like an

8   Assyrian Christian church?

9   A.  Yes, there are different denominations within the Assyrian

10  people, belong to Assyrian East Church, Catholic, or

11  Presbyterian.  Depends.

12  Q.  Okay.  Now, I want to direct your attention to the spring

13  of 2011.

14  A.  Okay.

15  Q.  Were you approached at that time to invest in real estate

16  in the Chicagoland area?

17  A.  Yes.

18  Q.  By whom?

19  A.  By Babajan Khoshabe.

20  Q.  Who is Babajan Khoshabe?

21  A.  He's my brother-in-law's brother.

22  Q.  So I guess the better question is, who -- so Babajan

23  Khoshabe is your brother-in-law's brother, right?

24  A.  Correct.

25  Q.  What is the name of your brother-in-law?

Badalian - direct                                22

1   A.   Fred Khoshabe.

2   Q.   And how long have you known Fred Khoshabe?

3   A.   Since I was at the University of Illinois.  I don't know,

4   '77, '78.

5   Q.   And then when did -- and Fred Khoshabe married one of your

6   sisters?

7   A.   Correct, my little sister.

8   Q.   When did that happen?

9   A.   1985.

10  Q.   And so you have known Fred since 1985 -- I'm sorry.  You

11  have known Fred since before they married, since 1985.  When

12  did you met Babajan?

13  A.   At various family events, you know, he would come to

14  California.  So, you know, it's my brother-in-law's brother.  I

15  met him.  And he was a student at my father's -- when my father

16  was principle in the high school in Iran, he was his student in

17  high school.  So there was some history there.

18  Q.   So you've had a long history with Babajan Khoshabe.

19  A.   Yeah, just acquaintance, yes.

20  Q.   What do you know about Babajan Khoshabe?  What does he do?

21  A.   My understanding from what I had information at that time

22  that was -- he was involved in mortgage lending and real

23  estate.

24  Q.   Okay.  And where did you have this first conversation with

25  Babajan about doing real estate investing in Chicago?

Badalian - direct                                          23

1   A.   It was at my niece's college graduation, about May of 2011.

2   And we were at that party, and he approached me.  He said, I --

3   you know, there is some distressed properties that you might

4   want to look at, invest in.  It's a good investment

5   opportunity.

6          So that is when he informed me of this opportunity,

7   let's say, to invest.

8   Q.   I'm going to show you on the screen what's been marked as

9   Government Exhibit Photo.

10         Do you recognize the person in Government's Exhibit

11  Photo 3?

12  A.   I am seeing it only on that screen.  Nothing is here, but

13  that looks like Babajan.

14  Q.   It's on your screen, though, right?

15  A.   It's coming up now.  Yes, that's Babajan.

16  Q.   Does that fairly and accurately depict Babajan Khoshabe?

17  A.   Yes.

18         MR. NOVAK:  Your Honor, I ask permission to publish

19  this to the jury?

20         THE COURT:  Any objection?

21         MR. FRANKEL:  No objection.

22         THE COURT:  Do you want to admit it in evidence, too?

23         MR. NOVAK:  Yes, and admit it into evidence.

24         THE COURT:  Government Photo Exhibit 3 is admitted in

25  evidence.

1        (Said exhibit was received in evidence.)

2   BY MR. NOVAK:

3   Q.   So what was Babajan's pitch to you?  What did he say to you

4   at this party?

5   A.   There are these distressed properties, that they are going

6   to foreclosure, and we are looking at getting notes for these

7   properties.  And would you be interested to come down and take

8   a look for yourself.

9        I said, yeah, doesn't hurt to come down to look at.

10  Q.   Okay.  And so what did you do as a result of talking with

11  Babajan?

12  A.   So after that event, I -- toward late of May, I flew to

13  Chicago.  I met with him and at the -- his office location.

14  And he then introduced me to Bert Rossini.  He showed me a few

15  properties, and of course we drove by them.  I took some

16  pictures at that time.

17  Q.   So let me ask you first, do you see Bert Rossini in the

18  courtroom today?

19  A.   Yes, he is sitting --

20  Q.   Can you point to him and describe a piece of clothing that

21  he --

22  A.   Light shirt with glasses.

23        MR. FRANKEL:  We stipulate that he can identify Bert

24  Rossini.

25        THE COURT:  Very good.  So stipulated.

1  BY MR. NOVAK:

2  Q.  So can you tell us when you first met with Mr. Rossini,

3  what did he tell you?  Did you talk about these investment

4  properties?

5  A.  Basically Bert and Babajan introduced him, that he is also

6  involved.  He's my partner.  We are working together on these

7  properties.  At that time the conversation, initial

8  conversation, before I saw the properties was sort of short.

9  And then -- but he -- he was introduced as a person who would

10 handle the financials and getting the deeds and notes, so

11 forth.

12 Q.  Did Mr. Rossini describe what sort of investment you would

13 be making with him at that time?

14 A.  He mentioned that the money invested would go toward

15 securing the notes and the deeds to these properties.  And he

16 explained little bit about the process.  It might take number

17 of months to get the notes.

18         And then I was shown the properties of -- you know,

19 the various properties they had.  And --

20 Q.  Who showed you those properties?

21 A.  I remember that Babajan drove me around.  I'm not sure if

22 Bert Rossini was also in the car with us when we were -- when I

23 was shown the initial three properties --

24 Q.  Okay.

25 A.  -- on that street.  So I don't recall if also Bert was with

1   me or not.  But --

2   Q.  Had you invested in mortgage notes before?

3   A.  Not -- not in mortgage notes.  Going back, I did some

4   investment with Babajan on some tax liens, what they call

5   scavenger sale, whatever.  And so I gave him some money to if

6   there are scavenger sale.

7          He was telling me beforehand, before I started this

8   investment experience with him, that, you know, he looks for

9   scavenger sale.  They buy them at a discount.  And you know, is

10  an opportunity to get properties once you pay the back taxes

11  and have -- you can get the properties.

12         So I gave him some money.  I said, okay, you can buy

13  some of these scavenger sale taxes, see what happens.  And then

14  there was -- he sent me expenses that he had in the process.

15  And at the end, I -- it -- we weren't successful to getting any

16  of those scavager sale loans, and he returned the remainder of

17  the money to me.

18  Q.  But the scavager sale investments with Babajan, that was

19  before May of 2011?

20  A.  Yes, before I say -- I'm not sure exactly what, during year

21  and a half, two years kind of.  Within close proximity but it

22  wasn't immediate the same time.

23  Q.  Other than that investment experience, had you invested in

24  -- did you know what a mortgage note was and how to invest in

25  them?

Badalian - direct                    27

1   A.   Not really, no.

2   Q.   Okay.  Who explained that to you what the note was?

3   A.   My understanding from the conversation I had with Babajan

4   and Bert was that these are like foreclosed properties, that

5   the notes -- the banks put out these notes for sale.  And they

6   will use the money that I would invest in to -- against

7   purchasing of these notes and securing the notes.  And then

8   these notes would eventually -- you would get -- I would get

9   title to those notes.

10          But, you know, there is always a chance that original

11  owner can buy back the note.  But, you know, I figured, okay.

12  If I get the note and that will be fine.  And if he -- they

13  explained to me if they don't get the note, then the money will

14  be returned, the invested money.

15  Q.   Your investment would be returned if they were not

16  successful?

17  A.   That is correct.

18  Q.   Okay.  Now, did you -- after this trip, did you go home?

19  A.   I went back to San Jose, yes.

20  Q.   Did you decide to invest with Mr. Rossini and with Babajan?

21  A.   Yes.

22  Q.   Before making that decision, did you consult with a lawyer

23  about this investment program?

24  A.   No, I didn't.

25  Q.   Did you consult with a financial advisor?

1  A.  No, I did not.

2  Q.  Why not?

3  A.  It was mostly that I -- well, from many acquaintances I

4  knew Babajan.  And he was in the mortgage and real estate, and

5  he had done this sort of tax -- you know, the -- participating

6  in the tax liens and purchasing property, that I figured he

7  knows what he's doing.  And he's family in a way.

8          So I didn't really investigate the parties involved at

9  that time.

10 Q.  Did there come a point where you communicated to Babajan or

11 to Mr. Rossini that you wanted to invest?

12 A.  Correct.  So when I went back to San Jose, I looked at the

13 properties.  And there were three of interest that they showed

14 me.  And I decided to participate in two of those properties

15 and then community -- communicated back to Babajan that, yes, I

16 am interested in these two properties.

17          And he mentioned, okay, we will send you instructions

18 how to write the cashier checks for these properties.

19 Q.  Now, before doing the investments, did Mr. Rossini or did

20 Babajan send you any other documents or sheets detailing what

21 sort of your return on your investment would be?

22 A.  For each property they would send a list that would show

23 like number of units, tax for the property, rent for the

24 property, or expenses while they are -- you know, other city

25 utility expenses.  And then the net would show, and they would

Badalian - direct                                     29

1   have like typically like a facts copy of the picture of the

2   building, PIN number associated with that lot or property.

3          So it would send like a, quote unquote, fact sheet on

4   each property.

5   Q.  And how would you go about actually purchasing property?

6   A.  So the instructions were to write -- make up cashier check,

7   to initially -- initial properties were kind of divided cashier

8   check payments.  It was cashier check to Mr. Rossini and then

9   Mr. Babajan and then Thomas Murphy.

10         And so I followed those instructions and made cashier

11  checks to different names, writing the address of each property

12  on the cashier check with the PIN number.  And then I Fed Ex'd

13  the checks to them.

14  Q.  Okay.  And the first two properties you bought, were they

15  at 4126 West Adams and 5410 West Fulton in Chicago?

16  A.  Yes.

17         MR. FRANKEL:  Objection, Judge, to the

18  characterization.

19         MR. NOVAK:  I'm sorry.  You are right.

20  BY MR. NOVAK:

21  Q.  That you invested in, were they at 4126 West Adams and 5410

22  West Fulton?

23  A.  Yes.

24  Q.  I'm going to show you on the screen -- actually it's going

25  to be easier.

1          MR. NOVAK:  May I approach, your Honor?

2          THE COURT:  You may.

3    BY MR. NOVAK:

4    Q.  I am going to show you what I have marked as Government

5    Exhibit Badalian 1 and Badalian 2.  Do you recognize those

6    documents, sir?

7    A.  Yes, I do.

8    Q.  What is -- what are those documents?

9    A.  These are the first pages of fact sheet of each property,

10   number of units, and then detailing the monthly rent, and then

11   the expenses, real estate, management fee, water and so forth.

12   And then the net income expected.

13   Q.  Okay.  And let's look at Badalian 1 specifically.  The

14   second page, do you recognize what the second page of that

15   exhibit is?

16   A.  Yes.  These are the cashier checks that I made out for --

17   Q.  Two --

18   A.  Two cashier checks.

19   Q.  And that property, that 4126 Adams, you eventually got a

20   deed to that property, correct?

21   A.  In 2013, yes.

22   Q.  So I want you to take a look at the last page of that

23   exhibit.

24   A.  It's the guaranteed quit claim deed, yes.

25   Q.  And looking at the second page of Badalian 2, do you

Badalian - direct                                    31

1    recognize what those are?

2    A.  Yes.  These are the cashier checks I made out for the 5410

3    West Fulton.

4    Q.  And are all of those the same, or substantially the same as

5    when you originally saw those documents?

6    A.  Yes.

7           MR. NOVAK:  Your Honor, I move -- offer those into

8    evidence and ask to publish them to the jury.

9           THE COURT:  Any objection?

10          MR. FRANKEL:  No objection.

11          THE COURT:  Badalian Exhibit 1 and Badalian Exhibit 2

12   are admitted in evidence.

13      (Said exhibits were received in evidence.)

14   BY MR. NOVAK:

15   Q.  So, Mr. Badalian, I'm going to start by showing you on the

16   screen here the first page of Badalian 1.  What are we looking

17   at?  I am going to blow up a bit here.

18   A.  This is the fact sheet for the 4126 West Adams.  Two units

19   and a garden unit.  Specifics about the number of bedrooms,

20   bath, rent that it's generating from these properties, total

21   monthly rent, total annual rent.  And then -- and then the

22   expenses were followed in terms of real estate expenses

23   management fee, water, other expenses, net income and the lot

24   size.

25   Q.  Okay.  And who provided you this document?

1    A.  This came from Bert Rossini.

2    Q.  Okay.  I'm going to show you page 2 of Badalian 1.  And

3    what are we looking at here?

4    A.  So these are the cashier checks I made out for 4126 West

5    Adams.  First one is 7500 made to Bert Rossini.  The second one

6    35,000 made to Thomas Murphy as agent.

7    Q.  And who is Thomas Murphy?

8    A.  He was introduced as the lawyer for who was handling the

9    transfer of deeds and the title.  So he was introduced as the

10   lawyer for Mr. Rossini and Babajan who -- in this investment

11   opportunity he was handling the legal aspects of.

12   Q.  And who made -- who directed you to make that -- to -- who

13   introduced him?  Was it Babajan or was it Mr. Rossini?  Do you

14   remember?

15   A.  I don't remember exactly if it was Mr. Rossini or Babajan.

16   It could have been either one.  I want to tend toward saying

17   that Mr. Rossini might have introduced.  I am not exactly sure.

18   Q.  All right.  And I want to show you what's in evidence as

19   Badalian 2.  This is that same -- this is another one of these

20   you call it fact sheets for the Fulton property?

21   A.  Correct.

22   Q.  Does it detail the same sort of projected return on your

23   investment?

24   A.  Yes, it does.  It lists again number of units, you know,

25   rooms, how many bedrooms, bathrooms and so forth.  The rent

Badalian - direct                    33

1    that are getting.  Indicates the garden unit is vacant at the

2    time the fact sheet was given to me.  The real estate taxes,

3    the lot size, and again some management fees and real estate

4    taxes, water bill and what have you.

5    Q.  I'm going to show you page 2 of Badalian 2.

6    A.  Okay.  These are the cashier checks that I made out for

7    5410 West Fulton.  I indicated the PIN number, the address on

8    each cashier check as instructed.  And then made three separate

9    checks, one in the amount of 20,000 to Babajan Khoshabe and

10   another 20,000 to Bert Rossini, and another 35,000 to Thomas

11   Murphy, agent.

12   Q.  And these were all dated May 24, right, all these checks?

13   A.  Correct, May 24, 2011.

14   Q.  2011.

15        Now, when -- so you're in California to -- negotiating

16   and speaking with Mr. Rossini about this deal, right?  How are

17   you communicating with him?

18   A.  It was with e-mails communication.  He would send me like

19   property information that Babajan had asked him to share with

20   me, like a picture of properties or address where they are.

21   And then I would look at the PIN number.  I would like look at

22   the PIN number and the county assessor's office.  Okay, where

23   is the party -- the property.  Sometimes I would use Google Map

24   to like look at the outside of the property, know kind of where

25   it is.

Badalian - direct                    34

1          And then depending on the property, was -- if I was

2    interested, then I told Babajan that, yes, or Bert that, yes, I

3    want to invest in this property.  And then, you know,

4    instruction would follow.  Okay, this is the fact sheet for the

5    property, and this is how you would need to make the cashier

6    checks.

7    Q.  I'm going to show you what I've marked as Government

8    Exhibit Badalian 16.

9    A.  Okay.

10   Q.  Do you recognize that document?

11   A.  Yes.  It's an e-mail from Bert Rossini to myself.

12   Q.  Okay.  And does that fairly and accurately depict the

13   e-mail that you received from Bert Rossini on May 26, 2011?

14   A.  Yes, it does.

15   Q.  With the attachments to it?

16   A.  Correct.

17          MR. NOVAK:  Your Honor, I offer that into evidence and

18   ask to publish to the jury.

19          THE COURT:  Any objection?

20          MR. FRANKEL:  Are you going to publish the

21   attachments?

22      (Brief pause.)

23          MR. FRANKEL:  No objection, Judge.

24          THE COURT:  All right.  So Badalian No. 16 is admitted

25   in evidence.

1        (Said exhibit was received in evidence.)

2   BY MR. NOVAK:

3   Q.   I'm going to show you the first page of this e-mail.  So

4   the from, that BertRossini4@aol, whose e-mail is that?

5   A.   Bert Rossini's e-mail.

6   Q.   And then the Robert Badalian@yahoo, was that your e-mail?

7   A.   Yes.

8   Q.   It says the subject is E fax message.  Do you know what

9   that is?

10  A.   It was -- no.  But it was attachment to the e-mail, so I

11  opened it up.

12  Q.   So this e-mail had an attachment on it, right?

13  A.   Yes.

14  Q.   Okay.  I am going to go to page 3.  That's a cover page?

15  A.   Yes, looks familiar, yes.

16  Q.   And then go to page 4.

17  A.   Yes.

18  Q.   So this fax cover, this is coming from, you see it says

19  here, the Center for Hard Money.  Do you know what that is?

20  A.   Center for Hard Money?  No.

21  Q.   Okay.  The address on Devon Street, do you know what that

22  address is?

23  A.   3924?  Not specifically, no, I can't say that.

24  Q.   Okay.  Well, can you tell me --

25          MR. NOVAK:  One second, Judge.  Just --

1   BY WITNESS:

2   A.   Might have been the address for Devon Investments on that

3   street number.   But I'm not hundred percent sure.   I don't

4   remember the exact address of Devon Street Investments.

5   BY MR. NOVAK:

6   Q.   Okay.   Well, but this has comments here from it says Robert

7   and find disbursement sheets for each property?

8   A.   Correct.

9   Q.   And this is -- this was attached to the e-mail you got from

10  Bert, right?

11  A.   Correct.

12  Q.   Okay.   Let's go to page 4.   What is this here on page 4?

13  A.   So after I showed interest in the properties, before I

14  started investing, Bert mentioned that we have this guarantee

15  agreement, that basically the money, it was -- it came across

16  as more kind of a understanding binding between the two parties

17  of, you know, during this investment, that the money that I

18  would invest would go direct toward purchasing of the notes.

19  And that later on I guess it was amended to also include

20  management fees associated with, you know, collecting rent on

21  these properties and what have you.

22          So this was an understanding between the two parties

23  that this is kind of the investment that we are participating

24  in.

25  Q.   Okay.   And what was your understanding that through this

Badalian - direct                    37

1    guaranty that would happen with money what were investing?

2    What would it be used for?

3    A.   So and my understanding was, I would give the money to go

4    toward securing the notes, purchasing the notes, and then

5    eventually getting the title to these properties.  And that if

6    they weren't successful in securing the notes and purchasing

7    the properties, that this money would be returned.

8    Q.   Okay.  So they were not successful in securing notes, they

9    return your money to you?

10   A.   That was my understanding, yes.

11   Q.   And it also says, if they were successful, that once a

12   property is closed, you would get title -- if they -- if they

13   ended up purchasing a note and foreclosing on a property, if

14   Bert -- if Bert's company ended up doing this, you would get

15   title to the property, right?

16   A.   That is correct.

17   Q.   Or to whoever you directed it to.

18   A.   Correct.

19   Q.   And then looking at page 5 of this exhibit, what are we

20   seeing here?  What is this?

21   A.   So this looks like the -- again the breakdown of the

22   property for 4126 in terms of the purchase price for the note

23   and how rents -- what would be the amount of rents and title

24   charges and so forth.

25   Q.   Okay.  And then the same on page 7 of this exhibit.  This

Badalian - direct                    38

1    is another disbursement sheet but now for the Fulton property?

2    A.   Correct, yes, that's correct.

3    Q.   Now, did you end up signing the guaranty agreement that

4    Bert had just sent you that we just looked at?

5    A.   Yes, I did.

6    Q.   I'm going to show you what I marked as Government Exhibit

7    Badalian 3.  What are we looking at here, sir?

8    A.   So this is my signature on the guaranty agreement.

9    Q.   This is the signed version of the guaranty agreement,

10   right?

11   A.   That is correct.

12   Q.   Is that fair and accurate copy of the guaranty agreement

13   you signed?

14   A.   This is my signature.

15        MR. NOVAK:  Your Honor, I offer this into evidence,

16   ask to publish it to the jury.

17        THE COURT:  Any objection?

18        MR. FRANKEL:  No objection.

19        THE COURT:  Badalian Exhibit 3 is admitted in

20   evidence.

21      (Said exhibit was received in evidence.)

22   BY MR. NOVAK:

23   Q.   And again, I'm going to direct your attention -- this the

24   same -- first, this is the same guaranty exhibit we just went

25   through a minute ago, right?

1   A.  Correct.

2   Q.  And going to direct your attention to the bottom left of

3   the exhibit.  I just blow it up.  That's your signature there

4   and the date?

5   A.  Yes.

6   Q.  And it's dated May 27, 2011?

7   A.  Correct.

8   Q.  Now, did you -- after these first two properties on Fulton

9   and Adams, did you continue to invest?

10  A.  Yes, I did.

11  Q.  And I'm going to direct your attention to June, early June,

12  of 2016 -- sorry, June 2 or so of 2011.  Did you invest in

13  another property on Wilcox?

14  A.  Yes, I did.

15  Q.  And how were you made aware of that investment?  How did

16  that come about?

17  A.  Okay.  Information unusual on the properties came from

18  Babajan or Bert sending for that is what Babajan wants you to

19  look at.  And I looked at it.  It seemed again something decent

20  to invest in.  The neighborhood was -- seemed decent.  So

21  that's -- I invested in that property as well.

22  Q.  Okay.  I'm going to show you what I have marked as

23  Government Exhibit Badalian 4.  Take a look at.  It's a two-

24  page document.

25      (Brief pause.)

1   BY MR. NOVAK:

2   Q.   Do you recognize those two documents, sir?

3   A.   Yes, I do.

4   Q.   What's the first page?

5   A.   The first page is potential income for the 4045 West Wilcox

6   property.

7   Q.   That's another one of those fact sheets?

8   A.   Correct, a facts sheet in terms of units and, you know,

9   potential rent.  Some unit was vacant at the time.  And again

10  expenses of real estate, water and maintenance, total expenses,

11  and then the net.

12  Q.   Okay.  And then what's the second page?

13  A.   The second one are copies of the three cashier's checks

14  that I made for this property.  The first one, 18,750 to Mr.

15  Bert Rossini.  The second one, 18,750 to Babajan Khoshabe.  And

16  the last one, 37,500 to Thomas Murphy as agent.

17  Q.   And do all those documents fairly and accurately depict the

18  facts sheet that you saw back in June of 2011 and those

19  cashier's checks you made?

20  A.   Yes.

21       MR. NOVAK:  Your Honor, I offer Badalian 4 into

22  evidence, ask to publish it to the jury.

23       THE COURT:  Any objection?

24       MR. FRANKEL:  No objection.

25       THE COURT:  Badalian 4 is admitted in evidence.

Badalian - direct                41

1        (Said exhibit was received in evidence.)

2    BY MR. NOVAK:

3    Q.   So this is another one of these fact sheets, right?  I am

4    showing you Badalian 4 first.  You just told us that, right?

5    A.   Yes.

6    Q.   And looks a little bit different than the first two that we

7    saw.  But -- but same information?

8    A.   It does.  More detail but basically the same.

9    Q.   And who signed it there at the bottom?

10   A.   Bert Rossini.

11   Q.   Okay.  And again, this is the -- the income here is -- what

12   were you understanding this income to be?

13   A.   My understanding was that some units of these properties

14   were already collecting rent, some vacant.  And that going

15   forward, this would be sort of the expected rent of income from

16   these properties.

17   Q.   And would -- you would get payments based off of the rents

18   that were collected, or supposedly collected, on your

19   properties, right?

20   A.   Correct.  So my -- what was communicated to me was that

21   when I purchased these notes, or at least paid the money toward

22   purchase of these notes, that until the title was secured and

23   transferred to my name, that I would be getting the rent from

24   these properties until that, either I got the title.  Or it was

25   that we couldn't get the note, then, you know --

Badalian - direct                    42

1   Q.   You said it was communicated to you.   Who communicated this

2   to you?

3   A.   This was through Bert Rossini.

4   Q.   Now, I'm going to show you the next page of Badalian 4.

5   And these are those cashier's checks you made out, right?

6   A.   That is correct.

7   Q.   One for -- two of them.   One to Bert Rossini for $18,750.

8   That's the top one?

9   A.   Yes.

10  Q.   The next one is to Babajan Khoshabe for that same amount of

11  money?

12  A.   Yes.

13  Q.   And then the last one is for 37,500 for Thomas Murphy?

14  A.   Correct.

15  Q.   Now, did you find it odd that you were making out three

16  different checks for -- towards the investment into one single

17  property?

18  A.   It seemed odd in the beginning.   The way it was explained

19  that, you know, there is three parties.   And initially I

20  thought that, okay, of course they're in this business to also

21  make some money on their own.   And internally they decide how

22  the money is divided for these notes for the purchase.

23        Maybe -- my understanding was, this 75,000, for

24  example, for a note was not all going toward purchasing of the

25  note, that they would have some, you know, money toward

Badalian - direct                43

1    making -- you know, on this purchasing of the notes.  But I

2    didn't really dig into what percentage of that money went

3    toward commissions or whatever money they were trying to make,

4    and what portion went to the actual note because I didn't have

5    access to know what the price of the note was.

6              But at that point I really -- it was -- it was in a

7    way a secondary issue.  It wasn't like important how they

8    divide as long as I got the notes.

9    Q.  And by that point you had that guaranty agreement that said

10   that you'd get your money back if they -- they give the note

11   for you to guarantee, or you get your money back?

