1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )  Docket No. 15 CR 515-1
                                     )
4                 Plaintiff,         )
                                     )
5            v.                      )  Chicago, Illinois
                                     )  June 6, 2018
6  ALBERT ROSSINI,                   )  10:00 o'clock a.m.
                                     )
7                 Defendant.         )

8                      VOLUME 2A
               TRANSCRIPT OF PROCEEDINGS - TRIAL
9        BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10  APPEARANCES:

11  For the Government:         HON. JOHN R. LAUSCH, JR.
                                United States Attorney, by
12                              MR. ERIK A. HOGSTROM
                                MR. WILLIAM PATRICK NOVAK
13                              Assistant United States Attorneys
                                219 South Dearborn Street
14                              Chicago, Illinois 60604

15  For the Defendant:          LAW OFFICES OF JOSHUA B. ADAMS,
                                P.C., by
16                              MR. JOSHUA B. ADAMS
                                53 West Jackson Boulevard
17                              Suite 1515
                                Chicago, Illinois 60604

18
                                FRANKEL & COHEN, by
19                              MR. SCOTT JAY FRANKEL
                                53 West Jackson Boulevard
20                              Suite 1615
                                Chicago, Illinois 60604

21

22                   ALEXANDRA ROTH, CSR, RPR
                       Official Court Reporter
23                   219 South Dearborn Street
                            Room 1224
24                   Chicago, Illinois 60604
                        (312) 408-5038
25

1      (The following proceedings were had in open court outside

2       the presence of the jury:)

3           THE COURT:  Case 15 CR 515-1, USA versus Albert

4    Rossini.

5           MR. HOGSTROM:  Good morning, your Honor.  Erik

6    Hogstrom and Bill Novak for the United States.

7           MR. FRANKEL:  Good morning.  Scott Frankel and Josh

8    Adams for Mr. Rossini, who's also in the courtroom.

9           THE COURT:  Good morning.

10          Is there anything that we need to address before we

11   proceed today?

12          MR. NOVAK:  The only just a small housekeeping matter.

13   The Court saw we handed up some additional exhibits for Bishop

14   Younan, who we believe is going to be our Friday witness.  We

15   just -- we update the exhibit binder.  We finalize the

16   exhibits.  We'll just keep handing it up.

17          THE COURT:  Okay.

18          MR. FRANKEL:  And we acknowledge receipt of those

19   additional exhibits.

20          THE COURT:  Very good.  Thank you.

21          So who will be the first witness today?

22          MR. HOGSTROM:  Awiquam Pithyou.

23          THE COURT:  Is he here?  Why don't you have him come

24   up.

25          MR. HOGSTROM:  There is also a translator.  So we'll

1    have to swear the translator.

2            THE COURT:  Who's the translator?  Step forward

3    please.

4            You can stand right next to him.  Thank you.  We are

5    going to bring the jury in.

6        (Jury entered the courtroom.)

7            THE COURT:  Good morning, ladies and gentlemen.

8            We will now proceed with the government's case in

9    chief.

10           Will the government call its next witness please.

11           MR. HOGSTROM:  Thank you, Judge.  The government calls

12   Reverend Awiquam Pithyou.

13           THE COURT:  Sir, will you please stand up.

14           And then we have a translator as well.  Can you

15   identify yourself.

16           THE INTERPRETER:  Robert Zaya, Z-a-y-a.

17       (Interpreter duly sworn.)

18       (Defendant duly sworn.)

19           THE COURT:  Please have a seat.  If you can move the

20   mike over to the translator, just pull it toward you.  Just

21   turn it over.  There you go.

22           Go ahead.

23          AWIQUAM PITHYOU, GOVERNMENT'S WITNESS, DULY SWORN

24                        DIRECT EXAMINATION

25   BY MR. HOGSTROM:

1   Q.  Good morning.  Please state and spell your name for the

2   court reporter.

3   A.  My name, Reverend Awiquam Pithyou, A-w-i-q-u-a-m,

4   P-i-t-h-y-o-u.

5   Q.  And how are you employed, sir?

6   A.  In the church.

7   Q.  And what church is that?

8   A.  St. Odisho Church.

9           THE COURT REPORTER:  I'm sorry?

10          THE INTERPRETER:  St. Odisho Church.

11  BY THE WITNESS:

12  A.  6201 North Pulaski.

13          THE INTERPRETER:  I believe it's spelled O-d-i-s-h-o.

14  BY MR. HOGSTROM:

15  Q.  What type of church is that?

16  A.  Church of the East.

17          THE INTERPRETER:  Church of the East.

18  BY THE WITNESS:

19  A.  Orthodox.

20  BY MR. HOGSTROM:

21  Q.  Is that Assyrian?

22  A.  Assyrian Church of the East, yes.

23  Q.  And what do you do at the church?

24  A.  Pray.

25          THE INTERPRETER:  Priest.

1       (Witness testifying through the interpreter:)

2   BY MR. HOGSTROM:

3   Q.   How long have you been a priest at the church, sir?

4   A.   50 years.

5   Q.   Approximately how many members does the church have in its

6   congregation?

7   A.   About 750.

8   Q.   And are most of the members also Assyrian?

9   A.   Yes.

10  Q.   What -- what is Assyrian?  What does the term Assyrian

11  refer to?

12  A.   Nation.  It's a nation, Assyrian nation.

13  Q.   Is it also a language?

14  A.   Yes.  They do have their own language.

15  Q.   Are you originally from the United States, sir?

16  A.   No.  I'm from Iraq.

17  Q.   When did you come to the United States?

18  A.   1983.

19  Q.   Why did you come to the United States?

20  A.   To run the church in Chicago and serve the people.

21  Q.   When you came to the United States -- first of all, when --

22  when was it?

23  A.   September of '83.

24  Q.   Are you now a citizen?

25  A.   Yes.

1    Q.   You mentioned the church has approximately 700 members, is

2    that correct?

3    A.   Yes, that's correct.

4    Q.   How would you describe the congregations?

5    A.   Assyrians mostly from Iraq, Syria and Lebanon.

6    Q.   Do the -- do the folks at the church speak mostly English

7    or mostly Assyrian with each other?

8    A.   Mostly Assyrian.

9    Q.   All right.  I like to turn your attention to the year 2011.

10   Were you introduced that year to an investment opportunity?

11   A.   Yes.  Yes, I was.

12   Q.   Approximately when did that happen?

13   A.   It was around Christmas time.

14   Q.   Do you recall the circumstances under which you were

15   introduced to this investment opportunity?

16   A.   We were celebrating Christmas, and we went to my

17   brother-in-law's residence.  And that's where I met Mr.

18   Babajan.  And he is my brother-in-law's brother-in-law.

19   Q.   So let me take a step -- take one step back.  You were

20   at -- whose residence were you at?

21   A.   The person's name is Ibrahim, Abe short for Ibrahim.

22   Q.   Is his last name Yousif?

23   A.   Yes.

24   Q.   And who was Ibrahim Yousif to you?

25   A.   My brother-in-law.

1  Q.  How long had you known Mr. Yousif?

2  A.  About 30, 40 years.  I've known him from back when I lived

3  in Iraq.

4  Q.  The other individual that you mentioned who was there, what

5  was his name?

6  A.  Khoshabe, Babajan.

7  Q.  Babajan first name, Khoshabe last name?

8  A.  Yes, Khoshabe is last name.

9  Q.  What was his relation to you?

10  A.  Ibrahim's sister is his wife.

11  Q.  Ibrahim's sister is whose wife?

12  A.  Babajan Khoshabe.

13  Q.  How long had you known Babajan?

14  A.  That was the first time I met him.

15  Q.  Had you heard about him before?

16  A.  No.

17  Q.  Did somebody introduce you to him?

18  A.  Ibrahim introduced me to him.

19  Q.  Where were you?  Were you standing?  Were you sitting when

20  you first met him?

21  A.  We were sitting down having dinner.

22  Q.  And who participated in the conversation when you first met

23  Babajan?

24  A.  He approached me first and asked me what I do for a living.

25  I told him that I'm a priest.  And he asked me how much I get a

1   year, what my salary is.  And when I gave him the number, he

2   was surprised.  And he said, how could you make ends meet with

3   this salary.

4          And he asked me if I want to invest some money and get

5   some good dividends in the end.

6   Q.  Was Mr. Yousif also participating in this portion of the

7   conversation?

8   A.  Yes, he was.

9   Q.  Did -- at that point did Babajan give you any details about

10  the investment that he had mentioned?

11  A.  He said we are real estate investors, and we buy foreclosed

12  properties.

13  Q.  Did -- what was your reaction to the suggestion that you

14  might invest?

15  A.  I asked him if this was -- if this was a legal thing that

16  he was investing in.  And he said, yes.  And he was -- yeah,

17  and I started to think about it.

18  Q.  Do you remember if Ibrahim had any reaction during that

19  conversation?

20  A.  He said that he would be investing as well.  And he asked

21  us to show up the following day at his office, and he would

22  give them more details.

23  Q.  Now, you mentioned your relation to Ibrahim.  Did you have

24  any familiarity with what Ibrahim did for a living?

25  A.  Yes, he's got his own business.

Awiquam Pithyou - direct                    211

1   Q.   Is it a successful business?

2   A.   Yes, it is.

3   Q.   What was your impression of him as far as how financially

4   well off he was?

5           THE INTERPRETER:  I'm sorry.  Could you repeat the

6   last part?

7   BY MR. HOGSTROM:

8   Q.   How financially well off he was.

9   A.   Yes, he is very well off.  He is a millionaire.

10  Q.   Did the fact that he expressed some interest in this give

11  you any feelings one way or the other about the possibility

12  of -- possibility of investing.

13  A.   Because since he was a church member and he had a good

14  reputation when I was introduced to him, I thought he was a

15  good businessman.

16  Q.   So did you in fact go meet with Babajan on a subsequent

17  occasion?

18  A.   Yeah, we -- Ibrahim and I went to his office to meet --

19  Q.   When did you go to his office?

20  A.   The following day.

21  Q.   Where was the office?

22  A.   It's on Devon Avenue, North Side of Chicago.

23  Q.   Was that near the church?

24  A.   Yes.

25  Q.   When you arrived at the office, who did you meet with?

1    A.   I met with Mr. Babajan and that individual sitting right on

2    your right, behind you.

3    Q.   Are you referring to the defendant?

4    A.   Yes.

5    Q.   Is that Albert Rossini?

6              THE INTERPRETER:  I'm sorry?

7    BY MR. HOGSTROM:

8    Q.   Is that Albert Rossini?

9    A.   Yes.

10             MR. HOGSTROM:  For the record, the witness has

11   identified the defendant as the individual he met with.

12             THE COURT:  So noted.

13   BY MR. HOGSTROM:

14   Q.   Could you describe what the office looked like when you

15   entered?

16   A.   Large office, multiple rooms, lot of employees.

17   Q.   Did it look busy?

18   A.   Yes, he looked very busy.

19   Q.   Did Babajan have his own office?

20   A.   Yeah, everybody had his own office.

21   Q.   Where -- where did you first meet with Babajan and Mr.

22   Rossini?

23   A.   In the office.  They were both together the same time.

24   Q.   So what was the first thing that happened when you met with

25   Mr. Babajan -- Babajan and the defendant?

Awiquam Pithyou - direct                213

1    A.   They presented some documents and properties that -- and he

2    told me these properties were taken from the bank, and they

3    were very reasonably priced.

4            They were foreclosed properties.

5    Q.   Who told you that?

6    A.   Both of them, Babajan and the other individual.

7    Q.   Now, I should ask, obviously you're speaking here today

8    through an interpreter.  Do you understand English?

9    A.   Babajan was interpreting during that time.  But -- but he

10   says he does understand English little bit.

11   Q.   So you have the ability to understand it.  Do you speak it

12   very well?

13   A.   Not -- not too well.

14   Q.   Now, during this meeting were both Babajan and the

15   defendant talking?

16   A.   Yes.

17   Q.   Now, you mentioned they showed you some documents.

18   A.   Yes, documents and property information as well.

19           MR. HOGSTROM:  May I approach, your Honor?

20           THE COURT:  You may.

21   BY MR. HOGSTROM:

22   Q.   I am handing the witness what's been marked as Government

23   Exhibit AW Pithyou 1.  Sir, do you recognize that document?

24   A.   Yes, I do.

25   Q.   What is it?

1   A.  It was a property description, like how many rooms,

2   bathrooms, bedrooms, like that.

3   Q.  And is there one property on page 1 and a second property

4   on page 2?

5   A.  Yes.

6   Q.  Is this document a fair and accurate depiction of the

7   document that you saw on the day in question?

8   A.  Yes, it is, both of them.

9           MR. HOGSTROM:  Government moves to admit Government

10  Exhibit AW Pithyou 1.

11          MR. ADAMS:  No objection.

12          THE COURT:  AW Pithyou 1 is admitted in evidence.

13      (Said exhibit was received in evidence.)

14          MR. HOGSTROM:  May I publish?

15          THE COURT:  You may.

16  BY MR. HOGSTROM:

17  Q.  Father Pithyou, the document will appear on your screen

18  now.  And I just want to go through a couple specific portions

19  of the document.

20          First on the top of the screen, it says Devon Street

21  Investments.  What did you understand that to be?

22  A.  That was the office, the name of the office.

23  Q.  Did you have an understanding of whose company that was?

24  A.  The real estate people.

25  Q.  And is this the address on Devon Street that you went to?

1  A.  Yes.

2  Q.  Just below that there is an address listed.  It says, 9124

3  Lawler, Skokie, Illinois.  Do you see that?

4  A.  Yes.

5  Q.  What was that a reference to?

6  A.  It was a property, two flat property.

7  Q.  Was this one of the properties that they were giving you

8  information about?

9  A.  Yes, it is.  Two flats.

10  Q.  Just below that there is a section that says, income.  What

11  did you understand this information to be?

12  A.  I was told the -- all these units were rented, and this was

13  the income coming in every month.  And I was told in six months

14  the property will be put -- transferred to your name.

15  Q.  And what was your understanding of what would happen in the

16  meantime while you were waiting for the title to be

17  transferred?

18  A.  It's -- they said it's a work in process.  And by the

19  time -- in six months it should be transferred to his name.

20  Just it would take like six months to be transferred.

21  Q.  And what would be happening with the rental income from

22  this property during that time?

23  A.  We would get a part of the rental property, rental income,

24  portion of it.

25  Q.  And who -- who was telling you all of this at the time you

Awiquam Pithyou - direct                216

1   looked at this document?

2   A.   Babajan and Mr. Rossini.

3            I asked if I could go and see the property.  They said

4   not -- not at this time because they're all rented and there is

5   no way for us to gain access to the property.

6   Q.   Okay.  I'll come back to that in just a minute.  I want to

7   ask you about a section right below, says, expenses.  And it

8   lists real estate tax, water, insurance.

9            Do you remember being told anything about what would

10  happen with the expenses on this building?

11  A.   They said you would not be paying any expense for next six

12  months.  You would be only collecting a portion of the rent.

13  Until they transferred to your name, then you will be

14  responsible for it.

15  Q.   All right.  On the bottom, there is a section that talks

16  about a cashier's check.  It lists the name Thomas Murphy.  Do

17  you remember what if anything they told you about this?

18  A.   Yes, I used to write all the checks to -- to this -- to

19  this name.

20  Q.   And were you told why you would need to write a check to

21  Mr. Murphy?

22  A.   Yeah, because he was working on the deal, and he was the

23  attorney for -- for this transaction.

24  Q.   I am going to turn your attention then to the next page --

25  let me back up.

1          Okay.  This is the second page of Exhibit 1 that we

2   are looking at.  At the top of the page, it references a

3   different address on Lawler.  It says, three-unit apartment

4   building.  Do you see that?

5   A.   Yes.

6   Q.   What was your understanding of what this document was?

7   A.   It's similar to the other document.

8   Q.   And below was there another section listing income from

9   each unit and expenses as well?

10  A.   Yes, they showed me all -- all this information.

11  Q.   And was it -- was it your understanding about this property

12  that it was the same as the first property as far as receiving

13  rental income and not being responsible for the expenses?

14  A.   Yes.

15  Q.   Okay.  Now, you mentioned that you asked to see the

16  property.  Did you -- were you able to see the outside of the

17  property?

18  A.   Yes, I was.

19  Q.   Did that happen on that day?

20  A.   No, on a different date.

21          THE INTERPRETER:  He is asking if this is the

22  three-unit building you are referring to.

23  BY MR. HOGSTROM:

24  Q.   The building on Lawler.

25  A.   Yes, they were -- it was right across the street.

Awiquam Pithyou - direct                    218

1  Q.  So who went with you to look at these buildings?

2  A.  Both of them.

3  Q.  And how did you get there?

4  A.  We drove.

5  Q.  Who drove?

6  A.  Babajan.

7  Q.  And was the defendant also in the car?

8  A.  Yes, he was.

9  Q.  When you went to the properties, what did you observe?

10 A.  It looked similar to the other property.  But he said we

11 cannot gain access at this point.

12 Q.  And why did they say you couldn't gain access to it?

13 A.  Because we didn't notify the tenants, and we didn't make

14 any appointments with them.

15 Q.  This property was in Skokie?

16 A.  Yes, it was.

17 Q.  What was your impression of the neighborhood?

18 A.  It's a nice neighborhood.

19 Q.  What was your impression of -- after seeing the property of

20 what sort of a potential investment property it would be for

21 you to hold?

22 A.  Considering the income, it looked like a good -- good

23 investment.

24 Q.  Did you decide to make an investment?

25 A.  No.

1   Q.   Not on that day?

2   A.   No, not on that day, no.

3   Q.   After that first day, what was the next thing that happened

4   that you recall relating to this investment?

5   A.   They showed me other properties.

6   Q.   How did they show you the other properties?

7   A.   They had the listings with them.  And they showed me the

8   listings.

9   Q.   Documents?

10  A.   Yes.

11  Q.   Did you ultimately decide to invest in those two Lawler

12  properties?

13  A.   Yes.

14  Q.   Approximately when do you think you made the decision to

15  invest in those properties?

16  A.   About a week or two.  I'm not exactly sure.

17  Q.   Do you recall if they gave you a price?

18  A.   Yes, they did.

19  Q.   What was the price?

20  A.   One of them was 85,000.  The three flat was $85,000.

21  Q.   Do you recall if there was -- strike that.

22       What did you do to secure your investment?

23  A.   My son purchased the three flat.

24  Q.   Okay.  Let me back up to the property -- properties on

25  Lawler.

Awiquam Pithyou - direct                    220

1              When you decided to invest, what did you have to do to

2    buy the property, or to invest in the property?

3    A.   The one on Lawler, right?

4    Q.   Yes.

5              THE INTERPRETER:  I think he is confused about which

6    unit you are talking about, which property.

7              MR. HOGSTROM:  Sure, I understand.

8    BY MR. HOGSTROM:

9    Q.   Sir, was there a number of properties that you invested in

10   over time?

11   A.   Okay.  In -- in one day we purchased two units, two

12   properties, on Lawler.  They were right across the street from

13   each other.

14             MR. HOGSTROM:  May I approach, your Honor?

15             THE COURT:  You may.

16   BY MR. HOGSTROM:

17   Q.   I'm showing the witness what has been marked as Government

18   Exhibit AW Pithyou 2.  Is this a two-page document?

19   A.   Yes.  These are the properties that they purchased that one

20   day.

21   Q.   And are those copies of cashier's checks?

22   A.   Yes, it is.

23   Q.   And do you -- you recognize them as the -- a fair and

24   accurate representation of the checks that you provided on that

25   day?

1    A.   Yes.  He said we would sell you both properties for

2    $105,000.  And these were the checks that I presented to them

3    on that date.

4              MR. HOGSTROM:  Okay.  The government moves to admit

5    Government Exhibit AW Pithyou 2.

6              MR. ADAMS:  No objection.

7              THE COURT:  AW Pithyou 2 is admitted in evidence.

8         (Said exhibit was received in evidence.)

9              MR. HOGSTROM:  Permission to publish?

10   BY MR. HOGSTROM:

11   Q.   Sir, I'm looking first at page -- the first page of this

12   exhibit, on the line, remitter.  Is that your name?

13   A.   Yes, it is.

14   Q.   And the amount of the check is what?

15   A.   $52,500.

16   Q.   So was that for one of the properties?

17   A.   Yes.

18   Q.   On the pay to the order of line, it says Thomas Murphy,

19   attorney agent.  And then there is a series of numbers.  Do you

20   know what that was?

21   A.   That's the bank number, though.

22   Q.   Is that the number of the property?

23   A.   I didn't pay attention to the number.  I just wrote the

24   check.

25   Q.   Where did you get the funds for this check?

Awiquam Pithyou - direct                    222

1   A.  My -- I had savings in the bank.

2   Q.  Turning your attention to the next page of this exhibit.

3   Is the remitter line -- that's your name again?

4   A.  Yes.

5   Q.  And the amount of this check was what?

6   A.  Fifty-two, five.

7   Q.  Was that for the other property?

8   A.  Yes.

9   Q.  I forgot to ask, but what is the date of these checks?

10  A.  December 28, 2011.

11  Q.  When you obtained this check, where did you bring it?

12  Where did you bring the check?

13  A.  To the office, to their office.

14  Q.  And who did you give it to?

15  A.  I gave it to Babajan.

16  Q.  Was there anyone else there when you gave the check over?

17  A.  The other gentleman was present.

18  Q.  The defendant?

19  A.  Yes.

20  Q.  Did you have any further conversations with Babajan or the

21  defendant about these properties when you handed over the

22  check?

23  A.  He gave me a brief description, and he showed me the

24  documents, and I trusted him at that point.

25  Q.  Okay.  And did you sign the document as well when you were

Awiquam Pithyou - direct                    223

1   there?

2   A.   Yes, I did.

3   Q.   Showing the witness Government Exhibit AW Pithyou 3.  Do

4   you recognize that document?

5   A.   Yes.

6   Q.   What is it?

7   A.   Guaranty agreement.

8   Q.   Was it signed by you?

9   A.   Yes.

10  Q.   This is a fair and accurate representation of the document

11  that you saw?

12  A.   Yes, it is.

13       MR. HOGSTROM:  Government moves to admit Government

14  Exhibit AW Pithyou 3.

15       MR. ADAMS:  No objection.

16       THE COURT:  Government Exhibit AW Pithyou 3 is

17  admitted in evidence.

18    (Said exhibit was received in evidence.)

19       MR. HOGSTROM:  Permission to publish?

20  BY MR. HOGSTROM:

21  Q.   On the screen in front of you you should see the document.

22  On the top of the screen, does it say guaranty agreement?

23  A.   Yes.

24  Q.   Let me ask -- I asked you earlier how well you understand

25  and speak English.  How well do you read English?

1  A.  I didn't read it myself, but Babajan explained to me

2  what -- what was in the document.  And I trusted him.  Since he

3  was an elderly gentleman I trusted him.  He presented himself

4  as a decent businessman.

5  Q.  Who brought the document to -- for you to sign?

6  A.  Babajan and Rossini, in the office.

7  Q.  So all of the language that is written here, this is not

8  something that you read at the time you signed it?

9  A.  No.  But I did, except for the signature.  Because I

10  trusted him.

11  Q.  Did the defendant say anything to you about the document?

12  A.  He just explained to me that -- what's going to happen

13  in -- for -- in the next six months.  And then he said that's

14  all in the -- in the agreement.

15  Q.  On the lower right-hand portion of the screen, there is a

16  signature there.  Do you know whose signature that is?

17  A.  Yes, it's Albert Rossini's signature.

18  Q.  And the date on this document is what?

19  A.  January 9, 2012.

20  Q.  Turn to the second page of this document.  There is a date

21  and a signature block.  What's the date, and whose signature is

22  that?

23  A.  January 9, 2012.  My name.

24  Q.  After you made this investment in the properties on Lawler,

25  did you come to invest in a third property short time later?

Awiquam Pithyou - direct                    225

1    A.  Yes, I did.

2    Q.  How did that next investment come about?

3    A.  It was similar to the first two properties.

4    Q.  How were -- were you contacted, or did you contact somebody

5    else?

6    A.  I used to go back and forth to their office and that's how

7    it was introduced.

8    Q.  So you had just -- you were just visiting the office, and

9    they mentioned another property to you?

10   A.  Yes, they had -- they had multiple properties, and they

11   said this would be a good fit for you.

12   Q.  Who was there during the conversation where you were

13   introduced to this next property?

14   A.  Babajan.

15   Q.  Was Mr. Rossini there?

16   A.  He used to come in after.

17   Q.  He -- I'm sorry, sir.  Can you say that again?

18   A.  He used to come in after to -- you know, whenever he visits

19   he would be there after.

20   Q.  He would we come in and out?

21   A.  Yes.

22   Q.  I'm showing the government exhibit -- what's been marked

23   Government Exhibit AW Pithyou 5.  Do you recognize this

24   document?

25   A.  Yes.

1    Q.  What is it?

2    A.  It's a description of the property, such as number of

3    rooms, income.

4    Q.  Do you recognize that as a fair and accurate copy of the

5    document you saw?

6    A.  Yes, I do.

7         MR. HOGSTROM:  Government moves to admit Government

8    Exhibit AW Pithyou 5.

9         MR. ADAMS:  No objection.

10        THE COURT:  AW Pithyou 5 is admitted in evidence.

11      (Said exhibit was received in evidence.)

12        MR. HOGSTROM:  Permission to publish.

13   BY MR. HOGSTROM:

14   Q.  I am placing -- one moment.

15      (Brief pause.)

16   BY MR. HOGSTROM:

17   Q.  All right.  I have placed Government Exhibit AW Pithyou 5

18   on the screen.  At the top there is an address there.  What

19   address is that?

20   A.  That's the address of the property you are referring to.

21   Q.  Was that -- did they provide a description to you of what

22   kind of a property this was?

23   A.  Yes, we would -- I would give the information, I would go

24   look at it.

25   Q.  And did they take you to look at this property?

Awiquam Pithyou - direct     227

1   A.   No, I went on my own.

2   Q.   Talk about that in just a moment.

3        Underneath the title or the address of the property,

4   there is some lines under units.  Was it your understanding

5   that this was a larger building than the other -- the other two

6   that you have invested in?

7   A.   Yes.  This is a much larger unit.

8   Q.   With more rental income?

9   A.   Yes.

10   Q.   Now, you said that you went and looked at it.  Did you talk

11   to them about going to look at it first?

12   A.   When I went to see this large unit, Babajan was with me at

13   that time.

14   Q.   Was the defendant with you for this property?

15   A.   No, just Babajan.

16   Q.   And what was your impression of the property when you

17   looked at it?

18   A.   It was a nice neighborhood and a large building.  And the

19   income was really good as well.

20   Q.   Were you able to see the inside of this property?

21   A.   No.  They said we cannot.

22   Q.   On the bottom of this document there is another reference

23   to a cashier's check, Thomas Murphy.  Was this the same

24   instruction about how to invest as the last two properties?

25   A.   Yes, similar.

1   Q.  Did you decide to invest in this property?

2   A.  Yes, we did purchase it.

3   Q.  Showing the witness what's been marked as Government

4   Exhibit AW Pithyou 6.  Do you recognize that document?

5   A.  Yes, that's the large apartment building.

6   Q.  Is this a fair and accurate copy of that property?

7   A.  Yes, it is.

8           MR. HOGSTROM:  Government moves to admit Government

9   Exhibit AW Pithyou 6.

10          MR. ADAMS:  No objection.

11          THE COURT:  AW Pithyou 6 is admitted in evidence.

12      (Said exhibit was received in evidence.)

13  BY MR. HOGSTROM:

14  Q.  Place it on the screen, sir.  What is the -- what is the

15  date on this check?

16  A.  January 17, 2012.

17  Q.  So that was approximately eight days after the first

18  investment?

19  A.  I don't remember exactly, but I think it's close to that.

20  Q.  And the amount of this investment was what?

21  A.  $160,000.

22  Q.  And the check refers to 5801 North Richmond?

23  A.  Yes, it is.

24  Q.  Who did you give this check to?

25  A.  I went to -- to the office, and I handed it over to

1    Babajan.

2    Q.   Do you recall if the defendant was there for that?

3    A.   I don't remember exactly that day, but he used to be there

4    most of the time.

5    Q.   I am showing the witness Government Exhibit AW Pithyou 7.

6    Do you recognize that document?

7    A.   It's similar to the other documents.

8    Q.   Is that -- is that a guaranty agreement for the Richmond

9    property?

