<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      )   Docket No. 15 CR 515-1
                                    )
 4                  Plaintiff,      )
                                    )
 5        v.                        )   Chicago, Illinois
                                    )   June 7, 2018
 6   ALBERT ROSSINI,                )   10:00 o'clock a.m.
                                    )
 7                  Defendant.      )

 8                          VOLUME 3A
                 TRANSCRIPT OF PROCEEDINGS - TRIAL
 9         BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10   APPEARANCES:

11   For the Government:        HON. JOHN R. LAUSCH, JR.
                                United States Attorney, by
12                              MR. ERIK A. HOGSTROM
                                MR. WILLIAM PATRICK NOVAK
13                              Assistant United States Attorneys
                                219 South Dearborn Street
14                              Chicago, Illinois 60604

15   For the Defendant:         LAW OFFICES OF JOSHUA B. ADAMS,
                                P.C., by
16                              MR. JOSHUA B. ADAMS
                                53 West Jackson Boulevard
17                              Suite 1515
                                Chicago, Illinois 60604
18
                                FRANKEL & COHEN, by
19                              MR. SCOTT JAY FRANKEL
                                53 West Jackson Boulevard
20                              Suite 1615
                                Chicago, Illinois 60604
21

22                    ALEXANDRA ROTH, CSR, RPR
                       Official Court Reporter
23                    219 South Dearborn Street
                              Room 1224
24                     Chicago, Illinois 60604
                          (312) 408-5038
25
</pre>

```
 1            (The following proceedings were had in open court outside
 2         the presence of the jury:)
 3              THE CLERK:  Case 15 CR 515, USA versus Albert Rossini,
 4    for jury trial.
 5              MR. HOGSTROM:  Good morning, your Honor.  Erik
 6    Hogstrom, Bill Novak for the United States.
 7              MR. NOVAK:  Good morning, your Honor.
 8              MR. ADAMS:  Good morning, your Honor.  Joshua Adams and
 9    Scott Frankel for Albert Rossini, who will be approaching
10    momentarily.
11              THE COURT:  Good morning.
12              Is there anything that we need to address today before
13    we begin?
14              MR. HOGSTROM:  Not from the government.
15              MR. ADAMS:  Not for Mr. Rossini, your Honor.
16              THE COURT:  Good morning, Mr. Rossini.  All right.
17    Let's bring them in then.  Shall we bring up Mr. --
18              MR. NOVAK:  Yes, we will get Mr. Pithyou.
19              THE COURT:  Good morning, Mr. Pithyou.
20              THE WITNESS:  Good morning.
21              THE COURT:  Mr Pithyou, I want to remind you that you
22    are still under oath, sir.
23              THE WITNESS:  Yes.
24         (Jury entered the courtroom.)
25              THE COURT:  Good morning, ladies and gentlemen.  We
```

 1   will now continue with the testimony of Mr. Pithyou.

 2            Mr. Hogstrom.

 3            MR. HOGSTROM:  Thank you, Judge.

 4       ASHOOR PITHYOU, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 5                 DIRECT EXAMINATION (Resumed)

 6   BY MR. HOGSTROM:

 7   Q.  Good morning, Mr. Pithyou.  How are you this morning?

 8   A.  Good.  Thank you.

 9   Q.  When we -- when we left off yesterday, we had just finished

10   talking about the property on Monticello.  Do you recall that?

11   A.  Yes.

12   Q.  I believe you testified that your mother had provided funds

13   to invest in that property, and you later went and looked at

14   it --

15   A.  Yes.

16   Q.  -- right?

17            And you observed that it was in poor condition?

18   A.  Yes.

19   Q.  What happened after you observed the conditions of the

20   Monticello property?

21   A.  I went back to the office, Devon Investment office.  And I

22   asked if anybody was actually living in that building.  They

23   said, yes, we do collect rent.  We have people there.

24            THE COURT:  Mr. Pithyou, can you move that mike closer

25   to you, please?

1      THE WITNESS:  Sure.

2   BY MR. HOGSTROM:

3   Q.   So they confirmed that there are people living in it and

4   they were collecting rent from the building?

5   A.   Yes.

6   Q.   When you say, they, who is this that you spoke to?

7   A.   It was Bert Rossini and Babajan Khoshabe.

8   Q.   Okay.  Do you recall approximately how long after your

9   mother had invested in that property that you had this

10  conversation?

11  A.   Maybe a week or so.

12  Q.   Now, if that -- if that property was -- if that investment

13  was made in late April of 2013, would this conversation then

14  have been sometime in May, it sounds like?

15  A.   Could have been, yeah.

16  Q.   After that conversation as of May, 2012, did you continue

17  to receive rent payments related to your investment in the

18  Kilpatrick property?

19  A.   Yes, they were coming in.

20  Q.   And initially, I think you testified that you were -- you

21  were receiving rent payments from Anthony through Reliant

22  Management, right?

23  A.   Correct.

24  Q.   Did that change at some point?

25  A.   The payments?

Ashoor Pithyou - direct                417

1   Q.  Yes.  Not the amount of the payments, but the way that you

2   were receiving the payments, did that change?

3   A.  So it went from checks to money order.

4   Q.  And approximately when, to the best of your recollection,

5   did you start receiving money orders instead of checks?

6   A.  I want to say by May, June.  Such a long time ago, I don't

7   remember specifically.

8   Q.  That's okay.

9           Do you remember where you were getting the money

10  orders from?

11  A.  I would go to the office and pick it up from there.

12  Q.  Who -- who would give you the money orders?

13  A.  It would be either Bert or Babajan, but most of the time it

14  was Bert.

15  Q.  Now, did there come a point where -- let me just approach.

16          Show you what's been marked as Government Exhibit

17  Ashoor 1.  Do you recognize that document?

18  A.  Yes.  E-mail between Bert and I, yes.

19  Q.  Is that a true and accurate copy of the e-mail that you

20  exchanged with the defendant?

21  A.  Yes.

22          MR. HOGSTROM:  Government moves to admit Government

23  Exhibit Ashoor 1.

24          MR. FRANKEL:  No objection.

25          THE COURT:  Ashoor 1 is admitted in evidence.

1      (Said exhibit was received in evidence.)

2   BY MR. HOGSTROM:

3   Q.  I'm placing this on the screen.  There is three pages to

4   this document.  But is it the case that the e-mail chain is

5   printed twice?

6   A.  Pardon?

7   Q.  Is the e-mail chain printed twice?  In other words, is the

8   relevant portion of this document just the first one and a half

9   pages?

10  A.  Is it printed twice?  Is that what you are asking?

11  Q.  Yes.

12         Let me -- let me just go straight to what I want to

13  ask you about.

14  A.  Yes, there is two copies of it.

15  Q.  Okay.

16  A.  Yes.

17  Q.  So at the bottom of page -- the second page of this

18  exhibit, is there -- I am highlighting here.  Is this e-mail

19  address ASHP6211@yahoo.com, is that you?

20  A.  Yes, it is.

21  Q.  And the e-mail address BertRossini4@aol.com, is that the

22  e-mail address that you would use to communicate with the

23  defendant?

24  A.  Yes.

25  Q.  And the date of this first e-mail in the chain that we are

Ashoor Pithyou - direct                    419

1   going to talk about is July 9, 2012, is that right?

2   A.   Yes.

3   Q.   And this e-mail is from you, is that right?

4   A.   Yes.

5   Q.   And what are you saying in the e-mail?

6   A.   Hope all is well, just wondering if you guys received the

7   July rents for Lawler property and Kilpatrick.

8   Q.   And what is the last part there?

9   A.   As they are Section 8 properties.

10  Q.   What did you mean by Section 8?

11  A.   Government properties, that people that live there get

12  Section 8 vouchers.

13  Q.   Does that mean -- would -- does that mean it was your

14  understanding that the rent payments for those units were being

15  subsidized or paid by vouchers from the government?

16  A.   Correct.

17  Q.   And did that -- did that give you the understanding that

18  the payments should have effectively been guaranteed?

19  A.   Correct.

20       MR. FRANKEL:  Objection.

21       THE COURT:  Sustained.  Please rephrase the question.

22  BY MR. HOGSTROM:

23  Q.   Did you have an understanding as to what the fact that they

24  were Section 8 meant about when you could receive payments?

25  A.   Yes.  Because Section 8, usually they get paid on a certain

Ashoor Pithyou - direct                    420

1    day of the month, beginning of the month, to my understanding.

2    Q.  So you were inquiring -- but you had not received them by

3    this -- that point, is that right?

4    A.  Correct.

5    Q.  And you were inquiring about that?

6    A.  Yes.

7    Q.  Now, where did you get the -- where did you come to believe

8    that these were Section 8 properties?

9    A.  They had told me so.

10   Q.  Who told you that?

11   A.  Bert and Babajan.

12            MR. FRANKEL:  Objection, foundation.

13            THE COURT:  Overruled.

14   BY MR. HOGSTROM:

15   Q.  During the time that you were looking at these properties

16   and potentially deciding to invest in them, did you have

17   conversations with the defendant and Babajan about the rental

18   income for these properties?

19   A.  Yes.

20   Q.  And was it during that time period that you were told they

21   were Section 8, or was that later?

22   A.  It was during the time when they would present the

23   paperwork.

24   Q.  Okay.  So the next e-mail in that chain, I am going to

25   highlight, this is from Bert Rossini, is that correct?

1   A.   Yes.

2   Q.   To you?

3   A.   Yes.

4   Q.   On July 9, 2012, is that right?

5   A.   Yes.

6   Q.   So same day later, is that right?

7   A.   Yes, looks like it.

8   Q.   And the subject -- the substance of this e-mail is what?

9   A.   He replied that they come from Thomas Murphy's firm first

10  and then to them.  He said, he'll be back in town on Wednesday

11  and check it out.  We should have them in your hands by the end

12  of the week.

13  Q.   Okay.  So that was July 9.  I'm going to go up to the next

14  e-mail in the chain.

15          Is this from you to the defendant?

16  A.   Yes.

17  Q.   Later on July 9, is that right?

18  A.   Yes.

19  Q.   And what are you saying?

20  A.   Okay.  I just thought that you guys switched over to a new

21  system, and that we are getting them earlier.

22  Q.   What did you mean by the new system?

23  A.   They were changing banks, I believe, at that time.  And

24  they were going to start to do direct deposits, I believe.

25  Q.   Why did you believe that?

Ashoor Pithyou - direct                                    422

1   A.   That's what they were going to do.   That's what they told

2   me they were going to do.

3   Q.   Who told you that?

4   A.   Again, Bert and Babajan.

5   Q.   Okay.   The next e-mail in the chain, July 10, is that

6   right?

7   A.   Yes.

8   Q.   And is this -- this e-mail from Bert to you?

9   A.   Yes.

10  Q.   And what does this one say?

11  A.   We are going to get them faster.   But as this is the first

12  month of the transfer, they have to get paperwork completed as

13  well as the new electronic transfers.

14  Q.   Okay.   So that was July 10.   The next e-mail in this chain,

15  is this from you to the defendant?

16  A.   Yes.

17  Q.   What is the date of this e-mail?

18  A.   July 16.

19  Q.   So little less than a week later, is that right?

20  A.   Yeah.

21  Q.   And what are you saying here?

22  A.   When will be a good time for my father to come in and get

23  the rental checks?   He just called me to contact.

24  Q.   Okay.   And the next or last e-mail in the chain, what is

25  the date of this e-mail?

1   A.   July 16.

2   Q.   And this is from --

3   A.   Bert Rossini.

4   Q.   To you?

5   A.   Yes.

6   Q.   And what is he saying in this e-mail?

7   A.   I just received word, the rents have come to my account.  I

8   will transfer them tomorrow to the management company and have

9   rent checks ready for your dad on Wednesday, any time in the

10  afternoon.

11  Q.   Now, did you understand this to mean that in this instance,

12  the rent payments were going directly to the defendant as

13  opposed to Thomas Murphy?

14  A.   Yes.

15  Q.   And that the defendant was going to transfer them to the

16  management company, and then they would get the checks ready

17  for your father?

18  A.   Yes.

19  Q.   Now, did you subsequently, shortly after that, receive some

20  rent payments for the Kilpatrick property?

21  A.   I don't remember.

22  Q.   I'm --

23  A.   I could have.

24  Q.   I'm showing the witness what's been marked Government

25  Exhibit Ashoor 2.  Do you recognize that document?

Ashoor Pithyou - direct                    424

1    A.   Okay.  Yes.

2    Q.   What is that document?

3    A.   This is the rent payment for the Kilpatrick.

4    Q.   Is that a fair and accurate copy of that document?

5    A.   Yes.

6              MR. HOGSTROM:  Government moves to admit Ashoor 2.

7              THE COURT:  Any objection?

8              MR. FRANKEL:  Sorry, Judge.  No objection.

9              THE COURT:  Ashoor 2 is admitted in evidence.

10        (Said exhibit was received in evidence.)

11   BY MR. HOGSTROM:

12   Q.   All right.  So what is written on the top of this document?

13   A.   Devon Street Management.

14   Q.   And what did you understand Devon Street Management was?

15   A.   It was the firm that manages these buildings.

16   Q.   Now, previously I believe you testified that Reliant

17   Management was the firm managing the buildings, is that right?

18   A.   Yes.  They switched names few times.

19   Q.   Do you have any understanding as to why they switched

20   names?

21   A.   I don't.  I don't know.

22   Q.   And then the next box, is this a reference to it being July

23   2012, rent and rent equivalent?

24   A.   Uh-huh.

25   Q.   And this is for the Kilpatrick property?

Ashoor Pithyou - direct                    425

1    A.   Yes.

2    Q.   And there is a line for total income and management fee and

3    then payment.  What was your understanding of why there were

4    three different entries on this invoice?

5    A.   So total income would be the total rent collected.  The

6    management fee was minus the management fee that they took out.

7    And the payment was the total payment that I received after

8    they took out the management fees.

9    Q.   Based on your understanding, what was the purpose of the

10   management fee?

11   A.   Building maintenance, such as grass cutting, snow removal,

12   any issues that occurred within the units in the building.

13   Q.   Showing you the bottom part of the document.  Is this a

14   copy of a money order?

15   A.   Yes, it is.

16   Q.   And it's a little hard to read, but can you see, what is --

17   A.   That's the address of the Kilpatrick.

18   Q.   So this is -- and what is the date?

19   A.   It's July 21, I believe.

20   Q.   So is that approximately five days after that e-mail that

21   we just looked at?

22   A.   Yes.

23   Q.   Now, Mr. Pithyou, did there come a point when the rent

24   payments became irregular or weren't coming as you expected

25   them to, on time as you expected them to?

Ashoor Pithyou - direct

1  A.  Yes.

2  Q.  And what happened -- what did you do when you discovered

3  that the rent payments were not arriving as you expected them

4  to?

5  A.  I would continue to contact them to see when we would get

6  our money.

7  Q.  And you were -- was it by phone or in person?

8  A.  It was by phone.  Sometimes -- their office was close to

9  our house.  I would just walk to their office.

10  Q.  Who would you speak to about the delayed rent payments?

11  A.  If they were there, it would either be Mr. Rossini or

12  Babajan Khoshabe, whoever was available at that time.

13  Q.  You spoke to both of them about the delayed rent payments?

14  A.  Yes.

15  Q.  This is during the summer of 2012, fall?

16  A.  Yes, around August.

17  Q.  And what were you being told about the rent payments?

18  A.  They were telling me that their attorney, Thomas Murphy, is

19  holding onto them.

20  Q.  I'm sorry, what?

21  A.  They were telling me that their attorney, Thomas Murphy,

22  was holding onto them.

23  Q.  Did they give you an indication as to why?

24  A.  No.

25  Q.  Did you begin to ask them about the status of the deed to

Ashoor Pithyou - direct                427

1    the property that you invested in?

2    A.   Yes, it's still going on in court, so we still have to wait

3    for the outcome.

4    Q.   Somebody told you that?

5    A.   Yeah, Mr. Rossini and Babajan at the same time, they were

6    telling me that.

7    Q.   In September of that year, was there -- did there come a

8    point where you had a meeting where the attorney, Thomas

9    Murphy, was actually present?

10   A.   Yes.

11   Q.   Can you explain how that meeting came about?

12   A.   So we requested that meeting so we wanted to know what was

13   going on with the properties, why there is a delay in payments.

14   Q.   And why was it that you wanted to meet with Thomas Murphy?

15   A.   We wanted to meet him and see what the status was of these

16   units.

17   Q.   Why did you believe that he would have that information?

18   A.   Well, Babajan and Bert Rossini told me that's they are --

19   he is their representatives in these cases, the bankruptcy and

20   obtaining of the titles.

21   Q.   Where -- where did the meeting occur?

22   A.   It was in Bert's office.

23   Q.   Who all was present?

24   A.   It was Bert, Babajan Khoshabe, Fred Khoshabe which happened

25   to be Babajan's brother, and Thomas Murphy, myself, and my

1    father.

2    Q.   So before we talk about the meeting, you mentioned Fred

3    Khoshabe.   Did you know Fred Khoshabe before this meeting?

4    A.   No.

5    Q.   Did you --

6    A.   I heard of him, but I never personally met him.

7    Q.   What was your understanding of what -- why he was present?

8    I mean --

9    A.   I was told that he would be also joining the firm as a

10   partner from California chapter.

11   Q.   Okay.   So during this meeting, can you describe what -- did

12   the defendant speak during this meeting?

13   A.   It was mostly Thomas Murphy explaining the process.

14   Q.   And what was -- what did he say?

15   A.   He was saying that now some of the owners of the building

16   are trying to get the properties back, so it's going to further

17   delay the process of us getting the titles to the house, to the

18   buildings.   So there is going to be further delay because of

19   that process.

20   Q.   So he indicated that there was a delay in the foreclosure

21   proceeding?

22   A.   Yes.

23   Q.   And you recall whether Babajan said anything during this

24   meeting?

25   A.   I don't remember exact words, but he just kind of

Ashoor Pithyou - direct                                    429

1    reiterated what Mr. Murphy was saying.

2    Q.   And what about the defendant?  Do you remember whether he

3    said anything during the meeting?

4    A.   He just agreed with what Thomas was saying.

5    Q.   Okay.  At some point -- or did there come a point when you

6    stopped receiving rent payments altogether?

7    A.   Yes.

8    Q.   Do you recall when -- approximately when the last rent

9    payment you received was?

10   A.   Could have been late that year, maybe October, November,

11   into December.

12   Q.   After that did you have further conversations with the

13   defendant about the missing rent payments?

14   A.   Yes.  After that we started making agreements for them to

15   pay us our money back.

16   Q.   So you asked for your money back?

17   A.   Yes.

18   Q.   And were you told when you would get the money back?

19   A.   Well, he drew up an agreement, and he put up dates to when

20   we would actually get our money back.

21   Q.   During that same time period, did you learn anything about

22   -- about a lawsuit?

23   A.   They claimed that they are -- they will be suing Thomas

24   Murphy for bookkeeping issues.

25   Q.   And who -- who said that?

Ashoor Pithyou - direct                    430

1   A.   It was Bert.

2   Q.   What did he say the purpose of the lawsuit was?

3   A.   Due to lack of consistency in his books, so they are going

4   to pursue legal action against him, so we can start getting our

5   money.

6   Q.   And was there discussion, to the best of your recollection,

7   about whether the defendant was alleging that Mr. Murphy had

8   engaged in malpractice or fraud or something to that fact?

9   A.   He was basically alleging -- alleging him of negligence.

10  Q.   And what -- did you have an understanding about why the

11  defendant was filing a lawsuit alleging negligence?

12  A.   Because we weren't getting our money back.  He said he is

13  holding it for some reason.

14  Q.   Now, did you -- after the lawsuit was filed, did you

15  continue to from time to time have conversations with the

16  defendant about the status of the lawsuit?

17  A.   Yes.

18  Q.   Did you -- were you ever given an update on the case that

19  it had been resolved or settled in any way?

20  A.   They kept saying it was being continued and delayed in --

21  in courts.

22  Q.   Did you ever hear an update that it had -- that there had

23  been a decision one way or the other within the courts?

24  A.   No, never.

25  Q.   As you sit here today, do you know whether that lawsuit is

Ashoor Pithyou - cross                    431

1   still pending?

2   A.  I don't even think that lawsuit even exists.  I'm not sure.

3   Q.  Did you -- you stopped getting rent payments in late 2012,

4   you said?

5   A.  Yes.

6   Q.  And you asked for your money back?

7   A.  Yes.

8   Q.  Did you ever get your money back?

9   A.  No.

10  Q.  Was the title to the property, the Kilpatrick property,

11  that you invested in ever turned over to you?

12  A.  No.

13          MR. HOGSTROM:  Nothing further.

14          THE COURT:  Mr. Frankel, your witness.

15          MR. FRANKEL:  Thank you, Judge.

16                    CROSS-EXAMINATION

17  BY MR. FRANKEL:

18  Q.  Good morning, Mr. Pithyou.

19  A.  Good morning.

20  Q.  You learned about investment opportunities through your

21  father initially, is that correct?

22  A.  Correct.

23  Q.  And he had been told about -- you learned that he had been

24  told about them from Ibrahim Yousif, is that right?

25  A.  It was -- no, it was Babajan Khoshabe that told him about

Ashoor Pithyou - cross                        432

1  it first.

2  Q.   Okay.  So Mr. Khoshabe told him about --

3  A.   It was at Ibrahim's house.

4  Q.   At Ibrahim's house?

5  A.   Yeah, it was a Christmas event.

6  Q.   Okay.  Ibrahim was there?

7  A.   Yes, I believe so.  I wasn't there.

8  Q.   Okay.  But your father related to you that's how he learned

9  about this investment possibility, is that right?

10  A.   Yes.

11  Q.   Okay.  And so your father invested first, is that right?

12  A.   Yes.

13  Q.   And then you saw what your father had done, and you wanted

14  to invest as well, is that correct?

15  A.   Yes.

16  Q.   So you contacted Mr. Yousif on your own, is that right?

17  A.   Yes.

18  Q.   And you talked to him about this investment possibility,

19  correct?

20  A.   Yes.

21  Q.   And he explained to you the parameters of the investment,

22  correct?

23  A.   Yes.

24  Q.   And he explained to you that you wouldn't actually be

25  investing in the properties themselves, but in notes, right?

Ashoor Pithyou - cross                    433

1   A.   Purchasing notes to obtain property.

2   Q.   And the notes would give you or someone the right to obtain

3   a property that was currently in foreclosure, correct?

4   A.   Can you repeat that?

5   Q.   The property -- the properties that these notes

6   represented, was it your understanding that they were in

7   foreclosure?

8   A.   Yes.

9   Q.   And so there were court proceedings tying up these

10  properties, correct?

11  A.   Yes.

12  Q.   And so it was somewhat of a speculative concept that you're

13  investing in notes, but the court proceeding had to be resolved

14  before you would have the right to take possession of the

15  property, is that right?

16  A.   Yes.

17  Q.   So in the meantime, you were told that you could receive

18  rent or rent equivalents, is that right?

19  A.   Right.

20  Q.   And so that was your guarantee that you were going to get

21  some payback in this process, even if the foreclosure didn't go

22  through as everyone hoped, is that right?

23  A.   Yeah.

24  Q.   And then did you sign a guarantee or something like that

25  that promised you that you'd get all your money back if the

Ashoor Pithyou - cross                434

1   foreclosure didn't go your way?

2   A.   Yes, it was given to me by Bert.

3   Q.   Okay.  So you thought this was a guaranteed deal that

4   couldn't go wrong, right?

5   A.   At that time, yes.

6   Q.   Now, you gave your investment check to Babajan Khoshabe, is

7   that right?

8   A.   Yes.

9   Q.   And there was a contract that was prepared, and you thought

10  that you were paying over this money to receive a note on the

11  Kilpatrick property, correct?

12  A.   Correct.

13  Q.   By the way, that contract was in your father's name, is

14  that true?

15  A.   Yes.

16  Q.   And that's because you were going through a divorce.  You

17  didn't want to use your name, is that right?

18  A.   Right, it was going to be a family venture.  I didn't want

19  anything --

20  Q.   You didn't want this property to get into the complications

21  of a divorce proceedings --

22  A.   Correct.

23  Q.   -- right?

24          As you got into this relationship with Devon

25  Investments, you referred someone else to Rossini, is that

1    right?

2    A.   Yes, they recommended to refer people.

3    Q.   How many people did you refer?

4    A.   One person.

5    Q.   Okay.  Was this Janet --

6    A.   Yes.

7    Q.   -- Khoshaba.

8    A.   Yes.

9    Q.   And you expected to get a referral fee for that referral,

10   is that right?

11   A.   Yes.

12   Q.   And you did get a referral fee.

13   A.   Yes.

14   Q.   They paid you what, $10,000?

15   A.   They paid -- yes.

16   Q.   Okay.  Sometime in -- as things started to -- as the rent

17   payment started to slow down and things got complicated, you

18   told us on direct examination that there was a meeting at --

19   A.   Yes.

20   Q.   Right?  At the offices?

21   A.   Yes.

22   Q.   And the people at the meeting included you were there, is

23   that right?

24   A.   Yeah.

25   Q.   Babajan Khoshabe?

Ashoor Pithyou - cross                    436

1  A.  Yes.

2  Q.  Rossini was there, is that right?

3  A.  Yes.

4  Q.  And Murphy was there.

5  A.  And Fred.

6  Q.  And Fred was there.

7          And you told us that Fred had joined the firm as a

8  partner from the California branch.

9  A.  That's what they told me.

10 Q.  Okay.  And Thomas Murphy, he is a lawyer, right?

11 A.  Yes.

12 Q.  And did you do any investigation into Thomas Murphy to

13 confirm that he was a lawyer?

14 A.  No.

15 Q.  They told you he was a lawyer?

16 A.  He was a lawyer, right.

17 Q.  And he basically ran the meeting, correct?

18 A.  Yes.

19 Q.  Okay.  And he did most of the talking at this meeting.

20 A.  It was between him and Bert, yes.

21 Q.  You told us on direct that Murphy was the one who explained

22 the delays, is that right?

23 A.  Yes.

24 Q.  And Murphy told you and everybody at the meeting that he

25 had all the notes that people had purchased in his possession,

Ashoor Pithyou - redirect                    437

1    is that right?

2    A.   That they acquired the notes.

3    Q.   That he had acquired the notes.  Okay.

4         How long did that meeting last?

5    A.   Maybe half an hour to 40 minutes, I believe.

6    Q.   By the way --

7         MR. FRANKEL:  One second, Judge.

8    (Brief pause.)

9         MR. FRANKEL:  One second, your Honor.

10   (Brief pause.)

11        MR. FRANKEL:  Nothing further, Judge.

12        THE COURT:  Any redirect?

13        MR. HOGSTROM:  Yes, Judge.

14                    REDIRECT EXAMINATION

15   BY MR. HOGSTROM:

16   Q.   Mr. Pithyou, you were asked a question about the nature of

17   the investment and the idea that it was -- it was speculative

18   as to what would happen when you invested.  Do you recall that?

19   A.   Yes.

20   Q.   Now, I am going to put on the screen -- one minute.

21        Government Exhibit AW Pithyou 11.  Is this the

22   agreement relating to the Kilpatrick property?

23   A.   The guarantee?

24   Q.   Yes.

25   A.   Yes.

Ashoor Pithyou - redirect                    438

1   Q.  And was it your understanding from signing this document --

2   or you didn't sign it.  Your father signed it, correct?

3   A.  Correct.

4   Q.  But you were there, is that right?

5   A.  Yes.

6   Q.  And it was explained to you in your presence, is that

7   right?

8   A.  Yes.

9   Q.  Was it your understanding from this document that the --

10  you would be purchasing the note, is that right?

11  A.  Yes.

12  Q.  And that ultimately the title would be transferred to you.

13  A.  Yes, that's what it says.

14  Q.  And then on the second page -- or excuse me.

15       On the bottom of the first page, does it indicate that

16  in the event that the property is not closed or the notes or

17  assignments are not purchased, Rossini shall be personally

18  responsible to return any and all funds so advanced and return

19  them within ten days.

20  A.  Right.

21  Q.  So was it your understanding after you invested that there

22  were really two options.  You were either going to ultimately

23  get the property, or you were going to get your money back?

