```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket No. 15 CR 515-1
                                      )
 4                    Plaintiff,      )
                                      )
 5           v.                       )  Chicago, Illinois
                                      )  June 8, 2018
 6   ALBERT ROSSINI,                  )  9:40 o'clock a.m.
                                      )
 7                    Defendant.      )

 8                            VOLUME 4A
                  TRANSCRIPT OF PROCEEDINGS - TRIAL
 9           BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10   APPEARANCES:

11   For the Government:           HON. JOHN R. LAUSCH, JR.
                                   United States Attorney, by
12                                 MR. ERIK A. HOGSTROM
                                   MR. WILLIAM PATRICK NOVAK
13                                 Assistant United States Attorneys
                                   219 South Dearborn Street
14                                 Chicago, Illinois 60604

15   For the Defendant:           LAW OFFICES OF JOSHUA B. ADAMS,
                                   P.C., by
16                                 MR. JOSHUA B. ADAMS
                                   53 West Jackson Boulevard
17                                 Suite 1515
                                   Chicago, Illinois 60604
18
                                   FRANKEL & COHEN, by
19                                 MR. SCOTT JAY FRANKEL
                                   53 West Jackson Boulevard
20                                 Suite 1615
                                   Chicago, Illinois 60604
21

22                       ALEXANDRA ROTH, CSR, RPR
                            Official Court Reporter
23                        219 South Dearborn Street
                                 Room 1224
24                        Chicago, Illinois 60604
                              (312) 408-5038
25
```

1    (The following proceedings were had in open court outside

2    the presence of the jury:)

3    THE CLERK:  15 CR 515, USA versus Albert Rossini, for

4    jury trial.

5    MR. ADAMS:  Judge, good morning.  Joshua Adams and

6    Scott Frankel for Albert Rossini, who's present.

7    MR. FRANKEL:  Good morning, Judge.

8    MR. NOVAK:  William Novak and Erik Hogstrom for the

9    United States.  Good morning, your Honor.

10   THE COURT:  Good morning.  All right.  So --

11   MR. ADAMS:  Judge, on cross-examination of Mr. Murphy

12   I'd like to use this demonstrative exhibit, which is a

13   sentencing guideline chart.  I showed it to the government.

14   They told me they do not object.  I wanted to raise it with the

15   Court before --

16   THE COURT:  That's fine.

17   MR. HOGSTROM:  The one issue that we have, Judge, is

18   our -- one of our witnesses, Janet Khoshaba, this morning, our

19   agent has been in communication with her, and she is under

20   subpoena and is -- it appears is in some amount of emotional

21   distress about this.

22   And we are considering -- we have briefly talked to

23   defendants, but we are considering putting either a

24   stipulation, and barring that having to make a decision whether

25   we call her at all.

1    I raise this for the Court only because it would
2    probably cut short the trial day by 30 to 45 minutes.  And I
3    know your Honor likes to keep things moving all the way up
4    until the last -- to the end of the day so as not to waste the
5    jury's time.
6         So I just want to front that with the Court and let
7    you know that that's -- that issue is out there.
8         THE COURT:  Okay.
9         MR. ADAMS:  Your Honor, can we look at the -- I like
10   to look at her 302 reports, and I think we can resolve this by
11   the lunch break.
12        THE COURT:  Okay.  That sound great.  If we have -- I
13   mean, it's Friday.  So I don't think that you are going to get
14   any objections from the jury if we end a little bit early
15   today.  All right?  And particularly if the parties can resolve
16   it by stipulation.
17        Okay.  All right.
18        MR. HOGSTROM:  Thank you, your Honor.
19    (Brief recess.)
20        THE CLERK:  Case 15 CR 515, USA versus Albert Rossini,
21   for jury trial.
22        MR. HOGSTROM:  Good morning, your Honor.  Erik
23   Hogstrom and Bill Novak for the United States.
24        MR. ADAMS:  Good morning, your Honor.  Joshua Adams
25   and Scott Frankel for Albert Rossini, who's present.

1              THE COURT:  Good morning.  We are just going to have

2    Mr. Murphy come back up.

3         (Witness resumed the stand.)

4              THE COURT:  Good morning, Mr. Murphy.  I want to

5    remind you, you are still under oath.

6              THE WITNESS:  Yes.

7              THE COURT:  Please take a seat.

8              Let's bring them in.

9         (Jury entered the courtroom.)

10             THE COURT:  Good morning, ladies and gentlemen.  We

11   will now continue with the testimony of Thomas Murphy.

12             MR. HOGSTROM:  Thank you, Judge.

13        THOMAS W. MURPHY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

14                   DIRECT EXAMINATION (Resumed)

15   BY MR. HOGSTROM:

16   Q.  Mr. Murphy, when we left off yesterday, we had just looked

17   at the Government Exhibit Murphy 6, which was an e-mail you

18   sent to Mr. Rossini on December 28, 2011, attaching the

19   guaranty agreement for the Reverend Awiquam Pithyou.

20             Do you recall that testimony?

21   A.  Yes, I do.

22   Q.  And I believe you said that there were many occasions when

23   Mr. Rossini would give you the name of an investor that he

24   needed a guaranty agreement for, and then you would then send

25   such guaranty agreement to him, is that right?

1   A.   That is correct.

2   Q.   Were there -- in addition to these guaranty agreements,

3   were there other types of documents or agreements related to

4   these investors that Mr. Rossini would from time to time ask

5   you to prepare?

6   A.   Yes, there were.

7   Q.   I'm showing the witness what's been marked as Government

8   Exhibit Murphy 7.  Do you recognize Government Exhibit

9   Murphy 7?

10  A.   I do.

11  Q.   What do you recognize it to be?

12  A.   These are documents that I prepared at Mr. Rossini's

13  direction, regarding an individual by the name of Yousif.

14  Q.   Are those true and accurate copies of the documents that

15  you prepared?

16  A.   Yes.

17       MR. HOGSTROM:   Government moves to admit Murphy 7?

18       MR. ADAMS:   No objection.

19       THE COURT:   Murphy 7 is admitted in evidence.

20       (Said exhibit was received in evidence.)

21  BY MR. HOGSTROM:

22  Q.   Placed on the screen the first page of Government Exhibit

23  Murphy 7.  Is this an e-mail sent on July 25, 2012, from

24  BertRossini4@aol.com to your e-mail at your law firm?

25  A.   Yes.

Murphy - direct                                             621

1   Q.  And the -- underneath the header it states:  Yousif

2   cancellations and letter agreements on commissions.

3   A.  Yes.

4   Q.  Do you know what that is a reference to?

5   A.  There were some commissions that Mr. Rossini said that he

6   owed to Mr. Yousif.  And I believe, if I recall correctly,

7   Mr. Yousif had a guaranty agreement which he was canceling.

8   Q.  Now, right below that, there is an embedded message header

9   that says, original message from E-Fax to BertRossini4@aol.com.

10  What is that?

11  A.  I don't have any recollection what that may be.

12  Q.  When you sent -- did you ever use a fax system to provide

13  documents to Mr. Rossini?

14  A.  I may have received documents from Mr. Rossini by fax.  I

15  don't recall faxing any documents to him.

16  Q.  When you did -- when you sent documents, it would be by

17  e-mail, is that right?

18  A.  Normally, yes.

19  Q.  So turn to the third page of that document please.  I'm

20  just going to highlight the date.  Is that June 11, 2012?

21  A.  Yes.

22  Q.  And who is this letter addressed to?

23  A.  Ibrahim Yousif.

24  Q.  And did you know at the time that you prepared this letter

25  at Mr. Rossini's request who Ibrahim Yousif was?

1  A.  No, I never talked to him or met him.

2  Q.  The body of the -- of the letter states:  The purpose of

3  this letter is to acknowledge the various commissions which I

4  have previously paid to you for your assistance in arranging to

5  have individuals advance funds either to purchase real property

6  or to acquire the notes and mortgages related to real property.

7  Below please find a list which has set forth the names of the

8  individuals, the address of the property, and the amount of the

9  commission paid to you for each.

10        Is that what it says?

11  A.  That is exactly what it says.

12  Q.  And that language that I just read from this document, who

13  -- who put that language in this document?

14  A.  I did.

15  Q.  And why did you put that language in this document?

16  A.  Because Mr. Rossini indicated to me or told me that he owed

17  Mr. Yousif commissions and had paid commissions to him.  And he

18  wanted it summarized in a letter.

19  Q.  Did he indicate why it was that he needed to pay Mr. Yousif

20  commissions, or why he needed a letter that summarized what the

21  amount of the commissions was?

22  A.  Because he wanted to make sure that he tied down the amount

23  that he owed.  And Mr. Yousif and he were having some

24  difficulties.

25  Q.  Now, I'm going to turn to the next page of this document.

1    Do you see at the top of the screen it says, release

2    indemnification and hold harmless agreement?

3    A.  I do.

4    Q.  I'm going to turn one further page.  And there is two sets

5    of signatures at the bottom.  Is this document signed by Albert

6    Rossini and Ibrahim Yousif?

7    A.  I recognize Mr. Rossini's signature.  I assume that it is

8    signed by Mr. Yousif but --

9    Q.  The name under the signature line is Ibrahim Yousif and

10   Aldar LLC, is that right?

11   A.  Yes.

12   Q.  Do you know what this document is?

13   A.  It was a document related to the guarantee which Mr.

14   Rossini had given to Mr. Yousif, and it was a settlement on the

15   guarantee.

16   Q.  Why -- why did you prepare it?

17   A.  At Mr. Rossini's direction.  He wanted to be protected in

18   case Mr. Yousif later made a claim.

19   Q.  And how would this document do that?

20   A.  It said that -- can I see the --

21   Q.  Sure.

22   A.  -- the document?

23        It was an agreement in paragraph 1 that Mr. Rossini

24   would pay an amount to Mr. Yousif, and that based on this

25   agreement, Mr. Yousif would indemnify and hold Mr. Rossini

Murphy - direct                                    624

1   harmless from any claim under the guarantee that's referred to

2   on the prior page.

3   Q.   In your years as a lawyer, were you familiar with similar

4   agreements to this hold harmless, indemnification, those types

5   of agreements?

6   A.   Yes.

7   Q.   What is the purpose of such an agreement?

8   A.   It is to waive any claims or to be used as a defense in

9   case a subsequent claim is made on a prior settlement.

10  Q.   So if Mr. Yousif were to have taken some action against

11  Mr. Rossini, would this document have provided an obstacle to

12  Mr. Yousif?

13  A.   If he was going to take action on the guarantee that's

14  referred to in the agreement, this would be used as a defense,

15  yes.

16  Q.   Now, this document specifically references Rossini, is that

17  right.

18  A.   Yes.

19  Q.   And Yousif, is that right?

20  A.   Yes.

21  Q.   Does your name appear anywhere in this document?

22  A.   No, it does not.

23  Q.   Does this document set forth terms that would protect you

24  in the event that somebody went after you?

25  A.   It does say that he is indemnifying Mr. Rossini and his

Murphy - direct                    625

1    respective affiliates, agents, representatives, servants,

2    attorneys, employees, successors and assigns, which is very

3    standard language.

4    Q.   That -- that language is the sort of language that normally

5    occurs in one of these documents, is that right?

6    A.   Yes.

7    Q.   There is nothing in here that specifically protects your

8    interests, is there?

9    A.   Am I not specifically named --

10              MR. ADAMS:  Objection, Judge, relevance.

11              THE COURT:  Overruled.

12   BY THE WITNESS:

13   A.   I am not specifically named in this document, no.

14   BY MR. HOGSTROM:

15   Q.   What's in this document is in here because Mr. Rossini

16   asked you to prepare it to protect his interests, correct?

17              MR. ADAMS:  Objection, leading.

18              THE COURT:  Sustained.  You can rephrase the question.

19   BY MR. HOGSTROM:

20   Q.   The content of this document -- is the content of this

21   document reflective of the instructions that Mr. Rossini gave

22   you?

23   A.   That is correct.

24   Q.   Now, I want to turn back briefly to the third page.  This

25   is the commission letter that we talked about earlier.  You

Murphy - direct

626

1   referenced the idea that Mr. Rossini was in some sort of a

2   dispute with Mr. Yousif, to your knowledge?

3   A.   That's what I had understood, and it was based on some

4   claim for commissions that Mr. Yousif said that Mr. Rossini

5   owed.

6   Q.   Did you at one point at Mr. Rossini's direction issue a

7   cashier's check to Mr. Yousif?

8   A.   I believe so.

9   Q.   I'm going to put on the screen what has been entered into

10  evidence as Government Exhibit Yousif 14.   Is this a cashier's

11  check that you prepared out of the account that held the

12  investor funds for July -- date July 16, 2012, in the name of

13  Ibrahim Yousif?

14  A.   Yes.

15  Q.   And the amount is $108,400, is that right?

16  A.   Correct.

17  Q.   Do you know why that amount was what it was?

18  A.   It was the amount that was given to me by Mr. Rossini to

19  have the check prepared.

20  Q.   On the bottom left-hand corner where the memo is, it

21  states:   Return of money invested less $116,600 paid to Yousif

22  in commissions.

23          Why did that language appear on the check?

24  A.   It didn't appear on the check when I got the check.   It

25  would have been added after.

1  Q.   And who did you give the check to?

2  A.   I gave it to Mr. Rossini.

3  Q.   Okay.  Now, we talked in the very beginning of your

4  testimony about you incorporating the company Devon Street

5  Investments.  Do you recall that testimony?

6  A.   I do.

7  Q.   Did Mr. Rossini ever instruct you to incorporate any other

8  legal entities related to the investment program?

9  A.   Yes.

10  Q.   Showing you what has been marked as Government Exhibit

11  Murphy 9 -- Murphy 8 and Murphy 9.  Do you recognize those

12  documents?

13  A.   Yes.

14  Q.   Generally what are they?

15  A.   These are incorporation papers and certificates to be used

16  for opening bank accounts.

17  Q.   Are these true and accurate copies of those documents?

18  A.   Yes, they are.

19       MR. HOGSTROM:  Government moves to admit Murphy 8 and

20  Murphy 9.

21       MR. ADAMS:  No objection.

22       THE COURT:  Murphy Exhibit 8 and Murphy Exhibit 9 are

23  admitted in evidence.

24     (Said exhibit was received in evidence.)

25  BY MR. HOGSTROM:

Murphy - direct                          628

1    Q.  I am placing on the screen the first page of Murphy 8.  I'm

2    going to highlight this portion of the document.

3              Is this an e-mail on October 31, 2011, from you to

4    Mr. Rossini, with the subject, Reliant dash certificate of

5    president?

6    A.  Yes.

7    Q.  Why were you sending this e-mail to Mr. Rossini?

8    A.  Mr. Rossini prior to this had contacted me and asked me to

9    incorporate a company known as Reliant Management on behalf of

10   Anthony Khoshabe.

11   Q.  Who was Anthony Khoshabe?

12   A.  Anthony Khoshabe was the son of Babajan Khoshabe, who was

13   dealing with Mr. Rossini.

14   Q.  Did Mr. Rossini tell you why he was wanting a company to be

15   incorporated in Anthony Khoshabe's name?

16   A.  Because Anthony Khoshabe was going to take over management

17   of properties for certain investors.

18   Q.  What did you understand Mr. Rossini meant by management of

19   properties?

20   A.  At that point I didn't know because there were no rents or

21   anything coming in.  So --

22   Q.  You just -- you just incorporated the -- the company as

23   requested, is that right?

24   A.  That's correct.

25   Q.  Now, turning to the second page of this document.  What is

1  this document?

2  A.  This again is a certificate of president, and attached to

3  it is a resolution which authorizes Anthony Khoshabe to open a

4  bank account.  I believe the first one that was prepared was

5  for Bank of America.

6  Q.  Generally speaking, what is a certificate of the president?

7  Is that a common document?

8  A.  It's a very common document.  It basically says, the

9  company has been incorporated.  The company has an employer

10 identification number.  These are the officers.  These are the

11 people who are authorized to act on behalf of the entity.  And

12 then you attach a resolution.  And the resolution, if it was to

13 open a bank account, would say open a bank account.  If it was

14 to sign a contract, the resolution say something about the

15 contract to be executed.

16 Q.  And the signature blocks for president, treasurer and

17 secretary are all Anthony Khoshabe, is that right?

18 A.  That is correct.

19 Q.  And was -- why was the name Anthony Khoshabe placed on

20 those signature blocks?

21 A.  Because I was told that Anthony Khoshabe was going to be

22 the sole owner of this entity.

23 Q.  Turning to the fifth page of this document -- excuse me,

24 the sixth page of this document.  What is this document?

25 A.  Those are the articles of incorporation which were filed

Murphy - direct                    630

1   with the Secretary of State of Illinois.

2   Q.   How were they filed?

3   A.   Electronically.

4   Q.   By you?

5   A.   Yes.

6   Q.   And just I am going to highlight, the corporate name is

7   Reliant Management, is that correct?

8   A.   That is correct.

9   Q.   And what does -- there is -- right below that there is your

10  name as initial registered agent.  What does that mean?

11  A.   A registered agent -- you have to have a registered agent

12  for any corporation in whatever state you are being organized.

13  And the registered agent is a person who they designate for

14  service of process.  So if you are suing that corporation, you

15  can either serve the officer of the corporation, or you can

16  serve the registered agent.

17  Q.   Now, I'm turning to -- excuse me.

18       Turning to the seventh page of this document.  Is this

19  another articles of incorporation?

20  A.   Yes.

21  Q.   And this one is dated July 6, 2012, is that right?

22  A.   No, it's dated June 6, 2012.

23  Q.   I'm sorry.  June 6, 2012, is that right?

24  A.   That is correct.

25  Q.   And the company name for this entity is Devon Street

1  Management, is that correct?

2  A.  That is correct.

3  Q.  This was approximately eight months after the Reliant

4  Management incorporation, is that right?  Or seven months

5  after?

6  A.  That is correct.

7  Q.  How did it come about that -- well, let me ask, did you

8  actually incorporate this entity?

9  A.  I did.

10  Q.  And why did you incorporate it?

11  A.  At the direction of Mr. Rossini.

12  Q.  Do you recall what Mr. Rossini told you about incorporating

13  this entity?

14  A.  He called me and asked me to incorporate an entity known as

15  Devon Street Management Company.

16  Q.  Was there an explanation as to why?

17  A.  No.

18  Q.  But you did it, correct?

19  A.  I did do it, yes.

20  Q.  Okay.  Now, in addition to the disbursement of funds and

21  the drafting of these documents and the incorporating these

22  companies, did there come a point when Mr. Rossini began

23  talking to you about getting together an accounting of all of

24  the rental income or income from investors, related to his

25  investment program?

Murphy - direct                    632

1  A.  Mr. Rossini contacted me and said that Fereidoon Khoshabe

2  and Babajan Khoshabe were asking for documentation regarding

3  income that was to be received and documents showing that these

4  properties had been either acquired, and Mr. Rossini said he

5  was going to get the documentation together to get to me.

6  Q.  Now, during this time period, did you become aware of

7  potential problems that Mr. Rossini was having with investors?

8        MR. ADAMS:  Objection, foundation, as to what time

9  period.

10        THE COURT:  Sustained.  Can you please get a time

11  period.

12        MR. HOGSTROM:  Sure.

13  BY MR. HOGSTROM:

14  Q.  Specifically directing your attention to the fall of 2012.

15  Do you recall learning that Mr. Rossini was having difficulty

16  with certain investors?

17  A.  Yes.

18  Q.  What do you recall about that?

19  A.  I would receive several phone calls at my office from

20  people I never talked to before, leaving me messages about

21  wanting to talk to me.  I would contact Mr. Rossini and say,

22  what is this about?  And he would tell me that he would handle

23  it.  Don't worry about it.

24  Q.  Did there come a point when Mr. Rossini told you about

25  something that Babajan was going to do related to you and your

1    office?

2    A.   I got a phone call one afternoon that Babajan Khoshabe was

3    going to my law office to see one of the partners.

4    Q.   And what was your reaction to that?

5    A.   I said, for what?  And he said -- kind of laughing, said,

6    oh, he's going to go in demand documents.

7    Q.   And what -- did you ask why?

8    A.   Because Babajan was asking where -- allegedly was asking

9    where all the rents were.

10   Q.   What was your reaction to that?

11   A.   I told Mr. Rossini, I don't know why he is going there.  I

12   had nothing to do with collection of rents.

13   Q.   And what -- what was his reaction to that?

14   A.   He laughed.

15   Q.   Now, did you become aware that -- let me back up.

16        When you said people would call you that you had never

17   spoken to, what were they calling you about?

18   A.   The messages were regarding the properties that they had

19   allegedly invested in.

20   Q.   And what -- what were they saying in the messages that they

21   were looking for from you?

22   A.   They would want me to call them.  They wanted a status or

23   an update on those properties.

24   Q.   During this time period, were you still receiving

25   investment checks coming in from Mr. Rossini, the same way that

Murphy - direct                                    634

1   you were before?

2   A.   There may have been a few in the fall of 2012.  But it

3   certainly was not in the same flow as it was prior to that.

4   Q.   And what about rental payments out?

5   A.   When money would come in, Mr. Rossini would ask for checks.

6   And he used those, I assumed, for rental payments out.

7   Q.   That was at a much lower rate than earlier in the year, is

8   that right?

9   A.   That's correct.

10  Q.   During this time period, did you begin having conversations

11  with Mr. Rossini about developing some sort of accounting or

12  record of the rental income?

13            MR. ADAMS:  Objection, leading.

14            THE COURT:  Sustained.  You can rephrase the question.

15  BY MR. HOGSTROM:

16  Q.   Did you -- during December approximately of 2012, did you

17  have any conversations with Mr. Rossini related to accounting?

18  A.   He was going -- he told me that he was going to be putting

19  together materials to send to me.

20  Q.   What type of materials did he say he was going to be

21  sending you?

22  A.   At that point I wasn't sure.  He was -- he said he had

23  boxes of things.  He had to go through them.  He had to get

24  them organized.  And then he was going to be sending me

25  materials.

Murphy - direct                    635

1  Q.  Why -- why did he say he was going to be sending you

2  materials?

3  A.  Because it was my understanding from Mr. Rossini that

4  Babajan Khoshabe and Fred Khoshabe were asking for

5  documentation.

6  Q.  I'm going to show you what's been entered -- what's been

7  marked as Government's Exhibit Murphy 10.  Do you recognize

8  that document?

9  A.  Yes, I do.

10  Q.  What is it?

11  A.  It is an accounting, or alleged accounting, that I received

12  from Mr. Rossini.

13  Q.  Is that a true and accurate copy of the document you

14  received?

15  A.  Yes.

16      MR. HOGSTROM:  Government moves to admit Murphy 10.

17      MR. ADAMS:  No objection.

18      THE COURT:  Murphy 10 is admitted in evidence.

19   (Said exhibit was received in evidence.)

20  BY MR. HOGSTROM:

21  Q.  Highlighting part of the first page, is this an e-mail from

22  December 13 of 2012, from Mr. Rossini to you with the subject

23  line, accounting?

24  A.  Yes.

25  Q.  Was there an attachment to this e-mail?

1   A.   Yes, there was.

2   Q.   Turning to the second page.  What are we looking at here?

3   A.   You are looking at a list of addresses of property, and a

4   list of income paid, and then the name of the investor for

5   those properties.

6   Q.   And going down the right-hand -- or first let's talk about

7   the left-hand column actually first.  Under the heading,

8   property, are there a number of addresses listed?

9   A.   Yes, there are.

10  Q.   And did you recognize those addresses as addresses for

11  properties that were involved in this investment program?

12  A.   A majority of them.  There were some that I didn't

13  recognize.

14  Q.   And the ones that you recognized, did you recognize because

15  you had issued -- or you had received cashier's checks related

16  to them?

17  A.   For the most part, yes.

18  Q.   And/or -- or that you had prepared guaranty agreements

19  related to them, is that right?

20  A.   I prepared guarantees for many of these.  But Mr. Rossini

21  would at times call me and say, he prepared his own guarantee

22  based on the forms that had been sent to him before.

23  Q.   Now, on the right-hand column under investors, do you

24  recognize the names in this column as people that you knew to

25  be investors in Mr. Rossini's investment program?

1    A.   I would say most of them I do recognize, yes.

2    Q.   Now, turning to the next page, is this similar information?

3    A.   Yes.

4    Q.   And now page 5, is this continuing similar information?

5    A.   Yes.

6    Q.   And then -- then there is a break, and it says, June 2012

7    rentals.  Is it your understanding that this -- this list was

8    divided up into months of rent payments?

9    A.   Yes.

10   Q.   Now, this list of -- and I apologize if this is an obvious

11   question.  But you received this from Mr. Rossini, correct?

12   A.   I did.

13   Q.   Did you prepare this?

14   A.   No, I did not.

15   Q.   Now, I want to turn your attention to early 2013.  Did

16   there come a point when you received letters from a lawyer on

17   behalf of Mr. Rossini?

18   A.   Yes.

19   Q.   What was the name of the lawyer who you received these

20   letters from?

21   A.   Richard Kruse.

22   Q.   At that point, were you familiar with Mr. Kruse?

23   A.   I knew who Mr. Kruse was.

24   Q.   How -- who did you know him to be?

25   A.   He was a lawyer who had an office space in the same general

Murphy - direct                                                    638

1   area that Mr. Rossini did.

2   Q.  When you say, same general area, you mean the same office

3   complex?

4   A.  Yes.

5   Q.  What did the letters that you received say?

6           MR. ADAMS:  Objection, hearsay.

7           THE COURT:  Sustained.

8       (Brief pause.)

9           THE COURT:  Sidebar.

10      (Sidebar proceedings out of the hearing of the jury:)

11          THE COURT:  So these are letters that Mr. Rossini's

12  lawyer sent to Mr. Murphy.

13          MR. HOGSTROM:  That's correct.  And they are not

14  offered for the truth of the matter.  They are --

15          THE COURT:  Hold on.  Can I see a copy?  Do you have a

16  copy of the letters?

17          MR. HOGSTROM:  No, we are -- we are not going to be

18  putting in a copy of the letters.  We -- it's essentially

19  foundational.  He's going to say, he received letters that

20  demanded an accounting.  And then subsequently he was served

21  with the lawsuit.

22          THE COURT:  Okay.

23          MR. ADAMS:  It's hearsay because it's offered for the

24  truth because they are going to eventually get into the fact

25  that it's their theory that this lawsuit was a sham and was

1    fraudulent.  So the fact that -- they coupled this.  They

2    already showed evidence that Rossini sent him an accounting of

3    the properties.  Coupled with this statement that the lawyer is

4    sending a letter asking -- demanding an accounting, demand or

5    he's going to file a lawsuit, is hearsay.  Offered for the

6    truth.

