1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )  Docket No. 15 CR 515-1
                        )
4              Plaintiff,   )
                        )
5        v.          )  Chicago, Illinois
                        )  June 11, 2018
6  ALBERT ROSSINI,          )  10:00 o'clock a.m.
                        )
7             Defendant.   )

8                  VOLUME 5A
          TRANSCRIPT OF PROCEEDINGS - TRIAL
9     BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10  APPEARANCES:

11  For the Government:         HON. JOHN R. LAUSCH, JR.
                      United States Attorney, by
12                    MR. ERIK A. HOGSTROM
                      MR. WILLIAM PATRICK NOVAK
13                    Assistant United States Attorneys
                      219 South Dearborn Street
14                    Chicago, Illinois 60604

15  For the Defendant:          LAW OFFICES OF JOSHUA B. ADAMS,
                      P.C., by
16                    MR. JOSHUA B. ADAMS
                      53 West Jackson Boulevard
17                    Suite 1515
                      Chicago, Illinois 60604
18
                      FRANKEL & COHEN, by
19                    MR. SCOTT JAY FRANKEL
                      53 West Jackson Boulevard
20                    Suite 1615
                      Chicago, Illinois 60604
21

22             ALEXANDRA ROTH, CSR, RPR
              Official Court Reporter
23            219 South Dearborn Street
                 Room 1224
24            Chicago, Illinois 60604
              (312) 408-5038
25

1      (The following proceedings were had in open court outside

2       the presence of the jury:)

3           THE CLERK:  Case 15 CR 515, USA versus Albert Rossini,

4  for jury trial.

5           MR. HOGSTROM:  Good morning, your Honor.  Erik

6  Hogstrom and Bill Novak for the United States.

7           MR. NOVAK:  Good morning.

8           MR. ADAMS:  Good morning, Judge.  Joshua Adams and

9  Scott Frankel for Albert Rossini, who's present.

10          THE COURT:  Good morning.

11          So who do we have up first today?

12          MR. NOVAK:  We are going to have -- first we are going

13  to read some stipulations, your Honor.  We're going to finish

14  our stipulations.  Then Sandra Prescott, forensic accountant

15  with the FBI, and Kelly Connors for the summary witness.

16          Mr. Kulnig we decided against calling.  We have

17  stipulations to his testimony.

18          THE COURT:  Okay.  Can we do the stipulations after

19  the first witness, rather than the beginning of the morning?

20          MR. NOVAK:  The --

21          THE COURT:  Or do you need them for the witnesses?

22          MR. NOVAK:  The only thing we would need, one --

23  couple of the records are contained that are on the bank

24  records disk she's going to look at.  And these are all records

25  that will be on the -- they are going to go back to the jury

1    anyways.  They're part of the stipulation.  If counsel is fine

2    with us talking about them, and then we will just read the

3    stipulation afterwards, that's fine with us.

4            THE COURT:  All right.  Well, if you need a factual

5    predicate or evidentiary predicate for the testimony, we will

6    do the stipulations first.  That's fine.

7            With regard to jury instructions, I have looked them

8    over.  I note that defendant has proposed two.  Aside from the

9    ones that you proposed, do you have any objections to the

10    government's instructions?

11            MR. ADAMS:  We do, your Honor.

12            THE COURT:  And is that -- let me just ask you just in

13    terms of quantity, how much do you have?

14            MR. FRANKEL:  Just a couple, Judge.  There are -- I

15    think there are a couple in there that don't apply.

16            THE COURT:  Well, then that's fine.  We can address

17    those at the end of the day then.

18            MR. FRANKEL:  That's fine.  It's not a big deal, no.

19            THE COURT:  And then does the government have

20    objections to the two that were proposed by the defendant?

21            MR. NOVAK:  We haven't had a chance -- we just got

22    them this morning.  We haven't had a real chance to look at

23    them.

24            THE COURT:  That's fine.  We will take them up at

25    4:30, at the end of the day.  All right?

1          MR. NOVAK:  Then today's exhibits, your Honor, we have

2    an Exhibit Binder 2, at the back of them.  I put them in

3    Exhibit Binder 2.

4          THE COURT:  Okay.  Anything else we need to address

5    before we begin?

6          MR. HOGSTROM:  Not from the government.

7          MR. ADAMS:  Not from Mr. Rossini, your Honor.

8          THE COURT:  All right.  Very good.  Let's bring them

9    in.

10       (Jury entered the courtroom.)

11         THE COURT:  Good morning, ladies and gentlemen.  Hope

12   you had a good weekend.

13         We will proceed with the government's case.  I think

14   we are going to first start with a couple of stipulations, is

15   that correct?

16         MR. NOVAK:  Yes, your Honor.

17         THE COURT:  Go ahead and proceed, Mr. Novak.

18         MR. NOVAK:  Thank you, your Honor.

19         Stipulation No. 12.  If called to testify, an employee

20   of ABC Bank would testify that the following government

21   exhibits consist of records maintained by ABC Bank in

22   connection with the following accounts:

23         Government Exhibit ABC 5791, an account ending 5791,

24   which was a checking account belonging to Babajan Khoshabe and

25   Anthony Khoshabe, signatories Babajan Khoshabe and Anthony

1    Khoshabe.

2           Government Exhibit CD 16463, certificate of deposit

3    16463, which certificate of deposit belonged to Anthony

4    Khoshabe, sole signatory Anthony Khoshabe.

5           Government Exhibit CD 16464, certificate of deposit

6    16464, which certificate of deposit belongs to Anthony

7    Khoshabe, sole signatory Anthony Khoshabe.

8           Government Exhibit CD 16513, certificate of deposit

9    16513, which certificate of deposit belonged to Babajan

10   Khoshabe and Anthony Khoshabe, signatories Babajan Khoshabe and

11   Anthony Khoshabe.

12          Government Exhibit Loan 22164, loan No. 22164, which

13   loan belonged to Babajan Khoshabe and Anthony Khoshabe.

14          Government Exhibit Loan 22447, loan No. 22447, which

15   loan belonged to Babajan Khoshabe.

16          Government Exhibit Loan 22535, loan No. 22 -- I'm

17   sorry 22353, which is loan No. 22353, which loan belonged to

18   Babajan Khoshabe and Anthony Khoshabe.

19          The records were obtained or made at or near the time

20   reflected on the individual documents by persons with knowledge

21   of the documents, with knowledge of the content in the course

22   of regularly conducted business activity.  It was the regular

23   practice of ABC Bank to obtain and make such records as part of

24   their business.

25          Parties stipulate and agree that the above

1    government's exhibits are admissible as evidence.  So

2    stipulated?

3         MR. ADAMS:  So stipulated.

4         THE COURT:  Stipulation No. 13.  If called to testify,

5    an employee of Barr Management would testify that Barr

6    Management operates a number of associated currency exchanges

7    in the Chicago area.  An employee of Barr Management would

8    further testify that Government Exhibit Barr Management Records

9    consists of records maintained by Barr Management in connection

10   with currency exchange transactions of Albert Rossini, Thomas

11   Murphy and Brenda Rossini.

12        Those records were obtained at -- or made at or near

13   the time reflected on the individual documents by persons with

14   knowledge of the contents in the course of regularly conducted

15   business activity.  It was the regular practice of Barr

16   Management to obtain and make such records as part of their

17   business.

18        The parties stipulate and agree that the above

19   government exhibits are admissible as evidence.

20        Stipulation No. 14.  If called to testify, Art Feldman

21   would testify that he is the owner of the Peterson-Cicero

22   Currency Exchange located in Chicago, Illinois, and that he

23   produced to the FBI the records found in Government Exhibit

24   Currency Exchange Records.  The records were obtained or made

25   at or near the time reflected on the individual documents by

1    persons with knowledge of the contents in the course of

2    regularly conducted business activity.  It was the regular

3    practice of the Peterson-Cicero Currency Exchange to obtain and

4    make such records as part of their business.

5         The parties stipulate and agree that Government

6    Exhibit Currency Exchange Records is admissible as evidence.

7         Finally if called to testify, an employee of Western

8    Union would testify that the records found in Government

9    Exhibit Western Union Records were obtained or made at or near

10   the time reflected on the individual documents by persons with

11   knowledge of the contents in the course of the regularly

12   conducted business activity.  It was the regular practice of

13   Western Union to obtain or make such records as part of their

14   business.

15        Parties stipulate and agree that Government Exhibit

16   Western Union Records is admissible as evidence.  So

17   stipulated?

18        MR. ADAMS:  So stipulated.

19        MR. NOVAK:  Your Honor, the government would move all

20   of the records that I just read into the record and

21   stipulations into evidence.

22        THE COURT:  All right.  The government's request to

23   admit in evidence ABC Bank Records, Barr Management Records,

24   the Currency Exchange Records, and Western Union Records, is

25   granted.

Prescott - direct                                              814

1          (Said exhibits were received in evidence.)

2               MR. NOVAK:  Thank you.

3               Your Honor, the government calls Sandra Prescott.

4               THE COURT:  Ms. Prescott, if you could step up to my

5    right.

6          SANDRA PRESCOTT, GOVERNMENT'S WITNESS, DULY SWORN

7                        DIRECT EXAMINATION

8    BY MR. NOVAK:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  In a loud, clear voice, can you please state your name and

12   spell your last name for the members of the jury and for the

13   court reporter?

14   A.  My name is Sandra Prescott.  My last name is spelled

15   P-r-e-s-c-o-t-t.

16   Q.  Are you currently employed, Ms. Prescott?

17   A.  Yes.

18   Q.  Where do you work?

19   A.  I work with the FBI.

20   Q.  And what do you do for the FBI?

21   A.  I'm a forensic accountant.

22   Q.  How long have you been a forensic accountant for the FBI?

23   A.  Twenty-seven years.

24   Q.  Can you please tell us some of your duties and

25   responsibilities as a forensic accountant for the FBI?

1   A.   I investigate financial fraud.  So I pretty much assist

2   case agents with reviewing financial records and determining

3   the sources and uses of funds.

4   Q.   And what is your education background?

5   A.   I got my bachelor's degree from the University of Illinois

6   at Chicago in accounting.  And I got my master's degree from

7   Stevenson University in forensic studies, with a concentration

8   in accounting.

9   Q.   Do you hold any professional licenses?

10  A.   Yes.  I am a certified public accountant, and I am also a

11  certified fraud examiner.

12  Q.   Can you tell us what it means to be a certificate fraud

13  examiner?

14  A.   It means that I had to pass a test, and it gave me more

15  training in how to investigate fraud.

16  Q.   Did you participate in an investigation into Albert

17  Rossini, Babajan Khoshabe, Thomas Murphy, Anthony Khoshabe and

18  related business entities?

19  A.   Yes.

20  Q.   What did you do for this investigation?

21  A.   Pretty much I reviewed financial records and currency

22  exchange records.

23  Q.   And what did you do with the records once you reviewed

24  them?

25  A.   I looked at them for the deposits and the expenses.  And I

Prescott - direct                    816

1   analyzed the deposits and expense.

2   Q.   Okay.  And the records you analyzed, I'm going to show

3   you -- I'm going to show you a disk that's been marked Bank

4   Records Disk.  Does that disk contain all of the records that

5   you analyzed to -- in connection with this investigation?

6   A.   Yes.

7   Q.   And does -- are you -- have you read -- how do I put it?

8        Does this disk contain the records that were entered

9   into record via stipulation?

10  A.   Yes.

11  Q.   Okay.  How do you recognize that that disk contains those

12  records?

13  A.   I reviewed the disk, and I initialed and dated it.

14  Q.   Do you see your initials and the date on there?

15  A.   I do.

16  Q.   Now as part of your analysis of those bank records, did you

17  create or aid in create -- aid in creating something called a

18  schedule for each account?

19  A.   Yes.

20  Q.   What is a schedule?

21  A.   A schedule is pretty much a re-creation of the bank

22  statements.  It's just an electronic format of the bank

23  statements so that I can analyze the data.

24  Q.   And what's the reason for re-creating the data in that

25  format?

Prescott - direct                    817

1  A.  So that I can analyze the deposits and the expenses, the

2  withdrawals.

3  Q.  After making those schedules, or aiding in their creation,

4  did you review them for accuracy?

5  A.  Yes.

6  Q.  I'm going to show you -- I'm going to show you a disk that

7  I marked Government Exhibit Schedules.  Do you recognize that

8  disk?

9  A.  Yes.

10 Q.  Did you prepare -- what does that disk contain?

11 A.  It contains the schedules that I prepared from the bank

12 statements, the financial records, and the currency exchange

13 records.

14 Q.  And did you prepare those records or caused them to be

15 prepared?

16 A.  Yes.

17 Q.  And do those schedules contain an accurate summary of the

18 records that you reviewed?

19 A.  Yes.

20         MR. NOVAK:  Your Honor, I move to admit that into

21 evidence?

22         THE COURT:  Any objection?

23         MR. ADAMS:  No objection.

24         THE COURT:  Government Exhibit Schedule is admitted in

25 evidence.

Prescott - direct                                            818

1        (Said exhibit was received in evidence.)

2   BY MR. NOVAK:

3   Q.   In your review of those bank records that we've been

4   talking about, did you determine that there were only certain

5   bank accounts that directly received or disbursed funds to

6   investors in this case?

7   A.   Yes.

8   Q.   Do you know which accounts those were and how many?

9   A.   Yes, there were five accounts.

10  Q.   Okay.

11  A.   And they were the Thomas Murphy account at Chase Bank, the

12  Rockford Commercial account at Bank of America, the Reliant

13  Management account at Chase Bank, and the Devon Street

14  Investments and Devon Street Management at Chase Bank.

15  Q.   Did you then create a chart to summarize the flow of funds

16  between those accounts?

17  A.   Yes.

18  Q.   I'm going to show you the chart, an exhibit that I've

19  marked Government Exhibit Investor Funds.  Do you recognize

20  that chart?

21  A.   Yes.

22  Q.   Did you prepare that chart or cause it to be prepared?

23  A.   Yes, I did.

24  Q.   Does the chart contain an accurate summary of the records

25  that underlie that chart?

Prescott - direct                    819

1    A.  Yes.

2           MR. NOVAK:  Your Honor, I move to admit this -- move

3    to admit this into evidence?

4           THE COURT:  Any objection?

5           MR. ADAMS:  No objection.

6           THE COURT:  Government Exhibit Investor Funds is

7    admitted in evidence.

8        (Said exhibit was received in evidence.)

9           MR. NOVAK:  And I would ask permission to publish it

10   to the jury.

11   BY MR. NOVAK:

12   Q.  So, Ms. Prescott, I have the -- this chart, Government

13   Exhibit Investor Funds, on the screen in front of you.  Do you

14   see it?

15   A.  Yes.

16   Q.  Let's start by talking with -- about the yellow box in the

17   middle of the chart there.  Can you explain to us what that

18   yellow box is?

19   A.  That yellow box represents the bank accounts that are

20   represented in this chart.  So it shows the flow of funds in

21   and out of those five accounts.

22   Q.  And next to the Thomas Murphy account and the Rockford

23   Commercial account, you have parentheticals with a balance as

24   of a particular date.  What does that mean?

25   A.  So the parameters of the chart are May 24, 2011, to August

1   31, 2013.  So in the Thomas Murphy 9389 account, the balance as

2   of 5/23 was $34,921.  So that is what the balance is at the

3   beginning of May 24, 2011.

4   Q.  Okay.

5   A.  And for the Rockford Commercial account at Bank of America,

6   it was not open on May 24.  So there is a zero balance.  But as

7   of August 31, 2013, there was a balance of approximately $80.

8   Q.  And there is no such numbers next to the Reliant Management

9   account or the two Devon Street accounts, correct?

10  A.  That's correct.

11  Q.  Why not?

12  A.  Because as of these dates, those accounts were not opened,

13  and they were not open as of May 24, 2011.  And they were

14  closed before August 31, 2013.

15  Q.  So they had zero balances at the beginning of your

16  timeframe and the end?

17  A.  That's correct.

18  Q.  Because this has a particular timeframe on it, correct?

19  A.  Correct.

20  Q.  And what's the timeframe you were specifically analyzing?

21  A.  May 24, 2011, through August 31, 2013.

22  Q.  Now, let's look at the top line.  There is three boxes at

23  the top line of this chart.  What do those three boxes

24  indicate?

25  A.  Those three boxes indicate all of the deposits into the

Prescott - direct                    821

1    five accounts.

2    Q.   Now, the middle red box there that says, investors, who

3    makes up that class of people in that chart?

4    A.   The investors box is checks that I noted as being from

5    investors.   These checks had either a property address on them

6    or a PIN number on them.   And I also conferred with the agent

7    and United States attorneys to confirm that these were investor

8    checks.

