```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      )   Docket No. 15 CR 515-1
                                    )
 4                 Plaintiff,       )
                                    )
 5         v.                       )   Chicago, Illinois
                                    )   June 13, 2018
 6   ALBERT ROSSINI,                )   9:50 o'clock a.m.
                                    )
 7                 Defendant.       )

 8                          VOLUME 6A
                  TRANSCRIPT OF PROCEEDINGS - TRIAL
 9          BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10   APPEARANCES:

11   For the Government:        HON. JOHN R. LAUSCH, JR.
                                United States Attorney, by
12                              MR. ERIK A. HOGSTROM
                                MR. WILLIAM PATRICK NOVAK
13                              Assistant United States Attorneys
                                219 South Dearborn Street
14                              Chicago, Illinois 60604

15   For the Defendant:         LAW OFFICES OF JOSHUA B. ADAMS,
                                P.C., by
16                              MR. JOSHUA B. ADAMS
                                53 West Jackson Boulevard
17                              Suite 1515
                                Chicago, Illinois 60604
18
                                FRANKEL & COHEN, by
19                              MR. SCOTT JAY FRANKEL
                                53 West Jackson Boulevard
20                              Suite 1615
                                Chicago, Illinois 60604
21

22                   ALEXANDRA ROTH, CSR, RPR
                        Official Court Reporter
23                   219 South Dearborn Street
                             Room 1224
24                   Chicago, Illinois 60604
                         (312) 408-5038
25
```

1        (The following proceedings were had in open court outside

2       the presence of the jury:)

3        THE CLERK:  15 CR 515, USA versus Albert Rossini, for

4 jury trial.

5        MR. HOGSTROM:  Good morning, your Honor.  Erik

6 Hogstrom and Bill Novak for the United States.

7        MR. NOVAK:  Good morning, your Honor.

8        MR. ADAMS:  Good morning, your Honor.  Joshua Adams

9 and Scott Frankel for Albert Rossini, who is in custody and

10 will be approaching momentarily.

11        THE COURT:  All right.  Good morning.

12        So one of the issues that remained was that Mr. Adams,

13 Mr. Frankel, you wanted to have an opportunity to discuss with

14 Mr. Rossini with regard to certain documents.  Have you come to

15 a resolution with regard to that?

16        MR. ADAMS:  Yes, your Honor.  I'd like to make a

17 record of that.  I received some documents yesterday from Mr.

18 Rossini's family regarding checks and other documents he wishes

19 me to introduce into evidence.  I've spoken to Mr. Rossini

20 about it and spoken to Mr. Frankel.  And it's in our

21 independent judgment and legal opinion that such documents

22 would be harmful and detrimental to his case.  And we think

23 that it is best that we do not introduce them into evidence.

24        I've spoken to Mr. Rossini about that, and I intend to

25 rest.  I just want to make sure -- make that on the record.  I'd

1  like Mr. Rossini to acknowledge he's heard that.

2          THE DEFENDANT:  We had the conversation, your Honor.

3          THE COURT:  Okay.  All right.  Very good.  So once we

4  have the jury come in, then at that point you will rest?

5          MR. ADAMS:  Yes, your Honor.

6          THE COURT:  Then we will go right into closings.

7  Okay?

8          MR. NOVAK:  Yes.

9          THE COURT:  So having rehearsed your closing, how long

10 do you think it will be?

11         MR. NOVAK:  No more than 40 minutes, probably closer

12 to 30.

13         MR. ADAMS:  Judge, I cut it significantly.  It should

14 be about 20, little less than 20.

15         THE COURT:  Okay.  All right.  Very good.  Let's just

16 take a short break then until 10:00 o'clock, and then we will

17 bring them in.

18         MR. ADAMS:  Thank you, your Honor.

19     (Brief recess.)

20         THE COURT:  All right.  So I gave you a copy of the

21 jury instructions for this case.  I incorporated the additional

22 changes that Mr. Frankel found in the government's latest

23 version.  And then I added the instructions that defendants

24 proposed pursuant to my rulings on Monday.  Okay?

25         All right.  Let's bring them in.

1          (Jury entered the courtroom.)

2                THE COURT:  Good morning, ladies and gentlemen.

3                Mr. Adams?

4                MR. ADAMS:  Your Honor, Mr. Rossini rests.

5                THE COURT:  Thank you.

6          So, ladies and gentlemen of the jury, we will now

7    proceed with closing arguments in this case.  The government

8    will go first, then the defendant will follow, and then the

9    government will have an opportunity for rebuttal.

10               Mr. Novak?

11               MR. NOVAK:  Thank you.

12           CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

13               MR. NOVAK:  Find me a gold mine and I'll start

14   digging.  These were the words that the defendant, Albert

15   Rossini, said to Bishop Ninos Younan to try and reassure the

16   Bishop that Rossini was doing everything possible to secure his

17   church's investment.  But those words really showed how Mr.

18   Rossini viewed the Assyrian communities of San Jose and Chicago

19   that invested with both him and his bogus investment program,

20   because from the first moment in May of 2011, when Robert

21   Badalian walked into the offices of Devon Street Investments

22   and received the investment pitch from Albert Rossini and

23   Babajan Khoshabe, Mr. Rossini knew he struck a mother lode.

24               And over the last week and a half you've heard how

25   Rossini and his co-schemers carefully, methodically, and

1    relentlessly dug every last ounce of treasure out of those

2    communities, leaving them with nothing but empty promises and

3    worthless paper.

4           And for this reason, Mr. Rossini is charged with two

5    different kinds -- two different types of crimes.  He's charged

6    with 11 counts of wire fraud, and three counts of mail fraud.

7           Now, it's the government's burden to establish each of

8    these charges beyond a reasonable doubt.  And that is precisely

9    what we have done.  But before we dig into the evidence, let's

10   go through a summary of the elements for each of these crimes

11   and some definitions that will be helpful to you in evaluating

12   these crimes as you go about your deliberations, because this

13   is what the defendant -- this is what the government -- this is

14   what the government must prove for you -- to you in order to

15   find the defendant guilty.

16          Soon the Judge will provide you with more detailed

17   instructions.  But for now again this is a summary.  So wire

18   fraud and mail fraud share many common elements.

19          The first three elements are the same.  The government

20   must prove that the defendant knowingly devised, participated

21   in a scheme to defraud as charged in the indictment.  The

22   government must prove that the defendant did so with the intent

23   to defraud.  And the government must prove that the scheme to

24   defraud involved a materially false or fraudulent pretense,

25   representation, or promise, which is a lot of words to describe

1    a simple concept, a lie.

2           The fourth element that the government must prove is

3    where the two charges differ.  For the wire fraud counts, the

4    government must prove to you that for the purpose of carrying

5    out the scheme or attempting to do so, defendant caused

6    interstate wire communications to take place as charged in the

7    indictment.

8           For the mail fraud counts, the government must prove

9    to you that for the purpose of carrying out the scheme or

10   attempting to do so, the defendant used or caused the use of a

11   commercial interstate carrier as charged in the particular

12   count.  We'll go over that at the end what that means.  Okay?

13          Couple more definitions.  A scheme is a plan or course

14   of action formed with the intent to accomplish some person --

15   some purpose.  A scheme to defraud is a scheme that is intended

16   to deceive or cheat another, and to obtain the money or

17   property or cause the loss of money or property to another by

18   means of materially false or fraudulent pretenses,

19   representations, or promises.  Again, lies.

20          In considering whether the government has proven the

21   scheme to defraud, the government must prove that one or more

22   of those false or fraudulent pretenses designed in the

23   indictment -- described in the indictment are charged beyond a

24   reasonable doubt -- or proved beyond a reasonable doubt.  The

25   government, however, is not required to prove all of them.

1          A false or fraudulent pretense, representation, or

2     promise is material if it is capable of influencing the

3     decision of the person to whom it was addressed.  That's what

4     material means.  And a person acts with the intent to defraud

5     if he acts knowingly with the intent to deceive or cheat in

6     order to cause the gain -- a gain of money or property to the

7     defendant or another, or the potential loss of money or

8     property to another.

9          A person acts knowingly if he or she realizes what he

10    or she is doing and is aware of the nature of his or her

11    conduct; does not act through ignorance, mistake or accident.

12    In deciding whether the defendant acted knowingly, you may

13    consider all of the evidence, including what the defendant did

14    or said.

15         Okay.  Got a road map.  Got some ideas.  Let's talk

16    about the scheme here.  Let's talk about the plan.  Okay?

17    Let's turn to it.  Remember, find me a goldmine, and I'll start

18    digging.

19         As you've heard, the scheme started in May of 2011,

20    when Robert Badalian met with Babajan Khoshabe at a family

21    gathering in California.  And at this gathering, Mr. Khoshabe

22    gave Badalian a quick pitch about a new investment opportunity

23    in the Chicagoland area, a real estate investment opportunity.

24         And you heard from Mr. Badalian that he knew Babajan.

25    He knew him as a real estate investor, and he trusted him as a

1   family member, his brother-in-law's brother, and a fellow

2   Assyrian.

3           So Babajan gives his short pitch and says, come out to

4   Chicago.  See for yourself.  You know Mr. Badalian took Babajan

5   up on that offer and made a Chicago trip later that month.  And

6   at that -- during that trip is when he met for the first time

7   with Albert Rossini.

8           And during this meeting with Rossini, Mr. Badalian was

9   given a more complete version of the investment pitch by Mr.

10  Rossini and Mr. -- and by Babajan.  I am going to take a minute

11  now to break down the pitch.  You heard it from all of the

12  investors.  You know that all of the investors testified that

13  they basically heard the same version of this pitch.  Let's

14  break down Mr. Badalian's.  We won't have to break down the

15  rest.  Okay?

16          What's the pitch?  Well, that Rossini or his company

17  had access to these mortgage notes, that the investors will pay

18  money in order to -- for the company to buy the notes, and the

19  investors will get the notes.

20          After the investors invest, Rossini or Devon Street

21  Investments, his company, will begin the foreclosure process,

22  usually through their lawyer, right, Tom Murphy.  That's

23  what -- that was the pitch.  And while the foreclosures process

24  is pending, you know that the -- the investors were told that

25  they would receive an immediate return on their investment

1    because they would receive rental income immediately from those

2    investments.  They would be making money while their investment

3    was pending.

4           And you -- and the pitch had two outcomes:  You either

5    got the deed to the property or a refund.

6           Now remember, the other thing that was told during

7    these pitches was, you can't go into the buildings.  We don't

8    have access to them.  We don't own them.  You can't go into the

9    buildings.  You can see them from the outside, but you can't go

10   in yourself to -- you can't go in yourself to verify.  Trust

11   us.  This is how it's going to work.

12          And you know and you heard that there were variations

13   to the pitch.  Sometimes Mr. Rossini or his people would say

14   they actually owned the notes versus just having access to

15   them.  Sometimes the initial pitch was given by other people.

16   But Rossini was always there to explain it and to answer any

17   questions that the investors had.

18          And to be clear, this pitch is what goes towards the

19   fact that the government has proved those first three elements,

20   the scheme, the plan, the intent to defraud, and those

21   materially false or fraudulent pretenses, representations, or

22   promises, those lies that were contained in this pitch, in

23   every pitch that the investors got, in all the agreements they

24   signed.  And we'll go over -- just put -- want to put -- for a

25   minute.  We'll go back to that before we're done talking today.

1    Okay?

2              But of course, Badalian, Mr. Badalian, didn't have all

3    the information at the time.  All he knew was that he was

4    getting an investment pitch from a family member, a trusted

5    family member, a family member's business partner.

6              So what happened?  Simple.  Mr. Badalian invested.  In

7    May two properties, about $117,000 paid into this bogus

8    investment program.  You saw, as all the witnesses did,

9    testified, he wrote his cashier's checks.  And on the checks,

10   he put those property addresses of the properties he thought he

11   was investing in, along with the PIN numbers, because it seemed

12   legitimate to him, and this seemed like that was how you

13   identify the property that you're investing in.