12             MR. FRANKEL:  Objection, leading.

13             THE COURT:  Sustained, please rephrase.

14   BY MR. NOVAK:

15   Q.  But at that point you had the guaranty agreement that you

16   had signed, right?

17   A.  Correct.

18   Q.  And you read the guaranty agreement?

19   A.  Yes, sir.

20   Q.  And what was your understanding of the investments you were

21   making with Mr. Rossini per the guaranty agreement?

22   A.  Understanding was that he would use the money to -- toward

23   these notes, as we were directed.  And that if we were -- he

24   was not successful in securing the note and title, that the

25   money would be returned.

Badalian - direct                    44

1   Q.   Okay.   Now, so this is dated -- these checks were made out
2   on June 2 of 2011, right?
3   A.   Correct.
4   Q.   Did you start to receive rents on some of your investments
5   in June?
6   A.   Probably June or July, I started getting from the first
7   properties that I purchased, or paid money towards.   I start
8   getting some rents, yes.
9   Q.   I'm going to show you -- I'm going to show you what I've
10  marked as Government Exhibit Badalian 5.   Do you recognize
11  Badalian 5?
12  A.   Yes, I do.
13  Q.   What is it?
14  A.   It's a check from Thomas Murphy that he sent me as part of
15  the rents collected for the properties I had.   And in the memo
16  he's marked, 5410 West Fulton.   And the other property I can't
17  quite make out.   It's a little bit dark.
18        But it says, these are the rent for those properties,
19  in the amount of $6,150.
20  Q.   And there is what looks to me an invoice at the top.   Did
21  you receive an invoice like that for your first -- with your
22  rent payments?
23  A.   Yes.
24  Q.   And those shows -- so does that fairly and accurately
25  depict the check and invoice that you received for rents for

1    that day?

2    A.   Yes.

3         MR. NOVAK:  Your Honor, I offer this into evidence and

4    ask to publish to the jury.

5         THE COURT:  Any objection?

6         MR. FRANKEL:  No objection.

7         THE COURT:  Badalian 5 is admitted into evidence.

8      (Said exhibit was received in evidence.)

9    BY MR. NOVAK:

10   Q.   I'm going to show this to you on the screen, Mr. Badalian.

11        So the top, that is this invoice, can you tell us what

12   the top says there?

13   A.   Yes.  Rents for Robert Badalian, June of 2011, for 4126

14   West Adams, amount of 3,450.  And 5410 West Fulton Avenue in

15   the amount of 2700.  Total 6150.

16   Q.   Those are the first two properties we saw you had invested,

17   right?

18   A.   Correct.

19   Q.   And the bottom, as you said, was this check from Mr.

20   Murphy?

21   A.   Correct.

22   Q.   And were you expecting Mr. Murphy to give you a check for

23   rents?  How were you expecting to get the rents?

24   A.   My understanding was that in addition to him in terms of

25   securing loans, notes and title, that he would also be the

Badalian - direct                                    46

1   financial manager of this investment group, I guess.

2   Q.  You just said that was your understanding of what was to

3   happen.  How did you come to have that understanding?

4   A.  Well, I was communicated through Bert and Babajan that Mr.

5   Murphy is the lawyer who will be securing the notes and

6   changing the title, and also handling the distribution of rents

7   and finances of this investment.

8   Q.  Now, after these first three properties, did you continue

9   to invest?

10  A.  Yes, I did.

11  Q.  And I'm going to -- I'm going to show you what I have

12  marked as Badalian 6.  Do you see that?

13  A.  Yes.

14  Q.  And is that -- what is that?

15  A.  Again, it's another fact sheet for property on 4118 West

16  Washington Street.

17  Q.  Is that the next property that you invested in with Mr.

18  Rossini?

19  A.  I believe so, yes.

20  Q.  Okay.  And what's page 2 of that exhibit?

21  A.  Page 2 is a cashier check in the amount of 65,000, made for

22  that property.

23  Q.  Okay.  Now, do those fairly and accurately represent the

24  fact sheets and the cashier's checks that you made for those

25  investments?

Badalian - direct                    47

1   A.   Yes.

2            MR. NOVAK:   Your Honor, I move that into evidence.

3            THE COURT:   Any objection?

4            MR. FRANKEL:   No.

5            THE COURT:   Badalian Exhibit 6 is admitted in

6   evidence.

7        (Said exhibit was received in evidence.)

8            MR. NOVAK:   And ask to publish it to the jury.

9   BY MR. NOVAK:

10  Q.   So this first is another one of those fact sheets, right?

11  A.   Correct.

12  Q.   And it's for 4118 West Washington?

13  A.   Yes.

14  Q.   Now, at this point you had gone to Chicago in May of 2011.

15  A.   Yes.

16  Q.   Had you come to Chicago again to look at more properties,

17  at this point in August of 2011?

18  A.   In August of 2011, no.

19  Q.   Okay.  Where were you getting your information about the

20  properties and to -- for these investments then?

21  A.   So that was again, Bert, Babajan would send me that this is

22  another property I found.  It's a good property.  It's on

23  Washington.  And I would -- I remember looking at is like,

24  okay, wide street.  Washington, I looked at the outside of the

25  building, was kind of a green stucco kind of a color.

1        And then -- and then Bert sent me the facts sheets for

2    the property after I showed interest in it.  And then of course

3    there is more detail in here stating, bank has a judgment of

4    329,000 on the property and what have you.  The number of units

5    and total annual income, actual monthly income for this

6    property.  And then the expenses.

7    Q.  Okay.  And --

8    A.  Then at the bottom there is instructions how to make the

9    check to and whose name.

10   Q.  And it's to make one check for $65,000, right?

11   A.  Correct, to Thomas Murphy.

12   Q.  Now, I'm going to show you page 2.  Like I said, this is

13   the check that you made, the cashier's check?

14   A.  That's correct.

15   Q.  And it's dated what date?

16   A.  August 25, 2011.

17   Q.  Now, the handwriting here for the address and the PIN,

18   whose handwriting is that?

19   A.  That's mine.

20   Q.  And the same for the bottom here, where you say, for

21   this -- for purchase of U.S. Bank note.  Whose is that?

22   A.  That's mine.

23   Q.  Where did you get the directions to make those notations on

24   the cashier's check?

25   A.  From Bert.

Badalian - direct                    49

1   Q.  Okay.  And --

2           THE COURT:  I'm sorry.  From whom?

3   BY THE WITNESS:

4   A.  From Bert.

5   BY MR. NOVAK:

6   Q.  Now, this one is a single check for $65,000.

7   A.  Yes.

8   Q.  The last properties you had invested in had multiple checks

9   for different amounts of money, right?

10  A.  Yes.

11  Q.  Who told you to make a single check for one amount?

12  A.  It -- it might have been either Bert or Babajan that I

13  learned that they wanted to consolidate this process to make it

14  more efficient, to -- instead of writing three checks to

15  individuals, to three individuals, they had consolidated this

16  process to make it more streamlined.  And going forward, it

17  would be one check for each property made out to Thomas Murphy.

18  Q.  Okay.  Now, after this property --

19          THE COURT:  Mr. Novak, perhaps this would be a good

20  time for --

21          MR. NOVAK:  Very good.

22          THE COURT:  -- a break.

23          MR. NOVAK:  Very good.

24          THE COURT:  Ladies and gentlemen of the jury, we will

25  take a short break for morning break.  During the break please

Badalian - direct                                        50

1   do not discuss this case with anyone, including one another.

2   Thank you very much.

3        (Jury exited the courtroom.)

4             THE COURT:  You may step down, sir.  We are in recess.

5             MR. NOVAK:  How long, Judge?

6             THE COURT:  Let's break for about ten minutes.

7        (Brief recess.)

8             THE COURT:  Anything we need to address?

9             MR. NOVAK:  I just want to make the Court and counsel

10  aware, this is one of the witnesses that gets an e-mail from

11  Mr. Rossini at the time of his arrest in January.  We are going

12  to go into that very briefly.  And within the motion of limine

13  obviously with the Court's ruling.  I just wanted to make sure

14  everybody is aware before we go down that road.  Not to the

15  end, just so you are aware.

16            THE COURT:  Thank you.

17       (Jury entered the courtroom.)

18            THE COURT:  Mr. Novak, you may proceed.

19            MR. NOVAK:  Thank you, your Honor.

20  BY MR. NOVAK:

21  Q.  So, Mr. Badalian, before the break, we had just got done

22  talking about the property that you invested in on 4118 West

23  Washington.  That's Badalian No. 6.  I have it up on your

24  screen in front of you.  Right?

25  A.  Correct.

1  Q.  Now, that investment you made -- I am going to go to page 2

2  of that exhibit -- was -- you wrote that check on August 25 of

3  2011, right?

4  A.  Correct.

5  Q.  Did you continue to invest with Mr. Rossini after that

6  building?

7  A.  Yes, I did.

8  Q.  Okay.  And was your next investment in early September of

9  2011 about?

10 A.  Sounds about right.

11 Q.  I'm going to show you what I have marked as Badalian 7.  Do

12 you recognize those sheets, sir, the two pages of that exhibit?

13 A.  Yes, I do.

14 Q.  And is the first page another fact sheet like you've been

15 talking about?

16 A.  Yes.

17 Q.  And what's the second page?

18 A.  Second page is the cashier's checks that I made to Thomas

19 Murphy for this property.

20 Q.  Okay.  And does that -- does that fairly and accurately

21 depict the cashier's checks and the fact sheets related with

22 this building?

23 A.  -- yes?

24      MR. NOVAK:  Your Honor, I offer this, Government

25 Exhibit Badalian 7, into evidence and ask to publish to the

1    jury.

2              THE COURT:  Any objection?

3              MR. FRANKEL:  No objection.

4              THE COURT:  Badalian Exhibit 7 is admitted into

5    evidence.

6         (Said exhibit was received in evidence.)

7    BY MR. NOVAK:

8    Q.   So, Mr. Badalian, on Badalian 7 here, this is another one

9    of these fact sheets, right?

10   A.   Correct.

11   Q.   And this property is located where?

12   A.   3822 West Monroe Street.

13   Q.   Okay.  And who did you receive this fact sheet from?

14   A.   From Bert Rossini.  He would send facts sheets.

15   Q.   And the directions here for the cashier's check and who to

16   make it payable to, that's from Mr. Rossini?  Those are his

17   directions?

18   A.   Correct.

19   Q.   Now, and then I'm going to show you page 2 of the exhibit.

20   I have to rotate it.

21            Maybe I can't rotate it.  Well, I don't think I can

22   actually rotate it.

23            But this is a cashier's check to Mr. Murphy for the

24   amount $50,000?

25   A.   Correct.

Badalian - direct                    53

1   Q.   And again, who wrote in the address and the PIN number?

2   A.   I did.

3   Q.   At whose direction?

4   A.   Mr. Bert Rossini.

5   Q.   And the date on this check is September 7 of 2011?

6   A.   Correct.

7   Q.   Okay.  Now, you again -- you continued to invest after this

8   building, right?

9   A.   Yes, I did.

10  Q.   And your next investment was made on a building on Adams

11  Street a couple of weeks later, right?

12  A.   Correct.

13  Q.   I'm going to show you Badalian 8.  Do you recognize

14  Badalian 8?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   It's a fact sheet, first page, on property on 4037 West

18  Adams Street.  And then instructions about this property, and

19  who make -- who to make the cashier's checks to.

20  Q.   Okay.  And the second page?

21  A.   Second page is a copy of the cashier's check I sent toward

22  this property or this note, made out to Thomas Murphy.

23  Q.   Okay.  And they fairly and accurately depict the fact sheet

24  and the cashier's check that you related to this property?

25  A.   Yes.

1          MR. NOVAK:  Your Honor, I offer these into evidence,

2    and ask to publish them to the jury.

3          THE COURT:  Any objection?

4          MR. FRANKEL:  No objection.

5          THE COURT:  Badalian Exhibit 8 is admitted in

6    evidence.

7      (Said exhibit was received in evidence.)

8    BY MR. NOVAK:

9    Q.  And again, this is for the property located at 4037 West

10   Adams?

11   A.  Yes.

12   Q.  You got this fact sheet from who?

13   A.  Bert Rossini.

14   Q.  And what does it say here at the bottom above the

15   directions on who to make the cashier's checks out to?  What

16   does it say?

17   A.  May I read it?

18   Q.  Yes.

19   A.  It says:  Babajan wants to give you a very good price on

20   this property.  We have an Indian-based company willing to

21   purchase at 85,000, but believe this is a wonderful property

22   for you in the future.

23          And then make cashier's check payable to Thomas

24   Murphy, attorney slash agent, for purchase of 4037 West Adams

25   Street, Chicago, Illinois.  And then the PIN number for the

Badalian - direct                                    55

1   property.

2   Q.   And did you make a cashier's check payable to Mr. Murphy at

3   that address?

4   A.   Yes, I did.

5   Q.   And that is the cashier's check we see here on page 2 of

6   the exhibit, right?

7   A.   Correct.

8   Q.   It's dated September 21 of 2011?

9   A.   Correct.

10  Q.   And again, it has on the top right corner the check, the

11  address and the PIN number?

12  A.   Correct.

13  Q.   Who wrote that in?

14  A.   I did.

15  Q.   Okay.  And made out to -- well, this one is made out to

16  Babajan Khoshabe.  Do you see that?

17  A.   Yes, I realize that.

18  Q.   Okay.  This -- but that -- Babajan is one of the people who

19  is -- you were investing with, right?

20  A.   Correct.

21  Q.   They didn't send you that check back and say, make a new

22  one?

23  A.   No.

24  Q.   Now, during this time -- so this is in September of 2011.

25  So you had been investing for about four months at this point?

Badalian - direct                          56

1  Approximately?

2  A.  Approximately, yes.

3  Q.  Were you receiving rent payments?

4  A.  I was receiving, yes, rent payment for some of those

5  properties.

6  Q.  Okay.  And similar to the check that I showed you right

7  before the break, right?

8  A.  Correct.

9  Q.  And those rents were coming from Thomas Murphy?

10 A.  Yes.

11 Q.  Now, at some point -- well, you know, let's stop there.

12 Let's move on to the next thing.

13         You continued to invest after this Adams building,

14 right?

15 A.  Yes, I did.

16 Q.  And I'm going to show you, your next investment was in

17 January of 2012, right?

18 A.  About right, yes.

19 Q.  Now, I'm going to show you what I have marked as Government

20 Exhibit Badalian 11.  Take a look at Badalian 11, all the

21 pages.

22     (Brief pause.)

23 BY THE WITNESS:

24 A.  It's very familiar, yes.

25 BY MR. NOVAK:

Badalian - direct                          57

1    Q.  And what is Badalian 11, in summary?

2    A.  This is in regards to three properties on West Arlington --

3    Arthington in Chicago.

4    Q.  And that's an e-mail that you received from Mr. Rossini?

5    A.  Correct.

6    Q.  And the attachment to that e-mail?

7    A.  The attachments are fact sheet for the property.

8    Q.  But that Badalian 16 is the e-mail and the attachments,

9    correct?

10   A.  E-mail and the attachments, yes.

11   Q.  And does that fairly and accurately depict the e-mail and

12   the attachments you received from Mr. Rossini at that day?

13   A.  Yes.

14          MR. NOVAK:  Your Honor, I offer Badalian 6 -- Badalian

15   11, I am sorry, into evidence, and ask to publish it to the

16   jury.

17          THE COURT:  Any objection?

18          MR. FRANKEL:  No objection.

19          THE COURT:  Badalian Exhibit 11 is admitted in

20   evidence.

21      (Said exhibit was received in evidence.)

22   BY MR. NOVAK:

23   Q.  So let's start with page 1 here.  This is a e-mail dated

24   January 19 of 2012?

25   A.  Yes.

Badalian - direct                    58

1   Q.   Okay.  And what is Mr. Rossini telling you in this e-mail?

2   A.   Was stating, Babajan ask that I send you this information

3   concerning the three properties on West Arthington in Chicago.

4   Excellent properties.  Please give Babajan a call about them.

5   Q.   And as we see, as you said, there was an attachment to that

6   e-mail, right?

7   A.   Correct.

8   Q.   Show you, page 4 of this exhibit is the attachment?

9   A.   Correct.

10  Q.   And what are we seeing here on this page?

11  A.   It's a fact sheet on one of the Arthington properties,

12  2422.  There were three in total.

13  Q.   We get --

14  A.   Yes, Devon Street Investments, fact sheet, again number of

15  units, rents and expenses associated with that.  And then

16  instruction to make check payable to Thomas Murphy for the

17  purchase of Plaza Bank note.

18  Q.   And next page is a picture of the property, right?

19  A.   Yes.

20  Q.   And there is some handwritten notes on the property?

21  A.   Yes, it's hundred percent rented, great properties.

22  Q.   And then there is another page related to this property?

23  A.   Correct, yes.

24  Q.   I'm going to go to page 8 of Badalian 11?

25  A.   Correct.  So this is fact sheet again on the 2444 West

1   Arthington, Chicago.  Similar information.

2   Q.  And again another picture?

3   A.  Correct.

4   Q.  And more pages attached with -- this looks like assessor's

5   office information, right?

6   A.  Yes.

7   Q.  And then finally, on page 12 of Badalian 11?

8   A.  Right.  This would be the third property on the same

9   street, 2446 West Arthington.

10  Q.  And this is another fact sheet for that property.

11  A.  Correct.

12  Q.  Similarly, another picture?  That's page 13.

13  A.  Yes.

14  Q.  And then more of these assessor's office pages, right?

15  A.  Correct.

16  Q.  Did you end up making an investment?

17  A.  Yes.

18  Q.  And I'm going to show you what I have marked as Badalian

19  No. 9.  Do you recognize Badalian 9, sir?

20  A.  Yes, I do.

21  Q.  And what is Badalian 9?

22  A.  So it's a copy of a cashier check I made toward 2442 West

23  Arthington, and the amount of $85,000.

24  Q.  And does it contain the cashier's checks and the fact

25  sheets for those three Arthington properties?  Can you take a

1   look?

2   A.  Yes, it does.

3   Q.  And do those fairly and accurately represent the fact

4   sheets and the cashier's checks for those properties that you

5   made at that time?

6   A.  Yes, it does.

7           MR. NOVAK:  Your Honor, I offer those Badalian 9 into

8   evidence, and ask to publish it to the jury.

9           THE COURT:  Any objection?

10          MR. FRANKEL:  No objection.

11          THE COURT:  Badalian Exhibit No. 9 is entered into

12  evidence.

13      (Said exhibit was received in evidence.)

14  BY MR. NOVAK:

15  Q.  So page 1 of Badalian 9, that's that first cashier's check?

16  A.  Correct.

17  Q.  What's the date on the check?

18  A.  January 23, 2012.

19  Q.  And the amount of this check?

20  A.  85,000, made toward 2442 West Arthington property, or note.

21  Q.  And then the next page is the fact sheet that we just saw,

22  right?

23  A.  Yes.

24  Q.  And then page 3, Badalian 9, what is this?

25  A.  This is a cashier check in amount of 85,000, for 2444 West

1    Arthington.

2    Q.   Then page 4 is another fact sheet for that property?

3    A.   Yes.

4    Q.   And page 5 is what?

5    A.   It's copy of cashier's checks that I made towards 2446 West

6    Arthington.

7    Q.   Another in the amount of 85,000?

8    A.   Correct.

9    Q.   And another one of those fact sheets that we just saw,

10   right?

11   A.   Yes.

12   Q.   Was the total amount you made for investing in those three

13   properties just over $250,000 in those cashier's checks?

14   A.   Yes.

15   Q.   Now, in January -- one moment please.

16       (Brief pause.)

17   BY MR. NOVAK:

18   Q.   Did you continue to invest after this Arthington property?

19   A.   Yes, I purchased one more property after the properties on

20   Arthington.

21   Q.   And where was that property located at?

22   A.   It was on Montrose.

23   Q.   And was this property, this investment, made in February of

24   2012?

25   A.   That's about right, yes.

1   Q.   I'm going to show -- Badalian 10.

2   A.   Thank you.

3   Q.   Why don't you take a look at Badalian 10.  Is that the fact

4   sheet and cashier's checks related to that property?

5   A.   Yes, yes.

6   Q.   And does that fairly and accurately represent the fact

7   sheet, cashier's checks related to that property as you saw

8   them back in February of 2012?

9   A.   Correct.

10        MR. NOVAK:  Your Honor, I off Badalian 10 into

11  evidence and publish it to the jury.

12        THE COURT:  Any objection?

13        MR. FRANKEL:  No objection.

14        THE COURT:  Badalian 10 is entered into evidence.

15    (Said exhibit was received in evidence.)

16  BY MR. NOVAK:

17  Q.   So -- and this again, I'm going to show you the first page,

18  is another fact sheet, right?

19  A.   Yes, yes.

20  Q.   And how big was this building that you were investing in?

21  A.   I'm sorry?

22  Q.   How big -- how many units were in the building?

23  A.   It was fairly large building, 15 units.  And I remember

24  that Babajan drove me to see the building from outside.

25  Q.   And drove, because you had made a trip to Chicago in

Badalian - direct                    63

1    January of 2012, right?

2    A.  Correct.

3    Q.  Okay.  Why don't you tell us about that trip that you made

4    in January of 2012.  What was the purpose of that trip?

5    A.  So I went there to just basically look at the properties

6    that I purchased.  And then Babajan mentioned that there is

7    another property that came up.  It's a big building, 15 units.

8    It can be basically a big value property, that he asked me if I

9    would be interested in it.  And he drove me to see it.  And he

10   mentioned that this note would be $280,000.

11           And I told him that I don't have that amount of money.

12   He said that, you know, we can go partner in this property.

13   You put up half, and then myself and Bert put up half.  So we

14   become partners.  And then -- in this property.  Do you have a

15   problem with that?

16           I said, no, it's okay, because I don't have that kind

17   of money anymore.  It was toward investing multiple units.

18           And so then the following two checks are copies for

19   80,000 and 60,000 for total $140,000 I made toward the

20   purchase, the note of this property.

21   Q.  And that's the checks here on Badalian 10, page 2, and

22   page 3?

23   A.  Correct.

24   Q.  Now, let's talk about this January trip.  Did you make this

25   trip after you had invested in the Arthington properties, if

1  you remember?

2  A.  I am -- I'm not certain if it was before or after the

3  purchase of the Arthington, because it happened close in that

4  January timeframe.  So I can't -- but I believe it was early

5  January I went there.

6  Q.  Who did you meet with when --

7  A.  I met with both Bert and Babajan.

8  Q.  And when you met with Bert and Babajan during this trip,

9  what sort of meetings did you take?  Did you go to dinner?  Did

10 you talk about the investments?

11           Tell us what happened.

12 A.  Yeah, I met at their office, and we were discussing these

13 properties.  And they said, okay, thank you for investing with

14 us.  You know, we definitely appreciate your, you know,

15 investment and truth.  And we went to dinner.  I remember a

16 Greek restaurant.

17 Q.  Okay.

18 A.  And we had a dinner, and they paid for the dinner.  It was

19 cordial dinner.

20           And then before coming back, I went for a short, over

21 the weekend kind of a trip.  Babajan drove me to see this other

22 Montrose property.  And then he drove me to the airport

23 basically.

24 Q.  When you were there, did you see -- did Mr. Rossini or

25 Babajan take you to any of the other properties that you had

Badalian - direct                    65

1   invested in?

2   A.   I believe, yes, we did take a drive toward the other

3   properties that I purchased.  Again, we couldn't go in.  We

4   just drove by those properties.

5   Q.   Let me ask you, who went on this drive with you?  Was it

6   Mr. Rossini?  Was it Babajan?  Was it both?

7   A.   I'm trying to remember.  I want to say Babajan was with me.

8   And I'm not hundred percent if also Bert was with us or not.

9   Q.   Okay.

10  A.   It was quite a while back.  So I don't remember exactly if

11  both or all three of us were together when we went to visit

12  these properties.

13  Q.   But you did go to visit with either Babajan, Bert, or both,

14  to visit the properties you were investing in?

15        MR. FRANKEL:  Objection, Judge.  I believe that

16  misstates his testimony.

17        THE COURT:  Sustained.  Please rephrase the question.

18  BY MR. NOVAK:

19  Q.   Well, regardless, you went with -- you went to visit and

20  look at your properties --

21  A.   Correct.

22  Q.   -- that you had invested in with Mr. Rossini?

23  A.   Correct.

24  Q.   When you went to visit the properties, were you allowed to

25  go inside?

Badalian - direct                66

1   A.   No.

2   Q.   Why not?

3   A.   Said there are tenants there in the apartment.  And they

4   can't just barge in and go to the apartment.  And some, because

5   the note is not secured, they're not allowed to go in.

6   Q.   Okay.  Now, and then Babajan took you to see the Montrose

7   building, you said.

8   A.   Correct, from outside.

9   Q.   From outside again.

10  A.   Yes.

11  Q.   And then you made your final investment?

12  A.   Correct.

13  Q.   Because did you invest again after Montrose?

14  A.   No.

15  Q.   Okay.  Did you continue to receive rents after this

16  investment in February 2012 in the Montrose building?

17  A.   Yes, I did.

18  Q.   And were the rents still coming from Thomas Murphy?

19  A.   No.  Starting in January timeframe, I was informed again by

20  Babajan and/or Bert that again they were going through

21  streamlining their process of managing these properties, and

22  that they had -- that going forward, these checks, collection

23  of checks and distribution, would be handled by Reliant

24  Management.

25            MR. NOVAK:  Okay.  One moment.

Badalian - direct                        67

1        (Brief pause.)