10   A.   Yes, it is.

11   Q.   Is that a fair and accurate representation of the document?

12   A.   Yes, it is.

13           MR. HOGSTROM:   Government moves to admit Government

14   Exhibit AW Pithyou 7.

15           MR. ADAMS:   No objection.

16           THE COURT:   AW Pithyou 7 is admitted in evidence.

17      (Said exhibit was received in evidence.)

18   BY MR. HOGSTROM:

19   Q.   I am placing AW Pithyou 7 on the screen.   At the top does

20   it say, guaranty agreement, in reference to 5801 North

21   Richmond?

22   A.   Yes.

23   Q.   Now, is this -- was it -- was it the same with this

24   document where you didn't yourself read it, but it was

25   explained to you?

Awiquam Pithyou - direct                    230

1   A.   Yes.

2   Q.   And do you recall who explained it?

3   A.   Babajan did.

4   Q.   Now, I want to turn to the second page of this document.

5   Lower right-hand corner there is a signature.  Whose signature

6   is that?

7   A.   Albert Rossini.

8   Q.   Was the defendant there when you were given this document

9   and signed it?

10  A.   Yes, he was present.  He handed it over to me to sign it.

11  Q.   And what was the date?

12  A.   January 17, 2012.

13  Q.   And on the lower left-hand side, does it also include that

14  date as well as your signature?

15  A.   Yes, it is.

16  Q.   You know, after you gave these initial investment checks,

17  was there any discussion about the rent income from these

18  properties that you had with the defendant or Babajan?

19  A.   Yes, it was.

20  Q.   And who did you have those conversations with?

21  A.   With Babajan.

22  Q.   When -- when did you first -- were you first alerted that

23  there may be rental income available for you?

24          THE INTERPRETER:  I couldn't hear.  I'm sorry.

25  BY MR. HOGSTROM:

Awiquam Pithyou - direct                231

1   Q.   When were you first alerted that there would be rental

2   income available?

3   A.   Within two to three weeks.

4   Q.   And how were you alerted to that?

5   A.   When we were signing over the documents.

6   Q.   Did there come a point where you actually received a check?

7   A.   Yes.

8   Q.   And how did you -- how did you learn that you were going to

9   receive a check.

10  A.   He would call me and asked me to come to the office to

11  collect the --

12  Q.   When you say he, are you referring to Babajan?

13  A.   Yes.

14  Q.   I'm handing the witness what's been marked Government

15  Exhibit AW Pithyou 8.  It's a three-page document.  Do you

16  recognize it?

17  A.   Yes.  These were the checks that I received.

18  Q.   And are these fair and accurate copies of those checks?

19  A.   Yes.

20          MR. HOGSTROM:  Government moves to admit Government

21  Exhibit AW Pithyou 8.

22          MR. ADAMS:  No objection.

23          THE COURT:  AW Pithyou 8 is admitted in evidence.

24      (Said exhibit was received in evidence.)

25  BY MR. HOGSTROM:

Awiquam Pithyou - direct                    232

1   Q.  First page of this exhibit, there is a check, check No.

2   1476, is that correct?

3   A.  Yes.

4   Q.  And who is the person that issued this check, according to

5   the document?

6   A.  Thomas Murphy.

7   Q.  Now, when you received a check from Babajan, and you

8   understood it to be rents from one of the properties, did you

9   have an understanding as to why you would be getting a check

10  from Thomas Murphy?

11  A.  No, I didn't think about that.

12  Q.  Now, in the memo line it says, January 2012 rent, 9129

13  Lawler.  Was that one of the first properties that you invested

14  in?

15  A.  Yes.

16  Q.  What was the amount?

17  A.  5,000?  I'm not sure.

18  Q.  Are you -- are you having little trouble reading --

19  A.  Yeah.

20  Q.  If --

21  A.  I think it's five.  The other one is four.

22  Q.  Okay.  Turning to the second page of this document, does

23  this reflect check No. 1477?

24          In the memo line does it say, January 2012 rents, 9124

25  Lawler?

1    A.  Yes.

2    Q.  And can you tell on this copy of this check what the amount

3    is of the check?

4    A.  7,700, I'm not sure exactly how much that is.

5    Q.  Is the copy a little difficult to read?

6    A.  Yes, it is.

7    Q.  Let me turn to the next page of the document then.  This is

8    check No. 1430?

9         In the memo line, does it say, pro rata January 2012,

10   5801 North Richmond?

11   A.  Yes.

12   Q.  And can you read the amount of this check?

13   A.  4100.

14   Q.  So actually let me ask one more question about this.  What

15   is the date?

16   A.  January 25, 2012.

17   Q.  So when you received these first few checks, is it fair to

18   say that you received what to you was a pretty large amount of

19   money?

20   A.  Yes.

21   Q.  In total it was over $10,000?

22   A.  Yes.

23   Q.  And you thought that this was monthly rental income that

24   you would be receiving indefinitely, right?

25   A.  Yes.

Awiquam Pithyou - direct                    234

1          MR. ADAMS:  Misstates -- the question misstates the

2   testimony.

3          THE COURT:  Why don't you go ahead.  Why don't you go

4   rephrase the question.

5   BY MR. HOGSTROM:

6   Q.  Did you believe that this was rental income that you would

7   be receiving every month indefinitely?

8          MR. ADAMS:  Same objection, your Honor.

9          THE COURT:  Overruled.  He can state -- he can answer

10  that question.

11  BY THE WITNESS:

12  A.  Yes, that's what I thought.  That's why I invested.

13  BY MR. HOGSTROM:

14  Q.  Now, after you began receiving these rent payments, did you

15  have further conversations with the defendant or Babajan about

16  additional properties that may be available?

17  A.  Yes, I -- he asked me if I would be interested.  And my

18  reply was, yes.  If I was going to be receiving good return on

19  a monthly basis, I would reinvest.

20  Q.  Now, Reverend Pithyou, do you have a son?

21  A.  Yes.

22  Q.  What is his name?

23  A.  Ashoor.

24  Q.  At any point did you have conversations about this

25  investment that you had engaged in with your son Ashoor?

1    A.  Yes.

2    Q.  Did he express any interest in getting involved himself?

3              MR. ADAMS:  Objection, Judge.  Foundation.

4              THE COURT:  Sustained.

5    BY MR. HOGSTROM:

6    Q.  The checks that you received that we just looked at, dated

7    in January 2012, during that time period did you have

8    conversations with your son Ashoor about whether he was

9    interested in investing?

10   A.  Yes, I did talk to him.  And we did go to --

11             MR. ADAMS:  Objection, Judge.

12   BY THE WITNESS:

13   A.  -- meet with them in their office.

14             THE COURT:  Overruled.

15   BY MR. HOGSTROM:

16   Q.  And were you aware, based on your conversations, whether

17   your son was interested in investing?

18             MR. ADAMS:  Objection.

19             THE COURT:  Sustained.

20             MR. HOGSTROM:  Judge, may I be heard at sidebar?

21             THE COURT:  You may.

22      (Sidebar proceedings out of the hearing of the jury:)

23             MR. HOGSTROM:  I don't know that I understand the

24   nature of the objection.  It was originally stated as a

25   foundation objection.  I laid further foundation.  I am getting

1   the sense that it's essentially a hearsay objection.  If that's

2   the objection, then I have a response.

3           But that's not how it was originally framed.

4           MR. ADAMS:  Now it's a hearsay objection, Judge.

5           MR. HOGSTROM:  It's not hearsay because it's not

6   offered for the truth of the matter.  It goes to his son's

7   state of mind, his son's intent in whether or not he wanted to

8   invest.  There is no fact that's asserted that is being offered

9   as true or not.

10          THE COURT:  I disagree.  The fact being asserted is

11  that his son stated that he would invest, and that he was going

12  to invest.  I am assuming -- I see him on the witness list.

13  You are going to call his son as a witness, right?

14          MR. HOGSTROM:  Most likely.

15          THE COURT:  Right.  And you can ask him that same

16  questions.  But I do believe that the response goes to the

17  truth of the matter asserted, which is whether or not his son

18  wanted to invest, and eventually whether or not the son did

19  invest.

20          So the hearsay objection is sustained.

21      (Further proceedings within the hearing of the jury:)

22  BY MR. HOGSTROM:

23  Q.  Reverend Pithyou, after these conversations that you had

24  with your son, did you and your son go to the office to speak

25  with the defendant and Mr. -- and Babajan?

1   A.  Yes.

2   Q.  And who was present for that meeting?

3   A.  Babajan.

4   Q.  What was discussed during that meeting?

5   A.  I said that my son would be interested into investing on

6   his own.

7   Q.  Did they have any properties to show you and your son that

8   might be suitable?

9   A.  Yes, they had plenty.

10  Q.  I am showing the witness what's been marked as Government

11  Exhibit AW Pithyou 9.  Do you recognize that document?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's a description of -- of the property and description of

15  the income.

16  Q.  For a particular property?

17  A.  The one on Kilpatrick.

18  Q.  Is this a fair and accurate copy of that document?

19  A.  Yes, it is.

20          MR. HOGSTROM:  Government would moved to admit AW

21  Pithyou 9.

22          MR. ADAMS:  No objection.

23          THE COURT:  AW Pithyou 9 is admitted in evidence.

24      (Said exhibit was received in evidence.)

25  BY MR. HOGSTROM:

Awiquam Pithyou - direct                238

1   Q.  Now, on the top of the screen or the left side, there is an

2   address there.  What is the address?

3   A.  Yes, that's the address.

4   Q.  What is it?

5   A.  That's the address for the property, for the building.

6   Q.  8142 Kilpatrick?

7   A.  Yes.

8   Q.  Was that in Skokie?

9   A.  Yes.

10  Q.  And does this also contain a description of the units and

11  the income and the expenses, like the other documents we talked

12  about?

13  A.  Yes, it is.

14  Q.  And again, on the bottom is there also a direction about

15  making a cashier's check?

16  A.  Yes, it's identical to the other documents.

17  Q.  Did you and your son ultimately look at this building as

18  well?

19  A.  Yes, we did.

20  Q.  Did you go in person?

21  A.  Yes.

22  Q.  Who went with you?

23  A.  My son and I.

24  Q.  You went on your own?

25  A.  Yes.

1    Q.  Did you see the inside of the building?

2    A.  No, only the outside.

3    Q.  Was it the same as the other properties where you have been

4    told --

5    A.  Yes.

6    Q.  You had been told not to go inside?

7    A.  Yes.

8    Q.  What was your impression of this property?

9    A.  It was a nice, nice reasonable.  It was three units.

10   Q.  Handing the witness what's been marked as Government

11   Exhibit AW Pithyou 10.  Do you recognize that document?

12   A.  Yes.

13   Q.  What is it?

14   A.  Check that we wrote to -- to Thomas Murphy.

15   Q.  Is this a true and accurate copy of that check?

16   A.  Yes, it is.

17          MR. HOGSTROM:  Government moves to admit Government

18   Exhibit AW Pithyou 10?

19          MR. ADAMS:  No objection.

20          THE COURT:  AW Pithyou 10 is admitted in evidence.

21      (Said exhibit was received in evidence.)

22   BY MR. HOGSTROM:

23   Q.  Place it on the screen.

24          Now, at the top it says, remitter Awiquam M. Pithyou,

25   is that right?

Awiquam Pithyou - direct                240

1    A.   Yes.

2    Q.   Who actually obtained this check?

3    A.   Babajan.  If it wasn't Babajan, the other individual would

4    receive the check.

5    Q.   Let me reask the question.

6          Who -- who went to the bank and obtained this check in

7    order to give -- the property.

8    A.   Ashoor.

9    Q.   Your son?

10   A.   Yes.

11   Q.   And what is the amount?

12   A.   85,000.

13   Q.   What is the date?

14   A.   February 6, 2012.

15   Q.   So this was about a month after you first started

16   investing, is that right?

17   A.   Yes.

18   Q.   And after you had started receiving your rental income?

19   A.   Yes, since I started receiving the money, we figured -- and

20   I ended up borrowing money from the bank to reinvest.

21   Q.   You said you ended up borrowing money from the bank to

22   invest?

23   A.   Yes.

24   Q.   Which property did you borrow money from the bank for to

25   invest?

1   A.   The Richmond property.

2   Q.   So the first -- if I understand correctly, the first

3   investment, the Lawler properties, that money came from your

4   savings?

5   A.   Yes.

6   Q.   And then the Richmond was borrowed from the bank?

7   A.   Yes, loan from the bank.

8   Q.   And then this Kilpatrick property, your son provided the

9   check, is that correct?

10  A.   He had his own business.  He sold it, and he invested the

11  money in -- in this property.

12  Q.   Now, after -- well, let me back up.

13          Show you one more document about this.  Showing you

14  Government Exhibit AW Pithyou 11.  Do you recognize this

15  document?

16  A.   Is same document as the others.

17  Q.   Is it a guaranty agreement for Kilpatrick?

18  A.   Yes, it is.

19  Q.   Is this a true and accurate copy of that agreement?

20  A.   Yes, it is.

21          MR. HOGSTROM:  Government moves to admit Government

22  Exhibit AW Pithyou 11.

23          MR. ADAMS:  No objection.

24          THE COURT:  AW Pithyou 11 is admitted in evidence.

25      (Said exhibit was received in evidence.)

Awiquam Pithyou - direct                242

1  BY MR. HOGSTROM:

2  Q.  At the top of the screen, I'm showing you, is a reference

3  to the address 8142 Kilpatrick?

4  A.  Yes, it is.

5  Q.  And the next page, what is the date?

6  A.  February 7.

7  Q.  Was that the day after the cashier's check that your son

8  obtained?

9  A.  Yes.

10  Q.  And who signed it?

11  A.  My signature.

12  Q.  And is there also a signature for Albert Rossini?

13  A.  Yes.

14  Q.  Do you recall were you there -- strike that.

15          Was your son there when this document was signed?

16  A.  Yes, he was.

17  Q.  Do you recall whether there was any discussion by the

18  defendant with your son or you about the -- what this document

19  was or what it meant?

20  A.  He just showed me the document.  Because we trusted him

21  since Babajan was one of -- he was an Assyrian, and we had full

22  trust in him.

23          And he would come to church on Sundays, and we would

24  put him on the head table after the ceremony, and he would have

25  breakfast with us.

Awiquam Pithyou - direct                           243

1          THE COURT:  Let him ask the question.

2     BY MR. HOGSTROM:

3     Q.  So that was February 7 of 2012.  Over the next two months

4     did you continue to receive rent checks from these four

5     properties that you and your son had invested in?

6     A.  Yes.

7     Q.  And do you recall whether those checks continued to be from

8     Thomas Murphy, or whether they came -- started coming from a

9     different source?

10    A.  Sometimes we wouldn't even look at it because Babajan would

11    hand over the check.  So I'm not sure exactly.  Sometimes his

12    son would hand it over to us.  And he would sign the checks as

13    well.

14    Q.  Who was his son?

15    A.  Anthony.

16    Q.  Anthony, Babajan's son?

17    A.  Yes.

18         THE COURT:  Mr. Hogstrom, why don't we go ahead and

19    take our morning break.

20         Ladies and gentlemen, we will take a short, let's take

21    a ten-minute break this morning.  And during the break please

22    do not discuss this case with anyone, including one another.

23    Thank you.

24    (Jury exited the courtroom.)

25         THE COURT:  All right.  We are in recess.  The witness

Awiquam Pithyou - direct                    244

1    may step down during the recess.  Thank you.

2         (Brief recess.)

3         (Jury entered the courtroom.)

4              THE COURT:  Can you remove that first chair from the

5    jury box.  Thank you.

6              You may proceed.

7              MR. HOGSTROM:  Thank you.  One moment.

8         (Brief pause.)

9    BY MR. HOGSTROM:

10   Q.   Reverend, when we left off, I think we were just starting

11   to talk about change in the rent payments.  And you mentioned

12   Babajan's son Anthony began to sign the checks.

13   A.   Yes.

14   Q.   I'm showing you what's been marked as Government Exhibit

15   AW Pithyou 12.  Do you recognize that?

16   A.   Yes, checks we received.

17   Q.   Are those true and accurate copies of those checks?

18   A.   Yes, they are.

19             MR. HOGSTROM:  Government moves to admit Government

20   Exhibit AW Pithyou 12.

21             THE COURT:  AW Pithyou 12 is admitted in evidence.

22        (Said exhibit was received in evidence.)

23   BY MR. HOGSTROM:

24   Q.   All right.  I placed this on the screen.

25             First I want to highlight the upper left-hand corner

1    of the check, where it lists the issuer of the check.  It says,

2    Reliant Management, Inc.  Do you recognize that name?

3    A.   Yes.

4    Q.   How -- what do you know about that name?

5    A.   Is their office.

6    Q.   This is whose office?

7    A.   Babajan and Rossini's office.

8    Q.   Now, are you familiar with the name Devon Street

9    Investments as well?

10   A.   Yes, it's this place.

11   Q.   So when you see Reliant Management on the top of the check,

12   you think of it as the same as --

13          MR. ADAMS:  Objection.

14   BY MR. HOGSTROM:

15   Q.   -- defendant's company?

16          MR. ADAMS:  Leading.

17          THE COURT:  Sustained.  Please rephrase your question.

18          MR. HOGSTROM:  Sure.

19   BY MR. HOGSTROM:

20   Q.   Do you understand -- did you understand there to be a

21   difference between Devon Street Investments and Reliant

22   Management?

23   A.   No, I wasn't.

24   Q.   I'm sorry.  You --

25          THE INTERPRETER:  He wasn't aware they were difference

Awiquam Pithyou - direct                 246

1   between Devon and Reliant.

2   BY MR. HOGSTROM:

3   Q.  So when you -- I'm just going to highlight the date on this

4   check.  Appears to be February 6, 2012?  Does that look

5   correct?

6   A.  February 6, 2012, yes.

7   Q.  So when you received this check from Reliant Management for

8   your rent payments, did you think of it as being different in

9   any way from the previous rent checks you received?

10  A.  No, I didn't.  It was the same.

11  Q.  Now, in the lower left-hand corner of the memo line, it

12  says, February rental income Lawler property.  Do you see that?

13  A.  Yes.

14  Q.  And on the right-hand side there is a signature.  Is that

15  Anthony Khoshabe's signature?

16  A.  Yes, it is.

17  Q.  Now, the first time that you received a check that was

18  signed by Anthony Khoshabe, did you have a conversation with

19  anyone about the fact that Anthony was signing the checks?

20  A.  No.

21  Q.  No.  You didn't -- when you saw Anthony Khoshabe's

22  signature, you didn't think one way -- you didn't think

23  anything one way or the other of it, correct?

24  A.  Babajan told -- advised me that Anthony would be giving me

25  the checks from now on.

1   Q.  Do you recall, was that conversation with Babajan in person

2   or over the phone?

3   A.  Face to face.

4   Q.  Do you remember what if anything Babajan said about why

5   Anthony was going to be giving you the checks?

6   A.  Yes, he said his son is working with them at that point,

7   and he would be handing out the -- the checks from now on.

8   Q.  Did you yourself meet Anthony?

9   A.  Yes.

10  Q.  And who introduced you to Anthony?

11  A.  The father introduced me at the office.

12  Q.  Babajan?

13  A.  Yes, Babajan.

14  Q.  You said this was at the office?

15  A.  Yes.  They sat right across from each other.

16  Q.  Anthony had his own office across the hall from Babajan?

17  A.  Yes.

18  Q.  When Babajan introduced you to Anthony, do you recall

19  anything that he said about what Anthony was doing at the

20  company?

21  A.  He said that he is in management, and he would be taking

22  care of the checks from now on.

23  Q.  When you say management, you mean property management?

24  A.  He is a manager at that office.

25  Q.  Did you -- subsequent to that first meeting with Anthony,

1    did you begin receiving your checks from him instead of

2    Babajan?

3    A.   Yes.

4    Q.   When you received your first check directly from Anthony,

5    do you recall having a conversations with him about the size of

6    the check that you received?

7              MR. ADAMS:   Judge, I'm going to object to hearsay.

8              THE COURT:   Sidebar.

9         (Sidebar proceedings out of the hearing of the jury:)

10             THE COURT:   Can you explain your objection to me?

11             MR. ADAMS:   Yes, your Honor.   He is asking for

12   statements between this witness and Anthony Khoshabe.   So

13   anything that he says is going to be offered for the truth of

14   the matter.   We think it's a -- it's a -- for the truth of the

15   matter.   Anything he said out of court is just repeating

16   out-of-court statement.

17             THE COURT:   So you are objecting to what the witness

18   said previously.

19             MR. ADAMS:   Yes, your Honor.   Previous consistent

20   statement.

21             THE COURT:   Okay.

22             MR. HOGSTROM:   First I haven't actually elicited any

23   statements.   But second, Anthony Khoshabe, as your Honor ruled

24   yesterday, is a member of the conspiracy.   And under the

25   Santiago proffer his statements will be admissible.   If they

1    were -- even if they were offered for the truth of the matter,

2    which I don't think they would be in this context, they would

3    be admissible under that ruling because they're co-conspirator

4    statements.

5           THE COURT:  I don't think the objection is to Anthony

6    Khoshabe's statement.

7           MR. ADAMS:  No, it's not.  It's to this witness

8    repeating what he said out of court.

9           THE COURT:  All right.  The objection is sustained.

10   Please rephrase your question.

11      (Further proceedings within the hearing of the jury:)

12   BY MR. HOGSTROM:

13   Q.  Reverend, do you recall any conversation -- in any

14   conversations that you -- let me back up.

15          First without saying anything more than yes or no, do

16   you recall having conversations with Anthony at the office?

17   A.  Yes, I have.

18   Q.  At the time that you picked up your first check, did you

19   have a conversation with Anthony?

20   A.  Yes, I have.

21   Q.  Do you recall anything about what Anthony said to you

22   during that conversation?

23   A.  I asked him if everything was done legally, and if there is

24   anything that I should be worried about or concerned.

25   Q.  And why did you ask him?

1   A.   I started to have a feeling that something wasn't done --

2   wasn't done right at that point.

3   Q.   Why did you have that feeling?

4   A.   Because they were switching the checks, and there were

5   delays issuing the checks.

6   Q.   What did Anthony say in response to your question about

7   whether all of this was legal and right?

8   A.   He assured me that everything was done legally, and there

9   is nothing for me to be worried about.

10  Q.   Now, this first check that you received from Anthony, we

11  looked at the date and it was early February 2012.

12  A.   Yes.

13  Q.   Do you recall whether you continued to receive checks from

14  Anthony after that date?

15  A.   Yes, from Anthony himself.

16  Q.   For approximately how long did you receive checks from

17  Anthony?

18  A.   Four, four or five checks.

19  Q.   And then did there come a point when you came to the office

20  to get checks, and he was not there?

21  A.   They would call me first and ask me to go to the office and

22  pick up the check.

23  Q.   And on one occasion when you came -- came to pick up the

24  check, did you find that Anthony was no longer there?

25  A.   After the fourth check --

1           THE COURT:  Hold on for a second.

2           Do you need a break?

3           A JUROR:  I need to get a drink of water.

4           THE COURT:  Let's take a short break.

5       (Brief pause.)

6           THE COURT:  Let's proceed.

7   BY MR. HOGSTROM:

8   Q.  When you discovered that Anthony was no longer there and

9   giving you the checks, did you learn from anyone where he had

10  gone?

11          THE COURT:  You can answer that yes or no, please.

12  BY THE WITNESS:

13  A.  No.

14  BY MR. HOGSTROM:

15  Q.  Now, after you received these checks from Reliance for a

16  few months, did you come to invest in a fifth property?

17  A.  Yes.

18  Q.  Do you recall how that came about?

19  A.  My brother-in-law introduced me to it.

20  Q.  Which brother-in-law?

21  A.  Ibrahim.

22  Q.  Now, I'm going to show you what's been marked as Government

23  Exhibit AW Pithyou 13.  Do you recognize that document?

24  A.  Yes.

25  Q.  What is that?

1   A.  Full description of the apartment, such as number of

2   bedrooms and monthly income.

3   Q.  This is for the fifth property?

4   A.  Yes.

5   Q.  Is that a true and accurate copy of the document that you

6   saw on this property?

7   A.  Yes, it is.

8           MR. HOGSTROM:  Government moves to admit AW Pithyou

9   13.

10          MR. ADAMS:  No objection.

11          THE COURT:  AW Pithyou 13 is admitted in evidence.

12      (Said exhibit was received in evidence.)

13  BY MR. HOGSTROM:

14  Q.  Okay.  At the top of this screen, there is an address, 4731

15  North Monticello.  Do you recognize that as the address of the

16  fifth property that you invested in?

17  A.  Yes, it is.

18  Q.  And is this like the other facts sheets that we looked at,

19  where it describes income and expenses?

20  A.  Yes.

21  Q.  And on the bottom is there instructions about a cashier's

22  check?

23  A.  Yes, same as the others.

24  Q.  Do you recall who presented you with this fact sheet?

25  A.  Babajan did.

1  Q.  And where was that conversation?

2  A.  In his office.

3  Q.  Was the defendant present?

4  A.  I don't remember.  He was always there, but I don't

5  remember this particular time.

6  Q.  Understood.

7          Did you -- after seeing this initial fact sheet, did

8  you look at this property in person or no?

9  A.  I just -- I didn't go see it myself.  I just took my

10  brother-in-law's word for it.  He said he had inspected it, and

11  it sounds like a good property.

12  Q.  I'm showing you what's been marked Government Exhibit AW

13  Pithyou 14 and AW Pithyou 15.  Can you take a look at both of

14  those exhibits and tell me if you recognize them?

15  A.  Yes, checks we received.

16  Q.  The No. 14, is that -- you say that's the check you

17  received?

18          THE INTERPRETER:  I'm sorry?

19  BY MR. HOGSTROM:

20  Q.  Is No. 14 the check that you received -- or check that you

21  paid?

22          THE INTERPRETER:  I can't -- could you repeat the

23  question please.

24  BY MR. HOGSTROM:

25  Q.  Is No. 14 the check that you paid?

```
 1   A.  Yes.

 2   Q.  And what is No. 15?

 3   A.  85,000.

 4   Q.  What is No. 15?

 5           THE COURT:  Exhibit 15.

 6   BY THE WITNESS:

 7   A.  The agreement.

 8   BY MR. HOGSTROM:

 9   Q.  Are these true and accurate copies of the documents?

10   A.  Yes, that's correct.

11           MR. HOGSTROM:  Government moves to admit Government

12   Exhibits AW Pithyou 14 and 15.

13           THE COURT:  Any objection?

14           MR. ADAMS:  No objection.

15           THE COURT:  AW Pithyou 14 and 15 are admitted in

16   evidence.

17       (Said exhibits were received in evidence.)

18   BY MR. HOGSTROM:

19   Q.  Turning your attention to Government Exhibit AW Pithyou 14,

20   the cashier's check.  Do you see that in front of you?

21   A.  Yes.

22   Q.  What is the date of this check?

23   A.  April 28.

24   Q.  So this was a couple months after your first investment, is

25   that correct?
```

1   A.   Yes.

2   Q.   Now, on the remitter line it states, Awiquam and Marna

3   Pithyou.  Who is Marna Pithyou?

4   A.   My wife.

5   Q.   Now, the other checks that we have looked at were in your

6   name alone.  Why was this check also in your wife's name?

7   A.   She asked me to include her name on the check, hoping that

8   when they receive the transfer, it would be on -- on both of

9   their names.

10  Q.   When you received the title to the property --

11  A.   Title.

12  Q.   -- in both your names?

13  A.   Transfer, yes.

14  Q.   The amount of this check is $85,000, is that correct?

15  A.   Yes.

16  Q.   Where did the funds for this check come from?

17  A.   I used some of the money that I received from the monthly

18  checks, plus my wife took out a loan on her 401(k).

19  Q.   Did you say 401(k)?

20  A.   401(k), yes.

21  Q.   Her retirement plan?

22  A.   Yes.

23  Q.   Now, after you made this fifth investment, was this fifth

24  investment, the Monticello property, was that your last

25  investment?

1    A.  Yes, it was.

2    Q.  Did you continue to receive rent payments for -- let me ask

3    that a different way.

4            How long did you continue to receive rent payments

5    for -- after you invested in the Monticello property?

6    A.  One or two months.  I'm not exactly sure.

7    Q.  What happened after one or two months?

8    A.  They started delaying the payments, and they would not

9    answer our phone calls.

10   Q.  When you say they started delaying payments, do you mean

11   that rent payments were not coming regularly every month?

12   A.  Yes.

13   Q.  And you tried to call the Devon Street offices?

14   A.  Yes.

15   Q.  Was nobody answering the phones?  Or were you leaving

16   messages?  Or what happened?