24  A.  Yes.

25  Q.  You were asked a question about a referral fee you

Ashoor Pithyou - redirect          439

1   received.  How did you know -- counsel asked you if you were --

2   if you expected -- if you expected to receive a referral fee.

3   And you said you did.

4          Where did you get the expectation that you would

5   receive a referral fee if you brought somebody else in?

6   A.   Well, Babajan said if you recommend anybody to us and if

7   they do purchase something, we will give you a two-percent

8   referral fee.

9   Q.   And who was it that you recommended?

10  A.   It was Janet Khoshaba.

11  Q.   After she invested you said you received $10,000?

12  A.   Yes.

13  Q.   Do you recall how you received it?

14  A.   It was a check drawn up by Thomas Murphy.

15  Q.   And do you recall who gave it to you?

16  A.   I don't remember if it was Bert or Babajan.  It was one of

17  the two.

18  Q.   Now, last thing I want to ask about this meeting where

19  Thomas Murphy was present.  You indicated that both Mr. Murphy

20  and Mr. Rossini were doing the talking at the meeting.

21          Is that an accurate --

22  A.   Yeah, they were all talking.

23  Q.   And most of the explanations about the foreclosure process

24  were provided by Mr. Murphy, is that true?

25  A.   Yes, the attorney.

1  Q.  And was that -- what was the -- what was the reason that

2  you were having the meeting in the first place?

3  A.  We wanted to know what the status was and why there has

4  been delay in our payments.

5  Q.  And who set up the meeting with Mr. Murphy so that you

6  could learn this information?

7  A.  It was set up by Bert Rossini.

8          MR. HOGSTROM:  Nothing further.

9          THE COURT:  Mr. Frankel, anything else?

10         MR. FRANKEL:  Yes, Judge.

11                         RECROSS-EXAMINATION

12  BY MR. FRANKEL:

13  Q.  You were just asked about this AW Pithyou Exhibit 11, which

14  is the Kilpatrick agreement?

15  A.  Yes.

16  Q.  It's on the screen?

17  A.  Yeah.

18  Q.  It's the one your father signed that really was your deal

19  basically.

20  A.  It was a joint.

21  Q.  Joint?

22  A.  Yes.

23  Q.  Okay.  The paragraph just above the one that's

24  highlighted -- and I don't really know how to use this part of

25  it -- it says -- oops.

1    Anyway, I'm going to read it to you:  Pithyou agrees
2  that Rossini may use the funds advanced as long as -- use the
3  funds advanced.  And that you understood that Rossini was going
4  to be able to take your money and purchase notes and spend the
5  money that you were giving him, is that right?
6  A.  Use the money that I was giving him to purchase the notes,
7  not to use it on whatever.
8  Q.  It says:  Rossini may use the funds advanced as long as
9  Rossini agrees to pay Pithyou the monthly equivalent of the
10  rentals for the property, correct?
11  A.  Okay, yes.
12  Q.  You see that there?
13  A.  Yes.
14  Q.  And did you read that carefully when you signed the
15  contract?
16  A.  Yes.
17  Q.  It doesn't say that you were going to receive rent pursuant
18  to this agreement, does it?  It says, monthly equivalent of
19  rentals, correct?
20  A.  Correct.
21  Q.  And you didn't ask Mr. Rossini what he meant by that?
22  A.  No.
23  Q.  You didn't ask anyone what was meant by that, did you?
24  A.  No.
25  Q.  And you never had this agreement reviewed by an attorney,

Ashoor Pithyou - redirect                    442

1    is that correct?

2    A.   Correct.

3    Q.   The only attorney who was involved in this entire endeavor,

4    as far as you know, was Thomas Murphy, isn't that true?

5    A.   Yes.

6             MR. FRANKEL:  Nothing further, Judge.

7             MR. HOGSTROM:  One very brief.

8                      FURTHER REDIRECT EXAMINATION

9    BY MR. HOGSTROM:

10   Q.   Same document, Mr. Pithyou, Government Exhibit AW Pithyou

11   11.  In the first paragraph does it state that Mr. Rossini has

12   asked Pithyou to advance funds in the amount of $85,000 to be

13   used to purchase the property pursuant to the assignment?

14   A.   That's what I believed the money was for.

15   Q.   And when Mr. Rossini explained this document to you as it

16   was signed, was it your understanding that the funds that you

17   are providing would be used to obtain the notes or the

18   property?

19   A.   Yes, of course.

20            MR. HOGSTROM:  Nothing further.

21            THE COURT:  Mr. Frankel, anything else?

22            MR. FRANKEL:  Nothing else.

23            THE COURT:  You may step down, sir.  Thank you.

24        (Witness excused.)

25            THE COURT:  You may call your next witness.

Alic - direct                      443

 1           MR. NOVAK:  Yes, your Honor.  The government calls
 2    Adis Alic.
 3           THE COURT:  Ladies and gentlemen, in the meantime why
 4    don't you take a stretch.
 5        (Brief pause.)
 6           THE COURT:  Mr. Alic, if you could step up here,
 7    please.  If you would remain standing, sir.
 8        (Witness duly sworn.)
 9           THE COURT:  Please take a seat.
10           Go ahead, Mr. Novak.
11           MR. NOVAK:  Thank you, your Honor.
12            ADIS ALIC, GOVERNMENT'S WITNESS, DULY SWORN
13                       DIRECT EXAMINATION
14    BY MR. NOVAK:
15    Q.  In a loud, clear voice, can you please state your name and
16    spell your last name for the court reporter?
17    A.  Adis Alic.  Last name A-l-i-c, A-d-i-s.
18    Q.  Alic, right?
19    A.  Yes.
20           THE COURT:  Can you move closer to the mike please.
21    BY MR. NOVAK:
22    Q.  Mr. Alic, where do you live?
23    A.  7941 Karlov Avenue.
24    Q.  In Skokie?
25    A.  Skokie.

1   Q.  How long have you lived at that property?

2   A.  Eleven years.

3   Q.  And I'm going to direct your attention to 2012.

4   A.  Okay.

5   Q.  Were you having trouble with your mortgage on that property

6   in 2012?

7   A.  Yes, I did.

8   Q.  And as a result of the trouble in that mortgage, did you

9   meet with anyone about obtaining a loan modification?

10  A.  Yes.

11  Q.  What was the name of the person that you met with?

12  A.  Albert Rossini.

13  Q.  If you saw that person again today, could you identify him,

14  do you think?

15  A.  Possibly.

16  Q.  I'd like you to look around the courtroom.  And if you see

17  Mr. Rossini, I'd like you to identify him and point to a piece

18  of clothing he is wearing?

19  A.  I don't think that I see him.

20  Q.  Okay.  That's fine.

21       Where did you meet with Mr. Rossini?

22  A.  At his office on Devon Avenue and Crawford.

23  Q.  And do you remember the name of his company?

24  A.  Devon Investments, or something like that.

25  Q.  How many times did you meet with Mr. Rossini in 2012?

1    A.  Myself, two times I believe.

2    Q.  And during these meetings -- well, let me ask you, did

3    other members of your family meet with Mr. Rossini?

4    A.  Yes.  The house that we owned, it's four of us, my

5    brother-in-law, his wife and myself.  So all of us are on the

6    title.  And we have been dealing with that house.

7    Q.  When you met with Mr. Rossini at his Devon Investments

8    office, what was the purpose of that meeting?

9    A.  To get a loan modification with him for us to keep the

10   house.

11   Q.  And what did you talk with him -- or what did he tell you

12   about the process for getting a loan modification?

13   A.  That he can do it for us, kind of negotiate the deal with

14   the bank.  And he wanted some money up front, and we didn't

15   want to pay.

16   Q.  How much money did he want up front for this loan

17   modification?

18        MR. ADAMS:  Your Honor, I'm going to object, ask for a

19   short sidebar.

20        THE COURT:  Yes.

21     (Sidebar proceedings out of the hearing of the jury:)

22        MR. ADAMS:  Judge, we are going to object to this

23   witness based on relevance.  He is not an investor.  There was

24   no lis pendens put on his house.  He is not relevant to this

25   case at all.

1           MR. NOVAK:  He was the property owner, met with Mr.

2    Rossini, gave Mr. Rossini documents for loan modification.  Mr.

3    Rossini tried to sell that house under him to Vladimir

4    Moghaddasi and Kathy Khodi.  They stipulated that he would say

5    almost the same thing, that he owned the property.  He never

6    knew Khodi, and he never -- I don't have the stipulation in

7    front of me.

8           But he's relevant because he is an owner.  I believe a

9    lis pendens was put on his house.

10          MR. FRANKEL:  Judge, may I answer?  That part is

11   relevant, and that's what we expected him to say.  We didn't

12   know he was going to get into an attempt to refinance the

13   house, meetings with Rossini about refinancing the house.

14          We don't see how that part is relevant.

15          THE COURT:  I guess the refinancing shows why he would

16   provide Rossini with information about the house.

17          MR. NOVAK:  Exactly.

18          THE COURT:  Right?

19          MR. NOVAK:  He gave him documents.  I expect he is

20   going to testify that he gave Mr. Rossini documents concerning

21   the mortgage, that he never had an agreement with Mr. Rossini

22   to sell the house or to sell the house to an investor, to have

23   it sold out from under him.  I think that's incredibly relevant

24   given Mr. Rossini's pitch.  The testimony has been, Mr.

25   Rossini's pitch to the investors has been, I have -- I have

1   been speaking with these owners.

2        And exactly put Mr. Moghaddasi's testimony that said,

3   the e-mails that say, I have been talking to the investors.  I

4   talked to Mrs. Adic as the -- it's Moghaddasi 20, that says, I

5   have been talking to Mrs. Adic about selling the property or

6   getting into a short sale.

7        He is going to say he obtained a loan modification

8   with his bank, and he stopped -- he meet with Rossini a couple

9   of times over three-month period in 2012.  And that was the end

10  of it.  He got his loan modification though his bank.

11       I think that's incredibly relevant.

12       THE COURT:  So I don't think the last question about

13  how much Mr. Rossini was going to charge for the modification

14  is relevant.  But I do agree that the context of why Mr. Alic

15  provided Mr. Rossini with information about his house is

16  relevant to the case.

17       MR. FRANKEL:  Judge, we have a standing objection.  I

18  think that the prejudicial potential of this testimony --

19       THE COURT:  Well, the house, Mr. Alic's house, is one

20  of the houses that Mr. Rossini used as part of the alleged

21  scheme.

22       MR. NOVAK:  That's exactly right, 7941 Karlov in

23  Skokie.

24       MR. FRANKEL:  So how is it relevant that he visited

25  Rossini in his office and asking --

1    THE COURT:  Objection overruled.  It's relevant

2  because that's how Rossini obtained the information about the

3  house.  I am assuming things like the address, the PIN, and all

4  of that information.

5    MR. NOVAK:  He obtained mortgage -- he obtained

6  whatever mortgage documents Mr. Alic had for the property.

7  It's incredibly relevant because that's the stuff.  And they

8  said when -- the investors said, Moghaddasi said, I received

9  fact sheets.  I received information about the property.  And I

10  was told that Mr. Rossini was negotiating with the owner to

11  sell the property.

12    He's going to say, I want to keep my house.  I

13  didn't -- I didn't want to invest with anyone.  I didn't want

14  to sell to an investor, get the title taken from me or my

15  family.

16    THE COURT:  Objection overruled.

17    (Further proceedings within the hearing of the jury:)

18    THE COURT:  Go ahead.

19    MR. NOVAK:  Thank you, your Honor.

20  BY MR. NOVAK:

21  Q.  Did you provide Mr. Rossini with any documents related to

22  this proposed loan modification?

23  A.  Yes, I did.

24  Q.  What kind of documents did you or other members of your

25  family provide?

Alic - direct                    449

1   A.  Bank statements, paperwork, closing documents, everything

2   pretty much for the house needed for a loan modification.

3   Q.  And did you ultimately -- in your discussions with Mr.

4   Rossini, did you discuss Mr. Rossini selling your property on

5   Karlov to another investor?

6   A.  We wanted to keep the property.  So not to sell.

7   Q.  You wanted to keep the property and in your name and your

8   family's name?

9   A.  Yes.

10  Q.  Not sell it to an investor?

11  A.  No.

12  Q.  And that was the discussions you had with Mr. Rossini,

13  right?

14  A.  Yes.

15  Q.  To keep the property in your name?

16  A.  Yes.

17  Q.  Now, did you ultimately decide to obtain a loan

18  modification through Mr. Rossini?

19  A.  Yes.

20  Q.  Through Mr. Rossini or through someone else?

21  A.  I'm sorry?

22  Q.  I will ask the question again.

23         Did you ultimately use Mr. Rossini to obtain a loan

24  modification?  Did you use his services?

25  A.  No.

1   Q.  Did you obtain a loan modification for your property?

2   A.  Yes, we did.

3   Q.  Through some other lawyer and through the bank?

4   A.  Correct.

5   Q.  Are you still in that property today?

6   A.  Yes, we are.

7   Q.  Now, approximately how long did you have meetings or deal

8   with Mr. Rossini?  What was the approximate timeframe?

9   A.  Couple months, maybe three months.

10  Q.  And did your wife, to your knowledge, also talk with Mr.

11  Rossini or bring documents to him?

12  A.  Maybe my brother-in-law, and maybe we called him like once

13  or twice just to settle.

14  Q.  After you decided not to use Mr. Rossini, did you talk with

15  him again?

16  A.  No.

17  Q.  Are you familiar with a man by the name of Vladimir

18  Moghaddasi?  Have you heard that name before?

19  A.  No, I did not.

20  Q.  Or the name Janet Khoshaba?

21  A.  No, I did not.

22          MR. NOVAK:  One moment please.

23      (Brief pause.)

24          MR. NOVAK:  One moment please.

25      (Brief pause.)

1          MR. NOVAK:  Nothing further.

2          THE COURT:  Mr. Frankel, cross-examination.

3          MR. FRANKEL:  Thank you, Judge.

4                    CROSS-EXAMINATION

5    BY MR. FRANKEL:

6    Q.  Mr. Alic, you -- what was the address of your property on

7    Karlov?

8    A.  7941.

9    Q.  And how long have you lived in that property?

10   A.  It's 11 years.  So we purchased in 2007.

11   Q.  Okay.  And you said you had a meeting with Mr. Rossini in

12   2012?

13   A.  Yes.

14   Q.  Did you write down the date of that meeting anywhere?

15   A.  No.

16   Q.  Did you keep any records of that meeting?

17   A.  No.

18   Q.  When you were interviewed by the agent in this case,

19   Special Agent Michael Gorman, did you bring him any documents

20   to show that -- about your meeting with Mr. Rossini?

21   A.  No, did not.

22   Q.  How did you hear about Mr. Rossini?

23   A.  Through friend of mine.

24   Q.  Through a friend of yours?

25   A.  Yes.

Alic - cross                    452

1   Q.  And who was that friend?

2   A.  Goran (phonetic).

3   Q.  Goran?

4   A.  Goran.

5   Q.  Goran told you go see Mr. Rossini, he might be able to help

6   you out?

7   A.  No, I think Goran came by to see that house, and that he

8   recognized the house that was my house.

9   Q.  Okay.  And you were in distress on the payments for the

10  mortgage, is that right?

11  A.  Correct.

12  Q.  Were you current on your payments?

13  A.  At that time or now?

14  Q.  At that time.

15  A.  No.

16  Q.  And had you received notice from a bank about --

17  A.  Yes, we did.

18  Q.  Did the bank say they were going to start foreclosure

19  proceedings?

20  A.  Yes.

21  Q.  And did you get a notice of -- about a court hearing for

22  foreclosure?

23  A.  No.

24  Q.  Were you in touch with a banker?

25  A.  Yes.

Alic - cross                                    453

1   Q.  How long had it been since you had made a mortgage payment?

2   A.  We just got loan modification like in 2017.  So it's been

3   process from 2010 through pretty much 2017.  I do own two

4   properties that were kind of related too.  So --

5   Q.  If I understand your answer to my question, you haven't

6   made a payment -- you didn't make a payment on your house from

7   2010 to 2017?

8   A.  Correct.

9   Q.  And you were worried that the bank would take the house?

10  A.  Correct.

11  Q.  And did you understand that in order for the bank to take

12  the house, they would have to start a foreclosure proceeding?

13  A.  Correct.  But we have two properties.  One, and then the

14  other, they were kind of connected through the loan.  It's

15  little bit complicated.

16  Q.  Okay.  Just answer my questions please.

17  A.  Go ahead.

18  Q.  And then after the conclusion of the foreclosure

19  proceeding, the deed -- a judge would enter an order

20  transferring the deed of your home to the bank, is that right?

21          MR. NOVAK:  Objection, your Honor.  Calls for

22  speculation.

23          THE COURT:  Sustained.

24  BY WITNESS:

25  A.  I am not sure.  I mean, how --

1    THE COURT:  Mr. Alic, you don't have to answer that

2  question.

3  BY MR. FRANKEL:

4  Q.  Okay.  So you ultimately did receive a loan modification in

5  2017?

6  A.  Yes, we did.

7  Q.  And you remain in the house?

8  A.  Yes, we are.

9    MR. FRANKEL:  Okay.  I have nothing further, Judge.

10    MR. NOVAK:  One moment.

11    (Brief pause.)

12    MR. NOVAK:  Nothing further, your Honor.

13    THE COURT:  You may step down.  Thank you.

14    (Witness excused.)

15    MR. NOVAK:  May we have a brief sidebar, your Honor.?

16    (Sidebar proceedings out of the hearing of the jury:)

17    MR. NOVAK:  So we have some stipulations we are going

18  to read just to take us through the break for the afternoon.

19  So there is some documents we are going to use with Ms. Khodi,

20  the bank records.  We are going to read stipulations just to

21  get them in.

22    And I can do some property owner stipulations that --

23  how long do you -- 15 minutes?

24    THE COURT:  Right.

25    MR. NOVAK:  Okay.  That's fine.

1        THE COURT:  You will read stipulations before our

2  morning break?

3        MR. NOVAK:  Yes.

4        MR. HOGSTROM:  Just go 11:15.

5        THE COURT:  So when you read the stipulations, just

6  announce that the various facts have been stipulated by the

7  parties.  And then just ask them to confirm once you are done

8  with the list that they are so stipulated.

9        MR. NOVAK:  So don't do it for each one?

10        THE COURT:  How many are there?

11        MR. NOVAK:  I mean, it depends.  We have a total of

12  about I think 42.  I am not going to read all 42 right now.  I

13  probably read between five and ten.

14        THE COURT:  Okay.  I think after a couple you can do

15  that, and just make sure it's as to all the statements.

16        MR. NOVAK:  I just don't want to make it belabored any

17  more than it has to be.

18      (Further proceedings within the hearing of the jury:)

19        MR. NOVAK:  Your Honor, the government has some

20  stipulations that it would read, some facts we agreed to with

21  defense counsel.

22        It is hereby stipulated and agreed by and between the

23  United States of America and defendant Albert Rossini by and

24  through his attorneys the following facts are and should be

25  considered by the jury to be true and accurate:

1          Stipulation No. 3.  Between on or about May 1, 2011,

2    and on or about August 20, 2015, the following individuals used

3    the following e-mail addresses:  Albert Rossini,

4    BertRossini4@gmail.com, and BertRossini4 -- and that's the

5    number 4 -- @gmail -- @aol.com.

6          Babajan Khoshabe, BKhoshabe@gmail.com.

7          Thomas Murphy, TMurphy@BNF-law.com,

8    TMurphy@Pedersenhoupt -- P-e-d-e-r-s-e-n-H-o-u-p-t -- .com,

9    MurphyThomaslaw@gmail.com, TWMurphy54@gmail.com.

10          Anthony Khoshabe, Khoshabe@gmail.com,

11    ReliantManagement@gmail.com, Anthony.Khoshabe@CVExchange.com.

12          Stipulation No. 4:  If called to testify, an employee

13    of Federal Express would state that Fed Ex is a commercial

14    interstate carrier.  Additionally, an employee of Fed Ex would

15    state that on or about July 24, 2012, Albert Rossini in

16    Illinois sent a Fed Ex package to Arizona.  Additionally an

17    employee from Fed Ex would state that on or about August 22,

18    2012, Albert Rossini in Illinois sent a Fed Ex package to

19    Arizona.  Additionally an employee from Fex Ex would state that

20    on or about November 13, 2012, Albert Rossini in Illinois sent

21    a Fed Ex package to Arizona.

22          Stipulation No. 5, if called to testify, an employee

23    of the Federal Reserve Bank would state that the Automated

24    Clearing House, ACH, banking system is operated by the Federal

25    Reserve Bank.  An employee of the Federal Reserve Bank would

1      further state that all Automated Clearing House, or ACH,

2      transactions, are routed through Federal Reserve Bank locations

3      either New Jersey or Texas before reaching their destination.

4                 So stipulated?

5                 MR. ADAMS:  So stipulated.

6                 MR. NOVAK:  Stipulation No. 6.  If called to testify

7      an employee of JPMorgan Chase N.A. would testify that the

8      following government exhibits consist of records maintained by

9      Chase Bank in connection with the following accounts:

10                Government Exhibit Chase 5099 is a -- which has an

11     account number ending in 5099, which was a credit card account

12     belonging to Anthony Khoshabe.

13                Government Exhibit Chase 6312, which has an account

14     ending 6312, which was a credit card account belonging to

15     Anthony Khoshabe.

16                Government Exhibit Chase 5770, which is an account

17     ending in 5770, which was a checking account belonging to

18     Anthony Khoshabe, sole signatory Anthony Khoshabe.

19                Government Exhibit Chase 76 -- 7162, which is an

20     account ending in 7162, which is a savings account belonging to

21     Anthony Khoshabe, sole signatory Anthony Khoshabe.

22                Government Exhibit Chase 2482, which is an account

23     ending 2482, was a checking account belonging to Reliant

24     Management Incorporated, sole signatory Anthony Khoshabe.

25                Government Exhibit Chase 2540, account ending 2540,

1   which was a checking account belonging to AD Investment
2   Partners, sole signatory Anthony Khoshabe.

3          Government Exhibit Chase 9389, account ending 9389,
4   which was a checking account belonging to Thomas Murphy, sole
5   signatory Thomas Murphy.

6          Government Exhibit Chase 7800, account ending 7800,
7   which was a checking account belonging to Devon Street
8   Investments Limited, sole signatory Albert Rossini.

9          Government Exhibit Chase 9628, account ending 9628,
10   which was a checking account belonging to Devon Street
11   Management Company, signatories Albert Rossini and Fereidoon
12   Khoshabe.

13          Government Exhibit Chase 1750, account ending 1750,
14   which was a checking account belonging to Babajan Khoshabe,
15   with signatories Babajan Khoshabe and Fereidoon Khoshabe.

16          Government Exhibit Chase 8750, account ending 8750,
17   which was a checking account belonging to Devon Street Realty
18   Limited, sole signatory Albert Rossini.

19          Government Exhibit Chase 4078, account ending 4078,
20   which was a checking account belonging to BRBK Investments
21   Incorporated, signatories Albert Rossini and Babajan Khoshabe.

22          Government Exhibit Chase 5672, account ending 5672,
23   which was a savings account belonging to Anthony Khoshabe and
24   Babajan Khoshabe.

25          The records were obtained or made at or near the time

1    reflected on the individual documents by persons with knowledge

2    of the contents, in the course of regularly conducted business

3    activity.  It was the regular practice of Chase Bank to obtain

4    and make such records as part of their business.

5         The parties stipulate and agree that the above

6    government exhibits are admissible as evidence.  So stipulated?

7         MR. ADAMS:  So stipulated.

8         MR. NOVAK:  Your Honor, we move those into evidence.

9         THE COURT:  Those Chase Exhibits Chase 5099, 6312,

10   5770, 7162, 2482, 2540, 9389, 7800, 9628, 1750, 8750, 4078 and

11   5672 are admitted in evidence.

12      (Said exhibits were received in evidence.)

13        MR. NOVAK:  Stipulation No. 7.  If called to testify,

14   an employee of Bank of America N.A. would testify that the

15   following government exhibits consist of records maintained by

16   Bank of America in connection with the following accounts:

17        Government Exhibit BOA 7345, account ending 7345,

18   which was a checking account belonging to Madison Consulting

19   Limited, sole signatory Thomas Murphy.

20        Government Exhibit BOA 6978, account ending 6978,

21   which was a checking account belonging to d/b/a Law Offices of

22   Thomas W. Murphy, Thomas W. Murphy sole proprietor, sole

23   signatory Thomas Murphy.

24        Government Exhibit BOA 5413, an account ending 5413,

25   which was a savings account belonging to Babajan Khoshabe in

1    trust for Anthony Khoshabe, sole signatory Babajan Khoshabe.

2         Government Exhibit BOA 8725, account ending 8725,

3    which was a checking account belonging to Anthony Khoshabe in

4    trust for Babajan Khoshabe, sole signatory Anthony Khoshabe.

5         Government Exhibit BOA 2375, an account ending 2375,

6    which was a savings account belonging to Anthony Khoshabe in

7    trust for Babajan Khoshabe, sole signatory Anthony Khoshabe.

8         Government Exhibit BOA 8129, account ending 8129,

9    which was a checking account belonging to Rockford Commercial

10   Limited, sole signatory Thomas Murphy.

11        The records were obtained or made at or near the time

12   reflected on the individual documents by persons with knowledge

13   of the contents in the course of regularly conducted business

14   activity.  It's the regular practice of Bank of America to

15   obtain and make such records as part of their business.

16        Parties stipulate and agree that above government

17   exhibits are admissible as evidence.  So stipulated?

18        MR. ADAMS:  So stipulated.

19        MR. NOVAK:  Your Honor, we move all of those in

20   evidence as well.

21        THE COURT:  Bank of America Exhibits 7345, 6978, 5413,

22   8725, 2375, and 8129 are admitted in evidence.

23     (Said exhibits were received in evidence.)

24        MR. NOVAK:  Stipulation No. 8.  If called to testify,

25   an employee of the International Bank of Chicago would testify

1    that Government Exhibit IBC records consists of records

2    maintained by the International Bank of Chicago in connection

3    with an account ending 3435, which was a checking account

4    belonging to Devon Street Investments Limit, sole signatory

5    Albert Rossini.  The records were obtain or made at or near he

6    time reflected on the individual documents by persons which --

7    with knowledge of the contents in the course of regularly

8    conducted business activity.  It was the regular practice of

9    the International Bank of Chicago to obtain and make such

10   records as part of their business.

11          Parties stipulated and agree that the above government

12   exhibits are admissible as evidence.

13          Stipulation No. 9, if called to testify, an employee

14   of MB Financial Bank N.A. would testify that the following

15   government exhibits consist of records maintained by MB

16   Financial Bank in connection with the following accounts:

17          Government Exhibit MB Financial 1325, an account

18   ending 1325, which was a checking account belonging to

19   Comprehensive Properties Limited, 3925 West Devon, Lincolnwood,

20   Illinois.

21          Government Exhibit MB Financial 0506, an account

22   ending 0506, which was a savings account belonging to Babajan

23   Khoshabe in trust for Anthony Khoshabe, sole signatory Babajan

24   Khoshabe.

25          Government Exhibit MB Financial 1979, an account

 1    ending 1979, which was a savings account belonging to Babajan

 2    Khoshabe, sole signatory Babajan Khoshabe.

 3         The records were obtained or made at or near the time

 4    reflected on the individual documents by persons with knowledge

 5    of the contents in the course of regularly conducted business

 6    activity.  It's the regular practice of MB Financial Bank N.A.

 7    to obtain and maintain such records as part of their business.

 8         Parties stipulated and agree the government -- above

 9    government exhibits are admissible as evidence.  So stipulated?

10         MR. ADAMS:  So stipulated.

11         MR. NOVAK:  Your Honor, the government would move the

12    IBC records and the MB Financial Bank records I just read into

13    the record into evidence.

14         THE COURT:  All right.  So IBC 3435 is admitted in

15    evidence.  MB Financial 1325, 0506, and 1979, are admitted in

16    evidence.

17    (Said exhibits were received in evidence.)