7              THE COURT:  The lawyer is acting as -- is there a

8    dispute that the lawyer was acting on behalf of Mr. Rossini

9    when he sent the letter?

10             MR. ADAMS:  No, not at all.  But there is a dispute, I

11   think, that it was in good faith.  They are saying it was a

12   sham lawsuit.

13             THE COURT:  Okay.  But if the lawyer is acting on

14   behalf of Mr. Rossini, as Mr. Rossini's agent, then would that

15   come under the exclusion for a party statement?

16             MR. HOGSTROM:  It would, Judge, if -- if it was ruled

17   that this was offered for the truth of the matter, then that

18   would be, I think, the rubric under which it would be

19   admissible.  Although it's our position it's not offered for

20   the truth of the matter because a demand is not a statement of

21   fact that can be proved true or not.

22             THE COURT:  Okay.  You just want to offer the letter

23   just for the impact that it had on Mr. Murphy, correct?

24             All right.  I am going to allow the question and the

25   answer for the following reasons:  First of all, I do believe

1  that Mr. Hogstrom is correct that it's being offered not for

2  the truth but for the impact it had on Mr. Murphy.  But even if

3  it were offered for the truth of the matter asserted, given the

4  fact that Mr. Kruse is operating as Mr. Rossini's agent, I

5  believe that that would qualify as a statement by a party in

6  this case and would not be hearsay.

7         So on that basis I am going to overrule the objection.

8     (Further proceedings within the hearing of the jury:)

9  BY MR. HOGSTROM:

10 Q.  Mr. Murphy, you stated that -- or I asked you, did you

11 receive letters from Mr. Kruse?

12 A.  I did.

13 Q.  And what -- in general terms, what were the letters about?

14 What did they say?

15 A.  The letters were demanding from me an accounting on behalf

16 of Devon Street Investments of all of the income and expenses

17 related to properties, and all of the notes, mortgages, and

18 other documents which would have been used to purchase these

19 properties.

20 Q.  What was your reaction to receiving that letter?

21 A.  I got the letter, and first thing I did is call Mr. Rossini

22 and say, what in the hell is this about?

23 Q.  What was his response?

24 A.  He needed to keep the investors at bay.  And this was just

25 a method of showing the investors that he was attempting to do

1   something while he figured out what he was going to do.

2   Q.  Did there come a point after you received those letters

3   when you were served with the lawsuit?

4   A.  In April of 2013, I was served with a lawsuit.

5   Q.  I'm going to show you what's been marked as Government

6   Exhibit Murphy 11.  Do you recognize that document?

7   A.  I do.

8   Q.  What is it?

9   A.  It is a complaint for accounting filed on behalf of Devon

10  Street Investments against me.

11  Q.  Does it appear to be a true and accurate copy of that

12  document?

13  A.  It does.

14          MR. HOGSTROM:  Government moves to admit Murphy 11?

15          MR. ADAMS:  No objection.

16          THE COURT:  Murphy 11 is admitted in evidence.

17      (Said exhibit was received in evidence.)

18  BY MR. HOGSTROM:

19  Q.  What are we looking at on the screen right now?

20  A.  It is the complaint which was filed in the Circuit Court of

21  Cook County.

22  Q.  And the plaintiff is listed as Devon Street Investments, is

23  that correct?

24  A.  That is correct.

25  Q.  And you are listed as the defendant?

1    A.   That is correct.

2    Q.   And it's sideways, but can you see the date that it was

3    filed?

4    A.   April 10 of 2013.

5    Q.   Is this the complaint that you were served with?

6    A.   It is.

7    Q.   Now, I want to direct your attention to paragraph 4 of this

8    document.  Does it state:  Beginning on or about December 31,

9    2010, plaintiffs entered into an agreement with the defendant

10   whereby the defendant would be the sole and exclusive attorney

11   slash agent for the purpose of negotiating and closing the

12   transactions for plaintiff's investors.  All the investors'

13   checks were made payable to the defendant.  Copies of those

14   checks are appended as Group Exhibit A.

15   A.   That is correct.  That's what it says.

16   Q.   Is that allegation true?

17   A.   Absolutely false.

18   Q.   What is false about it?

19   A.   I never had an agreement to be the sole and exclusive

20   attorney.  When Mr. Rossini first suggested this, he told me

21   that I would have no part in handling any of the closings or

22   negotiating any of the purchase agreements.  He said, I was

23   going to be busy with other things for him, and that he had

24   other attorneys that he would be using for those things.

25   Q.   Turning your attention to paragraph 6.  Does it state:

Murphy - direct                                              643

1    Additionally because these properties were income-producing

2    properties, the defendant collected all the rents from the

3    properties?

4    A.   That's what it says.

5    Q.   Was that true?

6    A.   Absolutely false.

7    Q.   Did you ever collect any rents related to these properties?

8    A.   Never.

9    Q.   Was it ever your understanding that the -- that Mr. Rossini

10   -- Mr. Rossini was expecting you to collect rents?

11   A.   It was never my understanding that at all.

12   Q.   Turning to page 2 of this document.  There is actually two

13   paragraph 7.  I am directing you to the first paragraph 7 on

14   the top of the page.

15          Does it state:  Since December 31, 2010, the defendant

16   has been in exclusive control of the plaintiff's and their

17   investor funds and documentation regarding the various

18   transaction the defendant was hired to negotiate and close.

19          Is that what that says?

20   A.   That is what it says.

21   Q.   Is that allegation true?

22   A.   It was -- the allegation generally is false.  I did close

23   at Mr. Rossini's request three or four transactions.

24   Q.   There were three or four properties that Mr. Rossini

25   purchased, is that correct?

Murphy - direct

644

1    A.   Devon Street Investments I believe was the purchaser.

2    Q.   And during that -- this is during the time period that we

3    were talking about, correct?

4    A.   Correct.

5    Q.   And you're saying that you were the attorney for the

6    closing of those transactions, right?

7    A.   Very limited number, yes.

8    Q.   As to the remainder of the allegation that you were in

9    exclusive control of the investors' funds and their

10   documentation, was that true?

11   A.   No.

12   Q.   On paragraph 8 does it state:  The defendant has failed and

13   refused to satisfy plaintiff's demands and has never rendered

14   any accounting or produced the documents requested?

15        Is that what that allegation states?

16   A.   Yes.

17   Q.   Was that true?

18   A.   No.

19   Q.   Did you -- did Mr. Rossini or anyone from Devon Street

20   Investments ever demand from you an accounting of the

21   investors' funds or the properties?

22   A.   No.  Quite to the contrary, Mr. Rossini said he had boxes

23   of documents and would be putting the information together.

24   Q.   And in fact, as we saw earlier, he sent you an e-mail where

25   he gave you an accounting, is that correct?

1    A.   That is correct.

2    Q.   Now, when you received this complaint, what was your

3    reaction?

4    A.   I was furious.  I called Mr. Rossini and said, what is this

5    all about?  And again, Mr. Rossini said, we're trying to do

6    this to show the investors we're doing something to keep them

7    at bay, until I figure out what's going to happen.

8    Q.   Okay.  But you're -- you're a lawyer at this point, right?

9    A.   At this point, yes, I was.

10   Q.   And how long had you been practicing at that point?

11   A.   Thirty-five, 36 years.

12   Q.   And you were not a litigator, right?

13   A.   Never was a litigator, no.

14   Q.   But through your time as a lawyer or being involved in

15   lawsuits, did you -- were you familiar with the way the

16   lawsuits, civil lawsuits, typically proceeded?

17   A.   Yes.

18   Q.   Did you have an understanding of what would happen now that

19   you had been served with a lawsuit as far as what would be

20   required of you and in terms of appearing in court or anything

21   of that nature?

22   A.   I would either have to appear and represent myself, or I

23   would have to hire an attorney to file an appearance in the

24   court.

25   Q.   And did you have an understanding that as a civil lawsuit

| | |
|---|---|
| 1 | proceeds, it may be the case that you would have to be deposed? |
| 2 | A.  Would either have to be deposed or required to produce |
| 3 | documents or answer interrogatories. |
| 4 | Q.  And did you have an understanding that when a civil lawsuit |
| 5 | is pending, there are regular status hearings before -- |
| 6 | MR. ADAMS:  Objection, leading. |
| 7 | THE COURT:  Sustained. |
| 8 | BY MR. HOGSTROM: |
| 9 | Q.  Did you have -- what was your understanding of -- if this |
| 10 | lawsuit was pending, what was your understanding of what would |
| 11 | be happening in the court? |
| 12 | A.  There could be a series of things.  One is, I would have to |
| 13 | file an appearance.  Either party could file various types of |
| 14 | motions for discovery, for production of documents, taking |
| 15 | depositions, motions to dismiss.  Things like that. |
| 16 | Q.  Did you raise these issues, these ideas, the idea that |
| 17 | these things would have to happen, with the defendant, Mr. |
| 18 | Rossini? |
| 19 | A.  I did. |
| 20 | Q.  What did he say? |
| 21 | A.  He said, don't worry about it.  Rich Kruse will take care |
| 22 | of it, and it'll just get continued. |
| 23 | Q.  I'm sorry.  Could you state the last part again? |
| 24 | A.  And Rich Kruse would take care of it.  The case would be |
| 25 | just get continued. |

1   Q.   When you say continued, you mean that they would appear in

2   court and ask for a delay to the next status hearing?

3   A.   That is correct.

4   Q.   And does that, in your -- to your understanding, does that

5   sometimes happen in cases?

6   A.   Yes.

7   Q.   After you had this conversation with the defendant, having

8   been served with this lawsuit, did you have conversations,

9   further conversations, with the defendant about the lawsuit as

10  it progressed?

11  A.   I did.

12  Q.   What -- what were those conversations about?

13  A.   Many times there was a court date coming up.  And he said,

14  don't worry about it.  Rich Kruse will take care of it.  And

15  then subsequently at some point Mr. Rossini arranged a meeting

16  that I was to attend with him and Mr. Kruse.

17  Q.   Do you recall approximately when that meeting occurred?

18  A.   I -- the best I can recall it might have been in June or

19  July.

20  Q.   And where did the meeting occur?

21  A.   It occurred in Mr. Kruse's office.

22  Q.   Who was present for the meeting?

23  A.   Mr. Rossini, Mr. Kruse and myself.

24  Q.   What was said during the meeting?

25  A.   We went into the office.  And right away Mr. Kruse said,

Murphy - direct                    648

1   none of these properties had ever been acquired.  So what

2   you're going to have to do is come up with some solution to

3   satisfy the investors.

4   Q.   What was your reaction to that?

5   A.   Well, by then I had known that none of these properties had

6   been acquired.  And Mr. Rossini made a suggestion of what could

7   be done.  And it was a very short meeting.

8   Q.   What was his suggestion about what could be done?

9   A.   Forming some type of entity which included all the

10  investors, where they would get a proportionate share of that

11  entity based upon the money they put in.  And he would then try

12  and acquire as many of these properties that were still

13  available and out there.

14  Q.   And how did he propose that he would be able to acquire

15  these properties?

16  A.   We really didn't get into it at that point.

17  Q.   Prior to this meeting, during your conversations with the

18  defendant, had you discussed with him at all something called a

19  lis pendens?

20  A.   I don't know whether it was before or after this meeting.

21  But, yes, we did have a discussions on a lis pendens issue.

22  Q.   And what is a lis pendens?

23  A.   Lis pendens is a notice which is recorded with the recorder

24  of deeds of the county where a piece of property is located

25  that the property is subject -- is a subject matter of a

Murphy - direct                                      649

1    lawsuit.  So it basically acts as a lien on the property.

2    Q.  And did Mr. Rossini tell you -- say to you anything about

3    lis pendenses related to these properties?

4    A.  When we did have a discussion, the reason the discussion

5    came up is, I got a notice that he put a lis pendens on my

6    personal residence.  And Mr. Rossini told me that they had

7    filed 85 -- approximately 85 list pendenses.  And I was

8    demanding that he take it off my personal residence.

9    Q.  Were the other lis pendenses related to the properties in

10   this case?

11   A.  At that point I had no idea what the lis pendenses were.

12   But, yes, subsequently I found out that he put lis pendens

13   notices on a number of properties that were related to this

14   case.

15   Q.  And during the time period of these -- these conversations

16   and this meeting that you had where Mr. Kruse was present, did

17   you ever hear Mr. Rossini talk about using the lis pendenses as

18   a means of obtaining the properties?

19   A.  It was Mr. Rossini's thought -- or I should say idea that

20   if he put a lis pendens on these properties, that he could then

21   deal with the lenders and make some agreement with the lenders

22   and/or the owners of the property, if they were subject to

23   short sales, to acquire the properties.  And then if they

24   needed to be rehabbed or if they needed to be flipped, then the

25   profit would go into an investor pool.

1  Q.  Now this lawsuit was filed in April of 2013, is that right?

2  A.  That is correct.

3  Q.  Did you, after it was filed, file an appearance?

4  A.  I filed an appearance in May of 2013.

5  Q.  What does -- what does that mean, to file an appearance?

6  A.  It means that I was served with the lawsuit.  I appeared as

7  my own attorney in the lawsuit.  And I gave notice to Mr. Kruse

8  that I had filed an appearance.

9  Q.  Did that mean that you actually physically went to court?

10  A.  I went to court to file the appearance.  I did not appear

11  before the judge.  You file the appearance -- at that time you

12  filed it manually with the clerk of the court.

13  Q.  Now, as the lawsuit progressed, did you yourself personally

14  actually appear for the hearings in this case?

15  A.  I appeared one time because Mr. Kruse had been continuing

16  the case.  And I believe then it got DWP'd, which means it was

17  dismissed because Mr. Kruse didn't appear at a status hearing.

18         After he had it reinstated, the judge ordered me to

19  appear.

20  Q.  And what happened at that appearance?

21  A.  At that appearance the Judge said to me, why haven't I

22  produced any documents?  And Mr. Kruse said that he would give

23  me time to produce documents.  And from then on in, it got

24  continued.

25  Q.  So after that appearance, was there ever another time that

1   you appeared in court?

2   A.   I don't believe I ever went back to court, no.

3   Q.   And why didn't you?

4   A.   Because again I was told that Mr. Kruse was taking care of

5   it.

6   Q.   Are you aware of whether that lawsuit is still pending?

7   A.   That lawsuit was dismissed in I believe July of 2016, or

8   sometime in July -- in 2016.

9   Q.   And you used the term DWP earlier.  I think the term you

10  used was, dismissed for want of prosecution, is that right?

11  A.   That is correct.

12  Q.   Was that the nature of the dismissal?

13  A.   Yes.

14  Q.   And that meeting -- what does dismissed for want of

15  prosecution mean?

16  A.   It means that the plaintiff basically has not pursued the

17  matter.

18  Q.   Okay.  So I like to go back to the time period when the

19  suit was first filed, in April of 2013.  Did you after this

20  suit was filed have conversations -- give me one moment.  I'm

21  sorry.

22       (Brief pause.)

23  BY MR. HOGSTROM:

24  Q.   Did you have any conversations with Mr. Rossini about

25  establishing another company?

1    A.  I did.

2    Q.  Do you recall how those conversations occurred?  Were they

3    in person or over the phone?

4    A.  They were over the phone.

5    Q.  What did Mr. Rossini say to you about setting up a new

6    company?

7    A.  It was in April of 2013.  Mr. Rossini told me that he was

8    going to be entering into an agreement with a woman by the name

9    of Kathy Khodi.  And he asked me to form a company called -- at

10   that point it was called Rockford Commercial.

11   Q.  I'm showing you what's been marked as Government Exhibit

12   Murphy 13, Murphy 14 and Murphy 15.  Do you recognize those

13   documents?

14   A.  Give me a second, please.

15       (Brief pause.)

16   BY THE WITNESS:

17   A.  Yes, I do.

18   BY MR. HOGSTROM:

19   Q.  And what do you recognize it to be?

20   A.  These are the incorporation papers, or part of the

21   incorporation papers, for the entity that I just said Mr.

22   Rossini had requested, Rockford Commercial Ltd.

23   Q.  Are those true and accurate copies of those documents?

24   A.  Yes.

25              MR. HOGSTROM:  Government moves to admit Government

1    Exhibit Murphy 13, 14 and 15.

2              MR. ADAMS:  No objection.

3              THE COURT:  Murphy Exhibit 13, 14 and 15 are admitted

4    in evidence.

5         (Said exhibits were received in evidence.)

6    BY MR. HOGSTROM:

7    Q.   Turning to Murphy 13, the first page.  Is this an e-mail

8    from you to Mr. Rossini on April 20 of 2013, titled, Rockford

9    Commercial dash Organizational Minutes?

10   A.   That is correct.

11   Q.   Why were you sending this e-mail to Mr. Rossini?

12   A.   Because Mr. Rossini had asked me to form this company.  And

13   he needed standard organizational minutes, which you would do

14   normally for any company that's formed.  So I sent them to him.

15   Q.   Now, I'm just going to briefly go back to Government

16   Exhibit Murphy 11.  This is the complaint for accounting, is

17   that right?

18   A.   That is correct.

19   Q.   Okay.  And the date that this lawsuit was filed is April

20   10, 2013, is that right?

21   A.   That is correct.

22   Q.   So to return to the first page of Murphy 13, this is April

23   20, is that right?

24   A.   Yes.

25   Q.   Ten days later?

1   A.  Yes.

2   Q.  Why were you incorporating a company for Mr. Rossini ten

3   days after he had sued you?

4   A.  I don't believe I had been served with the complaint at

5   that time.

6   Q.  Was this after Mr. Rossini had hired Mr. Kruse and sent you

7   letters demanding an accounting?

8   A.  Yes.

9   Q.  Turning to the third page of this document.  Is this

10  document entitled, action by sole incorporator of Rockford

11  Commercial Limited?

12  A.  Yes.

13  Q.  Is the date March 21, 2013?

14  A.  It's March 21 of 2013.

15  Q.  And who is listed as sole incorporator?

16  A.  I am.

17  Q.  Now, when you sent this e-mail with this attachment to

18  Mr. Rossini, did he respond to you about it?

19  A.  At that point, no.

20  Q.  Did you ultimately establish a company in a different name,

21  slightly different name, than Rockford Commercial?

22  A.  Yes.

23  Q.  And what was that company?

24  A.  That company's name was Rockford Commercial Mortgage.

25  Q.  Why did you establish a company called Rockford Commercial

1    Mortgage instead of Rockford Commercial Limited?

2    A.  When I had forwarded the articles of incorporation to Mr.

3    Rossini, I was listed as the registered agent of Rockford

4    Commercial Ltd.  Mr. Rossini told me he couldn't have it to

5    read that way because he didn't -- did not want to show Ms.

6    Khodi any documents that had any names of anybody who was

7    related to the prior investment program.

8    Q.  So he did not want your name on Rockford Commercial

9    Mortgage?

10   A.  No, on -- on Rockford Commercial.  So since Rockford

11   Commercial had already been organized, we set up Rockford

12   Commercial Mortgage, a separate -- a completely separate

13   entity.

14   Q.  I'm showing you Government Exhibit -- what's been marked

15   Government Exhibit Murphy 16.  Do you recognize that?

16   A.  Yes.

17   Q.  What is that document?

18   A.  Those are the articles of incorporation filed with the

19   Secretary of the State of Illinois for Rockford Commercial

20   Mortgage Company.

21   Q.  Is that a true and accurate copy of that document?

22   A.  It is.

23        MR. HOGSTROM:  Government moves to admit Government

24   Exhibit Murphy 16.

25        MR. ADAMS:  No objection.

1          THE COURT:  Murphy Exhibit 16 is admitted in evidence.

2          (Said exhibit was received in evidence.)

3    BY MR. HOGSTROM:

4    Q.  Placing Murphy 16 on the screen.  Is this an e-mail from

5    you to Mr. Rossini on May 17 of 2013.  Subject, Articles of

6    Incorp.?

7    A.  That is correct.

8    Q.  Turning to the third page of this document -- fourth page

9    of this document, excuse me.  Is this articles of incorporation

10   for Rockford Commercial Mortgage Company Limited?

11   A.  Those are the articles that were filed with the Secretary

12   of State of Illinois, yes.

13   Q.  And the date is May 17, 2013?

14   A.  That is correct.

15   Q.  And the registered agent is Albert Rossini?

16   A.  That's correct.

17   Q.  Prior to the time that you established Rockford Commercial

18   Mortgage, before that change had been made, did you set up a

19   bank account that could be used for Mr. Rossini's purposes

20   related to his investments with Ms. Khodi?

21   A.  Yes, I set up a bank account at the Bank of America.

22   Q.  I want to turn your attention to Government Exhibit 14,

23   Murphy 14, which I'm placing on the screen.  Is this an e-mail

24   from you to Mr. Rossini that was sent on April 29 of 2013?

25   A.  Yes.

1  Q.  And is -- does it provide a routing number and an account

2  number for a Bank of America account?

3  A.  Yes.  These are wire transfer instructions if somebody

4  wanted to wire money into that account.

5  Q.  And the account number ended in 8129, is that correct?

6  A.  That is correct.

7  Q.  By the point that you set up this bank account, had you

8  been served with the lawsuit yet?

9  A.  Yes.

10  Q.  Why were you setting up a bank account for Mr. Rossini to

11  use after he had served you with a lawsuit?

12  A.  Mr. Rossini had told me that funds that would be received

13  could be used to satisfy obligations due to investors, and he

14  kept telling me that we, meaning he and I, had to come up with

15  solutions.

16  Q.  Now, after you set up Rockford Commercial Mortgage with the

17  state and after you set up this bank account, did you become

18  aware that Ms. Khodi was directing funds into the bank account?

19  A.  On several occasions she did wire money into the account,

20  yes.

21  Q.  We talked earlier about the account that you used earlier

22  in the investment program, and about the fact that when you

23  received cashier's checks you would also receive disbursal

24  instructions from Mr. Rossini.

25          Do you recall that?

1   A.  Yes, I do.

2   Q.  Did Mr. Rossini provide you with disbursal instructions for

3   the funds that Ms. Khodi wired into the Rockford Commercial

4   account?

5   A.  Yes, he did.

6   Q.  Now, I'm going to show you what's been marked as Government

7   Exhibit 17, Murphy 17, and Government Exhibit Murphy 18.

8           THE COURT:  Before you get into those documents, let's

9   take our morning break.  All right?

10          So, ladies and gentlemen of the jury, it is 11:10.  We

11  will break for approximately ten minutes.  During the break

12  please do not discuss this case with one another or with anyone

13  else.  Please do not do any independent research about this

14  case.

15          Thank you.

16      (Jury exited the courtroom.)

17          THE COURT:  You may step down, Mr. Murphy.  We are in

18  recess.

19      (Brief recess.)

20

21

22

23

24

25

1          THE COURT:  Let's bring them in.

2      (Jury in.)

3          THE COURT:  Go ahead.

4   BY MR. HOGSTROM:

5   Q.  Mr. Murphy, before we broke, we were talking about

6   Rockford Commercial Mortgage.  Before we continue with that

7   line of questioning, I want to go back to one segment of your

8   earlier testimony.

9          And that was, after the lawsuit was filed against

10  you, you testified that you had conversations with Mr. Rossini

11  about the lawsuit and about what was going on with the

12  investors; is that right?

13  A.  Yes.

14  Q.  Okay.  And you also testified about the idea of coming up

15  with an accounting, for the purpose of the lawsuit, of the

16  properties and the rental income and those sorts of things,

17  right?

18  A.  Yes.

19  Q.  I'm going to show you what's marked Government Exhibit

20  Murphy 12.

21          Do you recognize that document?

22  A.  Yes, I do.

23  Q.  What is that document?

24  A.  An e-mail from Mr. Rossini to me.

25  Q.  Does it appear to be a fair and accurate copy of the

Murphy - direct

660

1   document?

2   A.  Yes.

3           MR. HOGSTROM:  Government moves to admit Murphy 12.

4           MR. ADAMS:  No objection.

5           THE COURT:  Murphy 12 is admitted in evidence.

6      (Murphy Exhibit No. 12 received in evidence.)

7   BY MR. HOGSTROM:

8   Q.  I'm going to put the first page of this document on the

9   screen.

10          Is this -- you said this is an e-mail from

11  Mr. Rossini to you, correct?

12  A.  Yes.

13  Q.  And is this dated June 2nd of 2013?

14  A.  Yes.

15  Q.  So is this approximately seven weeks after the lawsuit was

16  filed against you?

17  A.  Yes.

18  Q.  And what does the body of the e-mail say?

19  A.  He was sending back accounting information that he had

20  sent me, although it's incomplete.  He placed asterisks after

21  those properties we now own in the event you are unaware of

22  such.

23  Q.  Were you aware of properties that he now owned?

24  A.  No, other than the two or three that I specifically closed

25  or handled the closings on.

Murphy - direct

661

```
 1    Q.   Turning to page 3 of this document.

 2              Is this a spreadsheet entitled accounting

 3    information?

 4    A.   Yes.

 5    Q.   And are there a number of properties listed here?

 6    A.   Yes.

 7    Q.   Are these properties that you are familiar with as part of

 8    the investment program?

 9    A.   Yes.

10    Q.   And are there asterisks next to several of them?

11    A.   Yes.

12    Q.   Is there an asterisk next to 4126 West Adams?

13    A.   Yes.

14    Q.   5410 West Fulton?

15    A.   Yes.

16    Q.   4045 West Wilcox?

17    A.   Yes.

18    Q.   3820 West Adams?

19    A.   Yes.

20    Q.   4135 West Monroe?

21    A.   Yes.

22    Q.   4037 West Adams?

23    A.   Yes.

24    Q.   3822 West Monroe?

25    A.   Yes.
```

Murphy - direct

662

1    Q.   4333 West Adams?

2    A.   Yes.

3    Q.   211 North Kilbourn?

4    A.   Yes.

5    Q.   3650 West Polk -- or sorry -- 4520 West Jackson?

6    A.   Yes.

7    Q.   Are you aware of whether Mr. Rossini turned any of those

8    properties over to the investors?

9    A.   I did get a call from Mr. Rossini on several occasions

10   that he had asked me if I could prepare quitclaim deeds.  I

11   did prepare some of them, three or four.