9    Q.   And you made another separate chart that shows -- breaks

10   out who the specific investors are, correct?

11   A.   Yes.

12   Q.   We'll get to that in a minute.   Let's also first finish

13   talking about this charted.   And let's talk about this box on

14   the left, deposits not attributed to investors.

15         What does that box indicate?

16   A.   So this box indicates all deposits that I did not attribute

17   to investors.   So all other deposits into the Thomas Murphy or

18   the Rockford Commercial accounts are contained in this box.

19   Q.   And how much was deposited into the Thomas Murphy account

20   and the Rockford Commercial account in that time period?

21   A.   $1,739,529.

22   Q.   Now, I don't know if I asked you, how much was deposited by

23   investors in that time period?

24   A.   $7,381,787.

25   Q.   Now, there is another box on the right that also says,

Prescott - direct                                        822

1    deposits not attributed to investors.  What is that showing us?

2    A.  This box is showing all the deposits that I didn't

3    attribute to investors into the Reliant Management account, the

4    Devon Street Management account, and the Devon Street

5    Investments account.

6    Q.  And how much money was that during this time period?

7    A.  $543,000 -- $543,893.

8    Q.  Now, the two blue boxes on the outside, the not attributed

9    to investors, that's basically the same information, correct?

10   The same type of information?

11   A.  Correct.

12   Q.  Why did you put them into two separate boxes?

13   A.  I separated them because the Thomas Murphy account and the

14   Rockford Commercial account, Thomas Murphy was the sole

15   signatory on those accounts.  And for the Reliant Management

16   and Devon Street accounts, he was not a signatory on those

17   accounts at all.

18   Q.  Okay.  So let's talk about the boxes on the bottom of the

19   chart here and the lines on the bottom of the chart.  What is

20   that indicating?

21   A.  Those indicate all of the withdrawals out of the five

22   accounts.

23   Q.  And did you set them into certain categories?

24   A.  Yes.

25   Q.  What categories did you set them in?

Prescott - direct                   823

1  A.  I set them into payments to investors, payments to Albert

2  Rossini, payments to Anthony Khoshabe, payments to Babajan

3  Khoshabe, payments related to property acquisition, cash

4  withdrawals, other expenses out of the Reliant Management and

5  the Devon Street accounts, and expenses or payments to Thomas

6  Murphy.

7  Q.  Okay.  Now, let's talk about the payments to investors

8  first.  How much money did you observe being paid to investors

9  during that time period?

10  A.  $2,552,371.

11  Q.  How about payments made to Albert Rossini?

12  A.  $2,555,590.

13  Q.  Now, there is a little red asterisk next to the money going

14  to Mr. Rossini.  Why is there an asterisk next to that money?

15  A.  Because there were some deposits in from Mr. Rossini that I

16  just netted out of the withdrawals, the payments that were made

17  to him.

18  Q.  And do you know how much he would have deposited into

19  the -- those five accounts during that time period

20  approximately?

21  A.  Yes.  It was a little over $221,000.

22  Q.  So Mr. Rossini deposited $221,000 into these five accounts

23  during that time period.

24  A.  Correct.

25  Q.  But he still netted out over two and a half million dollars

 1   in disbursements from those five accounts.

 2   A.   Correct.

 3   Q.   What about for Anthony Khoshabe?  How much money went out?

 4   A.   $970,088.

 5   Q.   And that's another net deposit?

 6   A.   That's correct.

 7   Q.   What about for Mr. Babajan Khoshabe?

 8   A.   $298,543.

 9   Q.   Now, the next one is related to property acquisition.  How

10   much money was related to that?

11   A.   $438,515.

12   Q.   And how did you categorize what was related to property

13   acquisition?

14   A.   Any payments that were to title companies or an individual

15   that was related to property acquisition.

16   Q.   And that amount was $438,515 total?

17   A.   Correct.

18   Q.   Now there's another box underneath it.  What's the green

19   box underneath?

20   A.   That's investor related title company payments.

21   Q.   For property acquisition payments?

22   A.   Correct.

23   Q.   And how much money was paid out related to acquiring titles

24   for investors?

25   A.   200 -- $200,782.

Prescott - direct                                              825

1    Q.   What's the next box we have here, cash withdrawals?  How

2    much was that?

3    A.   $330,511.

4    Q.   And then how about for other expenses to Reliant Management

5    or the Devon Street accounts?

6    A.   $334,181.

7    Q.   And then how much money did you categorize as payments to

8    Thomas Murphy?

9    A.   $1,905,523.

10   Q.   Now, can you explain to us what sort of -- what sort of

11   transactions fell into that category for Thomas Murphy

12   payments?

13   A.   So any withdrawal that I could not put into any of the

14   other seven boxes down on the bottom were all thrown into

15   payments to Thomas Murphy, were attributed to him.

16   Q.   So another title for this box could have been, other

17   expenses Thomas Murphy, correct?

18   A.   Correct.

19   Q.   Now, there is a box underneath it that says, net to Murphy

20   from investors.  Can you tell us how much that was and how you

21   came up with that amount?

22   A.   The total is $165,994.  And I calculated that by taking the

23   total payments to Thomas Murphy, the 1.9 million, and

24   subtracting out the deposits of 1.7 million.  And then that was

25   the amount left over that investor funds had to be used to

Prescott - direct                              826

1   cover expenses out of the Thomas Murphy accounts.

2   Q.  So if I have this correctly, you basically took this

3   1.9 million number that I circled here, and subtracted the 1.7

4   number, correct?

5   A.  That is correct.

6   Q.  And the difference is the net to Murphy from -- that had to

7   be -- expenses that had to be covered by investor funds, right?

8   A.  Correct.

9   Q.  Now, let's take a look at Mr. Rossini's share for a minute.

10  According to your calculations, there is approximately $2.5

11  million, or just over, that went to Mr. Rossini, correct?

12  A.  That's correct.

13  Q.  Now, were you able to determine how much -- how most of his

14  money was processed or handled after it was paid out from one

15  of these five accounts to him?

16  A.  Yes.

17  Q.  How was it handled after it was paid out to him?

18  A.  Most of the checks were transacted at a currency exchange.

19  Q.  Okay.  At a single currency exchange or at a number of

20  currency --

21  A.  Number of currency exchanges.

22  Q.  Now, was there any currency exchange in particular that did

23  most of -- did the most business with Mr. Rossini?

24  A.  Yes.  Peterson-Cicero Currency Exchange.

25  Q.  And did you make a chart summarizing Mr. Rossini's

Prescott - direct                    827

1    transactions at the Peterson-Cicero Currency Exchange during

2    this same time period of May 24, 2011, to August 31, 2013?

3    A.  Yes.

4    Q.  I'm going to show you what I have marked as Government

5    Exhibit PC Currency Exchange.  Do you recognize this?

6    A.  Yes.

7    Q.  Did you prepare that chart or cause it to be prepared?

8    A.  Yes.

9    Q.  Does the chart contain an accurate summary of the records

10   from the Peterson-Cicero Currency Exchange?

11   A.  Yes.

12   Q.  For that time period?

13   A.  Yes.

14           MR. NOVAK:  Your Honor, I move Government Exhibit PC

15   Currency Exchange into evidence?

16           THE COURT:  Any objection?

17           MR. ADAMS:  No objection.

18           THE COURT:  Government Exhibit PC Currency Exchange is

19   admitted in evidence.

20       (Said exhibit was received in evidence.)

21           MR. NOVAK:  And ask permission to publish it to the

22   jury?

23           THE COURT:  Go ahead.

24   BY MR. NOVAK:

25   Q.  So this chart here titled Peterson-Cicero Currency Exchange

Prescott - direct                    828

1   transactions, this chart is a chart you made for that same time

2   period we just saw for investor funds, right?

3   A.  Correct.

4   Q.  And so can you just walk us through going top down.  It's

5   a simpler chart than the last one.  Can you just walk us

6   through the chart going down from the top?

7   A.  Yes.  So the $2,021,193 was the amount of money orders

8   purchased at the currency exchange or transacted through

9   their -- it was the checks transacted through the currency

10  exchange.

11  Q.  So let me stop you there.

12          So this $2,021,000 number, that is a subset of the 2.5

13  million number that we saw on the last chart, correct?

14  A.  Correct.

15  Q.  Go ahead.

16  A.  So that 2 million was transacted at the currency exchange.

17  Out of that, there were almost $76,000 in payments to

18  investors.  There was $917,492 in cash withdrawn.  And there

19  was 1,027,738 in other expenses.

20  Q.  When you say, payments to investors, what did you -- you

21  reviewed the actual money orders or slips that were taken out?

22  A.  Correct.

23  Q.  What sorts of payments?  When you say, payments to

24  investors, what does that mean?

25  A.  So I saw money orders that were payable to the people that

Prescott - direct                                              829

1   I had identified as investors.  In some cases there were

2   notations that said, rent, or had property addresses and had a

3   month by it.

4   Q.  Okay.  And then cash withdrawn, that's self-explanatory,

5   right?

6   A.  Yes.

7   Q.  And then other expenses.  Can you just generally tell us

8   what sort of other expenses fell into this category of -- that

9   you made there?

10  A.  So I saw payments to utilities, to a senior living

11  community.  I saw payments to the University of Colorado.  I

12  also saw payments for an apartment in Colorado.  I saw payments

13  to people that I -- were employees, so payroll payments, for

14  Devon Street or for one of the companies.

15  Q.  Do you know approximately how much of that $1,027,000

16  number was payroll payments in the other expenses,

17  approximately?

18  A.  Yes, it was just under 227,000.

19  Q.  And we talked about it a minute ago, but you said as well

20  that you -- when I was showing you the top line of the investor

21  funds chart, this investors number in that box, did you

22  actually make a chart that listed each of the people that you

23  had listed in this investors number?

24  A.  Yes.

25  Q.  And I'm going to show you -- I'm going to show you what I

Prescott - direct                              830

1    have marked as Government Exhibit Investor List.  Do you

2    recognize that chart?

3    A.   Yes.

4    Q.   And did you prepare that chart or cause it to be prepared?

5    A.   Yes.

6    Q.   Does it contain an accurate summary of the records that

7    underlie those charts?

8    A.   Yes.

9    Q.   That chart?

10        MR. NOVAK:  Your Honor, I move Government Exhibit

11   Investor List into evidence?

12        THE COURT:  Any objection?

13        MR. ADAMS:  No objection.

14        THE COURT:  Government Exhibit Investor List is

15   admitted in evidence.

16      (Said exhibit was received in evidence.)

17        MR. NOVAK:  And permission to publish to the jury?

18        THE COURT:  Go ahead.

19   BY MR. NOVAK:

20   Q.   So can you explain to us what we're looking at here on

21   Government Exhibit Investor List?

22   A.   Yes.  This is just a list of the investors that I had

23   identified.

24   Q.   And the -- so in that -- those are all the people listed in

25   the column under name?

Prescott - direct                                831

1   A.   Yes.

2   Q.   Under the amounts paid column, what are we seeing there?

3   A.   So that column represents the amount that these people paid

4   in to the -- for their investment.

5   Q.   And into those five bank accounts, right, that we saw on

6   the investor funds chart just a minute ago, right?

7   A.   Correct.

8   Q.   What about amounts received?

9   A.   Amounts received were the payments that were paid out --

10  paid out to these people out of the five bank accounts.

11  Q.   And then there is a difference amount, correct?

12  A.   Correct.

13  Q.   And that just is just showing the difference between the

14  two number?

15  A.   Correct.  It's just a -- the difference between the amount

16  invested and the amount paid out.

17  Q.   And again, this list of investors and these amounts paid

18  and received are only for the five bank accounts that we saw

19  here on Government Exhibit Investor Funds, right?

20  A.   Correct.

21  Q.   For example, would this list here, the investor list, would

22  that reflect any current -- that 76,000 in currency exchanges?

23  A.   No.

24  Q.   Now, let's take a look at a particular investor, Ms. Kathy

25  Khodi right here.  Did you review Ms. Khodi's three deposits

Prescott - direct                              832

1   into the Rockford Commercial account?

2   A.  Yes.

3   Q.  Those would be deposits on May 20 of 2013, July 12 of 2013,

4   and August 22 of 2013.

5   A.  Correct.

6   Q.  Did you prepare a chart that showed you how money was

7   disbursed after each deposit?

8   A.  Yes.

9   Q.  And what was the timeframe you looked at for the chart

10  generally?

11  A.  Generally it was about three to seven days after the money

12  was wired into the account.

13  Q.  Okay.  And I'm going to show you what I have marked as

14  Government Exhibit Khodi 5/20/2013, Khodi 7/12/2013, and Khodi

15  8/22/2013.  Do you recognize those exhibits?

16  A.  Yes.

17  Q.  Did you prepare those charts or cause them to be prepared?

18  A.  Yes.

19  Q.  Do those charts contain an accurate summary of the records

20  that you reviewed to prepare those charts?

21  A.  Yes.

22          MR. NOVAK:  Your Honor, I move to admit Government

23  Exhibit Khodi 5/20/2013, Khodi 7/12/2013, and Khodi 8/22/2013

24  into evidence.

25          MR. ADAMS:  No objection, your Honor.

Prescott - direct                          833

1         THE COURT:  All right.  Those exhibits are admitted in

2    evidence.

3         (Said exhibits were received in evidence.)

4    BY MR. NOVAK:

5    Q.  I'm going to show you on the screen, start with Khodi

6    5/20/2013.  What are we looking at here?

7    A.  So we are looking at the disbursement of the Kathy Khodi

8    funds that were wired in on May 20, 2013, into the Rockford

9    Commercial account.

10   Q.  Okay.  Can you just walk us down the chart and what we are

11   seeing?

12   A.  Yes.  So on May 20, 2013, a wire comes in from the Khodi

13   Family Trust in the amount $395,000.  There was also a deposit

14   on that same day in cash for $29,000.

15        Then the next -- there was -- the next transaction is

16   a cashier's check payable to Dukor Financial Group in the

17   amount of 30,000.  And the next transaction was a cashier's

18   check payable to Devon Street Investments for $29,000.

19        Then there was a cashier's check payable to Devon

20   Street Investments for $95,000, and a cashier's check payable

21   to Walid Aiyash for $100,000.  And on May 20 again there was a

22   cashier's check payable to Rockford Commercial Mortgage for

23   $100,000.

24        Again on May 20 there was a cashier's check payable to

25   Bert Rossini in the amount of $15,000.  Again on 5/20/2013

Prescott - direct                                            834

1   there was a cashier's check payable to Bert Rossini in the

2   amount of $13,000.  On May 20 there were bank fees in the

3   amount of $70,000.

4   Q.  Let me stop you right there.  So you are saying that on

5   May 20, when this $395,000 wire came in from Ms. Khodi's family

6   trust, along with that $29,000 cash deposit, that same day

7   there were one, two, three, four, five, six, seven cashier's

8   checks issued out of the account?

9   A.  Correct.

10  Q.  And then what happened on May 21?  How many transactions

11  were there on May 21, the day after that -- that was wired in?

12  A.  There were two transactions.

13  Q.  And then how many transactions were there on May 22, which

14  would have been two days after that was wired in?

15  A.  There were five transactions.

16  Q.  And then on May 23, how many transactions were there that

17  would have been three days after that wire came in?

18  A.  One transaction.

19  Q.  And so what was the total amount -- and there is also a

20  cash in of $60 on 5/22, right?

21  A.  Correct.

22  Q.  So in that three-day period from May 20, 2013, to May 23 of

23  2013, what was the total amount that was deposited into that

24  account?

25  A.  $424,060.

Prescott - direct                   835

1   Q.  What was the total amount in that same time period that was

2   withdrawn from that account?

3   A.  $423,878.03.

4   Q.  I'm going to show you Khodi 7/12/13, 2013.  Is this another

5   chart showing the same sort of activity?

6   A.  Yes.

7   Q.  So on what day was the -- did the wire come in from the

8   Khodi Family trust?

9   A.  July 12, 2013.

10  Q.  And how much was that wire?

11  A.  It was for $225,000.

12  Q.  That same day, how many transactions were there

13  withdrawals, from that account?

14  A.  Six.

15  Q.  And then three days later on July 15, 2013, how many

16  transactions were there withdrawals made from that account?

17  A.  Three.

18  Q.  And then there were some bank fees as well, right?

19  A.  Correct.

20  Q.  So the Lior Coresh, this name here, there is a cashier's

21  check payable to that man.  Do you see that?

22  A.  Yes.

23  Q.  Is he accounted for anywhere in your -- and that's a

24  cashier's check in the amount of $129,000, right?