14             He signed the guaranty agreement with Mr. Rossini that

15   said that Mr. Rossini had written assignments to acquire those

16   notes.  That Badalian, and just like all the investors, was

17   investing money to purchase those properties.  And that once

18   the property was closed, that title would be transferred to

19   Badalian or his -- whoever he directed it to go to.  But he

20   would get the title.  Right?  And if that didn't happen, what

21   does the guaranty agreement say?  There is a refund.  We'll

22   refund your investment.

23             And who signed the agreement?  Who signed all of these

24   guaranty agreements?  Not Babajan Khoshabe, not Thomas Murphy,

25   not anybody else at Devon Street Investments.  One person

1    signed those guaranty agreements, and that one person was the

2    defendant, Albert Rossini.

3              And what's the point of the pitch, and what's the

4    point of the guaranty agreement, ladies and gentlemen?  It's

5    simple.  It's to make people feel comfortable enough to give

6    money to people that they trust.  It's to build that trust to

7    get that money.  And that's what happened, right, because after

8    Badalian we're off to the races.  Badalian invests again in

9    June, one property $75,000.

10             He also gets his first, quote unquote, rent payment.

11   He thinks this is legitimate.  He's getting that rent that he

12   was promised.  Right?  But you know -- and we'll talk about

13   this in a minute -- there were no rents.  Tom Murphy never

14   collected rents.  There were no rents collected.  This is Mr.

15   Badalian's money being paid back to him in the form of what you

16   call a Ponzi payment.  Mr. Badalian is investing to repay

17   himself.

18             But again, he doesn't know that.  The other investors

19   don't know that.  In July and August, Mr. Moghadassi invests

20   along with the Assyrian Evangelical Church in San Jose.  Mr.

21   Badalian invests again, and almost a quarter million of dollars

22   goes into the bogus program.

23             In September almost $200,000 goes into the program.

24   In October another 90,000.  In December that's a good month.

25   We get a couple new investors that we see.  Not only Mr.

1    Moghadassi, not only the church, but Kathy Khodi who for the

2    first time invests over a hundred thousand dollars.

3              And there's a slight change in the focus of the

4    investment, the bogus investment program, because now it's not

5    just focusing on people in California.  Local people begin to

6    get involved.

7              You heard from Mr. Yousif and from Reverend Pithyou

8    about the Christmas dinner where Babajan was there and gave

9    that similar pitch.  Would you like to make more money?  I know

10   somebody that can help you make more money.  I am investing

11   with someone.  I have a business partner.

12             Who's that partner?  Albert Rossini.  Come in.  See

13   him.  Let's get investment together.  And you know that's what

14   happened because the reverend and Ibrahim Yousif invested

15   180,000 combined that month.

16             Reverend Pithyou continued to invest another $160,000

17   in January right away.  And let's talk about that property that

18   the reverend invested in, that property on North Richmond.

19   Again, remember the guaranty agreement says that Mr. Rossini

20   has written assignments of rent, written -- the written ability

21   to get those rents, those notes, together.  He has access.  He

22   is warranting.  He's promising that he has access to that.

23             But you know that's not true because you heard from

24   the owner of Richmond.  You heard from Mr. Dela Cruz who said

25   that building had been in his family since 2006.  Never was for

1    sale.  Never -- never heard of Rossini.  Never heard of Devon

2    Street.  Never heard of Murphy, Babajan Khoshabe.  Never heard

3    of any of the people involved in the case.

4            And you also heard a stipulation, which is an

5    agreement between the parties as to what the bank -- an

6    agreement between the parties what facts are.  And you heard

7    that if the bank representative was to testify they'd say, they

8    originated the mortgage to the Dela Cruz family on January 12

9    of 2012.  That's when that mortgage originated, which is about

10   a week before Pithyou signs that -- that guaranty agreement.

11           And they never heard of Devon Street Investments.  The

12   bank never heard of Devon Street Investments or Rossini.  Again

13   lies, just a lie, just a lie to get the reverend depart with

14   his money, which he did.  And you know the reverend said he got

15   those rent payments from both Murphy and from that Reliant

16   Management, the management company that's supposedly collecting

17   rents.

18           But again, what did Dela Cruz tell you on the stand?

19   Who collects the rents for Richmond?  Mr. Dela Cruz does.  He

20   does it because his daughter is too busy, and that's what he

21   does.  That's his job is to collect the rents.  He is the only

22   person who collects the rents.  Those rent were never collected

23   by anybody.  That is Mr. Pithyou's money, Reverend Pithyou's

24   money, being paid back to him in the form of a Ponzi payment.

25           But let's move on because the investment scheme moved

1    on, right?  In February, $860,000 being paid by the investors.

2    March, over half a million dollars goes into the bogus

3    investment program.  April, over $450,000 goes into the bogus

4    investment program.  May, the church St. Odisho invests its

5    $300,000 into the bogus investment program.  June, over a

6    quarter million dollars goes in.  And in July, Mr. Moghadassi

7    invests that $375,000.

8            Now, we talked a lot -- let's just take stock of what

9    you heard from the witnesses who testified and what they were

10   doing for that 14-month period, how successful this bogus

11   program was, right?  You heard about ten investors.  They

12   invested in about 41 properties, or so they thought.  And they

13   paid in almost $4.4 million into that bogus investment program.

14           But what happens in July?  What starts to happen is

15   that the wheels start to fall off of the scheme.  The wheels

16   start to fall off of the success, right?  It starts to fall

17   apart because the rents start becoming late or inconsistently

18   paid, the quote unquote rent payments.

19           And as the investors complained and those complaints

20   pile up, the excuses pile up.  There is a new system.  Reliant

21   Management is no longer.  We have a new management company.  We

22   have new this.  Just let our new system figure it out.  Oh, Mr.

23   Murphy is too busy.  Our lawyer is too busy getting things done

24   to get the paperwork right.  Just do it.

25           But as those excuses stopped working, then they start

1    changing a little bit.  It goes from Murphy is too busy to
2    Murphy did nothing.  Murphy stole.  Murphy did nothing.  But
3    the complaints keep piling up.  And Mr. Rossini can't keep
4    those investors at bay.  They want their money.  They want what
5    they get -- they want what Mr. Rossini has guaranteed them,
6    what he's promised them.

7              So how to deal with these issues?  A new tack, another
8    new tack.  April 2013, here is the idea.  April 10, let's file
9    that complaint for accounting, that lawsuit.  Rossini files
10   that lawsuit against Thomas Murphy saying, Murphy doesn't have
11   the papers.  I want the accounting.  This is the first step to
12   a malpractice suit, ladies and gentlemen.  It will take a few
13   months but -- investors, it will take a few months, but this
14   will be done.  Trust me.

15             This is the complaint for accounting.  Murphy screwed
16   up.  Murphy stole.  Murphy is an incompetent.  We can't -- of
17   course can't say that he stole because the -- his malpractice
18   insurance won't pay out if we accuse him of fraud.  But he was
19   negligent, but he essentially stole from me.

20             But what do you know about that account -- that
21   lawsuit after listening to the testimony that the investors did
22   not at the time?  That lawsuit was bogus.  That lawsuit was a
23   sham.  That lawsuit was designed to keep those people at bay,
24   to keep Rossini from paying them back.

25             How do you know that?  Well, couple reasons.  You

Novak - closing

1    heard from Murphy.  He told you it was a sham lawsuit.  He told

2    you he sat in on a meeting in I think it was June of 2013, with

3    Rossini and with Kruse.  And they discussed -- Kruse, Richard

4    Kruse, being the attorney that filed the lawsuit.  There were

5    frank discussions about what the purpose of this suit was.

6         And the purpose of the suit was to buy Rossini time to

7    make good on his promises.  And the Judge will tell you, and

8    you know, that Murphy testified under a cooperation agreement.

9    And you need take his testimony and view it with special

10   caution.  And you should.

11        But you don't have to take Murphy's word for the fact

12   that this was a bogus lawsuit.  You have the records and you

13   know that timeline because you know that ten days after that

14   complaint for accounting is filed, ten days after Rossini

15   accuses Murphy of neglect -- negligence, incompetence, fraud,

16   what happens?  Well, wait a minute.  Murphy -- Rossini asked

17   Murphy to incorporate a new company, Rockford Commercial.  Ten

18   days later, this incompetent attorney, hey, incorporate a

19   company for me on your way out of town.

20        And that's what Murphy does.  Why is Rockford

21   incorporated brought -- Rockford Commercial incorporated?  You

22   know this:  It's to get more money from Kathy Khodi.  You heard

23   Ms. Khodi testify that in the spring of 2013, she was asking --

24   complaining like the other investors about her -- the status of

25   her investments.

1          Rossini's response was to say, invest more money with

2   me.  And she's, I'm not going to do that.  Make good on your

3   first promises before we move on to the next ones.

4          And what does Rossini tell her?  You're not investing

5   with me.  You're buying properties directly from a seller.  I

6   am brokering the sale.

7          What does Ms. Khodi think?  Murphy is not involved in

8   this.  She thinks Rossini is not involved in the actual

9   company, that she is just -- he is just acting as a broker.

10  It's a safe investment.

11         And Murphy told you, that was the point of Rockford

12  Commercial is that they needed a way to get more money from

13  Kathy Khodi.  But it can't be involved with the prior scheme.

14  It can't be involved with Devon Street.  It can't be involved

15  with my name or your name or anybody's name that she knows

16  there is problems with.

17         The only problem with Rockford Commercial, which he

18  incorporates and he opens a bank account for, is that of course

19  Murphy screwed it up the first time because he put his name

20  there.  And that just wouldn't do.  That just wouldn't do.  You

21  can't have Murphy -- your name can't be here.  I'm suing you.

22  Rossini is suing Murphy.  He can't -- his name can't be on

23  there, that that looks strange.  That doesn't make sense.  Why

24  would the guy that I'm suing be incorporating my companies for

25  me?

1        So what's -- what's the solution?  You know this.

2    May 17, Rockford Commercial Mortgage Company, a new company,

3    incorporated by Murphy.  His name is not anywhere on it.  Just

4    in time it's incorporated because what happens?  May 20 Ms.

5    Khodi sends that first wire in of $395,000.

6        What happens to the money?  Well, again, Rockford

7    Commercial account, Murphy told you, he's the sole signatory on

8    the account.  He's got to write the checks.  But he writes the

9    checks, as he wrote every check in this case, at Rossini's

10   direction.

11        And within the same day that the wire comes in, one,

12   two, three, four, five, six, seven checks are written at

13   Rossini's direction.  Three of them directly to Rossini, two to

14   Devon Street Investments, one to that guy Mr. Aiyash, who

15   Murphy told you Rossini owed money to.  Had to pay that guy

16   off.  Had to pay that guy back.  That money is gone within

17   three days.

18        But the lawsuit continues, right?  The problem with

19   the lawsuit, as Murphy told you, is that his job is not to

20   handle the papers.  Hard to give an accounting if you are the

21   person who doesn't have the papers.  Rossini has all the

22   papers.  Rossini has all the paperwork.

23        How do you get around that?  Easy.  You saw.  In June

24   Mr. Rossini sends an e-mail, here is your accounting, quote

25   unquote.  Here is the information you need to answer my

1     lawsuit.

2           Review again from Rossini to Murphy, more of those

3     papers, more of that information that the only person that has

4     the information is Rossini.  Murphy's job is to write checks.

5     That was his job.

6           And important, right, don't screw up again, Murphy.

7     Don't screw up like you did by incorporating that first company

8     and using your name.

9           What does he say after he sends -- the same day that

10    he sends those first two e-mails with the papers with the

11    accounting information?  Do not forward what I sent you.  Send

12    under your own e-mail.  People can't know we're working

13    together.  That's the point of that -- of that e-mail.  Don't

14    screw up again, Tom.  You screwed up already with Rockford

15    Commercial and Rockford -- that first thing, you had to redo

16    it.  That's June.

17          But of course, things continue into July because Mr.

18    Khodi wires another $225,000 into the Rockford Commercial

19    account.  That money is immediately spent.  Three checks to

20    Bert Rossini, one check to that Lior Coresh, who you heard.

21    That money was used to buy those Riverdale condos that never

22    went into Ms. Khodi's name despite her repeated asking for

23    those titles.  But that money is spent again within three days.