2    BY MR. NOVAK:

3    Q.   Okay.  And who was Reliant Management?

4    A.   Reliant Management was a kind of a management group that

5    was headed by or ran by Babajan's son.  And he was then in the

6    process of streamlining the process, and he was going to

7    collect the rent and minus the management fee of ten percent

8    and distribute the rent according to the properties that were

9    owned -- invested.

10   Q.   What was the name of Babajan's son?  What is the name of

11   Babajan's son?

12   A.   Going black here.

13        Anthony Khoshabe.

14   Q.   Now, approximately how long did you continue to receive

15   rents from Reliant Management on the properties that you had

16   invested in?

17   A.   So I was receiving rents I would say close to like April

18   timeframe of 2012.

19   Q.   Okay.

20   A.   And then the rents stopped coming, rent checks stopped.

21   Q.   And why did the rent checks stop coming?  Did you ask about

22   this?

23   A.   Yes, after two months or so that passed by, we didn't get

24   one.  I sent inquiries, e-mails to Anthony, like, I haven't

25   received the rent.  And then contacted Bert through e-mail.

Badalian - direct                           68

1  And I think I also might have called Babajan.

2         And Bert informed me that this is just a glitch in the

3  operation, that there is some delay.  But the checks will be

4  coming in.  And they are sorting it out.

5  Q.  And you say, we didn't receive rent checks.  Were you the

6  only person you knew in California investing in these

7  properties?

8  A.  There were others in California that invested with Bert and

9  Babajan also.

10 Q.  Who else did you know that invested with these people?

11        MR. FRANKEL:  Objection, foundation.

12        THE COURT:  Sustained.  Please rephrase the question.

13 BY MR. NOVAK:

14 Q.  Okay.  How do you know that other people were investing

15 with Bert and his company in California?

16 A.  A number these other California investors were part of the

17 Assyrian community.  And we go to the same church.  So -- and

18 some of them through conversation, and we found out that, you

19 know, who invested.  And we were talking to each other that,

20 oh, this is great opportunity.  Maybe, you know, you should buy

21 more properties.  Or that's --

22        MR. FRANKEL:  Objection, hearsay.

23        THE COURT:  Sustained.  The jury is to disregard the

24 last response by the witness.

25        MR. NOVAK:  Okay.

Badalian - direct                    69

1   BY MR. NOVAK:

2   Q.  Can you give us the names of some of the people you knew in

3   California who were investing, without telling us any

4   conversations you had with them?

5   A.  Sure.  Henry Hormozian, Vladimir Moghaddasi, Raymond

6   Babaoghli, Fred Khoshabe, my sister Beneta Badalian, and Benva

7   Lazar, Dr. Benva Lazar.  Those come to mind.

8   Q.  Okay.  Now, you said that in the spring or summer of 2012,

9   you said rents came until April, right?

10  A.  Just about, yeah.

11  Q.  And then they stopped coming regularly.

12  A.  Correct.

13  Q.  And so you said you talked to -- you asked questions about

14  this, right?

15  A.  Correct.

16  Q.  How were you asking questions?  Was it in phone calls?  Was

17  it in e-mails?

18  A.  It was -- I remember that I had talked to -- the e-mail

19  went -- I believe first e-mail on this regard was to Anthony

20  because he was the distributor of these rent checks.  And then

21  followed up with Bert through e-mail.  Mostly my communication

22  with Bert was through e-mail initially, sometimes phone calls.

23  But Babajan was mostly phone calls because he didn't have kind

24  of a reliable e-mail in a way.

25          But that's how I found out that there was a glitch in

Badalian - direct                           70

1    the operation.

2    Q.   And what -- did Mr. Rossini explain this glitch to you as

3    you call it?

4    A.   He mentioned that there's some delay into collecting the

5    check.  And the bank -- and to distribute the money.  And later

6    on, when we kept this delay, process went on, we kept pressing

7    that where are the checks?  Because, you know, we were worried

8    that, you know, we are not getting the checks or what's going

9    on.

10        Bert explained that there was an issue with one of the

11   certificate of deposit that they deposit in the bank, that the

12   bank had put a hold on the certificate of deposit.  And that's

13   how they couldn't redistribute the rent, distribute the rent

14   money, because the bank had a hold on this money that was

15   deposited in the bank.

16   Q.   I'm going to -- let's jump ahead a little bit to the spring

17   of 2013.  Okay?

18   A.   Okay.

19   Q.   Had you -- did you continue to not receive rents from your

20   investments at this time?

21   A.   Correct, just --

22   Q.   Did you continue to ask Mr. Rossini questions about where

23   your rent payments were in trying to track down your investment

24   money?

25   A.   Continuously.

Badalian - direct                    71

1    Q.   And so did there come a point where Mr. Rossini talked
2    about anything he was doing with regard to any of his business
3    partners?
4    A.   Correct.  So toward April timeframe of 2013, with this
5    constant communication with him about the rent and rent money
6    not coming in, Mr. Rossini mentioned that some of this money is
7    tied up with Thomas Murphy.  He is not giving him back the
8    money, and that he is going to take legal action against Thomas
9    Murphy, what they called like accounting suit, if I am not
10   mistaken.
11          And this was around April of 2013.
12   Q.   Okay.  How did that make you feel as an investor to learn
13   that?
14   A.   Well, I was worried quite a bit.
15   Q.   Okay.  And did you continue to ask Mr. Rossini for updates
16   on the suit?
17   A.   Yes.  And in few months later, Raymond Babaoghli and I went
18   to Chicago.
19   Q.   And Raymond is another investor?
20   A.   Correct.
21   Q.   And why did you go to Chicago?
22   A.   Well, I wanted -- we wanted to have a more face-to-face
23   dialogue rather than e-mail, to kind of see what's going on,
24   because we were getting this kind of a cross-communication of,
25   well, you know, Thomas Murphy got the money.  And Babajan was

Badalian - direct                    72

1    saying, I don't have the money.  So it was like a pointing

2    finger at each other, like Bert, Babajan, Thomas Murphy.

3              So we were caught into this kind of a -- we didn't

4    know who was doing what.  And so on behalf of myself and some

5    of the investors in California, we said, okay, the two of us

6    will go there to talk to them and see what's going on, to get a

7    face-to-face meeting.

8    Q.   And was -- this trip happened in June of 2013?

9    A.   It's about right, I think.

10   Q.   Who did you meet with during this trip?

11   A.   So when we went there, we met with both Bert and Babajan,

12   said we are here to see what's going on.  And again, same kind

13   of explanations, that we want to give you the money, but Thomas

14   Murphy is holding up the money.  He is not giving it to us.  So

15   how can we distribute it?

16             And then while we were there, Mr. Rossini said, I have

17   a lawyer, Richard Kruse, in the same building.  And then we had

18   a meeting, myself, Raymond, Bert Rossini and his lawyer, about

19   this accounting suit.

20   Q.   And without getting into the substance of the conversations

21   you had with Mr. -- it's Richard Kruse, right?

22   A.   Correct.

23   Q.   Did -- were you given further explanations about what was

24   happening with the complaint accounting?

25   A.   Not much detail in terms of, but that, yes, this accounting

1  suit was filed.  And then Bert Rossini also mentioned that he's

2  putting liens on all the properties, so that he indicated that

3  he -- he wants to secure them so like Thomas Murphy doesn't

4  sell the properties.  So there was all these kind of we don't

5  know who's going to do what.  So on your behalf, to secure your

6  investment, I am putting liens on all these properties.

7  Q.  And were you trying to get title to any of the properties,

8  like the Wilcox properties or the Adams properties or the

9  Fulton property, at that time?

10  A.  Yes, correct.

11  Q.  Okay.  I'm going to show you what's marked as Badalian 12.

12  Do you recognize Badalian 12?

13  A.  Yes.

14  Q.  Do you recognize Badalian 12, Mr. Badalian?

15  A.  Yes, I do.

16  Q.  And is that a set of e-mails from June between you and Mr.

17  Rossini?

18  A.  Yes.

19  Q.  Does it fairly and accurately depict those e-mails as

20  you -- as they were at that time?

21  A.  Yes.

22       MR. NOVAK:  Your Honor, I offer those into evidence,

23  Badalian 12 into evidence, and ask to publish them.

24       THE COURT:  Any objection?

25       MR. FRANKEL:  No objection.

Badalian - direct                  74

1          MR. NOVAK:  Your Honor, I believe I want to make sure

2    I offered Badalian 10 into evidence.  I think I did.  I just

3    want to make sure we --

4          THE COURT:  You did.

5          Badalian 12 is admitted in evidence.

6      (Said exhibit was received in evidence.)

7    BY MR. NOVAK:

8    Q.  So this is in reverse order here in that the older e-mails

9    are at the bottom, Mr. Badalian.  This first e-mail is sent on

10   what date?

11   A.  June 13, 2013.

12   Q.  And this is an e-mail from who to who?

13   A.  Is an e-mail I sent to Bert Rossini, and I copied Fred

14   Khoshabe, myself.

15   Q.  Now, what are you asking Mr. Rossini to do in this e-mail?

16   A.  So I'm indicating that I want to proceed as soon as

17   possible with getting the titles for 4045 West Wilcox, 4126

18   West Adams, and 4037 West Adams, and 5410 West Fulton.  Based

19   on the timeline you provided, I expect to get full titles no

20   later than end of July.

21          Additionally these titles were assigned to Devon

22   Investments.  I expect to receive the back rents for these

23   properties since August of 2012.  The 4030 -- 4037 West Adams

24   property was fixed, as I paid for it through rent deduction.

25   And based on your last communication, this property, it was

1   fully rented out, including the fixed first floor and basement

2   rent -- basement, rent in the amount of $1,650.  I can provide

3   e-mails if you wish.  Why is there a lis pendent on 4037 West

4   Adams?

5          I look forward to your clear feedback regarding these

6   properties.

7   Q.  And the four properties you mention here was Wilcox, the

8   two properties on Adams, and West Fulton.  Those were some of

9   the first properties that you had invested in, right?

10  A.  Correct.

11  Q.  Back in May of 2011.

12  A.  Correct.

13  Q.  Now, there is a point here where -- in your e-mail where

14  you say, these titles were assigned to Devon Investments?

15  A.  Yes.

16  Q.  What does that mean?  What did you mean by that?

17  A.  Well, I looked up the PIN numbers.  You know, from time to

18  time I would go to the Cook County Assessor's record, you know,

19  website, and look these properties to track how is -- where is

20  the title at?  Because I wasn't getting enough clear

21  communication from Mr. Rossini, or anybody else for that

22  matter.

23         And then I found out that these titles were assigned

24  to Devon Investments, like why are these titles sent to Devon

25  Investments instead of being assigned to me, because they are

Badalian - direct                    76

1    my notes.

2    Q.   And Devon Investments, what did you understand Devon

3    Investments to be?

4    A.   So Devon Investments was I guess the entity name for the

5    investment group that Mr. Rossini was running and Babajan was

6    part of and Thomas Murphy.   That's --

7    Q.   That was --

8    A.   That was the name of their entity, yes.

9    Q.   Okay.   And you saw that their titles had been in Devon

10   Investments' name, right?

11   A.   Correct.

12   Q.   And let's go back to the guaranty agreement for a minute

13   that you signed.   That's Badalian 3.   The guaranty agreement

14   said that once the property was closed, if there was a title to

15   the property it would be in your name.

16   A.   Correct.

17   Q.   So that's your e-mail to Mr. Rossini on that day.   Let's

18   look at Mr. Rossini's response.

19        Okay.   What does Mr. Rossini's respond to you?

20   A.   Saying, your decision is fine with me.   We may have filed a

21   lis pendence by mistake on 4037 West Adams, unless it is a

22   building violation.   I will check this.

23        By the end of July, you will receive whatever rents I

24   received or Murphy received and you have not received to date

25   on these properties.   I will stand for those rents, even if I

Badalian - direct                    77

1    did not receive them from Murphy.

2            You will receive deeds to 4037 West Adams, 4126 West

3    Adams, 4045 West Wilcox and 5410 West Fulton by the end of July

4    2013.  Upon receipt of the deeds, I will send you a

5    cancellation of the guarantee on each of the above properties.

6    Thank you for your response.

7    Q.  Did you receive a deed for any of those four properties?

8    A.  Except one, 4126, later in 2013, yes.

9    Q.  So -- so we are clear, that's the only deed you received

10   was 4126?

11   A.  Correct.

12   Q.  Did you ever receive a deed for 4037, the Wilcox property

13   or the Fulton property?

14   A.  I did not.

15   Q.  Okay.  And I'm going to show you the part that we skipped

16   over for a minute in Badalian 1.  That's the deed you received

17   for that property, right?

18   A.  Correct.

19   Q.  That property being 4126 West Adams.

20   A.  Yes.

21   Q.  And that deed is dated July --

22   A.  30 of July 2013, yes.

23   Q.  Now, when you got the property, what did you do?  When you

24   got the deed to that property.  We'll talk about the other

25   property in a minute.  Let's talk about this property.

1  A.  So I got the property deed, the deed to the property.  I

2  was like, okay, that's a good sign.  At least I got one title.

3  And at that time those four properties were in play, meaning my

4  understanding was they are closer to getting title to those

5  four properties.  It was -- they were further along, for lack

6  of a better word.

7          So then I got 4126.  I said, okay, great, I got one.

8  And then hopefully the other ones will come through.

9          When I went back to Chicago in summer of 2013 to

10  discuss the -- you know, these issues with Mr. Rossini and

11  Babajan, I went to see this 4126 property.  And it was

12  basically gutted.  It was just, you know -- you know, lot of

13  damage to the property.  Graffiti everywhere.  You know, all

14  basically pipes ripped off, electricity.  You know, I mean,

15  there was just nothing left of the property, to say the least.

16  Q.  Did it appear to be rented?

17  A.  Pardon?

18  Q.  Did it appear to be rented?

19  A.  No.

20  Q.  Okay.  Did it appear to be abandoned?

21  A.  Yes.

22  Q.  Now, you continued in August of -- continued to request

23  updates on the titles to the other properties, right?

24  A.  Correct.

25  Q.  I'm going to show you Badalian 13.  Do you recognize

Badalian - direct                        79

1   Badalian 13, sir?

2   A.  Yes, I do.

3   Q.  And is that another e-mail between you and Mr. Rossini from

4   August of 2013?

5   A.  Yes.

6   Q.  Does it fairly and accurately depict the conversation you

7   had via e-mail on that day?

8   A.  Yes, it does.

9          MR. NOVAK:  Your Honor, I offer Badalian 13 into

10  evidence and ask permission to publishing it to the jury.

11         THE COURT:  Any objection?

12         MR. FRANKEL:  No objection.

13         THE COURT:  Badalian 13 is entered in evidence.

14     (Said exhibit was received in evidence.)

15  BY MR. NOVAK:

16  Q.  And this is another e-mail that you had on -- appears to be

17  August 9 of 2013?

18  A.  Correct.

19  Q.  And this is from Mr. Rossini to you?

20  A.  Yes.

21  Q.  What is Mr. Rossini saying in this e-mail?

22  A.  Says:  Robert, I will record the remaining titles on Monday

23  and send to you.  It took a while to get the encumbrances taken

24  care of, and that will be done by Monday morning.

25         Also, will give you and other investors a Tom, meaning

Badalian - direct                    80

1    Tom Murphy, update by mid-week.  I've spoken to the lawyer for
2    the three Arthington properties, and there may be some movement
3    there.  Will call you -- will call them again on Monday.
4    Q.  Okay.  Now, let's start with the remaining titles.  On
5    Monday.  When Mr. Rossini is referencing the remaining titles,
6    what do you understand that to be?
7    A.  The 5410 Fulton and the Wilcox properties that we were
8    discussing.
9    Q.  And he mentions in the next sentence that there were some
10   encumbrances on the property.  Were you aware of any
11   encumbrances on those properties?
12   A.  No.
13   Q.  Okay.  And then it says, there was a Tom update.  What did
14   you take that to mean?
15   A.  It would be update regarding Thomas Murphy.
16   Q.  And then the last sentence he talks about the lawyer for
17   the three Arthington properties and get some movement.  Did you
18   take that to be about the three just --
19   A.  The three Arthington properties we discussed, yes.
20   Q.  Okay.  What did you understand Mr. Rossini was trying to do
21   with the three Arthington properties?
22   A.  My understanding from -- is that he was talking to the
23   lawyer representing those properties and was trying to get him
24   to expedite this transfer of note.
25   Q.  Now, in this e-mail, Mr. Rossini mentions I believe it was

Badalian - direct                                    81

1    he would get you the remaining titles, record the titles on a

2    Monday.  Did you get those titles --

3    A.  No.

4    Q.  -- within the week or so?

5    A.  No.

6    Q.  I'm going to show you Badalian 14.  Do you recognize

7    Badalian 14, sir?

8    A.  Yes, I recognize this, yes.

9    Q.  Is this another e-mail communication between you and Mr.

10   Rossini in late August of 2013?

11   A.  Yes.

12   Q.  Does it fairly and accurately depict the communication that

13   you two had over e-mail at that time?

14   A.  Yes.

15          MR. NOVAK:  Your Honor, I offer Badalian 14 into

16   evidence and ask to publish it to the jury?

17          THE COURT:  Any objection?

18          MR. FRANKEL:  No objection.

19          THE COURT:  Badalian 14 is entered in evidence.

20       (Said exhibit was received in evidence.)

21   BY MR. NOVAK:

22   Q.  So again, we will start from this page on the bottom.  This

23   first is an e-mail that you sent to Mr. Rossini, right?

24   A.  Correct.

25   Q.  And in this you're asking him about, again, an update on

Badalian - direct                    82

1    those three properties, right?

2    A.   Correct.

3    Q.   So Mr. Rossini gave you a response.  What was his response?

4    A.   Says:  I am getting each turned over without a lien.  It's

5    the only thing I have gotten true cooperation from Murphy's

6    firm on.  I thought I could have gotten it done prior to the

7    end of July, but was impossible.  You should have the deeds

8    sometimes during next week.

9         I will meet with Mike, building manager, and go over

10   each and turn over all the files that I have to him.  Murphy's

11   old law firm will have a box of info and releases of us -- for

12   us on these properties by Tuesday or Wednesday morning.  So I

13   can get them recorded.  I will send you added info on

14   Arthington and Montrose when I get back to the office later

15   today.

16   Q.   Now, after this e-mail did you get the deeds to those three

17   properties?

18   A.   I did not.

19   Q.   And I'm going to ask you, did you ever get the deeds to

20   those three properties?

21   A.   I did not.

22   Q.   Did you ever at any point agree -- were you aware if there

23   were any mortgages or other encumbrances taken on those three

24   properties after you invested in them?

25   A.   During my kind of regular checking on those properties

Badalian - direct                    83

1    through county assessor's office, I learned that one of the

2    properties, I --

3                MR. FRANKEL:  Objection to foundation and this

4    information he just learned.

5                THE COURT:  Sidebar.

6         (Sidebar proceedings out of the hearing of the jury:)

7                THE COURT:  What's the basis for the objection?

8                MR. FRANKEL:  I object to the foundation --

9                THE COURT:  You have to talk a little bit more --

10               MR. FRANKEL:  I object to the foundation on this.

11   He's just -- there is no date, how, time or place.  He is just

12   saying he learned this information.  I think it needs to be

13   more specific to be admissible, rather than just general

14   information that came to him through checking.

15               MR. NOVAK:  He's saying he checked the county

16   assessor.  He's given the foundation.  He checked the county

17   assessor's website to learn there was a mortgage taken out on

18   the property, that he did not permit an encumbrance to be made

19   on the property by Mr. Rossini.

20               MR. FRANKEL:  When did he check?  Was -- where was he

21   when he checked it?  What date was it?  I mean --

22               MR. NOVAK:  I think this is going on -- I will ask him

23   those questions.  I think that we will -- I don't know if we're

24   going to get like a precise I checked on November 3 at 3:00

25   o'clock in the afternoon.  They are going to get, during the

Badalian - direct                          84

1  course of waiting the two years for my properties to come, I

2  will check up on them, and I found this encumbrance.

3          THE COURT:  Mr. Frankel would like some more

4  specificity with regard to foundation, the basis of his

5  objection.  And so I am going -- I'm going to sustain that

6  objection.  I don't think you need the time and the date

7  exactly where he was, but I think some more foundation is

8  warranted.

9          MR. NOVAK:  Fine.

10     (Further proceedings within the hearing of the jury:)

11          THE COURT:  Go ahead.

12          MR. NOVAK:  Thank you, your Honor.

13 BY MR. NOVAK:

14 Q.  So, Mr. Badalian, with regard to the properties on Fulton,

15 and Wilcox and 4037 West Adams --

16 A.  Yes.

17 Q.  -- you invested in those properties in the -- was between

18 May and September of 2011?

19 A.  Correct.

20 Q.  And what -- during the time that your investment was

21 pending and during the time we have been talking about, would

22 you use -- check public -- publicly available databases like a

23 recorder of deeds or county assessor's website about those

24 properties?

25 A.  Yes.  Yes.

Badalian - direct                                85

1   Q.   And what was the purpose of you checking up on those

2   properties?

3   A.   Just to track the title transfer, like if it was pending

4   from one person to the other, so I would get some sort of like

5   verified movement on those notes and --

6   Q.   Did you check those properties during the beginning of your

7   investment, as -- as -- did you check those -- that -- those

8   websites at that time, the beginning of your investments?

9   A.   Not so much in the beginning.  But after kind of these

10  rents didn't -- stop coming, and we've -- I figured that

11  something is not right, then, you know, my anxiety level went

12  up quite a bit on these investments.  And I started tracking

13  more closely to validate or verify my communication with Bert.

14  And to if it's, you know, just something really true or

15  something just, you know, communication.

16  Q.   And, for example, some of the communications you told us

17  about were these e-mails in June and August of 2013, like the

18  one I'm showing you here on Badalian 12, where Mr. Rossini

19  says, the titles will be transferred to you, right?

20  A.   Yes.

21  Q.   And did you then increase the frequency that you were

22  checking those -- the Cook County Recorder of Deeds, or Cook

23  County Assessor's website?

24  A.   Well, yeah, after this e-mail, because I was expecting a

25  title transfer, I went to check to see what's actually

Badalian - direct                                     86

1  happening with those titles, to see if it's transferred to my

2  name and not, you know.  So I did check, yes.

3  Q.  And so the checks we've been talking about, did there come

4  a point where you -- did you learn anything about any

5  encumbrances or mortgage that were taken out on any of those

6  two properties?

7  A.  Yes, I did find out, yes.

8  Q.  What did you learn?

9  A.  I found out that on one of those properties -- and I don't

10  exactly recall.  I had it in my notes.  I believe it was, I

11  want to say, 4037 West Adams.  But I am not certain.

12         But on one of these properties, there was another

13  mortgage against the property made to another gentleman on the

14  same note.  It was in amount of 250 K plus.  I don't exactly.

15  It might be two, 300.  But around that large figure number,

16  yes.

17  Q.  When you said 250 K, you mean it was in the amount of

18  $250,000 or more?

19  A.  Yes, $250,000.

20  Q.  Go ahead, sir.

21  A.  And then that -- I brought that to the attention of Bert

22  Rossini when we met with him, because I find out before meeting

23  them in summer of 2013.  I found out that there was this other

24  mortgage on one of the notes that I paid for -- towards.

25         So I asked Mr. Rossini why this is note.  And he kind

Badalian - direct                87

1   of sort of brushed it off.  This is kind of a short-term money

2   we needed to get for our operations.  And we will return this

3   money back, and the note will be clear.

4   Q.  Did you authorize any mortgages on those properties?

5   A.  I did not.

6   Q.  Okay.  Now --

7          MR. NOVAK:  One moment, please.  Your Honor.

8      (Brief pause.)

9   BY MR. NOVAK:

10  Q.  Now, what did you decide to do after -- in the fall of 2013

11  as a result of what you -- the explanations you were getting

12  from Mr. Rossini about your investments?

13  A.  So after our discussions, when Raymond and I went there,

14  and we had that face-to-face meeting, we figured that we are

15  not really getting a straight answer or clear answer to any of

16  our questions.  And when we went back to California, we met

17  with other investors.  We had a meeting.  We gave them an

18  update of what had taken place, what we discussed, what had

19  happened.

20         And shortly after we started looking for a law firm

21  that will represent us, because we figured it's -- we can't do

22  this on ourselves.  We need some legal -- some attorney to

23  represent us and push this forward.

24  Q.  Okay.  And did you eventually retain an attorney?

25  A.  Yes, we did.

Badalian - direct                    88

1    Q.   And did you -- what did you do after retaining an attorney?

2    A.   So after we retained the attorney, we gave him copies of

3    all the documents and communications we had with the -- Mr.

4    Rossini, Babajan and copies of the cashier checks, copies of

5    the rents received through Reliant, you know, anything that

6    would strengthen our case or accounting suit against Rossini,

7    Babajan and Murphy.

8    Q.   And did you eventually file a lawsuit against Mr. Rossini?

9    A.   Yes, we did.  In November 2013, if I'm not mistaken.

10   Q.   Okay.  And --

11        MR. NOVAK:  One moment please, your Honor.

12        (Brief pause.)

13   BY MR. NOVAK:

14   Q.   So, sir, is that lawsuit still pending?

15   A.   No, we -- they -- we stopped the lawsuit.  After initial

16   payments toward this cause and constant delays from Bert

17   Rossini, Thomas Murphy, not showing up to the court or not

18   participating in this process, we spent close to $45,000 in

19   legal fees.  And then our -- we had discussion with our lawyer

20   that was -- would be the next steps and potential cost to move

21   the case forward.  He advised us that it can be anywhere from

22   40, $60,000 for court fees, but that's just the very

23   preliminary estimate.  It can be much higher.