17   A.  Most of the time they would not answer our call.  But if

18   they do, they would tell us there is a delay and we haven't

19   received the rents yet.  And as soon as we do --

20   Q.  Who told you there was a delay and they haven't received

21   rents yet?

22   A.  Babajan did.

23   Q.  Did there come a point when the rent payment stopped

24   entirely?

25   A.  Yes.

1  Q.  And what did you do in response to the rent payments

2  stopping?

3  A.  I kept calling Babajan, and I left him a message saying if

4  he does not -- if he's not going to answer me, I am going to

5  file a complaint.

6  Q.  Showing you what's been marked as Government Exhibit AW

7  Pithyou 16.  It's a two-page document.  Do you recognize it?

8  A.  Yes.

9  Q.  What is that document?

10  A.  It's an agreement document as well.

11  Q.  And did you sign it?

12  A.  Yes.

13  Q.  Is this a true and accurate copy of the agreement you

14  signed?

15  A.  Yes.

16        MR. HOGSTROM:  Government moves to admit AW Pithyou

17  16.

18        MR. ADAMS:  No objection.

19        THE COURT:  AW Pithyou 16 is admitted in evidence.

20    (Said exhibit was received in evidence.)

21  BY MR. HOGSTROM:

22  Q.  I'm placing this exhibit on the screen, and I am just going

23  to highlight the date.  What is the date of this document?

24  A.  October 31, 2012.

25  Q.  So that was approximately six months after the last

Awiquam Pithyou - direct                          258

1    investment you made, is that correct?

2    A.   Yes.

3    Q.   And the line, RE colon, reference 5801 North Richmond, is

4    that correct?

5    A.   Yes.

6    Q.   Do you remember whether -- do you remember having any

7    conversations with anyone related to the defendant's office

8    about the Richmond property during this time period?

9    A.   Yes.

10   Q.   What do you recall of -- what conversations do you recall

11   about that?

12   A.   I would ask when they were going to switch -- they are

13   going to transfer the title.

14   Q.   Who are you asking about --

15   A.   From Babajan and Rossini.

16   Q.   Did there come a point where you asked for your money back

17   on some of the properties?

18   A.   Yes.  After I stopped receiving rent payments, I asked

19   them.

20   Q.   Who did you ask for the money back?

21   A.   Babajan and Rossini.

22   Q.   Did you do that in person or over the phone?

23   A.   Face to face.

24   Q.   At the office?

25   A.   Yes, at the office.

1    Q.   Do you recall approximately when you first asked for your

2    money back?

3    A.   I don't remember exactly.

4    Q.   Do you recall what if any response you got to that request?

5    A.   They said we are working on it.  We want to refund you your

6    money.

7    Q.   Now, did you decide to retain the Richmond property?

8    A.   Yes, we have purchased it.

9    Q.   You -- let me rephrase.

10          Did you decide that out of the properties that you had

11   invested in, you were going to keep or try to keep the Richmond

12   property but ask for your money back on the others?

13   A.   No, all of them.

14   Q.   Now, this document, Government Exhibit AW Pithyou 16, turn

15   to the second page.  Do you see on the lower right-hand side a

16   signature block and a date?

17          Is that your signature?

18   A.   Yes.

19   Q.   And is -- what is the date?

20   A.   November 5, 2019.

21   Q.   And --

22   A.   '12.  I'm sorry.

23   Q.   Did you know -- let me -- let me ask, who signed -- who

24   else signed this document?

25   A.   Rossini.

Awiquam Pithyou - direct                    260

1   Q.   Do you recall signing this document?

2   A.   Yes.

3   Q.   Do you recall being told why you were signing the document?

4   A.   For -- to purchase it.

5   Q.   Now, this -- the date of this document is November 5, 2012,

6   right?

7   A.   Yes.

8   Q.   That was -- was that several months after your last

9   purchase?

10  A.   Yes.

11  Q.   And this was after you had stopped receiving rent payments?

12  A.   Yes.

13  Q.   Do you recall why you would have been signing any other

14  agreements with the defendant well after you had stopped

15  receiving rent payments?

16  A.   I did not sign any other documents after I stopped

17  receiving payments.

18  Q.   Okay.  Well, I want to -- I just want to make sure I am

19  clear.  This document that's dated November 5, 2012, this is --

20  is this your signature?  Or did someone else sign it for you,

21  are you saying?

22  A.   Yes, my signature.

23  Q.   You don't know why you signed this document?

24  A.   For the property.

25  Q.   Okay.  I'm going to move on to the last exhibit I have for

1    you.  Was there one time in November of 2012 when you received

2    one final set of rent payments by direct deposit?

3    A.  Yes.

4    Q.  And do you recall how it came about that you were able to

5    receive payments by direct deposit?

6    A.  I don't remember exactly.  But I do remember them asking me

7    for my bank information in order to deposit the money

8    electronically.

9    Q.  I'm showing the witness what's been marked Government

10   Exhibit AW Pithyou 17.  Have you ever seen this document?

11             THE COURT:  You can answer that yes or no.

12   BY THE WITNESS:

13   A.  I don't remember exactly.

14   BY MR. HOGSTROM:

15   Q.  I'm sorry?

16   A.  I don't remember.

17   Q.  You don't remember if you have seen this document?

18   A.  No.

19   Q.  Okay.  Do you recall the date on which you received the

20   last set of rent payments by direct deposit?

21             THE INTERPRETER:  The direct deposit?

22             MR. HOGSTROM:  Yes.

23   BY THE WITNESS:

24   A.  No, I wasn't aware.

25   BY MR. HOGSTROM:

Awiquam Pithyou - cross                    262

1    Q.  Is your bank account -- does your bank account end in the

2    numbers 2344?

3    A.  Yes.

4               MR. HOGSTROM:  Permission to approach?

5               THE COURT:  You may.

6               MR. HOGSTROM:  Retrieve that.  I can take them all

7    actually.

8    BY MR. HOGSTROM:

9    Q.  Reverend Pithyou, do you know in total approximately how

10   much money you and your family members invested with the

11   defendant and Babajan?

12   A.  435,000.

13   Q.  And for how long did you receive rent payments in total?

14   A.  Around six months.

15   Q.  Did you -- you invested in five properties, is that

16   correct?

17   A.  Yes.

18   Q.  Did you receive a deed to any of those properties?

19   A.  No, none of them.

20   Q.  Did you ever receive a refund of your investment money?

21   A.  None.

22              MR. HOGSTROM:  Nothing further, Judge.

23              THE COURT:  Mr. Adams?

24                        CROSS-EXAMINATION

25   BY MR. ADAMS:

1  Q.  Good morning.  My name is Joshua Adams, and I am here today

2  on behalf of Mr. Rossini.

3         I want to talk to you first about your brother-in-law,

4  Mr. Yousif.  Is that okay?

5         THE INTERPRETER:  Can you speak up a little?

6         MR. ADAMS:  Yes.

7  BY MR. ADAMS:

8  Q.  I want to speak with you first about your brother-in-law

9  Abe.  Now Abe introduced you to Babajan?

10  A.  Yes.

11  Q.  And that was at this Christmas party?

12  A.  Yes.

13  Q.  And it goes without saying, you trusted -- you trust your

14  brother-in-law?

15  A.  Yes.

16  Q.  And you also said earlier that you trusted Babajan because

17  he was Assyrian.

18  A.  Yes.

19  Q.  And in fact your exact words were, you had -- he had your

20  full trust.

21  A.  Yes.

22  Q.  Now, when Yousif first referred you to Babajan, were you

23  aware that Yousif was getting commissions for these referrals?

24  A.  No.

25  Q.  Were you aware that Yousif was getting commissions from

1   referring all the Assyrian people to Babajan?

2   A.   No.

3   Q.   Did Yousif ever tell you this later on that he was

4   receiving money?

5   A.   No, never.

6   Q.   Is this the first time you are hearing of it now?

7   A.   Yes.

8   Q.   All right.   Now, when you first were interviewed by the FBI

9   in this case, you said that Babajan suggested the properties to

10  you.

11  A.   Yes.

12  Q.   And Babajan gave you these fact sheets that you called.

13  A.   Yes.

14  Q.   And that Babajan told you to make the checks out to Thomas

15  Murphy.

16  A.   Yes.

17  Q.   And Babajan told you where to -- where to mail them?

18  A.   Yes.

19  Q.   Now, if we could leave Babajan for a moment, I want to talk

20  to you about your investments.   Other than real estate, do you

21  invest in any other securities?

22  A.   No.

23  Q.   Not stocks?

24  A.   Yes, I do.

25  Q.   And do you have a stockbroker that you use?

1    A.   Yes.

2    Q.   Now, without getting too specific, is it a broker online,

3    or is it someone you see face to face?

4    A.   My son does it, but it's online.

5    Q.   Do you do your own research on -- on your investments?

6    A.   Yes, I do.

7    Q.   Okay.  So you are not new to investing your money.  It's

8    something you have done for a while.

9    A.   No.

10   Q.   So when you first started investing with Babajan, you did

11   it because you trusted him, correct?

12   A.   Yes.

13   Q.   And as the government has said earlier, the Assyrian

14   community is very tight-knit, right?

15   A.   Yes.

16   Q.   And Yousif vouched for Babajan?

17          THE INTERPRETER:  I'm sorry?

18   BY MR. ADAMS:

19   Q.   Yousif vouched for Babajan?

20   A.   Just because he's -- he's his brother-in-law.  But --

21   Q.   Very well.  Thank you.

22          Now at this first meeting that the government asked

23   you about earlier, you told the jury that you were speaking

24   mostly in Assyrian, correct?

25   A.   Yes.

Awiquam Pithyou - cross                          266

1   Q.   And majority of the meeting was with you and Babajan?

2   A.   Yes.

3   Q.   And Mr. Rossini would step in and out?

4            THE INTERPRETER:  I'm sorry?

5   BY MR. ADAMS:

6   Q.   Mr. Rossini would come in and out of this meeting?

7   A.   Yes.

8   Q.   Now, to your knowledge, Mr. Rossini does not speak

9   Assyrian, does he?

10  A.   Yes.

11  Q.   Yes, he does not?

12  A.   He does not speak Assyrian.

13  Q.   Thank you.

14           So you relied again on Babajan's statement.

15  A.   Yes.

16  Q.   Did you ever go and look at any of these properties before

17  you gave Murphy this money?

18           MR. HOGSTROM:  Objection, Judge.  That

19  mischaracterizes the testimony.

20           THE COURT:  He is just asking him a question.  He can

21  respond.

22           MR. ADAMS:  Repeat the question, your Honor?

23           THE COURT:  Go ahead.

24  BY MR. ADAMS:

25  Q.   Did you ever inspect yourself any of these properties

1   before you gave Murphy the money?

2   A.   Yes.

3   Q.   You did.  Which ones did you look at?

4   A.   The property on Richmond, on Lawler or Lawler.

5   Q.   So --

6   A.   And on Monticello.

7   Q.   Okay.  Now after inspecting them, and also with Yousif's

8   and Babajan's assurances, you felt comfortable investing,

9   correct?

10  A.   Yes.

11  Q.   Did you know who Thomas Murphy was?

12  A.   No, I was just told that he's the lawyer.

13  Q.   And Babajan told you that Murphy was trying to foreclose on

14  these bank notes, correct?

15  A.   Yes.

16  Q.   That was Murphy's distinct job in this investment company.

17  A.   Yes.

18  Q.   And you actually met with Murphy once, correct?

19  A.   Yes.

20  Q.   That was at the church?

21  A.   In his office.

22  Q.   It was at his office?

23  A.   Yes.

24  Q.   And you asked him about where the properties are, correct?

25          THE INTERPRETER:  I'm sorry?

Awiquam Pithyou - cross                    268

1    BY MR. ADAMS:

2    Q.  I'll rephrase that.  You asked Murphy what was going on

3    with the notes?

4    A.  Yes.

5    Q.  When was this meeting?

6    A.  I don't remember the exact date.

7    Q.  Was it in 2012?

8    A.  When we purchased the properties.

9    Q.  When you say, the properties, the first -- which ones?

10   A.  All of them.

11   Q.  All of them?

12   A.  Yes.

13   Q.  All right.  And what did Murphy tell you?

14   A.  He spoke quite a bit, and there was somebody in there

15   interpreting.

16   Q.  Okay.  Was Babajan there?

17   A.  His brother.

18   Q.  Okay.  Fred?

19   A.  Yes.

20   Q.  And did you know Fred prior to meeting Babajan?

21   A.  No.

22   Q.  After you met with Murphy, what were your feelings about

23   your investments?

24   A.  He spoke very positively about the transaction, and I felt

25   little bit more at ease.

1    Q.   You felt at ease because of what Murphy said?

2    A.   Yes.

3    Q.   Now, you told the jury earlier that you got a loan from

4    your bank for one of these investments, correct?

5    A.   Yes.

6    Q.   Which bank?

7    A.   Chase.

8    Q.   And what did you tell Chase to get -- when you were

9    applying for this loan?

10           MR. HOGSTROM:  Objection, relevance.

11           THE COURT:  I'm going to let the witness answer that

12   question.  Overruled.

13   BY THE WITNESS:

14   A.   I asked them for a loan to -- to make the purchase.  And

15   they -- I had a good credit, and they provided me with the

16   loan.

17   BY MR. ADAMS:

18   Q.   Did you have to -- well, strike that.

19           Did you show the bank this guaranty agreement that you

20   signed?

21   A.   No.

22   Q.   Did you show the bank this fact sheet that Babajan gave

23   you?

24   A.   No.

25   Q.   Did you show the bank any photos of any of these houses

1   that you were going to invest in?

2   A.   No, nothing.

3   Q.   Didn't show the bank anything?

4   A.   Nothing.

5   Q.   Now, when you read this guarantee, it's in English.  And

6   Babajan interpreted for you?

7   A.   He -- not the whole thing, just summarized the entire

8   agreement.

9   Q.   So Babajan just summarized the whole thing for you?

10  A.   Yes.

11  Q.   Did you ask him to read it line by line for you?

12  A.   No.  I trusted him.

13  Q.   Now, a part from this agreement says that you would get

14  monthly equivalents of rentals.

15  A.   Yes.

16  Q.   What did you interpret that to mean?

17  A.   I thought it was a good -- good deal for me.

18          MR. ADAMS:  Judge, may I have one moment?

19          THE COURT:  You may.

20      (Brief pause.)

21  BY MR. ADAMS:

22  Q.   How many checks did you write to Albert Rossini?

23  A.   Five.

24  Q.   Five checks to Rossini?

25  A.   To Thomas Murphy.

Awiquam Pithyou - cross                                          271

1   Q.   Right.  So you didn't write any checks to Albert Rossini.

2   A.   They asked me to write the checks -- to make the checks out

3   to Thomas Murphy.

4   Q.   Right.  And you said earlier Babajan said, write them all

5   to -- payable to Murphy.

6   A.   Both of them.

7   Q.   And you did that because it's your understanding that

8   Murphy is going to be the one closing on these -- on these

9   foreclosures.

10  A.   Yes.

11  Q.   Rossini never said he was closing on -- going to do this.

12  This was all Murphy's.

13  A.   He told me that his lawyer is working on it.

14  Q.   And as far as you know, Rossini is not a lawyer.

15  A.   No, he is not.

16  Q.   Now, when you were looking to invest in these properties,

17  Babajan or Mr. Rossini never made any representations as to the

18  conditions of the properties, did they?

19  A.   I would -- I would go and inspect them from the outside.

20  But the last property I did not physically inspect it.

21  Q.   In fact, when you got these fact sheets, they even say

22  specifically that they're uncertain as to the interior

23  condition of the properties.

24  A.   Yes.

25            MR. ADAMS:  Your Honor, if I may show the witness

1  what's been previously admitted as AW Pithyou 5 on the Elmo.

2  BY MR. ADAMS:

3  Q.  Showing you, Father, what's been previously admitted as

4  Pithyou Exhibit 5.  This was the fact sheet for Richmond.  Show

5  you right there.

6          Did Babajan interpret this -- this note for you on the

7  bottom?

8  A.  No.  I just looked at.

9  Q.  You just looked at it?

10          Did you ask him what it meant?

11  A.  He said just you are going to just -- he is referring to

12  the buildings, that Babajan told that he would be inspecting

13  the building from the outside, not the inside.

14  Q.  Thank you.

15          And again on the bottom, just so we're clear, it says,

16  make the cashier's check payable to Thomas Murphy, is that

17  correct?

18  A.  Yes.

19  Q.  And is that pretty much how it went for each one of the

20  properties?

21  A.  Yes, all of them.

22  Q.  And so you see this fact sheet, and Babajan would tell you

23  about it?

24  A.  Yes.

25  Q.  And Babajan would tell you where to make payment?

1   A.  Yes.

2   Q.  And when the checks started coming, you actually got a

3   couple checks from Thomas Murphy, correct?

4   A.  Yes.

5   Q.  Then you got some checks from Anthony Khoshabe?

6   A.  Yes.

7   Q.  That didn't raise any red flags to you?

8   A.  No.

9           MR. ADAMS:  Judge, nothing further.

10          THE COURT:  Any redirect?

11          MR. HOGSTROM:  Yes, Judge.

12                      REDIRECT EXAMINATION

13  BY MR. HOGSTROM:

14  Q.  Father, you were asked a number of questions about being

15  provided with information by Babajan.  When you would go to the

16  office on Devon Street, would you see anyone there in addition

17  to Babajan?

18  A.  Yes, there were a lot of people.

19  Q.  Did you see the defendant there?

20  A.  Yes.  If Babajan wasn't there, he would be there.

21  Q.  They were there together?

22  A.  Yes.

23  Q.  Did you understand them to be business partners?

24  A.  Yes.

25  Q.  The first meeting that you had about this investment

1    opportunity at the office, was it both Babajan and the

2    defendant, or was it just Babajan?

3    A.   Both of them.

4    Q.   Now, your brother-in-law, Mr. Yousif, was there as well,

5    correct?

6    A.   Yes, he was on the first time, first day.

7    Q.   It was the four of you?

8    A.   Yes.

9    Q.   Mr. Yousif speaks English, is that correct?

10   A.   Yes.

11   Q.   Do you recall if he and -- without saying anything about

12   what was said, do you recall whether the defendant and Mr.

13   Yousif spoke to each other?

14   A.   No.

15   Q.   You don't recall?

16   A.   No, we were all talking.

17   Q.   Everybody was talking.

18   A.   Yeah.

19   Q.   Did you hear the defendant speaking during this meeting?

20            MR. ADAMS:  Objection, Judge, asked and answered.

21            THE COURT:  Overruled.  He can answer.

22   BY THE WITNESS:

23   A.   Yes.

24   BY MR. HOGSTROM:

25   Q.   During future meetings where properties -- where you

Awiquam Pithyou - cross                    275

1  discussed properties with Babajan, was the defendant present at

2  times?

3  A.  Yes.

4  Q.  And do you recall whether he was speaking during those

5  meetings?

6  A.  Yes.

7  Q.  Thank you.

8        And you were asked questions about providing cashier's

9  checks, or providing payments to Mr. Murphy.  Do you recall

10 that?

11 A.  Yes.

12 Q.  Was it your understanding that you were paying Mr. Murphy

13 or that you were paying the defendant and Babajan's company?

14       MR. ADAMS:  Objection, relevance.

15       THE COURT:  Overruled.  You can go ahead and answer.

16 BY THE WITNESS:

17 A.  Money would go to Murphy, so he would make the purchases.

18 BY MR. HOGSTROM:

19 Q.  And it was your understanding that he was working on behalf

20 of the defendant in his company, is that right?

21 A.  Yes.

22 Q.  When you provided the cashier's checks, who did you give

23 them directly to?

24 A.  Either Babajan.  And if he wasn't available, I would give

25 it to Mr. Rossini.

Awiquam Pithyou - cross

276

1  Q.  So you sometimes provided them to Babajan and sometimes

2  directly to Mr. Rossini?

3  A.  Yes.

4  Q.  And why did you make the checks out to Thomas Murphy?

5  A.  They asked me to do so.

6  Q.  Who asked?

7  A.  He is a lawyer.

8           Both of them.

9  Q.  The defendant and Babajan?

10  A.  Yes.

11  Q.  When you gave these checks for these properties, did you

12  have any understanding that the defendant or Babajan was going

13  to be receiving a portion of those proceeds?

14           MR. ADAMS:  Objection, Judge.

15           THE COURT:  He can answer that yes or no.

16           Did you have an understanding, yes or no?

17  BY THE WITNESS:

18  A.  I'm not sure.

19  BY MR. HOGSTROM:

20  Q.  Were you told anything by the defendant or Babajan about

21  the idea that the money you were paying them would be going

22  directly to them rather than to the purchase of the property?

23  A.  Towards the properties.

24  Q.  The purpose of the money in your understanding was for the

25  purchase the properties, correct?

1   A.  Yes.

2   Q.  You were asked questions about what Mr. Murphy's role in

3   this enterprise was.

4          THE COURT:  Hold on.  Let's let him ask a question.

5   BY MR. HOGSTROM:

6   Q.  Did you -- did you ever discuss -- let me back up.

7          Did you learn information about Mr. Murphy's role from

8   Babajan?

9   A.  No, I was just told that he is the lawyer.

10  Q.  You were told by Babajan?

11  A.  Yes.

12  Q.  Mr. Rossini and you weren't speaking because you -- the two

13  of you didn't speak the same language, correct?

14  A.  When -- whenever Babajan is not present, I would talk to

15  Mr. Rossini.

16  Q.  You could talk to him even with Babajan was not present?

17  A.  Yes.

18  Q.  Is that because you -- you speak and understand some

19  English?

20  A.  Yes.

21  Q.  You were asked about a meeting that you had where Mr.

22  Murphy himself was present.  Do you recall that?

23  A.  Yes.

24  Q.  And you said that Fred Khoshabe was there?

25  A.  Yes.

1  Q.  Who else was present for that?

2  A.  Babajan and his brother.

3  Q.  Babajan and Fred?

4  A.  Fred, yes.

5  Q.  Was the defendant present for that meeting?

6  A.  Yes.

7          THE COURT:  Counsel, may I speak to you at sidebar?

8      (Sidebar proceedings out of the hearing of the jury:)

9          THE COURT:  Mr. Hogstrom, how much more do you have?

10         MR. HOGSTROM:  About thirty seconds.

11         THE COURT:  Any --

12         MR. ADAMS:  No, not based on this.

13     (Further proceedings within the hearing of the jury:)

14         THE COURT:  Go ahead.  Do you need the document

15 camera?

16         MR. HOGSTROM:  Yes.  Sorry.  Our laptop --

17         THE COURT:  That's fine.

18         MR. HOGSTROM:  -- fell asleep on us.

19 BY MR. HOGSTROM:

20 Q.  I'm putting on the screen what's been entered as Government

21 Exhibit AW Pithyou 5.  Counsel asked you some questions about

22 this document.  Do you recall that?

23 A.  Yes.

24 Q.  Now, previously you had been asked about whether your

25 guaranty agreement said that you would be getting rent

1    equivalents.  Do you recall that?

2    A.   Yes.

3    Q.   Is it correct that this document states you will be paid

4    the actual rentals collected on the property during this

5    period?

6    A.   Yes.

7              MR. HOGSTROM:  Nothing further.

8              MR. ADAMS:  Nothing further.

9              THE COURT:  The witness may step down.  Thank you.

10       (Witness excused.)

11             THE COURT:  Ladies and gentlemen, we will take our

12   lunch break now.  It is 12:35.  So let's reconvene at 1:35.

13   Okay?

14             During the lunch break, please do not discuss this

15   case with anyone, including one another.  And please do not do

16   any independent research regarding any of the issues in this

17   case.  Thank you.

18       (Jury exited the courtroom.)

19             THE COURT:  Who do we have on tap this afternoon?

20             MR. HOGSTROM:  Judge, Ibrahim Yousif, Albert Khamis,

21   and if we get to it Nastors Moshi.

22             THE COURT:  All right.  Let's proceed as expeditiously

23   as possible.  I think by now the jury kind of understands the

24   scope of the documentation, what the documentation involved.

25   And so I will leave it up to you.  But I don't think that doing

1    it document by document by document will be the most effective

2    use of time, as well as just keeping the jury's attention.

3           So let's try to keep pace and go through this as

4    expeditiously as possible.

5           MR. HOGSTROM:  Yes, Judge.

6           THE COURT:  Thank you.

7       (Trial recessed until 1:35 o'clock p.m. of the same day.)

8                              CERTIFICATE

9           I HEREBY CERTIFY that the foregoing is a true, correct

10   and complete transcript of the proceedings had at the hearing

11   of the aforementioned cause on the day and date hereof.