18         MR. NOVAK:  Stipulation No. 10.  If called to testify,

19    an employee of Wells Fargo Bank N.A. would testify that the

20    following government exhibits consist of records maintained by

21    Wells Fargo Bank in connection with the following accounts:

22         Government Exhibit Wells Fargo 6999, an account ending

23    6999, which was a checking account belonging to Anthony

24    Khoshabe, payable on death Babajan Khoshabe, sole signatory

25    Anthony Khoshabe.

1          Government Exhibit Wells Fargo 8113, account ending

2     8113, which was a savings account belonging to Babajan

3     Khoshabe, payable on death Anthony Khoshabe, sole signatory

4     Babajan Khoshabe.

5          The records were obtained or made at or near the time

6     reflected on the individual documents, persons with knowledge

7     of the contents in the course of regularly conducted business

8     activity.  It was the regular practice of Wells Fargo Bank N.A.

9     to obtain and make such records as part of their business.

10         Parties stipulate and agree the above government

11    exhibits are admissible as evidence.

12         Stipulation No. 11.  If called to testify an employee

13    of Wintrust Bank would testify that Government Exhibit Wintrust

14    1935 consists of records maintained by Wintrust Bank in

15    connection with account ending 1935, which was a checking

16    account belonging to Devon Street Management Company,

17    signatories Babajan Khoshabe, Fereidoon Khoshabe, Albert

18    Rossini.

19         Records were obtained or made at or near the time

20    reflected on the individual documents by persons with knowledge

21    of the contents in the course of regularly conducted business

22    activity.  It's the regular practice of Wintrust Bank to obtain

23    and maintain and make such records as part of their business.

24         Parties stipulate and agreed the above government

25    exhibits are admissible as evidence.  So stipulated to those?

1          MR. ADAMS:  So stipulated.

2          MR. NOVAK:  Your Honor, the government would move the

3     Wells Fargo exhibits and the Wintrust exhibits into evidence.

4          THE COURT:  Wells Fargo 6999 and 8113, and Wintrust

5     1935 are admitted in evidence.

6        (Said exhibits were received in evidence.)

7          MR. NOVAK:  Do you want to stop for a break?

8          THE COURT:  All right.  So, ladies and gentlemen,

9     let's take our morning break.  We will break for approximately

10    ten minutes.  During the break, please do not discuss this case

11    with anyone, including one another.  And please do not do any

12    independent research regarding any of the issues you have heard

13    discussed in this case.

14          Thank you very much.

15        (Jury exited the courtroom.)

16          THE COURT:  All right.  So who do we have on deck

17    next?

18          MR. HOGSTROM:  Kathy Khodi.

19          THE COURT:  Remind me, we have Ms. Khodi, and then who

20    else today?

21          MR. NOVAK:  We are going to have Armando Dela Cruz.

22    He is another -- he'll be short -- property owner.  And then

23    Thomas Murphy.

24          THE COURT:  And we expect Mr. Murphy will take us

25    through the rest of the day?

1          MR. HOGSTROM:  I would imagine so.

2          THE COURT:  Okay.  And just in case, in case we get to

3  finish Mr. Murphy before the end of the day, do you have

4  someone lined up?

5          MR. NOVAK:  There are stipulations I can read, Judge.

6  So we can fill the time, if we get that far.

7          THE COURT:  All right.  Very good.  We are in recess.

8      (Brief recess.)

9          MR. HOGSTROM:  Judge, I apologize.  Our paralegal is

10  on the way up.  She has the exhibits for the next witness.

11      (Brief pause.)

12          MR. HOGSTROM:  Judge, should we have the witness come

13  in and take the stand.  So when the jury starts we can just --

14          THE COURT:  It's okay.

15          MR. HOGSTROM:  Okay.

16      (Brief pause.)

17          MR. HOGSTROM:  Okay, Judge.  Thank you very much.

18          THE COURT:  All right.  Let's bring them in.

19      (Jury entered the courtroom.)

20          THE COURT:  Mr. Novak, I will take the binder.

21          MR. NOVAK:  Very good.

22          THE COURT:  You may call your next witness.

23          MR. HOGSTROM:  Government calls Kathy Khodi.

24          THE COURT:  Ms. Khodi, if you would step up to my

25  right.  If you would come up and remain standing, ma'am.

1      (Witness duly sworn.)

2                  THE COURT:  Please take a seat.

3                  If you could move up a little bit, be closer to the

4      microphone.  Thank you, ma'am.

5                  THE WITNESS:  Sure.

6                  THE COURT:  Go ahead.

7                  KATHY KHODI, GOVERNMENT'S WITNESS, DULY SWORN

8                            DIRECT EXAMINATION

9      BY MR. HOGSTROM:

10     Q.  Good morning, ma'am.

11     A.  Good morning.

12     Q.  Please state and spell your name for the court reporter.

13     A.  Kathy Khodi.  K-a-t-h-y, K-h-o-d-i.

14     Q.  Where do you reside, ma'am?

15     A.  Cupertino, California.

16     Q.  What do you do for a living?

17     A.  I've been in real estate, sales and development and such,

18     investing.

19     Q.  How long have you been involved in real estate?

20     A.  About 15 years or so.

21     Q.  Are you familiar with a man named Albert Rossini?

22     A.  Yes, I am.

23     Q.  How are you familiar with him?

24     A.  I made investments with him.

25     Q.  Approximately when was that?

1   A.  Starting December of 2011, and going on until August of

2   2013, through different investments.

3   Q.  How did you first hear about these investments?

4   A.  So I worked with a contractor in the South Bay, in

5   California, in development.  And he recommended that his

6   cousins and family members were involved with Mr. Rossini's

7   company as far as purchasing distressed notes, and which became

8   properties after foreclosure.  So that's the first I heard

9   about him.

10  Q.  Who was this contractor?

11  A.  Raymond Babaoghli.

12  Q.  And who was the cousin that he was referring to?

13  A.  Fred Khoshabe.

14  Q.  Did you ultimately meet with somebody about this

15  investment?

16  A.  Yes, I did.

17  Q.  Who did you meet with?

18  A.  I met with Mr. Fred Khoshabe.

19  Q.  Where did this meeting occur?

20  A.  It occurred at a coffee shop in California, Cupertino,

21  California, close to my home.

22  Q.  Approximately when was that?

23  A.  I would say when I met with him was in December of 2011.

24  Q.  Who was there for the meeting?

25  A.  Mr. Fred Khoshabe and myself.

1    Q.   And you discussed the investment?

2    A.   Yes.

3    Q.   What -- what was described about the investment?

4    A.   Well, he showed me some papers with properties on them.

5    And each property had a profile of what the income was, because

6    they were rentals.  So what the income was, what the costs

7    were, what the management fee would be, and the end what the

8    proceeds would be on the property.

9          And then the cost that was associated with purchasing

10   that note.

11   Q.   What was your understanding as to how the process would

12   work if you decided to purchase a note?

13   A.   My understanding was that I became the first lienholder of

14   the note, of the property.

15   Q.   What does that mean?

16   A.   That means that I become in place of the bank.  So the bank

17   had sold these notes apparently.  And so I become the bank.

18   And if they cannot make the payments, that we go through the

19   process of foreclosure on these properties.

20          And then the property would then be in my name.  And I

21   would be the owner of the property.

22   Q.   What was your understanding of what would happen while the

23   foreclosure process was ongoing?

24   A.   My understanding was that there was rents that were being

25   received from these properties.  And those rents would be

1  forwarded to me, minus the management fee.

2  Q.  What was the management fee for?

3  A.  Management fee, I actually asked that question because I

4  couldn't understand really because the property was, you know,

5  in foreclosure.  But they said that once the property would

6  come and they would manage it, that those -- they would

7  actually be doing management work on it.

8          But currently all they were doing was receiving the

9  rents, taking ten percent, and forwarding that rent to me -- to

10  me.

11  Q.  Now, you had this meeting with Fred Khoshabe, right?

12  A.  Yes.

13  Q.  Did he mention anyone else that he worked with on this

14  investment?

15  A.  Yes.

16  Q.  Who did he mention?

17  A.  He mentioned his brother and nephew and Mr. Bert Rossini.

18  So Mr. -- his brother's name I don't know.  Sorry.

19  Q.  Babajan Khoshabe?

20  A.  Yes.  And then Anthony Khoshabe, which is his nephew, and

21  Mr. Bert Rossini.

22  Q.  Did you have an understanding as to how -- what Fred

23  Khoshabe's financial interest in this was?  What was he going

24  to be making out of it if you decided to invest?

25  A.  He told me that he was -- so he was the person to -- point

1  of contact in California, and that he would be making

2  commission on the properties.  So each sale of the property was

3  $5,000.  But to his church -- he gave $2,000 to the church

4  members.  But since I was not part of the Assyrian church, that

5  he would do a onetime commission of 2,000 and then 5,000 after

6  that.

7  Q.  Who would be paying the commission?

8  A.  I was suppose to give -- I gave him a separate check in his

9  name.

10  Q.  Did -- was there anything mentioned about anyone else

11  involved in the investment program receiving commissions?

12  A.  He mentioned that they received $25,000 on each note that

13  they sold.

14  Q.  Who did?

15  A.  Mr. Bert Rossini and his team.

16  Q.  The company?

17  A.  Yes, the company.

18  Q.  You mentioned I think that Fred Khoshabe was referring to

19  specific properties, is that right?

20  A.  Yes.

21  Q.  Did he actually show you documents about that?

22  A.  Documents, just the piece of paper kind of outlining the

23  property, where it is, how many units it has, the rentals on it

24  and such.  And expenses and --

25  Q.  I'm showing the witness what's been marked as Government

Khodi - direct                    471

1   Exhibits 20, 21, Khodi 20 and Khodi 21.  Do you recognize those

2   documents?

3   A.  I do.

4   Q.  What is 20?

5   A.  Twenty is an e-mail that I received from Mr. Fred Khoshabe

6   telling me where to send the money, to overnight it.  I was to

7   overnight a money -- cashier's check, payable to Mr. Murphy.

8   Q.  And what was -- what is 21?  Just generally, what do you

9   recognize it to be?

10  A.  Twenty-one is the piece of paper that I was shown as far as

11  the outline of the property details.

12  Q.  Are these true and accurate copies of these documents?

13  A.  Yes.

14          MR. HOGSTROM:  Government moves to admit Khodi 20 and

15  Khodi 21.

16          MR. FRANKEL:  No objection.

17          THE COURT:  Khodi 20 and 21 are admitted in evidence.

18     (Said exhibits were received in evidence.)

19  BY MR. HOGSTROM:

20  Q.  I'm going to start actually with Khodi 21.  Give me one

21  moment.

22     (Brief pause.)

23          MR. HOGSTROM:  Can I approach one minute?

24          THE COURT:  You may.

25  BY MR. HOGSTROM:

Khodi - direct                                               472

1    Q.  Looks like one of the pages wasn't scanned into the system

2    properly.  So I am going to use the overhead projector to show

3    you this document.  I apologize for the brief delay there.

4           You can see on the screen, this is Government

5    Exhibit 21, Khodi 21.  Is this the document you referred to as

6    the information sheet about a property?

7    A.  Yes.

8    Q.  What is the address of this property that you were shown

9    this sheet about?

10   A.  This is 3650, 3652 West Polk Street.

11   Q.  And there is a section on the top that says, income.  A

12   section below that says, expenses.  Was this explained to you

13   by Mr. Khoshabe at the time?

14   A.  It was explained.

15   Q.  What was explained about it?

16   A.  It was explained that the units are being rented.  The rent

17   is being collected.  And that's on the top portion.  There are

18   expenses associated with the property, which I couldn't really

19   understand if we didn't own the property why there was

20   insurance and water payments and such.  But that wasn't clearly

21   explained.

22   Q.  Did you ask about that?

23   A.  I did.

24   Q.  And then on the bottom it says, make a cashier's check

25   payable to Thomas Murphy, attorney agent?

Khodi - direct                    473

1   A.   Correct.

2   Q.   Were you told who Thomas Murphy was?

3   A.   I was told this was the attorney that had purchased the

4   bulk notes.

5   Q.   And what was -- what was his association with Devon Street

6   Investments or this whole investment program?

7   A.   That he was the attorney involved with purchasing the

8   notes.  Basically that's it.

9   Q.   Okay.  I'm going to now go back to this screen in front of

10  you.

11  A.   I believe he was part of the group, which was my

12  understanding.

13          MR. FRANKEL:  Objection, no question pending.

14          THE COURT:  Overruled.  She was just providing further

15  elaboration of her last response.

16  BY MR. HOGSTROM:

17  Q.   Actually turn to Khodi 20.  This document is an e-mail sent

18  to you, is that correct?

19  A.   Yes.

20  Q.   What is the date of this e-mail?

21  A.   December 6, 2011.

22  Q.   And the e-mail address is FredKhoshabe@sbcglobal.net, is

23  that right?

24  A.   Correct.

25  Q.   And KKhodi@aol.com, is that you?

1    A.   Yes.

2    Q.   This FredKhoshabe@sbcglobal.net, was that Fred Khoshabe?

3    A.   Yes.

4    Q.   Okay.  And this is titled, instruction for note, is that

5    right?

6    A.   Correct.

7    Q.   And what is -- what is Mr. Khoshabe telling you in this

8    e-mail?

9    A.   Mr. Khoshabe is telling me to get a cashier's check and

10   overnight it, payable to Thomas Murphy, with the instructions.

11   Q.   Where is it to be Fed Ex'd to?

12   A.   It was Fed Ex'd to the -- Mr. Rossini.  I Fed Ex'd it to

13   Bert Rossini.

14   Q.   Now, turning to the second page of Government Exhibit

15   Khodi 20 -- Khodi 20.  Is this a copy of the cashier's check?

16   A.   Yes, it is.

17   Q.   What's the date of this?

18   A.   December 7, 2011.

19   Q.   It's in the amount of $105,000?

20   A.   Correct.

21   Q.   And the notation here appears to say, for purchase, and it

22   lists an address on Polk Street, is that right?

23   A.   Yes.

24   Q.   Is this your cashier's check?

25   A.   Yes, it is.

1   Q.  And where did you send this cashier's check?

2   A.  I overnight Fed Ex'd it as directed to Bert Rossini at the

3   Devon Street Investments address.

4   Q.  Turning to the next page of that document.  Is this a

5   document that's titled guaranty agreement?

6   A.  Yes.

7   Q.  How did you receive this document?

8   A.  E-mail.

9   Q.  From?

10  A.  From Mr. Fed Khoshabe, I believe.  Forwarded to me by him,

11  yes.

12  Q.  When you received this document by e-mail, what was your

13  understanding of why you were receiving it?

14  A.  This was -- my understanding was that this held my position

15  as the first lienholder on the note.  So I would become the

16  bank's position.

17  Q.  And did you read this document?

18  A.  I did.

19  Q.  And I'm just going to go to the bottom here.  The date says

20  December 8, 2011, is that right?

21  A.  Correct.

22  Q.  And who signed it?

23  A.  Mr. -- or Rossini, Bert Rossini.

24  Q.  Was the copy that you received from Fred Khoshabe already

25  signed by Mr. Rossini?

1    A.  Yes.

2    Q.  And did you yourself then sign it?

3    A.  Yes.  I was told -- yeah.

4    Q.  Okay.  And then on the bottom here, it's very hard to read

5    but appears to be some numbers.  What is that, if you know?

6    A.  Yeah, that was the number that I was given to fax back the

7    documents, which was going back to Mr. -- to Bert Rossini.

8    Q.  And is it -- the last seven digits that can be made out,

9    275-7408?

10    A.  Yes.

11    Q.  And did you in fact fax this -- after signing it, did you

12    fax this back to that number?

13    A.  Of course, yes.

14    Q.  Now, you talked about the idea that you would receive rent

15    payments.  What was your understanding about when you would

16    begin receiving rent payments?

17    A.  My understanding was that it would be prorated from the

18    date of purchase of the property.  And I would receive it

19    once -- they receive rent.  It goes through the management

20    process.  And then they are forwarded to -- direct deposit to

21    our account.

22    Q.  Now, I'm going to show you what's been marked Government

23    Exhibit Khodi 22 and Khodi 23.

24    A.  Okay.

25    Q.  Do you recognize both those documents?

Khodi - direct                                               477

1   A.  Yes.

2   Q.  What do you recognize them to be?

3   A.  This was the prorated deposit payment from Polk Street.

4   Q.  What was -- what is the second exhibit you have there?

5   A.  It's a deposit slip into my account.

6   Q.  Okay.  Are these true and accurate copies of the documents

7   you received?

8   A.  Yes.

9           MR. HOGSTROM:  Government moves to admit 22 and 23?

10          MR. FRANKEL:  No objection.

11          THE COURT:  Khodi Exhibit 22 and 23 are admitted in

12  evidence.

13      (Said exhibits were received in evidence.)

14  BY MR. HOGSTROM:

15  Q.  Now, I'm directing you to Government Exhibit Khodi 22.

16  Does this reflect an e-mail from Fred Khoshabe to you on

17  December 29, 2011?

18  A.  Yes.

19  Q.  Is the subject line, your deposit?

20  A.  Yes.

21  Q.  And what is being said here?

22  A.  He is -- there, that he has other properties, several good

23  deals, in great neighborhoods of Chicago.

24  Q.  And the first line it says:  Here is your deposit slip.

25  What did you understand that to be a reference to?

1   A.   I understood that to be a reference to the Polk Street

2   property that I had purchased on December 7.

3   Q.   The rent payment for it?

4   A.   Rent payment for that, correct.

5   Q.   And how was it -- what was your understanding how that rent

6   payment was going to be -- was being made to you?

7   A.   A direct deposit is what I was told.

8   Q.   So the next -- was there an attachment to this document?

9   A.   Yes.

10  Q.   And is that page 2 of this exhibit?

11  A.   Correct.

12  Q.   And does this reflect a deposit of $1,419.36?

13  A.   Yes.

14  Q.   And the account number that's there ends in 8943.  Was that

15  your account?

16  A.   Yes.

17  Q.   Was your understanding that this -- these funds that were

18  going to be put in your account were the rent payments from

19  that Polk Street property, right?

20  A.   Correct.

21  Q.   Now, after you initially received that one deposit in this

22  fashion, did you start receiving rent payments in a different

23  manner?

24  A.   Yes.  I would just receive kind of statements.  And -- and

25  then I would check my account.  And the money was deposited,

1   which I assumed was a direct deposit, which I was told.

2   Q.   So turn your attention to Exhibit 23.

3   A.   Uh-huh.

4   Q.   Is this a check from Reliant Management dated February 10,

5   2012?

6   A.   Yes.

7   Q.   In your name?

8   A.   Yes.

9   Q.   Now, does it reference in the memo line the Polk property?

10  A.   Yes, it does.

11  Q.   Now, did you actually receive copies of these checks?  Or

12  did they just appear in your account as having been deposited?

13  A.   I never received any checks or copies of them.

14  Q.   Did you know whether they were being -- whether the funds

15  were being wired into your account, or whether they were going

16  to a branch of your bank and physically depositing the checks?

17  A.   I did not know that.  I assumed it was being a direct

18  deposit.

19  Q.   And all you knew was that the money was showing up?

20  A.   Yes.

21  Q.   And the fact that the rent money was appearing in your

22  account, how did that make you feel about this investment

23  program?

24  A.   It made me feel like it was a legitimate investment.

25  Q.   And that -- the e-mail we just looked at from December 6,

1   you said that Mr. Khoshabe referenced other properties?

2   A.   Yes.

3   Q.   Did you end up talking to him about other properties you

4   can invest in?

5   A.   Yes, he contacted me.

6   Q.   Now, I'm going to show you what's been marked Khodi --

7   Government Exhibit Khodi 24.

8   A.   Okay.

9   Q.   Do you recognize that document?

10  A.   Yes.

11  Q.   What is it?

12  A.   It's the other two properties that I purchased from --

13  Q.   Are these true and accurate copies of the documents that

14  you received related to those properties?

15  A.   Yes.

16           MR. HOGSTROM:  Government moves to admit 24 into

17  evidence.

18           THE COURT:  Any objection?

19           MR. FRANKEL:  No objection.

20           THE COURT:  Khodi Exhibit 24 is admitted into

21  evidence.

22      (Said exhibit was received in evidence.)

23  BY MR. HOGSTROM:

24  Q.   Now, the first page of this document, this -- is this a

25  similar fact sheet to the fact sheet you had for the Polk

1    property?

2    A.   Yes.

3    Q.   Did it look the same to you?

4    A.   Yes.

5    Q.   Now, is the address for this property 1321 North Maplewood?

6    A.   Yes.

7    Q.   And was information again provided with income and

8    expenses?

9    A.   Yes.

10   Q.   And again was there instructions about making a check to

11   Tom Murphy?

12   A.   Instructions were usually through e-mail.

13   Q.   Did you get this document through -- from Mr. Khoshabe?

14   A.   I did get the document from Mr. Khoshabe, yes.

15   Q.   Did you have any idea who actually prepared it?

16   A.   No.  I know he didn't prepare it.  He said it came from the

17   Chicago group.  So I assumed it was Rossini --

18           MR. FRANKEL:  Objection, Judge.  Objection to

19   assumption.

20           THE COURT:  Sustained.  The jury is to disregard the

21   last statement.

22   BY MR. HOGSTROM:

23   Q.   The second page of this document, or the second page of

24   this document, is the address referenced 2323 West Haddon?

25   A.   Yes.

Khodi - direct                                    482

1   Q.   And was that the third property, or the second in this

2   pair, that you were looking at investing in?

3   A.   West Haddon was the second property.

4   Q.   Okay.  So again, was income and expenses listed here?

5   A.   Yes.

6   Q.   And turning to the third page of this document, did you

7   decide to invest?

8   A.   Yes.

9   Q.   And did you prepare a cashier's check?

10  A.   Yes.

11  Q.   Is this dated February 24, 2012?

12  A.   Yes.

13  Q.   And what is this -- which property is this for?

14  A.   This is for West Haddon.

15  Q.   And the amount is $245,000?

16  A.   Correct.

17  Q.   And you recognize this as your cashier's check, correct?

18  A.   Yes.

19  Q.   Next page of this document, is this another cashier's

20  check, this time for $145,000?

21  A.   Correct.

22  Q.   And this is the same date, correct?

23  A.   Yes.

24  Q.   February 24?

25           Which property was this one for?

Khodi - direct                         483

1   A.  Maplewood.

2   Q.  And these two cashier's checks for Haddon and Maplewood,

3   what did you do with them?

4   A.  I, as instructed, Fed Ex'd them overnight to Bert Rossini.

5   Q.  I'm going to direct your attention to page 5 of Government

6   Exhibit Khodi 24.  Is this another guaranty agreement?

7   A.  Yes.

8   Q.  And is this agreement meant to cover both the Maplewood and

9   Haddon properties together?

10  A.  Yes.

11  Q.  Did you -- when you received this, how did you receive it?

12  A.  E-mail.

13  Q.  And did you read it?

14  A.  I did.

15  Q.  Turning to the second page, it's dated February 28, is that

16  right?

17  A.  Correct.

18  Q.  And signed by Albert Rossini?

19  A.  Yes.

20  Q.  And was it signed when you received it?

21  A.  Yes.

22  Q.  And did you then sign it on the 20 -- is it the 28th or

23  29th?

24  A.  I think the 28th I signed it.  Or maybe the 29th.

25  Q.  After you signed it, what did you do with it?

Khodi - direct                484

1    A.   E-mailed it back, as told.

2    Q.   Okay.  After you made that second round of investments, now

3    there were three properties that you believed you had invested

4    in, is that right?

5    A.   Correct.

6    Q.   And did you continue to receive rent payments?

7    A.   I did, but not for long.

8    Q.   For approximately how long did you receive regular rent

9    payments?

10   A.   I would say a total of maximum five or six months.

11   Q.   And what -- what changed after five or six months?

12   A.   The payments were -- the rent payments weren't coming into

13   the account.

14   Q.   What did you do when you noticed that the rent payments

15   weren't coming in as they had been in the past?

16   A.   I tried contacting Mr. Fred Khoshabe, because he said he

17   was the main contact.  And he actually became -- after several

18   months of not receiving the payments and contacting him over

19   time, he became -- the last I spoke with him, he became

20   really -- it was really uncomfortable speaking to him.  He

21   became kind of aggressive and said, I don't know.  I don't know

22   what you want from me.  I haven't received the payments.  And

23   just very harsh.

24        And I said, okay.  But how do I find out where --

25   what's happening?  And he said, I don't know.  You can call

1    Bert Rossini.  He knows.  He knows what's going on.

2    Q.  And before you had this conversation where he directed you

3    to Mr. Rossini, was there a point where you spoke with Mr.

4    Khoshabe about providing him bank account information so that

5    fund -- rent payments could be deposited into your account

6    directly?

7    A.  Yes, he did mention that.

8    Q.  I'm going to show you what's been marked as Government

9    Exhibit 25.  Do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's an e-mail from Mr. Khoshabe.

13   Q.  Is that a true and accurate copy of the e-mail that you

14   received?

15   A.  Yes.

16         MR. HOGSTROM:  Move to admit Government Exhibit

17   Khodi 25?

18         MR. FRANKEL:  No objection.

19         THE COURT:  Khodi Exhibit 25 is admitted in evidence.

20      (Said exhibit was received in evidence.)

21   BY MR. HOGSTROM:

22   Q.  So I want to -- first I'm going to turn to the second page.

23   Actually the first -- the end of the first page spills over

24   into the second page.  But this is an e-mail chain, is that

25   correct?

1    A.   Correct.

2    Q.   And the way that it is printed out, the e-mail is in

3    reverse order, is that right?

4    A.   Yes.

5    Q.   So I'm going to start at the bottom of the page.  Is there

6    first an e-mail from you to Fred Khoshabe on July 9 of 2012?

7    A.   Yes.

8    Q.   And I will go to the second page, so we can read the

9    content of that document.

10         What is this a reference to?  It says:  Pleasure

11   meeting with you.  Here is a check per your request.

12   A.   Yes.  That was a check that he -- they wanted a void check

13   to be provided so that they could do a direct deposit.

14   Q.   Who wanted the void check?

15   A.   Mr. Fred Khoshabe wanted it from me, but it was coming from

16   the group in Chicago.

17   Q.   And the purpose of this was to -- to fix irregularities

18   that you were having with the rent payments?

19   A.   Correct.

20   Q.   So let's go back then to the first page of the document and

21   go to the next e-mail in the chain.  Is this an e-mail from

22   Fred to you on the same day, July 9, 2012, in response?

23   A.   Yes.

24   Q.   And does it indicate that he is going to add your account

25   to a direct deposit?

1    A.   Yes.

2    Q.   Did you in fact after that receive a direct deposit that

3    you believed corresponded to rent payments?

4    A.   Yes.

5    Q.   And that was in July of 2012?

6    A.   Correct.

7    Q.   Okay.  So you just mentioned that you had sort of an

8    uncomfortable conversation with Mr. Khoshabe, and he ultimately

9    directed you to Bert Rossini, right?

10            Did you in fact then contact Mr. Rossini?

11   A.   I did.

12   Q.   Did you have his phone number at the time?  How did you --

13   A.   I believe it was provided in the e-mails, or in the groups.

14   I followed through with Devon Group, or possibly Mr. Fred

15   Khoshabe forwarded it to me.  I don't recall exactly.  But I

16   did have his number.

17   Q.   But you called the phone number that was -- you understood

18   from the e-mails was associated with Mr. Rossini, is that

19   right?

20   A.   With Bert Rossini, yes.

21   Q.   And who answered the phone when you called?

22   A.   Bert Rossini.

23   Q.   He introduced himself as Bert?

24   A.   Yes.

25   Q.   And from that point on, did you have several conversations

1    over the course of the next several months with him in this

2    same way, over the phone?

3    A.  Yes.

4    Q.  Did you ever meet him in person?

5    A.  I never did.

6    Q.  So that initial phone call when you called him and you had

7    been talking to Mr. Khoshabe about frustrations about not

8    getting rent payments, did you relay those frustrations to Mr.

9    Rossini?

10   A.  I did.

11   Q.  What -- what did he say?

12   A.  Bert Rossini always had answers to everything.  Somehow it

13   made sense when he explained things.  There was an excuse for

14   everything.  There was a -- just there was always something.