12   Q.   Did you prepare a quitclaim deed for 4037 West Adams?

13   A.   I don't recall.  I would have to look and see.  I prepared

14   probably four or five.  I think they were all for Robert

15   Badalian.

16   Q.   Is Robert Badalian the only investor you're aware of where

17   a property was turned over, to your knowledge?

18   A.   That I can recall, yes.

19   Q.   Now, turning to page 6 of this document.

20          Is this an e-mail from Mr. Rossini to you, also on

21   June 2nd, 2013?

22   A.   Yes.

23   Q.   And does it state -- is the subject "review"?

24   A.   Yes.

25   Q.   And turning to the third page of the document, what are we

Murphy - direct

663

1   looking at here?

2   A.  Looking at the same information that was contained on the

3   document that we previously looked at -- well, wait a second.

4   I'm sorry.

5          It's accounting information that -- I believe it was

6   listing the amount for the note and then the brokerage amount

7   or profit amount that was received.

8   Q.  And the investor as well?

9   A.  And the investor, yes.

10  Q.  I want to turn then to page -- to the last page of this

11  document.

12  A.  Uh-huh.

13  Q.  Is this an e-mail sent from Mr. Rossini to you on the same

14  day, later that same day, on June 2nd, 2013?

15  A.  Yes.

16  Q.  Is the subject line "important"?

17  A.  Yes.

18  Q.  Will you please read the body of the e-mail.

19  A.  Do not forward what I sent you.  Send under your e-mail or

20  bring in Wednesday at Barnett Capital in the afternoon to

21  finalize the line of credit.  Should have titles by Tuesday.

22  Call you in early a.m.

23  Q.  What did you understand Mr. Rossini to be telling you?

24  A.  Well, several things.  One, he wanted me to send this

25  out -- and I did speak to him -- he wanted me to send this out

Murphy - direct

664

1    under my e-mail address to him, Babajan Khoshabe, and Fred

2    Khoshabe as if I had prepared these documents or bring an

3    e-mail to this meeting at Barnett Capital; and that he should

4    have the titles by Tuesday, which indicated that he would get

5    the documents he had been promising to put together to give me

6    by that date.

7    Q.   Okay.  Now, I want to turn back to where we were right

8    before the break, when you testified that you had established

9    Rockford Commercial or you had set up -- organized Rockford

10   Commercial and set up a bank account for that entity; is that

11   right?

12   A.   That is correct.

13   Q.   And subsequently, at Mr. Rossini's instruction, you set up

14   Rockford Commercial Mortgage, Limited with Mr. Rossini's name

15   as the president and your name not appearing; is that right?

16   A.   And Mr. Rossini's name appearing as the registered agent

17   on the articles and not my name, yes.

18   Q.   That Rockford Commercial Mortgage was incorporated on

19   May 17th, 2013; is that right?

20   A.   Yes.

21   Q.   So that was approximately five weeks after the lawsuit was

22   filed against you; is that right?

23   A.   That is correct.

24   Q.   And we also went over the fact that you had previously

25   received investor funds and disbursement instructions from

Murphy - direct

665

1   Mr. Rossini and that you were doing -- you were -- the same

2   thing was done with respect to the Rockford Commercial

3   account; is that right?

4   A.  The -- it was under the name of Rockford Commercial

5   Mortgage at that point, yes.

6   Q.  Okay.  So before we broke, I believe I put Government --

7   what's been marked as Government Exhibit Murphy 17 and Murphy

8   18 in front of you.  Do you still have those?

9   A.  Yes, I do.

10  Q.  And do you recognize those documents?

11  A.  Yes, I do.

12  Q.  What are they?

13  A.  Well, Government Exhibit 17 is checks written on the

14  Rockford Commercial account because it was titled Rockford

15  Commercial.  And these were the checks that the bank had

16  produced.  We used the same account.

17  Q.  What's Rockford 18 -- or Murphy 18?

18  A.  Murphy 18 is a series of cashier's checks that were issued

19  from that account.

20  Q.  Are those true and accurate copies of those documents?

21  A.  Yes.

22          MR. HOGSTROM:  Government moves to admit Murphy 17

23  and 18.

24          MR. ADAMS:  No objection.

25          THE COURT:  Murphy 17 and 18 are admitted into

Murphy - direct
666

1   evidence.

2     (Murphy Exhibit No. 17 and 18 received in evidence.)

3   BY MR. HOGSTROM:

4   Q.  Okay.  I'm turning to the first page of Government Exhibit

5   Murphy 17.

6           Is this a check in the name of Rockford Commercial,

7   Limited?

8   A.  Yes.

9   Q.  And did you sign it?

10  A.  I signed it and that is my printing throughout the check,

11  yes.

12  Q.  This is your handwriting?

13  A.  Yes, it is.

14  Q.  And is the amount $9,300?

15  A.  It is, yes.

16  Q.  And why did you -- I'm sorry.  I need -- it was paid to

17  the order of Devon Street Investments, correct?

18  A.  Yes.

19  Q.  And why did you issue that check?

20  A.  At Mr. Rossini's direction.

21  Q.  The next page of this document, is there another check for

22  the same amount on the same date?

23  A.  No, that's the same check.

24  Q.  Oh, a different copy of the same check?

25  A.  Yes.

Murphy - direct

667

1   Q.  Now, I want to turn to the fourth page -- third page of

2   this document.  Is this a check -- another check in the name

3   of Rockford Commercial, Limited?

4   A.  Yes.

5   Q.  And the date of this check is July 11th, 2013; is that

6   right?

7   A.  That is correct.

8   Q.  And it's pay to the order of Lior Coresh?

9   A.  Yes.

10  Q.  And it says 16 Riverdale condos; is that right?

11  A.  That's correct.

12  Q.  And is it signed by Albert Rossini?

13  A.  That's correct.

14  Q.  Do you recognize the handwriting on this check?

15  A.  Yes.

16  Q.  Whose handwriting is that?

17  A.  Mr. Rossini's.

18  Q.  Did you provide him with a blank check out of this

19  account?

20  A.  I did provide him with a couple of checks, yes.

21  Q.  Turning to the next page, is this another check in

22  Rockford Commercial, Limited?

23  A.  Yes.

24  Q.  Is it on July 10th, 2013?

25  A.  Yes.

Murphy - direct

668

1    Q.  Is the date July 10th, 2013?

2    A.  Yes.

3    Q.  And is this -- is this a check for $4,386 to Brenda

4    Rossini?

5    A.  Yes.

6    Q.  Do you know who Brenda Rossini is?

7    A.  Mr. Rossini's wife.

8    Q.  And whose signature is this on the bottom?

9    A.  That is my signature.

10   Q.  Is this your handwriting on the check?

11   A.  No.

12   Q.  Do you know whose handwriting that is?

13   A.  It looks to be Mr. Rossini's.

14   Q.  The next page of Murphy 18 -- or Murphy 17 -- excuse me --

15   is this another check, this time dated July 15th, 2013, pay to

16   the order of Joe Calato for $25,800?

17   A.  Yes.

18   Q.  And whose -- who signed the check?

19   A.  I signed the check.

20   Q.  And whose handwriting is on the check, to your knowledge?

21   A.  Mr. Rossini's.

22   Q.  Do you know who Joe Calato is?

23   A.  I don't have any idea.

24   Q.  So we're going to now turn to Government Exhibit Murphy

25   18.

Murphy - direct

669

1          Now, the checks in Murphy 17, those are all personal

2   checks, correct?

3   A.   They are checks written on Rockford Commercial, yes.

4   Q.   Right.   They're -- I used the term personal checks as

5   opposed to cashier's checks, correct?

6   A.   Yes.

7   Q.   So Murphy 18, is this a series of cashier's checks that

8   were issued from the Rockford Commercial account?

9   A.   Yes.

10  Q.   And who issued these checks?

11  A.   I went to Bank of America and got these checks in the

12  amounts that Mr. Rossini directed.

13  Q.   So the first page of this document, is this a copy of a

14  cashier's check dated May 20th, 2013?

15  A.   Correct.

16  Q.   Now, are you aware that Ms. Khodi wired $395,000 into

17  Rockford Commercial Mortgage's account on May 20th, 2013?

18  A.   Yes, I am.

19  Q.   And on this same date, did you prepare a request and then

20  issue this cashier's check for $30,000 to Dukor Financial

21  Group?

22  A.   I did.

23  Q.   Do you know who Dukor Financial Group is?

24  A.   I didn't have a clue.

25  Q.   Why did you put Dukor Financial Group as the --

Murphy - direct

670

1   A.  That was --

2   Q.  -- party being paid?

3   A.  That was per Mr. Rossini's direction.

4   Q.  The next page of this document, is there another cashier's

5   check dated May 20th, 2013?

6   A.  Correct.

7   Q.  And is it in the amount of $29,000?

8   A.  Yes.

9   Q.  And is it pay to the order of Devon Street Investments?

10  A.  Yes.

11  Q.  Who told you to make it out to Devon Street Investments?

12  A.  Mr. Rossini.

13  Q.  The next page of this document, is this another cashier's

14  check dated May 20th, 2013?

15  A.  Yes.

16  Q.  And is the amount of this check $95,000?

17  A.  Yes.

18  Q.  And who is it payable to?

19  A.  Devon Street Investments.

20  Q.  Who told you to make it out to Devon Street Investments?

21  A.  Mr. Rossini.

22  Q.  The next page of this document, also dated -- another

23  check dated May 20th, 2013 in the amount of $100,000; is that

24  correct?

25  A.  That is correct.

Murphy - direct

671

1    Q.   And can you read who it is paid to?

2    A.   Walid Aiyash.

3    Q.   Do you know who Walid Aiyash is?

4    A.   Yes.

5    Q.   Who is Walid Aiyash?

6    A.   He was an individual that Mr. Rossini was attempting to

7    get interested in his Riverdale project.

8    Q.   And why did you make this check payable to Walid Aiyash?

9    A.   Because Mr. Rossini told me that he had a hundred thousand

10   dollars from Mr. Aiyash and he needed to repay him.

11   Q.   Turn your attention to page 5 of this exhibit.  Is this

12   another cashier's check dated May 20th, 2013 in the amount of

13   $100,000?

14   A.   Yes.

15   Q.   And who is it payable to?

16   A.   Rockford Commercial Mortgage.

17   Q.   Who told you to make it out to Rockford Commercial

18   Mortgage?

19   A.   Mr. Rossini.

20   Q.   Now, I just want to go back through this.

21         On May 20th, it's $30,000; on May 20th, there's

22   another $29,000; and then another 95,000; another 100; and

23   then another 100.

24         Would you agree that that adds up to -- I'm not very

25   good with math -- but approximately $350,000?

Murphy - direct

672

1    A.  Yes, approximately.

2    Q.  And you were aware that Ms. Khodi wired in $395,000 on

3    that same date; is that right?

4    A.  Yes.

5    Q.  Now, turning to the ninth page of this document, is there

6    another cashier's check for -- dated May 20th, 2013?

7    A.  Yes.

8    Q.  And who is this one payable to?

9    A.  Bert Rossini.

10   Q.  And is the amount $15,000?

11   A.  Yes.

12   Q.  The next page of the document, is there another cashier's

13   check dated May 20th, 2013 in the amount of $13,000 payable to

14   Bert Rossini?

15   A.  Yes.

16   Q.  And were those checks to Mr. Rossini issued at his

17   direction?

18   A.  Yes.

19   Q.  Okay.  I want to turn your attention then to the

20   thirteenth page of this document, which I've placed on the

21   screen.  Do we have here a cashier's check dated July 12th,

22   2013?

23   A.  Yes.

24   Q.  And is this the next cashier's check that you issued from

25   this account?

Murphy - direct

673

1    A.  I don't know if it's the next cashier's check, but it is a

2    cashier's check issued from this account, yes.

3    Q.  Are you aware that around this same time, Ms. Khodi wired

4    $225,000 into the account?

5    A.  I believe that is correct.

6    Q.  Did you receive disbursal instructions from Mr. Rossini in

7    connection with that wire?

8    A.  Yes.  Any -- any checks that were issued at or about that

9    time were all issued at his direction.

10   Q.  So this check on the screen now is payable to Bert Rossini

11   for 14,000; is that right?

12   A.  Yes.

13   Q.  Turning to the next page of the document, is this another

14   cashier's check?

15   A.  Yes.

16   Q.  Dated July 12th, 2013?

17   A.  Yes.

18   Q.  Who is it payable to?

19   A.  A company called Tallisman Investments, LLC.

20   Q.  Do you know who Tallisman Investments, LLC is?

21   A.  I do.

22   Q.  Who is it?

23   A.  It is a buyer of a piece of property that Mr. Rossini was

24   trying to sell.  He had received earnest money from Tallisman,

25   and he couldn't get the property under contract and he had to

Murphy - direct

674

1   refund the earnest money.

2   Q.   Was the amount of that check $15,500?

3   A.   It was.

4   Q.   The next page of this document, is this another cashier's

5   check dated July 12th, 2013 in the amount of $14,500?

6   A.   Yes.

7   Q.   Who is it payable to?

8   A.   Bert Rossini.

9   Q.   The next page, is this another cashier's check on

10  July 12th, 2013 in the amount of $25,800?

11  A.   That's correct.

12  Q.   Who is it payable to?

13  A.   Bert Rossini.

14  Q.   The next page of this document, is this another cashier's

15  check dated July 12th, 2013 in the amount of $9,500?

16  A.   That's correct.

17  Q.   Who is it payable to?

18  A.   Kimball Lawrence.

19  Q.   Do you know what Kimball Lawrence is?

20  A.   I believe Kimball Lawrence is a currency exchange.

21  Q.   Okay.  Now, those checks that we just went through on

22  July 12th, 2013, for 14,000, 15,500, 14,500, 25,800, 9,500,

23  were those all issued at Mr. Rossini's direction?

24  A.   Yes.

25  Q.   And then I want to turn back to -- briefly -- to Murphy

Murphy - direct

675

1    17.

2            And is there a check on July 11th, 2013 that was

3    written out by -- the handwriting that you said is

4    Mr. Rossini's -- for $129,462 to Lior Coresh for 16 Riverdale

5    condos?

6    A.   Yes.

7    Q.   Now, returning to Government Exhibit Murphy 18.

8            Okay.  Were you aware of a wire transfer into the

9    account on August 22nd, 2013 from Kathy Khodi in the amount of

10   $184,640?

11   A.   Yes.

12   Q.   Did you receive disbursal instructions from Mr. Rossini in

13   connection with that wire transfer?

14   A.   I did.

15   Q.   Turning your attention to the next page of this document,

16   page 20, is this a cashier's check dated August 22nd, 2013 in

17   the amount of $48,048?

18   A.   That's correct.

19   Q.   Who is it payable to?

20   A.   Albert Rossini.

21   Q.   Next page of this document, is there another cashier's

22   check dated August 22nd, 2013?

23   A.   Yes.

24   Q.   In the amount of $24,024?

25   A.   That is correct.

Murphy - direct

676

1    Q.   Is it also payable to Albert Rossini?

2    A.   Yes.

3    Q.   The next page of this document, is this another cashier's

4    check dated August 22nd, 2013 in the amount of $42,504?

5    A.   That's correct.

6    Q.   Is it payable to Albert Rossini?

7    A.   Yes.

8    Q.   The next page of this document, is this another cashier's

9    check dated August 22nd, 2013 in the amount of $10,176 payable

10   to Albert Rossini?

11   A.   That's correct.

12   Q.   Turning to the next page of the document, is this another

13   cashier's check dated August 22nd, 2013, and this one in the

14   amount of $12,000, also payable to Albert Rossini?

15   A.   That's correct.

16   Q.   Turning to the next page of the document, is this another

17   cashier's check dated August 22nd, 2013 in the amount of

18   $12,002 payable to Albert Rossini?

19   A.   Yes.

20   Q.   Turning to the next page of the document, is this another

21   cashier's check on the same date, August 22nd, 2013, payable

22   in the amount of $25,806 to Joe Calato?

23   A.   Yes.

24   Q.   And do you know who Joe Calato is?

25   A.   No, I do not.

Murphy - direct

677

1    Q.  Who -- who told you to put Joe Calato's name on the check?

2    A.  Mr. Rossini.

3    Q.  On August 22nd, 2013, is there another cashier's check in

4    the amount of $5,000 -- can you make out the payee on this

5    check?

6    A.  No, I can't.

7    Q.  Does Robinson Ural, LLC look familiar to you?

8    A.  It looks somewhat familiar, yes, but I don't recall who

9    that is.

10   Q.  If -- whatever name is on this check, would you have put

11   it there yourself or were you directed to put it there by

12   Mr. Rossini?

13   A.  I had it issued at the direction of Mr. Rossini.

14   Q.  Okay.  Now, Mr. Murphy, after those August 22nd, 2013

15   cashier's checks for Rockford Commercial Mortgage, did you --

16   did you do any further payment, receipts, or disbursals for

17   Mr. Rossini related to Kathy Khodi or Devon Street Investments

18   after that date?

19   A.  No, I believe I did not.

20   Q.  And at this point in late August of 2013, was the lawsuit

21   against you by Mr. Rossini still pending?

22   A.  It was still pending.

23   Q.  So all of those cashier's checks that you just issued --

24   we just went through that were issued during this time period

25   were issued while the lawsuit was pending against you; is that

Murphy - cross

678

1    right?

2    A.  That is correct.

3            MR. HOGSTROM:  Nothing further for the witness.

4            MR. ADAMS:  Can we have a very quick sidebar, Judge.

5      (Proceedings heard at sidebar:)

6            MR. ADAMS:  I'm going to go way past 12:30.  I know

7    you don't want to waste the jury's time.  Could we take our

8    break now instead of -- so we don't break it up?

9            THE COURT:  I told them -- we've been consistently

10   breaking at 12:30.

11           MR. ADAMS:  Okay.

12           THE COURT:  Let's just go ahead.

13           MR. ADAMS:  Okay.

14     (Proceedings heard in open court:)

15           THE COURT:  You may proceed, Mr. Adams.

16           MR. ADAMS:  Thank you, your Honor.

17                    CROSS-EXAMINATION

18   BY MR. ADAMS:

19   Q.  Mr. Murphy, good afternoon.

20   A.  Good afternoon.

21   Q.  We have never spoken before, have we?

22   A.  No, we have not.

23   Q.  We have seen each other in the hall, but we've never

24   talked?

25   A.  That is correct.

Murphy - cross

679

1    Q.   Now, yesterday you told the jury that you went to

2    St. Ignatius High School, correct?

3    A.   That is correct.

4    Q.   That's a Catholic high school?

5    A.   That is correct.

6    Q.   And being a part of Catholic education, you go to

7    religious studies, correct?

8    A.   Yes.

9    Q.   And you learn about the bible, correct?

10   A.   Yes.

11   Q.   And part of the bible is the Ten Commandments, correct?

12   A.   That is correct.

13   Q.   Part of those commandments is thou shall not steal,

14   correct?

15   A.   That is correct.

16   Q.   And another one is thou shall not lie, correct?

17   A.   That is correct.

18   Q.   Now, when you passed the bar, that was, what?  1979?

19   A.   1977.

20   Q.   '77.  And that was a happy day for you, wasn't it?

21   A.   Yes.

22   Q.   I mean, it's an achievement to go to law school and pass

23   the bar exam, correct?

24   A.   Correct.

25   Q.   You put a lot of hard work in?

Murphy - cross

680

```
1   A.  I did.

2   Q.  A lot of sacrifice?

3   A.  Yes.

4   Q.  Your family sacrificed?

5   A.  Yes.

6   Q.  Did you ever think you'd see yourself sitting here today?

7   A.  No.

8   Q.  Now, after you go to law school, what was your first job?

9   A.  I worked for a small tax firm.

10  Q.  Did you work as a public defender ever?

11  A.  I did work at the public defender while I was in law

12  school, and I was also employed by the public defender for a

13  period of time when I was also employed by the tax firm.

14  Q.  And what did you do as a public defender?

15  A.  I wrote criminal appeals.

16  Q.  And you helped people who couldn't afford an attorney?

17  A.  Yes.

18  Q.  And then after that, you decided to use your license to

19  make a living for yourself, correct?

20  A.  Yes.

21  Q.  Make a living for your family?

22  A.  Yes.

23  Q.  And pass on a legacy for your family, correct?

24  A.  Yes.

25  Q.  And you tried to do that for about 34 years?
```

Murphy - cross
681

```
 1   A.  I was a lawyer for 37, yes.

 2   Q.  37.  Thank you.

 3           Now, yesterday you told the jury that you were

 4   disbarred in 2014?

 5   A.  Yes.

 6   Q.  Let's talk a little bit about that.  Now, getting

 7   disbarred isn't just like a -- it doesn't just happen

 8   overnight, correct?

 9   A.  That's correct.

10   Q.  There's actually proceedings before something called the

11   Attorney Registration and Disciplinary committee, correct?

12   A.  Correct.

13   Q.  And the shorthand for that is the ARDC?

14   A.  Yes.

15   Q.  And when you become a lawyer, you register with the ARDC,

16   right?

17   A.  Yes.

18   Q.  And that's how you get your license to practice law?

19   A.  That's correct.

20   Q.  And you did that for 37 years?

21   A.  That is correct.

22   Q.  And every year you had to reapply or reinstate your

23   license, correct?

24   A.  You have to pay, fill out an annual form, yes.

25   Q.  And they ask you if you have any lawsuits pending or if
```

Murphy - cross

682

```
 1   you've -- are the subject of any lawsuits, correct?
 2   A.  Malpractice suits, yes.
 3   Q.  Now, after you worked for the tax firm, was there a time
 4   that you became a trustee for family trusts?
 5   A.  I was trustee for a number of trusts, yes.
 6   Q.  One of those trusts was the Cgnonia Family Trust?  Am I
 7   pronouncing that correctly?
 8   A.  Cgnonia.
 9   Q.  Cgnonia?
10   A.  Yes.
11          THE COURT REPORTER:  Could you spell that, please.
12          THE WITNESS:  C-g-n-o-n-i-a.
13   BY MR. ADAMS:
14   Q.  Now, please tell the jury, what does a trustee do?  What
15   were your job and responsibilities as a trustee?
16   A.  Well, in that particular instance?
17   Q.  Yes, sir.
18   A.  When Mr. Cgnonia died, I was the trustee.  My
19   responsibility was to collect the funds that were payable to
20   the trust and invest the funds pursuant to the powers in the
21   trust agreement and distribute money pursuant to the terms of
22   the trust.
23   Q.  And you said Mr. Cgnonia died, correct?
24   A.  Yes.
25   Q.  That's why it was set up?
```

Murphy - cross

683

1    A.  Yes.

2    Q.  And it was set up for the purpose of taking care of his

3    wife after he had passed, correct?

4    A.  His wife and his children.

5    Q.  Now, being a trustee carries what -- the legal term is a

6    fiduciary duty, correct?

7    A.  Yes.

8    Q.  And that's a duty of loyalty to your client?

9    A.  Yes.

10   Q.  You have an obligation of being honest with your client?

11   A.  Yes.

12   Q.  An obligation of being open with your client?

13   A.  Yes.

14   Q.  Now, there's a significant amount of trust that's put in

15   when a family entrusts you with their family savings, correct?

16   A.  Yes.

17   Q.  Now, Mr. Cgnonia died in September 2000, correct?

18   A.  I believe that's correct.

19   Q.  And then in December is when you opened an account for

20   that trust, correct?

21   A.  Approximately, yes.

22   Q.  And you deposited a check for about $1.1 million?

23   A.  Yes.  That was the insurance proceeds.

24   Q.  On that same day that you deposited a check for a million

25   dollars, you also cut yourself a check for 15,000, correct?

Murphy - cross

684

1   A.   That is correct.

2   Q.   And -- but you said it was for your law firm, right?

3   A.   No.   I believe that was for executor's fees.

4   Q.   And that's what you told the ARDC, right?

5   A.   I believe that's correct.

6   Q.   And they didn't believe you though, did they?

7            MR. HOGSTROM:   Objection, Judge.

8            THE COURT:   Sustained.

9   BY MR. ADAMS:

10  Q.   That was a lie, wasn't it?

11  A.   No.

12  Q.   You're telling the jury today that the $15,000 that you

13  took from that trust was for legal fees?

14  A.   Not legal fees.   It was for an executor trustee fee, which

15  I was allowed to take under the trust agreement.

16  Q.   And you -- but you signed that check Schwartz & Freeman,

17  correct?

18  A.   I believe that is correct.   I would have to look at the

19  check.

20  Q.   And you signed that check and you put it in your personal

21  account, correct?

22  A.   Yes.

23  Q.   And that actually was the subject of part of the ARDC

24  disciplinary hearing, wasn't it?

25  A.   Yes.

Murphy - cross

685

1    Q.  And you're saying that today that you thought you were

2    entitled to that money, right?

3    A.  Pursuant to the agreement, I was, yes.

4    Q.  Except you didn't furnish any legal fees, did you, to the

5    ARDC -- any bills?

6    A.  There were bills for the law firm that were separate

7    that -- legal fees that were paid.

8    Q.  Did you show those to the ARDC?

9    A.  I believe my attorney did.

10   Q.  So when the ARDC said that you did not --

11              MR. HOGSTROM:  Objection.

12              THE COURT:  Sustained.

13   BY MR. ADAMS:

14   Q.  Was part of your disbarment because of your misuse of

15   funds with the Cgnonia trust?

16   A.  That was the allegation, yes.

17   Q.  Well, it wasn't only an allegation, was it?  There was a

18   finding?

19   A.  That's what --

20              MR. HOGSTROM:  Judge, could we have a sidebar.

21      (Proceedings heard at sidebar:)

22              MR. HOGSTROM:  Obviously it's fair game to get in the

23   fact that he was disbarred.  It's fair game to get into the

24   conduct as -- within the parameters of the Court's previous

25   ruling.

Murphy - cross

1           We object to characterizations of what the ARDC did

2    or said or found or believed.  That is putting an imprimatur

3    of authority that is -- the jury is then supposed to take as

4    their own or to use in weighing Mr. Murphy's credibility.

5    They can look -- they can listen to the facts and make their

6    own conclusion, but it goes a bridge too far to state that the

7    ARDC believed or concluded something.

8           THE COURT:  I don't think so.  I think Mr. Adams can

9    get into this area, and you can ask him questions and we'll

10   see what the witness has to say.  Obviously Mr. Adams can't

11   use extrinsic evidence to prove up any inconsistencies, but

12   it's up to this witness to testify as to those issues.  I

13   think it's fair game.  So objection overruled.