25  A.  Correct.

Prescott - direct                                836

1  Q.  A little more, 129,482.

2          Is he accounted for in any of your other charts, that

3  cashier's check?

4  A.  Yes.  He is -- his money is in that box that's titled,

5  transactions related to property acquisitions.

6  Q.  And I'm going to go back to the investor funds for just a

7  minute, just to -- so his money would be accounted for in here,

8  and in those two boxes, the two middle boxes under 438,515,

9  right?

10 A.  Correct.

11 Q.  So showing you Khodi 7/12/2013 again.  Between July 12 and

12 July 15 of 2013, how much money was deposited into that

13 account?

14 A.  $225,000.

15 Q.  In that same timeframe, how much money was withdrawn from

16 that account?

17 A.  $224,800.

18 Q.  Finally, I'm going to show you Government Exhibit Khodi

19 8/22/2013.  What date was the wire that came in from Ms.

20 Khodi's family trust?

21 A.  August 22, 2013.

22 Q.  And how much was the amount of that wire?

23 A.  $184,800.

24 Q.  Now, how many transactions, how many withdrawals or

25 cashier's checks, were issued on that same day?

1  A.  Nine.

2  Q.  So -- and then it's bank fees on August 22, and bank fees

3  on August 23?

4  A.  Correct.

5  Q.  Now, so then on August 22, how much money came into Ms.

6  Khodi's account?

7  A.  $184,800.

8  Q.  And by August 23, how much money was withdrawn from the

9  Rockford Commercial account?

10  A.  $184,652.

11          MR. NOVAK:  One moment please.

12      (Brief pause.)

13          MR. NOVAK:  Nothing further.

14                  CROSS-EXAMINATION

15  BY MR. ADAMS:

16  Q.  Good morning, Ms. Prescott.

17  A.  Good morning.

18  Q.  Government showed you -- by the way, before we start, who

19  asked you to make these charts?

20  A.  The case agent and the United States attorneys.

21  Q.  And this was after the case was indicted, correct?

22  A.  Correct.

23  Q.  And you knew this was being made for purposes of trial,

24  correct?

25  A.  I did.

Prescott - cross                    838

1    Q.  And the purpose was to obtain a conviction, correct?

2            MR. NOVAK:  Objection, your Honor.

3            THE COURT:  Sustained.

4    BY MR. ADAMS:

5    Q.  Purpose was for the government to use it in their case

6    at -- at -- for their case, correct?

7    A.  Yes, I -- I'm just reflecting what their financial records

8    say.

9    Q.  As told to you by the case agent and the U.S. attorneys

10   sitting here?

11           MR. NOVAK:  Objection, your Honor.

12           THE COURT:  Sustained.

13           MR. ADAMS:  Judge, I'll move on.  Can I have the Elmo

14   please.

15   BY MR. ADAMS:

16   Q.  You were previously shown this exhibit, Government Investor

17   Funds.  Do you remember that?

18   A.  Yes.

19   Q.  And when looking at this chart, if you see here it says,

20   payment to investors is 2.5 million, correct?

21   A.  Correct.

22   Q.  And the payment to Albert Rossini is 2.55, correct?

23   A.  Correct.

24   Q.  And the difference is approximately only $3,000, right?

25   A.  Correct.

Prescott - cross                                839

1   Q.   Now, if we go down here where it says, payment related to

2   property acquisitions, the government had asked you about a

3   check from Lior Coresh, right?

4   A.   Correct.

5   Q.   And that's reflected in this 438,000?

6   A.   Yes.

7   Q.   What was that property for?

8   A.   I don't know.

9   Q.   Who bought that property?

10  A.   I don't know.

11  Q.   Who sold that property?

12  A.   I don't know.

13  Q.   How was Mr. Rossini involved in that property transaction?

14  A.   I don't know.

15  Q.   Who's Lior Coresh?

16  A.   I don't know.

17  Q.   Did you ask the government who Lior Coresh was?

18  A.   No.

19  Q.   If we can turn now to Khodi Exhibit 5/20/2013.  We notice

20  there is a -- we'll start here.  There is a withdrawal from --

21  on 5/22 -- I have starred it on red -- for Thomas Murphy.  Do

22  you see that?

23  A.   Yes.

24  Q.   That's for $12,600?

25  A.   Yes.

Prescott - cross                        840

1    Q.  What was that for?

2    A.  I am not exactly sure.  It says, loan servicing.  So a loan

3    payment for Thomas Murphy.

4    Q.  And you see two rows down it says, 5/23/13, check 1180.

5    It's the last entry?

6    A.  Yes.

7    Q.  That's a payment to cash for $1,200?

8    A.  Yes.

9    Q.  Who's that for?

10   A.  That I do not know.  It was just a check written to cash.

11   Q.  If you had any questions about checks or payments or

12   disbursements, who did you go to to ask in this case?

13   A.  If I had any questions, I would usually go to the bank.

14   Q.  To the bank.  Did you ask the case agent?

15   A.  No.

16   Q.  Did you ask the U.S. attorney?

17   A.  No.

18   Q.  I'd like to show you now Khodi 7/12/2013.  I go up bigger

19   for the jury.

20           If we see on 7/15 there is a check payable for Lior

21   Coresh, correct?

22   A.  Correct.

23   Q.  And that's the only time his name shows up here?

24   A.  Yes.

25   Q.  In all of your review of all the checks and all the

Prescott - cross                     841

1   payments, is that the only time he shows up?

2   A.  There was a check to him previously that bounced, that was

3   NSF.

4   Q.  And if you see on this date he made 129,000, is that

5   correct?

6   A.  Correct.

7   Q.  And if we add up how much Mr. Rossini got, it's about

8   60,000.  Would that be about correct?

9           Rough estimate?

10  A.  Yeah, that's about correct.

11  Q.  So he got twice what Mr. Rossini made?

12  A.  He -- are you saying --

13  Q.  I'm sorry, yes.  Mr. Coresh withdrew twice what Mr. Rossini

14  withdrew from this account?

15  A.  He was issued a check, yes, that was that amount, that was

16  twice that amount, yes.

17  Q.  Did he deposit that check?

18  A.  I -- I'm trying to think what the endorsement was at the

19  time.  I believe so.

20  Q.  Where did he deposit it to?

21  A.  I do not know.

22  Q.  All right.  If we could go back to the flow of funds chart.

23  If you see on the far right-hand side it says, to Mr. Murphy --

24  A.  Yes.

25  Q.  -- 1.9.

Prescott - cross                              842

1              And then it says, net to Murphy from investors?

2       A.   Yes.

3       Q.   What happened to that 165?

4       A.   There were various expenses that he paid out.

5       Q.   What was the purpose of the 1.9 that was sent to him, do

6       you know?

7       A.   No.  It was various expenses.  There were payments to --

8       there were medical expense payments.  There were education

9       expenses, utilities.  There were mortgage payments, credit card

10      payments.

11      Q.   And if we look on the top left where it says, deposits not

12      attributed to investors, for Mr. Murphy's account for 1.7?

13      A.   Yes.

14      Q.   Where do those come from?

15      A.   The -- what were the source of the deposits?

16      Q.   Yes.  Thank you.

17      A.   They were -- some of them were from individuals.  Some of

18      them were from title companies.  That was pretty much -- pretty

19      much either title companies, individuals.

20      Q.   And was that to purchase properties?

21      A.   I don't know.

22      Q.   Was it to sell properties?

23      A.   I don't know.

24              MR. ADAMS:  Judge, may I have one moment?

25              THE COURT:  You may.

1        (Brief pause.)

2    BY MR. ADAMS:

3    Q.   Ms. Prescott, are you familiar with a man named Craig

4    Schaeffer?

5    A.   No, only from seeing his name in the bank records.

6    Q.   And that's what I mean.  Have you seen his name in the bank

7    records?

8    A.   I have.

9    Q.   And did you see payments to Craig Schaeffer for

10   approximately $350,000?

11   A.   I saw payments to Craig Schaeffer.  I'm not exactly sure

12   how many -- how much he got.

13   Q.   And where do the payment come -- originate?  Where did they

14   come from?

15   A.   I think most of them came from Thomas Murphy's 9389

16   account.  I'm -- I'm not sure.

17   Q.   And is that -- are those payments on the bottom either

18   payments made out to Mr. Rossini, Mr. Khoshabe, Babajan

19   Khoshabe -- he is not reflected on here, is he?

20   A.   He is lumped in to the payments -- out of the Thomas

21   Murphy, the other, the 1.9 million, his payments are lumped

22   into there.

23   Q.   So 1.9 there should be a separate entry for Craig Schaeffer

24   that would be part of that 1.9?

25   A.   Craig Schaeffer's money is in there, yes.

Prescott - cross                                    844

1   Q.   And what was that money for?

2   A.   I have no idea.

3   Q.   Was the money -- did it come from Devon Street?

4   A.   I -- I don't know.

5   Q.   Was it for the purchase of properties?

6   A.   I don't know.

7   Q.   To your knowledge, did Craig Schaeffer purchase any

8   properties from Devon Street?

9   A.   I don't know.

10          MR. ADAMS:  Judge, nothing further.  Actually, Judge,

11  one --

12      (Brief pause.)

13  BY MR. ADAMS:

14  Q.   One brief question.  I apologize.

15          If I show you this investor list chart that was --

16  that you created.  On the bottom there is a line for Ibrahim

17  Yousif.  Do you see that one?

18  A.   Yes.

19  Q.   And the amount that he paid out was 225,000, right?

20  A.   That was the amount that Ibrahim paid into the five

21  accounts.

22  Q.   And the amount that he received was 259,000, correct?

23  A.   That's correct.

24  Q.   So he made a profit of 34,271, is that correct?

25  A.   According to this chart, yes.

1          MR. ADAMS:  Thank you.

2          Thank you, Judge.

3          THE COURT:  Redirect?

4          MR. NOVAK:  Very briefly.

5          Can I use the computer?

6                     REDIRECT EXAMINATION

7    BY MR. NOVAK:

8    Q.   Just to show you, going back to the Khodi charts again.

9    These payments to Bert Rossini, would they have been reflected

10   in the investor funds chart you were just shown, the larger

11   chart you made, the overview?

12   A.   Yes.

13   Q.   What category would they have been reflected in?

14   A.   Into the payments to Bert Rossini.

15   Q.   And the Lior Coresh payment, you reflected that into what

16   category on the other chart?

17   A.   Into the payments for property acquisition.

18   Q.   Let me show you Khodi 5/20/13.  This loan servicing amount,

19   is that reflected in your larger overview chart of investor

20   funds?

21   A.   Yes.  That's going to be in the payments to Thomas Murphy,

22   that 1.9 million.

23   Q.   And the cash that counsel was showing you, the checks

24   payable to cash, would that have been reflected in another part

25   of your larger fund?

Prescott - redirect                    846

1    A.  Yes.  That would be under the cash withdrawals.

2    Q.  So pull up the investor funds here, just highlight.

3         So the cash withdrawals that it showed you, that would

4    be here in this cash withdrawals box, right?

5    A.  Correct.

6    Q.  And payments to investors, did you review the sort of

7    checks -- I think I asked you this, but did you review the sort

8    of checks that were being paid out to investors from those five

9    accounts?

10   A.  Yes.

11   Q.  Did you see the notations on those checks from those five

12   accounts?

13   A.  Yes.

14   Q.  Generally what kind of notations were on those checks?

15   A.  The checks being paid out to investors from those five

16   accounts, the memo line usually said, rent, gave a date or a

17   month, and an address.

18   Q.  And now, you had said that the investors in this box here,

19   the middle red box, that those investors are -- that box

20   consists of only these people that are on the Exhibit Investor

21   List, right?

22   A.  Correct.

23   Q.  So deposits not attributed to investors, what you mean is,

24   deposits not attributed to the people on the list I just showed

25   you in Government Exhibit Investor List, right?

1   A.   Correct.

2   Q.   So if -- so if -- so other business in Murphy's account,

3   any of that business got lumped, as you put it, into the Thomas

4   Murphy box down here, correct?

5   A.   Correct.

6   Q.   Okay.  And so -- and what was the total amount of money

7   that Rossini got, that was netted to him from these five

8   accounts in that timeframe?

9   A.   That he put into the account?

10  Q.   No, that he received --

11  A.   That he received?

12  Q.   -- net of what he put in?

13  A.   $2,555,590.

14            MR. NOVAK:  Nothing further.

15            THE COURT:  Anything else?

16            MR. ADAMS:  No, your Honor.

17            THE COURT:  You may step down.  Thank you, ma'am.

18       (Witness excused.)

19            THE COURT:  May I see counsel at sidebar, please.

20       (Sidebar proceedings out of the hearing of the jury:)

21            THE COURT:  So do you have stipulations now?

22            MR. NOVAK:  Sure, I can do.  Yes, we can --

23            THE COURT:  Or call the next witness.  It's up to you.

24            MR. HOGSTROM:  I think we do stipulations.

25            MR. NOVAK:  Let's do stipulations, and we'll do it to

1     the break.  Then we'll call our witness after the break.

2               THE COURT:  Okay.  That's fine.

3               MR. NOVAK:  About 11:15, Judge?

4               THE COURT:  Yes, 11:10, 11:15.

5          (Further proceedings within the hearing of the jury:)

6               MR. NOVAK:  Your Honor I am sure everyone is

7     delighted.  Government has a few more stipulations to read into

8     the record.  Okay.

9               So stipulation No. 1, if called to testify, an

10    employee of Google would state that Google did not have gmail

11    servers in the State of Illinois for the time period spanning

12    on or about April 13, 2013, through on or about March 28, 2014.

13    The employee of Google would state that all gmail e-mails were

14    routed through a computer server in California during that same

15    time period.

16              Additionally an employee of Google would state that in

17    response to a search warrant served by the FBI related to an

18    e-mail account BertRossini4@gmail.com, Google produced the

19    records in Government Exhibit Gmail Disks 1 and 2, including

20    e-mails to the FBI.  And that those records were made at or

21    near the time by or from information transmitted by someone

22    with knowledge, kept in the course of regularly conducted

23    activity of Google.  And it was the regular practice of Google

24    to make those records.

25              The parties stipulate and agree Government Exhibit

1    Gmail Disks 1 and 2 are admissible as evidence.

2            Stipulation No. 2, if called to testify, an employee

3    of America Online, AOL, would state that AOL did not have AOL

4    servers in the State of Illinois for the time period spanning

5    on or about June 14, 2012, through on or about July 16, 2012.

6            Additionally, an employee of AOL would state that in

7    response to a search warrant served by the FBI related to

8    e-mail account BertRossini4@aol.com, AOL produced the records

9    in Government Exhibit AOL Disk, including e-mails to the FBI.

10   And that those records were made at or near the time by or from

11   information transmitted by someone with knowledge kept in the

12   course of a regularly conducted activity of AOL.  And it was

13   the regular practice of AOL to make those records.

14           Parties stipulate and agree that Government Exhibit

15   AOL Disk is admissible as evidence.  So stipulated?

16           MR. ADAMS:  So stipulated.

17           MR. NOVAK:  And, your Honor, the government moves

18   Government Exhibits Gmail Disk 1 and Gmail Disk 2 into

19   evidence, and Government Exhibit AOL Disk into evidence.

20           THE COURT:  Those exhibit will be accepted into

21   evidence.

22       (Said exhibits were received in evidence.)

23           MR. NOVAK:  Stipulation No. 16.  If called to testify,

24   Christopher Pettenon, P-e-t-t-e-n-o-n, would testify that he

25   was formerly the owner of the property located at 6425 North

1    Washtenaw Avenue, Chicago, Illinois.  Mr. Pettenon would

2    further testify he purchased 6425 North Washtenaw in

3    approximately June 2007, and owned the property through

4    approximately January 2013.

5          Mr. Pettenon would further testify that in

6    approximately January 2013, the property was foreclosed by PNC

7    Bank.  Mr. Pettenon would further testify he has never had any

8    contact or conducted any business with Devon Street

9    Investments, Albert Rossini, Babajan Khoshabe, or Thomas

10   Murphy.

11         Stipulation No. 17.  If called to testify, an employee

12   of Astoria Federal Savings Bank would testify that they are the

13   owner of the property located at 9124 Lawler, Skokie, Illinois,

14   and that Astoria Federal Savings Bank foreclosed on the

15   property in approximately April 2012, and were in title as of

16   May 22, 2013.

17         An employee of Astoria Federal Savings Bank would

18   further testify that their files show no record of any parties

19   contacting the bank regarding the sale of the mortgage note for

20   9124 Lawler.