24          We get to August of 2013, what happens?  Well, you

25    heard about the August 8 meeting between Mr. Rossini, Rich

| | |
|---|---|
| 1 | Kruse, Bishop Younan and Ashoor Pithyou, right, at Devon Street |
| 2 | Investments.  What's the point of that meeting?  Go discuss the |
| 3 | lawsuit, to discuss how they are going to -- Rossini is going |
| 4 | to make sure that Murphy makes a full accounting, makes a full |
| 5 | accounting in that malpractice, and that Murphy pays for his |
| 6 | mistakes, right?  And the accounting. |
| 7 |         What was discussed there?  The tenor of the lawsuit, |
| 8 | the fact that what?  Murphy wasn't cooperating anymore. |
| 9 | Remember?  You don't have to take the Pithyous word for it |
| 10 | because you have the recording.  You heard what Rossini |
| 11 | actually said. |
| 12 |         What did he say about his cooperation with Murphy and |
| 13 | his relationship with Murphy at that point?  Yeah, he, meaning |
| 14 | Murphy, started off cooperating, and then, boom, cut it off. |
| 15 | Those are words designed to make the listener think one thing. |
| 16 | Murphy and Rossini are no longer talking to each other.  They |
| 17 | are not in contact anymore.  It's designed to conceal what's |
| 18 | really happening. |
| 19 |         Because what is really happening?  It's designed to |
| 20 | conceal those Rockford Commercial disbursements from May and |
| 21 | June, May and July.  It's also designed to conceal that next |
| 22 | disbursement two weeks later from the Kathy Khodi's next wire |
| 23 | of $184,800.  What happens?  Six checks immediately payable to |
| 24 | Bert Rossini, over $144,000.  That money is spent.  Pretty good |
| 25 | for -- pretty good communication for a guy that cut off |

1    contact.

2          And you know that after August, the investments stop

3    coming in from these investors.  But the lies continued, and

4    Mr. Rossini kept repaying with excuses and lies.  Your deed's

5    not coming in.  Your title is not here.  Your money is not

6    there.  The lawsuit continues, right?  You've heard and heard

7    and heard that the lies continued and the stringing these

8    people along continued after August of 2013.

9          So I spent a bit of time discussing the scheme itself.

10   And they -- let me take a minute again, like I said.  I'll go

11   over some of the lies, some of those materially false and

12   fraudulent pretenses, representations, or promises that Mr.

13   Rossini made in furtherance of the scheme that he made here,

14   right?

15         What are the lies, right?  And what did Mr. Rossini

16   say in that August recording about lying?  It's hard for

17   somebody to keep talking and keep saying something if in

18   reality they didn't do something.  Not exactly the case here

19   because what does Mr. Rossini say and what is reality?

20         Well, again, early he said, he owned notes or had the

21   ability to purchase the notes, those mortgage notes.  They

22   didn't.  That's not true.

23         The investor money was used to purchase properties.

24   And you know that overwhelmingly wasn't true.  The investor

25   money went to paying the investors back in Ponzi payments and

1    went to paying Mr. Rossini, went to paying co-schemers'

2    expense.

3              That titles would be transferred to investors.  You

4    know that they got some titles, but only three were transferred

5    of all those titles.  Rossini kept the rest.  That money would

6    be refunded upon request.  And you know there were almost no

7    refunds.  The one you heard about was for Mr. Yousif, who had

8    to sign paper after paper and not take a full refund.  He got

9    the -- those commission payments taken off of it.  So even then

10   that wasn't exactly as described.

11             That Devon Street Investments or Murphy would initiate

12   foreclosure process for the investors.  You know there are

13   almost no foreclosures.  That Murphy stole the investor money.

14   You know that's not true because we know Rossini took the

15   money.  You saw the charts.  We'll talk about the money in a

16   minute, but you know most of the money here went to Rossini.

17             Mr. Rossini says, Murphy tells people Murphy has sole

18   control over the money.  But you know the money was disbursed

19   solely at Rossini's direction.  You saw those -- you saw those

20   charts from Kathy Khodi's disbursements, from the Rockford

21   Commercial account.

22             Only one person signing the checks on that account,

23   and that's Tom Murphy.  And for a guy who's suing another guys,

24   he's writing an awful -- getting sued by Bert Rossini, he's

25   writing him an awful lot of checks.

1        That Murphy was a crook, an incompetent or both.

2   That's what he tells anybody that will listen to him to try and

3   move the -- keep these investors at bay.  But you know that

4   Murphy and Rossini continued to do business long after the

5   lawsuit was filed.  Rockford Commercial, the bank accounts,

6   Kathy Khodi's money in the spring and summer of 2013.

7        Again, Rossini says he filed the lawsuit against

8   Murphy to keep -- really get to the bottom of what was

9   happening.  But you know that lawsuit was a sham.

10       Let's talk about those rents, those Ponzi payments.

11  Again, you heard from two of the property owners, and we talked

12  about stipulations to the rest.  We'll talk about those.  But

13  the rents for Richmond, that's Mr. Dela Cruz.  He's the only

14  one that's collecting the rents.

15       You heard about Karlov.  You heard from Mr. Alic, who

16  went and spoke with Mr. Rossini, but not to sell him his

17  property.  To get a loan modification so he could stay in his

18  homes.  That's why he went there.  And you saw what Mr. Rossini

19  did with that information.  He used it to get other people and

20  to sell that investment in that note.

21       And again, you heard the property owner and bank

22  stipulations there.  Over and over again the property owners

23  and the banks that were involved in these properties

24  legitimately had not heard of Albert Rossini, Thomas Murphy,

25  Babajan Khoshabe, or Devon Street Investments.  That was a lie.

1    And to top it off, Murphy told you, I didn't collect rents.

2    That was not my job.  No rents were collected.

3           So why did you do -- why -- why did this happen?  It's

4    easy.  It's money.  Again, they only believe in George

5    Washington.  That's Mr. Rossini of course talking about the

6    insurance company in that recording.

7           But I think you will see it applies to other things

8    because you heard from FBI analyst Sandra Prescott, the

9    forensic accountant who showed you, between May 24 of 2011 and

10   August 31 of 2013, $7.3 million of investment money was paid

11   into the bogus scheme by investors.  And you saw of that money

12   two and a half million went back to investors as those fake

13   rent payments.  We'll talk about that in a minute.  And two and

14   a half million dollars went directly to Bert Rossini.

15          You know how he spent that money.  We talked about

16   currency exchanges.  That's just one currency exchange where

17   Mr. Rossini literally cashed in almost a million dollars of

18   investor money in that timeframe, from just one currency

19   exchange.

20          And again, you saw that list of investors who paid in

21   and got their money back overwhelmingly as rental payments,

22   paying themselves on their investments, because there weren't

23   real rents being collected.  And you saw the shortfall that

24   almost every one of those investors had.

25          Again, ladies and gentlemen, you saw what happened

1  with that money.  Ms. Khodi's examples being ones that I'll

2  talk about right now, how on May 20, 2013, the money comes in.

3  It's immediately spent.  On July 12, 2013, Ms. Khodi's money

4  comes in, gets wired in.  It's immediately spent, within three

5  days.

6         And how on August 22, 2013, Ms. Khodi's wire comes

7  into commercial -- Rockford Commercial's account, and is

8  literally spent the same day.  $144,000, directly to Mr.

9  Rossini.

10        Now let's talk about the actual counts that you'll be

11 considering here, and that's where that fourth element comes in

12 about wire fraud being interstate wires, mail fraud being

13 interstate carriers.  Gonna put up -- let's talk about the wire

14 fraud counts first.

15        So this chart will show you the count, date of the

16 count and what the type of wire is, right?  Count 1 you're

17 going to consider is from a June 14, 2012 e-mail, sent by

18 Rossini in Illinois to Mr. Nastors Moshi in Arizona.  That's

19 Exhibit Moshi 5.  That's where you see that wire.  Because

20 e-mails you will -- the Judge will instruct you that e-mails

21 are type of wire communication.

22        You're going to see on Count 2 that on July 16, 2012,

23 there was an e-mail sent from Rossini to Ashoor Pithyou that

24 routed through that computer server in Virginia.  That's that

25 AOL e-mail.  I read a stipulation a day or two ago.  The

1    parties agree that that type of e-mail is interstate in nature,

2    was interstate in nature type of e-mail.  That's Exhibit

3    Ashoor 1.

4           Counts 3, 6, and 8 involve three specific ACH

5    transactions, or those -- those basically wire transactions,

6    from Devon Street Management to Kathy Khodi or to Reverend

7    Pithyou.  You'll find those, the actual transactions,

8    summarized there in that DSM Chase 9628 Chart.  And the -- and

9    the government read a stipulation.  They agree that those --

10   the parties agree that ACH transactions are of an interstate

11   nature.  Those are in the stipulations.

12          No. 9 is an April 13, 2013 e-mail sent by Rossini to

13   Bishop Younan, routed through a computer server in California.

14   That's one of those gmails.  Again, another stipulation.  The

15   parties agreed that that e-mail is of an interstate nature.

16   That's in Younan 9.

17          Ten, is the May 20 wire transfer from Kathy Khodi to

18   that Rockford Commercial account in Illinois.  That's at Khodi

19   5/20/2013.  And the Judge is going to tell you again -- I

20   expect the Judge will instruct you that Mr. Rossini, then the

21   defendant, need not actually personally -- or personally use

22   the interstate carrier or the wire communication facility.

23   Okay?  So that's one of them.

24          No. 11, May 22, another e-mail from Bishop -- from

25   Rossini to Bishop Younan, another gmail going through

1   California.  That's Younan 8.

2          Twelve is another one of the wire transfers on

3   July 12, from Kathy Khodi to Rockford Commercial.  That's Khodi

4   7/12/2013.

5          Thirteen is the August 22 wire transfer from Kathy

6   Khodi to Rockford Commercial.  And that's at Khodi 8/22/13.

7          Fourteen, Count 14, is the March 28, 2014 e-mail from

8   Mr. Rossini to Bishop Younan.  And you'll find that e-mail at

9   Younan 10.

10          Let's talk about the mail fraud counts.  There are

11   three of them.  Count 4 is the July 24, 2012 Fed Ex sent by Mr.

12   Rossini in Illinois to Albert Khamis in Arizona, containing the

13   invoice and the money order.  That's at Khamis 3.

14          Again for Fed Ex, there is another stipulation,

15   agreement, between the parties that Fed Ex is an interstate

16   carrier, right?  And the parties agree that Mr. Rossini

17   actually sent those Fed Ex's and Mr. Khamis testified about the

18   contents.

19          Count 5, August 22, 2012, Fed Ex from Rossini to

20   Khamis containing a check.  That's at Khamis 4.

21          And Count 7, November 13, 2012 Fed Ex from Rossini to

22   Khamis containing another, quote unquote, rent check, really

23   just Mr. Khamis' money being paid back to him.  That's at

24   Khamis 5.

25          Find me a gold mine, and I'll start digging.  Over the

Adams - closing                                948

1    last week and a half you have heard how Rossini and his

2    co-schemers hit the mother lode when they convinced the

3    Assyrian communities of San Jose and Chicago to invest in their

4    bogus investment program.  You heard how those people

5    treated -- trusted Rossini with their hard-earned money, and

6    were -- that trust was repaid with empty promise, lies, and

7    excuses.

8           Now it's time for you to evaluate the case.  The

9    government asks that you review the evidence, apply the law,

10   and return the only verdict that's warranted.  That's a verdict

11   of guilty as to all counts.

12          Thank you.

13          THE COURT:  Thank you, Mr. Novak.

14          Mr. Adams?

15          MR. ADAMS:  Thank you.

16           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17          MR. ADAMS:  Good morning, ladies and gentlemen of the

18   jury.

19          The events in this case occurred between 2011, 2012.

20   During that time, we all know there was a significant economic

21   downturn in the real estate market all over the country.

22   Chicago is no different.  Real estate prices tanked.

23   Properties could be bought at a discount.  Along with this --

24   the discounted properties came foreclosures.  With these

25   foreclosures came the opportunity for investors to buy notes at

1    discounted price and sell them.