24        And after our discussions again with -- internally

25   with California investors and seeking his counsel in terms of

Badalian - direct                89

1   what was the likelihood that we will get to any bottom of this,

2   he advised us that he sees a very low probability of success.

3   And we decided to stop the suit at that time and not throw in

4   another 60, hundred thousand dollars in legal fees in this

5   case.

6   Q.   Okay.   Now in total, how many properties did you invest in

7   with Mr. Rossini and Mr. Khoshabe and this investment program?

8   A.   Ten properties.

9   Q.   And approximately how much money did you invest in total in

10  this investment program?

11  A.   $785,000.

12  Q.   And approximately how much money did you -- and so you kept

13  records of your investments, right?

14  A.   Correct.

15  Q.   And you kept records of the rents you received and any

16  money you may have taken in from this property?

17  A.   Yes.

18  Q.   And have you been able to calculate an estimate of how much

19  money you made back in this investment program?

20  A.   Well, it was some rent money, as you mentioned, about

21  256,000 rent.   But at the end I lost around $500,000.

22  Q.   And you said you invested in ten properties, right, in

23  notes for ten properties?

24  A.   Ten properties, correct.

25  Q.   And was it your expectation that you would get the titles

Badalian - direct                    90

1   to those properties?

2   A.   Mostly.  Or if I didn't get the title, I would get the

3   money back.

4   Q.   Did you receive -- how many titles did you receive

5   properties to of the ten that you invested in?

6   A.   One.

7   Q.   And you just said that your -- when you talked with the

8   lawyer that you had retained for your private suit, that he

9   advised you there's a low probability of success.  Did you --

10  did you want to clarify?  Did that mean in retaining money or

11  in winning the lawsuits?  Or do you know?

12  A.   It was mostly if we go to the trial, and that even we find

13  judgment for us, that the probability of recovering your money

14  would be very low.

15          MR. NOVAK:  Okay.  Nothing further, your Honor.

16          THE COURT:  All right.  Before we commence with the

17  cross-examination, it's almost 12:30.  Let's go and take our

18  lunch break.

19          So, ladies and gentlemen of the jury, we will break

20  approximately an hour for lunch.  We will reconvene at 1:30.

21  Please be in the jury room by 1:30.

22          During the break, please do not discuss this case with

23  one another, or with anyone else for that matter.  Please do

24  not do any independent research regarding any of the issues

25  that you have heard discussed in this case.

1        Thank you very much for your attention this morning.

2    (Jury exited the courtroom.)

3        THE COURT:  Mr. Badalian, during the break please do

4    not discuss the substance of your testimony with anyone.

5        THE WITNESS:  Yes.

6        THE COURT:  Thank you.

7        At this point, Mr. Frankel, how long do you expect on

8    cross?

9        MR. FRANKEL:  I think about half hour.

10       THE COURT:  Okay.  And then who else do we have lined

11   up for today?

12       MR. NOVAK:  We have Mr. Moghaddasi lined up today.

13   His -- we just need to make -- he has his high school -- his

14   son's high school graduation tomorrow.  So we were hoping to

15   get him in and out.  I don't think he'll be as long as Mr.

16   Badalian on direct.

17       THE COURT:  Is Mr. Badalian more or less the longest

18   direct witness that you have?

19       MR. NOVAK:  Definitely --

20       MR. HOGSTROM:  As for the investors, yes.

21       MR. NOVAK:  I think so.

22       THE COURT:  Okay.  Obviously we'll have --

23       MR. HOGSTROM:  There may be one investor, but that --

24   who's longer, but she's later in the trial.

25       THE COURT:  Okay.  All right.  And so do you think

1    that with the next witness that will basically take up the

2    whole day?

3         MR. NOVAK:  Probably close to it, between this direct

4    and cross.  We have Mr. Yousif from yesterday.  We have a third

5    witness that we can, who's ready to go today if we need a third

6    witness, if we somehow end short enough for a third witness.

7         THE COURT:  All right.  Very good.  Thank you.

8         (Trial recessed until 1:30 o'clock p.m. of the same day.)

9                         CERTIFICATE

10        I HEREBY CERTIFY that the foregoing is a true, correct

11   and complete transcript of the proceedings had at the hearing

12   of the aforementioned cause on the day and date hereof.

13

14   /s/Alexandra Roth                        6/7/2018
     _____    _____
15   Official Court Reporter                   Date
     U.S. District Court
     Northern District of Illinois
16   Eastern Division

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )      Docket No. 15 CR 515-1
                                      )
 4              Plaintiff,            )
                                      )
 5    v.                              )      Chicago, Illinois
                                      )      June 5, 2018
 6   ALBERT ROSSINI,                  )      1:30 o'clock p.m.
                                      )
 7              Defendant.            )

 8                            VOLUME 1B
                   TRANSCRIPT OF PROCEEDINGS - TRIAL
 9          BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10   APPEARANCES:

11   For the Government:       HON. JOHN R. LAUSCH, JR.
                               United States Attorney, by
12                             MR. ERIK A. HOGSTROM
                               MR. WILLIAM PATRICK NOVAK
13                             Assistant United States Attorneys
                               219 South Dearborn Street
14                             Chicago, Illinois  60604

15   For the Defendant:        LAW OFFICES OF JOSHUA B. ADAMS,
                               P.C., by
16                             MR. JOSHUA B. ADAMS
                               53 West Jackson Boulevard
17                             Suite 1515
                               Chicago, Illinois  60604
18
                               FRANKEL & COHEN, by
19                             MR. SCOTT JAY FRANKEL
                               53 West Jackson Boulevard
20                             Suite 1615
                               Chicago, Illinois  60604
21

22                        ALEXANDRA ROTH, CSR, RPR
                            Official Court Reporter
23                        219 South Dearborn Street
                                 Room 1224
24                        Chicago, Illinois 60604
                              (312) 408-5038
25
```

Badalian - cross