12

      /s/Alexandra Roth                        6/8/2018
13   _____      _____
      Official Court Reporter                    Date
14   U.S. District Court
      Northern District of Illinois
15   Eastern Division

16

17

18

19

20

21

22

23

24

25

281

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                    Plaintiff,       )
                                       )
 5                                     )
                                       )  Case No. 15 CR 515-1
 6    -vs-                             )
                                       )  Chicago, Illinois
 7    ALBERT ROSSINI,                  )  June 6, 2018
                                       )  1:35 o'clock p.m.
 8                    Defendant.       )

 9                          VOLUME 2B
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE JOHN Z. LEE, and a jury
11
      APPEARANCES:
12
      For the Plaintiff:      HON. JOEL R. LEVIN
13                            United States Attorney
                              BY:  MR. ERIK A. HOGSTROM
14                                 MR. WILLIAM PATRICK NOVAK
                              Assistant United States Attorneys
15                            219 South Dearborn Street
                              Chicago, Illinois 60604
16
      For the Defendant:      LAW OFFICES OF JOSHUA B. ADAMS
17                            P.C., by
                              MR. JOSHUA B. ADAMS
18                            53 West Jackson Boulevard
                              Suite 1515
19                            Chicago, Illinois 60604

20                            FRANKEL & COHEN, by
                              MR. SCOTT JAY FRANKEL
21                            53 West Jackson Boulevard
                              Suite 1615
22                            Chicago, Illinois 60604

23              ALEXANDRA ROTH, CSR, RPR
                   Official Court Reporter
24            United States District Court
       219 South Dearborn Street, Room 1224
25             Chicago, Illinois  60604
            Telephone:  (312) 408-5038
```

Khamis - direct                                    282

```
 1              (Proceedings had in open court:)
 2                   THE COURT:  Are we ready?
 3                   MR. NOVAK:  Yes, Judge.
 4                   THE COURT:  All right.  Let's call them.
 5              (Jury entered the courtroom.)
 6                   THE COURT:  The government may call its next
 7     witness, please.
 8                   MR. NOVAK:  Yes, your Honor.  The government calls
 9     Albert Khamis.
10                   THE COURT:  Mr. Khamis, will you please step up to
11     my right?
12              ALBERT KHAMIS, GOVERNMENT'S WITNESS, DULY SWORN
13                   THE COURT:  Please take a seat.
14                   You may proceed, Mr. Novak.
15                   MR. NOVAK:  Thank you, your Honor.
16                          DIRECT EXAMINATION
17     BY MR. NOVAK:
18     Q.   Good afternoon, sir.
19     A.   Good afternoon, sir.
20     Q.   In a loud, clear voice could you please state your name
21     and spell your last name for the court reporter and the jury?
22     A.   Sure.  My name is Albert Khamis.  Khamis is K-H-A-M-I-S.
23     Q.   And where do you currently live, sir?
24     A.   I live in Mesa, Arizona.
25     Q.   Are you working?
```

:39PM (line 5)
:41PM (line 10)
:42PM (line 15)
:42PM (line 20)
:42PM (line 25)

1   A.   I'm early retired.

2   Q.   Okay. Before you retired what did you do?

3   A.   I used to -- of course, if I start since I came to this

4   country, I did work for city of Midland, Texas, as lab

:43PM   5   analyst, lab technician there, for a water purification plant

6   for the city.

7   Q.   And --

8   A.   And then after that, moved to Arizona. I got my own

9   business at a convenience store.

:43PM   10   Q.   Okay. And how long were you in the convenience store

11   business?

12   A.   Convenience store I started probably '99 until -- at

13   least 12 years I did work for that convenience store.

14   Q.   And how long have you been retired?

:43PM   15   A.   I retired since I got -- it will be four years or

16   five years.

17   Q.   Now, you said that you -- when you came to this country

18   you started working for Midland, Texas, right?

19   A.   Yes, sir.

:43PM   20   Q.   Where did you come from originally?

21   A.   I come from Middle East, from Iraq.

22   Q.   Okay. And are you part of a specific ethnicity in Iraq?

23   A.   Yeah. I'm Assyrian, Christian Assyrian.

24   Q.   Now, I'm going to direct your attention to March

:44PM   25   of 2012, okay?

1   A.   Yes.

2   Q.   At that time were you approached about investing in real

3   estate in the Chicago area?

4   A.   Yes.

:44PM   5   Q.   Who approached you?

6   A.   First name -- it's my wife's cousin.

7   Q.   Was his name Ibrahim Yousif?

8   A.   Ibrahim Yousif.  I'm sorry.  Ibrahim Yousif, yeah.

9   Q.   And this was your wife's cousin?

:44PM   10   A.   Yeah.

11   Q.   What did Mr. Yousif tell you about investing?

12   A.   He just told us about how we invest here.  There's

13   buildings, foreclosure building, and when you invest in those

14   buildings, and you get to get rent for that building.

:45PM   15   Q.   Okay.

16   A.   And that building, after a certain time, which he

17   specified, after six or eight months they gonna go

18   foreclosure; then you gonna be the first one to buy those by

19   the same amount we -- announced that amount.

:45PM   20   Q.   Did Mr. Yousif say he was doing the investing on his own

21   or was he working with anyone else?

22   A.   Well, he didn't mention who was he working -- he was

23   working with the company, whatever he -- they were, investors

24   here.  And he -- he told us also there's like a lawyer, a

:45PM   25   Thomas Murphy, who was in charge, or he is on the top of all

1    those selling and buying.

2    Q.   And --

3    A.   And there was companies.  They were management

4    companies, management companies; they are managing the rent

:45PM  5    for these companies.  And one of those, they were like --

6    what's that street in Chicago, a management company --

7    Q.   Devon Street?

8    A.   Devon Street.  Devon Street company.  And there's a --

9              THE COURT:  Mr. Khamis?

10             THE WITNESS:  Yes.

11             THE COURT:  Why don't you allow the attorney to ask

12   you questions.

13             THE WITNESS:  Yes.

14   BY MR. NOVAK:

:46PM  15   Q.   The management company, you said it was Devon Street?

16   A.   Yeah, Devon Street.

17   Q.   Did you learn who was working -- or who was a part of

18   Devon Street, who was working for Devon Street?

19   A.   Okay.  He was Albert Rossini.

:46PM  20   Q.   And Mr. --

21   A.   Yeah.

22   Q.   Mr. Yousif told you that?

23   A.   Yeah.  Yes.  I'm sorry.

24   Q.   Did Mr. Yousif tell you anybody else who was working for

:46PM  25   that company?

A.    There was one -- two.  Anthony and his father also
working for the same company.

Q.    Now, did Mr. Yousif put you in touch with Mr. Rossini?

A.    Yes.

Q.    When did you get in touch with Mr. Rossini?

A.    While we -- I called him or he called me, and he
specifically explained how much is the rent for those
buildings.  And he just divide those -- the amount.  They get
a percentage -- certain percentage as a management company,
and what the rest, will send it to me.

Q.    And was this conversation in March of 2012 you had with
Mr. Rossini?

A.    Well, exactly the date or the month -- specifically I
don't remember that date exactly --

Q.    Let me ask --

A.    -- to be --

Q.    That's fine.

      Let me ask you this:  Did you invest in the
property?

A.    Yes, I did.

Q.    And did you invest in a property on Washtenaw?

A.    Washtenaw, yeah.

Q.    Did you speak with Mr. Rossini about the investment --

A.    Yes, I did.

Q.    -- before you made the investment?

1    Did you speak with Mr. Rossini about that

2    investment before you made it?

3  A.   Yeah.

4  Q.   Okay.  And did Mr. Rossini send you any documents about

:47PM  5  the investment?

6  A.   Yeah.

7  Q.   Okay.

8  A.   Yes.  He send me the document about the investment.

9  Q.   Give me one minute, okay?  I'm going to show you what

:48PM  10  I've marked as Khamis 1 and Khamis 2.

11  A.   Sure.

12  Q.   I want you to take a look at those.

13  A.   Yeah.

14  Q.   Khamis 1, is that document -- Khamis 1 and Khamis 2, are

:48PM  15  those documents related to your investments, specifically a

16  fax sheet and cashier's check on Khamis 1, and a guaranty

17  agreement on Khamis 2?

18  A.   Yes, sir.

19  Q.   Are they true and accurate copies of those documents

:48PM  20  that you saw back then?

21  A.   Yes, they are.

22    MR. NOVAK:  Your Honor, I would offer Khamis 1 and

23  Khamis 2 into evidence and ask to publish them to the jury?

24    THE COURT:  Any objection?

:48PM  25    MR. ADAMS:  No objection.

1    THE COURT:  Khamis Exhibits 1 and 2 are admitted in

2    evidence.

3        (Said exhibits were received into evidence.)

4    BY MR. NOVAK:

:48PM   5    Q.   Mr. Khamis, I'm going to show you the first page of

6    Khamis 1 on the screen, okay?

7    A.   Okay.

8            THE COURT:  Are you on VGA or --

9            MR. NOVAK:  I am not on anything right now.  Let me

:49PM  10    plug in.  Now I'm on VGA.

11    BY MR. NOVAK:

12    Q.   What generally is this sheet we're looking at on

13    Khamis 1?

14    A.   Yes, sir.  The sheet was showing that the Washtenaw

:49PM  15    building, they do have three units in that building.  He said

16    that, and he said how much they are rented, and total amount

17    was like $4,070.

18            And he is explaining here in that sheet, it was the

19    annual expenses, real estate and management fees and water

:49PM  20    bills and all that.  So total amount was 15,868, and net

21    income, 32,971.

22    Q.   You said he explained this to you?

23    A.   Yes, he did.

24    Q.   Who is he?

:50PM  25    A.   Okay.  Albert Rossini.

1  Q.  Now, because of that did you also -- and after looking

2  at this sheet of the investment property, did you also send a

3  check?

4  A.  Yes, I -- yeah, I did send a check.

:50PM  5  Q.  I'm going to show you Page 2 of Khamis 1.

6        You actually sent two checks?

7  A.  Two checks, two different account.

8  Q.  And the amount was -- you invested was $97,000, right?

9  A.  97,000, yes.

:50PM  10  Q.  Now, who directed you to -- these checks are made out to

11  Thomas Murphy.  Do you see that?

12  A.  Thomas Murphy, yes.

13  Q.  Who directed you to make the checks out to Thomas

14  Murphy?

:50PM  15  A.  Yousif.

16  Q.  Yousif did?

17  A.  Yeah, Mr. Yousif.

18  Q.  Okay.  So you followed his direction, right?

19  A.  Yeah.

:51PM  20  Q.  And you sent the checks?

21  A.  Checks to that name, Thomas Murphy.  And there was a PIN

22  number, account number, also on the check, which was a match

23  with the PIN number -- or with the case of that building.

24  Q.  Now I'm going to show you Khamis 2.

:51PM  25        Is this a guaranty agreement that you signed for

1    that property?

2    A.    Yes, I did.

3    Q.    And who sent you that guaranty agreement?

4    A.    That's Albert Rossini.

:51PM    5    Q.    Did you speak with Mr. Rossini before reading and

6    signing that agreement?

7    A.    Yes, I did.

8    Q.    Did Mr. Rossini explain the agreement to you?

9    A.    He did explain all that -- what's in that documents.

:51PM    10    Q.    Let me ask you, did you speak with him over e-mail, in

11    person, on the phone?  How did you speak with him?

12    A.    On the phone.

13    Q.    What did Mr. Rossini explain this agreement as?

14    A.    Like I said before, probably Albert repeated again; he

:52PM    15    said there's like foreclosure -- you are investing in

16    foreclosure buildings, and this is one of those foreclosures.

17    And during they are going for resale or sale, or they

18    gonna -- you get -- you invest that money in these buildings,

19    you get -- that period of time you get the rent of that

:52PM    20    investment.  After that, you own that building --

21    Q.    Okay.

22    A.    -- when they finish the paperwork for the closing on

23    that properties.

24    Q.    What did you understand would happen if they were not

:52PM    25    able to close the property and give you the building?  What

1  would happen to your money?

2  A.  After -- I would still get the rent --

3  Q.  Okay.

4  A.  -- as long as I -- they are in process.

:52PM  5  Q.  Did you understand that you would get a refund if they

6  were unable to --

7  A.  Yes, they told me that.  He said, if we don't do that

8  within eight month, you gonna get refund your money.

9  Q.  Who told you that?

:53PM  10  A.  Albert Rossini.  He told me, you gonna get refund plus

11  those months you get the rent, that will be yours.

12  Q.  Did there come a point when you actually received rent

13  checks for this property?

14  A.  Yes, I did.

:53PM  15  Q.  And this was the only property that you invested in,

16  correct?

17  A.  Yes.

18  Q.  Where did the money for this property come from?

19  A.  From Devon Management.

:53PM  20  Q.  Okay.

21  A.  There's probably two of them.  I didn't pay attention to

22  that, but I would have it documented.  From Devon -- I know

23  from Devon Management, we do have checks from them.

24  Q.  Would you get the checks in the mail, in FedEx?  How

:53PM  25  would you get --

1   A.   I get them in FedEx.

2   Q.   Okay.  I'm going to show you what I've marked as Khamis

3   3, 4 and 5.

4        I would like you to take a look at those, sir.

:54PM   5   A.   Yes.

6   Q.   Are those the copies of the air bill from FedEx and

7   checks or invoices for rent that you received from

8   Mr. Rossini's company?

9   A.   Exhibit 3, yes.  That's the --

:54PM   10   Q.   Before we show it to the jury, sir, are all three of

11   those exhibits, 3, 4, and 5 --

12   A.   3, 4, 5, Bert Rossini -- yes, they are.

13   Q.   Are those fair and accurate copies of the --

14   A.   Yes, they are.

:54PM   15        THE COURT:  Mr. Khamis, let him finish the

16   questions, please.

17   BY MR. NOVAK:

18   Q.   Are those fair and accurate copies of the FedEx air

19   bills and the checks or invoices you received?

:55PM   20   A.   Yes.

21        MR. NOVAK:  Your Honor, I would offer Khamis 3, 4

22   and 5 into evidence and ask to publish them to the jury.

23        MR. ADAMS:  No objection, your Honor.

24        THE COURT:  Khamis 3, 4 and 5 are admitted into

:55PM   25   evidence.

| | |
|---|---|
| 1 | (Said exhibits were received into evidence.) |
| 2 | BY MR. NOVAK: |
| 3 | Q.   I'm going to show you Khamis 3, sir.  This is -- what's |
| 4 | the date on this FedEx air bill? |
| 5 | A.   7/24, 2012. |
| 6 | Q.   And it's from Mr. Rossini -- |
| 7 | A.   Rossini. |
| 8 | Q.   -- in Lincolnwood, Illinois? |
| 9 | A.   Yeah, Lincolnwood, Illinois. |
| 10 | Q.   And who is it addressed to? |
| 11 | A.   Albert, Mona Khamis. |
| 12 | Q.   In Mesa, Arizona? |
| 13 | A.   Mesa, Arizona, 1712 South Lemon. |
| 14 | Q.   That's you, right? |
| 15 | A.   Yes. |
| 16 | Q.   I'm going to show you Page 2 of this exhibit. |
| 17 |      What are we looking at here? |
| 18 | A.   We are looking for cashier check or money order by |
| 19 | amount $3,663. |
| 20 | Q.   And an invoice, right? |
| 21 | A.   Yeah. |
| 22 | Q.   Is this a copy -- this is a copy of the invoice and |
| 23 | money order that you received in that FedEx for your rent |
| 24 | payment from Mr. Rossini's company, right? |
| 25 | A.   Yes, I did. |

:55PM (line 5)
:55PM (line 10)
:55PM (line 15)
:56PM (line 20)
:56PM (line 25)

| | |
|---|---|
| 1 | Q. I'm going to show you Khamis 4. Is this another air |
| 2 | bill -- |
| 3 | A. Yes. |
| 4 | Q. -- from FedEx? |
| 5 | It's dated August 22nd of 2012? |
| 6 | A. Yes, correct. |
| 7 | Q. Who sent it? |
| 8 | A. Bert Rossini. |
| 9 | Q. In Lincolnwood, Illinois? |
| 10 | A. Lincolnwood, Illinois. |
| 11 | Q. Who is it addressed to? |
| 12 | A. Albert and Mona Khamis. |
| 13 | Q. In Mesa, Arizona? |
| 14 | A. Yes, sir. |
| 15 | Q. I show you Page 2. Is this a copy of the check you |
| 16 | received in that air bill? |
| 17 | A. Yes. |
| 18 | Q. From Devon Street Management? |
| 19 | A. Yeah, Devon Street Management. |
| 20 | Q. Okay. And it says here August 2012 in the memo line. |
| 21 | Do you see that? |
| 22 | A. Yes. |
| 23 | Q. What did you understand that August 2012 to be? What |
| 24 | was he paying you for? |
| 25 | A. For rent. |

:56PM (5)
:56PM (10)
:56PM (15)
:56PM (20)
:57PM (25)

1    Q.   I'm going to show you Khamis 5.  Is this another air
2    bill?
3    A.   Yes.
4    Q.   What date is on the air bill?
5    A.   11/13, 2012.
6    Q.   Who is it from?
7    A.   Bert Rossini.
8    Q.   Who is it addressed to?
9    A.   To Albert, Mona Khamis.
10   Q.   And coming from Illinois to Arizona?
11   A.   Illinois -- yeah.
12   Q.   I show you Page 2.  Is this a copy of the check that was
13   in that air bill?
14   A.   Yes.
15   Q.   And it says it's for October 2012, here in the memo
16   line.Do you see that?
17   A.   Yes.
18   Q.   What did you understand that to be?
19   A.   The rent of the Washtenaw building.
20   Q.   Now, the rents that you received, did you -- how long,
21   approximately, did you receive rents from Mr. Rossini's
22   company?
23   A.   How long?
24   Q.   Yeah.  How many months, approximately, if you remember?
25   A.   Probably four -- four -- four months.

1    Q.   Okay.

2    A.   Yeah.

3    Q.   And when the -- so there came a point when the rent

4    checks stopped coming to you?

:58PM   5    A.   Delayed, yeah, and stopped.

6    Q.   When these payments were delayed and stopped, did you

7    contact anyone about your rents?

8    A.   Yes.  I contacted Anthony's father, which name --

9    Q.   Is his name -- do you know his name to be Babajan

:58PM   10   Koshabe?

11   A.   Babajan.  Yeah, Babajan.

12   Q.   Okay.

13   A.   Yeah, contact him because they told me that he's in

14   charge of those buildings, or he's one of the -- the one,

:58PM   15   he's in charge of those, and I did spoke to him about those.

16   Q.   Who told you that Babajan was in charge?

17   A.   Ibrahim and also Albert Rossini told me that Babajan, he

18   is the one.

19   Q.   Okay.  What happened when you spoke to Babajan?

:59PM   20   A.   Well, he was kind of like -- I'm sorry to say that he

21   was nasty on the phone with me, and he said you can go

22   anywhere.  He refused to speak about that first, and then he

23   said, do you -- I'm not refunding no money, and you guys

24   bought those properties and you are getting the rent.

:59PM   25          And I ask him, I say, I will agree if I get lien

1    holder, to be a lien holder on that property or document

2    there.  And I'll agree to just not the -- I mean, the rent.

3    I don't need the rent.  Just put my name on those property.

4    He said, no, there's no such thing.  You guys, you want to go

:59PM    5    anywhere, you can go complain, get the cops, whatever.  He

6    was not polite.

7    Q.    That was Babajan?

8    A.    Babajan, yes.

9    Q.    Did you talk to Mr. Rossini about your late or missing

:59PM   10    rents?

11    A.    Yes.  I used to talk to him about those missing and he

12    was giving excuses.  He was giving excuses.  We didn't get

13    refund from Thomas Murphy one time.  And then he said,

14    Babajan, there's some issues --

:00PM   15            MR. ADAMS:  Your Honor, I'm going to object on

16    foundation, when these conversations occurred.

17            THE COURT:  Okay.  I'll sustain that.

18            Can you give some more background on when those

19    conversations --

:00PM   20            MR. NOVAK:  Sure.

21            THE COURT:  Thank you.

22    BY MR. NOVAK:

23    Q.    So when, approximately, were you calling Mr. Rossini to

24    complain about your missing or delayed rent payments?

:00PM   25    A.    After like five months.

1   Q.   So you invested in March of 20 -- let's look at your
2   guaranty agreement again.
3        I'm going to show you Khamis 2, Page 2.  You signed
4   your guaranty agreement in March of 2012?
:00PM   5   A.   2012, yeah.
6   Q.   So you said approximately five months later --
7   A.   Oh, maybe more than five.  Six -- six months.
8   Q.   Okay.
9   A.   Yeah.
:01PM   10   Q.   That's when you started to call?
11   A.   Yeah.
12   Q.   And that's when you had talked to Mr. Rossini?
13   A.   Yeah, I talked -- I spoke with Mr. Rossini.
14   Q.   How often would you call Mr. Rossini about your late or
:01PM   15   missing rent payments, starting in six months after you
16   started to invest?
17   A.   Well --
18   Q.   Daily, weekly?
19   A.   Probably weekly.
:01PM   20   Q.   Okay.  And during these conversations what would
21   Mr. Rossini tell you about the missing or delayed or late
22   rent payments?
23   A.   They was always excuse about that.  And at one point --
24   probably I forgot to tell -- at one point he said, well,
:01PM   25   Thomas Murphy, we do have a court against Thomas Murphy

| | |
|---|---|
| 1 | because he took the money or -- or that agreement, whatever |
| 2 | it was in between them. |
| 3 | Q.   You said Thomas Murphy took the money? |
| 4 | A.   Yeah. |
| 5 | Q.   But you understood that you had signed a guaranty |
| 6 | agreement -- |
| 7 | A.   With -- |
| 8 | Q.   -- Mr. Rossini, right? |
| 9 | A.   That's absolutely right. |
| 10 | Q.   Not with Thomas Murphy? |
| 11 | A.   Absolutely, yes. |
| 12 | MR. NOVAK:  One moment, please, your Honor. |
| 13 | (Brief pause.) |
| 14 | MR. NOVAK:  Nothing further. |
| 15 | THE COURT:  Mr. Adams? |
| 16 | CROSS EXAMINATION |
| 17 | BY MR. ADAMS: |
| 18 | Q.   Good afternoon, Mr. Khamis. |
| 19 | A.   Good afternoon. |
| 20 | Q.   My name is Joshua Adams and I'm here today for |
| 21 | Mr. Rossini.  So I'm going to ask you a few questions, if |
| 22 | that's okay. |
| 23 | A.   Yes, sir. |
| 24 | Q.   All right.  So how do you know Mr. Yousif? |
| 25 | A.   He is my wife's cousin. |

:01PM  5
:02PM  10
:02PM  15
:02PM  20
:02PM  25

 1    Q.   And were you aware that Mr. Yousif was getting money for

 2    referring investors like yourself to Mr. Khoshabe's business?

 3    A.   He was getting money?  No.

 4    Q.   Did you know he was getting a percentage or whatever

 5    money you gave to Babajan?

 6    A.   No, I didn't know that.

 7    Q.   Now, you first learned about Babajan's company from

 8    Yousif, right?

 9    A.   Yousif.  He was the one who did advertise for that

10    company.

11    Q.   And --

12    A.   Or he got contact with the people.

13    Q.   Okay.  Thank you.

14         And Yousif is the one who told you to write a check

15    to Thomas Murphy?

16    A.   Yousif, he was the one.  But after that he refer me to

17    Albert Rossini.

18    Q.   And Babajan, correct?

19    A.   Yes.

20    Q.   And they told you to make checks to Thomas Murphy for

21    these notes, correct?

22    A.   Yes.

23    Q.   So all the money you're paying goes towards Thomas

24    Murphy?

25    A.   I'm sorry?

1          MR. NOVAK:  Objection, your Honor.  Misstates the

2    testimony.

3          THE COURT:  Yes.  Why don't you ask him a question.

4    BY MR. ADAMS:

:03PM    5    Q.   How many checks did you write specifically to Albert

6    Rossini?

7    A.   The checks were mailed by me of Thomas Murphy.

8    Q.   Thank you.

9    A.   But they were -- they told us, because he is the lawyer

:03PM   10    who was managing that company.  He is the one who does all

11    that paper.

12    Q.   Thank you.

13          Now, you actually talked to Yousif about this

14    business, correct?

:04PM   15    A.   Yes, I did.

16    Q.   And you talked to him several times around July 2012,

17    correct?

18    A.   July 2012 -- probably, yes.

19    Q.   Around then.

:04PM   20          And do you remember meeting with the FBI -- I know

21    it's a long time ago, but you met with the FBI in June

22    of 2013?  Do you remember that meeting?

23    A.   Meeting?

24    Q.   It was over the phone.

:04PM   25    A.   Over the phone, yes.

1    Q.   And you remember there -- a couple agents were on the

2    phone with you discussing your investments, correct?

3    A.   Yes, they did.

4    Q.   And do you remember talking to them about how you

:04PM   5    mentioned -- a conversation you had with Mr. Yousif about

6    your irregular rent payments?  This was around that time,

7    July, August, 2012.  Do you remember that conversation?

8    A.   Conversation?

9    Q.   Yes.

:05PM   10   A.   About irregularity --

11   Q.   About the late rent payments.

12   A.   Yes, that was when the FBI, they contact me.  That was

13   after they caught all --

14        THE COURT:  Mr. Khamis, why don't you just let him

:05PM   15   ask a question?

16        THE WITNESS:  Okay.

17   BY MR. ADAMS:

18   Q.   Do you remember telling the FBI that you had a

19   conversation with Mr. Yousif about the late rent payments?

:05PM   20   A.   I remember, yeah.

21   Q.   Do you remember that -- in that conversation Mr. Yousif

22   told you if you would return all of his commission?

23   A.   Yeah, he told us he gonna return all his commission to

24   us if the company is not a legit company.

:05PM   25   Q.   Mr. Yousif said that?

1    A.   Yes.

2    Q.   Okay.

3         Now, the government mentioned earlier that -- this

4    guaranty that was signed by Mr. Rossini, right?

5         The guaranty agreement?  Do you remember he showed

6    you that?

7    A.   Yes, Albert Rossini.

8    Q.   Yes.  But all the money is going to Thomas Murphy,

9    right?

10   A.   That's what it shows.

11   Q.   Right.

12        Now, Mr. Rossini told you that there was going to

13   be a lawsuit with Thomas Murphy, correct?

14   A.   He said that on the phone.

15   Q.   And what your response to that was, you wanted to put a

16   lien on the property, right?

17   A.   I was talking to Mr. Babajan.

18   Q.   Okay.  Let's talk about that.

19        So you told Babajan you wanted to put a lien on the

20   property to protect your investment, correct?

21   A.   Yes.

22   Q.   And putting a lien on the property, in your mind, what

23   would that do?  Why would you want that?

24   A.   Lien property -- when you put a lien against a property,

25   they cannot sell it or take whatever people divide it or --

| | |
|---|---|
| 1 | so the lien -- you gonna be questioned before they go to |
| 2 | sell. |
| 3 | Q. Do you know what a lis pendens is? |
| 4 | A. No, I don't. |
| 5 | Q. Okay. |
| 6 | MR. ADAMS: Judge, may I have one moment? |
| 7 | THE COURT: You may. |
| 8 | (Brief pause.) |
| 9 | MR. ADAMS: Nothing further, your Honor. Thank |
| 10 | you. |
| 11 | THE COURT: Anything more from the government? |
| 12 | MR. NOVAK: Briefly, Judge. |
| 13 | REDIRECT EXAMINATION |
| 14 | BY MR. NOVAK: |
| 15 | Q. So you were just asked on cross-examination a couple of |
| 16 | things. |
| 17 | One, you wrote the check to -- the check for your |
| 18 | investment -- the two checks, actually -- |
| 19 | A. Yes. |
| 20 | Q. -- to Thomas Murphy, right? |
| 21 | A. Yes. |
| 22 | Q. Who did speak with on the phone about the guaranty -- |
| 23 | who did you speak with on the phone about the guaranty |
| 24 | agreement? |
| 25 | A. Albert Rossini. |

:06PM (line 5)
:07PM (line 10)
:07PM (line 15)
:07PM (line 20)
:07PM (line 25)

1    Q.   And Mr. Rossini -- I'm going to show you again Khamis 2,

2    Page 2.

3            Mr. Rossini signed the guaranty agreement, right?

4    A.   Yes, he signed that.

5    Q.   And he explained the guaranty agreement?

6    A.   Yes, he did.

7    Q.   And Mr. Rossini -- we just talked about this -- or

8    showed you this a minute ago.  I'm going to show you

9    Khamis 4.

10           He sent you what he called rent payments, right?

11   A.   Yes, he did.

12   Q.   And Mr. Rossini signed the checks for the --

13   A.   Yes, he did sign the checks.

14   Q.   Not Thomas Murphy?

15   A.   Yes.

16   Q.   Not Babajan Khoshabe?

17   A.   No.

18   Q.   The person that -- the people you talked to about this

19   were Bert Rossini, right?

20   A.   Yes.

21   Q.   And did he tell you that this company, Devon Street, was

22   his company?

23   A.   He's the one -- yeah, it's his company.

24   Q.   And you talked to Babajan Khoshabe, right?

25   A.   Yes.

| | |
|---|---|
| 1 | Q.   And you were talking about your -- one moment, please. |
| 2 | (Brief pause.) |
| 3 | MR. NOVAK:  Nothing further. |
| 4 | MR. ADAMS:  Nothing further, your Honor. |
| 5 | THE COURT:  You may step down, sir.  Thank you. |
| 6 | THE WITNESS:  You're very welcome.  Thank you. |
| 7 | (Witness excused.) |
| 8 | THE COURT:  Next witness? |
| 9 | MR. HOGSTROM:  The government calls Ibrahim Yousif. |
| 10 | THE COURT:  Mr. Yousif, if you would step up to my |
| 11 | right. |
| 12 | IBRAHIM YOUSIF, GOVERNMENT'S WITNESS, DULY SWORN |
| 13 | THE COURT:  Mr. Hogstrom, you might grab the |
| 14 | exhibits that are up there. |
| 15 | MR. HOGSTROM:  Yes, Judge. |
| 16 | DIRECT EXAMINATION |
| 17 | BY MR. HOGSTROM: |
| 18 | Q.   Good afternoon, sir.  Please state and spell your name. |
| 19 | A.   My name is Ibrahim Yousif. |
| 20 | Q.   How do you spell your last name? |
| 21 | A.   Y-O-U-S-I-F. |
| 22 | Q.   Sir, what do you do for a living? |
| 23 | A.   I'm self-employed.  I own Bucthel, a metal finishing |
| 24 | corporation. |
| 25 | Q.   What kind of company? |

:09PM (line 5)
:09PM (line 10)
:10PM (line 15)
:10PM (line 20)
:10PM (line 25)

1    A.   It's a metal finishing corporation.

2    Q.   And did you say the name was Bucthel?

3    A.   Bucthel.

4    Q.   Where is that located?

:11PM  5    A.   1945 Touhy Avenue in Elk Grove Village.

6    Q.   You reside in that area as well?

7    A.   Yes.

8    Q.   For how long have you been working at that company and

9    living in that area?

:11PM  10   A.   35 years.

11   Q.   Where were you born?

12   A.   Northern Iraq, Moza (phonetic).

13   Q.   When did you come to the United States?

14   A.   1979.

:11PM  15   Q.   Under what circumstances?

16   A.   Looking for better life.

17   Q.   Okay.  Did you come straight to Chicago?

18   A.   Yes.

19   Q.   Are you a citizen now?

:11PM  20   A.   Yes.

21   Q.   When you came here from Iraq, did you know anyone who

22   was already here?

23   A.   There were Assyrians here, yes.

24   Q.   I'm sorry?

:11PM  25   A.   There were Assyrians here, yes.

| | | |
|---|---|---|
| 1 | Q. | There were Assyrians here? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  You're an Assyrian? |
| 4 | A. | Correct. |

:11PM 5   Q.   Did you know -- did you later know an individual who

6   also came over from Iraq --

7   A.   Correct.

8   Q.   -- Awiquam Pithyou?

9   A.   Yes.  Reverend Awiquam Pithyou.

:12PM 10   Q.   And you called him Reverend Pithyou?

11   A.   Reverend Pithyou, yes.

12   Q.   And who was Reverend Pithyou to you?

13   A.   He's my brother-in-law.

14   Q.   You knew him in Iraq?

:12PM 15   A.   Yes.

16   Q.   What do you know that he did in Iraq?

17   A.   He was some priest, and he was a priest in Europe, too.

18   Q.   A priest at a church --

19   A.   Assyrian community, yes.

:12PM 20   Q.   Was that the church that you --

21   A.   Church of the East, Old Calendar.

22   Q.   And were you a member of that church in Iraq?

23   A.   Yes.

24   Q.   When the Reverend came to the United States, did he

:12PM 25   establish a church here as well?

A.   Correct.

Q.   And was it the same church?

A.   Yes.

Q.   Were you a member of the church here as well?

:13PM   A.   Correct.

Q.   Where is that church?

A.   It's on the Devon Avenue and Pulaski, on the corner.

Q.   Here in Chicago?

A.   Chicago.

:13PM   Q.   And what kind of church is it?  What denomination?

A.   It's, I would say, orthodox, close to Greek orthodox.

Q.   And are those of the members Assyrians?

A.   Correct.

Q.   And in your own words, what does Assyrian mean?

:13PM   A.   Assyrian nationality.  We're mostly in Iraq and Iran and

Syria.  We're Christian.

Q.   And what language do you speak?

A.   We speak Assyrian.  That's our own language.

Q.   And how would you describe the Assyrian community

:13PM   surrounding the Church of the East up in --

A.   We're very close and good to each other.

Q.   How large is the church, approximately?

A.   It's a medium size.  Probably about -- I would say about

3,000 square foot, if I would measure it.

:14PM   Q.   Mr. Yousif, do you know a man named Albert Rossini?

1    A.   Yes.

2    Q.   Do you see Mr. Rossini here in court today?

3    A.   Yes.

4            MR. ADAMS:   Judge, we'll stipulate.

:14PM   5            THE COURT:   All right.  So stipulated.

6    BY MR. NOVAK:

7    Q.   Do you know a man named Babajan Khoshabe?

8    A.   Yes.

9    Q.   Are you related to Babajan?

:14PM   10   A.   Yes.

11   Q.   How are you related to him?

12   A.   He's my ex-brother-in-law.

13   Q.   Can you explain what you mean by ex-brother-in-law?

14   A.   He was married to my wife's sister, deceased.

:14PM   15   Q.   How long have you known Babajan?

16   A.   Since 1985.

17   Q.   Do you also know an individual named Anthony Khoshabe?

18   A.   Yes.

19   Q.   How do you know Anthony?

:15PM   20   A.   He's a son.

21   Q.   Son of?

22   A.   Of Babajan.

23   Q.   In approximately 2011 did there come a time that you

24   became aware of an investment program involving real estate

:15PM   25   in the Chicago area?

1  A.   Correct.

2  Q.   How -- where were you when you first learned about this

3  investment?

4  A.   The first time we were approached by Babajan in my house

5  at the Christmas dinner.

6  Q.   Christmas, you said?

7  A.   Yes.

8  Q.   In 2011?

9  A.   Yes.

10 Q.   You said we were approached.  Who else was with you?

11 A.   Me and my brother-in-law, the priest, Reverend Pithyou.

12 Q.   So it was you and Reverend Pithyou, and Babajan was

13 there?

14 A.   Correct.

15 Q.   Was there anyone else present?

16 A.   There was about 20 people.  But we were then at the

17 table, me and the priest and Babajan.

18 Q.   So it was really the three of you having this

19 conversation?

20 A.   Correct.

21 Q.   Do you recall how the topic of the investment

22 opportunity came up?

23 A.   Well, Mr. Babajan approach us that there's investment,

24 good investment by buying notes, the first time for me to

25 know what's note.  You know, he start talking about buying

1   notes or properties.

2   Q.   What did he say about who was -- who was selling notes?

3   A.   He was selling them.  We learned specifically he was

4   selling them.

5   Q.   Did he explain whether he was working with a company or

6   working with some -- somebody else, or was it just --

7   A.   At that time he didn't mention anything.  We said, let's

8   leave it like that, we can meet at different time so explain

9   to us what's going on.

10  Q.   So he suggested that you might be interested and you

11  decided to talk with him at another time about it?

12  A.   Correct.

13  Q.   Okay.  Was there another time when you met with him and

14  talked to him about it?

15  A.   Well, I think in a day or two we met -- we went to see

16  him, me and the priest.

17  Q.   You and --

18  A.   My brother-in-law.

19  Q.   You and Reverend Pithyou went to see him?

20  A.   Correct.

21  Q.   Where did you go?

22  A.   He told us to go and see him at Devon Investment, which

23  is Devon and Pulaski.

24  Q.   That's the office --

25  A.   That's the office for Devon Investment.

1   Q.   When you arrived at the office, who did you meet with

2   first?

3   A.   He introduced us to Albert Rossini.

4   Q.   Let me first ask, what -- can you describe the office?

5   What did it look like?  What were your impressions of it?

6   A.   It was a real estate office, long.  There's three, four

7   rooms to the right and three, four rooms to the left, and

8   Albert Rossini's office was right in front.

9   Q.   So right when you arrived Babajan introduced you to

10  Mr. Rossini, is that correct?

11  A.   Correct.

12  Q.   And what do you recall was said by Mr. Rossini when you

13  first met him?

14  A.   Not much.  They just -- they told us that there's good

15  investment.  And we said, what are we gonna do now?  He said,

16  let's go and take a look at the properties first and we'll

17  explain to you what's going on after that.

18  Q.   Who said that?

19  A.   Albert Rossini and Babajan together.

20  Q.   Together?

21  A.   Yes.

22  Q.   Did you, in fact, then go out and look at properties?

23  A.   Yes.  Right away we -- me and my brother-in-law, the

24  priest, they took us in their car, SUV, and took us to show

25  the property.

1    Q.    When you say they, you mean --

2    A.    Babajan and Mr. Rossini.

3    Q.    Okay.  So it was the four of you in the car?

4    A.    Four of us in the car.

5    Q.    And what do you remember about where they took you and

6    what you saw?

7    A.    They took us to a building in Skokie.

8    Q.    Do you remember what street it was on?

9    A.    Not really.  It was long time ago.

10   Q.    And what was your impression of the building that they

11   showed you?

12   A.    The building was nice, and Babajan started talking to my

13   brother-in-law about it.

14   Q.    And when you say Babajan is talking to your

15   brother-in-law, did your brother-in-law speak mostly in

16   Assyrian or --

17   A.    He was speaking in Assyrian, yes.

18   Q.    And was Babajan speaking in Assyrian?

19   A.    Assyrian to my brother-in-law, correct.

20   Q.    Now, you obviously speak English?

21   A.    I speak both of them, yes.

22   Q.    During the car ride, in these initial conversations, was

23   the defendant, Mr. Rossini, also speaking?

24   A.    He was telling us about the investment, minimum

25   information about the investment.

|   |   |
|---|---|
| 1 | Q.  And was he speaking in English? |
| 2 | A.  In English, correct. |
| 3 | Q.  So did you -- were you able to see the inside of the |
| 4 | property? |
| :19PM 5 | A.  No.  When we arrived to see the property I asked |
| 6 | specific of Rossini and Babajan to go inside the building. |
| 7 | They say we cannot see it.  The reason why is rented to |
| 8 | Section 8. |
| 9 | Q.  What did you understand that to mean? |
| :20PM 10 | A.  I know about Section 8.  It's low income people that, |
| 11 | you know -- that was it. |
| 12 | Q.  And why did that mean you couldn't go inside the |
| 13 | building? |
| 14 | A.  He did say that we cannot see it because of that reason. |
| :20PM 15 | Q.  All right.  After you saw the building, did you go back |
| 16 | to the office? |
| 17 | A.  We went right back to the office, yes. |
| 18 | Q.  And where did you go when you got back to the office? |
| 19 | A.  We went to Babajan's office. |
| :20PM 20 | Q.  You and the Reverend and -- |
| 21 | A.  Yes. |
| 22 | Q.  And the four of you continued to talk? |
| 23 | A.  Yes.  We -- we start talking about it.  And they said, |
| 24 | you're buying the note of those properties; and the note is |
| :21PM 25 | hold by the bank for now until we get it for you, but you |

1  have to pay for it first.

2  Q.   So they -- if I understand correctly, you're saying that

3  they told you that you would be paying them for the note?

4  A.   For the properties, yes.

5  Q.   For the properties.

6  A.   Correct.

7  Q.   It was your understanding that by providing money, you

8  would --

9           MR. ADAMS:  Object, your Honor.  Leading.

10          MR. HOGSTROM:  I'm attempting to clarify, Judge.

11          THE COURT:  Why don't you rephrase your question?

12  BY MR. HOGSTROM:

13  Q.   What was your understanding of what would happen when

14  you -- if you were to give money --

15  A.   We get the property, we get the property.

16  Q.   When?

17  A.   It was mentioned to us it takes three to six months to

18  get the property.

19  Q.   What was your understanding of what would -- what was

20  the reason for it taking three to six months?

21  A.   They explain to us it takes lot of time to get the note

22  from the bank.

23  Q.   And what -- was there any conversation or explanation

24  about income that would be generated from the properties?

25  A.   Correct.

1    Q.    What --

2    A.    They mentioned that right away, after they pay us for

3    the building, you will get rental income.

4    Q.    Did they explain how the rental income would be

5    collected and paid?

6    A.    No.  We didn't know.  He just said you gonna get the

7    rental income.

8    Q.    Did they talk to you about -- specifically about any

9    specific properties?

10   A.    No, not at that time.

11   Q.    Not at that time.

12            So what was the conclusion of this meeting?

13   A.    When I left like that and I left, I went home.

14   Q.    What was the next thing that happened related to the

15   investment?

16   A.    Next thing happen, my brother-in-law, the priest, called

17   me; he said, I bought the property.

18   Q.    And what did you think --

19   A.    I told him --

20   Q.    -- when you heard that?

21   A.    I told him just hold on, investigate more and see what's

22   going on.  He said, I already talked to Babajan and Bert.  I

23   feel good about it and I trust them, and I bought it and paid

24   for it already.

25   Q.    And what did that -- did that have any influence on what

1   you were deciding to do?

2   A.   Yes.  I didn't know what commission, to be honest with

3   you.  The priest is, you know, very respected and nobody

4   touch the priest.  It's like, you know, he had his own place.

5   You cannot cheat the priest or the church.

6   Q.   So what did that tell you about the investment program?

7   A.   I thought it was good because, you know, the income is

8   coming from us -- from the rent -- from the rental income,

9   coming from us right away, and they mentioned that we're not

10  responsible for paying the taxes until we get the closing.

11  So I thought it was a great investment.

12  Q.   Did there come a time when you discussed any specific

13  properties with Babajan or the defendant?

14  A.   Yes.

15       After about a week or so from the priest buying the

16  first property, Babajan called me.  He got -- he said, I got

17  another property for you to take a look at.

18  Q.   And where -- what did you do after that conversation?

19  A.   I went to see him and he gave me the information about

20  that property.

21       MR. HOGSTROM:   I'm showing the witness what's been

22  marked as Government Exhibits Yousif 1, Yousif 2 and

23  Yousif 3.

24  BY MR. HOGSTROM:

25  Q.   Take a look at each of those exhibits in turn and tell

1    me, once you've looked at them, whether you recognize them?

2    A.   Yes.

3    Q.   Can you tell me what Yousif 1 is?

4    A.   Yeah.  The first one is for the first building, 7935

5    Karlov in Skokie.

6    Q.   Is that a fax sheet about the building?

7    A.   Yes.

8    Q.   Yousif 2, tell me what that is.

9    A.   The second one is guaranty agreement that Mr. Rossini

10   brought to us to sign.

11   Q.   And the third, Yousif 3, what is that?

12   A.   That was a cashier check from us made to Thomas Murphy,

13   their lawyer.

14   Q.   Do each of those exhibits appear to be fair and accurate

15   copies of the documents that you saw?

16   A.   Yes, sir.

17            MR. HOGSTROM:  The government would move into

18   evidence Government Exhibits Yousif 1, Yousif 2 and Yousif 3.

19            MR. ADAMS:  No objection.

20            THE COURT:  Yousif 1, 2 and 3 are admitted into

21   evidence.

22        (Said exhibits were received into evidence.)

23   BY MR. HOGSTROM:

24   Q.   Now, I've put on the screen -- Yousif 1 on the screen.

25   The top of the screen, Devon Street Investments, was that the

1    name of the company that you understood was being run by the

2    defendant and Babajan?

3    A.    Yes.

4    Q.    And underneath that it says 7935 Karlov.  What was that?

5    A.    That is for the building that they are buying.

6    Q.    Okay.

7          And in the middle -- I'm going to highlight --

8    there's a section called Income, a section called Expenses.

9    What was this?

10   A.    He just give us this paper and he said, this is what the

11   buildings is -- discussion of the building and the insurance

12   and all the stuff.  But we didn't pay that much attention to

13   it.  We said -- he mentioned that how much the income was

14   coming and the price was very good for the property.

15   Q.    And who was telling you this?

16   A.    Babajan and Bert.

17   Q.    So originally -- I think a little while ago you said

18   that you met with Babajan about the specific property.  When

19   did the defendant enter the conversation?

20   A.    Bert came to -- to Babajan's office and brought us the

21   guaranty agreement.

22   Q.    Okay.  And on the bottom of this document it says,

23   Thomas Murphy, attorney/agent, for purchase of; and you list

24   a note and property.  What do you understand this information

25   to mean?  Why was this on this document?

1   A.   I mean, we were very put at ease when he said we have a

2   lawyer, that he will take care of all the documents for

3   closing the property.  And they tell us that everything have

4   to be in a cashier check, and we not accepting any cashier

5   check from you unless there's a PIN number in the cashier

6   check for the building, specific building.

7   Q.   Now I'm going to turn to Yousif 2.  Is this a document

8   called guaranty agreement?

9   A.   Correct.

10  Q.   And on the bottom the date is December 30th, 2011, is

11  that right?

12  A.   Correct.

13  Q.   And it's signed by Albert Rossini, is that right?

14  A.   Correct.

15  Q.   Now, you said that Mr. Rossini brought you this

16  document?

17  A.   Correct.

18  Q.   Before it was given to you, did he explain to you what

19  it was?

20  A.   Not really, no.

21  Q.   What was your understanding of why he was bringing you

22  this document?

23  A.   We thought that we're -- this is guaranty, for us to

24  sign it and to get the property.

25  Q.   Did you read it?

1    A.    No.

2    Q.    Why didn't you read it?

3    A.    Most of the time we work with the trust, especially with

4    Babajan being there.  But, you know, this is what it is and

5    we sign and we get the property.

6    Q.    Now, I want to --

7    A.    One more thing.  Like I mentioned, he said that there's

8    lawyer involved, and we pay in cashier check for the

9    property, and there's a PIN number, and that put us at ease

10   that we are gonna get the property.

11   Q.    I want to ask one more question about this page.

12            It says on here -- the name on here is Aldar, LLC.

13   What was that?

14   A.    That was my LLC corporation for the properties.

15   Q.    So you put this in the name of -- your intention was to

16   put this investment -- or this property in the name of this

17   company, Aldar?

18   A.    Correct.  Aldar, yes.

19   Q.    Page 2 of the guaranty agreement, whose signature is

20   that under the -- underneath Aldar, LLC?

21   A.    That's my signature.

22   Q.    Now, turning to Exhibit Yousif 3, what is -- what are we

23   looking at here?

24   A.    A cashier check made to Thomas Murphy, attorney, with a

25   PIN number and address of the property.

1    Q.   This is for the Karlov property?

2    A.   Karlov property, correct.

3    Q.   And what is the amount of the cashier's check?

4    A.   $75,000.

5    Q.   And who is listed as the remitter?

6    A.   Mr. --

7    Q.   I'll blow it up.  It's a little small.

8    A.   Daniel Yousif, yes.

9    Q.   Who is Daniel Yousif?

10   A.   My son.

11   Q.   And why was his name on this check?

12   A.   He's with me in the Aldar, LLC.  He was included in

13   Aldar.

14   Q.   He was part of Aldar --

15   A.   Aldar, yes.

16   Q.   Now, this amount, $75,000, was it your understanding

17   that you would be giving $75,000 and eventually receiving

18   title to a property?

19   A.   Correct.

20   Q.   Did you have an understanding of what might -- what

21   would happen if for some reason you couldn't get title to the

22   property?

23   A.   They guarantee for us that we gonna get it.  There's no

24   other thing.  We just buying the property.

25   Q.   So after you invested in this first property, did you

1   start receiving rental income?

2   A.   Yes.

3   Q.   And how did you receive that rental income?

4   A.   The rental income was given to us by Babajan.

5   Q.   How did you know to get it from Babajan?

6   A.   Most of the time he will call us.

7            MR. HOGSTROM:  I'm handing the witness what has

8   been marked as Government Exhibits Yousif 4 and Yousif 5.

9   BY MR. HOGSTROM:

10  Q.   Do you recognize Yousif 4 and Yousif 5?

11  A.   Correct.

12  Q.   What is Yousif 4?

13  A.   A check for 12,500.

14  Q.   And what is Yousif 5?

15  A.   A check for 2,257 -- 2,200.  Sorry.

16  Q.   Are these fair and accurate copies of these documents?

17  A.   Yes.

18           MR. HOGSTROM:  The government moves to admit

19  Yousif 4 and Yousif 5.

20           MR. ADAMS:  No objection.

21           THE COURT:  Yousif Exhibits 4 and 5 are admitted in

22  evidence.

23       (Said exhibits were received into evidence.)

24  BY MR. HOGSTROM:

25  Q.   I want to start slightly out of order, Yousif 5 first.

1    I'm going to enlarge this.

2         What is this check?

3    A.   This is a check was brought to me, to my office, by

4    Anthony Khoshabe, who is Babajan's son.

5    Q.   What is the date of this check?

6    A.   January 18th of 2012.

7    Q.   And you said that you and -- your original investment

8    was December 30th, 2012, correct?

9    A.   Yeah.

10   Q.   Or 2011, correct?

11   A.   Yes.

12   Q.   And that was around the same time that the Reverend

13   invested, is that right?

14   A.   Correct.

15   Q.   Was there -- were you aware -- let me back up.

16        On January 18th or shortly thereafter you said

17   Anthony came to your office?

18   A.   Correct.

19   Q.   And he brought you this check?

20   A.   He brought me this check personally, yes.

21   Q.   What did -- what did he say when he gave you this check?

22   A.   This is -- he said, this is a check sent to you from my

23   dad, me and Babajan.

24   Q.   And what was your reaction when you saw the check?

25   A.   I was surprised.  I told him, are you sure this is for

1   me?  He said, yes.

2   Q.   Why were you surprised?

3   A.   Because the amount was high.

4   Q.   And the property listed in the memo line, 5801 North

5   Richmond, was that the property you had invested in?

6   A.   No.

7   Q.   Did you know whose property that was?

8   A.   At that time, no.

9        But the reason why -- he explain to me that the

10  Reverend bought properties from him.  This is -- was like a

11  referral fee to you because of the Reverend Pithyou buying

12  more properties from him.

13  Q.   Okay.  And what did you do after you -- it was explained

14  to you that this was a referral fee?

15  A.   I didn't ask for it, I didn't agree for anything, but he

16  was giving to me, so --

17  Q.   And did you think after that, that you might get

18  additional referral fees?

19  A.   No.  At that time, no.

20  Q.   All right.  So now let's go to -- I'm sorry.  I called

21  that Yousif 5.  That was actually Yousif 4.

22       Now let's move to Yousif 5.  And this is dated

23  January 25th, this check, is that right?

24  A.   Correct, yes.

25  Q.   And this check is made out to you, is that right?

1    A.   Correct, yeah.

2    Q.   And who made out this check?

3    A.   This is made -- Thomas Murphy.

4    Q.   And what is the amount?

:35PM   5    A.   2,200.

6    Q.   Now, there's nothing in the memo line, but did you have

7    an understanding of what you were being given this check for?

8    A.   It was for rental.

9    Q.   Who told you that?

:36PM   10   A.   Babajan.

11   Q.   And that's who gave you the check?

12   A.   Correct.

13   Q.   Now, when you received checks from Babajan, was it in

14   person when you would go to the office or how did you receive

:36PM   15   them?

16   A.   Most of the time in person.  Sometimes he would send it

17   with his son that works for me.

18   Q.   Okay.  So at this time period Anthony worked for you?

19   A.   Correct.

:36PM   20   Q.   At Bucthel Metal Finishing, LLC?

21   A.   Correct.

22   Q.   So sometimes the checks would come to you through

23   Anthony and sometimes you would go and get them from Babajan?

24   A.   Correct.

:36PM   25   Q.   When you got the checks from Babajan, did you also see

1   the defendant there?

2   A.   Yes.

3   Q.   Now, after you received this referral fee and you began

4   receiving rent payments, what was your impression of the

:36PM   5   investment program at that point?

6   A.   Well, I thought it was a great investment, and I thought

7   Babajan trying to help his community and his people and the

8   church and the priest and -- you know.

9   Q.   And did you decide as time went on to invest in

:37PM   10   additional properties?

11   A.   Correct, yes.

12   Q.   Do you remember which was the next property that you

13   invested in?

14   A.   I think the next property was Hamilton?

:37PM   15   Q.   And was there a third property as well?

16   A.   Correct.  Knox.

17   Q.   Bear with me.  I'm just going to get a handful of these

18   documents together at one time so we can kind of do them all

19   at once.

:38PM   20       (Brief pause.)

21   BY MR. HOGSTROM:

22   Q.   I'm showing the witness Government Exhibits Yousif 6,

23   Yousif 7, Yousif 8, Yousif 9 and Yousif 10.  Take a moment to

24   look through each of these, and in turn, and tell me whether

:38PM   25   you recognize them.

| | | |
|---|---|---|
| 1 | A. | Same agreement. |
| 2 | Q. | Do you recognize each of those documents, first? |
| 3 | A. | Correct. |
| 4 | Q. | Now, Yousif 6, what is that? |
| :38PM 5 | A. | This is agreement to buy 8249 Knox in Chicago. |
| 6 | Q. | What is Yousif 7? |
| 7 | A. | I'm sorry? |
| 8 | Q. | What is Yousif 7, the next exhibit?  What is Yousif 7? |
| 9 | A. | Check made for Thomas Murphy for 37,500. |
| :39PM 10 | Q. | And what is Yousif 8? |
| 11 | A. | Another check made for other half, 7,500, for the same |

property.

| | | |
|---|---|---|
| 13 | Q. | And what is Yousif 9? |
| 14 | A. | A check of $75,000 made to Thomas Murphy. |
| :39PM 15 | Q. | And what is Yousif 10? |
| 16 | A. | Guaranty signed by me from Albert Rossini. |
| 17 | Q. | Do these appear to be true and accurate copies of the |

18  documents that -- documents that you saw during the time

19  period that we're talking about?

| | | |
|---|---|---|
| :39PM 20 | A. | Yes, sir. |

21          MR. HOGSTROM:  The government would move to admit

22  Government Exhibits Yousif 6 through 10.

23          MR. ADAMS:  No objection.

24          THE COURT:  Government Exhibits Yousif 6 through 10

:39PM 25  are admitted in evidence.

1       (Said exhibits were received into evidence.)

2    BY MR. HOGSTROM:

3    Q.   Okay.

4           Government Exhibit Yousif 6 first I put up on the

5    screen.  Is this a guaranty agreement for the property at

6    8249 Knox?

7    A.   Yes, sir.

8    Q.   I want to go to the second page first to figure out the

9    date.

10          What's the date on this agreement?

11   A.   8th of February, 2012.

12   Q.   So was this approximately three weeks after you got your

13   first rent payment?  Is that correct?

14   A.   Correct.

15   Q.   Now, going back to the first page of Yousif 6, the first

16   line says, the undersigned, Albert Rossini, hereby

17   acknowledges that he has presented to Ibrahim Yousif and

18   Gewargis Khoshabe?

19          Who is Gewargis Khoshabe?

20   A.   My friend.

21   Q.   And what do you call him?

22   A.   We call him George.

23   Q.   George?

24   A.   Yes.

25   Q.   How did George Khoshabe become involved?

1  A.   He wanted to invest with me.  He have half of the money

2  of the property, so I agree to go with him half and half.

3  Q.   And when you were discussing this property with Babajan

4  and the defendant, was he present as well or was it just you?

:41PM  5  A.   Yes, me and George were present.

6  Q.   And where did these discussions occur?

7  A.   In Babajan's office.

8  Q.   And both Babajan and the defendant were there?

9  A.   At that time Bert was not present.

:41PM  10  Q.   Okay.  At the time that you discussed the --

11  A.   The property.

12  Q.   -- the property in the first place?

13  A.   Yes.

14  Q.   Okay.  So we'll come back to Yousif 6 in a minute.

:42PM  15       I'm putting up Yousif 7.  What is this?

16  A.   This is a cashier check for 37,500 made to Mr. Thomas

17  Murphy with the PIN number of the property and the address of

18  the property.

19  Q.   Okay.  And the date is February 7th, 2012?

:42PM  20  A.   February 7, yes, cashier check.

21  Q.   And then Yousif 8 is another cashier's check on the same

22  date, isn't that right, February 7th?

23  A.   Correct.

24  Q.   Okay.  And it references 8249 Knox, is that right?

:43PM  25  A.   Correct.

1    Q.   Were these two checks together meant to be yours and

2    George's contributions to purchasing this -- or investing in

3    this property?

4    A.   Correct.

:43PM    5    Q.   Now, going back to Yousif 7, after you gave the

6    cashier's check -- or cashier's checks -- who did you give

7    them to, first of all?

8    A.   To -- always we giving the check when Babajan and Albert

9    Rossini were present.

:43PM   10    Q.   Okay.  And who brought you the guaranty agreement?

11    A.   The guaranty was always brought by Mr. Albert Rossini.

12    Q.   And what would -- do you remember if he told you

13    anything about this document when you were there with George?

14    Was it --

:43PM   15    A.   No.  He just says, this is where you gonna sign.  And we

16    sign and we leave.

17    Q.   Did you ever read this document?

18    A.   To be honest with you, not.

19    Q.   Okay.  Turning to Government Exhibit Yousif 9, on the

:44PM   20    top of this document it says, 6159 North Hamilton.  Do you

21    recognize that address?

22    A.   Correct.

23    Q.   What is that address?

24    A.   This is for the third property that I bought from

:44PM   25    invest -- Devon Investment.

1    Q.   Now, this document is undated, but do you remember

2    approximately when you bought the third property?

3    A.   This was the last one.  I would say around probably

4    February, end of February.  I'm not sure.

:44PM  5  Q.   And did you acquire this, or did you invest -- do this

6    investment through the cashier's check that --

7    A.   I invested myself with the cashier check.

8    Q.   So I'm showing you Government Exhibit Yousif 9.  Is this

9    the cashier's check for $75,000 that references 6159 North

:45PM 10  Hamilton?

11   A.   Yes, sir.

12   Q.   And again, this is from Daniel Yousif, but that's you,

13   correct?

14   A.   Yeah.  We're together.

:45PM 15  Q.   You and your son together.

16        Do you recall, again, what this guaranty

17   agreement --

18   A.   Correct.

19   Q.   Who brought it to you?

:45PM 20  A.   Mr. Albert Rossini.

21   Q.   And did you read this one?

22   A.   No.

23   Q.   Okay.  And then Government Exhibit Yousif 10.

24        Now, this document, I'm going to direct you to the

:45PM 25  very top of it.  The heading on this is different than the

1    other ones.  This says AD Investment Partners.  Do you

2    remember that?

3    A.    No.

4    Q.    No?

5          And the date is February 13th, and it references

6    6159 North Hamilton, is that right?

7    A.    Yes.  We thought all the properties were coming from

8    Devon Investment.

9    Q.    Okay.

10         Now, it says, with respect to the above property,

11   we propose that you and AD Investment Partners will form a

12   joint venture to purchase either the property itself or the

13   existing note and mortgage on the property, and it goes on

14   from there.

15         Do you remember being told anything about

16   partnering with somebody called AD Investment Partners?

17   A.    No.  This is the first time I heard about AD Investment.

18   Q.    Okay.

19         And the last page, there's signature blocks that

20   reference Albert Rossini and Anthony Khoshabe.  Do you

21   recognize that?

22   A.    No.

23   Q.    Okay.  Do you remember ever signing a document like

24   this?

25   A.    No.