15   And it just made sense the way he explained it.

16        But he explained that the rents were having problem

17   because he was having -- there is a problem with Thomas -- at

18   first it was just the rents are being backlogged, and it's the

19   process of getting them.

20        Then it was that he is having a problem with Thomas

21   Murphy, the attorney, had actually committed fraud and sold

22   each of those notes to multiple individuals.

23   Q.  So let me back up.  Initially Mr. Rossini told you that

24   there was a problem in processing the rent payments?

25   A.  Yeah, and receiving them through the banks, through the

1   process of foreclosure, through --

2   Q.  Did he give you an indication of how and when that problem

3   would be resolved?

4   A.  He said -- he said there is absolutely nothing to worry

5   about, is what he would always say.  There's absolutely nothing

6   to worry about.  Everything is held into the account for you.

7   And its -- it's right there.  It's just, you know, through

8   processes of the court or bankruptcy or foreclosure, things

9   that are getting released.

10          At first it was that topic.

11  Q.  And then there came a point when he began talking to you

12  about Mr. Murphy?

13  A.  That's right.

14  Q.  And do you recall what he first told you about the supposed

15  issues he was having with Mr. Murphy?

16  A.  Well, he basically said that Mr. Murphy was doing some

17  illegal things in regards to the notes, and that he had hired

18  attorneys, and that he -- the attorneys, are following through.

19  Everything is okay.

20          He -- what Mr. Murphy had did was sell each note to

21  multiple individuals.  But rest assured, Kathy, your notes

22  are -- you're the first lienholder, and those properties are

23  yours.  There is nothing to worry about.  It's just the process

24  that we need to take.

25  Q.  When you were told by Mr. Rossini that Mr. Murphy had been

1  engaging in improper conduct with these notes, what was your

2  reaction?

3  A.  My reaction was, well, that's criminal activity.  Why

4  aren't you pursuing that criminally?

5  Q.  What was Mr. Rossini's response?

6  A.  I actually have an e-mail somewhere associated with that.

7  But he actually said that we cannot -- it's much better to go

8  after him on a civil suit because we'll get our money that way.

9  If we go after him criminally, we will not get any money.

10 Q.  Did he -- did Mr. Rossini at some point indicate to you

11 that he had pursued legal action against Mr. Murphy?

12 A.  Yes.

13 Q.  What did he tell you about that?

14 A.  He -- there is actually e-mails that he would forward to me

15 from different attorneys that would give him an undate on, you

16 know, the process of things that Murphy had agreed to.  And

17 that Murphy is cooperating because he doesn't want to be

18 criminally -- you know, involved into criminal activities and

19 such.  And he's cooperating, and he's following everything.

20       And everything is fine.  Everything is going to work

21 out.  It's just a process.  Just takes time.

22 Q.  Now, I'm going to show you what's been marked as Government

23 Exhibit Khodi 26, series of pages there.  Can you just quick

24 flip through them and tell me if you recognize them?

25 A.  Yes.

1  Q.  What are they?

2  A.  These are e-mails from Bert Rossini to me, giving me an

3  update on Thomas Murphy's case.

4  Q.  Are those true and accurate copies?

5  A.  Yes.

6       MR. HOGSTROM:  Government moves to admit Khodi 26?

7       MR. FRANKEL:  No objection.

8       THE COURT:  Khodi Exhibit 26 is admitted in evidence.

9    (Said exhibit was received in evidence.)

10 BY MR. HOGSTROM:

11 Q.  Now I want to turn first to page -- the first page of that

12 exhibit.  Is this an e-mail from Bert to you on April 28, 2013?

13 A.  Yes.

14 Q.  And is it entitled, update on lawsuit?

15 A.  Yes.

16 Q.  So at this point, had he already told you that there was a

17 lawsuit --

18 A.  Yes.

19 Q.  -- that he filed?

20       Now, can you just tell the members of the jury what

21 this e-mail says?

22 A.  Would like me to read it?

23 Q.  Sure.

24 A.  Okay.  It says:  Kathy, Tom Murphy signed an agreed order

25 with your -- with our attorney Rich Kruse, which I should have

1    tomorrow to send you.  The order compels Murphy to present us

2    the assignments, accounting and money within 21 days or face an

3    order for rule to show cause.  He --

4    Q.  Go ahead.

5    A.  He seems to be complying with the agreed order, and we

6    shall see what is coming in the next week or so.  I am happy

7    that he and his firm are cooperating with us at this point,

8    especially in subjecting themselves to the court without us

9    having to compel them.  Bert.

10   Q.  Now, at this -- during this period of time, you mentioned

11   that there had been -- you had been missing rent payments for a

12   while, is that right?

13   A.  Yes.

14   Q.  Was there a point in late 2012 when you were given a large

15   catch-up payment?

16   A.  Yes.

17   Q.  And was that in November approximately?

18   A.  July and November, I believe, yes.

19   Q.  Okay.  And were those funds that were supposed to be rent

20   payments that were directly deposited into your account?

21   A.  Yes.

22   Q.  Now, when you received those catch-up payments and then you

23   were having these communications about taking legal action

24   against Mr. Murphy, what was your overall feeling about --

25   about the situation, about the investment?

1   A.  At this time?

2   Q.  Yes.  At that time.

3   A.  After knowing that the -- there is an attorney involved and

4   there is a lawsuit against Murphy?  I started feeling better

5   because I -- Bert Rossini would forward e-mails from the

6   attorney to me kind of updating as well.  And I started feeling

7   better about the investments that, okay, they're okay.

8   There -- it's just a process, and they're going to, you know,

9   come about.

10   Q.  And during this time period, was he also giving you updates

11   about the original three properties that you invested in?

12   A.  Yes.

13   Q.  Okay.  Did you -- during this time period, did -- did he

14   discuss with you other types of investments he was involving

15   himself in?

16   A.  Yes.

17   Q.  Do you recall whether he asked you whether you would be

18   interested in some of them?

19   A.  I believe he did.

20   Q.  I'm going to turn -- have you turn to the second page of

21   that Government Exhibit 26.  And first page, is this an e-mail

22   on April 30, 2013, from Mr. Rossini to you?

23   A.  Yes.

24   Q.  And the subject, it says, Rockford portfolio.

25   A.  Correct.

1  Q.  And the body of the e-mail says:  I'm not sure if you're

2  interested in this portfolio.  But I can get it priced at

3  1.5 -- $1,537,000.  And then there's some more information.

4  The negative is it must be done very quickly.

5           What was this e-mail about?

6  A.  This e-mail was about a note portfolio.

7  Q.  What is a note portfolio?

8  A.  Not portfolio is a pool of mortgages.  Notes are like

9  mortgages to a property.

10          So there is a pool of mortgages.  So some mortgages

11  that are paying on time, those are called performing notes,

12  which means they are paying, making their payments on time on

13  their properties.  And you're getting -- you become like a bank

14  when you purchase the note.  And you -- so they pay the rent to

15  you.  They pay the mortgage to you.

16          So this pool was a pool of some properties that had

17  notes that were performing.  So mortgages that were performing,

18  that were paying.  And some notes, mortgages, that were not

19  making payments on the mortgages, that were in default.  So

20  going through some type of foreclosure.

21          So some of them already had been going through the

22  process of foreclosure, and some of -- some were in the -- you

23  know.

24  Q.  And you would be purchasing the pool, is that correct?

25  A.  Correct.  That's what I was offered.

1  Q.  And what would you be receiving after you purchased the
2  pool?
3  A.  So I was to receive the monthly mortgages that was coming
4  in on the mortgages that were making payments.  And on the
5  others, you know, you go through the process of either trying
6  to work with the homeowner and bring down their interest rate
7  to make them become, you know, performing.  Or you go through
8  the foreclosure process and take the property back and either
9  sell it or rent it or --
10 Q.  Okay.  I'm going to turn to the next page, if you would.
11 A.  Uh-huh.
12 Q.  Is this an e-mail dated May 6, 2013, from Mr. Rossini to
13 you, titled, Rockford notes and other transactions?
14 A.  Yes.
15 Q.  And this e-mail indicates that, last week they made the
16 Rockford transaction very lucrative.  I have not received a
17 return correspondence by e-mail.  So call me if you are
18 interested.
19         What was -- what was your understanding of what you
20 were being asked here?
21 A.  My understanding was to contact Bert Rossini in regards to
22 learning more about the Rockford note pool.
23 Q.  Were you interested?
24 A.  I was interested.
25 Q.  Okay.  Now, turning to the next page of that document.  Is

1  this an e-mail dated May 20, 2013, titled, Rockford package

2  from Mr. Rossini?

3  A.  Yes.

4  Q.  Okay.  And does it indicate:  I sent you the contracts,

5  notes yesterday, also send by gmail tonight.  And then does it

6  list wire instructions?

7  A.  Yes.

8  Q.  And what were the -- what was the wire instruction -- what

9  were the wire instructions for?

10  A.  The wire instructions were to purchase the Rockford

11  portfolio.

12  Q.  And were you giving a price?

13  A.  I was.

14  Q.  What was the price?

15  A.  $395,000.

16  Q.  This bank account that you were -- were you being told that

17  you would be wiring funds to this bank account, is that right?

18  A.  Yes.

19  Q.  It says, for credit to Rockford Commercial?

20  A.  Correct.

21  Q.  What is Rockford -- what did you understand Rockford

22  Commercial was?

23  A.  I understood Rockford Commercial to be an individual

24  company that I was purchasing the notes from.

25  Q.  You understood that the Rockford Commercial was the company

Khodi - direct                                              497

1   that owned the notes, and you were buying them from --

2   A.  That's right.

3   Q.  What was your understanding how Mr. Rossini would be making

4   money on this transaction?

5   A.  He told me that there was a $95,000 commission on that

6   395,000 that I was paying, that that was his commission.

7   Q.  So 300 would be going to Rockford Commercial for the

8   purchase of the notes, and you would be receiving -- he would

9   be receiving $95,000 commission?

10  A.  Correct.  Because I did ask how he -- I asked.

11  Q.  Did you have any understanding at that time, did he give

12  you any indication, that he, Mr. Rossini, himself was involved

13  with the company Rockford Commercial?

14  A.  No.

15  Q.  Did you have -- did he give you any indication or did you

16  have an understanding from him that he -- he was involved along

17  with Thomas Murphy in -- with Rockford Commercial?

18  A.  No.

19  Q.  Did you in fact make a wire payment for $395,000 for the

20  Rockford note pool on May 20?

21  A.  Yes, I did.

22  Q.  To that account?

23  A.  Yes.

24  Q.  What -- when you made that wire transfer, what was your

25  expectation of what would happen?

Khodi - direct
498

1   A.   The Rockford -- they were supposed to be transferred into
2   the Khodi trust name.  Those --
3   Q.   Your family trust?
4   A.   Yes.  They were supposed to be transferred into that.  So
5   the name was to go --
6   Q.   They -- I'm sorry.  Go ahead.
7   A.   It was supposed to go into, you know, my account and my
8   name, the titles of the pool.
9   Q.   Did you have an understanding of when that would occur?
10  A.   It was supposed to be pretty immediate.  I mean, I was
11  purchasing them.
12  Q.   Okay.  And what about the payments that you would be
13  receiving out of the pool?
14  A.   The payments were supposed to come directly to me.
15  Q.   And did you have an estimate of what those payments -- what
16  amount those payments were supposed to be?
17  A.   I believe it was roughly 32,000 some odd dollars monthly on
18  the performing.
19  Q.   So the mortgages that were being paid on time, that money
20  would total approximately $32,000?
21  A.   I believe, yes.
22  Q.   Did you -- did you have a sense of how long it would be
23  before you received those -- that roughly $30,000?
24  A.   That, according to him, was supposed to be immediate.
25  Q.   Did you receive it immediately?

1   A.  No.

2   Q.  What was -- what was your -- what did you do in response to

3   not receiving it immediately?

4   A.  Well, I contacted him, and I asked him questions in regards

5   to it.  But there was always, as I said, an answer.

6   Q.  Okay.  Did you ultimately, after talking to him about it,

7   have your concerns allayed for that time period?

8   A.  Yes.

9   Q.  Okay.  After that, in July of 2013, were you -- did he talk

10  to you about another real estate transaction?

11  A.  Yes.

12  Q.  I'm going to show you what's been marked as Government

13  Exhibit Khodi 27 and Khodi 28.  Do you recognize those?

14  A.  Yes.

15  Q.  What are those documents?

16  A.  These documents are documents on the Riverdale townhomes.

17  Q.  Are those true and accurate copies of documents --

18  A.  Yes.

19  Q.  -- that you received at the time?

20          MR. HOGSTROM:  Government moves to admit 27 and 28.

21          MR. FRANKEL:  No objection.

22          THE COURT:  Khodi Exhibits 27, 28 are admitted in

23  evidence.

24      (Said exhibits were received in evidence.)

25  BY MR. HOGSTROM:

1    Q.  I'm putting on the screen Khodi 27.  Is this an e-mail on

2    July 11, 2013, from Mr. Rossini to you, titled Riverdale

3    returns?

4    A.  Yes.

5    Q.  Okay.  And can you just read for the jury what it says?

6    A.  Dear Kathy.  Here is something to look at on the Riverdale

7    properties.  I have completed a financial return based on all

8    net income paid to the investor on the actual net income as of

9    today, and the net income as of today with the vacant units

10   being rented as Section 8 rent.  Bert.

11   Q.  Was this a reference -- was this e-mail in reference to a

12   prior phone conversation you had with him?

13   A.  Yes.

14   Q.  Do you recall what he told you about what's referenced here

15   as Riverdale properties?

16   A.  Yeah, because I actually did not want to make any more

17   investments with Bert Rossini.  And I mentioned that to him.

18   And he said, this is actually not an investment.  You're not

19   buying notes.  You're not buying anything from me.  You're

20   purchasing this from the seller, who's an Israeli investor who

21   has -- unfortunately is losing all of his properties and

22   assets.

23         Therefore, you are not buying -- this is just --

24   you're buying this directly from the seller.

25   Q.  What was it that you would be buying?

1   A.   On the first $225,000 was 16 townhomes in Riverdale.

2   Q.   Riverdale, Illinois?

3   A.   Yes.

4   Q.   And so it was your understanding that you -- you would be

5   purchasing these directly from a seller.  And Mr. Rossini's

6   role would be essentially as a real estate broker --

7   A.   Exactly.

8   Q.   -- correct?

9        Did this -- was there some material attached to this

10  e-mail?  Turn to the second page.

11  A.   Uh-huh.

12  Q.   And do you see this document that's titled, Riverdale homes

13  actual?

14  A.   Yes.

15  Q.   Is this financial information about these townhomes and

16  about rental returns and expenses?

17  A.   Yes.

18  Q.   And turning to the third page of this document, is there

19  another set of numbers and information with the heading, actual

20  and pro forma rents?

21  A.   Yes.

22  Q.   Now, I'd like to turn to Government Exhibit 28.

23       Before we talk about this, did you give an indication

24  to Mr. Rossini that you might be -- you were being interested

25  in purchasing these townhomes?

Khodi - direct                           502

1   A.  Yes.

2   Q.  Okay.  On July 11, did Mr. Rossini send you an e-mail with

3   a title, wire transfer info?

4   A.  Yes.

5   Q.  And is this again the bank account information for Rockford

6   Commercial?

7   A.  Yes.

8   Q.  And what was your understanding why you were receiving this

9   with -- bank account information?

10  A.  This was to purchase the Riverdale properties.

11  Q.  Okay.  And did you in fact wire funds pursuant to this

12  instruction on or about this date, or shortly thereafter?

13  A.  Unfortunately, yes.

14  Q.  And that was for $225,000?

15  A.  Yes.

16  Q.  What was your understanding when you wired the funds of

17  what would happen?

18  A.  My understanding was that I was to get title on the

19  properties.  They are actual properties being sold by an

20  individual that owns the properties, and I was to get title on

21  them.

22  Q.  And did that in fact happen?

23  A.  No.

24  Q.  After that -- that wire transfer -- let me back up.

25          How long did you -- were you told it would take for

1   the title to be given over to you for those properties?

2   A.  Well, it was supposed to go through regular title process

3   timeframe.  So I was assuming between 30 to 45 days is what

4   was --

5   Q.  Okay.  So this was like 30 to 45-day closing period?

6   A.  Exactly.

7   Q.  So if you wired the money in the middle of July, you would

8   have expected to receive the title by the end of August, is

9   that fair?

10  A.  Yeah.

11  Q.  Before you got to the end of August, was there -- did Mr.

12  Rossini talk to you about additional Riverdale properties?

13  A.  Yeah, he had originally talked about them.  And I said I

14  would just make the initial investment.  And then I was waiting

15  for the title to come.

16          But he called and said, okay, you need to pay for the

17  rest of the properties in Riverdale.  And I said, well, what

18  if -- you know, I haven't received the title to the others yet.

19  And he actually -- it was very uncomfortable speaking with him.

20  He became -- he is -- he was always very cordial and

21  charismatic and very nice to talk to over the phone, and very

22  convincing.

23          And this conversation was super uncomfortable.

24  Q.  In what way?

25  A.  It was almost as if -- if I didn't do this, you know --

1   Q.  If you didn't do it, what?

2   A.  You know --

3           MR. FRANKEL:  Judge, objection.

4   BY THE WITNESS:

5   A.  Felt --

6           THE COURT:  Hold on for a second.

7           Sustained.  Why don't you ask her what was said.

8   BY MR. HOGSTROM:

9   Q.  Why were you uncomfortable?

10          THE COURT:  No, rephrase the question.

11  BY MR. HOGSTROM:

12  Q.  What about the conversation that you had with the defendant

13  made you uncomfortable?

14          MR. FRANKEL:  Objection.

15          THE COURT:  Sustained.

16  BY MR. HOGSTROM:

17  Q.  What was your impression of his tone?

18          MR. FRANKEL:  Objection.

19  BY WITNESS:

20  A.  His tone --

21          THE COURT:  Overruled.

22  BY THE WITNESS:

23  A.  -- was -- I was fearful.  I was fearful, is the best way to

24  say it.

25  BY MR. HOGSTROM:

Khodi - direct                    505

1    Q.  What did he say?

2    A.  He said, you said you were going to make the payment.  You

3    need to make the payment.  He was just very abrupt and just

4    very -- it was very uncomfortable.  And I was very fearful.

5            And so I said, okay.

6    Q.  What was the payment that you were supposed to be making?

7    A.  184,000 and five -- 184,500.

8    Q.  And did you make $184,000 payment?

9    A.  Unfortunately I did.

10   Q.  Was that by wire?

11   A.  Yes.

12   Q.  To the same bank account?

13   A.  Yes.

14   Q.  Was that in August of 2013?

15   A.  Uh-huh.  Yes.

16           THE COURT:  Mr. Hogstrom, it's past 12:30.  Would now

17   be a good time for a break?

18           MR. HOGSTROM:  It would be.

19           THE COURT:  All right.  So, ladies and gentlemen, we

20   will take our lunch break.  We will reconvene at 1:35.  During

21   the break, please do not discuss this case with anyone,

22   including one another.  And please do not do any independent

23   research regarding any of the topics that you heard discussed

24   in this case.

25           Thank you very much for your attention this morning.

1        (Jury exited the courtroom.)

2             THE COURT:  Ms. Khodi, we will break until 1:35.

3    During the break, please do not discuss the testimony with

4    anyone.

5             THE WITNESS:  Okay.  Thank you.

6             THE COURT:  Thank you.  We are in recess.

7             THE WITNESS:  Shall I leave --

8             THE COURT:  You can leave it right there.

9        (Trial recessed until 1:35 o'clock p.m. of the same day.)

10                         CERTIFICATE

11            I HEREBY CERTIFY that the foregoing is a true, correct

12   and complete transcript of the proceedings had at the hearing

13   of the aforementioned cause on the day and date hereof.

14

      /s/Alexandra Roth                        6/9/2018
15   _____    _____
      Official Court Reporter                     Date
16   U.S. District Court
      Northern District of Illinois
17   Eastern Division

18

19

20

21

22

23

24

25

507

1               IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )    Docket No. 15 CR 515-1
                           )
4           Plaintiff,       )
                           )
5   v.                   )    Chicago, Illinois
                           )    June 7, 2018
6  ALBERT ROSSINI,          )    1:35 o'clock p.m.
                           )
7           Defendant.       )

8                    VOLUME 3B
            TRANSCRIPT OF PROCEEDINGS - TRIAL
9      BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10  APPEARANCES:

11  For the Government:       HON. JOHN R. LAUSCH, JR.
                        United States Attorney, by
12                    MR. ERIK A. HOGSTROM
                        MR. WILLIAM PATRICK NOVAK
13                    Assistant United States Attorneys
                        219 South Dearborn Street
14                    Chicago, Illinois  60604

15  For the Defendant:        LAW OFFICES OF JOSHUA B. ADAMS,
                        P.C., by
16                    MR. JOSHUA B. ADAMS
                        53 West Jackson Boulevard
17                    Suite 1515
                        Chicago, Illinois  60604
18
                        FRANKEL & COHEN, by
19                    MR. SCOTT JAY FRANKEL
                        53 West Jackson Boulevard
20                    Suite 1615
                        Chicago, Illinois  60604
21

22               ALEXANDRA ROTH, CSR, RPR
                  Official Court Reporter
23            219 South Dearborn Street
                     Room 1224
24             Chicago, Illinois 60604
                  (312) 408-5038
25

1          THE CLERK:  15 CR 515, USA v. Rossini.

2          THE COURT:  Are we ready?

3          MR. HOGSTROM:  Judge, there's one -- there's one

4     issue to raise before the witness comes back.  We expect

5     Mr. Murphy will testify -- not the next witness but the

6     following one after a short witness.  During opening

7     statements and at points in cross, there's been suggestions,

8     references, to Mr. Murphy being disbarred and to having stolen

9     client funds.

10          As your Honor may or may not recall, part of the

11    conduct that he pled guilty to or was included in the factual

12    basis of his plea agreement as relevant conduct was two

13    instances in which he took client funds in transactions where

14    Mr. Rossini was his partner; and very similar to the conduct

15    alleged in the indictment, although not charged in the

16    indictment.  Essentially the admission being that there was a

17    proposed real estate transaction.  They took in funds for

18    earnest money or --

19          THE COURT:  Hold on.

20      (Brief pause.)

21          THE COURT:  Go ahead.

22          MR. HOGSTROM:  That funds were taken in for earnest

23    money or for -- otherwise to be used for the transaction and

24    Murphy deposited it into a bank account, and then he and

25    Mr. Rossini disbursed the funds for their own benefit.  That's

1    what he admitted to in his plea agreement.

2         It was our intention, in preparing Mr. Murphy's

3    testimony, that we were not going to go into that.  We prepped

4    him that we're not going to discuss it on direct examination;

5    he should avoid talking about it.  The portion where we -- of

6    the direct examination where we cover his background with

7    Mr. Rossini is sort of deliberately vague about his prior

8    dealings.

9         However, if the defense is going to, on cross-

10   examination, question him about having stolen client funds in

11   the past, presumably for the purpose of suggesting that

12   Mr. Rossini may have been similarly some sort of an unwitting

13   client victim of his, then that would open the door to the

14   response being that Mr. Rossini of course would not have been

15   unwitting and been -- having been taken in by this shady

16   attorney when, in fact, in the past, there's evidence that in

17   the past he had worked with him on these same types of

18   transactions and done the same thing.

19        You know, in all, it would be our preference for the

20   issue not to come in at all.  But obviously it seems to be

21   part of the defense strategy.  And so we wanted to flag it

22   just -- and get the Court's ruling one way or the other before

23   Mr. Murphy testifies as to whether -- if it's brought up on

24   cross-examination whether it's a subject matter that we can go

25   into on redirect examination.

1          And for the Court's consideration, my intention would

2     be that on redirect examination, I would ask a pretty short

3     series of questions about it, simply that the subject matter

4     of his disbarment included a transaction where he was business

5     partners with Mr. Rossini and that he was found by ARDC to

6     have taken in funds and that he and Mr. Rossini used them for

7     their benefit.  I wouldn't go into a whole lot more detail

8     than that.  But I think it's important -- I think it would be

9     misleading to the jury if they didn't have the context that

10    this conduct was engaged in with the defendant who is now

11    claiming that he had no idea that Mr. Murphy might have been

12    involved in ciphering client funds for his own use.

13          Oh, and Mr. Novak just reminded me, Mr. Murphy -- we

14    also expect that Mr. Murphy would testify that he -- if he was

15    asked -- that when this -- the scheme that's alleged in the

16    indictment was originally proposed to him by Mr. Rossini, that

17    it was described as one of the -- a way that they could pay

18    back the clients that were the victims of the client -- the

19    stealing of client funds that caused the disbarment.  So he

20    would testify that the motivation for starting this conduct

21    was tied in to that prior activity.

22          THE COURT:  But you wouldn't raise that in your

23    direct?

24          MR. HOGSTROM:  We would not.

25          THE COURT:  All right.  Who is going to

1    cross-examine?

2           MR. ADAMS:  I am, your Honor.

3           THE COURT:  How do you intend to -- well, let me --

4    I'll just open it up to you.  Do you have a response?

5           MR. ADAMS:  Yes.  First, bringing up any uncharged

6    conduct between Mr. Rossini and Mr. Murphy, we think, is

7    impermissible 404(b) evidence, first of all.

8           Second, if we were to cross him on prior instances of

9    dishonesty, I don't see how that opens the door to bringing in

10   other instances of uncharged conduct of Mr. Rossini.  There

11   are instances in the ARDC complaint of Mr. Murphy's wrongful

12   conduct that do not implicate Mr. Rossini; that happened

13   decades before he met Mr. Rossini.  I think those,

14   respectfully, Judge, are fair game and do not open the door to

15   any sort of -- of this 404(b) evidence.

16          Even if we were to bring up that he took the clients'

17   money, we also don't think that opens the door to bring up

18   prior conduct or any sort of instances of dishonesty between

19   Mr. Murphy and Mr. Rossini.

20          THE COURT:  Well, with regard to the prior conduct

21   that involved both Mr. Murphy and Mr. Rossini, I'm looking

22   for -- I'm trying to find that in his plea.

23          MR. HOGSTROM:  Judge, it's the first -- second

24   paragraph of the factual basis, which should be on page 6, I

25   think -- no, page 3.  It starts on page 3 -- yes, it starts on

1   the top of page 3. And there's two instances that are

2   described. One -- the first one is related who -- the person

3   is described as victim DK, which is a woman named Doris Kling.

4   That transaction was not part of the ARDC suit that caused his

5   disbarment but it was a prior instance in which the two --

6          THE COURT: Hold on. Let me just read it.

7    (Brief pause.)

8          THE COURT: So with regard to the instance involving

9   Mr. Murphy and Mr. Rossini, what are you going to ask him?

10         MR. ADAMS: I am not going to get into this conduct

11  on page 3. I specifically tailored my cross not to get into

12  this.

13         THE COURT: So starting on page 3 and going on to

14  page 4, so it's FA and with DK?

15    (Brief pause.)

16         THE COURT: Those are the two transactions, right?

17         MR. HOGSTROM: Yes.

18         MR. ADAMS: I'm not getting into that either, your

19  Honor.

20         MR. HOGSTROM: So in -- I would agree with the

21  defense that it's probative of truthfulness. And in that

22  sense, it is generally appropriate for cross. The problem is

23  that it was already suggested in openings and has been

24  suggested, I think, through the cross that that is not -- even

25  if that is an inference the jury should draw from it, that is

513

1   not the only inference they're going to argue about it.

2   They're going to argue not just that you shouldn't believe Tom

3   Murphy's testimony because he previously stole client funds.

4   They're going to argue that Mr. Rossini in some form of

5   advice-of-counsel defense was relying on this attorney and did

6   not knowingly or intentionally involve -- commit fraud

7   because, in fact, he was the one who was being defrauded by

8   his attorney and this attorney was stealing funds from clients

9   and he was the client.

10          So if that is the argument they're going to make,

11  then I think it's highly misleading to the jury if that

12  context isn't provided.  If they're going to forgo making that

13  argument or suggesting that in any way to the jury, then I

14  think we would be -- we would withdraw our objection to

15  getting into this area.  If it is exclusively for the purpose

16  of probing his truthfulness, then we wouldn't object to that.