14     (Proceedings heard in open court:)

15   BY MR. ADAMS:

16   Q.  Mr. Murphy, we're talking about the Cgnonia trust and the

17   $15,000 that you wrote to yourself.  And you're claiming today

18   that it was a legal fee?

19   A.  No, I didn't say that.

20   Q.  Executor fee?

21   A.  Executor trustee fee, yes.

22   Q.  And you went before a hearing board, correct?

23   A.  I did.

24   Q.  At the ARDC?

25   A.  I did.

Murphy - cross

687

1   Q.  Were you placed under oath at that hearing board?

2   A.  Yes.

3   Q.  And just like you were placed under oath yesterday and

4   today, correct?

5   A.  Yes.

6   Q.  And the purpose of being placed under oath is to tell the

7   truth, right?

8   A.  Yes.

9   Q.  And what's the penalty if you lie under oath?

10  A.  Perjury.

11  Q.  That's a separate crime, correct?

12  A.  Yes.

13  Q.  Now, the hearing board found that -- found your claim

14  unbelievable, right?

15  A.  I believe that was their finding, correct.

16  Q.  They did not believe what you said?

17  A.  Correct.

18  Q.  Now, that wasn't the only time you misused funds from the

19  Cgnonia trust, was it?

20  A.  What are you referring to?

21  Q.  You mentioned yesterday about a man named Ray Mobile?

22  A.  Yes.

23  Q.  And he owned a company called M2 Industries, correct?

24  A.  He did.

25  Q.  And you were a -- you were the lawyer for M2 Industries?

Murphy - cross

688

1   A.   That is correct.

2   Q.   And that was between the mid-1980s and about 2004,

3   correct?

4   A.   It was very -- there were some different entities but --

5   that he had at the time but, yes.

6   Q.   During the course of your representation of Mobile and his

7   M2 company, you loaned him about a hundred thousand dollars?

8   A.   Approximately.

9   Q.   Did you pay him back -- did he pay you back?

10  A.   No.  He paid part of it back, yes.

11  Q.   There's no document of that loan, is there?

12  A.   There were schedules of loan payments and amortization

13  schedules, yes.

14  Q.   But nothing -- no promissory note?

15  A.   I don't recall if there was, but --

16  Q.   You didn't give one to the ARDC though, did you?

17  A.   I don't recall.

18  Q.   Also, at the same time you were representing M2, you also

19  were the executor trustee of the Cgnonia trust, right?

20  A.   I was.

21  Q.   And you didn't disclose to either party that you were

22  representing the other one, correct?

23  A.   I disclosed it to Mr. Mobile, yes.

24  Q.   But you didn't tell the trust?

25  A.   I did in an accounting showing --

Murphy - cross

689

1   Q.   You --

2   A.   -- in a monthly statement showing that they had an

3   investment.

4   Q.   Now, for Ginger Cgnonia, you didn't tell her that you

5   loaned M2 $222,000, did you?

6   A.   No.

7   Q.   You didn't tell her that at the time you loaned M2

8   $222,000, you represented the person you made the loan to?

9   A.   No, I did not.

10  Q.   And, in fact, at that same time, you also had your own

11  personal interests in that loan, right?

12  A.   I had loaned money to M2 myself, yes.

13  Q.   So you were hoping to get paid back --

14  A.   Yes.

15  Q.   -- from M2?

16          And giving M2 $200,000 would help solve that problem,

17  wouldn't it?

18  A.   It didn't though because I didn't take any money.

19  Q.   The family members of the Cgnonia trust started asking you

20  what was going on with the trust, didn't they?

21  A.   They did.

22  Q.   And you willfully didn't answer their questions?

23  A.   That's not correct.

24  Q.   Well, you ignored them for several months?

25  A.   We had set up several meetings and I had sent them

Murphy - cross

690

1   statements, yes.

2   Q.  And that was after they asked for an accounting, right?

3   A.  No.  I had sent them statements and gave them summaries

4   before that.

5   Q.  Was there a loan agreement between the Cgnonia trust and

6   M2?

7   A.  There may have been e-mails or letters, but I don't

8   believe that a formal loan agreement exists.

9   Q.  There was no note, right?  No promissory note?

10  A.  That, I don't remember.

11  Q.  No collateral?

12  A.  Well, there was collateral.

13  Q.  So you're saying now there was collateral?

14  A.  There was collateral on the equipment of M2 for purposes

15  of part of the loans.

16  Q.  In fact, the only lawyer representing either side in this

17  was you?

18  A.  I actually acted as lawyer for M2 and I was acting as

19  trustee.  But, yes.

20  Q.  And that's a conflict of interest under the rules of

21  ethics, isn't it?

22  A.  Yes.

23  Q.  And you didn't disclose that to either party?

24  A.  I did disclose it to M2.  He knew I was trustee of the

25  trust.

Murphy - cross

691

1  Q.  Is that after you got caught or before you got caught?

2  A.  Before.

3  Q.  Now, there's another trust you represented, right, in New

4  York?

5  A.  Yes.

6  Q.  That was called the -- I'll probably pronounce it wrong --

7  Sanial trust?

8  A.  Sanial, S-a-n-i-a-l.

9  Q.  Thank you.

10       That was between 1979 and 1990, right?

11  A.  Yes.

12  Q.  They live in New York?

13  A.  Pardon me?

14  Q.  They live in New York?

15  A.  Yes.

16  Q.  Are you admitted to the New York bar?

17  A.  I am.

18  Q.  Are you still admitted to the New York bar?

19  A.  Yes.

20  Q.  Did you inform the New York bar about your disbarment from

21  Illinois?

22  A.  I believe they have been informed, yes.

23  Q.  When?

24  A.  Right after it happened because I got various notices from

25  other courts that my license to practice in front of them had

Murphy - cross

692

1     been revoked.  But I believe so.

2     Q.  Now, the Sanial Family Trust was funded by assets of

3     around a million dollars, right?

4     A.  Approximately, yes.

5     Q.  You were the executor and the attorney for this trust,

6     right?

7     A.  Correct.

8     Q.  In fact, when did Arthur die?

9     A.  He was my wife's grandfather.  I believe he died in 1979.

10    Q.  So you had a familial -- family relationship with this --

11    with this family, correct?

12    A.  I do.

13    Q.  They had a lot of trust in you?

14    A.  Yes.

15    Q.  They believed you when you would tell them facts about the

16    trust or what you were doing in terms of your legal position

17    with this trust?

18    A.  Yes.

19    Q.  They didn't question you?

20    A.  No.

21    Q.  You could do whatever you want under this cloak of trust

22    and authority, right?

23    A.  I could do whatever I wanted pursuant to the trust

24    agreement, yes.

25    Q.  But you violated that trust agreement, didn't you?

Murphy - cross

693

```
 1   A.  I don't believe I did, but --

 2   Q.  The ARDC believes you did, doesn't it -- don't they?

 3   A.  That was part of their finding, yes.

 4   Q.  And they believed that the violation was so egregious, you

 5   were disbarred?

 6   A.  I don't believe the disbarment was based on that.

 7   Q.  On a different theft or this theft?

 8   A.  I don't consider it a theft.  But it was based on an

 9   involvement that I had with your client and another piece of

10   property.

11   Q.  Now, in between 1999 and 2000, related to this trust, you

12   wrote several checks to M2, didn't you?

13   A.  Yes.

14   Q.  And that's the same M2 company, right?

15   A.  Yes.

16   Q.  And you didn't tell the trust you were writing checks to

17   that company, did you?

18   A.  No.

19   Q.  And you didn't tell the trust that you represented M2, did

20   you?

21   A.  No.

22   Q.  And you wrote a check in 2001 for close to $7,000, and --

23   didn't you?

24   A.  I'd have to look at the check, but I believe that's

25   probably correct.
```

Murphy - cross

694

1    Q.  And in the notation line, you said it's a loan to M2,

2    correct?

3    A.  Correct.

4    Q.  At this time, between 1999 and 2000, were you still owed a

5    hundred thousand dollars from M2?

6    A.  Yes.

7    Q.  So you're technically a creditor at this time of M2?

8    A.  Yes.

9    Q.  And you didn't tell this trust that you were a creditor of

10   M2?

11   A.  No.

12   Q.  And you still took the money?

13   A.  I still lent the money, yes, from the trust.

14   Q.  And then in August of 2002, you took a check from the

15   Sanial trust for over $280,000 and then deposited it into the

16   Cgnonia trust, didn't you?

17   A.  Yes.  They bought the interests of the Cgnonia trust.

18   Q.  And the timing of this is significant though, right?

19   A.  I don't understand your question.

20   Q.  I'll explain.  The check was drafted in August 2002,

21   right?

22   A.  Yes, I believe so.

23   Q.  But this was after Ginger Cgnonia hired a new attorney to

24   do -- to ask you for an accounting, right?

25   A.  At or about -- hired new attorney?

Murphy - cross

695

1   Q.   Yes.

2   A.   No.

3   Q.   This was before?

4   A.   It was Mitch -- Mitchell Goldsmith represented her at that

5   point, and I had turned that over to Mr. Goldsmith.

6   Q.   In fact, they had to hire a new lawyer because they didn't

7   trust you anymore, did they?

8   A.   They wanted to take control of the trust, yes.

9   Q.   Because the person they had originally hired, you,

10  violated that trust, right?

11  A.   Actually I hired myself because I was the trustee.  I had

12  the right to do that.

13  Q.   And then you were fired?

14  A.   I was asked to resign.

15  Q.   Because of your misuse of their funds?

16  A.   I was asked to resign.

17  Q.   Because of misuse of family money, right?

18  A.   Actually I was asked to resign before that, but -- before

19  the allegations.

20  Q.   But you didn't?

21  A.   I did.  I tendered my resignation.

22  Q.   I want to talk to you now about some of the exhibits the

23  government showed you yesterday.

24          Now, the government showed you a bunch of checks,

25  right?  Do you remember those checks with your signature on

Murphy - cross

1    them?

2    A.   Yes.

3    Q.   In fact, I'll show you what's been previously admitted as

4    Badalian 5.

5             That's your signature, right?

6    A.   That is my signature, correct.

7    Q.   And on the top left-hand corner, what address is that for?

8    A.   That was an address that my law firm was located at when I

9    opened this account.

10   Q.   And which firm was that?

11   A.   Berger Newmark & Fenchel.

12   Q.   And which bank account does that correspond to?

13   A.   It is my business bank account at Chase.

14   Q.   It's your business account?

15   A.   It was a business account that I had at Chase, yes.

16   Q.   Did you have like a client number for Mr. Rossini at your

17   law firm?

18   A.   For his various entities, there were numbers, yes.

19   Q.   Did you bill Mr. Rossini for the work you did?

20   A.   I billed Mr. Rossini, yes, for work that was done, legal

21   work that was done.

22   Q.   And, in fact, he didn't pay the bills, did he?

23   A.   Never paid any of the bills.

24   Q.   And you continued to do work for him?

25   A.   Yes.

Murphy - cross

1    Q.  I'm going to show you another check.

2              Again, this has been admitted as Badalian No. 9.  And

3    that is made out to you, Thomas Murphy, attorney/agent, right?

4    A.  Yes.

5    Q.  And the date of this check is January 23rd, 2012?

6    A.  Yes.

7    Q.  And you received a lot of checks, right?

8    A.  I did.

9    Q.  You received a lot of checks with a lot of different

10   people's names on them, right?

11   A.  Correct.

12   Q.  You told this jury yesterday -- or this morning that you

13   were completely taken by surprise when people started calling

14   you.  Is that what you're saying today?

15   A.  That's -- that's what I testified to.

16   Q.  So you are receiving all these checks with all these

17   people's names, and then you're shocked when they call you?

18   A.  Yes, because Mr. Rossini had informed me that he was

19   handling those things and I had no involvement in the

20   acquisition of any of the properties.

21   Q.  So if that's true, when you got the first check, you

22   didn't send it back to Mr. Badalian, did you?

23   A.  No, I did not.

24   Q.  You didn't send it back to Mr. Moghaddasi, did you?

25   A.  No, I did not.

Murphy - cross

698

1   Q.  You didn't send it back to Mr. Yousif, did you?

2   A.  No, I did not.

3   Q.  You kept them?

4   A.  I deposited them, yes.

5   Q.  You kept them for yourself?

6   A.  No, I didn't keep them for myself.  If you look at the

7   records, I issued checks pursuant to your client's direction,

8   many of which or most of which went to him.

9   Q.  That's right.  So pretty much you're doing everything

10  because Mr. Rossini told you to?

11  A.  Absolutely.

12  Q.  So you have no free will in this, do you then, right?

13  A.  I didn't disburse anything without his direction.

14  Q.  He's got this control over you, right?

15  A.  No.

16  Q.  Did he --

17  A.  I followed his direction.

18  Q.  So you had no choice in the matter, did you?

19  A.  Well, I wasn't going to spend any money unless he directed

20  it.

21  Q.  And you weren't going to give it back either, right?

22  A.  It wasn't there that long.  I'd get a check on a Monday,

23  and Tuesday morning he was disbursing it.

24  Q.  Well, you didn't -- at the time this happened, you didn't

25  call the FBI, did you?

Murphy - cross

699

```
 1   A.  No, I did not.

 2   Q.  You didn't call the Chicago Police?

 3   A.  No, I did not.

 4   Q.  You didn't consult other attorneys in your firm of what to

 5   do?

 6   A.  I might have.  But probably not, no.

 7   Q.  In fact, the first time we're hearing about this is -- the

 8   first time we're hearing that your -- this story is when you

 9   met with the FBI, right, in --

10   A.  I don't understand your question.

11   Q.  I'm going to restate that.

12           MR. ADAMS:  Strike that, your Honor.

13   BY MR. ADAMS:

14   Q.  You met with the FBI several times in this case, right?

15   A.  I met with the FBI after the indictments in this case.

16   Q.  Right.  And you met with the prosecutors who are sitting

17   right here?

18   A.  I have.

19   Q.  And the agents who are sitting at the table as well?

20   A.  Yes.

21   Q.  And other agents who are coming in and out, right?

22   A.  That is correct.

23   Q.  And you met with them several times?

24   A.  Yes.

25   Q.  And you met with them because you wanted something, right?
```

Murphy - cross

700

```
 1   A.  I met with them per the advice of my attorney.
 2   Q.  And you -- you don't want to go to prison, do you?
 3   A.  No, I don't.
 4   Q.  You'd do anything to get out of going to prison, won't
 5   you?
 6   A.  I don't want to go to prison, no.
 7   Q.  Is there anything you won't do to stay out of prison?
 8   A.  I'm just following the advice of my attorney.
 9   Q.  So you're following the advice of your attorney here, and
10   you were following Albert Rossini's instructions back in 2012.
11   Is that what you're saying?
12   A.  Yes.
13   Q.  Do you ever do anything on your own?
14   A.  Sure, I have.
15   Q.  Yeah, you chose to deposit these checks, right?
16   A.  I absolutely chose to deposit the checks when I probably
17   should have either refused them or put them in an escrow
18   account.
19   Q.  And you -- well, you -- and you could have, right, because
20   your firm had an escrow account?
21   A.  An escrow account was available, but Mr. Rossini said he
22   would not allow the money to be put in escrow.  He had an
23   agreement to be able to use the funds.
24   Q.  And, of course, if you went to a -- if you went to the
25   bank and tried to put them in an escrow account, what would
```

Murphy - cross

701

1    have happened?

2    A.  I could have created an escrow account or I could have

3    deposited them with my firm.

4    Q.  And you chose not to?

5    A.  No.

6    Q.  You first met with the FBI about February of 2016,

7    correct?  Does that sound about right?

8    A.  Approximately.

9    Q.  And you went there with your lawyer?

10   A.  Yes.

11   Q.  And, as you said, the government prosecutors were there?

12   A.  Yes.

13   Q.  And they gave you a piece of paper to sign, right?

14   A.  I signed something, yes.

15   Q.  And did you --

16   A.  I --

17   Q.  Well, did you read that document before you signed it?

18   A.  I did.

19   Q.  And did your lawyer explain it to you?

20   A.  Generally.

21   Q.  Not specifically?

22   A.  I don't recall specifically, but the prosecutors explained

23   it to me.

24   Q.  The prosecutors explained it to you?

25   A.  Yes.

Murphy - cross

702

1    Q.  And that's almost like an immunity document, isn't it?

2             MR. HOGSTROM:  Objection, Judge.

3             THE COURT:  Sustained.

4    BY MR. ADAMS:

5    Q.  The document is -- the legal term is it's called a proffer

6    letter, right?

7    A.  Correct.

8    Q.  It's a letter saying that anything you say to the

9    government at this meeting, it cannot be held against you --

10   A.  I believe that's --

11   Q.  -- in court?

12   A.  -- what it says, yes.

13   Q.  And that's the first time you tell anybody about

14   Mr. Rossini telling you to deposit checks, correct?

15   A.  That is the first time.

16   Q.  And --

17   A.  Other than my attorney when I -- I had conversations with

18   him.

19   Q.  I'm not asking you to talk about that, only about what you

20   told the government.

21            And it's the first time you told anybody about this

22   lawsuit for an accounting, right?

23   A.  That's not correct.

24   Q.  And it's the first time you said you knew that there were

25   no rents or rental agreements or properties, correct?

Murphy - cross

703

1   A.  No, that's not the first time I said there was no rental

2   agreements.

3   Q.  Well, when did you -- what law enforcement did you contact

4   before your meeting in February 2016?

5   A.  You asked me if that was the first time I had mentioned

6   it, not whether I had contacted any law enforcement about it.

7   Q.  It's the first time you had contacted law enforcement,

8   wasn't it?

9   A.  The first time I had a meeting with anybody from --

10  Q.  From law -- right, from the federal government?

11  A.  Correct.

12  Q.  And, you know, you didn't come here -- you didn't come to

13  them out of the goodness of your heart, right?

14  A.  No.  I came because I had been charged along with other

15  people in this case.

16  Q.  And you don't want to go to prison?

17  A.  I said that.

18  Q.  You're doing it for your own self -- for your own benefit?

19  A.  I'm doing it on the advice of my counsel.

20  Q.  You have no opinion on the matter, is that what you're

21  saying?

22  A.  I followed the advice of my counsel, and we agreed to meet

23  with the government.

24  Q.  And you met with them several times, didn't you, the

25  government?

```
 1   A.  Yes.
 2   Q.  Met with them about three or four times in 2016?
 3   A.  I don't know exactly how many, but I did meet with them a
 4   number of times.
 5   Q.  And you met with them as late as last week, right?
 6   A.  As late as Wednesday of --
 7   Q.  Yesterday?
 8   A.  -- last week.
 9   Q.  Or two days ago?
10   A.  No.  As late as Sunday of last week.  And then I -- I met
11   with them Sunday, and then I met again with them the day --
12   the Thursday before this case would have started.
13   Q.  Now, I want to talk to you about this lawsuit for an
14   accounting that we heard about earlier.  At the time you
15   were -- at the time Rich Kruse contacted you about a demand
16   letter, you told the jury that you were completely shocked
17   about the lawsuit?
18   A.  I was shocked that I got the letter.  And then -- because
19   I was told that it was for the purpose of satisfying investors
20   who wanted -- were pressing Mr. Rossini and Babajan Khoshabe
21   for some action, that I was surprised that it turned into a
22   lawsuit because Mr. Rossini had said he was taking care of it.
23   Q.  So it's your story today that you knew it was a sham
24   lawsuit from the beginning?
25   A.  I knew that the allegations that were in the lawsuit were
```

Murphy - cross

705

1    completely false.

2    Q.  And you didn't file a motion to dismiss?

3    A.  I didn't file anything.

4    Q.  And you didn't contact the ARDC to tell them that Rich

5    Kruse was filing frivolous and illegal documents with a court?

6    A.  I discussed it with my attorney, and I followed his

7    advice.

8    Q.  So that's a no, you didn't contact the ARDC?

9    A.  No, I did not.

10   Q.  Did you contact the FBI?

11   A.  No, I did not.

12   Q.  Did you contact the Chicago Police?

13   A.  No, I did not.

14   Q.  Where is Rich Kruse now?

15   A.  I have no idea.

16   Q.  Is he being prosecuted?

17          MR. HOGSTROM:  Objection.

18          THE COURT:  Sustained.

19   BY MR. ADAMS:

20   Q.  Is that the only time you had interaction with Rich Kruse?

21   A.  The only time I myself had interaction with Rich Kruse,

22   yes.

23   Q.  How many continuances did he get in this -- in that case?

24   A.  There were a number of them.

25   Q.  More than ten?

Murphy - cross

1    A.  I don't know.  I'd have to look at the docket.  But there

2    were a number of continuances in relation to me.  And then

3    once the banks started making motions to remove the lis

4    pendens, I was not involved in that.  So I have no idea how

5    many continuances there may have been.

6    Q.  So each time there was a continuance, that was an

7    opportunity for you to go to the court and say, your Honor,

8    this is a fake lawsuit, isn't it?

9    A.  I could have, yes.

10   Q.  And each time you could have filed a motion to dismiss,

11   right?

12   A.  I could have filed some motions, yes.

13   Q.  And each time you could have contacted the ARDC about

14   this, right?

15   A.  Yes.

16   Q.  But you didn't?

17   A.  On the advice of my counsel, I didn't take any action.

18   Q.  You never did, did you?

19   A.  No, I didn't.

20   Q.  In fact, the first time you told anybody in the government

21   that this lawsuit was fake was after you decided to meet with

22   the government, right?

23   A.  Yes.

24   Q.  You didn't write a letter anonymously to the ARDC, did

25   you?

Murphy - cross

707

1   A.  No, I did not.

2   Q.  You didn't have your lawyer write a letter to the ARDC,

3   did you?

4   A.  No, I did not.

5   Q.  In fact, you know that lawyers have an obligation to tell

6   on other lawyers if they know they are committing a crime,

7   right?

8   A.  Yes.

9   Q.  And you didn't do that?

10  A.  No, I didn't.

11  Q.  So you lied to the Circuit Court of Cook County?

12  A.  I didn't take any action.

13  Q.  Well, you lied by omission?

14  A.  I didn't take any action.

15  Q.  Each time you went -- you knew there was a status and you

16  intentionally didn't go, you lied to that court?

17  A.  No.

18  Q.  You said that when you heard about this lawsuit, you were,

19  quote, furious.  Those were your words, not mine.  Do you

20  remember saying that?

21  A.  I do remember.

22  Q.  But you were so furious about this lawsuit, you didn't do

23  anything about it, right?

24  A.  That's correct.

25  Q.  You were so furious about this lawsuit, you didn't go to

Murphy - cross

708

1   court?

2   A.  I went to court one time.

3   Q.  Once?

4   A.  Right.

5   Q.  Once out of how many?

6   A.  I don't know how many status dates there were.

7   Q.  You don't remember the status dates, but you remember

8   meeting with Kruse, right?

9   A.  Yes.

10  Q.  You remember meeting with Rossini, right?

11  A.  Yes.

12  Q.  You remember all that except when court was; is that what

13  you're telling the jury today?

14  A.  At the time that the status dates were up on the case, I

15  knew that there were status dates.  But I would have to check

16  the docket to specifically answer for you when there were

17  status dates.  I do remember one in December of 2013, which

18  was the last status date that I can recall that Mr. Kruse went

19  in and continued it.  But at a certain point, Mr. Kruse didn't

20  show up and the case was dismissed for want of prosecution;

21  and then subsequently it was dismissed for the same reason.

22  Q.  Who is Glenn Seiden?

23  A.  Glenn Seiden is a former attorney of Mr. Rossini's.

24  Q.  And who is Ted Netzky?

25  A.  I believe he's Mr. Seiden's partner.

Murphy - cross

709

1   Q.  They're law partners?

2   A.  I believe so.  I don't know for a fact.

3   Q.  Have you ever spoken to either of them?

4   A.  I've never spoken to Mr. Netzky.  I may have said hello to

5   Mr. Seiden when I've seen him.

6          THE COURT:  Mr. Adams, perhaps this is a convenient

7   time to break?

8          MR. ADAMS:  Actually it is, yes.

9          THE COURT:  Okay.  Ladies and gentlemen of the jury,

10  we'll now take our lunch break.  Let's break until -- it's

11  12:30 now -- until 1:45.  We'll start at 1:45.  Please be back

12  in the jury room by then.

13         During the lunch break, please do not discuss this

14  case with anyone, including one another.  And please do not do

15  any independent research regarding any of the issues or people

16  involved in the case.

17         Thank you very much for your attention this morning.

18    (Jury out.)

19         THE COURT:  You may step down, sir.

20    (Witness temporarily excused.)

21         THE COURT:  Can I speak with counsel at sidebar.

22    (Proceedings heard at sidebar:)

23         THE COURT:  At this point, do you have any sense of

24  how much longer you have for cross?

25         MR. ADAMS:  Half an hour, 45 minutes.

1          THE COURT:  Okay.

2          MR. ADAMS:  Depending on how he does, but I think a

3    half an hour, 45 minutes.

4          THE COURT:  Okay.  How about for redirect?

5          MR. HOGSTROM:  Depending on how much left -- 10 or

6    15 minutes maybe at the most.

7          THE COURT:  Okay.  And then after Mr. Murphy, who do

8    we have?

9          MR. NOVAK:  Ninos Younan, John Kulnig.  And we spoke

10   with counsel.  We're going to stipulate to Ms. Khoshaba's

11   testimony.

12         THE COURT:  Okay.

13         MR. NOVAK:  We'll get something together on these

14   representations, probably not today, just because I don't want

15   to rush something when we're going to be back on Monday.  So

16   I'll probably -- we'll read something Monday morning.  But we

17   have other stipulations if we have time to fill at the end of

18   the day.

19         THE COURT:  So with those two witnesses, how long do

20   you think the directs will be?  Are these investors?

21         MR. HOGSTROM:  One is an investor, one is a property

22   owner.

23         MR. NOVAK:  Mr. Kulnig will be 10 minutes.

24         MR. HOGSTROM:  Mr. Younan will probably be, I'm

25   guessing, an hour on direct.  There's a recording so it will

1    take a little longer.

2           THE COURT:  Okay.  So if for some reason the parties

3    can't work out the stipulation, then the witness will go first

4    on Monday?

5           MR. NOVAK:  We can get her here Monday if we have to.

6           THE COURT:  Well, I'm assuming that --

7           MR. HOGSTROM:  If we can't work out a stipulation.

8    We have in principle agreed to a stipulation.

9           MR. NOVAK:  Yes, we just have to draft --

10          MR. ADAMS:  We have --

11          THE COURT REPORTER:  Hold on.

12          THE COURT:  Everyone is saying that they think they

13   can work out a stipulation.