21         Stipulation No. 18.  If called to testify, Stella

22   Sfikas S-f-i-k-a-s, would testify that as of August 22, 2014,

23   she and her husband George Sfikas were the owners of the

24   property located at 8142 Kilpatrick, Skokie, Illinois.  Ms.

25   Sfikas would further testify that neither she nor her husband

1    have ever heard of or spoken with Albert Rossini, Thomas

2    Murphy, or Devon Street Investments.

3         Stipulation 21.  If called to testify, Jose Castro

4    would testify that as of August 13 -- 23, 2014, he and his wife

5    were the owners of the property located at 4731 North

6    Monticello, Chicago, Illinois, and had owned the property since

7    approximately March 1999.  Mr. Castro would further testify, in

8    2011 he and his wife attempted to renegotiate the mortgage with

9    the bank in 2011, but their attempts were unsuccessful.  And as

10   of August 23, 2014, they were in the process of a bank-approved

11   short sale of the property.

12        Mr. Castro would further testify that they never heard

13   of nor had contact with Devon Street Investments, Albert

14   Rossini, Babajan Khoshabe or Thomas Murphy.

15        Stipulation 22.  If called to testify, Grigore Brici

16   B-r-i-c-i, would testify he is the former owner of the property

17   located at four -- 5421 North Artesian Avenue, Chicago,

18   Illinois.  Mr. Brici would further testify he had purchased the

19   property in approximately June 2007 and stopped making mortgage

20   payments in approximately November of 2011.

21        Mr. Brici would further testify that Bank of America

22   began the foreclosure process in approximately November 2012,

23   and the process was completed in approximately April 2013.  Mr.

24   Brici would further testify he has never heard of Devon Street

25   Investments, Albert Rossini, Babajan Khoshabe, or Thomas

1    Murphy.

2           Stipulation 23.  If called to testify Mark Canton

3    would testify he is the former owner of the property located at

4    8718 Kimball Avenue, Chicago, Illinois.  Mr. Canton would

5    further testify that he had purchased the property in

6    approximately October 1996 and lost it to foreclosure in

7    approximately February 2013.  Mr. Canton would further testify

8    he has never heard of Devon Street Investments, Albert Rossini,

9    Babajan Khoshabe, or Thomas Murphy.

10          Stipulation 24.  If called to testify, Paul Marinescu

11   M-a-r-i-n-e-s-c-u, would testify he is the former owner of the

12   property located at 6957 North Sheridan Road, Chicago,

13   Illinois.  Mr. Marinescu would further testify that he had

14   purchased the property in approximately August 2007 and went

15   into default in approximately January 2011.  Mr. Marinescu

16   would further testify he has never done business with Devon

17   Street Investments, Albert Rossini, Babajan Khoshabe, or Thomas

18   Murphy.

19          Stipulation 25.  If called to testify, John Kulnig,

20   K-u-l-i-n-g, would testify that as of April 13, 2015, he was

21   the owner of the property located at 3333 West Berteau,

22   Chicago, Illinois, and had owned the property for approximately

23   20 years.  Mr. Kulnig would further testify that he does not

24   know or has ever done business with Devon Street Investments,

25   Albert Rossini, Babajan Khoshabe, or Thomas Murphy.

1    Stipulation 26.  If called to testify an employee of

2   North Community Bank would testify that as of October 21, 2014,

3   North Community Bank held the mortgage note for the property

4   located at 3333 West Berteau Chicago, Illinois.  The employee

5   of North Community Bank would further testify they have no

6   record of any negotiations, discussions or agreements between

7   North Community Bank and Devon Street Investments concerning

8   the property located at 3333 West Berteau.

9    If called to testify Victor Martinez would testify

10  that as of September 5, 2014, he was the owner of the property

11  located at 2619 West Rascher, Chicago, Illinois.  Mr. Martinez

12  would testify he purchased the property in approximately

13  November 1996, and as of September 5, 2014, was in negotiations

14  with his bank for a short sale of the building.  Mr. Martinez

15  would further testify he does not know Devon Street

16  Investments, Albert Rossini, Babajan Khoshabe, or Thomas

17  Murphy.

18   Stipulation 28.  If called to testify, Ari Golson

19  would testify he is an employee of The Wolcott Group LLC, the

20  private -- the private equity real estate investment that owns

21  the property located at 2129 North Sheffield, Chicago,

22  Illinois.  Mr. Golson would further testify that The Wolcott

23  Group acquired 2129 North Sheffield from Chase Bank on or about

24  December 22, 2011.

25   Mr. Golson would further testify that 2129 North

1    Sheffield has not been in foreclosure during the time it has

2    been owned by The Wolcott Group.  Mr. Golson further testify he

3    does not know nor has ever had contact with Albert Rossini,

4    Babajan Khoshabe, Thomas Murphy, or Devon Street Investments.

5            Stipulation No. 30.  If called to testify, an employee

6    of Northbrook Bank would testify that between on or about June

7    16, 2010, and December 21, 2012, Northbrook Bank held a

8    mortgage note for the property located at 3340 North Oakley,

9    Chicago, Illinois.  The employee of Northbrook Bank would

10   further testify that on or about June 8, 2011, Northbrook Bank

11   initiated foreclosure proceeding against Charles Mudd, the

12   mortgagee of 3340 North Oakley, and entered into a loan

13   modification with Charles Mudd on or about February 24, 2012.

14           The employee of Northbrook Bank would further testify

15   that on or about December 21, 2012, Northbrook Bank sold the

16   mortgage note to 3340 North Oakley to SP W6 Loan LLC.  The

17   employee of Northbrook Bank would further testify that

18   Northbrook Bank has no record of any negotiations, discussions

19   or agreements between Northbrook Bank and Devon Street

20   Investments concerning the property located at 3340 North

21   Oakley.

22           I can continue, Judge, or do you want --

23           THE COURT:  How much -- how many more do you have?

24           MR. NOVAK:  Probably at least 20 minutes more.  So we

25   can do it at another break, if that makes sense.

1        THE COURT:  That's fine.

2        MR. NOVAK:  So stipulated, counsel?

3        MR. ADAMS:  So stipulated.

4        THE COURT:  So, ladies and gentlemen, we will take our

5   morning break.  We will break for approximately ten minutes.

6   During the break, please do not discuss this case with anyone

7   including one another.  And please do not do any independent

8   research regarding this case.

9        Thank you.

10     (Jury exited the courtroom.)

11       THE COURT:  All right.  So please be seated.  Do you

12   intend to do the stipulations after the witness or before?

13       MR. HOGSTROM:  I don't think it makes too much

14   difference.  Maybe we will do half of them before, do the

15   witness, and then finish with the stipulations.

16       THE COURT:  And how long do you think the direct will

17   take of this next witness?

18       MR. HOGSTROM:  Not terribly long, probably 20 minutes.

19       THE COURT:  And cross?

20       MR. ADAMS:  Not terribly long, ten minutes maybe.

21       THE COURT:  Okay.  At that point will the government

22   have any further witnesses?

23       MR. HOGSTROM:  I believe we will be resting at that

24   point.

25       MR. NOVAK:  We will be resting.

1        THE COURT:  And so, Mr. Adams, at this point will

2   defense offer any witnesses?

3        MR. ADAMS:  Depending on how the cross goes of Agent

4   Connors, only we call -- only we call Agent Evans.  Should be

5   short.

6        THE COURT:  Okay.  At this point have you made a

7   determination as to whether or not Mr. Rossini will testify or

8   not?

9        MR. ADAMS:  Yes, Judge.  We had a conversation

10  yesterday.  May I have one moment, your Honor?

11       THE COURT:  You may.

12    (Brief pause.)

13       THE COURT:  Mr. Adams, why don't you take the break

14  and talk to Mr. Rossini.

15       MR. ADAMS:  Very good.

16       THE COURT:  All right.  We are in recess.

17    (Brief recess.)

18       THE COURT:  Do we have Mr. Rossini?

19       MR. ADAMS:  Yes, your Honor.

20       THE COURT:  Yes.  So have you had further discussion

21  with Mr. Rossini?

22       MR. ADAMS:  Yes, your Honor.  I spoke with Mr. Rossini

23  as late as yesterday afternoon.  I went and visited him at the

24  MCC for approximately an hour.  We discussed whether or not he

25  wishes to testify.  And I spoke with him this morning at the

1    break.

2           It's Mr. Rossini's wish that he unconditionally wishes

3    to waive his right to testify in his own defense.  We discussed

4    the pros and cons, and that is his wish.

5           I'd like for Mr. Rossini just to put that on the

6    record.

7           THE COURT:  That's fine.  Mr. Rossini, if you can step

8    up please to the microphone.

9           Mr. Rossini, you understand that you have the right to

10   testify in your own defense.

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  But you have decided to waive that right,

13   is that correct?

14          THE DEFENDANT:  Correct, your Honor.

15          THE COURT:  And you have discussed your decision to

16   waive that right with your attorneys?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And is your decision to waive your right

19   to testify made voluntarily, completely based upon your own

20   free will?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  And no one has pressured you in any way to

23   make that decision, is that correct, sir?

24          THE DEFENDANT:  No.

25          THE COURT:  That's fine.  So, Mr. Rossini, I just

1    wanted to note that for the record.

2              THE DEFENDANT:  Yes, your Honor.

3              MR. ADAMS:  Thank you.  One moment.

4         (Brief pause.)

5              MR. ADAMS:  Thank you, your Honor.

6              THE COURT:  All right.  Very good.  So now we will

7    proceed with the stipulations, the government's final witness?

8              MR. NOVAK:  There is about ten left, so I will just

9    read them, and then they will be done.

10             THE COURT:  Okay.  And who's your final witness?

11             MR. HOGSTROM:  Agent Connors, Kelly Connors.

12             THE COURT:  And then, Mr. Adams, you said you are

13   going to put on Special Agent Evans?

14             MR. ADAMS:  Yes, your Honor.  Just for impeachment,

15   though.  That's about it.

16             THE COURT:  Okay.  Very good.  Let's bring them in.

17   Thank you.

18        (Jury entered the courtroom.)

19             THE COURT:  You may proceed, Mr. Novak.

20             MR. NOVAK:  Thank you, your Honor.

21             Stipulation 31.  If called to testify Zakhar,

22   Z-a-k-h-a-r, Kozachuk, K-o-z-a-c-h-u-k, would testify that as

23   of September 15, 2014, he was the owner of the property located

24   at 4831 Lee, Skokie, Illinois.  Mr. Kozachuk would further

25   testify that he purchased the property in April of 2004, and

1    lost the property to foreclosure in October of 2012.  Mr.

2    Kozachuk would further testify that during his ownership of the

3    property, he never conducted any negotiations with Devon Street

4    Investments, Albert Rossini, Babajan Khoshabe, or Thomas Murphy

5    about the purchase of the mortgage note for the property.

6         Stipulation 32.  If called to testify, Anel, A-n-e-l,

7    Ramirez would testify that she is the former owner of the

8    property located at 4118 West Washington, Chicago, Illinois.

9    Ms. Ramirez Would further testify she purchased the property in

10   approximately November 2005.  U.S. Bank foreclosed on the

11   property in June of 2011.  And a sheriff's sale of the property

12   occurred on or about October 22, 2012.

13        Ms. Ramirez would further testify that during her

14   ownership of 4118 West Washington she had never heard of nor

15   negotiated with Devon Street Investments, Albert Rossini,

16   Babajan Khoshabe, or Thomas Murphy.

17        Stipulation 33.  If called to testify, Melvin Chapman

18   would testify that as of August 25, 2016, he was the owner of

19   the property located at 3822 West Monroe, Chicago, Illinois.

20   Mr. Chapman would further testify that he purchased the

21   property in approximately April 2006.  Mr. Chapman would

22   further testify he does not know Devon Street Investments,

23   Albert Rossini, Babajan Khoshabe, or Thomas Murphy.

24        Stipulation 34.  If called to testify, Alex Brusha,

25   B-r-u-s-h-a, would testify that as of July 29, 2016, he was the

1   owner of the properties located at 2442 West Arthington,

2   Chicago, Illinois; 2444 West Arthington, Chicago, Illinois; and

3   2446 West Arthington, Chicago, Illinois.  Mr. Brusha would

4   further testify he purchased the properties in approximately

5   August 2011.  Mr. Brusha would further testify he does not know

6   nor has any kind of financial transaction or agreement with

7   Devon Street Investments, Albert Rossini, Babajan Khoshabe, or

8   Thomas Murphy.

9           Stipulation 36.  If called to testified, Jin Yan would

10  testify that as of August 5, 2014, she was an attorney,

11  represented MB Financial Bank in a foreclosure proceeding for

12  the property located at 2323 West Haddon, Chicago, Illinois.

13  Ms. Yan would further testify that MB Bank's foreclosure

14  proceedings against the property located at 2323 East Haddon,

15  was initiated on or about April 7, 2011.  Mrs. Yan would

16  further testify that Devon Street Investments, had no interest

17  in the property located at 2323 West Haddon, and that MB

18  Financial had no agreement with Devon Street Investments to

19  acquire, sell or assign any interest in the property.

20          Stipulation 37.  If called to testify, John Kriarakis

21  K-r-i-a-r-a-k-i-s, would testify that he is the former owner of

22  the property located at 1321 North Maplewood, Chicago,

23  Illinois.  Mr. Kriarakis would further testify he purchased the

24  property in approximately September 1996 and sold the property

25  in approximately June 2013.  Mr. Kriarakis would further

1   testify during his ownership of 1321 North Maplewood he had

2   never heard of nor negotiated with Devon Street Investments,

3   Albert Rossini, Babajan Khoshabe, or Thomas Murphy.

4           Stipulation 38.  If called to testify, Qamar Khan,

5   Q-a-m-a-r, K-h-a-n, would testify that as of August 22, 2014,

6   he along with his wife Julia Khan were the owners of the

7   property located at 6159 North Hamilton, Chicago, Illinois.

8   Mr. Khan would further testify that he and his wife purchased

9   the property in approximately April 1993, and as of August 22,

10  2014 still owned the property.  Mr. Khan would further testify

11  that they never conducted business with Devon Street

12  Investments, Albert Rossini, Babajan Khoshabe, or Thomas

13  Murphy.

14          Stipulation 39.  If called to testify, an employee of

15  Bank of America would testify that between on or about January

16  2006 and on or about May 24, 2013, Bank of America held the

17  mortgage note for the property located at 8249 Knox, Chicago,

18  Illinois.  The employee for Bank of America would further

19  testify that Bank of America has no record of any negotiations,

20  discussions or agreement between Bank of America and Devon

21  Street Investments concerning the property located at 8249

22  Knox.

23          Stipulation 40.  If called to testify, Judy Miranda

24  would testify that she is the owner of the property located at

25  5725 North Kimball Avenue, Chicago, Illinois.  Ms. Miranda

1   would further testify she has owned 5725 North Kimball since

2   approximately 1992.  Ms. Miranda would further testify that

3   foreclosure proceedings were initiated against 5725 North

4   Kimball in 2011, but she obtained a loan modification and the

5   foreclosure proceeding was terminated.

6           Ms. Miranda would further testify she does not know

7   nor has ever had contact with Albert Rossini, Babajan Khoshabe,

8   Thomas Murphy, or Devon Street Investments.

9           Stipulation 41.  If called to testify, Krysztof

10  K-r-y-s-z-t-o-f, Ochwat, O-c-h-w-a-t, would testify that as of

11  August 1, 2016, he was the owner of the property located at

12  4009 West Polk, Chicago, Illinois.  Mr. Ochwat would further

13  testify he purchased the property in approximately 2005 and

14  later lost the property for -- to foreclosure.

15          Mr. Ochwat would further testify he does not know nor

16  has ever had contact with Albert Rossini, Babajan Khoshabe,

17  Thomas Murphy, or Devon Street Investments.

18          Stipulation 42.  If called to testify, Charles Ligon,

19  L-i-g-o-n, would testify that as of August 9, 2016, he was the

20  owner of the property located at 5536 West Jackson Boulevard,

21  Chicago, Illinois.  Mr. Ligon would further testify he

22  purchased the property in approximately June 2012.  Mr. Ligon

23  would further testify he has never heard of Devon Street

24  Investments, Albert Rossini, Babajan Khoshabe, or Thomas

25  Murphy.

1      Stipulation 43, if called to testify, an employee of

2   the Cook County Recorder of Deeds would testify that Government

3   Group Exhibit CCRD consists of record maintained by the Cook

4   County Recorder of Deeds.  The employee would further testify

5   that the Cook County Recorder of Deeds is a public office.  The

6   record contained in Government Group Exhibit CCRD set forth the

7   office's activities.  And the matters observed and recorded in

8   these documents are set forth by people who are under a legal

9   duty to report.