2            And that was Albert Rossini's business plan.  And to

3    execute this plan, he needed investors and he needed an

4    attorney.  For the investors you heard that Babajan Khoshabe

5    had a friend named Ibrahim Yousif.  And Yousif had contacts in

6    the Assyrian community and solicited investors.  And for his

7    efforts he received over $100,000 in commission payments.

8            The second part was that Mr. Rossini needed an

9    attorney, lawyer to institute foreclosure proceedings, transfer

10   title, more significantly obtain these properties.  That's

11   where Thomas Murphy enters the story.

12           But little did Mr. Rossini know, Mr. Murphy had his

13   own plan.  That plan was to treat Mr. Rossini's business as a

14   piggy bank to withdraw funds, to take funds for his own use,

15   and to lie to Mr. Rossini, to lie to the investors.

16           Mr. Murphy held himself out and acted as an attorney

17   for Mr. Rossini.  You saw e-mails between Rossini and Murphy

18   discussing guaranty agreements, promissory notes and

19   investments.  Mr. Rossini asked for certain language in these

20   property agreements.  Mr. Murphy gave his legal expertise.

21           And most significantly, these checks that we saw were

22   all addressed to Thomas Murphy.  They're addressed to Thomas

23   Murphy with the property address and a property identification

24   number, that PIN number.  And there is a reason for that.  That

25   reason is because those payments were supposed to be for the

Adams - closing                                    950

1    purchase of these notes.  Why else would they have the property

2    address on there?  Why these would they be made out to Thomas

3    Murphy, attorney agent?  Was not to Bert Rossini; made out to

4    Thomas Murphy.

5            Now, remember Mr. Murphy's testimony.  He said that he

6    was surprised when he started receiving checks in the mail.

7    Now, I don't know about you.  But the average person, if they

8    start receiving six-figure checks from people that they, quote,

9    have never heard of, they don't deposit them in their bank

10   account.  They don't keep them.  They don't say, huh, it's

11   weird.  I'm going to keep $100,000.  Nobody is that lucky.

12           So what did Murphy do?  What did he not do?  He didn't

13   call these investors.  He didn't send the checks back.  He

14   pocketed them.  He kept them for himself, and he put them, as

15   he said, in his personal bank account.  And when asked why by

16   the government, he said, I don't know.  Frankly that's a

17   foolish and ridiculous response.  He does know.  The answer is

18   greed, and that's why he did it.

19           And the only evidence the government has shown you

20   that those checks were for some other purpose other than to buy

21   property is Thomas Murphy's statements that they were.  And his

22   statements about why all this is not his fault, it's Albert

23   Rossini's fault, the timing of these are very curious.

24           Let's be -- and we'll get back to that later on.  But

25   let's be very clear about one thing:  Thomas Murphy testified

1    for one person and one person only:  Thomas Murphy.  Just like

2    the rest of his life, the only thing he cared about, the only

3    person he cared about was himself.  He cared about money.

4    Everyone else, you're on your own, especially Albert Rossini.

5            Now I want you to think back to when Mr. Murphy

6    testified.  I want you to think about this plea agreement he

7    has.  I want you to imagine it's in his back pocket because

8    when he's testifying, in the forefront of his mind is, he wants

9    the government to believe him.  He needs the government to

10   believe him.  Otherwise he is going to prison for a very, very

11   long time.

12           And you saw this chart, this sentencing guideline

13   chart, that I showed you, and it has numbers about how long he

14   will be in prison for.  If Mr. Murphy did not testify, Mr.

15   Murphy did not plead guilty, he was looking at nine years in

16   prison.  Because of the statements he made to the government

17   and because of his testimony, the government is going to ask

18   for about four and a half years.  That's cutting his time in

19   prison in half.

20           I want you to ask yourselves when you're back in the

21   jury room, what would Thomas Murphy do for four and a half

22   years of freedom?  We already saw what he'd do for money.  He'd

23   throw away his law license.  What would he do for four and a

24   half years of life, of freedom, not behind bars?

25           Murphy represented Mr. Rossini as an attorney at his

1    law firm.  He held himself out as an attorney with three

2    decades of legal expertise.  Even had a billing code for Mr.

3    Rossini, billed him through his firm.  The checks that Mr.

4    Rossini deposited and he wrote out were from his firm.

5          And again, remember what the investors said.  The

6    investors said, supposed to make them out to Thomas Murphy.  It

7    is incredulous to believe that those checks just appeared in

8    Thomas Murphy's doorstep without any explanation, any reason.

9    He knew exactly what they were doing, but he had other plans.

10   He had other motives.

11         Now, the first time Mr. Murphy ever mentions that

12   these checks that were addressed to him were really for Albert

13   Rossini is after he's arrested and after he decides to

14   cooperate.  If it was really the truth, he would have -- as an

15   attorney, he would have sent those checks back.  He would have

16   said something long before it was in his best interest to do

17   so.  And I'm going to talk about the jury instruction you're

18   going to get a little later about Thomas Murphy's testimony.

19         And also most significantly Mr. Murphy was at a

20   meeting September 2012.  At that meeting Albert was there,

21   Reverend Younan was there, and the Pithyous were there.  And at

22   that meeting Murphy said, the reason you don't have the deeds

23   is because they are being held up in the court system.  Again,

24   little did Mr. Rossini know, Mr. Murphy was completely lying to

25   everybody.

Adams - closing                                953

1          Now, government says that somehow this was a scheme

2   between Murphy and Rossini.  The only evidence that's a scheme

3   between Murphy and Rossini again rests on Mr. Murphy's

4   shoulders and all that he has to gain by saying this.  Because

5   if it's not a scheme and if he's hang up -- if he's doing it on

6   his own and he went rogue and decided to kept the money for

7   himself, he is not getting four and a half years.  He's getting

8   nine, maybe even more.

9          Let's talk about the lawsuit.  Lawsuit is filed in

10  April 2013.  And again, the first time that Thomas Murphy ever

11  says that this lawsuit is a fraud or a sham is after he gets a

12  deal from the government, after he has an incentive to say it

13  is.  His statement, his testimony, is completely and utterly

14  worthless.

15         If it was a sham and he is a lawyer, then he would

16  have filed a motion to dismiss the case.  He would have

17  contacted law enforcement.  He would have done something other

18  than just not go to court.  And remember what he said when he

19  heard about the lawsuit.  He was, quote unquote, furious.  He

20  was so mad that he got sued, that he did nothing.  Again,

21  another implausible, incredulous and unbelievable statement by

22  Thomas Murphy.

23         If I spend a lot of time talking about Thomas Murphy

24  this morning, it's because he is the only linchpin in this case

25  tying all these facts together.  If the only evidence they have

Adams - closing                                954

1   is that Thomas Murphy said so, that's reasonable doubt.  If the

2   only evidence they have that these checks were really not for

3   property, even though it says it on the checks, that's

4   reasonable doubt.  There is enough reasonable doubt that the

5   government has not met their burden and you must acquit Albert

6   of all the charges that were -- have been levied against him by

7   the government.

8            I consider it an honor and a privilege to come to this

9   courtroom, to this building, every day and practice.  And I

10  think about the sacrifices that were made, sacrifices I made to

11  stand here today.  And I believe all the attorneys in this room

12  think that they hold themselves out as, we like to say, as

13  officers of the court.  We have an obligation to administer

14  justice, to provide truthful, honest testimony, to make sure

15  the court system is moving along smoothly.

16           Unfortunately, Thomas Murphy felt different.  He threw

17  all of that away.  He threw away years of hard work, decades of

18  trust of his family, his friends.  And for what?  To line his

19  own pockets.  I think that's been made evidently clear by the

20  government's evidence this week and this past week.

21           To Mr. Murphy oaths he takes, the oath is nothing but

22  words.  They're not anything to live by.  They don't mean

23  anything.  They're empty promises.  Things he says to get by to

24  get what he wants.

25           And how do we know that?  There have been three

1    instances when Mr. Murphy was called upon to act truthfully, to

2    tell the truth, and to be honest.  And each time he failed.

3    What were those times?  Let's talk about his ARDC complaint,

4    his ARDC disbarment.

5            As you heard, getting disbarred doesn't happen

6    overnight, doesn't happen because you make one or two mistakes

7    or a lapse in judgment.  It's the result of choices, years of

8    choices, of dishonesty, of deceit, of lies.  That's what Thomas

9    Murphy did.  He lied not only to his clients but to his family.

10           And you remember what he said.  He was the executor of

11   a trust, this Cgnonia trust.  And he said, that was the

12   grandmother of his wife.  And what does he do when he's

13   entrusted with the financial legacy of his wife's grandmother?

14   He decides to take a loan out to a company he represented

15   already.  And by the way, he also loaned that other company a

16   hundred thousand dollars from his own personal bank account.

17   So he has a vested interest in paying that company back so he

18   can get paid back.

19           But before he did all that, he made sure to take

20   $15,000 from himself.  And when confronted with that fact, he

21   still thinks today he's entitled to that money, even though the

22   ARDC had a finding, after hearings, after evidence, after

23   testimony, that he was not, that he acted in violation of his

24   oath as an attorney, as a lawyer that he took all those years

25   ago.  They found he was not entitled to it.  And he sits there

1    saying, no, that was mine.  I deserve this.  Again, Thomas

2    Murphy looks out for Thomas Murphy.

3         And what else did he do?  There is another trust.  The

4    Sanial family trust.  He took money from there too.  And when

5    called upon to show proof of bills, and proof that he actually

6    did the work, he submitted nothing.  And when confronted with

7    that evidence, he remained absolute, and he remained defiant

8    that he did nothing wrong, even though the regulation board of

9    attorneys in this state disbarred him.  He is not allowed to

10   practice law anymore because of all of the terrible, dishonest

11   things he has done.  But, no, it wasn't his fault.  He takes no

12   responsibility for anything that happens to him.

13        Second thing, the bankruptcy petitions.  You saw the

14   bankruptcy petition that he signed.  It says, under the penalty

15   of perjury, he certifies everything in this document is

16   correct.  He knows where it's going.  It's going to a

17   bankruptcy -- going to a court of law in this building.  And

18   he's certifying to this -- to a judge, your Honor, everything I

19   am saying in here is true and accurate.

20        Again, these are words that mean nothing to Thomas

21   Murphy.  Oaths, truths, honesty are just ways for him to get

22   more money.  Means nothing.

23        And you saw what those lies were in those bankruptcy

24   petitions.  He lied about his home address.  We heard why

25   that's significant, because if you don't put your home address

1    on a bankruptcy petition, the creditors can't find how much

2    money you owe.  Makes it harder to find out what your debts are

3    to get that bankruptcy resolved.

4           He also declined to put how much money he makes.  He

5    put zero.  It's a lie.  He's telling the court that it's the

6    truth.  He took an oath in front of you last week and said to

7    tell the truth.  Why should today be any different than the

8    past 30 years of Thomas Murphy's life?  And the answer is, it

9    hasn't and it won't, and it was not.

10          And the second time he filed a bankruptcy petition, he

11   said, oh, I just trusted my lawyer.  He said everything was

12   fine.  I believed what he said.  And, you know, I hope that

13   sounded familiar to some people here.  And he let his lawyer

14   sign his name.  Again, a document that he's swearing is the

15   truth, he doesn't care what's in it.  He didn't care what the

16   truth is.

17          To Thomas Murphy the truth is a fluid idea that

18   changes with his needs.  And it changed with his needs in court

19   because he -- again, bears repeating, he does not want to go to

20   prison.  He will do and say whatever it takes to stay out of

21   prison.

22          And most importantly, most importantly, he admits to

23   lying in this case.  He admitted to committing a fraud in this

24   case.  And he admitted that he should have been disbarred for

25   his actions in this case.  Powerful, powerful evidence that

1    Thomas Murphy cannot and should not be trusted.

2            Let's talk about that plea agreement.  We'll come back

3    to that, come back to that now.  That plea agreement states

4    that in the government's opinion if Thomas Murphy told the

5    truth, they are going to give him 33 percent off, a significant

6    reduction in his time.  Again, it's another two years off.  He

7    will scratch and claw for whatever benefits him.  And everyone

8    else is thrown into the wind, especially Albert.