```
 1            THE CLERK:  15 CR 515, United States of America v.
 2   Rossini.
 3            THE COURT:  Do we have our witness, Mr. Novak?
 4            MR. NOVAK:  Yes, I'll get him.
 5      (Brief pause.)
 6            THE COURT:  I want to remind you, sir, you're still
 7   under oath.
 8            THE WITNESS:  Yes.
 9            THE COURT:  Okay.  You can bring them in.
10      (Jury in.)
11            THE COURT:  You may proceed.
12       ROBERT BADALIAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
13                        CROSS-EXAMINATION
14   BY MR. FRANKEL:
15   Q.  Good afternoon, Mr. Badalian.
16   A.  Good afternoon.
17   Q.  How are you?
18   A.  I'm well.  Thank you.
19   Q.  I'm Scott Frankel and I represent Mr. Rossini.
20   A.  Okay.
21   Q.  We've never met before, correct?
22   A.  Correct.
23   Q.  And we've never talked about this case before; is that
24   correct?
25   A.  Correct.
```

Badalian - cross

95

1   Q.  Okay.  You met with the government before you testified

2   here today?

3   A.  Yes.

4   Q.  Okay.  I want to ask you some questions a little bit about

5   your background.

6           You said that you met Fred Khoshabe at University of

7   Illinois, right?

8   A.  Correct.

9   Q.  And that was back in 19- -- how long ago?  1985?

10  A.  No.  It was when I was going to University of Illinois at

11  Chicago.  I would say '78, '79 time frame.

12  Q.  '78 or '79?

13  A.  Correct.

14  Q.  And do you remember what he was studying?

15  A.  Also electrical engineer.

16  Q.  Okay.  So he's an electrical engineer?

17  A.  Yes.  We had some classes together --

18  Q.  Okay.

19  A.  -- at that time.

20  Q.  And you're an electrical engineer, correct?

21  A.  That's correct.

22  Q.  And what year did you graduate?

23  A.  In '81.

24  Q.  And after you graduated in 1981, what did you do?

25  A.  Went back to -- well, I went to San Jose with my sister,

Badalian - cross

1   who also graduated.  And then -- so we headed to San Jose

2   because I wanted to be in the electrical electronics industry,

3   semiconductors, and that's where it was.

4   Q.  And you got a job out in San Jose; is that correct?

5   A.  Yes, that's correct.

6   Q.  And where were you employed?

7   A.  My initial semiconductor-related job was at a company

8   called Exar, E-x-a-r.

9   Q.  Okay.

10  A.  And then I went to another company after that to -- a few

11  companies over the past, you know, 25 years plus, 30 --

12  Q.  Okay.

13  A.  -- years plus.

14  Q.  And you left one company to go to another company to take

15  on more responsibility?

16  A.  Well, it's probably not -- more responsibility, promotion

17  opportunity.  After approximately five years at Exar, I went

18  to a start-up and -- but that didn't go -- I mean, they didn't

19  get their funding.  And then after that, I went to another

20  company called Maxim Integrated Products.  I was there for

21  approximately 12 years.  Then I went to another start-up, and

22  they got purchased by Cypress Semiconductor so I ended up at

23  Cypress Semiconductor.  After Cypress, I came back -- I went

24  back to Maxim again for another eight years.  And then I left

25  Maxim in 2012 and went to another company called Invensys for

Badalian - cross

1   two years.  And then I went to Freescale Semiconductors, and

2   they got purchased by NXP Semiconductors.  And I was at NXP

3   until about two months ago.  And then I'm at a new company

4   called NextInput.

5   Q.  Okay.  And these are all semiconductor businesses?

6   A.  That is correct.

7   Q.  And what exactly is a semiconductor?

8   A.  It is making different circuits on a silicon subframe, so

9   you can make computer chips or other related products.

10  Q.  Okay.  And you mentioned that some of these companies were

11  start-ups?

12  A.  Some were start-ups, yes.  Smaller companies that hadn't

13  gone public.

14  Q.  Okay.  And some of the start-ups had investors; is that

15  correct?

16  A.  To my understanding, yes.  They --

17  Q.  And some of the start-ups you worked -- where you worked

18  were successful and others not so much, correct?

19  A.  That's correct, yeah.

20  Q.  It was -- working in the tech industry is a -- can be

21  risky as an investment, correct?

22  A.  As a start-up you can say yes, it has higher risk than --

23  Q.  Okay.

24  A.  -- established companies.

25  Q.  You -- when you went out to San Jose, you connected with

1    the Assyrian community out there?

2    A.   Correct, yes.

3    Q.   And you said you went out there with your sister?

4    A.   Yes.

5    Q.   Is she an engineer as well?

6    A.   No.  She is accounting background.

7    Q.   Okay.  And did the Khoshabes move out there too or how did

8    you get to stay in touch with them?

9    A.   He also moved to San Jose.  After he graduated, he moved

10   out to San Jose I think about six months after I graduated.

11   So he also graduated from University of Illinois.  And I met

12   him again in San Jose in the Assyrian community, and we kind

13   of kept in touch, you know --

14   Q.   Okay.

15   A.   -- after that.

16   Q.   And you stayed friends?

17   A.   Yes, yes.

18   Q.   Okay.  And he had -- Fred had a relative Babajan Khoshabe,

19   correct?

20   A.   That's his brother, yes.

21   Q.   And they -- when did you first meet Babajan Khoshabe?

22   A.   I would say the first time would be at my sister's

23   wedding.

24   Q.   And when was that?

25   A.   That was 1985.

Badalian - cross

99

1   Q.  Okay.  So you had known Babajan for a long time, correct?

2   A.  That's when I met him.  And then I had few run-ins with

3   him, acquaintances to family parties, get-togethers.  But I

4   didn't know him, I mean, as I know Fred of course.  I've spent

5   more time with Fred.  But Babajan, I met him a few times, yes.

6   Q.  Okay.  Well, as a friend, as an Assyrian, as a fellow

7   member of your church, you trusted Fred Khoshabe; would you

8   say that?

9   A.  Yes.

10  Q.  And that trust extended to his brother Babajan Khoshabe?

11  A.  To -- yes, yeah.

12  Q.  You told us that at some point you met Babajan Khoshabe at

13  a college graduation party?

14  A.  Correct.  It was my niece's graduation party.

15  Q.  And where was that?

16  A.  In San Jose.

17  Q.  At somebody's house?

18  A.  It was an outside venue.  They rented a hall to have this.

19  It was about a hundred people.  So it was a big crowd, yeah.

20  Q.  Okay.  And you ended up, at some point during this party,

21  talking to Babajan Khoshabe, correct?

22  A.  That's correct.

23  Q.  Was Fred there when you had this conversation?

24  A.  I don't believe so.

25  Q.  And at this conversation, that was the first time he

Badalian - cross

1   mentioned to you that he had been investing in real estate?

2   A.   That's where he mentioned first time this opportunity that

3   there are these notes that I could invest in.  He said these

4   are like properties that are going to foreclosure, and there's

5   an opportunity to invest in acquiring the notes; and that if I

6   would be interested in coming to Chicago and taking a look for

7   myself.  I said, yeah, that sounds like a good idea.  I can

8   take a look at it.  I can decide whether I want to invest or

9   not, but at least take a look at it.  And that's how the

10  conversation went.

11  Q.   Okay.  He didn't -- he didn't offer you investment in real

12  estate, but he explained that you'd be investing in notes; is

13  that right?

14  A.   The explanation was -- yes, these would be the notes that

15  you would purchase because these are properties that are going

16  to foreclosure; and that at some time going through the

17  process that I would get titles to some of them, maybe not all

18  because some of the titles might not be convertible, going to

19  the original owner.  But that's the brief discussions we had.

20  Once I met him again in Chicago, we had more detailed

21  discussion.

22  Q.   Okay.  At that conversation your understanding was that

23  you would be investing in notes, mortgage notes, and not the

24  actual real estate itself, the underlying property?

25  A.   It would be paying for the notes for those properties,

 1   yes, that's --

 2   Q.  And there was some uncertainty on whether those notes

 3   could be turned into ownership of property, correct?

 4   A.  Correct.

 5   Q.  Okay.  And Babajan was explaining -- Babajan Khoshabe was

 6   explaining to you the process of turning the notes into

 7   ownership of property, correct?

 8   A.  Babajan's explanation was more of an opportunity to invest

 9   in these properties, slash, notes, purchasing the notes.  And

10   then afterwards, when I went to Chicago to actually see these

11   properties, I met him and also Mr. Rossini; and together they

12   were explaining this process of how it -- the process will go

13   forward.

14   Q.  You understood that the properties they were talking

15   about, some of them were in foreclosure proceedings, correct?

16   A.  That was my understanding, yes.

17   Q.  Okay.  And by buying the note, you were not buying the

18   property, right?

19   A.  The way it was explained to me, that you would be -- they

20   would -- with the money that I'm investing, they would buy the

21   note and then transfer the title to the note holder, which

22   would be me at the end of the day.

23   Q.  But that would require a process, a legal process,

24   correct?

25   A.  Correct.  They say it takes six to nine months typically

Badalian - cross

1   to get legal title to the property.

2   Q.   Okay.  And a lawyer would have to be involved in pursuing

3   getting legal title?

4   A.   They didn't mention, like, a lawyer, I think.  But I guess

5   later on Thomas Murphy was introduced as the legal arm, that

6   he would be responsible for converting the notes and -- to the

7   title.

8   Q.   Okay.  Well, did you understand that a foreclosure

9   proceeding is a legal process?

10  A.   Is a legal process?

11  Q.   Yes.  Did you understand that?  Did you ask about that?

12  A.   I didn't ask specifically about it, but I -- from what I

13  looked into, it was that the owner of the original -- current

14  owner of the property has a right to -- even in foreclosure --

15  to take care of whatever got him into foreclosure and gain the

16  title back.  Even if somebody has a note, he can pay the note

17  and gain the title back.

18  Q.   Okay.  But --

19  A.   That was my understanding.

20  Q.   So you didn't understand or know that a foreclosure

21  process takes place in a -- in court?  Did you not know that?

22  A.   I didn't know the details of foreclosure process to that

23  extent.  I had a very -- like a general view of it, but I did

24  not have detail understanding of what happens at every step.

25  Q.   Okay.  And you were relying on what Babajan -- and you

Badalian - cross

1   said you met with Rossini -- what they were telling you; is

2   that right?

3   A.  Correct.

4   Q.  And you trusted Babajan because of your relationship with

5   him?

6   A.  With his brother and by extension with him, yes.

7   Q.  Okay.  Now, didn't you -- after you found out about Thomas

8   Murphy being the lawyer involved in this, didn't you do a

9   little research on Thomas Murphy?

10  A.  I looked up the law firm that he was at; and I saw his

11  picture on the -- you know, their website.  He was listed as

12  an attorney working at BNF if I'm not mistaken, the law firm,

13  and --

14  Q.  Would that be Berger Newmark & Fenchel, BNF?

15  A.  Yes, correct.

16  Q.  Okay.

17  A.  And this was kind of a big law firm in Chicago.  So I

18  figured that added credibility.  Okay, he's working at this

19  law firm and he's involved with this investment, so it gave me

20  a little peace of mind.

21  Q.  It gave you peace of mind to look him up online on the --

22  in the internet, and you saw that he was associated with a

23  legitimate law firm; is that right?

24  A.  Yes.

25  Q.  Okay.  You told us that you came to Chicago in 2011 to

Badalian - cross

1   look around; is that right?

2   A.   Correct.   It was the first time I think toward the end of

3   May of 2011.   After my initial conversation with Babajan, he

4   recommended that I come here and take a closer look myself at

5   the properties; and I came down for that purpose.

6   Q.   Okay.   And you flew from San Jose and --

7   A.   Into O'Hare.

8   Q.   -- did Babajan Khoshabe pick you up at the airport?

9   A.   I think that's my recollection.

10  Q.   Okay.

11  A.   I might have taken like a cab to his place, but I remember

12  him picking up.

13  Q.   And you were shown three properties?

14  A.   Correct.

15  Q.   And you told us on direct examination that you believed

16  that it was Babajan Khoshabe who drove you around?

17  A.   That's my recollection.

18  Q.   Okay.   And, in fact, you also said on direct that you had

19  invested in scavenger sale properties with Babajan Khoshabe;

20  is that right?

21  A.   Prior to this, yes.

22  Q.   And what's your understanding of a scavenger sale?

23  A.   I mean, not too much.   It was that the properties that

24  have back -- they haven't paid taxes on those properties, they

25  have back paid amount of tax due.   When the owner -- property

Badalian - cross

1  owner doesn't pay those taxes, those properties go on a sale.

2  And that what this is called, like, scavenger's tax sale, if

3  I'm understanding correctly.  And that Babajan was involved in

4  that.  He would go to these scavenger sales, pick up

5  properties of interest of -- that can be high value and

6  selling at a discount and pick up the tax, I guess, notes.  I

7  don't know the exact terminology.  But participate in those

8  scavenger sales and acquire some of those properties and go

9  through the process of then later on acquiring title for those

10  properties.

11  Q.  Okay.  And did you get the titles of those properties

12  during the --

13  A.  No, I didn't.

14  Q.  No, you didn't.  Okay.

15      Do you know if Babajan Khoshabe actually did purchase

16  properties in scavenger sales?

17  A.  He told me that he purchased few.  And then later on when

18  I follow up with him, he said that they didn't go through --

19  they didn't amount to too much.  And that he send me a

20  recording of the expenses he had done, amounts paid or

21  expenses he has and deducted it from the original amount that

22  I had paid him and he returned the rest.

23  Q.  And did you recall -- can you recall as you're sitting

24  here testifying today how much you gave him to purchase

25  properties in the scavenger sale?

Badalian - cross

1    A.  I recall around $20,000 or something like that.

2    Q.  Okay.  And so did you get any of your investment back?

3    A.  I got about half back, 10,000 back.

4    Q.  Okay.

5    A.  Or roughly 10,000.

6    Q.  Did Babajan Khoshabe ever show you any documents that

7    showed that he had actually bought any properties in the

8    scavenger sales?

9    A.  He sent me some records that he participated in those

10   notes and which properties they were.  And I think that when I

11   came here -- came back to Chicago the second time, he actually

12   drove me to some of those, that this is kind of the thing that

13   I also --

14   Q.  Okay.

15   A.  -- was one of the properties that we're trying to get, you

16   know, through that scavenger sale.

17   Q.  He showed you -- he drove you around?

18   A.  He drove me around, yeah.  He showed me --

19   Q.  And the document he gave you was just the expense sheet

20   that he said he had as part of the scavenger sale process,

21   right?

22   A.  Yes.

23   Q.  He never really gave you -- he never showed you a deed or

24   a bill of sale or anything relating to that scavenger sale?

25   A.  It was some info related, but I didn't see an official

Badalian - cross

1    deed of --

2    Q.   Okay.

3    A.   -- transfer because scavenger sale, I didn't know what the

4    process of in terms of when you participate in it, any part of

5    the tax or the lien on the property, what document you get.

6    Q.   Okay.

7    A.   I didn't know.

8    Q.   So as you're sitting here right now, it's safe to say you

9    don't know if he actually did participate in that scavenger

10   sale process?

11   A.   I can't say for sure that he did.

12   Q.   Okay.  So you ended up going forward and investing in some

13   properties.  And I think Badalian No. 1 was shown to you on

14   direct, and that was the first -- the first check that -- set

15   of checks that you wrote to get involved in this investment?

16   A.   Correct.  These are the first checks for 4126 West Adams.

17        MR. FRANKEL:  Judge, if the record could reflect I

18   have placed Government Exhibit 1 -- or Badalian 1 on the Elmo

19   to show to the witness.

20        THE COURT:  So noted.

21        MR. FRANKEL:  Thank you.

22   BY MR. FRANKEL:

23   Q.   So there are actually two checks here.  One is for 7500.

24   And it says in quotes Bert Rossini, correct?

25   A.   That's correct.

Badalian - cross

1    Q.  And the second one is for 35,000.  And that says in

2    quotes, at some point, Thomas Murphy, agent, correct?

3    A.  Correct.

4    Q.  So Thomas Murphy got the bulk of this initial amount of

5    money obviously?

6    A.  It seems, yes.

7    Q.  Yes.  Okay.  And there's a notation 4126 West Adams

8    Street?

9    A.  That is correct.

10   Q.  That -- that property was the property you told us that

11   you actually received the deed for; is that right?

12   A.  Correct, in 2013 sometime.

13   Q.  Okay.  And you were shown -- this is part of group exhibit

14   Badalian 1.  Showing it to you on the Elmo.  And that's the

15   quitclaim deed you got for this property, correct?

16   A.  That is correct.

17   Q.  4126 West Adams Street?

18   A.  Yes.

19   Q.  Okay.  This document was prepared by Anthony Klytta.  Do

20   you know who that is?

21   A.  No, I don't.

22   Q.  Okay.  Are you aware that he's an attorney?

23   A.  I was not.

24   Q.  Okay.

25          When Babajan was driving you around in 2011 right

Badalian - cross

1     before you made those first investments, did you drive by this

2     address, 4126 West Adams?

3     A.   Those are the properties I drove by, yes.

4     Q.   Okay.  You actually did see that?

5     A.   I saw them.  I took pictures of them.  I was in the

6     neighborhood, checking out the neighborhood, status of the

7     condition of the neighborhood, you know.  Just, building is

8     nice, curtains, people kind of walking about, neighborhood is

9     not trashy or something.  So it was like okay, you know, it's

10    not like -- it's not Northbrook but, hey, this is not bad.

11    Q.   It's definitely not Northbrook.

12    A.   No, it's not.  But, you know, it's -- these are distressed

13    properties.  And it wasn't -- you know, it was a high school

14    close by, a church close by, people going about their

15    business.  So it's like, yeah, okay, not bad, you know.

16    Q.   And then as -- by contrast when you went and looked at the

17    property after you got ownership in 2013, you said it had been

18    trashed and gutted?

19    A.   Yes.

20    Q.   Okay.  You don't know who did that?

21    A.   No.  Squatters.  I don't know.

22    Q.   When you first looked at the property, it seemed clear to

23    you that people were renting the property --

24    A.   Correct.

25    Q.   -- and it was being taken care of?

Badalian - cross

1    A.  Yes.

2    Q.  Okay.

3            After you sent the money, you received a guaranty

4    agreement -- something called a guaranty agreement?

5    A.  Yes.

6    Q.  And this -- the guaranty agreement -- I'm showing you on

7    the Elmo what the government previously marked as Badalian

8    No. 3.  And you identified this document on direct

9    examination?

10   A.  Yes, this the guaranty agreement.

11   Q.  Okay.  The document says that you -- that Albert Rossini

12   acknowledges that he has presented to Robert Badalian certain

13   parcels of real property for Badalian to purchase.

14           He -- it doesn't say he sold those properties to you;

15   is that correct?

16   A.  No.  I mean, that's what it says, yes.

17   Q.  It says he presented them.  In other words, he showed you

18   these properties, which he did do; is that right?

19   A.  Correct.

20   Q.  It says that he asked you to advance funds to be used to

21   purchase properties pursuant to assignments; is that correct?

22   A.  Yes.

23   Q.  And Mr. Rossini is acknowledging that you have advanced

24   funds on several properties, correct?

25   A.  Yes.

Badalian - cross

1   Q.  And you acknowledged that once a property is closed, the

2   title to that property shall be deeded to you or to someone as

3   you shall direct, correct?

4   A.  That is correct.

5   Q.  And you told us that you did receive the deed on one of

6   the properties, correct?

7   A.  That is correct.

8   Q.  And the other properties you didn't receive the deeds to,

9   right?

10  A.  That is correct.

11  Q.  And those properties never closed as far as you know;

12  isn't that true?

13  A.  I'm not aware if they did or not.

14  Q.  Okay.  You didn't follow up on that?

15  A.  Well, I was following up with Mr. Rossini and Babajan.  I

16  wasn't getting any information on those, what the status was

17  on those properties.

18  Q.  Well, you know that real estate transactions are public

19  transactions and --

20  A.  I was -- as I was saying -- stating earlier, from time to

21  time, I would check the county assessor's office to see

22  movement in title from the original owner to some other

23  entity.  And in that process, I learned that the -- that three

24  of those properties of the four were granted title under Devon

25  Investments, which is an entity that Mr. Rossini owns.

Badalian - cross

1   Q.  Right.

2   A.  So then I brought it up, that why these properties are

3   under Devon Investments rather than Robert Badalian since I

4   paid for those notes.  And there was some e-mail exchange as

5   was shown earlier on that.

6   Q.  Right.  And you ended up getting the 4126 property; is

7   that right?

8   A.  That's the one I got, yes.

9   Q.  Okay.

10          And then it says that Badalian agrees that Rossini

11  may use the funds advanced as long as Rossini agrees to pay to

12  Badalian the monthly equivalent of the rentals for the

13  properties on which funds have been advanced.

14          Do you see that language?

15  A.  Yes, I do.

16  Q.  And you understand that to mean that Rossini could use

17  your money as needed for these investments as long as he paid

18  you a rental equivalent; is that right?

19  A.  My understanding was the money would be used to secure the

20  notes and that I would get the monthly rental income from

21  these properties.

22  Q.  Well, where does it say in there that you would get the

23  monthly income from the rentals on the property?

24  A.  Because when I was receiving -- prior to the signature, I

25  received a fact sheet that stated --

Badalian - cross

1   Q.  Well, I'm asking you where it says it on this document --

2   A.  Oh.

3   Q.  -- that you --

4   A.  So including --

5   Q.  -- that is a guarantee and that you signed on the bottom.

6   A.  Correct.  So here it say Badalian -- the monthly

7   equivalent of the rentals for the property on which funds have

8   been advanced.  So that, to me, meant that I would -- for the

9   money that I advanced to these properties, I would get rental

10  income.

11  Q.  It says monthly equivalent of the rentals.  I'm not trying

12  to quibble with the language there, but isn't that different

13  from rental income?

14  A.  Right.  I mean, the way I understood it from my

15  conversations with Mr. Rossini on these rentals, going back to

16  the fact sheet, that these rental amounts can change, are not

17  exactly the same as the actual when -- because tenants change

18  and what have you; that the amounts will be close to this --

19  it was a close approximation of the rent of -- that these

20  income properties -- or these properties generate.  So my

21  understanding, by the equivalent rent was like something close

22  to the fact sheet that I had seen.

23  Q.  Okay.  And did you -- how did you receive this document?

24  A.  I was -- when I was in Chicago, I got this from

25  Mr. Rossini.  And I believe Babajan was also with me in that

Badalian - cross

1    meeting.  And I read it.  And it was explained that this is

2    how it is; we're going to use the money to secure the notes

3    and you will get the rent.  I read through it, and then I

4    signed this document.

5    Q.   Babajan Khoshabe was in the meeting?

6    A.   I believe he was also in the meeting with us.

7    Q.   Okay.  And did you consider taking this document to an

8    attorney to look at it?

9    A.   Unfortunately I did not.

10   Q.   Okay.  So you -- they just showed it to you and you signed

11   it while you were meeting with them?

12   A.   Right.  When I read it and it was representing the -- the

13   agreement that -- with the understanding that we had, so this

14   was a way to kind of put it in writing, the understanding that

15   we had between us into how this process works, so it's not

16   verbal but something written down and you sign and Rossini

17   signed it.  So it became more to me as kind of an official

18   understanding between us as to what getting exchanged and what

19   the expectations were, you know.

20   Q.   Do you know if a lawyer drafted this or how it came to be?

21   A.   I'm sure -- no, I don't know if a lawyer drafted this

22   document.  He placed this document in front of me, that this

23   would be kind of an understanding between us in how we conduct

24   the business.  And I read through it.  And at that time -- I

25   mean, I'm not a lawyer.  But, I mean, I didn't see kind of

Badalian - cross

1    something that was out of the ordinary with respect to the

2    conversations that we had so I signed it.  That was my mindset

3    at that time.

4    Q.  And at this point, you still felt trust towards Babajan

5    Khoshabe?

6    A.  I mean, this was early on in May.  So, yeah, I mean, it

7    was -- I went to Chicago because, you know, I -- if I didn't

8    know him, I probably wouldn't go to Chicago, if somebody say,

9    okay, come to Chicago.  And then after I saw the properties

10   and the -- presented the opportunity in terms of rental

11   incomes, it was, like, okay, this is interesting.  And I

12   decided to purchase two of those properties.

13   Q.  Okay.  And you didn't know Albert Rossini that well at

14   that --

15   A.  No, I didn't.  That was the first time I met Mr. Rossini.

16   Q.  Okay.  And it's safe to say if Mr. Babajan Khoshabe had

17   not been involved in the meeting when you signed this, you

18   wouldn't have signed it; is that right?

19   A.  That's a fair assessment.  I wouldn't have.

20   Q.  At some point you met Anthony Khoshabe?

21   A.  Yes.  He was living with his dad.

22   Q.  Pardon me?

23   A.  He was living with his dad, so that's where I met him.

24   Q.  Okay.  And did you learn that he had some responsibility

25   relating to this enterprise?

Badalian - cross

1   A.   Correct.  After beginning of -- around January of 2012,

2   beginning of 2012, he was put in charge of collecting rents

3   for these different properties that, you know, investor had

4   bought under Devon Investments.  And he was presented as a way

5   to streamline the process, make it more efficient; and that

6   checks would be start coming in -- rent checks, distribution,

7   from Reliant group and --

8   Q.   Reliant Management?

9   A.   Reliant Management I think.

10  Q.   Okay.  Now, Reliant Management was Anthony's business; is

11  that right?

12  A.   That was my understanding, that he was running Reliant

13  Management.

14  Q.   Okay.  And you were getting checks from Anthony Khoshabe?

15  A.   It became like a wire transfer from Reliant, yes.

16  Q.   Okay.  He was taking out a percentage from each check

17  for --

18  A.   Right.  Initially the guaranty agreement was updated to

19  include also management of these properties.  So our

20  understanding was that Devon Investments, the group, would

21  manage these properties in terms of tenants, the upkeep, and

22  what have you.  And so the 10 percent management fee was

23  deducted from the rent.

24  Q.   And did you deal with him or talk to him?

25  A.   Through e-mails.  Sometimes if there was like discrepancy

Badalian - cross

1    or late delivery of rental income disbursement, I contacted

2    him through e-mail.  Not necessarily talking to him on the

3    phone.  It was mostly e-mail exchange.

4    Q.  Okay.  And do you remember when Anthony Khoshabe started

5    sending you the checks?

6    A.  From Reliant?

7    Q.  Yeah.

8    A.  I would say early January -- early 2012, maybe February,

9    January-February time frame, I started getting then checks

10   from Reliant rather than the previous method of mailing

11   checks.

12   Q.  Okay.  And the checks stopped around June or July of 2012?

13   A.  Roughly, yes.

14   Q.  Okay.  And you told us that you got about $200,000 or

15   more?

16   A.  Right.  About 250 range, just -- I don't remember exact

17   figure, but around 250 range from the initial investments,

18   yes.

19   Q.  Okay.

20         So you told us that at some point, instead of sending

21   checks where -- instead of sending separate checks to

22   Mr. Rossini, Mr. Khoshabe, and Mr. Murphy, you ended up --