```
 1              THE COURT:  Counsel, perhaps this is a convenient
 2    time to take a break?
 3              MR. HOGSTROM:  Sure.
 4              THE COURT:  All right.
 5              Ladies and gentlemen of the jury, we'll take our
 6    afternoon break.  We'll break for approximately 15 minutes
 7    from now, until 3:00 o'clock.
 8              During the break please do not discuss this case
 9    with anyone, including one another.  And please do not do any
10    independent research regarding any of the issues or the
11    people you heard discussed in this case.  Thank you.
12         (Jury exited the courtroom.)
13              THE COURT:  Sir, you may step down.
14         (Witness left the stand.)
15              THE COURT:  We're in recess.
16         (Brief recess was taken.)
17         (Jury entered the courtroom.)
18              THE COURT:  You may continue.
19              MR. HOGSTROM:  Thank you.
20    BY MR. HOGSTROM:
21    Q.   Now, Mr. Yousif, when we stopped for the break we had
22    talked about the last property that you invested in, and that
23    was 6159 North Hamilton, is that right?
24    A.   Correct.
25    Q.   And were those three properties the only three
```

:47PM (line 5)
:47PM (line 10)
:48PM (line 15)
:04PM (line 20)
:04PM (line 25)

| | |
|---|---|
| 1 | properties that you invested in? |
| 2 | A.   Yes. |
| 3 | Q.   Now, at the time that you were originally investing, |
| 4 | what was your involvement in the church and its congregation? |
| 5 | A.   Well, I was on the committee and always go to church |
| 6 | every Friday, late Friday prayer, and Sunday -- I mean |
| 7 | Saturday prayer, Sabbath, and Sunday.  Almost every -- |
| 8 | Q.   What committee was that? |
| 9 | A.   Assyrians -- the Church of the East, Saint Odisho. |
| 10 | Q.   What committee? |
| 11 | A.   Assyrian's committee -- oh, a committee of the church, |
| 12 | the Saint Odisho church. |
| 13 | Q.   Is that the governing board of the church or something |
| 14 | to that effect? |
| 15 | A.   I'm sorry? |
| 16 | Q.   Is that like the board of the church? |
| 17 | A.   Yes, yeah. |
| 18 | Q.   And how many people do you think you knew in that |
| 19 | community? |
| 20 |      Were you somebody that knew a lot of people? |
| 21 | A.   Almost everybody. |
| 22 | Q.   And did you have a sense of what your status in the |
| 23 | community was, what other people thought of you? |
| 24 | A.   You know, I thought they respect me. |
| 25 |      MR. ADAMS:  Objection. |

:04PM (line 5)
:04PM (line 10)
:05PM (line 15)
:05PM (line 20)
:05PM (line 25)

| | 1 | THE COURT:  Hold on for a second. |

1      THE COURT:  Hold on for a second.

2      Sustained.

3  BY THE WITNESS:

4  A.  I thought they respect me --

:05PM  5      THE COURT:  Hold on.  He's going to ask another

6  question.

7      THE WITNESS:  I'm sorry.

8  BY MR. HOGSTROM:

9  Q.  Did you -- after you invested did you over a period of

:05PM  10  time have a number of discussions with various other people

11  associated with the church about your investment experience?

12  A.  No.  I mean, about this specific investment or --

13  Q.  About the -- about Devon Street Investments, about the

14  fact that you had invested in properties.

:06PM  15  A.  Yes, yes, for sure.

16  Q.  And generally speaking, what did you tell people when

17  you talked to them about it?

18  A.  I told them this is a good investment.  And I told the

19  church member this would be good for our church if we can

:06PM  20  invest money --

21  Q.  In fact --

22  A.  -- to benefit the church.

23  Q.  Was there a time that you and the Reverend discussed

24  that the church itself would invest?

:06PM  25  A.  Correct.

1    Q.   What did you have to do with that process?

2    A.   Well, we explained -- me and Reverend explain what we

3    doing with the Devon Investment, that we investing our own

4    money.  And the priest said, let's get the committee all

5    together, explain to them what we're doing.

6            MR. ADAMS:  Objection, your Honor.  Hearsay and

7    foundation to this conversation.

8            THE COURT:  Sustained as to hearsay.

9            The jury will disregard Mr. Yousif's statements as

10   to what someone else said.

11   BY MR. HOGSTROM:

12   Q.   Mr. Yousif, did you -- why did you -- why did you tell

13   other people that you thought it was a good investment?

14   A.   Because I wanted to help them.

15   Q.   And what made you think for yourself that it had been a

16   good investment?

17   A.   Well, we trusted Babajan, and he's my ex-brother-in-law,

18   and we're family, close to each other.  If I could benefit

19   from it, then other people could benefit from it, that's fine

20   with me.

21   Q.   Were you receiving rent payments?

22   A.   Rent payments, correct.

23   Q.   And we talked earlier about the instance where Anthony

24   came to you with a $12,000 check that he said was from

25   Babajan for a referral fee.  Do you remember that?

1    A.   Correct, yes.

2    Q.   Were there other times that you were given referral fee

3    checks?

4    A.   Yes.

:07PM    5    Q.   And how were you given those?

6    A.   Sometimes Babajan would call me, I go get them;

7    sometimes he just send it to me with Anthony Khoshabe.

8    Q.   And approximately how many times do you think you got a

9    check like that?

:08PM   10    A.   I can't remember.  Maybe six, seven times.

11    Q.   Did you have an idea -- let me back up.

12         Before you started receiving these checks, did you

13    ever talk to them about wanting to get referral fees?

14    A.   No.  There was no agreement at all was offered to me and

:08PM   15    that's it.

16    Q.   And when you started receiving them, you deposited them,

17    correct?

18    A.   Correct.

19    Q.   And why -- why were you taking the referral checks?

:08PM   20    A.   I thought that they were -- they were doing really good,

21    so they was offering us something as a referral fee, because

22    a lot of people were going to them and mention my name, that

23    I'm investing with them, so, you know, doing me a good thing.

24    I don't know.

:08PM   25    Q.   Did you have any idea whether other people involved were

| | |
|---|---|
| 1 | getting referral fees? |
| 2 | A.   Yes, yes.  If I was buying, somebody else might get the |
| 3 | referral fee. |
| 4 | Q.   That's what you thought anyway, right? |
| :09PM 5 | A.   Yes. |
| 6 | Q.   Do you know who that you talked to later invested?  Who |
| 7 | else that you talked to later invested? |
| 8 | A.   I'm sorry? |
| 9 | Q.   Do you know which other people invested? |
| :09PM 10 | A.   Oh, my cousins. |
| 11 | Q.   And who are those? |
| 12 | A.   Moshi, Moshi family, Nastors Moshi, Fidel Moshi, |
| 13 | Valentin. |
| 14 | Q.   Albert Khamis? |
| :09PM 15 | A.   Albert Khamis from Arizona, yes, Nastors Moshi. |
| 16 | Q.   You said you received a number of these referral checks? |
| 17 | A.   Yes. |
| 18 | Q.   Do you remember how much in total those checks were when |
| 19 | you added it all up? |
| :09PM 20 | A.   116,000. |
| 21 | Q.   Now, you -- earlier you discussed, I think it was |
| 22 | Exhibit Pithyou 5, that your first rent check came from |
| 23 | Thomas Murphy.  Do you remember that? |
| 24 | A.   Correct. |
| :10PM 25 | Q.   After that did you begin receiving rent checks from a |

1    different source?

2    A.   Correct.

3    Q.   Where were the rent checks coming from after the first

4    one from Thomas Murphy?

5    A.   It was from Reliant and Management service.

6         MR. HOGSTROM:   I'm handing the witness what's been

7    marked Government Exhibit Yousif 11.

8    BY MR. HOGSTROM:

9    Q.   Do you see this document?

10   A.   Yes, sir.

11   Q.   Do you recognize it?

12   A.   Correct.

13   Q.   What is that document?

14   A.   This is a check from Reliant Management company for

15   rental, payable to me.

16   Q.   And are there several pages with several checks on them?

17   A.   Correct.

18   Q.   Are these true and accurate copies of the checks you

19   received?

20   A.   Yes.

21        MR. HOGSTROM:   The government moves to admit

22   Government Exhibit Yousif 11.

23        MR. ADAMS:   No objection.

24        THE COURT:   Yousif 11 is admitted in evidence.

25        (Said exhibit was received into evidence.)

1  BY MR. HOGSTROM:

2  Q.   Now, the first page of Yousif 11 I'm putting up on the

3  screen.  First, in the upper left-hand corner of the check,

4  it says Reliant Management.  You just referenced that

5  company.

6         What did you understand Reliant Management to be?

7  A.   The management here was as usual, for removal of the

8  snow, landscaping, if something goes with -- wrong with the

9  building.

10 Q.   Well, that's what you understood property management --

11 A.   Property management.

12 Q.   What did you understand this company, Reliant

13 Management, was?

14 A.   That's what I understand.

15 Q.   Whose company was it?

16 A.   I think it was formed by Anthony Khoshabe.

17 Q.   Is that Babajan's son?

18 A.   Babajan's son, yeah.

19 Q.   And why do you think it was formed by Anthony Khoshabe?

20 Why do you think that it was Anthony Khoshabe's company?

21 A.   Because he was sitting in the office and he said, this

22 is my company, that I'm managing the properties.

23 Q.   Is that when he first started giving you rent checks?

24 A.   Yes.

25 Q.   Did he tell you what he would be doing as the person who

1    ran Reliant Management?

2    A.   He didn't tell me what was -- you know, we thought it

3    just managing the company.  Management means managing the

4    company.

5    Q.   He said managing the properties?

6    A.   The properties.

7    Q.   And you understood that to mean maintaining, mowing the

8    lawns, things like that?

9    A.   Yes, sir.

10   Q.   Was it your understanding that the rent payments that

11   you would be receiving from Reliant Management would --

12   included deduction for management fees?

13   A.   He didn't say at that time, no.

14   Q.   Not that time?

15   A.   No.

16   Q.   Did you learn about that at a later time?

17   A.   Yes.

18   Q.   Who told you about that?

19   A.   Well, there was a letter sent to us by -- from Albert

20   Rossini.

21   Q.   And what did it say?

22   A.   It said, we will deduct management fee and insurance and

23   stuff like that from the rent.

24   Q.   Okay.  So -- and did you have an understanding of where

25   the amount that was being deducted was going?

|       |    |    |                                                              |
|-------|----|----|--------------------------------------------------------------|

A.    No.

Q.    So this first check that I put on the screen, the first

page of this exhibit, is dated February 21st, 2012, and the

amount is $2,340.  Is that right?

:13PM    A.    Correct.

Q.    And in the memo line it says, February rents pro-rated.

Is that right?

A.    Correct.

Q.    And would this have been for the first two properties

:13PM    that you invested in?

A.    Yes.

Q.    And it's signed by Anthony Khoshabe, right?

A.    Correct.

Q.    So then the next check is on March 6th, is that correct?

:13PM    A.    Correct.

Q.    And then April 10th is the next one, is that right?

A.    Yes.

Q.    And another on April 10th, correct?

A.    Correct.

:14PM    Q.    And then April 26th, is that right?

A.    Yes, sir.

Q.    And then May 16th, is that correct?

A.    Correct.

Q.    And May 17th, is that correct?

:14PM    A.    Yes, sir.

1  Q.   Now, each time that you received these checks, were

2  these the ones that you were getting directly from Anthony?

3  A.   From Anthony.

4  Q.   Okay.

5       After this May 17th check did something change

6  about the way you were receiving rent payments?

7  A.   Yes.  It changed to money order.

8  Q.   Where were the money orders coming from?

9  A.   From Bert Rossini.

10 Q.   And how do you know they came from Bert Rossini?  Did he

11 give them to you directly?

12 A.   Well, Babajan was handing them to us and we thought it

13 comes from Albert Rossini.

14 Q.   Why did you think they were coming from Bert Rossini?

15 Were they signed by him?

16 A.   I don't remember that, to be honest with you.

17 Q.   Did there come a point where the rent payments became

18 irregular or they stopped?

19 A.   When I was still there it was going on.

20 Q.   I'm sorry?

21 A.   When I was still there the money come -- was coming --

22 the rent never stopped.

23 Q.   Okay.  So you got rent checks regularly until at least

24 June, is that correct, June of 2012?

25 A.   Yes, when I decide to sell my properties.

1    Q.   Sometime in June of 2012 or shortly before that, did you

2    come to be concerned about this investment situation?

3    A.   Yes.

4    Q.   What caused you to be concerned about it?

5    A.   Well, the reason I kept asking Mr. Rossini when we gonna

6    be closing and given the properties, originally he mentioned

7    three to six month, and this was almost getting close to

8    that.  There was nothing happening, and I start pressing them

9    for the note.  And that's when my suspicions got, you know,

10   bigger and bigger.

11   Q.   So where and how were you having these conversations

12   with Mr. Rossini about asking for -- receiving the notes?

13   A.   In his office.

14   Q.   How often do you think you had these conversations with

15   him?

16   A.   Lot of time.

17   Q.   What would you say and what would he say?

18   A.   He said that it takes a lot of time, the lawyer is

19   taking care of it, it's not an easy process when you taking

20   the notes from the bank to transfer it to you, and all of

21   that.  And we took it as is.

22   Q.   So how long of a period of time do you think it was that

23   you were asking about this and not getting an answer -- a

24   satisfactory answer?

25   A.   Probably about two -- two-and-a-half, three months I

1    started asking more and more.

2    Q.   After that period of time did you do something related

3    to the fact that you were concerned about this?

4    A.   Yes.  I contacted my brother-in-law, Reverend Awiquam

5    Pithyou, about it.  And I said, something is not right here;

6    maybe you should just go and investigate more and ask Rossini

7    what's going on, why we not getting the notes, the closing.

8    Q.   And did you, after that, decide that you were going to

9    pull out of the investment?

10   A.   Correct.

11   Q.   And how did you make -- come to that decision?

12   A.   Well, as a matter of fact, it wasn't -- the reason push

13   me for -- Albert Rossini called right away after that phone

14   call with my Reverend -- my brother-in-law, Reverend Awiquam

15   Pithyou.

16   Q.   Okay.  Let me stop you there and back up one step.

17        You had this conversation with the Reverend?

18   A.   Correct.

19   Q.   How long after that was this next phone call that you

20   just referred to from the defendant?

21   A.   Probably not even an hour.

22   Q.   So you received a phone call from Mr. Rossini?

23   A.   Albert Rossini, correct.

24   Q.   And what did he say when he called you?

25   A.   Accusing me of being a bad apple and spreading rumors

1  | that this is bad investment, and this and that.  And he said
2  | to me, you come over, we buy your property back, we get your
3  | money and you're out.  Just like that.
4  | Q.   And what did you do in response to that?
5  | A.   I said, fine.
6  | Q.   After you finished that phone call, what did you do?
7  | A.   Well, I decided to go to the Lincolnwood Police
8  | Department and report what's going on.
9  | Q.   Why did you decide to do that?
10 | A.   There was no answer for me when we gonna do closing.
11 | There was suspicion about -- instead of cashier check there
12 | was money orders coming for rent.  And all things just come
13 | together, that this is something that's not right here.
14 | Q.   So did you actually go to the police department?
15 | A.   Correct.
16 | Q.   And did you speak to a representative of the police
17 | department?
18 | A.   Yes.  I file a report, a police report, and they decide
19 | to --
20 | Q.   Let me stop you there.
21 |          Without saying what they told you, after you filed
22 | the police report what happened next?
23 | A.   I wait another week and I got a call from Albert Rossini
24 | to come and sign some documents and get my money.
25 | Q.   Okay.  And did you go to his office then?

1    A.    Correct.

2    Q.    And when you went to his office, did he have some

3    documents for you to sign?

4    A.    Correct.

:19PM    5         MR. HOGSTROM:  Showing the witness what's been

6    marked Government Exhibit Yousif 12.

7    BY MR. HOGSTROM:

8    Q.    Do you recognize that?

9    A.    Yes.

:19PM   10   Q.    What is Yousif 12?

11   A.    For me was listing all the referral fee, referral fee or

12   commission amount that was deducted then from my investment.

13   Q.    And is that a true and accurate copy of that document?

14   A.    Yes.

:20PM   15        MR. HOGSTROM:  The government moves to admit

16   Yousif 12.

17             MR. ADAMS:  No objection.

18             THE COURT:  Yousif 12 is admitted in evidence.

19        (Said exhibit was received into evidence.)

:20PM   20   BY MR. HOGSTROM:

21   Q.    Now, the date of this document is June 11th, 2012.  Does

22   that look right?

23   A.    Correct.

24   Q.    Do you remember about how long before this you went to

:20PM   25   the police department?

1    A.    About a week.

2    Q.    Now, it says, the purpose of this letter is to

3    acknowledge the various commissions which I have previously

4    paid to you for your assistance in arranging to have

5    individuals advance funds either to purchase real property or

6    to acquire the notes and mortgages related to real property.

7    Below please find a list which has set forth the names of the

8    individuals, the address of the property and the amount of

9    the commissions paid to you for each.  And then there's a

10   list of the number of properties.

11            When you got to the defendant's office and he

12   provided you with this, did he explain why it was that he

13   wanted you to sign this document?

14   A.    He just explained to me that I'm deducting this amount

15   from your initial investment, and that's it.

16   Q.    So what was the total of your initial investment?

17   A.    222,000 -- 225,000.  I'm sorry.

18   Q.    So it was your understanding that he was going to repay

19   that money but deduct from it this 116,000 --

20   A.    Absolutely.

21   Q.    And he signed it, correct?

22   A.    Correct.

23   Q.    Did you sign it?

24   A.    Correct.  I signed it.

25   Q.    What's this other signature here on the bottom?

1    A.   He brought another person that works in the office with

2    him as to witness that I'm getting my money.

3    Q.   Okay.

4         Now, after you signed this document what was the --

5    what was your understanding of how long it would be before

6    your money was refunded?

7    A.   He said a couple days he would send me the money.

8    Q.   He said it would be a couple days?

9    A.   Couple days, yeah.  It was supposed to come from

10   Mr. Thomas Murphy.

11   Q.   And did you have an arrangement for when you were going

12   to come pick it up or --

13   A.   He was gonna call me.

14   Q.   Let me -- I'm going to show you what's been marked

15   Government Exhibit Yousif 14.

16        Do you recognize that?

17   A.   Correct.

18   Q.   Is that a true -- what is that?

19   A.   It's a copy of cashier check made payable to me, for a

20   hundred --

21   Q.   Is that -- I'm sorry?

22   A.   For 108,400.

23   Q.   Is that a true and accurate copy of that check?

24   A.   Yes, sir.

25   Q.   Okay.  I've put Government Exhibit Yousif 14 on the

1    screen.  What is the date of this check?

2    A.   July 16th.

3    Q.   So that was approximately a month after --

4    A.   Yes.

5               MR. HOGSTROM:  I'm sorry, Judge.  I forgot to admit

6    the document.

7               We would move to admit Government Exhibit Yousif --

8               THE COURT:  14?

9               MR. HOGSTROM:  14, yes.

10              MR. ADAMS:  No objection.

11              THE COURT:  Yousif Exhibit 14 is admitted in

12   evidence.

13        (Said exhibit was received into evidence.)

14   BY MR. HOGSTROM:

15   Q.   All right.  So what is the date of this check?

16   A.   7/16.

17   Q.   And is that approximately a month after the previous

18   document you signed with the defendant?

19   A.   I didn't pay attention to that, to be honest with you.

20   Q.   Okay.  Well, do you remember whether you got the money,

21   your repayment money, within two days, as the defendant had

22   promised, or do you remember waiting a period of time?

23   A.   It wasn't two days.  It was awhile, but I don't remember

24   exactly how much time.

25   Q.   Okay.  And in the memo line, what does it say on this

1  check?

2  A.   Return of money invested less $116,600 paid to Yousif in

3  commissions.

4  Q.   So if I understand correctly, you originally invested

5  $225,000; the commissions that you received, or referral

6  fees, were 116,000.  And so this check was the difference

7  between those two?

8  A.   Yes.

9  Q.   You also received rent payments during that period of

10  time, did you not?

11  A.   Correct.

12  Q.   Okay.  Do you remember what the total amount of rent

13  money that you received was?

14  A.   Around 49,000, 50, something like that.

15  Q.   And what happened with that money?

16  A.   The money I -- when I know there was something not right

17  here, I put it aside and I told my lawyer that this is not

18  for me, I don't want to have anything to do with it.  And he

19  advised me -- I was gonna give it to Albert Rossini.  He

20  said, no, put it aside, let's see what happen with it.  So I

21  put it aside and I gave it to the U.S. Marshals after that.

22  Q.   Okay.  So it's now in the custody of U.S. Marshals?

23  A.   Yes, I had nothing to do with it.  That was bad money

24  for me.

25  Q.   Quickly, you mentioned you gave it to your attorney.

1    This was an attorney that you used for your business,

2    correct?

3    A.   For business, yeah.

4    Q.   Just one brief line of questioning.

5         Did you -- you invested in these three properties;

6    you got your money back.  Are you aware of -- did you know a

7    number of other people that invested?

8    A.   Yes.

9    Q.   And did you ever hear about anybody else receiving the

10   properties that they invested in the end?

11   A.   No.

12        MR. HOGSTROM:  I have nothing else.

13        THE COURT:  Mr. Adams, your witness.

14        MR. ADAMS:  Thank you, your Honor.

15                    CROSS EXAMINATION

16   BY MR. ADAMS:

17   Q.   Good afternoon, Mr. Yousif.

18   A.   Good afternoon, sir.

19   Q.   So you own a company -- a metal plating company?

20   A.   Metal polishing.

21   Q.   Polishing.

22        How long have you been in business for?

23   A.   35 years.

24   Q.   And in that 35 years, you say in your words, you've done

25   pretty well?

1   A.   Yes.

2   Q.   Do you use lawyers to handle your business transactions?

3   A.   For business transactions, yes.

4   Q.   So this investment you did with Khoshabe, this wasn't

5   the first time you've invested money, is it?

6   A.   No.

7   Q.   You've invested before?

8   A.   Correct.

9   Q.   What types of investments?

10  A.   I invested in stock market and real estate.

11  Q.   Do you have a stockbroker?

12  A.   Yes.

13  Q.   Do you have a financial advisor?

14  A.   No.

15  Q.   How do you do your research when you're investing?

16  A.   I just, you know, do it on my own.  I listen to radio

17  sometimes and, you know, sometimes give me -- people call me

18  and give me advice or say this is a good stock or this is bad

19  or this and that, you know.  I gather my own information.

20  Q.   So when you say someone called you with a stock tip, do

21  you -- what do you do after that?  Do you go and research it

22  or do you just go and buy it?

23  A.   Sometimes I buy it right away, sometimes, you know.  It

24  depends.

25  Q.   Okay.



1    Now, I want to talk to you now about your

2    investments here with Devon.

3    A.   Yes.

4    Q.   Now, you told this jury that you received a commission

5    check after one of the sales, correct?

6    A.   Correct.

7    Q.   And who was that commission check -- what was that from,

8    which investor?

9    A.   I didn't know at that time it was from who.

10   Q.   You didn't know?

11   A.   No.

12   Q.   All right.  You only learned that later on, when you had

13   to sign that document we just looked at?

14   A.   Yes.

15   Q.   And after this first commission check, you had said that

16   you weren't expecting it, correct?

17   A.   Correct.

18   Q.   But you came to learn that if you would refer more

19   people, you would get more money?

20   A.   I never referred anybody.

21   Q.   You never told anybody to go to Devon to invest in this

22   real estate?

23   A.   90 percent, most of them they call me if they wanted to

24   invest.

25   Q.   So they called you if they wanted to invest in Devon,

1    and then you told them to?

2    A.   I said I'm investing and -- the person investing and we

3    left it like that.

4    Q.   So based on your representations they decided to invest?

5    A.   Yes.

6    Q.   So is it your testimony to the jury today that you've

7    never, ever referred anybody on your own to Devon?

8    A.   No --

9         MR. HOGSTROM:  Objection to the term "referred."  I

10   think there's a --

11        THE COURT:  Overruled.  He can answer.

12   BY THE WITNESS:

13   A.   Most of the people that call me and asking about Devon

14   Investment, I said, we're investing and the priest investing,

15   and that's what it is.

16   BY MR. ADAMS:

17   Q.   When you say most, which ones?

18   A.   My cousins, my sister, you know, my brother and my

19   brother-in-law.

20   Q.   Do you know a guy named Albert Khamis?

21   A.   Yes.

22   Q.   Did you refer Albert Khamis to Devon?

23   A.   No.

24   Q.   You did not?

25   A.   The call was made to me from his wife, which is my first

1    cousin, and explained to him what we doing.  And exactly I

2    told her, you have to have your own lawyer, and she said, as

3    long as you're investing, we're investing.

4    Q.   And that's again because the Assyrian community is

5    tight-knit, close?

6    A.   Yes, yes.

7    Q.   Now, I know it's about three years ago, but do you

8    remember talking with the FBI at your place of business about

9    these investments in 2015?

10   A.   With FBI?

11   Q.   Yeah.  Do you remember it was February 2015?

12   A.   Yes.

13   Q.   And do you remember -- you were talking to Agent Lyle,

14   who is sitting over here?  Do you remember speaking with him?

15   A.   Yes.

16   Q.   And I know -- again, it's three-and-a-half years ago, so

17   it's a long time.  But do you remember that you actually told

18   Agent Lyle that you would --

19            MR. HOGSTROM:  Objection to hearsay, Judge.  This

20   is the witness' prior statement that he's asking him --

21            MR. ADAMS:  Impeaching --

22            MR. HOGSTROM:  And he's --

23            THE COURT:  Hold on.  Hold on.  Sidebar.

24        (Proceedings had at sidebar:)

25            THE COURT:  All right.