17          THE COURT:  So the question becomes, Mr. Adams,

18  Mr. Frankel, are you going to argue at closing that

19  Mr. Rossini was either -- was duped by Mr. Murphy into

20  believing that these transactions were legitimate based

21  upon -- and use Mr. Murphy's prior issues with the ARDC to

22  support such an argument?

23          MR. ADAMS:  Your Honor, I do not mean to be evasive

24  to the Court.  I don't know yet.  I want to see how Mr. Murphy

25  comes off on direct.  I want to see what he gives on cross.

514

 1    And I believe that -- respectfully, I think the jury can make

 2    either inference based on the evidence before them.

 3          THE COURT:  Well, sure, the jury can make whatever

 4    inference they believe is reasonable.  But if you're going to

 5    argue that Mr. Rossini was an innocent bystander, had no idea

 6    about, you know, that Mr. -- I mean, just -- let me

 7    paraphrase.  Had no idea, you would argue, that Mr. Murphy was

 8    this -- was a crook and that he was just led down the primrose

 9    path by Mr. Murphy and argue to the jury, look, you know, of

10    course Mr. Murphy he's done all this bad stuff in the past

11    too; Mr. Murphy is the crooked one and he just convinced

12    Mr. Rossini to follow him.  If that is going to be the

13    argument at closing, I'm going to let the government get into

14    this because I believe that the -- I do agree with the

15    government that it would be -- it would leave an unfair

16    impression upon the jury that Mr. Rossini had no involvement

17    in -- or had no knowledge of Mr. Murphy's history of

18    misconduct, for lack of a better word.

19          MR. FRANKEL:  Judge, there's a lot of evidence in the

20    case that Murphy was the main actor in this scheme.  He got

21    all the checks for a long time.  He talked -- he had that

22    important meeting where he was calming some of the investors.

23    He was giving people advice.  He was giving an imprimatur of

24    legal activity just by being a member of a law firm and

25    showing up.  I think it's a fair argument to make based on the

1   evidence that we have.

2          And if we avoid the specific instance of Rossini and

3   Murphy engaging in some separate fraudulent activity together,

4   which we plan to, there's still enough in Murphy's background,

5   just through the ARDC complaint, that he had stolen from

6   clients; he had violated a trust; he had -- you know, done --

7   he had acted corruptly as a lawyer and gotten disbarred as a

8   result.  So that further reinforces that he had an important

9   corrupt role to play here.  I think that's a fair argument to

10  make even without opening the door.

11         THE COURT:  Right.  And you have that evidence

12  already.

13         MR. FRANKEL:  Right.

14         THE COURT:  And so I take it that the government --

15  if they're not going to get into these issues, right, and they

16  get into Mr. Murphy's background and they argue that

17  Mr. Murphy was basically the instigator of all -- the

18  mastermind behind all of this and Mr. Rossini was not, that,

19  to me, seems like a different argument than the argument

20  you're trying to get out.

21         MR. HOGSTROM:  I agree.  And I fully expect that is

22  the argument.  But if a component of the argument about

23  Mr. Murphy is he, Mr. Murphy, is crooked and stole --

24  mishandled in some way or mistreated in some way his client,

25  Mr. Rossini, and that Mr. Rossini was unaware that Mr. Murphy

1    was somebody that shouldn't be dealt with or somebody who

2    would steal client funds or mishandle client funds, then I

3    agree with what your Honor said, that it leaves -- it would

4    leave an unfair impression to the jury about the overall

5    circumstances.  The general idea --

6          THE COURT:  Hold on.  It's a fine line, right, and so

7    I think that Mr. Hogstrom is correct.  There's nothing

8    improper with the argument, Mr. Frankel, as you presented it.

9          MR. FRANKEL:  Okay.

10         THE COURT:  Okay.  However, if there's the added

11   element of this notion that Mr. Rossini had no idea that

12   Mr. Murphy was crooked, right, or that if somehow Mr. --

13   right.  And that he trusted Mr. Murphy because he was -- he

14   knew him to be an honest, law-abiding lawyer, right, if you

15   get into those elements, those elements would raise the

16   concerns that the government is expressing.  As opposed to a

17   more straightforward argument that, look, Mr. Murphy is a

18   lawyer, he's -- he admitted to all -- he admitted to the

19   offenses that are at issue here.  You know, he was the one

20   doing all this, and yet there's no evidence that Mr. Rossini

21   is.  If you do it that way, then I don't think the government

22   has any objection.  Is that correct?

23         MR. HOGSTROM:  That's correct.

24         MR. FRANKEL:  I think we can live within those

25   bounds.

Khodi - direct

517

```
 1            THE COURT:  Okay.  All right.  So just as we go

 2  forward, so you aren't -- Mr. Adams, you aren't going to get

 3  into the incidents involving DK and RK; is that correct?

 4            MR. ADAMS:  Correct, your Honor, I'm not.

 5            THE COURT:  Okay.  Let's bring them in.

 6      (Jury in.)

 7            THE COURT:  Ms. Khodi, you understand you're still

 8  under oath, ma'am?

 9            THE WITNESS:  Yes.

10            THE COURT:  You may continue, Mr. Hogstrom.

11        KATHY KHODI, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION (Resumed)

13  BY MR. HOGSTROM:

14  Q.  Good afternoon, Ms. Khodi.

15            When we left off, we had talked about the last wire

16  that you sent related to the Riverdale property in August.

17  Before we move on from that, I want to -- I just want to take

18  a few steps back in time right before you -- that wire was

19  sent and talk about a couple other interactions that you had

20  with -- with Mr. Rossini.

21            THE COURT:  Mr. Hogstrom, I'm going to ask you to

22  bring the mic closer to you as well.

23            MR. HOGSTROM:  Sure.

24  BY MR. HOGSTROM:

25  Q.  And I'm going to approach and show you Government Exhibit
```

Khodi - direct

518

1    Khodi 29, Khodi 34, and Khodi 30.

2           I ask you to take a quick look at each of those and

3    tell me if you recognize them.

4    A.   Thank you.

5      (Brief pause.)

6    BY THE WITNESS:

7    A.   I do recognize 29 and 30.  34 I don't remember seeing.  It

8    was never given to me.

9    BY MR. HOGSTROM:

10   Q.   Okay.  Let's talk about 29 and 30.  Did -- are those fair

11   and accurate copies of the documents that you've seen before?

12   A.   Uh-huh, yes.

13          MR. HOGSTROM:  I move to admit Khodi 29 and 30.

14          MR. FRANKEL:  No objection.

15          THE COURT:  Khodi 29 and 30 are admitted in evidence.

16     (Khodi Exhibit No. 29 and 30 received in evidence.)

17   BY MR. HOGSTROM:

18   Q.   So Government Exhibit 29 is on the screen now.  And is

19   this an e-mail from Mr. Rossini to you on August 13th of 2013?

20   A.   Yes.

21   Q.   Now, is that -- that was approximately a week and a half

22   before the last wire that you sent for the Riverdale

23   properties, correct?

24   A.   Correct.

25   Q.   In the body of this e-mail -- and it's long, so I'm not

Khodi - direct

1    going to ask you to read all of it, but could you just read

2    the first four sentences of that paragraph, please.

3    A.   Kathy, two of the checks from the bankruptcy court was a

4    double endorsement of the Rockford bank and U.S. -- and us and

5    Bank America -- U.S. and Bank America held it for 14 days.

6    Since I wrote you one check for the entire amount, I did not

7    have enough available funds to clear the check when it came

8    back through Bank of America.

9         Is that all or do you want me to --

10   Q.   Read the next two sentences.

11   A.   Had I known I have -- I would have held off on writing the

12   check.  I just realized this when I returned from Minneapolis.

13   Q.   And then one more.  Sorry.

14   A.   I have deposited the $30,000 in money orders to your

15   account to cover the returned payment.

16   Q.   Okay.  What is this a reference to?

17   A.   This is in reference to the performing mortgages or notes

18   on the Rockford portfolio purchase.

19   Q.   And you said earlier that -- that you expected to receive

20   $30,000 approximately from the Rockford note pool?

21   A.   Correct.

22   Q.   And that was the first investment that you made with him

23   after things supposedly went south with Mr. Murphy?

24   A.   That is right.

25   Q.   Okay.  Did -- there's a reference to funds not clearing.

Khodi - direct

1   Did you know what that was about?

2   A.   Basically, he justified that as he had a lot more checks

3   going out than money in the account and that everything is

4   fine.

5   Q.   So --

6   A.   There's plenty of money now and he's --

7   Q.   So there was a bounced check?

8   A.   Yes.

9   Q.   And then it indicates that he has deposited $30,000 in

10  money orders into your account.  Around that time, did you, in

11  fact, receive a $30,000 deposit?

12  A.   Yes.

13  Q.   And you understood that to be a deposit from Mr. Rossini?

14  A.   Yes.

15  Q.   Okay.  Was that shortly before the last wire that you made

16  on the Riverdale property?

17  A.   Yes.

18  Q.   When you received the $30,000, did that -- what did that

19  make you think about all of this interaction you were having

20  with the defendant and about the investments or purchases he

21  was offering you?

22  A.   Well, I thought they were legitimate.  It's just taking

23  the process for things to happen.

24  Q.   Now, I'm going to highlight another portion of this first

25  paragraph, right at the bottom.

Khodi - direct

521

1          It says -- starting with:  I have waited to send you

2   a package with documents from Rockford and Riverdale until you

3   return home since I did not know if you would have someone to

4   receive the package and did not want the originals to be lost.

5          What is that a reference to?

6   A.  That was supposed to be a package with the deeds of the

7   properties of Riverdale coming to me.

8   Q.  So that was the second wire that you sent, which was for

9   those 16 Riverdale townhomes for $225,000?

10  A.  Yes.

11  Q.  And you were expecting still to receive the deeds to

12  those?

13  A.  Yes.  So all the deeds were supposed to come together

14  apparently from the original 16-plus investments.

15  Q.  The second paragraph of this e-mail, could you read what

16  that says?

17  A.  Riverdale is ours and awaiting village inspection and then

18  will be able to send titles at the end of this week.  Money

19  will be received from Section 8 by the end of this month for

20  July and August.  Starting September, we will receive the

21  rents directly into your account.

22  Q.  What did you understand him to be explaining here?

23  A.  I understood him saying that the deeds are going to be

24  transferred into my name, the titles, and that -- there was

25  always something.  So apparently there had to be an inspection

Khodi - direct

1    done on these properties before we could get the deeds or get

2    the title.

3    Q.  That's what --

4    A.  So --

5    Q.  That's what he told you?

6    A.  That's what he told me, yes.

7           And there's -- I believe there's an e-mail to

8    reference that that I have somewhere.

9    Q.  The third paragraph, can you read what that says?

10   A.  Additionally, we will finally get the deed on 3650 West

11   Polk at the end of August, together with all monies held by

12   the receiver over the past year.  Still waiting to hear about

13   the buyer on 2323 West Haddon.

14   Q.  What did you understand those two -- the references to

15   those two properties, what do you understand him to be saying?

16   A.  Well, he had been telling me that the deed to Polk Street

17   is ready and that it's coming; he has to go pick it up.  And

18   that -- well, I assumed that he's picking up the deed to Polk

19   Street that's going to be titled in my name.  And he was

20   trying to find a buyer for west Haddon to buy the note because

21   I didn't feel comfortable keeping the properties at that time.

22   Q.  Now, I want to turn your attention to Government Exhibit

23   Khodi 30.  Is this an e-mail from August 20th of 2013 from

24   Mr. Rossini to you referencing:  Forward:  Riverdale deeds?

25   A.  Yes.

Khodi - direct

1    Q.   Now, this was -- was -- let me strike that.

2            Was the date that you wired the last wire to him

3    for -- related to Riverdale after what you described as that

4    uncomfortable conversation -- was the date of that

5    August 22nd, 2013?

6    A.   It might have been.  It was late August.

7    Q.   You're not sure?

8    A.   I'm not.  But I do have documentation in regards to that.

9    It's just -- it's been a while.

10   Q.   That's okay.

11   A.   Yeah.

12   Q.   This e-mail, the date of this e-mail, August 20th, 2013,

13   does that, to your memory --

14   A.   Yeah.

15   Q.   -- seem to be around the same time?

16   A.   Yes, yes.

17   Q.   Okay.  Now, I've highlighted part of the body of this

18   e-mail.  Can you please read the first paragraph?

19   A.   Kathy, here are the deeds and affidavits to the City of

20   Riverdale in regard to the inspection on this Friday.  Once

21   the point-of-sale inspection takes place, I can record the

22   deeds at the Cook County Recorder's Office.  They will not

23   allow them to be recorded until the inspection, and that is

24   why I have not already placed them into the Khodi trust.  In a

25   second e-mail, I am sending all the insurance papers on the

Khodi - direct

1    buildings.  Again, once we get through the inspection, I will

2    change the insurance to the Khodi Family Trust.

3    Q.  So now I want to go to the next couple pages of this

4    document.  Are there attachments to this e-mail?

5    A.  There may be.

6            Yes, it looks like there is, uh-huh.

7    Q.  So turning to the third page.

8    A.  Uh-huh.

9    Q.  Do you see that?

10           What is this document?

11   A.  I have no idea.

12   Q.  It says warranty deed on the top?

13   A.  Yeah.

14   Q.  I'll scroll down to near the bottom, and I'm highlighting

15   a section that references a permanent real estate index number

16   and an address.  What is that?

17   A.  I assumed that's the property APN number.

18   Q.  And the title of this e-mail and the text we just read

19   indicated that he was sending you deeds; is that right?

20   A.  That's right.  That's what I was expecting.

21   Q.  Now, highlighting the third paragraph, does it state that

22   it's a covenant and promise agreed with the party of the

23   second --

24           THE COURT:  Mr. Hogstrom, you have to slow down.

25           MR. HOGSTROM:  I'm sorry.

Khodi - direct

1    BY MR. HOGSTROM:

2    Q.  Does this paragraph indicate that it's a covenant, promise

3    and agreed to and with the party of the second part, Khodi

4    Family Trust 2008, heirs and assigns -- and I'm skipping

5    forward -- that it will warrant and defend as to all matters

6    of title?

7    A.  Yes.

8    Q.  Okay.  And turning to the second page of this document,

9    who signed this?

10   A.  Albert Rossini.

11   Q.  And that was under the name of Rockford Commercial

12   Mortgage Company?

13   A.  Yes.

14   Q.  Now, what did you think this document was?

15   A.  Frankly, I didn't know what it was.

16   Q.  Okay.

17   A.  I -- it didn't look like a deed to me.

18   Q.  Have you -- you're in real estate, correct?

19   A.  Yes.

20   Q.  Had you seen deeds before?

21   A.  Yes.

22   Q.  Based on what was stated in the e-mail, did you have an

23   understanding at this point in time when you received this of

24   whether, according to Mr. Rossini, the property was yours?

25   A.  Yes.

Khodi - direct

1   Q.  Okay.  But did you understand that there was going to be

2   some further contingency before it could really be put in your

3   name?

4   A.  No.

5   Q.  Okay.  What did you understand was supposed to happen with

6   the inspection?

7   A.  I had no idea.  I did ask him.  I have never heard of

8   inspection before purchasing a property.

9   Q.  Okay.

10  A.  And he said that that's the rule in this county, and

11  that's the way it goes.

12  Q.  Did you --

13  A.  Chicago is different.  Chicago is always different than

14  other places.

15  Q.  Did you know whether the titles to these properties was --

16  were recorded in your name or under the name of your trust?

17  A.  I know they were not.

18  Q.  Okay.  What is -- you said you're -- you've been in real

19  estate.  Are you familiar with the process known as recording?

20  A.  Yeah.

21  Q.  What does that refer to?

22  A.  Recording, you go to the recorder's office.  And there's a

23  deed that you place and -- I mean, there's -- it's a process.

24  I've done it mainly through title companies because that's how

25  it's usually done.  So I haven't actually walked through the

Khodi - direct

527

1    entire process of how a recording is done, but --

2    Q.  But is it your understanding that when -- when a property

3    is recorded and property is recorded in somebody's name, that

4    it's a public declaration?

5    A.  Absolutely.

6    Q.  That it's your property?

7    A.  Yes.  Usually it says deed of --

8         MR. FRANKEL:  Objection to usually.  It's

9    non-responsive.

10   BY THE WITNESS:

11   A.  Well, the deed --

12        THE COURT:  Hold on a second.

13        Sustained.  The jury is to disregard the last

14   statement.

15        Mr. Hogstrom, ask a question, please.

16        MR. HOGSTROM:  Yes.

17   BY MR. HOGSTROM:

18   Q.  Were you -- at this point in time, did you believe that

19   the property was going to be -- was supposed to still be

20   recorded in the name of your trust?

21   A.  Yes.

22   Q.  And this -- when you received these deeds, this was around

23   the same time that you sent the final wire payment; is that

24   right?

25   A.  Correct.

Khodi - direct

528

1   Q.  So after you sent that last wire payment, was that --

2   obviously it was the last wire payment with respect to the

3   Riverdale deeds, but was it the last amount of money that you

4   ever sent Bert Rossini?

5   A.  The 84,500, yes.

6   Q.  After you received this document and these e-mails and you

7   made the last wire, did you ever receive title to the

8   Riverdale properties?

9   A.  I did not.

10  Q.  Did you ever receive the notes from the Rockford

11  Commercial note pool?

12  A.  I did not.

13  Q.  Did you at some point talk to an attorney?

14  A.  I did.

15  Q.  And did you hire the attorney to attempt to obtain these

16  things on your behalf?

17  A.  Yes.

18  Q.  During the time period that you were using an attorney to

19  do this, did you also have direct communications with

20  Mr. Rossini?

21  A.  Yes, I did.

22  Q.  How did you have those communications?

23  A.  E-mail, and phone conversations, I believe, but mainly

24  e-mail.

25  Q.  What were --

Khodi - direct

1    A.   And text.  Text as well, yes.

2    Q.   What were those conversations about?

3    A.   They were about trying to receive title on the property.

4    So, you know, you said that Riverdale is just going straight

5    into my name, what's happening, what's the hold up, inspection

6    was done a long time ago.  So trying to get an understanding

7    of what -- when the title was going to be put into my name.

8    And getting understanding on other things.  But this was

9    the -- the one thing that was, you know, obvious that he had

10   said title would go immediately into my name so --

11   Q.   Were these -- were these conversations during the last few

12   months of 2013?

13   A.   Yes.

14   Q.   Showing you what's been marked as Government Exhibit Khodi

15   31 and 32.

16   A.   Okay.

17   Q.   Do you recognize those documents?

18   A.   Yes.

19   Q.   What are they?

20   A.   E-mails.

21   Q.   And --

22   A.   And they could be also texts as well I think.  I think

23   they're e-mails.

24   Q.   Are they e-mails between you and --

25   A.   Yes.

Khodi - direct

530

1   Q.   -- Mr. Rossini?

2   A.   Yes.

3   Q.   Are those true and accurate copies of the e-mails?

4   A.   These are copies, yes, of the e-mails between Bert Rossini

5   and myself.

6        MR. HOGSTROM:  The government moves to admit Khodi 31

7   and 32.

8        MR. FRANKEL:  I have no objection.

9        THE COURT:  Khodi 31 and 32 are admitted in evidence.

10     (Khodi Exhibit No. 31 and 32 received in evidence.)

11  BY MR. HOGSTROM:

12  Q.   I am putting Government Exhibit Khodi 31 on the screen.

13       Now, is this an e-mail chain of some of these

14  conversations between you and Mr. Rossini?

15  A.   Yes.

16  Q.   These are printed in reverse order; is that right?

17  A.   Correct.

18  Q.   So the earliest e-mails are at the end; is that right?

19  A.   Right.

20  Q.   So I'm going to ask you to turn to the last page of this

21  document, which is the fifth page.  So -- and I know the

22  formatting on this is a little bit -- a little bit odd, but

23  bear with me.

24       On October 29th, 2013, is there an e-mail from you to

25  Mr. Rossini?

Khodi - direct

531

1    A.  Yes.

2    Q.  And it says:  Is the wire of return of my funds going to

3    take place tomorrow?  Is that right?

4    A.  That's right.

5    Q.  And what was that a reference to?

6    A.  That was a reference to -- after going back and forth with

7    attorneys and his attorneys finally telling us that he was

8    going to return my funds minus the funds that he had already

9    returned to me over the payments of -- the monthly payments

10   and such, that he was supposed to pay those back by a certain

11   date.

12   Q.  And you expected that date to be around October 30th I

13   take it?

14   A.  This was probably one of the dates.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  Turning then to the next -- the page before that.  On

18   October 31st, is there an e-mail from Mr. Rossini to you

19   stating:  I am in the process of borrowing the money -- and

20   then it spills over onto the next page -- with the properties

21   and notes and mortgages as collateral.  Should take into next

22   week but is going well.

23          What did you understand that to mean?

24   A.  I understood that to mean that he's getting the money to

25   pay me back.

Khodi - direct

532

1    Q.  On November 7th -- I'm sorry -- on November 6th, did you

2    ask him if the wire was ready to be processed back to you?

3    A.  I sure did.

4    Q.  And on November 7th, did he state:  Sorry I have not

5    responded to you.  Barb or Ron may have already sent a message

6    to Patrick Valentino on November 12th, 2013 for

7    approximately -- first payment will be coming on

8    November 12th, 2013 for approximately $409,500 with the

9    reimbursement for the notes and mortgages by the end of

10   November.

11        Was that the message you received?

12   A.  Yes.

13   Q.  Who was Barb and Ron and who is Patrick Valentino?

14   A.  Patrick Valentino was the attorney that I had hired.  Barb

15   and Ron are the attorneys that Bert Rossini had hired.

16   Q.  On November 18th, did you e-mail him:  I need the wires

17   for all of the money to be in this Wednesday.  I can't wait

18   for my money any longer.  Advise as to completion today,

19   tomorrow, or Wednesday.

20   A.  That's me.

21   Q.  And did Mr. Rossini respond:  Sounds good for Wednesday

22   morning.  I am finalizing the loan on my behalf tomorrow.

23   A.  Sounds good to me.

24   Q.  Now, turning to the previous page, which should be page 3,

25   did you reply:  So I will have $1,257,468.44 wired to and in

Khodi - direct

533

1   my account Wednesday morning, correct?

2   A.  Yes, I did.

3   Q.  And what was that amount a reference to?

4   A.  That amount was a reference to the settlement that my

5   attorney and his attorneys had come to, the demand.

6   Q.  Was that the amount that you had given him as an -- as

7   investment money?

8   A.  That was the amount that I had given him as investment

9   money minus all the payments that he had made to me, plus, I

10  believe, and interest.

11  Q.  And on November 18th, did he reply that:  At present, I

12  have arranged for the 225,000, 184,800 and 395,000.  I am

13  working on the original three properties that are currently

14  part of a lawsuit.  So I do not have an answer on those but

15  will by tomorrow.

16  A.  Yes, he did.

17  Q.  On November 18th -- well, I'll just do these two at the

18  same time.  First, on November 18th at 2:11 p.m., did you say:

19  So the 804,800 will be deposited Wednesday morning?

20          And then on the same day, later did he respond:  I am

21  completing the loan tomorrow afternoon, and the money will be

22  available Wednesday.

23  A.  That's right.

24  Q.  On November 20th, did you ask him again if the wire had

25  been completed?

Khodi - direct

534

1    A.  I did.

2    Q.  On November 20th, did he respond:  I am in the process of

3    closing my transaction this morning.  I had a few problems

4    with convertible and option transfers yesterday, and they are

5    being handled this morning.  I will send you an e-mail as soon

6    as completed.

7            Is that what --

8    A.  Yes.

9    Q.  -- you were told?

10   A.  Yes.  The money was always coming.

11   Q.  Now, there is -- is there, from here, a whole long string

12   of e-mails that goes all the way into December of 2013?

13   A.  Yep.  Yes, there is.

14   Q.  And without going through every page -- or every e-mail of

15   this document, did -- on December 1st, 2013, did the defendant

16   tell you that you're getting the money back by the middle of

17   this week.  He's completed his refinancing package.  Release

18   documents will be sent to you by Tuesday.  He could pay out

19   immediately thereafter, et cetera, et cetera?

20   A.  Yes.

21   Q.  Okay.  Now, did you, in fact, receive any payments from

22   him following these e-mails?

23   A.  No, I did not.

24   Q.  Now, I lastly want to turn your attention to Khodi 32.  A

25   couple of weeks after that, on December 13th, did he send you

Khodi - direct

535

1    an e-mail saying:  In response to your last e-mail seeking

2    clarification on payment, I am concluding settlement on the

3    loans to pay you back your investment.  It will be completed

4    by Monday afternoon with a payment to you by Tuesday,

5    December 17th, 2013.  I will send you a release by e-mail to

6    acknowledge the payoff and ask that you return it at -- at

7    payment.

8    A.   Yes.

9    Q.   What -- he says he's asking in response to your last

10   e-mail seeking clarification on payment.  Do you recall what

11   that was about?

12   A.   I must have been requesting the payments.

13   Q.   Okay.

14   A.   That's, I think -- you know, you always have hope.

15   Q.   So did you -- you said you didn't end up getting the money

16   back.  Did you ever receive title to the Polk property or the

17   Haddon property or the Maplewood property?

18   A.   I did not.

19   Q.   Did you ever receive a refund for those properties?

20   A.   I did not.

21   Q.   In total, do you know what amount of money you sent to the

22   defendant?

23   A.   If you add all of that up, it becomes, what, about close

24   to 1.5, something around there, 1.3, 1.4.

25   Q.   Million?

Khodi - cross

1   A.  Million dollars.

2   Q.  Million?

3   A.  Million dollars, uh-huh.

4           THE COURT:  Counsel, could I speak with you at

5   sidebar.

6     (Proceedings heard at sidebar:)

7           THE COURT:  There's a gentlemen that's sitting in the

8   gallery with a pink tie.  That's not one of your witnesses, is

9   it?

10          MR. ADAMS:  No, that's one of the marshals.

11          THE COURT:  Okay.  I didn't recognize him with the

12  pink tie.  All right.

13    (Proceedings heard in open court:)

14          MR. HOGSTROM:  I have nothing further for the

15  witness.

16          THE COURT:  Mr. Frankel, you may proceed.

17          MR. FRANKEL:  Thank you, Judge.

18                      CROSS-EXAMINATION

19  BY MR. FRANKEL:

20  Q.  Good afternoon, Ms. Khodi.

21  A.  Good afternoon.

22  Q.  Obviously this was a frustrating experience for you?

23  A.  Absolutely.  It's like --

24  Q.  A disappointing experience for you?

25  A.  I'm sorry?

Khodi - cross

1  Q.  A disappointing experience?

2  A.  A devastating experience.

3  Q.  Yeah, you just told us you lost a million and a half

4  dollars; is that --

5  A.  That's right.

6  Q.  Over the course of about two years; is that right?

7  A.  That's right.

8  Q.  The money was -- the money came out of a family trust?

9  A.  Yes.

10  Q.  And were you the only one contributing into that trust?

11  A.  Yes.

12  Q.  Okay.  You told us that you had been engaging in real

13  estate for 15 years?

14  A.  Or so, yeah.

15  Q.  Is that something you did right out of college?

16  A.  Shortly after.

17  Q.  And where did you go to college?

18  A.  Santa Clara University.

19  Q.  And what year did you graduate?

20  A.  '93.

21  Q.  And how did you get into the real estate business?

22  A.  I went and got my real estate license.  I went into real

23  estate sales at first.  But I was always interested in real

24  estate, into purchasing property for investment and flipping

25  properties, which is kind of remodeling and putting it back on

Khodi - cross

1    the market and things like that.

2    Q.  Okay.  And did you have your own business or did you work

3    for somebody else?

4    A.  No, I don't -- I worked as a salesperson, but I didn't do

5    this for others.  I did it mainly for myself, yes.

6    Q.  Okay.  So you invested, rehabbed, and flipped properties

7    on your own account; is that right?

8    A.  Yes.

9    Q.  And that was mostly in California?

10   A.  Mostly, uh-huh.

11   Q.  And did you also buy notes in California, mortgage notes,

12   distressed notes on commercial property in California?

13   A.  I purchased distressed notes around the same time, not

14   in -- necessarily all in California, no.  In other parts of

15   the States.