14          Okay.  And then we'll have the two agents testify on

15   Monday and you think we can get through them on Monday?

16          MR. HOGSTROM:  Yes.

17          MR. ADAMS:  I've got about an hour cross for Kelly

18   Connors right now.  I might pare it down, but that's what I'm

19   looking at.

20          THE COURT:  Okay.  Very good.  See you after lunch.

21          MR. ADAMS:  Thank you.

22     (Trial recessed until 1:45 p.m. of the same day.)

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )
4                    Plaintiff,         )
                                        )
5                                       )
                                        )   Case No. 15 CR 515-1
6    -vs-                               )
                                        )   Chicago, Illinois
7    ALBERT ROSSINI,                    )   June 8, 2018
                                        )   1:45 o'clock p.m.
8                    Defendant.         )

9
                        VOLUME 4B
10          TRANSCRIPT OF PROCEEDINGS - TRIAL
       BEFORE THE HONORABLE JOHN Z. LEE, and a jury
11
     APPEARANCES:
12
     For the Plaintiff:      HON. JOEL R. LEVIN
13                           United States Attorney
                             BY:  MR. ERIK A. HOGSTROM
14                                MR. WILLIAM PATRICK NOVAK
                             Assistant United States Attorneys
15                           219 South Dearborn Street
                             Chicago, Illinois 60604
16
     For the Defendant:      LAW OFFICES OF JOSHUA B. ADAMS
17                           P.C., by
                             MR. JOSHUA B. ADAMS
18                           53 West Jackson Boulevard
                             Suite 1515
19                           Chicago, Illinois 60604

20                           FRANKEL & COHEN, by
                             MR. SCOTT JAY FRANKEL
21                           53 West Jackson Boulevard
                             Suite 1615
22                           Chicago, Illinois 60604

23             ALEXANDRA ROTH, CSR, RPR
                 Official Court Reporter
24           United States District Court
       219 South Dearborn Street, Room 1224
25             Chicago, Illinois  60604
             Telephone:  (312) 408-5038

```
 1              (Jury entered the courtroom.)

 2              THE CLERK:  You may be seated.

 3              THE COURT:  All right.  Mr. Adams, you may

 4    continue.

 5              MR. ADAMS:  Thank you, your Honor.

 6         THOMAS W. MURPHY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 7                   CROSS EXAMINATION (resumed)

 8    BY MR. ADAMS:

 9    Q.   Mr. Murphy, before the break we were talking about this

10    lawsuit for an accounting.  Do you remember that?

11    A.   Yes.

12    Q.   Now, when you're served with a lawsuit, your next step

13    in the legal process is to file an answer, correct?

14    A.   No.

15    Q.   One of the steps is to file an answer?

16    A.   Yes.

17    Q.   And an answer is either admitting or denying the

18    allegations in a complaint, correct?

19    A.   Yes.  Or you could be filing motions to dismiss or --

20    Q.   Right.

21    A.   -- responsive pleadings.

22    Q.   Specifically, though, as for an answer, you never filed

23    an answer in this case?

24    A.   No.

25    Q.   You could have filed an answer, right?
```

Murphy - cross                                                    714

```
 1    A.   I could have filed anything, yes.

 2    Q.   But you didn't?

 3    A.   No, I did not.

 4    Q.   You could have gone line by line denying each claim in

 5    that accounting, couldn't you have?

 6    A.   I could have.

 7    Q.   But you chose not to?

 8    A.   Yes.

 9    Q.   Now, I want to switch topics now.

10         Did you ever meet with any of the investors?

11    A.   I met with the Pithyous.

12    Q.   And that was around September 2012?

13    A.   I believe that's generally the time period.

14    Q.   I know it's a long time ago, but can you tell us

15    generally?  I'm not asking for specifics.  And that was at

16    Mr. Rossini's office?

17    A.   That is correct.

18    Q.   And that was regarding the properties for the church,

19    right?

20    A.   The meeting, just to put it in context, was not a

21    scheduled meeting.  They happened to be there when I was

22    there to meet with Mr. Rossini and they asked me to sit down

23    with them.

24    Q.   And at that meeting you said that you had all of the

25    notes in your possession?
```

 1    A.   No, I did not.

 2    Q.   You never said that?

 3    A.   No, I did not.

 4    Q.   And you also didn't say that you would give them their

 5    money back?

 6    A.   I never said that.

 7    Q.   And did you write Mr. Pithyou a check?

 8    A.   I never recall writing him a check, no.

 9    Q.   You never wrote a check?

:53PM 10    A.   Not to my knowledge.

11    Q.   And you never wrote a check that bounced?

12    A.   To Mr. Pithyou?

13    Q.   Correct.

14    A.   Not that I'm aware of.

:53PM 15    Q.   All right.

16         Mr. Murphy, have you filed bankruptcy before?

17    A.   I did.

18    Q.   You filed bankruptcy three times, correct?

19    A.   Yes, because the first two were improperly filed.

:53PM 20    Q.   We'll get to that.

21         MR. ADAMS:   Judge, may I approach?

22         THE COURT:   You may.

23    BY MR. ADAMS:

24    Q.   Mr. Murphy, I've just handed you what I've noted as

:53PM 25    Defense Exhibits 1, 2 and 3.  Can you please look at those

```
 1   briefly?
 2          (Brief pause.)
 3   BY MR. ADAMS:
 4   Q.   Let us know when you're finished.
 5   A.   Yes.
 6   Q.   Do you recognize those documents?
 7   A.   Yes.
 8   Q.   What do you recognize those to be?
 9   A.   These are three different bankruptcy petitions.
10   Q.   Are those your bankruptcy petitions?
11   A.   Yes.
12   Q.   Are they in the same or substantially the same condition
13   as when you last saw them?
14   A.   I believe so.
15          MR. ADAMS:  Judge, Mr. Rossini moves to admit
16   Defense Exhibits 1, 2 and 3.
17          THE COURT:  Any objection?
18          MR. NOVAK:  One moment, your Honor.
19      (Brief pause.)
20          MR. HOGSTROM:  Could we have a brief sidebar,
21   Judge?
22          THE COURT:  Okay.
23      (Proceedings had at sidebar:)
24          MR. HOGSTROM:  This isn't the first time that I've
25   seen these documents, but I didn't know that they were going
```

:54PM (line 5)
:54PM (line 10)
:54PM (line 15)
:55PM (line 20)
:55PM (line 25)

1    to go into them.  So I'm just looking at this in detail in

2    connection with cross for the first time and I'm just -- I

3    think it would help me to -- if there's a proffer of what the

4    relevance is of -- not the fact that he filed bankruptcy but

5    the entirety of this document, because there's a lot of

6    attachments that I think are irrelevant -- appear to be

7    irrelevant to the case, including tax returns.

8              MR. ADAMS:  Yes, your Honor.  There's a signed

9    document -- there's a signed page on there in which he

10   certifies under penalty of perjury that everything is true.

11   And he lies in each one of these statements, each one of

12   these bankruptcy petitions.

13             THE COURT:  In what way does he lie?

14             MR. ADAMS:  He lies about what his home address is,

15   and he lies about what his assets and liabilities are in each

16   one.

17             And there's a report from the bankruptcy trustee in

18   which each was dismissed for giving improper information and

19   purposely admitting other information.

20             THE COURT:  Well, can you -- why don't you ask him

21   about that without admitting the exhibit.  He can refer to

22   the exhibit, but you're basically trying -- you're

23   cross-examining him and you're attacking his credibility

24   regarding collateral matters, right?

25             MR. ADAMS:  His ability to tell the truth, yes.

MR. FRANKEL: Judge, can he show -- there's a page where he signed it under penalty of perjury. I think Mr. Adams would like to put it on the ELMO and show it to him and say --

MR. ADAMS: And show the jury.

MR. FRANKEL: -- is that part of it certain relevant --

MR. HOGSTROM: I don't think we would object to the jury seeing the page where he signs under penalty of perjury. I just -- there's a lot in this document and in the attachments that --

:56PM

MR. NOVAK: It looks like there's routine motions and other court filings that --

MR. HOGSTROM: And to the extent that there's a court finding that that would be -- a statement made by the Court would not be his own statement.

:57PM

THE COURT: All right. So I will allow you to show to the jury the page of the petitions where he signed under penalty of perjury.

You can refer him to portions of the document, ask him, but I'm not going to admit the document itself in evidence.

:57PM

MR. ADAMS: Okay.

THE COURT: Okay?

MR. ADAMS: Okay.

| | |
|---|---|
| 1 | MR. FRANKEL:  Thank you, Judge. |
| 2 | THE COURT:  But you can say, Mr. Murphy, could you |
| 3 | look at Defendant's Exhibit No. 2.  On this page you said |
| 4 | this was your address, right? |
| :57PM 5 | MR. ADAMS:  Yes. |
| 6 | THE COURT:  And it's not your address, is it? |
| 7 | MR. ADAMS:  Okay, Judge. |
| 8 | THE COURT:  You can do it that way.  Okay? |
| 9 | MR. NOVAK:  Thank you, Judge. |
| :57PM 10 | MR. ADAMS:  Okay. |
| 11 | (Proceedings had in open court:) |
| 12 | THE COURT:  You may proceed. |
| 13 | MR. ADAMS:  Thank you, your Honor. |
| 14 | BY MR. ADAMS: |
| :58PM 15 | Q.   Mr. Murphy, I want to turn your attention -- actually -- |
| 16 | MR. ADAMS:  Judge, may I approach? |
| 17 | THE COURT:  You may. |
| 18 | MR. ADAMS:  I'll take those back. |
| 19 | BY MR. ADAMS: |
| :58PM 20 | Q.   Mr. Murphy, your first bankruptcy petition was filed in |
| 21 | August 2013; does that sound correct? |
| 22 | A.   Sounds correct. |
| 23 | Q.   Did you file that by yourself? |
| 24 | A.   It was basically filled out by a Mr. Jeff Deer, who was |
| :58PM 25 | representing me at the time.  And I did sign it. |

1    Q.   Jeff Deer is a lawyer?

2    A.   Yes.

3    Q.   And you signed it, correct?

4    A.   Correct.

5    Q.   All right.

6              I'm showing you the page that you signed.  And if

7    you look -- I'm going to mark with a red pen the last line

8    and underline it.  Can you please read for the jury what that

9    says?

10   A.   I certify under penalty of perjury that the information

11   provided above is true and correct.

12   Q.   And it says, signed by debtor.  And who is that?

13   A.   Myself.

14   Q.   And you read this before you signed it?

15   A.   No.  I signed that form without reading the petition.

16   Q.   And did you read the line that says, I certify under

17   penalty of perjury that the information provided is true and

18   correct?

19   A.   To be very honest with you, I was given the form and

20   signed it so it could be filed.

21   Q.   You're a lawyer, right?

22   A.   Yes.

23   Q.   You didn't read a legal document that was given to you?

24   A.   No, I didn't.

25   Q.   And you knew this was going to be given to a court of

1    law, right?

2    A.   I knew it was going to be filed, yes.

3    Q.   And you didn't care what was in it, did you?

4         THE COURT REPORTER:   I'm sorry?

5    BY THE WITNESS:

6    A.   I relied on my lawyer to file the appropriate documents.

7    BY MR. ADAMS:

8    Q.   My previous question was, you did not care what was in

9    this petition, did you?

10   A.   I didn't say that.  I said I relied that he was filing

11   the correct documents and was doing it correctly.

12   Q.   Part of the petition requires you to put in your home

13   address, correct?

14   A.   Correct.

15   Q.   And the reason you put in your home address in a

16   bankruptcy petition is so that creditors can -- so people can

17   find out how much money you owe, correct?

18   A.   I believe that.  I'm not a bankruptcy attorney, but I do

19   believe that's correct.

20   Q.   And if you put a different address, it makes it harder

21   for the creditors to find out, A, where you are, correct?

22   A.   Again, I assume that's correct, yes.

23   Q.   Or, B, how much you owe, correct?

24   A.   Again, I would assume that's correct.  I'm not a

25   bankruptcy --

```
       1    Q.   And on your first petition for bankruptcy, do you
       2    remember the address you put as your home address?
       3    A.   No, I don't remember what address was on it.  I didn't
       4    see the address when you showed me the documents.
:00PM  5    Q.   Did you put the address of 130 South Jefferson Street in
       6    Chicago?
       7    A.   Again, I didn't fill that out.  That was Mr. Deer.
       8    That's the address of his law office.
       9    Q.   That's not your home address?
:00PM  10   A.   No, it is not.
       11   Q.   So that was a lie?
       12   A.   It was incorrect, yes.
       13   Q.   You also had to include statements of income, correct?
       14   A.   Yes, I believe so.  Again --
:01PM  15   Q.   Well, it's a bankruptcy petition.
       16        What did you think you were filing when you filed a
       17   bankruptcy petition?
       18   A.   He was going to file a bankruptcy petition for me.  He
       19   gave me what I needed to sign.
:01PM  20   Q.   Mr. Murphy, I didn't ask you what your lawyer was doing.
       21   I asked you, what did you think you were filing when you --
       22   A.   Filing for bankruptcy, yes.
       23   Q.   And in that first petition you didn't include what your
       24   income was, did you?
:01PM  25   A.   No.  He said he was going to file the schedules later,
```

1    and he had time within which to file them.

2    Q.   And you didn't file any statements of who your debtors

3    were, did you?

4    A.   Other than the one debtor, no.

:01PM    5    Q.   And the first petition, that was dismissed, wasn't it?

6    A.   I believe it was.

7    Q.   Why was it dismissed?

8    A.   Because it was improperly filed.

9    Q.   You filed a second petition, didn't you?

:02PM    10   A.   No.  Mr. Deer filed that.  And looking at the signatures

11   on that, those are not my signatures.

12   Q.   I'm sorry.  Is that your testimony today, that you did

13   not sign the second bankruptcy petition?

14   A.   You will look at the signatures.  That is not my

:02PM    15   signature.  Mr. Deer filed that.

16   Q.   Showing you your second bankruptcy petition that was

17   filed in November of 2013, do you see that on the ELMO?

18   A.   I do.

19   Q.   Do you see the underlined portion?

:02PM    20   A.   Same portion that you showed me before.

21   Q.   And that says, I certify under penalty of perjury the

22   information provided is true and correct, right?

23   A.   That's what it says.

24   Q.   And we talked about perjury before, right?

:02PM    25   A.   Correct.

Murphy - cross                                            724

```
         1    Q.   That's making a false statement under oath?
         2    A.   That's correct.
         3    Q.   And you're under oath today?
         4    A.   That's correct.
:02PM    5    Q.   Except now you're saying this is not your signature?
         6    A.   Comparative, it's not my signature, no.
         7    Q.   And, of course, you told the government this when you
         8    first met with them, right?
         9    A.   I don't believe we discussed that.
:03PM   10    Q.   They didn't ask you?
        11    A.   I don't believe the discussion of the bankruptcies came
        12    up.
        13    Q.   You definitely didn't volunteer it?
        14    A.   No.
:03PM   15    Q.   Now, for the second petition, the one that we just saw,
        16    did you use your home address that time?
        17    A.   In -- the home address was not used in any petition that
        18    Mr. Deer filed.
        19    Q.   Even though you knew you were supposed to file your home
:03PM   20    address?
        21    A.   Again, I'm not -- I wasn't a bankruptcy attorney.  He
        22    practiced bankruptcy and I thought he knew what he was doing.
        23    Q.   Are you saying that you relied on the advice of your
        24    lawyer?
:03PM   25    A.   I did.
```

| | | |
|---|---|---|
| | 1 | Q. Did he file documents? |
| | 2 | A. Yes. |
| | 3 | Q. So you took what your lawyer said as true? |
| | 4 | A. I did. |
| :03PM | 5 | Q. You didn't question him? |
| | 6 | A. No. |
| | 7 | Q. So you're saying Mr. Deer filed these? |
| | 8 | A. Yes. |
| | 9 | Q. And Mr. Deer put a false address on the address section? |
| :03PM | 10 | A. Whatever address he put in, he put in. |
| | 11 | Q. So you didn't review this before you signed it? |
| | 12 | A. I've told you several times, I didn't sign this |
| | 13 | petition. That's not my signature. |
| | 14 | Q. So you let him sign it for you? |
| :04PM | 15 | A. I didn't know he signed it for me. |
| | 16 | Q. So are you telling us today that unwittingly someone |
| | 17 | filed a second bankruptcy petition for you? |
| | 18 | A. He called me and told he had already filed the petition. |
| | 19 | Q. And what was your response? |
| :04PM | 20 | A. Okay. |
| | 21 | Q. Did you authorize him to file this petition? |
| | 22 | A. I told him I wanted it done correctly because the first |
| | 23 | one was dismissed. |
| | 24 | Q. Now you're saying you wanted it done correctly? |
| :04PM | 25 | A. Because it was dismissed, because there's no information |

1    or -- for some reason he told me it got dismissed.  So I'm

2    not sure why it was dismissed.  I just wanted it done.

3    Q.   So you don't know why your personal bankruptcy got

4    dismissed?

:04PM  5    A.   That's what I said.

6    Q.   You never asked why?

7    A.   He may have told me, but he was going to take care of

8    it.

9    Q.   You never looked on-line to see why?

:05PM  10   A.   No.

11   Q.   Did you care why it was dismissed?

12   A.   I just wanted it done.

13   Q.   You just wanted to file a bankruptcy?

14   A.   I wanted it done and he was going to do it for me.

:05PM  15   Q.   You wanted to get rid of your debts?

16   A.   Yes.

17   Q.   You didn't care how you got rid of them?

18   A.   I wanted it done properly.

19   Q.   And it was filed a third time, right?

:05PM  20   A.   Yes.

21   Q.   And the third time, did you put your home address?

22   A.   I would have to look at it, but I guess Mr. Deer didn't

23   use the home address at all.

24   Q.   And you're saying Mr. Deer was a bankruptcy attorney?

:05PM  25   A.   He said he practiced bankruptcy.

1    Q.   So are you saying today it's Mr. Deer's fault that these

2    three petitions got dismissed?

3    A.   Absolutely.

4    Q.   Did you refer him to the ARDC?

:05PM   5    A.   No.  I hired another attorney.

6    Q.   And did you file a fourth bankruptcy petition?

7    A.   No.  We got it -- we took care of the third bankruptcy

8    petition, and I entered into an agreed order with the

9    bankruptcy trustee.

:05PM   10   Q.   So the third time you finally got it right?

11   A.   Apparently, yes.

12   Q.   Yes?  Is that what you're saying today?

13   A.   Yes.

14   Q.   Mr. Murphy, I want to talk to you now about the plea

:06PM   15   agreement in this case, okay?

16   A.   Okay.

17   Q.   Now, do you remember you told the jury yesterday that

18   you and the government entered into an agreement, right?

19   A.   That is correct.

:06PM   20   Q.   And you agreed to plead guilty to one count in this

21   indictment, right?

22   A.   Yes.

23   Q.   And the plea agreement, it's like a contract, correct?

24   A.   Yes.

:06PM   25   Q.   You're giving something to the government, right?

1    A.   Yes.

2    Q.   And they're giving something to you?

3    A.   They're promising to -- based on my testimony, to make a

4    recommendation, yes.

:06PM    5    Q.   Now, when you first went and saw them in February

6    of 2016, they didn't say, okay, here's your deal; we don't

7    really care what you have to say, did they?

8    A.   No.

9    Q.   They wanted to hear what you said first?

:06PM    10   A.   Yes.

11   Q.   In fact, you had to go in to meet with them several

12   times before they gave you this deal?

13   A.   Yes.

14   Q.   You had to go in with your lawyer, right?

:07PM    15   A.   Correct.

16   Q.   And as a former lawyer you know exactly what the

17   government wants to hear to get a conviction?

18   A.   No.  I'm not a criminal attorney, so --

19   Q.   No.

:07PM    20   A.   -- I wouldn't know.

21   Q.   You negotiated this deal, didn't you?

22   A.   I had -- I did not negotiate the deal.  The lawyers

23   negotiated the deal.

24   Q.   Well, but you had some input in it, right?

:07PM    25   A.   No.  My lawyer handled it.

1  Q.  Are you saying that the most important document in your

2  life you had no input into?

3  A.  My lawyer told me what he had negotiated and recommended

4  that I sign it.

:07PM  5  Q.  Did you like it?

6  A.  Maybe I didn't like it, but it was what I decided to do.

7  Q.  And you're happy with this deal?

8  A.  Yes.

9  Q.  Do you wish it could have been a better deal?

:07PM  10  A.  You can always wish there's something better, but I was

11  satisfied.

12  Q.  Now, part of this agreement is -- you have a cooperation

13  section, right?

14  A.  Yes.

:08PM  15  Q.  By the way, did you read this document before you signed

16  it?

17  A.  Yes.

18  Q.  The whole thing?

19  A.  Yes.

:08PM  20  Q.  Part of the deal says that you have to cooperate, right,

21  to get this reduction in sentence?

22  A.  Yes.

23  Q.  And who has to determine whether you testify truthfully

24  or not?

:08PM  25  A.  It's my understanding that the government will make that

1    determination.

2    Q.   And when you say the government, you mean the

3    prosecutors standing right here, right?

4    A.   I believe that they are the ones who have to make the

:08PM  5    recommendation, yes.

6    Q.   Mr. Hogstrom signed this contract with you, didn't he?

7    A.   Mr. Hogstrom signed it on behalf of the government, yes.

8    Q.   And you signed it, too?

9    A.   I did.

:08PM 10    Q.   And you are hoping that you please Mr. Hogstrom enough

11    that he comes to court and makes the recommendation for a

12    lower sentence?

13    A.   That's correct.

14    Q.   And you know that if you told the government things they

:09PM 15    didn't need or are irrelevant to this case, you wouldn't get

16    this deal, right?

17    A.   I would get the deal if I came here and told the truth.

18    Q.   And the truth as far as the government believes,

19    correct?

:09PM 20    A.   The truth as it exists.

21    Q.   Well, let's talk about that.

22         You pled guilty to wire fraud, correct?

23    A.   Count 10 of the complaint, yes.

24    Q.   And the maximum sentence you could get on the wire fraud

:09PM 25    is 20 years, right?

1    A.   I believe that is correct.

2    Q.   That's 240 months, right?

3    A.   That's correct.

4    Q.   All right.

:09PM   5         Now, I'm showing you on the ELMO what we call --

6    what is a sentencing guideline chart, sentencing table.  Did

7    you go over this chart with your lawyer before you signed

8    this plea agreement?

9    A.   I did not.

:09PM  10   Q.   So when you read this plea agreement --

11        THE COURT:  Mr. Adams, do you want me to show this

12   to the jury?

13        MR. ADAMS:  Oh, yes, please, your Honor.

14        THE COURT:  Any objection?

:10PM  15        MR. HOGSTROM:  No, Judge.

16        MR. ADAMS:  Thank you, Judge.

17   BY MR. ADAMS:

18   Q.   So when you went over this plea and you talked about the

19   sentencing guidelines with your lawyer, did you not consult

:10PM  20   this chart that tells you what the guidelines are?

21   A.   No.  He told me what the guidelines were.

22   Q.   And you accepted that representation?

23   A.   Yes.

24   Q.   Because you accept what your lawyer tells you?

:10PM  25   A.   Yes.

1    Q.   Now, your guideline range, it turns out, after all is
2    said and done, is at a Level 28, right?  I'll just mark it
3    right here.  (Indicating.)
4             Is that your understanding of your plea agreement?
:10PM  5    A.   I believe that is correct.
6    Q.   And that puts you at your guidelines, meaning months in
7    jail, prison, between 78 and 97 months, right?
8    A.   Yes.
9    Q.   So you went down from 240 and you negotiated now to 78
:10PM  10   to 97, correct?
11   A.   That's correct.
12   Q.   And you're in the first column here, criminal history I,
13   right?  That's the first column?
14   A.   Yes.
:11PM  15   Q.   And that's because you have no criminal history, right?
16   A.   That is correct.
17   Q.   At least no convictions.
18             Now -- and you understand that the government is
19   asking for more time off than the 78, correct?
:11PM  20   A.   They are, yes.
21   Q.   And it's your hope that after you testify for the
22   government, they're going to make a motion and ask for
23   another third off of the 78, right?
24   A.   That's what the agreement says, yes.
:11PM  25   Q.   That's another 24 months off, right?

1    A.    Approximately.

2    Q.    Approximately 24 months off.

3          So from 78, minus 24 -- so now you're at 54 months,

4    correct?

5    A.    Correct.

6    Q.    So you bargained from the beginning, looking at the

7    maximum of 240, and now you're looking at 54 months.  Is that

8    correct?

9    A.    Yes.

10    Q.    And that's only if you testify for the government,

11    right?

12    A.    If I testify truthfully, yes.

13    Q.    If you don't testify for them, you don't get the other

14    24 months off, right?

15    A.    If I didn't cooperate and testify, they would not make

16    that recommendation, no.

17    Q.    I'm going to bring this back up.  I took it off

18    prematurely.

19          You're at 28.  If you decided to go to trial, did

20    you understand what your guidelines would be?

21    A.    I didn't discuss that with my attorney.

22    Q.    You never discussed what would happen if you decided to

23    go to trial?

24    A.    No.

25    Q.    You understand part of this agreement is, you get three

1    points -- and the points are in the first left-hand -- you

2    understand that your calculation for your sentence are based

3    on a point system, right?

4    A.    Generally, yes.

5    Q.    And your lawyer explained the point system to you for

6    the sentencing guidelines?

7    A.    He did, briefly.

8    Q.    And those are laid out in the plea agreement that you

9    read, right?

10   A.    I believe so.

11   Q.    Now, if you didn't go to -- and you're getting three

12   points off because you're pleading guilty, right?

13   A.    I believe that's correct.

14   Q.    And so if you didn't plead guilty, your guidelines go

15   from 28 to 31, right?

16   A.    I believe that's correct.

17   Q.    So if you didn't plead guilty, you didn't cooperate, you

18   went to trial, the guidelines would be 108 to 135 months,

19   correct?

20   A.    Based on this chart, yes.

21   Q.    On this chart.

22          But because you're cooperating today, that was cut

23   in half, to 54 months, correct?

24   A.    It was not cut in half.  The government will only make a

25   recommendation.  The Court is the one who decides whether

1    they will accept it or not.

2    Q.   The Court is the one who decides what your ultimate

3    sentence is, right?

4    A.   That is correct.

5    Q.   But the person you have to please here today, though, is

6    the government, the prosecutor, right?