10      The parties stipulate and agree that Government Group

11  Exhibit CCRD is admissible as evidence.

12      Finally, stipulation 44.  If called to testify, Janet

13  Khoshaba would testify that in July 2012, she met with Ashoor

14  Pithyou to discuss a real estate investment.  Ms. Khoshaba

15  would further testify that later that month, Ashoor Pithyou

16  took her to view a property located at 7935 North Karlov,

17  Skokie, Illinois, and that Ashoor Pithyou informed her that the

18  note for this building could be purchased from Devon Street

19  Investments for $125,000.

20      Ms. Khoshaba would further testify that Ashoor Pithyou

21  instructed her that in order to purchase the note to this

22  property she needed to obtain a cashier's check for $125,000,

23  made payable to Thomas Murphy.  Ms. Khoshaba would further

24  testify that on July 20, 2012, she obtained a cashier's check

25  in the amount of $125,000, made payable to Thomas Murphy, and

1   that Government Exhibit Khoshaba 1 is a true and accurate copy
2   of that check along with the fact sheet for 7935 Karlov.

3        Ms. Khoshaba would further testify that she went with
4   Ashoor Pithyou to Devon Street Investments on approximately
5   July 20, 2012, where she met with Albert Rossini.  Ms. Khoshaba
6   would further testify that Mr. Rossini explained the investment
7   to her, and she then gave Mr. Rossini the cashier's check for
8   the $125,000, and also executed a guaranty agreement with Mr.
9   Rossini in order to purchase the note for 7935 Karlov.  And
10  that Government Exhibit Khoshaba 2 is a true and accurate copy
11  of that agreement.

12       Ms. Khoshaba would further testify that she received
13  regular rent payments for her investment in 7935 Karlov from
14  approximately July 2012 to July 2015.  And the total amount she
15  was paid was approximately $16,746.  Ms. Khoshaba would further
16  testify she never received the note to 7935 Karlov, the title
17  to the property, nor a refund of her $125,000 investment,
18  despite asking for one from Mr. Rossini.

19       The parties further stipulate that Government Exhibit
20  Khoshaba 1 and Government Exhibit Khoshaba 2 are admissible as
21  evidence.  So stipulated?

22       MR. ADAMS:  So stipulated.

23       MR. NOVAK:  Your Honor, the government would move
24  Government Exhibit Group Exhibit CCRD and Government Exhibit
25  Khoshabe 1 and Khoshaba 2 into evidence.

```
1        THE COURT:  Government Exhibits CCRD and Khoshaba 1

2   and Khoshaba 2 are admitted in evidence.

3       (Said exhibits were received in evidence.)

4        MR. HOGSTROM:  Government calls Special Agent Kelly

5   Connors.

6        THE COURT:  If you would step up.

7        KELLY CONNORS, GOVERNMENT'S WITNESS, DULY SWORN

8                    DIRECT EXAMINATION

9   BY MR. HOGSTROM:

10  Q.  Good morning.

11  A.  Good morning.

12  Q.  Please state and spell your name for the court reporter.

13  A.  Kelly Connors.  K-e-l-l-y, C-o-n-n-o-r-s.

14  Q.  How are you employed?

15  A.  I am a special agent with the Federal Bureau of

16  Investigation.

17  Q.  For how long have you been a special agent with the FBI?

18  A.  I joined the bureau in -- on September 7, 2014, and I

19  graduated from Quantico March 26, 2015.

20  Q.  What did you do before you joined the FBI?

21  A.  I was an attorney practicing in New York.

22  Q.  In your time with the FBI, what have been your duties?

23  A.  I work in the south resident agency, which is located in

24  Orland Park.  I investigate white color crimes, money

25  laundering and public corruption.
```

Connors - direct                    866

1   Q.   And were you involved in the investigation of this case?

2   A.   Yes, I was.

3   Q.   And have you been involved in the trial as well?

4   A.   Yes, I have been.

5   Q.   Are you familiar with the allegations and the evidence that

6   has been introduced at trial?

7   A.   Yes.

8   Q.   Are you aware that this case involves individuals investing

9   money for -- related to certain properties in the Chicagoland

10  area?

11  A.   Yes.

12  Q.   And were these actual properties?

13  A.   Yes, they were.

14  Q.   Are you familiar with -- based on your familiarity with the

15  case and the evidence you've seen, are you aware that

16  individuals who invested would provide cashier's checks with

17  specific property identification numbers identified?

18  A.   Yes.

19  Q.   What is a property identification number?

20  A.   A property identification number is a number that's

21  assigned to specifically identify personal property.

22  Q.   How is it assigned, do you know?

23  A.   It's assigned by the -- by Cook County Recorder of Deeds.

24  Q.   Does every property have its own unique number?

25  A.   Yes, it does.

Connors - direct                                867

1   Q.   What is the Cook County Recorder of Deeds?

2   A.   The Cook County Recorder of Deeds is an entity that stores,

3   maintains and records information relating to public lands.

4   Q.   Is this a public office?

5   A.   Yes, it is.

6   Q.   And does it make those records related to public lands

7   publicly available?

8   A.   Yes, it does.

9   Q.   You mentioned -- we talked about the property

10  identification number.  If a person knew a property

11  identification number for a specific property, would it be

12  possible to search the title history for that property with the

13  recorder of deeds?

14  A.   Yes, you would be able to.

15  Q.   And how would one go about doing that?

16  A.   It's actually publicly available online.  So you could

17  enter in the property identification number.  And then you

18  would be able to see the entire title history of the property.

19  Q.   Did investigators in this case do that for all of the

20  properties that have been identified as related to this case?

21  A.   Yes, we have.

22  Q.   Now, were the records that were produced through that

23  search voluminous?

24  A.   Yes, they were.

25  Q.   Approximately how many properties were searched?

Connors - direct                    868

1   A.  Approximately 57 properties, give or take a few.

2   Q.  Now, have you reviewed what has been entered into evidence

3   as CCRD Group Exhibit -- Government Exhibit Group Exhibit CCRD?

4   A.  Yes, I have.

5   Q.  And are those transaction histories or title histories for

6   the properties that were identified in this case?

7   A.  Yes, they are.

8   Q.  Have you also observed some of the trial here --

9   A.  Yes, I have.

10  Q.  -- last week?

11         And for the witnesses that you did not observe, have

12  you reviewed their transcript of their testimony?

13  A.  Yes, I have.

14  Q.  Have you also read stipulations that have been agreed to

15  between the parties in this case?

16  A.  Yes, I have.

17  Q.  I'm going to show you what's been marked Government Exhibit

18  Chart 1.  Do you recognize that?

19  A.  Yes, I do.

20  Q.  What is it generally?

21  A.  It is a chart that I assisted in preparing that contains

22  some of the investors that invested with Mr. Rossini and Devon

23  Street Investments, as well as their -- the properties that

24  they were investing in.

25  Q.  Is this a fair and accurate summary of the information that

Connors - direct                          869

1   you reviewed?

2   A.  Yes, it is.

3          MR. HOGSTROM:  Government would move to admit

4   Government Exhibit Chart 1?

5          THE COURT:  Any objection?

6          MR. ADAMS:  No objection.

7          THE COURT:  Government Exhibit Chart 1 is admitted in

8   evidence.

9      (Said exhibit was received in evidence.)

10         MR. HOGSTROM:  I'm going to use the Elmo for this one.

11  BY MR. HOGSTROM:

12  Q.  So I'm placing on the overhead projector Government Exhibit

13  Chart 1.  Do you have that on the screen in front of you?

14  A.  Yes, I do.

15  Q.  And you also have the hard copy in front of you as well?

16  A.  I do.

17  Q.  And this is a chart that contains several different boxes,

18  is that right?

19  A.  Yes, it does.

20  Q.  Why don't we go through and talk about the columns first --

21  A.  Sure.

22  Q.  -- and have you explain.

23         So the first column says, investor witness.  Can you

24  explain what that is.

25  A.  Yes.  The investor witness box contains the name of an

Connors - direct                    870

1  investor that has testified in this case or has been stipulated

2  to, that invested with Mr. Rossini and/or Devon Street

3  Investments.

4  Q.   So this chart contains information only for the investors

5  that have either testified or for whom there has been a

6  stipulation entered into?

7  A.   Correct.

8  Q.   Next line says, property address.  Is that self-

9  explanatory?

10 A.   Yes, these are the properties that the investors invested

11 in.

12 Q.   And there is also -- underneath each property there is a

13 long string of numbers here.  Is that the property

14 identification number?

15 A.   Yes, it is.

16 Q.   Now, the group Exhibit CCRD that we talked about, those are

17 the printouts from the recorder of deeds title histories,

18 correct?

19 A.   Yes, they are.

20 Q.   Now, do those records include the address for the

21 properties?

22 A.   No, they do not.

23 Q.   So they are only identified based on the PIN number?

24 A.   That's correct.

25 Q.   Now, the next -- next column is investment date.  Can you

1   explain what that means?

2   A.   Yes.   That is the date that the cashier's check was

3   provided by the investors, as well as when they signed the

4   guaranty agreement.

5   Q.   So this is based on the records that have been entered into

6   evidence for the bank records and other documents for when the

7   investor provided the funds, is that correct?

8   A.   That's correct.

9   Q.   The next line, can you just state what this is?

10  A.   Yes.   This was a box providing a summary of whether the

11  note was owned by Bert Rossini or Devon Street Investment

12  entities at the time of the investment.

13  Q.   Now, when you say -- when the chart here says, note, does

14  that reference to mortgage note?

15  A.   Yes, it does.

16  Q.   Rossini is the defendant, is that correct?

17  A.   Yes.

18  Q.   DSI entities, what does that mean?

19  A.   Devon Street Investments, and any related entities, for

20  example Reliant Management.

21  Q.   That include Devon Street Management, Rockford Commercial

22  Mortgage, for example?

23  A.   Yes, it would.

24  Q.   Now, the next column over, can you indicate what this

25  column is?

1    A.   Yes.   This box is a summary of the evidence of whether the

2    mortgage note was acquired by Bert Rossini or a Devon Street

3    Investment entity after the investment was made, meaning when

4    the investor provided their cashier's check.

5    Q.   Okay.   And then the second to last column, what is that?

6    A.   This is a summary of whether title was obtained by Bert

7    Rossini or a Devon Street Investment entity.

8    Q.   Does that mean that the recorder of deeds records reflect

9    whether -- is it based on whether the recorder of deeds records

10   reflect transfer of title to Mr. Rossini or one of the DSI

11   entities?

12   A.   Yes, it would.

13   Q.   And finally, what's the last column?

14   A.   Was a summary of whether title was transferred to the

15   investor.

16   Q.   All right.   So now having gone over the -- what's in each

17   column, I just want to go through a couple, or several,

18   specific aspects of this chart.   And I think where I want to

19   start is with this fourth column, note owned by Rossini or DSI

20   entities at the time of investment.

21         So you indicated, this is a reference to on the date

22   that the investment check was provided whether or not the note

23   was already owned by Mr. Rossini or the DSI entities, correct?

24   A.   That's correct.

25   Q.   And underneath in the column for each property, does it

1    indicate yes or no?

2    A.   Yes, it does.

3    Q.   And scrolling down the rest of this column, it appears that

4    all of them are marked, no, is that correct?

5    A.   That's correct.

6    Q.   Does that mean that based on your review of the recorder of

7    deeds records, at the time that investment monies were provided

8    there was no instance in which the note was already owned by

9    Mr. Rossini or a DSI entity?

10   A.   That's correct.

11   Q.   So the next column then, note acquired by Rossini or DSI

12   entities after investment, is that a reflection of whether or

13   not the recorder of deeds records show a transfer of ownership

14   for one of these notes to Mr. Rossini or the DSI entities

15   starting from the date of the investment onward?

16   A.   That's correct.

17   Q.   And again, these boxes marked, no or yes?

18   A.   Yes, they are.

19   Q.   And just scrolling down, are they all marked, no?

20   A.   Yes, they were all marked, no.

21   Q.   Does that indicate, for none of these properties where

22   investment money was provided do the recorder of deeds records

23   reflect that Mr. Rossini or DSI acquired the note after the

24   investor paid the money?

25   A.   That's correct.

Connors - direct                               874

1  Q.  So the second to last column, title obtained by Rossini or

2  DSI entities.  Is it the case that when -- when a property is

3  transferred between two people, there is something called the

4  deed?

5  A.  Yes.

6  Q.  And that is sometimes also called title, is that right?

7  A.  Yes.

8  Q.  When a deed -- and a deed is an actual document, correct?

9  A.  Yes, it's a legal document.

10 Q.  When a deed is transferred, is it typically recorded with

11 the recorder of deeds?

12 A.  Yes, it is.

13 Q.  And that is a way of publicly declaring that a property

14 belongs to one person and not another, is that correct?

15 A.  Yes, it is.

16 Q.  So for this column, for each of these properties, did you

17 find any instances in which title was actually obtained by Mr.

18 Rossini or a Devon Street entity?

19 A.  Yes, there were a few instances where title was obtained by

20 Bert Rossini or Devon Street Investment entity.

21 Q.  And approximately how many times did that happen?

22 A.  According to this chart, approximately six.

23 Q.  So that's six.  And are all the rest of these marked, no?

24 A.  That's correct.

25 Q.  Okay.  Meaning the title was not obtained for any of the

Connors - direct                                    875

1    properties that are marked, no, correct?

2    A.   That's correct.

3    Q.   So I'm going to now talk about the last column, title

4    transferred to investor.  Sort of in conjunction with the

5    information you just provided, does this last column indicate

6    whether for the instances where Mr. Rossini or Devon Street

7    entity obtained a deed, that dead was then turned over to the

8    investor?

9    A.   Yes.

10   Q.   So you indicated there were six instances in which title

11   was obtained by Mr. Rossini or a DSI entity, correct?

12   A.   That's correct.

13   Q.   How many instances did you find where title was transferred

14   then to the investor?

15   A.   According to the Cook County Recorder of Deeds records that

16   we reviewed, three properties.

17   Q.   And so let me talk about those three instances

18   specifically.  So I am going to back out a little bit so we can

19   see the left-hand side of the chart.

20          The first instance I'm going to talk about is 4126

21   West Adams.  Do you see that is the first property that's

22   listed on the chart?

23   A.   Yes, I do.

24   Q.   And is that for investor Robert Badalian?

25   A.   Yes.

Connors - direct                     876

1   Q.  Now, does it indicate that Mr. Badalian invested on May 23,

2   2011?

3   A.  That's correct.

4   Q.  And does the second to last column indicate that Mr.

5   Rossini or a DSI entity obtained the deed on December 6 of

6   2011 --

7   A.  Yes.

8   Q.  -- for that property?

9            And does it indicate that the title was then

10  transferred to Mr. Badalian on July 30 of 2013?

11  A.  Yes, it does.

12  Q.  So approximately 18 months later?

13  A.  Yes.

14  Q.  Now, turning to the second entry, 5410 West Fulton, also

15  for Mr. Badalian.  Was the investment date for this May 24,

16  2011?

17  A.  Yes.

18  Q.  Does it indicate the title was obtained on May 15 of 2012?

19  A.  Yes.

20  Q.  And that title was not then transferred over to Mr.

21  Badalian?

22  A.  No, title was never transferred.

23  Q.  For 4045 West Wilcox, the next line down, does it indicate

24  that the investment was made on June 2, 2011?

25  A.  Yes, it does.

Connors - direct                877

1   Q.  And that title was obtained on January 30, 2012, by an

2   entity called Hoya Properties?

3   A.  Yes.

4   Q.  And are you familiar with what Hoya properties is?

5   A.  Yes, I am.

6   Q.  And is it an entity that was incorporated under Mr.

7   Rossini's name?

8   A.  Yes, it was.

9   Q.  And does the last column indicate that title was not

10  transferred to Mr. Badalian, but was instead transferred to

11  somebody named Julie Mai Kirkel, on May 15, 2014?

12  A.  Yes, it does.

13  Q.  Now, going down a few more lines for -- again under Mr.

14  Badalian, 4037 West Adams.  Was this investment date

15  September 21, 2011?

16  A.  Yes.

17  Q.  And does the chart indicate that title was obtained by Mr.

18  Rossini or DSI on June 25, 2012?

19  A.  Yes.

20  Q.  And that it was not then transferred to the investor?

21  A.  No, title was not transferred to Mr. Badalian.

22  Q.  So let's move on down to Mr. Moghadassi.  The first

23  property on his list is 4520 West Jackson.