9            You are going to receive a jury instruction that says,

10   you should regard Mr. Murphy's testimony with what's called

11   caution and great care.  And that's significant because Mr.

12   Murphy is not like any other witness in this case, not like the

13   FBI agents, not like the investors, not like the homeowners.

14           He has a personal vested interest in this case.  He

15   has a personal interest in the government believing him.  And

16   he has an interest in staying out of prison.  That alone should

17   render his testimony unreliable.  And without his testimony,

18   that's reasonable doubts.  That's reasonable doubt as to the

19   purpose of the checks.  And it's reasonable doubt as to the

20   purpose of the lawsuit.

21           Again, those statements about the checks and the

22   lawsuits do not come out until after the government agrees to

23   help him out.  You have to wonder why -- if it's the truth and

24   Mr. Murphy is an honest person, the government wants you to

25   believe, why didn't he say something earlier?  Because it

1  didn't benefit him to make up that story until later, until

2  2016.  The events here happened in 2013.  He had three years to

3  say something, and he remained silent.

4       He gets caught.  He thinks you know what?  I'll tell

5  the story.  I'll run to the government first.  I'll make up a

6  story.  It fits with their theme.  They'll give me a deal.  I'm

7  going home in four years.

8       And it's hard not to be moved by the investors in this

9  case, right?  I mean, they lost a lot of money.  They thought

10  they were buying property.  Thomas Murphy lied to them.  But

11  it's important to judge the case on the facts and without our

12  hearts, which is a hard thing to do.

13       But the facts don't show that the government has

14  proven Mr. Rossini guilty beyond a reasonable doubt.  What the

15  facts do show is that Thomas Murphy is a liar.  Thomas Murphy

16  lied to Mr. Rossini, lied to the investors, and lied to this

17  Court and to you.

18       I want to leave you with one final thought, and it's

19  about Mr. Murphy.  Mr. Murphy lied to everybody he knew.  He

20  threw away 30 years of his reputation for lying.  He lied to

21  his family.  He lied to his clients.  He lied to clients that

22  paid him money to protect their interests.  These are people he

23  knew.  These are people that he had forged deep personal

24  relationships with.  He threw it away.

25       Imagine what he'd say to 12 people he never met.

1      Thank you.

2      THE COURT:  Thank you, Mr. Adams.

3      Mr. Hogstrom.

4      MR. HOGSTROM:  Judge, can we have the Elmo?

5      REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

6      MR. HOGSTROM:  Ladies and gentlemen, what you just

7  heard is exactly the way the defendant planned it seven years

8  ago.  Okay?  This whole thing was set up the way it was so that

9  he would have places to point the finger.

10     He didn't just go to investors and say, you give me

11  money.  You don't know who I am, but you give me money.  And I

12  promise that you will get what I am promising you back.  He

13  worked with other people.  He worked with Babajan Khoshabe, who

14  had an in with the Assyrian communities, who are -- as you

15  heard, are communities that operate on implicit trust amongst

16  other members of the community.  They knew this, and he worked

17  with Babajan and had Babajan start trying to recruit investors.

18     And he brought in Tom Murphy, because he wanted to be

19  able to tell the investors and show the investors this was

20  legitimate, this was real.  There is an attorney involved.  And

21  you don't make the -- you don't make your checks to me.  You

22  make them to the attorney, Thomas Murphy.  And that should give

23  you comfort, right?

24     And so he knew by doing that, that down the line if he

25  ever got caught, he would be able to say, I didn't get the

1    checks.  They didn't make the checks payable to me, Albert

2    Rossini.  They made them to Thomas Murphy.  It wasn't me who

3    recruited the investors.  It was Babajan.  He set this up so

4    that he would have this sort of deniability.

5          The problem is, he didn't anticipate that when he did

6    get caught, the FBI would do as thorough of an investigation as

7    they did.  He didn't anticipate that we would have his e-mails,

8    that we would have all these bank records, and that we would go

9    track down the owners of these properties to come into court

10   and to tell you the truth about these properties.

11         And based on all that evidence, you know that he not

12   only was not just a middleman between -- an unwitting middleman

13   between two other fraudsters.  Mr. Rossini was the brains

14   behind the operation.  Mr. Rossini was the person who devised

15   this scheme and put it into motion.  He is the person at the

16   heart of it.

17         Now, Mr. Adams talked a lot about Thomas Murphy, which

18   is understandable because Mr. Murphy is not exactly an

19   upstanding citizen.  The thing is -- and that he is right, you

20   should view Mr. Murphy's testimony with caution and great care.

21   He is not only potentially getting a benefit for testifying.

22   But he's also admitting to lying.  He's admitting that what he

23   did in this case was dishonest.

24         But here is the thing:  He is admitting it.  He got on

25   the stand and said, I did it.  And he didn't get up there and

1  say, I didn't do anything.  It was that guy.  He did it all.

2  He got up here and said, yeah, I did it, and here is who I did

3  it with.

4          And you don't just have to take his word for it

5  because the documents and all the other evidence you have bear

6  it out.  And I am going to talk for just a little longer about

7  some of the conduct that he was directly involved in and the

8  evidence that supports is.  And then we're going to talk about

9  some stuff that Mr. Murphy had nothing to do with.  And then

10 you're going to see at the end of that, that whatever you think

11 of Mr. Murphy, you have all the evidence you need to find the

12 defendant guilty.

13         So first, what did Mr. Murphy do with Mr. Rossini?

14 You heard his testimony, that he worked with Mr. Rossini to

15 prepare documents that Mr. Rossini can give the investors.  And

16 there is this -- there has been this suggestion that, well, Mr.

17 Rossini doesn't -- doesn't really know the legalities.  He's --

18 he was relying on his attorney who prepared all these -- these

19 documents.

20         But you know, not just based on Mr. Murphy's testimony

21 but based on the evidence, that -- independent evidence, the

22 documents, that that's not true.

23         I'm putting on the screen Government Exhibit Murphy 4.

24 Now -- this you may recall.  This is an e-mail early in the

25 scheme from Mr. Murphy to Mr. Rossini, dated June 28, 2011.

1    And he is attaching a document called Badalian Note.  Mr.

2    Murphy explained what this was.  Mr. Murphy wanted a piece of

3    paper that he could give to the investor Robert Badalian.  And

4    here is what Mr. Murphy -- excuse me.

5         Here is what Mr. Murphy drafted.  He drafted this

6    document called Note.  And he explained that this was what's

7    known as a promissory note.  And I am not going to go through

8    all the language.  You'll have it back there with you if you

9    want to look at it.

10        But in essence what it does is it sets out terms of a

11   loan.  This is a promissory note.  A promissory note means that

12   Mr. Rossini is saying, I'm getting money from you, Mr.

13   Badalian.  And after some period of time or after some

14   triggering event, which in here is the acquisition of these

15   properties, I will repay you that money plus some extra on top

16   of it.  Right?

17        And the whole idea there is that you have given me

18   this money.  And now it is mine to use.  It's a loan.  I can

19   use it however I want.  I am not conditioning my giving you

20   this money based on what I am going to do with it.

21        And what happened?  Mr. Murphy told you that that is

22   not what Mr. Rossini wanted.  Mr. Rossini said, no.  I want

23   something more informal.  I want something that offers a

24   personal guarantee by me.  And that is when he came up with the

25   guaranty agreement.

1          Bear with me one moment.

2      (Brief pause.)

3          MR. HOGSTROM:  And that is this document.  The

4  specific one that I have on the screen here is Government

5  Exhibit AW Pithyou 7.  This is for the 5801 North Richmond

6  property.  But you recall I think it's Murphy 4, which is right

7  after the e-mail we just saw about the Badalian promissory

8  note.

9          Murphy sends Mr. Rossini a new version, and it's

10  titled guaranty agreement.  And it has all these blanks in it.

11  And it says in the body of the e-mail, Mr. Murphy says:  I have

12  included the language that you asked for.  Okay?

13          So this is the basis for this, the guaranty agreement,

14  that you've seen, that all the investors got.  And who signed

15  every one of them?  Mr. Rossini.  And you know from those

16  e-mails that it was not just Murphy drafting these things and

17  saying in my legal opinion this is what you should do.  It was

18  Rossini asking for certain things to be included in them.  So

19  you know that Mr. Rossini was directly and intimately involved

20  with that part of it.

21          You also know that Mr. Rossini was directly and

22  intimately involved in the Ponzi part of this scheme, the part

23  where the investors got these supposed rent checks.  So I am

24  going to put on the screen Government Badalian 5.  This is the

25  first rent check that any investor in this case testified

1    about.  This is the first check that Mr. Badalian got.

2              And you see and you may remember this testimony.

3    Mr. Murphy wrote this check himself.  It's on his account.

4    It's June 6, 2011.  And there is a memo line reflecting rent

5    payments, right?  And you can see, there is Mr. Murphy's

6    signature.  There is Mr. Murphy's handwriting.

7              But then it changed.  Mr. Murphy started giving

8    Mr. Rossini checks that were partially filled out and signed by

9     Mr. Murphy.  But then Rossini started filling out who they

10   went to and what the amounts were.  And you can look for

11   yourself and see, this is not the same person writing it.

12   Okay?

13             And then you know that as time went on, Mr. Murphy --

14   Mr. Rossini asked Mr. Murphy to incorporate Reliant Management.

15   Reliant Management was a company run by Babajan's son Anthony

16   Khoshabe.  And the investors were told, well, now Anthony

17   Khoshabe and his company are going to be, quote, collecting the

18   rents.  And you know, of course, there were no rents collected,

19   right?  So Mr. Murphy had nothing to do with that.

20             You also know that Mr. Murphy didn't, as Mr. Adams

21   says, use this money as his own personal piggy bank.  On the

22   contrary, he operated as Mr. Rossini's personal currency

23   exchange.  Mr. -- every time the investor checks came in, Mr.

24   Rossini gave Mr. Murphy disbursal instructions.  And that's not

25   just Mr. Murphy's word that you have to believe that.

1          Government Exhibit Murphy 3, there we go.  This is an

2     e-mail from February 28, 2012.  It's just an example.  But it

3     shows Mr. Rossini e-mailing Mr. Murphy, asking him to cut

4     cashier's checks.  Okay?

5          You also have Government Exhibit -- another part of

6     Government Exhibit Murphy 3.  These are handwritten records

7     that Mr. Murphy provided to the FBI that were entered into

8     evidence here.  And you will see, $90,000.  And then there is a

9     list of how it's supposed to be broken up.

10          And if you so choose, you can look at the schedules of

11     the Thomas Murphy bank account.  And that's schedule Murphy

12     9389.  Those are the last four digits of the account number.

13     That's where all the money that the investors gave ended up and

14     how they were disbursed.  And you can look for yourself.  And I

15     am not going to go through every line of it because you can do

16     it yourself.  But on the bottom of the page that I have here,

17     and this is for transactions in November of 2011, you can see,

18     $90,000 in, Vladimir Moghaddasi.  90,000.

19          And then you can see -- it's hard to get it all fit on

20     the same page.  But you can see, $10,000, $10,000; 12,875,

21     12,875, and so forth and so on.  And you can see that in fact

22     checks were disbursed exactly according to Mr. Rossini's

23     instructions.

24          But you also can infer the fact that Mr. Rossini was

25     directing all of this based on who got the money.  You may have

1    heard the phrase, follow the money?  That applies here as much

2    as it does anywhere, because you heard agent -- or Ms.

3    Prescott's testimony, who did the financial analysis.  And you

4    have those financial exhibits.  And you can see that out of

5    everybody in this case, the person who benefited by far the

6    most was Mr. Rossini.  He got $2.5 million of the investors'

7    money.

8           All right.  So there is just a couple more things I

9    want to show you before I leave you to your deliberations.  And

10   that is that even if you believe that Mr. Murphy is a liar and

11   you have to throw out everything that Mr. Murphy says and

12   pretend that he is not in the case, even if that is what you

13   decided to do, you would still have ample evidence to convict

14   Mr. Rossini because there is a lot of conduct that he engaged

15   in that was direct with the investors that had nothing to do

16   with Mr. Murphy.