23   they asked you to send one check to Mr. Murphy?

24   A.  Correct.

25   Q.  I'm showing you what the government previously marked

Badalian - cross

1    Badalian No. 6.

2          Was that the first check you sent him or --

3    A.  This is the check, cashier check, for 4118 West

4    Washington, 65,000 to Thomas Murphy as agent.

5    Q.  Okay.  And obviously you sent the entire $65,000 to Thomas

6    Murphy; is that right?

7    A.  Correct.

8    Q.  Okay.  You were shown group exhibit Badalian No. 8, which

9    included the fact sheet on 4037 West Adams Street; is that

10   correct?

11   A.  Yes.

12   Q.  And this is in that group exhibit No. 8.  And that's a

13   check for $75,000, correct?

14   A.  That is correct.

15   Q.  And it's made out to Babajan Khoshabe?

16   A.  Yes.

17   Q.  As the agent for that address, 4037 West Adams Street,

18   correct?

19   A.  Yes.

20   Q.  Okay.  You were shown group exhibit No. 9, which included

21   this sheet for 2442 West Arthington?

22   A.  Yes.

23   Q.  I should leave it a little longer.

24          And the investment check is made out to Thomas Murphy

25   for $85,000, right?

Badalian - cross

1   A.   Correct.

2   Q.   And that exhibit also contained this sheet for 2444 West

3   Arthington?

4   A.   Yes.

5   Q.   And 2446 West Arthington, right?

6   A.   That's correct.

7   Q.   And you wrote out a check to Thomas Murphy for $85,000,

8   correct?

9   A.   That's correct.

10  Q.   Finally, you invested in a property on 4832 West Montrose?

11  A.   Correct, last one.

12  Q.   And this was a property that -- you told us on direct

13  examination that Babajan Khoshabe contacted you about; is that

14  right?

15  A.   Right.  He drove me to see the property.  And he mentioned

16  that this a good apartment complex; that him and Bert are also

17  looking at, you know, this property.  And if I would be

18  interested in purchasing it.  And then we discussed the

19  amount, and I believe he mentioned something like 280,000 that

20  I said I don't have and I can go 50 percent --

21  Q.   Okay.  So --

22  A.   -- into.

23  Q.   -- this was a conversation that you had with Babajan

24  Khoshabe?

25  A.   Correct.

Badalian - cross

1   Q.  How much the building or the note would cost --

2   A.  Yes.

3   Q.  -- he was telling you that, right?

4   A.  Yes.

5   Q.  And how good the building was, he was telling you that?

6   A.  Yes.

7   Q.  And what a good investment it would be for you, that was

8   all Babajan Khoshabe who was telling you that?

9   A.  Yes.

10  Q.  And he was the one who drove you to the property, correct?

11  A.  Correct.

12  Q.  And you were shown in Badalian group exhibit No. 10 -- and

13  I'm showing you again on the Elmo -- that you wrote a check

14  for $80,000 made out to Thomas Murphy for -- and the

15  indication is for 4832 West Montrose?

16  A.  That's correct.

17  Q.  And you wrote another check for $60,000 made out to Thomas

18  Murphy --

19  A.  Correct.

20  Q.  -- for 4832 West Montrose?

21  A.  Yes.

22  Q.  The checks you were receiving stopped coming, right?

23  A.  Yes, around June, July, 2012.

24  Q.  And that's when you got together with the other investors

25  and you hired an attorney?

Badalian - cross

1   A.  Not right away.  I mean, we started our discussions with

2   Bert and Babajan about the delays; and we got different story

3   every time.

4           And then in April of 2013, we learned from Bert that

5   he's filing an accounting suit against Thomas Murphy because

6   he was communicating that Thomas Murphy is holding the money

7   and he has the money and he's filing this suit to get an

8   accounting from Thomas Murphy.  I said, where the money went

9   and what's the status of the notes and all that.  And then --

10  Q.  You wrote checks to Thomas Murphy, right?

11  A.  Checks were written to Thomas Murphy per instructions from

12  Bert and Babajan.

13  Q.  Well, you wrote -- you wrote sizable checks to Thomas

14  Murphy, right?

15  A.  Correct, because my understanding was that he was --

16  Q.  And you saw that Thomas Murphy was a lawyer at a

17  legitimate law firm, right?

18  A.  Yes, correct.

19  Q.  And the fact that he was a lawyer at a law firm, you

20  already told us, gave you confidence that he knew what he was

21  doing and he wasn't going to steal the money; is that right?

22  A.  Well, I mean, confidence, yes.  And I was also told that

23  he's handling the transactions and acquiring the title to the

24  notes, so it made sense that -- I mean, him getting the notes

25  wasn't, like, unusual, but if he's --

Badalian - cross

1    Q.  And it turned out that he didn't do the job you expected

2    him to, acquiring the notes; is that right?

3    A.  Well, I saw him --

4            MR. NOVAK:  Objection, your Honor.

5    BY THE WITNESS:

6    A.  -- as a party to the Devon Investments.

7            THE COURT:  Hold on a second.

8            MR. NOVAK:  Foundation as to how he would know that.

9            THE COURT:  Sustained.

10   BY MR. FRANKEL:

11   Q.  Bert told you that he was going to file a lawsuit to try

12   to find out what Murphy did with the money; those were your

13   words, right?

14   A.  He filed an accounting lawsuit, yes, against Murphy.

15   Q.  Okay.  And did you see a copy of the lawsuit?

16   A.  I don't recall that I did.

17   Q.  Did you hire a lawyer to take a look at the lawsuit?

18   A.  No, because he had his own lawyer who had filed the

19   lawsuit against him.  At that time I didn't see a copy of the

20   lawsuit.

21   Q.  Bert hired a lawyer, right?

22   A.  Correct.

23   Q.  Do you remember the name of that lawyer?

24   A.  I believe Richard Kruse.

25   Q.  So you knew the name of Bert's lawyer.  Did you ever give

Badalian - cross

1   him a call?

2   A.  We went -- met with him when we went back in 2013, early

3   2013.  When we went to Chicago again with Raymond to talk to

4   Bert and Babajan about, you know, just investigating more,

5   getting hopefully better answer being face-to-face, that --

6   that's when Bert took us to Richard Kruse's office and says

7   this is my lawyer and he's handling this.  And then we had a

8   short meeting with him.

9   Q.  And Richard Kruse told you what the lawsuit was about?

10  A.  He said he's going to -- per instructions from Rossini,

11  he's filing an accounting lawsuit against Thomas Murphy.

12  Q.  And he did file an accounting lawsuit against Thomas

13  Murphy?

14  A.  I believe so, that he did, yes.

15  Q.  Did you follow up on that to make sure that he did?

16  A.  When we came back from Chicago, we got our own lawyer and

17  they mentioned that accounting -- an accounting suit was filed

18  against him.  That's how I verified it, from our own lawyers.

19  Q.  Okay.  So you -- Kruse didn't show you a copy of the

20  lawsuit?

21  A.  No, he didn't.

22  Q.  You didn't tell him please keep us in the loop; we've got

23  a lot of money tied up with these guys?

24  A.  We did.  We had those discussions when we met with him

25  with Raymond.  And at that time, he hadn't actually -- he was

Badalian - cross

1     in the process of filing it.  It wasn't something filed for

2     him to show us a copy.  But when we met with him, it was also

3     we were trying to plead our case, bring to his attention as

4     another lawyer that, you know, we don't know where's the

5     status of this money or the notes are.

6     Q.  By the way, he worked in a law office; is that right?

7     A.  He had an office.  It looked like a law office, yes.

8     Q.  Okay.

9     A.  Like a -- you know, your own personal kind of a law firm.

10    It wasn't elaborate, but it looked like a law office.

11    Q.  It didn't look like a front or anything?

12    A.  No, it was just like a person -- a lawyer had -- I mean,

13    we went in his office.  We sat, had a discussion and --

14    Q.  His --

15    A.  -- took --

16    Q.  He had his --

17    A.  He gave me his card and --

18          THE COURT:  One at a time, please.

19    BY MR. FRANKEL:

20    Q.  He had his diplomas on the wall; did he not, or --

21    A.  I didn't pay attention.  I don't recall.

22    Q.  Okay.  Eventually, I think it was in November of 2013, you

23    and some other individuals who had money tied up with Murphy

24    filed a lawsuit; is that right?

25    A.  That's correct.

Badalian - cross

1    Q.  And what was the name of your lawyer?

2    A.  Elliot Schiff group.

3    Q.  And you paid the lawyer $45,000?

4    A.  In total, yes.

5    Q.  And --

6    A.  Over the course of the --

7    Q.  Go ahead.

8    A.  Over the course of the investigation and the filed

9    lawsuits and so forth.

10   Q.  Okay.  And after you paid him the $45,000, he told you

11   that the lawsuit wasn't going anywhere?

12   A.  Well, it had gone long enough that we asked him about what

13   would be next steps and what would be the costs associated

14   with next steps.  Because some of the investors didn't have as

15   much money invested, relative -- it's all relative, of course.

16   And we wanted to see how much more we need to spend to get

17   anything out of this process.

18   Q.  Okay.

19          MR. FRANKEL:  One second, Judge.

20     (Brief pause.)

21          MR. FRANKEL:  Nothing further, Judge.

22          THE COURT:  All right.  Any redirect?

23          MR. NOVAK:  Yes.  One moment.

24     (Brief pause.)

25          MR. NOVAK:  Very briefly.

Badalian - redirect

126

1                       REDIRECT EXAMINATION

2    BY MR. NOVAK:

3    Q.  On cross-examination, you mentioned your -- you discussed

4    your first meeting with Mr. Rossini and Mr. -- and Babajan

5    Khoshabe in May of 2011 when you flew out here --

6    A.  Correct.

7    Q.  -- remember?

8    A.  Correct.

9    Q.  And you said that you met -- you were at Rossini's office

10   I believe?

11   A.  Their offices were next to each other, very close in the

12   same building, yes.

13   Q.  Okay.  And you discussed the investments?

14   A.  Discussed the invested properties as we were shown, yes.

15   Q.  And they explained to you what you were investing in?

16   A.  Correct.

17   Q.  And how the investment would go?

18   A.  Yes.

19   Q.  Both Rossini and Babajan, right?

20   A.  They were together, yeah.

21   Q.  And they -- Babajan said that -- did Babajan tell you that

22   Bert Rossini was his partner?

23   A.  Yes.

24   Q.  And did Bert tell you that Babajan was his partner?

25   A.  Not in so many words, yes, but they clearly communicated

Badalian - redirect

1   they were working together; that one handles the finding the

2   properties and the other one handles the investment side.

3   Q.  And did they go over the guaranty agreement -- I believe

4   you said they went over the guaranty agreement with you?

5   A.  Mr. Rossini gave me the guaranty agreement.  I read

6   through it, and it was based on the -- what was written in the

7   agreement --

8   Q.  Just one second.  I'm showing you -- this agreement that

9   I'm showing you here in Badalian 3, right?

10  A.  Correct.

11  Q.  And he -- Mr. Rossini explained the agreement to you?

12  A.  Yes.

13  Q.  Because you said you're not a lawyer?

14  A.  Correct.

15  Q.  And you didn't consult with a lawyer before doing this

16  investment agreement, right?

17  A.  I did not.

18  Q.  Because you trusted Babajan?

19          MR. FRANKEL:  Objection.

20  BY THE WITNESS:

21  A.  Correct.

22          MR. FRANKEL:  Judge, this is redirect and these are

23  leading questions.

24          THE COURT:  Sustained.  Please rephrase.

25  BY MR. NOVAK:

Badalian - redirect

1   Q.  Why did you not go to a lawyer?

2   A.  I trusted first Babajan.  And then the conversation that

3   we had with Babajan and Rossini were reflected in this

4   agreement.  So it wasn't something that it's out of ordinary.

5   Yes, we had these verbal conversation about how this process

6   was moving forward.  And this was everything documented

7   capturing that conversation.

8   Q.  And I believe you -- because when we talked on direct -- I

9   just want to make sure I'm clear on this.  One moment.  I have

10  to find the right -- I believe you said you came back -- you

11  went back to San Jose?

12  A.  Yes.

13  Q.  Before you invested?

14  A.  I had to go back to send them the cashier's checks, yes.

15  Q.  And then -- I'm going to show you Badalian 16.  That's the

16  e-mail that Mr. Rossini sent you, right?

17  A.  Yes.

18  Q.  And that's where he says:  Enclosed is -- I have included

19  our guaranty agreement that we had for each transaction?

20  A.  It says Babajan and I have for each -- yes.

21  Q.  And that -- and this is all Badalian 16, which we talked

22  about at length the last time.  This is the same agreement,

23  right?

24  A.  Yes.

25  Q.  And then go back to 3.  You signed it back in San Jose,

Badalian - redirect

1   right?

2   A.  Yes, and I faxed it back to him.

3   Q.  You faxed it back.  Okay.

4        Now, you also discussed about the checks that you

5   wrote to Mr. Murphy, to Mr. Khoshabe, to Mr. Rossini.  Who

6   told you who to write the checks to?  Where -- what people to

7   write the checks to?

8   A.  The instructions to write the checks, I believe -- let me

9   think about it.

10       I'm not hundred percent sure; but for the initial

11  properties, I believe the instruction might have come --

12            MR. FRANKEL:  Objection.

13  BY THE WITNESS:

14  A.  -- from either Babajan or Bert, how to distribute the

15  checks amount.

16            THE COURT:  Do you have an objection?

17            MR. FRANKEL:  No.  I withdraw it, Judge.

18  BY MR. NOVAK:

19  Q.  But either Bert or Babajan gave you the -- for the initial

20  properties -- gave you the directions?

21  A.  Yes.

22  Q.  After that who gave you the directions?

23  A.  It was -- as the notes -- the sheet says make check

24  payable to so-and-so and that was like from Bert.

25  Q.  Who -- so those directions came from Mr. Rossini you're

Badalian - recross

1    saying?

2    A.  Yes.  I followed the instruction on the fact sheet that

3    was given -- either through fact sheets or e-mails, who to

4    write the checks to.

5            MR. NOVAK:  Nothing further.

6            THE COURT:  Anything further, Mr. Frankel?

7                        RECROSS EXAMINATION

8    BY MR. FRANKEL:

9    Q.  You don't remember initially who gave you the instruction

10   to -- who to write the checks to; is that what you're telling

11   us?

12   A.  It's not a hundred percent clear, but there was only two

13   parties I was dealing with in this process.

14   Q.  Okay.  But you don't remember?  That's the question.

15   A.  Well, it's been seven, eight years ago.  I mean --

16   Q.  No problem with not remembering.  As long as you're --

17   A.  I'm not hundred percent sure.

18   Q.  Okay.  And every time, you followed instructions that came

19   over the fax machine or through e-mail, is that what you're

20   saying?

21   A.  It was e-mail instruction -- it wasn't like a telephone

22   conversation, send the check to so-and-so.  It was, this is

23   the property, make checks to so-and-so, put the address, put

24   the PIN number, and follow those instructions.

25   Q.  Okay.

Moghaddasi - direct

1     MR. FRANKEL:  Nothing further, Judge.

2     MR. NOVAK:  Nothing further.

3     THE COURT:  You may step down, sir.  Thank you.

4     THE WITNESS:  Thank you.

5   (Witness excused.)

6     THE COURT:  The government may call its next witness.

7     MR. NOVAK:  The government calls Vladimir Moghaddasi.

8     THE COURT:  While Mr. Moghaddasi is getting up here

9   on the stand, why don't we all just take a break, standing up,

10  stretch.

11  (Brief pause.)

12  (Witness sworn.)

13     THE COURT:  Let's proceed.

14     MR. NOVAK:  Thank you.

15     VLADIMIR MOGHADDASI, GOVERNMENT'S WITNESS, SWORN

16                     DIRECT EXAMINATION

17  BY MR. NOVAK:

18  Q.  In a loud, clear voice, can you please state your name and

19  spell your last name for the jury and the court reporter.

20  A.  My name is Vladimir, and my last name is Moghaddasi,

21  M-o-g-h-a-d-d-a-s-i.

22  Q.  And, Mr. Moghaddasi, where do you live?

23  A.  San Jose, California.

24  Q.  And what do you do for work?

25  A.  I'm a software engineer, work for a high-tech company in

Moghaddasi - direct

1   Silicon Valley.

2   Q.  How long have you been a software engineer in Silicon

3   Valley?

4   A.  Since 1993.

5   Q.  Now, were you born in this country?

6   A.  I was born in Tehran, Iran.

7   Q.  And when did you come to the United States?

8   A.  December 18, 1991.

9   Q.  Why did you come to the U.S.?

10  A.  As a Christian refugee from Iran.

11  Q.  Okay.  And are you a member of a specific ethnicity in

12  Iran?

13  A.  Yes, it's called Assyrian.

14  Q.  Can you tell us what -- briefly what an Assyrian is?

15  A.  There are two Christian minority in Iran, one is Armenian

16  and one is Assyrian.  Our culture goes back to 5500 in

17  Mesopotamia, and we are a small minority in Iran.

18  Q.  Okay.  And when you came over from Tehran, where did you

19  first come when you went to the United States?

20  A.  My wife and I landed in LAX in LA because my brother and

21  sister used to live there.

22  Q.  Okay.  And how long were you in Los Angeles?

23  A.  December 18, 1991 till May of 1993.

24  Q.  And that's when you went to --

25  A.  San Jose.

Moghaddasi - direct

1   Q.   Okay.  And in San Jose -- are you a member of any church

2   in San Jose?

3   A.   Yes.  I continued my membership.  I used to be a member of

4   Assyrian Evangelical Church of Tehran, Iran.  And I became a

5   member of Assyrian Evangelical Church of San Jose.

6   Q.   And -- so you've been a member about 25 years?

7   A.   Yes.

8   Q.   23?

9   A.   23.

10  Q.   As a member of the church, have you also held any

11  leadership positions within the church?

12  A.   Yes.  For several years I was the -- one of the elder of

13  the board of elders.  And then for some years, I was the

14  president of the board of elders.

15  Q.   And what sort of duties and responsibilities would you

16  have as president of the board of elders?

17  A.   All the decisions are being made by the board, board of

18  elders.  We oversee the biblical teaching, the sermons, and

19  also the financial state of the church.

20  Q.   Okay.  So would you have signing authority on behalf of

21  the board as -- when --

22  A.   Yes.

23  Q.   -- when you're chairman or president?

24  A.   Yes.

25  Q.   Okay.  Now, I'm going to direct your attention to the

Moghaddasi - direct

1   summer of 2011.

2   A.   Okay.

3   Q.   Were you approached by anyone to invest in real estate in

4   the Chicagoland area?

5   A.   Yes.

6   Q.   Who?

7   A.   My cousin, Fred Khoshabe.

8   Q.   Okay.  And who is Fred Khoshabe briefly?

9   A.   Fred Khoshabe's mom -- mother was my mother's first

10   cousin.  So he and I are second cousins.

11   Q.   And was he also a member of the Assyrian Evangelical

12   Church?

13   A.   Yes.

14   Q.   And what -- how long had you known Fred Khoshabe by this

15   point?

16   A.   Since 1993.

17   Q.   Since you first went to San Jose?

18   A.   First went to San Jose, and I saw him in the church.

19   Q.   Okay.  Now, what sort of -- what did Fred tell you about

20   investing in real estate?

21   A.   He approached the church, and also me personally, saying

22   that his brother, which his name is Alfred -- we call him

23   Alfred but it looks like Babajan -- he and a partner named

24   Bert and another partner named Thomas, together they have this

25   opportunity for investment.

Moghaddasi - direct

1   Q.  Okay.  And you say he approached the church.  What do you

2   mean he approached the church?

3   A.  He came to our board meeting, and he said that there is

4   opportunity.  And he knew that we were looking to find income

5   in order to buy a church for ourselves in San Jose.

6   Q.  Now, what -- so did you know -- did you know Babajan?

7   A.  No.  I just knew that Fred Khoshabe had two brothers

8   because my mom has been telling me for so many years.

9   Q.  Okay.  And you knew one of them was Babajan?

10  A.  Yes.

11  Q.  And so what did the church -- what else did Fred tell you

12  about this investment opportunity in Chicago?

13  A.  He said basically it was very simple.  He said that they

14  have connections.  They will buy us a foreclosure notes from

15  banks.  And then we will either get the title or a deed in six

16  months or 12 months or we going to get our money back if for

17  whatever reason the court does not see that -- we can get the

18  title; and during that period, we're going to get the rent.

19  Q.  Okay.  And when you say they are going to buy it, who is

20  they?

21  A.  Bert and Thomas Murphy.

22  Q.  Okay.  And did there come a point -- just jump ahead a

23  little bit -- where you met Mr. Rossini?

24  A.  At that point, no.

25  Q.  Okay.  But later on you did?

Moghaddasi - direct

1    A.   Yes.

2    Q.   Okay.  Do you see him in court today?

3    A.   Yes.

4    Q.   Where is he?  If you could point --

5    A.   Last person.

6    Q.   And identify a piece of clothing he's wearing.

7              MR. FRANKEL:  Judge, we'll stipulate that he can

8    identify Mr. Rossini.

9              THE COURT:  So noted.

10   BY MR. NOVAK:

11   Q.   So the -- so they tell you that there is -- they -- Fred

12   tells you this about this investment opportunity --

13   A.   Yes.

14   Q.   -- correct?

15             What decision does the church make?  Or how does it

16   come to its decision, I guess?

17   A.   He showed us a piece of paper at that point with kind of

18   like a sheet of what the property, the location is --

19   Q.   Right.

20   A.   -- how much the church is going to get monthly rent, and

21   what is the price of the property.  And then if you send a

22   check, while we are getting the rent, in six to 12 months we

23   going to get the title.  So we -- basically after we review

24   that, we -- honestly we didn't see anything there, you know,

25   risky.  We said, okay, we will take this.

Moghaddasi - direct

1    Q.  Why did you not think it was risky?

2    A.  Fred -- well, Fred, he used to do some real estate on the

3    side in San Jose.  Number two, he used to be a member of the

4    board at some point.  Fred was a known figure and a very

5    honest person in the church.  And all together, including our

6    pastor, said that there is -- there can't be anything wrong

7    with this because Fred is suggesting it.

8    Q.  Okay.  Now, the -- did you also decide to invest in

9    this -- take advantage of this opportunity and invest?

10   A.  Yes.

11   Q.  Okay.  And I'm going to show you what I've marked as

12   Moghaddasi 1 and Moghaddasi 2.  Take a look at Moghaddasi 1

13   first.

14   A.  Okay.

15   Q.  Do you recognize that?

16   A.  Yes.  This is the property on west Jackson.

17   Q.  Okay.  And that's a property at -- I think it's 4520 West

18   Jackson?

19   A.  Yes.

20   Q.  Is that, the front first page, one of those fact sheets

21   that you received?

22   A.  Yes.

23   Q.  And what's the next page?

24   A.  This was the cashier's check I sent to Thomas Murphy

25   because I was told that it has to be sent to Thomas Murphy.

Moghaddasi - direct

1    And then I put the address of the property on the check.

2    Q.  Okay.  And then what's the next page?  What's the next set

3    of pages after that?

4    A.  This is the deed.

5    Q.  Because you eventually got the deed to that property,

6    right?

7    A.  After several months, I got the deed for this one.

8    Q.  Does that fairly and accurately represent those documents

9    that you saw back at that time?

10   A.  Yes.

11          MR. NOVAK:  Your Honor, I move Moghaddasi 2 into

12   evidence and -- offer it into evidence and ask to publish it.

13          THE COURT:  Moghaddasi 1 or 2?

14          MR. NOVAK:  1.  I'm sorry.  We'll do 2 next.

15          THE COURT:  Any objection to Moghaddasi 1?

16          MR. FRANKEL:  No objection.

17   BY MR. NOVAK:

18   Q.  And let's take a look at Moghaddasi 2 while it's up there.

19   What's Moghaddasi 2?

20   A.  This is a -- this our church cashier check from the

21   Citibank to Thomas Murphy for the first property I think that

22   we had.

23   Q.  And that's the property at 30- -- 3027 West --

24          THE COURT REPORTER:  I'm sorry?

25   BY MR. NOVAK:

Moghaddasi - direct

1   Q.  3327 Monroe?

2   A.  I put 3327 West Monroe, yes.

3   Q.  Okay.  And that's the first property the church invested

4   in, right?

5   A.  Yes.

6   Q.  And how do you recognize that's the church's cashier's

7   check?

8   A.  I know because we had the Citibank account and also I put

9   my notes here that -- this is my handwriting here, purchase of

10  3327 West Monroe Street.

11  Q.  Okay.  And does that fairly and accurately represent the

12  cashier's check that was written at that time?

13  A.  Yes.

14          MR. NOVAK:  Your Honor, I would offer that into

15  evidence as Moghaddasi 2 into evidence.

16          THE COURT:  Any objection?

17          MR. FRANKEL:  No objection.

18          MR. NOVAK:  Your Honor, I --

19          THE COURT:  Moghaddasi Exhibit 2 is admitted into

20  evidence as is Moghaddasi Exhibit 1.

21    (Moghaddasi Exhibit No. 1 and 2 received in evidence.)

22  BY MR. NOVAK:

23  Q.  Let's take a look at Moghaddasi 1.  So this is one of the

24  fact sheets for that property on Jackson, sir?

25  A.  Yes.

Moghaddasi - direct

1    Q.  And this is the property at 4520 West Jackson?

2    A.  Yes.

3    Q.  And what did you understand the rest of the writing on

4    here to be, the -- what were you -- what was this?  What was

5    your understanding of this to be?

6    A.  It's a property that was going foreclose.  The property

7    value was higher than what I was buying for.  I'm going to get

8    the rent for 3600 a month.  That has more potential.  And

9    there's some costs associated with it, which I agreed.

10   Q.  Okay.  And you agreed to write a cashier's check -- this

11   is page 2 of Moghaddasi 1 -- on August 5th of 2011?

12   A.  Yes.

13   Q.  For $80,000?

14   A.  Yes.

15   Q.  To Thomas Murphy?

16   A.  Yes.

17   Q.  For that building, right?

18   A.  Yes.

19   Q.  And is that -- you said that's your handwriting?

20   A.  Yes.

21         MR. FRANKEL:  Objection, Judge.  That

22   mischaracterizes the document.  Purchase a note --

23         MR. NOVAK:  Oh.

24   BY MR. NOVAK:

25   Q.  For investing in purchasing a mortgage note, right?

Moghaddasi - direct

1   A.  Yes.

2   Q.  Okay.  Let me show you Moghaddasi 2.

3           This is the church's check for the investment in the

4   3327 West Monroe Street?

5   A.  Yes.

6   Q.  Dated August 8th and $75,000?

7   A.  75,000, yes.

8   Q.  Now, had you ever done real estate investing before this?

9   A.  Yes.

10  Q.  What kind of real estate investing?

11  A.  I bought a house.

12  Q.  Other than buying your own house --

13  A.  No, other -- I have another house, rental.

14  Q.  Okay.  But had you ever done mortgage note investing?

15  A.  No.

16  Q.  And had you ever done out-of-state investing like this?

17  A.  No.

18  Q.  Did you consult with a lawyer before this?

19  A.  No.

20  Q.  Did you consult with a financial advisor?

21  A.  No.

22  Q.  Why not?

23  A.  I told you, I trusted my cousin Fred.

24  Q.  Okay.  And by extension his cousin -- his brother Babajan?

25  A.  Yes.

Moghaddasi - direct

1   Q.  Now, after writing that initial check, were you provided

2   something called a guaranty agreement?

3   A.  Yes.

4   Q.  And was the church also given one to sign?

5   A.  Yes.

6   Q.  I'm going to show you what I marked as Moghaddasi 3 and 4.

7          Do you recognize Moghaddasi 3?

8   A.  Yes.

9   Q.  What is that?

10  A.  This is what Bert required us to sign as basically

11  defining the relationship.  Either you're going to -- he's

12  going to get the -- he's going to get us either the title and,

13  if not, we're going to get our money back.

14  Q.  And that's the guaranty agreement, right?

15  A.  Yes.

16  Q.  And does that fairly and accurately -- and Moghaddasi 4,

17  is that the same guaranty agreement but made out to the

18  church?

19  A.  That is for the church, yes, which I have signed, yes.

20  Q.  You signed that one?

21  A.  Yes.

22  Q.  As chairman or president of the board?

23  A.  Yes.

24  Q.  Do those fairly and accurately represent those agreements

25  that you executed back in August of 2011?

1   A.  Yes.

2          MR. NOVAK:  Your Honor, I offer Moghaddasi 3 and 4

3   into evidence.

4          THE COURT:  Any objection?

5          MR. FRANKEL:  No objection.

6          THE COURT:  Moghaddasi Exhibit 3 and Moghaddasi

7   Exhibit 4 are admitted in evidence.

8     (Moghaddasi Exhibit No. 3 and 4 received in evidence.)

9   BY MR. NOVAK:

10  Q.  I'm going to show you Moghaddasi 3, sir.

11         Where did you get this agreement from?  How did you

12  get this, do you remember?

13  A.  Via e-mail.  All of them came via e-mail, either

14  directly -- some of them from Bert, some of them from Bert to

15  Fred to us.

16  Q.  Okay.  And this is -- who explained this agreement to you?

17  A.  No one.

18  Q.  You read it?

19  A.  Honestly, not the whole thing --

20  Q.  Okay.

21  A.  -- because I trusted Fred that he had done his homework,

22  putting us and the church.

23  Q.  And this is August 17th of 2011?

24  A.  Uh-huh.

25  Q.  You signed it?

Moghaddasi - direct