```
 1          First of all, I've tolerated a little bit of
 2    argument in objections before the jury, but no longer.  So no
 3    more standing objections.  This is cross-examination.  I'm
 4    going to allow it for that limited purpose.
```
:31PM
```
 5          MR. ADAMS:  Thank you, your Honor.
 6          MR. FRANKEL:  If we object, one-word objection?
 7    Would that be sufficient, or you don't want us to say
 8    anything?
 9          THE COURT:  No.  One-word objection is fine.  Even
```
:31PM
```
10    two words is fine, if it takes you two or three words to tell
11    me the basis.  But I don't want you to argue it, okay?  If
12    the other side wants a sidebar, they can ask for a sidebar.
13          MR. NOVAK:  Thank you, your Honor.
14          MR. FRANKEL:  Okay.  Thank you, Judge.
```
:31PM
```
15       (Proceedings had in open court:)
16          THE COURT:  You may proceed.
17          MR. ADAMS:  Thank you.
18    BY MR ADAMS.
19    Q.   I'll repeat the question.
20    A.   Yes, sir.
21    Q.   So we're talking about your meeting with the FBI in 2015
22    at your business.  Do you remember telling the agent that you
23    referred a number of friends and family to Devon Street?
24    A.   I can't remember that.
```
:31PM
```
25    Q.   You don't remember saying that?
```

1    A.    No.

2    Q.    If it was in a report that an agent said, would you

3    accept that as true?

4    A.    Like I said, all I can say is most of the people will

5    call me and I'll tell them what we're doing and they said

6    we're going to invest.

7    Q.    Thank you.

8    A.    I don't know how to consider referral or not referral,

9    but this is the honest truth.

10   Q.    Okay.  Then do you remember meeting again with the FBI

11   and the United States Attorney back -- actually in -- I

12   believe it was May 28th of this year, so last month?  Do you

13   remember that?

14   A.    Yes.

15   Q.    And that meeting was here?

16   A.    Correct.

17   Q.    In this building?

18   A.    Uh-huh.

19   Q.    And your lawyer was there, too, correct?

20   A.    Yes.

21   Q.    And your lawyer is here today?

22   A.    Yes.

23   Q.    Okay.

24          Now, at that meeting you actually denied reaching

25   out to investors, correct?

1    A.   I'm sorry?

2    Q.   You denied -- you told the agents that you did not reach

3    out to anybody to solicit business?

4    A.   Yeah, no.

:32PM   5    Q.   But despite that, you received $116,000 in commission,

6    correct?

7    A.   Correct.

8    Q.   And how much of that did you give back to your cousins

9    and relatives and fellow Assyrians?

:32PM   10   A.   I'm sorry?

11   Q.   How much of the 116,000 did you return back to your

12   friends and relatives?

13   A.   I didn't get anything from that 116.  I never got any

14   money.  I gave it back to them -- I mean, give it back to

:33PM   15   Rossini.

16   Q.   So your testimony now is that you gave the 116,000 back

17   to Rossini?

18   A.   Yeah.  He took it from my initial investment.

19   Q.   Do you remember on direct you told the jury that you

:33PM   20   received a check for $108,000?

21   A.   Correct.

22   Q.   And then you received another payment for $48,000?

23   A.   The rental income, 48, 49,000, yes.

24   Q.   And that might be the way I phrased it, so I apologize.

:33PM   25   But do you remember over the course of your involvement you

1    received $116,000?

2    A.   Yes.

3    Q.   And that was for referring people and receiving

4    commission, correct?

5    A.   Correct.

6    Q.   I'm going to ask it one more time.  Did you give any of

7    that money back to anybody?

8    A.   No, I didn't give it.

9    Q.   You kept it for yourself?

10   A.   Correct.

11   Q.   And you're saying again today that you never referred

12   Albert Khamis --

13   A.   No.

14   Q.   -- to Devon?

15   A.   No.

16          MR. ADAMS:  Judge, may I have one moment?

17          THE COURT:  Yes.

18       (Brief pause.)

19          MR. ADAMS:  Thank you, your Honor.

20   BY MR. ADAMS:

21   Q.   In the course of operating your business, do you have

22   lawyers look over contracts that you enter into?

23   A.   I get simple business most of the time.  I don't, you

24   know -- the only time the lawyer would handle, if non-payment

25   from a customer.  That's all.