16   Q.  In other parts of?

17   A.  The States.

18   Q.  The States?

19   A.  Of the United States.

20   Q.  Where else did you invest?

21   A.  I bought a pool of notes.

22   Q.  Were you one of the investors in a pool of notes or that

23   was offered for sale?

24   A.  That was offered for sale.  And on the bulk of the one

25   pool, I was the sole investor.  And on the bulk -- on part of

Khodi - cross

1   the other pool, I was a part investor.

2   Q.  Okay.  And these were mortgage notes?

3   A.  Yes.

4   Q.  Were they residential or commercial notes?

5   A.  Residential, I believe.

6   Q.  Okay.  And were they performing or how did this investment

7   become available to you?

8   A.  Through a broker.

9   Q.  So you became a person that brokers contacted and offered

10  investment opportunities to; is that what happened?

11  A.  I did just a few, but not -- yeah.

12  Q.  Okay.  And on that -- on that -- those notes, that pool of

13  notes, did you say it was once or twice?

14  A.  Once.

15  Q.  Once.  And do you still own those notes?

16  A.  I -- I should own those notes, but I got hit by another

17  case very similar to this one unfortunately.

18  Q.  So you --

19  A.  So that's under investigation at this time.

20  Q.  So you invested in another pool of mortgage notes that is

21  currently under investigation?

22  A.  I did.

23  Q.  By the FBI?

24  A.  I don't know.  I know the SEC is involved at this time.

25  Q.  And can you tell us who sold you those notes?

Khodi - cross

```
 1    A.   Those notes were sold through --
 2              MR. HOGSTROM:   Judge, I'm going to object to the
 3    relevance of this line of questioning.
 4              THE COURT:   Sustained.  I'll sustain the objection as
 5    to the question.  You can ask another question.
 6              MR. FRANKEL:   Okay.  Thank you, Judge.
 7    BY MR. FRANKEL:
 8    Q.   Aside from investing in notes, pools of notes, you told us
 9    that you flip properties; is that right?
10    A.   Yeah.
11    Q.   Did you -- are there other categories of investments that
12    you got involved in?
13    A.   We do developments as well with the contractor that I work
14    with.
15    Q.   Okay.  Contractor who does construction?
16    A.   Yes.
17    Q.   So you purchase property and develop the property into new
18    buildings or something like that, commercial --
19    A.   New homes.
20    Q.   -- buildings?
21              New homes?
22    A.   Uh-huh.
23    Q.   Is it always residential or is it also commercial?
24    A.   There was one note that I purchased that was commercial
25    and residential in San Francisco, uh-huh.
```

Khodi - cross

541

1   Q.  Okay.  Now, you told us that you were working with a Bay

2   Area building contractor named Raymond -- and I'm going to

3   butcher the name -- Babaoghli?

4   A.  Yes.

5   Q.  And is that someone you still work with?

6   A.  No.

7   Q.  And he was the one who introduced you to Fred Khoshabe?

8   A.  That's correct.

9   Q.  And Mr. Khoshabe told you about this investment

10  opportunity in Chicago; is that right?

11  A.  That's correct.

12  Q.  And you -- he was the one who told you how the investment

13  worked; is that right?

14  A.  Yes.

15  Q.  He explained to you that you were going to be buying

16  notes, mortgage notes?

17  A.  Mortgage notes, correct.

18  Q.  On properties that were going to be or were in

19  foreclosure; is that right?

20  A.  Properties that were in foreclosure is what I was told.

21  Q.  So just so we're clear, when a property is in foreclosure,

22  it's because the owner of the property has failed to make

23  timely payments on that property, correct?

24  A.  Correct.

25  Q.  And the bank has instituted some kind of legal proceeding

Khodi - cross

542

1  to get the property back; is that right?

2  A.  That's right.

3  Q.  So when someone buys a property, there's two components to

4  it; is that right?  There's the note and the deed?

5  A.  Uh-huh, sure.

6  Q.  And so when you're talking about buying the note, what

7  does that mean for the deed?  Can you explain to the jury

8  exactly how this process works?

9  A.  To the best of my knowledge I can.

10  Q.  Okay.

11  A.  But I'm sure you'll correct me if I'm wrong.

12       But a note is you're buying -- like I said, you

13  become the bank for the property.  So if they make mortgage

14  payments or rents, which would be like a landlord situation

15  type -- so you become the bank and the mortgage payment comes

16  to the bank.  And that's what a note holder is, right?

17       And if the property -- if they don't make the

18  payments, then there are procedures that you follow through

19  the legal system that you can -- you -- the process usually

20  goes through a time of foreclosure where the owners have time

21  to be able to make payment back.  If they can't, it goes

22  through a judicial sale.  And at that time, if nobody

23  purchases it, it comes to the note -- or the bank.

24  Q.  Okay.

25  A.  Correct?

Khodi - cross

1   Q.  So there are a number of steps involved; and during any of

2   those steps, the underlying property could end up in somebody

3   else's hands.  Would that be safe to say?

4   A.  That is safe to say.  But usually when you are the bank,

5   you usually get repaid.

6   Q.  Okay.

7   A.  Yes.

8   Q.  Now, when you bought these notes, you understood that --

9   or believed that these properties were in foreclosure

10  proceedings in court, right?

11  A.  That's correct.

12  Q.  And so before you bought the notes, who would have been

13  prosecuting these foreclosure proceedings?

14  A.  You might want to ask your client because I put my trust

15  in him.  He did the homework.  He was the one that said that

16  these are in foreclosure processes.  And I would assume that

17  he's following a legal system to follow the foreclosure

18  process.  So that's a good question to ask your client.

19  Q.  Well, I'm asking you.

20  A.  That was what I was told.

21  Q.  Okay.

22  A.  So, you know --

23  Q.  I'm just asking you based on your experience and what you

24  know.  I'm not talking about any specific transaction --

25  A.  Yeah, well --

Khodi - cross

544

1    Q.   -- here.

2    A.   -- let me explain to you that Mr. -- or Bert Rossini told

3    me that Chicago is very different than most of the states.

4    Q.   Okay.  Well --

5    A.   The process of getting -- going through the foreclosure is

6    different.  It takes time.  It's a process you have to follow,

7    and I -- and I unfortunately trusted that.

8    Q.   Okay.

9    A.   Uh-huh.

10   Q.   So I'm just trying to understand.  If you -- if a property

11   is in foreclosure --

12   A.   Uh-huh.

13   Q.   -- is it your understanding that the bank would be

14   litigating that foreclosure, right?

15   A.   Okay.  When --

16   Q.   The holder of the note?

17   A.   When you purchase a note pool, when a note pool is

18   purchased, you become the owner of that pool of notes.  So you

19   become the bank.  Does that make sense?

20   Q.   Well, yeah, that makes sense.  But I'm asking you a

21   slightly different question.

22   A.   I'm not understanding your question then --

23   Q.   Okay.  So you --

24   A.   -- because --

25   Q.   You said you -- you believed you were purchasing the notes

Khodi - cross

1    on three properties?

2    A.  Yes.

3    Q.  One on Polk, one on Haddon, and one on Maplewood, right?

4    A.  Right.

5    Q.  And you believed that each of those properties was in a

6    foreclosure proceeding --

7    A.  Correct.

8    Q.  -- in court, correct?

9    A.  I don't know how foreclosure works in Chicago.

10   Q.  Well, your understanding is that foreclosure happens in

11   court; is that true?

12   A.  Foreclosure processes have --

13   Q.  And if you don't know, just say you don't know.  That's

14   okay.

15   A.  It has varying processes.  But to my knowledge, it goes

16   through -- you know, the bank sends you letters; and if you do

17   not receive -- or respond to those letters, it goes through a

18   judicial sale or a trust sale.

19   Q.  Okay.  And so what I'm asking you is, that when you took

20   over these notes --

21   A.  Uh-huh.

22   Q.  -- did you make arrangements to make sure that there was a

23   lawyer taking over the bank's position in the foreclosure

24   hearings that you believed were happening?

25   A.  Well, I believed that Bert Rossini and his company were

Khodi - cross

1    doing that.

2    Q.  Okay.

3    A.  That's what I believed.

4    Q.  You believed it?

5    A.  Yes, I did.

6    Q.  By the way --

7    A.  At least that's what I was told.

8    Q.  -- you've never seen Bert Rossini in person?

9    A.  No, I have not.

10   Q.  You talked to him on the phone?

11   A.  Correct.

12   Q.  You exchanged e-mails with him?

13   A.  Correct.

14   Q.  And everything you know about the -- everything you

15   learned about the investment, you learned from Fred Khoshabe,

16   initially?

17   A.  Initially he explained it.  But he did mention that the

18   group in Chicago handles everything.  He's just the

19   representative, kind of like a broker.  And that's why I paid

20   him those additional payments to him.  Those were commissions

21   because he was a broker.

22   Q.  When you -- let's see --

23             MR. FRANKEL:  One second, Judge.

24     (Brief pause.)

25   BY MR. FRANKEL:

Khodi - cross

547

1   Q.   Okay.   The government showed you a group exhibit, No. 21.

2   And this is what the government called the fact sheet on the

3   3650-3652 West Polk Street.   Do you remember being shown this?

4   A.   Yes.

5   Q.   And this was one of the properties that you thought you

6   were investing in initially, correct?

7   A.   Correct.

8   Q.   And when you saw this, this looked like something that you

9   wanted to get involved in, is that right, because of the

10  numbers?

11  A.   Sure.   The numbers looked good.

12  Q.   And at the bottom, the document asks you to make a check

13  payable to Thomas Murphy, attorney/agent, right?

14  A.   Uh-huh.

15  Q.   And did you know who Thomas Murphy was?

16  A.   The attorney that purchased the bulk notes.

17  Q.   Okay.   And so you knew there was an attorney, a lawyer,

18  involved in the transactions; is that right?

19  A.   Yes, I did.

20  Q.   Okay.   Then did you show this document to anybody, a

21  financial advisor, for example?

22  A.   Unfortunately I did not.   I should have, but I did not.

23  But that --

24  Q.   Okay.

25  A.   -- doesn't just, you know, eliminate the fact that what

Khodi - cross

1    was done was wrong.

2    Q.  But you didn't show it to anybody?

3    A.  I didn't.

4    Q.  That's all I'm asking.

5    A.  No, I didn't.

6    Q.  Okay.  And also part of Government Exhibit 21 is this

7    guaranty agreement.

8          Do you remember testifying about this?  This is also

9    in Government Group Exhibit 21.

10   A.  Yes.

11   Q.  And it says the word guaranty on top, correct?

12   A.  It does.

13   Q.  And did you believe because you were signing this that

14   this was a guaranteed investment?

15   A.  Yes, I did.

16   Q.  Okay.  In your experience in real estate, are there -- is

17   it common to see a guaranteed investment?

18   A.  This was Chicago and Chicago was different.

19   Q.  Did you ever come to Chicago?

20   A.  For a visit.

21   Q.  Did you ever try to talk to lawyers in Chicago?

22   A.  I did not.  I hired a lawyer close to home.

23   Q.  Okay.  Did you -- when you came to Chicago, was that

24   between 2011 and 2013?

25   A.  No.

Khodi - cross

1    Q.  Okay.  Did you do any research online or in any way to see

2    how Chicago might be different?

3    A.  I did not.

4    Q.  Did it make sense to you that Chicago would have

5    guaranteed real estate transactions but California wouldn't?

6    A.  You know, Bert Rossini is very convincing.  So I did not

7    do -- I may have not done it, but it does not justify what was

8    done at the end of the day.

9    Q.  Okay.  So I want to ask you about this one paragraph here.

10   It's the second paragraph.  And it says:  Khodi agrees that

11   Rossini may use the funds advanced as long as Rossini agrees

12   to pay Khodi the monthly equivalent of the rentals for the

13   property.

14         Do you remember reading that in the agreement?

15   A.  I must have read it, but --

16   Q.  Did you ask Mr. Rossini what was used by -- what was meant

17   by Rossini may use the funds advanced as long as Rossini

18   agrees to pay Khodi the monthly equivalent of the rentals for

19   the property?

20   A.  No, because, remember, I spoke to him after the rents were

21   not coming in on time.  So I was told to contact Fred Khoshabe

22   for any questions.

23   Q.  Okay.  Did you ask Fred Khoshabe about this provision in

24   the guaranty agreement?

25   A.  I did not.

Khodi - cross

1   Q.  And did you ever ask Mr. Rossini what was meant by monthly

2   equivalent of rentals?

3   A.  You know, it was explained that -- that sometimes their

4   property gets vacant.  So the rent on the property on some of

5   the units may not be there; therefore, if it's not -- if the

6   property is vacant, then you wouldn't receive the rent for

7   that unit.  But I didn't understand it to be anything other

8   than that.

9   Q.  You didn't specifically ask anybody what was meant by

10  equivalent of rentals as opposed to the rent?

11  A.  No.  Had I, would that make a difference?

12  Q.  Would it have made a difference if you had asked that

13  question?  I guess that's what I'm asking.

14  A.  Would I have -- would I have my funds in hand right now if

15  I had asked that question?

16  Q.  Would you have made the investment?

17  A.  I'm sorry?

18  Q.  Would you have made the investment if you had asked

19  questions about what was happening?

20  A.  I did ask quite a bit of questions.

21  Q.  Okay.  The problems with the rents on the first three

22  properties started happening right -- right in the beginning,

23  right, in 2012?  2011, 2012?

24          You didn't get rental equivalents and the rent

25  payments were slow?

Khodi - cross

1   A.  I think closer around May time frame of 2012.

2   Q.  Okay.

3   A.  Yeah.

4   Q.  But you continued to invest a substantial amount of money

5   in 2013 and 2014, right?

6   A.  Would you like me to explain that?

7   Q.  No.  I'm just asking --

8          THE COURT:  Can you just answer the question?

9   BY THE WITNESS:

10  A.  I did, but those were supposed to be different

11  investments.  They weren't with Bert Rossini's company.  They

12  were supposed to be directly deposited into my name or

13  transferred into my name.

14  BY MR. FRANKEL:

15  Q.  Well, you were dealing with Mr. Rossini on those other

16  investments; is that right?

17  A.  Yeah.

18  Q.  By the way, on any of the properties that we're talking

19  about here, did you ever see any photographs of any of the

20  properties?

21  A.  He sent me photographs.  As a matter of fact, Bert Rossini

22  said that on the first property, west Polk, there's a boat; so

23  the property comes with a boat.

24  Q.  Was that a description or a photograph?

25  A.  I believe he described it.  I have -- I have lots of

Khodi - cross

1    e-mails with pictures and all sorts of stuff, so --

2    Q.   Okay.

3    A.   -- it could be in there.

4         THE COURT:  Mr. Frankel, perhaps this is a convenient

5    time to take a break?

6         MR. FRANKEL:  Sure.

7         THE COURT:  Ladies and gentlemen, we will take our

8    afternoon break.  We'll break for approximately 15 minutes.

9    During the break, please do not discuss this case with anyone,

10   including one another.  And please do not do any independent

11   research regarding any of the issues that you've heard

12   discussed about this case.  Thank you.

13     (Jury out.)

14         THE COURT:  You may step down, ma'am.

15         THE WITNESS:  Okay.  Thank you.

16         THE COURT:  We're in recess.

17     (Recess taken.)

18     (Jury in.)

19         THE COURT:  Mr. Frankel, you may proceed.

20         MR. FRANKEL:  Judge, I do have a couple more

21   questions.

22   BY MR. FRANKEL:

23   Q.   Ms. Khodi, you told us that at some point, you spoke to

24   Fred Khoshabe about purchasing bulk mortgage notes; is that

25   right?

Khodi - cross

553

1    A.  He contacted me.

2    Q.  Okay.  You had a conversation about it?

3    A.  Yes.

4    Q.  And he told you that Thomas Murphy, the attorney for Devon

5    Street, purchased the bulk mortgage notes and resold the notes

6    for investors, right?

7    A.  He said there was a bulk purchase made through an

8    attorney.

9    Q.  Okay.  You don't remember the name Thomas Murphy?

10   A.  I do remember the name Thomas Murphy, but I'm not sure if

11   it was directly him or it was a group or --

12   Q.  Okay.  Do you remember being interviewed on April 8th,

13   2015 by Special Agent Lyle Evans?

14   A.  I do.

15   Q.  And do you remember telling him:  Fred told Khodi that

16   Thomas Murphy, the attorney for Devon Street, purchased bulk

17   mortgage notes and resold the notes to investors for a price

18   that included a fee of $25,000 per note?

19   A.  I do remember that.  Thank you for refreshing my memory.

20   Q.  And then you asked Fred why no title company was involved

21   in the closings?  Do you remember that?

22   A.  Uh-huh, yes.

23   Q.  And Fred told you that none was required for the transfer

24   of notes.  Do you remember him telling you that?

25   A.  He did mention that Chicago was different, as I -- that's

Khodi - cross

554

1   what I recall.  Now, if he specifically said that, then that's

2   what I recalled at that time, yes.

3   Q.  Did you tell Special Agent Lyle Evans during that April 8,

4   2015 interview that Fred told you that Chicago was different?

5   A.  I did.

6   Q.  You did?

7   A.  I must have.

8   Q.  So if it's --

9   A.  I don't know.

10  Q.  If it's not in his report, that's an omission by him?

11  A.  I'm not certain.  You know, it was a long time ago.

12  Whatever I stated at that time, if it's there -- I don't

13  recall the exact wording.

14  Q.  Okay.

15  A.  And this is from 2011 to 2013 you have to recall.  And

16  just to -- justifying myself, I went through a deep depression

17  given the circumstances.  It's --

18          MR. FRANKEL:  Your Honor, could I ask the witness to

19  be responsive to my questions?

20          THE COURT:  Yes.  Just respond to the questions.

21          THE WITNESS:  Okay.

22          THE COURT:  Thank you.

23  BY MR. FRANKEL:

24  Q.  And Fred told you that his family had purchased the notes

25  from Devon Street, and Fred told you that the investment was

Khodi - redirect

555

1   rock solid?

2   A.  Yeah.

3   Q.  Do you recall that?

4   A.  He did, uh-huh.

5   Q.  Okay.  Fred told you there was a demand for the notes; and

6   if you decided to purchase -- he gave you details about the

7   requirements that Devon Street would need the funds within

8   24 hours.  Do you recall that?

9   A.  Yes.  They had to be very quick, have to be quick to

10  respond.

11          MR. FRANKEL:  Judge, I have nothing further.

12          THE COURT:  Okay.

13          Any redirect?

14                      REDIRECT EXAMINATION

15  BY MR. HOGSTROM:

16  Q.  Ms. Khodi -- one moment.

17    (Brief pause.)

18  BY MR. HOGSTROM:

19  Q.  Ms. Khodi, on cross-examination, Mr. Frankel asked you

20  about the Polk property and the fact sheet that you originally

21  received?

22  A.  Yes.

23  Q.  And there was questions about your understanding that

24  these were properties that were in foreclosure and there being

25  some uncertainty as to whether you might -- what would happen

Khodi - redirect

 1   at the end of the foreclosure process?

 2   A.  Yes.

 3   Q.  Do you recall those questions?

 4   A.  Yes.

 5   Q.  I'm going to put on the screen Government Exhibit Khodi

 6   29.

 7           And this is an e-mail from Mr. Rossini on

 8   August 13th, 2013; is that right?

 9   A.  Correct.  I have it in front of me but not on the computer

10   if you're trying to show me anything.

11   Q.  Okay.

12           MR. HOGSTROM:  Judge, may I publish this?

13     (Brief pause.)

14           THE COURT:  Is your computer plugged in?

15     (Brief pause.)

16           MR. HOGSTROM:  Yes.

17   BY MR. HOGSTROM:

18   Q.  Okay.  Do you see it on your screen now?

19   A.  Yes, I do.

20   Q.  So the date of this is August 13th, 2013?

21   A.  Yes.

22   Q.  And I'm going to highlight just this one -- the third

23   paragraph down.

24           Did Mr. Rossini state:  We will finally get the deed

25   on 3650 West Polk at the end of August, together with all

Khodi - redirect

557

1  monies held by the receiver over the past year.

2  A.  Yes.

3  Q.  Did you understand the reference to the receiver to be a

4  reference to the conclusion of the foreclosure proceedings?

5  A.  Correct.

6  Q.  Okay.

7          MR. HOGSTROM:  I don't have any further questions for

8  the witness.

9          MR. FRANKEL:  Nothing further.

10         THE COURT:  Ma'am, you may step down.

11         THE WITNESS:  Thank you.

12         THE COURT:  Thank you very much.

13         THE WITNESS:  Thank you.

14         MR. HOGSTROM:  Judge, we would request to read a

15  stipulation at this point.

16         THE COURT:  Let the witness step down.

17    (Witness excused.)

18         THE COURT:  You may proceed.

19         MR. HOGSTROM:  Stipulation No. 35:  If called to

20  testify, Juan Juarbe would testify that as of August 4th,

21  2014, he was the owner of the property located at 3650 to 3652

22  West Polk, Chicago, Illinois.

23         Mr. Juarbe would further testify that he purchased

24  the property in a cash transaction in approximately

25  February 2012, and thus no mortgage note exists on the

Dela Cruz - direct

558

```
 1   property located at 3650 to 3652 West Polk.

 2            So stipulated?

 3            MR. ADAMS:  So stipulated.

 4            MR. NOVAK:  The government calls Armando Dela Cruz.

 5            THE COURT:  Mr. Dela Cruz, you can come up this way

 6   by me.  You can leave your jacket there, sir, at the bench.

 7            Right up here.  All the way up.

 8            THE WITNESS:  Oh, okay.

 9            Here?

10            THE COURT:  Yes.  Come on up and stay standing please

11   for a second.

12      (Witness sworn.)

13            THE COURT:  Please take a seat.  Mr. Dela Cruz, I'm

14   going to ask you to scoot up so you're talking into the

15   microphone.  Okay?

16            You may proceed.

17            MR. NOVAK:  Thank you, your Honor.

18          ARMANDO DELA CRUZ, GOVERNMENT'S WITNESS, SWORN

19                       DIRECT EXAMINATION

20   BY MR. NOVAK:

21   Q.  Good afternoon, sir.

22            Good afternoon, sir.

23   A.  Good afternoon.

24   Q.  In a loud clear voice, can you please state your name and

25   spell your last name for the court reporter and the members of
```

Dela Cruz - direct

559

1   the jury.

2   A.  Can you speak a little bit louder because I have problem

3   hearing.  I don't hear in one ear.  I only hear here.  That's

4   why --

5   Q.  No problem, sir.

6           In a loud clear voice, can you please state your name

7   and spell your last name for the members of the jury.

8   A.  Armando Dela Cruz.

9   Q.  What --

10  A.  D --

11  Q.  I'm sorry.  Go ahead, sir.

12  A.  Spell the last name?

13  Q.  Yes.

14  A.  D-e-l-a, space, C-r-u-z, as in zebra.

15  Q.  What city and state do you live in?

16  A.  Chicago, Illinois.

17  Q.  Are you familiar with the building located at 5801 North

18  Richmond in Chicago?

19  A.  Yes.

20  Q.  How are you familiar with that building?

21  A.  That's my building.

22  Q.  Do you own the building?

23  A.  Yeah.  I bought it in December 13 of 2006.

24  Q.  And have you owned that building since December of 2006?

25  A.  Yes.

Dela Cruz - direct

560

1    Q.   Is the building currently in your name or is it in someone

2    else's name?

3    A.   Now it is in my daughter's name.

4    Q.   When did you transfer title to your daughter?

5    A.   Because I'm retired.  I don't need it anymore.

6    Q.   And when did you do so?  When?  What date, what time, do

7    you remember?

8    A.   2009.  December 2009 I gave to my daughter.

9    Q.   Is it a building that you rent out apartments in?

10   A.   Yes.

11   Q.   Who collects the rent for the apartments?

12   A.   I do.

13   Q.   You collect the rents?

14   A.   Because my daughter is so busy.  She's teaching and she

15   can't attend to it.

16   Q.   So you manage the property?

17   A.   Yes.

18   Q.   And you collect the rents?

19   A.   Right.

20   Q.   Have you been collecting the rents since 2009?

21   A.   Yes.

22   Q.   Now, I want to direct your attention back to January

23   of 2012.

24   A.   Uh-huh.

25   Q.   Did you have a mortgage on the building at that time?

Dela Cruz - direct

561

```
 1   A.  Yes.

 2   Q.  What bank held the mortgage?

 3   A.  First American Bank.

 4   Q.  And you were collecting the rents --

 5   A.  Yes.

 6   Q.  -- for the building in January of 2012, right?

 7   A.  Yes.

 8   Q.  Are you familiar with a company called Devon Street

 9   Investments?

10   A.  No.

11   Q.  Are you familiar with a man named Albert Rossini?

12   A.  No.

13   Q.  A man named Babajan Khoshabe?

14   A.  No.

15   Q.  Anthony Khoshabe?

16   A.  No.

17   Q.  Thomas Murphy?

18   A.  No.

19           MR. NOVAK:  Nothing further.

20           THE COURT:  Anything for this witness?

21           MR. FRANKEL:  Your Honor, we have no questions.

22           THE COURT:  All right.  Sir, thank you very much.

23           THE WITNESS:  Thank you.

24      (Witness excused.)

25           MR. NOVAK:  We ask to read one stipulation once the
```

562

1   witness leaves.

2     (Brief pause.)

3             THE COURT:  Go ahead.

4             MR. NOVAK:  Thank you.

5             Stipulation No. 20:  If called to testify, an

6   employee of First American Bank would testify that, as of May

7   7th, 2013, First American Bank held the mortgage note for the

8   property located at 5801 Richmond, Chicago, Illinois.

9             The employee of First American Bank would further

10  testify that the mortgage for 5801 Richmond originated on

11  January 12th, 2012; and as of May 7th, 2013, the loan for 5801

12  Richmond was in good standing.  The employee at First American

13  Bank would further testify that First American Bank had no

14  documents or knowledge of any negotiations between First

15  American Bank and a third party regarding acquisition of the

16  note or a short sale, First American Bank entering into any

17  agreements to assign rents, or any rent being collected by

18  First American Bank on behalf of a third party.

19            So stipulated?

20            MR. ADAMS:  So stipulated.

21            THE COURT:  The government may call its next witness,

22  please.

23            MR. HOGSTROM:  The government calls Thomas Murphy.

24            THE COURT:  Mr. Murphy, if you would step up to my

25  right.

Murphy - direct

563

```
 1              If you would step up and remain standing, sir.
 2        (Witness sworn.)
 3              THE COURT:  You may proceed.
 4              THOMAS W. MURPHY, GOVERNMENT'S WITNESS, SWORN
 5                       DIRECT EXAMINATION
 6   BY MR. HOGSTROM:
 7   Q.  Good afternoon.  Please state and spell your name.
 8   A.  Thomas W. Murphy, M-u-r-p-h-y.
 9   Q.  Would you please state -- you stated your name.  Would you
10   spell it for the court reporter?
11              You did?
12   A.  Yes.
13   Q.  I'm sorry.  I didn't hear that.  Without being too
14   specific, where do you reside, sir?
15   A.  In Lake County, Illinois.
16   Q.  What is your educational background?
17   A.  I was a graduate of St. Ignatius High School here in
18   Chicago.  Then I graduated from Georgetown University in
19   Washington, D.C.  And then I graduated from the John Marshall
20   Law School here in Chicago.
21   Q.  After you graduated from law school, did you begin
22   practicing law?
23   A.  Yes.  I practiced law from 1977 until 2014.
24   Q.  For how long did you practice law?
25   A.  Approximately 37 years.
```

Murphy - direct

564

```
 1              THE COURT:  Mr. Murphy, could you pull the mic down
 2   closer to you.
 3              There you go.
 4   BY MR. HOGSTROM:
 5   Q.  Do you still practice law?
 6   A.  No, I do not.
 7   Q.  Why not?
 8   A.  I was disbarred in 2014.
 9   Q.  For how long had you been practicing law when you were
10   disbarred?
11   A.  37 years.
12   Q.  Directing your attention to 2010 through 2013, were you a
13   practicing lawyer during that period of time?
14   A.  Yes.
15   Q.  What type of law did you practice?
16   A.  I practiced a number of different areas, but one was real
17   estate.  I did a lot of corporate law, employment law, and
18   then I represented charitable institutions.
19   Q.  In that capacity did you do work for a man named Albert
20   Rossini and related companies of his?
21   A.  Yes, I did.
22   Q.  Do you see Mr. Rossini here in court today?
23   A.  Yes, I do.
24              MR. ADAMS:  Judge, we'll stipulate.
25              THE COURT:  So stipulated as to identification.
```

Murphy - direct

565

BY MR. HOGSTROM:

Q.   Did you also have some association with Mr. Rossini with

individuals you knew as Babajan Khoshabe and Anthony Khoshabe?