7              MR. HOGSTROM:  Object to the characterization,

8    Judge.

9              THE COURT:  Sustained.

10   BY MR. ADAMS:

11   Q.   The person who's ultimately making the determination

12   whether you were truthful today or not, is this prosecutor

13   sitting right there today, right?

14   A.   Whether I cooperated or not would be the prosecutor,

15   yes.

16             MR. ADAMS:  Judge, may I have one moment?

17             THE COURT:  You may.

18        (Brief pause.)

19             MR. ADAMS:  Very briefly, your Honor.

20   BY MR. ADAMS:

21   Q.   Mr. Murphy, you haven't been sentenced yet, right?

22   A.   No, I have not.

23   Q.   Because the government wants to wait and see what you'll

24   say at trial today, right?

25   A.   I believe that's correct.

1    Q.   Even they don't trust you to tell the truth, do they?

2              MR. HOGSTROM:  Objection, Judge.

3              THE COURT:  Sustained.

4              MR. ADAMS:  Nothing further, your Honor.

5              THE COURT:  Redirect.

6              MR. HOGSTROM:  Thank you, Judge.

7                      REDIRECT EXAMINATION

8    BY MR. HOGSTROM:

9    Q.   Mr. Murphy, what is your understanding of what your

10   obligation is under the terms of your plea agreement?

11   A.   My obligation is to come in here, testify truthfully and

12   completely and cooperate.

13   Q.   And who will determine your sentence?

14   A.   The only person who will determine my sentence is Judge

15   Lee.

16   Q.   The judge who is sitting here in court today?

17   A.   That's correct.

18   Q.   And are you aware that when you are sentenced there will

19   be, as counsel just referenced, a sentencing guidelines

20   calculation for you?

21   A.   Yes.

22   Q.   And that is a range of months that are recommended under

23   something called the sentencing guidelines, is that right?

24   A.   That is my understanding, yes.

25   Q.   Is it your understanding that the judge, when he

1    sentences you, will be able -- has discretion to sentence you

2    within your guideline range or outside of your guideline

3    range?

4    A.    That is my understanding, yes.

:16PM   5    Q.    Obviously you are hoping that the government will

6    recommend that you receive a third reduction from the low end

7    of your guideline range, right?

8    A.    Absolutely.

9    Q.    Do you have an understanding as to whether the judge is

:16PM  10    obligated to follow the government's recommendation?

11    A.    My understanding is that my sentence is at the complete

12    discretion of the judge.

13    Q.    Now, Mr. Murphy, you were asked some questions about the

14    fact that you continued to work with Mr. Rossini after you

:17PM  15    discovered or realized or became suspicious that these checks

16    you were being given were improper, right?

17    A.    That is correct.

18    Q.    Okay.  Why did you continue to participate in this

19    endeavor with Mr. Rossini?

:17PM  20    A.    Well, several reasons.

21          One, there was an obligation that was created in a

22    different matter from -- with Mr. Rossini that --

23          MR. ADAMS:  Objection, your Honor.

24          THE COURT:  I think that's fine for now.

:17PM  25          Why don't you wait for your attorney to -- Mr.

 1    Hogstrom to pose another question.

 2              THE WITNESS:  Thank you, Judge.

 3    BY MR. HOGSTROM:

 4    Q.   Without going into any further detail, what was your

 5    financial situation at the time that --

 6    A.   Situation was that there were several debts that were

 7    created, one exclusively by Mr. Rossini, which I was being

 8    held responsible for --

 9              MR. ADAMS:  Objection, your Honor.

10              THE COURT:  Hold on for a second.

11         (Brief pause.)

12              THE COURT:  Sidebar.

13         (Proceedings had at sidebar:)

14              THE COURT:  All right.  So far he hasn't -- his

15    testimony doesn't cast -- doesn't go into whether Mr. Rossini

16    did or did not act properly with regard to the prior

17    incident.  All right?

18              Mr. Hogstrom, what is it that you're trying to get

19    at?

20              MR. HOGSTROM:  Mr. Adams questioned Mr. Murphy

21    about his participation in the scheme and sort of cast as

22    incredible, as though Mr. Murphy's testimony was that he did

23    this, you know, because he didn't have a choice, because he

24    did just whatever Mr. Rossini told him to or, alternatively,

25    that his explanation as to why he was participating wasn't

1    credible.

2         I think the jury is entitled to know that he was,

3    in fact, getting something out of it.  And I think he will

4    say that part of what he was getting out of it was that he

:19PM   5    was using some of this money to pay off some of these debts.

6         MR. ADAMS:  Judge, the reason for why he's doing

7    this, to use the money, is a totally separate issue.  They

8    have already gotten out that he was getting paid for his

9    actions here.

:19PM   10        MR. FRANKEL:  Also, Judge, if I may, at -- the

11   cross-examination didn't go outside the bounds of anything --

12   or any impression they created on direct.  Every question

13   they had of him was, I did it because of Rossini.  And that's

14   all the cross was, was that he did it because of Rossini, and

:20PM   15   it is preposterous.  And, you know, they raised that and he

16   just repeated it.  I don't think he opened the door to any

17   other kind of debt or obligation.

18        MR. HOGSTROM:  Judge, that's exactly the point.  If

19   the argument is preposterous, that he did this only because

:20PM   20   Mr. Rossini told him to -- the question was asked, did he put

21   a gun to your head.  And our position is, what his motivation

22   --

23        THE COURT:  Why don't you ask -- well, here.  Given

24   the subject matter, I'll give you a little leeway to ask him

:20PM   25   some leading questions.

| | |
|---|---|
| 1 | Why don't you ask him, one of the reasons you did |
| 2 | it is because you needed money.  He'll say yes and that will |
| 3 | be the end of it.  And you got money out of this, right? |
| 4 | MR. HOGSTROM:  That's fine.  Thank you, Judge. |
| :20PM  5 | THE COURT:  Okay. |
| 6 | (Proceedings had in open court:) |
| 7 | BY MR. HOGSTROM: |
| 8 | Q.    Mr. Murphy, was one of the reasons that you participated |
| 9 | in this scheme because you needed money? |
| :21PM  10 | A.    I did need money, yes. |
| 11 | Q.    You owed hundreds of thousands of dollars, is that |
| 12 | right? |
| 13 | A.    From prior real estate transactions -- |
| 14 | Q.    Without saying what for, you owed hundreds of thousands |
| :21PM  15 | of dollars? |
| 16 | A.    I owed a good amount of money, yes. |
| 17 | Q.    And you've testified Mr. Rossini also, in giving you |
| 18 | disbursement instructions, would sometimes allow you to -- |
| 19 | each time would allow you to keep some portion of the |
| :21PM  20 | disbursement money? |
| 21 | A.    Yes, that's correct. |
| 22 | MR. HOGSTROM:  One moment. |
| 23 | (Brief pause.) |
| 24 | BY MR. HOGSTROM: |
| :21PM  25 | Q.    For example, you were questioned on cross-examination |

1    about the Sanial trust matter.  Do you recall that?

2    A.   Yes, I do.

3    Q.   Did you, in fact, use some of the money you obtained

4    from this scheme to partially repay the Sanial family?

5    A.   Yes, I did.

6    Q.   When you realized -- or when you were served with the

7    lawsuit and read it, as you've testified, I think, is it

8    correct that you concluded that it contained false

9    allegations?

10   A.   That is correct.

11   Q.   You then had a meeting with Mr. Cruz and Mr. Rossini, is

12   that right?

13   A.   Sometime after, yes.

14   Q.   Okay.  You were asked whether you referred Mr. Cruz to

15   the ARDC.

16   A.   I was.

17   Q.   And you were asked whether you reported all of this to

18   the FBI, is that right?

19   A.   Yes, I was.

20   Q.   And you were asked whether you alerted the Circuit Court

21   of Cook County to the fact that this was a sham lawsuit.  Do

22   you recall that?

23   A.   I recall testifying to that, yes.

24   Q.   Why didn't you report this to the ARDC or tell the

25   Circuit Court of Cook County or call the FBI?

1  A.   Because during this process Mr. Rossini told me that it

2  was going to be a suit in name only, and it was to keep the

3  investors at bay while we figured out a way to get them taken

4  care of or satisfied.

:23PM  5  Q.   And if -- at that point, if the FBI or the ARDC had

6  started investigating this lawsuit and the circumstances of

7  it, would you have had any concern that your role in all of

8  this might have been uncovered?

9  A.   Yes.

:23PM  10  Q.   Did you want to get caught?

11  A.   I didn't want to get in trouble, no.

12  Q.   Okay.

13         MR. HOGSTROM:   Nothing further, Judge.

14         MR. ADAMS:   Briefly, your Honor.

:24PM  15                   RECROSS EXAMINATION

16  Q.   You just told the jury that you kept quiet because you

17  didn't want to get in trouble?

18  A.   That's correct.

19  Q.   So you lied to a court to stay out of trouble; is that

:24PM  20  was you're saying?

21  A.   Didn't lie to a court.

22  Q.   You lied by omission, right?

23  A.   No.

24  Q.   So you --

:24PM  25  A.   I didn't -- excuse me.  Can I finish?

```
 1              I didn't file any pleadings whatsoever other than
 2    an appearance in the case.
 3    Q.   And you gave the appearance to the Circuit Court of Cook
 4    County that that was a lawful lawsuit, didn't you?
 5    A.   I didn't give any appearance.  I didn't file any
 6    responsive pleadings.
 7    Q.   Because you just said, if you did, then you would have
 8    been caught, right?
 9    A.   Not necessarily.  But I didn't file any responsive
10    pleadings.
11    Q.   Mr. Murphy, you're a man that -- you lie to get what you
12    want, don't you?
13    A.   Excuse me?
14    Q.   You lie to get what you want?
15              You lie to get money, correct?
16    A.   I don't understand your question.
17    Q.   You have lied in the past to get money?  Yes or no?
18    A.   When are you talking about and what are you talking
19    about?
20    Q.   With your actions with the two trusts that we talked
21    about on cross-examination.  Do you remember those questions?
22    A.   I remember discussing the trust, yes.
23    Q.   And you lied to the trust to get money?
24    A.   I did not lie.  I didn't disclose certain information.
25    Q.   So I guess the ARDC -- are you saying now the ARDC got
```

:24PM (line 5)
:24PM (line 10)
:25PM (line 15)
:25PM (line 20)
:25PM (line 25)

1    it wrong?

2    A.   I don't agree with the ARDC'S decision.

3    Q.   And that's accepting your responsibility?

4    A.   No.  I accept responsibility for everything I've done in

5    relation to this case and the ARDC.

6              MR. ADAMS:  Judge, I have nothing further.

7              FURTHER REDIRECT EXAMINATION

8    BY MR. HOGSTROM:

9    Q.   Mr. Murphy, are you saying that you have factual

10   disagreements with what the ARDC concluded?

11   A.   I do.

12   Q.   Let me ask you this:  You testified about your role in

13   this case, about what you did with money that you were given

14   and not depositing it into an IOLTA account, and a number of

15   other things.

16             Should you have been disbarred for this case, even

17   if you hadn't been disbarred for the other one?

18   A.   Yes, I should have been disbarred for this case.

19             MR. HOGSTROM:  Nothing further.

20             MR. ADAMS:  Nothing further, Judge.

21             THE COURT:  You may step down.  Thank you.

22        (Witness excused.)

23             THE COURT:  You may call your next witness.

24             MR. HOGSTROM:  The government calls Bishop Ninos

25   Younan.

| | |
|---|---|
| 1 | NINOS YOUNAN, GOVERNMENT'S WITNESS, DULY SWORN |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. HOGSTROM: |
| 4 | Q.   Good afternoon. |
| 5 | A.   Hello. |
| 6 | Q.   Please state and spell your name for the court reporter. |
| 7 | A.   Ninos Younan.  First name N-I-N-O-S, Y-O-U-N-A-N. |
| 8 | Q.   How are you employed, sir? |
| 9 | A.   I'm a bishop, an ordained bishop for my church. |
| 10 | Q.   What church is that? |
| 11 | A.   The Ancient Church for the East.  I'm a bishop for the |
| 12 | Chicago Diocese. |
| 13 | Q.   What kind of church is the Church of the East? |
| 14 | A.   It's an eastern apostolic church. |
| 15 | Q.   And is it associated with any particular ethnicity? |
| 16 | A.   Assyrian primarily. |
| 17 | Q.   What does Assyrian mean? |
| 18 | A.   It's you would say nationality.  It's a very ancient |
| 19 | culture, been around for thousands of years; very close knit |
| 20 | community, primarily from the Middle East. |
| 21 | Most of the Assyrian people immigrated here due to |
| 22 | wars, due to persecution of Christians in the Middle East. |
| 23 | So for the last few decades most of the Assyrian community |
| 24 | immigrated here from Iraq, Syria, Turkey. |
| 25 | Q.   What role does the church play in the Assyrian |

:27PM
:27PM
:28PM
:28PM
:28PM

1  community?

2  A.   Well, being as how most of the Assyrian community is

3  scattered throughout the world and we don't have our own

4  nation, the church has become sort of the entity that keeps

5  the community together.  It's the place where the community

6  gets together; it's the place where the community meet each

7  other.

8          We don't really have community centers or Assyrian

9  centers of our own, so the church has now become the central

10 hub of the community.

11 Q.   Approximately how large is your church?

12 A.   Our specific -- my specific parish is approximately a

13 thousand families, anywhere from 800 to a thousand families

14 at a given time.

15 Q.   How large is the Assyrian community here in Chicago?

16 A.   Estimated around 150,000 people.

17 Q.   Just a little bit about your personal background.

18         Did you do anything before you became a bishop?

19 A.   I was an assistant bank manager.

20 Q.   And where was that?

21 A.   Fifth Third Bank.

22 Q.   Here in Chicago?

23 A.   My location was Rosemont, right outside of Chicago.

24 Q.   How long did you do that job?

25 A.   Five years.

1  Q.  And then how did you come to become involved with the

2  church after that?

3  A.  Actually I was involved with the church from early

4  childhood.  Ever since I can remember, we've been going to

:30PM  5  the church.  As I said, it's just something that everybody in

6  the community does.  I come from a very religious family.

7          I was ordained a sub-deacon at the age of 12; I was

8  elevated to the rank of a deacon at the age of 16; and then

9  when I was 31 I became a priest, 33 I was elevated to the

:30PM  10  rank of bishop.

11  Q.  So during the time that you were working at the bank,

12  that was the time you were also working at the church?

13  A.  Yes.

14  Q.  Now as the bishop, that's your -- is that your sole

:31PM  15  occupation?

16  A.  Yes.

17  Q.  What are your duties as the bishop at the church?

18  A.  Overseeing the operations of the parish, more of a

19  religious, spiritual leader; also making sure that the parish

:31PM  20  is following the doctrines of the church.  I teach, I perform

21  Bible studies, I visit parishioners on a regular basis.

22  Pretty much anything that's needed from me in the community.

23  Q.  What about with respect to the day-to-day operations of

24  the church and the finances of the church?

:31PM  25  A.  Well, we have a committee, but the committee answers to

1  the bishop, and we oversee what's actually taking place as

2  far as finances.

3          The committee is the one who actually decides what

4  to do with it, but they have to inform us, as the bishop, so

5  that we can approve certain activities if they want to go

6  ahead with them.  And also, if we see that there's a need for

7  the church or the community, we present it to the board as

8  well.

9  Q.  Do you have signatory authority over the church's bank

10  account?

11  A.  No.

12  Q.  Okay.  Let me direct your attention to the year 2012.

13  A.  Yes.

14  Q.  Did you come to learn about an investment program that

15  other members of the community were involved in?

16  A.  Yes.

17  Q.  And how did you first hear about this?

18  A.  Originally it was brought forth to us by a member of our

19  community, named Ibrahim.  He originally had approached the

20  parish priest, Reverend Pithyou, and then it was brought then

21  to all of us in the board.  At the time I was a priest.

22  Q.  The Reverend Pithyou, can you just explain what it was

23  that you learned -- or discussed with Reverend Pithyou that

24  brought it to the church board?

25  A.  Well, he had been approached by Ibrahim, and it was

1    about an investment.  We had saved up a bit of money.  We

2    were thinking about paying down the church loan, because we

3    had obtained a construction loan to rebuild the church in

4    1999.  And then Reverend Pithyou sort of approached myself

:33PM 5    and said, well, what if there's a way we can invest the money

6    in order to alleviate some of the financial burden on the

7    people --

8        (Brief pause.)

9    BY THE WITNESS:

:33PM 10   A.   -- if there was a way that we can alleviate the

11   financial burden for the people, have a steady stream of

12   income for the church that would also help the church for

13   further advancement, paying off the loan and things like

14   that.  And I said, sure, why not.  Let's -- you know, let's

:33PM 15   see what it is.

16       And then after that was when Ibrahim set up an

17   appointment with the committee.  The committee got together.

18   I was there, so was the Reverend Pithyou, and he presented

19   this investment opportunity.

:34PM 20   Q.   And do you recall what the investment opportunity was?

21   A.   The investment opportunity was -- there was -- the

22   investment firm that he was working with, he -- he was the

23   sales executive for Devon Street Investments.

24       They had obtained several bank notes, is what they

:34PM 25   referred to them as.  Basically properties -- the way it was

1    explained to us was that there were several properties that

2    had been foreclosed upon, and the amount that was owed on the

3    properties exceeded the value at the time.

4              Of course, at the time the real estate market had

:34PM   5    dropped, so a lot of properties had dropped in value, and

6    this was a way that banks recouped some of their lost income;

7    they were selling off the bank loans.

8              All of these properties were in the process of

9    foreclosure.  This company had obtained these notes and was

:35PM   10   then selling them off to anybody who had enough capital to

11   purchase the notes.  The notes were then repurchased by the

12   church.

13             For instance, they presented us with a specific

14   property.  The church was to purchase that.  And then what

:35PM   15   would happen is -- there was actually residents living within

16   the building, so they were paying -- the building was getting

17   rental income.  That rental income would then be transferred

18   from the investment company to the church.  And the

19   investment company would maintain the buildings and obtain a

:35PM   20   fee from the rental income up until that point when the

21   foreclosure finally went through, at which time the deeds for

22   the properties would then be placed in the name of the

23   church.

24   Q.   Now, after that meeting, where you learned the details

:35PM   25   about this investment, did you go to an office where you

1   learned more about the investment program?

2   A.   Yes.

3   Q.   Where was that office?

4   A.   It was on Devon, just north of Pulaski.

5   Q.   And who did you meet at that office?

6   A.   When I went the first time, it was Bert Rossini; Ibrahim

7   was there and, I believe, Babajan Khoshabe was there as well.

8   Q.   And you mentioned Ibrahim.  Who is Babajan?

9   A.   Babajan is another member of the community.

10  Q.   You mentioned the name Bert Rossini as well.  Do you see

11  Mr. Rossini here in court today?

12  A.   Yes.

13  Q.   Would you please identify him?  Just identify an article

14  of clothing that he's wearing.

15  A.   He's the gentleman wearing the -- is that a gray

16  sweater?

17            MR. HOGSTROM:  Let the record reflect the

18  identification of the defendant.

19            THE COURT:  So noted.

20  BY MR. HOGSTROM:

21  Q.   Where did this meeting occur within the office space?

22  A.   Well, when you first walk into the office building there

23  are several offices there.  You walk down the hall; there was

24  the first office when you got to the end of the hall.

25  Q.   Whose office was it, to your understanding?

| | |
|---|---|
| 1 | A.   If I'm not mistaken, it was Ibrahim's office, Ibrahim |
| 2 | and Babajan. |
| 3 | Q.   And who was there when you first went into the office to |
| 4 | discuss the investment? |
| :37PM  5 | A.   When we first walked in it was Babajan and it was |
| 6 | Ibrahim, and then afterward Robert walked in. |
| 7 | Q.   And did Mr. Rossini come in at some point? |
| 8 | A.   Yes, right at the very beginning, right after we |
| 9 | entered. |
| :37PM 10 | Q.   Pardon? |
| 11 | A.   Right after I entered and sat down he came in. |
| 12 | Q.   Do you recall what was discussed at this meeting? |
| 13 | A.   The original investment for that one property on 3333 |
| 14 | Berteau, I believe. |
| :37PM 15 | Q.   You were presented with information regarding a specific |
| 16 | property? |
| 17 | A.   Yes. |
| 18 | Q.   Who talked to you about this property? |
| 19 | A.   Bert Rossini. |
| :38PM 20 | Q.   I'm going to show you what's been marked as Government |
| 21 | Exhibits Younan 1, Younan 2, and Younan 3. |
| 22 | Take a look at each of those documents and tell me |
| 23 | if you recognize them. |
| 24 | A.   Yes. |
| :38PM 25 | Q.   What are they? |

1   A.   This is the -- the first one, Exhibit 1, was what was

2   presented to us.  Basically the breakdown of the actual

3   property, how many units were in the property, how many of

4   them were actually rented out, what the rental income would

:38PM   5   be.  And it's an estimated total annual expense -- or net

6   income -- expenses and net income for the property that we

7   would be obtaining.  And --

8   Q.   Regarding -- are you done?

9   A.   Yes.

:38PM   10   Q.   Okay.  Regarding Exhibit 2, can you just generally

11   describe what it is?

12   A.   I'm sorry?

13   Q.   Can you describe in general terms what Exhibit 2 is?

14   A.   Exhibit 2 is the copy of a check that we presented for

:39PM   15   the purchase of the note.

16   Q.   And what about Exhibit 3?  What is that, generally?

17   A.   Exhibit 3 was the guaranty agreement that we signed.

18   Q.   Are these true and accurate copies of the documents that

19   you saw?

:39PM   20   A.   Yes.

21       MR. HOGSTROM:  The government moves to admit

22   Younan 1, 2 and 3.

23       THE COURT:  Any objection?

24       MR. FRANKEL:  No objection.

:39PM   25       THE COURT:  Younan 1, 2 and 3 are admitted in

1    evidence.

2            (Said exhibits were received into evidence.)

3    BY MR. HOGSTROM:

4    Q.   Bishop, I'm placing on the screen Government Exhibit

5    Younan 1.  What are we looking at here?

6    A.   Yes.  This is the -- basically a portfolio, you could

7    say, that shows that the building has 13 units, how much

8    rental income is being collected from them each month, the

9    actual expenses for the unit, and an estimated net income for

10   the church.

11   Q.   Now, is the address for this property 3333 West Berteau?

12   A.   Yes.

13   Q.   And underneath that is there income and expense figures?

14   A.   Yes.

15   Q.   Does this sheet indicate that this building produced an

16   annual income of $115,000?

17   A.   Gross income, yes.

18   Q.   Gross income.

19            And on the bottom there's a section that is

20   entitled Note.

21   A.   Yes.

22   Q.   Does it indicate the owner -- and I'm looking at the

23   third sentence -- the owner owes $1,004,000 and is in

24   foreclosure.  It will take approximately 6 to 12 months to

25   get the title; however, you will be paid rentals during this

1    period.

2         Is that what you read when you were given this

3    document?

4    A.   Yes.

:40PM 5    Q.   If the building -- if you were told the building owner

6    owed over a million dollars on the mortgage, were you told

7    anything about the value of the property?

8    A.   We were told that the value of the property was less

9    than a million dollars, and that's why the owner had

:41PM 10   abandoned it, and that's why the property was in foreclosure.

11        But what was happening is that the foreclosure

12   process takes awhile, there's a lot of legality involved,

13   making sure the documentation was filed.  But in the meantime

14   the bank had given Devon Street Investments the note, and

:41PM 15   that's what they were selling to us.

16   Q.   So who told you that?

17   A.   Bert Rossini.

18   Q.   He told you that the bank -- that they had the note?

19   A.   Yes.

:41PM 20   Q.   Okay.  Did you have a sense -- strike that.

21        Did they tell you how much the purchase of this

22   note would be for you, for the church?

23   A.   $300,000.

24   Q.   Did you -- did the church decide to invest?

:42PM 25   A.   Yes.

1  Q.   I'm going to turn your attention then to Government
2  Exhibit Younan 2.  I'm putting it up on the screen.
3       Do you recognize this as the cashier's check
4  remitted by St. Odisho church?
5  A.   Yes.
6  Q.   And what is the date of the check?
7  A.   May 1st, 2012.
8  Q.   And the amount is $300,000?
9  A.   Yes.
10 Q.   Okay.
11      And it says, paid to the order of Thomas Murphy,
12 attorney/agent, and it was the address on Berteau that we
13 just discussed.  Do you know why that was placed in that
14 segment of the check?
15 A.   Why the --
16 Q.   Why that language was placed in that segment of the
17 check.
18 A.   You mean why was the check made out to Thomas Murphy?
19 Q.   Yes.
20 A.   Oh.  Well, the way it was explained to us was that
21 Thomas Murphy was their attorney, and he was the one who
22 handled all this, and he had an IOLTA account in which all
23 the money would go into, and then from there he would
24 disburse it.
25 Q.   And who told you that?

1    A.   Bert Rossini.

2    Q.   I'm turning to Government Exhibit Younan 3.  Is this

3    document titled Guaranty Agreement?

4    A.   Yes.

5    Q.   I'm going to turn first to the second page.  There's a

6    couple signature blocks; one is for St. Odisho church.  Who

7    signed that?

8    A.   I did.

9    Q.   And it is also signed by another person above.  Who was

10   that?

11   A.   Albert Rossini.

12   Q.   Did you -- were you present in person with Mr. Rossini

13   when you signed this?

14   A.   Yes.

15   Q.   Okay.  Who gave you this document?

16   A.   Bert Rossini.

17   Q.   Did he discuss it with you at all?

18   A.   He said this document shows that this property now is

19   for the church, and that we have claim on this property, and

20   that the rental income from now on was going to go to us, to

21   the church.  And then once the foreclosure was all completed,

22   the title for the building would then be transferred to the

23   church.

24   Q.   Okay.  After you signed this document and the church

25   provided the cashier's check, did the church actually receive

1   rental income?

2   A.   Yes.

3   Q.   Do you recall how -- were you involved in the receiving

4   of the rental income personally, you?

:45PM   5   A.   There were sometimes, yes, I would go and personally

6   pick up the check for the rental income from the office

7   because it was just right down the street from where I lived,

8   near by the church.

9   Q.   How would you know to go pick it up?

:45PM   10   A.   We would be contacted by Bert Rossini and he would tell

11   us to come get it.

12   Q.   So you would be contacted by Mr. Rossini?

13   A.   Yes.

14   Q.   Okay.  And you walked to the office?

:45PM   15   A.   Yes.