24  A.  That's correct.

25  Q.  And is the investment date for that August 5, 2011?

Connors - direct                    878

1   A.   Yes.

2   Q.   And scrolling to the far right, does this indicate that

3   Devon Street Investments obtained this title on June 21 2012?

4   A.   Yes.

5   Q.   And that they then transferred the title, actually did

6   transfer the title, to Mr. Moghadassi on August 28, 2012?

7   A.   Yes, it does.

8   Q.   In the original acquisition of the title, according to this

9   chart, was ten -- approximately ten months after the investment

10  was made, is that correct?

11  A.   That's correct.

12  Q.   Now, scrolling down little further to 3327 West Monroe, you

13  see in the first column underneath Vladimir Moghaddasi, where

14  in paren, parentheses, it says, AEC?

15  A.   Yes.

16  Q.   What does that indicate?

17  A.   That is the Assyrian Church of San Jose.

18  Q.   And you're familiar with Mr. Moghadassi's testimony?

19  A.   Yes, I am.

20  Q.   Did he testify that he signed some of the documents on

21  behalf of the Assyrian Evangelical Church, who became an

22  investor?

23  A.   Yes, he was chairman at the time and had authority to sign

24  those documents.

25  Q.   Okay.  So does this indicate that the church invested on

Connors - direct                    879

1  October 11, 2011?

2  A.  Yes, it does.

3  Q.  And that Mr. Rossini obtained -- or Devon Street obtained

4  title on September 30, 2011?

5  A.  Yes, it does.

6  Q.  And that title was transferred to the church on October 24,

7  2011?

8  A.  That's correct.

9  Q.  Now, are those all of the instances in which title was

10  obtained by Mr. Rossini or Devon Street Investments, and all of

11  the instances in which title was transferred to an investor?

12  A.  Yes, for the individuals that testified or were stipulated

13  to for this case.

14  Q.  Okay.  Does that mean then that for investors Kathy Khodi,

15  Ibrahim Yousif, Awiquam and Ashoor Pithyou, St. Odisho by Ninos

16  Younan, Nastors Moshi, Albert Khamis, and Janet Khoshaba, that

17  none of those individuals received any of the titles for their

18  investments?

19  A.  That's correct.

20  Q.  And that for Mr. Badalian, he received only one out of the

21  properties that he invested in?

22  A.  Yes.  In the I believe ten properties that Mr. Badalian

23  invested in, he only received title to one property.

24  Q.  And for Mr. Moghadassi, he received one property

25  individually, and then the church received one property.

Connors - direct                    880

1    A.   That's correct.

2    Q.   Now, are you familiar with the subset of CCRD Group Exhibit

3    marked CCRD-2?

4    A.   Yes, I am.

5    Q.   And what is that?

6    A.   I believe that's the information related to the Riverdale

7    properties?

8    Q.   Okay.  When you say the Riverdale property, what are you

9    referring to?

10   A.   Those were a group of townhomes that Kathy Khodi invested

11   in.

12   Q.   And were you -- were you here for Ms. Khodi's testimony?

13   A.   Yes, I was.

14   Q.   And did you -- were you familiar with her testimony that

15   she provided $225,000 for the purchase of 17 townhomes in

16   Riverdale, Illinois, on or about July 12, 2013?

17   A.   Yes.

18   Q.   The records in CCRD No. 2, are those similar title history

19   printouts to what we were just discussing?

20   A.   Yes.

21   Q.   And those are for those 17 townhomes?

22   A.   Yes, they are.

23   Q.   Do the records indicate that the -- on the date of Ms.

24   Khodi's investment, July 12, 2013, that the properties were

25   being held by an individual named Lior Coresh?

Connors - direct                881

1   A.  Yes.

2   Q.  Okay.  And do you -- did you see anywhere in the records

3   that indicated whether the title was transferred out of Mr.

4   Lior Coresh's possession?

5   A.  Yes, they were.

6   Q.  And to whom were they transferred?

7   A.  They were transferred into Rockford Commercial Mortgage.

8   Q.  And do you recall what the date was that they were

9   transferred?

10  A.  I believe it was in September of 2013.

11  Q.  Would it have been September 9?

12  A.  Possibly, yes.

13  Q.  Okay.  At any point do the records reflect that title was

14  transferred into Ms. Khodi's name or the name of her family

15  trust?

16  A.  No, they were not.

17  Q.  Lastly, have you -- you indicate you reviewed all the

18  stipulations in this case, is that right?

19  A.  I have.

20  Q.  And you have been here for all the testimony?

21  A.  I have not been present for all the testimony, but I have

22  reviewed the transcripts.

23  Q.  Have you been -- you have reviewed the transcripts of the

24  trial, right?

25  A.  That's correct.

Connors - direct                            882

1    Q.  Have you been present for the testimony of all the owner --

2    property owners who testified?

3    A.  No, I have not.

4    Q.  Okay.  But you reviewed Mr. Alic's testimony, is that

5    right?

6    A.  Yes.

7    Q.  Okay.  Having reviewed all of those records, are you aware

8    of any property owner or any holder of a mortgage note for one

9    of these properties identified in this chart that reported

10   having negotiated to sell a mortgage note or a property with

11   Mr. Rossini or Devon Street Investments or Thomas Murphy?

12   A.  The only individual was Adis Alic -- I think I am

13   pronouncing that correctly -- was the only individual that met

14   with Mr. Rossini.  But he did not sell his property to Mr.

15   Rossini and instead entered into a loan modification agreement.

16   Q.  Just to clarify, did Mr. Alic indicate that he entered into

17   a loan modification or that he was going to?

18   A.  Was going to.  That's correct.

19   Q.  But none of the other owners or note holders reported

20   negotiations or --

21          MR. ADAMS:  Objection, Judge.

22          THE COURT:  Sustained.

23   BY MR. HOGSTROM:

24   Q.  Are you aware of whether any of the other owners or note

25   holders apart from Mr. Alic had contact with --

Connors - cross                              883

1              MR. ADAMS:  Objection, your Honor.

2              THE COURT:  Sustained.

3         (Brief pause.)

4              MR. HOGSTROM:  Nothing further, Judge.

5                       CROSS-EXAMINATION

6    BY MR. ADAMS:

7    Q.  Good morning, Agent.

8    A.  Good morning.

9    Q.  So you just told the jury that you were -- you graduated

10   from Quantico in March 2015?

11   A.  Yes.

12   Q.  And when -- part of your training involves learning how to

13   write reports?

14   A.  Yes.

15   Q.  And those reports are commonly known as 302s, correct?

16   A.  That's correct?

17   Q.  And you're trained to be specific in those reports,

18   correct?

19   A.  Yes.

20   Q.  And put relevant facts, right?

21   A.  Yes.

22   Q.  For use at trial?

23   A.  Yes.  Potentially.

24   Q.  Potentially.  Correct.

25              You also testified in the grand jury in this case,

1   correct?

2   A.   I did.

3   Q.   And you testified three times approximately, give or take?

4   A.   It was actually more than that.

5   Q.   More than three?

6             And each time you were put under oath.

7   A.   I was.

8   Q.   Same as you were today.

9   A.   That's correct.

10  Q.   And I want to talk to you about a person named Ibrahim

11  Yousif.  Are you familiar with who that is?

12  A.   I am.

13  Q.   And did you read his 302s in this case?

14  A.   I did.

15  Q.   Did you discuss those 302s with Special Agent Evans?

16  A.   Some of them, but not all of them.

17  Q.   And did you notice any inaccuracies or inconsistencies in

18  those reports?

19  A.   Nothing that I can think of.

20  Q.   You --

21  A.   There is a lot of reports in this case.

22  Q.   There are --

23  A.   Very -- this has been a very voluminous case.  So I've

24  reviewed probably thousands of documents.  So --

25  Q.   With respect to Mr. Yousif, are you adopting those reports

1    as your own?

2              THE COURT:  Which reports?

3              MR. ADAMS:  Ibrahim Yousif's 302s.

4              THE COURT:  The ones that she created or generally?

5              MR. ADAMS:  The one -- generally.

6              MR. HOGSTROM:  Objection, Judge.  She just

7    testified -- can we have a sidebar, Judge.

8         (Sidebar proceedings out of the hearing of the jury:)

9              MR. HOGSTROM:  I didn't want to argue in front of the

10   jury.  I just -- she just testified that they are not her

11   reports.  Agent Evans prepared them.  So I think asking her to

12   adopt them is improper.

13             THE COURT:  No, I think that she can answer the

14   question.  I think it's a proper question.  And if she wants to

15   adopt them she can.

16             MR. NOVAK:  Can you specify which report?  I think

17   this is Mr. Evans' impeachment.  Call Mr. Evans --

18             MR. ADAMS:  It is.  In an effort of judicial economy,

19   if this -- this agent testified -- this agent testified she was

20   familiar with these reports.  I am trying to get that

21   impeachment out now instead of having to call my own witness.

22             THE COURT:  And what's the impeachment?

23             MR. ADAMS:  Mr. Yousif testified he did not receive

24   any commissions and he did not refer people to Devon Street.

25   And he specifically says in two separate reports, 2/25/15 and

1   then on 4/24/15, that he did refer people for commissions.

2        THE COURT:  Why don't you ask her those specific

3   questions.  Okay?  You can even show her the reports if you

4   want.  You can say, well, you know, doesn't --

5        MR. ADAMS:  Okay.

6        THE COURT:  -- the report say, blank.  And then ask

7   her if she agrees.  Or you can show her the report and say, do

8   you believe this is accurate?

9        MR. ADAMS:  Okay.

10       THE COURT:  And then you can kind of go into it more

11  specifically.

12       MR. ADAMS:  Okay.  Thank you.

13       THE COURT:  All right.

14     (Further proceedings within the hearing of the jury:)

15  BY MR. ADAMS:

16  Q.  Agent Connors, you stated that you reviewed Ibrahim

17  Yousif's 302 reports, is that correct?

18  A.  Yes, I have.

19  Q.  And specifically since you said there were voluminous

20  reports in this case, I'm talking specifically about February

21  25, 2015.  Do you remember reading that report?

22  A.  Not specifically, I don't.

23  Q.  If I showed you that report, would that refresh your

24  memory?

25  A.  Perhaps.

Connors - cross                                    887

 1              MR. ADAMS:  Judge, may I approach?

 2              THE COURT:  You may.

 3    BY THE WITNESS:

 4    A.  Thank you.

 5    BY MR. ADAMS:

 6    Q.  I just handed you what's marked for identification as

 7    Rossini Exhibit 4.  Do you have that in your hand?

 8    A.  I do.

 9    Q.  Please take a moment to review it.

10         (Brief pause.)

11    BY MR. ADAMS:

12    Q.  Please let us know when you are finished.

13         (Brief pause.)

14              THE COURT:  Agent Connors, does that refresh your

15    recollection as to whether or not you reviewed this report

16    before?

17              THE WITNESS:  Yes.  I mean, it does look familiar.

18    But, I mean, sometimes many of these investors were interviewed

19    several times in this case.  And sometimes they gave the same

20    information over and over again.

21              So it does look familiar, but obviously I haven't read

22    the entire thing.

23    BY MR. ADAMS:

24    Q.  Thank you.

25    A.  That's okay.

Connors - cross                                        888

1   Q.  Agent Connors, were you aware that Ibrahim Yousif received
2   commissions for referring investors to DSI?
3   A.  Yes, I was.  And so did a couple of other investors.
4   Q.  And did you hear Mr. Yousif's testimony?
5   A.  I did not.  I wasn't present.
6   Q.  Did you review the transcript of his testimony?
7   A.  Yes.
8   Q.  And did you review the part of that transcript where he
9   denied accepting commissions for referring?
10  A.  I don't specifically remember his specific language that he
11  said, to be quite honest with you.
12  Q.  All right.  I also want to talk to you about Thomas Murphy.
13  Were you here for his testimony?
14  A.  Most of it.
15  Q.  Do you recall the government asking Mr. Murphy about a
16  lawsuit that was filed against him by Mr. Rossini in the
17  Circuit Court of Cook County?
18  A.  Yes, I do.
19  Q.  And that was for an accounting, correct?
20  A.  That was.
21  Q.  And you heard Mr. Murphy's testimony that he believes that
22  lawsuit was fraudulently filed?
23  A.  Yes.
24  Q.  When did you interview attorney Richard Kruse in this case?
25  A.  I did not interview Richard Kruse in this case.  But --

1          MR. HOGSTROM:  Objection, Judge.

2          THE COURT:  Sidebar.

3      (Sidebar proceedings out of the hearing of the jury:)

4          THE COURT:  Where are you going with this, Mr. Adams?

5          MR. ADAMS:  Judge, the government has elicited

6  testimony that they believe this lawsuit is fraudulently -- was

7  fraudulently filed.  The only evidence is Mr. Murphy's

8  testimony.  I think the jury should hear whether or not based

9  on this knowledge the government interviewed Mr. Kruse, tried

10 either -- if he was arrested, if there was any adverse action

11 taken against him for filing a fraudulent lawsuit.

12         I think the evidence that they have not is evidence

13 that is -- that the lawsuit was filed in good faith.

14         MR. HOGSTROM:  The jury is going to be specifically

15 instruction they are not to consider why anyone is -- that they

16 heard about is here or not.  I can proffer to the Court that he

17 was attempted to be interviewed.  He did not invoke his Fifth

18 Amendment, but he stated he wouldn't meet with them without

19 having attorney Glenn Seiden present.

20         This ultimately resulted in him not being interviewed.

21         THE COURT:  All right.  I am going to -- I agree with

22 the government on this.  I'm going to sustain the objection.  I

23 don't think whether or not the government prosecuted or went

24 after, interviewed Mr. Kruse is relevant to the issues that the

25 jury are to consider with regard to Mr. Rossini.  To the extent

1    it has any relevance -- and I think the relevance is dubious --

2    I think that bringing that up at this point before the jury

3    would cause substantial prejudice, undue prejudice, to the

4    government, but also would lead to jury confusion since it's

5    not Mr. Kruse that is being pursued here but Mr. Rossini.

6         So on that basis, the objection is sustained.

7         (Further proceedings within the hearing of the jury:)

8    BY MR. ADAMS:

9    Q.  Agent Connors, you are familiar with an individual named

10   Reverend Ninos Younan?

11   A.  Yes.

12   Q.  And are you familiar with his testimony?

13   A.  Yes, I am.

14   Q.  And are you familiar with a meeting that happened in

15   September 2012 at Mr. Rossini's office between Mr. -- Reverend

16   Younan, the Pithyous and Mr. Murphy?

17   A.  I believe that it was Mr. -- the Bishop's testimony that he

18   never met with Mr. Murphy.

19   Q.  Right.  Well, in the course of your investigation, did you

20   learn whether or not there was a meeting at Mr. Rossini's

21   office with Mr. Murphy and Reverend Younan?

22   A.  Yes.

23   Q.  And Mr. Murphy was at that meeting, wasn't he?

24   A.  According to the information that I reviewed that he was at

25   that meeting.

1   Q.  And that meeting Mr. Murphy said that the delays in

2   obtaining the title was because the court were backed up.  Do

3   you remember that?

4   A.  Not specifically, I do not.

5           MR. ADAMS:  Judge, may I have one moment?

6           THE COURT:  You may.

7       (Brief pause.)

8   BY MR. ADAMS:

9   Q.  You testified before the grand jury in June of 2015,

10  correct?

11  A.  Yes, approximately then.

12  Q.  And you were asked several questions regarding this meeting

13  that took place in September 2012, is that correct?

14  A.  Yes, I was.

15  Q.  One of the questions you asked then was -- that were asked

16  to you was, did Rossini explain that Murphy was there to

17  explain the issues that they were having obtaining the deeds?

18          Do you remember that question?

19  A.  I have some recollection as to that.

20  Q.  And your answer was, yes?

21  A.  Yes.

22  Q.  Then you were asked:  Did Murphy state that the delays in

23  obtaining the titles was due to the courts being backed up?

24          Do you remember being asked that question?

25  A.  I think so, yes.

1   Q.  And --

2   A.  Few years ago but --

3   Q.  I understand.

4         And the answer to that question was, yes, is that

5   correct?

6   A.  Yes.

7         MR. ADAMS:  Judge, nothing further.

8         MR. HOGSTROM:  Judge, no redirect.

9         THE COURT:  You may step down.  Thank you.

10    (Witness excused.)

11         THE COURT:  May I speak to counsel at sidebar please?

12    (Sidebar proceedings out of the hearing of the jury:)

13         THE COURT:  So does the government have anything else

14   at this time?