17          In fact, you know that Mr. Murphy, with apart from

18   that one meeting that happened over a year after the scheme

19   started, Mr. Murphy never engaged with the investors at all.

20   Okay?  It was always Mr. Rossini.

21          So let's look at Government Exhibit Ashoor 1.  Okay?

22   This is getting July 2012.  This is defendant telling Ashoor

23   Pithyou something about the delayed rent payments.  He is

24   trying to reassure him.  And he's telling him:  I just received

25   word that rents have come into my account.  I will transfer

1   them tomorrow to the management company and have rent checks

2   ready for your dad on Wednesday.  Okay?

3          He is telling him, the rents came into my account, and

4   I will transfer them to you.  And what happens?  Government

5   Exhibit Ashoor 2, sure enough, a money order -- by the way,

6   note, from Peterson-Cicero Currency Exchange, which is the

7   currency exchange where he negotiated $2 million of the

8   investors' money that you heard about.  And you can barely read

9   it, but it says, 8142 Kilpatrick here.  This is the supposed

10  rent payment for Kilpatrick.  In the name of Devon Street

11  Management.  This is Mr. Rossini paying this money.

12         And then if you want, you can look at the Devon Street

13  Management bank schedule.  And the last four digits of that

14  account are 9628.  And I think the schedule is called Schedule

15  DSM 9628, if you want to look at it in the exhibit book.  And

16  you can look for yourself.

17         Look through July 2012.  And you will see that there

18  is no place where, quote, the rents have just come into my

19  account.  In fact, the most recent addition to the account was

20  a check from Thomas Murphy on June 29.  Okay.  That was three

21  weeks before this e-mail where he is telling Ashoor Pithyou the

22  rents have just come into my account.  The rents didn't just

23  come into his account.  That was a lie.  Okay?

24         And there were other examples where the defendant is

25  dealing with the defendants directly -- or with the investors

1    directly and misleading them, having nothing to do with Thomas

2    Murphy.  Government Exhibit Badalian 12.  And there are a lot

3    of these similar exhibits involving Mr. Badalian and Mr.

4    Moghadassi, which you should look at, where Mr. Rossini is

5    e-mailing them things that turn out to be patently false.

6            June 13, 2013, Mr. Rossini tells Mr. Badalian:  By the

7    end of July, you will receive whatever rents I received or

8    Murphy received and you have nothing received on these

9    properties.  He's also saying:  You will receive deeds to 4037

10   West Adams, 4126 West Adams, 4045 West Wilcox, and 5410 West

11   Fulton by the end of July 2013.  Okay?

12           So let's look at Government Exhibit Chart 1.  And you

13   may remember this is the chart, summary chart, that Agent

14   Connors testified about.  And she reviewed the Cook County

15   Recorder of Deeds Records, which you also will have to look at

16   if you want to.  And she reviewed all the stipulations in this

17   case.

18           And this chart is a summary of the actual status of

19   these properties that are underlying Mr. Rossini's statements

20   to the investors.  And you will see, those properties that he

21   is talking about, so 4126 West Adams.  He says, Mr. Badalian

22   you are going to get that property by the end of July.  Okay?

23   Sure enough, title was transferred to Mr. Badalian on July 30,

24   2013.

25           The problem is, the investment occurred in May of

1   2011, and Mr. Rossini acquired it himself in December of 2011.

2   No explanation as to why it would take eight months to turn it

3   over to him.  But let's credit him that one.  Okay?  That was

4   one of the four properties that he talked about in the e-mail

5   that I just put up, Badalian 18.

6          5410 West Fulton is the next one.  Okay?  You will get

7   this by the end of July.  He did obtain it in May of 2012.  So

8   at that time Mr. Rossini had the property.  It was his.  Did he

9   transfer it?  No, he did not.

10          4045 West Wilcox, same story.  He acquired it in

11  January of 2012.  Did he transfer it?  No.  In fact he

12  transferred it to somebody else the next year, 2014.  Okay?

13          And then 4037 West Adams.  He acquired it in June of

14  2012.  He didn't turn it over.  And what's really interesting

15  is, you can look.  The CCRD records, CCRD 5 in particular I am

16  putting on the screen.  These are the transaction histories,

17  title histories, for these properties.  And it's a little

18  confusing because they -- they don't have the addresses on

19  them.  They are identified by property identification number.

20          But if you look at the chart, Chart 1, you can see

21  what the property -- what the PIN numbers are.  And then you

22  can compare them with what's -- what's on these histories.  And

23  if you look at these histories, you'll find that not only did

24  Mr. Rossini not turn over the Wilcox property and the Fulton

25  property and the 4037 West Adams to Mr. Badalian.  He took

1    out -- he used them to get a mortgage. Okay? After he tells

2    Badalian this, he turns around and used them to get a mortgage.

3    And you can see that in the records.

4          So that's another example of an instance where Mr.

5    Rossini is dealing with people directly. Has nothing to do

6    with Tom Murphy. He's telling them lies himself, and that's

7    where you'll get the false and fraudulent pretenses.

8          So you can forget about Tom Murphy if you want to.

9    But don't forget about that. Don't forget about those lies.

10   And don't forget about Kathy Khodi, because if you think of

11   nothing else in this case, you should think about Kathy Khodi

12   and Rockford Commercial Mortgage.

13         Because after Mr. Rossini is suing Mr. Murphy

14   supposedly, after he's telling all the investors that Mr.

15   Murphy did it, Mr. Murphy stole your money, which isn't true --

16   you know that because you can see in the bank records. But

17   after he did this, he turns around and he incorporates a

18   company through Mr. Murphy.

19         And he doesn't just incorporate a company. But he has

20   him set up a bank account. And he tells this guy, who

21   supposedly either stole or lost his money, he tells this guy

22   that he wants to take money that's directed for him, Mr.

23   Rossini, and he wants to give it to Murphy and put it in his

24   bank account. That doesn't make any sense. Okay?

25         He did it that way because he wanted to keep this

1    going and to hide his involvement with Mr. Murphy from the

2    investors.  And sure enough, you can look at the -- those --

3    those charts that Mr. Novak highlighted, 5/22/2013 Khodi,

4    5/12/2013 Khodi, and 8/22/2013 Khodi.  And you can see that as

5    Mr. Murphy testified, as soon as the money came in, it was

6    drained within three to five days.  And most of the money went

7    directly to Bert Rossini or Devon Street Investments.

8           So based on all that, you know that this was the Bert

9    Rossini show.  This wasn't about Tom Murphy.  It wasn't about

10   Babajan Khoshabe.  They were involved, no doubt about it.  But

11   he isn't charged with running a scheme all by himself.  He is

12   charged with working with other people to run this scheme.

13          And you can tell, based on all of the evidence, that

14   these investors who tapped their 401(k)s and took out home

15   equity loans on their houses and lost their life savings, they

16   trusted this man because of the way that he set this program

17   up, involving the attorney, involving the Assyrian community.

18   And he betrayed that trust.  He stole their money.

19          And for that reason, we ask you to find the only

20   verdict consistent with the evidence:  Guilty on all counts.

21          Thank you.

22          THE COURT:  Thank you.

23      (Brief pause.)

24          THE COURT:  Members of the jury, I will now instruct

25   you on the law that you must follow in deciding this case.  If

1    you would read along with me, starting on page 1.

2         Member of the jury, I will now instruct you on the law

3    that you must follow in deciding this case.  I will also give

4    you a copy of these instructions to use in the jury room.  You

5    must follow all of my instructions about the law, even if you

6    disagree with them.  This includes instructions I gave you

7    before the trial, any instructions I gave you during the trial,

8    and the instructions that I am giving you now.

9         As jurors, you have two duties.  Your first duty is to

10   decide the facts from the evidence that you saw and heard here

11   in court.  This is your job, not my job or anyone else's job.

12        Your second duty is to take the law as I give it to

13   you, apply it to the facts, and decide if the government has

14   proved the defendant guilty beyond a reasonable doubt.  You

15   must perform these duties fairly and impartially.  Do not let

16   sympathy, prejudice, fear or public opinion influence you.  In

17   addition, do not let any person's race, color, religion,

18   national ancestry or gender influence you.

19        You must not take anything I said or did during the

20   trial as indicating that I have an opinion about the evidence

21   our about what I think your verdict should be.

22        The charges against the defendant are in a document

23   called an indictment.  You will have a copy of the indictment

24   during your deliberations.  The indictment in this case charges

25   the defendant committed the crimes of mail and wire fraud.  The

1    defendant has pleaded not guilty to the charges.

2          The indictment is simply the formal way of telling the

3    defendant what crime he is accused of committing.  It is not

4    evidence that the defendant is guilty.  It does not even raise

5    a suspicion of guilt.

6          The defendant is presumed innocent of the charges.

7    This presumption continues throughout the case, including

8    during your deliberations.  It is not overcome unless from all

9    the evidence in the case you are convinced beyond a reasonable

10   doubt that the defendant is guilty as charged.

11         The government has the burden of proving the

12   defendant's guilt beyond a reasonable doubt.  This burden of

13   proof stays with the government throughout the case.  The

14   defendant is never required to prove his innocence.  He is not

15   required to produce any evidence at all.

16         You must make a decision based only on the evidence

17   that you saw and heard here in court.  Do not consider anything

18   you may have seen or heard outside of court, including anything

19   from the newspaper, television, radio, internet, or any other

20   source.

21         The evidence includes only what the witnesses said

22   when they were testifying under oath, the exhibits that I

23   allowed into evidence, and the stipulations that the lawyers

24   agreed to.  A stipulation is an agreement that certain facts

25   are true or that a witness would have given certain testimony.

1          Nothing else is evidence.  The lawyers' statements and

2    arguments are not evidence.  If what a lawyer said is different

3    from the evidence as you remember it, the evidence is what

4    counts.  The lawyers' questions and objections likewise are not

5    evidence.

6          A lawyer has a duty to object if he thinks a question

7    is improper.  If I sustained objections to questions the

8    lawyers asked, you must not speculate on what the answers might

9    have been.  If during the trial I struck testimony or exhibits

10   from the record or told you to disregard something, you must

11   not consider it.

12         Give the evidence whatever weight you decide it

13   deserves.  Use your common sense in weighing the evidence, and

14   consider the evidence in light of your own everyday experience.

15         People sometimes look at one fact and conclude from it

16   that another fact exists.  This is called an inference.  You

17   are allowed to make reasonable inferences, so long as they are

18   based on the evidence.

19         You may have heard the terms direct evidence and

20   circumstantial evidence.  Direct evidence is evidence that

21   directly proves a fact.  Circumstantial evidence is evidence

22   that indirectly proves a fact.

23         You are to consider both direct and circumstantial

24   evidence.  The law does not say that one is better than the

25   other.  It is up to you to decide how much weight to give to

1    any evidence, whether direct or circumstantial.

2           Do not make any decisions simply by counting the

3    number of witnesses who testified about a certain point.  What

4    is important is how truthful and accurate the witnesses were

5    and how much weight you think their testimony deserves.

6           A defendant has an absolute right not to testify or

7    present evidence.  You may not consider in any way the fact

8    that defendant did not testify or present evidence.  You should

9    not even discuss it in your deliberations.

10          Part of your job as jurors is to decide how believable

11   each witness was and how much weight to give each witness'

12   testimony.  You may accept all of what a witness says or part

13   of it or none of it.

14          Some factors you may consider include the age of the

15   witness; the intelligence of the witness; the witness' ability

16   and opportunity to see, hear or know the things the witness

17   testified about; the witness' memory; the witness' demeanor;

18   whether the witness had any bias, prejudice or other reason to

19   lie or slant the testimony; the truthfulness and accuracy of

20   the witness' testimony in light of the other evidence

21   presented; and inconsistent statements or conduct by the

22   witness.

23          You have heard evidence that before the trial certain

24   witnesses made statements that may be inconsistent with their

25   testimony here in court.  You may consider inconsistent

1    statements made before the trial to help you decide how

2    believable a witness' testimony was here in court.

3            You have heard the testimony from Thomas Murphy, who

4    was promised a benefit in return for his testimony and

5    cooperation with the government, has admitted to signing at

6    least one bankruptcy petition under the pain and penalty of

7    perjury that contained inaccurate information, has pled guilty

8    to and stated that he was involved in some of the crimes

9    defendant is charged with committing.