```
 1   A.  Yes.
 2   Q.  On the 18th?
 3           That's yours, right?
 4   A.  Yes.
 5   Q.  And this is a guaranty agreement for the church that you
 6   signed on behalf of the church --
 7   A.  Yes.
 8   Q.  -- on the 18th, right?
 9   A.  Yes.
10   Q.  And did you send it back to -- who did you send these
11   signed documents back to?
12   A.  To Bert.
13   Q.  Okay.  Directly?
14   A.  Yes.
15   Q.  Now, did you -- and what did you understand these
16   documents to mean?  What did you understand you were signing
17   and getting into here?
18   A.  Our understanding basically was that they were
19   representing us.  They are getting these --
20   Q.  Who is "they"?
21   A.  Bert and Devon -- I don't know exactly the name, that
22   company that he had.  Basically they were going to get these
23   foreclosure notes.  They will work with the court going
24   through that process of -- they told us for six months and
25   then they said 12 months and then it became 18 months -- to
```

Moghaddasi - direct

145

1   get us our title.  Meanwhile, we're going to get our rental.

2   And basically they are representing us to get us those title.

3   Q.  What's your understanding -- what happens to your money if

4   they are not successful in getting you a title?

5   A.  It was clearly said that we will get the money back.

6   Q.  The money that you invested?

7   A.  Yes.

8   Q.  And so did you personally continue to invest in these

9   properties after that first one?

10  A.  Yes.

11  Q.  Was your next investment in September of 2011?

12  A.  Yes.

13  Q.  Okay.  I'm going to show you Moghaddasi 5.

14          THE COURT:  Mr. Novak, before we get into Moghaddasi

15  5, I suggest we take our afternoon break.

16          MR. NOVAK:  Okay.

17          THE COURT:  So, ladies and gentlemen of the jury, we

18  will take our afternoon break.  We'll break for approximately

19  15 minutes.  We should have some light snacks for you in the

20  jury room.

21          During the break, please do not discuss this case

22  with anyone, including one another, and please do not do any

23  independent research regarding this case.

24          Thank you very much.

25    (Jury out.)

Moghaddasi - direct

1          THE COURT:  The witness may step down during the

2   break.  We're in recess.

3          THE WITNESS:  Thank you.

4      (Recess taken.)

5          MR. NOVAK:  Before we bring the witness back, Judge,

6   just one thing on scheduling.  This is the witness that we

7   talked about.  I don't think -- it's not going to be as

8   lengthy as Mr. Badalian.  This is his son's high school

9   graduation tomorrow, so if -- if we have a little indulgence,

10  if maybe we have to go a bit past 4:30.  Hopefully we will be

11  done, but I really --

12         THE COURT:  I would say get him done by 4:30.  I

13  mean, I try to keep my word to the jury on when we're going to

14  end.

15         MR. NOVAK:  Okay.

16         THE COURT:  They're putting their life on hold.  So

17  let's finish this witness as close to 4:30 as possible.  All

18  right?

19         MR. NOVAK:  Okay.  Very good.

20     (Jury in.)

21         THE COURT:  Let's proceed, Mr. Novak.

22         MR. NOVAK:  Thank you, your Honor.

23         THE COURT:  You can have a seat.

24  BY MR. NOVAK:

25  Q.  Mr. Moghaddasi, I'm going to show you -- we just talked

Moghaddasi - direct

147

1   about -- we went over what the guaranty agreement that you

2   signed on behalf of yourself and on behalf of the church,

3   right?

4   A.  Yes.

5   Q.  And you -- both you and the church continued to invest

6   with Mr. Rossini's company for a length of time, up until

7   really July of 2012, right?

8   A.  Yes.

9   Q.  So I'm going to show you a number of exhibits.  We'll get

10  them all in at once and then go over them.  Okay?

11  A.  Okay.

12  Q.  So I'm going to show you what I've marked as Moghaddasi 5

13  through 9 and then Moghaddasi 11 and 13.  Okay?

14  A.  Okay.

15    (Brief pause.)

16  BY MR. NOVAK:

17  Q.  I believe Moghaddasi 10 as well is in there.

18    (Brief pause.)

19  BY THE WITNESS:

20  A.  Yes.

21  BY MR. NOVAK:

22  Q.  Do you recognize those as fact sheets and cashier's checks

23  and associated documents made with your personal or the

24  church's investments in -- with Mr. Rossini and his company?

25  A.  Yes.

Moghaddasi - direct

1    Q.  Do they fairly and accurately reflect those documents as

2    you saw them at the time?

3    A.  Yes.

4    Q.  Okay.

5         MR. NOVAK:  Your Honor, I'd offer Government Exhibit

6    Moghaddasi 5, 6, 7, 8, 9, 10, 11, and 13 into evidence and ask

7    to be able to publish them to the jury.

8         THE COURT:  Any objection?

9         MR. FRANKEL:  No objection.

10        THE COURT:  So Moghaddasi Exhibits 5 through 9, 10,

11   11, and 13 are admitted into evidence.

12     (Moghaddasi Exhibit No. 5 through 11 and 13 received in

13      evidence.)

14   BY MR. NOVAK:

15   Q.  So let's start with Moghaddasi 5.  This was a fact sheet

16   for one of your investments on 3610 West Lexington, right?

17   A.  Yes.

18   Q.  And for this, who did you receive the -- this fact sheet

19   from?

20   A.  I don't remember.  Either Bert or via Fred.

21   Q.  Okay.  But you ended up investing yourself, and the second

22   page of this exhibit is the check that you drew -- that you

23   wrote from September 22nd of 2011?

24   A.  For 66 K.

25   Q.  For 66,000?

Moghaddasi - direct

1   A.  Yes, for Lexington.  This is mine, yes.

2   Q.  Okay.  And I'm going to show you your next -- I'm going to

3   show you Government Moghaddasi 6.  Ask you to take a look at

4   that.

5           That's your next investment, right, on 5062 West

6   Congress?

7   A.  Yes.

8   Q.  And the first page is the fact sheet like the other ones

9   we've talked about, right?

10  A.  Yes.

11  Q.  And then your cashier's check that you wrote on

12  October 31st of 2011?

13  A.  Yes.

14  Q.  Or that you obtained?

15  A.  Yes, for west Congress, yeah.

16  Q.  For $90,000?

17  A.  For 90 -- yes.

18  Q.  The writing here for the Congress address, whose writing

19  is that?  Do you recognize it?

20  A.  On the check?

21  Q.  Yeah.

22  A.  Mine.

23  Q.  That's your handwriting?

24  A.  Yes.

25  Q.  Now, the church also continued to invest, right?

Moghaddasi - direct

1   A.   Yes.

2   Q.   And is this the -- Moghaddasi 7, is that one of the

3   investments for the church -- that's one of the investments

4   for the church on west Polk?

5   A.   Yes.   It's for two $50,000, yes.

6   Q.   So there's the one for west Polk with the cashier's check,

7   page 2 of Moghaddasi 7, is for $50,000?

8   A.   Yes.

9   Q.   On December 13th?

10  A.   Yes.

11  Q.   And 5336 West Jackson?

12  A.   West Jackson, yeah.

13  Q.   Also for $50,000 on the 13th --

14  A.   Yes.

15  Q.   -- of December?

16  A.   Yes.

17  Q.   And then you also personally invested, on December 28th,

18  at 7941 Karlov in Skokie?

19  A.   In Skokie, uh-huh, yes.

20  Q.   And that's the fact sheet here on Moghaddasi No. 9?

21  A.   Yes.

22  Q.   And then your cashier's check for $108,800 from

23  December 28th?

24  A.   Yes.

25  Q.   Okay.   Now, so let's just stop here for a minute and talk

Moghaddasi - direct

1    about December 2011.

2         Were you receiving rent payments from Mr. Rossini or

3    his company from this -- from these investments?

4    A.  Yes.

5    Q.  And do you remember who you were getting the checks from

6    at that time?

7    A.  It's long time ago.  First it was coming from Bert, and

8    then at some point switched to a different company.

9    Q.  Was it switched to a company named Reliant Management?

10   A.  Reliant something -- yes.

11   Q.  Okay.  And was the church also receiving rents at that

12   time?

13   A.  Yes.

14   Q.  And the church, in fact, received a deed for that property

15   in 3327 West Monroe, right?

16   A.  Yes.

17   Q.  In October of 2011?

18   A.  Yes.

19   Q.  The church got the deed to the property from Mr. Rossini?

20   A.  Yes.

21   Q.  And when the church received the deed in October of '11,

22   how did that make you feel -- how did that affect your comfort

23   level with continuing to invest?

24   A.  That was one of the reason that we felt comfortable that

25   everything is going as we were told because now we have a

Moghaddasi - direct

1   deed.  It means others are going to produce deed too.

2   Q.  Okay.  Because in -- and that shows -- because you have

3   that Karlov investment in December, right?

4   A.  Yes.

5   Q.  And then at that point, did you travel to Chicago in

6   March -- or approximately March of 2012?

7   A.  2012, yes, I --

8   Q.  In the --

9   A.  -- was here with my family.

10       Yes.

11       THE COURT REPORTER:  I'm sorry?

12   BY MR. NOVAK:

13   Q.  In the spring of 2012?

14   A.  Yes.

15   Q.  And why did you come to Chicago in the spring of 2012?

16   A.  Two reason.  One, vacation; and at the same time, Bert and

17   Babajan told me that they can show me some more properties by

18   driving by.

19   Q.  Okay.

20   A.  So I took half a day from my family and then went with

21   them.

22   Q.  And so tell us what happened when you met with Mr. Rossini

23   and with Babajan.  What happened?

24   A.  They picked me up from the hotel.  We went around the

25   town.  First we stopped at the west Jackson, and they talked

Moghaddasi - direct

1   about the building.  And they didn't let me go in.  They said

2   it's in not very good neighborhood so --

3            MR. FRANKEL:  Objection, Judge.

4   BY THE WITNESS:

5   A.  -- you have to stay in --

6            THE COURT:  Hold on for a second, please.

7            MR. FRANKEL:  There's no question pending.

8            THE COURT:  Why don't you go ahead and ask another

9   question.

10  BY MR. NOVAK:

11  Q.  So they picked you up from the hotel you said?

12  A.  Yes.

13  Q.  And who is they?  It's Mr. Rossini and Mr. --

14  A.  And Babajan, yes.

15  Q.  Did you visit any properties --

16  A.  Yes, other --

17  Q.  -- when --

18  A.  -- than the one that I had, they showed me at least five

19  or six more properties.

20  Q.  And they being both Mr. Rossini and Babajan?

21  A.  Babajan --

22  Q.  And --

23  A.  -- yes.

24  Q.  And --

25           THE COURT:  If you could just wait until he finishes

Moghaddasi - direct

154

1    his question, please.

2              THE WITNESS:  Sure.

3              THE COURT:  Thank you.

4              THE WITNESS:  You're welcome.

5    BY MR. NOVAK:

6    Q.  You said that they -- first they took you to that property

7    at west Jackson, at 5336 West Jackson?  Or at your property on

8    Jackson?

9    A.  My property.

10   Q.  At 45- --

11   A.  4520.

12   Q.  And what did they do when they took you to that property?

13   What did they do?  Were you able to go in?  What happened?

14   A.  They ask me to sit in the car because they said that you

15   can't -- we can't get you in.  It's not a good neighborhood.

16   So I sat there in the car.  They just show me from the behind

17   because there was a detached garage.  And that was it.

18   Q.  Okay.  Did they show you any other properties -- let me

19   ask you first:  What did you think of the property at Jackson?

20   Was that the first time you had seen it in person?

21   A.  Yes.

22   Q.  Okay.  What did you think?

23   A.  I didn't appreciate the neighborhood; but because the

24   rental income was coming, I said we -- I will keep it.

25   Q.  Okay.  Did you -- did they show you other properties to

Moghaddasi - direct

155

1    invest in?

2    A.  Yes.  We went around the town.  The first time in my life

3    in Chicago, so they showed me at least five or six properties.

4    Q.  Did they end up showing you a property on Sheffield

5    Avenue?

6    A.  Yes.

7    Q.  Okay.  And what happened when you saw this property on

8    Sheffield?

9    A.  It was a very nice property.  I mean, from looking at --

10   from the street.  And basically they had a number.  They

11   showed -- they didn't have the fact sheet but just talked

12   about it.  When I got back, I got a fact sheet and I invested

13   in that.

14   Q.  And that was the property at 2129 Sheffield we'll talk a

15   little bit more about --

16   A.  Yes.

17   Q.  -- in a minute, right?

18        Did Mr. Rossini and Mr. Khoshabe also talk to you

19   about the progress of your investments and getting the notes

20   or the titles to your properties?

21        MR. FRANKEL:  Objection.  I believe that's a compound

22   question.

23        THE COURT:  Sustained.

24   BY MR. NOVAK:

25   Q.  Did they talk to you about the status of your investments?

Moghaddasi - direct

1           MR. FRANKEL:  Again, it's the same objection.

2           THE COURT:  Overruled.

3    BY THE WITNESS:

4    A.  So, yes, they -- during the discussion, a casual -- I'm

5    sitting in the back.  They're sitting in front.  Bert is

6    driving and Babajan is sitting in the passenger side.  They

7    said something to the effect -- I'm paraphrasing -- that we

8    know what we are doing and don't worry; we are making

9    progress; you are getting your rent; you're going to get your

10   titles.

11   BY MR. NOVAK:

12   Q.  When you say they are saying it, it's Bert and Babajan are

13   in the car --

14   A.  Yes.

15   Q.  -- right?

16           Do you remember is -- specifically what maybe

17   Mr. Rossini told you or specifically what Mr. Khoshabe told

18   you during this drive?

19   A.  I remember Mr. Babajan was saying that he used to work at

20   the City; he has a lot of connections and that he has been

21   around doing a lot of real estate.  And Mr. Rossini was also

22   saying that he has been -- he's been in this legal system; he

23   knows this stuff, and I should not worry about anything

24   basically.

25   Q.  Okay.  And that's when you said, during this same trip,

Moghaddasi - direct

1  they showed you 2129 Sheffield?

2  A.  Yes.  That's one of those.

3  Q.  And that was one when you got back -- and I'll show you

4  Government Exhibit 11.

5       That's one of the ones that you ended up -- you ended

6  up investing in that property, right?

7  A.  11?  Yes.

8  Q.  And 11, that's the fact sheet for the property, for 2129

9  Sheffield?

10  A.  Yes.

11  Q.  And page 2 is the cashier's check that you wrote for the

12  property, correct?

13  A.  Yes.

14  Q.  And what's the amount of the cashier's check?

15  A.  235,000.

16  Q.  And that was on March 6th of 2012?

17  A.  Yes.

18  Q.  About how long was it after -- about how long had you been

19  back home from your trip when you got this cashier's check?

20  A.  Honestly, I don't remember --

21  Q.  Okay.

22  A.  -- exact but it was not -- shouldn't be that long.

23  Q.  More than a week?  More than two weeks?

24  A.  It's long time ago.  I don't remember honestly.

25  Q.  Okay.  Now, at the same time, in March of 2012, did

Moghaddasi - direct

1    anything happen to the church's property on Monroe Street?

2    A.   Yeah.  We had the title, so we got a call -- I don't

3    remember who -- I think they called Fred -- I mean, either

4    Babajan or Bert, I don't know who called Fred.  He called a

5    meeting, a board meeting.  And he said that unfortunately the

6    apartment -- the unit has been on fire and basically -- the

7    first thing we ask, anybody has injured; everybody is safe.

8    They said yes.  So basically fire department got everybody

9    out.  So after a day, we were told that basically has to be

10   demolished; there is nothing left there.  And then after going

11   through the process, the insurance company paid the church the

12   value of that property at that time.

13   Q.   So the church got an insurance payout for the property?

14   A.   Yes.

15   Q.   And how did that make you feel about your investments when

16   this happened?

17   A.   Because it was -- it was our own title and we got the

18   money for the property, it was good.  We said, okay, at least

19   we haven't lost.

20   Q.   Okay.  Now -- so this is March or so of 2012.  You were

21   still receiving rents --

22   A.   Yes.

23   Q.   -- from your investments?

24   A.   Yes.

25   Q.   And they're coming from Reliant at this point, right?

Moghaddasi - direct

1  A.  Yes.

2  Q.  Did there come a point when the rent checks stopped

3  coming?

4  A.  We had one or two instances that they were late, which

5  after I complained, I got different answer; but, yes, at some

6  point it stopped.

7  Q.  Okay.  And did you reach out to anyone about these missing

8  or late rent checks?

9  A.  Yes.  First, I talk to Fred.  Then I started actually

10  communicating with Bert via e-mail directly because I was very

11  frustrated.

12  Q.  Now, what did Mr. Rossini tell you about these late rent

13  payments when you were e-mailing him?

14       MR. FRANKEL:  Objection, foundation.

15       THE COURT:  I'm sorry?

16       MR. FRANKEL:  Foundation, what did he tell you.

17       THE COURT:  Sidebar.

18    (Proceedings heard at sidebar:)

19       MR. FRANKEL:  Obviously it's an admissible hearsay

20  statement because of the Santiago proffer, but I think he

21  needs to lay a foundation of when it happened, where it

22  happened, who was present.

23       THE COURT:  That's fine.  If you can provide some

24  foundation, just general time frame.  I think you went over

25  it, but --

1    MR. FRANKEL:  I have the time but not anything else

2  about the conversation, where it was, when.  I mean, it goes

3  to the -- our ability to cross on whether the statement

4  happened at all.

5    THE COURT:  Well, that's something you can cross him

6  on though.  You can talk about the statement.  You can ask

7  when did it happen.  So why don't you give him some general --

8    MR. NOVAK:  I have an e-mail I'll put in.

9    THE COURT:  Okay.

10   (Proceedings heard in open court:)

11  BY MR. NOVAK:

12  Q.  So, Mr. Moghaddasi, you said that the rents stopped coming

13  sometime around June, right?

14  A.  Yes.

15  Q.  And you ended up e-mailing and -- communicating with Fred

16  or with Bert, right?

17  A.  Yes.

18  Q.  Now, most of your communications with Bert, were they on

19  the phone or were they over e-mail?

20  A.  All of them was -- most of them was e-mail.

21  Q.  Okay.  Why -- why mostly e-mail with Mr. Rossini?

22  A.  Because that was the easiest way to talk and also make

23  sure if I have something, I can share with others.

24  Q.  Okay.  Now -- and in addition, you had also e-mailed with

25  Fred --

Moghaddasi - direct

161

1    A.  Yes.

2    Q.  -- right?

3          And would Fred also forward you e-mails that he

4    received from Mr. Rossini?

5    A.  Yes.

6    Q.  I'm going to show you what I marked as Government Exhibit

7    Moghaddasi 12.

8          Do you recognize Moghaddasi 12?

9    A.  Yes.

10   Q.  What is Moghaddasi 12?

11   A.  After my frustration on behalf of the church and my

12   personal investment, then I send an e-mail to -- Anthony I

13   think was in charge of the Reliant Management.  And then

14   complaining to Fred, Fred talked to Bert, and then Fred

15   forwarded an e-mail which was from Bert explaining why there

16   is a delay.

17   Q.  And so that's a set of e-mails from -- that's the set of

18   e-mails that -- from that time period in June of 2016, right?

19   A.  Yes.

20   Q.  And does that fairly and accurately represent the e-mail

21   conversation that you had or that was forwarded to you?

22   A.  Yes.  Some of the e-mails are basically the rent and some

23   of them is my complaint that we are not getting the rent.  And

24   the top one is the one that -- is the one that actually Fred

25   and Bert and Babajan used to convince everybody else that

Moghaddasi - direct

1   everything is cool.

2   Q.  Does that fairly and accurately depict -- reflect those

3   e-mails and that conversation, that e-mail traffic?

4   A.  Yes.

5           MR. NOVAK:  Your Honor, I offer Moghaddasi 12 into

6   evidence.

7           THE COURT:  Any objection?

8           MR. FRANKEL:  No, Judge.

9           THE COURT:  I'm sorry?

10          MR. FRANKEL:  No objection.

11          THE COURT:  Moghaddasi Exhibit 12 is admitted into

12  evidence.

13     (Moghaddasi Exhibit No. 12 received in evidence.)

14  BY MR. NOVAK:

15  Q.  I'm going to show you here the first page.  So it's a

16  little bit out of order.

17          Let's start with page 2 of Moghaddasi -- you see it

18  on the screen?

19          This is from June 21st?

20  A.  Yes.

21  Q.  Now, the "from," is that you?

22  A.  Yes.

23  Q.  That's your e-mail?

24  A.  Yes.

25  Q.  The "to," it says it's ReliantManagement@gmail.  Whose

 1   e-mail is that?  Who was using that e-mail?

 2   A.  Anthony.

 3   Q.  Okay.  How do you know Anthony was using that e-mail?

 4   A.  He first communicated to us via that e-mail, and I'm

 5   responding to him.

 6   Q.  Reliant Management, that's the same name of the company

 7   that was --

 8   A.  Yes.

 9   Q.  -- your property manager?

10   A.  Yes.  We were told that they are property managers.

11   Q.  And so this is from June 21st.  You say:  Hi, Anthony.

12   Any update on the June rents?

13   A.  Yes.

14   Q.  And so now I have to go a little bit backwards to page 1.

15       And what was Anthony's response on June 22nd?

16   A.  You should be receiving them any day.

17   Q.  And then you -- it looks like you forwarded this or sent

18   something to Reliant again and cc'd Fred?

19   A.  Again, on June 22nd, I said:  It's almost end of the

20   month.  Could you please send me what the issues are.

21   Q.  Then I'm going to do June 26th here.  Did you receive a

22   response from Fred?

23   A.  Yes.

24   Q.  And that's the response we see that he says he's

25   forwarding something from Mr. Rossini, right?

1    A.  And Fred says he hasn't received the rent himself.  It

2    means that he's with us in the same problem.

3    Q.  And this is where -- this is from Mr. Rossini and starts:

4    Dear Fred, right?

5    A.  Yes.

6    Q.  What is the explanation?

7    A.  Basically -- I don't want to get into details.  Basically

8    he's telling us that they're changing the process to make

9    going to the court on our behalf, getting the -- transferring

10   the notes to titles, and everything else is going to be much

11   more smooth than what we have.  That's the reason we will have

12   a delay of a month; but after that it's going back on track,

13   and you're going to get the rent on time.

14   Q.  Okay.  And you responded to Fred saying:  Thanks a lot;

15   that makes sense?

16   A.  Yes.

17   Q.  You also -- in addition to -- you said going through

18   Fred -- you also would e-mail Mr. Rossini directly with

19   questions, right?

20   A.  Yes.

21   Q.  Now, even -- when you received -- because even though the

22   rents weren't coming, you still invested in one more property,

23   right?

24   A.  Yes.

25   Q.  And I'm going to ask you to take a look at Government 13.

Moghaddasi - direct

1      That's this property here on 3340 North Oakley?

2   A.  Yes.

3   Q.  That you ended up investing in on July 9th?

4   A.  Yes.

5   Q.  You gave a cashier's check -- you sent a cashier's check

6   to Mr. Murphy for $375,000?

7   A.  Yes.

8   Q.  Now, did you continue -- even after this investment, did

9   you continue to have issues with getting your rent payments?

10  A.  Yes.

11  Q.  And did there come a point that summer -- so this is July

12  of 2012 that you invested on Oakley.  Did you ever receive a

13  deed to any properties that you had -- you personally had

14  invested in?

15  A.  Other than the one in Jackson, no.

16  Q.  So you did receive one -- we talked about this -- on 4520

17  West Jackson?

18  A.  Yes.

19  Q.  And you received that deed in August of 2012?

20  A.  Yes, I -- yes.  I don't remember exactly the date, but I

21  received it.

22  Q.  Okay.

23  A.  The deed.

24  Q.  And even with that, did you still have problems with your

25  rent -- even after receiving the deed, did you still make

Moghaddasi - direct

1  inquiries?

2  A.   After I received the deed, a lot of things changes because

3  up to that point, we were receiving exactly that amount that

4  was in the fact sheet.  But after I got the title, I was told

5  by Bert that one of the tenant is paying $500, one of them

6  is -- whatever it is -- on welfare, $800, the other one we

7  don't have a tenant so we have to go through this process

8  together to see -- I have a handyman working there.  So it

9  was -- in itself it was often a hassle, but I thought that,

10  okay, now at least I have a deed.

11  Q.   Okay.  And did there come a point where -- did you receive

12  titles to any of your other properties?

13  A.   No.

14  Q.   Did you receive refunds to any of your other properties?

15  A.   No.

16  Q.   Like it was in your guaranty agreement?

17  A.   No.

18  Q.   Okay.  Now, did -- at some point did you learn from

19  Mr. Rossini that he was taking legal action against one of his

20  business partners?

21  A.   That was when all of us in San Jose, you know, people who

22  have invested, we complained.  And we had a conference call,

23  if I remember.  He said that I am taking -- he had -- he had

24  an attorney.  I don't -- I forget his name.  But he said he

25  had a lawyer; that we are taking -- either we filed a lawsuit

Moghaddasi - direct

1    or we are filing a lawsuit against Thomas Murphy.

2    Q.   When approximately was that?

3    A.   Honestly, I don't remember.

4    Q.   Okay.

5    A.   It was --

6    Q.   Was it in the spring or fall of -- spring or winter

7    of 2013?

8    A.   I don't remember.  But we had a conference call I

9    remember.  And Babajan was on the other side with Bert and

10   their lawyer -- or his lawyer.  I don't know exactly.

11   Q.   Now, did there come a point where you continued to receive

12   e-mail updates from Mr. Rossini about your properties?

13   A.   Yes.  I think that we had received -- I have received or

14   we have received some about the progress being made.

15   Q.   Because sometimes you would receive e-mails directly or

16   sometimes there would be e-mails sent to all of these

17   California investors?

18   A.   Yes.

19   Q.   I'm going to show you what I've marked as Government

20   Exhibit Moghaddasi 17.

21        This is an e-mail from June of 2013.  Do you

22   recognize it?

23   A.   Yes.

24   Q.   And is that an e-mail from Mr. Rossini to you that was

25   entitled investor report?

Moghaddasi - direct

1    A.   Uh-huh, yes.

2    Q.   And the attachment that it has?

3    A.   Yes.

4    Q.   Does that fairly and accurately represent that e-mail that

5    you received?

6    A.   Yes.

7           MR. NOVAK:  I'm going to offer it into evidence and

8    ask to publish it to the jury, Judge.

9           THE COURT:  Any objection?

10          MR. FRANKEL:  No objection.

11          THE COURT:  Moghaddasi 17 is admitted in evidence.

12      (Moghaddasi Exhibit No. 17 received in evidence.)

13   BY MR. NOVAK:

14   Q.   So this is a -- I have it up on the screen.  It's -- it

15   looks like it's from June 30th of 2013?

16   A.   Yes.

17   Q.   Sent from Mr. Rossini's e-mail to you and to other

18   investors?

19   A.   Yes.

20   Q.   And it's got an attachment entitled investor report,

21   right?

22   A.   Yes.

23   Q.   And attached Mr. Rossini says:  I sent this yesterday.  He

24   reported to me his e-mail was hacked so I'll send the

25   applicable reports to other investors.  But Mr. Rossini is

Moghaddasi - direct

1  saying he is attaching a report?

2  A.  Uh-huh.

3  Q.  That's your understanding?

4  A.  Yes.

5  Q.  And the attachment is an investor report dated June 29th

6  of 2013.  And it has certain representations about various

7  properties and who they belong to.  For example, your property

8  on Congress -- on 5062 West Congress, he has an update for

9  you, right?

10  A.  Yes.

11  Q.  And for the church's property at 5336 West Jackson, he has

12  an update about what it is -- what the foreclosure process is,

13  right?

14  A.  Yes.

15  Q.  There is the next page, which would be page 3 of the

16  exhibit, your property -- your investment on 3610 West

17  Lexington:  It's in foreclosure and owner occupied; Section 8

18  has canceled rents.  That's yours, right?

19  A.  Yes.

20  Q.  That's your property --

21  A.  Yes.

22  Q.  -- you invested in?

23       An update on the Polk property for the church and the

24  Oakley property for you that you had just invested in the year

25  before, right?

Moghaddasi - direct

1  A.  Yes.

2  Q.  I think there's one more page.

3          And he's got an update on your property at Sheffield:

4  Order for judgment and receiver report; I am negotiating with

5  owner.  That's your 2129 investment on Sheffield?

6  A.  Yes.

7  Q.  And your Karlov investment at 7941:  Still in foreclosure.

8  Bank of America's paperwork is a problem.  We're on this deal

9  and I've spoken to owner who is attempting to get money to pay

10 off the loan.  It appears our worst-case scenario is we will

11 recoup money on the deal.  Right?

12 A.  Yes.

13 Q.  That wasn't the only report you received from Mr. Rossini

14 or other e-mail communication, not a formal report maybe.  For

15 example, in July of 2018 -- on July 27th, he had sent you an

16 e-mail about another update for your properties, right?

17         I'm going to show you what is Moghaddasi 18.

18 A.  Okay.

19         Yes.  This is the one that he mentioned he's putting

20 liens on on our behalf.

21 Q.  Does that fairly and accurately represent the e-mail that

22 you received from him at that time?

23 A.  Yes.

24         MR. NOVAK:  Your Honor, I offer Moghaddasi 18 into

25 evidence.

Moghaddasi - direct

1          MR. FRANKEL:  No objection.

2          THE COURT:  Moghaddasi 18 is admitted in evidence.

3      (Moghaddasi Exhibit No. 18 received in evidence.)

4          MR. NOVAK:  And ask to publish it to the jury.

5   BY MR. NOVAK:

6   Q.  And so in this one, you mentioned that there were liens

7   put on your properties.  What's your understanding of this?

8   What was going on in this e-mail with this lien talk?

9   A.  Basically nobody can do anything with this -- with these

10  properties because we paid for it and our name is as the

11  lienholder on the property.

12  Q.  Okay.  And Mr. Rossini's e-mail indicates he's the one

13  putting the liens on these --

14  A.  Yes.

15  Q.  -- properties, right?

16          And he also has specific updates for you on Sheffield

17  and Oakley?

18  A.  Yes.

19  Q.  Go to page 2.

20          Has another update on Karlov, that he has spoken with

21  the lawyers for the bank; that the owner has stalled

22  foreclosure with mediation but will not last much longer,

23  right?

24  A.  Yes.

25  Q.  And you were getting e-mails from him as late as November,

Moghaddasi - direct

172

 1    right?

 2              I'm going to show you Moghaddasi 20.

 3              Does that fairly and accurately reflect another

 4    e-mail Mr. Rossini sent you in November of 2013?

 5    A.  Yes.

 6    Q.  Okay.

 7              MR. NOVAK:  Your Honor, I move Moghaddasi 20 into

 8    evidence.

 9              THE COURT:  Any objection?

10              MR. FRANKEL:  No objection.

11              THE COURT:  Moghaddasi 20 is entered in evidence.

12       (Moghaddasi Exhibit No. 20 received in evidence.)

13              MR. NOVAK:  And ask to publish.

14              THE COURT:  Go ahead.

15    BY MR. NOVAK:

16    Q.  This is one where you, on November 21st, asked him if

17    there's any updates, right?

18    A.  Yes.

19    Q.  Part of the e-mail.

20              He responded on the -- I believe it was the -- at

21    least on UTC time -- the 22nd of November where he says:  I

22    spoke to Ed George, the bank rep; and he said -- this is your

23    Lexington investment, right?  Because it says the subject line

24    is regarding Lexington?

25    A.  Yes.

Moghaddasi - direct

1   Q.  Then he also -- he also mentions Karlov again,

2   Mr. Rossini, saying:  I've had some discussions with the bank

3   and owner on 7941 Karlov.  Mrs. Adic is willing to turn it

4   over but now I need to get the okay from the bank; however, it

5   is progress.  Right?

6   A.  Yes.  The Karlov is in Skokie, yes.

7   Q.  Now, did you ever get the titles to those properties?

8   A.  No.

9   Q.  Or your refunds, like your guaranty agreement?

10  A.  No.

11  Q.  In total -- so you kept -- did you keep records of how

12  much you invested with Mr. Rossini?

13  A.  Yes, close to, I think, $960,000.

14  Q.  And did you keep records of how much rent payments you

15  received from Mr. Rossini or his affiliated companies?

16  A.  Yes, because I put all of these in my taxes, rental

17  income.  If I'm not mistaken, total was 224 or something,

18  200 --

19  Q.  So were you able to calculate what you estimated your loss

20  from your investments?

21  A.  700 something.

22  Q.  Thousand dollars?

23  A.  $750,000.

24  Q.  And you invested in -- if I'm not mistaken, personally