```
 1   Q.   Okay.  Did you have your business lawyer look over any
 2   documents that you received from Babajan and Mr. Rossini in
 3   this case?
 4   A.   No.  In this case, no.
 5              MR. ADAMS:  Nothing further, Judge.
 6              THE COURT:  Any redirect?
 7              MR. HOGSTROM:  Yes, Judge.
 8                      REDIRECT EXAMINATION
 9   BY MR. HOGSTROM:
10   Q.   Mr. Yousif, whatever word one uses, referral,
11   commission --
12   A.   Okay.
13   Q.   -- to be clear, what you are saying is that you had
14   conversations with your friends or family members where you
15   told them you thought this was a good investment, correct?
16   A.   Initial call was from them, and I told them exactly this
17   is a good investment.
18   Q.   And you were asked whether you gave your, quote,
19   unquote, commission money back to anyone else.  Did you
20   receive any money from any of your friends or family?
21   A.   No.
22   Q.   You gave Mr. Rossini $225,000, correct?
23   A.   Correct.
24   Q.   And when you wanted out, he gave you -- he didn't give
25   you $225,000, did he?
```

:34PM
:35PM
:35PM
:35PM
:35PM

1   A.   No.

2   Q.   What you got was the amount that was left over when he

3   deducted the, quote, unquote, commission payments?

4   A.   Yes, correct.

5                MR. HOGSTROM:  Nothing else.

6                MR. ADAMS:  Very briefly, Judge.

7                     RECROSS EXAMINATION

8   BY MR. ADAMS:

9   Q.   So you received $108,000?

10  A.   Yes.

11  Q.   And then you received plus 48,000, correct?

12  A.   Rental income, sure.

13  Q.   Whatever you want to call it.

14           So that is about 160,000, correct?

15  A.   Yes.

16  Q.   Then you received another 116,000 over the course of

17  your involvement, right?

18  A.   Yes.

19  Q.   That's over 225,000?

20  A.   Yes.

21               MR. HOGSTROM:  Judge, that misstates the evidence.

22               THE COURT:  You can ask -- are you done?

23               MR. ADAMS:  I could ask one more question, Judge.

24  BY MR. ADAMS:

25  Q.   What's the total amount you received from your

| | |
|---|---|
| 1 | involvement with Devon Street? |
| 2 | A.    225,000. |
| 3 | MR. ADAMS:  Thank you.  Nothing further. |
| 4 | FURTHER REDIRECT EXAMINATION |
| :36PM  5 | BY MR. HOGSTROM: |
| 6 | Q.    To be clear, Mr. Yousif, you originally gave Devon |
| 7 | Street Investments $225,000, correct? |
| 8 | A.    Yes. |
| 9 | Q.    You got back $225,000 correct? |
| :37PM  10 | A.    Yes, exactly. |
| 11 | Q.    And then the $48,000 in rent payments, what happened to |
| 12 | that money? |
| 13 | A.    It was put aside and I gave it to U.S. Marshals. |
| 14 | MR. HOGSTROM:  Nothing further. |
| :37PM  15 | MR. ADAMS:  Nothing further, Judge. |
| 16 | THE COURT:  You may step down.  Thank you, sir. |
| 17 | THE WITNESS:  Thank you, your Honor. |
| 18 | (Witness excused.) |
| 19 | THE COURT:  The government may call its next |
| :37PM  20 | witness. |
| 21 | MR. NOVAK:  Yes, your Honor.  The government calls |
| 22 | Nastors Moshi. |
| 23 | NASTORS J. MOSHI, GOVERNMENT'S WITNESS, DULY SWORN |
| 24 | THE COURT:  Go ahead. |
| :38PM  25 | MR. NOVAK:  Thank you, your Honor. |

|   |   |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. NOVAK: |
| 3 | Q.   Good afternoon, sir. |
| 4 | A.   Good afternoon, sir. |
| 5 | Q.   In a loud, clear voice, can you please state your name |
| 6 | and spell your last name for the court reporter and the jury? |
| 7 | A.   My name is N-A-S-T-O-R-S, J, Moshi, M-O-S-H-I. |
| 8 | Q.   Nastors Moshi? |
| 9 | A.   Nastors Moshi. |
| 10 | Q.   Do you also go by the name Moses? |
| 11 | A.   I do, yes, sir. |
| 12 | Q.   Where do you live, sir? |
| 13 | A.   Arizona. |
| 14 | Q.   And do you currently work? |
| 15 | A.   No.  I'm retired, sir. |
| 16 | Q.   What did you do before you retired? |
| 17 | A.   I had my own business. |
| 18 | Q.   What kind of business was it? |
| 19 | A.   Polishing business. |
| 20 | Q.   Metal polishing? |
| 21 | A.   Metal polishing, yes, sir. |
| 22 | Q.   And how long were you in the metal polishing business? |
| 23 | A.   For over 20 years. |
| 24 | Q.   Now, are you originally from this country? |
| 25 | A.   I'm from Iraq. |

:38PM (line 5)
:39PM (line 10)
:39PM (line 15)
:39PM (line 20)
:39PM (line 25)

|  |  |
|---|---|
| 1 | Q.   And when did you come from Iraq to the United States? |
| 2 | A.   December 18, 1972. |
| 3 | Q.   Why did you come from Iraq to the U.S.? |
| 4 | A.   I come refugees to this country, sir. |
| 5 | Q.   Are you a part of a specific minority, ethnic minority |
| 6 | in Iraq, or ethnic group? |
| 7 | A.   Assyrian. |
| 8 | Q.   You're an Assyrian? |
| 9 | A.   Assyrian. |
| 10 | Q.   Now, when you came from Iraq in 1972, what did you do |
| 11 | when you first came to this country? |
| 12 | A.   I work in factory jobs. |
| 13 | Q.   Okay.  And did you first come to Chicago or did you come |
| 14 | somewhere else? |
| 15 | A.   Chicago. |
| 16 | Q.   How long were you in Chicago? |
| 17 | A.   I was in Chicago until 1980, then I moved back to |
| 18 | Arkansas. |
| 19 | Q.   And what did you do in Arkansas? |
| 20 | A.   I had my own business, convenience store. |
| 21 | Q.   How long did you have that business? |
| 22 | A.   I have since '80 to 1992. |
| 23 | Q.   Then what did you do? |
| 24 | A.   Pardon me? |
| 25 | Q.   Then what did you do? |

```
          1    A.   After that I moved to California for one year.  I
          2    couldn't find jobs in the area, then I moved back to Arizona.
          3    Q.   And is that when you started your metal polishing
          4    business?
:40PM     5    A.   That's correct.
          6    Q.   And you worked at that until you retired?
          7    A.   Until that, that's correct.
          8    Q.   I'm going to direct your attention to March of 2012.
          9    Were you approached by someone about real estate investing in
:40PM    10    Chicago?
         11    A.   Yes, by Ibrahim Yousif.
         12    Q.   Who is Ibrahim Yousif?
         13    A.   Ibrahim Yousif is my first cousin.
         14    Q.   And when Mr. Yousif -- or did you speak with him -- when
:41PM    15    you spoke with him about real estate investing, what was the
         16    conversation?
         17    A.   He called me about purchasing building in Chicago.  By
         18    that time was a collapsed market, and he told me it's a good
         19    investment, just for investment on purchase building.
:41PM    20    Q.   Okay.  And did he tell you anything about what he was
         21    doing with this company?
         22    A.   He was involved with his brother-in-law, Babajan
         23    Khoshabe, and he was like involved with him, and he -- at the
         24    same time he was a salesman to them, approached me as a
:41PM    25    sales.
```

1    Q.    And did Mr. Yousif tell you -- was he also investing?

2    A.    He told me that but I have no proof on that.

3    Q.    Now, did you speak with Mr. Yousif and Mr. Khoshabe

4    about investing at that time?

:42PM    5    A.    Yes, I did.

6    Q.    And I'm going to show you -- did you actually invest in

7    a number of buildings with Mr. Yousif and Mr. Khoshabe and

8    his company?

9    A.    Yes, first two buildings, sir.

:42PM    10    Q.    And do you remember the name of the company?

11    A.    Devon Realty or Devon Investments, something like that.

12    Q.    Does Devon Street Investments sound familiar?

13    A.    That's correct.

14    Q.    I'm going to show you first what I've marked as

:42PM    15    Government Exhibit Moshi 1 and Moshi 2.  Okay?

16    A.    Okay.

17    Q.    I want you to take a look at Government Exhibits Moshi 1

18    and Moshi 2.

19          Do you recognize those documents?

:42PM    20    A.    Absolutely, yes, sir.

21    Q.    What are those documents in Moshi 1 and Moshi 2?

22    A.    Those documents --

23    Q.    Generally.

24    A.    Generally was a purchasing building on 5421 North

:43PM    25    Artesian, Chicago, Illinois.

1     Q.    Artesian?

2     A.    Artesian, yeah.

3     Q.    And what's Moshi No. 2?

4     A.    No. 2 was apartment building located at 6957 North

:43PM  5    Sheridan Road, Chicago, Illinois 60626.

6     Q.    Okay.

7           Do the documents there, are they fair and accurate

8     documents -- copies of documents that you received or

9     generated for those investments?

:43PM  10   A.    Could you repeat the question again?

11    Q.    Are those fair and accurate copies of documents related

12    to those investments?

13    A.    Yes, sir.

14    Q.    All right.

:43PM  15         MR. NOVAK:  I would offer Government Exhibits

16    Moshi 1 and Moshi 2 into evidence and ask permission to

17    publish them to the jury.

18         MR. ADAMS:  No objection.

19         THE COURT:  Moshi 1 and Moshi 2 are admitted in

:43PM  20   evidence.

21         (Said exhibits were received into evidence.)

22    BY MR. NOVAK:

23    Q.    I'm going to start with Moshi 1 --

24         THE COURT:  Are you on VGA or --

:44PM  25         MR. NOVAK:  I am.  I need to plug it back in.

1     (Brief pause.)

2     BY MR. NOVAK:

3     Q.   You said this was -- well, tell us.  What is the first

4     page here of Moshi 1?

:44PM 5     A.   First page is showing unit 1 and 2 and 3, three-bedroom

6     each, one bath.  They divide it, how much is utility, real

7     estate taxes, management, water bill, insurance; total was

8     $16,070.74.  And they took $16,070.74 as a maintenance, and

9     they told me your net income yearly was 34,629.46.

:44PM 10    Q.   Okay.  And this fax sheet for the information at 5124

11    North Artesian, where did you get this from?

12    A.   I got it from Devon Investment.

13    Q.   And specifically, who were you -- you said you were

14    talking to Yousif and Babajan Khoshabe about this property?

:45PM 15    A.   Exactly.

16         First of all, I don't know nothing about this

17    investment.  My cousin, Ibrahim Yousif, he called me, he told

18    me about this investment, otherwise I never be invested in

19    this business.

:45PM 20    Q.   Okay.  And why did you invest when your cousin called

21    you about this?

22    A.   Well, he convinced me it's a good investment, it's very

23    cheap price, you gonna have a good income yearly, and down in

24    the road somehow the building is gonna go up price, you gonna

:45PM 25    have good future on good investment.

1    Q.   Did you trust your cousin?

2    A.   Absolutely I trust him.  He's my first cousin.

3    Q.   And Mr. Khoshabe -- did you know anything about

4    Mr. Khoshabe?

:45PM    5    A.   I have no idea about Mr. Khoshabe.  I never met him, I

6    don't know him, I never seen him.

7    Q.   But did you speak with him on the phone?

8    A.   I speak with him on the phone, yes, sir, I do.

9    Q.   Do you know if he was also an Assyrian, like you?

:46PM    10   A.   Absolutely, yes, sir.

11   Q.   Did you learn that?

12   A.   Yeah.  I know that -- Yousif told me about that because

13   they are brother-in-law.

14   Q.   And did that make you feel also more comfortable with

:46PM    15   the investment, that Mr. Khoshabe was also Assyrian?

16   A.   Exactly, yes, sir.

17   Q.   I'm going to show you -- so you decided to invest in

18   this property on Artesian, right?

19   A.   Yes.

:46PM    20   Q.   I'm going to show you Page 2 and Page 3.

21   A.   Yes.

22   Q.   Are those two cashier's checks that you made out for

23   that investment?

24   A.   Yes, sir.

:46PM    25   Q.   And that is one check for --

1    A.    90,000 and one for 15.

2    Q.    And one for 15?

3    A.    Yes.

4    Q.    And they're made out to Thomas Murphy.  Who told you to

:46PM    5    make these checks out to Thomas Murphy?

6    A.    Absolutely Ibrahim Yousif.  And he told me, go ahead,

7    send it to my address.  And I send it to his address, then he

8    forwarded it to Thomas.

9    Q.    Okay.  And to Devon Street, right?

:47PM    10   A.    Yes.

11   Q.    Okay.  Now, did you also receive this guaranty

12   agreement, which I'm showing you on Page 3?

13   A.    Yes, sir.

14   Q.    And did you read the agreement?

:47PM    15   A.    I read the agreement.  I don't know it was legitimate --

16   legit.  And I understand that it was real and good and I

17   trust him, that he convinced me to -- is a good guaranty

18   agreement and I sign it.

19   Q.    And who also signed the -- and this is Page 5 of that

:47PM    20   exhibit, Moshi 1.  That's your signature there?

21   A.    Yes, that's my signature.

22   Q.    Who also signed the agreement?

23   A.    Albert Rossini.

24   Q.    Who is Albert Rossini; do you know?

:47PM    25   A.    I have no idea.  I talked to him so many times but I

1    never seen him, what he looks like.  I'll be honest.

2    Q.    That's fine.  And I'm not talking about do you know what

3    he looks like.  Do you know who he is as a person?

4    A.    No, no.

5    Q.    Well, you talked to him on the phone, right?

6    A.    On the phone, yes.

7    Q.    Who told you to talk to him on the phone?

8    A.    First two building, when I purchase it, was Ibrahim

9    Yousif and Khoshabe.  Then after that, when they told me your

10    papers being transferred to Bert Rossini, Bert Rossini is

11    control all your management and -- of the property.

12    Q.    And so you understood that Mr. Rossini worked with or

13    for Devon Street?

14    A.    Yes.

15    Q.    And that he was a part of this investment project,

16    right?

17    A.    Exactly.

18    Q.    And you spoke with him after your first two building

19    purchases, right?

20    A.    Yes, absolutely.

21    Q.    Because the second building -- we'll do this very

22    briefly.

23         I'm going to show you Moshi 2.  Is that a building

24    you purchased on -- you said on Sheridan Road, right?

25    A.    Yes.

1    Q.   Now, you said after your first two investments someone
2    told you that they were transferring you to Bert Rossini?
3    A.   Yes.
4    Q.   Okay.  And then did you speak with Mr. Rossini directly?
:48PM    5    A.   Yes.
6    Q.   And did you speak with Mr. Rossini about purchasing more
7    properties?
8    A.   Yes.
9    Q.   How many properties did you purchase -- or invest in,
:49PM    10   invest in, with Mr. Rossini after speaking with him?
11   A.   Three.
12   Q.   Okay.  I'm going to show you what I've marked as
13   Moshi 3, Moshi 4 and Moshi 6.  I want you to take a look at
14   these.
:49PM    15   A.   Thank you.
16   Q.   Do you recognize those documents?
17   A.   Yes, I do.
18   Q.   Are those documents real estate documents related to
19   those three investments you did, additional investments with
:49PM    20   Mr. Rossini?
21   A.   Yes, sir.  6443 North Greenview Avenue, Chicago,
22   Illinois.
23   Q.   That's Moshi --
24   A.   -- 3.
:49PM    25   Q.   -- 3.

1    What's Moshi 4, what building?

2  A.   Moshi 4 is apartment building located at 5424 North

3  Paulina.

4  Q.   And what about Moshi 6?

5  A.   Moshi 5?

6  Q.   6, No. 6.  Moshi No. 6.

7  A.   No. 6.

8       Okay.  No. 6 is 8718 North Kimball, Skokie,

9  Illinois.

10  Q.   And are the documents in those exhibits true and

11  accurate copies of the documents -- real estate related

12  documents you received in regard to these investments?

13  A.   Yes.

14       MR. NOVAK:  Your Honor, I offer Moshi 3, 4 and 6

15  into evidence and ask permission to publish them to the jury.

16       MR. FRANKEL:  No objection.

17       THE COURT:  Moshi Exhibits 3, 4 and 6 are admitted

18  in evidence.

19       (Said exhibits were received into evidence.)

20  BY MR. NOVAK:

21  Q.   I'm going to show you first Moshi 3.  This is the fax

22  sheet for the building at 6443 North Greenview?

23  A.   Yes, that's correct.

24  Q.   Who sent that to you?

25  A.   Bert Rossini.

1    Q.   And were you speaking with him -- you were speaking with

2    him on the phone, you said, right?

3    A.   Yes.

4    Q.   What other ways did you communicate with Mr. Rossini?

5    You didn't meet him in person?

6    A.   No.

7    Q.   Did you communicate with him e-mail or fax or anything

8    else?

9    A.   E-mail, fax and phone.

10   Q.   Now, who explained the investment in this property to

11   you on Greenview?

12   A.   Mr. Rossini.

13   Q.   And did you then -- in April of 2012 you wrote a check,

14   right?

15   A.   Yes.

16   Q.   Or you obtained a cashier's check?

17   A.   Cashier check from Chase Morgan, yes.

18   Q.   For how much money?

19   A.   120,000.

20   Q.   And it's written to Thomas Murphy.  Who gave you the

21   direction to make that check out to Thomas Murphy?  Who told

22   you to make that check out?

23   A.   Mr. Rossini told me.

24   Q.   And there's a guaranty agreement for this property,

25   right?

A.   Yes.

Q.   And it's signed by you on April 9th, right?

A.   That's correct.

Q.   And by Mr. Rossini on the same day?

A.   Yes, sir.

Q.   Who explained this guaranty agreement to you?

A.   Mr. Rossini.

Q.   What was your understanding of this guaranty agreement after speaking with Mr. Rossini?

A.   Mr. Rossini, he explained it to me and he convinced me is the truth guaranty agreement.

Q.   What were you going to get -- what did Mr. Rossini explain and what was your understanding about the agreement? What was the agreement you were making with Mr. Rossini?

A.   Agreement was just down in the road we can get a title, a warranty deed on those building, but I just keep asking when and how long it takes.

Q.   And we'll get to that in a minute, sir.  Let me ask you, though, your understanding was you would get a title to the building?

A.   Yes.

Q.   Eventually?

A.   Eventually.

Q.   While that was pending -- well, who would make sure you got a title to the building?  Did Mr. Rossini tell you?

1    A.    Yes.

2    Q.    Who did he tell you would give you the title to the

3    building?  How would you get it?

4    A.    I would get it through the banks.

:52PM   5    Q.    Okay.  And did he tell you that his company would work

6    on getting the title for you?

7    A.    Yes.

8    Q.    What would you get in the meantime, while his company

9    was working to obtain the title to this building for you?

:53PM  10    A.    What I'm getting?

11    Q.    What you would get?  What would your return on

12    investment be?  What would you get?

13    A.    I was supposed to get rent off of those investment.

14    Q.    Payments for rent?

:53PM  15    A.    Payment for rent, yes.

16    Q.    Now, what happened -- did Mr. Rossini tell you what

17    would happen if you did not receive title to the building?

18    A.    We wrote the -- the promissory notes was.

19    Q.    Did he tell you you would get refunds if you --

:53PM  20    A.    Refund the building, yeah.  If we don't get the refund

21    on the buildings, we'll pay you as interest up to 2016.  If

22    we don't get it, we gonna pay penalty on that one.  But I

23    never did see anything.

24    Q.    Okay.  But you understood that you would get the title

:53PM  25    to the building?

1    A.   Title to building, yes.

2    Q.   Rents while that was pending?

3    A.   Exactly.

4    Q.   His company would work towards getting the title?

:53PM  5    A.   That's correct.

6    Q.   And if that was not successful, you would get a refund?

7    A.   That's correct.

8    Q.   I'm going to show you Moshi 4.  That's another building

9    that you invested in on North Paulina?

:54PM  10   A.   4?

11   Q.   You can see it on the screen, too, sir.

12   A.   Yes.  Okay.

13   Q.   That's the building you invested in on North Paulina?

14   A.   Yes, I did.

:54PM  15   Q.   And who sent you this fax sheet?

16   A.   Mr. Rossini.

17   Q.   And because of that -- and then you sent a check, right?

18   A.   Exactly.  Yes.

19   Q.   For how much money?

:54PM  20   A.   For 160,000.

21   Q.   And it's made out to Thomas Murphy?

22   A.   Thomas Murphy, that's correct.

23   Q.   And who gave you the direction to make it to Thomas

24   Murphy?

:54PM  25   A.   Mr. Rossini.

1  Q.   And then the final building you invested in -- I'm going

2  to show you Moshi 5 -- I'm sorry, Moshi 6.

3         That was what building?

4  A.   Kimball, 8718 North Kimball.

:54PM  5  Q.   And this is the fax sheet that you got for this

6  building?

7  A.   Yes.

8  Q.   Who sent you this fax sheet?

9  A.   Mr. Rossini.

:55PM  10  Q.   And you sent a check to invest in this building, right?

11  A.   That's correct.

12  Q.   How much did you invest in this building?

13  A.   110,000.

14  Q.   Your last investment was on June 15th of 2012?

:55PM  15  A.   Yes.

16  Q.   Now, you said that you had communicated by e-mail with

17  Mr. Rossini, correct?

18  A.   That's correct.

19  Q.   The guaranty agreement that you signed for this

:55PM  20  document, for this building, for this investment on

21  Kimball --

22  A.   Yes.

23  Q.   -- how did you receive that guaranty agreement from

24  Mr. Rossini?

:55PM  25  A.   By fax and by e-mail.

Moshi - Direct                                                    382

1   Q.   I'm going to show you what I've marked as Moshi 5.  Do

2   you recognize that document?

3   A.   Yes, I do.  Yes, I do.

4   Q.   And what is that document?

:55PM  5   A.   Is an e-mail forward between Mr. Rossini and between me.

6   Date was on Thursday or -- June 14th, 2012.

7   Q.   And is there anything attached to that e-mail?

8   A.   Subject, forward fax messages from unknown, two pages,

9   from Bert Rossini to Moses.

:56PM  10   Q.   And I want you to flip forward a couple of pages.  Is

11   there anything attached to that e-mail?

12   A.   Yes.

13   Q.   What is attached?

14   A.   8718 Kimball guaranty agreement.

:56PM  15   Q.   Now, sir, let me ask you, is that a fair and accurate

16   copy of that e-mail communication and attachment that you

17   received on June 14th, 2012?

18   A.   Yes.

19            MR. NOVAK:  Your Honor, I offer Moshi 5 into

:56PM  20   evidence and ask permission to publish it to the jury.

21            MR. FRANKEL:  No objection.

22            THE COURT:  Moshi 5 is entered in evidence.

23        (Said exhibit was received into evidence.)

24   BY MR. NOVAK:

:56PM  25   Q.   I just want to briefly talk about it with you, sir.

Moshi - direct

383

1          So as you told us -- what's the date of this

2   e-mail?

3   A.   It was June 14th, 2012.

4   Q.   Now, it says it's from, and do you recognize the e-mail

5   on the "from"?

6   A.   Yes, I do.

7   Q.   Whose e-mail is that?

8   A.   Bert Rossini.

9   Q.   And who is it to?

10  A.   Moses.

11  Q.   Is that your e-mail address?

12  A.   That's my e-mail address, MosesNM202@gmail.com.

13  Q.   Moses -- Nastors Moses --

14  A.   At hotmail.com.  Yes.

15  Q.   Okay.

16  A.   I have two e-mails.

17  Q.   And I'm going to show you Page 3 of this e-mail.  Is

18  that a copy of the guaranty agreement, Pages 3 and 4?

19  A.   Yes.

20  Q.   And that's the same guaranty agreement, I show you, on

21  Moshi 6, Page 3, that you ended up signing and sending back

22  to Mr. Rossini, right?

23  A.   Yes, yes.

24  Q.   And the date of Mr. Rossini's signature on that guaranty

25  agreement was what?

1    A.   June -- 15 day of June, 2012.

2    Q.   June 15th, that's the day you signed it, right?

3    A.   That's the date I signed it, yes.

4    Q.   What's the date next to Mr. Rossini's signature?

5    A.   June 14.

6    Q.   And that's the same day that the e-mail --

7    A.   Same, yes.

8    Q.   Now, did you receive rents as a part of -- for your

9    investment, as you had expected, from your investments with

10   Devon Street?

11   A.   Yes, I did.

12   Q.   How long did you receive rent payments for?

13   A.   I receive it until end of 2012.  It start delayed in

14   2013 off and on, off and on.  And by May or April completely

15   start to get -- not to get paid anything.

16   Q.   Now, if you -- when your rent payments started to be

17   delayed or stopped, did you contact anyone?

18   A.   Absolutely I did.

19   Q.   Who did you contact?

20   A.   I contact Mr. Rossini.

21   Q.   How did you contact him, via phone, via e-mail?

22   A.   I contact him by phone and by e-mail.

23   Q.   And when you spoke with him, what would he tell you

24   about the reason for these delays?

25   A.   Well, he just tell me, be patient with us, we gonna send

1   you the rent, and delayed and delayed, but I never get

2   receive for that.

3           MR. NOVAK:  One moment please, your Honor.

4       (Brief pause.)

5   BY MR. NOVAK:

6   Q.   Now, did there come a point -- I'm going to direct your

7   attention to October of 2012.  So this is after your last

8   investment, right?

9   A.   Yes.

10  Q.   Did there come a point where you -- you said you were

11  reaching out to Mr. Rossini to complain about your rents,

12  correct?

13  A.   Yes.

14  Q.   Did there come a point where you -- where he sent you

15  and you reached another agreement with him?

16  A.   Yes.

17  Q.   Okay.  I'm going to show you what I've marked as

18  Moshi 7.

19  A.   Thank you.

20  Q.   Do you recognize that document?

21  A.   I do.

22  Q.   Is that a copy of the agreement that you reached with

23  Mr. Rossini in October of 2012?

24  A.   Yes.

25  Q.   Is it a fair and accurate copy of that agreement?

A.   Yes.

            MR. NOVAK:  Your Honor, I would offer Moshi 7 into

evidence and ask permission to publish it.

            MR. FRANKEL:  No objection.

:00PM            THE COURT:  Moshi 7 is admitted in evidence.

      (Said exhibit was received into evidence.)

BY MR. NOVAK:

Q.   I'm going to show you on the screen Moshi 7, sir.  This

is a release indemnification and hold harmless agreement.

:00PM            Do you see that?

A.   I see that, yes.

Q.   And who is it between?

A.   Between me and Mr. Rossini.

Q.   Now, what did you understand you were agreeing to with

:01PM Mr. Rossini in this document?  What was the agreement?

A.   The agreement was, if we don't get paid any more, we can

get you up to $495,000 of your building.

Q.   Okay.

A.   Yes.

:01PM Q.   And did you agree to -- this was an agreement for four

of your buildings --

A.   Four.

Q.   -- which you had invested in?

A.   Absolutely, and keep one of them on Sheridan.

:01PM Q.   And you wanted to keep your investment active on the

1   Sheridan Road property?

2   A.   That's correct.

3   Q.   Now, was there a date -- and this is an agreement that

4   Mr. Rossini agreed to pay back your investment refund to you,

5   right?

6   A.   Yes.

7   Q.   And that was per your guaranty agreement that you

8   signed, that if they were unsuccessful, you would be able to

9   be refunded, correct?

10  A.   That's correct.

11  Q.   Okay.  I'm going to show you Page 2 of this document --

12  this exhibit.

13       What date was Mr. Rossini going to refund you your

14  monies for your investments?

15  A.   October 31st, 2012, was written in that one.

16  Q.   And that's when he agreed to pay you the full amount,

17  correct?

18  A.   Full amount, 495,000.

19  Q.   Or it says, to make partial payments during such period,

20  correct?

21  A.   That's correct.

22  Q.   And you signed this?

23  A.   Yes, I did.

24  Q.   And he signed it?

25  A.   He signed.

1   Q.   Now, did you receive a payment of $495,000 as a refund

2   for your investments by October 31st, 2012?

3   A.   Absolutely not.

4   Q.   Did there come a point where Mr. Rossini spoke with you

:02PM  5   about -- let me ask you, for this hold harmless agreement,

6   who explained this agreement to you?

7   A.   Mr. Rossini.

8   Q.   He answered your questions about it?

9   A.   Yes.

:02PM  10  Q.   And told you what it meant?

11  A.   Yes.

12  Q.   Did there come a point where Mr. Rossini talked about a

13  short sale for one of your properties that you had invested

14  in?

:03PM  15  A.   Yes.

16  Q.   Which property was it; do you remember?

17  A.   Kimball.

18  Q.   And did you know what a short sale of a property was at

19  the time?

:03PM  20  A.   No, I don't know.  But he told me it's a short sale, we

21  have to bid on it because we have another indian guy, he

22  gonna bid on this, he gonna take the building, so we need to

23  bid on it to get it.  And I told him, I say, listen, already

24  I bought the property --

:03PM  25           THE COURT:  Slow down, please.

1      THE WITNESS:  Yes.

2    BY THE WITNESS:

3    A.  Yes.  Already -- already I bought the building --

4    BY MR. NOVAK:

5    Q.  Let me ask you a question first, sir.  Okay?

6    A.  Sure.

7    Q.  Let me ask you a couple follow-up questions to that.

8    And we have the court reporter, so just slow down just a

9    little bit for her, okay?

10    A.  Yes.  Okay.

11    Q.  Now, did Mr. Rossini -- you said he talked with you

12    about a short sale?

13    A.  Yes.

14    Q.  At the time that Mr. Rossini mentioned this, was this in

15    December or so of 2012?

16    A.  Close by that date, yes.

17    Q.  At that time did you understand what a short sale was?

18    A.  Yes.

19    Q.  Did you understand on your own or did someone tell you?

20    A.  No.  When I -- I talked to several people in real

21    estate.  They told me short sale on it, so --

22    Q.  You talked --

23    A.  I got that opinion on it.  Yes, they explain to me.

24    Q.  Did Mr. Rossini also explain to you what the short sale

25    would be?

1  A.   Yes, he did a short sale, explain to me.

2  Q.   Now, what did he tell you you would have to do for your

3  short sale?

4  A.   We have to buy the building again.

5  Q.   And was this a surprise to you?

6  A.   A big surprise.

7  Q.   Why was it a surprise to you?

8  A.   Because already I paid the $110,000 in that building.

9  Supposed to be that building belong to me according to that

10  document.

11  Q.   Now, did you, though, agree to a short sale on this

12  building?

13  A.   No, I didn't.

14  Q.   Well, I'm going to show you what has been -- I've put in

15  evidence as Moshi six-five.

16       This was an agreement for a negotiation for a short

17  sale you received from Mr. Rossini, correct?

18       Do you recognize that document?

19  A.   Yes.

20  Q.   And it's dated December 24th?

21  A.   Yes.

22  Q.   And who is it addressed to?

23  A.   Nastors Moshi, 202 North 43rd Avenue.

24  Q.   And that's something that you signed, right?

25  A.   Yes.

:05PM

:05PM

:05PM

:05PM

:06PM

:06PM

1   Q.   Now, it says here -- Mr. Rossini is telling you he's

2   negotiating a short sale for your building that you had

3   invested in on Kimball, right?

4   A.   Yes.

5   Q.   And he was going to have an investor to short sale the

6   building, right?

7   A.   Yes.

8   Q.   And then use the costs to pay you back for your

9   investment?

10   A.   Yes.

11   Q.   And you agreed to that, right?

12   A.   Yes.

13   Q.   Did you ever receive any disbursements from a short sale

14   of that building at 8718 Kimball?

15   A.   No, sir.

16         MR. NOVAK:  One moment, please.

17       (Brief pause.)

18         MR. NOVAK:  Nothing further.

19         THE COURT:  Mr. Frankel, your witness.

20         MR. FRANKEL:  Thank you, Judge.

21                 CROSS EXAMINATION

22   BY MR. FRANKEL:

23   Q.   Good afternoon, Mr. Moshi.

24   A.   Good afternoon, sir.

25   Q.   I'm Scott Frankel.  I represent Albert Rossini.

1           You said that you never met Albert Rossini in

2    person?

3    A.   No.

4    Q.   And you don't know what he looks like?

:06PM  5    A.   No.

6    Q.   The only conversations you had with him were over the

7    phone?

8    A.   The phone, e-mail and fax.

9    Q.   And fax?

:06PM  10   A.   Yes.

11   Q.   You were living in Arizona at the time that most of this

12   happened or --

13   A.   Arizona.

14   Q.   Arizona.

:07PM  15   A.   Yes.

16   Q.   Okay.  Before moving to Arizona you had a convenience

17   store, is that right?

18   A.   Before Arizona?  No -- before Arizona, yes.  I have a

19   convenience store in Arkansas.

:07PM  20   Q.   So you were a businessman?

21   A.   Yes.

22   Q.   And how long did you run that business?

23   A.   I run it for about ten years.

24   Q.   And you were the head of the business, I take it?

:07PM  25   A.   I was control on it, yes.

1   Q.   Okay.  And that was an investment that you made,

2   correct?

3   A.   That's correct.

4   Q.   Before you purchased -- did you have to purchase a

5   convenience store or did you start it yourself?

6   A.   No, that's first store.

7   Q.   Pardon me?

8   A.   That's first one -- convenience store, that's first one

9   I purchased.

10  Q.   And did you have to go to the bank and get a loan to

11  help you start this business?

12  A.   I refinance through the owner.

13  Q.   You did purchase a convenience store?

14  A.   I purchase the store but I -- the owner finance it on

15  me.

16  Q.   Okay.

17  A.   I didn't go to the bank.

18  Q.   You negotiated a deal with the owner and he --

19  A.   Yes.

20  Q.   -- helped you purchase it by providing the funds for --

21  A.   Yes.  It was through a title company.

22  Q.   And over the course of the ownership of that store, you

23  paid back a loan on that?

24  A.   Yes, absolutely.

25  Q.   Okay.  And you told us that sometime in 2012 you were

1  presented with the possibility of a real estate investment,

2  correct?

3  A.  It was just a friend of mine.  I just took his opinion

4  on it.

:08PM  5  Q.  Okay.  Was it your cousin, Ibrahim Yousif?

6  A.  Ibrahim Yousif is my first cousin.

7  Q.  And you -- he's Assyrian, is that correct?

8  A.  He's Assyrian.

9  Q.  You're Assyrian?

:09PM  10  A.  I'm Assyrian.

11  Q.  And did you participate in the Assyrian community in

12  Arizona?

13  A.  I purchase to -- Assyrian community in Arizona?

14  Q.  Yes.

:09PM  15  A.  You mean purchase building or something like that?

16  Q.  No.  Do you belong to a church in Arizona?

17  A.  Yes, I do.

18  Q.  Okay.  And the Assyrian community is a tight-knit

19  community?

:09PM  20  A.  Yes.

21  Q.  Okay.  And Ibrahim Yousif sometime in 2012 approached

22  you regarding participation in a real estate investment,

23  correct?

24  A.  That's correct.

:09PM  25  Q.  And Yousif met with you and met with your family, along