A.   Yes.

Q.   As well as a company called Reliant Management?

A.   Yes.

Q.   And Devon Street Investments?

A.   Yes.

Q.   Did your work related to Devon Street Investments and

Reliant Management result in your being charged with crimes

and arrested in this case?

A.   It did.

Q.   When were you charged in this case?

A.   I believe it was August of 2015.

Q.   What crimes were you charged with?

A.   I was charged with counts -- various counts of wire fraud

and mail fraud.

Q.   Did you commit the crimes that you were charged with?

A.   Yes.

Q.   Have you pled guilty in this case?

A.   Yes, I did.

Q.   Did you plead guilty pursuant to what's called a plea

agreement with the government?

A.   I did.

Q.   Does the plea agreement -- strike that.

Murphy - direct

1          Was the plea agreement a written document that was --

2   A.  Yes.

3   Q.  -- that was signed by you and your attorney and attorneys

4   for the government?

5   A.  Yes.

6   Q.  Does the agreement provide a summary of your role in the

7   fraud scheme charged in the case that you have admitted to be

8   true?

9   A.  Yes.

10  Q.  Was this a complete statement of everything you know or

11  was this just a summary?

12  A.  No, it was just a summary.

13  Q.  Did you agree to provide more detailed testimony if called

14  upon to do so by the government?

15  A.  Pursuant to the plea agreement, I did.

16  Q.  What is your understanding of what the government expects

17  of you under the terms of your plea agreement?

18  A.  To appear as a witness and to testify truthfully as to the

19  facts as I know them.

20  Q.  What is your understanding of what the government will do

21  in exchange for your truthful testimony?

22  A.  They would recommend to the Court a reduction of the

23  minimum guidelines.

24  Q.  What is your understanding of what the government would do

25  if it concluded that you did not provide truthful testimony

Murphy - direct

567

1   here at trial?

2   A.  They would not make a recommendation for a reduction.

3   Q.  Are you also aware that you're under oath here today?

4   A.  Yes.

5   Q.  Are you aware that if you were to provide untruthful

6   testimony here today, you could be prosecuted for additional

7   crimes such as perjury?

8   A.  Yes.

9   Q.  Does your plea agreement set out the expected sentencing

10  range that you could be facing under the federal sentencing

11  guidelines?

12  A.  Yes, it does.

13  Q.  And what is your understanding of what the government will

14  do with respect to the sentencing range that you are facing?

15  A.  They would recommend a potential reduction by a third.

16  Q.  And what is your understanding of who ultimately would

17  determine what that sentence is?

18  A.  It would be the Court.

19  Q.  When did you first meet the defendant Albert Rossini?

20  A.  In late 2007, early 2008.

21  Q.  Could you describe the circumstances under which you met

22  him?

23  A.  I was representing an individual by the name of Raymond

24  Mobile who owned a metal stamping company that operated in

25  Montgomery, Illinois.  Mr. Rossini and his partner -- I

Murphy - direct

1    believe his name is Steven Weisman -- had arranged for a loan

2    for Mr. Mobile and his company, and Mr. Mobile asked me to

3    attend the loan closing at American Enterprise Bank to review

4    the documents.

5    Q.  How did you eventually come to do legal work for

6    Mr. Rossini?

7    A.  At that time Mr. Rossini asked if I'd be interested in

8    doing legal work for him if he wanted me to.

9    Q.  And did you end up doing that?

10   A.  Yes.

11   Q.  And generally what type of work were you doing for

12   Mr. Rossini initially?

13   A.  There were various things.  There were -- I drafted some

14   promissory notes.  I drafted some proposals, some real estate

15   contracts, also worked with him on loans that he was obtaining

16   for another individual at Associated Bank.

17   Q.  So this all related to real estate and loans and

18   associated business ventures?

19   A.  Yes.

20   Q.  Between 2008 and 2011, how often would you say that you

21   did work for Mr. Rossini?

22   A.  I would say it was occasionally.  I mean, I had other

23   clients that I was doing a lot more work for.

24   Q.  Through the course of some of your work with Mr. Rossini,

25   did you and Mr. Rossini end up owing money to others?

Murphy - direct

1  A.  Yes.  We owed money to American Chartered Bank.

2  Q.  Did there come a point --

3          MR. ADAMS:  I'm going to object.

4          THE COURT:  Sidebar.

5    (Proceedings heard at sidebar:)

6          THE COURT:  Yes?

7          MR. ADAMS:  It's relevancy and 404(b), your Honor.

8  This was, I thought, evidence that they were not going to get

9  into unless we got into these other dealings.  Now they're

10  talking about owing money to banks unrelated to this case.  I

11  don't know how this is relevant.

12          MR. HOGSTROM:  I'm -- we're not attempting to get

13  into anything that's 404(b) or that has to do with the prior

14  conduct with Mr. Rossini in the way we discussed it earlier.

15  It is simply providing -- we're trying to walk the line

16  between providing context for how his venture with Mr. Rossini

17  started and not going into things that are going to be overly

18  prejudicial.

19          The basic idea of what he's going to testify to is

20  that when Mr. Rossini called him about this venture, he said

21  this is a way that we can repay these obligations that we

22  have.  So we were just going to say, in general terms, did you

23  owe money to other people.  That's it.  And I actually didn't

24  expect the witness to say a specific party that they owed

25  money to.  But, in any event, that's as far as we were going

Murphy - direct

1    to go with it.

2              THE COURT:  All right.  I think that's fine.  I don't

3    think it's overly prejudicial.  It just provides context for

4    the government's theory as to what happened here and really

5    the motive of what started this process.  So objection is

6    overruled.  But obviously the government knows it's not

7    supposed to get into how the money became owed or all of the

8    underlying facts about that.  We're just jumping right now

9    into the current incidents?

10             MR. HOGSTROM:  Correct.

11             THE COURT:  All right.  Very good.

12     (Proceedings heard in open court:)

13   BY MR. HOGSTROM:

14   Q.  Did there come a point when Mr. Rossini talked to you

15   about a new way that you could make money together that would

16   allow you to repay the obligations that we just discussed?

17   A.  Mr. Rossini --

18             THE COURT:  Can you answer that yes or no, please.

19   BY THE WITNESS:

20   A.  Yes.

21   BY MR. HOGSTROM:

22   Q.  Do you recall how this conversation occurred?  Where it

23   occurred?

24   A.  I do.

25   Q.  And how did it occur?  Where were you?

Murphy - direct

1    A.   Mr. Rossini called me, and it was over the phone.

2    Q.   What did Mr. Rossini say?

3    A.   That he and Babajan Khoshabe were talking about starting a

4    new business where they would buy property on short sales or

5    they would buy notes and mortgages that were in default or in

6    foreclosure; and they would have investors, that they would

7    obtain, put up the money.

8    Q.   Did you know who Babajan Khoshabe was at that time?

9    A.   I knew him generally.  I may have met him once or twice at

10   that point.  But I didn't really have much of a relationship

11   with him.

12   Q.   Do you know when approximately this conversation occurred?

13   A.   I would say sometime in late March, early April of 2011.

14   Q.   What is it that Mr. Rossini was asking you to do?

15   A.   At that point nothing.  He was describing what -- his

16   idea.

17   Q.   Did the subject come up again at some point?

18   A.   Yes.  He had -- he had gotten a commitment from some -- an

19   investor, and he asked me to prepare a promissory note.

20   Q.   Was there also a point when he asked you about filing

21   documents related to incorporating a business?

22   A.   Yes.

23   Q.   Do you recall approximately when that was?

24   A.   I believe that was in May of 2011.

25            MR. HOGSTROM:  I'm showing the witness what has been

Murphy - direct

1    marked as Government Exhibit Murphy 1.

2    BY MR. HOGSTROM:

3    Q.  Do you recognize that?

4    A.  Yes, I do.

5    Q.  What is that document?

6    A.  Well, this is several documents.  The first one is an

7    articles of incorporation for an entity Devon Street

8    Investments, which was filed with the secretary of the state

9    of Illinois.

10          The second document is a letter from the Internal

11   Revenue Service issuing an employer identification number for

12   this corporation.

13          And the third document is a certificate to open a

14   bank account at a bank for the corporation.

15   Q.  Does this appear to be a true and accurate copy of those

16   documents?

17   A.  Yes.

18          MR. HOGSTROM:  Government moves to admit Murphy 1.

19          MR. ADAMS:  No objection.

20          THE COURT:  Murphy 1 is admitted in evidence.

21     (Murphy Exhibit No. 1 received in evidence.)

22   BY MR. HOGSTROM:

23   Q.  I'm placing this document on the screen.

24          First, is the first page of this document an e-mail

25   dated May 10th of 2011?

Murphy - direct

573

1    A.  Yes.

2    Q.  And what -- which address is -- what e-mail address is

3    listed on the "from" line?

4    A.  It is from my -- the law firm that I was at -- with at the

5    time.

6    Q.  And is this address TMurphy@BNF-law.com, was that your

7    e-mail address at the time?

8    A.  Yes.  It was my e-mail address at the law firm.

9    Q.  And is the address BertRossini4@aol.com, was that an

10   e-mail address that you communicated with Mr. Rossini through?

11   A.  It was one of those, yes.

12   Q.  And was this e-mail an e-mail that contained attachments?

13   A.  I'm sorry?

14   Q.  Did this e-mail have attachments?

15   A.  Yes, it did.

16   Q.  And below the line referencing attachments, does it state

17   articles, IRS letter, certificate of bank?

18   A.  It does.

19   Q.  Now, turning your attention to the next page of the

20   document in the upper left-hand corner, does this say articles

21   of incorporation?

22   A.  This is the form of articles of incorporation filed with

23   the Illinois Secretary of State, yes.

24   Q.  And what is the entity name?

25   A.  Devon Street Investments, Ltd.

Murphy - direct

1  Q.  Let me ask you before we go too much farther in looking at

2  this document:  Why did you send this e-mail to Mr. Rossini?

3  A.  Because Mr. Rossini had asked me to incorporate this

4  entity on his behalf.

5  Q.  Had there been other occasions when you incorporated

6  entities for him?

7  A.  There had been other occasions.  I don't believe before

8  this though.

9  Q.  Was the process of incorporating an entity with the

10  Secretary of State something that you were acquainted with

11  through your law practice?

12  A.  Yes.  I filed many corporations with the Illinois

13  Secretary of State.

14  Q.  Now, going back to this articles of incorporation, the

15  corporation named Devon Street Investments, Limited, whose --

16  who gave you that name?

17  A.  Mr. Rossini.

18  Q.  And is there a file stamp?

19  A.  There is a file stamp from the Illinois Secretary of

20  State, yes.

21  Q.  And is that dated May 10th of 2011?

22  A.  Yes.

23  Q.  Now, under initial registered agent, what name is listed

24  there?

25  A.  Daniel Ramirez.

Murphy - direct

575

1   Q.  Did you -- do you know who Daniel Ramirez is?

2   A.  I knew he was an individual who did some work with or for

3   Mr. Rossini.

4   Q.  And the address listed next to initial registered office,

5   3924 West Devon Street, were you familiar with that address?

6   A.  I was familiar with that address, yes.

7   Q.  What address is that?

8   A.  That is the address of the office where Mr. Rossini

9   maintained offices.

10  Q.  Turning to the next page of this document, is this -- this

11  is a letter from the IRS; is that correct?

12  A.  It is a letter generated by the IRS after an application

13  for an employer identification number was filed online.

14  Q.  And is that part of the legal process of setting up a

15  corporation?

16  A.  It's part of the general process.  I wouldn't call it a

17  legal process.  But it is a process of forming an entity, yes.

18  Q.  Turning to the fourth page, certificate of the president

19  of Devon Street Investments -- excuse me.  I clipped that

20  wrong.  Let me try that again.

21          What is this?

22  A.  This is a certificate which would be presented to the bank

23  in order to open a bank account.

24  Q.  Now, was there a reason why -- that you knew of -- why

25  Daniel Ramirez was listed as the president of this company --

Murphy - direct

1   A.   Yes.

2   Q.   -- as opposed to Mr. Rossini?

3   A.   Yes.

4   Q.   What was that?

5   A.   Mr. Rossini was not able to open bank accounts, for

6   whatever reason, and he wanted Mr. Ramirez to be the president

7   and be able to go to the bank and open an account.

8   Q.   Now, around this same time, did you have conversations

9   with Mr. Rossini about -- with respect to this investment

10  program that he had described about the funds that he was

11  taking in from investors?

12  A.   Well, Mr. Rossini called me and told me he had to see me

13  and that he had several checks; and he came down to meet me.

14  Q.   At the time that he called you and said that he had

15  several checks, did you -- did you expect that you would be

16  receiving checks from him?

17  A.   At that point, no, I didn't.  I didn't know who they were

18  going to be made payable to.

19  Q.   Based on your prior conversations with Mr. Rossini, did

20  you have an understanding of whether you had a particular role

21  with respect to this Devon Street Investments endeavor?

22  A.   It wasn't until just about the time that you described

23  that he was coming down to see me that I had a idea of what my

24  role was going to be.

25  Q.   And what did you think your role was going to be?

Murphy - direct

577

1   A.  Well, at that point, I was supposed to be receiving funds

2   and depositing the funds.  Mr. Rossini told me that he had a

3   group of people that were going to be researching properties,

4   finding properties, and I was really not going to be involved

5   in anything to do with the properties.

6   Q.  Were you going to be involved with the investors as far as

7   you knew?

8   A.  No.

9   Q.  When he came -- when he called you and said he had checks,

10  did you, in fact, meet with him regarding those checks?

11  A.  Yes.

12  Q.  What -- to the best of your recollection, what did he tell

13  you about the checks?

14  A.  He gave me the checks, and I looked at them.  And they

15  were made payable -- the first couple of checks were made

16  payable to Republic Title and to me as agent of Republic

17  Title.  And I questioned why checks were being made payable to

18  me, and I was told by Mr. Rossini that that is the way that

19  Babajan Khoshabe told the investor to make out the checks.

20  Q.  Now, I'm going to put on the screen what has been admitted

21  as Government Exhibit Badalian 1.  And specifically -- excuse

22  me.  Sorry.  I think I went one page too far.

23          Page 2 of this document.  Do you see that on the

24  screen in front of you?

25  A.  Yes, I do.

Murphy - direct

578

1   Q.  I'm going to try to enlarge it a little bit, part of it

2   anyway.

3           Who is listed as the remitter?

4   A.  Remitter is Robert Badalian.

5   Q.  And is this -- as you look at this document, does this

6   appear to be one of the checks that you got from Mr. Rossini?

7   A.  I don't recall this specific check, no.

8   Q.  Okay.  Did you -- well, let me back up and highlight a

9   particular portion.

10          In the lower left-hand side of the cashier's check

11  that ends in the number 3632 on the bottom of the screen, who

12  is this check made out to?

13  A.  This is the check I was referring to, Republic Title,

14  Thomas Murphy, agent.

15  Q.  And who is listed as the remitter?

16  A.  Robert Badalian.

17  Q.  When Mr. Rossini brought you this check, did you have --

18  did you know who Robert Badalian was?

19  A.  No, I did not.

20  Q.  What is the amount of this check?

21  A.  $35,000.

22  Q.  And written near the top above that, it says 4126 West

23  Adams and there appears to be a PIN number; is that correct?

24  A.  That is correct.

25  Q.  Did you have an understanding as to why there was a

Murphy - direct

1    property address and a PIN number written on this check?

2    A.  I was told that this is a property that Mr. Badalian was

3    going to be an investor for.

4    Q.  So you learned from Mr. Rossini that this --

5              MR. ADAMS:  Judge, I'm going to object based --

6              THE COURT:  Sidebar.

7      (Proceedings heard at sidebar:)

8              THE COURT:  What is the basis of the objection?

9              MR. ADAMS:  The witness testified he doesn't remember

10   the check.  Now they're asking questions about the check and

11   what the check was for.  The testimony was he doesn't remember

12   receiving this check, and he's just pretty much reading an

13   exhibit.

14             MR. HOGSTROM:  Can I clarify that?  There's two

15   checks on the page.  And I can clarify this on the record if

16   necessary.  But I believe he said he didn't remember the first

17   check.  But when I showed him the lower check that

18   specifically said Republic Title, he said this is the check

19   that I received.

20             THE COURT:  Why don't you clarify it with him.  Okay.

21     (Proceedings heard in open court:)

22   BY MR. HOGSTROM:

23   Q.  Mr. Murphy, on this page of this exhibit, there are two

24   checks, correct?

25   A.  Yes.

Murphy - direct

1    Q.  A little while ago, I asked you about the first check on

2    the top of the page and you said you didn't remember receiving

3    this check; is that right?

4    A.  That is correct.

5    Q.  And then I just asked you about the second check, which is

6    made out to Republic Title and Thomas Murphy, agent.  Do you

7    remember this check?

8    A.  Yes, I do.

9    Q.  Okay.  Now, going back to where it says 4126 West Adams,

10   is it your testimony that you understood that Mr. Rossini told

11   you that an individual named Robert Badalian was investing in

12   this property?

13   A.  Yes.

14   Q.  Did you have an understanding of what that meant, that he

15   was, quote, investing in it?

16   A.  It was my understanding that he was putting up money to

17   either acquire it, as I said, on a short sale or to buy the

18   existing notes and mortgages.

19   Q.  When you received this check, were there additional checks

20   that you received at the same time, do you recall?

21   A.  I believe there were three checks that were written to

22   Republic Title and Thomas Murphy, agent, from Mr. Badalian at

23   or about the same time.

24   Q.  I'm showing you what's been admitted as Government Exhibit

25   Badalian 2, page 2 of Badalian 2.

Murphy - direct

581

1          And are there three Bank of America cashier's checks

2   listed on this?

3   A.  Yes.

4   Q.  And the one on the bottom of the screen, which ends in

5   2467, I'm going to highlight the lower left-hand portion.

6          Is this made out to Republic Title, Thomas Murphy,

7   agent?

8   A.  Yes.

9   Q.  And is the date May 24th, 2011?

10  A.  Correct.

11  Q.  Is this one of the other checks that you were talking

12  about?

13  A.  It's a check that I received at or about the same time,

14  yes.

15  Q.  And does this reference the property at 5410 West Fulton

16  with a PIN number?

17  A.  It did.

18  Q.  And is this also made out for $35,000?

19  A.  Yes.

20  Q.  Now, I want to direct your attention to what's been

21  admitted as Government Exhibit Badalian 4, page 2 of that

22  exhibit.

23          Is this another set of three checks?

24          Is this three cashier's checks?

25  A.  That is correct, yes.

Murphy - direct

1  Q.  At the bottom of the screen, the cashier's check ending in

2  3531, is this made out to Republic Title, memo, colon, Thomas

3  Murphy, agent?

4  A.  Yes.

5  Q.  And is the date of this check June 2nd, 2011?

6  A.  Yes.

7  Q.  Was this the other check that you were referring to out of

8  the three that you received at around the same time?

9  A.  Yes.

10  Q.  I'm going to direct your attention to the address listed

11  there.  Is it 4045 West Wilcox Street?

12  A.  Yes, in Chicago.

13  Q.  And is the amount listed $37,500?

14  A.  Yes.

15  Q.  Now, when Mr. Rossini gave you these checks, what was your

16  understanding that you were to do with them?

17  A.  Well, the first thing I wanted to know, why they were made

18  payable to me.

19  Q.  And what did Mr. Rossini say?

20  A.  That's what Mr. Khoshabe had told the investor to do.

21  Q.  And what was your reaction to that?

22  A.  I thought it was odd.  And then Mr. Rossini said he wanted

23  those deposited.  And that included, you know, a profit.  And

24  he would want those checks disbursed once they were deposited.

25  Q.  And, now, what was your -- what was your reaction to the

Murphy - direct

1  idea that you were supposed to be receiving these checks and

2  depositing them and then disbursing the funds?

3  A.  Well, one of the initial reactions I had is they were

4  making a profit on this -- these transactions; why not just

5  distribute the profit amount.  And Mr. Rossini informed me

6  that he and Babajan Khoshabe expected all these funds to be

7  disbursed and nothing held back.

8  Q.  Now, I have to ask, you know, you were a lawyer at this

9  point; is that right?

10 A.  I was.

11 Q.  And you had been a lawyer at this point for well over

12 30 years; is that correct?

13 A.  Yes.

14 Q.  Were you familiar with the rules of ethics that govern the

15 legal profession?

16 A.  Yes, I was.

17 Q.  Are there a great deal of rules and regulations that

18 govern the handling of funds that somebody gives an attorney?

19 A.  Yes.

20 Q.  What is typically done with funds that are handled to an

21 attorney?

22 A.  They would either be put in a law firm escrow account or

23 they would be put in what is called an IOLTA account as

24 required by the regulations.

25 Q.  And is an -- is the term IOLTA, is that also often known

Murphy - direct

1  as an attorney trust account?

2  A.  Yes.

3  Q.  Now, you saw these checks were made payable to you as

4  attorney/agent; is that right?

5  A.  Yes.

6  Q.  So did Mr. Rossini give you any particular directions

7  about where you should be depositing these checks?

8  A.  He said that he had the right to use the funds, that was

9  his agreement.  And I -- I just went ahead and didn't put them

10  in a trust account.  I put them in a personal business

11  account.

12  Q.  Why did you do that?

13  A.  I don't have any good reason for doing -- have done it,

14  but I did do it.

15  Q.  At the time did anything seem unusual or suspicious about

16  being given checks that you were supposed to deposit and then

17  disburse?

18  A.  It seemed unusual to me that all of the funds that were

19  going to be given would be deposit -- would be disbursed

20  immediately.

21  Q.  Did you have some understanding of what it is that you

22  were getting out of depositing these checks and then

23  disbursing the funds?

24  A.  At that point, no.  But with subsequent discussions, I

25  did.

Murphy - direct

585

1  Q.  Well, we'll talk about that in a little more detail, but

2  let me ask:  You said you deposited them in your personal

3  account?

4  A.  Personal business account at Chase Bank.

5  Q.  That was in your name, correct?

6  A.  Yes.

7  Q.  Was that an account that ended in 9389?

8  A.  I believe, yes.

9  Q.  Now, you mentioned that you were given -- or that it was

10 expected that the funds would be disbursed.  Were you given

11 any instructions about how to disburse them?

12 A.  Mr. Rossini would call me and he would tell me exactly how

13 the amount would be disbursed.

14 Q.  I'm going to show you what's been marked as Government

15 Exhibit Murphy 2.

16         Do you recognize that document or the series of

17 documents?

18 A.  Yes, I do.

19 Q.  And what are they?

20 A.  They are three checks written off my business account

21 disbursing funds to Mr. Rossini.

22 Q.  Now, I'm going to -- well, I'll ask first:  Do these

23 appear to be true and accurate copies of those documents?

24 A.  Yes, they do.

25         MR. HOGSTROM:  The government moves to admit

Murphy - direct

586

```
 1   Government Exhibit Murphy 2.

 2              MR. ADAMS:  No objection.

 3              THE COURT:  Murphy 2 is admitted in evidence.

 4      (Murphy Exhibit No. 2 received in evidence.)

 5   BY MR. HOGSTROM:

 6   Q.  I'm placing Government Exhibit Murphy 2 on the screen.

 7              Page 1 of this document, is this a personal check?

 8   A.  It's a check written on my personal business account, yes.

 9   Q.  Okay.  And that was -- this is your name and this is the

10   address that you were using at the time related to your

11   business?

12   A.  Yes.

13   Q.  What is the date of this check?

14   A.  It is dated May 25, 2011.

15   Q.  And who is it payable to?

16   A.  It's payable to Albert Rossini.

17   Q.  And what is the amount?

18   A.  $7,500.

19   Q.  And why did you issue this check?

20   A.  Pursuant to Mr. Rossini's direction.

21   Q.  Turning to the next page, is this another personal check?

22   A.  It is.

23   Q.  Is it dated May 26, 2011?

24   A.  I believe it's May 26.  It's hard to read the -- whether

25   it's a six or not.  But, yes.
```

Murphy - direct

587

1  Q.  Is this also payable to Albert Rossini?

2  A.  Yes.  And that's -- just to be clear, I did not write the

3  name of the payee in there.  That is written by someone else,

4  and I believe it was Mr. Rossini.

5           MR. ADAMS:  Objection.

6           THE COURT:  Sustained.  The jury is to disregard the

7  testimony as to who he believed was the one that put the name

8  on the checks.

9  BY MR. HOGSTROM:

10 Q.  Let me back up.  Were there occasions when -- during your

11 interactions with Mr. Rossini, were there occasions when you

12 gave him checks out of this account?

13 A.  Yes.

14 Q.  Did you give him checks that were signed by you and dated

15 by you?

16 A.  Signed by me with an amount and dated.

17 Q.  Okay.  And why would you do that?

18 A.  Because Mr. Rossini requested several blank checks because

19 he had to decide how he was breaking funds up.

20 Q.  And over the course of -- how long have you been dealing

21 with Mr. Rossini?

22 A.  I first met Mr. Rossini in late 2007, 2008 -- early 2008.

23 Q.  And over the course of the time that you represented him

24 or did various business dealings with him, did you see many

25 documents that he was a party to?

Murphy - direct

588

1   A.  Yes.

2   Q.  Did you receive handwritten papers from him?

3   A.  On occasion, yes.

4   Q.  Did you see his signature?

5   A.  Yes.

6   Q.  Approximately how many times do you think you saw

7   Mr. Rossini's signature?

8   A.  Over the period of time that I've known him or just from

9   2007?

10  Q.  Over the time that you've known him.

11  A.  Countless times.

12  Q.  And how many times do you think you've seen his

13  handwriting?

14  A.  Countless times.

15  Q.  Do you recognize the handwriting on the pay to the order

16  of line of this check?

17  A.  Yes.

18  Q.  And whose handwriting is it?

19  A.  Mr. Rossini's.

20  Q.  Now -- and I'll just ask, on the back of the check, is

21  there an endorsement signature?

22  A.  Yes.

23  Q.  Do you recognize that signature?

24  A.  It's Mr. Rossini's.

25  Q.  Now, on the memo line, there's a word written there.  I

Murphy - direct

1    think it says reimbursement; is that right?

2    A.   That's what it appears to me, yes.

3    Q.   And who -- do you recognize the handwriting for that memo

4    line?

5    A.   Yes.

6    Q.   Whose is that?

7    A.   Mr. Rossini's.

8    Q.   You didn't write reimbursement there?

9    A.   No, I did not.

10   Q.   When -- so you gave this check to Mr. Rossini?

11   A.   Yes.

12   Q.   And when you gave it to him, what you gave him was a check

13   that was filled out, including the amount, but just not the

14   pay to the order of line; is that right?

15   A.   Yes.

16   Q.   Now, the last page of this exhibit, is this another check

17   from your account to Albert Rossini, this one dated -- also

18   dated May 26th of 2011?

19   A.   Yes.

20   Q.   And was the amount of this check $5,000?

21   A.   It was.

22   Q.   And does the memo line state fee?

23   A.   Yes.

24   Q.   And do you recognize the handwriting on the pay to the

25   order of line and the memo line?

1   A.  Yes.

2   Q.  And whose is it?

3   A.  Mr. Rossini's.

4   Q.  Is it also Mr. Rossini's signature on the back?

5   A.  Yes.

6   Q.  Were these some of -- these exhibits that we just looked

7   at in Murphy 2, Government Exhibit Murphy 2, were these some

8   of the first checks that you gave to Mr. Rossini after he gave

9   you an investor check?

10  A.  Yes.

11  Q.  Following that -- and this was in May 2011; is that right?

12  A.  Yes.

13  Q.  Following May 2011, did you continue to fulfill this role

14  of receiving checks from Mr. Rossini, depositing them, and

15  then issuing checks on his direction?