16   Q.   I'm going to show you what's been marked as Government

17   Exhibit Younan 4.  Do you recognize that document?

18   A.   Yes.

19   Q.   What is it?

:45PM   20   A.   It is a check made payable to the church.

21   Q.   And is this a true and accurate copy of that document?

22   A.   Yes.

23        MR. HOGSTROM:  The government moves to admit

24   Younan 4.

:46PM   25        MR. FRANKEL:  No objection.

| | |
|---|---|
| 1 | THE COURT: Younan 4 is admitted in evidence. |
| 2 | (Said exhibit was received into evidence.) |
| 3 | BY MR. HOGSTROM: |
| 4 | Q. I'm placing the first page of that document on the |
| 5 | screen. I'm just going to blow up the portion that shows |
| 6 | this check. |
| 7 | Who issued this check? |
| 8 | A. Reliant Management, Incorporated. |
| 9 | Q. Do you know who Reliant Management was? |
| 10 | A. No. |
| 11 | Q. When you -- who gave you this check? |
| 12 | A. Bert Rossini. |
| 13 | Q. Did you wonder why the check was coming from Reliant |
| 14 | Management? |
| 15 | A. I just assumed it is another management company, yeah. |
| 16 | Q. What is the date of the check? |
| 17 | A. May 16, 2012. |
| 18 | Q. And what is indicated on the memo line? |
| 19 | A. May rents. |
| 20 | Q. Now, I want to turn to the next page of this document. |
| 21 | What are we looking at here? |
| 22 | A. This is an invoice. |
| 23 | Q. And what is the -- I'm going to -- is this an invoice |
| 24 | that you received? |
| 25 | A. Yes. |

:46PM (lines 5)
:46PM (line 10)
:46PM (line 15)
:46PM (line 20)
:47PM (line 25)

1    Q.    What is reflected on the invoice?

2    A.    It shows how much rental income that was collected for

3    May minus expenses that they would collect, and then the

4    difference was the total amount of the check that was given

:47PM   5    to us.

6    Q.    What expenses, to your understanding, were being

7    deducted?

8    A.    The management fee.

9    Q.    What was the management fee?

:47PM   10   A.    Well, they would be taking care of these properties

11   since they own the deeds -- or they own the notes.

12          They would have to take care of these properties,

13   make sure the properties were maintained, making sure that

14   the bills and whatever expenses were paid off.  And they

:47PM   15   collected a fee for that, a certain percentage, and then we

16   would get the net.

17   Q.    Who explained the management fee to you?

18   A.    Bert Rossini.

19   Q.    Turning to the next page of this document, is this

:48PM   20   another invoice?

21   A.    Yes, sir.

22   Q.    And is this one for June 2012?

23   A.    Yes, sir.

24   Q.    How long did you receive rent payments, to the best of

:48PM   25   your recollection?

1    A.    We received about four months worth of rent.

2    Q.    What happened after those four months?

3    A.    Prior to the last month being received it started

4    getting later and later, where it would be -- you would not

:48PM  5    get the rent payments on time.  We were supposed to get them

6    somewhere in the middle of the month every single month,

7    whether the second or third week.  By the end of the second

8    week it was supposed to be -- they would collect the rent,

9    manage the properties, take away the -- their commission, or

:48PM  10   their fee, and they would then give us the rest.  But then

11   the time would lapse even greater and greater.  We were not

12   getting the month -- the rent, and then eventually the rent

13   stopped.

14   Q.    Did there come a point when you got a rent check that

:49PM  15   bounced?

16   A.    Yes.

17   Q.    What happened when that happened?

18   A.    They had paid us --

19   Q.    I'm sorry.  Let me reask that.

:49PM  20         What did you do when that happened?

21         MR. FRANKEL:  Judge, objection.  Foundation,

22   timeframe.

23         THE COURT:  Overruled.

24   BY THE WITNESS:

:49PM  25   A.    We had received -- it had been a couple of months before

1    we had received any rental income.

2               We were presented with a check for two months rent.

3    We deposited the check, and then by the end of the month,

4    when the bank had received -- when the church had received

5    its bank statement, we realized the check had bounced.

6    BY MR. HOGSTROM:

7    Q.   What did you do when you realized the check had bounced?

8    A.   We immediately contacted Bert Rossini, notified him that

9    this check had bounced.  He informed us that there was a

10   financial management error, the funds hadn't cleared yet,

11   something of that nature, and he would be issuing us another

12   check.

13              MR. HOGSTROM:  One moment.

14        (Brief pause.)

15   BY MR. HOGSTROM:

16   Q.   Did he issue you another check?

17   A.   Yes.

18   Q.   Okay.

19              At some point did you stop receiving rent payments

20   altogether?

21   A.   Yes.

22   Q.   What did you do when that happened?

23   A.   Well, then we went about trying to contact him, trying

24   to find a resolution to this, why were we not collecting

25   rental income, what was happening.  We didn't understand the

1   situation.  And we kept just getting excuses.

2          Even the reimbursement check that he had given us,

3   it was post-dated.  And every time when we would come by,

4   when it came to being able to cash the check, he contacted us

5   and said, no, no, don't, the funds in -- the check won't

6   clear.  The deposit we made hasn't cleared yet; we're having

7   issues with the bank clearing our funds.  And then we would

8   wait, and then he said he would issue us another check and,

9   again, he didn't issue us another check, and it went back and

10  forth like that.

11  Q.   Did you eventually decide -- or did the church

12  eventually decide to ask for its money back?

13  A.   Yes.

14  Q.   I'm going to show you what's been marked as Government

15  Exhibit Younan 5.  Do you recognize that document?

16  A.   Yes.

17  Q.   Generally what is it?

18  A.   It was an indemnification form, basically stating that

19  we would be getting -- the church would be getting its

20  initial investment back.

21  Q.   Is that a true and accurate copy of that document?

22  A.   Yes.

23          MR. HOGSTROM:  The government moves to admit

24  Younan 4.

25          THE COURT:  Younan 4?

```
 1            MR. ADAMS:  No objection.

 2            THE COURT:  Younan 4 is admitted in evidence.

 3            MR. HOGSTROM:  I'm sorry, Judge.  I think I gave

 4    the wrong exhibit number.  I think that was actually Younan

 5    5.

 6            One moment.

 7        (Brief pause.)

 8            MR. HOGSTROM:  Apologies, Judge.  I said Younan 4.

 9    It's actually Younan 5.

10            THE COURT:  Bishop, may I see that document?

11            THE WITNESS:  Sure.

12        (Brief pause.)

13            THE COURT:  I believe Younan 4 was previously

14    admitted, right?

15            MR. ADAMS:  Yes, Judge.

16            MR. HOGSTROM:  That's correct, Judge.

17            THE COURT:  Is there any objection to Younan 5?

18            MR. ADAMS:  No, Judge.

19            THE COURT:  Younan 5 is admitted in evidence as

20    well.

21        (Said document was admitted into evidence.)

22            MR. HOGSTROM:  I apologize for the confusion.

23    BY MR. HOGSTROM:

24    Q.   I'm placing Younan 5 on the screen.  Is this entitled

25    Release, Indemnification and Hold Harmless Agreement?
```

1    A.   Yes.

2    Q.   And what is the date?

3    A.   December 28th, 2012.

4    Q.   And who is this agreement -- an agreement between?

:53PM 5   A.   St. Odisho church and Devon Street Investments and

6    Albert Rossini.

7    Q.   Were you involved in the -- in any discussions about the

8    preparation of this agreement?

9    A.   Yes.

:53PM 10  Q.   Okay.  And what do you recall about that?

11   A.   After an extended period of time when we were not

12   collecting any -- any of the rental income, we then stated

13   that we wanted our initial investment back, at which time

14   Albert Rossini said, sure, no problem; you can come back and

:53PM 15  get your initial investment.  And then he contacted us to get

16   together and sign this form.

17   Q.   Okay.  I'm going to turn your attention to Paragraph 1.

18        Does this agreement provide that Rossini shall pay

19   $300,000 to St. Odisho in full settlement, and that it will

:54PM 20  do so on February 15th, 2013?

21   A.   Yes.

22   Q.   Does it also indicate that you'll be getting

23   back-rentals?

24   A.   All the months of the rental income that we had not

:54PM 25  received yet, yes.

1  Q.   And how many months of back-rent was that?

2  A.   I believe it was from September through the middle of

3  February.

4  Q.   I'm going to turn to the next page of this document.

5              Who signed it?

6  A.   Albert Rossini signed it, as did I.

7  Q.   Did the church receive its money back on or about

8  February 15th, 2013?

9  A.   No.

10 Q.   What about the back-rents?  Did you receive any of the

11 back-rents?

12 A.   No.

13 Q.   After this did you begin communicating with Mr. Rossini

14 by e-mail about the investment?

15 A.   Yes.

16 Q.   I'm going to show you what's been marked as Government

17 Exhibits Younan 7, Younan 8, Younan 9 and Younan 10.

18          THE COURT:  Mr. Hogstrom, before you do that, let's

19 take our afternoon break, okay?

20          Ladies and gentlemen of the jury, we'll take our

21 afternoon break now.  We'll break for approximately 15

22 minutes.

23          During the break please do not discuss this case

24 with anyone, including one another.  And please do not do any

25 independent research regarding this case.

1              Thank you very much.

2          (Jury exited the courtroom.)

3              THE COURT:  You may step down during the break.

4      Thank you.

:56PM    5              We're in recess.

6          (Brief recess was taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Mr. Hogstrom, how much longer do you think

2    you have for the Bishop?

3    MR. HOGSTROM:  I think I have maybe ten minutes more

4    of questions, and then there is a recording.  And that will be

5    interrupted at times with some certain questions.  But I think

6    the recording is about a half hour, maybe 25 minutes, something

7    like that.

8    THE COURT:  All right.  Let's bring them in.

9    MR. HOGSTROM:  Judge, there is one -- one thing to

10   note about the -- on that front.  There is a probably four or

11   five times during the video where for unknown reasons there is

12   status, lasts about three seconds.  I think if it was actually

13   played in here it would be really irritating to the jury.

14   So we were just going to pause it for those three

15   seconds each time, or mute it.

16   (Jury entered the courtroom.)

17   THE COURT:  Please proceed.

18   BY MR. HOGSTROM:

19   Q.  Bishop, when we broke, you had just indicated that after

20   signing the hold-harmless agreement and subsequently not

21   receiving refund of the funds, you had further e-mail

22   communications with Mr. Rossini, is that right?

23   A.  Yes.

24   Q.  I am showing you what's been marked Government Exhibit 7,

25   Younan 7, Younan 8, Younan 9, Younan 10.  Take a look at those

1    and tell me if you recognize them?

2    A.   Yes.

3    Q.   What are they?

4    A.   These are e-mail correspondence that went back and forth

5    between myself and Bert Rossini.

6    Q.   Are they true and accurate copies?

7    A.   Yes.

8           MR. HOGSTROM:  Government moves to admit Younan 7, 8,

9    9 and 10.

10          MR. FRANKEL:  No objection.

11          THE COURT:  Younan Exhibit 7, 8, 9 and 10 are admitted

12   in evidence.

13       (Said exhibits were received in evidence.)

14   BY MR. HOGSTROM:

15   Q.   Beginning with Younan 7, I'm putting on the screen here, is

16   this an e-mail from Mr. Rossini to NinosYounan@yahoo.com?

17   A.   Yes.

18   Q.   Is that your e-mail address?

19   A.   Yes.

20   Q.   And is BertRossini4@gmail.com the e-mail address you were

21   communicating with Mr. Rossini through?

22   A.   Yes.

23   Q.   Is the date of this e-mail January 28, 2013?

24   A.   Yes.

25   Q.   Now, on -- I'm going to go in reverse order.  On the bottom

Younan - direct                        770

1    of the screen, it lists your original e-mail to Mr. Rossini, is

2    that correct?

3    A.   Yes.

4    Q.   That was on January 15, 2013?

5    A.   Yes.

6    Q.   Can you please read for the jury what is -- what you stated

7    in this e-mail?

8    A.   Bert, this is Reverend Ninos from St. Odisho Church.  I

9    hope that all is well with you.  I visited your office earlier

10   this afternoon, but you were out.

11            THE COURT:  Slow down a little bit because the court

12   reporter is taking it down.

13            THE WITNESS:  Sorry about that.

14   BY THE WITNESS:

15   A.   We haven't heard from you in a while.  I wish to inquire in

16   regards to past-due rent payments from the Berteau property.

17   When we spoke last, I understood that we would be receiving the

18   past payments beginning on January 15.  Please e-mail me when I

19   can stop by and pick up any payments that have been received.

20   Thanks and God bless.

21   BY MR. HOGSTROM:

22   Q.   And how did Mr. Rossini respond?

23   A.   He responded:  Dear Father, I should have a payment for you

24   by the end of this week.  I will call on Thursday.  Hope you

25   are well.  Bert.

1   Q.  And I'm going to show you what's been marked as Government

2   Exhibit Younan 6.  Do you recognize that document?

3   A.  Yes, sir.

4   Q.  What is it?

5   A.  It is a check that was written to St. Odisho Church from

6   this Devon Street Investments.

7   Q.  I am going to put on the screen Younan -- well, is that a

8   true and accurate copy?

9   A.  Yes.

10          MR. HOGSTROM:  Government moves to admit Younan 6?

11          THE COURT:  Any objection?

12          MR. FRANKEL:  No objection.

13          THE COURT:  Younan 6 is admitted in evidence.

14      (Said exhibit was received in evidence.)

15  BY MR. HOGSTROM:

16  Q.  I am going to place it on the screen.  Is this a check from

17  Devon Street Investments for $18,335?

18  A.  Yes, sir.

19  Q.  Is that dated February 6, 2013?

20  A.  Yes, sir.

21  Q.  What was the -- what is written on the memo line?

22  A.  September 2012, October 2012.

23  Q.  Is this a check that you received from Mr. Rossini?

24  A.  Yes, sir.

25  Q.  Was -- at that point in time, how much rent was owed to the

1  church under your understanding of the agreement you had?

2  A.  From September through February.

3  Q.  So this check was for September and October?

4  A.  Yes, sir.

5  Q.  Do you recall what happened with this check?

6  A.  It did not go through, did not clear.

7  Q.  Now, going back to -- moving on to Younan 8.  Is this an

8  e-mail from Mr. Rossini to you on May 22, 2013?

9  A.  Eight?  Yes.

10  Q.  And I'm going to first highlight the lower portion of this

11  exhibit, where there is an -- appears to be an e-mail this is

12  being responded to that you wrote, is that right?

13  A.  Yes, sir.

14  Q.  Here you state:  Hello, Bert.  Thank you for forwarding the

15  filed notice to me.  Also your attorney, Mr. Kruse, was going

16  to try and pull up the filings on the property that took place

17  in June of 2012.  He tried to pull them up yesterday from the

18  recorder of deeds website, but they wouldn't come up.  I would

19  greatly appreciate it if we could see what those filings were.

20  I would pull them up myself, but Mr. Kruse said that I would

21  not be able to.  The site requires password for access.

22          What were you saying there?  What was that a reference

23  to?

24  A.  I believe this was reference to certain documentation or

25  files that they made for the properties, primarily --

1    specifically the property of the church.

2    Q.   Okay.  Was this a reference to filings with the recorder of

3    deeds?

4    A.   Yes, sir.

5    Q.   What were you told about filings with the recorder of

6    deeds?

7    A.   I believe that they -- they said that they had filed what

8    they called a notice of lis pendens on the property.

9    Q.   Who said that?

10   A.   Bert Rossini.

11   Q.   Did Mr. Rossini tell you what -- why they filed a -- what

12   he called a notice of lis pendens?

13   A.   He stated that a notice of lis pendens was a notification

14   or a lien on the deed of the property, notifying the owners or

15   the bank that there is a legal matter involving this specific

16   property.  And that would prevent the property from being sold

17   or for the title from changing names, so long as that lien was

18   on, up until the lien was -- would be taken, which can only be

19   taken by Devon Street Investments or Bert Rossini.

20   Q.   Now, I want to turn you to Exhibit 9, Younan 9.  This is

21   slightly out of order.  Is this e-mail from April 13, 2013?

22   A.   Yes.

23   Q.   It's from Mr. Rossini to you?

24   A.   Yes, sir.

25   Q.   And does it reflect there is an attachment?

1   A.  Yes.

2   Q.  And what does Mr. Rossini say to you?

3   A.  Father, I wanted to give you -- give this to you in person

4   so you would know what is happening.  Sorry I did not see you

5   this week, but I will call Monday morning.  Bert.

6   Q.  And turn to the third page -- fourth page of this document.

7   Is this the attachment to the e-mail?

8   A.  Yes, sir.

9   Q.  And what are we looking at here?

10  A.  It is a filing between Devon Street Investments against

11  Thomas Murphy.

12  Q.  Did you have conversations with Mr. Rossini about this

13  document?

14  A.  Yes.

15  Q.  How did you have those conversations, in person or over the

16  phone?

17  A.  We had spoken I believe over the phone and in person

18  regarding this filing.

19  Q.  What did Mr. Rossini tell you about this document?

20  A.  He stated that they -- they were suing Thomas Murphy, and

21  they had filed against him because Thomas Murphy had not

22  fulfilled his responsibility as their attorney for the

23  properties.

24  Q.  What was your understanding of what -- what the consequence

25  of that might be for you receiving the return of your

1    investment money, or the church's investment money?

2    A.   I'm sorry.  I don't understand.

3    Q.   Did you have an understanding of why this -- the filing of

4    this lawsuit was relevant to the possibility of the church

5    might return -- get their money back?

6    A.   Well, he -- he stated that by suing him and showing that he

7    did not -- he simply took the money and did not fulfill his

8    requirements, they would be able to cease his funds somehow and

9    be able to reimburse the investors their money.

10   Q.   Now, lastly I want to turn your attention to Exhibit

11   Younan 10.  Is this an e-mail from Mr. Rossini to you dated

12   March 29, 2014?

13   A.   Yes, sir.

14   Q.   And does it indicate that there is an attachment?

15   A.   Yes, sir.

16   Q.   Turning your attention to the fourth page of this document,

17   is this the attachment?

18   A.   Yes, sir.

19   Q.   Or rather is this the first page of the attachment?

20   A.   Yes, sir.

21   Q.   Is this -- is there language on the top of this document

22   that indicates that it is a note purchase agreement for 3333

23   West Berteau?

24   A.   Yes, sir.

25   Q.   Did you know why Mr. Rossini was sending you this document?

1    A.   I believe it was just to show that the property -- that the
2    necessary documentation had been filed for the purchase of the
3    note of the property.
4    Q.   Upper right-hand corner of the document, is there a stamp
5    for the Cook County Recorder of Deeds?
6    A.   Yes, sir.
7    Q.   And turning the next page of the document, which is page 5
8    of Younan 10, is there language written under the name,
9    memorandum?
10   A.   Yes, sir.
11   Q.   Does it indicate that I am specifically recording this note
12   purchase agreement to put others on notice of the agreements'
13   existence.  Additionally note that consideration has been paid
14   in the amount of $300,000 as of today's date.  We are
15   finalizing our agreement to purchase the note.
16   A.   Yes, sir.
17   Q.   As of that date, which was in January of 2014, were you
18   aware of any efforts that were being made to obtain the note
19   that you believed you had purchased from Mr. Rossini?
20   A.   You mean like besides what they had said?
21   Q.   As referenced in this memorandum, had you had any
22   communication with Mr. Rossini about him being in the final
23   stages of an agreement to purchase the note?
24   A.   No.  The last time that we had spoken was primarily about
25   the church receiving its initial investment back.

Younan - direct                    777

1  Q.  Additionally, what was your understanding -- at the time

2  that you made the investment and heard about it from Mr.

3  Rossini, what did you believe the status of the note was?

4  A.  We believed that they already had the note.  We didn't

5  believe that they were just now trying to get it.  Initially

6  they informed us that the notes were in their possession, that

7  these are notes that their investment company had already

8  purchased.

9       We didn't realize that all of this would be taking

10 place after the fact.  That is not what they had conveyed to us

11 originally.

12 Q.  Now, I'm directing your attention to the seventh page of

13 this document.  Is this titled, agreement to purchase note

14 mortgage and collateral documents?

15 A.  Yes, sir.

16 Q.  And does it purport to be a, quote, mortgage sale agreement

17 made and entered into this 5th date of December, 2012?

18 A.  Yes, sir.

19 Q.  And does it indicate here that the seller, North Community

20 Bank -- was that the bank that held the note on this property?

21 A.  I believe so.

22 Q.  That the seller, North Community Bank, and buyer, Devon

23 Street Investments, desired to enter into this agreement to

24 purchase and sell the note and mortgage and related

25 documents -- continuing on -- related to 3333 West Berteau

1   Avenue in Chicago.

2   A.  Yes, sir.

3   Q.  Were you -- did you have any awareness of any agreement

4   between Devon Street Investments and North Community Bank to

5   purchase this note in December of 2012?

6   A.  No, sir.

7   Q.  Now, I want to go to the next page of the document, which

8   is page 8.  There are -- are there two signature blocks here?

9   A.  Yes, sir.

10  Q.  Under Devon Street Investments Limited, whose signature is

11  there?

12  A.  Bert Rossini.

13  Q.  And under the seller, North Community Bank, whose signature

14  is that?

15  A.  Nobody.  It's missing.

16  Q.  Now, following these e-mail communications, did you come

17  into contact with the FBI?

18  A.  Yes, sir.

19  Q.  How did that happen?

20  A.  I came into contact with the FBI through Ashoor Pithyou,

21  Reverend Pithyou's son.

22  Q.  Did you, after being contacted by the FBI, agree to assist

23  the FBI in having a communication with Mr. Rossini while

24  wearing a concealed recording device?

25  A.  Yes, sir.

Younan - direct                                          779

1    Q.   Did that occur on or about August 8 of 2013?

2    A.   Yes, sir.

3    Q.   Since then, have you reviewed a recording of that meeting

4    that you had on August 8 of 2013?

5    A.   Yes, sir.

6    Q.   Was there also a transcript prepared of that?

7    A.   Yes.

8    Q.   Showing you what's been marked as Government Exhibit Younan

9    Recording.  Do you recognize that document -- or that disk?

10   A.   Yes, sir.

11   Q.   What is it?

12   A.   This is a disk of the recording that took place.

13   Q.   And how do you know that that disk is the same -- or

14   recording of the same meeting that we were referring to?

15   A.   I initialed and dated it.

16   Q.   Did you do that today?

17   A.   Yes, sir.

18   Q.   So you have reviewed this recording and confirmed that it

19   is a true and accurate representation of what occurred?

20   A.   Yes, sir.

21   Q.   I want to show you what's been marked as Government Exhibit

22   Younan Transcript.  Do you recognize that?

23   A.   Yes, sir.

24   Q.   What is it?

25   A.   It's a transcript of the recording.

1   Q.  And have you reviewed that transcript in conjunction with

2   the recording, and can you confirm that it is an accurate

3   representation of the words and sounds spoken -- words spoken

4   and sounds heard in the recording?

5   A.  Yes.

6   Q.  And did you sign and initial it?

7   A.  I initialed it, yes.

8           MR. HOGSTROM:  Government would move to admit Younan

9   Recording and to publish Younan Recording and then to publish

10  Government Exhibit Younan Transcript to the jury.

11          MR. FRANKEL:  No objection.

12          THE COURT:  All right.  Younan Recording is entered in

13  evidence.

14      (Said exhibit was received in evidence.)

15          THE COURT:  And with regard to the transcript, you

16  simply want to publish it to the jury?

17          MR. HOGSTROM:  Yes, Judge.  We have copies that we are

18  going to pass out.

19          THE COURT:  All right.  The government may use Younan

20  Transcript for demonstrative purposes and provide it to the

21  jury.

22      (Documents tendered to the jury.)

23          MR. HOGSTROM:  Permission to proceed, your Honor.

24          THE COURT:  Go ahead.

25  BY MR. HOGSTROM:

1    Q.   Bishop Younan, does this transcript start -- excuse me.

2           Bishop Younan, does this transcript start part way

3    through the full recording?

4    A.   Actually I don't have one.

5    Q.   My apologies.

6    A.   It's all right.

7           To answer your question, yes, it does.

8    Q.   I'm going to start playing the recording at the time stamp

9    of approximately 11:04:46, where it indicates on the transcript

10   it begins.  And I am just going to ask you to follow along and

11   listen.  And from time to time I may stop and ask you questions

12   about it.  Okay?

13   A.   Yes.

14      (Video-recording was played in open court.)

15   BY MR. HOGSTROM:

16   Q.   All right.  So right after that, do you know -- on the

17   screen no one's face is visible right now on the screen, is

18   that correct?

19   A.   Yes, sir.

20   Q.   Do you recognize the voices that are being spoken?

21   A.   Yes.  That's myself.  And I believe that's the attorney,

22   Richard Kruse.

23   Q.   So an attorney named Richard Kruse was present for this

24   meeting?

25   A.   Yes.

1    Q.   Who else was present?

2    A.   It was myself, Bert Rossini, Richard Kruse and Ashoor

3    Pithyou.

4    Q.   And at the time that you arrived -- well, where was the

5    meeting?

6    A.   The meeting took place at Bert Rossini's office, was all

7    the way at the end of the hall.

8    Q.   And at the time that you arrived at the office, what was

9    your understanding of what you would be discussing?

10   A.   We would be discussing the current situation of the

11   properties, what was happening with them.

12   Q.   And this again was August 8 of 2013, is that right?

13   A.   Yes, sir.

14   Q.   So that was approximately four months after the lawsuit was

15   filed, is that correct?

16   A.   Yes, sir.

17        (Video-recording continued to be played in open court.)

18   BY MR. HOGSTROM:

19   Q.   Mr. Rossini just referred in this recording to a

20   deposition.  Do you recall what that was a reference to?

21   A.   The deposition was what was scheduled for Thomas Murphy.

22   They had scheduled a deposition where he would come in.  And

23   their attorney Richard Kruse had a series of questions he was

24   going to ask him.

25             MR. HOGSTROM:  Continue the recording.

1        (Video-recording continued to be played in open court.)

2   BY MR. HOGSTROM:

3   Q.  Let me stop the recording again.  Mr. Rossini just stated

4   on the recording:  Or if we have a right to those rents.