15         MR. NOVAK:  No, I think all of our --

16         MR. HOGSTROM:  We want to double check, make sure all

17   the exhibits or stipulation got read.  Do we have --

18         MR. NOVAK:  I have a list.  I read all the

19   stipulations but two.  So I think there is one relating to Mr.

20   Alic, who's testified, and related to Mr. Dela Cruz, who

21   testified.

22         So I think -- I think they all got read over the

23   course of the trial.  And I think as long as we can make sure

24   that all of the evidence was in, that we put up today, was part

25   of the stipulations, I think we rest, right?

1        MR. HOGSTROM:  Yes.

2        THE COURT:  Okay.  And then do you intend to call

3   Agent Evans?

4        MR. ADAMS:  No, Judge, I think that impeachment was

5   all we needed.  We got it out.

6        THE COURT:  Because I rather have -- if that's all we

7   are going to have today, I'd rather just let the jury go then

8   and not have to come back after lunch.

9        MR. ADAMS:  Your Honor, if the government is resting,

10  Mr. Rossini, for the record, is making a Rule 29 motion.

11       THE COURT:  I understand.  And we can do that after I

12  let the jury go, because as long as you do it before the case

13  is submitted to the jury you are fine.

14       MR. NOVAK:  Just so mechanically you will let the jury

15  go.  We will go over the exhibits, and --

16       THE COURT:  No.  I think you had everything in that

17  you want to get in.

18       MR. NOVAK:  I think so, too.  Everything -- the only

19  things were on the stipulations today.  I think I moved all of

20  those into evidence.

21       THE COURT:  Do you want to take five minutes now and

22  go through it?

23       MR. NOVAK:  Better safe than sorry.

24       THE COURT:  So then at that point I will ask the

25  government if the government has anything else.  You can rest.

1    I will ask the defense if you have anything else.  And you say,

2    no, defense rests.

3            MR. FRANKEL:  Judge, there is an issue with that based

4    on things Mr. Rossini wants us to look into.  We would rather

5    rest on Wednesday, if that's possible.

6            MR. ADAMS:  We'll be ready to close on Wednesday.

7            MR. FRANKEL:  Ready to close.

8            MR. ADAMS:  He wants us to --

9            THE COURT:  Shall we call him up?

10           Mr. Rossini, can you join us please?  I just wanted

11   you to be part of this conversation.  Go ahead.

12           MR. FRANKEL:  Well, I was just requesting to the

13   Judge, based on a matter that was raised recently, that we were

14   not prepared to rest to Wednesday morning to complete the

15   possibility of this investigation that we talked about.  And

16   that we would be prepared to close and finish the case on

17   Wednesday.

18           THE COURT:  Okay.  So --

19           MR. FRANKEL:  This was a late-breaking matter, I'd

20   say.

21           THE COURT:  Okay.

22           MR. HOGSTROM:  I think we'd like to know what it is,

23   what it pertains to.

24           THE DEFENDANT:  The government already has --

25           MR. ADAMS:  I can make the record.  There are checks

1    Mr. Rossini wishes us to introduce related to other properties.

2    And he wishes us to look into that, introduce those into

3    evidence.  I don't have them with me right now.  But I believe

4    once I go back to the office I can get them.

5         And if in our legal opinion whether they are relevant

6    to the case, then we will move to introduce them on Wednesday.

7    Otherwise we are ready to close Wednesday morning.

8         THE COURT:  Okay.

9         MR. FRANKEL:  We can be in touch with the

10   government --

11        MR. ADAMS:  And we will be.

12        MR. FRANKEL:  -- throughout this process.

13        THE COURT:  All right.

14        MR. HOGSTROM:  As long as it's -- I just want to

15   confirm, we are not potentially going to appear in court on

16   Wednesday, and then have significant amount of something to

17   deal with.

18        MR. ADAMS:  No, no.  No witnesses.  It's actually just

19   documents, checks.

20        THE COURT:  Okay.  All right.  So why don't --

21        MR. NOVAK:  Give them a five-minute break?

22        THE COURT:  I will give them a five-minute break.  You

23   can look over things, and then we'll go from there.  Okay?

24     (Further proceedings within the hearing of the jury:)

25        THE COURT:  Ladies and gentlemen, as you know, we

1    typically take a lunch break around this time.  But what I'd

2    like to do today is, let's take a five-minute break, okay?  And

3    then I will ask you to come back.  And then I will let you know

4    what's going on.

5             Thank you.

6          (Jury exited the courtroom.)

7             THE COURT:  We will take a short five-minute break.

8          (Brief recess.)

9             THE COURT:  Ready?

10            MR. NOVAK:  I think so.

11            So in talking, the only thing that we think needs to

12   be admitted that wasn't was the Bank Records Disk.  It contains

13   all the bank records that were on the stipulation.  But just in

14   an abundance of caution, we would offer that into evidence as

15   well so it can go back to the jury if they want to take a look

16   at it.

17            So --

18            THE COURT:  So Bank Records Disk contains records from

19   which banks?

20            MR. NOVAK:  All the banks that were on the

21   stipulations and the currency exchange.  So stipulations --

22            THE COURT:  No, I understand.

23            Any objection?

24            MR. ADAMS:  No objection.

25            THE COURT:  So what is it called?

1      MR. NOVAK:  Bank Records Disk.

2      THE COURT:  All right.  So Bank Records Disk is

3  admitted in evidence.

4      (Said exhibit was received in evidence.)

5      MR. NOVAK:  And then like I said, we -- I have been

6  keeping track of the stipulations that I read.  They were

7  numbered.  They were 1 through 44.  And I had that I had read,

8  or we had read every one but 19 and 29.  So I think --

9      MR. HOGSTROM:  Those were covered by testimony.

10      MR. NOVAK:  Yes.  And all the charts and everything

11  came into evidence today.  So I think we are fine.

12      THE COURT:  So I am going to call the jury in, ask the

13  government whether you have anything further.  At that point

14  you will rest.  And then I will let the jury know the overall

15  schedule.  I will tell them that we are ahead of schedule, and

16  that we anticipate that we will be -- that on Wednesday there

17  may be some additional proceedings, but certainly closing

18  arguments Wednesday.  I will provide them with instructions.

19  And at this point, we believe that they will be able to begin

20  their deliberations on Wednesday.  Okay?

21      And then jury instructions we will deal -- I am going

22  to ask everyone to come back today at 3:00 o'clock in the

23  afternoon to deal with jury instructions.  Okay?  All right.

24      Let's bring them in.

25      (Jury entered the courtroom.)

1          THE COURT:  Please be seated.

2          Does the government have anything further?

3          MR. HOGSTROM:  Judge, at this time the government

4   rests.

5          THE COURT:  Okay, Mr. Hogstrom.

6          So, ladies and gentlemen of the jury, we are ahead of

7   schedule at the moment, just to let you know.  What we are

8   going to do is, we are going to break for the day.  All right?

9   And as you know, we will not have trial tomorrow.

10          And so we will reconvene on Wednesday at 10:00

11   o'clock.  Please be in the jury room by 9:45.  At this point we

12   anticipate that there may be some additional proceedings on

13   Wednesday, and certainly we anticipate that the attorneys will

14   be able to present their closing arguments to you on Wednesday.

15          I will then provide you with the jury instructions.

16   And at this point we believe that you will be able to begin

17   your deliberations on Wednesday.  All right?  Just to give you

18   an idea of what to expect.

19          So until then, please do not discuss this case with

20   anyone, including one another.  Also please do not do any

21   independent research regarding any of the persons that you have

22   heard discussed in this case, any of the properties or any of

23   the issues in this case.

24          I want to thank you for your attention this morning.

25   And we will see you here Wednesday morning.  Thank you.

1    (Jury exited the courtroom.)

2         THE COURT:  We will see the parties back here at 3:00

3  o'clock to deal with the handful of issues with regard to the

4  jury instructions.  And until then we are in recess.

5         Thank you.

6         MR. HOGSTROM:  Thank you, your Honor.

7         MR. ADAMS:  Thank you, your Honor.

8    (Trial recessed until 3:00 o'clock p.m. of the same day.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

900

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )      Docket No. 15 CR 515-1
                                       )
 4              Plaintiff,             )
                                       )
 5     v.                              )      Chicago, Illinois
                                       )      June 11, 2018
 6    ALBERT ROSSINI,                  )      3:00 o'clock p.m.
                                       )
 7              Defendant.             )

 8                              VOLUME 5B
                     TRANSCRIPT OF PROCEEDINGS - TRIAL
 9               BEFORE THE HONORABLE JOHN Z. LEE

10    APPEARANCES:

11    For the Government:         HON. JOHN R. LAUSCH, JR.
                                  United States Attorney, by
12                                MR. ERIK A. HOGSTROM
                                  MR. WILLIAM PATRICK NOVAK
13                                Assistant United States Attorneys
                                  219 South Dearborn Street
14                                Chicago, Illinois  60604

15    For the Defendant:          LAW OFFICES OF JOSHUA B. ADAMS,
                                  P.C., by
16                                MR. JOSHUA B. ADAMS
                                  53 West Jackson Boulevard
17                                Suite 1515
                                  Chicago, Illinois  60604
18
                                  FRANKEL & COHEN, by
19                                MR. SCOTT JAY FRANKEL
                                  53 West Jackson Boulevard
20                                Suite 1615
                                  Chicago, Illinois  60604
21