10           You may not consider his guilty plea as evidence

11   against the defendant.  You may give Thomas Murphy's testimony

12   whatever weight you believe is appropriate, keeping in mind

13   that you must consider that testimony with caution and great

14   care.

15           It is proper for an attorney to interview any witness

16   in preparation for trial.

17           If you have taken notes during the trial, you may use

18   them during deliberations to help you remember what happened

19   during the trial.  You should use your notes only as aids to

20   your memory.  The notes are not evidence.  All of you should

21   rely on your independent recollection of the evidence, and you

22   should not be unduly influenced by the notes of other jurors.

23   Notes are not entitled to any more weight than the memory or

24   impression of each juror.

25           You have heard a recorded conversation.  This is

proper evidence that you should consider together with and in the same way you consider other evidence.

You were also given a transcript of the conversation to help you follow the recording as you listened to it. The recording is the evidence of what is says and who said it. The transcript is not evidence.

If you notice any differences between what you heard in conversation and what you read in the transcript, your understanding of the recording is what matters. In other words, you must rely on what you heard, not what you read. And if you cannot hear or understand some parts of the recording, you must ignore the transcripts as far as those parts are concerned.

I am providing you with the recording and a device with instructs on its use. It is up to you to decide whether to listen to the recording during the deliberations. You may if you wish rely on your recollections of what you heard during the trial.

Certain summaries were admitted in evidence. You may use those summaries as evidence.

Certain charts were shown to you to help explain other evidence that was admitted. These charts are not themselves evidence or proof of any facts.

An offense may be committed by more than one person. A defendant's guilt may be established without proof that the

1  defendant personally performed every act constituting the

2  charge.

3          Counts 1 through 3, 6 through -- I'm sorry.  Let me

4  start over.

5          Counts 1 through 3, 6, and 8 through 14, charge the

6  defendant with wire fraud.  In order for you to find defendant

7  guilty of this charge, the government must prove each of the

8  following elements beyond a reasonable doubt:

9          That the defendant knowingly devised or participated

10 in the scheme to defraud as charged in the particular count of

11 the indictment; that the defendant did so with the intent to

12 defraud; and the scheme to defraud involved a material false or

13 fraudulent pretense, misrepresentation or promise; and that for

14 the purpose of carrying out the scheme or attempting to do so,

15 the defendant caused interstate wire communications to take

16 place in the manner charged in the particular count.

17         If you find from your consideration of all the

18 evidence the government has proved each of these elements

19 beyond a reasonable doubt as to the charge you are

20 consideration, then you should find the defendant guilty of

21 that charge.  If on the other hand you find from your

22 consideration of all the evidence that the defendant has failed

23 to prove any one of these elements beyond a reasonable doubt as

24 to the charge you are considering, then you should find

25 defendant not guilty of that charge.

1    Counts 4, 5 and 7 charge the defendant with mail
2    fraud.  In order for you to find the defendant guilty of this
3    charge, the defendant -- the government must prove each of the
4    following elements beyond a reasonable doubt:

5    That the defendant knowingly devised or participated
6    in the scheme to defraud as charged in the particular count of
7    the indictment; and that the defendant did so with the intent
8    to defraud; and the scheme to defraud involved a material false
9    or fraudulent pretense, representation or promise; and that for
10   the purpose of carrying out the scheme or attempting to do so,
11   the defendant used or caused the use of a commercial interstate
12   carrier in the manner charged in the particular count.

13   If you find from your consideration of all the
14   evidence the government has proved each of these elements
15   beyond a reasonable doubt as to the charge you are considering,
16   then you should find the defendant guilty of that charge.  If
17   on the other hand you find from your consideration of all the
18   evidence that the government has failed to prove any one of
19   these charges beyond a reasonable doubt as to the charge you
20   are considering, then you should find the defendant not guilty
21   of that charge.

22   A scheme is a plan or course of action formed with the
23   intent to accomplish some purpose.  A scheme to defraud is a
24   scheme that is intended to deceive or cheat another and to
25   obtain money or property or to cause a loss of money or

1   property to another by means of materially false or fraudulent

2   pretenses, representations or promises.

3   In considering whether the government has proved a

4   scheme to defraud, the government must prove that one or more

5   of the false or fraudulent pretenses, representations or

6   promises charged in the portion of the indictment described in

7   the scheme be proved beyond a reasonable doubt.  The

8   government, however, is not required to prove all of them.

9   A false or fraudulent pretense, representation or

10  promise is material if it is capable of influencing the

11  decision of a person to whom it was addressed.

12  A person acts with the intent to defraud if he acts

13  knowingly with the intent to deceive or to cheat in order to

14  cause a gain of money or property to the defendant or another,

15  or the potential loss of money or property to another.

16  The mail fraud statute and wire fraud statute can be

17  violated whether or not there is any loss or damage to the

18  victim of the crime or gain to the defendant.  The government

19  need not prove that the scheme to defraud actually succeeded.

20  E-mails and wire transfer of funds constitute

21  transmission by means of wire communication.

22  With respect to Counts 1 through 3, 6, and 8 through

23  14, the government must prove that interstate communications

24  facilities were used to carry out the scheme or incidental to

25  an essential part of the scheme.  With respect to Counts 4, 5

1   and 7, the government must prove that commercial interstate

2   carriers were used to carry out the scheme or incidental to an

3   essential part of the scheme.

4           In order to use or cause the use of commercial

5   interstate carriers or use or cause interstate wire

6   communications to take place, defendant need not actually

7   intend that use to take place. You must find that the

8   defendant knew this use would actually occur, or the defendant

9   knew it would occur in the ordinary course of business, or

10  defendant knew facts from which that use could reasonably have

11  been foreseen.

12          However, the government does not have to prove that

13  defendant knew that the wire communication was of an actual

14  interstate nature or that the carrier was an interstate

15  carrier.

16          A defendant need not actually personally use the

17  interstate carrier or interstate communication facilities.

18          Although an item mailed or communicated interstate

19  need not itself contain a fraudulent representation or promise

20  or request for money, it must carry out or attempt to carry out

21  the scheme.

22          In connection with whether a mailing or wire

23  communication was made, you may consider evidence of the habit

24  or the routine practice of the person or an organization.

25          Each separate use of the commercial carriers or

1   interstate communication facilities in furtherance of the

2   scheme to defraud constitutes a separate offense.

3           A person acts knowingly if he or she realizes that he

4   or she is doing -- let me start again.

5           A person acts knowingly if he or she realizes what he

6   or she is doing and is aware of the nature of his or her

7   conduct and does not act through ignorance, mistake or

8   accident.  In deciding whether defendant acted knowingly, you

9   may consider all of the evidence, including what the defendant

10  did or said.

11          An offense may be committed by more than one person,

12  and defendant's guilt may be established without proof that the

13  defendant personally performed every act constituting the crime

14  charged.

15          If a defendant performed acts that advanced the crime

16  but had no knowledge that the crime was being committed or was

17  about to be committed, those acts are not sufficient by

18  themselves to establish defendant's guilt.

19          The indictment charges the crimes happened on or

20  about.  The government must prove that the crimes happened

21  reasonably close to those dates.  The government is not

22  required to prove that the crimes happened on those exact

23  dates.

24          In deciding your verdict, you should not consider the

25  possible punishment for the defendant.  If you decide the

1   government has proved the defendant guilty beyond a reasonable

2   doubt, then it will be my job to decide on the appropriate

3   punishment.

4          Once you are in the jury room, the first thing you

5   should do is choose a foreperson.  The foreperson should see to

6   it that discussions are carried out in an organized way, and

7   that everyone has a fair chance to be heard.  You may discuss

8   the case only when all jurors are present.

9          Once you start deliberating, do not communicate about

10  the case or your deliberations with anyone except other members

11  of your jury.  You may not communicate with others about the

12  case or deliberations by any means.  This means oral or written

13  communication, as well as any electronic method of

14  communication such as telephone, cell phone, smart phone,

15  iPhone, computer, text messaging, instant messaging, the

16  internet, chat rooms, blogs, websites, or services like

17  Facebook, LinkedIn, YouTube, Twitter or any other method of

18  communication.

19         If you need to communicate with me while you are

20  deliberating, send a note through the court security officer.

21  The note should be signed by the foreperson, or by one or more

22  members of the jury.  To have a complete record of this trial,

23  it is important that you do not communicate with me except by

24  written note.

25         I may have to talk to the lawyers about your message,

1   so it may take me some time to get back to you.  You may

2   continue deliberations while you wait for my answer.

3         Please be advised that transcripts of trial testimony

4   are not available to you.  You must rely on your collective

5   memory of the testimony.

6         If you send me a message, do not include the breakdown

7   of any votes you may have conducted.  In other words, do not

8   tell me that you are split six-six or eight-four, or whatever

9   your vote happens to be.

10         A verdict form has been prepared for you.  You should

11   take this form with you to the jury room.  Here is the verdict

12   form.  It says:  Verdict form.  We, the jury, find the

13   defendant Albert Rossini, and then it states as follows.  Let

14   me read.

15         On Count 1 of the indictment, guilty, and there is an

16   empty box; not guilty, and there is an empty box.  Please check

17   the appropriate box.  And then it goes down from Count 2 of the

18   indictment through Count 14 of the indictment in that manner.

19         The second page has signature lines for the foreperson

20   and other members of the jury and a place to put the date.

21         When you have reached unanimous agreement, your

22   foreperson should fill in and date and sign the verdict form.

23   Each of you will sign it as well.

24         Advise the court security officer once you have

25   reached a verdict.  When you come back to the courtroom, I will

1    read the verdict aloud.

2            The verdict must represent the considered judgment of

3    each juror.  Your verdict, whether it is guilty or not guilty,

4    must be unanimous.  You must make every reasonable effort to

5    reach a verdict.  In doing so, you should consult with one

6    another, express your own views, and listen to your fellow

7    jurors' opinions.  Discuss your differences with an open mind.

8    Do not hesitate to reexamine your own view and change your

9    opinion if you come to believe it is wrong.  But you should not

10   surrender your honest beliefs about the weight or effect of

11   evidence just because of the opinions of your fellow jurors or

12   just so that there can be a unanimous verdict.

13           The 12 of you should give fair and equal consideration

14   to all the evidence.  You should deliberate with the goal of

15   reaching an agreement that is consistent with the individual

16   judgment of each juror.  You are impartial judges of the facts.

17   Your sole interest is to determine whether the government has

18   proved this case beyond a reasonable doubt.

19           At this point in time I am going to ask Ms. Acevedo to

20   please swear in the court security officer.

21       (Court security officer duly sworn.)

22           THE COURT:  So, ladies and gentlemen of the jury, I

23   will now allow you to go to the jury room and begin your

24   deliberations.  With regard to the jury instructions, please

25   leave them on your chair.  And we will provide copies of them

1    for you in the jury room.  Okay?

2         So at this point in time, you may go, proceed to the

3    jury room.

4         Ms. Jacqueline Lovett and Ms. Catherine Voelker, if

5    you would stay seated here please.  Thank you.

6         (Jury retired to deliberate on its verdict at 11:45 a.m.)

7         THE COURT:  Ms. Lovett, Ms. Voelker, you were

8    designated as alternate jurors in this case.  But what that

9    means, though, is that you are still under duty to perform your

10   duties as alternate jurors.  What does that mean?

11        Well, if you would leave your notebooks and cell phone

12   number with Ms. Acevedo where we can contact you.  We will

13   contact you in one of two instances.  One, if your services

14   will be needed we will contact you.  And two, if your services

15   are not needed and the jury arrives at a verdict or otherwise

16   the case is terminated, we will contact you as well.

17        Until you hear from us, please do not discuss this

18   case with anyone because you are still serving as alternate

19   jurors, including one another or family members or friends.

20   And please do not do any independent research regarding this

21   case.  Okay?

22        Also, if you would leave your addresses with Ms.

23   Acevedo as well.  We will be mailing you something with regard

24   to your jury service.  Okay?  So thank you again, for your

25   service to this court.