25  invested in --

Moghaddasi - cross

1   A.  Five.

2   Q.  -- six properties, right, total?

3   A.  Yes.

4   Q.  And how many of those properties did you get the titles

5   to?

6   A.  One.

7   Q.  The church invested in how many properties total?

8   A.  Four.

9   Q.  How many titles or deeds did the church get in total?

10  A.  One.

11  Q.  Did the church -- are you aware, did the church get any

12  refunds from Mr. Rossini for the other three?

13  A.  No.

14          MR. NOVAK:  One moment, please.

15    (Brief pause.)

16          MR. NOVAK:  Nothing further.

17          THE COURT:  Mr. Frankel, your witness.

18          MR. FRANKEL:  Thank you, Judge.

19                      CROSS-EXAMINATION

20  BY MR. FRANKEL:

21  Q.  Good afternoon, Mr. Moghaddasi.

22  A.  Good afternoon, sir.

23  Q.  I'm Scott Frankel and I represent Mr. Rossini in this

24  matter.

25          You told us that you arrived to the United States

Moghaddasi - cross

1    from Iran; is that correct?

2    A.   Yes.

3    Q.   And in 1991 through 1993, you lived in LA?

4    A.   Yes.

5    Q.   Do you -- how far did you get in your education?

6    A.   I have computer science software engineering degree from

7    Iran.

8    Q.   Okay.  In 2011, where were you employed?

9    A.   Apple.

10   Q.   And what was your position entitled at Apple?

11   A.   Software QA position.  I was a manager.

12   Q.   And was that the final position that you obtained in

13   Apple?

14   A.   No.

15   Q.   What --

16   A.   Support -- enterprise support engineer now.

17   Q.   Enterprise support engineer?  Okay.

18   A.   Yes.

19   Q.   Is that an executive position?

20   A.   No.

21   Q.   You said that when you got to San Jose you joined the

22   Assyrian Evangelical Church?

23   A.   Yes.

24   Q.   And you became an elder in that community?

25   A.   Yes.

Moghaddasi - cross

1   Q.  And you were on the board of elders, correct?

2   A.  Yes.

3   Q.  And president of the board of elders, correct?

4   A.  At some point I became president, yes.

5   Q.  And were you president in 2011 when you were approached by

6   Fred Khoshabe?

7   A.  Yes.

8   Q.  And the church -- I take it that's a non-profit

9   institution?

10  A.  Yes.

11  Q.  Fred wanted or suggested the church engage in investments?

12  A.  Yes.

13  Q.  Is that -- was the -- had the church been involved in

14  investing its money in profit-making enterprises before?

15  A.  It's not profit-making.  We have a house also in San Jose

16  so it's helping us with the income --

17          THE COURT REPORTER:  I'm sorry, sir?

18  BY THE WITNESS:

19  A.  Another property that we owned in San Jose because we

20  couldn't afford buying a church.  We bought a house.  So --

21  and this was another way to increase -- other than the

22  offering of the title to the people because we wanted to buy a

23  church.

24  BY MR. FRANKEL:

25  Q.  You wanted to buy a church?

Moghaddasi - cross

1    A.   Yes.

2    Q.   But the choice was made to invest in mortgage notes --

3    A.   As --

4    Q.   -- in Chicago?

5    A.   As it helped income of the church.  We wanted to see if

6    there were any ways that we -- it can help with our mortgage

7    if we decide to buy a church.

8    Q.   Okay.

9    A.   It was a legitimate purchase, at that time it looked like.

10   Q.   You talked to Fred.  Did he also -- he introduced you to

11   his brother Babajan Khoshabe, correct?

12   A.   He didn't introduce me to Babajan.  I know that there

13   was -- he had two other brothers because I told everybody that

14   they are my cousin, but I haven't met Babajan.  So Fred told

15   us that Babajan and Bert and Thomas together are doing this

16   business of getting the notes, foreclosure note, and will get

17   us the titles.

18   Q.   And most of your understanding about this process of the

19   foreclosure notes and the titles you learned from Fred?

20   A.   At that time, yes, Fred.

21   Q.   Okay.  And you had known Fred for how long?

22   A.   Since 1993.

23   Q.   And he was also an active participant in your community?

24   A.   Yes.  He was part of the Assyrian Evangelical Church, and

25   at some point he was an elder.

Moghaddasi - cross

1    Q.   And you trusted him?

2    A.   Very much.

3    Q.   As the -- as the investment was explained to you, there

4    was no downside to this investment; is that correct?

5    A.   There was a downside, yes.  It was -- the downside was you

6    buy a property, the neighborhood goes bad, and then you lose

7    the value of the property.  And we were willing to take that.

8    Q.   Okay.  But as you understood it, you weren't actually

9    buying the property.  You were buying a note of a property

10   that was in foreclosure?

11   A.   We were buying a note in order to transfer it to title; if

12   not, we were going to get our money back.

13   Q.   So in order to own this property, somebody had to go to

14   court and succeed in the foreclosure hearings and then the

15   deed would be transferred over to you as the owner of the

16   note.  Was that your understanding?

17   A.   Yes.

18   Q.   And you were investing in the process of the foreclosure

19   to see the foreclosure go through completion so that would

20   ultimately result in the deeding of the property to you?

21   A.   No.  I was not investing in process.  I was investing in

22   purchasing a foreclosure note in order to transfer that to be

23   a title.

24   Q.   So you --

25   A.   In the engineering side, when you talk about the process,

Moghaddasi - cross

1    process is A to B.  We were not investing in any process.  We

2    were told, we going to purchase the notes.  We will go to

3    court.  We will transfer this to title if we can because the

4    judge might return this to the owner.  Then we going to get

5    your money back while you're getting the rent.

6    Q.  Okay.  So you understood that there would be a hearing.

7    The judge could either decide to give the property to you or

8    to the owner?

9    A.  Absolutely.

10   Q.  And if it went to the owner, then you would get your money

11   back?

12   A.  Yes.

13   Q.  So you weren't actually buying the property.  You were

14   buying an investment into this process of the foreclosure?

15   A.  You can put -- you can call it process.  I don't.  Sorry.

16   I just -- you either buy a note or you buy a title or you get

17   your money back.  There are three options.  Sorry, I am

18   engineer.  Either one, two, three.  There is no process.

19   Either I pay something -- I buy a car or I lease a car.  We

20   were told that you have three options.  We going to get you --

21   we going to get the note definitely.  Either we will give you

22   a title or we going to get you money back.  So there's no

23   process.  Process is for that duration of time when they're

24   working to get us the title.

25   Q.  And that could be a successful process -- a successful --

Moghaddasi - cross

1   A.  Yes.

2   Q.  -- period of --

3   A.  Definitely, yes.

4   Q.  -- or not successful?

5   A.  Amen.  Yes.

6   Q.  And you bore no risk in your investment of whether that

7   was successful or not successful?

8   A.  The risk for us was that I was going to get a title in

9   Chicago and then suddenly, you know, the property was not even

10  worth $10,000.  And I was willing to take that risk, which is

11  you buy a property and the neighborhood goes bad and then you

12  lose it, yes.  But I -- the investment was in either the

13  note -- give me the note or give me the title or give me my

14  money back.

15  Q.  Okay.  And that sounded pretty good to you, either give me

16  the title or my money back?

17  A.  It sounded very legitimate.  And, yes, it sounded like

18  everybody else was doing.  When you save money and you put it

19  in notes, foreclosure notes, you will end up either title or

20  you're going to get your money back.

21  Q.  You say it sounded legitimate because it sounded like no

22  matter which way things turned, you would get your money back?

23  A.  I don't know how many ways I have to say it.  Sorry.  It

24  was --

25  Q.  I just want you to answer my question.

Moghaddasi - cross

1   A.   Okay.   What's your question?

2   Q.   The question is:   You were shown this -- this is going to

3   take a second to warm up.

4   A.   That's fine.

5   Q.   So you at some point were shown this guaranty agreement --

6   A.   Yes.

7   Q.   -- correct?

8            And you -- it says it right on the top, "guaranty,"

9   right?

10  A.   Yes.

11  Q.   And in this document, you read that Rossini guarantees to

12  Moghaddasi that if any one or more of the properties for which

13  Moghaddasi has advanced funds are not closed and purchased,

14  you shall get a return of the funds?

15  A.   Yes.

16  Q.   So it was too good to pass up this deal, right?   That's

17  what it looked like to you?

18  A.   What do you mean, it is too good to pass up?   I don't

19  understand.   Sorry.   I mean, you have --

20  Q.   Well, you told the jury that this looked like a legitimate

21  deal.   And I'm showing you that this looked like a guaranteed

22  deal.

23  A.   Yes, it's a guaranteed --

24  Q.   Those two things are different, aren't they?

25  A.   It's a guaranteed -- it's guaranteed based on the

Moghaddasi - cross

1   relationship that Fred had.  If it was someone else, I would

2   have had the lawyer reviewing this, right.

3   Q.  So the reason you didn't have a lawyer is because your

4   good friend, Fred Khoshabe --

5   A.  Not friend.  He's my cousin.  I trusted him.

6   Q.  A trusted person and a friend, maybe in family, there were

7   all these relationships; and you trusted what he told you?

8   A.  Yes.

9   Q.  By the way, this guaranty has a fax mark on the top of it,

10  doesn't it?  Can you see what that says there?

11  A.  Berger, New- --

12  Q.  Newmark & Fenchel, BNF, Thomas Murphy's law firm?

13  A.  Yes, at that point -- at that point, I -- yes, it looks

14  like -- I see it now, yes.

15  Q.  Okay.  But you know Thomas -- you knew who Thomas -- you

16  had met Thomas Murphy at some point?

17  A.  No.

18  Q.  You -- but you knew who he was?  You --

19  A.  Yes.  We were told that he worked with Bert and he's the

20  lawyer; that he's going to get the cashier's check and he's

21  going to do the work.

22  Q.  And you knew he worked at this law firm?

23  A.  Yes.

24  Q.  And that's where this document appears to have come from,

25  correct?

Moghaddasi - cross

183

1   A.  Yes.

2   Q.  On August 18th, 2011?

3   A.  But at that point, I didn't --

4           THE COURT:  You can just answer the question, please.

5           MR. FRANKEL:  By the way, your Honor, this is

6   Moghaddasi Exhibit 3 I'm showing him.

7   BY MR. FRANKEL:

8   Q.  The document -- this guaranty says that Rossini agrees to

9   pay you the monthly equivalent of the rentals?

10  A.  Yes.

11  Q.  When you read that, did you -- did that raise a question

12  in your mind, what's the equivalent of a rental as opposed to

13  the rental income that -- itself?

14  A.  No.

15  Q.  You didn't question Rossini where was this money going to

16  come from?

17  A.  No.  Equivalent of rents.  I'm not a lawyer.  I thought

18  this means the total amount of rent.

19  Q.  And it says:  Moghaddasi agrees that Rossini may use the

20  funds advanced.  You understood that you were giving him

21  permission to use the funds without any qualification or

22  limitation there in that sentence?

23  A.  As advanced means, doing something for us, which is

24  getting the note and converting in to deeds.

25  Q.  Okay.  That was your understanding of what you were

Moghaddasi - cross

1   signing?

2   A.  Yes.

3   Q.  And did you make sure that this document actually

4   protected your interests by showing it to a lawyer or --

5   A.  No.

6   Q.  Okay.  You told us that the church -- the church invested

7   in four properties and got the title on one?

8   A.  Yes, sir.

9   Q.  And you invested in six properties and got the title on

10  one property?

11  A.  Yes.

12  Q.  Okay.  And the money that you sent for these investments,

13  that all went in the form of checks that you were shown --

14  A.  Cashier's --

15  Q.  -- on --

16  A.  -- check, yes.

17  Q.  And those checks were all made out to Thomas Murphy?

18  A.  Yes.

19  Q.  Every single one of them?

20  A.  Every single one.

21  Q.  Okay.  I just want to show you Moghaddasi Exhibit 4.

22  That's another copy of the guaranty agreement, correct?

23  A.  Yes.

24  Q.  And this one also shows a fax mark from Thomas Murphy's

25  law firm, correct?

Moghaddasi - cross

1  A.  Yes.

2  Q.  I just want to show you Moghaddasi Exhibit 11.  You were

3  shown a number of documents that looked similar to this one.

4  These are the, as the government called it, fact sheet?

5  A.  Yes.

6  Q.  And this particular fact sheet showed financial

7  information relating to 2129 North Sheffield, correct?

8  A.  Yes.

9  Q.  And the cashier's check, as you've already told us, was

10 made out to Thomas Murphy, correct?

11 A.  Yes.

12 Q.  And it says attorney/agent, correct?

13 A.  Yes.

14 Q.  You received $224,000 in rent payments?

15 A.  Sorry.  I didn't hear you.

16 Q.  You told us that you received about $224,000 in rent

17 payments?

18 A.  Yes.

19 Q.  And you know that because you kept track of what you were

20 receiving --

21 A.  Yes.

22 Q.  -- for your taxes?

23 A.  I don't remember the exact number.  But, yes, I -- it was

24 over -- between 200 and 250.

25 Q.  Okay.  And those payments came from -- at some point they

Moghaddasi - cross

1   were coming from Anthony Khoshabe's business; is that correct?

2   A.  I did not know it's his business.  I knew that Reliant

3   Management was a company that Bert and Babajan introduced to

4   us as the property manager, and we started receiving the rents

5   through that.  And then Anthony's name signature at the bottom

6   of the e-mail told me that he's someone there.  I don't know

7   what his position was at the time.

8   Q.  Okay.  You didn't know what Anthony Khoshabe's

9   relationship was to Babajan Khoshabe?

10   A.  No.  I knew he was son.  I didn't know his role.

11   Q.  You didn't know his role?

12   A.  Yeah.

13   Q.  But did you understand the role of Reliant?

14   A.  Yes.

15   Q.  And what was your understanding what they were doing?

16   A.  Property manager.

17   Q.  And they were -- and you thought that they were collecting

18   the rents; is that right?

19   A.  Yes.

20   Q.  Did Fred -- never -- you knew -- Fred told you that

21   Anthony was Babajan's son?

22   A.  No, I knew.

23   Q.  You knew?

24   A.  Yeah.

25   Q.  Okay.  And did it cause you to trust him more to know that

Moghaddasi - cross

1    he was related to the Khoshabes?

2    A.  It -- it didn't change the equation because I know

3    Babajan.  And now they have a company doing the property

4    management.  So we -- we were receiving the rents and now

5    their property manager taking over and it didn't cause us any

6    plus or minus.

7    Q.  Okay.

8         Okay.  You were shown Moghaddasi Exhibit 12 by the

9    government.  Do you recognize that document?

10   A.  Sorry.  I didn't hear you, sir.

11   Q.  Do you recognize that document?

12   A.  Yes.

13   Q.  It looks like an e-mail that you received -- that Fred

14   received from Bert?

15   A.  Yes.  Because when I was frustrated on behalf of everybody

16   talking to Anthony, on Reliant, cc'd Fred, and Fred talked to

17   Bert, and then Bert sent him an e-mail, and then he forwarded

18   this to me.

19   Q.  Okay.  And the e-mail says:  Dear Fred, I am sending this

20   e-mail in the event any of our investors are wondering why

21   payments have been so late this month.

22         Do you see that there?

23         THE COURT:  Can you magnify that, please.

24   BY THE WITNESS:

25   A.  Thank you.

Moghaddasi - cross

1              It's too much.

2    BY MR. FRANKEL:

3    Q.  How's that?

4    A.  Thank you.

5              Which section you are referring to?

6      (Brief pause.)

7    BY THE WITNESS:

8    A.  Yes.

9    BY MR. FRANKEL:

10   Q.  Okay.  And the response starts:  Starting the last week of

11   May 2012, in response to our seeking a quicker route to the

12   end of the foreclosure process, acquisition of properties, and

13   transfer of mortgages, Tom Murphy and his firm began asking

14   for the transfer of notes, mortgages, and foreclosure

15   proceedings, together with assignment of rents to his firm.

16             Do you see that?

17   A.  Yes.

18   Q.  And when you read this e-mail, you knew that Tom Murphy

19   was a lawyer that was working with Bert Rossini; is that

20   correct?

21   A.  Yes.

22   Q.  And did you know that he was in a firm -- in a law firm at

23   that time?

24   A.  Yes.

25   Q.  On direct examination, you were also shown Moghaddasi 17.

Moghaddasi - cross

1    Do you remember seeing this exhibit just a few minutes ago?

2    A.   Yes.

3    Q.   And it's titled investor report at the top?

4    A.   Yes.

5    Q.   And this is a June 30th, 2013 e-mail, correct?

6    A.   Yes.

7    Q.   And you're one of the recipients, Vladi.M@apple.com?

8    A.   Yes.

9    Q.   And there's an attachment which says investor report,

10   correct?

11   A.   Yes.

12   Q.   So I want to turn to the investor report, which starts on

13   the next page of the exhibit.

14          This is the June 29, 2013 investor report, correct?

15   A.   Yes.

16   Q.   And it says:  This week we received financial spreadsheets

17   from Tom Murphy.  Correct?

18   A.   Yes.

19   Q.   Again, the lawyer that you knew was working with Rossini?

20   A.   Yes.

21   Q.   And did you know who Rich Kruse was?

22   A.   At some point when -- I don't remember the time, but when

23   we had the conference call with Mr. Rossini, he was on the

24   other side.  He's being the attorney for Mr. Rossini.

25   Q.   Okay.  You knew that Richard Kruse -- Rich Kruse was

Moghaddasi - cross

1    representing Mr. Rossini in a lawsuit against Mr. Murphy?

2    A.   When -- yes, during that conference call --

3    Q.   Okay.

4    A.   -- it became clear that he had a lawyer.

5    Q.   Rich Kruse is a lawyer?

6    A.   Yes.

7    Q.   Okay.  Did you ever look up Rich Kruse to see that he was

8    a lawyer?

9    A.   No.

10   Q.   Did you ever talk to Rich -- and do you -- did you

11   yourself ever talk to Rich Kruse?

12   A.   Other than the conference call, no.

13   Q.   Okay.  Rich -- it says here that:  Rich Kruse has stated

14   to me we cannot verify the spreadsheets without a copy of the

15   paid checks to match up with what he has sent to us.

16          Do you see that?

17   A.   Yes.

18   Q.   And do you also see that it's written there that:  We have

19   subpoenaed these statements and Tom has stated to Rich that he

20   would provide them prior to July 8th court date.

21   A.   Yes.

22   Q.   Do you know if Tom ever provided the -- this information

23   to Rich prior to the July 8th court date?

24   A.   I don't know.

25   Q.   It says:  Rich -- and there he's referring to Rich

Moghaddasi - cross

1  Kruse -- was to meet with Tom again yesterday afternoon and I

2  will have his update Monday.

3          Do you remember if you received that update from Bert

4  Rossini?

5  A.  I don't remember.

6  Q.  And then it says:  In the meantime, I have below of

7  what -- a synopsis of what Tom says he paid out.  Correct?

8  A.  Yes.

9  Q.  So the rest of the information in this investor report --

10  and it goes on for another two and a half pages -- involves

11  information that came from the lawyer, Tom Murphy, correct?

12  A.  Yes.

13          THE COURT:  Counsel, can I speak to you at sidebar,

14  please.

15    (Proceedings heard at sidebar:)

16          MR. FRANKEL:  I'm almost done.

17          THE COURT:  That was my question.  How much more do

18  you have?

19          MR. FRANKEL:  That might be my last question, but I'm

20  really close.

21          THE COURT:  Okay.  How much for redirect?

22          MR. NOVAK:  Not very much, maybe 10, 15 minutes.

23          MR. HOGSTROM:  If we have extra time, we have a

24  couple of stipulations.

25          THE COURT:  Okay.  Very good.

Moghaddasi - redirect

1     (Proceedings heard in open court:)

2          MR. FRANKEL:  One second, Judge.  I might be done.  I

3     just want to double check my notes.

4          THE COURT:  Sure.

5     (Brief pause.)

6          MR. FRANKEL:  I have nothing further.

7          THE COURT:  Okay, Mr. Frankel.

8          Any redirect?

9          MR. NOVAK:  Yeah, briefly, your Honor.  One moment.

10                    REDIRECT EXAMINATION

11    BY MR. NOVAK:

12    Q.  On cross-examination you were shown the guaranty agreement

13    that you signed, Moghaddasi 3.  I'll put it up on the

14    projector here.

15         And can you tell the jury again what your

16    understanding of this agreement was that you had with

17    Mr. Rossini?

18    A.  Our understanding was it's a contract between us and his

19    company.  He's going to represent us, working with Murphy,

20    getting our -- the notes and at the end getting us a title or

21    returning our money while we are getting the rent.

22    Q.  The money that you were giving Mr. Rossini for these

23    investments, what did you understand you were giving this

24    money for?

25    A.  To buy the foreclosure notes.

Moghaddasi - redirect

1   Q.  And in this guaranty agreement -- that's borne out by the

2   guaranty agreement, right?

3           If you look here, it says:  Rossini has asked

4   Moghaddasi -- that's you?

5   A.  Yes.

6   Q.  To advance funds to be used to purchase property or

7   properties pursuant to the assignments.  Right?

8   A.  Yes.

9   Q.  And Mr. Rossini has also represented in this agreement

10  that he has obtained written assignments of the right to

11  acquire the parcels that you're investing in?

12  A.  Yes.

13  Q.  Again, he says that:  Once one of these properties has

14  been closed, the title shall be deeded to Mr. Moghaddasi or as

15  you shall direct?

16  A.  Yes.

17  Q.  In case of the purchase of existing notes, the foreclosure

18  will be completed and thereafter have title to the property

19  deeded to Moghaddasi and Moghaddasi can direct, right?

20  A.  Yes.

21  Q.  And then this last paragraph says that:  Rossini hereby

22  guarantees to Moghaddasi that in the event that any one or

23  more of the properties for which Moghaddasi has advanced funds

24  are not closed or purchased pursuant to the assignment,

25  Rossini is personally responsible to return any and all sums

Moghaddasi - redirect

1  so advanced by Moghaddasi for that particular property.

2  Right?

3  A.  Yes.

4  Q.  And in reading that, is that why you had the understanding

5  that you were giving money to purchase a note -- as you said

6  on cross-examination, you viewed it as three options:  You

7  were getting the note, the title, or the refund?

8  A.  Or the money -- our money back, yes.

9  Q.  The money back.

10        Now, you also were shown a couple of e-mails,

11  Moghaddasi 12.  This was -- we just looked at it.  I'm not

12  going to belabor the point, but this was the e-mail that

13  Mr. Rossini had sent to Fred for Fred to forward it, right?

14  A.  Yes.

15  Q.  And did you ever reach out to Tom Murphy to confirm what

16  Mr. Rossini was representing --

17  A.  No.

18  Q.  -- to you?

19        Why not?

20  A.  The contract that I have is with --

21        MR. FRANKEL:  I object to "why not" as being

22  irrelevant.

23        THE COURT:  Overruled.

24  BY THE WITNESS:

25  A.  The contract we signed and we dealt with Mr. Rossini, not

1  with Thomas.  He ask us to send the money to Thomas.  I never

2  talked to him, so I didn't have to check.

3  BY MR. NOVAK:

4  Q.  Mr. Rossini -- you were shown a check, I think for the

5  Oakley property, where you had written the check -- the

6  cashier's check as you did, I think, for all of them -- to

7  Thomas Murphy, attorney/agent, right?

8  A.  Yes.

9  Q.  Who gave you the direction to write the check in that way?

10  Did Mr. Murphy?

11  A.  No.

12  Q.  Who did?

13  A.  Mr. Rossini.

14  Q.  We also went over Moghaddasi 17, the investor report.  And

15  so -- this is Moghaddasi 17.  I'm on page 2.

16          At the top where Mr. Rossini -- so this is in June

17  of 2013, right?

18  A.  Yes.

19  Q.  Did you visit Chicago in June of 2013 personally?

20  A.  No.

21  Q.  You were still in San Jose, right?

22  A.  Yes.

23  Q.  And Mr. Rossini represents in this:  We received financial

24  spreadsheets from Tom Murphy.

25  A.  Yes.

Moghaddasi - recross

1  Q.  At this point, did you reach out to Mr. Murphy -- you knew

2  he was a lawyer, you knew his -- we went over his law firm

3  where he was working.  Did you reach out to Mr. Murphy to

4  confirm that that was correct?

5  A.  No.

6  Q.  So in this you were taking the representations of

7  Mr. Rossini as correct?

8  A.  Yes.

9  Q.  And that he actually had received spreadsheets from

10  Mr. Murphy?

11  A.  Yes.

12  Q.  Do you know for certain as you sit here if Mr. Rossini

13  obtained -- actually obtained spreadsheets from Mr. Murphy as

14  he put in this report?

15        MR. FRANKEL:  Objection.

16        THE COURT:  You can answer that yes or no.  Do you

17  know whether he did?

18  BY THE WITNESS:

19  A.  No.

20        MR. NOVAK:  Nothing further.

21        THE COURT:  Mr. Frankel, anything else?

22        MR. FRANKEL:  Just briefly, Judge.

23                    RECROSS EXAMINATION

24  BY MR. FRANKEL:

25  Q.  Showing you this Moghaddasi 3 again.  You don't know who

Moghaddasi - recross

1    wrote this document, do you?

2    A.  Sorry.  What did --

3    Q.  You received this document from Albert Rossini, correct?

4    A.  Yes.

5    Q.  You don't know who wrote this document?

6    A.  What do you mean?  I received from -- this from

7    Mr. Rossini.

8    Q.  You don't know if Mr. Rossini wrote this document or

9    Mr. Murphy wrote this document, do you?

10   A.  My assumption was Mr. Rossini wrote it.

11   Q.  You're telling us it was your assumption that he wrote it

12   because you received it from him, right?

13   A.  When someone sends you a document and ask you to sign it,

14   what do you think?

15   Q.  So because someone sent you a document and asked you to

16   sign it, you think Mr. Rossini wrote it?

17   A.  I thought -- yes, I thought Mr. Rossini wrote this.

18   Q.  Even though Thomas Murphy's law firm is at the very top of

19   the document?

20   A.  Sir, keep in mind that for us, all of them were together.

21   Q.  I'm just asking you a simple question.  You don't know who

22   drafted this document, do you?

23   A.  For sure, no.

24   Q.  For sure, no?

25   A.  No, I don't -- I assume that Mr. Rossini wrote it.

Moghaddasi - redirect

1    Q.  You don't know who drafted this document?  It's a yes or

2    no question.  Hard to answer, but that's the question.

3    A.  I assumed that I'm dealing with Mr. Rossini and Devon

4    management, so he wrote it.  He send it to me.  I signed it.

5            MR. FRANKEL:  Judge, could you ask the witness to

6    answer my question?

7            THE COURT:  Mr. Moghaddasi, can you answer the

8    question of:  Do you have specific knowledge as to who in

9    particular specifically drafted this document?

10           THE WITNESS:  No.

11           THE COURT:  Thank you.

12           MR. FRANKEL:  Thank you, Judge.  That's all I have.

13           THE COURT:  Anything further?

14           MR. NOVAK:  One question.

15                    REDIRECT EXAMINATION

16   BY MR. NOVAK:

17   Q.  Same document, Moghaddasi 3.  Who signed it?

18   A.  Mr. Rossini.

19           MR. NOVAK:  Nothing further, your Honor.

20           THE COURT:  Anything else, Mr. Frankel?

21           MR. FRANKEL:  No, your Honor.

22           THE COURT:  You may step down.  Thank you, sir.

23           THE WITNESS:  Thank you for the opportunity, Judge.

24     (Witness excused.)

25           THE COURT:  Ladies and gentlemen of the jury, it is

1    almost 4:30.  Why don't we go ahead and adjourn for the day.

2    So tomorrow we will start again at 10:00 o'clock.  Please be

3    in the jury room by 9:45.

4         During the overnight break, please do not discuss

5    this case with anyone, including one another.  And please do

6    not do any independent research regarding any of the issues or

7    parties that you've heard discussed in this case.

8         I want to thank you very much for your attention

9    today, and we will see you tomorrow.  Thank you.  Enjoy your

10   evening.

11        There is one more thing that I want to tell you about

12   scheduling wise, that due to family circumstances specific to

13   me, we will not be holding trial next Tuesday on the 12th.

14   Okay.  I just wanted to let you know.  All right.  Thank you.

15     (Jury out.)

16        THE COURT:  Please be seated.

17        I generally like to, at the end of a trial day, go

18   through -- review with the parties all of the exhibits that I

19   have admitted in evidence during that day so we can all be on

20   the same page.  So let me read those to you now.

21        Tell me when you're ready.

22        MR. NOVAK:  We're ready, your Honor.

23        MR. ADAMS:  Ready, your Honor.

24        THE COURT:  Government Photo 3; Badalian 1, 2, 16, 3,

25   4, 5, 6, 7, 8, 11, 9, 10, 12, 13, 14; Moghaddasi 1, 2, 3, 4, 5

1    through 9, 10, 11, 13, 12, 17, 18, and 20.

2            MR. FRANKEL:  That's -- those are the ones we have,

3    Judge.

4            MR. HOGSTROM:  Same here, Judge.

5            THE COURT:  Very good.

6            The other thing that -- this came up briefly today in

7    sidebar.  But I just wanted to make the record clear.  I did

8    require the government to submit a Santiago proffer prior to

9    trial in this case.  And we've been operating under the

10   Santiago proffer.  But in case it was not clear, I just wanted

11   to put my findings on the record so it is on the record.

12           So based upon the Santiago proffer provided by the

13   government and the record that I have in this case, the Court

14   finds that the government has shown that it is more likely

15   than not that the conspiracy existed regarding the scheme as

16   to the real estate notes as alleged by the government; that

17   Albert Rossini, Babajan Khoshabe, and Anthony Khoshabe were

18   members of the conspiracy; that the hearsay statements

19   described by the government -- were offered by the government

20   in their motion -- and I want to be specific here -- on

21   page 22 of their Santiago proffer were made; and the

22   statements were made in furtherance of the conspiracy.

23           Now, I will note that the statements provided --

24   identified by the government are of a general nature.  But

25   with regard to those categories that are set forth in the

1  government's Santiago proffer at 22, I do find that they all

2  qualify as statements in furtherance of the conspiracy;

3  however, obviously with regard to any individual statements,

4  if there are any objections as we go along in that regard, the

5  defendants can raise that.

6        MR. FRANKEL:  Thank you, Judge.

7        THE COURT:  All right.  Is there anything else we

8  need to address today?

9        MR. HOGSTROM:  No, Judge.

10       THE COURT:  The other question I had is with regard

11  to timing.  So the -- other than the two witnesses that the

12  defendant put on the witness list, does the government at this

13  point plan on presenting all of these potential witnesses

14  during its case?

15       MR. NOVAK:  Not all of the witnesses.  We will --

16  we're taking a look right now actually just to make sure all

17  of them -- the -- we have two more out-of-town witnesses --

18  three more to go.  So I think it's two tomorrow.  That would

19  be Khamis and Moshi.  And one on Thursday, which would be

20  Khodi, and then some of the local witnesses tomorrow too.

21  We'll talk to counsel about that.  And if we end up striking

22  anyone from the list, we will let the Court and counsel know

23  as soon as we do.

24       THE COURT:  Okay.  But I just want to make sure that

25  we're still on track for Monday or I guess it would be

202

1    Wednesday of next week?

2             MR. HOGSTROM:  I believe so, Judge.

3             MR. NOVAK:  I think so.

4             THE COURT:  All right.  Very good.  Thank you.  And

5    I'll just keep you on task just -- if you can give me updates

6    as we go along, if for some reason that estimate changes.

7    Okay?

8             MR. HOGSTROM:  Yes, Judge.

9             THE COURT:  Thank you.  We're adjourned.

10      (Trial adjourned until June 6, 2018, at 10:00 a.m.)

11                        *   *   *   *   *

12

13   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

14

15
     _/s/ Nancy C. LaBella_                _June 7, 2018_
16   Official Court Reporter

17

18

19

20

21

22

23

24

25