```
        1   with Reverend Pithyou, regarding your participation in this

        2   real estate investment?

        3   A.   He didn't met with me.  He's in Chicago, I'm in Arizona;

        4   we just talk on the phone.

:09PM   5   Q.   Okay.  Do you remember being interviewed by the FBI, an

        6   agent of the FBI, on March 4th, 2014?

        7   A.   Who?  Me or him?

        8   Q.   You.  You were interviewed by Agent Evans Lyle?  Lyle

        9   Evans?

:10PM  10   A.   I don't remember that time.  It's been seven years.

       11   Q.   You don't remember being interviewed?

       12   A.   No.  I live in Arizona, so I never met Evans.

       13   Q.   You don't remember telling the agent that you met with

       14   Moshi and other members of Moshi -- that Yousif met with you

:10PM  15   and other members of your family, along with the family of

       16   Reverend Pithyou, regarding Yousif's participation in a very

       17   lucrative real estate investment?

       18   A.   I say I never met him.  I say I talked to him on the

       19   phone.

:10PM  20   Q.   And do you remember that Yousif told you that, hey,

       21   cousin, everything is good, you will be rich investing in

       22   real estate?

       23   A.   That's correct.

       24   Q.   He told you this was a really good investment, right?

:10PM  25   A.   That's correct.
```

| | |
|---|---|
| 1 | Q. And he built it up to you, is that correct? |
| 2 | A. Pardon me? |
| 3 | Q. He built up the investment to you, right? |
| 4 | A. Yeah, he convinced me to invest, yes. |
| 5 | Q. Okay. And did you talk to Babajan Khoshabe about the |
| 6 | investment as well? |
| 7 | A. I talked to him a couple time, maybe four or five times. |
| 8 | Q. Okay. And you didn't know Babajan Khoshabe, correct? |
| 9 | A. No, I don't know him. |
| 10 | Q. You knew he was in the Assyrian community, correct? |
| 11 | A. He's in Assyrian community. He's a brother-in-law to |
| 12 | Yousif. |
| 13 | Q. Okay. And you had a lot of faith and trust in Ibrahim |
| 14 | Yousif as your first cousin, correct? |
| 15 | A. Exactly. |
| 16 | Q. And he referred you, this guy Babajan Khoshabe, who was |
| 17 | involved in this investment program, is that correct? |
| 18 | A. That's correct. |
| 19 | MR. FRANKEL: One second, Judge. |
| 20 | (Brief pause.) |
| 21 | MR. FRANKEL: I have nothing further, Judge. |
| 22 | THE COURT: Any redirect? |
| 23 | MR. NOVAK: One moment, your Honor. |
| 24 | (Brief pause.) |
| 25 | MR. NOVAK: Nothing further. |

:11PM (lines 5-6)
:11PM (line 10)
:11PM (line 15)
:11PM (line 20)
:12PM (line 25)

```
 1              THE COURT:  You may step down, sir.  Thank you.
 2              THE WITNESS:  Thank you.
 3          (Witness excused.)
 4              THE COURT:  The government may call its next
 5   witness.
 6              MR. HOGSTROM:  The government calls Ashoor Pithyou.
 7           ASHOOR PITHYOU, GOVERNMENT'S WITNESS, DULY SWORN
 8              THE COURT:  Go ahead.
 9                        DIRECT EXAMINATION
10   BY MR. HOGSTROM:
11   Q.   Good afternoon, sir.
12          Please state and spell your name for the court
13   reporter.
14   A.   Ashoor Pithyou, A-S-H-O-O-R, P-I-T-H-Y-O-U.
15   Q.   Where do you reside, sir?
16   A.   6211 Springfield, Chicago, Illinois 60659.
17   Q.   And what do you do for a living?
18   A.   I am a server at the Hilton Hotel.
19   Q.   How long have you been a server at the Hilton?
20   A.   Three-and-a-half years.
21   Q.   What did you do before that?
22   A.   I worked for a printing company and then was a Subway
23   franchisee.
24   Q.   You owned a Subway franchise?
25   A.   Uh-huh.
```

1    Q.    Where were you born?

2    A.    Baghdad, Iraq.

3    Q.    And when did you come to the United States?

4    A.    '84.

5    Q.    Under what circumstances?

6    A.    Refugees.

7    Q.    Who did you come here with?

8    A.    My parents.

9    Q.    And who are your parents?

10   A.    Reverend Awiquam Pithyou and Marna Pithyou.

11   Q.    Your father is Reverend Awiquam Pithyou?

12   A.    Yes.

13   Q.    And is he the priest at Saint Odisho Church of the East?

14   A.    Yes.

15   Q.    That's here in Chicago?

16   A.    Yes.

17   Q.    Is that an Assyrian church?

18   A.    Yes.

19   Q.    Can you just describe in general terms what the church

20   is and what Assyrian is?

21   A.    Assyrian is a nationality.  We are -- that's small

22   minority in the Middle East, Christian minority.  So we are a

23   community of about 50,000 people here in Chicago.

24   Q.    Okay.  In approximately 2012 did you become aware of an

25   investment program related to real estate in the Chicago

1    area?

2    A.   Yes.

3    Q.   And how did you become aware of that?

4    A.   Through my dad.  He told me that he -- we were at a

5    Christmas event and he told me that he had made some

6    investments.

7    Q.   Okay.  And did you become -- without saying anything

8    that he told you, did you become aware that he and others had

9    invested in this program?

10   A.   Yes.

11   Q.   Was there a time when you were present when your dad

12   invested in additional property that was located on Richmond

13   Avenue in Chicago?

14   A.   Yes.

15   Q.   Do you recall approximately when that was?

16   A.   It was wintertime, maybe January, February.

17   Q.   And do you recall where the -- was there a meeting about

18   that?

19   A.   At Devon Street Investment on Devon.

20   Q.   Okay.  And who was present for that?

21   A.   Babajan Khoshabe and Rossini.

22   Q.   Who is Babajan Khoshabe?

23   A.   He is Rossini's partner.

24   Q.   And did you know him before this encounter?

25   A.   Yes.

 1  Q.   How did you know him?

 2  A.   His wife and my uncle's wife are sisters.

 3  Q.   Okay.  So he's related to you in an indirect way?

 4  A.   Yeah.

 5  Q.   He was present at this meeting, and you said Rossini.

 6  Who is Rossini?

 7  A.   The gentleman sitting over there.  (Indicating.)

 8  Q.   The defendant?

 9  A.   Yes.

10  Q.   Is it Albert Rossini?

11  A.   Albert Rossini.

12       MR. HOGSTROM:  Excuse me one moment, Judge.

13       (Brief pause.)

14       MR. HOGSTROM:  I don't think there's any objection,

15  but for the record, the witness identified the defendant.

16       THE COURT:  So noted.

17  BY MR. HOGSTROM:

18  Q.   I want to direct your attention to the screen in front

19  of you.  And I'm going to put on the screen what's been

20  admitted into evidence as Government Exhibit AW Pithyou 7.

21       Do you recognize this document?

22  A.   Yes.

23  Q.   And what is it?

24  A.   It's a purchase of a note for this property.

25  Q.   On Richmond?

1    A.    On Richmond.

2    Q.    And were you present when this document was discussed?

3    A.    Yes.

4    Q.    Do you recall whether anyone in the meeting explained

5    the contents of this document?

6    A.    Well, with this one was Bert and Babajan.

7    Q.    They were both explaining?

8    A.    Yes.

9    Q.    Now, your father doesn't speak English very well, is

10   that correct?

11   A.    Yes.

12   Q.    You do, obviously, is that correct?

13   A.    Yes.

14   Q.    So were you participating in these discussions about

15   this document?

16   A.    Well, I was, yeah, questioning, you know, how long it

17   would take to get the -- the lien on -- the actual lien on

18   the house.

19   Q.    Did you -- let me ask you this:  Did you have an

20   understanding, based either on what was said or what you read

21   in this document, about what would happen with -- after your

22   father invested?

23   A.    Well, after he would invest he would get all rental

24   incomes until they actually get the title to the property.

25   Q.    It was your understanding that he would eventually get

1    title?

2    A.    Yes, within 12 months or so.

3    Q.    And did you have an understanding of what would happen

4    if he didn't receive the title?

5    A.    They said that they will return the funds.

6    Q.    Now, did you at some point become interested in

7    investing in this program yourself?

8    A.    Yes, with my dad.

9    Q.    How did you go about getting more information about

10   doing that?

11   A.    Basically I was contacted by my uncle, Ibrahim, and he

12   filled me in on the details.  And then I went over there to

13   Devon Street Investments.

14   Q.    And your Uncle Ibrahim, he had also invested, is that

15   right?

16   A.    I believe so.

17   Q.    Okay.  So you went over to Devon Street.  Was it just

18   you or did you have anyone else with you?

19   A.    I believe I went there with my dad.  Not 100 percent

20   sure, because we were off and on many times.

21   Q.    Do you remember whether you discussed a particular

22   property when you went over to Devon Street Investments'

23   office?

24   A.    It was the Kilpatrick property in Skokie.

25   Q.    The property was on Kilpatrick?

1    A.    Skokie.  Yeah.

2    Q.    Who was present for this conversation where you were

3    discussing the Kilpatrick property?

4    A.    As I recall, at first it was Babajan Khoshabe, and then

:21PM    5    later on Mr. Rossini walked into the room.

6    Q.    Okay.  And what role did he play in the conversation?

7    A.    He was basically explaining to me what was gonna happen,

8    that I was gonna receive monthly payments for the rentals

9    until they would acquire the title for me to own.

:22PM    10    Q.    Do you recall whether anyone told you anything

11    specifically about this property?

12    A.    No.  They just showed me the numbers and they told me

13    this is how much it makes.

14    Q.    Okay.  Now, I've put on the screen Government Exhibit

:22PM    15    AW Pithyou 9.  Do you recognize this?

16    A.    Yeah.  This is the investment that I was going to

17    make -- that I actually made.

18    Q.    Okay.  So this -- this document lists 8142 Kilpatrick,

19    is that right?

:22PM    20    A.    8142, yes.

21    Q.    And there's some other information on here related to

22    the units and the expenses, is that correct?

23    A.    Yes.

24    Q.    Is this information that the defendant and Mr. Khoshabe

:22PM    25    went over with you?

1  A.   Yes.  They basically showed me the -- this document.

2  It's pretty self-explanatory what it was.

3  Q.   Okay.  And you ultimately decided to invest in this

4  property?

5  A.   Yes.

6  Q.   And do you recall how you obtained the funds to invest

7  in it?

8  A.   Well, these funds were from the sale of my business.

9  Q.   Okay.  How much was it?

10 A.   The sale of my business or the property?

11 Q.   The property.

12 A.   I believe it was 85,000.

13 Q.   I'm putting on the screen --

14 A.   Yeah, 85,000.

15 Q.   I'm putting on the screen Government Exhibit

16 AW Pithyou 11.  Is this a copy of the cashier's check that

17 you made out for this investment?

18 A.   Yes.  I transferred the funds to my dad's name and then

19 he -- we printed out this check.

20 Q.   After you made this investment in the Kilpatrick

21 property, did you begin receiving rent payments related to

22 that?

23 A.   Yes.

24 Q.   How did you receive those payments?

25 A.   They would have -- in money order, sometimes in checks.

1    Q.   The checks -- where did the checks come from?

2    A.   The checks came from sometimes Reliant Management or

3    Devon Street Investment.

4    Q.   What was Reliant Management?

:24PM  5    A.   It was a management company that was later established

6    by Anthony Khoshabe, which they took out monthly fees for

7    building management.

8    Q.   Who told you about the taking out of monthly fees?

9    A.   It was by Babajan Khoshabe.  And then when I spoke to

:24PM  10   Anthony, he said that they established this to help us manage

11   the building, because we can't go in there since the -- we

12   don't own the building, so they want to manage it for us.  So

13   they take a ten percent fee.

14   Q.   When and where did you have this conversation with

:25PM  15   Anthony Khoshabe?

16   A.   This was also at Devon Street Investment, in his office,

17   Anthony's office.

18   Q.   This is around the time you started receiving the

19   Reliant Management checks?

:25PM  20   A.   Yes.

21   Q.   Do you recall whether he said -- explained what it is

22   that the management was, what it was that he would be --

23   A.   So basically it would be landscaping, any issues with

24   buildings, such as plumbing or leaks anywhere.  They will

:25PM  25   also help in renting out the apartment if somebody were to

1    vacate it.  So that was their management.

2    Q.   Now, in approximately April of 2012, did you have

3    occasion to look at a property on Monticello?

4    A.   Yes.

:26PM  5    Q.   Do you recall why you went and looked at a property on

6    Monticello?

7    A.   When the property was purchased, I was out of town.  I

8    came back home and later I learned that my parents had

9    purchased another property.  So I figured I would go there

:26PM  10   and check it out, see what it is.

11   Q.   What did you observe when you saw the property on

12   Monticello?

13   A.   I saw a building that was -- seemed like it was run down

14   and --

:26PM  15   Q.   What do you mean by run down?

16   A.   The patio in the back was torn down basically and the

17   windows looked old.

18   Q.   Did it appear to be inhabited?

19   A.   It could have been, yeah, but I couldn't go inside the

:26PM  20   building and see.  But from the outside it was in bad shape.

21   Q.   What did you do after you observed the building in that

22   condition?

23   A.   I just went back and I asked if people were actually --

24   I talked to -- I don't remember if it was Rossini or Babajan.

:27PM  25   I asked him if anybody was living in there, and they said,

1  yeah, we collect rent; and they showed me how much rent it

2  was collecting.

3  Q.   When you say they showed you how much, what specifically

4  did they show you?

:27PM  5  A.   Similar sheet to that agreement, where it says how much

6  they collect, how much taxes is, the breakdown sheet.

7  Q.   Okay.  Now, did there come a point when you -- your rent

8  payments stopped coming in as regularly?

9  A.   It started off by delays.  The payments were getting

:27PM  10  delayed, and then they stopped coming in.  So instead of

11  getting them the first few days of the month, it started

12  coming in the middle of the month, and then they started

13  getting delayed.

14  Q.   And when that happened, did you communicate with anyone

:27PM  15  about the delayed payments?

16  A.   Yes, with Bert Rossini.

17  Q.   Did you communicate with him in person, over the phone

18  or --

19  A.   At that time I started e-mailing.

:28PM  20  Q.   Why were you e-mailing with him?

21  A.   He wasn't picking up the phone; most of the time it was

22  busy.  So he seemed to be getting back at me with e-mail

23  faster.

24  Q.   Okay.

:28PM  25          THE COURT:  Mr. Hogstrom, before we get to the next

1 exhibit, perhaps this is a good time to take our overnight

2 break.

3          All right.  So, ladies and gentlemen, it is now

4 4:30.  We will adjourn for the day.  We will restart tomorrow

:28PM   5 at 10:00 a.m.  Please be in the jury room by 9:45.

6          As usual, during the overnight break please do not

7 discuss this case with anyone, including one another, and

8 please do not do any independent research regarding any of

9 the terms or the topics or the parties you've heard discussed

:28PM  10 in this case.

11          Thank you very much for your attention today.

12      (Jury exited the courtroom.)

13          THE COURT:  The witness may step down.

14          Please do not discuss your testimony with anyone

:29PM  15 during the overnight break.  Thank you.

16      (Witness temporarily excused.)

17          THE COURT:  Please be seated.

18          All right.  So who do we have up tomorrow?

19          MR. NOVAK:  Tomorrow is -- we'll continue with Mr.

:30PM  20 Pithyou.  We have Adis Alic, should be here in the morning.

21          THE COURT:  Okay.

22          MR. NOVAK:  Then Ms. Khodi, Kathy Khodi.  And then

23 Dela Cruz, Armando Dela Cruz.  And then probably Mr. Murphy

24 in the afternoon.  That's the plan.

:30PM  25          THE COURT:  Okay.

409

1      MR. NOVAK:  And then we're still looking.  We're

2  talking about a stipulation for our records witness that may

3  knock one witness off.  And there's a couple other -- a

4  property owner or two that we probably will not call.  We

:30PM  5  have stipulations, so we'll just do that.  And another

6  witness that we're discussing we probably -- an out-of-town

7  witness we don't think we're going to fly in for this.

8      THE COURT:  Okay.  So then after Mr. Murphy, we may

9  have a couple of other witnesses?

:31PM  10      MR. HOGSTROM:  It should be two more investor

11  witnesses after Mr. Murphy.

12      MR. NOVAK:  Shorter witnesses.

13      MR. HOGSTROM:  And that may take us through --

14      MR. NOVAK:  And one more set of property owners for

:31PM  15  Friday.  They go with the Friday investor witness, just to

16  keep it together.  But that should take us through Friday,

17  almost the whole day, I think.

18      MR. HOGSTROM:  I think that's probably the end of

19  our case, right?

:31PM  20      MR. NOVAK:  Yes.  Maybe like financial or --

21      MR. HOGSTROM:  That's right.  We have two more

22  witnesses that we'll have on Monday, a summary witness and

23  financial analyst.

24      THE COURT:  Okay.

:31PM  25      All right.  Very good.  So at this point in time

1    the government estimates that you'll be basically ending your

2    case sometime by the close of Monday?

3              MR. HOGSTROM:  Yes, Judge.

4              MR. NOVAK:  Definitely by the close of Monday.

5              THE COURT:  All right.

6              And then as I said, because of my scheduling,

7    issues have come up.  We're going to take a break on Tuesday.

8    And so you will -- I guess I'll talk to defense on Monday,

9    whether or not you think if by that time you've made a

10   decision as to the two defense witnesses and whether at that

11   point in time you believe that Mr. Rossini will take the

12   stand.

13             MR. FRANKEL:  Yes.

14             THE COURT:  All right.  I'm not going to hold you

15   to anything, but at this point do you have any sense with

16   regard to the two witnesses?

17             MR. ADAMS:  I'm not going to call Agent Blau.  I

18   would like to talk to the government.  I think I'm going to

19   propose a stipulation.

20             THE COURT:  With regard to Agent Blau?

21             MR. ADAMS:  We're not going to call Blau.

22             THE COURT:  Okay.

23             MR. FRANKEL:  Just some impeachment, which could be

24   subject to -- we can do it by stipulation probably.

25             THE COURT:  All right.  Very good.

1      MR. NOVAK:  And then, your Honor, just so we can

2 figure out our timing, should we be prepared to close on

3 Monday or --

4      THE COURT:  No.  I think what I would like to do

:33PM  5 is, assuming -- obviously if Mr. Rossini testifies, then

6 we're going to go beyond Monday.  But assuming that the

7 defense doesn't have any witnesses or all the evidence will

8 be in on Monday, what I would like to do is, I would like to

9 have our final jury instruction conference at the end of the

:33PM  10 day on Monday --

11      MR. NOVAK:  Okay.

12      THE COURT:  -- and see if there's -- I don't

13 anticipate there will be any, but to the extent there are any

14 additional issues with regard to jury instructions, just so

:33PM  15 that the attorneys -- so that you know what the jury

16 instructions will be as you prepare for your closings.  And

17 then we'll do closings on Wednesday.

18      MR. NOVAK:  Okay.

19      THE COURT:  Which will be nice because you guys

:34PM  20 will have a day to prepare.  And then I'll charge the jury

21 Wednesday, probably right around lunchtime or so, and then

22 they can start the deliberations.

23      MR. NOVAK:  Okay.  Very good.

24      THE COURT:  All right.  So let's just try to keep

:34PM  25 on that schedule.

1    MR. NOVAK:  Very good.

2    MR. ADAMS:  Thank you, Judge.

3    MR. FRANKEL:  Thank you.

4    THE COURT:  Thank you.

:34PM  5    I want to go through the list of exhibits that were

6    admitted.

7    I have the following:  I have AW Pithyou 1, 2, 3,

8    5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15, 16; Khamis

9    Exhibits 1, 2, 3, 4 and 5; Yousif Exhibits 1, 2, 3, 4, 5, 6

:35PM  10   through 10, 11, 12 and 14; and I have Moshi Exhibits 1, 2, 3,

11   4, 6, 5 and 7.

12   MR. NOVAK:  Same.

13   THE COURT:  Is that consistent with your list?

14   MR. NOVAK:  Yes, your Honor.

:36PM  15   MR. ADAMS:  Yes, Judge.

16   THE COURT:  Great.  Thank you.

17   (Court adjourned to June 7, 2018, 10:00 o'clock a.m.)

18   CERTIFICATE

19   I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21

22   /s/ *Mary M. Hacker*                    *June 8, 2018*

23   _____        _____

24   Mary M. Hacker                          Date
     Official Court Reporter

25