16  A.  I either received them from Mr. Rossini or someone he sent

17  down to deliver those checks to me, yes.

18  Q.  For how long did you do this receipt and depositing of

19  checks with Mr. Rossini?

20  A.  It started at this time, May of 2011, and I believe it

21  went to early 2012.

22  Q.  For a period of months?

23  A.  Yes.

24  Q.  Do you have an estimate of how many checks you received

25  from Mr. Rossini and deposited into your personal checking

 1    account?

 2    A.  I don't have an approximate number, no, but there were a

 3    number of them.

 4    Q.  Do you have an idea of how many checks you wrote that were

 5    disbursals directed by Mr. Rossini?

 6    A.  No, I don't.

 7    Q.  I'm going to show you what's been marked Government

 8    Exhibit Murphy 3.

 9           Do you recognize that document?

10     (Brief pause.)

11    BY THE WITNESS:

12    A.  Yes, I do.

13    BY MR. HOGSTROM:

14    Q.  What do you recognize it to be?

15    A.  The first page is an e-mail which I received from

16    Mr. Rossini directing me to obtain several cashier's checks.

17    Q.  And do you recognize the subsequent pages, in general,

18    without specifically stating what they are?

19    A.  Yes, I do.

20    Q.  And do these appear to be fair and accurate copies of the

21    documents that you recognize?

22    A.  Yes.

23           MR. HOGSTROM:  Government moves to admit Government

24    Exhibit Murphy 3.

25           MR. ADAMS:  No objection.

Murphy - direct

592

```
 1          THE COURT:  Murphy 3 is admitted into evidence.
 2      (Murphy Exhibit No. 3 received in evidence.)
 3  BY MR. HOGSTROM:
 4  Q.  Now, is Government Exhibit Murphy 3 a seven-page document?
 5  A.  Yes.
 6  Q.  Or a set of documents that totals seven pages?
 7  A.  Yes, I believe there are seven pages.
 8  Q.  So I want to start on the first page.
 9  A.  Okay.
10  Q.  You stated that there were -- that when Mr. Rossini gave
11  you checks, he would issue instructions on how to disburse the
12  funds; is that right?
13  A.  Yes.
14  Q.  What -- how did he typically give you those instructions?
15  A.  Normally he would call me.  There were a few occasions
16  where he would send me an e-mail.  And then -- or he would
17  hand me a little sheet of paper when the checks were
18  originally delivered before deposited, how they were to be
19  broken down.
20  Q.  So turning to the first page of Exhibit Murphy 3.  Is this
21  an e-mail from Mr. Rossini to you on February 28th, 2012?
22  A.  It is.
23  Q.  And does -- is the memo line cashier's checks?
24  A.  Yes.
25  Q.  Now, I should ask:  When you -- the first couple of
```

Murphy - direct

1    checks, first three checks I guess that we looked at, those

2    were personal checks that you wrote out of your account or

3    that you issued out of your account that you gave to

4    Mr. Rossini; is that right?

5    A.   That is right.

6    Q.   As this practice went on, did you -- did there come a

7    point where you started providing the funds to Mr. Rossini in

8    a different form?

9    A.   I provided funds to Mr. Rossini in several forms.  One

10   would have been the personal business checks.  Others would

11   have been cashier's checks.  And then at times he wanted cash.

12   Q.   Now, when you -- when you took out cashier's checks, why

13   would you do it in that way?

14   A.   Because -- well, in one -- initially he wanted cashier's

15   checks.  He said Babajan Khoshabe wanted cashier's checks.

16   Q.   Okay.  Did you have an understanding as to why?

17   A.   No.  Mr. Rossini just told me that he wanted cashier's

18   checks.

19   Q.   Okay.  Let's talk about this -- the first page of Exhibit

20   Murphy 3, this e-mail.  This is from February 28th, 2012.  Is

21   this one example, this e-mail, of a disbursal instruction that

22   you received?

23   A.   Yes.

24   Q.   Now, can you read what it says in the body of the e-mail?

25   A.   We will deposit Fred's checks to his account --

Murphy - direct

1    Q.  Let me stop you there.  Could you start at the very top

2    where it says "Tom"?

3    A.  Can you get me three cashier's checks.

4    Q.  And then does it say -- list two checks to Fereidoon

5    Khoshabe and one to Albert Rossini?

6    A.  Yes.

7    Q.  What are the amounts of those checks?

8    A.  Fereidoon Khoshabe has a check for 40,000 and a check for

9    $28,334.

10   Q.  And Albert Rossini has a check for what amount?

11   A.  $40,000.

12   Q.  And does it say:  I'll give you the checks when I get

13   there?

14   A.  Yes.

15   Q.  What is that a reference to?

16   A.  I'm not exactly sure.  But if you look at the Exhibit 3,

17   there are three business checks which a line was drawn

18   through.  So I issued business checks for these amounts.

19   Q.  Well, let's turn then to the next page of Murphy 3.

20         Is this a list of -- a set of three checks; is that

21   right?

22   A.  Yes.

23   Q.  Okay.  So these are all -- these are three personal

24   checks; and are these checks where they are all made out fully

25   except for the pay to the order of line and the memo line?

1   A.  Yes.

2   Q.  And you signed these?

3   A.  I did.

4   Q.  And is that your handwriting?

5   A.  It is.

6   Q.  Is this an example of some of the checks that you would

7   have prepared and in some circumstances would have given

8   Mr. Rossini that he may have later have filled out on his own?

9   A.  Yes.

10  Q.  Do you know why these checks have lines drawn through

11  them?

12  A.  Because they were void.

13  Q.  Why were they void?

14  A.  Because he was returning them to me in exchange for

15  cashier's checks.

16  Q.  So instead of these blank personal checks that he would

17  fill out, he wanted cashier's checks now?

18  A.  Yes, he did.

19  Q.  And I just want to turn to the next page.

20          Is this a copy of a cashier's check?

21  A.  Yes.  This is a copy of a cashier's check to Fereidoon

22  Khoshabe.

23  Q.  Is this dated February 28th, 2012 for $40,000?

24  A.  Yes.

25  Q.  And, again, to Fereidoon Khoshabe?

Murphy - direct

596

1    A.  Yes.

2    Q.  Is this one example of a cashier's check that you went and

3    obtained?

4    A.  Yes.

5    Q.  Did you follow this same procedure where you were given

6    instructions about disbursing money by cashier's check on a

7    number of occasions after this date?

8    A.  Yes.  I only disbursed funds per Mr. Rossini's direction.

9    Q.  Who was it that you were disbursing funds to, generally

10   speaking?

11   A.  Generally there was Mr. Rossini, Fred Khoshabe or

12   Fereidoon Khoshabe, and Babajan Khoshabe and I'll say, slash,

13   Anthony Khoshabe.

14   Q.  Why do you say, slash, Anthony Khoshabe?

15   A.  Because at one point, Mr. Rossini called me and said

16   Babajan Khoshabe wanted any disbursement that he was to

17   receive to be payable to Anthony.  He didn't want funds coming

18   in his name.

19   Q.  And were there -- were there a number of occasions where

20   you, in fact, issued cashier's checks to Anthony Khoshabe?

21   A.  I believe, yes.

22   Q.  Let me ask about you.  There were all these checks being

23   issued to these other people that were involved in Devon

24   Street Investments.  Were you getting anything out of this?

25   A.  Yes.  When a check -- a check was received and to be

 1  disbursed, Mr. Rossini would tell me how much I could retain

 2  for myself.

 3  Q.  How much were you usually retaining for yourself?

 4  A.  It varied depending upon what was left.  Mr. Rossini

 5  determined what it was.

 6  Q.  It was a function of how large the original cashier's

 7  check was?

 8  A.  Not necessarily.  It was just whatever Mr. Rossini needed

 9  at the time and then whatever was left.

10  Q.  Now, when a cashier's check would be deposited into the

11  account and then funds would be disbursed through these

12  cashier's checks, how did the -- in your -- from what you

13  could observe, what was -- how did the amounts of funds that

14  were being disbursed from these cashier's checks relate to the

15  amount of the original cashier's check that you deposited from

16  the investors?

17  A.  100 percent of the funds received were disbursed.

18  Q.  And some of them were disbursed this way through these

19  cashier's checks; is that right?

20  A.  Some were disbursed by cashier's checks, yes.

21  Q.  Were there also funds that were disbursed in the form of

22  what were termed rent payments?

23  A.  There were funds, yes.

24  Q.  Did you have an understanding based upon your knowledge of

25  the investment program that Mr. Rossini was offering to

Murphy - direct

598

1    investors of the -- did you have any understanding of what

2    funds were going to be paid to investors through this

3    investment program?

4    A.  Mr. Rossini had said that he was either going to pay the

5    investors the rent that was to be received from these

6    properties that he was going to acquire or what he called the

7    rent equivalent.

8    Q.  So the disbursal instructions that you received about the

9    cashier's checks, the larger ones that we just talked about to

10   those four or five individuals, how did the amounts of the,

11   quote, rent checks that you issued compare to that?

12   A.  They were much smaller.

13   Q.  Where would you get the -- the totals, the dollar values

14   that you would put on the, quote, rent checks?

15   A.  They would be determined by Mr. Rossini.  And Mr. Rossini

16   would give me instructions either to write a business check or

17   obtain a cashier's check.

18   Q.  I want to direct your attention to the second to last page

19   of this document.  It's a set of handwritten numbers that

20   starts with 12,850.

21          Do you see that?

22   A.  It's not on the screen.

23   Q.  I'm sorry.  I will put it on right now.

24          Do you see this?

25   A.  I do.

Murphy - direct

599

1   Q.  What is -- what are we looking at?

2   A.  Looking at a list -- a handwritten list that was given to

3   me by Mr. Rossini of checks.

4   Q.  Whose handwriting is this?

5   A.  Mr. Rossini's.

6   Q.  There are checks here in amounts ranging from what appear

7   to be $1,700 to $12,850; is that right?

8   A.  Yes.

9   Q.  Did you have an understanding of how -- did you have an

10  understanding of which of these checks were supposed to be

11  rent checks and which were supposed to be commission checks?

12  A.  No.  This was just a list of disbursements that I was

13  given.

14  Q.  Now, when you had a list like this, would this be an

15  instance where you would provide those checks that were

16  pre-filled out but blank as to the pay to the order of line?

17  A.  Yes.

18  Q.  Or would these be cashier's checks?

19  A.  No, these were not -- these would not be cashier's checks,

20  no.

21  Q.  Now, when you -- so it was your understanding that

22  Mr. Rossini was paying rent or rent equivalents you said,

23  right?

24  A.  Yes.

25  Q.  You were the person with signatory authority over the

Murphy - direct

600

1 account into which all of the investors' funds were deposited;

2 is that right?

3 A.  Yes.

4 Q.  Did you ever see any rent payments or collections of rents

5 be deposited into this account?

6 A.  No.

7 Q.  Did you yourself ever collect rents on any properties?

8 A.  No.

9 Q.  Did you have discussions with banks about receiving rents

10 for properties that were in foreclosure?

11 A.  No.

12 Q.  Okay.  Now, in addition to incorporating these companies

13 and disbursing these checks, did you also prepare documents

14 for Mr. Rossini in connection with this investment program?

15 A.  I prepared a number of either documents or letter

16 agreements.

17 Q.  Bear with me one moment while I collect some of -- some

18 exhibits at one time so I can give them to you all at once.

19    (Brief pause.)

20       MR. HOGSTROM:  I'm handing the witness what has been

21 marked Government Exhibits Murphy 4, Murphy 5, Murphy 6, and

22 Murphy 7.

23 BY MR. HOGSTROM:

24 Q.  Sir, do you recognize those documents?

25    (Brief pause.)

Murphy - direct

601

1   BY THE WITNESS:

2   A.  Yes, I do.

3   BY MR. HOGSTROM:

4   Q.  What are they?

5   A.  In general?

6   Q.  In general, what are they?

7   A.  In general, they are documents that I prepared at

8   Mr. Rossini's direction.

9   Q.  Do they appear to be true and accurate copies of the

10  documents you prepared?

11  A.  Yes, they do.

12          MR. HOGSTROM:  Government moves to admit Murphy 3 --

13  4, 5, 6, and 7.

14          THE COURT:  Any objection?

15          MR. ADAMS:  No objection.

16          THE COURT:  Murphy Exhibits 4, 5, 6, and 7 are

17  admitted in evidence.

18    (Murphy Exhibit No. 4, 5, 6, and 7 received in evidence.)

19  BY MR. HOGSTROM:

20  Q.  Mr. Murphy, I'm placing on the screen the first page of

21  Government Exhibit Murphy 4.  Is this an e-mail to you from

22  Mr. Rossini on June 28th, 2011?

23  A.  Yes.

24  Q.  With the subject line Robert?

25  A.  Yes.

Murphy - direct

602

1  Q.  I'm sorry.  I think I got the order wrong.  It's from you

2  to him; is that right?

3  A.  Yes.

4  Q.  And is there an attachment listed here?

5  A.  There is.

6  Q.  What is the attachment?

7  A.  It's a copy of the promissory note that I prepared at

8  Mr. Rossini's direction related to Robert Badalian.

9  Q.  What -- what did Mr. Rossini tell you about Mr. Badalian

10 that led to the creation of this document?

11 A.  He told me that Mr. Badalian was investing $40,000 and

12 that Mr. Rossini had promised to repay the $40,000 plus an

13 additional sum in September of 2011.

14 Q.  So I'm going to turn to -- have you turn to the third page

15 of this document.  It says "note" on the top of the screen.

16        Do you see that?

17 A.  Yes.

18 Q.  It has an amount of $40,000; is that right?

19 A.  Correct.

20 Q.  Now, without going through all of the language in this

21 document, can you generally describe what this document is

22 supposed to be?

23 A.  Yes.  It was a -- to evidence the fact that Mr. Badalian

24 had given $40,000 to either acquire the title to a piece of

25 property, which is listed at 4333 West Adams, or to acquire

Murphy - direct

603

1    the note and mortgage currently on the property.

2    Q.   And turning to the next page, is it listed as -- is there

3    a line for borrower and then the name Albert Rossini?

4    A.   Yes.

5    Q.   When you -- so you sent this to him through this e-mail;

6    is that right?

7    A.   I did.

8    Q.   Why did you draft it the way that you did?

9    A.   I drafted it on the instructions of Mr. Rossini.

10   Q.   He said that he wanted a document that was a promissory

11   note?

12   A.   Yes.

13   Q.   For those of us in the room who aren't lawyers, what -- in

14   general terms, what is a promissory note?

15   A.   A promissory note is an evidence of an obligation to make

16   a payment -- that funds have been borrowed and what amount has

17   been borrowed, what the return is to the lender, and when that

18   money is to be paid.

19   Q.   Is a promissory note in essence a loan?

20   A.   It is in essence a loan, yes.

21   Q.   So under a promissory note, if somebody -- if I understand

22   you correctly, if somebody receives funds under the terms of a

23   promissory note, they are able to use the funds as they see

24   fit; is that right?

25   A.   That is correct.

Murphy - direct

1   Q.  After you sent this document to Mr. Rossini, did you have

2   any further conversations with him about the investment that

3   he was engaged in with Mr. Badalian?

4   A.  Well, Mr. Rossini subsequently said that he did not want

5   something as formal as a note.  He wanted something that was

6   less language, less legalese.

7   Q.  Did you have that conversation with him over the phone?

8   A.  Most of my conversations with Mr. Rossini -- I would say

9   90 percent of them -- were over the phone or by e-mail.

10  Q.  Did he give you an indication of how he wanted -- what

11  type of different document that he wanted apart from a

12  promissory note?

13  A.  He wanted something that simply evidenced his guarantee or

14  his promise to acquire the property and then evidence as to

15  what return he was giving the investor.

16  Q.  And you said he wanted something less formal?

17  A.  Yes.

18  Q.  Did he say why he wanted it to be less formal?

19  A.  He just didn't want promissory notes.

20  Q.  Now, was this conversation about promissory note -- not

21  having a promissory note but having something that guaranteed

22  the investment, was this simply pertaining to Mr. Badalian or

23  was it about the entire investment program?

24  A.  It was basically about the entire investment program and

25  it would apply to any investor.

Murphy - direct

605

1   Q.  Turning your attention to Exhibit Murphy 5.

2          Is this an e-mail sent from you to Mr. Rossini on

3   July 21st, 2011?

4   A.  Yes.

5   Q.  And is the subject line revised doc?

6   A.  Yes.

7   Q.  And what is it that you say in the body of the e-mail?

8   A.  It says:  I added the language on the foreclosure process

9   that you requested.

10  Q.  Turning to the next page -- the third page actually,

11  was -- what's on the third page here, was this what was

12  attached to that e-mail?

13  A.  Yes.

14  Q.  And, I'm sorry, I think I accidentally skipped forward.

15  One moment.

16         Okay.  So this document that is on page 3 of Murphy

17  5, what are we looking at here?

18  A.  You're looking at a template that I prepared of a guaranty

19  agreement and that I sent to Mr. Rossini to review.

20  Q.  And the e-mail -- the body of the e-mail, as we just

21  referenced, indicated that Mr. Rossini had asked you to add

22  language?

23  A.  Yes.

24  Q.  Do you recall what -- what it was that he wanted to be in

25  this document that wasn't there before?

Murphy - direct

606

1  A.  If you look at the end of the first paragraph, it says:

2  Rossini agrees that he will cause the foreclosure process to

3  be completed and thereafter shall have the title to the

4  property deeded to or as the person directs.

5  Q.  And this is language that Mr. Rossini directed you to put

6  in this document?

7  A.  It is.

8  Q.  I'll ask you about some other language in the document.

9         The fourth line through about the seventh or eighth

10 line says:  With respect to each such parcel of real property

11 and/or notes and mortgages presented, Rossini acknowledges

12 that he has obtained written assignments of the right to

13 acquire each such parcel from the contract purchaser and/or

14 the existing notes and mortgages from the lender, and based

15 upon those written assignments, Rossini has asked blank to

16 advance funds to be used to purchase the properties pursuant

17 to the assignments.

18         Was this language placed in this document at your

19 instance or Mr. Rossini's instance?

20 A.  At Mr. Rossini's instance.  And he also had this document

21 reviewed by Mr. Khoshabe.  And some of the input Mr. Khoshabe

22 had Mr. Rossini passed on to me.

23 Q.  So you had conversations with Mr. Rossini where he would

24 tell you that Babajan wanted things added to this document; is

25 that right?

Murphy - direct

607

1   A.  Yes.  I believe there's an e-mail that was sent to me by

2   Mr. Rossini that Babajan Khoshabe was requesting certain

3   provisions in the document.

4   Q.  Okay.  This language, that Mr. Rossini has obtained

5   written assignments, did you ever see any written evidence of

6   Mr. Rossini's right to obtain any of these notes or acquire

7   any of these notes or evidence of ownership of any of these

8   notes?

9   A.  No, I did not.

10  Q.  When you put this language in the document, did you --

11  were you aware that you had never seen any evidence of these

12  written assignments?

13          MR. ADAMS:  Objection, form of the question.

14          THE COURT:  Sustained.  Please rephrase your

15  question.

16  BY MR. HOGSTROM:

17  Q.  When you put this -- let me ask it this way:  Did it cause

18  you any concern that you would be putting -- that you were

19  putting a statement in this document that Mr. Rossini had

20  written rights of assignments when you had never seen any

21  evidence that he had such items?

22  A.  It did.

23  Q.  What concern did it give you?

24  A.  Well, I asked Mr. Rossini if, in fact, he had done that;

25  and I was told that he and his people were working on those --

Murphy - direct

608

1    that part of the transactions, and I didn't need to be worried

2    about it.

3    Q.   Okay.  I want to talk about -- a little more about the

4    third paragraph.  Does it state:  Rossini hereby guarantees to

5    blank that in the event that any one or more of the properties

6    for which blank has advanced funds are not closed and/or the

7    notes and mortgages are not purchased from the lender and

8    purchased pursuant to the assignment for that property, that

9    Rossini shall be personally responsible to return any and all

10   sums so advanced by blank for that particular property and

11   shall return such funds within five days after Rossini has

12   determined that no closing and/or purchase will occur pursuant

13   to the assignment.

14        Is that what it says in that paragraph?

15   A.   It is.

16   Q.   Is that language that you put in this document or that

17   Mr. Rossini asked you to put in the document?

18   A.   Base -- the wording is mine, but it is the idea and the

19   concept is Mr. Rossini's.

20   Q.   And what was the concept that he asked you to enshrine in

21   this language?

22   A.   Basically if the deals that he allegedly had do not close,

23   he would then have to give the money back to the individual

24   within five days, that -- when he determined he could no

25   longer acquire the property or the notes.

Murphy - direct

609

1   Q.  Now, this document that we're looking at here, it has a

2   lot of blanks in it; is that right?

3   A.  Yes.

4   Q.  You called it a template earlier.  Is -- did this template

5   that we're looking at, was this used for specific guaranty

6   agreements that were given to other investors?

7   A.  Yes.

8   Q.  And direct your attention then to Government Exhibit

9   Murphy 6.

10          Is this an e-mail from December 28th, 2011 from you

11  to Mr. Rossini?

12  A.  It is.

13  Q.  And is the subject Rossini-Pithyou Guaranty.docx?

14  A.  Yes.

15  Q.  And does it reflect there's an attachment?

16  A.  It is.

17  Q.  I'm going to turn to the attachment, which is page 2.

18          Is this a guaranty agreement?

19  A.  It is.

20  Q.  And who -- which -- which investor is this agreement for?

21  A.  This is for the Assyrian Church in Chicago, a Bishop --

22  and I really -- I know it's Pithyou is the last name, but I do

23  not know how to pronounce his first name.

24  Q.  At the time that you sent this e-mail to Mr. Rossini, had

25  you ever met Awiquam Pithyou?

Murphy - direct

 1   A.  No, I had not.

 2   Q.  Were you involved in any way in speaking to him about the

 3   investment program at that time?

 4   A.  No.

 5   Q.  How did you know that this guaranty agreement should have

 6   his name in it?

 7   A.  Mr. Rossini directed me to complete a guaranty agreement

 8   with his name in it.

 9   Q.  Now, on the bottom of the screen, there's a signature line

10   and a line for a date.  They're blank in this document; is

11   that right?

12   A.  They are.

13   Q.  Did you ever receive an executed version of these

14   documents with signatures on it or dates?

15   A.  No, I did not.

16   Q.  So you would send them to Mr. Rossini, and that was the

17   last you would see of them?

18   A.  Yes.

19   Q.  Before I move on to the next document, you had previously

20   said that you would get these investor checks in and then

21   funds would be disbursed; and that very often, the funds would

22   be close to, if not all of, the amount of the original

23   deposit; is that right?

24   A.  The funds disbursed were always 100 percent of the amount

25   deposited.

Murphy - direct
611

1    Q.  So this guaranty agreement -- and this is in December

2    of 2011; is that right?

3    A.  That's when I drafted it, yes.

4    Q.  So this is five or six, seven months after the very first

5    one you did; is that right?

6    A.  Yes.

7    Q.  So this is well along -- I'm just going to highlight that

8    last paragraph again where it says that Mr. Rossini would

9    return funds within five days.

10          When you sent him this document, did you have any

11   concerns about whether it would be possible for him to return

12   funds to investors within five days?

13   A.  But it says five days after Mr. Rossini himself would

14   determine that he could not close a transaction.  So it wasn't

15   to be returned within five days.  It was to -- there was a

16   whole process when you negotiate to buy loan documents or

17   you're in foreclosure.  Sometimes foreclosures can take two,

18   three years.

19   Q.  But the -- the starting point of the five days, according

20   to this document, is Mr. Rossini's sole discretion; is that

21   right?

22   A.  Yes.

23   Q.  How did that idea get into the document?

24   A.  That was from Mr. Rossini.

25   Q.  I'm going to turn your attention to Government Exhibit

612

1    Murphy 7.

2            THE COURT:  Actually I think this might be a good

3    time to break since you're going into another subject matter,

4    right?

5            MR. HOGSTROM:  Yes, Judge.

6            THE COURT:  All right.  So, ladies and gentlemen, we

7    will adjourn for the day.  We will reconvene tomorrow at

8    10:00 a.m.  Please be in the jury room by 9:45 as usual.

9    During the overnight break, please do not discuss this case

10   with one another or with anyone else for that matter.  And

11   please do not do any independent research regarding any of the

12   terms or people or companies or properties that you've heard

13   discussed in this case.

14           I want to thank you very much today for your

15   attention.  I do want to let you know that we're on track as

16   far as timing goes.  Okay.  Thank you.

17     (Jury out.)

18           THE COURT:  Mr. Murphy, you may step down.  During

19   the overnight break, please do not discuss the subject matter

20   of your testimony with anyone.

21           THE WITNESS:  Yes, your Honor.

22           THE COURT:  Thank you.

23     (Witness temporarily excused.)

24           THE COURT:  All right.  So who do we have up for

25   tomorrow other than Mr. Murphy?

1      MR. NOVAK:  We have Bishop Ninos Younan, John Kulnig,

2  and Janet Khoshaba.  That will probably take us to the end of

3  the day or close, and we can read stipulations to finish up

4  the day.

5      THE COURT:  Okay.

6      MR. NOVAK:  But that should -- I was talking with

7  counsel about timing, and we're going to stipulate -- they're

8  going to stipulate to a witness, so that will be the last --

9  other than the financial analyst and the summary witness, that

10 should be the last of our witnesses tomorrow.

11     THE COURT:  Okay.  And then the financial witness and

12 the summary witness will go on on Monday?

13     MR. NOVAK:  Monday morning.

14     THE COURT:  And do you expect them to take more than

15 the full day?

16     MR. HOGSTROM:  No.

17     MR. NOVAK:  No.

18     MR. HOGSTROM:  Probably, at most, the morning.

19     THE COURT:  Including cross?

20     MR. NOVAK:  They won't go past the day with cross.

21     THE COURT:  All right.

22     MR. FRANKEL:  Judge, will we have a final jury

23 instruction conference?  We can do it Monday afternoon if we

24 break --

25     THE COURT:  We'll do it Monday at the end of the day.

```
 1            At this point in time, as of now, do -- defense, do
 2   you intend to put any witnesses on?
 3            MR. ADAMS:  At this point, no.  We're -- I'm still
 4   trying to put together some stipulations for the government.
 5   I haven't had a chance yet.  I'll probably do that after cross
 6   tomorrow with Mr. Murphy.
 7            THE COURT:  Okay.
 8            MR. ADAMS:  I'll know more tomorrow afternoon, your
 9   Honor.  But most likely, no.
10            THE COURT:  All right.
11            MR. NOVAK:  It would just be Agent Evans anyway?
12            MR. ADAMS:  Just Agent Evans.
13            MR. NOVAK:  So we can probably work that out over the
14   weekend.
15            THE COURT:  At this point in time, do you know
16   whether Mr. Rossini is going to testify?
17            MR. ADAMS:  We're still talking about it, your Honor.
18            THE COURT:  I understand.
19            Okay.  Very good.  We will see you tomorrow at 10:00
20   o'clock.
21            Oh, sorry.  We're going to go through exhibits.  I
22   always forget about exhibits.
23            This is what I have on my list:  There is Ashoor 1,
24   Ashoor 2.  The bank documents I'm just going to name by bank.
25   Chase documents, the Bank of America documents, the IBC
```

615

1   document, MB Financial documents, Wells Fargo documents, and

2   the Wintrust document.  And then Khodi, 20, 21, 22, 23, 24,

3   25, 26, 27, 28, 29, 30, 31, and 32.  And then Murphy

4   Exhibits 1, 2, 3, 4, 5, 6, and 7.

5           Is that consistent with the government's list?

6           MR. NOVAK:  Yes, your Honor.

7           THE COURT:  Is that consistent with the defense list?

8           MR. ADAMS:  Yes, your Honor.

9           THE COURT:  Very good.  See you tomorrow.

10     (Trial adjourned until June 8, 2018, at 10:00 a.m.)

11                      *    *    *    *    *

12

13  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

14

15

    */s/ Nancy C. LaBella*              *June 8, 2018*
16  Official Court Reporter

17

18

19

20

21

22

23

24

25