5        What was your reaction when you heard that?

6   A.  I was actually quite upset, was getting sick to my stomach.

7   Q.  Why?

8   A.  Because that's not what they had told us initially.  When

9   they brought this investment to us, they stated that they had

10  these notes.  These notes belonged to them.  The properties

11  were still under foreclosure, which is why the deeds -- and we

12  couldn't have a closing, and we couldn't have the deeds put in

13  our names.

14       But they said that they controlled these properties.

15  This was their rent.  Their rents were already coming to them.

16  the fact that we're even going through this at this time was

17  completely ridiculous.

18       Different -- it was completely opposite from what they

19  originally told us.

20       (Video-recording continued to be played in open court.)

21  BY MR. HOGSTROM:

22  Q.  Stop it right there.  What did you understand that

23  reference to lis pendens to mean?

24  A.  Meaning the documentation that they had filed on the -- or

25  the lien that they had placed on the title of the property,

1    that the property itself, the ownership could not be changed,

2    whether it was from the bank to the original owner to being

3    resold, because of the lis pendens that they placed on the

4    property.

5            MR. HOGSTROM:  Continue the recording.

6      (Video-recording continued to be played in open court.)

7    BY MR. HOGSTROM:

8    Q.  I'm going to stop right there.  That discussion that you

9    just heard, where Mr. Rossini was discussing either getting the

10   bank to pay him or to be able to buy the property from the

11   bank, what did you understand that to -- to mean?

12   A.  They were using the liens that they placed on the

13   properties to basically strongarm the banks.  The bank would

14   not be able to sell the property unless they settled with them

15   first.  So they would keep these liens on there for a couple of

16   years.

17        I mean, it was very actually upsetting because it

18   seems that the money that we had given Devon Street Investments

19   for the properties that we had -- for the notes, that we were

20   led to believe that they had already owned, they were simply

21   transferring the notes to us -- turns out that they didn't own

22   them.

23        Not only did they not own them, but the funds that we

24   had given them to their attorney, they are now saying that the

25   attorney never actually filed the documentation.  So they went

1   and placed these liens on these properties, that they have no

2   rights to place any lien on.  And they are using that as

3   leverage --

4            MR. FRANKEL:  I object.  There is no question pending.

5            THE COURT:  Overruled.  The question was, what was his

6   understanding.

7   BY THE WITNESS:

8   A.  And now that they have these liens on these properties, the

9   bank is put in a position where they either have to settle with

10  them or wait the several years it takes for the liens to come

11  off.

12           So according to Bert, they would -- they are more

13  likely to pay us money or to sell us the property and not have

14  to go through the years of having a lien on there in order to

15  just settle these properties out.

16  BY MR. HOGSTROM:

17  Q.  What was your reaction to the idea of buying the properties

18  from the banks?

19  A.  Well, if they have the money to buy the properties from the

20  banks, why not simply use that money to pay off their investors

21  that they scammed to begin with?

22           MR. HOGSTROM:  Continue.

23      (Video-recording continued to be played in open court.)

24  BY MR. HOGSTROM:

25  Q.  Let me ask, there is a reference on line 21 to the

1    malpractice.  And then there is discussion about insurance

2    company.

3            What was your understanding of what was being

4    explained during this part of the conversation?

5    A.  Well, they were filing a lawsuit against Thomas Murphy for

6    malpractice.  And Thomas Murphy was a licensed, bonded

7    attorney, and he had insurance.  And then even if he couldn't

8    pay, the insurer -- whatever insurance company attorney keeps

9    would then pay the damages caused by the attorney's negligence.

10   Q.  So it was your understanding that they -- they could or

11   were intending to file a malpractice suit that would result in

12   an insurance payout that would then recoup the church's money?

13   A.  Yes.

14       (Video-recording continued to be played in open court.)

15   BY MR. HOGSTROM:

16   Q.  Mr. Kruse in the recording just indicated that the

17   malpractice suit was, quote, different than the ones pending

18   now.

19           What did you understand him to be saying there?

20   A.  The ones pending now being the things that they were

21   filing, the lis pendens and the liens that they were filing

22   against all the properties.  The other avenue by which they

23   were hoping to obtain their money or the properties themselves.

24   Q.  Okay.  So the malpractice lawsuit, to your understanding,

25   was something that would possibly happen in the future?

1  A.  Yes.

2      (Video-recording continued to be played in open court.)

3  BY MR. HOGSTROM:

4  Q.  Stop the recording.  On line 36, Mr. Rossini stated:  Tom

5  said he was collecting the rents.

6          At the time that you made this investment and at the

7  time that you began receiving what you believed were rent

8  payments, did you have an understanding about who was going to

9  be collecting the rent?

10 A.  Devon Street Management.

11 Q.  And who told you that?

12 A.  Bert Rossini.

13 Q.  Did Mr. Rossini ever tell you that Tom Murphy was going to

14 be collecting rents?

15 A.  No, he said that Tom Murphy was their attorney.  He was the

16 one who did all the filing of paper, make sure everything was

17 done correctly.

18 Q.  Continuing the recording now.

19     (Video-recording continued to be played in open court.)

20 BY MR. HOGSTROM:

21 Q.  Stopping the recording briefly.  There is a reference to

22 Mr. Kruse just stating that you could go contact the bank this

23 afternoon to find out the status.

24          Bishop Younan, if you wanted -- if you had wanted to

25 find out from the bank what the status of the note was, who

1    owned it, who was collecting rents on the property, would you

2    have had any idea how to do that?

3    A.   No.

4    Q.   Now, there is reference in the recording you having been a

5    banker, and you said you were a bank manager.  Was your -- did

6    you have any experience with mortgage notes?

7    A.   No, sir.

8    Q.   Okay.  Or receivables for properties that were in

9    foreclosure?

10   A.   No, sir.

11        (Video-recording continued to be played in open court.)

12   BY MR. HOGSTROM:

13   Q.   I'm going to stop it right there.  There was reference by

14   Mr. Rossini and Mr. Kruse on the recording to not -- the idea

15   of not referencing fraud or not raising issues of fraud or

16   criminality.

17            What did you understand them to be telling you?

18   A.   Well, that if they actually went down that avenue and said

19   that he had committed fraud, that Thomas Murphy had committed

20   fraud, they would not be able to collect from his insurance

21   company for his negligence.

22   Q.   And did you take that to mean that if you were to allege

23   fraud in some way related to these transactions, that then you

24   would never get your money back?

25   A.   Yes, because they didn't want us -- for instance, one of

Younan - direct                                              789

1   the reasons why we're not asking about the bank, if their bank

2   knew that fraud had been committed against them, then the bank

3   itself would probably have to file, you know, various documents

4   that fraud had been, you know, committed against them for

5   properties that they own.  So they wanted to keep it specific,

6   so that they would be able to obtain money from, you know, a

7   lawsuit against him or against his insurance company for his

8   malpractice.

9            MR. HOGSTROM:  Continue the recording.

10        (Video-recording continued to be played in open court.)

11  BY MR. HOGSTROM:

12  Q.  So I'm going to stop right there.  When Mr. Kruse on lines

13  1 through 5 of the transcript references him -- is he going to

14  show on Wednesday and sit down?  And within 30 days if he

15  doesn't show they will have a court order compelling him.

16           What did you understand Mr. Kruse to be saying?

17  A.  They had initially tried to obtain files, documentation,

18  information from Thomas Murphy, and he was not giving them that

19  information.  So they filed a subpoena or something like that

20  against him so that he would have a deposition.

21           So he was scheduled to come in on Wednesday and sit

22  down for an actual deposition.  But if he did not show up, then

23  the next course of action would be that within 30 days, that

24  they would obtain a court order compelling Thomas Murphy to

25  actually go through with the deposition.

1    Q.   Thank you.

2         (Video-recording continued to be played in open court.)

3    BY MR. HOGSTROM:

4    Q.   I'm going to stop the recording there.  Lines 13 through

5    16, Mr. Kruse references the idea that you could file an

6    intervention in a foreclosure action.

7              What did you understand him to be stating there?

8    A.   It wasn't quite sure.  I'm assuming -- I just assumed it

9    would be something like a filing, or maybe another type of

10   legal pathway that they can take so that they can prevent this

11   property from finalizing the foreclosure or being transferred

12   or being given to different owner or something like that.

13             MR. HOGSTROM:  Continuing the recording.

14        (Video-recording continued to be played in open court.)

15   BY MR. HOGSTROM:

16   Q.   Now, the first couple lines of this page 17 and the last

17   few lines of page 16, there is a reference to properties being

18   on the MLS and receiving -- stating that they made a bid.

19             What did you understand that portion of the

20   conversation to be about?

21   A.   They attempted to purchase those properties.  They made a

22   bid on the property.  The property in question is listed for

23   sale.  So they made an offer to purchase it.

24        (Video-recording continued to be played in open court.)

25   BY MR. HOGSTROM:

Younan - direct

1   Q.  Mr. Rossini, on line 6 of page 18, just said that it's

2   Wednesday or Thursday.  And then on line 10 says:  I'll call

3   you Wednesday afternoon and let you know if he showed.

4          What was that a reference to?

5   A.  That's whether or not Thomas Murphy showed for the

6   deposition.

7   Q.  Did Mr. Rossini call you that following Wednesday and let

8   you know --

9   A.  No.

10  Q.  -- whether Mr. Murphy showed for the deposition?

11  A.  No, sir.

12  Q.  Did you ever after that hear about Mr. Murphy being

13  deposed?

14  A.  No.

15     (Video-recording continued to be played in open court.)

16  BY MR. HOGSTROM:

17  Q.  Okay.  I have stopped the recording.  Was that the end of

18  the meeting?

19  A.  Yes, sir.

20  Q.  Now, at a few different places there, is it correct that

21  you had asked Mr. Rossini for an information of the person at

22  the -- at the bank that he had spoken with about the note for

23  your property?

24  A.  Yes, sir.

25  Q.  And Mr. Rossini indicated that he was going to provide

1    information to you, is that right?

2    A.   Yes, sir.

3    Q.   Did you ever receive that information from Mr. Rossini?

4    A.   No, sir.

5    Q.   There was a number of references to a malpractice suit

6    potentially being filed.  Remember that?

7    A.   Yes, sir.

8    Q.   Were you ever made aware that a malpractice suit was filed

9    against Thomas Murphy?

10   A.   I believe the document -- the only document I ever seen

11   anything filed against Thomas Murphy was the one that was shown

12   previously.

13   Q.   And that was the complaint for accounting?

14   A.   Yes.

15   Q.   There was a reference to intervening on the church's behalf

16   in a foreclosure case.

17   A.   Yes.

18   Q.   Do you recall that?

19        Did that -- to your knowledge, did that ever happen?

20   A.   No, sir.

21   Q.   Did the church ever receive a refund of the $300,000?

22   A.   No, sir.

23   Q.   Did the church ever receive title to this property?

24   A.   No, sir.

25        (Brief pause.)

1   BY MR. HOGSTROM:

2   Q.  Bishop Younan, there was significant amount of discussion

3   in this recording about Mr. Murphy.  Do you recall that?

4   A.  Yes, sir.

5   Q.  And generally during this time period, did you have

6   conversations with Mr. Rossini about Mr. Murphy?

7   A.  Yes, sir.

8   Q.  What was your impression of what -- his relationship with

9   Mr. Murphy during this time period, from April 2013 through

10  August 2013?

11  A.  After -- I'm sorry.  When -- during this time period, I

12  would think that -- I understood that Thomas Murphy had not

13  filed what they had stated that he was going to file, or had

14  not completed his task as their attorney.  So they were in the

15  process of taking legal action against him, in trying to obtain

16  information from him regarding the properties that he was

17  supposed to have handled for them.

18  Q.  And what did you think Mr. Rossini's relationship with

19  Mr. Murphy was like?  Did you think that they were

20  communicating with each other during this time period?

21          MR. FRANKEL:  Objection.

22          THE COURT:  Sustained.  Why don't you rephrase the

23  question.

24  BY MR. HOGSTROM:

25  Q.  From what you had been told by Mr. Rossini, did you have

1   any understanding of the status of his -- of Mr. Rossini's

2   relationship with Mr. Murphy?

3   A.   Initially, when we would approach Mr. Rossini about the

4   payments that the church hadn't received, we were told by Mr.

5   Rossini that the work load was so great that Thomas Murphy was

6   unable to catch up.  And he would show us file cabinets.  He

7   would show us banker boxes full of files for different

8   properties, all of which were still pending because there is

9   just -- business is just so good that he is not able to keep

10  up.

11          And then afterward, as time went by, he -- he -- at

12  one time I remember I visited his office.  Bert Rossini showed

13  us several staff members that they had hired to help Thomas

14  Murphy catch up on his work.

15          And then after the fact -- then after that it became,

16  oh, well, it doesn't seem like Thomas Murphy has done his job.

17  So they had hired several other people, sort of investigators,

18  something like that, ex-sheriffs, ex-police, or law

19  enforcement, that were investigating and kind of catching up on

20  him, trying to make sure that he did -- done the file work.

21          Then after that it became, well, we're going to file

22  legal action against him because he hasn't presented us -- or

23  he -- he was negligent in fulfilling his duties.

24  Q.   Well, there was reference during the recording to Mr.

25  Murphy having taken the money in exchange for doing no legal --

Younan - cross                    795

1    not doing the legal work --

2    A.   Yes.

3    Q.   -- is that right?

4    A.   Yes.

5    Q.   Was it your understanding that Mr. Rossini was in essence

6    accusing Mr. Murphy of fraud?

7    A.   Yes.

8    Q.   Would it surprise you if you learned that Mr. Rossini was

9    still conducting business with Mr. Murphy during this time

10   period?

11             MR. FRANKEL:  Objection, Judge.

12             THE COURT:  Sustained.

13             MR. HOGSTROM:  Nothing further, Judge.

14                        CROSS-EXAMINATION

15   BY MR. FRANKEL:

16   Q.   Good afternoon.

17             THE COURT:  Cross-examination, go ahead.

18             MR. FRANKEL:  Thank you, Judge.

19   BY MR. FRANKEL:

20   Q.   Good afternoon, Bishop Younan.

21   A.   Good afternoon.

22   Q.   This started back in 2012 -- or 2011, is that correct?

23   A.   Yes, sir.

24   Q.   And you told us that someone named Ibrahim brought an idea

25   for an investment to the church, is that right?

1    A.   Yes, sir.

2    Q.   Is that Ibrahim Yousif?

3    A.   Yes.

4    Q.   Pardon me?

5    A.   Yes, sir.

6    Q.   Okay.  And you met with Reverend Pithyou, who presented an

7    investment opportunity, is that right?

8    A.   He didn't present the investment opportunity.  He suggested

9    that maybe we can invest the money and obtain a greater return

10   than simply paying off a certain portion of the loan.  It was a

11   means by which the church could alleviate some of the financial

12   burden on the parish if there was a way that we can take this

13   money and investment and have a steady stream of income come

14   in.  That would benefit the church in the long return far

15   better.

16   Q.   Okay.  So it was an investment opportunity that you thought

17   that you -- the church could benefit from getting into this

18   program that Ibrahim Yousif had told you about.

19   A.   Yes, sir.

20   Q.   And would alleviate some of the financial pressure on the

21   church.

22   A.   Yes.

23   Q.   And the church had $300,000?

24   A.   Yes.

25   Q.   Okay.  You said that you met Ibrahim and Babajan.  Was that

1    Babajan Khoshabe?

2    A.  Yes, sir.

3    Q.  And he is also a member of the church?

4    A.  Yes, sir.

5    Q.  And you met him at Devon Street?

6    A.  Yes.

7    Q.  At the offices there where we saw the recording?

8    A.  Yes.

9    Q.  And also Bert Rossini was there, is that right?

10   A.  Yes, sir.

11   Q.  That's when you learned of the 333 Berteau note?

12   A.  Initially it was mentioned by Ibrahim the day before.

13   Q.  Okay.

14   A.  That's when we got together, and it was further explained

15   by Bert Rossini.

16   Q.  Okay.  When Ibrahim explained it to you -- and you went

17   into some detail on this on direct examination -- he explained

18   that the note wasn't the property itself, but the property

19   was -- you believed the property was in foreclosure and that

20   some court proceedings would have to take place to complete the

21   transfer of the deed, pursuant to the note, is that right?

22   A.  We were told that the property was at the time in

23   foreclosure.

24   Q.  Okay.

25   A.  And foreclosure would take some time.  In the meantime, the

Younan - cross                    798

1    banks were selling the notes.

2    Q.   That was -- it was Ibrahim who told you that, right?

3    A.   As well as Bert.

4    Q.   And while you own the note but before the deed transferred,

5    you would be entitled to rents?

6    A.   Yes.

7    Q.   In fact, you did get some rent checks for a period of time,

8    is that right?

9    A.   Yes, sir.

10   Q.   Now, later there was a meeting in September of 2012.  Do

11   you remember that?

12            This was a meeting with yourself, Reverend Pithyou,

13   Ashoor.  And you met with Thomas Murphy to discuss the property

14   transaction.

15   A.   I never met with Thomas Murphy.

16   Q.   You never met Thomas Murphy?

17   A.   No, sir.

18   Q.   So if you -- were you -- do you remember being interviewed

19   by Special Agent -- FBI Special Agent Lyle Evans on March 15,

20   2013?

21   A.   I believe so.  I don't remember the exact date.

22   Q.   You don't -- were you interviewed by Special Agent Evans?

23   A.   Yes, sir.

24   Q.   In connection with this case?

25   A.   Yes, sir.

Younan - cross                                                        799

1   Q.  And you tried to tell him to the best of your recollection

2   what happened --

3   A.  Yes, sir.

4   Q.  -- leading up to the loss of the $300,000, is that right?

5   A.  Yes, sir.

6   Q.  And you wanted to be truthful and complete as much as

7   possible?

8   A.  Absolutely.

9   Q.  And do you recall telling him that in September of 2012,

10  you, Reverend Pithyou and Ashoor met with Murphy to discuss the

11  property transaction.  Murphy told the group that the mortgage

12  notes for the properties that St. Odisho parishioners had

13  purchased had been acquired from the banks.  Murphy further

14  told the group that it would take two to three months to

15  complete the legal process to acquire the titles for the

16  properties.  Murphy told the group that they could get their

17  money back at any time.

18         You remember telling --

19  A.  No, I never met with Thomas Murphy.

20  Q.  You never met Thomas Murphy?

21  A.  No, sir.

22  Q.  So if it's -- you knew a lot about Thomas Murphy, huh?

23  A.  Only from what Bert said.

24  Q.  You knew he was the lawyer for Devon Street --

25  A.  Yes.

1    Q.   -- is that right?

2              And you knew that at some point Bert Rossini was, as

3    we just heard on direct examination, blaming Thomas Murphy for

4    the delays in getting the rent payments, for obtaining the

5    notes, and for completing any kind of foreclosure on the

6    properties, is that right?

7    A.   Yes, sir.

8    Q.   And during this video, it was basically continuation of the

9    same conversations that you've been having with Mr. Rossini

10   during the course of 2012 and 2013, is that right?

11   A.   I'm sorry.  Can you repeat the question?

12   Q.   The recording is consistent with the conversations you were

13   having with Mr. Rossini throughout this entire period in terms

14   of saying that Mr. Murphy was responsible for what happened.

15   A.   Yes, sir.

16   Q.   So just to back up a little bit.  You told us that you

17   started your career prior to becoming elevated at the church,

18   that you were a banker, is that right?

19   A.   A bank manager, yes.

20   Q.   A bank manager?

21   A.   Yes.

22   Q.   You went to college, I take it?

23   A.   Yes.

24   Q.   Do you have a finance degree?

25   A.   Management degree.

1   Q.   Management?  And college, MBA?

2   A.   Currently getting my master's of theology.

3   Q.   Okay.  And although you didn't have any connection when you

4   were a banker with commercial banking or residential mortgage

5   practices?

6   A.   I dealt with loan officers, but it wasn't for notes or

7   anything like that.

8   Q.   Pardon?

9   A.   I dealt with loan officers, but nothing of this --

10  Q.   Okay.  Well, you knew that if a note existed in connection

11  with a piece of property, the note had to have physical

12  existence.  In other words, there was ink on paper that someone

13  could look at, right?

14  A.   No, I hadn't dealt with any type of purchasing of notes.

15  Q.   So you didn't know whether a note existed in -- in any kind

16  of physical form, or just something somebody told you they had?

17  A.   This is how -- this is when I even heard of the concept of

18  buying notes.

19  Q.   What -- what did you think a note was when Ibrahim told you

20  about this concept of buying notes?

21  A.   It was a legal term.

22  Q.   Just a legal term?

23  A.   Like it was a process of -- by which certain property was

24  placed in a certain company's name or a certain individual's

25  name.  Not the title, but they had rights over that property.

1   That's how it was explained to me.

2   Q.  Where did you think the note existed?  Just like in a

3   computer or just an agreement between parties?

4   A.  I assumed it was a legal document.

5   Q.  Did you -- that's what I am asking.  Did you ever ask to

6   see the note that you thought St. Odisho was purchasing?

7   A.  No.

8   Q.  And obviously you never saw a note, is that right?

9   A.  No.

10          MR. FRANKEL:  I have nothing further, Judge.

11          THE COURT:  Any redirect?

12      (Brief pause.)

13          MR. HOGSTROM:  Nothing further.

14          THE COURT:  You may step down.  Thank you very much.

15      (Witness excused.)

16          THE COURT:  May I speak to the attorneys at sidebar

17  please.

18      (Sidebar proceedings out of the hearing of the jury:)

19          THE COURT:  Well, I think at this point we should

20  probably just adjourn for the day.  You have one -- you have

21  that --

22          MR. NOVAK:  Can we make sure Kulnig, Mr. Kulnig, is

23  available on Monday morning?  We had intended him for today.

24          THE COURT:  No.  Make sure he is available Monday

25  morning.

1      MR. NOVAK:  Fine.

2      THE COURT:  I am not going to keep the jury any longer

3  than they need to be here.

4      All right.  So then we have stipulations you said?

5      MR. HOGSTROM:  Yes, we have previous number of

6  stipulations left, 30 probably.  We need to read those.

7      THE COURT:  So why don't we do the owner on Monday,

8  and then we do the stipulations, and then we go from there.

9  Okay?

10     (Further proceedings within the hearing of the jury:)

11     THE COURT:  Ladies and gentlemen, we are going to

12  adjourn for the weekend.  So it's now 4:25.  I want to thank

13  you very much for your attention.  I know it's been a long

14  week.  We started early on Monday.  You were faced with a lot

15  of questions during voir dire.  And I can tell you all have

16  been paying very close attention to the testimony.

17     So I know that the attorneys and the parties here

18  appreciate your attention, and I certainly do because I know

19  it's not an easy job.  So thank you very much.

20     During the weekend, please do not discuss this case

21  with anyone, including your family or friends, and certainly

22  not with one another.  And please, during the weekend do not do

23  any independent research regarding any of the parties in this

24  case, any of the terms you have heard discussed in this case,

25  or the types of transactions you have heard about in this case.

1   Okay?  I can't stress to you how important it is that your

2   verdict be based upon only the evidence that is introduced here

3   in this courtroom.

4            We will start on Monday at 10:00 o'clock.  Please be

5   in the jury room by 9:45.

6            A JUROR:  Do you want these back?

7            THE COURT:  You can leave those on your chair, that is

8   the transcripts on your chair.  Please leave your notebooks in

9   the jury room.  It will be locked up over the weekend.  Okay?

10           And I have been more than happy to write the notes or

11  letters that some of you have requested of me.  If it will be

12  helpful for me to write additional letters for anyone's

13  employer or what have you with regard to the length of this

14  trial --

15      (Brief interruption.)

16           THE COURT:  -- please let Ms. Acevedo or the court

17  security officer know, and I will be happy to do it for you.

18           Thank you very much.  Enjoy the weekend.

19           And before you go, remember Tuesday, there will be no

20  trial on Tuesday.  Thank you.

21      (Jury exited the courtroom.)

22           THE COURT:  All right.  Please be seated.

23           Let's go over the exhibits that were admitted today.

24  I have as follows:  Murphy Exhibit 7, Murphy Exhibit 8, 9, 10,

25  11, 13, 14, 15, 16, 12, 17, 18.  Younan Exhibits 1, 2, 3, 4, 5,

1    7, 8, 9, 10, 6, and Younan Recording.

2           Is that consistent with your list?

3           MR. HOGSTROM:  Yes, Judge.

4           MR. ADAMS:  Yes, your Honor.

5           THE COURT:  Great.  Is there anything else we need to

6    address at the moment before we adjourn for the weekend?

7           MR. HOGSTROM:  Not for the government.

8           MR. ADAMS:  Not for Mr. Rossini.

9           THE COURT:  All right.  So, Mr. Novak, have you had a

10   chance to e-mail the jury instructions?

11          MR. NOVAK:  I e-mailed them last night.  Everybody

12   should --

13          MR. ADAMS:  I received a copy.

14          THE COURT:  Great.  I will look for it.  And again, if

15   there -- Mr. Adams, why don't you and Mr. Frankel take a look

16   at the proposed jury instructions.  I know whatever objections

17   were made previously are still going to stand.  And I think I

18   ruled on a couple of them.  And we can discuss very briefly, so

19   we know how much time to set aside for the final jury

20   instruction conference, on Monday morning before we start

21   whether or not you have any objections and the extent of those

22   objections.  Okay?

23          MR. FRANKEL:  Thank you.

24          MR. NOVAK:  And I think to be clear, I e-mailed the

25   government's proposed instructions from the pretrial order.  I

1    think Mr. Adams proposed a couple of instructions.  I didn't

2    know which ones he adopted with Mr. Khoshabe.  So I didn't add

3    those.

4            MR. ADAMS:  I will submit a separate submission.  Does

5    the Court want that for Mr. Rossini?

6            THE COURT:  How many do you --

7            MR. ADAMS:  I think two or three maybe, off the top of

8    my head.

9            THE COURT:  That's fine.  Okay.  Thank you.

10           MR. NOVAK:  Thank you.

11           MR. ADAMS:  Thank you, Judge.

12       (Trial adjourned until June 11, 2018, at the hour of 10:00

13         o'clock a.m.)

14                          CERTIFICATE

15           I HEREBY CERTIFY that the foregoing is a true, correct

16   and complete transcript of the proceedings had at the hearing

17   of the aforementioned cause on the day and date hereof.

18    /s/Nancy C. LaBella

19    /s/Mary M. Hacker

20    /s/Alexandra Roth                          6/10/2018
     _____      _____
21    Official Court Reporter                         Date
      U.S. District Court
22    Northern District of Illinois
      Eastern Division
23

24

25