22                         ALEXANDRA ROTH, CSR, RPR
                              Official Court Reporter
23                          219 South Dearborn Street
                                   Room 1224
24                           Chicago, Illinois 60604
                                (312) 408-5038
25
```

1          THE CLERK:  15 CR 515, USA v. Rossini.

2          THE COURT:  Okay.  This is the final jury instruction

3     conference in this case.  The government has circulated their

4     latest version of their proposed jury instructions.  I

5     understand defendant has some objections or some comments to

6     those, and then there are a couple of additional ones that the

7     defendant would like to propose.  So let's first deal with the

8     defendant's objections to the government's proposed jury

9     instructions.

10         MR. FRANKEL:  Judge, if I -- hopefully I have the

11    most recent version of their proposed instructions.  Some of

12    these are just comments in the way of editing.

13         Government instruction No. 7.  It says --

14         THE COURT:  Can you just go by page number, please.

15         MR. FRANKEL:  Page No. 8.

16         THE COURT:  Yes.

17         MR. FRANKEL:  The middle paragraph says:  You may

18    find the testimony of one witness or a few witnesses, et

19    cetera.

20         According to the comments on that pattern jury

21    instruction, that second paragraph should not be given if the

22    defendant does not testify.  So we'd propose that the second

23    paragraph be removed.

24         THE COURT:  Any objection?

25         MR. HOGSTROM:  No objection.

1          THE COURT:  Okay.  So we will remove that second

2   paragraph.

3          MR. FRANKEL:  And page 10, credibility of witnesses.

4          THE COURT:  That's government's instruction No. 9?

5          MR. FRANKEL:  Correct.

6          THE COURT:  Okay.

7          MR. FRANKEL:  It says:  Part of your job as jurors is

8   to decide how believable each witness was and how much weight

9   to give each witness' testimony, including that of each

10  defendant.  So that should be removed obviously.

11         THE COURT:  Okay.

12         MR. FRANKEL:  The -- I'm on page 12, government

13  instruction No. 11.

14         THE COURT:  Hold on for one second.

15    (Brief pause.)

16         THE COURT:  Yes.

17         MR. FRANKEL:  I believe this is -- should not be

18  submitted at all.

19         THE COURT:  That's correct.

20         MR. FRANKEL:  Page 14, government instruction 13.

21  This is written in plural throughout, and there was only one

22  recording and one conversation.  So I would just -- I think it

23  needs to be edited:  You have heard -- for example:  You have

24  heard a recorded conversation.  You were also given a

25  transcript of the conversation to help you follow the

1    recording as -- et cetera, et cetera, all the way through.

2         THE COURT:  Okay.

3         MR. FRANKEL:  Page 16, government instruction 15.  So

4    this involves summary exhibits that were not admitted into

5    evidence.  I think there's an instruction if the summary

6    exhibit was admitted into evidence on page 15.

7         THE COURT:  I believe the only chart that wasn't

8    admitted in evidence was the sentencing guideline chart.

9         MR. FRANKEL:  Oh.  The others were admitted in

10   evidence?  So, I mean, do we need both?

11        THE COURT:  I think --

12        MR. FRANKEL:  We need both because of that?

13        THE COURT:  We should keep government instruction

14   No. 13 but just limit it to charts.

15        MR. FRANKEL:  Okay.

16        THE COURT:  Certain charts.  Okay?

17        MR. FRANKEL:  Yes.

18        THE COURT:  All right.

19        MR. FRANKEL:  No. 16 does not apply, on page 17,

20   government instruction 16.

21        THE COURT:  Yes.  And obviously the plural of

22   defendants, right, needs to be changed?

23        MR. FRANKEL:  Right, on page 20, government

24   instruction 19.

25        THE COURT:  Yes.

1      MR. FRANKEL:  And also on page 19, government

2    instruction 18.

3      THE COURT:  Right.

4      MR. FRANKEL:  Judge, I was going to -- on page 25,

5    government instruction No. 24:  The mail fraud statute and

6    wire fraud statute can be violated whether or not there is any

7    loss or damage to the victim of the crime or gain to the

8    defendant.

9      We're objecting to this because it doesn't reflect

10   the state of the evidence.  And I believe that this

11   instruction would have the effect of lowering the government's

12   burden of proof because it's an instruction telling the jury

13   what they don't have to -- another instruction telling the

14   jury what they don't have to find in order to find the

15   defendant guilty.  I think it was pretty clear all the victims

16   who testified suffered a loss.

17     THE COURT:  Any objection from the government?

18     MR. HOGSTROM:  Yes, Judge.  There was one victim that

19   testified he did not suffer a loss, and that was Mr. Yousif.

20   Otherwise, that's true.  But because there's the one victim,

21   we think it's still appropriate.

22     MR. FRANKEL:  We'll just rest on the argument, Judge.

23   I think maybe -- yes, one victim, I think, said that they were

24   made whole at the end.

25     THE COURT:  All right.  Given the testimony of

1    Mr. Yousif, I will keep government instruction No. 24.

2            MR. FRANKEL:  And on page 32, government instruction

3    30, it says:  In deciding your verdict, you should not

4    consider the possible punishment for the defendant.

5            I don't believe either side intends to argue

6    punishment.  And, again, this is an instruction that tells the

7    jury what not to consider.  I think it has the effect of

8    lowering the burden of proof.  And we'd object to it since

9    it's not going to be an issue anyway.

10           MR. HOGSTROM:  Judge, it's our view it's an accurate

11   statement of the law.  It's appropriate.  The jury should be

12   made aware that they should not be considering the potential

13   consequences beyond the fact that they need to find the facts.

14           THE COURT:  I agree with the government on this

15   point.  I believe that the jury should know that they have to

16   render a verdict without giving any consideration to the

17   possible punishment of the defendant.  That's my job alone.

18   So I'm going to keep the government's instruction No. 30.

19           MR. FRANKEL:  Judge, we previously proposed two jury

20   instructions.  Then just over the break, we submitted two

21   more.  So four total.

22           THE COURT:  I didn't receive the ones that were

23   submitted over the break.  Do you have copies of those?

24           MR. FRANKEL:  Yes.

25     (Tendered.)

1    MR. FRANKEL:  And we've tendered copies to the

2    government.

3      (Brief pause.)

4         THE COURT:  All right.  So does the defendant have

5    any other objections to the proposed instructions by the

6    government?

7         MR. FRANKEL:  No.

8         THE COURT:  So let's first deal with the -- moving

9    then to the instructions that defendant Rossini would like to

10   propose, let's start with Rossini instruction No. 1 that was

11   previously submitted.  Let me hear from the government as to

12   this particular issue.

13        MR. HOGSTROM:  Judge, we would object to the advice

14   of counsel instruction.  It's simply not applicable to the

15   facts of the case.  The mere fact that an attorney was

16   involved does not mean that the defendant is entitled to an

17   advice of counsel instruction.  In order to have the

18   instruction, he would have -- there would have to be evidence

19   in the record that he sought the advice of an attorney and

20   that he did so for the purpose of securing advice on the

21   lawfulness of his conduct, that he reported all material facts

22   to the attorney, and then acted strictly in accordance with

23   the advice.

24        There's zero evidence in the record that Mr. Rossini

25   received advice from anyone about the lawfulness of his

1    conduct.  On the contrary, the only evidence about an attorney

2    is the evidence from Mr. Murphy who testified, in essence,

3    that he jointly committed a fraud with Mr. Rossini.  So

4    without further evidence in the record on this point, I don't

5    think that the evidence supports it.

6              MR. FRANKEL:  Judge, Mr. Rossini was represented by

7    Thomas Murphy throughout.

8              THE COURT:  So by attorney you mean Thomas Murphy?

9              MR. FRANKEL:  Yes.

10             THE COURT:  Okay.  Go ahead.

11             MR. FRANKEL:  And he clearly acted according to

12   Mr. Murphy's advice.  The instruction asks the jury to look at

13   the evidence and determine whether he qualifies to rely in

14   good faith on the advice of attorney based on four elements.

15   They can find that he did or didn't based on those elements.

16   It doesn't mean that those elements exist in the record before

17   the instruction is given.  All we need -- all there needs to

18   be in the record is some evidence that the instruction is

19   appropriate, and then the jury has to decide based on the

20   instruction whether to find in favor of the defendant or not.

21             MR. ADAMS:  And, your Honor, specifically, the

22   evidence that Mr. Rossini relied on Mr. Murphy, Mr. Murphy

23   testified that Rossini was a client and he had a billing code

24   number for his firm and that he rendered legal advice to

25   Mr. Rossini regarding --

1           THE COURT:  Right.  But just the fact that Mr. Murphy

2   may have acted with Mr. Rossini in other respects or other

3   transactions, I don't recall any evidence with regard to the

4   transactions at issue in this case and the investments at

5   issue in this case that Mr. Murphy acted in -- well, that any

6   of these particular elements of the instruction would apply.

7   For example, I don't think there's any evidence that -- or any

8   indication even from Mr. Murphy who testified -- that

9   Mr. Murphy advised Mr. Rossini how to proceed with these

10  transactions, even on cross-examination, or that Mr. Rossini

11  sought advice from Mr. Murphy as to these transactions or

12  that, frankly, even that Mr. Murphy was acting as a lawyer in

13  these transactions.

14          In fact, the only evidence that's in the record is

15  that Mr. Murphy was told that he wouldn't be acting as a

16  lawyer, a real estate lawyer, with regard to these

17  transactions.  And so I guess, counsel, I'm just not seeing

18  the basis for granting this or providing this instruction

19  given the record in this case.

20          MR. FRANKEL:  Judge, there was the September 2012

21  meeting where Mr. Murphy explained to the investors how the

22  process worked and what was taking so long.  All the checks

23  were made out to Mr. Murphy.  Mr. Murphy was frequently around

24  at the office apparently.  And he was -- I think it's -- you

25  can infer from this record that Mr. Rossini consulted with

1    Mr. Murphy throughout this process.  So I do -- I think there

2    is evidence that there was an attorney-client relationship

3    here.

4            THE COURT:  All right.  I'm not going to grant this

5    instruction.  I believe that this instruction is intended for

6    those instances where the defendant takes the position that he

7    did what he did, he committed the acts that are alleged,

8    because he obtained, in good faith, advice of -- advice from a

9    lawyer and that he followed those lawyer's instructions after

10   providing the lawyer with all of the relevant and material

11   information.

12           As I noted, there is -- other than -- there is just

13   no facts in the record that would come close to supporting

14   even a reasonable inference of the elements that are part of

15   this instruction.  As I said, the evidence from Mr. Murphy is

16   that he was pulled into the transactions; but he was

17   specifically told that he wouldn't have any activity with

18   regard to the real estate transactions.  He was instructed on

19   what to do with the funds, when to deposit them, when to issue

20   checks out of them.  And to a large extent, that was the

21   extent of his role.  There is nothing that Mr. Murphy said,

22   either on direct or cross, that would support any reasonable

23   inference that Mr. Rossini sought his advice on how to go

24   about these transactions, that he consulted with him in order

25   to secure legal advice as to these transactions, that he

1    provided Mr. Murphy a full and accurate report of all the

2    material facts, to the extent Mr. Rossini knew it, or that

3    Mr. Rossini acted strictly in accordance with those -- with

4    the advice that Mr. Murphy gave him.  So based upon that, I'm

5    going to decline to provide Rossini instruction No. 1 to the

6    jury.

7              Let's now proceed to Rossini instruction No. 2.

8              MR. FRANKEL:  Judge, No. 2 is a mere presence

9    instruction.  We just submit it on its face.  And we think

10   there's enough evidence here to support this instruction.  The

11   jury can decide.

12             THE COURT:  Any objection?

13             MR. HOGSTROM:  We don't have an objection.

14             THE COURT:  Okay.  So I'll go ahead and include

15   Rossini instruction No. 2.

16             All right.  Now, let's go to the two additional ones

17   that the defendant has proposed during the break.  The first

18   one, let's deal with the prior inconsistent statements one.

19             MR. FRANKEL:  Well, we have evidence that there was a

20   prior consistent statement by -- prior inconsistent statement

21   by two witnesses, Ibrahim Yousif and Mr. -- and Bishop Younan.

22   And those -- that impeachment was proven up by Mr. Adams

23   during the cross-examination of the agent.  And so we believe

24   that the instruction is appropriate.

25             THE COURT:  Any objection?

1          MR. HOGSTROM:  Just to the -- just for clarity, at

2     least the copies we have, both of them refer to 3.03, prior

3     inconsistent statement on the bottom.  I just want to make

4     sure -- oh, there's another one?

5          MR. FRANKEL:  Sorry about that.

6          MR. HOGSTROM:  Not a problem.

7          So we have no objection to 3.03.

8          THE COURT:  Okay.  The last one is defendant's

9     proposed instruction regarding Mr. Murphy.

10          MR. FRANKEL:  This instruction definitely applies in

11    this case.  Mr. Murphy received a benefit for his testimony,

12    plus admitted to participating in the alleged offense.  And

13    under those circumstances, this instruction, where the jury is

14    told to treat the testimony with caution and great care, is

15    appropriate.

16      (Brief pause.)

17          THE COURT:  With regard to "has admitted to lying

18    under oath" --

19          MR. FRANKEL:  That was during the bankruptcy

20    petition.  There's a penalty for perjury -- or the statements

21    are given under penalty of perjury, a statement that he signed

22    at the bottom of the bankruptcy petition, which Mr. Adams

23    brought out.

24          MR. HOGSTROM:  And, Judge, we would argue that they

25    can certainly -- they can certainly argue that to the jury if

1    they want to.  But the record doesn't actually reflect that

2    Mr. Murphy admitted to lying under oath.  We looked through

3    his transcript trying to find someplace where that was the

4    case and we didn't find it.  The closest was that he admitted

5    that the address that was included on his petition was

6    incorrect, but he stated that it was submitted by his attorney

7    and he relied on his attorney to do it.  I mean, they can

8    certainly argue to the jury that that's not believable; and

9    the jury can make their own conclusion.  But to have the Court

10    essentially instruct them that he has admitted to lying under

11    oath, I think, would be inappropriate.

12           MR. ADAMS:  Your Honor, respectfully, Mr. Murphy

13    signed a false statement under penalty of perjury in a court

14    document for a bankruptcy filing.  Whether he admitted it or

15    not, it was in the text that he gave an incorrect address for

16    the purposes of misleading the bankruptcy court.  And he

17    admitted he signed it.

18     (Brief pause.)

19           THE COURT:  And remind me, was there one petition or

20    more than one petition?

21           MR. ADAMS:  Three.

22           THE COURT:  That had inaccurate information?

23           MR. ADAMS:  All three, your Honor.

24           THE COURT:  I think that if -- I think that's

25    something that the jury can consider.  But I think "has

1    admitted to lying under oath" though has the risk of confusing

2    the jury as to what exactly is meant by that.  It certainly

3    confused me.  And so what I would propose is adding, for that

4    second bullet point:  Has admitted to signing a -- admitted to

5    signing bankruptcy petitions, under the penalty -- under the

6    pains and penalties of perjury, that contain inaccurate

7    information, which I think is about as accurately as it can be

8    described with regard to his testimony.

9             Any objection to that?

10            MR. ADAMS:  No, your Honor.

11            THE COURT:  Does the government have any objection to

12   that modification?

13            MR. HOGSTROM:  One moment, your Honor.

14            MR. NOVAK:  We're just checking because I think he

15   said he didn't sign one of the petitions.

16            THE COURT:  Well, that's true.  He said his attorney

17   signed one of them, right?

18            MR. NOVAK:  At least one of them, so I'm just looking

19   through the record -- I'm looking through the transcript to

20   see what he said.

21     (Brief pause.)

22            THE COURT:  Mr. Adams, what if we change it to:  Has

23   admitted to signing at least one bankruptcy petition, under

24   the pains and penalties of perjury, that contain inaccurate

25   information?

914

1          MR. ADAMS:  That's fine, your Honor.  There's no

2     objection to that.

3          MR. HOGSTROM:  Okay, Judge, we're fine with that.

4          THE COURT:  And then does the government have any

5     objection with the third bullet point, that he has pleaded

6     guilty to and stated that he was involved in some of the

7     crimes the defendant is charged with committing.  You may not

8     consider his guilty plea as evidence against the defendant.

9          MR. HOGSTROM:  I think that's the pattern, and it's

10    applicable here.  So we don't object.

11         THE COURT:  All right.  Very good.  So I will adopt

12    that instruction with those revisions.

13         With regard to the -- I don't know if I said this,

14    but with regard to the first bullet point, I think rather than

15    "received a benefit," I think it should be, "Thomas Murphy,

16    who was promised a benefit in return for his testimony and

17    cooperation with the government."

18         Any objection to that?

19         MR. FRANKEL:  No objection.

20         MR. HOGSTROM:  No objection.

21         THE COURT:  Okay.

22         And just for the sake of completeness, the other

23    reason why I think that Rossini instruction No. 1 is

24    inappropriate is because I think that, given just the dearth

25    of evidence that this instruction addresses, I think it would

1    cause unnecessary confusion for the jury.  They have enough

2    things to decide.

3          So I think those are all the jury instruction issues.

4          Did you submit the new ones to the proposed order

5    in-box?

6          MR. ADAMS:  Yes, Judge.

7          THE COURT:  We'll go about making the revisions then.

8          MR. FRANKEL:  Okay.

9          THE COURT:  Okay.

10         MR. FRANKEL:  So, Judge --

11         THE COURT:  One thing that I would like the

12   government to do, please, is -- I don't know if you were

13   taking notes with regard to all the ones that we had changed

14   with regard to the government's instructions.

15         MR. HOGSTROM:  Yes, Judge.

16         THE COURT:  Okay.  Could you make those changes or

17   have someone make those changes -- if it were me back in the

18   DOJ days, I would have to make them myself, but perhaps you

19   have more staff than I do, I don't know, or that I did.

20         What I would like you to do is incorporate those

21   changes, please.  Then take off the source citation, so the

22   government instruction No. 1, Seventh Circuit committee, all

23   that stuff, take out the page numbering as well.

24         MR. NOVAK:  Okay.

25         THE COURT:  And then just send them back to me in the

1   proposed order in-box.

2         MR. HOGSTROM:  That's just for the government's

3   instructions or do you want us to do --

4         THE COURT:  Yes.  We'll incorporate the other ones.

5   I took notes on the other ones.

6         MR. NOVAK:  So no page numbers and no --

7         THE COURT:  No citations or attributions.  Okay.

8         MR. NOVAK:  So then we just had just a couple of

9   housekeeping questions.

10         THE COURT:  Yes.

11         MR. NOVAK:  Our paralegal wanted to know how the jury

12   was going to receive the exhibits, if they were going to get

13   them in folders and binders or in PDFs on a disk, what the

14   Court's preferred method was.

15         THE COURT:  I would prefer them to receive them in

16   binders.

17         MR. NOVAK:  Okay.

18         THE COURT:  I think it's just easier for them to

19   review that way.

20         MR. NOVAK:  And do -- should we prepare an admitted

21   exhibit list to go back with --

22         THE COURT:  No.  What I would suggest is a separate

23   binder for each witness.

24         MR. NOVAK:  Okay.

25         THE COURT:  I think that makes it a lot easier for

1    them to find materials.  And then you can have a general

2    exhibits binder with exhibits perhaps that came in through

3    other means.

4              MR. NOVAK:  Okay.

5              THE COURT:  With regard to the audiotape -- or the

6    video/audiotape, we will have a clean laptop back there for

7    them, so you can just provide me with a disk.

8              MR. NOVAK:  We -- for the e-mail disks, if they want

9    to look at them, we can put -- we were talking to counsel

10   about this.  We have the capability to put essentially a dummy

11   Outlook folder on our laptop so we can provide that if they

12   ask for it from one of our jury laptops that goes back

13   normally so that they can review e-mails if they need to.

14             THE COURT:  I think the -- you mean the e-mails in

15   addition to the ones that you presented during the trial?

16             MR. NOVAK:  The disks have just the e-mails from

17   Mr. Rossini's account.  So that -- those were put in via

18   stipulation.  So we -- the ones that were put in in the trial

19   will go back in the binders.  If there's additional e-mails,

20   if they want to look, we have the capability to give them the

21   folders.  We tried to put them in PDF format.  It didn't work.

22             THE COURT:  That's fine.  Just make sure that -- and

23   that would be a clean laptop?

24             MR. NOVAK:  That would be one of our clean machines

25   that goes back normally.

918

1          THE COURT:  Just make sure that Mr. Adams and
2    Mr. Frankel get a look at it --
3          MR. NOVAK:  Sure.
4          THE COURT:  -- before it goes back.
5          Anything else?
6          MR. HOGSTROM:  Judge, the -- for the purposes of the
7    indictment, we weren't going to make any changes to it because
8    the names that are in it already -- we were going to --
9    obviously we're going to redact the other defendants in the
10   captions and such.  But as far as the description in the
11   indictment, we weren't going to change Murphy to Individual A
12   or anything like that because all of the names were talked
13   about in court here today.  We just wanted to make sure you
14   were okay with that.
15         THE COURT:  I'm okay with that.  Any objection to
16   that?
17         MR. ADAMS:  No objection.
18         THE COURT:  Okay.  Mr. Adams, Mr. Frankel, you said
19   that you wanted to make a motion under Rule 29?
20         MR. ADAMS:  Yes, your Honor.
21         THE COURT:  Are you doing so now?
22         MR. ADAMS:  Yes, your Honor.  I'm making that motion
23   for Mr. Rossini under Rule 29 for a directed verdict.
24         THE COURT:  Okay.  I'll take that under advisement.
25         MR. ADAMS:  Thank you, your Honor.

1          THE COURT:  Anything else we need to address today

2   then?

3          MR. FRANKEL:  I don't think so, Judge.

4          THE COURT:  So one -- I guess there are a couple of

5   other things.  One is, how long do you think you will need for

6   closing?  Who is going to do the opening closing and who is

7   going to do the rebuttal?

8          MR. NOVAK:  I'll do the opening closing.  I'm going

9   to try and make it less than an hour, hopefully much less than

10  an hour, but no more than an hour.

11         THE COURT:  Okay.

12         MR. HOGSTROM:  I'll be doing the rebuttal.  Obviously

13  it's to some extent contingent on what comes out in

14  defendant's closing, but 15 to 20 minutes I would guess.

15         MR. ADAMS:  Approximately an hour.  I did a rough

16  draft yesterday of about 56 minutes, so I'm trying to tighten

17  it up.

18         THE COURT:  I don't need to tell you that the shorter

19  the better for these arguments.

20         MR. ADAMS:  Yes, your Honor.

21         THE COURT:  Okay.  So what I'll put down is I will

22  allot each side as follows:  The government I'll give an

23  hour -- up to an hour for the opening closing and 15 minutes

24  for rebuttal; and I'll give the defense an hour -- up to an

25  hour for their closing.

```
 1              MR. FRANKEL:  Thank you.

 2              MR. NOVAK:  Thank you.

 3              THE COURT:  And otherwise we have the jury

 4     instructions, so I think we're all ready to go.

 5              MR. FRANKEL:  Yes.

 6              THE COURT:  And so Wednesday morning then, we can

 7     talk -- let's start at 9:45.  I don't think my call is that

 8     long on Wednesday.  And then you can let me know what your

 9     thoughts are with regard to those particular documents that

10     you discussed earlier.

11              MR. ADAMS:  Yes, your Honor.

12              THE COURT:  Okay.  Very good.  Thank you.

13              MR. FRANKEL:  Thank you.

14              MR. HOGSTROM:  Thank you.

15       (Which were all the proceedings heard.)

16                    *    *    *    *    *

17
       We certify that the foregoing is a correct transcript from the
18     record of proceedings in the above-entitled matter.

19

20
       /s/ Alexandra Roth                    June 12, 2018
21     Official Court Reporter

22
       /s/ Nancy C. LaBella                  June 12, 2018
23     Official Court Reporter

24

25
```