1          You can go.  The court security officer will get your

2     belongings as well.

3          (Alternate jurors excused.)

4               THE COURT:  If you would all, if the attorneys --

5     please be seated.

6               If the attorneys would provide your cell phone numbers

7     on one sheet of paper, give them to Ms. Acevedo.  We will

8     contact you if we hear anything.

9               I asked the jurors to leave their instructions because

10    I noticed that there was one bracket on the instructions that

11    wasn't deleted.  So I am just going to go ahead and do that,

12    and then submit them back to the jury room.

13              Any objection to that?

14              MR. HOGSTROM:  No, Judge.  There was one other --

15              MR. ADAMS:  No objection.

16              MR. HOGSTROM:  There is one other.  On the wire fraud

17    instruction?

18              THE COURT:  Yes.

19              MR. HOGSTROM:  It could be that we misheard it, but it

20    sounded -- I think when you wrote -- the very last paragraph, I

21    think when you read it, says -- you said, if on the other hand

22    you find from your consideration of all the evidence that the,

23    I believe you said the defendant has failed to prove any one of

24    these elements.  I think it was a slip of the tongue.  But I

25    just wanted to note for the record that -- that that's what we

1    heard.  Just want to make sure if that's -- if that's what

2    happened, it was a slip of the tongue and raise it as to

3    whether they need to be reinstructed, or if it's better to not

4    draw attention to it.

5            THE COURT:  I think that it seems to me that given the

6    fact that they are going to receive the written instructions,

7    that it's probably best not to draw attention to it.

8            MR. FRANKEL:  I agree, Judge.

9            Judge, is the bracket you're talking about on how much

10   weight to give each witness?

11           THE COURT:  That's correct.

12           MR. FRANKEL:  Yes.

13           THE COURT:  Okay.  Is there anything else we need to

14   address?

15           MR. NOVAK:  There is one more typo we found on the --

16   the offense may be committed by more than one person.  It says,

17   defendant's --

18           THE COURT:  Where is that?

19           MR. HOGSTROM:  It is near the back, after -- after the

20   knowingly, person acts knowingly instruction.  The next one is,

21   an offense may be committed by more than one person.

22           THE COURT:  Okay.

23           MR. HOGSTROM:  The second sentence, the defendant's

24   guilty.  It should say, the defendant's guilt.

25           THE COURT:  I think it's best leave that alone too.

1          MR. FRANKEL:  I agree.

2          THE COURT:  Anything else we need to address?

3          MR. ADAMS:  No, your Honor.

4          MR. HOGSTROM:  No, Judge.

5          THE COURT:  Okay.  We will be contacting you.  Thank

6  you.

7      (Trial recessed until 2:50 o'clock p.m. of the same day.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 IN THE UNITED STATES DISTRICT COURT
 NORTHERN DISTRICT OF ILLINOIS
2 EASTERN DIVISION

3 UNITED STATES OF AMERICA, ) Docket No. 15 CR 515-1
 )
4 Plaintiff, )
 )
5 v. ) Chicago, Illinois
 ) June 13, 2018
6 ALBERT ROSSINI, ) 2:50 o'clock p.m.
 )
7 Defendant. )

8 VOLUME 6B
 TRANSCRIPT OF PROCEEDINGS - TRIAL
9 BEFORE THE HONORABLE JOHN Z. LEE, and a jury

10 APPEARANCES:

11 For the Government: HON. JOHN R. LAUSCH, JR.
 United States Attorney, by
12 MR. ERIK A. HOGSTROM
 MR. WILLIAM PATRICK NOVAK
13 Assistant United States Attorneys
 219 South Dearborn Street
14 Chicago, Illinois 60604

15 For the Defendant: LAW OFFICES OF JOSHUA B. ADAMS,
 P.C., by
16 MR. JOSHUA B. ADAMS
 53 West Jackson Boulevard
17 Suite 1515
 Chicago, Illinois 60604
18
 FRANKEL & COHEN, by
19 MR. SCOTT JAY FRANKEL
 53 West Jackson Boulevard
20 Suite 1615
 Chicago, Illinois 60604
21

22 ALEXANDRA ROTH, CSR, RPR
 Official Court Reporter
23 219 South Dearborn Street
 Room 1224
24 Chicago, Illinois 60604
 (312) 408-5038
25

1    (The following proceedings were had in open court outside

2    the presence of the jury:)

3        THE CLERK:  Case 15 CR 515, United States of America

4    versus Albert Rossini.

5        THE COURT:  All right.  Counsel, I have been informed

6    by the foreperson, Susan Mazur, that they have arrived at a

7    verdict.

8        MR. FRANKEL:  Okay.

9        THE COURT:  Okay.  So let's call the jury in.

10       MR. FRANKEL:  Judge, just out of -- curious.  Was

11   there a question before the verdict?

12       No?  Okay.

13   (Jury entered the courtroom.)

14       THE COURT:  Ladies and gentlemen of the jury, I

15   understand that you have arrived at a verdict.  Who was

16   selected as the foreperson?

17       THE FOREPERSON:  I was.

18       THE COURT:  Can you please stand, ma'am.  Can you

19   state your name.

20       THE FOREPERSON:  My name is Susan Mazur.

21       THE COURT:  Ms. Mazur, has the jury unanimously agreed

22   upon its verdict?

23       THE FOREPERSON:  Yes, we have.

24       THE COURT:  Can you please provide the verdict form to

25   the court security officer.

1   (Document tendered.)

2     THE COURT:  Ladies and gentlemen of the jury, your

3 verdict will now be published.  Please pay close attention to

4 the verdict as I read it.  After it is read, each juror may be

5 asked whether the verdict as I have read it is in fact the

6 verdict that he or she decided upon individually in all

7 respects.

8     All right.  Verdict form.  We the jury find the

9 defendant Albert Rossini on Count 1 of the indictment, guilty.

10 On Count 2 of the indictment, guilty.  On Count 3 of the

11 indictment, guilty.  On Count 4 of the indictment, guilty.  On

12 Count 5 of the indictment, guilty.  On Count 6 of the

13 indictment, guilty.  On Count 7 of the indictment, guilty.  On

14 Count 8 of the indictment, guilty.  On Count 9 of the

15 indictment, guilty.  On Count 10 of the indictment, guilty.  On

16 Count 11 of the indictment, guilty.  On Count 12 of the

17 indictment, guilty.  On Count 13 of the indictment, guilty.  On

18 Count 14 of the indictment, guilty.

19     Is there a request from counsel to poll the jury?

20     MR. ADAMS:  Yes, your Honor.

21     THE COURT:  All right.  So when I state your name, if

22 you would please rise.

23     Virginia Bratton.  Ma'am, does the verdict as I have

24 read it constitute your individual verdict in this case?

25     JUROR BRATTON:  Yes.

1        THE COURT:  Thank you, ma'am.

2        Ms. Haley Williams.  Ms. Williams, does the verdict as

3  I have read it constitute your individual verdict in this case?

4        JUROR WILLIAMS:  Yes.

5        THE COURT:  Thank you, ma'am.

6        Gloria Byrnside.  Ms. Byrnside, does the verdict as I

7  have read it constitute your individual verdict in this case?

8        JUROR BYRNSIDE:  Yes.

9        THE COURT:  Thank you.

10        Ms. Mazur, does the verdict as I have read it

11  constitute your individual verdict in this case?

12        THE FOREPERSON:  Yes, it does.

13        THE COURT:  Linda Chicola.  Ms. Chicola, does the

14  verdict as read constitute your individual verdict in this

15  case?

16        JUROR CHICOLA:  Yes, it does.

17        THE COURT:  David Lamblin.  Mr. Lamblin, does the

18  verdict as read constitute your individual verdict in this

19  case?

20        JUROR LAMBLIN:  Yes.

21        THE COURT:  David Blatzheim.  Mr. Blatzheim, does the

22  verdict as read constitute your individual verdict in this

23  case?

24        JUROR BLATZHEIM:  Yes, it does.

25        THE COURT:  Annette Barragan.  Ms. Barragan, does the

1    verdict as read constitute your individual verdict in this

2    case?

3             JUROR BARRAGAN:  Yes.

4             THE COURT:  Amber Stringer.  Ms. Stringer, does the

5    verdict as read constitute your individual verdict in this

6    case?

7             JUROR STRINGER:  Yes.

8             THE COURT:  Juan Padilla.  Mr. Padilla, does the

9    verdict as read constitute your individual verdict in this

10   case?

11            JUROR PADILLA:  Yes.

12            THE COURT:  Diana Nolan.  Ms. Nolan, does the verdict

13   as read constitute your individual verdict in this case?

14            JUROR NOLAN:  Yes.

15            THE COURT:  Michael Gallegos.  Mr. Gallegos, does the

16   verdict as read constitute your individual verdict in this

17   case?

18            JUROR GALLEGOS:  Yes.

19            THE COURT:  Thank you.  The verdict will now be

20   recorded.

21            Ladies and gentlemen of the jury, I want to thank you

22   again for your tremendous service to this court.  Your

23   assistance is so instrumental to our system of justice.

24            If you wouldn't mind, please return to the jury room,

25   and I will join you in a couple of moments after speaking with

1      counsel.

2              Thank you again for your service.

3          (Jury excused.)

4              THE COURT:  All right.  With regard to the pending

5      motion under Rule 29 made by the defendant, I find when viewing

6      the evidence that is the subject of the Rule 29 motion in light

7      most favorable to the government, as I must, I find that there

8      is sufficient evidence from which a reasonable jury can find

9      defendant guilty beyond a reasonable doubt.  Accordingly,

10     defendant's motion under Rule 29 is denied.

11             All right.  So let's talk about sentencing.

12             MR. FRANKEL:  Judge, before we set the sentencing,

13     could we make a motion for an extension of time on motion for

14     new trial, about 60 days?

15             THE COURT:  So when do you think you will be able to

16     file it?

17             MR. ADAMS:  Can we have August 27?

18             THE COURT:  Any objection to that?

19             MR. HOGSTROM:  No, Judge.

20             THE COURT:  All right.  So defendant's motion for new

21     trial will be due, and other post-trial motions will be due, on

22     August 27.

23             How much time does the government need for response?

24             MR. HOGSTROM:  Three weeks?

25             THE COURT:  That will be September 17.  And 14 days

1    for reply, October 1.

2           With regard to sentencing then, I will set it for

3    sentencing far enough out so that I can get all the briefs in,

4    review the motion, and rule.

5           How is November 13 for sentencing?

6           MR. ADAMS:  That's fine, your Honor.

7           MR. HOGSTROM:  That's fine, Judge.

8           THE COURT:  So we will set this for sentencing on

9    November 13 at 2:00 p.m.  And then we will have all the interim

10   dates in the minute order that goes out.  Okay.

11          MR. HOGSTROM:  Judge, can we ask for a slightly

12   extended date for government's version?  I think it's 14 days

13   by rule.  Could we have 30?

14          THE COURT:  I will give you 28 days.  That's

15   government's version for the PSR, right?

16          MR. HOGSTROM:  Yes.

17          MR. NOVAK:  Yes.

18          THE COURT:  Yes.  We baked in enough time to do that.

19          All right.  And I will order that the recommendation

20   of the probation officer be provided to both parties.

21          MR. ADAMS:  Thank you, Judge.

22          THE COURT:  Is there anything else we need to address

23   today?

24          MR. ADAMS:  No, your Honor, for Mr. Rossini.

25          MR. HOGSTROM:  No, Judge.

1          MR. NOVAK:  No.

2          THE COURT:  Very good.  We are adjourned.  Thank you.

3          MR. ADAMS:  Thank you.

4          MR. HOGSTROM:  Thank you.

5       (Which were all the proceedings heard in this case.)

6                           CERTIFICATE

7          I HEREBY CERTIFY that the foregoing is a true, correct

8   and complete transcript of the proceedings had at the hearing

9   of the aforementioned cause on the day and date hereof.

10

11   /s/Alexandra Roth                        6/15/2018
     _____        _____
12   Official Court Reporter                    Date
     U.S. District Court
13   Northern District of Illinois
     Eastern Division
14

15

16

17

18

19

20

21

22

23

24

25