

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

# FILED

AUG 07 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

               Plaintiff,

          v.              Case No. 15 CR 515-1

                         Hon. John Z. Lee

ALBERT ROSSINI,

               Defendant.

## MOTION FOR NEW TRIAL

NOW COMES Albert Rossini, Defendant Pro Se, and submits this motion and memorandum of law for a new trial pursuant to Federal Rule of Criminal Procedure 33(a).

## OPENING STATEMENT

Big fraud schemes generally give rise to big prosecutions. They involve numerous transactions and a great many trial exhibits both on behalf of the government and for the defense. In Defendant Rossini's case, his attorneys spurned a defense entirely, without bothering to inform Defendant Client of their irresponsible strategy, if one may call failure to present a defense in this document - and - witness - heavy defense, a strategy. That they played cat and

mouse with their own client throughout the course of these proceedings is reprehensible. On Defendant's behalf, their idea of zealous representation was to take the path of lease resistance and effort.

They subpoenaed no witnesses, although Defendant provided a steady stream of legitimate, defense-supporting witnesses and documents. They did not investigate these witnesses because they never contacted them. They failed to review with Defendant what the witness testimony would likely have been. At trial, they had no prepared questions and answers, no labeled exhibits, and no list of witnesses. It is beyond reason to presume that none of these witnesses could have affected the trial's outcome without having first heard of, and reviewed, their probably testimony. The cumulative effect of the additional evidence would have had a significant impact on whether a jury viewed the government's witnesses as credible. Therefore, this Court must grant Defendant Rossini's Motion for a New Trial, pursuant to Fed.R.Crim.P. 33(a), with newly-appointed counsel.

Defendant's appointed counsel were Joshua Adams and Scott Frankel, hereinafter "Adams" and/or "Frankel." It was their unilateral, undisclosed decision not to call a witness. Defendant had repeatedly requested that they interview and schedule witnesses. None of that was forthcoming. Their lack of commitment during the pendency of the proceedings should convince this Court further of the merit of Defendant's Motion for a New Trial.

At no time did they prepare Defendant for trial (on Sunday afternoon, June 10, 2018, Adams spent one hour at the

MCC with Defendant). They at no time showed familiarity with the documents relevant to the case, nor even an expertise of what they signified for the defense. It is possible that Adams and Frankel did not consciously decide and agree not to call witnesses on behalf of Defendant. What is more likely is that they did not contact them because of indolence. This descriptive is unfortunate, but supported by what Defendant shall disclose in the paragraphs that follow. "An attorney's performance is deficient when a defendant provides the names of possible mitigation witnesses and the attorney does not determine for himself whether their testimony would be helpful." United States v. Simpson, 864 F.3d 830 (7th Cir. 2017).

In support of this Motion for a New Trial, Defendant Rossini attaches his affidavit (Exhibit 1, attached and incorporated herein), asserting that he told Adams and Frankel of these witnesses he wanted to call. Neither attorney contacted them, and, therefore, could not and did not (reasonably) investigate.

BACKGROUND

On June 13, 2018, a jury convicted Defendant Rossini on eleven counts of mail fraud and three counts of wire fraud. The Defendant's lawyers asked for an extension to file a motion for new trial; it was granted by this Court. The government did not oppose this extension. (Adams stated to Defendant that the date for submitting the motion was August 27, 2018; however, the docket sheet shows August 7, 2018 (see Exhibit 2, attached and incorporated herein).

3

On June 4, 2018, Defendant orally represented to this Court that his attorneys had not adequately prepared for trial and proceeding to trial at this time seriously prejudiced the Defendant. His attorneys spent 15 minutes, four times with Defendant while he was detained at Jerome Combs Detention Center (July 28, 2017 - May 9, 2018) and not once visited the Defendant in the four weeks while detained at the Metropolitan Correctional Center ("MCC") prior to trial. Both Adams and Frankel have offices at 53 W. Jackson Boulevard, across the street from the MCC.

After a court appearance for status on May 29, 2018, Adams and Frankel met with Defendant for 15-20 minutes in the court holding center. Defendant realized that neither one had a grasp of the economic, testimonial, or documentary evidence. They had not reviewed and thus were uninformed of Defendant's and Devon Street Investments, Ltd. ("DSI") business plan, the facts related to Defendant's defense, the various witnesses proposed in the months leading up to trial. By May 29, 2018, they had clearly failed to review the voluminous documents, and had no notes or papers with them with which to review.

Unfortunately, with his MCC unit 23H under lockdown and without email or telephone use until May 31, 2018, Defendant mailed the Court a letter setting forth his urgent concerns, and which similar concerns he expressed several days later in open court.

The Court rejected Defendant's argument, stating Defendant had many Court status dates during which to complain about his attorneys (although Rossini had complained to this Court by letter in December 2017). What the Court did not

4

have before it was attorney Frankel's intent to withdraw due to his campaign for Cook County judgeship. Defendant attributed Frankel's failure to meet with him as Frankel's customary unavailability. In fact, by then, Frankel was campaigning to be elected a Cook County judge. Adams advised Rossini that he had several ideas for alternative counsel. The Court must also have been left unaware of this situation and Frankel's defacto non-representation of Defendant. Yet, how does a Defendant apprise the Court? Some time in April 2018, Frankel returned and advised Defendant he was going to work on the case. Defendant believed him, to his detriment and to the jury verdict. Rossini did not foresee that his attorneys would spend no time with him prior to trial, that they would not speak to any witnesses, and would present no defense on his behalf. They rested without informing Defendant of this unintelligible strategy.

On February 20, 2018, prior to trial and during the pendency of the proceedings, Rossini mailed to Adams and Frankel:

- Defendant's Motion To Dismiss The Indictment For Prosecutorial Misconduct And Memorandum Of Law In Support (attached and incorporated herein as Exhibit 3);

- Letters and debit card statements concerning Defendant's trips to Los Angeles (attached and incorporated herein as Exhibit 4).

On March 28, 2018, Defendant mailed to Adams and Frankel:

- Defendant's Motion And Memorandum Of Law To Strike And

Dismiss The Government's Allegations Of Non-Existent Property Sales From The Record As Erroneous And False (attached and incorporated herein as Exhibit 5);

- Defendant's Motion To Reject And Dismiss The Government's Substitution Of Deliberate Indifference For Mens Rea (attached and incorporated herein as Exhibit 6);

- Defendant's Explanation of Guarantee Agreements (attached and incorporated herein as Exhibit 7);

- Defendant's Chart Of Investment and Flow of Funds (attached and incorporated herein as Exhibit 8).

On April 16, 2018, Rossini mailed to Adams and Frankel:

- Defendant's Motion For Production By The Government Of Brady And Giglio Material related to Murphy and attorney Jeffrey Deer ("Deer") accusing Rossini of arson in connection with the November 2015 fire at Deer's residence (attached and incorporated herein as Exhibit 9);

- Defendant Rossini's 2012-1040 federal income tax return, DSI 1120S-2012 federal income tax return and IRS audit commentary (attached and incorporated herein as Exhibit 10);

- Attorney Registration and Disciplinary Committee Synopsis of Findings in re Thomas W. Murphy (attached and incorporated herein as Exhibit 11);

- In re Thomas W. Murphy Rule 2004 Federal Bankruptcy deposition before the United States Trustee, AUSA Jeffrey Snell for the U.S. Trustee on June 2, 2014 (attached and incorporated herein as Exhibit 12);

- Thomas W. Murphy Statement of Financial Affairs, In re Thomas W. Murphy, 14 BR-03922 (attached and incorporated herein as Exhibit 13);

- United States Trustee's Motion to Dismiss the Thomas W. Murphy Bankruptcy case No. 14-BR-03922 (attached and incorporated herein as Exhibit 14);

- World Wide Realty, LLC Motion To Dismiss the Thomas W. Murphy Bankruptcy Case No. 14-BR-03922 (attached and incorporated herein as Exhibit 15);

- Defendant's 26-page question and answer report prepared by Rossini for his counsel concerning the case (attached and incorporated herein as Exhibit 16).

These Motions in Limine were prepared and researched thoroughly by Defendant for the purpose of presentation before this Court. Defendant anticipated the Court holding hearings on these motions. Adams and Frankel neither read, reviewed, assessed, nor submitted rewritten motions and memorandums which had been intended for the Court as Defendant's material and verifiable pleadings; because Defendant fully intended to go to trial. Defendant intended that the Court read and rule on the Motions in Limine. Adams and Frankel, however, ignored the Defendant's assistance, which could have relieved them of the effort required in trial preparation. How else can a detained Defendant submit motions and memorandums prior to trial - not to harass or subvert, but with the intention to define and/or limit erroneous or false allegations and set forth his defense of innocence?

Beginning August 2017, and through February 2018, Defendant mailed letters to Adams and Frankel concerning his bond revocation of August 2, 2017, which included his documentation proving to the Court his Court authorized trips.

Defendant requested that Adams and Frankel read the documents because not showing proof to the Court would effect a divisive opinion. Nothing was submitted to the Court by Adams and Frankel. Worse they requested o hearing and offered no argument nor affirmative defense (i.e. the Court authorized trips and Defendant's compliance therewith - see Exhibit 4 herein).

In the August 2, 2017 bond hearing, Adams informed Defendant that he had been out of town and the government had just presented him with documents. He did not have a copy of the Revocation Motion for Rossini. Rossini was uninformed by counsel of the government's allegations other than the bank fraud charge. Neither Adams nor Frankel met with Defendant to review these documents except for five minutes prior to the hearing. At the hearing, neither counsel requested a recess in order to review allegations in a Motion neither one had read or understood: Adams had to ask Rossini, in court, what address he was supposed to have been authorized by the Court to reside while in Los Angeles. No witnesses were called and no defense given by Defendant's lawyers. In such an instance, how does a detained defendant alert the Court of his counsels' deficiencies? After Court, neither Adams nor Frankel met with Defendant.

On June 4, 2018, the first day of trial, Rossini asked Adams whether they had read his motions, memorandums, letters and notes. Attorney Adams stated, "we read everything." Defendant was justifiably doubtful that Adams' statement was true. They had not questioned Defendant on any of the documents. Defendant asked both Adams and Frankel why they

8

had o witnesses?  Attorney Adams said he intended to call
agents Lyle Evans ("Evans") and Jody Blau ("Blau") at trial.
Adams and Frankel feigned to Defendant that they were going to
put on a Defense.  They had no notes, no labeled exhibits, no
list of witnesses, no proposed Questions and Answers, and none
of the information, accounting, timeline, documents, Murphy NS
F checks, contained within Defendant's many submitted Motions
in Limine.  They had not even thoroughly discussed with
Defendant at the time whether or not they intended to call him
to testify in his defense.

     During the trial, Defendant consistently slipped notes to
Adams and Frankel, urging them to contact various witnesses,
or to inform them as to Government' witness misstatements.
Neither Adams no Frankel were near-lucid about the elements
for this case.  On Tuesday, June 12, 2018, Defendant
specifically directed his lawyers the following issues in his
defense (see attached email incorporated herein as Exhibit
17).


     (i).  Checks made payable to attorney Thomas Murphy
("Murphy") by Rossini and codefendants Babajan Khoshabe and
Anthony Khoshabe in the same format as those by investors that
were shown as government exhibits (see Exhibit 18, attached
and incorporated herein).  These checks showed that Rossini
and the Khoshabes had themselves invested over $500,000 to
purchase mortgage notes from attorney Murphy during 2011 and
2012.  These checks showed Defendant's reliance on Defendant
Murphy's mortgage note practice and expertise.  Rossini had to
contact attorney Harvey Waller in order to get copies of these

payments because Adams and Frankel failed to do so during the
pendency of this case, nor did they have them ready for trial.
Adams and Frankel did not even bother to question attorney
Waller prior to trial about the checks. Copies of these checks
had been turned over to the FBI by Rossini in September 2014.

On June 12, 2018, Defendant provided these checks to
Adams who reviewed them for the first time, Defendant
believed. Adams refused to submit them to the jury. In
Rossini's estimation this lack of willingness by Adams was an
indication of his yet undisclosed intention to to present a
defense on behalf of the Defendant. The checks go directly to
whether Rossini had knowledge of Murphy's scheme and to
Defendant Rossini's lack of intent to defraud the investors.
Rossini was himself losing hundreds of thousands of dollars to
Defendant Murphy in the same manner as the investors.

Adams stated in Court that he had discussed his
unwillingness to present the checks into evidence with
Rossini. Defendant stated in response to the Court that he
"acknowledged the conversation" --not that he agreed with his
attorney's purported trial tactic, whatever that may have
been. How, if fact, can a Defendant address the Court during
trial, about his attorney's unwillingness due to
unpreparedness and unfamiliarity?

Adams and Frankel had not understood the significance.
Checks are documents. What is printed there on is easily
admissible. Documents - the black and white - easily impeach
or contradict the witness testimony. Adams and Frankel
ignored the checks, which were indicative of Defendant's lack
of intent. Perhaps they were worried about government

impeachment by showing the funds came from investors as Rossini's (illicit) profits. Yet, that was exactly Rossini's point. Defendant wanted the jury to consider: Why would Defendant steal money to give it to the other thief if he knew Murphy's notes were nonexistent? Rossini told his attorneys that the jury should decide the significance of the checks. If fell on deaf ears.

Rossini was concededly reluctant to confront his attorneys' competence on Wednesday, June 13, 2018 as they prepared final argument. Notwithstanding, Defendant believed it unconscionable, as should this Court that his Motions in Limine, documents and testimonial witnesses --- evidence crucial to his defense was disregarded by his attorneys.


(ii). Rossini's previous attorney, Glenn Seiden ("Seiden") submitted to AUSA Hogstrom a copy of Defendant's comprehensive fire, building and liability insurance policies with Mount Vernon Insurance and Seattle Specialty Insurance Company together with premium payments. DSI had contracted to insure approximately 70 properties that were the subject of notes Murphy was supposed to have purchased for DSI and its investors. Defendant reasonably believed Murphy was reputable and had legitimate notes and mortgages (see Rossini Affidavit). Rossini requested Adams and Frankel call Sol Eisenstein an insurance broker with Evergreen Insurance to testify as an expert that banks and mortgage holders, follow customary business practices, and "force place" insurance on properties to which they hold mortgages in foreclosure as added protection for their investment.

In August 2014, Rossini became aware that FBI agents Lyle Evans, Jody Blau and Cook County Investigator Paul Martinez were interviewing former DSI employees. In September 2014, Seiden presented the agents with boxes of documents from Defendant for government review. This was a voluntary presentation of documents not in response to subpoena. Included in these documents were copies of the cashiers checks from Rossini to Murphy as well as the insurance policies and paid premiums. Rossini asked Adams and Frankel to call agents Evans and Blau to testify about these received documents. They were not called as government witnesses. The Government instead called agent Kelly Connors as a witness. Adams and Frankel had not subpoenaed nor requested the Government to make Evans and Blau available. Agent Connors had been assigned to this case several months prior to the August 2015 indictment. She had not participated in the Court suppressed interview of July 2015 in which agents Evans and Blau were identified as making intentional misstatements to Anthony Khoshabe (see Exhibit 19, attached and incorporated herein).

That agents Evans and Blau lied to Anthony Khoshabe should have been explored prior to trial and during trial, especially since they were the investigating agents in Rossini's case--were conveniently not called to testify by the Government. Agents Evans and Blau abused and intimidated witnesses, particularly those who might provide exculpatory evidence, and intimidated them by forcefully advising that the Government would otherwise consider them "part of the [Rossini] team." The agents continuously asked witnesses whether they had "googled" Rossini and if they knew about

Defendant's record to present Rossini as the culprit in this case. (see Motion to Dismiss, Exhibit 3 herein).

From Motions submitted by Defendant to Adams and Frankel (and from Meir Rotstein, Nubia Rendak, Danielle Gabi, Pamela Sauer, and Richard Espe among others), agents interviewed witnesses to make claims that Rossini dispensed cash to investors through 3d parties -- thinking that their 302 statement would support the Government's false narrative. In one instance, witness was a DSI custodial worker, Francisco Cisneros. However, CPA Craig Shaffer ("Shaffer") had prepared Mr. Cisneros tax returns. The written record -- Cisneros' tax return, prepared and filed prior to the FBI investigation -- directly contradicted a verbal statement Cisneros supposedly voluntarily made to an agent, one aggressively seeking to confirm laundering and Ponzi scheming by Rossini. Rossini's attorneys should have called agents Evans and Blau as Rossini continuously prompted; Adams and Frankel also should have called Ms. Sauer, Ms. Rendak, Mr. Rotstein, Mr. Espe, Ms, Gabi and Mr. Cisneros to impeach the agents' testimony. The agents engaged in misconduct from the inception through trial (a trial for which attorneys Adams and Frankel improbably excluded a defense for Defendant, and without informing Defendant).

As detailed herein, the Government engaged in conduct that, by any reasonable measure, improperly influenced the witnesses. Providing witnesses with information about Rossini's past conduct and intent in this case was misleading and based on biased and uninformed conclusions of Government agents. Supplying neutral witnesses with supposed facts to

13

manipulate them is remarkable and reprehensible. It is a forced feed. However, the jury did not hear this because the Defendant's attorneys did not investigate nor call any witnesses.

(iii). Rossini wanted Adams and Frankel to call FBI forensic accountant Sandie Prescott, as a defense witness, to question her thoroughly about the expenditures from which she stated was the total Rossini received from this scheme. Her testimony was cursory. Ms. Prescott should have been made to present item-by-item accounting of this money. Adams and Frankel should have brought an expert witness in forensic accounting for the defense. Rossini wanted Adams and Frankel to introduce his tax returns to show that he did not hide any income derived from these investments.

Defendant asked that Internal Revenue examiner Joan Sanders be called as a witness to present his income and expenses during this critical period. Rossini told his attorneys that he was involved in an audit and he and examiner had disagreed as to expense deductions. Her value as a witness would be in stating that Rossini wished to take deductions for payments to investors, refunds and office operations. This was vital in combating the Government's assertions that Rossini merely lived off money from investors. It would also have shown the Government's claims through witnesses Badalian and Moghadassi that payments to investors ceased in June 2012 was erroneous. In fact, the two witnesses, as well as other investors, received payments through November 2012. In some cases, such as Janet Khoshaba,

investors received payments from Rossini as late as June 2015.

In a Government exhibit binder, the Devon Street Management and DSI bank statements plainly revealed these facts. Rossini brought this to his attorneys attention at trial -- to no avail.

On June 12, 2018, Attorney Adams sent an email to Rossini stating that "[a]t this stage of the trial, I should be focusing on the closing argument. You want me to prepare basically cross-examination for the case agent and the financial analyst." (see Adams email, Exhibit 20, attached and incorporated herein). Adams statement, without context, would seem to show he had presented a robust defense and Rossini just wanted to rehash statements of Government witnesses. In fact, Defendant's attorneys presented no defense, contrary to Rossini's instructions. (see email of June 12, 2018, attached and incorporated herein as Exhibit 21).

The Government didn't have to concern itself at trial because of Adams and Frankel's inadequate preparation. It didn't not have to concern itself with the inaccuracies of their figures at trial though contradicted at Murphy's bond hearing, or Murphy's bankruptcies, or Murphy's tax returns, or Defendant's tax returns for the relevant time period.

Instead, ignoring that its agents and forensic accountant reached for Rossini's motherload but hadn't found it, or its own statements about Murphy's money in prior court hearings, at trial, the Government threw out a sum for the jury, with round-numbers of Rossini's income but without detailed expenditures. Defense counsel never once asked the jury to consider this inexplicable circumstance--Rossini took the

money but we couldn't find it, or, on the other hand, he took the money and this is how he spent it.

The FBI forensic accountant, with all due respect, was rudimentary in her analysis--parsing the actual numbers and arriving only at totals. Of course, Ms. Prescott's totals worked to the Government's advantage: Defendant took $2,550,000.

Had Adams and Frankel believably reviewed the financial records and presented them to the jury, i.e. the tax returns, bank statements, money orders, etc., of Defendant's routine course of expenditures, it would have been left to the jury for consideration. As the records in the Government's possession as well as with Defense Counsel, Defendant's expenditures were as stated in Exhibit 22, attached and incorporated herein).

An expert and thorough review of finances, by either the FBI or defense expert would have shown that the Defendant spent the majority of money he received on interest for investors, on the same mortgage notes as investors, and operating his business. Instead, the jury heard that Defendant conclusively received $2,550,000 of stolen proceeds.

(iv). In documents and correspondence sent to his attorneys and detailed herein, Rossini directed counsels to present copies of Murphy's insufficient funds checks to DSI and Devon Street Management, Ltd. ("Devon Management") from Murphy's Chase bank account in November and December 2012. The bounced checks created an overdraft of $169,000 in the Devon Management account. An additional $216,000 interest also needed to be paid to investors from DSI based on the bounced checks. (see Exhibit 22, attached and incorporated herein). Murphy told Rossini that his checks bounced because he was behind collecting money from foreclosing law firms, banks and receivers and that the problem would be solved in a few weeks. Murphy had written millions of dollars in checks to Rossini, DSI, Reliant Management, Devon Management, investors and brokers without a bounced check. Rossini covered Murphy's overdrafts with money he had saved from his business, believing Murphy's problem was a temporary delay in collecting funds.

Rossini later realized that the bounced checks coincided with large payments for the purchase of 2015 N. Racine for him and Tamera Brown. In letters, motions and memorandums detailed herein, as well as notes at trial, Rossini requested that his attorneys call Denise Azizian, J.P. Morgan Chase commercial banker as a witness. Ms. Azizian has knowledge of these events, bank statements, including deposits and debits, payments to investors, Rossini covering the accounts and Murphy's machinations with his account during November and December 2012. Tamera Brown answered interrogatories to attorney Richard L. Kruse in the DSI v. Thomas Murphy, Cook

County Circuit Court Chancery Division accounting complaint.
(The case was introduced by the Government at trial). Ms,.
Brown's answers concerned Murphy's purchase of the Racine
house at the same time as Murphy wrote the NSF checks to the
Devon Street firms.

Ms Prescott, the FBI forensic accountant, apparently
reviewed the Devon Management and DSI accounts and defense
questioning could have provided her confirming testimony as to
the NSF checks, overdrafts, and Rossini covering these
overdrafts.

Fereidoon Khoshabe sent the ACH (automatic debit)
payments to investors from the Devon Management account and he
could also testify to sending these payments to investors,
especially Badalian and Moghadassi in June, August, October,
and November 2012, contrary to the false testimony elicited by
the government from investors. The facts as to these payments
were plainly contained in the Devon Management and DSI bank
account statements. They were not brought to the jury's
attention by the Defendant's attorneys because they did not
review the statements (even though they were in a Government
binder of exhibits on the Defense table), did not speak to and
investigate the witnesses who could speak to these payments,
Murphy's NSF checks and Rossini's covering of these
overdrafts.


(v). Rossini requested, and his attorneys failed to
present Murphy's perjury, tax evasion, career-long client
conversions, real estate expertise, misappropriations (with
exception of the Zgonina and Sanial Trusts), evasive LLC

formations, Ponzi schemes as modus operandi over the years, and falsely shifting the blame to others during both his sworn Rule 2004 and ARDC testimony. Felons, convenient culprits for the government and easy targets for predatory attorneys must, in this instance, affirmatively reject the government's imputations. Murphy was perfectly competent from years of habit, to conduct another unilateral scheme. His buffer was the respected law firm(s) where he was an attorney and partner.

The United States Bankruptcy Trustee filed motions to dismiss, for which judgment of dismissal was entered in re Thomas W. Murphy Bankruptcy, 14 BR-03922, due to his falsehoods (see United States Trustee Motion as Exhibit 14, herein). The significance of these bankruptcy pleadings which Rossini sent to Adams and Frankel on April 16, 2018, with expectations they would present them to the jury. was to show the government's knowledge that Murphy lied repeatedly and materially in these filings and in his Rule 2004 deposition before AUSA Jeffrey Snell representing the United States Trustee. The government did not notify Defendant of this exculpatory evidence; see also Rossini's Brady Giglio Motion, (Exhibit 9, herein). Remarkably, or perhaps, typically, Murphy blamed Rossini in these Bankruptcy Petitions as owing him money but being "broke" so that he would not be able to repay Murphy.

In Rossini's trial, his attorneys limited questioning to Murphy's signature as to his willingness to commit perjury by signing these documents. Attorney Adams, had failed to review Murphy's bankruptcy filings and in his bankruptcy deposition,

19

and was unfamiliar with the contents. In response to Attorney
Adams, Murphy blamed another person, his long-time partner,
attorney Jeffrey Deer, for the inaccuracies (he tried not to
do so at his bankruptcy deposition, but one would have to have
read them to catch this falsehood of Murphy's on the witness
stand). But Rossini believes the United States Trustee's
Motion and the Rule 2004 deposition showed far more pertinent
information as to Murphy's willingness to lie under oath.

For instance, the United States Trustee insisted that
Murphy hid his interest in real property, misstated or
deliberately hid his income and bank statements through
continuously misnumbering his social security number, and
"knowingly and fraudulently made false oaths and [statements
as to ]accounts in Case I and Case II in violation of Section
727(a)(4) and his discharge in bankruptcy should be denied
under Section 727(a)(7)." This was the statement and
accusation of an AUSA representing the United States Trustee
against Debtor Thomas W. Murphy. The Trustee asserted that
Murphy concealed property within one year of his bankruptcy
filing with intent to hinder, delay or defraud a creditor also
in violation of Section 727(a)(2)(A).

In his June 2, 2014 Rule 2004 deposition before AUSA
Snell, Murphy made false and misleading statements regarding
his purchase of the house at 2015 N. Racine, Chicago to live
with Tamera Brown. Murphy testified he was the sole owner of
2015 N. Racine LLC and he was purchasing the property to
"flip" with Rossini. In reality (and in the records
voluntarily submitted to the government by Defendant in
September 2014; in Defendant Murphy's records; and in records

produced by Defendant to his own counsel). Murphy and Tamera Brown each owned 50% of the LLC, and were purchasing the property to live in together. Ms. Brown stated in her interrogatories to attorney Kruse, representing DSI, that Murphy was supposed to live with her in the property but that "he lied to me." Murphy testified under oath in the Rule 2004 deposition that a "non-paying" tenant occupied the Racine property, when, in fact, Ms. Brown lived at 2015 N. Racine.

Murphy further stated in the Rule 2004 deposition that he paid $10,000 per month "rent" on the property and had deposited earnest money of $60,000 toward purchase. Justin Fox, the Racine property seller, stated otherwise--that Murphy's earnest money was to be $600,000. On or about May 9, after Court, Rossini told his attorneys that the significance of this was twofold. It was discernible from an accounting and review of Murphy's records. First, Murphy had been depositing and hiding money with Tamera Brown; the government at the August 28, 2015 bond hearing said that amount was approximately $465,000. However, the records of payments contained in Rossini's boxes delivered to agents by attorney Seiden showed the amount Murphy hid was closer to $1,200,000 with or for Ms. Brown.

Prior to Murphy's serial bankruptcies--to disrupt creditor proceedings such as those brought by Rossini (details of which were contained in Defendant's Motions in Limine sent to his attorneys), and in an effort to hide his activities, Murphy failed to make mortgage payments on his family residence in Kildeer, Illinois (quitclaimed to his wife in 2008) after Murphy's Prestige Realty Partners LLC dissolved.

In the June 2, 2014 Rule 2004 deposition, Murphy testified he had not made mortgage payments on his residence for 11 months and Deutsche Bank had instituted foreclosure proceedings. Yet, according to Murphy's testimony, he made a $60,000 earnest money deposit on 2015 N. Racine, paid at least $10,000 per month rent, purchased the Del Ray Beach condominium, paid rent at McClurg Court, and made payments on a late model BMW automobile licensed in Florida.

On March 28, 2018, Rossini mailed a detailed summary of payments by Murphy, Defendant and DSI to his attorneys. He requested that they present this information at trial to show an accounting of the money and that Murphy took funds from one investor in order to cover the missing funds from other investors. The evidence of Murphy's expenditures and his Rule 2004, June 2, 2014 testimony were significantly contradictory. In the Rule 2004 deposition Murphy said he made less than $200,000 gross income before expenses during 2011 and 2012. In a 2013 bankruptcy petition Murphy stated he received no income during those years. Yet, from January 2011 through 2013, he spent a minimum of $1,974,454 on living expenses, office expenses, payments for investments with or for Tamera Brown, and payments to Sanial Trust. These calculations were in the records attorney Selden gave the government agents, and which were in the possession of attorneys Adams and Frankel, who failed to exercise a thoughtful investigation and zealous defense on behalf of their client, Defendant Rossini.

Another example of Murphy's willingness to lie under oath was the "Motion to Dismiss Chapter 7 Case and Bar Future Petitions filed by World Wide Realty, LLC ("World Wide") on

March 31, 2014 in re Thomas W. Murphy Case Number 14-BR-03922.
"The bad faith nature of Murphy's Chapter 7 Petition is
further evidenced by the fact Murphy's prior two Chapter 7
proceedings were both dismissed after Murphy failed to provide
complete and accurate statements and schedules as required by
Section 521(a). Murphy's current Petition [14-BR-03922] fails
to attach the documents required under Section 521(a). Murphy
's current Petition and the Statement of Financial Affairs
attached [Exhibit 13, herein] thereto also willfully
misrepresents Murphy's income and liabilities.

"Specifically, Murphy fails to disclose (1) income he
appeared to have earned as an attorney rendering legal
services during 2011 and 2012 totaling $323,717; (2) income he
appeared to have earned from a title insurance company he owne
d and operated during 2011 and 2012 totaling $337,558; and (3)
World Wide's pending state court lawsuit wherein World Wide is
seeking to collect its judgment of $199,160. Instead, Murphy
certifies that he has earned no income in the past two years,
has no lawsuits pending against him, and has only $0 to
$50,000 in liabilities." Again, these were facts known to the
Government, but withheld without any suggestion as to why such
withholding was justice meted out on behalf of the public
against Defendant.

As World Wide stated, "[d]despite several court orders to
produce documents responsive to the rider, to date Murphy has
failed to produce any documents other than his 2010, 2011, and
2012 federal income tax returns and an Income and Assets
Form...Murphy has refused to produce any other financial
documents that could show the source or location of his income

23

and assets, including any bank statements. Murphy has also repeatedly failed to appear for a Citation examination despite several orders of the Circuit Court requiring him to appear in Court or at a location agreed upon by the parties attorneys." (see World Wide Realty Motion to Dismiss Chapter 7 Case and To Bar Future Petitions, herein as Exhibit 15).

Although presented with these documents months in advance of trial by Defendant, Adams and Frankel failed to investigate these proven and adjudicated allegations against Murphy, failed to interview Colin W. Anderson, a World Wide attorney, or anyone from the law firm of Barone and Jenkins, representing World Wide in the Murphy bankruptcies. this was strong impeachment evidence against Murphy and also against the FBI forensic accountant's cursory review of the flow of investors' money.

(vi). The Government presented copies of guarantee agreements executed by Rossini and investors. The prosecution's narrative was Defendant used these agreements to convince investors , especially Radalian, that the DSI program was safe. Murphy testified Rossini thought up and composed the guarantee agreement and defendant Murphy simply revised wording. Rossini asked Adams and Frankel call CPA Craig Shaffer ("Shaffer") and other witnesses to prove the guarantee agreement originated and was composed by then attorney Murphy. Mr. Shaffer would have testified the agreement was proposed by Murphy to counter fears that Murphy had been double-dealing with his existing short sale clients, Alex Mysko, ICG Properties, LLC and Stephanie Andre, on

24

investment properties DSI and Shaffer funded in January through March 2011. These included 4135 West Monroe, 4654 West Adams, and 5131 West Crystal, Chicago.

These were real properties purchased and sold by Defendant in the ordinary course of business. The Government alleged in its indictment that Defendant sold non-existent properties. The failure by Adams and Frankel to countermand the allegation in the indictment , by way of a Motion to Strike and Dismiss, prior to trial, was inexcusable. It can be reasonably inferred that during this relevant time period, Adams and Frankel had not reviewed the list of properties in which Defendant dealt (see Defendant's submitted Motion to Dismiss The Indictment, Exhibit 3, attached an incorporated herein).

Murphy advised the FBI that on April 15, 2018, he was served with a lawsuit filed by attorney Glenn Seiden on behalf of Craig Shaffer. The lawsuit concerns Murphy's double-dealing in the above properties (see Federal Bureau of Investigation Statement dated May 21, 2018, Exhibit 23, attached and incorporated herein). (Also see Exhibit 24, attached and incorporated herein with Murphy's May 29, 2018 statement to FBI concerning the Guarantee Agreement(s)).

Shaffer had visited 4135 W. Monroe Street; yet, Murphy's client, Alex Mysko, told Shaffer that neither DSI nor Shaffer were owners of the property. Rossini was driving from Colorado to Chicago when Murphy telephoned Defendant with Craig Shaffer on the phone, and suggested that he, Murphy, would compose a guarantee agreement which Rossini and Shaffer would execute, since both DSI and Murphy's short-sale clients

were clients of Pedersen & Houpt ("Pedersen"), the firm at
which Murphy was a partner. Shaffer was among the witnesses
Adams and Frankel failed to call for the defense, and the
substance of which was as follows: there was a dated telephone
call; a telephone call placed from the law firm of Pedersen &
Houpt; placed by Murphy to Defendant; Craig Shaffer was on the
line, concerned that he and Rossini were informed by a third
party that they were not the owners of properties they paid
for, and the origination of the guarantee agreement was
proposed by Defendant Murphy (who on the stand on June 8,
2018, testified that the guarantee agreement was originated by
Rossini to induce Robert Badalian to invest in non-existent
properties.

Murphy advised Rossini and Shaffer that it took at least
90 to 180 days for the deeds to be transferred in short-sale
transactions. Shaffer purchased 3820 W. Adams, Chicago, a
property in which the deed could not be transferred for 90
days. Murphy's explanation and solution was believable.
After all, as Murphy stated to Rossini and Shaffer, Pedersen
stood behind these transactions. Shaffer would have testified
to these conversations, documents, properties and payments.
It was fully one month after the origination of the guarantee
agreement before Rossini met Badalian. Defendant informed
Adams and Frankel, and in his motions, memorandums, letters,
and finally at trial, while Murphy testified about the
guarantee agreements.


(vii). Rossini directed his attorneys to call attorney
Richard L. Kruse to testify about the Cook County Circuit

Court Chancery Division accounting lawsuit brought by DSI against Murphy in April 2013. The Government showed Rossini was still doing business with Murphy after the initiation of the lawsuit. Attorney Kruse would have testified as to the reason for business with Murphy post-lawsuit. It was due to the agreed order, signed by Murphy, to provide accounting and documentation of notes, mortgages, names of attorneys with whom Murphy was corresponding concerning the notes, mortgages and the foreclosure lawsuits. Murphy subsequent bankruptcies defeated the progress of Rossini's lawsuit, and those of others. This was known to the Government (as set forth in Rossini's proposed Motion in Limine, Exhibit 3, herein). Yet, the Government misrepresented that it was a "sham lawsuit." Adams and Frankel, being unprepared, did not dispute the misrepresentation effectively, nor present to the jury Rossini's version and the relevant documents in support.

Attorney Kruse would testify as to Rossini emailing a copy of Defendant's documentation to Murphy concerning how much interest or rental income was paid to investors. Murphy told attorney Kruse that he should have had an assistant just for the DSI workload but since he did not, he needed to see what documentation Rossini had in order for Murphy to recreate accounting from his Chase bank account. Murphy told Mr. Kruse that at Pedersen, his assistant Emily Mansell, was an excellent administrator but that he had left Pedersen during July 2011 and therefore needed Rossini's accounting as a starting place. From this, Murphy said he could include the remainder of the checks and invoices he had accumulated in 2012 and 2013.

Attorney Kruse was present at the meeting with Father Ninos Younan, Ashoor Pithyou and Rossini which was the subject of a taped conversation played by the government to the jury. Mr. Kruse would have given context to the taped conversations.

Mr. Kruse was also present for meetings with investors Janet Khoshaba, Ilias Bolos, Gus Bahramis, Robert Badalian, Moshi Moshi, Havanna Moshi, John Khoshaba, Raymond Babaoghli and Fereidoon Khoshabe. It was imperative for Rossini's attorneys to contact Mr. Kruse. Yet, Adams and Frankel failed to call Mr. Kruse, failed to contact Mr. Kruse at any time prior to or during the trial to refute the Government's claim of a sham lawsuit.

(viii). Rossini wanted his attorneys to show he was not merely "stalling" or "lulling" Kathy Khodi when he sent emails to Ms. Khodi that he was closing a line of credit (or transaction) to pay her. Rossini and attorney Theodore Netzky negotiated with Barnett Capital of Northbrook, Illinois for a $3,000,000 loan with the Riverdale townhomes and other properties as collateral. The loan was approved by Barnett Capital, Rossini paid a $10,000 fee to Barnett's lawyers, Lavenfeld & Perlstein and Mr. Netzky was finalizing the loan when government agents interfered with the loan closing. Netzky and Rossini had informed Daniel Sobelman of Barnett Capital about Rossini's difficulties prior to the loan application; however, on information and belief the agents pressured Barnett not to close the loan. This should have been the subject of questions for agents Evans and Blau and possibly attorney Netzky as well as Mr. Sobelman. Rossini's

attorneys did not call any witnesses about the Barnett loan
and this could have counteracted Ms. Khodi's effective
testimony  about Rossini "stalling" her in repayment.

The Defendant suggested various witnesses to his lawyers
to counter Ms. Khodi's testimony.  Lior Coresh is a real
estate investor who sold Rossini the 16 Riverdale townhomes in
which Ms. Khodi invested.  Mr. Coresh would have testified to
the condition of the properties, need for renovation and the
difficulty with the Riverdale regulatory process when
transferring property.  Mr. Coresh had to pay Rossini the
rentals for several months after closing since effective
transfer of the deeds needed Riverdale point of sale
inspection approval prior to Section 8 monthly rental
transfers.  Attorney Anthony Klytta represented Rossini and
Rockford Commercial Mortgage Company in closing the Riverdale
transaction and before the Village of Riverdale.  His
testimony concerning Rossini's attempts to transfer the
properties to Ms. Khodi including execution of deeds to the
Khodi Family Trust would have been invaluable for the defense.
 Mr. Klytta had also, on behalf of the Defendant, investigated
each Cook County Circuit Court Chancery Division file on the
notes and mortgages Murphy was to purchase on behalf of
Rossini, DSI and its investors.  Attorney Klytta copied each
foreclosure file for Rossini to call the mortgage holder's
lawyers to determine whether DSI and its investors owned any
of the notes Murphy was given money to purchase.

Attorneys Barbara Boiko and Ronald Osimani, Fidelity
Title Insurance agents negotiated with Ms. Khodi's attorney,
Patrick Valentino during the time Rossini and Mr. Netzky were

attempting to close the Barnett Capital loan to pay the Khodi
Family Trust. Attorneys in the Boiko & Osimani law firm were
speaking with bank foreclosure attorneys in an effort to
determine which notes DSI actually owned and to purchase on
behalf of its investors the many notes Murphy had not closed.
Ms. Boiko and Mr. Osimani could testify to this activity. Ms.
Boiko also alerted Rossini that an Ocwen Loan Servicing Bulk
Sale package of properties that the Defendant was purchasing
on behalf of the Khodi Family Trust showed multiple
irregularities and fraud in the transfer on the part of Ocwen,
its client American Home Mortgages and their brokers.
Consequently, the Defendant was unable to purchase this Bulk
Sale of notes and properties with Ms. Khodi.

(ix). Rossini's sent information to his attorneys on
February 20, 2018 concerning Murphy's Ponzi scheme modus
operandi, specifically through a company called Prestige
Realty Partners, LLC ("Prestige"). From this information,
attorneys Adams and Frankel were directed to investigate and
call Harry Gio, a 50% membership owner in Prestige as a
witness. Mr. Murphy owned the remaining 50% ownership in
Prestige. Prestige operated between 2002-2007, in mortgages
and bank loans involving over $22 million in losses (per
Murphy's testimony in his Rule 2004 Bankruptcy deposition).
How selective can the government be in ignoring Prestige's
large-scale mortgage fraud, investigating indifferently in
2008-2013, and shifting its prosecution (and blame, as per
Murphy's modus operandi) to the Defendant and Babajan
Khoshabe.

Murphy informed Defendant that the government was investigating Murphy's partner--the one, conveniently, with a criminal background--Harry Gio, for mortgage fraud, but that neither Murphy or Pedersen & Houpt--where he was a partner in those years--were under scrutiny. (See attached and incorporated herein Murphy's operation not Prestige is in the Bankruptcy Petition deposition, Murphy's 2014 Financial Disclosure Forms, the World Wide Realty LLC's Motion to Dismiss Murphy's Bankruptcy [World Wide Realty LLC is included below as one of Murphy's "hard money" financiers], Defendant's Motion to Admit and Motion to Take Judicial Notice).

Murphy testified in 2014 under oath before government attorney Jeffrey Snell that Prestige was a defunct business that dealt in buying and selling properties. Murphy and Prestige, purchased apartment properties to convert to condominiums that were sold to buyers for substantially more than the cost or value of those properties. This and the following information is parsed from Murphy's bankruptcies, numerous civil cases involving Murphy. It is pertinent in this case to show Murphy's modus operandi and his willingness to blame others for his own deceit and fraudulent activity.

Sales were financed with mortgages based on property values that were inflated by Murphy. Buyers defaulted on the loans and the mortgages were foreclosed but by which time Murphy had got his profits from the deals made by selling the properties at inflated prices. The higher the property value, the higher the loan; the higher the sales price, the larger the profit. In order to obtain loans for the highest possible property value, and reap the highest possible profit, Murphy

misrepresented to lenders: about the true buyers, the source
of down payments, the value of the properties, the income and
employment of buyers, whether buyers could occupy the
properties, the income and  employment of buyers, whether
buyers could occupy the properties, and whether the properties
owned by the buyers were being leased.

Murphy lied about the true owners of the properties to
disguise the fact that Prestige was behind the transactions
and was actually selling the properties to himself and
Prestige.  Unbeknownst to the lenders, Murphy recruited people
with good credit scores to serve as straw buyers.  He had some
of them purchase several properties from him, using loans from
different lenders, all of which were obtained within a short
period of time so that each successive lender would not find
out about the other loans to that borrower.  Once multiple
loans or mortgages showed up on the buyer's credit report--
which typically took a few weeks--it became difficult for that
buyer to qualify for new loans.  At that point, the buyer's
usefulness to Murphy was at an end and he would recruit a new
buyer in the course of running this business.

Only Murphy's inflated property values could circumvent
lenders' loan-to-value requirements and increase the selling
price.  For example, a bank could make a loan for $200,000
under the assumption that it was lending 80% on a property
worth $250,000 when in reality the bank was lending 133% on a
property worth only $150,000.

Murphy's scheme needed many straw buyers.  He recruited.
He did so by pitching the model to people known through his
family contacts at the Illinois Department of Transportation,

33

Streets and Sanitation, Chicago Police and Firemen. The
business model involved buying distressed apartment buildings
on Chicago's south side at a discount, renovating and
furnishing them, renting them on lucrative short-term leases,
and later, selling them for a profit. Murphy assured the
straw buyers that he and his associates would take care of
mortgage payments, taxes, insurance, association fees, and all
other expenses, and that the would maintain the properties,
lease and collect rents and then pay out to the straw buyers
any excess rental income.

The only way Murphy could conceivably stay current on the
existing mortgage loans was by using the incoming flow of
sales proceeds to make the loan payments on units previously
sold to straw buyers.

Once again the Prestige and Murphy operation shows the
government's unwillingness to disclose information where it
refutes their false narrative of Defendant directing Murphy in
how and when to commit fraud. Defendant did not meet Murphy
until November 2007. Murphy operated Prestige from 2002-2007.
Prestige and the witnesses concerning Prestige is relevant
because it shows Murphy's scheming, sophistication and modus
operandi of paying old investors and bank loans with money
from new investors and bank loans.

Prestige was at a minimum a loss of $22 million to banks
and investors (per Murphy testimony at the 2014 Bankruptcy
deposition in the Rule 2004 Hearing, attached and incorporated
herein) every one of the mortgages went into foreclosure. The
Defendant was not involved, especially since he did not know
Murphy at that time. The Defendant witness list for Prestige

34

included Harry Gio, David Katz, a hedge fund manager from New York City, officers of World Wide Realty, LLC, Bryn Perna of American Chartered Bank, see attached and incorporated herein).

(x). Rossini asked his lawyers to present evidence that the government was hiding information contrary to Brady and Giglio and this could be brought out by calling agents Evans and Blau, Cambridge Management directors and officers Jason Mitan, Barbara Kalinowski, and Howard Goldberg as defense witnesses. This post indictment instance shows the government's heated and unwarranted interference, preventing payment on a Rossini guarantee for investors.

In November 2015, an arson fire occurred at the home of Murphy's longtime colleague, attorney Jeffrey Deer (in his trial testimony, Murphy blamed attorney Deer for the inadequacies and misstatements in Murphy's bankruptcy petitions, see attached and incorporated herein). Murphy introduced Deer to Rossini in 2011 as an attorney who would represent DSI and Rossini in litigation matters. At the time, and still pending, Deer was under indictment in Cook county for forgery, perjury, interference with court orders, and money laundering.

The government in the herein case was made aware that Rossini would be testifying in the Murphy criminal case in Cook County from which he had been dismissed. The government attitude was nevertheless persistent about Rossini. It turned to investigate Rossini for his work with Cambridge Management, just as he was investigated with any business in which he

became involved. Agents Evans and Blau told officers and
directors at Cambridge that Rossini was going to launder the
illicit gains taken from his investors into a Cambridge
transaction. Deer was under pressure to return money to a
client from a settlement that Deer's firm had negotiated.
Then Deer's house was suspiciously torched. Rossini was told
by Peter Poulos (a Murphy client) that Murphy and Deer accused
Rossini as the arsonist to investigating authorities.

The Defendant contacted pretrial officer Justin Wiersema
and related the arson information. Officer Wiersema told
Rossini to give any investigators his telephone number since
he knew exactly where Defendant was before, during and after
the fire. Interestingly, two of Jeffrey Deer's clients at the
time of the arson had been previously convicted of arson in
the 1980s and served federal prison time.

Prior to trial in this Court, the government informed
Rossini's attorneys that Deer was to testify against Rossini.

The federal government's strategy was purposefully
oblivious to Murphy's conduct, statements, background, and
testimony because it had its false narrative from which it
would not veer, notwithstanding the facts. It narrative,
which bears repeating, is the one which convinced a Grand Jury
to indict Rossini and a jury to convict him, without the
government having looked at the records, and the one which
inspired them to charge and convict Rossini as the
Macchiavelian schemer and/or launderer where former attorney
Murphy suffered the domination of Rossini's directives to put
investor money into his (Murphy's) pockets. In light of the
Murphy history, the records (ignored, undisclosed or omitted

by the government and not challenged through defense
witnesses) administrative judgments, and Rossini's
comprehensive records (not presented to the jury by his
attorneys) Murphy as a hapless Pangloss beggars believability.
 Only through the lack of presenting a defense would these fac
ts not come into evidence.


## DISCUSSION


The Federal Public Defender Service Publishes through the
Criminal Practice Institute the following under part D,
"Interviewing Defense Witnesses."

"Counsel should seek out and talk to every potential
defense witness as soon as possible.  These include not only
alibi witnesses and other obviously important witnesses, but
also those who can corroborate even a small part of the
defense case.  Care should not only learn what each witness
has to say about the case but also facts about the witness--
for example, criminal record or reasons for possible bias,
which may subject the witness to embarrassing impeachment at
trial.  In addition, witnesses can often provide leads to
other witnesses.  Counsel may ask defense witnesses to come to
counsel's office for an interview, but if they refuse, an
investigator should be sent to interview them.  Whether to
take signed statements from defense witnesses or to serve a
subpoena at the time of initial contact are matters of
judgment that will depend on the circumstances...In Arrington
v. United States, 804 A.2d 1068 (D.C. 2002), the Court
reversed the trial court's denial without a hearing of a

motion for new trial based on ineffective assistance of counsel and a motion for new trial based on newly discovered evidence. The ineffectiveness claim alleged that trial counsel failed to attempt to locate or interview exculpatory witnesses after being provided with several names by the defendant, and the trial court erroneously denied the motion without an evidentiary hearing to determine credibility of defendant's assertions."

Defendant's trial attorneys did not communicate with any of Rossini's witnesses and did not call any witnesses in his defense. The cumulative effect of the aditional evidence detailed herein and in the Defendant's affidavit would have had a significant impact on whether the jury viewed the government witnesses as credible and therefore this Court must grant Rossini a new trial under Fed. R. Crim. P. 33(a) with a new trial attorney.

The actions of the Defendant's attorneys not to call witnesses suggested to them by the Defendant was not a strategic decision since they did not investigate any of the witnesses and therefore they could not have consciously decided not to call them in Rossini's defense. Their actions were a result of an indolent defense, actually no defense at all. An attorney's performance is deficient when a defendant provides the names of possible mitigation witnesses and the attorney does not determine for himself whether their testimony would be helpful. United States v. Simpson, 864 F.3d 830 (7th Cir. 2017). In support of his motion for a new trial, Rossini attaches an affidavit asserting that he told or wrote his trial counsels of the many witnesses he wanted them

to call, reasons to call them, but that his attorneys did not contact one of these prospective witnesses.

The Court generally reviews ineffective assistance claims on collateral review; however, when a defendant raises an ineffective assistance claim in a motion for a new trial, that "claim is addressed by holding an evidentiary hearing for the trial court to consider the evidence of the trial counsel's deficiency and its possible effect on the outcome." United States v. Malone, 484 F.3d 916, 919 (7th Cir. 2007). As the Seventh Circuit has stated in the habeas corpus context, "[i]neffective assistance claims often require an evidentiary hearing because they frequently allege facts that the record does not fully disclose." Osagiede v. United States, 543 F.3d 399, 408 (7th Cir. 2008).

The decision not to call a particular witness is frequently strategic, insulated from attack on ineffective assistance grounds. But, "[a]n outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." Blackmon v. Williams, 823 F.3d 1088 (7th Cir. 2016)(quoting United States v. Best, 426 F.3d 937, 945 (7th Cir. 2005), citing Rompilla v. Beard, 545 U.S. 374, 387 (2005). "If counsel never learned what the witnesses would have said, he 'could not possibly have made a reasonable professional judgment that their testimony would have been cumulative.'" Mosely v. Atchison, 689 F.3d 838, 848 (7th Cir. 2012); see also Campbell v. Reardon, 780 F.3d 752, 764 (7th Cir 2015)(rejecting state court's assumption that lawyer's decision not to interview eye witnesses was reasonable; proper inquiry was "whether the investigation supporting counsel's

decision" not to call the witnesses "was itself reasonable.").

The unreasonableness of counsel's failure to investigate is "further bolstered by the significant potential benefits of obtaining alibi testimony from witnesses..." Blackmon, 823 F.3d at 1104. Rossini's counsel could not have known whether witnesses had any vulnerabilities without doing at least some investigation of the witnesses and testimony they could provide. There is also no indication counsel considered the effect all the witnesses might have had in combination, any individual weaknesses notwithstanding. Blackmon, 823 F.3d at 1105 quoting Kaygoza v. Hulick, 474 F.3d 958, 964(7th Cir. 2007)(rejecting attorney's decision not to call additional alibi witnesses where he "picked off" each witness based on potential vulnerabilities without considering the cumulative impact of their testimony).

There can be no support to treat as reasonable a decision not to investigate any of the available defense witnesses. Rossini's intent was a pivotal issue fo rthe defense. "Additional disinterested and credible alibi witnesses could have made a significant difference in the viability of [Rossini's] defense..." Blackmon, 823 F.3d at 1105 (quoting Campbell, 780 F.3d at 765, citing Strickland v. Washington, 466 U.S. 668, 691 and "the benefits could have been enormous." Blackmon, 823 F.3d at 1105.

One witness might have been able to show Rossini's intent to the jury and all of them could have supported his claim that he believed Murphy was purchasing notes and mortgages for DSI and its investors. "A reasonable probability is 'a

probability sufficient' to undermine confidence in the outcome." Mosely, 689 F.3d at 851, quoting Strickland 466 U.S. at 694. The issue here is whether Rossini would have had a "reasonable chance" of acquittal absent counsel's errors. Stanley v. Bartley, 465 F.3d 810, 814 (7th Cir. 2006)(noting also that "it needn't be a 50 percent or greater chance"). Of course the existing verdict in Rossini's case is now overshelmingly supported by the evidence before the jury because Rossini's counsel presented no evidence; they presented no defense even though Rossini had provided them ample evidence and witnesses to contradict the government's narrative.

Under the Strickland test, in the first prong, a hearing would produce evidence consistent with Rossini's affidavit, that his trial cousnel did not communicate with the Defendant's proposed witnesses. Rossini recognizes that "the Constitution does not oblige counsel to present each and every witness that is suggested to him." United States v. Best, 426 F.3d 937, 945 (7th Cir. 2005). However, Rossini's attorneys had a duty to "investigate the various lines of defense available in a given case." Wiggins v. United States, 539 U.S. 521-23 (2003). Trial counsel did not speak to any of Rossini's witnesses. Failure to conduct any investigation regarding the potentially exculpatory witnesses certainly consitutes deficient performance. See Hall v. Washington, 106 F.3d 742, 750 (7th Cir. 1997)(concluding that an attorney's performance is deficient when "a defendant provides the names of possible mitigation witnesses" and the attorney does not "determine for himself whether their testimony would be helpful.

41

As to Strickland's second prong, the testimony of Rossini's witnesses would have impacted the trial's outcome. As impeachment evidence, their testimony could have had a meaningful impact on the outcome of the trial.

Mr. Murphy testified that the Defendant concocted the guaranty agreement to induce Robert Badalian into investing in nonexistent properties. However, defense witness Craig Shaffer would have testified that the guaranty agreement was initiated to guaranty properties that he and DSI were purchasing in February and March 2011. Documentation that had been presented by the Defendant to his attorneys in April 2018 had they been admitted by his attorneys would have shown that the agreements were believed by Rossini as similar to credit default swaps. The guaranty agreements were not an inducement for investors to fund transactions since Rossini did not send the agreements until after he received the funds and after he believed Murphy had purchased the notes or had secured assignments of the right to purchase said notes.

The Circuit Court of Cook County Chancery Division accounting lawsuit of DSI v. Thomas Murphy in which Rossini's witnesses would have proven that the complaint was not a sham to lull investors but an attempt to recoup money for the investors. Rossini and the Khoshabes paid Murphy over $500,000 to purchase the same notes and mortgages as the victims were being asked to fund. Rossini purchased two comprehensive building, fire and liability insurance policies and paid the premiums to insure 70 buildings that the government called nonexistent properties. The premiums paid often were in excess of $14,000 per month and this directly

contradicts the government's narrative that Rossini was selling nonexistent properties. A jury needs to determine whether it is reasonable to assume that the Defendant would pay over $500,000 to purchase notes he knew were nonexistent and over $14,000 per month in premiums to insure those nonexistent buildings.

The Defendant's witnesses would have testified to Rossini's purchase of the Riverdale properties and both his attempt to transfer these townhomes to the Khodi Family Trust and the reason for the delay. Rossini provided a copy of the Riverdale Village transfer ordinances but his attorneys did not admit them nor use them in cross examination of Ms. Khodi. Other defense witnesses would have testified to Rossini's negotiations to obtain a loan at Barnett Capital to return investor funds once he realized that Murphy had absconded with their funds. The same witnesses would have testified to the Defendant's attempt to purchase a Bulk Sale of notes and properties from both Commercial Mortgage Corporation of Rockford and Ocwen Loan Servicing Corp for the Khodi Family Trust and as replacement for notes to investors once he realized Murphy had diverted their funds for his own purposes. A thorough review of finances by either the FBI forensic accountant or a defense specialist would have proved that the Defendant spent a great majority of the money he received for payment to investors, purchase properties for investors, insurance premiums to protect those properties and to invest in notes similar to his investors. Other witnesses would have testified as to Murphy's thirty year ponzi modus operandi.

Defendant Rossini's prospective witnesses were unencumbered by previous convictions, they are credible and could have made a significant difference in providing the Defendant a defense. Nothing in the record or in an evidentiary hearing would show that investigating Rossini's witnesses would have been "fruitless or harmful," Campbell, 780 F.3d at 765, citing Strickland, 466 U.S. at 691.

Based upon Rossini's statement to the Court on June 4, 2018 that his attorneys were unprepared for trial and the fact that they did not investigate any of his defense witnesses nor call any witnesses in defense, the Court must grant the Defendant a new trial.

Respectfully submitted,

*Albert Rossini*

Albert Rossini, Defendant Pro Se
#08043-424
METROPOLITAN CORRECTIONAI CENTER
71 WEST VANBUREN STREET
Chicago, ILLINOIS 60605

AFFIDAVIT

I, ALBERT ROSSINI, under penalty of perjury state the following:

Between August 2017 and June 4, 2018, I mailed, emailed or otherwise provided to my attorneys, Joshua Adams and Scott Frankel, the following information and documentation concerning my criminal case Number 15-CR-515-1 in order for them to prepare my defense.

MOTIONS SUBMITTED BY ME TO MY ATTORNEYS:

1.   Defendant Albert Rossini's Motion and Memorandum of Law to Dismiss the Indictment for Prosecutorial Misconduct, Memorandum of Law and Supplement in Support;

2.   Defendant Albert Rossini's Motion and Memorandum of Law to Strike and Dismiss Government Allegations of Non-Existent Property Sales from the Record as Erroneous and False;

3.   Defendant Albert Rossini's Motion for Production by the Government of Brady and Giglio Material;

4.   Defendant Albert Rossini's Motion and Memorandum of Law to Reject and Dismiss the Government's Substitution of Deliberate Indifference for Mens Rea;

Memorandums and letters submitted to attorneys Adams and Frankel between August 2017 and June 4, 2018 concerning my criminal cases, bond issues and detention:

1.   Explanation of Guaranty Agreements;

2. Twenty-six pages of questions and answers concerning case number 15-CR-515-1;

3. Accounting chart of investor funds and disbursements;

4. Copies of cashier checks, money orders, commission rebates paid by me and the Khoshabes to Thomas W. Murphy so that he could purchase notes and mortgages for me and the Khoshabes similar to those he was purchasing for our investors;

5. Copy of insurance policies and premiums payments insuraning over 70 propreties, most of which were properties underlying the notes and mortgages that Murphy was purchasing for me, the Khoshabes, Devon Street Investments, Ltd. ("DSI") and investors;

6. Copy of mechanic's lien and my actions involving 7815 Kolmar, Skokie, Illinois;

7. Explanation of Rossini's court approved trips and proof that he was where court had authorized him to travel;

8. Rossini's 2010, 2011, and 2012 tax returns with 1040 schedule C gross revenues of $577,967 in 2011, 1040 schedule C gross revenues of $849,528 in 2012 and 1120S gross revenues for DSI of $2,350,099 in 2012;

9. Letters to Hon. John Z. Lee.


The following are witnesses I asked my attorneys, Joshua Adams and Scott Frankel, to call in my defense:

MEIR ROTSTEIN, a real estate broker working in the DSI office responsible for comparative market analysis (CMA) of

A-2

propreties in which investors and I were investing . Mr.
Rotstein was also the real estate broker that introduced me to
Liam Ben David and Haim Gabi.  Mr. Rotsten was the real estate
broker who introduced me to Lior Coresh from whom I purchased
the 16 Riverdale townhomes for Rockford Commercial Mortgage
Company, Ltd. and Kathy Khodi.  Mr. Rotstein also introduced
me to Verticle Mortgage Funding Corporation from which I
purchased the note and mortgage for 211 N. Kilbourn, Chicago.
He would testify to many of the events that government
witnesses described in their testimony as well as to a defense
presentation of facts surrounding the purchase and attempted
transfer of 16 Riverdale townhome properties to Kathy Khodi,
Khodi Family Trust.

LISA ROSEN worked as a short sale and note purchase negotiator
for DSI and introduced Rossini to many investors and sellers
including, but not limited to, Walid Aiyesh, Commercial
Mortgage Corporation, attorney Carl Pallidinetti, investor
Julie Mai Kirkel, the property at 3327 W. Monroe and 1921 N.
Richmond, Chicago, Illinois. Ms. Rosen worked on many
transactions including the purchase of a $3,500,000 commercial
mortgage portfolio from North Community Bank and a 20 building
portfolio controlled by Harris Bank of Chicago.  Ms. Rosen
would testify as to the daily workings of DSI, note purchase
agreements and investor visits to Rossini.

PAMELA SAUER worked as a real estate broker in the DSI office
and also reviewed comparative market analysis of properties
for Rossini.  She worked closely with several investors

including Ilias Bolos and could testify as to their frequent
visits to the DSI office.

RICHARD L. KRUSE, ESQ. represented DSI and Rossini in an
accounting lawsuit against Thomas Murphy in Cook County
Circuit Court, Chancery Division. The complaint was filed in
April 2013. Mr. Kruse advised Rossini to place lis pendens on
the properties Murphy was alleged to have purchased on behalf
of DSI and investors, until DSI could ascertain the existence
of the notes and mortgages and whether Murphy had purchaesd
them on behalf of DSI, its investors or other clients Murphy
was representing. Mr. Kruse attended meetings with several
investors including Ashoor Pithyou, Father Ninos Younan,
Father Awiquam Pithyou, Fereidoon Khoshabe, Babajan Khoshabe,
Craig Shaffer, Robert Badalian, Raymond Babaoghli, Moshi
Moshi, Havanna Moshi, Janet Khoshaba, John Khoshaba, and Ilias
Bolos. Mr. Kruse also represented DSI and Craig Shaffer in a
lawsuit filed in Cook County Circuit Court, Chancery Division
against several of Murphy's short sale broker clients in which
it is believed Murphy double sold properties which DSI and
investors provided funds for closing of the transactions. Mr.
Kruse's testimony would be critical to combat the government's
narrative that the 2013 DSI accounting lawsuit was a sham
meant to lull and stall investors.

CRAID SHAFFER is a certified public accountant and the DSI
original investor introduced to Rossini by Babajan Khoshabe.
Mr. Shaffer received a deed from DSI for 3820 W. Adams, 4129
W. Adams and 4139 W. Adams but did not receive deeds for 4

additional properties that are the subject of a Cook County
Circuit Court, Chancery Division lawsuit alleging that Murphy
and several of his short sale clients defrauded DSI and
Shaffer using their funds to purchaes properties and not
transferring them to DSI or Shaffer. These properties
included 4135 W. Monroe, 4654 W. Adams, 5131 W. Crystal and
5019 W. Adams. The original guaranty agreements were composed
by Murphy in response to Mr. Shaffer and DSI not receiving a
transfer of the above named propeties. At trial, the
government through testimony of Thomas Murphy stated that the
guarantees were concocted or devised by me to induce Robert
Badalian to invest money with DSI in May 2011, but in fact,
Mr. Shaffer could testify that the guarantees were a result of
properties Murphy was purchasing with other short sale clients
in February, March and April 2011. Mr. Shaffer could testify
to the fact that the guarantees were first concocted and
composed by Murphy to hide from Rossini and Shaffer that
Murphy was double dealing with funds they had provided to him
for the purchase of properties.

ANTHONY KLYTTA, ESQ. is an attorney who represented Rossini in
a number of property closings and several lawsuits. He also
represented Rossini and Rockford Commercial Mortgage
Corporation in the purchase and attempted transfer to Mr.
Khodi of 16 Riverdale townhomes. Mr. Klytta attended
meetings at the Riverdale City Hall and with the Riverdale
Building Marshall negotiating the terms of transfer from Lior
Coresh to Rockford Commercial Mortgage and then to the Khodi
Family Trust. Mr. Klytta could testify to the difficulty in

A-5

immediate transfer of properties in Riverdale without
renovation first being performed on the subject properties.
Also, Mr. Klytta investigated on behalf of Rossini, the
foreclosure files in the Cook County Chancery Clerk's office
that DSI, Rossini and investors had sent money for Murphy to
purchase. Mr. Klytta could testify that he copied each of the
foreclosure files for Rossini and conferred with him in 2013
as to their status. Mr. Klytta was familiar with Rossini's
business and could testify as to the fact that he did purchase
properties on behalf of investors.

LIOR CORESH is a real estate investor introduced to Rossini by
Meir Rotstein. He sold 16 Riverdale Townhomes that he owned
to Rockford Commercial Mortgage. Mr. Coresh could testify as
to the difficulty with transferring these specific properties,
the regulatory process, and construction needed to be
completed.

BARBARA BOIKO and RONALD OSIMANI, attorneys and Fidelity Title
Agents. Boiko and Osimani negotiated with Ms. Khodi's
attorney, Patrick Valentino, and also was familiar with the
Barnett Capital transaction that Rossini and Theodore Netzky
were attempting to close so as to reimburse Ms. Khodi and
other investors. Assistant attorneys in Ms. Boiko's office
negotiated with bank foreclosure attorneys to obtain
properties on behalf of Rossini and investors that Murphy was
supposed to have purchased. Ms. Boiko and Mr. Osimani could
testify to this activity. Ms. Boiko also alerted Rossini that
an Ocwen Loan Servicing Bulk Sale package of propeties that

Rossini was purchasing on behalf of himself, Ms. Khodi and others showed multiple irregularities and fraud on the part of Ocwen, American Home Mortgage and or brokers assocated wtih those companies.

HARRY GIO was a 50% member together with Thomas Murphy in Prestige Realty Partners LLC. The company purchased many properties and resold them as condominiums between 2002 and 2005. Prestige Realty shows Murphy's modus operandi with ponzi schemes whether through use of investor funds or bank loans.

TAMERA BROWN was a friend and business partner of Thomas Murphy. She participated in both the purchase of 2015 N. Racine with Murphy and several enterprises including a catering service. Ms. Brown answered interrogatories provided her by attorney Kruse on behalf of DSI in the DSI v. Thomas Murphy, Cook County Circuit Court Chancery Division case. She stated that she and Murphy were purchasing 2015 N. Racine and that they would live there together. Rossini and the Khoshabes believed that at least $600,000 of investor funds had been diverted by Murphy into the purchase of that property. At the August 2015 bond hearing before Judge Gilbert, the government postulated that Muprhy had deposited over $450,000 in accounts with Ms. Brown from October 2011 through 2013. It is my belief stated to my attorneys that much of the investor money was diverted by Murphy for the use of he and Ms. Brown and therefore it was important to call her as a witness.

EMILY MANSELL   is a paralegal at Pedersen & Houpt and
Murphy's assistant while he was at that firm.  She worked on
many Rossini transactions and litigation in which Pedersen
represented me or family members.  She was Murphy's paralegal
when he devised and composed the original guaranty agreement.

MATTHEW POICASTRO was an associate at Berger Newmark &
Fenschel who represented me, DSI and investors in building
code violation cases as co-counsel with Murphy.

TRISHA HENDERSON is a real estate broker representing FREDDIE
MAC in its sale of 8718 Kimball, Skokie, Illinois.  I
negotiated with Ms. Hendersen to purchase Kimball on behalf of
Nastors Moshi.  I executed a contract prepared by Ms.
Henderson to purchase the Kimball property.  She was aware of
the lis pendens on 8718 Kimball, the reason for the lien and
my willingness to purchase the property on behalf of Nastors
Moshi.

BRIAN TRACY is a partner at Codilis & Associates overseeing
the bank owned property division.  Codilis is one of the
premier plaintiff foreclosure law firms in Chicago.  They are
officed in Burr Ridge, Illinois.  Mr. Tracy and I often spoke
about the lis pendens, when I would release liens on certain
properties, my reasoning for recording the liens to protect
investors and my need to purchase certain properties that
Murphy was supposed to have purchased with investor funds.
Mr. Tracy was familiar with 8718 Kimball, 2043 Birchwood, and

many other properties that Rossini had recorded lis pendens against.

JOAN SANDERS is an Internal Revenue Agent and Examiner assigned to my 2012 personal and DSI tax audit. Ms. Sanders could testify to my statements of gross income, expenses, and business plan.

DENISE AZIZIAN was a commercial banker at J.P. Morgan Chase Bank in Winnetka, Illinois during 2012. She now works for PNC Bank. She is familiar with the DSI, Devon Street Management and Devon Street Realty accounts at Chase Bank and Murphy's account also at Chase. Ms. Azizian could testify as to Murphy bouncing over $550,000 of checks to both DSI and Devon Street Realty in November and December 2012. She could also testify to Rossini covering the overdrafted accounts with his savings and as to the Chase investigation. Ms. Azizian would also be able to testify as to preparing cashier checks for me to purchase notes and mortgages for my own account from Mr. Murphy.

TARIQ ISAC and ANWAR MICHAEL were investors to whom I returned money shortly after they invested to purchase notes and mortgages. They were returned the very same money with which they invested and no other investor money had been received just prior or during the period in which their money was invested. They could testify as to a return of their funds.

Attorneys Adams and Frankel did not speak or email any of

these witnesses before trial.  They did not call or email any
of these witnesses during trial even after I gave them the
telephone numbers of several witnesses, especially Messrs.
Rotstein, Klytta, Kruse and Tracy.  Attorneys Adams and
Frankel stated they were calling FBI Agents Evans and Blau as
defense witnesses but refysed to do so after I insisted they
call them.  I stated to my attorneys that it seems the
government is not calling the main investigators in the case
but instead using an agent with approximately two months
experience in this case, probably due to the fact that she was
not present at the July 2015 interview of Anthony Khoshabe and
could not be impeached using the suppression of Anthony's inte
rview.
and asked them to call each and summon them as witnesses on by
behalf.  Mr. Adams and Frankel refused to investigate
witnesses on my behalf.


Respectfully submitted under penalty of perjury this _31_ day
of July, 2018.

*Albert Rossini*

Albert Rossini
No. 08043-424
Defendant Pro Se
Metropolitan Correcxtional Center
71 W. Van Buren Street
Chicago, IL 60605

A -10

EXHIBIT 1
AFFIDAVIT OF DEFENDANT ALBERT ROSSINI
INCLUDED WITH MOTION FOR NEW TRIAL

AFFIDAVIT

I, ALBERT ROSSINI, under penalty of perjury state the
following:

Between August 2017 and June 4, 2018, I mailed, emailed or
otherwise provided to my attorneys, Joshua Adams and Scott
Frankel, the following information and documentation
concerning my criminal case Number 15-CR-515-1 in order for
them to prepare my defense.

MOTIONS SUBMITTED BY ME TO MY ATTORNEYS:

1. Defendant Albert Rossini's Motion and Memorandum of
Law to Dismiss the Indictment for Prosecutorial Misconduct,
Memorandum of Law and Supplement in Support;

2. Defendant Albert Rossini's Motion and Memorandum of
Law to Strike and Dismiss Government Allegations of Non-
Existent Property Sales from the Record as Erroneous and
False;

3. Defendant Albert Rossini's Motion for Production by
the Government of Brady and Giglio Material;

4. Defendant Albert Rossini's Motion and Memorandum of
Law to Reject and Dismiss the Government's Substitution of
Deliberate Indifference for Mens Rea;

Memorandums and letters submitted to attorneys Adams and
Frankel between August 2017 and June 4, 2018 concerning my
criminal cases, bond issues and detention:

1. Explanation of Guaranty Agreements;

A-1

2. Twenty-six pages of questions and answers concerning case number 15-CR-515-1;

3. Accounting chart of investor funds and disbursements;

4. Copies of cashier checks, money orders, commission rebates paid by me and the Khoshabes to Thomas W. Murphy so that he could purchase notes and mortgages for me and the Khoshabes similar to those he was purchasing for our investors;

5. Copy of insurance policies and premiums payments insuring over 70 properties, most of which were properties underlying the notes and mortgages that Murphy was purchasing for me, the Khoshabes, Devon Street Investments, Ltd. ("DSI") and investors;

6. Copy of mechanic's lien and my actions involving 7815 Kolmar, Skokie, Illinois;

7. Explanation of Rossini's court approved trips and proof that he was where court had authorized him to travel;

8. Rossini's 2010, 2011, and 2012 tax returns with 1040 schedule C gross revenues of $577,967 in 2011, 1040 schedule C gross revenues of $849,528 in 2012 and 1120S gross revenues for DSI of $2,350,099 in 2012;

9. Letters to Hon. John Z. Lee.

The following are witnesses I asked my attorneys, Joshua Adams and Scott Frankel, to call in my defense:

MEIR ROTSTEIN, a real estate broker working in the DSI office responsible for comparative market analysis (CMA) of

A-2

properties in which investors and I were investing . Mr.
Rotstein was also the real estate broker that introduced me to
Liam Ben David and Haim Gabi. Mr. Rotstein was the real
estate broker who introduced me to Lior Coresh from whom I
purchased the 16 Riverdale townhomes for Rockford Commercial
Mortgage Company, Ltd. and Kathy Khodi. Mr. Rotstein also
introduced me to Verticle Mortgage Funding Corporation from
which I purchased the note and mortgage for 211 N. Kilbourn,
Chicago. He would testify to many of the events that
government witnesses described in their testimony as well as
to a defense presentation of facts surrounding the purchase
and attempted transfer of 16 Riverdale townhome properties to
Kathy Khodi, Khodi Family Trust.

LISA ROSEN worked as a short sale and note purchase negotiator
for DSI and introduced Rossini to many investors and sellers
including, but not limited to, Walid Aiyesh, Commercial
Mortgage Corporation, attorney Carl Pallidinetti, investor
Julie Mai Kirkel, the property at 3327 W. Monroe and 1921 N.
Richmond, Chicago, Illinois. Ms. Rosen worked on many
transactions including the purchase of a $3,500,000 commercial
mortgage portfolio from North Community Bank and a 20 building
portfolio controlled by Harris Bank of Chicago. Ms. Rosen
would testify as to the daily workings of DSI, note purchase
agreements and investor visits to Rossini.

PAMELA SAUER worked as a real estate broker in the DSI office
and also reviewed comparative market analysis of properties
for Rossini. She worked closely with several investors

including Ilias Bolos and could testify as to their frequent
visits to the DSI office.

RICHARD L. KRUSE, ESQ. represented DSI and Rossini in an
accounting lawsuit against Thomas Murphy in Cook County
Circuit Court, Chancery Division. The complaint was filed in
April 2013. Mr. Kruse advised Rossini to place lis pendens on
the properties Murphy was alleged to have purchased on behalf
of DSI and investors, until DSI could ascertain the existence
of the notes and mortgages and whether Murphy had purchased
them on behalf of DSI, its investors or other clients Murphy
was representing. Mr. Kruse attended meetings with several
investors including Ashoor Pithyou, Father Ninos Younan,
Father Awiquam Pithyou, Fereidoon Khoshabe, Babajan Khoshabe,
Craig Shaffer, Robert Badalian, Raymond Babaoghli, Moshi
Moshi, Havanna Moshi, Janet Khoshaba, John Khoshaba, and Ilias
Bolos. Mr. Kruse also represented DSI and Craig Shaffer in a
lawsuit filed in Cook County Circuit Court, Chancery Division
against several of Murphy's short sale broker clients in which
it is believed Murphy double sold properties which DSI and
investors provided funds for closing of the transactions. Mr.
Kruse's testimony would be critical to combat the government's
narrative that the 2013 DSI accounting lawsuit was a sham
meant to lull and stall investors.

CRAIG SHAFFER is a certified public accountant and the DSI
original investor introduced to Rossini by Babajan Khoshabe.
Mr. Shaffer received a deed from DSI for 3820 W. Adams, 4129
W. Adams and 4139 W. Adams but did not receive deeds for 4

A-4

additional properties that are the subject of a Cook County
Circuit Court, Chancery Division lawsuit alleging that Murphy
and several of his short sale clients defrauded DSI and
Shaffer using their funds to purchase properties and not
transferring them to DSI or Shaffer. These properties
included 4135 W. Monroe, 4654 W. Adams, 5131 W. Crystal and
5019 W. Adams. The original guaranty agreements were composed
by Murphy in response to Mr. Shaffer and DSI not receiving a
transfer of the above named properties. At trial, the
government through testimony of Thomas Murphy stated that the
guarantees were concocted or devised by me to induce Robert
Badalian to invest money with DSI in May 2011, but in fact,
Mr. Shaffer could testify that the guarantees were a result of
properties Murphy was purchasing with other short sale clients
in February, March and April 2011. Mr. Shaffer could testify
to the fact that the guarantees were first concocted and
composed by Murphy to hide from Rossini and Shaffer that
Murphy was double dealing with funds they had provided to him
for the purchase of properties.

ANTHONY KLYTTA, ESQ. is an attorney who represented Rossini in
a number of property closings and several lawsuits. He also
represented Rossini and Rockford Commercial Mortgage
Corporation in the purchase and attempted transfer to Mr.
Khodi of 16 Riverdale townhomes. Mr. Klytta attended meetings
at the Riverdale City Hall and with the Riverdale Building
Marshall negotiating the terms of transfer from Lior Coresh to
Rockford Commercial Mortgage and then to the Khodi Family
Trust. Mr. Klytta could testify to the difficulty in

A-5

immediate transfer of properties in Riverdale without
renovation first being performed on the subject properties.
Also, Mr. Klytta investigated on behalf of Rossini, the
foreclosure files in the Cook County Chancery Clerk's office
that DSI, Rossini and investors had sent money for Murphy to
purchase. Mr. Klytta could testify that he copied each of the
foreclosure files for Rossini and conferred with him in 2013
as to their status. Mr. Klytta was familiar with Rossini's
business and could testify as to the fact that he did purchase
properties on behalf of investors.

LIOR CORESH is a real estate investor introduced to Rossini by
Meir Rotstein. He sold 16 Riverdale Townhomes that he owned
to Rockford Commercial Mortgage. Mr. Coresh could testify as
to the difficulty with transferring these specific properties,
the regulatory process, and construction needed to be
completed.

BARBARA BOIKO and RONALD OSIMANI, attorneys and Fidelity Title
Agents. Boiko and Osimani negotiated with Ms. Khodi's
attorney, Patrick Valentino, and also was familiar with the
Barnett Capital transaction that Rossini and Theodore Netzky
were attempting to close so as to reimburse Ms. Khodi and
other investors. Assistant attorneys in Ms. Boiko's office
negotiated with bank foreclosure attorneys to obtain
properties on behalf of Rossini and investors that Murphy was
supposed to have purchased. Ms. Boiko and Mr. Osimani could
testify to this activity. Ms. Boiko also alerted Rossini that
an Ocwen Loan Servicing Bulk Sale package of properties that

Rossini was purchasing on behalf of himself, Ms. Khodi and others showed multiple irregularities and fraud on the part of Ocwen, American Home Mortgage and or brokers associated with those companies.

HARRY GIO was a 50% member together with Thomas Murphy in Prestige Realty Partners LLC. The company purchased many properties and resold them as condominiums between 2002 and 2005. Prestige Realty shows Murphy's modus operandi with ponzi schemes whether through use of investor funds or bank loans.

TAMERA BROWN was a friend and business partner of Thomas Murphy. She participated in both the purchase of 2015 N. Racine with Murphy and several enterprises including a catering service. Ms. Brown answered interrogatories provided her by attorney Kruse on behalf of DSI in the DSI v. Thomas Murphy, Cook County Circuit Court Chancery Division case. She stated that she and Murphy were purchasing 2015 N. Racine and that they would live there together. Rossini and the Khoshabes believed that at least $600,000 of investor funds had been diverted by Murphy into the purchase of that property. At the August 2015 bond hearing before Judge Gilbert, the government postulated that Murphy had deposited over $450,000 in accounts with Ms. Brown from October 2011 through 2013. It is my belief stated to my attorneys that much of the investor money was diverted by Murphy for the use of he and Ms. Brown and therefore it was important to call her as a witness.

EMILY MANSELL  is a paralegal at Pedersen & Houpt and
Murphy's assistant while he was at that firm.  She worked on
many Rossini transactions and litigation in which Pedersen
represented me or family members.  She was Murphy's paralegal
when he devised and composed the original guaranty agreement.

MATTHEW POLICASTRO was an associate at Berger Newmark &
Fenschel who represented me, DSI and investors in building
code violation cases as co-counsel with Murphy.

TRISHA HENDERSON is a real estate broker representing FREDDIE
MAC in its sale of 8718 Kimball, Skokie, Illinois.  I
negotiated with Ms. Henderson to purchase Kimball on behalf of
Nastors Moshi.  I executed a contract prepared by Ms.
Henderson to purchase the Kimball property.  She was aware of
the lis pendens on 8718 Kimball, the reason for the lien and
my willingness to purchase the property on behalf of Nastors
Moshi.

BRIAN TRACY is a partner at Codilis & Associates overseeing
the bank owned property division.  Codilis is one of the
premier plaintiff foreclosure law firms in Chicago.  They are
officed in Burr Ridge, Illinois. Mr. Tracy and I often spoke
about the lis pendens, when I would release liens on certain
properties, my reasoning for recording the liens to protect
investors and my need to purchase certain properties that
Murphy was supposed to have purchased with investor funds.
Mr. Tracy was familiar with 8718 Kimball, 2043 Birchwood, and

A - 8

many other properties that Rossini had recorded lis pendens against.

JOAN SANDERS is an Internal Revenue Agent and Examiner assigned to my 2012 personal and DSI tax audit. Ms. Sanders could testify to my statements of gross income, expenses, and business plan.

DENISE AZIZIAN was a commercial banker at J.P. Morgan Chase Bank in Winnetka, Illinois during 2012. She now works for PNC Bank. She is familiar with the DSI, Devon Street Management and Devon Street Realty accounts at Chase Bank and Murphy's account also at Chase. Ms. Azizian could testify as to Murphy bouncing over $550,000 of checks to both DSI and Devon Street Realty in November and December 2012. She could also testify to Rossini covering the overdrafted accounts with his savings and as to the Chase investigation. Ms. Azizian would also be able to testify as to preparing cashier checks for me to purchase notes and mortgages for my own account from Mr. Murphy.

TARIQ ISAC and ANWAR MICHAEL were investors to whom I returned money shortly after they invested to purchase notes and mortgages. They were returned the very same money with which they invested and no other investor money had been received just prior or during the period in which their money was invested. They could testify as to a return of their funds.

Attorneys Adams and Frankel did not speak or email any of

A - 9

these witnesses before trial. They did not call or email any
of these witnesses during trial even after I gave them the
telephone numbers of several witnesses, especially Messrs.
Rotstein, Klytta, Kruse and Tracy. Attorneys Adams and
Frankel stated they were calling FBI Agents Evans and Blau as
defense witnesses but refused to do so after I insisted they
call them. I stated to my attorneys that it seems the
government is not calling the main investigators in the case
but instead using an agent with approximately two months
experience in this case, probably due to the fact that she was
not present at the July 2015 interview of Anthony Khoshabe and
could not be impeached using the suppression of Anthony's
interview.
and asked them to call each and summon them as witnesses on by
behalf. Mr. Adams and Frankel refused to investigate
witnesses on my behalf.

Respectfully submitted under penalty of perjury this _31_ day
of July, 2018.

Albert Rossini
No. 08043-424
Defendant Pro Se
Metropolitan Correctional Center
71 W. Van Street
Chicago, IL 60605

EXHIBIT 2
JOSHUA ADAMS EMAIL TO DEFENDANT
ROSSINI CONCERNING DATE FOR FILING
NEW MOTION AND DOCKET SHEET

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------------------------------

FROM: Adams, Josh
TO: 08043424
SUBJECT: RE: Update
DATE: 06/16/2018 01:36:09 PM

Hey Bert. yes, I got your email. Im working on getting the DSI bank statements. and yes 8/27 for motion for new trial.

ALBERT ROSSINI on 6/15/2018 12:52:47 PM wrote
Josh,
I hope you received my earlier email seeking bank statements for Devon Street Investments, Ltd. , Devon Street Management and Devon Street Realty. Please mail copies to me here at the MCC. I need them for my tax audit.

Secondly, please email me the dates that the motion for a new trial needs to be submitted -- I believe I heard August 27, 2018 with the government having either 14 0r 28 days to respond. Just send me an email today letting me know the dates.

Sincerely,
Albert Rossini



**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

THOMAS G. BRUTON
CLERK

¹Prisoner Correspondence

Date: **07/20/2018**

In response to your enclosed request, please see the box or boxes checked below:

☐ This court does not have the requested forms. Check with your law library or the public library.

☐ Communications to the court (such as letters sent to the judge) without a certificate of service showing that you mailed copies to all parties are what the law calls "ex parte" and will not be considered by the court. All court filings must be in the form of pleadings, with the case name, number, and caption, and served on opposing parties, in order to comply with Fed. R. Civ. P. 5. Any requests for court action must be made by motion (such as "motion for an extension of time"). **No judge's name should appear on the outside of the envelope; letters should be addressed to the Clerk of Court (in care of the Prisoner Correspondent, if you are incarcerated).**

☐ The enclosed material contains no case number or case title. Without that information the document cannot be processed. Accordingly, the material you submitted to this office is being returned to you. See Fed. R. Civ. P. 10(a).

☐ Check with the trust fund officer at your institution to determine the status of payment of your court filing fees.

☑ Status request: Attached is the latest docket entry in your case.

☐ Please be advised that we are not attorneys and are prevented by federal law from answering questions of a legal nature. We are also prohibited from interpreting the rules. You should direct your questions to an attorney who will be able to give you the legal advice you seek, or to contact the law library at your institution. We regret that we cannot assist you in this matter.

Contact:      Attorney Registration and Disciplinary Commission of the Illinois Supreme Court (ARDC)
One Prudential Plaza
130 E. Randolph Drive, Suite 1500
Chicago IL 606901

---

¹ The Prisoner Correspondence Office is the department of the Clerk's Office which processes all mail from inmates.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| USA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cr-515-1 |
| | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| Albert Rossini | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

### ORDER

Jury trial ended on 6/14/18. The jury returns a verdict of guilty as to Counts One through Fourteen. Defendant is remanded to the custody of the U.S. Marshals pending sentencing. The cause is referred to the probation office for the preparation of a pre-sentence investigation report. Defendant's sentencing memorandum and objections to the report are to be filed by 10/29/18, and the government's response by 11/5/18. Sentencing is set for 11/13/18 at 2:00 p.m. For the reasons stated, Defendant's Rule 29 motion made at the close of the government's case is denied. The Probation Office is directed to provide the parties with a copy of its sentencing recommendation. Defendant's motion, if any, for a new trial shall be due by 8/7/18; response due by 9/17/18; reply due by 10/1/18.

Pursuant to 18 U.S.C. § 3664(d)(1), if restitution is being sought in this case, 60 days prior to the sentencing date, the Government shall provide the Probation Office and the courtroom deputy an electronic standardized spreadsheet (available on the Court's website) with a list of victims and their full current contact information. This list shall include any amounts subject to restitution. If the Government is not able to provide the full victim list 60 days prior to sentencing, they shall file a motion to request an extension of time to compile the information, to the extent permitted by 18 U.S.C. § 3664(d)(5).

_John Z. Lee_
John Z. Lee

6/14/18

2.5

EXHIBIT 3

DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT AND MEMORANDUM OF LAW IN SUPPORT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

     vs.                        CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

     Defendants.

Defendant Albert Rossini's Motion to Dismiss the Indictment for Prosecutorial Misconduct,

Memorandum of Law and Supplement in Support

Defendant Albert Rossini, pro se, respectfully submits this Motion and Memorandum of Law with Supplement in Support thereof, to Dismiss the Indictment for Prosecutorial Misconduct, before the Grand Jury and throughout the pendency of this cause, and to find as a matter of law that the government's pleadings against Defendant alleging *inter alia* "non-existent properties," "lulling," and intent were false and misleading, and known by the government to be false, and further, Defendant states as follows:

1

An incomplete record and information, purposefully and intentionally presented by the government, show a fundamental abuse of prosecutorial authority. The government targeted Rossini and then provided a false narrative to find the basis for charging him, *nunc pro tunc.*

It took misconduct by the government that fatally tainted the independence of the grand jury to make that happen in this case.

While the factual underpinnings of this Motion, Memorandum of Law and Supplement are complex and necessarily detailed, Defendant's position regarding dismissal for prosecutorial misconduct affecting the grand jury's decision is simple and straightforward: this indictment should be dismissed due to fundamental patterns of government misconduct that prejudiced the grand jury proceedings.

1. The government withheld exculpatory evidence in its possession from the grand jury to pursue the government's false narrative and obtain an indictment of the Defendant.

2. The government made repeated false, misleading and erroneous statements of fact concerning conduct by Rossini to witnesses both before the grand jury and outside its presence that had the effect of unalterably influencing the testimony of key witnesses and influencing the grand jury in its consideration of the case.

3. The government engaged in other misconduct that violated Rossini's constitutional rights and used selective evidence before the grand jury. These actions of collective and cumulative misconduct pushed the grand jury to indict the defendant.

As a result of this governmental misconduct, the indictment was preordained, and the grand jury's limited, but critical, independence was compromised.

    A. In August of 2014, Rossini became aware that FBI agents Lyle Evans, Jody Blau and Cook County Investigator Paul Martinez were interrogating former Devon Street Investments, Ltd. ("Devon Street") employees. In September 2014, Defendant's then-attorney, Glen Seiden, presented the agents with four boxes of documents prepared by Defendant for government review. This was a voluntary presentation of documents not in response to subpoena.

Included in these documents were copies of cashier checks and commission payments showing that Defendant Rossini and co-Defendant Babajan Khoshabe ("Babajan") had themselves invested over $955,000 to purchase mortgage notes from attorney Thomas W. Murphy ("Murphy") during 2011 and 2012. These were similar to the mortgage notes Devon Street Investors was purchasing from Murphy for its investors.

Also included in Defendant's records was a copy of a comprehensive fire, liability and building insurance policy for which Devon Street had contracted with Seattle Specialty Insurance Company. Included were copies of premium payments made by Rossini to the insurance company and a listing of all mortgage loan properties purchased from Murphy by Devon Street, Rossini and Babajan. There were copies of deeds of properties owned by Devon Street or related entities as well as the

3

quitclaims of properties Defendant transferred to investors. Included was a comprehensive Devon Street business plan.

There were Cook County lawsuits filed by Rossini, Babajan, and investor Craig Shaffer, CPA, against Murphy—who had been their attorney and for whose services they had paid Murphy and his law firm(s). There were numerous lawsuits filed in the Circuit Court of Cook County, including those brought by American Chartered Bank, Aurora Loan Servicing, and World Wide Realty LLC v. Thomas W. Murphy and Prestige Partners LLC (2013 L 50095). Another document was Murphy's 2008 quitclaim of his Kildeer residence, with lawsuits pending, to his wife. This information is also contained in Murphy's bankruptcy filings.

There was the ARDC Synopsis of Hearing Board Report and Recommendations regarding Thomas W. Murphy (Commission No. 2010 PR 00114, July 9, 2013); four Murphy chapter 7 bankruptcy petitions (13-B-03922, 13-B-45386, 14-B-00372, and 14-B-03922) in which he was represented by his partner attorney Jeffrey Deer; Murphy's sworn deposition before the U.S. Trustee attorney, per Rule 2004 (June 2, 2014); World Wide Realty LLC's Motion to Dismiss Murphy's chapter 7 Bankruptcy and to bar future such petitions; Murphy's Statement of Financial Affairs (submitted with his 2014 Bankruptcy Petition, but not with the three prior petitions which were dismissed); and his tax returns submitted in the bankruptcies, including his Schedule C for 2010, 2011, and 2012, filed as sole proprietor, and which included his title

4

company, Legal and Title Consultants and Insurance, which had an office in Indianapolis with Tamera Brown, but in the tax returns, Murphy's 70 W. Madison, Chicago office was listed.

The government (with)held Murphy's law firm personnel records; prior ARDC matters; Murphy correspondence; investigations of Murphy and his partner attorney Jeffrey Deer; the Tamera Brown investigation; real estate records; Secretary of State corporate and LLC records; Murphy's Florida arrest; Murphy's bankruptcy filings with Jeffrey Deer as his lawyer; sworn depositions before a government attorney; sworn affidavits, court pleadings and lawsuits; tax returns; cancelled checks; and Rossini's business plans.

From a review of these documents, it can be reasonably presumed that Murphy was the sole and capable schemer of investors, as well as a double-dealer of the investors and of his clients Devon Street, defendants Rossini and Babajan, and Craig Shaffer (Supplement, *infra*). The references and information related to the records Defendant produced to the government are more fully set out below.

A short time after Defendant Rossini produced his records to the government, attorney Glen Seiden met with AUSA Hoekstra, and presented copies of Rossini's liability insurance and premium payments. These showed that Rossini insured and paid the premiums for over 70 mortgage note properties that he legitimately purchased from Murphy.

5

On August 25, 2015, Defendant was arrested, along with Babajan, his son, Anthony Khoshabe, and Murphy on a multicount indictment alleging they fraudulently perpetrated a Ponzi scheme. At the August 28, 2015 bond hearing, Agent Evans admitted in questioning by attorney Seiden that the agents had not reviewed the documents presented to them in September 2014, but that they "would get around to it."

The government purposefully failed or intentionally omitted presenting Rossini's exculpatory evidence to the Grand Jury because it did not fit the government's false narrative that Rossini was selling "non-existent property." The government's refusal to present this exculpatory evidence to the Grand Jury was at best a reverse form of "willful blindness," and at worst, a deliberate targeting of the Defendant. These documents, presented to agents in September 2014, 11 months prior to the indictment, were powerful evidence that Rossini and the Khoshabes lacked the requisite intent to defraud the investors. The government acted in bad faith by not presenting Defendant's payments for mortgage notes, insurance premiums, properties purchased by Defendant Rossini, monies paid to Murphy, NSF checks by Murphy to Rossini, Babajan, and Devon Street, and Rossini quitclaims of properties to investors in the normal course of Devon Street business.

B. The government failed to present documentation in its possession to the grand jury, to Rossini or to the Court, concerning Murphy's serial, fraudulent, bankruptcies during 2013 and 2014. Murphy's bankruptcies followed his issuance of NSF checks to Rossini and Babajan: $31,000 (Jan. 2013), $215,000 and $356,000 (Nov. 2012) for

6

rentals and interest to investors, Rossini and Babajan (contained in the Defendant's boxes).

In Murphy's Bankruptcy petitions, represented by attorney Jeffrey Deer, he repeatedly used fake social security numbers, presented income tax returns for 2010, 2011 and 2012 that grossly understated his income by over $1,000,000, and admitted in his Rule 2004 bankruptcy hearing before assistant U.S. Attorney Jeffrey Snell, representing the U.S. Trustee, to buying and "flipping" properties-- that rightfully belonged to Rossini, Babajan and their investors, all of whom paid Murphy for the properties.

In the June 2, 2014 deposition before AUSA Snell, Murphy made false, fraudulent and misleading statements regarding his purchase of 2015 N. Racine, Chicago. In a convoluted statement, Murphy testified that he had executed a purchase contract for the property on behalf of the 2015 N. Racine LLC and that he, Murphy, was sole owner of the limited liability company.

In reality, Murphy and Tamera Brown each owned 50% of the company and were purchasing the Racine property together just as they had purchased a condominium in Del Ray Beach, Florida together. In his testimony, Murphy stated that a non-paying tenant had occupied the property when in fact Ms. Brown lived in 2015 N. Racine. In answering Devon Street's interrogatories (re a civil case in Cook County) in early 2015, Ms. Brown stated to Devon Street attorney Richard Kruse that Murphy was supposed to live with her at the property but that "he

7

lied to me." Murphy admitted in the Rule 2004 hearing that he paid $10,000 per month "rent" on the property but in other records, the accounting indicated $17,000 per month. Murphy stated he may have paid as much as $60,000 earnest money for Racine. Justin Fox, the Racine property seller, said Murphy deposited $600,000. (see the Supplement, *infra*, for the forensic calculations).

The significance of this is twofold. First, Murphy had been depositing and hiding money with Tamera Brown; the government at the August 28, 2015 bond hearing said that amount was approximately $465,000. However, the records of payments contained in Rossini's boxes showed the amount Murphy hid was closer to $1,200,000.

The government failed to present this information because it proved Defendant's narrative that Murphy was solely responsible for the conversion of investor funds and double-dealing, for his own pocket. He took the funds, as the government stated, but he did so either as his own flat-out Ponzi, or double-dealing. Refer to the Supplement, *infra*, for details regarding specific properties, which 1. Contradict the government's persistent false accusations and pleadings that Rossini sold non-existent properties, and 2. Indicate that Murphy surreptitiously sold properties to 3d parties which he had previously sold to Devon Street Investors, Rossini, and Babajan.

The monies paid Murphy by investors and by Murphy's paying clients-- Devon Street, Rossini, and Babajan-- were converted and/or repaid with NSF checks by Murphy (contained In Rossini boxes; also *infra* in Supplement).

With the issuance to them by Murphy of sizeable NSF checks in Nov. 2012, Rossini and Babajan were alerted to a Murphy problem. They filed a Complaint for an Accounting from Murphy and his law firm in the Chancery Court of Cook County in April 2013. Murphy was forthcoming in that he signed agreed orders to turn over records, which he then did not. Thereafter, the California investors sued Murphy, he filed his bankruptcy cases and the Rossini and Babajan accounting lawsuit ceased.

The government's failure to present Murphy's perjury, tax evasion, career-long client conversions, real estate expertise and misappropriations, evasive LLC formations, habitual Ponzi practices, and falsely shifting the blame (in this and other causes) to Defendant Rossini during his sworn ARDC testimony and sworn Bankruptcy 2004 deposition testimony was calculated and malicious. Felons-- convenient culprits for the government and easy targets for predatory attorneys-- must in this instance, affirmatively reject the government's imputations. The fault lies in defendant Thomas W. Murphy who heretofore enjoyed an unexamined and unrestricted operation.

9

C.  The government failed to present the ARDC Synopsis of Hearing, Board Report and
    Recommendations filed in July 2013 that Murphy be disbarred for converting funds of Rossini
    investor Nina Jozers.

The Commission finding stated "[R]espondent's [Murphy] conversion of funds he was holding
for Jozers was deceitful. He acted in direct contravention to the terms spelled out in the
September 2010 letter he forwarded to Alamprese, and his explanations for his actions were
unconvincing. As stated with respect to Count VI, in the fall of 2010, Respondent acknowledged
to attorney Herzog that he was holding funds in his client trust account. His testimony at
hearing that the funds were intended for a purpose other than what was stated in the letter,
and that he was authorized by Rossini to transfer the funds, was not believable. We conclude,
therefore, that Respondent [Murphy] engaged in dishonesty, fraud, deceit, and
misrepresentation in violation of Rule 8.4(a)(4)." P. 57.

Again, the government did not present this information since it directly contradicted its central
theory that it was Rossini who concocted a scheme to bilk investors with Babajan as his
sidekick. Rossini dictated the what, how, where and when of the scheme to Murphy, directing
him as Rasputin did to the demented Tsarina and Tsar.

Murphy was a partner and high-level attorney at Pedersen & Houpt from 2006 to August 2011,
before that at Burke Warren from 2001 to 2006, and previously at Johnson and Bell. His clients
included the Chicago Archdiocese, the Congregation of the Resurrection Fathers, Gordon
Technical Institute and College Preparatory High School, Prospect Airport Services, New Century
Bank and many real estate companies and businesses, including Republic Title Insurance

Company. Rossini and Babajan's clients routinely "googled" Murphy, all of whom were reassured by his clientele. Murphy's google profile was kept pristine. But the record reveals that Agent Evans, in repeated manipulative questioning of witnesses, recommended selective googling—only of Rossini or Babajan. Neither Rossini nor Babajan had been students of the internet nor aware that one's reputation and problems could be "scrubbed" as had Murphy, conveniently, throughout his representation of Rossini, Babajan, Devon Street, and various sophisticated investors, and thereafter.

D. The government consistently portrayed Rossini as selling "non-existent" properties. The agents had been presented with numerous documents in September 2014 by attorney Seiden detailing over 30 properties purchased by Rossini or related entities and many of which were quitclaimed to investors in settlement of Rossini's guarantees. (See Motion to Admit.)

--4126 W. Adams, Chicago quitclaimed to Robert Badalian in partial satisfaction of guaranty agreement (accepted by Badalian).

--4520 W. Jackson, Chicago quitclaimed to Vladimir Moghaddasi in partial satisfaction of guaranty agreement (accepted by Moghaddasi).

--3327 W. Monroe, Chicago quitclaimed to the Assyrian Evangelical Church of San Jose, CA, as partial satisfaction of guaranty (accepted).

---3 properties: 3820 W. Adams, Chicago; 4129 W. Adams, Chicago, and 4139 W. Adams, Chicago—each quitclaimed to Craig Shaffer as partial satisfaction of guaranty agreements (accepted).

11

--Assignments of contracts for the following three properties: 4135 W. Monroe, Chicago, 4654 W. Adams, Chicago, 5131 W. Crystal, Chicago, reassigned to Craig Shaffer as satisfaction of guaranty agreement (accepted).

--16 townhomes in Riverdale IL quitclaimed to Khodi Family Trust in August 2013 as partial satisfaction of guaranty agreements (rejected by Kathy Khodi).

--211 N. Kilbourne, Chicago—mortgage note purchased by Devon Street Investments from the Vertical Mortgage Funding Corp. Transferred to Beneta Badalian as partial satisfaction of guaranty agreement (rejected by Beneta Badalian).

The government failed to present this exculpatory evidence to the grand jury because it conflicted with the government's false and misleading narrative that Rossini was selling non-existent properties.

E. The government agents Evans, Blau and investigator Martinez stated to witnesses in and outside the Grand Jury that Rossini's payments to investors—as per Rossini's Guarantee Agreements—were "lulling payments." The government repeatedly stated, and alleged in its pleadings, that the payments were designed to lull investors into believing they were receiving money to which they were entitled, but the government did not believe they were so entitled. (See Supplement.)

12

Rossini believed the payments from Murphy were from property rentals and interest and therefore paid them out to investors. According to Judge Richard Posner in *U.S. v. Jaime Lopez*, No. 16-2269 (dissenting opinion, August 29, 2017): "[b]ut they were [not lulling]; the defendant's firm was contractually obligated to make the payments to investors. The district judge had acknowledged before the trial that terming a payment a 'lulling payment' was 'argumentative and had the potential to prejudicially influence the jury' if used in summary evidence." At trial in *Lopez*, the judge allowed the agent to repeat her fraud accusations more than a dozen times. But Judge Posner disagreed, saying this should not have been permitted "to offer such opinion testimony." The conclusion regarding intent was for the jury to make. But this was exactly what the government did in pursuing its false and misleading narrative in this case. Defendant Rossini was contractually obligated by the guarantees--drafted by his lawyer, Thomas W. Murphy. Rossini and Babajan paid for the services of the trusted law firm and lawyer for the preparation of the guarantees. When Murphy defrauded Rossini and Babajan of their invested money (see Supplement, *infra*), he rendered them unable to make good on the guarantees.

F. The government violated Rossini's Sixth Amendment right to counsel.

In the Fall of 2013 and Spring 2014, Rossini and Theodore Netzky of Seiden Netzky Law Offices negotiated with Barnett Capital for a $3,000,000 loan. Rossini and Netzky had been approved by Barnett Capital, and Rossini paid a $10,000 fee to Barnett's lawyers, Levenfeld & Pearlstein.

Agents Evans and Blau interfered with the loan, and Barnett Capital did not close with Rossini and Netzky. The purpose of the loan was to pay Rossini's guarantees to investors. The government asserted that Rossini's guarantees were in furtherance of the fraud. Incredibly, the government then used the loan interference as part of its argument to remove Seiden Netzky as Rossini's attorneys.

Additionally, so far as the government's aggressive effort to disqualify Defendant's counsel, Seiden and Netzky, it taped a conversation between Candace Wells and Mark Werley. (Government records and bond hearing.). Candace had worked for Netzky for nearly 20 years, during the 80s and 90s, but thereafter remained a homemaker to care for her five children. In May 2014, Netzky requested that Rossini hire Candace part time to assist Rossini in buying and selling larger, commercial properties.

In conversation with the government's wired witness, Mark Werley, (id.) Candace was induced to discuss Rossini. Candace said she was introduced by Ted Netzky because he wanted her to both help Rossini and watch his investments in the Riverdale properties. Netzky told Candace, perhaps in a moment of puffery, that he had invested several hundred thousand in the Riverdale property and wanted her to keep track of how his investment was being handled, and to watch what Bert was doing.

The government knew, from its interference in 2013 with the Barnett Capital loan, above, that Netzky did not invest any money with Rossini in the Riverdale property, nor in any other property. He acted as his attorney of the Seiden Netzky firm.

14

As the government knew, Netzky did attempt to accommodate Rossini with the $3 million loan at Barnett to pay investors. He informed the people at Barnett that he hadn't invested any money, and this, the government knew. Yet, in its January or February 2016 filing, the government falsely asserted that Netzky had invested money, and that therefore he was conflicted in his representation of Rossini. The Seiden law firm pled that the government's allegations were untrue. Defendant Rossini waived the conflict, if one existed. Notwithstanding, this Court agreed with the government, and especially so far as to whether the Seiden Netzky firm were to receive a CJA appointment to act as Rossini's attorneys, and removed them from the case.

G. Agents Evans and Blau abused and intimidated witnesses, particularly those providing exculpatory evidence such as Pamela Sauer, Meir Rotstein, Lisa Rosen, Nubia Rendak and Daniel Ramirez, stating that the government considered them "part of the (Rossini) team," thereby intimidating them. The agents continuously asked witnesses whether they had "googled" Rossini and if they knew about Defendant's record. Meir Rotstein told agent Evans that the Defendant had served his time and deserved another chance. Evans answered "No, he does not."

It is evident from the record (and from verbal statements by the government to co-defendants) that agents inveigled witnesses to make purported claims that Rossini dispensed cash to investors through 3d parties--perhaps with the intention that a 302 agent statement would support the government's false narrative. In one instance, it was a custodial worker,

15

Francisco Cisneros. However, CPA Craig Shaffer had prepared Cisneros' tax returns (Rossini documents produced to the government prior to the grand jury). The written record-- Cisneros' tax returns prepared and filed prior to the FBI investigation-- directly contradicts a verbal statement he supposedly voluntarily delivered to an agent aggressively seeking to confirm laundering and Ponzi scheming by Rossini.


Agents continually followed Rossini's wife before and after his indictment, especially during her early morning jogs along Sheridan Road in Winnetka IL. Such invasive action in predawn hours of someone not a target is extraordinary.


Prior to Defendant and wife being forced to motel living during this case, federal agents rented the flat below theirs at 928 Elm in Winnetka. One of them continually maneuvered to enter the apartment to look around, and to falsely engage with Defendant's wife, suggesting that his "wife" would come to cook for Defendant and his wife. He offered that his "wife"—who appeared to be self-undernourished—was "a great cook."


It is directly contrary to the manner in which the government treated Tamera Brown and Murphy, even though they used the Hampton Inn, annexed to the motel where Rossini and his wife resided and where federal agents conducted all-night surveillance and questioned the motel employees about Defendant.

The surveillance of Mrs. Rossini only ended when she confronted a female agent one early morning in a Winnetka parking lot, asking the agent what she was doing. This conduct reflects the government's prejudice in the investigation.

    H. Agents stated to witnesses such as Meir Rotstein that Devon Street's accounting lawsuit against Murphy filed in April 2013 in Cook County Circuit Court, was a sham to lull investors. According to the government, this was proof of Defendant's fraud even though the complaint was filed by attorney Richard Kruse, a 40-year member of the Illinois bar.

Misconduct has permeated this investigation from inception to the present. As detailed herein, the government repeatedly engaged in conduct that by any reasonable and objective measure improperly influenced the witnesses and the grand jury in its decision to indict Rossini.

Routinely providing witnesses with information about Rossini and Babajan's past conduct and supposed intent was misleading and based on the biased and uninformed conclusions of the government agents. Supplying neutral witnesses with supposed facts to manipulate them and the investigation is remarkable and reprehensible.

## ARGUMENT

As the prime statement in this field of the law has it, "While a prosecutor may strike hard blows, he is not at liberty to strike foul ones." *U.S. v. Turner*, 651 F.3d 743, 752 (7 Cir. 2011)

17

(quoting *Berger*, 295 U.S. at 88). This also pertains to FBI agents and Chicago police assigned to an investigation. This is true whether conducting an investigation or before a grand jury as it is at trial. Courts must enforce these limits. And, "[b]ased on the principles established by the Supreme Court, the Seventh Circuit has held that such "prejudice occurs when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful the decision to indict was free from that violation's considerable influence." *U.S. v. Brooks,* 125 F.3d 484, 498 (7 Cir. 1997).

By not submitting to the grand jury evidence of Rossini and Babajan purchasing mortgage notes from Murphy, and investing in the same instruments as their investors—all victims—the government failed to disclose and omitted exculpatory evidence to the grand jury in violation of Rossini and Babajan's constitutional rights.

The central question is whether the government misconduct threatened to overwhelm the grand jury's independence. The government cannot escape the consequence of its misconduct by arguing that each instance of misconduct must be weighed separately on the scale of prejudice—for example, that agent lies to Anthony Khoshabe and the subsequent suppression of his 1 ½ - hour interrogation was an isolated incident. In point of fact, the Court must consider the "cumulative effect" of the government's misconduct "in determining whether the grand jury's independent role in returning the indictment was usurped." *U.S. v. Turner*, 620 F.Supp. 525, 527-528 (D. Col. 1985) aff'd, 799 F.2d 627 (10 Cir. 1986).

## VIOLATION OF FIFTH AND SIXTH AMENDMENT RIGHTS

A criminal defendant is "unquestionably entitled to 'a meaningful opportunity to present a complete defense.'" *U.S. v. Alayeto*, 628 F.3d 917, 922 (7 Cir. 2010). "A fundamental element of due process is the right of the accused to present witnesses in his own defense." *U.S. v. Johnson*, 437 F.3d 665, 677 (7 Cir. 2006). The tainting of a witness' testimony through undue manipulation is akin to bad faith destruction of evidence. In the Seventh Circuit, a defendant's Fifth Amendment due process rights are violated "if (1) the [government] acted in bad faith; (2) the exculpatory value of evidence was apparent before it was destroyed; and (3) the evidence was of such nature that the [defendant] was unable to obtain comparable evidence by other reasonably available means. *McCarthy v. Pollard*, 656 F.3d 478, 485 (7 Cir. 2011). A defendant is able to demonstrate bad faith by showing "official animus" or "conscious effort to suppress exculpatory evidence "on the part of the government. *U.S. v. Bell*, 819 F.3d 310, 317 (7 Cir. 2016). Once a due process violation is established, the decision to suppress the evidence or dismiss the indictment turns on the prejudice to the defendant's rights to a fair trial. See *U.S. v. Bohl*, 251 F.3d 904, 914 (10 Cir. 1994).

The government's refusal to acknowledge the investment by Rossini and Babajan and that by purchasing mortgage notes from Murphy they were also victims, or defendants' payment of insurance premiums and quitclaim of properties to investors as exculpatory evidence, together with admitting Anthony's statements to the grand jury (albeit later suppressed after indictment) violated the Defendant's due process rights.

The Seventh Circuit has stated "[t]he government's knowing use of false testimony violates due process "which may form the basis for a finding that the defendant was prejudiced by the government's misconduct. *U.S. v. Useni*, 516 F.3d 634, 656 (7 Cir. 2008). Although the Supreme Court has recognized that a prosecutor need not provide exculpatory evidence to a grand jury (see *Williams*, 504 U.S. at 51-52), it is equally plain that a "prosecutor may not deliberately mislead a grand jury or install false impressions to it in an effort to obtain an indictment." *U.S. v. Red Elk*, 955 F.Supp. 1170, 1182 (D.S.D. 1997).

The introduction of misleading testimony by the government or its agents, especially when the evidence is designed to impugn the defendant in front of the grand jury can "pollute the waters of justice," making dismissal "necessary to protect the integrity of the judicial process." *U.S. v. Asdrubal-Herrera*, 470 F.Supp. 939, 943 (N.D. IL. 1979) (quoting *Mesarosh v. U.S.*, 352 U.S. 1, 14 (1956).

As demonstrated in *U.S. v. Lawson*, 502 F.Supp. 158 (D. Md. 1980), the government's privilege to present its side of the story to the grand jury does not entitle it to simply ignore exculpatory evidence that renders the government's presentation misleading.

---Evidence of Rossini and Khoshabes' mortgage note investments;

---Insurance premium payments made by Rossini and Khoshabe;

---Property transfers to the investors;

---Principal payments to investors as per guarantee agreements;

---Murphy's attempts before the ARDC to blame Rossini found not credible by the Commission;

---Murphy's false testimony to the U.S. Bankruptcy Trustee;

---Agent prejudicial statements to neutral or defendant-favorable witnesses;

---Agent interference with Seiden Netzky and Barnett Capital, in effect, canceling payments to investors.

---Extraordinary surveillance measurers on Rossini's family.

Simply, the government misled witnesses and the grand jury as to the most crucial element in this case: Rossini's intent.

Nor can the government rely on an "ostrich defense," so far as the contents of Defendant's records, Murphy's records, court and administrative records, and attorney Glen Seiden's meeting with AUSA Hoekstra, *inter alia*. As per *U.S. v. Thomas Burnside*, 824 F.Supp. 1215 (N. Dist. IL, 1993). "The government cannot assert the "ostrich defense." Allowing the government to absolve itself on the basis of its counsel's ignorance of the facts—ignorance prompted by the government's lawyers closing their eyes to facts which should have prompted them to investigate—would be akin to allowing criminal defendants to avoid guilty knowledge by means of the ostrich defense. Time and again, the government has argued, and the Seventh Circuit has concurred, that when such "ostrich defense" is presented to a jury...an instruction of willful blindness is appropriate," quoting *U.S. v. Stone*, 987 F2d 469, 470471 (7 Cir. 1993) and *U.S. v. Caliendo*, 910 F.2d 423, 433-434 (7 Cir. 1990).

These examples of prosecutorial misconduct are indeed illustrative rather than exhaustive. Moreover, reviewing the proceedings in their entirety, one must conclude that the effect of the government's cumulative improprieties may be greater than what Defendant has discerned independently. Indeed, the government's frenzied attack on Defendant as a bad guy continued in each bond revocation hearing to excuse lies to the Court, misuse of evidence by the agents, and other misconduct in this case-- rendering meaningless Defendant's right to a fair trial.

## SUPPLEMENT

The government presented a false narrative to the Grand Jury and then supplied only evidence that fit this narrative. An accurate theory of this case is one that should make sense of the existing facts and that fits the law and plausibility.

This Supplement was composed through a search of Murphy documents—many of which, were in the government's possession as a result of past and present investigations, and court matters. As Defendant is in detention, the process of collating the materials for the Court has been concededly protracted. During this time, Defendant made accurate calculations and drawn reasonable conclusions which the government failed to do prior to the Grand Jury, prior to Indictment and thereafter, and which Defendant herewith submits to the Court in support of his Motion and Memorandum.

The government's case is that Defendant Albert Rossini concocted the scheme to defraud investors supplied by Defendant Babajan Khoshabe ("Babajan") and used, directed and ordered attorney Thomas W. Murphy, a partner in five major law firms during a 30-year legal career, in the commission of this fraud.

As the record aptly reflects, Murphy's career has been littered with similar schemes, conversions, mendacity, accusations and financial casuistry. No "googling" would have discovered this, since Murphy "scrubbed" his profile assiduously. The government chose to

23

ignore the Murphy background and then wilfully failed to disclose his well-established patterns to Defendant and to the Court.

(a) Murphy's propensity to blame Rossini for Murphy's fraud, deceit, and dishonesty. On pages 38-39 of the ARDC Synopsis of Findings, July 2013, Murphy discussed doing business with Rossini. "[a]fter he, [Murphy] began working on the [Martingale] transaction but before April 9, 2010, he [Murphy] became aware that Rossini had been convicted of a financial crime and had spent time in jail but was not aware of the exact circumstances of Rossini's conviction. After discovering Rossini's criminal history, he [Murphy] continued to represent Rossini because his closings were being completed without problems. At a sworn statement on April 22, 2010, [murphy] stated he understood doing business with a person such as Rossini is not only dangerous but foolish and he would be very careful about getting involved in a transaction."

On page 13 of the July 2013 ARDC finding, Murphy testified that he stopped acting as Ray Mobile and M2 Industries' lawyer in 2004. This was purposely deceptive. At Murphy's prior ARDC case, while he was with Johnson & Bell, which involved the young attorney he was training, Richard Perna, as well as attorney Jeffrey Deer, Ray Mobile testified on Murphy's behalf. Furthermore, Ray Mobile's M2 Industries had been insolvent and ceased operations in favor of a successor limited liability company, Metal Networking LLC, that Murphy set up for Ray Mobile.

24

Rossini met Murphy in October 2007 just as he was leaving federal halfway house, after completing a 41-month sentence for a fraud crime. Rossini arranged financing for the purchase of 1266 S. Orchard, Montgomery IL, a 9-acre property with a 78,000-square-foot manufacturing building for Mobile's Metal Networking LLC.

Defendant Rossini informed Murphy of his sentence and Murphy assured him it was not a problem. He said he was a partner in Prestige Partners Realty Group LLC in Glenview (see Bankruptcy Petition) with Harry Gio, a felon convicted of insurance fraud. Murphy stated he and his law firm gave Gio respectability and both business and banking connections.

(b) Murphy's use of client funds to perpetrate a Ponzi scheme.

M2 Industries was insolvent by 2004 and Murphy formed Metal Networking LLC for Ray Mobile. Mobile had filed a bankruptcy and owed income tax liability; therefore, Murphy organized Metal Networking with Mobile as the LLC manager but without membership interests. Mobile had sole control over company operations; interests were sold to investors who had no control over daily business activity.

Murphy represented investors Steve Shah and Dr. Mark Glazer in their $600,000 investment into Metal Networking LLC. (In the ARDC records, Murphy used part of the Shah and Glazer funds to pay Sanial Trust beneficiaries.). The ARDC findings show also that Murphy had loaned Ray Mobile $100,000 at the time of the earlier ARDC case with Johnson and Bell, at which Mobile testified on behalf of Murphy, but that the loan was never repaid by Mobile.

25

The July 2013 ARDC Synopsis of Findings specifically refers to this type of Murphy activity when it wrote about the Zgonina Insurance Trust and the Mobile-M2 Industries investment. "[a]t no time did [Murphy] advise [them] to seek independent legal advice...or the advantages and risk involved in the representation of both [clients] in the matter."

(c) Murphy converting money from one client to pay previous debts to another client.

According to the ARDC Synopsis of Findings, Murphy, late in the 1990s, served as trustee for the Sanial Trust and issued checks made payable to cash; they were deposited by Ray Mobile or M2 Industries. In 2001, Murphy began making loans from the Zgonina Insurance trust to M2 Industries. Murphy loaned $281,453.58 from the Zgonina Insurance Trust to M2 Industries. From 2002-2007, Murphy wrote checks for Prestige Partners to cash, and these were endorsed by Ray Mobile.

Donna Zgonina, beneficiary of the Casimir Zgonina 2000 Insurance Trust and her lawyer, Mitchell Goldsmith, had been pressing Murphy to account for funds and transactions he directed, as trustee of the Trust, to M2 Industries. Murphy issued a check on August 5, 2002 from a Sanial Trust bank account payable to the Casimir Zgonina Insurance Trust in the amount of $281,453.58. On or about the same date, Murphy endorsed the check "Casimir H. Zgonina 2000 Insurance Trust by Thomas W. Murphy, Trustee," and deposited it into an account he held on behalf of the Zgonina Insurance Trust.

26

In a letter dated August 7, 2002, Murphy advised attorney Goldsmith that transactions had been completed to obtain payment for the Zgonina insurance Trust; he did not turn over the records until October 9, 2002 when he forwarded to Goldsmith a binder with records relating to the Insurance Trust, including M2 transactions, along with a letter stating that $281,453.58 had been deposited into the Zgonina Insurance Trust bank account on August 5, 2002. "As a result of another entity's purchase of the trust's interest in the line of credit, lease and note."

At the ARDC hearing, both Arthur Yackel and Mary Hudson—Sanial Trust beneficiaries-- testified they were not informed that Murphy issued a check from a Sanial Trust account in the amount of $281,453.58 to the Casimir H. Zgonina Insurance Trust, and they did not authorize Murphy to make that payment. Based on the foregoing, the Commission found that Murphy converted $281,453.58 from the Sanial Trust to pay the Casimir Zgonina 2000 Insurance Trust the money it was owed by Ray Mobile and M2 Industries.

In October 2013, parallel to the ARDC disbarment proceeding, a Cook County criminal indictment was pending against Murphy and Rossini for Nina Jozers' monies (i.e., one of the ARDC matters). In October 2015, Rossini was dismissed from the criminal complaint and the State of Illinois held Rossini had not converted Nina Jozers' funds (as similarly held in the ARDC hearing where it was determined that, despite Murphy's testimony under oath and blaming Rossini, that Murphy had converted the Jozers' funds for his own use).

27

Government Conduct Following Rossini Dismissal from State Case, Oct. 2015

Immediately following Rossini's dismissal in October 2015, the federal government began and

continued to follow, harass, and attempt to revoke Rossini's bond. If Rossini was revealing of

his business dealings or his friends and associates, government agents would descend upon

those contacts. They showed up unannounced at doorsteps, homes and offices, questioning

them and specifically stating that Rossini "was laundering investor monies." See Defendant's

Motion to Admit for detailed account of investor, Rossini, Babajan, and Devon Street monies,

and for record and tax returns of custodial worker Francisco Cisneros and of Craig Shaffer,

CPA.).

Among the agents' unwitting subjects in Oct. 2015 were the following:

---Candace Wells' home in Lake Geneva WI;

---Cambridge Management office in Northfield IL;

---Thomas Miner's apartment in Streeterville, Chicago;

---Jason Mitan's home in Highland Park;

---Richard Espe's home in Glencoe Il;

---Thomas and Nubia Rendak's apartment in Rogers Park, Chicago;

---Jacob Fine's house in Hawthorne Woods;

---Meir Rotstein's home in Skokie;

---Attorney Richard Kruse at his office, 3924 W. Devon, Lincolnwood IL.

No other conclusion can be made of the federal government's heated efforts following Rossini's dismissal in Murphy's Cook County criminal case in October 2015 except that it was a concerted effort to keep Rossini from earning a living even under the bond restrictions, or from renting a normal apartment instead of a motel room—the agents even went to interview the landlords for residences where Rossini had applied.

No other conclusion can be made of the federal government's heated efforts following Rossini's dismissal in Murphy's Cook County criminal case in October 2015 except that it was a bad-faith enabler of Murphy's pathology—his pattern of shifting blame, and in the last few career instances, shifting blame to Rossini. In Murphy's 2014 Bankruptcy deposition—from which attorney Jeffrey Deer withdrew his appearance because of a "sanctions" matter—Murphy testified under oath to a government attorney that Rossini owed him $30,000 and that he, Murphy, would never get it back because Rossini was "penniless." In point of fact, Murphy had written an NSF check in January 2013 to Rossini in the amount of $31,000.

The October 2015 scenario, of the government interfering in any way possible with Rossini contracts proceeded with all possible dispatch. Agent Evans stated to Devon Street investor Liam Ben David, in October 2015, "We know Bert (Defendant) did it. We just don't know how he did it." Thus, even though there was ample evidence, including the Government's many admissions, that Murphy took the money, somehow Defendant Rossini got the money from Murphy.

29

In a September 2015 court order of Judge Gilbert, the provisions included the following: "Rossini could not sell, mortgage or defease any of the properties, mortgage notes, or liens that Rossini owned prior to August 25, 2015 without prior court approval."

Defendant alleges herein that the government ignored the specific language of the court order when, in October 2015, in regard to Defendant's three properties held with Liam Ben David, it conducted a mini swat team operation upon Defendant's showing of a property to prospective buyers.

In August 2012, Defendant had executed a mortgage to Liam Ben David on these three properties: 5410 W. Fulton, Chicago, 4045 W. Wilcox, Chicago, and 4037 W. Adams, Chicago, for a $275,000 loan. The loan was to be used for the purchase of a mortgage note for $150,000 on 2200 N. Kedzie, Chicago (to be owned jointly by Ben David and Defendant Rossini), and towards payment of $125,000 by Rossini to Robert Badalian and for partial payment on Rossini's guarantee. Attorneys for both parties—Ben David and Defendant Rossini—exchanged extensive emails and drew up the contracts and guarantees. Rossini's attorney was Thomas W. Murphy and his firm Berger Newmark.

In October 2015, and while Defendant was represented by attorney Glen Seiden, Defendant asked his property manager, Robert Allen, to meet *potential* buyers of the three properties at the Fulton Street location and to show them the properties. Defendant was under house arrest and Allen was familiar with the properties.

Attorney Seiden had informed Mr. Sephergyan, broker for all the buyers, that Rossini would need Magistrate Gilbert's approval before closing on a transaction. Attorney Seiden would present a motion before Judge Gilbert if there was a confirmed transaction.

On the date of showing, Allen met the buyers at the 5410 W. Fulton property. FBI agents, with the Chicago Police, arrived immediately, surrounded the building, and questioned the buyers about why they were there and whether they knew Defendant Rossini was indicted.

This was another sordid example of the government's unwarranted interference, preventing payment on a Rossini guarantee for an investor (Ben David)—whom the government would hope to reduce to the role of "victim."

Then, the government attempted to use "showing of property" as proof that Rossini was circumventing Judge Gilbert's order, as they did at the bond revocation in December 2015.

Yet, according to attorney Seiden, a seasoned lawyer of long-standing, in his legal opinion, Judge Gilbert's order did not state that Defendant Rossini could not place properties for sale, or obtain contracts to sell, or to place additional liens.

Another instance of Murphy blame and the Government's Knowledge:

In another post-October 2015 instance, in November 2015, an arson fire occurred at the home of Murphy's longtime colleague, attorney Jeffrey Deer. At the time, and still pending, attorney

31

Deer was under indictment in Cook County for forgery, perjury, interference with court orders, and money laundering.

The government in the herein case was made aware that Rossini would be testifying in the Murphy criminal case in Cook County from which he had been dismissed. The government attitude was nevertheless persistent about Rossini. It turned to investigate Rossini for his work with Cambridge Management, just as he was investigated with any business in which he became involved.

Murphy and Deer were under pressure to return $78,000 to Cambridge for a check that had been paid to Murphy and Deer. Then, Deer's house was suspiciously torched (details follow below). Murphy and Deer accused Rossini as the arsonist to investigating authorities.

The federal government's strategy was purposefully oblivious to Murphy's conduct, statements, background, and testimony because it had its false narrative from which it would not veer, notwithstanding the facts (*U.S. v. Burnside, U.S. v. Stone, U.S. v. Caliendo*). Its narrative, which bears repeating, is the one which convinced a Grand Jury to indict Rossini, without the government having looked at the records, and the one which inspired them to charge Rossini as the Macchiavellian schemer and/or launderer where former attorney Murphy suffered the domination of Rossini's directives to put investor money into his (Murphy's) pockets. In light of the Murphy history, the records (ignored, undisclosed or omitted by the government),

32

administrative judgments, and Rossini's comprehensive financial records, Murphy as hapless Pangloss beggars believability.

I.  CAMBRIDGE MANAGEMENT INC.

Murphy and Rossini were codefendants in a Cook County criminal case instituted September 28, 2013 for the theft of Mrs. Nina Jozer's funds. Mrs. Jozer's daughter, Beneta Alamprese had deposited $353,000 in Murphy's account in 2010. The conversion of several hundred thousand dollars led to Murphy's disbarment in May 2014 by the ARDC. In testimony to the ARDC, Murphy blamed Rossini, stating the Defendant had directed Murphy in disbursing the funds. The Commission stated Murphy's testimony was not believable. The ARDC findings show Murphy had continuously, over a 20-year period converted various client moneys to pay money previously taken from clients—in essence, an in-client Ponzi scheme. Rossini was dismissed from the State criminal proceedings in October 2015.

However, a year earlier, in May 2014 at Cook County Criminal Court, Murphy, Rossini and attorney Glen Seiden discussed the possibility of Rossini purchasing or financing through his contacts from Murphy's clients. This would help Rossini repay his guarantees to investors. It was agreed at this meeting that transactions would be monitored by Seiden Netzky Law Group and any escrow funds would be held in Seiden trust accounts.

In June 2015, Murphy asked Defendant to finance the acquisition of Meadowlands Medical Center by Cambridge Management Inc. Rossini's fee was to be approximately $2,500,000. Defendant knew of the Cambridge principals Jason Mitan, Thomas Miner and Barbara

33

Kalinowski, and referred them to attorneys Seiden and Netzky. As per federal bond orders, Seiden informed Judge Gilbert and the government of Rossini having worked on Cambridge prior to the August 2015 federal indictment, and that he continued working on the transaction. The Cambridge principals had been informed as well as their lawyer Jeffrey Deer.

Immediately, agents Evans and Blau descended on Cambridge offices, informing them that Rossini was attempting to launder money he had stolen from investors. This created insurmountable difficulties in completing the transaction. As with the Barnett Capital loan in 2013-2014, the government kept Rossini's guarantees from being paid to investors.

In fact, each time the Defendant or his attorneys complied with court orders to inform the government of details, personal information, business associates or friends, agents descended upon whatever name they were given in an effort to intimidate and contaminate.

II.   Prior to indictment, Murphy informed Rossini that attorney Deer was desperate to close the Cambridge transaction because Deer had withdrawn several hundred thousand from the Deer-Stone Law Firm escrow account from a client's insurance settlement. Murphy stated that the client, a businessman, kept his business afloat by borrowing money from Russian businessmen. They were pressuring Deer for a return of their money. Murphy had not reported Deer per the *Himmel* case.

In November 2015, Deer called Defendant at 4 a.m. seeking a telephone number of a broker associated with Deer and Cambridge. Deer said his phone with contacts had been destroyed in

a fire at his home, around 11 p.m. the previous night. The garage and the Porsche parked

outside were unscathed. Several days later, Defendant received a call from Peter Poulos, a

broker-renovation specialist and Murphy client. Murphy and Deer were informing investigating

authorities, falsely, that Rossini was responsible for the suspicious fire at Deer's house. In his 4

a.m. phone call to Rossini, Deer informed Rossini that the contents of his house were insured

for over $550,000.

After the telephone call, Defendant contacted pretrial officer Justin Wiersema and related the

arson information. Officer Wiersema told Rossini to give any investigators his telephone

number since he knew exactly where Defendant was before, during and after the fire.

Interestingly, two of Jeffrey Deer's clients at the time of the arson had been previously

convicted of arson in the 1980s and served ten years in prison.

The government had this information in its possession but once again it did not follow this path

because it did not comport with the government's false narrative so far as Rossini was

concerned.

III.      Murphy failed to disclose in his Bankruptcy filings, sworn statements and deposition

that he and Tamera Brown purchased a condominium at 5300 W. Atlantic Blvd., No.

700, Del Ray Beach, Florida 33484. Furthermore, records of the mortgage holder are

included in the Bankruptcy filings, but it is apparent that the government had no

interest in the sum total of Murphy's purchases, income and assets. Instead, it

looked away and spun the narrative that Rossini salted away investor millions --as

government agents alleged to numerous witnesses in its fervid search for the cash or

35

in its shabby surveillance of Defendant's wife in their home, as well as in the early morning hours of her jogs.

In April 2014, while visiting with Ms. Brown in Del Ray, Murphy was arrested and charged with battering her in a barroom altercation. Subsequently, Tamera Brown telephoned attorney Richard Kruse with her interrogatory answers from the pending civil case against Murphy that she ended contact with Murphy after the battery.

However, in January 2016, Murphy had an assignation with Tamera Brown at the Hampton Inn in Skokie. Murphy was sprightly and upright as he crossed the parking lot to the hotel (annexed to the motel where Defendant was living and where federal agents were on all-night surveillance of Defendant and his wife.). Later, Ms. Brown departed the hotel in her BMW with Florida license plates. At his bond hearing in this case, Murphy alleged serial debilitating physical problems.

It is both interesting and disconcerting that the agents who continually followed Rossini and his wife were not tracking the activities of Murphy and Ms. Brown, especially when at the August 28, 2015 bond hearing, the government pointed out that Murphy had deposited $465,000 into accounts controlled by or with Ms. Brown. In addition, the September 2014 boxes of documents presented to government agents by Attorney Seiden listed an additional $1,500,000 that Murphy concealed with or for Ms. Brown.

Prior to his bankruptcies, in an effort to hide his activities, Murphy failed to make mortgage payments on his family residence at 209 Middleton, Kildeer IL (quitclaimed to his wife in

36

2008). In the June 2, 2014 Rule 2004 hearing, Murphy stated that he had not made

mortgage payments for 11 months. Deutsche Bank filed a foreclosure complaint in 2014.

Yet, he had made, according to Murphy's testimony, $60,000 in payments for 2015 N.

Racine during that period. The Racine property seller, Justin Fox, related it was $600,000.

Thus, Murphy made those payments for the Racine property, purchased the Del Ray Beach

condominium; paid rent at a McClurg Court apartment in Chicago, and made payments on a

late model BMW licensed in Florida.

The following chart shows a portion of the money which Murphy converted from Rossini,

Babajan, Devon Street and its investors.

| EXPENDITURES | MINIMUM | MAXIMUM |
|---|---|---|
| McClurg Court apt. | | |
| from 9/2011-4/2014 | | |
| (31 months @ $1500 | 46,500 | |
| 31 months @ $2000) | | 62,000 |
| Downpayment, 2015 N. Racine | 60,000 | 600,000 |
| Monthly payment 2015 N. Racine | 60,000 | 102,000 |
| Del Ray Beach Condo | 200,000 | 500,000 |
| BMW auto | 40,000 | 100,000 |
| Gov't. stated deposit to Brown | 465,000 | 465,000 |
| Gov't. stated amount Murphy wrote | | |
| to cash | 1,102,954.46 | 1,102,954.46 |

Legal fees paid to Murphy by

| | | |
|---|---|---|
| Devon Street - $5000/transaction | 400,000 | 400,000 |
| TOTAL | 2,374,454.46 | 3,331,954.46 |

The money for which Murphy failed to account to Rossini, Babajan, Devon Street, and investors, of between $2,374,454.46 to $3,331,954.46, is direct evidence of his fraudulent intent and his alone. As per his documented custom and habit, Murphy took funds from one investor to pay another in order to cover missing funds.

The evidence of Murphy's expenditures and his testimony in the June 2, 2014 Rule 2004 Bankruptcy hearing are contradictory. Murphy said he made less than $200,000 gross income before expenses during 2011 and 2012. Yet from September 2011 through 2013, he spent a minimum of $1,974,454 on living expenses with Tamera Brown—not including his office expenses, payments to Sanial Trust and for his own family. These calculations were in the records had the government exercised a thoughtful investigation, before it targeted Rossini for indictment.

IV.     Murphy maintained the illusion of legitimacy and success by using funds from newer investors to pay "returns" to Rossini, Babajan, Devon Street and its investors. Murphy advised and convinced Rossini to give Devon Street investors guarantees for their funds. Rossini understood the guarantees to be legitimate credit swaps.

Murphy himself either ran a Ponzi scheme, as he had done in prior Murphy-related cases, and/or he was double-dealing Rossini, Babajan, Devon Street, and investors. This is a notion unacceptable to the government because Rossini and Babajan are felons; the government was never at a loss for reminding the Court. Yet, are they not "fed with the same food, hurt with the same weapons, subject to the same diseases, healed by the same means, warmed and cooled by the same winter and summer...?"

Rossini and Babajan had a legitimate business model (Rossini's records turned over to government). They ploughed money to Murphy and hired employees in order to make the business a success. Murphy had a sizeable real estate practice. In many instances, Rossini bought many of the properties and, in other instances, Murphy bought them and flipped them as the attorney. These were real property transactions. The government's allegation that Rossini dealt in non-existent properties is patently false.

Murphy was also buying properties himself and selling to others, e.g., a pending Circuit Court of Cook County case of Craig Shaffer v. ICG Properties and Alex Misko (a Murphy client). Rossini and Babajan bought the subject property (3820 W. Adams, Chicago) with Craig Shaffer from Alex Misko and got title Dec. 31, 2010. In January, February and March of 2011, Shaffer, Rossini and Babajan paid for two more properties from Misko: 4135 W. Monroe, Chicago; and 4654 W. Adams, Chicago; and also purchased 5531 W. Crystal, Chicago, from Stephanie Andre, another Murphy client. For these latter three properties, Shaffer, Rossini and Babajan received no title. In the Stephanie Andre instance, she disputed the signature that appeared on the Assignment of Contract to Devon Street, telling attorney

Kruse that it was not hers, and that on seeing Murphy's signatures, she believed it was he who had signed her name to the Assignment. Thus, Rossini could not quitclaim to Shaffer as he had with other properties, because neither Murphy nor Misko turned over the titles. Rossini and Babajan received rentals from Murphy for the next two years, through Dec. 2012, but no titles. Where there had been a transfer of title (as with 4129 W. Adams, Chicago and 4139 W. Adams, Chicago), Rossini quitclaimed to Shaffer.

Murphy was paid $100,000 by Rossini and Babajan for a mortgage note to buy property in 2012. With this, and other such received monies, Murphy likely may have paid Rossini, Babajan Devon Street, and investors with monies he made buying property with Shaffer, Rossini and Babajan, and making money for himself in 2011, 2012 and 2013.

Rossini's guarantees to investors are analogous to credit default swaps, and legitimate. As set forth above in Defendant's Motion and Memorandum of Law, *U.S. v. Jaime Lopez*, No. 16-2269 (dissenting opinion, August 29, 2017), Judge Posner's opinion was that such guarantees leave the guarantor contractually bound. It is the functional equivalent of a credit default swap. There must be a negotiated time frame that determines legitimacy, and in this case, the following codification is applicable: 17 C.F.R. § 39.13(g)(2)(ii)), at (D) "[s]uch longer liquidation time as is appropriate based on the specific characteristics of a particular product or portfolio." See *Bloomberg L.P. vs. Commission FTC*, 949 F.Supp.105 (2013).

In all the instances cited herein, Rossini made every effort to make good on the guarantees until Murphy's NSF checks and litany of fraudulent activity, and then the government's

interference in transactions intended to make investors whole, worked to defeat Rossini's
ability and contractual obligation.

In the Fall of 2015, following indictment, and having a close look at the real estate issues,
attorney Richard Kruse filed suit against Alex Misko and Stephanie Andre, re 4135 W.
Monroe, Chicago and 4654 W. Adams, Chicago. The Seller had been titled in an LLC formed
in 2010; it was learned that the LLC was owned by Misko with Murphy as attorney.

In his Bankruptcy deposition, June 2, 2014, government attorney Snell asked Murphy about
property at 5551 W. Congress, Chicago. Snell believed Murphy or an LLC owned it. Murphy
answered "didn't know the property."

V.      Prestige Partners Realty Group, LLC

Big fraud schemes generally give rise to big prosecutions. They involve numerous transactions
and a great many trial exhibits and witnesses (unlike, e.g., agent Evans 2008-2009 investigation
and ultimate charging of Defendant Babajan Khoshabe in a mortgage fraud case. It involved
one mortgage that resulted in a conviction with restitution and fine totaling $12,500.).

Prestige Partners LLC, a Murphy entity, operated between 2002-2007, in mortgages and bank
loans involving over $22 million in losses (per Murphy's testimony in his Rule 2004 Bankruptcy
deposition). How selective can the government be in ignoring Prestige Partners' large-scale
mortgage fraud, investigated indifferently in 2013, and shifting its prosecution (and blame, as
per Murphy's habit) to Defendants Rossini and Babajan?

41

In this case, the government's list of interviewees includes Bryn Perna (wife of the aforesaid attorney Richard Perna who became embroiled, as Murphy's trainee, in an ARDC hearing where Perna was blamed). Bryn Perna was American Chartered Bank's Executive VP overseeing foreclosures. Murphy had many foreclosure lawsuits with AMC.

In 2008, Defendant Rossini and his then-partner, Tzvi Weissman, attempted to purchase from Murphy 7952 S. Phillips St., Chicago, a multiunit building. Murphy's 2006 AMC loan was $1.8 million, far in excess of the property's appraised value of $600,000 in 2008—which value Murphy had misrepresented to AMC. The transaction could not close. AMC sued Rossini and Murphy for the $35,000 earnest money, and then placed a garnishment on Rossini's Scottrade account.

Murphy informed Defendant that the government was investigating Murphy's partner—the one, conveniently, with a criminal background-- Harry Gio, for mortgage fraud, but that neither Murphy nor Pedersen & Houpt—where he was a partner in those years—were under scrutiny. (Murphy's operation of Prestige is in the Bankruptcy Petition deposition, Murphy's 2014 financial disclosure forms, the World Wide Realty LLC's Motion to Dismiss Murphy's Bankruptcy [World Wide Realty LLC is included below as one of Murphy's "hard-money" financiers], Defendant's Motion to Admit and Motion to Take Judicial Notice).

Murphy testified in 2014 under oath before government attorney Snell that Prestige was a defunct business that dealt in buying and selling properties. Murphy and Prestige LLC, purchased apartment properties to convert to condominiums that were sold to buyers for substantially more than the cost or value of those properties This and the following information

42

is parsed from Murphy's bankruptcies, numerous civil cases involving Murphy, and a 2010 civil case in the Circuit Court of Cook County, American Chartered Bank N.A. vs. Thomas Murphy and Shorewood Partners (Defendant was Shorewood Partners. At some point, Murphy falsely represented to AMC that Shorewood Partners was going to provide the money for his debt. Neither Shorewood nor Defendant were ever involved with the loans. Notwithstanding, when Defendant's Scottrade account was withheld because of undisclosed government subpoenas and interference, Defendant learned his account had a garnishment levied in 2014 by AMC. (Defendant's Motion to Quash).

Sales were financed with mortgages based on property values that were inflated by Murphy. Buyers defaulted on the loans and the mortgages were foreclosed but by which time Murphy had got his profits from the deals made by selling the properties at inflated prices.

The higher the property value, the higher the loan; the higher the sales price, the larger the profit. In order to obtain loans for the highest possible property value, and reap the highest possible profit, Murphy misrepresented to lenders: about true buyers, the source of down payments, the value of the properties, the income and employment of buyers, whether buyers could occupy the properties, and whether properties owned by the buyers were being leased.

Murphy lied about the true owners of the properties to disguise the fact that Prestige was behind the transactions and was actually selling the properties to himself and Prestige. Unbeknownst to the lenders, Murphy recruited people with good credit scores to serve as straw buyers. He had some of them purchase several properties from him, using loans from different lenders, all of which were obtained within a short period of time so that each

43

successive lender would not find out about the other loans to that borrower. Once multiple loans or mortgages showed up on the buyer's credit report-- which typically took a few weeks-- it became difficult for that buyer to qualify for new loans. At that point, the buyer's usefulness to Murphy was at an end and he would recruit a new buyer in the course of running this business.

Murphy lied about the source of the down payments to cover up that he supplied—or Prestige did--most or all the money to the straw buyers.

Lenders want to know that money for a down payment actually comes from the buyer because a buyer who has a substantial stake in the property is considered a better credit risk. Murphy circumvented that safeguard in a variety of ways. He would give a borrower money to park in a bank account long enough for the lender to verify the money's presence, and then Murphy would take it back. He falsified HUD-1 settlement statements that were signed at closing to show "cash from borrower," though the money came from Murphy, Prestige, or an associate. He altered checks from bank accounts of straw buyers or altered the straw buyer's bank account statements. With most or all of the loans, the borrowers signed documents at closing falsely representing that they were supplying the down payment. The government investigating Harry Gio at Prestige's Glenview office in 2013 would have seen the expansive wooden table in use as an assembly of paperwork, cutting-and-pasting, and signing.

Only Murphy's inflated property values could circumvent lenders' loan-to-value requirements and increase the selling price. For example, a bank could make a loan for $200,000 under the

44

assumption that it was lending 80% on a property worth $250,000 when in reality the bank was lending 133% on a property worth only $150,000.

Murphy needed the cooperation of appraisers for which he paid (as he had but not disclosed in the Tzvi Weissman and Rossini transaction). (Historically in the real estate world, appraisers supported inflated valuations by cherry-picking inappropriate comparative sales; by concealing recent prior sales of the same property for far lower amounts, by including upgrades that had not actually been done, and by neglecting to report conditions that would depress property values, such as a property's proximity to railroad tracks or a landfill or its infestation with black mold.)

Murphy lied about a straw buyer's income on loan applications in order to qualify buyers for loans of the size they were seeking. Those lies in turn required lies about the buyer's income. As part of the lies, some borrowers got "promoted" on their loan applications. Murphy's associates would generate fake W2s and pay stubs, or they would answer phone calls posing as the borrower's employer. These particulars of Murphy mortgage and loan practices, for which he was serially sued, are in routine usage in mortgage fraud indictments brought by the government.

Murphy lied about the intended use of the properties in order to get better loan terms and interest rates available for owner-occupied properties. Lenders operate on the assumption that a borrower will be more motivated to make payments on his own home than on an investment property, which is why investment loans require higher interest rates and larger down payments. As for condos, some developments had restrictions on the percentage of units that

45

could be rented out, and many lenders would not lend on condo units if the complex owner-occupancy rate was below a certain level. Carrying out Murphy's instructions, straw buyers represented on loan applications that they intended to use the property as their primary residence, even though they were actually buying multiple properties and had no intention of moving in. Other buyers signed their names to blank applications, leaving Murphy to generate whatever false information was necessary to meet the lender's underwriting standards.

Murphy lied about whether residences that buyers already owned and occupied would be leased in order to cover up that the new properties would not be used as residences. And, the straw buyers who did disclose to lenders that they were buying properties for investment needed to show that the properties would produce enough rental income to cover the mortgage payments. Murphy met this need by generating fake lease contracts with nonexistent tenants (AMC lawsuits and motions; New Century Bank), or by inflating the income generated by properties that were actually rented.

Murphy's scheme needed many straw buyers. He recruited. He did so by pitching the model to people known through his family contacts at the Illinois Dept. of Transportation, Streets and Sanitation, Chicago Police and Chicago Firemen. The business model involved buying distressed apartment buildings on Chicago's south side at a discount, renovating and furnishing them, renting them on lucrative short-term leases, and later, selling them for a profit.

Murphy told "investors" –the straw buyers—that they would not have to put up their own money into the deal—just to sign their name and have good credit. Murphy assured them that he and his associates would take care of mortgage payments, taxes, insurance, association fees,

and all other expenses, and that he would maintain the properties, lease and collect rents and then pay out to the straw buyers any excess rental income.

After the straw buyers purchased properties, they would sign quitclaim deeds, conveying the properties to Prestige. *Those quitclaim deeds were concealed from the lenders and not recorded* until Murphy was ready to resell. Murphy also obtained second mortgages or used the properties as cross-collateral for larger loans.

In order to get money needed for down payments and to purchase large apartment buildings at a discount, Murphy borrowed "hard money' –short term cash loans at double-digit interest rates –from wealthy acquaintances. His financiers included Jeff Kroll of Kroll Investigations, World Wide Realty LLC, and David Katz, from a New York hedge fund.

Murphy further carried out *his scheme* through his Indiana title company, held at some point in Indianapolis with Tamera Brown and later, per his Bankruptcy petitions, at his 70 W. Madison office. That title company would also have held an escrow fund.

The success of his scheme depended on these factors:

1. Purchasing apartment buildings at a significant discount;
2. Obtaining short-term "hard money" loans to purchase and renovate the apartment buildings so the units could be sold as condos;
3. Finding straw buyers willing to place their credit up for Prestige;
4. "Selling" the condos to straw buyers at a high enough price to pay the hard money loan, pay the straw buyers a premium at closing for their signature.

47

The only way Murphy could conceivably stay current on the existing mortgage loans was by using the incoming flow of sales proceeds to make the loan payments on units previously sold to straw buyers.

By November 2007 (the month Defendant first met Murphy), the national mortgage market was collapsing. Most subprime or substandard mortgage bankers collapsed and it became difficult to get mortgage approval for straw buyers.

Although buyers were required to have good credit scores, most lacked the assets to make down payments on properties. Most had difficulty making payments on a loan other than their existing primary residence, let alone on the multiple mortgages that were taken out in their names. In return for their part in the Murphy schemes, buyers were paid between $5000 to $10,000 for each loan transaction.

Some of the properties Murphy bought sat vacant, such as a home on Greenwood in Glenview, Illinois. After building it on a golf course lot for $1.4 million, Murphy used an inflated valuation to sell it to a straw buyer for $2.8 million.

Those lured in as straw buyers by Murphy were not the only ones injured. The neighborhoods where the properties were located suffered from depressed housing values because of the foreclosures that always followed the purchase.

Lenders such as American Chartered Bank began investigating after they noticed a high number of loan defaults; auditors uncovered falsified information and valuations.

Once again the Prestige and Murphy operation shows the government's unwillingness to disclose information where it refutes their false narrative of Defendant directing Murphy in how and when to commit fraud. Defendant did not meet Murphy until Nov. 2007. Murphy operated Prestige from 2002-2007. Prestige is relevant because it shows Murphy's scheming, sophistication and habitual pattern of paying old investors and bank loans with money from new investors and bank loans.

Prestige was a $22 million loss to banks and investors (per Murphy testimony at the 2014 Bankruptcy deposition; every one of the mortgages went into foreclosure. Neither Defendant nor Babajan were involved, especially since they didn't know Murphy at that time.

Murphy's 2014 Bankruptcy was dismissed with prejudice. The government took no action.

Instead, the government engaged proactively in willful ignorance and misconduct in order that charges lay against Defendant Rossini and Babajan, their prior convictions as proof that Thomas W. Murphy was led, a sacrificial lamb, luring investors to a Ponzi scheme.

It is generally understood that willful ignorance is equivalent to knowledge and that culpability presupposes a guilty mind. Is it reasonable to presume, or conjure as in this case, that Rossini and Babajan would pay Murphy hundreds of thousands of their own money to purchase mortgage notes for themselves if they knew the notes were fraudulent...giving Murphy thousands to let him steal from them? Oliver Wendell Holmes, Jr. stated "even a dog knows the difference between being stumbled over or being kicked." Common Law, No. 2, 1888.

So far as this case, and the indictment of Rossini and Babajan, It can be nothing else, to quote the fastidious forensic sleuth, Sherlock Holmes, that "When you exclude the impossible, whatever remains, however improbable, must be the truth."

WHEREFORE Defendant Albert Rossini, pro se, respectfully submits the herein Motion, Memorandum of Law and Supplement, and prays the Court dismiss the Indictment for Prosecutorial Misconduct and/or to find as a matter of law that the government's pleadings against Defendant alleging "non-existent Properties," "lulling," and intent were false and misleading and known by the government to be false and misleading, and for such other and further relief as this Court deems just and equitable.

BY:

_____

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL 60901

EXHIBIT 4

LETTERS AND DEBIT CARD STATEMENTS
OF DEFENDANT MAILED TO JOSHUA ADAMS

**NETSPEND**
A TSYS Company

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
Po Box 517
WINNETKA,IL 60093

**Account Balance: $51.74**

**Statement for Account Number: 5422697748**
**Statement Period: October 2016**

## Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $51.74 |
| 10/31/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $30.84 | | $51.74 |
| 10/30/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $21.00 | | $82.58 |
| 10/30/2016 | Debit: Signature purchase from 224540000221989 MICHAELS S` | 9288 | $50.62 | | $103.58 |
| 10/29/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI { | 9288 | $25.18 | | $154.20 |
| 10/28/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $4.16 | | $179.38 |
| 10/21/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $100.00 | $183.54 |
| 10/16/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $18.50 | | $83.54 |
| 10/16/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $39.78 | | $102.04 |
| 10/16/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $6.25 | | $141.82 |
| 10/14/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $6.08 | | $148.07 |
| 10/13/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $44.35 | | $154.15 |
| 10/12/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $100.00 | $198.50 |
| 10/11/2016 | Debit: Signature purchase from 510165090124462 OSCAR NAIL‹ | 9288 | $51.00 | | $98.50 |
| 10/11/2016 | Debit: Signature purchase from 029200000019786 SAFEWAY S1 | 9288 | $37.47 | | $149.50 |
| 10/09/2016 | Debit: Signature purchase from 03-8028602855 VIRGIN AMERIC | 9288 | $8.00 | | $186.97 |
| 10/09/2016 | Debit: Signature purchase from 029200000019786 SAFEWAY S1 | 9288 | $63.35 | | $194.97 |
| 10/08/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $120.00 | $258.32 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Posting Date | Transaction | | Debit | Credit | Balance |
|---|---|---|---|---|---|
| 10/08/2016 | Debit: Signature purchase from 474262000473884 MLB.COM W\ | 9288 | $9.99 | | $138.32 |
| 10/08/2016 | Debit: Signature purchase from 03-9508471472 DELTA AIR 0062 | 9288 | $144.10 | | $148.31 |
| 10/08/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $4.06 | | $292.41 |
| 10/07/2016 | Debit: Signature purchase from 445134698999 LYFT *CANCEL F | 9288 | $5.00 | | $296.47 |
| 10/07/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $200.00 | $301.47 |
| 10/07/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $14.20 | | $101.47 |
| 10/07/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $11.80 | | $115.67 |
| 10/05/2016 | Debit: Signature purchase from 053100020251625 STARBUCKS | 9288 | $8.26 | | $127.47 |
| 10/04/2016 | Debit: Plan Fee 10/03/2016 | | $9.95 | | $135.73 |
| 10/02/2016 | Debit: Signature purchase from 4445001179549 MINUTECLINIC | 9288 | $29.00 | | $145.68 |
| 10/02/2016 | Debit: Signature purchase from 4445077008760 CVS/PHARMAC | 9288 | $18.64 | | $174.68 |
| 10/01/2016 | Debit: Signature purchase from 242661000053360 SQ *GOSQ.C | 9288 | $45.00 | | $193.32 |
| 10/01/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $120.00 | $238.32 |
| | Beginning Balance | | | | $118.32 |

## Overdraft Fees

| | This Month | Year To Date |
|---|---|---|
| Overdraft Fees | $0.00 | $0.00 |

**NETSPEND**
*A TSYS® Company*

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT M ROSSINI**
Po box 517
WINNETKA,IL 60093

**Account Balance: $0.00**

**Statement for Account Number: 6903608037**
**Statement Period: October 2016**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $0.00 |
| 10/30/2016 | Debit: PIN purchase from FOOD 4 LESS 2420 W. MAIN ST. EVA | 2802 | $12.96 | | $0.00 |
| 10/29/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $10.99 | | $12.96 |
| 10/29/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.50 | | $23.95 |
| 10/29/2016 | Debit: Signature purchase from 4445011830042 BOSTON MARK | 2802 | $24.66 | | $34.45 |
| 10/27/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $59.11 |
| 10/26/2016 | Debit: PIN purchase from 00150019902 OFFICE DEPOT 00 6165 | 2802 | $29.04 | | $68.11 |
| 10/26/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $13.74 | | $97.15 |
| 10/26/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $110.89 |
| 10/26/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $119.89 |
| 10/26/2016 | Debit: ATM Cash Withdrawal at CHASE 4200 DEMPSTER ST SK | 2802 | $43.00 | | $122.39 |
| 10/25/2016 | Debit: Signature purchase from 39570009900 ABC*PLANET FIT | 2802 | $19.99 | | $165.39 |
| 10/25/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $185.38 |
| 10/24/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $194.38 |
| 10/24/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $103.00 | | $196.88 |
| 10/24/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.02 | | $299.88 |
| 10/24/2016 | Debit: Signature purchase from 518089730162831 BACKYARD C | 2802 | $12.15 | | $309.90 |
| 10/24/2016 | Debit: Signature purchase from 518089730162831 BACKYARD C | 2802 | $11.60 | | $322.05 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Date | Description | | Debit | Credit | Balance |
|---|---|---|---|---|---|
| 10/23/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $8.00 | | $333.65 |
| 10/22/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $11.52 | | $341.65 |
| 10/21/2016 | Debit: Signature purchase from 199081000395566 FANNIE MAY | 2802 | $8.99 | | $353.17 |
| 10/21/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $362.16 |
| 10/21/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $100.00 | | $367.11 |
| 10/21/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $467.11 |
| 10/20/2016 | Debit: Signature purchase from 03-9500091518 TURTLE WAX C | 2802 | $50.99 | | $476.11 |
| 10/20/2016 | Debit: PIN purchase from DOLLAR TREE 3521 W DEVON AVE ( | 2802 | $3.31 | | $527.10 |
| 10/20/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $5.09 | | $530.41 |
| 10/20/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $535.50 |
| 10/19/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $544.50 |
| 10/19/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $63.00 | | $547.00 |
| 10/19/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $610.00 |
| 10/18/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $496.00 | $619.00 |
| 10/18/2016 | Debit: Signature purchase from 7008937140 AMERICAN NEEDLI | 2802 | $45.00 | | $123.00 |
| 10/18/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $168.00 |
| 10/17/2016 | Debit: Signature purchase from 372048809886 AMERICAN AIR0 | 2802 | $25.00 | | $177.00 |
| 10/17/2016 | Debit: PIN purchase from NST THE HOME DEPOT 881557 6211 | 2802 | $30.32 | | $202.00 |
| 10/17/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.01 | | $232.32 |
| 10/16/2016 | Debit: Signature purchase from 372048809886 AMERICAN AIR0 | 2802 | $28.94 | | $242.33 |
| 10/15/2016 | Debit: Signature purchase from 372048801883 AMERICAN AIR0 | 2802 | $243.10 | | $271.27 |
| 10/15/2016 | Credit: Cash Load at Walmart 6433 Fallbrook Ave WEST HILLS,( | | | $100.00 | $514.37 |
| 10/14/2016 | Debit: Signature purchase from 517927710102195 SUPER 8 MO | 2802 | $120.12 | | $414.37 |
| 10/14/2016 | Debit: Signature purchase from 517927710102195 SUPER 8 MO | 2802 | $120.12 | | $534.49 |
| 10/14/2016 | Debit: PIN purchase from 000013761460001 99 CENTS ONLY S | 2802 | $17.26 | | $654.61 |
| 10/14/2016 | Debit: PIN purchase from WAL-MART #5152 Wal-Mart Store WE | 2802 | $18.17 | | $671.87 |
| 10/13/2016 | Debit: Signature purchase from 372048809886 AMERICAN AIR0 | 2802 | $25.00 | | $690.04 |
| 10/12/2016 | Debit: Signature purchase from 372048801883 AMERICAN AIR0 | 2802 | $243.10 | | $715.04 |
| 10/12/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $100.00 | | $958.14 |
| 10/12/2016 | Debit: Signature purchase from 650000007052742 SOUTH LOOF | 2802 | $33.00 | | $1,058.14 |
| 10/12/2016 | Debit: PIN purchase from WM SUPERCENTER # Wal-Mart Supe | 2802 | $39.39 | | $1,091.14 |
| 10/12/2016 | Debit: PIN purchase from 04400073379901 7-ELEVEN WINNETH | 2802 | $10.02 | | $1,130.53 |
| 10/11/2016 | Debit: Signature purchase from 395700099000 ABC*PLANET FI1 | 2802 | $39.00 | | $1,140.55 |
| 10/11/2016 | Debit: Signature purchase from 254149000984724 EXPEDIA EXF | 2802 | $19.00 | | $1,179.55 |
| 10/11/2016 | Credit: Cash Load at New Devon Center Currency Exchange 542 | | | $950.00 | $1,198.55 |
| 10/11/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $248.55 |
| 10/11/2016 | Debit: Signature purchase from 267359343881 SUBURBAN EZ-E | 2802 | $56.23 | | $257.55 |
| 10/10/2016 | Debit: Signature purchase from 920167839884 SKOKIE FINANCI | 2802 | $100.14 | | $313.78 |
| 10/10/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $413.92 |
| 10/09/2016 | Debit: Signature purchase from 4445108211144 NORTHSHORE | 2802 | $136.00 | | $422.92 |
| 10/09/2016 | Debit: Signature purchase from 17-8027201717 CENTURIES ANI | 2802 | $64.84 | | $558.92 |
| 10/09/2016 | Debit: Signature purchase from 029122000090841 FARMERS IN | 2802 | $39.07 | | $623.76 |
| 10/09/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $8.00 | | $662.83 |
| 10/08/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $670.83 |
| 10/08/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $120.00 | | $675.78 |
| 10/07/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $795.78 |
| 10/07/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $200.00 | | $800.73 |
| 10/07/2016 | Credit: Cash Load at New Devon Center Currency Exchange 542 | | | $999.00 | $1,000.73 |
| 10/06/2016 | Debit: Signature purchase from 21-8021511145 HAMPTON INNS | 2802 | $182.06 | | $1.73 |
| 10/06/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $183.79 |
| 10/06/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $103.00 | | $186.29 |
| 10/06/2016 | Debit: ATM Transaction Decline Fee - Domestic | 2802 | $1.00 | | $289.29 |
| 10/05/2016 | Debit: PIN purchase from 04400073379901 7-ELEVEN WINNETH | 2802 | $12.04 | | $290.29 |

**NETSPEND**
*A TSYS® Company*

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
Po Box 517
WINNETKA,IL 60093

**Account Balance: $276.57**

**Statement for Account Number: 5422697748**
**Statement Period: December 2016**

## Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $276.57 |
| 12/29/2016 | Debit: Foreign Transaction Surcharge | 9288 | $1.82 | | $276.57 |
| 12/29/2016 | Debit: Signature purchase from 4772786 DEKEL SABAN LTD KIF | 9288 | $51.94 | | $278.39 |
| 12/28/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $250.00 | $330.33 |
| 12/19/2016 | Debit: Signature purchase from 21-8030692639 JAMES BEACH I | 9288 | $25.89 | | $80.33 |
| 12/19/2016 | Debit: Signature purchase from 934000000576025 LAX 3129B TH | 9288 | $37.16 | | $106.22 |
| 12/18/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $125.00 | $143.38 |
| 12/15/2016 | Debit: Signature purchase from 09260000052886 PAYLESS SH | 9288 | $36.27 | | $18.38 |
| 12/14/2016 | Debit: Signature purchase from 025500000265603 SUBWAY 002 | 9288 | $6.95 | | $54.65 |
| 12/13/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE MON | 9288 | $10.79 | | $61.60 |
| 12/13/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $10.57 | | $72.39 |
| 12/13/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE MON | 9288 | $11.12 | | $82.96 |
| 12/12/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $15.00 | | $94.08 |
| 12/12/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $17.41 | | $109.08 |
| 12/12/2016 | Debit: Signature purchase from 4445100070706 WALGREENS # | 9288 | $20.24 | | $126.49 |
| 12/11/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $15.00 | | $146.73 |
| 12/10/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI 7 | 9288 | $6.33 | | $161.73 |
| 12/10/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $125.00 | $168.06 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| 12/10/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $24.47 | | $43.06 |
|------------|-----------------------------------------------------------|------|--------|--|--------|
| 12/10/2016 | Debit: Signature purchase from 4445090990226 RALPHS #0070 | 9288 | $17.25 | | $67.53 |
| 12/09/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $15.00 | | $84.78 |
| 12/08/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $50.00 | $99.78 |
| 12/04/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $36.85 | | $49.78 |
| 12/04/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $15.00 | | $86.63 |
| 12/04/2016 | Debit: PIN purchase from RALPHS 22915 VICTORY BLVD WEST | 9288 | $139.98 | | $101.63 |
| 12/04/2016 | Debit: Plan Fee 12/03/2016 | | $9.95 | | $241.61 |
| 12/04/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI { | 9288 | $1.40 | | $251.56 |
| 12/04/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $7.54 | | $252.96 |
| 12/03/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI { | 9288 | $11.70 | | $260.50 |
| 12/03/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI { | 9288 | $9.21 | | $272.20 |
| 12/02/2016 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $200.00 | $281.41 |
| 12/02/2016 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $12.85 | | $81.41 |
| | Beginning Balance | | | | $94.26 |

## Overdraft Fees

| | This Month | Year To Date |
|--|------------|--------------|
| Overdraft Fees | $0.00 | $0.00 |

**NETSPEND**
*A TSYS® Company*

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT M ROSSINI**
Po box 517
WINNETKA,IL 60093

**Account Balance: $615.88**

**Statement for Account Number: 6903608037**
**Statement Period:  December 2016**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $615.88 |
| 12/31/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $500.00 | $615.88 |
| 12/30/2016 | Debit: Signature purchase from 260329000119835 NICOR GAS E | 2802 | $149.02 | | $115.88 |
| 12/30/2016 | Debit: Signature purchase from 210938000015342 UNITED 0167 | 2802 | $198.10 | | $264.90 |
| 12/30/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $19.00 | | $463.00 |
| 12/29/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $37.65 | | $482.00 |
| 12/29/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $400.00 | $519.65 |
| 12/28/2016 | Debit: Signature purchase from 03-0090000266 AGENT FEE 890 | 2802 | $55.00 | | $119.65 |
| 12/28/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $174.65 |
| 12/28/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $43.00 | | $177.15 |
| 12/28/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $220.15 |
| 12/28/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to . | | $250.00 | | $225.10 |
| 12/28/2016 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $300.00 | $475.10 |
| 12/27/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $175.10 |
| 12/27/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $63.00 | | $177.60 |
| 12/27/2016 | Debit: PIN purchase from W0392622 WALGREENS STORE 182! | 2802 | $7.12 | | $240.60 |
| 12/27/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $6.50 | | $247.72 |
| 12/26/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $5.77 | | $254.22 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Date | Description | | Amount | | Balance |
|------|-------------|------|--------|------|---------|
| 12/26/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $3.29 | | $259.99 |
| 12/24/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $263.28 |
| 12/24/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $103.00 | | $265.78 |
| 12/23/2016 | Debit: Signature purchase from 313286908881 CHICAGO TRIBU | 2802 | $0.99 | | $368.78 |
| 12/23/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $360.00 | $369.77 |
| 12/23/2016 | Debit: PIN purchase from 277249461991 MONTROSE DELI INC | 2802 | $12.07 | | $9.77 |
| 12/23/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $21.84 |
| 12/22/2016 | Debit: Signature purchase from 395700099000 ABC*PLANET FIT | 2802 | $19.99 | | $30.84 |
| 12/22/2016 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $6.00 | | $50.83 |
| 12/22/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $22.74 | | $56.83 |
| 12/22/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $6.50 | | $79.57 |
| 12/22/2016 | Debit: Signature purchase from 267359343881 SUBURBAN EZ-E | 2802 | $58.84 | | $86.07 |
| 12/21/2016 | Debit: Signature purchase from 008788850039139 THE CLASSI( | 2802 | $168.41 | | $144.91 |
| 12/21/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $313.32 |
| 12/21/2016 | Debit: ATM Cash Withdrawal at Graham CStore Skokie 3750 TOL | 2802 | $203.00 | | $315.82 |
| 12/19/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $500.00 | $518.82 |
| 12/18/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $18.82 |
| 12/18/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $125.00 | | $23.77 |
| 12/18/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $148.77 |
| 12/18/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $163.00 | | $151.27 |
| 12/17/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.50 | | $314.27 |
| 12/16/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $41.42 | | $324.77 |
| 12/16/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $43.29 | | $366.19 |
| 12/16/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $409.48 |
| 12/15/2016 | Debit: PIN purchase from 00121262203 BARNESNOBLE 55 Old | 2802 | $20.84 | | $418.48 |
| 12/15/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.32 | | $439.32 |
| 12/14/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $449.64 |
| 12/12/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $458.64 |
| 12/12/2016 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $83.00 | | $461.14 |
| 12/10/2016 | Debit: PIN purchase from 00121262204 BARNESNOBLE 55 Old | 2802 | $27.70 | | $544.14 |
| 12/10/2016 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $239.33 | | $571.84 |
| 12/10/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $811.17 |
| 12/10/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $125.00 | | $816.12 |
| 12/10/2016 | Credit: Cash Load at New Devon Center Currency Exchange 542: | | | $600.00 | $941.12 |
| 12/09/2016 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $6.59 | | $341.12 |
| 12/08/2016 | Debit: Signature purchase from 518089731611232 TOMOYA SU! | 2802 | $55.62 | | $347.71 |
| 12/08/2016 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $53.00 | | $403.33 |
| 12/08/2016 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $456.33 |
| 12/08/2016 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $50.00 | | $461.28 |
| 12/07/2016 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $248.68 | | $511.28 |
| 12/06/2016 | Debit: PIN purchase from DOLLAR TREE 6454 PLATT AVE WES | 2802 | $13.08 | | $759.96 |
| 12/06/2016 | Debit: PIN purchase from DOLLAR TREE 6454 PLATT AVE WES | 2802 | $26.16 | | $773.04 |
| 12/06/2016 | Credit: Cash Load at Walmart 6433 Fallbrook Ave WEST HILLS,( | | | $500.00 | $799.20 |
| 12/05/2016 | Debit: Signature purchase from 84870020067667 ABM ONSITE \ | 2802 | $1.00 | | $299.20 |
| 12/05/2016 | Debit: Plan Fee 12/04/2016 | | $9.95 | | $300.20 |
| 12/04/2016 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $444.81 | | $310.15 |
| 12/04/2016 | Debit: Signature purchase from 03-8028142431 FRONTIER AI AF | 2802 | $87.00 | | $754.96 |
| 12/03/2016 | Debit: Signature purchase from 4445091015743 MACY*S .COM # | 2802 | $77.50 | | $841.96 |
| 12/03/2016 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $919.46 |
| 12/03/2016 | Debit: ATM Cash Withdrawal at BMO HARRIS BANK O'HARE AII | 2802 | $101.50 | | $921.96 |
| 12/03/2016 | Debit: Signature purchase from 239892000238521 GEICO *AUT( | 2802 | $99.02 | | $1,023.46 |
| 12/03/2016 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $496.00 | $1,122.48 |
| 12/03/2016 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $10.50 | | $626.48 |

**NETSPEND**
A TSYS® Company

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
Po Box 517
WINNETKA,IL 60093

**Account Balance: $101.75**

**Statement for Account Number: 5422697748**
**Statement Period:  January 2017**

## Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $101.75 |
| 01/31/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542' | | | $78.00 | $101.75 |
| 01/30/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE MON | 9288 | $32.80 | | $23.75 |
| 01/30/2017 | Debit: Signature purchase from 372624624881 HUDSONNEWS ! | 9288 | $14.86 | | $56.55 |
| 01/29/2017 | Debit: Signature purchase from 4445014113563 WHOLEFDS CH | 9288 | $42.58 | | $71.41 |
| 01/29/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI ? | 9288 | $40.74 | | $113.99 |
| 01/28/2017 | Debit: Signature purchase from 650000007669081 BENI KOSHE | 9288 | $23.28 | | $154.73 |
| 01/27/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $21.50 | | $178.01 |
| 01/27/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $23.20 | | $199.51 |
| 01/23/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $23.40 | | $222.71 |
| 01/20/2017 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $120.00 | $246.11 |
| 01/17/2017 | Debit: Signature purchase from 372338829883 FINGER NAILS W | 9288 | $19.00 | | $126.11 |
| 01/16/2017 | Debit: Signature purchase from 372419513885 ISLAND FOOT SI | 9288 | $20.00 | | $145.11 |
| 01/16/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $21.40 | | $165.11 |
| 01/14/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI ? | 9288 | $38.90 | | $186.51 |
| 01/12/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE TUE | 9288 | $30.60 | | $225.41 |
| 01/12/2017 | Debit: Signature purchase from 4445002009035 WHOLEFDS TR | 9288 | $117.43 | | $256.01 |
| 01/10/2017 | Credit: Account-to-Account Transfer from ALBERT M ROSSINI to | | | $300.00 | $373.44 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND
(1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement
or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you
no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will
credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us
to complete our investigation.

| | | | | Balance |
|---|---|---|---|---|
| 01/08/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $15.40 | $73.44 |
| 01/07/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI | 9288 | $38.13 | $88.84 |
| 01/07/2017 | Debit: Signature purchase from 4445090991281 RALPHS #0213 | 9288 | $100.00 | $126.97 |
| 01/06/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $24.65 | $226.97 |
| 01/05/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $15.00 | $251.62 |
| 01/04/2017 | Debit: Plan Fee 01/03/2017 | | $9.95 | $266.62 |
| | Beginning Balance | | | $276.57 |

## Overdraft Fees

| | This Month | Year To Date |
|---|---|---|
| Overdraft Fees | $0.00 | $0.00 |

NETSPEND
A TSYS® Company

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT M ROSSINI**
Po box 517
WINNETKA,IL 60093

**Account Balance: ($0.12)**

**Statement for Account Number: 6903608037**
**Statement Period: January 2017**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | ($0.12) |
| 01/24/2017 | Debit: Signature purchase from 395700099000 ABC*PLANET FIT | 2802 | $19.99 | | ($0.12) |
| 01/24/2017 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $19.87 |
| 01/24/2017 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $103.00 | | $22.37 |
| 01/24/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $9.00 | | $125.37 |
| 01/23/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $336.33 | | $134.37 |
| 01/23/2017 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $470.70 |
| 01/23/2017 | Debit: ATM Cash Withdrawal at Cardtronics CCW 88 GREENBAY | 2802 | $103.95 | | $473.20 |
| 01/22/2017 | Debit: PIN purchase from 00121262204 BARNESNOBLE 55 Old | 2802 | $25.18 | | $577.15 |
| 01/21/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $600.00 | $602.33 |
| 01/20/2017 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $2.33 |
| 01/20/2017 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $120.00 | | $7.28 |
| 01/20/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $6.50 | | $127.28 |
| 01/19/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $560.55 | | $133.78 |
| 01/19/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 2802 | $19.00 | | $694.33 |
| 01/18/2017 | Debit: Signature purchase from 84870007003495 AMERICAN FA | 2802 | $85.66 | | $713.33 |
| 01/17/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $112.11 | | $798.99 |
| 01/17/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $200.00 | $911.10 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Date | Description | | Amount | Credit | Balance |
|---|---|---|---|---|---|
| 01/17/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $500.00 | $711.10 |
| 01/17/2017 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $52.09 | | $211.10 |
| 01/17/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US ' | 2802 | $9.00 | | $263.19 |
| 01/16/2017 | Debit: Signature purchase from 698944000835355 RCN*CABLE | 2802 | $146.90 | | $272.19 |
| 01/13/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $40.00 | | $419.09 |
| 01/12/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $140.19 | | $459.09 |
| 01/11/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $784.77 | | $599.28 |
| 01/10/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $108.00 | | $1,384.05 |
| 01/10/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $500.00 | $1,492.05 |
| 01/10/2017 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $992.05 |
| 01/10/2017 | Debit: Account-to-Account Transfer from ALBERT M ROSSINI to | | $300.00 | | $997.00 |
| 01/09/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542 | | | $800.00 | $1,297.00 |
| 01/09/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $500.00 | $497.00 |
| 01/08/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 2802 | $3.00 | | ($3.00) |
| 01/07/2017 | Debit: PIN purchase from FOOD 4 LESS 2420 W. MAIN ST. EVA | 2802 | $25.27 | | $0.00 |
| 01/07/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US ' | 2802 | $10.50 | | $25.27 |
| 01/07/2017 | Debit: Signature purchase from 372624021880 HUDSONNEWS ! | 2802 | $5.99 | | $35.77 |
| 01/07/2017 | Debit: Signature purchase from 650000007669081 BENI KOSHE | 2802 | $3.29 | | $41.76 |
| 01/07/2017 | Debit: Signature purchase from 650000007669081 BENI KOSHE | 2802 | $32.14 | | $45.05 |
| 01/07/2017 | Debit: Signature purchase from 650000007669081 BENI KOSHE | 2802 | $10.99 | | $77.19 |
| 01/06/2017 | Debit: Signature purchase from 01861313 THY AIRLINE 2357892 | 2802 | $110.00 | | $88.18 |
| 01/06/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $102.19 | | $198.18 |
| 01/06/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $62.00 | | $300.37 |
| 01/05/2017 | Debit: PIN purchase from DOLLAR TREE 6454 PLATT AVE WES | 2802 | $16.31 | | $362.37 |
| 01/05/2017 | Debit: Signature purchase from 254149000984724 EXPEDIA723 | 2802 | $19.00 | | $378.68 |
| 01/05/2017 | Debit: Plan Fee 01/04/2017 | | $9.95 | | $397.68 |
| 01/04/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 2802 | $2.00 | | $407.63 |
| 01/04/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 2802 | $940.40 | | $409.63 |
| 01/03/2017 | Debit: Signature purchase from 846021428889 SPIRIT AIRLINES | 2802 | $10.95 | | $1,350.03 |
| 01/03/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $55.00 | | $1,360.98 |
| 01/03/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542 | | | $999.00 | $1,415.98 |
| 01/03/2017 | Debit: Signature purchase from 239892000238521 GEICO *AUT( | 2802 | $99.02 | | $416.98 |
| 01/03/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US ' | 2802 | $9.00 | | $516.00 |
| 01/01/2017 | Debit: PIN purchase from 00121255204 BARNESNOBLE 5405 T( | 2802 | $26.74 | | $525.00 |
| 01/01/2017 | Debit: PIN purchase from DOLLAR TREE 3521 W DEVON AVE ( | 2802 | $7.72 | | $551.74 |
| 01/01/2017 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $18.96 | | $559.46 |
| 01/01/2017 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 2802 | $25.52 | | $578.42 |
| 01/01/2017 | Debit: PIN purchase from W1521122 WALGREENS STORE 323; | 2802 | $9.95 | | $603.94 |
| 01/01/2017 | Debit: PIN purchase from 168544955099 USPS KIOSK 16854 51 | 2802 | $1.99 | | $613.89 |
| | Beginning Balance | | | | $615.88 |

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
928 Elm St
Apt 2B
WINNETKA,IL 60093

**Account Balance: \$0.00**

**Statement for Account Number: 8679185860**
**Statement Period: January 2017**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | \$0.00 |
| 01/26/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$0.00 |
| 01/26/2017 | Debit: PIN purchase from 000000000128547 LINCOLN MOBIL LI | 3551 | \$13.22 | | \$2.00 |
| 01/26/2017 | Debit: Signature Purchase Transaction Fee | 3551 | \$1.00 | | \$15.22 |
| 01/26/2017 | Debit: Signature purchase from 236433400119901 DD/BR #3381 | 3551 | \$3.36 | | \$16.22 |
| 01/23/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$19.58 |
| 01/23/2017 | Debit: PIN purchase from 7-ELEVEN 88 GREEN BAY ROAD US | 3551 | \$9.00 | | \$21.58 |
| 01/22/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$30.58 |
| 01/22/2017 | Debit: PIN purchase from 00121262204 BARNESNOBLE 55 Old | 3551 | \$7.20 | | \$32.58 |
| 01/22/2017 | Debit: Signature Purchase Transaction Fee | 3551 | \$1.00 | | \$39.78 |
| 01/22/2017 | Debit: Signature purchase from 051512000203554 ACT*Winnetki | 3551 | \$15.00 | | \$40.78 |
| 01/21/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$55.78 |
| 01/21/2017 | Debit: PIN purchase from CVS/PHARMACY #08 08749--3950 W. | 3551 | \$11.51 | | \$57.78 |
| 01/19/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$69.29 |
| 01/19/2017 | Debit: PIN purchase from 000000000456026 UIC Coll of Dent - D | 3551 | \$139.00 | | \$71.29 |
| 01/18/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | \$200.00 | \$210.29 |
| 01/13/2017 | Debit: PIN Purchase Transaction Fee | 3551 | \$2.00 | | \$10.29 |
| X 01/13/2017 | Debit: PIN purchase from CVS/PHARMACY #09 09682--22968 Vi | 3551 | \$5.43 | | \$12.29 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Posting Date | Transaction | | | | | Balance |
|---|---|---|---|---|---|---|
| 01/12/2017 | Debit: PIN Purchase Transaction Fee | 3551 | $2.00 | | | $17.72 |
| X 01/12/2017 | Debit: PIN purchase from RALPHS 22915 VICTORY BLVD WEST | 3551 | $12.41 | | | $19.72 |
| 01/12/2017 | Debit: PIN Purchase Transaction Fee | 3551 | $2.00 | | | $32.13 |
| X 01/12/2017 | Debit: PIN purchase from CVS/PHARMACY #09 09682--22968 Vi | 3551 | $8.47 | | | $34.13 |
| X 01/12/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $42.60 |
| X 01/12/2017 | Debit: Signature purchase from 483209699998 CITY OF LA DWF | 3551 | $44.62 | | | $43.60 |
| X 01/12/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $88.22 |
| X 01/12/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 3551 | $3.00 | | | $89.22 |
| X 01/12/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $92.22 |
| X 01/12/2017 | Debit: Signature purchase from 593119401285449 LOS ANGELE | 3551 | $5.00 | | | $93.22 |
| 01/11/2017 | Debit: PIN Purchase Transaction Fee | 3551 | $2.00 | | | $98.22 |
| X 01/11/2017 | Debit: PIN purchase from F4067 PARTY CITY 6559 FallbrookWe | 3551 | $28.67 | | | $100.22 |
| 01/11/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $128.89 |
| 01/11/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 3551 | $50.00 | | | $129.89 |
| 01/11/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $179.89 |
| 01/11/2017 | Debit: Signature Purchase Transaction Fee | 3551 | $1.00 | | | $180.89 |
| X 01/11/2017 | Debit: Signature purchase from 372624455880 HUDSON NEWS | 3551 | $6.60 | | | $181.89 |
| X 01/11/2017 | Debit: Signature purchase from 372624455880 HUDSON NEWS | 3551 | $11.01 | | | $188.49 |
| 01/10/2017 | Debit: Balance Inquiry Fee - Telephone Automated Service | | $0.50 | | | $199.50 |
| 01/10/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | | $200.00 | $200.00 |
| | Beginning Balance | | | | | $0.00 |

**NETSPEND**
A TSYS® Company

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT M ROSSINI**
Po box 517
WINNETKA,IL 60093

**Account Balance: $0.00**

**Statement for Account Number:  6903608037**
**Statement Period:   March 2017**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $0.00 |
| 03/23/2017 | Debit: Signature purchase from 673938300700010 NORTHBROC | 2802 | $20.98 | | $0.00 |
| 03/23/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 2802 | $2.00 | | $20.98 |
| 03/22/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 2802 | $68.00 | | $22.98 |
| 03/22/2017 | Debit: ATM Cash Withdrawal Fee - Domestic | 2802 | $2.50 | | $90.98 |
| 03/22/2017 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 2802 | $63.00 | | $93.48 |
| 03/22/2017 | Debit: Signature purchase from 445301504996 SQ *POKE RAINE | 2802 | $29.36 | | $156.48 |
| 03/22/2017 | Debit: Signature purchase from 362551436888 FRESH CLEANEI | 2802 | $52.65 | | $185.84 |
| 03/21/2017 | Debit: Signature purchase from 395700099000 ABC*PLANET FIT | 2802 | $19.99 | | $238.49 |
| 03/21/2017 | Credit: Account-to-Account Transfer from ALBERT ROSSINI to Al | | | $75.00 | $258.48 |
| 03/18/2017 | Debit: PIN purchase from 000000000013659 SPROUTS FARMEI | 2802 | $30.65 | | $183.48 |
| 03/18/2017 | Debit: PIN purchase from CVS/PHARMACY #09 09682--22968 Vi | 2802 | $13.04 | | $214.13 |
| 03/18/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 2802 | $2.00 | | $227.17 |
| 03/18/2017 | Debit: PIN purchase from CVS/PHARMACY #09 09613--23357 M | 2802 | $10.65 | | $229.17 |
| 03/17/2017 | Debit: Signature purchase from 395700099000 ABC*PLANET FIT | 2802 | $29.99 | | $239.82 |
| 03/16/2017 | Debit: Signature purchase from 218543000217339 AAA LIFE INS | 2802 | $129.00 | | $269.81 |
| 03/16/2017 | Debit: Signature purchase from 218543000217339 AAA LIFE INS | 2802 | $99.00 | | $398.81 |
| 03/15/2017 | Credit: Cash Load at NATIONAL CITY BANK - DEVON 6333 NOF | | | $496.00 | $497.81 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

    (1) Tell us your name and account number (if any).
    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
    (3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

NETSPEND
A TSYS® Company
Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
Po Box 517
WINNETKA,IL 60093

**Account Balance: $238.03**

**Statement for Account Number: 5422697748**
**Statement Period: March 2017**

## Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $238.03 |
| 03/31/2017 | Debit: Signature purchase from 4445001899922 WHOLEFDS WI | 9288 | $66.26 | | $238.03 |
| 03/28/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $298.00 | $304.29 |
| 03/23/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE WEE | 9288 | $25.00 | | $6.29 |
| 03/23/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE WEE | 9288 | $8.90 | | $31.29 |
| 03/23/2017 | Debit: Signature purchase from 4445077009682 CVS/PHARMAC | 9288 | $7.06 | | $40.19 |
| 03/23/2017 | Debit: Signature purchase from 376192903999 LIVING SPACES | 9288 | $39.17 | | $47.25 |
| 03/23/2017 | Debit: Signature purchase from 589778901507158 RITE AID STC | 9288 | $21.74 | | $86.42 |
| 03/21/2017 | Debit: Account-to-Account Transfer from ALBERT ROSSINI to AL | | $75.00 | | $108.16 |
| 03/18/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI ! | 9288 | $10.30 | | $183.16 |
| 03/18/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE FRI ! | 9288 | $25.00 | | $193.46 |
| 03/17/2017 | Debit: Signature purchase from 4445077009682 CVS/PHARMAC | 9288 | $10.20 | | $218.46 |
| 03/16/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 9288 | $204.19 | | $228.66 |
| 03/15/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $135.00 | $432.85 |
| 03/14/2017 | Debit: Signature purchase from 06170710272SUW1 SPROUTS F | 9288 | $120.99 | | $297.85 |
| 03/14/2017 | Debit: Signature purchase from 372532323881 OH GOSSIP NAIL | 9288 | $75.00 | | $418.84 |
| 03/13/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE SAT | 9288 | $3.44 | | $493.84 |
| 03/11/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $498.00 | $497.28 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Posting Date | Transaction | Last 4 of BAN | Debit(s) | Credit(s) | Balance |
|---|---|---|---|---|---|
| 03/08/2017 | Debit: Signature purchase from 06170710272SUW1 SPROUTS F | 9288 | $35.56 | | ($0.72) |
| 03/07/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE MON | 9288 | $5.00 | | $34.84 |
| 03/06/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE SUN | 9288 | $15.30 | | $39.84 |
| 03/04/2017 | Debit: Plan Fee 03/03/2017 | | $9.95 | | $55.14 |
| 03/03/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE THU | 9288 | $26.40 | | $65.09 |
| 03/03/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542 | | | $50.00 | $91.49 |
| 03/02/2017 | Debit: Signature purchase from 445134698999 LYFT *RIDE WED | 9288 | $42.40 | | $41.49 |
| 03/01/2017 | Debit: Signature purchase from 301322233871223 L A SUPERIO | 9288 | $1.00 | | $83.89 |
| 03/01/2017 | Debit: Signature purchase from 301322233871223 L A SUPERIO | 9288 | $1.00 | | $84.89 |
| 03/01/2017 | Debit: Signature purchase from 301322233871223 L A SUPERIO | 9288 | $1.00 | | $85.89 |
| | Beginning Balance | | | | $86.89 |

## Overdraft Fees

| | This Month | Year To Date |
|---|---|---|
| Overdraft Fees | $0.00 | $0.00 |

**NETSPEND**
A TSYS Company

Netspend Corporation
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
928 Elm St
Apt 2B
WINNETKA,IL 60093

**Account Balance: $249.55**

**Statement for Account Number: 8679185860**
**Statement Period:   May 2017**

## Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $249.55 |
| 05/30/2017 | Debit: ATM Cash Withdrawal Fee - Domestic | 3551 | $2.50 | | $249.55 |
| 05/30/2017 | Debit: ATM Cash Withdrawal at Cardtronics CCSB 3950 W DEVC | 3551 | $203.00 | | $252.05 |
| 05/26/2017 | Debit: Account-to-Account Transfer Fee - CS Agent | | $4.95 | | $455.05 |
| 05/26/2017 | Debit: Account-to-Account Transfer from Albert Rossini to ALBER | | $540.00 | | $460.00 |
| 05/26/2017 | Credit: Cash Load at walmart 3626 TOUHY AVE SKOKIE,IL 6007 | | | $500.00 | $1,000.00 |
| 05/26/2017 | Credit: Cash Load at Walmart 5630 W Touhy Ave NILES,IL 6071· | | | $500.00 | $500.00 |
| 05/14/2017 | Debit: Signature purchase from 008788850039139 THE CLASSI( | 3551 | $100.00 | | $0.00 |
| 05/14/2017 | Debit: PIN purchase from FOOD 4 LESS 2420 W. MAIN ST. EVA | 3551 | $7.15 | | $100.00 |
| 05/13/2017 | Debit: PIN purchase from WALGREENS STORE 9150 SKOKIE B | 3551 | $6.60 | | $107.15 |
| 05/13/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 3551 | $500.00 | | $113.75 |
| 05/13/2017 | Debit: Plan Fee 05/12/2017 | | $9.95 | | $613.75 |
| 05/12/2017 | Debit: Signature purchase from 328013499996 AT&T S621 4055 | 3551 | $18.37 | | $623.70 |
| 05/12/2017 | Debit: Balance Inquiry Fee - Telephone Automated Service | | $0.50 | | $642.07 |
| 05/12/2017 | Credit: Cash Load at Rite Aid 21949 VENTURA BOULEVARD W( | | | $500.00 | $642.57 |
| 05/11/2017 | Debit: PIN purchase from CVS/PHARMACY #02 02289--19701 V. | 3551 | $21.65 | | $142.57 |
| 05/10/2017 | Debit: PIN purchase from 002900002066001 VONS Store 2066 T | 3551 | $50.49 | | $164.22 |
| 05/10/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 3551 | $1,000.00 | | $214.71 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

| Posting Date | Transaction | | Debit | Credit | Balance |
|---|---|---|---|---|---|
| 05/09/2017 | Debit: Signature purchase from 590949301512123 RESIDENCE | 3551 | $224.22 | | $1,214.71 |
| 05/08/2017 | Debit: Signature purchase from 000720000302136 TAXI SVC GA | 3551 | $83.65 | | $1,438.93 |
| 05/08/2017 | Debit: Balance Inquiry Fee - Telephone Automated Service | | $0.50 | | $1,522.58 |
| 05/08/2017 | Debit: Signature purchase from 053100020251625 STARBUCKS | 3551 | $4.18 | | $1,523.08 |
| 05/08/2017 | Credit: Cash Load at Rite Aid 21949 VENTURA BOULEVARD W( | | | $395.00 | $1,527.26 |
| 05/08/2017 | Debit: Signature purchase from 06737057274MDF1 MCDONALD | 3551 | $4.29 | | $1,132.26 |
| 05/07/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 3551 | $52.00 | | $1,136.55 |
| 05/07/2017 | Debit: Signature purchase from 846021428889 SPIRIT AIRLINES | 3551 | $10.95 | | $1,188.55 |
| 05/07/2017 | Credit: Cash Load at Rite Aid 21949 VENTURA BOULEVARD W( | | | $500.00 | $1,199.50 |
| 05/07/2017 | Debit: Balance Inquiry Fee - Telephone Automated Service | | $0.50 | | $699.50 |
| 05/07/2017 | Credit: Cash Load at Rite Aid 21949 VENTURA BOULEVARD W( | | | $500.00 | $700.00 |
| 05/06/2017 | Credit: Cash Load at New Devon Center Currency Exchange 542! | | | $200.00 | $200.00 |
| | Beginning Balance | | | | $0.00 |

NETSPEND
Netspend Corporation
A TSYS Company
P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
Po Box 517
WINNETKA,IL 60093

**Account Balance: $11.54**

**Statement for Account Number: 5422697748**
**Statement Period: May 2017**

**Posted Transactions**

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | $11.54 |
| 05/31/2017 | Debit: Signature purchase from 591559101519772 BROOK FURI | 9288 | $500.00 | | $11.54 |
| 05/29/2017 | Debit: Signature purchase from 589778901507158 RITE AID STC | 9288 | $18.01 | | $511.54 |
| 05/26/2017 | Debit: Balance Inquiry Fee - Telephone Automated Service | | $0.50 | | $529.55 |
| 05/26/2017 | Debit: Plan Fee 05/03/2017 | | $9.95 | | $530.05 |
| 05/26/2017 | Credit: Account-to-Account Transfer from Albert Rossini to ALBEF | | | $540.00 | $540.00 |
| | Beginning Balance | | | | $0.00 |

**Overdraft Fees**

| | This Month | Year To Date | |
|---|---|---|---|
| Overdraft Fees | $0.00 | $0.00 | |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

**NETSPEND** Netspend Corporation
A TSYS Company P. O. Box 2136
Austin, TX 78768-2136

**ALBERT ROSSINI**
928 Elm St
Apt 2B
WINNETKA,IL 60093

**Account Balance: \$0.00**

**Statement for Account Number: 8679185860**
**Statement Period: June 2017**

### Posted Transactions

| Posting Date | Transaction | Last 4 of PAN | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|---|
| | Ending Balance | | | | \$0.00 |
| 06/30/2017 | Debit: PIN purchase from 000000000852801 SHELL Service Stat | 3551 | \$2.69 | | \$0.00 |
| 06/20/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 3551 | \$2.00 | | \$2.69 |
| 06/16/2017 | Debit: Signature purchase from 03-8027632267 SPIRIT AIRLINE! | 3551 | \$3.00 | | \$4.69 |
| 06/15/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 3551 | \$18.00 | | \$7.69 |
| 06/15/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 3551 | \$335.19 | | \$25.69 |
| 06/14/2017 | Debit: Signature purchase from 074100000010009 FEDEX 7868! | 3551 | \$34.50 | | \$360.88 |
| 06/14/2017 | Debit: ATM Cash Withdrawal Fee - Domestic | 3551 | \$2.50 | | \$395.38 |
| 06/14/2017 | Debit: ATM Cash Withdrawal at FIRST BANK 5939 CANOGA AVI | 3551 | \$63.00 | | \$397.88 |
| 06/14/2017 | Debit: Signature purchase from 17-8029864637 BOBBI ROCCO \ | 3551 | \$215.33 | | \$460.88 |
| 06/13/2017 | Debit: PIN purchase from 000001899922001 WHOLEFDS WDH | 3551 | \$130.37 | | \$676.21 |
| 06/13/2017 | Debit: Plan Fee 06/12/2017 | | \$9.95 | | \$806.58 |
| 06/12/2017 | Debit: PIN purchase from RALPHS 22915 VICTORY BLVD WES˙ | 3551 | \$82.76 | | \$816.53 |
| 06/12/2017 | Debit: Signature purchase from 4445011830026 BOSTON MARK | 3551 | \$33.63 | | \$899.29 |
| 06/11/2017 | Debit: Signature purchase from 536472701175144 RED ROOF II | 3551 | \$482.44 | | \$932.92 |
| 06/11/2017 | Debit: Signature purchase from 536472701175144 RED ROOF II | 3551 | \$147.45 | | \$1,415.36 |
| 06/11/2017 | Debit: Signature purchase from 4445000739367 PACER800-676- | 3551 | \$92.10 | | \$1,562.81 |
| 06/10/2017 | Debit: Signature purchase from 03-9508698116 SPIRIT AIRL 487 | 3551 | \$223.19 | | \$1,654.91 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Telephone us at 1-86-NETSPEND (1-866-387-7363) or write us at P.O. Box 2136 Austin, TX 78768-2136 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can
(3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.



**GObank**

P.O. BOX 5100. | PASADENA, CA 91117

Statement Period
5/14/2017 – 6/13/2017

Account Number
311369539783                Page 2 of 5

**TRANSACTIONS**

**Albert Rossini**

3924 W DEVON AVE STE 200
LINCOLNWOOD, IL 60712-1040

| Date | Description | Type | Amount | Available |
|------|-------------|------|--------|-----------|
| 05/26 | Cash Deposit | Deposit | +$1,100.00 | $1,100.00 |
| 05/16 | MARIANOS FRESH MARKET NORTHFIELD, IL | Purchase | -$1.85 | $0.00 |
| 05/16 | SPEEDY CASH 888-3331360, KS | Misc Debit | -$21.09 | $1.85 |
| 05/16 | WALGREENS 63 GREEN BAY | Purchase | -$48.99 | $22.94 |
| 05/15 | Monthly Membership Fee | Fee | -$0.00 | $71.93 |
| 05/15 | SPIRIT AIRLINES 08008261300, WI | Purchase | -$14.00 | $71.93 |
| 05/15 | BENI KOSHER MARKET WOODLAND HILL, CA | Purchase | -$22.49 | $85.93 |
| 05/15 | RCN*CABLE PHONE INTERN | Purchase | -$150.00 | $108.42 |
| 05/15 | SPIRIT AI 48701504029920 MIRAMAR, FL | Purchase | -$197.19 | $258.42 |
| 05/15 | AT&T*BILL PAYMENT 08003310500, TX | Purchase | -$307.72 | $455.61 |
| 05/15 | Cash Deposit | Deposit | +$300.00 | $763.33 |

**CHECKING ACCOUNT**

| | |
|---|---|
| Beginning Balance: | $463.33 |
| Credits (3) | +$1,900.00 |
| Debits (27) | -$2,360.90 |
| Ending Balance: | $2.43 |

**MONEY VAULT**

| | |
|---|---|
| Beginning Balance: | $0.00 |
| Credits (0) | +$0.00 |
| Debits (0) | -$0.00 |
| Ending Balance: | $0.00 |

**CONTACT US**

| | |
|---|---|
| email | help@gobank.com |
| phone | 1-888-280-8260 |
| web | GoBank.com/Contact |

GoBank is a brand of Green Dot Bank, member FDIC ©2013 Green Dot Bank. All rights reserved.

NET SPEND

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 10/12/16 | American Airlines (2802) | 243.10 |
| 10/13/16 | American Air (Baggage)(2802) | 25.00 |
| 10/13/16 | Lyft (9288)          (W. Lincoln Ave) | 44.35 |
| 10/14/16 | Walmart (0802)   6433 Fallmouth #5152 | 18.17 |
| 10/14/16 | 99° Only Store + Plant (2 ) | 17.26 |
| 10/14/16 | Super 8 Motel (Topanga)(2802) | 120.12 |
| 10/14/16 | Super 8 Motel (Topanga)(2802) | 120.2 |
| 10/15/16 | Walmart (6433 Falmouth)(2802) | 100.00 |
| 10/15/16 | moved in to 21021 Erwin St #152 |  |
|  | Paid deposit + rent, rent 5.0 Rs. 1 room |  |
|  | Jamie Garcia |  |
| 10/15/16 | American Air (2802) | 243.10 |
| 10/16/16 | American Air (Bags Seat)(2802) | 28.94 |
| 10/16/16 | Lyft (9288)(Sunday) | 39.78 |
|  |  |  |
| 12/4/16 | Frontier Air (2802) | 87.00 |
| 12/5/16 | Frontier Air (2802) | 1.00 |
| 12/4/16 | Lyft (9288)(Sat) | 36.25 |
| 12/6/16 | Walmart 2802 6433 Fallbrook | 200.15 |
| 12/6/16 | Dollar Tree 6454 Platt (2802) | 26.16 |
| 12/6/16 | Dollar Tree 6454 Platt (2802) | 13.08 |
| 12/8/16 | Spirit Air (2802) | 53.00 |
| 12/8/16 | Tomayo Sushi (2802) Oxnard/Canoga | 37.52 |
| 12/10/16 | Lyft (9288)(Thursday) | 24.47 |
| 12/4/16 | Paid rent at 21021 Erwin St 152 to |  |
|  | Courtney, the manager |  |

NET SPEND

| DATE | PAYEE | AMOUN |
|---|---|---|
| 1/3/17 | SPIRIT AR (2802) | 55.05 |
| 1/3/17 | SPIRIT AIR (2802) | 10.95 |
| 1/4/17 | SPIRIT AIR (2802) | 2.00 |
| 1/6/17 | Lyft (9288) | 24.65 |
| 1/5/17 | Lyft (9288) | 15.00 |
| 1/5/17 | Expedia (2802) | 19.00 |
| 1/5/17 | Dollar Tree (2802) 6454 PLATT | 10.31 |
| 1/6/17 | Spirit AIR (2802) | 62.00 |
| 1/6/17 | Spirit AIR (2802) | 102.19 |
| 1/7/17 | Bens Kosher Market (OXNARD, PLATT) (2802) | 10.99 |
| 1/7/17 | Bens Kosher Market (OXNARD/PLATT) (2802) | 32.19 |
| 1/7/17 | Bens Kosher Market (OXNARD/PLATT) (2802) | 3.2? |
| 1/10/17 | Spirit AIR (2802) | 108.?? |
| 1/12/17 | Spirit AIR (2802) ( | 40.? |
| 1/13/17 | Spirit AIR (2802) (BAGS) | 40.00 |
| 1/12/17 | Whole Foods (9288) | 117.4? |
| 1/12/17 | Lyft (9288) (Tuesday) | 30.6? |
| 1/14/17 | Lyft (9288) (FRIDAY) | 38.9? |
| 1/4/17 | Paid rent to Courtney at 21021 ERWIN | |

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 1/11/17 | Spirit Air (3551) BAGS | 50.00 |
| 1/11/17 | Party City, 6559 Fallbrook (3551) | 28.67 |
| 1/12/17 | City LA Power (3551) | 44.62 |
| 1/12/17 | CVS Pharmacy 22908 Victory | 8.44 |
| 1/12/17 | Ralph's Supermarket 22915 Victory | 12.41 |
| 1/13/17 | CVS Pharmacy 22908 Victory | 5.43 |
| | | |
| 3/18/17 | CVS Pharmacy #02 09713 (2802) | 10.65 |
| 3/18/17 | CVS Pharmacy #22966 Victory (2802) | 15.74 |
| 3/18/17 | SPROUTS MARKET-V... ... FALLBROOK (2802) | 30.65 |
| 3/22/17 | SQ RAINER (2802) | 29.36 |
| 3/22/17 | FRESH CLEANERS (2802) ONTARIO/CANOGA (2802) | 52.65 |
| | | |
| 3/16/17 | Spirit Air (9288) | 20.19 |
| 3/18/17 | Lyft (FRD)(9288) 4451 3 4 4 B... | 25.00 |
| 3/18/17 | Lyft (FRD)(9288) 4451 3 4 4 B... | 19.53 |
| 3/23/17 | Lyft (WED)(9288) 4451 3 ... V.. | ... |
| 3/23/17 | Lyft (WED)(9288) 4451 3 ... V.. | 25.00 |

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 5/11/17 | CVS PHARMACY - 19731 VICTORY (3551) | 21.65 |
| 5/2/17 | RITE AID - 21949 Ventura blvd (3551) | 50.00 |
| 5/12/17 | BOT - ORANGA~ERWIN | 18.3? |
| 5/7/17 | Rite Aid - 21949 ventura (3551) | |
| 6/?/? | RITE AID - 21949 ventura (357...) | 3.?? |
| | | |
| 5/? | | 315.?? |
| 5/8/17 | Starbucks - (3551) | 4.18 |
| 5/8/17 | | 52.65 |
| 5/15/17 | Deni Kocher MKT Woodland Hills (9783) | 22.49 |
| 5/3/17 | | |
| | FOR FURNITURE at 4021 ... ... #158 | |
| | | |
| | | |
| 6/12/17 | RAlphs Market - | |
| 6/3/17 | | 130.37 |
| 6/14/17 | | |
| | | 83.?? |



P.O. BOX 5100 | PASADENA, CA 91117

**Statement Period**
5/14/2017 – 6/13/2017

**Account Number**
311369539783                     Page 2 of 5

## TRANSACTIONS

**Albert Rossini**

3924 W DEVON AVE STE 200
LINCOLNWOOD, IL 60712-1040

| Date | Description | Type | Amount | Available |
|------|-------------|------|--------|-----------|
| 05/26 | Cash Deposit | Deposit | +$1,100.00 | $1,100.00 |
| 05/16 | MARIANOS FRESH MARKET NORTHFIELD, IL | Purchase | -$1.85 | $0.00 |
| 05/16 | SPEEDY CASH 888-3331360, KS | Misc Debit | -$21.09 | $1.85 |
| 05/16 | WALGREENS 63 GREEN BAY | Purchase | -$48.99 | $22.94 |
| 05/15 | Monthly Membership Fee | Fee | -$0.00 | $71.93 |
| 05/15 | SPIRIT AIRLINES 08008261300, WI | Purchase | -$14.00 | $71.93 |
| 05/15 | BENI KOSHER MARKET WOODLAND HILL, CA | Purchase | -$22.49 | $85.93 |
| 05/15 | RCN*CABLE PHONE INTERN | Purchase | -$150.00 | $108.42 |
| 05/15 | SPIRIT AI 48701504029920 MIRAMAR, FL | Purchase | -$197.19 | $258.42 |
| 05/15 | AT&T*BILL PAYMENT 08003310500, TX | Purchase | -$307.72 | $455.61 |
| 05/15 | Cash Deposit | Deposit | +$300.00 | $763.33 |

### CHECKING ACCOUNT

| | |
|---|---|
| Beginning Balance: | $463.33 |
| Credits (3) | +$1,900.00 |
| Debits (27) | -$2,360.90 |
| Ending Balance: | $2.43 |

### MONEY VAULT

| | |
|---|---|
| Beginning Balance: | $0.00 |
| Credits (0) | +$0.00 |
| Debits (0) | -$0.00 |
| Ending Balance: | $0.00 |

### CONTACT US

| | |
|---|---|
| email | help@gobank.com |
| phone | 1-888-280-8260 |
| web | GoBank.com/Contact |

GoBank is a brand of Green Dot Bank, member FDIC ©2013 Green Dot Bank. All rights reserved.

EXHIBIT 5

DEFENDANT'S MOTION AND MEMORANDUM
OF LAW TO STRIKE AND DISMISS THE GOVERNMENT'S
ALLEGATIONS OF NON-EXISTENT PROPERTY SALES FROM
THE RECORD AS ERRONEOUS AND FALSE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
          Plaintiff,
             vs.

CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*
          Defendants.

## Defendant Albert Rossini's Motion and Memorandum of Law to Strike and Dismiss Government Allegations of Non-Existent Property Sales from the Record, as Erroneous and False

NOW COMES Defendant Albert Rossini, pro se, and moves this Honorable Court to

strike from the record each and every allegation set forth by the Government so far as

Defendant's purported sales of non-existent properties, said statements and allegations

being patently erroneous and false and without basis in the facts and records duly

produced to the Government prior to indictment, and in support of which Defendant

states as follows:

As set forth in Defendant Albert Rossini's (Rossini) previously filed Motion to Dismiss

the Indictment for Prosecutorial Misconduct (Misconduct Motion), in September 2014,

11 months prior to indictment, Defendant and attorney Glen Seiden voluntarily presented

to Government agents, Defendant's documents and records of properties purchased and

sold.

1

These records were powerful evidence that Rossini and codefendants Babajan and Anthony Khoshabes lacked the requisite intent to defraud investors.

A short time after Defendant Rossini produced his records to the Government, attorney Seiden met with AUSA Hoekstra, and presented copies of Rossini's liability insurance and premium payments. These showed that Rossini insured and paid premiums for over 70 mortgage note properties he legitimately purchased from Defendant Thomas W. Murphy.

On August 25, 2015, Defendant was arrested, along with Babajan, his son, Anthony, and Murphy on a multicount indictment alleging they fraudulently perpetrated a Ponzi scheme with Defendant Thomas W. Murphy. At the August 28, 2015 bond hearing, Agent Evans admitted in questioning by attorney Seiden that the agents had not reviewed the documents presented to them in September 2014, but that they "would get around to it."

Thus, the Government purposefully failed or intentionally omitted presenting Rossini's exculpatory evidence to the Grand Jury because it did not fit the government's false narrative that Rossini was selling "non-existent property."

The government's refusal to present this exculpatory evidence to the Grand Jury was at best a reverse form of "willful blindness," and at worst, a deliberate targeting of the Defendant.

2

The government acted in bad faith by not presenting Defendant's payments for mortgage notes, insurance premiums, properties purchased by Defendant Rossini, monies paid to Murphy, NSF checks by Murphy to Rossini, Babajan, and Devon Street, and Rossini quitclaims of properties to investors in the normal course of Devon Street business.

Included in Rossini's production:

1. Investor cashier's checks payable to Thomas Murphy Attorney/Agent; his law firms Pedersen & Houpt or Berger Newmark included on the check ledger line. Also listed under Murphy's name were the property address and property index number. The check amounts included the mortgage note price, Murphy and Pedersen & Houpt or Berger Newmark fees, profits for Rossini, Babajan and brokers, together with the guaranty fee for Devon Street Investments Ltd.

2. The records related to Murphy's collection of the money to purchase the mortgage notes.

3. The amount of cash collateral that Murphy, Pedersen & Houpt or Berger Newmark held totalled $5,044,000.

4. Per calculations, produced to the Government, Devon Street borrowed a small portion of the total money invested to insure the risk of losses. Statistics indicated firmly that only a fraction of mortgage notes in foreclosure were modified or brought current by homeowners in foreclosure.

Defendant Thomas W. Murphy and his law firms Petersen & Houpt and Berger Newmark Possession and Escrow of Monies

Defendant Murphy and his firms held $5,044,000 for mortgage note purchases and were obligated to return to Devon Street any money not used to purchase mortgage notes. Therefore, only the portion paid to Rossini and Babajan and the brokers needed to be insured. Devon Street sold properties, mortgage notes, or retained cash to cover a portion of this amount.

In support of this business practice, Defendant Rossini refers the Court to this applicable business practices' quotation: "The really beautiful part of the scheme was that Demchak's team calculated that the SPV (special purpose vehicle) would need to sell only a relatively small amount of notes to outside investors in order to raise the money to insure all of that risk. Normally, the SPV would be expected to be 'fully funded,' meaning that it would have to sell notes totaling the complete amount of risk that it was insuring.

The J.P. Morgan team reckoned full funding just wasn't necessary; the number of defaults would be so low that so much capital wouldn't even be needed for covering losses." (From *Fool's Gold: The Inside Story of J.P. Morgan and How Wall Street Greed Corrupted Its Bold Dream and Created a Financial Catastrophe*, by Gillian Tett [2009], pp. 51-55). "Just to be safe, though, Demchak decided that the SPV would invest the $700 million pot (from notes it sold) in AAA-rated Treasury bonds, so that if it were ever needed, there would be no doubt the money would be there. That ultra safe investment plan would also help assure investors that the scheme was sound." (p.55). J.P. Morgan

Bulk Purchase Agreement. The addresses of these and the Riverdale properties are in the Defendant's storage locker.

WHEREFORE, Defendant Albert Rossini, pro se, respectfully requests this Honorable Court for a finding that Defendant bought and sold properties, and did so in the ordinary course of business; that the records in support thereto were produced to the Government voluntarily by Defendant 11 months prior to Indictment, and that Defendant's lawyer, Glen Seiden, met with the Government to review Defendant's paid insurance policies for the properties; that the Government failed, either intentionally or negligently, to review the files; that the Government failed to produce this exculpatory evidence to the Grand Jury; that the Government then alleged in the Indictment that Defendant engaged in a ponzi scheme of sales of non-existent properties; that the said allegations were erroneous and false and without basis in the facts; and for such other and further relief as this Court deems just and equitable.

BY:

_Albert Rossini_

Albert M. Rossini, Defendant pro se

Jerome Combs Center
3050 S. Justice Way
Kankakee IL 60901

EXHIBIT 6

DEFENDANT'S MOTION TO REJECT
AND DISMISS THE GOVERNMENT'S SUBSTITUTION OF
DELIBERATE INDIFFERENCE FOR MENS REA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.                           CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

      Defendants.


Defendant Albert Rossini's Motion and Memorandum of Law to Reject and Dismiss the

Government's Substitution of Deliberate Indifference for *Mens Rea*


Defendant Albert Rossini, pro se, respectfully submits this Motion and Memorandum of Law to

Reject and Dismiss the Government's substitution of deliberate Indifference for *mens rea*, and

in support of which, states as follows:


## ARGUMENT

By substituting "deliberate indifference," as the Government promotes, for the statutory

element of knowledge, this Court would contradict decades of Supreme Court *mens rea*

jurisprudence, beginning with *Morissette v. United States*, 342 U.S. 246 (1952).

1

Second, *Global-tech Appliances Inc. v. SEB S.A.*, 563 U.S. 754 (2011) expressly rejected

deliberate indifferences as a substitute for knowledge.

Third, downgrading knowledge to deliberate indifference would confer even greater discretion

on federal prosecutors who already hold enormous power and violate separation of powers.

Fourth, a broad array of federal criminal statutes require proof of a defendant's knowledge.

The Supreme Court has held that knowledge of facts constituting criminal conduct is central to

criminal responsibility. The "central thought," the Court has declared, is that a person must be

"blameworthy in mind" before he can be held accountable for a crime. *Morissette*, 342 U.S. at

252. This principle means "that a defendant generally must know the facts that make his

conduct fit the definition of the offense," even if he does not know that the facts give rise to a

crime." *Elonis v. United States*, 135 S.Ct. 2001, 2009 (2015) (quoting *Staples v. United States*,

511 U.S. 600, 608, n.3 (1994).

The "blameworthy in mind" principle is so fundamental that even when a criminal statute is

silent on *mens rea*, the court generally applies the knowledge element. As the *Elonis* court

explained, "'the fact that the statute does not specify any required mental state does not mean

that none exists. We have repeatedly held that "mere omission from a criminal enactment of

any mention of criminal intent should not be read as dispensing with it." *Elonis*, 135 S.Ct. at

2009 (quoting *Morissette*, 342 U.S. at 250); see, e.g., *Posters 'N Things v. United States*, 511 U.S.

513, 522 (1994) (holding drug paraphernalia statute to require knowledge); *United States v.*

2

*United States Gypsum Co.*, 438 U.S. 422, 438 ·1978) (reading an intent requirement into the Sherman Act).

In keeping with this approach, the Court in *Morissette* interpreted the federal theft statute (18 U.S.C. sec. 641) to require proof that the defendant knew the property at issue belonged to the government. 342 U.S. at 275-76. In *Staples,* the Court held that the statute prohibiting possession of a machine gun required proof that the defendant knew the firearm had automatic firing capability. And in *United States v. X-Citement Video*, 513 U.S. 64 (1994), the Court held that the statute prohibiting certain shipments of visual depictions of minors engaging in sex acts requires proof that the defendant knew that the person depicted was a minor. See. *Id.* at 78.

The aforesaid cases honor strictly the "blameworthy in mind" principle by reading knowledge into criminal statutes that do not expressly state that element. This Court should not dilute the express knowledge element to "deliberate indifference." That would conflict with decades of case law by the Supreme Court and fundamental principles of criminal responsibility.

The Government's position here conflicts with *Global-Tech Appliances, supra.* The Supreme Court recognized (over a dissent by Justice Kennedy) that willful blindness could satisfy a statutory knowledge requirement. But the Court distinguished willful blindness, which can equal knowledge, from "deliberate indifference," which cannot.

3

*Global-Tech* defined the elements of willful blindness as follows: "(1) the defendant must subjectively believe that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 769. The Court emphasized the defendant must take "deliberate actions" to avoid learning the key fact. "We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 769-70.

In *Global-Tech*, the Circuit Court required only "deliberate indifference": "[In] demanding only 'deliberate indifference' to that risk [that the disputed fact existed], the Federal Circuit's test does not require active efforts by an inducer to avoid knowing [the fact]." *Id.* at 770; see *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994), equating deliberate indifference and recklessness. As *Global-Tech* and *Farmer* show, "deliberate indifference" and "reckless indifference" are virtually identical for the statutory element of knowledge of falsity.

Replacing the requirement of knowledge with a watered-down "deliberate indifference" standard eliminates an essential layer of protection for ordinary citizens while transferring even greater power to federal prosecutors. See, e.g., *Yates v. United States*, 135 S.Ct. 1074, 1100-01 (2015) (J. Kagan dissenting, and discussing the "overcriminalization and excessive punishment in the U.S. Code" and noting that the statute at issue, by "giving prosecutors too much leverage" is "an emblem of a deeper pathology in the criminal code."); Stephen F. Smith,

4

Overcoming Overcriminalization, 102 *J. Crim. L. and Criminology*, 557 574 (2012) (discussing the importance of strong *mens rea* requirements in constraining prosecutorial discretion). As Justice Scalia stated, "Only someone who has worked in the field of law enforcement can fully appreciate the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (J. Scalia, dissenting). Under a recklessness standard, disputes currently resolved civilly would become criminally prosecutable, further augmenting a prosecutor's arsenal of potential charges.

Judicial downgrading of knowledge to deliberate indifference also violates the separation of powers. When "the judiciary substitutes a lesser mental state for statutorily prescribed knowledge, then it encroaches on the legislative prerogative of defining criminal conduct." Ira P. Robbins, "The Ostrich Instructions: Deliberate Ignorance as a Criminal *Mens Rea*," 81 *J.Crim. L. and Criminology*, 191, 194-95 (1990); see also *United States v. Wiltberger*, 18 U.S. (5 Wheat) 76, 93 (1820) ("It is the legislature, not the court, which is to define a crime and ordain its punishment."); Julie R. O'Sullivan, *Federal White Collar Crime*, sec. D, at 7 (6 Ed. 2016) ("If Congress meant to demand only recklessness, it could have and would have said so. Reading a statute that demands 'knowledge' to be satisfied by 'recklessness,' then, contravenes long-established distinctions in degrees of *mens rea* as well as congressional intent.").

A Court's substitution of deliberate indifference for knowledge, if allowed to stand, risks weakening the *mens rea* element in the broad array of federal criminal statutes requiring proof of knowledge. There is no principled basis for limiting the court's construction of the

5

"knowingly" element of fraud statutes. The Supreme Court has intervened repeatedly in the past to safeguard this "background assumption" of the criminal law, *Liparota v. United States*, 471 U.S. 419, 426 (1985). This Court should thus disregard the Government's unprincipled subordination of *mens rea* to deliberate indifference–"principled" being a descriptive in emphatic use in the *mens rea* cases and law reports in support of Defendant's Argument.

WHEREFORE Defendant Albert Rossini, pro se, respectfully submits the Motion and Memorandum of Law to Reject, Strike and Dismiss the Government's substitution of deliberate indifference for *mens rea*, and for such other and further relief as this Court deems just and equitable.

BY:

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL 60901

EXHIBIT 7

DEFENDANT'S EXPLANATION OF GUARANTEE AGREEMENTS

The Guaranty Agreement

In May 2011, Thomas Murphy, while at Pedersen & Haupt ("Murphy"), devised a guaranty agreement in response to my request of how to protect investor funds. Murphy advised me to use the guaranty on each transaction involving investor funds since he and Pedersen were acting as attorneys and agents on the transactions. I wanted an instrument similar to a credit default swap ("CDS") that protected investor funds during the long period between the date of investment and completion of the transaction.

As an example, on Dec. 31, 2010, Devon Street Investments, Ltd. ("Devon Street") and Murphy closed a short sale purchase of 3820 W. Adams, Chicago IL with funds provided by Craig Shaffer ("Shaffer"). Due to deed restrictions imposed by the lender agreeing to the short sale of its mortgage note, Devon Street was not able to quit claim the property to Shaffer until May 2011.

The guaranty was similar to a CDS contract in which both Rossini and Devon Street took the place of Murphy and his firm as to the indebtedness to investors. If Murphy failed to close on a property or mortgage note purchased from a lender pursuant to the assignment Murphy said he controlled (as the assignments may have been in the name of other Murphy clients), then Rossini and Devon Street were obliged to reimburse the investor(s). The guaranty was a substitute for the mortgage notes.

Rossini, Devon Street and investors posted $5,041,300 in cash collateral with Murphy from Jan. 2011 to Sept. 2013 under the terms of their agreement to secure purchase of properties and mortgage notes. Devon Street was entitled to a return of the cash collateral for further payment to investors.

Under the terms of both the guaranty and verbal agreements, Rossini and Babajan Khoshabe, Rossini's partner, with investors, the investors paid a premium in profits, up front, on each transaction. In exchange, Rossini and Devon Street would be obligated to pay the "floating" amount of debt owed an investor if Murphy defaulted. The amount owed to an investor was floating because often an investor added to his or her investment and each month or quarterly the investor received a return of principal through rental payments or a quitclaim of property from Devon Street.

The guaranty provided protection against several specific occurrences:

1. A failure by Murphy to deliver the properties or mortgage notes;
2. A failure by Murphy to pay rental income, as a return of principal to the investor(s);
3. A complete writedown of the mortgage note investment due to the homeowner or borrower completing a loan modification or repayment of the arrearage that led to foreclosure. Such an event would render a mortgage note discount inapplicable since a current note ended any economic incentive for the investor.

Devon Street was the calculation agent for how much each investor was owed under the guaranty. The monthly and quarterly rental payments became a return of principal in the event of default. This was easy to document; however, the value of each property transferred was more subjective and calculated by broker comparative market analysis ("CMA"), appraisals, or the amount an insurance company was willing to insure the subject property. Further, Rossini and Devon Street were expressly permitted, under the guaranty, to negotiate the purchase and sale of properties and purchase of mortgage notes, in its sole discretion as long as they made "protection payments" to investors in the event of Murphy's default.

The level of the payout on the guaranty was based on the investor's total investment less monthly and quarterly rental payments allocated to principal in the event of default and less the valuation of any property quitclaimed to the investor.

| INVESTMENT: | | 100% |
|---|---|---|
| Less monthly/quarterly payments | | -$ |
| Less property transferred | | -$ |
| TOTAL Guaranty Payout | = | $ |

1

| INVESTOR | ADDRESS | NOTE PAYMENT/COLLATERAL AMOUNT |
|---|---|---|
| Robert Badalian | 2442 W. Arthington | 25,000 |
| Robert Badalian | 2444 W. Arthington | 25,000 |
| Robert Badalian | 2446 W. Arthington | 25,000 |
| V. Moghaddasi | 2129 N. Sheffield | 60,000 |
| St. Oddisho | 3333 W. Berteau | 185,000 |
| A & K Khoshabe | 7410 N. Winchester | 70,000 |
| A.Pithyou | 5801 N. Richmond | 50,000 |
| R. Baboghli | 929 N. Lakeview | 60,000 |
| B. Lazar | 2007, 2043 W. Birchwood | 134,800 |
| J. Khoshaba | 4725 W. Drake | 45,000 |
| A.Pithyou | 4731 N. Monticello | 40,000 |
| A&F Khoshabe | 2459 W. Fillmore | 40,000 |
| I. Yousif | 8249 Knox | 30,500 |
| N. Moshi | 5424 N. Paulina | 50,000 |
| N. Moshi | 6443 N. Greenwood | 50,000 |
| A.Pithyou | 8143 Kilpatrick | 30,000 |
| M&M Khoshabe | 3152 W. Diversey | 85,000 |
| H. Moshi | 4844 Hull | 40,000 |
| N. Moshi | 5421 N. Artesian | 50,000 |
| KMI Enterprises | 7420 N. Artesian | 70,000 |
| F. Khoshabe | 7230 N. Hamilton | 50,000 |
| A. Khamis | 6425 N. Washtenaw | 45,000 |
| V. Moshi | 4209 Oakton | 30,000 |
| F. Khoshabe | 5621 N. Bernard | 40,000 |
| F. Khoshabe | 5749 N. Spaulding | 40,000 |
| K. Khodi | 3650 W. Polk | 50,000 |
| K. Khodi | 2323 W. Haddon | 95,000 |
| K. Khodi | 1321 N. Maplewood | 45,000 |

2

| | | |
|---|---|---|
| K. Khodi | Riverdale Package | 225,000 |
| K. Khodi | Rockford Package | 354,000 |
| D. Yousif | 6159 N. Hamilton | 45,000 |
| Assyrian Evangelical | 5725 N. Kimball | 40,000 |
| Assyrian Evangelical | 5757 W. Jackson | 40,000 |
| KMI Enterprises | 5721 N. Kimball | 75,000 |
| F. Moshi | 3340 N. Oakley | 135,000 |
| N. Moshi | 8718 Kimball | 51,500 |
| H.G. Electric | 8440 Kimball | 75,000 |
| V. Moshi | 4831 Lee St. | 40,000 |
| A.Pithyou | 9124 Lawlor | 40,000 |
| A.Pithyou | 9121 Lawlor | 40,000 |
| R. Badalian | 4126 W. Adams | 40,000 |
| V. Moghaddasi | 4520 W. Jackson | 50,000 |
| Assyrian Evangelical | 3327 W. Monroe | 50,000 |
| R. Baboghli | 3350 W. Monroe | 50,000 |
| Janet Khoshaba | 7935 Karlov | 115,000 |
| V. Moghaddasi | 7941 Karlov | 108,000 |
| R. Badalian | 4832 W. Montrose | 150,000 |
| Bolos-Bahramis | 2615 W. Rascher | 50,000 |
| Craig Shaffer | 3820 W. Adams | 37,500 |
| Craig Shaffer | 4129 W. Adams | 37,500 |
| Craig Shaffer | 4139 W. Adams | 37,500 |
| Craig Shaffer | 4135 W. Monroe | 50,000 |
| Craig Shaffer | 4654 W. Adams | 50,000 |
| Craig Shaffer | 5131 W. Crystal | 50,000 |
| Craig Shaffer | 5019 W. Adams | 50,000 |
| Craig Shaffer | 7845 Kolmar | 45,000 |
| R. Badalian | 4045 Wilcox | 45,000 |

3

| Bonita Badalian | 5551 W. Jackson | 50,000 |
|---|---|---|
| Bonita Badalian | 211 N. Kilbourne | 50,000 |
| H. Hormozian | 5555 W. Jackson | 50,000 |
| H. Hormozian | 1418 Talman | 50,000 |
| A. Khoshabe | 3512 W. Shakespeare | 35,000 |
| Liam Ben David | 2200 N. Kedzie | 275,000 |
| B&K Investments | 2742 W. Granville | 100,000 |
| B&K Investments | 3337 N. Halsted | 100,000 |
| AD Investments | 3941 W. Gladys | 35,000 |
| AD Investments | 5551 W. Congress | 35,000 |
| AD Investments | 4019 W. Lexington | 30,000 |
| AD Investments | 3837 W. Wilcox | 20,000 |
| AD Investments | 3839 W. Wilcox | 20,500 |
| B&K Investments | 2710 N. Artesian | 50,000 |
| B&K Investments | 1105 N. Damen | 105,000 |
| B&K Investments | 4946 W. Washington | 50,000 |
| Assyrian Evangelical | 4019 W. Polk | 50,000 |
| | | **$5,041,300** |

EXHIBIT _8_

DEFENDANT'S CHART OF INVESTMENTS
AND FLOW OF FUNDS

| ADDRESS (1) | TOTAL INVESTMENT | NAME | NOTE | RLS. | DIVIDEND | ANTHONY | JOLISH | FRED | Becker | Devon |
|---|---|---|---|---|---|---|---|---|---|---|
| 3820 W. ADAMS | 67,000 | SHAFFER | 37,500 | 12,500 | 12,500 | | | | 5000 | |
| 4135 W. MONROE | 80,000 | SHAffer | 42,000 | 15,000 | 15,000 | | | | 8000 | |
| 4654 W. ADAMS | 75,000 | SHAffer | 45,000 | 15,000 | 15,000 | | | | | |
| 5131 W. CRYSTAL | 70,000 | SHAffer | 45,000 | 12,500 | 12,500 | | | | | |
| 5019 W. ADAMS | 75,000 | SHAffer | 45,000 | 15,000 | 15,000 | | | | | |
| 4126 W. ADAMS | 75,000 | ROBERT BAOAHAN | 42,500 | 12,500 | 20,000 | | | | | |
| 4316 W. ADAMS | 52,000 | FEREIDOON Khoshabe | 37,000 | 12,500 | 12,500 | | | | | |
| 3327 W. MONROE | 75,000 | ASSYRIAN chruch | 45,000 | 10,000 | 10,000 | | | 10,000 | | |
| 3650 W. POLK | 105,000 | KATHY Khodi | 75,000 | 10,000 | 10,000 | | | 10000 | | |
| 9024 LAWLER | 52,500 | AWIQUAM PITHYOU | 35,000 | 7,500 | 7,500 | | 2500 | | | |
| 9021 Lawler | 52,500 | AWIBUAM PiTh you | 35,000 | 7,500 | 7,500 | | 2500 | | | |
| 7941 KARLOV | 108,000 | VLAD MOGHADASSI | 75,000 | 12,500 | 12,500 | | | 8000 | | |
| 7935 KARLOV | 125,000 | JANET Khoshaba | 75,000 | 20,000 | 20,000 | | | | | 10,000 |
| 4009 OAKTON | 105,000 | AD INVEST F. Khoshabe | FOR | PURCHASE | → | | | | | |
| 4012 MAIN | 105,000 | AD INVEST F. Khoshabe | FOR | PURCHASE | → | | | 8,000 | | |
| 4946 W. WASHington | 50,000 | AD INVEST | 50,000 | → | → | | | | | |
| 2323 W. HADDON | 245,000 | KATHY Khodi | 95,000 | 55,000 | | 55,000 | | 40,000 | | |
| 1321 N MAPLEWOOD | 145,000 | KATHY Khodi | 45,000 | 35,833 | | 35,833 | | 28,334 | | |

"[It's] just shots at the net and traffic, and . . . sometimes they go in," Quenneville said. "Let's get some simpler looks, and sometimes they go in. I think we're gaining confidence there. It seems like we're having the puck more and longer and sustaining some offense off it. We're looking to shoot more."

Shoot the puck, retrieve the puck, shoot again. Good advice, after all.

*Follow me on Twitter @MarkLazerus.*

**Email:** mlazerus@suntimes.com

| ADDRESS ② | TOTAL INVESTMENT | | | KOSSINI | ZAGHANI | ANTHONY | YOUSIF | FRED | BROKER | DEVON |
|---|---|---|---|---|---|---|---|---|---|---|
| 8142 Kilpatrick | 85,000 | Awiguam Pithyou | 30,000 | 17,833 | 17,833 | 17,833 | 1,500 | | | |
| 3152 W. Diversey | 85,000 | A Khosaap Na-M Khoshab | 75,000 | 5,000 | | 5,000 | | | | |
| 6957 N. Sheridan | 125,000 | Nastors Moshi | 55,000 | 20,666 | 20,666 | 17,668 | 14,000 | | | |
| 4844 Mull | 75,000 | Havanna Moshi | 40,000 | 11,666 | 11,666 | 8,667 | 3,000 | | | |
| 5421 N. Artesian | 105,000 | Nastors Moshi | 50,000 | 15,666 | 15,666 | 12,667 | 11,000 | | | |
| 7230 N. Hamilton | 75,000 | Fred Khoshabe | 50,000 | 12,500 | | 12,500 | | | | |
| 6425 N. Washtenaw | 97,000 | Albert Khamis | 45,000 | 16,500 | 16,500 | 11,000 | 8,000 | | | |
| 4209 Oakton | 70,000 | Valentina Moshi | 30,000 | 12,633 | 12,633 | 12,634 | 2,100 | | | |
| 5621 N. Bernard | 55,000 | Fred Khoshabe | 40,000 | 7,500 | | 7,500 | | | | |
| 5749 N. Spaulding | 50,000 | Fred Khoshabe | 40,000 | 5,000 | | 5,000 | | | | |
| 4942 Mulford | 100,000 | Moghadassi AD Invest | 80,000 | 7,500 | 7,500 | | | 5,000 | | |
| 3941 W. Gladys | 35,000 | AD Investment | 35,000 | --> | --> | | | | | |
| 5551-53 N Congress | 100,000 | AD Investment | 100,000 | --> | --> | | | | | |
| 4520 W. Jackson | 105,000 | Vlad Moghadassi | 55,000 | 20,000 | 20,000 | | | 10,000 | | |
| 4045 W. Wilcox | 75,000 | Badalian Devon | 45,000 | 15,000 | 15,000 | | | | | |
| 4037 W. Adams | 80,000 | Badalian Devon | 45,000 | 17,500 | 17,500 | | | | | |
| 5410 W. Fulton | 90,000 | Badalian Devon | 69,000 | 10,000 | 10,000 | | | | | 1,000 |
| 2442 W. Arthington | 85,000 | Robert Badalian | 25,000 | 30,000 | | 30,000 | | | | |
| 2444 W. Arthington | 85,000 | Robert Badalian | 25,000 | 30,00 | | 30,000 | | | | |
| 2446 W. Arthington | 85,000 | Robert Badalian | 25,000 | 30,000 | | 30,000 | | | | |

defensemen, a group he is working his way into.

"You look at [Niklas] Lidstrom and [Chris] Pronger, those guys weren't always skating 100 miles an hour every shift," Keith said. "It was being smart and being in good position and skating hard when you had to."

Keith has changed his training, nutrition and game-day preparation to stay on top. But he has said that has less to do with his age than with hockey itself. The game has changed quite a bit since Keith broke into the league in the mid-2000s. The plodding, trapping pace of play has given way to a speed-oriented style, with burners on seemingly every line.

What the league will look like 10 years from now is anybody's guess. But Keith fully expects to be there to find out. Nobody who knows him is betting against it.

"He's just a horse back there," winger Patrick Kane said. "And it seems like he's still as good as anyone out there on the back end."

*Follow me on Twitter @MarkLazerus.*

**Email:** mlazerus@suntimes.com

| ADDRESS ③ | INVESTMENT | NAME | NOTE | ROSSINI | BABAJAN | ANTHONY | YOUSIF | FRED | BOOKER | DEVON |
|---|---|---|---|---|---|---|---|---|---|---|
| 4019 W. POLK | 75,000 | ASSYRIAN Church | 50,000 | 8,750 | 8,750 | | | 7,500 | | |
| 5551 W. JACKSON | 70,000 | Benela BADALIAN | 50,000 | 8,750 | 8,750 | | | 7,500 | | |
| 211 N. KILBOURN | 70,000 | Beneta Badalian | 50,000 | 8,750 | 8,750 | | | 7,500 | | |
| 3512 W. SHAKESPEARE | 40,000 | ANTHONY Khoshabe | 35,000 | 2,500 | 2,500 | | | | | |
| 5355 W. JACKSON | 75,000 | Henry HORMOZIAN | 40,000 | 12,000 | 12,000 | | | 11,000 | | |
| 1418 N. TALMAN | 100,000 | HENRY HORMOZIAN | 60,000 | 13,000 | 13,000 | | | 13,000 | | 1000 |
| 5557 W. JACKSON | 75,000 | ASSYRIAN CHURCH | 40,000 | 13,000 | 13,000 | | | 11,000 | | |
| 4129 W. ADAMS | 62,500 | SHAFFER | 37,800 | → | → | | | | | 25,000 |
| 4139 W ADAMS | 37,500 | SHAFFER | 37,500 | → | → | | | | | |
| 7845 KOLMAR | 65,000 | SHAFFER | 45,000 | → | → | | | | | 20,000 |
| RIVERDALE PACKAGE | 410,000 | KhoDi | 225,000 | | | | | | | 185,000 |
| 1114 AYATITE | 154,000 | DENG/ KIRKEL | 114,000 | | | | | | 10,000 | 30,000 |
| 8315 KEATING | 94,034 | Benua LAZAR | 50,000 | 12,383 | 12,383 | | | 16,667 | | 2601 |
| 4725 N. DRAKE | 85,000 | Edwo KhOSHABA | 45,000 | 11,667 | 11,666 | 11,667 | 8,000 | | | |
| 4731 N. MONTICELLO | 85,000 | AWIQUAM PITHYOU | 40,000 | 13,667 | 13,666 | 13,667 | 4,000 | | | |
| 2459 W. FILLMORE | 55,000 | A Khoshabe F Khoshabe | 40,000 | 7,500 | 7,500 | | | | | |
| 8249 N. KNOX | 75,000 | IBRAhIM YOUSiF | 30,500 | 14,333 | 14,333 | 14,333 | 1,500 | | | |
| 5424 N. PAULINA | 160,000 | NASTORS MOSHI | 50,000 | 30,666 | 30,666 | 30,667 | 161000 | | | 2000 |
| 6443 N. Greenview | 120,000 | NASTORS MOSHI | 50,000 | 20,000 | 20,000 | 20,000 | 10,000 | | | |

Patrick Kane celebrates his power-play goal in the first period Wednesday night in Tampa. (AP Photo)

The Hawks felt snakebitten for much of the season, particularly during a pair of three-game stretches without a power-play goal. So now that the power play is clicking — six power-play goals in the last four games — they're trying not to take it for granted.

**RELATED STORIES**

Blackhawks squander two-goal lead in OT loss to Lightning

Blackhawks defenseman Duncan Keith: 'I want to play till I'm 45.'

"It seems like we're starting to get some chemistry, the units are starting to get some chemistry," winger Patrick Kane said. "Just keep working on it, keep getting some new ideas and take it seriously every time you're out there."

Kane's 5-on-3 power-play goal in the first period Wednesday against the Lightning was a good example of the fine line a power play walks. A couple of weeks ago, when confidence was low, Duncan Keith probably doesn't make that nice save at the blue line to maintain the zone. Cody Franson and Keith probably play catch with the puck a few seconds longer, allowing the opponent to break up and break out. Franson's daring pass to Kane probably goes awry, and the common refrain of the Hawks making too many passes pops up again. And Kane probably doesn't convert from a super-sharp angle, his back foot on the goal line.

But it all worked on that play. The five-man unit was in constant motion, the passes were crisper and harder and the finish was there. That's how it has gone the last four games: All the things that went wrong earlier in the season suddenly are going right.

"Sometimes you get breaks," coach Joel Quenneville said.

Kane's pretty goal against the Lightning was the exception, however. During this hot streak, the Hawks have proved right all their cliches and platitudes about keeping it simple and just putting the puck on net.

Against the Penguins, Gustav Forsling snapped a simple shot right off a faceoff for one goal, and Anisimov used his long reach to snag a loose puck and tuck it in for another. Against the Rangers, Anisimov went to the net and cleaned up a rebound of a shot by Franson. Against the Devils, Jan Rutta turned and fired a loose puck through traffic for one goal, and Kane swept in a rebound for another.

| ADDRESS | INVESTMENT | NAME | NOTE | ROSSINI | BAGATAN | ANTHONY | YOUSIF | FRED | BROKER DEVON |
|---|---|---|---|---|---|---|---|---|---|
| 3346 W. MONROE | 75,000 | RAY BABACCGHLI | 75,000 | 10,000 | 10,000 | | | 10,000 | |
| 6159 N. HAMILTON | 75,000 | DANIEL YOUSIF | 45,000 | 9,500 | 9,500 | 9,500 | 1,500 | | |
| 5725 N. KIMBAL | 95,000 | ASSYRIAN church | 40,000 | 20,000 | | 20,000 | | 15,000 | |
| 3340 N. OAKLEY | 170,000 | FIDEL MOSHI | 135,000 | 11,166 | 11,166 | 11,166 | 1,500 | | |
| 8718 KIMBAL | 110,000 | NASTORS MOSHI | 51,500 | 29,000 | 29,000 | | | 500 | |
| 4831 Lee | 101,000 | VALENTINA MOSHI | 40,000 | 30,000 | 30,000 | | | | |
| 7250 N. ARTESIAN | 130,000 | KM ENTERPRISE | 80,000 | 20,000 | 20,000 | | | 10,000 | |
| 5750 N. KIMBAL | 130,000 | KM I ENTERPRISE | 80,000 | 20,000 | 20,000 | | | 10,000 | |
| 1105 N. DAMEN | 105,000 | BRBK | 105,000 | → | → | | | | |
| 4852 N. MONTROSE | 175,000 | R. BADALIAN BRBK | 150,000 | 12,500 | 12,500 | → | | | |
| 8446 KIMBAL | 95,000 | H.G. ELEC. | 95,000 | → | → | → | | | |
| 2200 N. KEDZIE | 275,000 | BEN DAVID DEVON | 150,000 | → | | | | | 125,000 |
| 2742 W. GRANVILLE | 100,000 | BRBK | 100,000 | → | → | | | | |
| 3337 N. HALSTED | 100,000 | BRBK | 100,000 | → | | | | | |
| 4019 W LEXINGTON | 50,000 | BADALIAN AD INVEST | 30,000 | 10,000 | 10,000 | | | | |
| 2710 N. ARTESIAN | 50,000 | BRBK | 50,000 | → | → | | | | |
| 1921 N. RICHMOND | 134,000 | KIRSHNER | 98,000 | 12,000 | | | | | 24,000 |
| 3837 W. WILCOX | 20,000 | AD INVESTMT | 20,000 | → | → | | | | |
| 3839 W. WILCOX | 20,500 | AD INVESTMT | 20,500 | → | → | | | | |

# An expansion team unlike any other, Golden Knights could make NHL playoffs in 1st season

*Isabelle Khurshudyan*

Nate Schmidt's first memory of an NHL expansion draft goes back to 2000, when he was 8 years old and his beloved home state of Minnesota got a new team, the Wild. That was also when Schmidt first learned about the reality for expansion franchises in their first season.

"They had a lot of growing pains," Schmidt said with a laugh. The Wild won just 25 games that year, finishing last in the division.

Fast-forward 17 years and there's Schmidt's name being announced by the Vegas Golden Knights as their expansion draft selection from the Washington Capitals. The 26-year-old defenseman started his NHL career with a team that won the most regular-season games over the past three years, so Schmidt tempered his expectations for the Golden Knights' inaugural season. But 20 games in, Vegas has won 13 of them, good for first place in the Pacific Division.

So, about those expectations?

"I don't really know how to put it any other way, but not the way we started," Schmidt said.

Perhaps it hit home for Schmidt when, less than a month into the season, the Golden Knights already had eight wins, matching the Capitals' miserable 1974-75 campaign. Washington went 8-67-5 that year, still the worst season ever. With more than 40 years separating the two teams, their different trajectories underscore how the expansion draft has changed - and how impressive the Golden Knights' start has been.

Just three teams who were in a playoff position on Thanksgiving last season fell out by the end of the season, holding true to a trend: Since the league expanded to 30 clubs in 2000, roughly 80 percent of playoff teams on Turkey Day ultimately make the postseason. That means the Golden Knights are on track to

| ADDRESS (5) | TOTAL INVESTMENT | NAME | | KUSYN | DABIRIAN | ANTHONY | YOUSIF | FRED | BROKER | DEVON |
|---|---|---|---|---|---|---|---|---|---|---|
| 2129 N. SHEFFIELD | 235,000 | VLAD moghADASSi | 60,000 | 63,333 | | 63,334 | | 48,333 | | |
| 3333 W. Berteau | 300,000 | ST. ODISHO church | 185,000 | 34,167 | 34,167 | 26,667 | 20,000 | | | |
| 7410 N. Winchester | 80,000 | A Khoshabe E. Khoshabe | 70,000 | 5,000 | 5,000 | | | | | |
| 5801 N. RichmonD | 105,000 | AWIQUAM PITAYOU | 105,000 | 40,000 | 40,000 | 12,500 | 12,500 | | | |
| 929 N. LAKESHORE | 75,000 | RAYMOND BABAOYNI | 60,000 | 7,500 | 17,500 | | | | | |
| 2007 W. BirchwooD | 83,033 | BENUA LAZAR | 40,000 | 12,383 | 12,383 | | | 16,667 | | 1600 |
| 2043 W. Birchwood | 83,033 | BENUA LAZAR | 40,000 | 12,983 | 12,383 | | | 16,668 | | 1600 |
| ROCKFORD PackAge | 395,000 | Khodi | 354,000 | → | → | | | | | 41,000 |
| 4033 W. ADAMS | 80,000 | PUNJAB INVESTMT | 45,000 | ⇒ | ⇒ | | | | 20,000 | 15,000 |
| LOAN PACKAGE (CDS) | 612,000 | KMI INVESTMTS | LOAN | → | → | | | | | 612,000 |
| TOTAL | 9379,709 | | 5,476,000 | 1,074,744 | 775,527 | 524,803 | 116,500 | 266,834 | 28,000 | 1,023,301 |

Case: 1:15-cr-00515-SL Document #: 365 Filed: 08/07/19 Page 179 of 441 PageID #:2824

# Blackhawks keeping it simple — and successful — on the power play

*Mark Lazerus @MarkLazerus | email*

TAMPA, Fla. — In late October, when the Blackhawks' power play had found new depths of futility and despair, Artem Anisimov offered his advice about how to score with the man advantage. It was profound in its simplicity.

"Shoot the puck, retrieve the puck, shoot again," he said with a shrug.

Of course, it's not quite that easy. There are so many things that go into a successful power play — breakouts, entries, retrievals, puck movement, net-front presence, deception and diversity of attack.

Then there are all the bits of luck that go into it. Maybe a well-planned deflection goes just wide or just high. Maybe a designed play is disrupted by a rolling puck. Maybe a goalie just makes a whole bunch of great saves.



EXHIBIT  9

DEFENDANT'S MOTION FOR PRODUCTION BY THE GOVERNMENT OF BRADY AND Giglio MATERIAl

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                         CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

    Defendants.

## Defendant Albert Rossini's Motion for Production by the Government

### of Brady and Giglio Material

NOW COMES Defendant Albert Rossini, pro se, and respectfully moves the Court for an order directing the Government to turn over to Defendant all *Brady* and *Giglio* material, including its Notes of Witness Interviews, and for an entry of sanctions against the Government for knowingly withholding the said records and documents as well as for its pernicious, intentional cooperation with attorney Jeffrey Deer and defendant Thomas W. Murphy in order that Deer testify as to Deer and Murphy's claim that Defendant was an arsonist, and in support of which, Defendant states as follows:

The Government has not turned over to Defendant Albert Rossini (Rossini), and should be so ordered, all evidence in its possession, including, but not limited to, agent, police, fire

1

department investigative notes and collateral documents regarding an arson fire at the residence of attorney Jeffrey Deer (Deer), Highland Park IL, in November 2015. This demand includes all documents in the Government's possession relating to the attorney escrow and trust accounts of Thomas W. Murphy (Murphy), attorney Deer, and the law firm of Deer Stone & Maya, from January 1, 2014 through December 31, 2016. These are relevant to show that Deer had stolen money from his clients—thus the reasoning as to why his house, its insured contents, and two dogs, went up in smoke on Nov. 5, 2015. The client thefts were also part of an June 2015 ARDC case against Deer.

Nor has the Government turned over to Rossini its Thomas W. Murphy personnel records from the following law firms: Johnson Cusack & Bell, 1988-2001; Burke Warren & McKay, 2001-2006; Pedersen & Houpt, 2006-2011; Berger Newmark & Fenchel, 2011-2014. Nor has it produced records related to Thomas W. Murphy and Prestige Realty Partners LLC, which references appeared in the ARDC Synopsis of Facts, in Murphy's serial bankruptcy petitions, 2013-2014, and in Murphy's sworn testimony before the U.S. Attorney in his bankruptcy matter(s).

The Court must order the Government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

The Government's persistent theory, before the Grand Jury, before the Court, and in its pleadings, is the false narrative that Rossini sold non-existent properties. Further, the Government postulates Rossini concocted a scheme to bilk investors, mostly supplied by codefendant Babajan Khoshabe (Babajan), and then instructed, directed and ordered then-attorney Murphy in perpetrating the scheme.

2

However, Rossini has presented in his pleadings that he, Babajan, and codefendant Anthony

Khoshabe were likewise victims of Murphy's unilateral deceit and fraudulent behavior; they

were not parties to a scheme-- which was carried out solely by Murphy. He was gifted by way of

experience as reflected in his ARDC record, in the Prestige Realty LLC records, his bankruptcy

petitions and his sworn testimony before the U.S. Attorney in the bankruptcy matters

(Defendant Albert M. Rossini's Motion to Dismiss the Indictment for Prosecutorial Misconduct,

"Misconduct Motion", pp. 3-5, 7, 9, 25, 27, 35-38, 41-43).

Murphy's modus operandi over the past 30-years of his legal career was to engage in ponzi-like

activities and place the blame on others, particularly clients of disgraced repute, such as former

felons, or underling attorneys, or unwitting bankers. Murphy's inclination toward these

individuals is no less indefensible than a predator trolling the internet for victims. (see ARDC

Synopsis of Findings, July 9, 2013, In re Thomas W. Murphy).

The Government had reason to know of Murphy's activities, at least by way of its 2013-2014

investigation of his Prestige Realty Partners LLC or the recurrent ARDC beefs and lawsuits

against Murphy (Misconduct Motion). The Government had reason to know because Murphy's

law firms would have disclosed his personnel files. Unlike Defendant Rossini or Babajan, or the

investors herein, these records were refused them, and, as previously pled in Rossini's

Misconduct Motion (pp. 10-11), Murphy routinely "scrubbed" his Google profile.

Rossini is also a codefendant with attorney Deer in a Cook County, Illinois criminal case. On Oct.

25, 2015, Rossini pled guilty to money laundering in the Deer case; Deer awaits trial in Fall 2018

for attempting to manipulate the court system in posting a $400,000 cash bond in a drug case.

The events following Rossini's simultaneous dismissal on Oct. 25, 2015 from Murphy's state case, and his plea in the Deer state case, follow below and are included in Rossini's Misconduct Motion, pp. 28-32. Attorney Deer continues practicing law while awaiting trial in state court. Murphy is also awaiting trial in state court.

Murphy introduced Deer in 2011 to Rossini in order that he handle litigation. Deer was Murphy's understudy at Johnson & Cusack & Bell law firm in the 1990s. Deer also represented Murphy in Murphy's serial bankruptcy petitions in 2013 and 2014 and Murphy operates in Deer's office, per the information set forth in his sworn bankruptcy filings.

On information and belief, Murphy has cooperated with the Government in this cause, including the Government's investigation and targeting of Defendant as an arsonist. After Rossini presented his pro se motions, his attorney returned and informed him that Murphy decided against a plea of guilty since Rossini was detained and less of a cognizable threat. Thus, any information, especially Murphy's unabated falsehoods and deceitful conduct toward Rossini and partners is important, exculpatory evidence.

Defendant requests the Court, in considering this Motion to Produce, take exacting notice of Rossini's lack of representation or underrepresentation for the last several years. Rossini was placed on home confinement and then home detention with severe movement and financial restriction from August 25, 2015 through July 28, 2017, and detained at the Jerome Combs Detention Center from July 28, 2017 to the present. Most of Defendant's files have been unavailable to him.

4

Upon examination of the discovery available in the Government's ongoing investigation of the Defendant (ostensibly to solidify its theme that Rossini sold nonexistent property by lulling investors and dominating Murphy), Rossini believes there are instances where the Government failed to record witness statements, where the agents' and other law enforcement information conflicted with witness testimony, and that the Government knowingly failed to provide Rossini with these investigative records and documents.

By happenstance, Rossini learned that the Government's had knowledge of, and failed to disclose, the Murphy and Deer schemes to blame Rossini for a violent federal felony, following his dismissal from Murphy's state case on Oct. 25, 2015 and his plea in the Deer state case on Oct. 25, 2015. Rossini's testimony was anticipated at their state trials.

On Thursday, March 22, 2018, Defendant was transported by Cook County State's Attorney Police from Jerome Combs Detention Center, Kankakee IL to the Cook County Criminal Court at 26th and California, Chicago. Rossini appeared before the Honorable Arturo Maldonado regarding a probation revocation in People v. Jeffery Deer, due to the Defendant's federal pretrial detention. Assistant State's Attorney Thomas Simpson spoke to Rossini about Deer's anticipated trial in Fall 2018, in the presence of two Cook County State's Attorney police officers.

ASA Simpson said he had decided not to call Rossini as a witness in Deer's trial. Rossini inquired about the November 2015 fire that destroyed Deer's house and his two dogs, and if arson was confirmed. The fire occurred at 11 p.m. Deer and his family were still awake, and so escaped the flames. Two dogs left inside were killed. The garage and the Porsche parked outside were

5

unscathed, but Deer received insurance money for the remodeling. Deer's house contents were insured for $575,000.

ASA Simpson replied that he understood Rossini had a loan against Deer's residence—implying that Rossini was somehow involved because he had an economic interest in Deer's property. Rossini denied this Deer fantasy about a loan to him from Rossini. Rossini reminded ASA Simpson of the documents in the state's file regarding Deer and the disputed signatures he had affixed.

Rossini reminded Simpson of the conversations with Peter Poulos (Misconduct Motion, p. 35). Poulos, a Murphy and Deer client, said the two were blaming Rossini for the house fire to investigating detectives. (id) As set forth in Rossini's Misconduct Motion, the Murphy and Deer blame strategy, along with the Government agents' concerted efforts against Rossini, began in earnest post-October 25, 2015, when Rossini was dismissed from the Murphy state case and agreed to be a witness in the Deer state case.

The only reasonable inference that can be drawn is that the Government's conduct has been calculated and deceptive. How then can the Court countenance the Government's definition of who is a danger to the community? Its own conduct, on behalf of the people, and in furtherance of the justice system, has been dishonorable at the least. Its quixotic application of the pejorative accommodates the Government only as it sees fit.

Rossini has been hounded, accused, barred from a residence or from making a living and forced into detention and jail by the Government as a danger. Murphy—with a long-discredited past

6

and present of financial, corporate, and real estate misdealings, with years' long patterns of escrow money fiddling and skimming, forgeries, fictitious illnesses, perjury, tax evasion, post-Indictment trysts with his escort girlfriend whom the Government knew helped him hide money and property in this case, and now an accessory before, during and/or after the Deer house arson—the Government considers a benign subject?

Worse, the Government has not informed the Court, and only lately has Defendant learned, of its fatuous decision to call attorney Deer as a witness against Defendant—to testify that Deer loaned money to Rossini. Defendant avers the likelihood of such a financial exchange was as ludicrous as the Government and Murphy/Deer accusing Rossini of the arson of Deer's house. At the status on April 3, 2018, the Government wisely withdrew its intent to call Deer as a witness. Nevertheless, its cooperation and participation with Deer and Murphy in the arson angle is reprehensible.

ASA Simpson's conversation with Rossini demonstrated that the Government investigated Rossini, regarding the arson at Deer's house, on information that could only have come from Murphy and Deer. The Government never disclosed this information to Rossini.

In early August 2015, Murphy telephoned Rossini because he was concerned that the Cambridge Management deal might not close. He said that Deer, representing Cambridge Management in its attempt to purchase the Meadowlands Medical Center (see Rossini's first Bond Revocation hearing before Magistrate Judge Gilbert, December 2015; see also Misconduct Motion, pp. 28, 32-34), was under increasing pressure to reimburse a client's funds that Deer had withdrawn from his attorney trust account. The amount was in the hundreds of

7

thousands. Deer's client (for whom the funds were held) owed money to Russian businessmen and he had promised to repay them from the settlement funds Deer had in his trust account.

Deer's reckless abandon with his trust accounts, from 2010 – 2015, were brought to light by the ARDC which filed a complaint against Attorney Jeffrey Wade Deer in June 2015, about two months' prior to Murphy's confidential information to Rossini. The ARDC complaint against Deer included the client accounts from which he took money, and also included reference to his client, "Ray's Mobile Service," a too-similar name of a Murphy client, Ray Mobile (Murphy's witness in an ARDC case some years prior to the disbarment proceeding; ARDC July 13, p.13; Misconduct Motion at pp.24-27).

In October 2015, Rossini was dismissed from the Murphy state case. In a written agreement, signed by Rossini, attorney Glen Seiden and ASA Simpson, it was stated that Murphy was responsible for the theft of his client, Nina Jozers' funds (approximately $353,000). Thereafter, in federal court, Murphy's attorney, Lawrence Wolf Levin, told attorney Seiden that he (Seiden) had "screwed" Levin. Within a month, Rossini was targeted by Murphy and Deer as the arsonist of Deer's house, i.e., Murphy and Deer knew the house fire was not accidental, but an arson.

After Oct. 25, 2015, the Government also increased its unremitting investigation of Rossini and followed his wife in their home, along her jogs, and at the needlepoint shop where she stitched with friends. In November 2015, the Deer house caught fire.

At 4 a.m. on that November (arson) morning, 2015, Deer telephoned Rossini stating his home had been destroyed by a late-night fire the previous evening and that he needed the telephone

8

number for "Thaddeus," a Deer client who had loaned Deer a million dollars. Deer said his
phone had been destroyed in the fire so he no longer had his list of phone numbers.

Mr. Thaddeus, who is African-American, subsequently arrived at Rossini's office, and identified
himself as "Jason Mitan" of Cambridge Management and wanted to inquire about the progress
of the Cambridge-Meadowlands transaction. He said attorney Deer was to repay a loan to Mr.
Thaddeus from Deer's attorney fees that included a "success fee" for completion of the sale.
Thus, by November 2015, Deer owed two huge fees to demanding clients: a client who owed
Russians, and also to Mr. Thaddeus.

Then, two more visitors came to Rossini's office about Cambridge (on which Rossini was
working prior to indictment). These were Mr. Richards and "Pete the Greek." They were
attorney Deer clients and "hard money" lenders to Deer's client, Cambridge Management.
They inquired about the Cambridge/Meadowlands transaction because they also expected to
be paid off from Deer's anticipated "success fee."

Interestingly, and unknown to ASA Simpson on March 22, 2018, nor apparently to the
investigators, nor to Deer and Murphy, Mr. Richard and "Pete the Greek" had been clients of
famed Chicago defense attorney Julius Lucius Echeles (Mrs. Rossini's employer/colleague during
the 1970s-1990s). Mr. Richards and Pete the Greek were convicted years earlier of arson in a
Northern District of Illinois federal court.

The real Jason Mitan, a Cambridge Management director, met with Rossini and attorney Glen
Seiden and said that "Molotov-like cocktails" were thrown onto the roof and destroyed Deer's

9

house. Mitan and fellow directors, Barbara Kalinowski and Thomas Mitan, sought to disengage from Deer's representation. Rossini had referred them to attorneys Seiden and Netzky. As per federal bond orders, Seiden informed Judge Gilbert and the Government of Rossini having worked on Cambridge prior to the August 2015 federal indictment, and that he continued working on the transaction. The Cambridge principals had been informed as well. Notwithstanding, agents Evans and Blau descended on Cambridge offices informing them that Rossini was attempting to launder money he had stolen from investors.

Each time the Defendant, or his attorneys, complied with court orders to inform the Government of details, personal information, business associates or friends, agents descended upon whatever names they were given in an effort to intimidate and contaminate. But as to the Government's arson investigation of Rossini, they were mum. Were it not for ASA Simpson, Rossini would not have been informed.

The Government apparently assumed Rossini, while on home detention and under constant investigation by federal agents, was involved in the house fire because of accusations by Murphy and Deer (the ARDC recognized Murphy's modus operandi in blaming others; it had been Rossini's turn in the ARDC Synopsis of Findings, In re Thomas W. Murphy, July 9, 2013.).

The next day after the fire, a broker-associate, Peter Poulos, warned Defendant about Murphy and Deer's accusations (Misconduct Motion). Incredibly, as of the date of the fire, both Murphy and Deer themselves concluded the house fire was an arson and then blamed Rossini as the arsonist.

Defendant immediately informed pretrial office Justin Wiersema; Rossini was connected to electronic home monitoring—the certitude of which was apparently unknown to Murphy and Deer. Officer Wiersema instructed Defendant to direct any investigators who would question Rossini to call Wiersema, since he knew where Rossini was before, during and after the fire.

These allegations are significant because they show the Government's attempt to reinforce part of its false narrative that Rossini is a danger to the community. Also, it might well be a tact the Government entertains to discredit Rossini by raising the arson allegations at further proceedings or as "other-act" evidence.

Following ASA Simpson's conversation, and as luck and circumstance would have it, Rossini learned that another Murphy/Deer client, the owners of a shopping center at 63rd/Halsted, Chicago, also experienced a suspicious fire after several years of infighting. In 2014, prior to the Halsted fire, Rossini had tendered Murphy, acting as title and legal consultant for the sellers, a purchase contract for the shopping center to present to his clients. The lender, however, balked at the price and the deal fell through. Then came the fire that destroyed the 63/Halsted property.

From the conversation with ASA Simpson, Defendant Rossini can only presume that the Government knew Murphy was blaming Rossini for Deer's house fire of Nov. 5, 2015. At no time did the Government divulge this information to Rossini. Rossini learned from his returning attorney, two weeks' prior to the filing of the herein Motion, that the Government actually intended to use the arson pretext and to call Deer as a witness against Rossini.

Therefore, Defendant requests and demands that the Government produce the following:

1. All evidence, documents, statements, investigator notes and reports, and witnesses, in its possession concerning the investigation of the Deer residential fire in November 2015, including but not limited to insurance policies, cancelled checks, (front and back), loan documents, receipts, signatories, and results of handwriting experts;

2. Thomas Murphy, Jeffrey Deer, and Deer Stone & Maya escrow and attorney trust accounts for the period January 1, 2014 through December 2016.

3. All handwritten or other notes in the Government's possession of any interview or substantive statement provided to the Government, related to the Deer fire, including drafts of any final reports or memorandums of such interviews or substantive statements concerning the Deer residence fire and subsequent investigation or, in the alternative, to conduct an *in camera* review of these notes for evidence not disclosed to Rossini.

4. The name of any person who was interviewed by or gave a substantive statement to the Government in this case, and concerning the matters described herein, whom the Government has not already provided Rossini.

5. The Jeffrey Deer ARDC records from June 2015 to the present.

6. The complete and comprehensive Thomas W. Murphy personnel records from the following law firms: Johnson Cusack & Bell, 1988-2001; Burke Warren & McKay, 2001-2006; Pedersen &Houpt, 2006-2011; Berger Newmark & Fenchel, 2011-2014.

7. All handwritten or other notes in the Government's possession of any interview or substantive statement provided to the Government, and all its agent notes, related to

Thomas W. Murphy and Prestige Realty Partners LLC, including drafts of any final

reports or memorandums of interviews or substantive statements concerning Prestige

and subsequent investigations.

### Brady and Giglio violations

The information requested by Rossini, especially statements that include Murphy's unabated

falsehoods and deceitful conduct toward Rossini and partners is important, exculpatory

evidence.

Defendant Rossini requests that this Court enter an order directing the Government to comply

with its obligations under Brady v. Maryland, id. and Giglio, id. The motion is supported by

Defendant's independent discovery that the Government's disclosures omitted material,

exculpatory information, and that the Government failed to disclose the materials altogether.

The Seventh Circuit has said, "[i]n the typical reasonable due diligence case, the question is

whether defense counsel had access to the document containing the Brady material." Boss v.

Pierce, 263 F.3d 734, 741 (7 Cir. 2001). Here, the Defendant did not know the extent of the

Government investigation because he thought the idea of his being an arsonist beyond

incredulity. As the Seventh Circuit observed, it is an "untenabl[y]broad rule that any

information possessed by a defense witness must be considered available to the defense for

Brady purposes." Id. at 740. The "witness may be uncooperative or reluctant..."Id. (Murphy and

Deer fall into this category). "With regard to witnesses, "[b]ecause mind-reading is beyond the

abilities of even the most diligent attorney, such materials simply cannot be considered

13

available in the same way as a document." *Id*. at 741. Ultimately, the *Brady* rule is simple,

"when the government obtains any exculpatory statement and fails to disclose that statement,

the government proceeds at its own risk and places any resulting conviction in jeopardy." *U.S.*

*v. Barraza Cazares*, 465 F.3d 327, 335 (8 Cir. 2006).

The Seventh Circuit has cast significant doubt on the continued vitality of its admissibility rule,

stating that it was inclined to adopt the majority position, which extends *Brady* to evidence that

may lead to the discovery of admissible evidence: "It is hard to find a principled basis for

distinguishing inadmissible impeachment evidence and other inadmissible evidence that, if

disclosed, would lead to the discovery of evidence reasonably likely to affect a trial's outcome."

*U.S. v. Morales*, 746 F.3d 310, 315 (7 Cir. 2014).

Defendant Rossini further requests all the agent notes in this case, pursuant to *Brady*. See *U.S.*

*v. Muhammad*, 120 F.3d 688, 699 (7 Cir. 1997). The government cannot seek to avoid its

disclosure obligations by pointing to the volume of material it has provided. The number of

reports, their pages, emails, and audios is meaningless when there is reason to believe that

those reports are either not accurate or complete. (See the Government transcripts in Anthony

Khoshabe's Motion to Suppress and Order).

#### Sanctions

As set out fully in Defendant's Motion to Dismiss the Indictment for Prosecutorial Misconduct,

the Government's conduct in this case has been knowing, flagrant and malicious—in order to

buttress a stilted premise against Rossini, and, for some unfathomable reason, sparing

14

defendant Thomas W. Murphy the calumny and detention he deserved for his habitual and established practice of defrauding clients. In this matter, Murphy concocted a scheme to defraud Rossini, the Khoshabes, and the investors, and then shifted the blame to candidates whom the Government would swallow hook, line and sinker.

The Government's knowledge is indisputable. See *U.S. v. Burnside*, 824 F.Supp.1215 (N.D. IL 1993) for a parallel instance of knowing prosecutorial misconduct. In *Burnside*, Judge Holderman held that federal prosecutor William Hogan engaged in numerous and egregious instances of misconduct, and knowingly concealed exculpatory evidence from the defense in violation of *Brady* and *Giglio*. He held there was "a silent agreement" between prosecutors and their witnesses: "lenience as to the illegal drug use in exchange for testimony helpful to the government." Lenience, or the "ostrich" defense, is likewise discernible in this case so far as the conduct of the Government towards witnesses on which it depended to prove the false allegations of its case against Defendant Rossini.

### Conclusion

WHEREFORE, for the reasons stated, and supported by the facts and law, Defendant Albert Rossini respectfully requests that the Court grant his Motion to Produce, with a finding by the Court of the Government's violation of its obligation under *Brady* and Giglio, and that the Government produce the documents as aforesaid at p. 12-13, for entry of sanctions against the Government, and for such other and further relief as this Court deems just and equitable.

BY:

_Albert M Rossini_

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL  60901

16

EXHIBIT _10_

DEFENDANT ROSSINI'S 2012-1040
FEDERAL INCOME TAX RETURN, DSI 1120S-2012 Federal
INCOME TAX RETURN AND IRS AUDIT COMMENTARY

| Taxpayer Name: | ROSSINI, ALBERT M &amp; BRENDA A | Examiner: | Sanders, Joan |
|---|---|---|---|
| TIN: | 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 | | |
| Tax Form: | 1040 | Date: 3/3 &amp; 5/4/17 | |
| Tax Year (s): | 201212 | | |

## Schedule C Gross Receipts

| Tax Period | Per Return | Per Exam | Adjustment | Reference |
|---|---|---|---|---|
| 201212 | 849,528.00 | 849,528.00 | .00 | |

**Conclusion:** *(Reflects the final determination on the issue.)*

No adjustment is required per IRC 61 and Treasury Regulation 6001 for 201212

| Audit Steps: *(Document audit steps taken or to be taken.)* | Workpaper Reference |
|---|---|
| 1. Reconcile the amount per return to Taxpayer's records. | 401 |
| 2. Note items that are unusual in origin, nature or amount. | 401 |
| 3. Test the books of original entry by tracing the entries back to the original sales slips, original cash register tapes, original contracts, job record book, or bank deposits. | N/A |
| 4. Be alert for taxable income which may not appear on the books | 401 |
| 5. | |

**Facts:** *(Document the relevant facts.)*

This audit is for Federal Income Tax Form 1040 for Albert M. & Brenda A. Rossini for 201212 which includes a Schedule C business, Comprehensive Properties, and a Schedule E loss taken on Form 1040 for $(382,636) but the Schedule E form was not attached to the return. At the initial interview, Mr. Rossini provided a copy of the 2012 Form 1120S for Devon Street Investments LTD which indicates Mr. Rossini is President and 100% shareholder. Form K-1 was blank. This is the only year the entity filed a return, it is for the period of 1/1/2012-12/31/2012 and an S form election was effective on 5/10/2011. TP stated he has not filed Federal Income Tax returns for Devon Street Investments for 2013 or 2014 and agreed to file these with the RA. These additional returns have not been filed. 201212 was the last year Federal Income Tax Form 1040 was filed to include Mr. Rossini and the last year a filed return included Comprehensive Properties.

Mr. Rossini stated that he is involved in residential and commercial properties in the Chicagoland area. He described various activities he is involved in which included collection of rent (usually 10% of the monthly rent paid), property management to include restitution of properties, consulting work determining properties worth and services for properties to obtain written assignments of rights to acquire the property and/or their notes, mortgages or amounts due in order to deed the property to an investor. Many of the properties are not in Mr. Rossini's name. He obtains funds for the activities by finding investors in each activity.

At the initial interview with Mr. Rossini, he stated that most transactions were partially included on his Form 1040, Sch C business (Comprehensive Properties) and partially included on the Form 1120S (Devon Street Investments LTD). He stated he had no idea how or why some transactions were included on one entity versus the other entity. He stated he prepared the return with the help of a local accountant who did not sign the return. Mr. Rossini presented worksheets showing various amounts for income and expenses for both returns and these amounts changed each time he provided documents. It appears amounts are commingled between the S Corporation and the Schedule C entity. The substantiation Mr. Rossini provided did not reconcile to any of the amounts on the returns. Check copies he provided indicated Mr. Rossini did receive funds for real estate transactions. Mr. Rossini frequently stated he received more funds than is shown on the returns. Gross Receipts amount per return is accepted. No adjustment is required per IRC 61 and 6001 for 201212

| Taxpayer Name: | Devon Street Investments Ltd | Examiner: | Sanders, Joan |
|---|---|---|---|
| TIN: | 45-2155017 | | |
| Tax Form: | 1120S | Date: | |
| | | 3/1/2017;05/09/17 | |
| Tax Year (s): | 201212 | | |

## S Corporation Interest Expense Lead Sheet

| Tax Period | Per Return | Per Exam | Adjustment | Reference |
|---|---|---|---|---|
| 201212 | 2,350,099.00 | .00 | 2,350,099.00 | |

**Conclusion:** *(Reflects the final determination on the issue.)*

An adjustment of $2,350,099.00 for 201212 is required per IRC 6001, 163, 162, 212.

**Facts:** *(Document the relevant facts.)*

The key case is for Albert M. & Brenda A. Rossini for their 201212 Form 1040. At the initial interview, Mr. Rossini provided a copy of the 2012 Form 1120S for Devon Street Investments LTD which indicates Mr. Rossini is President and 100% shareholder. Form K-1 was blank. This is the only year the entity filed a return, it is for the period of 1/1/2012-12/31/2012 and an S form election was effective on 5/10/2011. TP stated he had not filed returns for Devon Street Investments for 2013 or 2014 and agreed to file these with RA. These additional returns have not been received.

At the initial interview with Mr. Rossini, he stated that most transactions were partially included on his Form 1040, Sch C business (Comprehensive Properties) and partially included on the Form 1120S (Devon Street Investments LTD). He stated he had no idea how or why some transactions were included on one entity versus the other entity. Mr. Rossini stated that he is involved in residential and commercial properties in the Chicagoland area. He described various activities he is involved in which included collection of rent, property management to include restitution of properties, consulting work determining properties worth and services for properties to obtain written assignments of rights to acquire the property and/or their notes, mortgages or amounts due in order to deed the property to an investor. Most of the properties are not in Mr. Rossini's name. He obtains funds for the activities by finding investors in each activity.

The substantiation provided did not reconcile to the return and frequently did not provide proof of payment by Devon Street Investments Ltd, but rather, indicated payments by others. The summary sheet provided by the taxpayer indicates the largest payee is AD Investments for $201,420. None of the hundreds of pages of substantiation provided included any proof of payment or detail to support transactions with AD Investments. The summary sheet provided shows interest payments of $157,795.03 made to Fereidoon Khoshabe, the detail summary provided for that payee totals $226,804.03 and the only payment by Devon was $4,700 paid to Reliant Management for the property at 2549 West Fillmore. Notes show Fereidoon was paid 50% of this gross which totals $2,115 paid to him while the detail summary show $8,224.55 was paid to him on this property. In terms of considering the Agreement justifying the interest payments, the interest payments made to Fereidoon are a 31% return of his $729,000 investment, using the detailed summary substantiation. The Agreement does not specify that type of interest payments due. The payments made to those 'investors' are also called at various times-rent, rent equivalent or management fees earned by Devon/Rossini. Payments to Craig Shaffer total $186,045 on the summary sheet. Again, no substantiation was received for any payments or detail of transactions with the individual. The interest payment process was outlined by Mr. Rossini. He had described the interest payments as rent equivalents or rent paid to the investors as required under the Guaranty Agreements. When the process was traced to the substantiation, the interest payments were frequently made by others, not Devon Street, Comprehensive Properties or Mr. Rossini. The documents provided did not provide sufficient information as to how the interest was ordinary and necessary as described in IRC 162 as payments were not made on all properties, or to each investor or uniformly charged. The records provided did not meet the requirements in IRC 6001 as they did not support the amount on the return or reconcile to the various summary sheets provided. It is unclear how this expense was incurred for the production of income (IRC 212) as there was no correlation between payments made and income received. The agreements and transactions did not meet the

Form **1120S**

**U.S. Income Tax Return for an S Corporation**

OMB No. 1545-0130

**2012**

Department of the Treasury
Internal Revenue Service

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Information about Form 1120S and its separate instructions is at www.irs.gov/form1120s.

For calendar year 2012 or tax year beginning **JANUARY 1**, 2012, ending **DECEMBER 31**, 20 **12**

| | | |
|---|---|---|
| A S election effective date | Name **DEVON STREET INVESTMENTS, LTD** | D Employer identification number **45-2155017** |
| B Business activity code number (see instructions) | TYPE OR PRINT  Number, street, and room or suite no. If a P.O. box, see instructions. **3924 WEST DEVON STREET** | E Date incorporated |
| C Check if Sch. M-3 attached ☐ | City or town, state, and ZIP code **LINCOLNWOOD, IL 60712** | F Total assets (see instructions) $ |

G Is the corporation electing to be an S corporation beginning with this tax year? ☒ Yes – ☐ No  If "Yes," attach Form 2553 if not already filed
H Check if: (1) ☐ Final return  (2) ☐ Name change  (3) ☐ Address change  (4) ☐ Amended return  (5) ☐ S election termination or revocation
I Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . ▶

Caution. Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

**Income**

| | | | | |
|---|---|---|---|---|
| 1a | Gross receipts or sales . . . . . . . . . . . . . . . . | 1a | 2,613,500 00 | |
| b | Returns and allowances . . . . . . . . . . . . . . . | 1b | | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . | 1c | | |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . | 2 | | |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . | 3 | 2,613,600 00 |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . | 4 | | |
| 5 | Other income (loss) (see instructions⎯attach statement) . . . . . . | 5 | | |
| 6 | Total income (loss). Add lines 3 through 5 . . . . . . . . . . ▶ | 6 | 2,613,500 00 |

**Deductions (see instructions for limitations)**

| | | | | |
|---|---|---|---|---|
| 7 | Compensation of officers . . . . . . . . . . . . . . . . | 7 | | |
| 8 | Salaries and wages (less employment credits) . . . . . . . . . . | 8 | | |
| 9 | Repairs and maintenance . . . . . . . . . . . . . . . . | 9 | | |
| 10 | Bad debts . . . . . . . . . . . . . . . . . . . . | 10 | | |
| 11 | Rents . . . . . . . . . . . . . . . . . . . . . | 11 | (6,200. 00) |
| 12 | Taxes and licenses . . . . . . . . . . . . . . . . . . | 12 | | |
| 13 | Interest . . . . . . . . . . . . . . . . . . . . . | 13 | 2,350,094 00 |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . . . . | 14 | | |
| 15 | Depletion (Do not deduct oil and gas depletion.) . . . . . . . . . | 15 | | |
| 16 | Depletion . . . . . . . . . . . . . . . . . . . . | 16 | | |
| 17 | Pension, profit-sharing, etc., plans . . . . . . . . . . . . . | 17 | | |
| 18 | Employee benefit programs . . . . . . . . . . . . . . . . | 18 | | |
| 19 | Other deductions (attach statement) . . . . . . . . . . . . . | 19 | 539,837 43 |
| 20 | Total deductions. Add lines 7 through 19 . . . . . . . . . . ▶ | 20 | 2,896,136 43 |
| 21 | Ordinary business income (loss). Subtract line 20 from line 6 . . . . . | 21 | (382,636 43) |

**Tax and Payments**

| | | | | |
|---|---|---|---|---|
| 22a | Excess net passive income or LIFO recapture tax (see instructions) . . | 22a | | |
| b | Tax from Schedule D (Form 1120S) . . . . . . . . . . . | 22b | | |
| c | Add lines 22a and 22b (see instructions for additional taxes) . . . . . . . . . | 22c | |
| 23a | 2012 estimated tax payments and 2011 overpayment credited to 2012 | 23a | | |
| b | Tax deposited with Form 7004 . . . . . . . . . . . . | 23b | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) . . . . . | 23c | | |
| d | Add lines 23a through 23c . . . . . . . . . . . . . . . . . . | 23d | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . . ▶ ☐ | 24 | – 0 – |
| 25 | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed . . | 25 | – 0 – |
| 26 | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . | 26 | – 0 – |
| 27 | Enter amount from line 26 Credited to 2013 estimated tax ▶ | Refunded ▶ | 27 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _(signed)_    Date **8-5-14**    Title **PRESIDENT**

May the IRS discuss this return with the preparer shown below (see instructions)? ☐ Yes ☐ No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed   PTIN |
| Firm's name  ▶ | | | Firm's EIN ▶ |
| Firm's address ▶ | | | Phone no. |

For Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 11510H    Form **1120S** (2012)

| | | | | | Total amount | |
|---|---|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) | | | 1 | 376,436 |43
| | 2 | Net rental real estate income (loss) (attach Form 8825) | | | 2 | |
| | 3a | Other gross rental income (loss) | 3a | (6,200) 00 | | |
| | b | Expenses from other rental activities (attach statement) | 3b | -0- | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a | | | 3c | (6,200) 00 |
| | 4 | Interest income | | | 4 | |
| | 5 | Dividends: a Ordinary dividends | | | 5a | |
| | | b Qualified dividends | 5b | | | |
| | 6 | Royalties | | | 6 | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) | | | 7 | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) | | | 8a | |
| | b | Collectibles (28%) gain (loss) | 8b | | | |
| | c | Unrecaptured section 1250 gain (attach statement) | 8c | | | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) | | | 9 | |
| | 10 | Other income (loss) (see instructions) . . . Type a | | | 10 | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) | | | 11 | |
| | 12a | Charitable contributions | | | 12a | |
| | b | Investment interest expense | | | 12b | |
| | c | Section 59(e)(2) expenditures (1) Type a | | (2) Amount a | 12c(2) | |
| | d | Other deductions (see instructions) . . . Type a | | | 12d | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) | | | 13a | |
| | b | Low-income housing credit (other) | | | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | | | 13c | |
| | d | Other rental real estate credits (see instructions) Type a | | | 13d | |
| | e | Other rental credits (see instructions) . . . Type a | | | 13e | |
| | f | Alcohol and cellulosic biofuel fuels credit (attach Form 6478) | | | 13f | |
| | g | Other credits (see instructions) . . . . . Type a | | | 13g | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession a | | | | |
| | b | Gross income from all sources | | | 14b | |
| | c | Gross income sourced at shareholder level | | | 14c | |
| | | Foreign gross income sourced at corporate level | | | | |
| | d | Passive category | | | 14d | |
| | e | General category | | | 14e | |
| | f | Other (attach statement) | | | 14f | |
| | | Deductions allocated and apportioned at shareholder level | | | | |
| | g | Interest expense | | | 14g | |
| | h | Other | | | 14h | |
| | | Deductions allocated and apportioned at corporate level to foreign source income | | | | |
| | i | Passive category | | | 14i | |
| | j | General category | | | 14j | |
| | k | Other (attach statement) | | | 14k | |
| | | Other information | | | | |
| | l | Total foreign taxes (check one): a ☐ Paid ☐ Accrued | | | 14l | |
| | m | Reduction in taxes available for credit (attach statement) | | | 14m | |
| | n | Other foreign tax information (attach statement) | | | | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment | | | 15a | |
| | b | Adjusted gain or loss | | | 15b | |
| | c | Depletion (other than oil and gas) | | | 15c | |
| | d | Oil, gas, and geothermal properties☐ gross income | | | 15d | |
| | e | Oil, gas, and geothermal properties☐ deductions | | | 15d | |
| | f | Other AMT items (attach statement) | | | 15e | |
| **Items Affecting Shareholder Basis** | 16a | Tax-exempt interest income | | | 16f | |
| | b | Other tax-exempt income | | | 16a | |
| | c | Nondeductible expenses | | | 16b | |
| | d | Distributions (attach statement if required) (see instructions) | | | 16c | |
| | e | Repayment of loans from shareholders | | | 16d | |
| | | | | | 16e | |

Form 1120S (2012)

T-1

Form **1040**  Department of the Treasury – Internal Revenue Service (99)

**U.S. Individual Income Tax Return**  2011  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2011, or other tax year beginning _____, 2011, ending _____, 20____  **See separate instructions.**

| | | |
|---|---|---|
| Your first name and initial | Last name | Your social security number |
| Albert M | Rossini | 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 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| Brenda A | Rossini | 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 |

Home address (number and street). If you have a P.O. box, see instructions.  Apt. no.

928 Elm St.

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Winnetka IL 60093

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

| Foreign country name | Foreign province/county | Foreign postal code |
|---|---|---|

**Filing Status**
Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a .
b ☒ Spouse

Boxes checked on 6a and 6b: **2**

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| Spencer   Rossini | 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 | Son | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

No. of children on 6c who:
• lived with you **1**
• did not live with you due to divorce or separation (see instructions) ____
Dependents on 6c not entered above ____
Add numbers on lines above ▶ **3**

d Total number of exemptions claimed .

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . | 7 | |
| 8a | Taxable interest. Attach Schedule B if required . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required . | 9a | |
| b | Qualified dividends . | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | 10 | |
| 11 | Alimony received . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . | 12 | 84,834. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . | 14 | |
| 15a | IRA distributions . 15a | b Taxable amount | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | -9,817. |
| 18 | Farm income or (loss). Attach Schedule F . | 18 | |
| 19 | Unemployment compensation . | 19 | |
| 20a | Social security benefits 20a | b Taxable amount | 20b | |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 75,017. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ . | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 | |
| 26 | Moving expenses. Attach Form 3903 . | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | 5,993. |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . | 28 | |
| 29 | Self-employed health insurance deduction . | 29 | |
| 30 | Penalty on early withdrawal of savings . | 30 | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction . | 32 | |
| 33 | Student loan interest deduction . | 33 | |
| 34 | Tuition and fees. Attach Form 8917 . | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 35 . | 36 | 5,993. |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ▶ | 37 | 69,024. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  Form **1040** (2011)

Form 1040 (2011)                                                                                                                    Page 2

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | | 38 | 69,024. |
| | 39a | Check if: ☐ You were born before January 2, 1947, ☐ Blind. ☐ Spouse was born before January 2, 1947, ☐ Blind. Total boxes checked ▶ 39a | | | |
| **Standard Deduction for—** | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☐ | | | |
| • People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. | 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 40 | 21,033. |
| | 41 | Subtract line 40 from line 38 | | 41 | 47,991. |
| | 42 | Exemptions. Multiply $3,700 by the number on line 6d | | 42 | 11,100. |
| | 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | | 43 | 36,891. |
| | 44 | Tax (see instructions). Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ 962 election | | 44 | 4,681. |
| • All others: | 45 | Alternative minimum tax (see instructions). Attach Form 6251 | | 45 | |
| Single or Married filing separately, $5,800 | 46 | Add lines 44 and 45 ▶ | | 46 | 4,681. |
| | 47 | Foreign tax credit. Attach Form 1116 if required | 47 | | |
| Married filing jointly or Qualifying widow(er), $11,600 | 48 | Credit for child and dependent care expenses. Attach Form 2441 | 48 | | |
| | 49 | Education credits from Form 8863, line 23 | 49 | 1,500. | |
| | 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | | |
| Head of household, $8,500 | 51 | Child tax credit (see instructions) | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 | 52 | | |
| | 53 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 53 | | |
| | 54 | Add lines 47 through 53. These are your total credits | | 54 | 1,500. |
| | 55 | Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- ▶ | | 55 | 3,181. |
| **Other Taxes** | 56 | Self-employment tax. Attach Schedule SE | | 56 | 10,420. |
| | 57 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | | 57 | |
| | 58 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | | 58 | |
| | 59a | Household employment taxes from Schedule H | | 59a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | | 59b | |
| | 60 | Other taxes. Enter code(s) from instructions | | 60 | |
| | 61 | Add lines 55 through 60. This is your total tax ▶ | | 61 | 13,601. |
| **Payments** | 62 | Federal income tax withheld from Forms W-2 and 1099 | 62 | | |
| | 63 | 2011 estimated tax payments and amount applied from 2010 return | 63 | | |
| If you have a qualifying child, attach Schedule EIC. | 64a | Earned income credit (EIC) | 64a | | |
| | b | Nontaxable combat pay election 64b | | | |
| | 65 | Additional child tax credit. Attach Form 8812 | 65 | | |
| | 66 | American opportunity credit from Form 8863, line 14 | 66 | 1,000. | |
| | 67 | First-time homebuyer credit from Form 5405, line 10 | 67 | | |
| | 68 | Amount paid with request for extension to file | 68 | | |
| | 69 | Excess social security and tier 1 RRTA tax withheld | 69 | | |
| | 70 | Credit for federal tax on fuels. Attach Form 4136 | 70 | | |
| | 71 | Credits from Form: a ☐ 2439 b ☐ 8839 c ☐ 8801 d ☐ 8885 | 71 | | |
| | 72 | Add lines 62, 63, 64a, and 65 through 71. These are your total payments ▶ | | 72 | 1,000. |
| **Refund** | 73 | If line 72 is more than line 61, subtract line 61 from line 72. This is the amount you overpaid | | 73 | |
| | 74a | Amount of line 73 you want refunded to you. If Form 8888 is attached, check here ▶ ☐ | | 74a | |
| Direct deposit? ▶ See instructions. | b | Routing number X X X X X X X X X ▶ c Type: ☐ Checking ☐ Savings | | | |
| | d | Account number X X X X X X X X X X X X X X X X X | | | |
| | 75 | Amount of line 73 you want applied to your 2012 estimated tax ▶ 75 | | | |
| **Amount You Owe** | 76 | Amount you owe. Subtract line 72 from line 61. For details on how to pay, see instructions ▶ | | 76 | 12,759. |
| | 77 | Estimated tax penalty (see instructions) 77 | 158. | | |

**Third Party Designee**
Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete below. ☑ No

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN) ▶ |
|---|---|---|

**Sign Here**
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date 4/17/12 | Your occupation Real Estate Consultant | Daytime phone number |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation Retired | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

Joint return? See instructions. Keep a copy for your records.

**Paid Preparer Use Only**

| Print/Type preparer's name CASEY CZARNECKI | Preparer's signature CZARNECKI, CPA | Date | Check ☑ if self-employed | PTIN P00 132995 |
|---|---|---|---|---|
| Firm's name ▶ CASEY CZARNECKI, CPA | | | Firm's EIN ▶ | |
| Firm's address ▶ 3924 W. DEVON LINCOLNWOOD, IL 60712 | | | Phone no. 708·267·3093 | |

REV 02/22/12 TTW                                                                                                         Form **1040** (2011)

**SCHEDULE A**
**(Form 1040)**

**Itemized Deductions**

OMB No. 1545-0074

**2011**

Department of the Treasury
Internal Revenue Service (99)

► Attach to Form 1040.    ► See Instructions for Schedule A (Form 1040).

Attachment
Sequence No. **07**

Name(s) shown on Form 1040

Albert M & Brenda A Rossini

Your social security number

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

| | | | | | |
|---|---|---|---|---|---|
| **Medical and Dental Expenses** | | **Caution.** Do not include expenses reimbursed or paid by others. | | | |
| | 1 | Medical and dental expenses (see instructions) | **1** | 24,932. | |
| | 2 | Enter amount from Form 1040, line 38 **2** 69,024. | | | |
| | 3 | Multiply line 2 by 7.5% (.075) | **3** | 5,177. | |
| | 4 | Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | | | **4** 19,755. |
| **Taxes You Paid** | 5 | State and local (check only one box): | | | |
| | | a ☒ Income taxes, or | **5** | 1,278. | |
| | | b ☐ General sales taxes | | | |
| | 6 | Real estate taxes (see instructions) | **6** | | |
| | 7 | Personal property taxes | **7** | | |
| | 8 | Other taxes. List type and amount ► | | | |
| | | | **8** | | |
| | 9 | Add lines 5 through 8. | | | **9** 1,278. |
| **Interest You Paid** | 10 | Home mortgage interest and points reported to you on Form 1098 | **10** | | |
| | 11 | Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see instructions and show that person's name, identifying no., and address ► | | | |
| **Note.** Your mortgage interest deduction may be limited (see instructions). | | | **11** | | |
| | 12 | Points not reported to you on Form 1098. See instructions for special rules. | **12** | | |
| | 13 | Mortgage insurance premiums (see instructions) | **13** | | |
| | 14 | Investment interest. Attach Form 4952 if required. (See instructions.) | **14** | | |
| | 15 | Add lines 10 through 14 | | | **15** |
| **Gifts to Charity** | 16 | Gifts by cash or check. If you made any gift of $250 or more, see instructions. | **16** | | |
| If you made a gift and got a benefit for it, see instructions. | 17 | Other than by cash or check. If any gift of $250 or more, see instructions. You must attach Form 8283 if over $500 | **17** | | |
| | 18 | Carryover from prior year | **18** | | |
| | 19 | Add lines 16 through 18 | | | **19** |
| **Casualty and Theft Losses** | 20 | Casualty or theft loss(es). Attach Form 4684. (See instructions.) | | | **20** |
| **Job Expenses and Certain Miscellaneous Deductions** | 21 | Unreimbursed employee expenses—job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required. (See instructions.) ► | **21** | | |
| | 22 | Tax preparation fees | **22** | | |
| | 23 | Other expenses—investment, safe deposit box, etc. List type and amount ► | | | |
| | | | **23** | | |
| | 24 | Add lines 21 through 23 | **24** | | |
| | 25 | Enter amount from Form 1040, line 38 **25** | | | |
| | 26 | Multiply line 25 by 2% (.02) | **26** | | |
| | 27 | Subtract line 26 from line 24. If line 26 is more than line 24, enter -0- | | | **27** |
| **Other Miscellaneous Deductions** | 28 | Other—from list in instructions. List type and amount ► | | | |
| | | | | | **28** |
| **Total Itemized Deductions** | 29 | Add the amounts in the far right column for lines 4 through 28. Also, enter this amount on Form 1040, line 40 | | | **29** 21,033. |
| | 30 | If you elect to itemize deductions even though they are less than your standard deduction, check here ► ☐ | | | |

For Paperwork Reduction Act Notice, see Form 1040 instructions.  BAA

REV 12/06/11 TTW

Schedule A (Form 1040) 2011

| SCHEDULE C (Form 1040) | Profit or Loss From Business | OMB No. 1545-0074 |
|---|---|---|
| | (Sole Proprietorship) | 2011 |
| Department of the Treasury Internal Revenue Service (99) | ▶ For information on Schedule C and its instructions, go to *www.irs.gov/schedulec* ▶ Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065. | Attachment Sequence No. 09 |

| Name of proprietor | Social security number (SSN) |
|---|---|
| Albert M Rossini | 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 |

| A | Principal business or profession, including product or service (see instructions) | B Enter code from instructions |
|---|---|---|
| | Real Estate Consultant | ▶ 5 3 1 3 9 0 |

| C | Business name. If no separate business name, leave blank. | D Employer ID number (EIN), (see instr.) |
|---|---|---|
| | Comprehensive Properties | |

| E | Business address (including suite or room no.) ▶ 3924 W. Devon Suuite 200 |
|---|---|
| | City, town or post office, state, and ZIP code   Lincolnwood, IL 60712 |

| F | Accounting method: (1) ☒ Cash (2) ☐ Accrual (3) ☐ Other (specify) ▶ | | |
|---|---|---|---|
| G | Did you "materially participate" in the operation of this business during 2011? If "No," see instructions for limit on losses | ☒ Yes | ☐ No |
| H | If you started or acquired this business during 2011, check here | ▶ ☐ | |
| I | Did you make any payments in 2011 that would require you to file Form(s) 1099? (see instructions) | ☒ Yes | ☐ No |
| J | If "Yes," did you or will you file all required Forms 1099? | ☒ Yes | ☐ No |

**Part I   Income**

| | | | | |
|---|---|---|---|---|
| 1a | Merchant card and third party payments. For 2011, enter -0- | 1a | 0. | |
| b | Gross receipts or sales not entered on line 1a (see instructions) | 1b | 577,967. | |
| c | Income reported to you on Form W-2 if the "Statutory Employee" box on that form was checked. **Caution.** See instr. before completing this line | 1c | | |
| d | Total gross receipts. Add lines 1a through 1c | | | 1d | 577,967. |
| 2 | Returns and allowances plus any other adjustments (see instructions) | | | 2 | 78,982. |
| 3 | Subtract line 2 from line 1d | | | 3 | 498,985. |
| 4 | Cost of goods sold (from line 42) | | | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 | | | 5 | 498,985. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | | | 6 | |
| 7 | Gross income. Add lines 5 and 6 | | ▶ | 7 | 498,985. |

**Part II   Expenses**    Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | 125. | 18 | Office expense (see instructions) | 18 | |
| 9 | Car and truck expenses (see instructions) | 9 | 6,458. | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | 45,470. | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | 174,471. | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | 49,544. |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 21 | Repairs and maintenance | 21 | |
| | | | | 22 | Supplies (not included in Part III) | 22 | 2,070. |
| | | | | 23 | Taxes and licenses | 23 | 199. |
| 14 | Employee benefit programs (other than on line 19) | 14 | | 24 | Travel, meals, and entertainment: | | |
| 15 | Insurance (other than health) | 15 | | a | Travel | 24a | |
| 16 | Interest: | | | b | Deductible meals and entertainment (see instructions) | 24b | |
| a | Mortgage (paid to banks, etc.) | 16a | | 25 | Utilities | 25 | 16,468. |
| b | Other | 16b | 18,000. | 26 | Wages (less employment credits) | 26 | |
| 17 | Legal and professional services | 17 | 87,680. | 27a | Other expenses (from line 48) | 27a | 13,666. |
| | | | | b | Reserved for future use | 27b | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27a | ▶ 28 | 414,151. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | 29 | 84,834. |
| 30 | Expenses for business use of your home. Attach Form 8829. Do **not** report such expenses elsewhere | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on both Form 1040, line 12 (or Form 1040NR, line 13) and on Schedule SE, line 2. If you entered an amount on line 1c, see instr. Estates and trusts, enter on Form 1041, line 3. | 31 | 84,834. |
| | • If a loss, you **must** go to line 32. | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on both Form 1040, line 12, (or Form 1040NR, line 13) and on Schedule SE, line 2. If you entered an amount on line 1c, see the instructions for line 31. Estates and trusts, enter on Form 1041, line 3. | 32a ☐ All investment is at risk. 32b ☐ Some investment is not at risk. | |
| | • If you checked 32b, you must attach Form 6198. Your loss may be limited. | | |

For Paperwork Reduction Act Notice, see your tax return instructions.   BAA      REV 01/11/12 TTW      Schedule C (Form 1040) 2011

EXHIBIT **11**

ATTORNEY REGISTRATION AND DISCIPLINARY
COMMITTEE SYNOPSIS OF FINDINGS IN RE THOMAS W. Murphy

*Filed July 9, 2013*

### In re Thomas William Murphy
Attorney-Respondent

Commission No. 2010PR00114

### Synopsis of Hearing Board Report and Recommendation
(July 2013)

The Administrator filed a seven-count Complaint against Respondent. Counts I through IV alleged Respondent served as attorney and trustee of the Zgonina Trust and engaged in misconduct with respect to the manner in which he handled assets of the trust. Count I alleged he used $15,000 of the trust funds for his own purposes, Count II alleged he wrote checks from the trust fund to his law firm in excess of the amount billed by his firm, and Counts III and IV alleged he invested trust funds in companies he represented and in which he had a financial stake.

Count V involved Respondent's duties and actions with respect to the Sanial Trust, and alleged he used approximately $281,000 from that trust to repay the Zgonina Trust. Counts VI and VII alleged misconduct relating to Respondent's handling of funds in two proposed real estate transactions.

The Hearing Board found that Respondent engaged in some of the misconduct alleged in Counts I through III. and all of the misconduct alleged in Counts V, VI and VII. Specifically, Respondent improperly took funds from the Zgonina Trust under the guise of a trustee's fee, breached his fiduciary duty to the trust by failing to provide invoices regarding work performed by his law firm, represented the trust when the representation conflicted with his own interests and that of another client, misused funds from the Sanial Trust, and misused funds he was holding in connection with two real estate transactions. The Hearing Board found that the charges of Count IV were not proved.

Considering the serious nature of the misconduct and the substantial amount of money that was converted, the Hearing Board recommended that Respondent be disbarred.

### BEFORE THE HEARING BOARD
### OF THE
### ILLINOIS ATTORNEY REGISTRATION
### AND
### DISCIPLINARY COMMISSION

In the Matter of:

### THOMAS WILLIAM MURPHY,

Attorney-Respondent,                                    Commission No. 2010PR00114

No. 1998404.

### REPORT AND RECOMMENDATION OF THE HEARING BOARD

## INTRODUCTION

The hearing in this matter was held on October 23 and 24 and November 5, 2012 at the offices of the Attorney Registration and Disciplinary Commission ("ARDC") before a panel consisting of Henry T. Kelly, Chair, Adam J. Lysinski and David C. Rudd. The Administrator was represented by Marita C. Sullivan. Respondent Thomas William Murphy appeared and was represented by George C. Collins.

## PLEADINGS

### Complaint

On August 24, 2010 the Administrator filed a four-count Complaint against Respondent. A seven-count Amended Complaint was filed on April 12, 2012. Counts I through IV alleged Respondent served as attorney and trustee of the Zgonina trust and engaged in misconduct with respect to the manner in which he handled assets of the trust. Count V involved Respondent's duties and actions with respect to the Sanial Trust. Counts VI and VII alleged misconduct relating to Respondent's handling of funds in two proposed real estate transactions.

PAGE 2:

### Answer

On June 4, 2012 Respondent filed an answer to the Amended Complaint in which he admitted some of the factual allegations of the Complaint, denied other factual allegations, and denied engaging in any professional misconduct.

## ALLEGED MISCONDUCT

The Administrator charged the following misconduct: 1) conversion (Counts I, II, V-VII); 2) breach of fiduciary duty (Counts I-V); 3) conduct involving dishonesty, fraud deceit or misrepresentation in violation of Rule 8.4(a)(4) (Counts I - VII); 4) conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) (Counts I, II, V); 5) representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) (Counts III, IV); 6) representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b) (Counts III, IV); 7) failure to explain the implications of the common representation and the advantages and risks involved, when representation of multiple clients in a single matter is undertaken in violation of Rule 1.7(c) (Counts III, IV); 8) failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property, in violation of Rule 1.15(e); (VI, VII); 9) conduct that tends to defeat the administration of justice or bring the legal profession into disrepute (Counts I-VII).

## EVIDENCE

The Administrator called Donna Zgonina, Mitchell Goldsmith, Robert Tepper, Arthur Yackel, Ellen Makofsky, Bruce Klein, Mary Jane Houston, Paul Jacknow, Bonita Jozers, Frank Alamprese, David Herzog and Respondent as witnesses, and presented 105 exhibits that were

PAGE 3:

admitted into evidence. Respondent testified on his own behalf, called William Maddux, Thomas Hoffman,

Stephanie Denby, Michael Folan, Kelli Jones, and Lawrence Levin as witnesses, and presented one exhibit that was admitted into evidence.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In attorney disciplinary proceedings the Administrator has the burden of proving the charges of misconduct by clear and convincing evidence. *In re Ingersoll*, 186 Ill. 2d 163, 710 N.E.2d 390, 393 (1999). Clear and convincing evidence constitutes a high level of certainty, which is greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *People v. Williams*, 143 Ill. 2d 477, 577 N.E.2d 762 (1991).

### Count I

### ($15,000 check to Schwartz & Freeman from Zgonina Insurance Trust)

### Background and Admitted Facts

In or about 1978, Respondent met Casimir H. Zgonina ("Casimir"). At that time, Respondent began representing Casimir's company, Uni-Label & Tag, and also began representing Casimir and his family members in personal legal matters. In or about March 2000, Casimir was diagnosed with pancreatic cancer. (Ans. par. 1, 2; Tr. 97).

In or about early April 2000, Respondent, or another attorney under his direction, prepared documents necessary to create the Casimir H. Zgonina 2000 Insurance Trust ("Insurance Trust") and Casimir executed those documents. Under the terms of the Insurance Trust, Casimir designated the trust as the owner and beneficiary of various insurance policies on his life, made his wife Donna Jean Zgonina ("Zgonina") the sole income beneficiary, and named Respondent as sole trustee. The purpose of the Insurance Trust was to provide for Zgonina's care and support upon Casimir's death. (Ans. par. 3; Tr. 98-99, 1048; Adm. Ex. 1).

PAGE 4:

In or about May 2000, Respondent, or another attorney under his direction, drafted documents to amend the Casimir H. Zgonina Revocable Trust ("Revocable Trust"), which had been originally created on behalf of Casimir in 1989. On or about June 1, 2000, Casimir executed the "Amendment and Restatement of the Casimir H. Zgonina Revocable Trust." Under the terms of the amended Revocable Trust, upon Casimir's death Respondent would serve as successor co-trustee with Zgonina. Casimir designated Zgonina as the sole income beneficiary of the Revocable Trust. (Ans. par. 4; Tr. 99, 1048).

In or about May 2000, Respondent, or another attorney under his direction, drafted a last will and testament for Casimir. On or about June 1, 2000, Casimir executed the will. Under the terms of his will, Casimir named Respondent and Zgonina as co-executors. (Ans. par. 5; Tr. 100).

Casimir died on September 27, 2000. On or about October 25, 2000, Respondent filed a petition for probate of will and for letters testamentary in the Circuit Court of Cook County, requesting that Casimir's will be admitted to probate. At all relevant times, Respondent was the attorney for the Revocable Trust, the Insurance Trust, and Casimir's probate estate. (Ans. par. 6- 8; Tr. 100; Adm. Ex. 4).

**I. Respondent is charged in Count I with conversion and conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

## A. Admitted Facts and Evidence Considered

Section 7.6 of the Zgonina Insurance Trust provides that "[a]ny trustee shall be entitled to reasonable compensation for services in administering and distributing the trust property, and to reimbursement for expenses." Donna Zgonina recalled meeting with Respondent on December 7, 2000 to endorse an insurance proceeds check, which Respondent planned to deposit into an account at Harris Bank. Zgonina denied that Respondent mentioned a trustee's fee at that

PAGE 5:

meeting, but at some point he may have mentioned that he was entitled to receive "a percentage." (Tr. 100-103, 145; Adm. Ex. 1).

On or about December 8, 2000, Respondent opened an account at Harris Bank entitled "Casimir H. Zgonina 2000 Insurance Trust" ("Harris account") and deposited $1,182,330.95 into the account. On or about December 8, 2000, he issued check number 002 on the Harris account payable to his law firm Schwartz & Freeman in the amount of $15,000. He then endorsed the check "Schwartz & Freeman by Thomas W. Murphy" and deposited the trust check into his own personal account he held with his wife at American National Bank entitled "Thomas W. Murphy and Christine Murphy." After depositing check 002, Respondent and/or his wife used the money for their own business or personal purposes. (Ans. par. 10-12; Adm. Ex. 1).

Respondent testified the $15,000 check was a payment to him for a trustee fee, and it was customary to receive checks for trustee's fees directly. He stated his law firm did not receive money for his work as a trustee, and he did not bill time for his work as a trustee. (Tr. 968, 1026, 1048-49).

Zgonina testified, and Respondent admitted, that Respondent never told her he was depositing $15,000 of the Insurance Trust funds into his and his wife's personal account, or that he was using those funds for their own business or personal purposes. Zgonina did not authorize Respondent to use any portion of the Insurance Trust funds for his or his wife's own business or personal purposes. (Ans. par. 13; Tr. 102-103).

In June 2002 Zgonina requested that Respondent resign as trustee of the Insurance Trust. On August 5, 2002 Respondent issued a check for $281,000 to the Insurance Trust from an unrelated trust for which he also served as trustee. In a follow-up letter to Zgonina's attorney Mitchell Goldsmith, Respondent explained that the check for $281,000 included payment on a $15,000 promissory note, along with interest of $3,010. At hearing Respondent testified that the

PAGE 6:

repayment of $18,010 was for the $15,000 trustee fee he had received, plus interest of $3,010. He stated he repaid the fee to Zgonina, with interest, as soon as he was asked to resign because he did not want any issues. Respondent noted there was no loss to the Zgonina Insurance Trust as a result of the trustee's fee. (Tr. 968-69, 1026-30; Adm. Exs. 32, 36, 39).

In January and March 2003, attorney Goldsmith requested specific documents from Respondent regarding his handling of the Insurance Trust, including an accounting, but received no response. Zgonina then retained attorney Robert Tepper to initiate proceedings to obtain trust documents and to determine what happened to the trust assets. In the fall of 2003 Tepper filed a lawsuit against Respondent alleging breach of fiduciary duty, and requesting an accounting and Respondent's removal as trustee. Tepper recalled a lengthy

period during which Respondent failed to comply with discovery requests and court orders pertaining to discovery, and noted that Respondent never did provide an accounting. (Tr. 55-56, 60-61, 64, 84-87, 140, 513-15; Adm. Exs. 41, 43).

Tepper eventually received information by issuing subpoenas to banks, a stockbroker, and law firms. He reviewed Respondent's billing records for services provided to the Zgonina estate from September 2000 to May 2001 as well as financial records of the Insurance Trust. With respect to the December 8, 2000 check for $15,000 written to Schwartz & Freeman and deposited into Respondent's personal account, Tepper stated the check did not correspond to any Schwartz & Freeman invoice. (Tr. 65, 71-76; Adm. Exs. 1, 2).

### B. Analysis and Conclusions

By its terms, the Zgonina Insurance Trust provided that the trustee was entitled to reasonable compensation for his services. Respondent, who served as trustee, claimed the $15,000 check he deposited into his account on December 8, 2000 was a fee for his services as trustee. Based on the evidence we reviewed, however, we do not find Respondent's claim to be

PAGE 7:

credible. First, no document substantiated his claim. We saw no invoice to the trust for his services, nor was there an invoice from his firm that matched that amount. Second, we received no evidence that Respondent, at the time he wrote and deposited the check for $15,000, had performed any services as trustee for the trust other than meeting with Zgonina and depositing an insurance proceeds check. Third, the fact Respondent wrote the check to Schwartz & Freeman is suspect since he specifically stated the bills from the law firm did not include his services as trustee. Further, he offered no explanation as to why the check was directed to the firm, yet not tendered to the firm. Last, and most telling, are Respondent's conflicting statements regarding the repayment of the $15,000. Respondent testified at hearing that a check he transmitted to Zgonina's attorney in August 2002 included repayment of the $15,000 trustee fee, plus $3,010 in interest. In an October 2002 letter to the attorney, however, he stated the payment of $18,010 was for a $15,000 promissory note, with interest of $3,010 on the note. There was no evidence of a promissory note.

The Supreme Court has defined conversion as "any unauthorized act, which deprives a man of his property permanently or for an indefinite time." *In re Rosin*, 156 Ill. 2d 202, 206, 620 N.E.2d 368 (1993). Since we do not accept Respondent's explanation that the check for $15,000 was compensation for his services as trustee, we find that he engaged in conversion by depositing the check into his own account and using the funds for his own purposes. In addition, given all the circumstances noted, we find Respondent engaged in dishonesty and deceit in violation of Rule 8.4(a)(4). Taking funds from the trust for his own purposes, without notification to the trust beneficiaries and under the guise of payment to his law firm, was clearly a dishonest act. His subsequent reluctance to turn over information or provide an accounting of the trust assets, despite repeated requests by Zgonina and her attorneys, further cements our conclusion.

PAGE 8:

## II. Respondent is charged in Count I with breach of fiduciary duty

### A. Evidence Considered

We consider the evidence previously summarized in section I.

### B. Analysis and Conclusions

As trustee of the Zgonina Insurance Trust, Respondent owed a fiduciary duty to the trust's beneficiaries and was obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith. *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1009, 932 N.E.2d 569 (1st. Dist. 2010). A trustee must use care and diligence in the discharge of his duties, and must act honestly and with undivided loyalty to the trust. *Id.* at 1013. The duty to serve the interests of the beneficiaries with complete loyalty prohibits the trustee from dealing with trust property for his own benefit. *Home Federal Savings and Loan Association v. Zarkin*, 89 Ill. 2d 232, 239, 432 N.E.2d 841 (1982).[1] We find that Respondent, by converting trust funds to his own benefit and engaging in dishonest conduct, breached his fiduciary duties to the trust beneficiaries.

Even if we had found that the $15,000 check to Schwartz & Freeman was payment for a legitimate trustee's fee, we would find that Respondent breached his fiduciary duty by failing to properly document the fee with an invoice to the trust and a summary of his services.

**III. Respondent is charged in Count I with conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.**

## A. Evidence Considered

We consider the evidence previously summarized in section I.

## B. Analysis and Conclusions

We do not find that Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). That rule has been interpreted as requiring proof of actual

PAGE 9:

prejudice to the administration of justice, and the involvement of a tribunal. *In re Vrdolyak*, 137 Ill. 2d 407, 425, 560 N.E.2d 840 (1990); *In re Milks*, 09 CH 30, M.R. 25588 (Nov. 19, 2012) (Review Bd. at 11). The evidence in this case showed that the $15,000 was returned to the Insurance Trust, with interest, prior to the involvement of any tribunal.

We do find, however, that Respondent's unauthorized taking of $15,000 tends to defeat the administration of justice and bring the legal profession into disrepute. An attorney's conversion of funds "manifests a serious breach of trust, and tends to defeat the administration of justice and to bring the legal profession into disrepute." *In re Feldman*, 89 Ill. 2d 7, 11, 431 N.E.2d 388 (1982). *See also In re Lewis*, 118 Ill. 2d 357, 362-63, 515 N.E.2d 96 (1987) (conversion places the entire legal profession in disrepute).[2]

### Count II

### (Checks written to Schwartz & Freeman)

**IV. Respondent is charged in Count II with conversion and dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4).**

## A. Admitted Facts and Evidence Considered

Count II of the Complaint realleges the allegations of Count I and therefore we consider the evidence as to

that Count along with the following admitted facts and evidence.

Between 1998 and May 2001, Respondent was a partner at the law firm Schwartz & Freeman in Chicago. Between September 27, 2000, and May 1, 2001, that firm issued invoices to the Casimir H. Zgonina estate totaling $23,416.50 and invoices to the Zgonina Insurance Trust totaling $6,307.00, for a total amount of $29,723.50. Respondent testified the bills covered his legal services as well as work provided by paralegals and other attorneys handling the probate of the estate, but did not include his work as trustee. He noted that Schwartz & Freeman had its own billing department, and he was not in charge of preparing bills sent out by the firm. (Tr. 981, 1049; Adm. Ex. 1).

PAGE 10:

Respondent acknowledged he was in charge of paying bills received by the Zgonina estate and the Insurance Trust. Between September 27, 2000, and May 1, 2001, he issued eight checks totaling $46,216.79 payable to Schwartz & Freeman from the funds of the Insurance Trust and Revocable Trust, and those checks were deposited into the law firm account. (A ninth check issued to Schwartz & Freeman during that time period in the amount of $15,000 was previously discussed in Count I). (Ans. par. 19; Tr. 981; Adm. Ex. 2).

Robert Tepper, the attorney who was subsequently retained by Donna Zgonina to obtain documents and information from Respondent regarding the Insurance Trust, testified that the invoices from Schwartz & Freeman did not match the payments made to the firm, and he could not find a corresponding bill for each payment that was made. Zgonina testified Respondent never told her he was disbursing funds from the Insurance Trust and Revocable Trust to Schwartz & Freeman in an amount greater than the invoices issued by that firm, and she denied authorizing Respondent to disburse funds to his law firm in an amount greater than the invoices. (Tr. 76-77, 140).

Respondent testified he did not knowingly overpay Schwartz & Freeman, and he did not believe the firm had been overpaid. He denied he would derive any advantage from an overpayment to the firm, but acknowledged that, as a partner of the firm, an increase in billed hours inured to his benefit. (Tr. 982, 1033; Adm. Ex. 106).

In 2001 Zgonina requested an accounting from Respondent. She was particularly interested in seeing any invoices and checks pertaining to the trust account, including any payments for attorneys' fees. In June and September 2001 she received information from Respondent regarding the investments held by the Insurance Trust, but her questions about checks written for fees from the Insurance Trust were not answered. In February 2003, Zgonina requested that Respondent provide an accounting of legal fees withdrawn from the trust, as well

PAGE 11:

as the 2001 trust tax return. She never received the accounting. (Tr. 109-12, 117-18, 138-39; Adm. Exs. 14, 18, 19, 42).

## B. Analysis and Conclusions

The evidence shows that Respondent, as trustee of the Zgonina Insurance Trust, issued eight checks to Schwartz & Freeman over a seven month period totaling $46,216.79. The invoices for legal services during that time period, however, totaled only $29,723.50, resulting in a difference of $16,493.29. Respondent offered no explanation for the discrepancy but denied knowingly overpaying his firm and denied that the

firm had been overpaid.

The Administrator did not allege that the surplus of $16,493.29 landed in Respondent's hands or that he used the money for his own purposes. In fact, no one disputed that Schwartz & Freeman received each of the eight checks and did not return any of the funds. We assume that the law firm, in its normal course of business, would have reconciled its collections with its billings and notified the client of any overpayment, yet we heard no evidence that any overpayment was detected or reported. As for the Administrator's argument that Respondent derived a benefit from bringing in an additional $16,000 to the firm, we did not receive enough evidence regarding his total billings or the firm's compensation structure to reach that conclusion.

We recognize that conversion can occur even if the attorney does not take the funds for his personal use or derive a benefit from the funds. See In re Lenz, 108 Ill. 2d 445, 484 N.E.2d 1093 (1985) (conversion found where attorney used funds in his client trust account to purchase a wheelchair-equipped van for a disabled client). In this case, however, we do not believe a sufficient showing was made that the funds were paid to the law firm in error. Therefore, we do not find that Respondent engaged in conversion. For the same reasons, we do not find that the

PAGE 12:

charge of conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4) was proved by clear and convincing evidence.

## V. Respondent is charged in Count II with breach of fiduciary duty

### A. Evidence Considered

We consider the evidence previously summarized in section IV.

### B. Analysis and Conclusions

Although we did not find that Respondent converted funds or engaged in dishonest conduct, we find he failed the trust beneficiaries in other respects. As trustee of the Insurance Trust, he had a fiduciary duty to administer the trust with good faith, fidelity, due care and diligence. See Janowiak v. Tiesi, 402 Ill. App. 3d at 1013. We find he breached his fiduciary duty as trustee, as well as his fiduciary duty as attorney for Zgonina's estate and attorney for the trust, by failing to ensure that proper invoices were submitted for legal services and that payment was made based only on the invoices received. His lack of care in ensuring proper documentation not only jeopardized the assets of the trust, but caused difficulties for those who later were tasked with reconstructing his actions.

## VI. Respondent is charged in Count II with engaging in conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and engaging in conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.

### A. Evidence Considered

We consider the evidence previously summarized in section IV.

### B. Analysis and Conclusions

We do not find that Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). As stated previously, that rule requires proof of actual prejudice to the administration of justice, and the involvement of a tribunal. *Vrdolyak*, 137 Ill. 2d at 425; *Milks*, 09 CH 30 (Review Bd. at 11). Because the evidence was not sufficient to

PAGE 13:

establish that the payments to Schwartz & Freeman were made in error, we do not find Respondent's conduct resulted in any actual prejudice.

Further, while Respondent failed to act with due care, we do not find that his failure to ensure that payments were substantiated by invoices tended to defeat the administration of justice or bring the legal profession into disrepute.

## Count III

### (Loan from Zgonina Insurance Trust to M2 Industries)

## VII. Respondent is charged in Count III with breach of fiduciary duty

### A. Admitted Facts and Evidence Considered

Count III of the Complaint realleges the allegations of Counts I and II and therefore we consider the evidence as to those counts along with the following admitted facts and evidence.

### Respondent's Relationship with Ray Mobile and M2

Respondent met Ray Mobile in or about the late 1980s and performed legal work for him between the time they met and 2004. Respondent testified he was not Mobile's main lawyer, but in a prior sworn statement he admitted he represented Mobile continually during that period of time and was Mobile's lawyer for whatever legal need arose. Although Respondent previously described Mobile as a friend, at hearing he characterized Mobile as a client and an acquaintance and stated he has not been to Mobile's home nor has Mobile been to his home. Respondent loaned Mobile $30,000 in the early 1990s for a stamp products business and received partial repayment of that loan. (Tr. 892-94, 899-900, 965-66; Adm. Ex. 106).

In or about the late 1990s, Ray Mobile formed a company, M2 Industries ("M2"), which was in the business of metal fabrication and metal stamping. Respondent incorporated M2, reviewed a lease for the company and may have performed some other minor work for M2, but has never held stock in the company. Respondent acknowledged he personally loaned $100,000

PAGE 14:

to M2 Industries and did not receive a promissory note from Mobile. On subsequent examination he stated that the $100,000 loan was made to Mobile, in increments, during the start-up phase of M2 and Mobile's prior stamp products company. (Tr. 892-96, 966-67, 1050).

Beginning in the late 1990s Respondent served as trustee for the Sanial Trust (as detailed more fully in Count V) and identified a series of checks he wrote on Sanial Trust accounts between June 1999 and October 2000. As to checks written to "cash," of which there were several, he assumed he gave those funds to M2 as an advance to cover payroll or some other expense. He also wrote two other checks directly to M2

from the Sanial Trust account. Regarding one check that was made payable to his law firm Schwartz & Freeman, Respondent acknowledged he deposited it into M2's bank account. (Tr. 870-73, 879-81; Adm. Exs. 93, 94).

## Loan and Equipment Lease from Zgonina Trust to M2

In January 2001, while Respondent was serving as trustee of the Zgonina Insurance Trust, the trust extended a line of credit to M2 Industries, pursuant to which it then loaned M2 $222,702.20 at an interest rate of 12% per annum. Respondent testified he structured the loan to M2 and believed it was secured by equipment and a personal guaranty. A January 31, 2001 custodial account agreement between the Zgonina Insurance Trust, as principal, and Visco, Inc., as custodian, makes reference to Visco being authorized to invest $250,000 in loan transactions on behalf of the trust and guaranteeing a 12% rate of return. Respondent testified in a prior deposition that his intention was to use Visco to monitor the line of credit to M2, but the agreement never took effect and Respondent monitored the payments and kept the records himself. (Ans. par. 28; Tr. 1049-50; Adm. Exs. 28, 105).

Respondent testified that no one was representing M2 for purposes of the loan other than himself. At the time of the purported loan, Respondent believed the investment was sound and he saw no indication that the company was failing, although he did acknowledge the company

PAGE 15:

had to sell its accounts receivables for cash flow purposes. Respondent did not advise Donna Zgonina of the investment or of his relationship with Mobile or M2 before he extended the line of credit from the trust, nor did he tell her he was still owed $100,000 from the owner on a prior loan. He denied that the loan from the Zgonina Insurance Trust to M2 was made because of his relationship to Mobile. (Ans. par. 28-29; Tr. 131, 896, 900-901, 982, 1050; Adm. Exs. 28, 105).

In or about January 2001, Respondent, on behalf of the Zgonina Insurance Trust, purchased three pieces of manufacturing equipment for a cost of $35,000 for purposes of leasing the equipment to M2 Industries. On or about January 23, 2001, Respondent, on behalf of the trust, executed an equipment lease agreement whereby M2 Industries was to pay the trust 260 weekly installments of $300 commencing in February 2001. At the time Respondent purchased the manufacturing equipment and executed the equipment lease, he did not advise Zgonina he was doing so. (Ans. par. 30-31; Adm. Ex. 27).

Respondent testified the Zgonina Insurance Trust agreement included many pages giving him power to make investments and, based on that agreement, the loan was a lawful investment for the trust and within his power as a trustee to make. He also believed he had power, under the trust, to buy equipment and lease it to M2. Article VII of the Zgonina Insurance Trust enumerates numerous powers given to the trustee, including the power to invest trust estates in business interests as shareholder, security holder, creditor or otherwise and to participate in the conduct of the business. (Tr. 978-79; Adm. Ex. 1).

At no time did Respondent advise Zgonina or Mobile to seek independent legal advice regarding the loan transaction or equipment lease. At no time did Respondent explain to either Zgonina or Mobile the implications of his representation of both of them in the loan transaction and equipment lease, or the advantages and risks involved in the representation of both Zgonina and Mobile in the matter. (Ans. par. 33, 34).

PAGE 16:

Filed July 9                                                    https: www.iardc.org HB_RB_Disp_HtmLasp?id=11006

## Repayment on Loan and Equipment Lease

Respondent recalled that, for the most part, payments by M2 on the loan were kept up to date, but at times he contributed his own money to prevent any missed payments. In January 2002 he informed Zgonina by letter that "weekly payments on the equipment lease and line of credit continue to be deposited" into the Insurance Trust account, and he intended to have the trust "out of each of these investments in full on or about February 15, 2002." In February 2002 he sent her further information regarding payments that had been received. In August 2002 Respondent wrote a check on an unrelated trust account (as detailed more fully in Count V) to the Zgonina Insurance Trust for $281,000 to pay off the line of credit and equipment lease. (Tr. 130-32, 982-83; Adm. Exs. 26, 28, 36, 37, 105).

Zgonina's attorney, Mitchell Goldsmith, reviewed materials sent to him by Respondent in October 2002 and determined that the interest on the M2 loan had been paid in full for the period it was owned by the Zgonina Insurance Trust, despite some earlier arrearages, and the equipment leases had been paid off. He acknowledged that the amount of money in the trust matched the information that was provided by Respondent. He did not know whether the payments were actually made by M2 or whether they came from another source, but he assumed they came from M2 because it was the only entity on the notes. (Tr. 516-17, 520, 529-30, 541-42).

M2 Industries went out of business in 2004 or 2005. Respondent testified the company had solid customers and tremendous business but Mobile was not properly managing the finances. Respondent never received payment from Mobile or M2 for his personal loan of $100,000, and never took money from M2 ahead of the Insurance Trust. Based on figures provided by an accountant, Respondent understood the Zgonina Insurance Trust has been repaid in full and suffered no loss from the M2 investment. (Tr. 896-98, 967-68; Adm. Ex. 106).

PAGE 17:

Zgonina had no knowledge whether she lost any principal as a result of the loan to M2. (Tr. 159).

### B. Analysis and Conclusions

Respondent, on behalf of the Zgonina Insurance Trust, entered into a loan transaction and equipment lease with Ray Mobile's company, M2 Industries.

Respondent acknowledged he was the person who structured the loan arrangement. He pointed out that the Insurance Trust agreement gave him broad authority to make investments and, based on that authority, he believed the loan and equipment lease were proper transactions for the trust. We agree that the trust agreement gave Respondent the power to enter into such transactions. In his role as trustee and attorney for the trust, however, he had an overriding fiduciary duty to act with loyalty and fidelity. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009; *Home Fed. Savings & Loan Ass'n v. Zarkin*, 89 Ill. 2d at 239; *In re Winthrop*, 219 Ill. 2d 526, 848 N.E.2d 961 (2006).

We find that Respondent breached his fiduciary duties of loyalty and fidelity to the Insurance Trust when he entered into the loan and equipment lease with M2. He testified he believed the loan was secured by equipment and a personal guaranty, but there was no documentary evidence of a valid loan agreement, note or guaranty that would protect the interests of the trust or the beneficiaries. Further, prior to entering into the loan and equipment lease, he did not advise Zgonina of his substantial connections to Mobile and M2, which included a long-standing personal relationship with Mobile, legal representation of both M2 and

Mobile, and an outstanding personal loan of at least $100,000 to M2. The fact that Respondent arranged for the Insurance Trust to loan money to a company that was indebted to him for a substantial amount, with no protection for the trust, along with other questionable payments from

PAGE 18:

the Sanial Trust to M2 (as discussed below) is particularly disturbing as it signifies a person working in his own self-interest.

**VIII. Respondent is charged in Count III with representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) and representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b)**

### A. Evidence Considered

We consider the evidence previously summarized in section VII.

### B. Analysis and Conclusions

The Administrator charged several types of misconduct based upon the allegedly competing interests of the Zgonina Insurance Trust and Respondent and M2. We note at the outset that while Respondent appeared to be acting in his capacity as trustee of the Insurance Trust when he entered into the transactions with M2, in actuality he wore several hats with respect to the Zgonina estate and trusts. As to the transactions at issue, his roles as attorney and trustee were necessarily intertwined, as no other attorney was representing the trust for purposes of assessing the legal implications of the transactions.

With respect to M2, the evidence showed that Respondent was representing Ray Mobile, the founder of the company, during the relevant time period and had also performed legal work for M2, including incorporating the company. Respondent acknowledged that, with respect to the loan transaction and equipment lease, no other attorney was representing the interests of Mobile and M2. Although we did not hear testimony from Mobile, we believe the circumstances show that Respondent was representing Mobile and M2 at the time of the transaction.

Rule 1.7(a) provides that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship, and each client consents after disclosure.

PAGE 19:

In this case the financial interests of the Zgonina Insurance Trust and M2, one as the lender/lessor and the other as the borrower/lessee, were clearly adverse since both had an incentive to seek the best possible terms for the loan and lease. *See In re Demuth*, 126 Ill. 2d 1, 9, 533 N.E.2d 867 (1988) ("It is obvious that a lender and borrower have conflicting interests"). As noted previously, Respondent did not disclose the competing interests to Zgonina and no consent was given to the dual representation. With respect to the loan transaction and equipment lease, therefore, we find Respondent violated Rule 1.7(a).

Rule 1.7(b) states that a lawyer shall not represent a client if the representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after

disclosure. Respondent's responsibilities and connections to M2 and Mobile, as well as his own financial interest as a creditor of M2, are all factors which could have materially limited his objective and independent representation of the Trust. As he did not disclose his conflicting interests to Zgonina or obtain her consent, we find that he violated Rule 1.7(b).

**IX. Respondent is charged in Count III with failing to explain the implications of the common representation and the advantages and risks involved, when representing multiple clients in a single matter in violation of Rule 1.7(c)**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

Respondent admitted he did not advise either Zgonina or Mobile to seek independent legal advice regarding the loan transaction or equipment lease, or explain to them the implications, advantages, or risks of his dual role. We find therefore that he violated Rule 1.7(c)

PAGE 20:

by representing multiple clients in a single matter and failing to explain the implications of the common representation and the advantages and risks involved.

In making the foregoing findings of misconduct, we emphasize that we are not faulting Respondent for his investment decisions as trustee or for the fact that M2 ultimately failed as a business. *See In re Bruckner* 00 CH 12, M.R. 17722 (Nov. 28, 2001) (trustee who acts within terms of trust instrument and does not act maliciously or in bad faith, is not subject to discipline for poor investment decisions). Rather, the misconduct stems from his service of two masters with competing interests and his failure to recognize or take protective action to ensure they were fully informed and received objective representation.

**X. Respondent is charged in Count III with engaging in dishonesty, deceit, fraud or misrepresentation in violation of Rule 8.4(a)(4)**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

While Respondent failed to recognize and address the competing interests of his clients, we do not view his conduct as deceitful. We accept his testimony that he believed M2 was performing well at the time he committed the Insurance Trust to the loan and equipment lease. In fact, we heard evidence that most payments on the loan and lease were made to the trust in a timely manner and, in the event M2 missed a payment, Respondent contributed the funds to the trust. Approximately eighteen months after the transaction, at a time when Respondent had not recouped any of his own personal investment in the company, he arranged for the Insurance Trust to be repaid in full. Based on the foregoing, we do not believe the Administrator proved by clear and convincing evidence that Respondent engaged in dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4).

PAGE 21:

**XI. Respondent is charged in Count III with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute.**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

Ultimately the Zgonina Insurance Trust was repaid for the loan and equipment lease to M2. Therefore we do not find that Respondent's breach of fiduciary duty and representation of competing interests tended to defeat the administration of justice or bring the legal profession into disrepute.

### Count IV

### (Purchase of Stock in Virtual Sellers)

**XII. Respondent is charged in Count IV with breach of fiduciary duty**

### A. Admitted Facts and Evidence Considered

Count IV of the Complaint realleges the allegations of Counts I through III and therefore we consider the evidence as to those counts along with the following admitted facts and evidence.

In or about the late 1990s, Dennis Sinclair founded an internet e-commerce company known as Virtual Sellers, and then served as president of that company. Respondent testified he drafted a trust agreement for Sinclair at some point, but the agreement was never executed and Respondent was not paid for his time. In a prior sworn statement, Respondent stated he performed work for Sinclair during the time he worked for the law firm Burke Warren, which was from November 2000 to January 2006, but noted Sinclair was no longer with Virtual Sellers at the time. Respondent also reviewed a lease for Sinclair in connection with a facility that Virtual Sellers was interested in leasing. Respondent recalled that Burke Warren represented

PAGE 22:

Virtual Sellers prior to the time Respondent joined that firm. Respondent denied performing any legal work for the company. (Ans. par. 37; Tr. 984, 1013. Adm. Ex. 106).

Respondent made a personal investment in Virtual Sellers, a publicly traded company, or its predecessor by purchasing stock on several different occasions, including a $10,000 investment in the late 1990s. With respect to each purchase, he subsequently sold his shares at a gain. He testified that by March 30, 2001 he held no interest in Virtual Sellers, as he had sold his shares prior to that time. (Tr. 983-86, 1051).

Section 7.1 of the Zgonina Insurance Trust provides that the trustee shall have power to invest the trust estate in stocks of corporations. On or about March 30, 2001, Respondent issued check number 141 from an account at Bank One entitled "Casimir H. Zgonina 2000 Insurance Trust" to purchase stock in Virtual Sellers in the amount of $25,000. The $25,000 purchase price reflected the trust's purchase of 100,000 shares of stock at 25 cents per share. Respondent denied gaining anything from the trust's investment in Virtual Sellers, and denied that his work for Sinclair influenced his decision to purchase the stock on behalf

of the trust. At the time he made the purchase, he thought the company was doing well. Sometime later, when he was no longer trustee of the Insurance Trust, the value of the stock sank to zero. (Tr. 172, 984-86, 1051; Adm. Exs. 1, 13, 19).

At the time the Zgonina Insurance Trust purchased $25,000 of stock in Virtual Sellers, Respondent did not advise Donna Zgonina of the purchase or that she should seek independent legal advice regarding the purchase. Zgonina testified she was never advised by Respondent that he owned stock in Virtual Sellers or that he had performed legal work for Sinclair. (Ans. par. 41, 42; Tr. 120).

PAGE 23:

## B. Analysis and Conclusions

Respondent's investment in Virtual Sellers on behalf of the Zgonina Insurance Trust was within the powers he was granted as trustee. As shown previously, however, even if Respondent was acting within the authority given to him as trustee, we must determine if he breached his overriding fiduciary duty to act with loyalty and fidelity with respect to the trust. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009; *Home Fed. Savings & Loan Ass'n v. Zarkin*, 89 Ill. 2d at 239; *Winthrop*, 219 Ill. 2d 526.

We heard evidence that Respondent, at one time, owned shares in Virtual Sellers. He testified, and the Administrator did not prove otherwise, that when he purchased shares of Virtual Sellers on behalf of the Zgonina Insurance Trust in March 2001, he had no personal interest or ownership in Virtual Sellers.

Likewise, we received no evidence that Virtual Sellers was a client of Respondent, or of Respondent's firm, at the time of the stock purchase in March 2001. Respondent testified he had drafted a trust agreement for Sinclair and performed other work for which he was never compensated, but the time frame of those representations was not clearly established. He also acknowledged that his law firm had done work for Virtual Sellers prior to his joining the firm, but we were not presented with any clear evidence of a continuing attorney/client relationship.

Because the Administrator did not prove Respondent had any ownership interest in Virtual Sellers or that he was representing the company or its founder at the time he purchased stock on behalf of the Zgonina Insurance Trust, we find he did not breach any fiduciary duty of loyalty or fidelity with respect to Zgonina or the trust.

PAGE 24:

**XIII. Respondent is charged in Count IV with representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) and representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

We find these charges were not proved by clear and convincing evidence. Because no dual representation was established, we find Respondent did not represent a client where the representation of that client was

directly adverse to another client in violation of Rule 1.7(a).

We were not presented with clear and convincing evidence that Respondent, at the time he purchased stock in Virtual Sellers for the Zgonina Trust, was limited by any responsibilities to Virtual Sellers. He was not representing that company, nor did the evidence show that he had any allegiance to Sinclair or any personal stake in the transaction. Therefore we find he did not represent a client where the representation of that client may be materially limited by his responsibilities to another client or to a third person, or by his own interests in violation of Rule 1.7(b).

**XIV. Respondent is charged in Count IV with failing to explain the implications of the common representation and the advantages and risks involved, when representing multiple clients in a single matter in violation of Rule 1.7(c)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

Because Respondent was not representing multiple clients in a single matter, he did not have any obligation to explain the implications of any common representation or the advantages and risks involved, and therefore did not violate Rule 1.7(c).

PAGE 25:

**XV. Respondent is charged in Count IV with engaging in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

The evidence did not establish that Respondent's actions were dishonest in any way. He did not derive any profit from the trust's investment in Virtual Sellers, and he had valid reasons for purchasing the stock, that is, the gain he realized on his personal investment and his belief that the company was doing well. We find therefore that Respondent did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)

**XVI. Respondent is charged in Count IV with engaging in conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

We have found no breach of fiduciary duty or violation of any Professional Rule with respect to Respondent's purchase of shares of Virtual Sellers on behalf of the Insurance Trust. We believe his actions

were proper pursuant to the terms of the Insurance Trust, and therefore we do not find that his conduct tended to defeat the administration of justice or bring the courts or legal profession into disrepute.

Having determined that there was a failure of proof as to the charges of Count IV, we recommend that those charges be dismissed.

PAGE 26:

## Count V

## (Payment from Sanial Trust to Zgonina Trust)

**XVII. Respondent is charged in Count V with conversion and dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

Count V of the Complaint realleges the allegations of Counts I to IV and therefore we consider the evidence as to those Counts along with the following admitted facts and evidence.

### A. Admitted Facts and Evidence Considered

### Respondent's actions with respect to the Sanial Trust prior to August 2002

Between 1979 and 1990 Respondent drafted wills, and codicils thereto, for Arthur Sanial and his wife Mignon Sanial, who were residents of New York. On July 21, 1996, Mignon died. After bequests and distributions, Mignon's monetary assets, which totaled approximately $1,104,432, poured into a residuary trust ("Sanial Trust"), the terms of which provided that, upon Arthur's death, the assets of the trust were to be distributed to seven trust beneficiaries, all of whom were Sanial family members. On December 1, 1998, Arthur died. (Ans. par. 46, 47, 48; Tr. 231).

At all relevant times, Respondent served as the executor of both Mignon's estate and Arthur's estate, was the attorney for the respective estates, served as the trustee for the Sanial Trust, and was also the attorney for the Sanial Trust. Respondent was previously married to one of Arthur Sanial's granddaughters, who was a beneficiary of the Sanial Trust. (Ans. par. 49, 50; Tr. 236, 295-96, 853, 969).

Mary Jane Houston, a resident of New York, is one of two grandchildren of Arthur Sanial and is a beneficiary of the Sanial Trust. Prior to 2000 she asked Respondent for an accounting of the Sanial Trust, but did not receive one. Arthur Yackel, also of New York and the nephew of Arthur Sanial and a beneficiary of the Sanial Trust, testified he repeatedly contacted Respondent between 2000 and 2002 regarding the value of the Sanial Trust and the length of time it was

PAGE 27:

taking to probate Arthur Sanial's will, and made repeated requests for accountings. Yackel stated that Respondent had total control of the finances and never provided any information. (Tr. 230, 232, 240-43, 293-95, 297; Adm. Ex. 69).

As noted in Count III, between June 1999 and October 2000 Respondent wrote several checks on Sanial Trust accounts either to or for M2 Industries purportedly to cover the company's expenses, without advising the trust beneficiaries of those payments. He did not maintain a separate ledger for those payments, and testified he would have to review the checks to determine the total amount paid. On September 10, 2001 he

issued a check for $6,925.27 on a Sanial Trust account payable to the Zgonina Insurance Trust, with the notation "loan M2" on the memo line. Respondent acknowledged he did not open all of the bank statements and correspondence related to the Sanial Trust, but stated he generally knew what was in the trust accounts. (Tr. 870-73, 877-79, 883, 953-54, 1060; Adm. Exs. 47, 93, 94).

## Respondent's actions with respect to the Zgonina Insurance Trust prior to August 2002

In 2001 and early 2002 Donna Zgonina attempted to obtain from Respondent an accounting of transactions with respect to the Zgonina Insurance Trust, including checks written from the trust account. She received a list of the trust's holdings from Respondent in June 2001, a binder with information in September 2001, and then several letters with additional information, but she did not receive answers to all of her questions or sufficient explanations that she could understand. (Tr. 109-10, 117-18, 124-29, 131-33; Adm. Exs. 14, 18, 19, 21, 25, 26, 27).

With respect to the line of credit and equipment lease to M2 Industries (detailed in Count III), Zgonina acknowledged receiving information from Respondent in January and February 2002 regarding the status of payments. She testified she was not comfortable with the M2 investment and wondered why Respondent was loaning trust funds to that company without

PAGE 28:

discussing it with her, and without her approval, when her own company was in need of financial support. She acknowledged she did not ask Respondent about it or express her disapproval at that time. (Tr. 130-33, 162, 167, 173; Adm. Exs. 26-28).

Eventually Zgonina became dissatisfied with Respondent's lack of explanations and in May 2002 she retained a new attorney, Mitchell Goldsmith, to represent both the trust and her company. Goldsmith wanted to identify the assets and investments of the trust and determine if the investments could be liquidated. In reviewing information provided by Zgonina, he was particularly concerned about the loan and line of credit to M2 Industries. On May 9, 2002 Goldsmith sent a letter to Respondent requesting records of the trust and corporation, and asking him to resign as trustee of the trust and director of the corporation. (Tr. 133-34, 493-97; Adm. Ex. 29).

Goldsmith did not receive materials from Respondent, and repeated his request in letters dated May 29 and June 10, 2002. In June 2002 Zgonina sent a similar request to Respondent. On June 20, 2002 Respondent responded with a letter stating he was waiting for legal advice regarding his resignation as trustee but he made no mention of the documents pertaining to the trust. Goldsmith recalled sending another request for records in July 2000 and then speaking to Respondent by phone, at which time Respondent briefly outlined the private investments held by the trust, advised Goldsmith he was selling real estate in New York to get Zgonina out of the private transactions, and indicated he would turn over the trust files when the sale was accomplished in several weeks. Goldsmith testified he was pushing Respondent to get out of the M2 loan and equipment lease so the proceeds could be placed in safer investments. He was concerned about the creditworthiness of M2, the fact the company was in arrears as to some of the payments, and the fact the investment was not liquid. Goldsmith acknowledged he did not run a credit check on the company. (Tr. 135, 495-504, 508-509, 517, 520; Adm. Exs. 30-35).

PAGE 29:

## August 2002 Payment from Sanial Trust to Zgonina Trust

On August 5, 2002 Respondent issued a check from a Sanial Trust bank account payable to the Zgonina Insurance Trust in the amount of $281,453.58. On or about that same date. Respondent endorsed the check "Casimir H. Zgonina 2000 Insurance Trust by Thomas W. Murphy, Trustee," and deposited it into an account he held on behalf of the Zgonina Insurance Trust. (Tr. Adm. Ex. 36).

In a letter of August 7, 2002 Respondent advised attorney Goldsmith that transactions had been completed to obtain payment for the Zgonina Insurance Trust's investment in a line of credit and equipment lease; the funds had been deposited into the Insurance Trust account; and an accounting would be provided within days. Goldsmith testified he was pleased to learn of the payment, but noted Respondent did not turn over records in August or September 2002, despite another request. (Tr. 506-508, 517, Adm. Exs. 37, 38).

On October 9, 2002, Respondent forwarded to Goldsmith a binder with records relating to the Insurance Trust, including the M2 transactions, along with a letter stating that $281,453.58 had been deposited into the Zgonina Insurance Trust bank account on August 5, 2002 "as a result of another entity's purchase of the trust's interest in the line of credit, lease and note." Respondent's letter broke down the amount received by the Insurance Trust as follows: $229,543.58 for the line of credit ($222,702.20 for principal and $6,841.38 interest); $33,900 for the equipment lease agreement ($30,000 for the machine and $3,900 for accrued lease payments); and $18,010 for a promissory note ($15,000 principal and $3,010 interest). Respondent acknowledged the latter amount was actually repayment of a $15,000 trustee's fee he had paid to himself from the Zgonina Insurance Trust. He stated he reimbursed the Sanial Trust for the $18,010 payment, and assumed the reimbursement would be reflected in the records

PAGE 30:

from his checking account and the Sanial Trust bank statements. (Tr. 508, 969, 1027-30, Adm. Exs. 39).

Arthur Yackel and Mary Houston each testified they were not informed that Respondent issued a check from a Sanial Trust account in the amount of $281,453.58 to the Zgonina Insurance Trust, and they did not authorize Respondent to make that payment. In August 2002 Houston believed the funds were safe somewhere and earning a small interest rate. She testified that her mother Catherine, with whom she maintained regular contact, never mentioned a check being issued from the Sanial Trust. (Tr. 241, 302-305).

Respondent acknowledged purchasing the M2 loan from the Zgonina Insurance Trust on behalf of the Sanial Trust with money from the Sanial Trust, and stated the investment was within his authority as trustee. Article VIII of Arthur Sanial's will reflects numerous powers were bestow upon the trustee, including the authority to sell and manage property of the trust estate, borrow money, invest the trust estate in stocks, securities, bonds, mortgages, or other types of enumerated assets, and purchase or invest in any business or business interest. (Tr. 978-79; Adm. Ex. 55).

Respondent recalled that at the time of the purchase, M2's business and client list were expanding and the company had substantial receivables. Although M2's cash flow was tight, Respondent believed the investment was a good one and had no reason to believe the company was in financial trouble. He noted that the trust agreement did not require him to provide notice to the beneficiaries or seek pre-approval for any investment. He believed if such a requirement existed, even large trust companies would decline to serve as trustees. Respondent acknowledged he did not advise the Sanial Trust beneficiaries of his relationship with Mobile or M2 before issuing the check for $281,000. He denied deriving any personal profit from the investment he made on behalf of the Sanial Trust. (Tr. 901, 974-75, 979-80, 986-88).

PAGE 31:

Respondent does not believe he converted $281,000 from the Sanial Trust and denied that his purchase of the M2 loan and equipment lease for the Sanial Trust was because Zgonina was questioning his conduct with respect to the Zgonina Insurance Trust. He noted the Zgonina Insurance Trust agreement gave him power to lend funds to M2 and to buy equipment for lease to M2, and the loan was generating monthly payments for the trust. (Tr. 973, 975, 978).

Sometime in or around 2004, M2 Industries went out of business. According to Respondent, the company ran into financial problems and could no longer sell its accounts receivable after a customer refused to pay for a tardy shipment. Respondent acknowledged that while the Sanial Trust had received about ten interest payments, it lost the investment of $281,000. He believes a record of interest payments exists, but he did not review the many boxes of Sanial trust records to locate it. (Tr. 896, 960-61, 976, 978, 987).

### Payments to Sanial Beneficiaries

Between 2003 and 2009 Arthur Yackel sent Respondent letters and e-mails with questions and concerns, but received no information regarding the status of the Sanial Trust. Yackel stated he was never advised as to what Respondent was doing with the trust assets or where they were being held. In 2004 Yackel visited the courthouse in Riverhead, New York and reviewed the Sanial estate file to try to obtain the information Respondent was not supplying. Yackel acknowledged receiving some distributions and, beginning in 2006, quarterly interest payments in amounts between $15,000 and $20,000, but noted that several of the checks for small distributions were returned for insufficient funds. Yackel was very frustrated and discouraged by Respondent's sloppiness and his unwillingness to provide information. (Tr. 244-63, 269-70, 274; Adm. Exs. 70-77, 81-83, 85-87).

In November and December 2009 Yackel's attorney, Ellen Makofsky, sent letters to Respondent and spoke to him regarding a distribution to Yackel and an accounting. Makofsky,

PAGE 32:

who practices in New York, testified that pursuant to the terms of the trust, distributions were at the discretion of the trustee but were to be made in the best interest of the beneficiary. She recalled that when she spoke to Respondent, he agreed Yackel's request for distribution met the criteria set forth in the agreement. Despite Makofsky's requests, Respondent did not make a distribution to Yackel or provide an accounting, but pursuant to a separate request by Makofsky, Respondent did make a distribution to Yackel's daughter. After December 2009, Makofsky provided no further services to Yackel or to his daughter. Yackel was billed for the letters Makofsky wrote to Respondent. (Tr. 281-89; Adm. Ex. 84).

In July 2010 Yackel sent a letter to Respondent expressing his frustration with Respondent's failure to make distributions, and advised Respondent that a new attorney was planning to forward the matter to the ARDC. Yackel then received a check for $57,271.98. When that check bounced, Respondent sent a replacement check in the amount of $57,540.89. Yackel testified he has no idea if he received his full distribution because he never knew the value of the trust, and he does not know if the trust investments suffered any losses because he did not know how the funds were invested. Yackel and his wife were disconcerted and upset by their dealings with Respondent. (Tr. 265-69, 273; Adm. Exs. 88-91).

Mary Jane Houston testified to similar difficulties in obtaining information and distributions from Respondent. Between 2002 and 2008 Houston, along with her husband, made multiple requests for accountings from Respondent regarding trust assets and distributions, but were not able to obtain the information requested. Houston recalled receiving some small distributions over the years, after begging for

Filed July 9

them, and believed some of the checks came from Respondent's own account. She had no knowledge of the trust assets or activity, however, and assumed the funds were sitting quietly in a low interest account. When she requested that Respondent make a monthly distribution of $750 to her mother who had been diagnosed with

PAGE 33:

lymphoma, Respondent made three distributions and then stopped. (Tr. 298-301, 306-308, 310-13, 321, 323; Adm. Ex. 92).

In November 2010 Houston retained New York attorney Bruce Klein to pursue legal action against Respondent for distribution of the trust funds. Klein requested an accounting with specific information regarding trust assets, receipts, expenses and distributions. He recalled that Respondent supplied a spreadsheet and an estate tax return and made a distribution to Houston, but did not provide an accounting. On February 22, 2011 Klein filed a lawsuit in New York for a compulsory accounting. On August 1, 2011, after Respondent failed to file an appearance, failed to file an accounting as directed, and failed to appear in court to show cause why he should not be held in contempt, the court suspended his duties as trustee and executor and ordered him to provide an accounting. Respondent did not comply and a second contempt hearing was set for October 25, 2011, at which time Respondent again failed to appear. Thereafter, the parties reached a settlement agreement whereby Respondent agreed to pay $200,000 plus attorney's fees and Houston agreed not to take any enforcement action with respect to any court order. After the case was settled, the court entered an order holding Respondent in contempt, but Klein has not attempted to enforce that order. (Tr. 192-209, 222-23, 314; Adm. Exs. 54, 56-59, 62, 65, 66).

Klein testified he never saw any account statements or bank statements, but accepted the settlement amount based upon the estate tax return and the information Respondent did provide. He had no knowledge of whether Respondent ever converted funds or had funds in his possession, or whether the trust suffered losses over the years. He noted that after missing a couple of payments, Respondent paid the settlement amount and penalty fees by January 2012. Houston confirmed that she had received her final payment from Respondent. (Tr. 210, 217-18, 315, 322).

PAGE 34:

In February 2012 Klein's firm was engaged by Houston's mother, Catherine Sanial, who also was a beneficiary of the Sanial Trust and who was concerned about the trust assets and distributions. Klein sent a demand letter to Respondent in early March and the parties reached a settlement in May 2012 whereby Respondent agreed to pay $375,000 plus attorney's fees. Klein stated that Respondent has been making payments pursuant to a schedule. (Tr. 211-13; Adm. Ex. 67).

Respondent admitted he never provided the Sanial beneficiaries with an accounting detailing the source and use of proceeds in the trust, and acknowledged that none of the beneficiaries knew the trust lost money, including the $281,000 that was paid to the Zgonina Trust. In a prior deposition he acknowledged the beneficiaries did not know he was investing the trust assets, but at hearing he disagreed with that statement. (Tr. 955-56, 959-60; Adm. Ex. 109).

With respect to reimbursement to the beneficiaries of the Sanial Trust, Respondent testified that a trustee does not have an obligation to repay a trust if an investment by the trustee goes bad. When his bad investment resulted in a loss of money to the Sanial Trust, however, he felt a personal obligation to make the beneficiaries whole because the Sanials were his former relatives. Respondent has been using his personal

funds to repay the beneficiaries. (Tr. 970-71, 987-88, 1018).

Respondent testified he has made repayment as quickly as possible but noted that certain individuals were not entitled to an immediate distribution under the trust agreement. For example, Yackel's portion was to be held for life and Respondent had to obtain approval from his children to make the distribution. Respondent stated his former mother-in-law, Catherine Sanial, is the only beneficiary who has not been repaid in full but he is current in his payments of $10,000 per month plus interest. He acknowledged that Catherine's receipt of funds is dependent on his own financial solvency. (Tr. 970-72, 988, 1030-31).

PAGE 35:

Respondent described a trustee's job as a thankless one and noted he never received a fee as trustee of the Sanial Trust. (Tr. 1018, 979).

### B. Analysis and Conclusions

With respect to the charge of conversion, the evidence showed that during the summer of 2002 Respondent was under mounting pressure to resign as trustee of the Zgonina Insurance Trust, to provide an accounting of the trust's investments and disbursements, and to divest the trust of any investment or business dealings with M2. During that time period he was also serving as trustee of the Sanial Trust and in that capacity had full access to the funds held by that trust, with a history of little or no accountability to the beneficiaries. When Respondent needed funds for the Zgonina trust to cover the M2 transactions, he simply wrote a check from the Sanial Trust to the Zgonina Trust. The check, written for $281,453.58, included $263,443.58 to reimburse the Zgonina Trust for the M2 investments.

Respondent's explanation that he purchased the M2 loan and equipment lease as a legitimate investment for the Sanial Trust simply was not credible. While it is true that the Sanial trust agreement gave Respondent, as trustee, broad authority to make investments, we saw no evidence that the trust received anything in exchange for the funds expended. Respondent presented no documents to reflect Sanial's official purchase of the loan or equipment lease, such as an enforceable assignment of rights or a letter agreement between the trusts. We also saw no documentation of any payments made by M2 to the Sanial Trust after the purported purchase of the loan and equipment lease. We conclude that Respondent did not engage in a valid business transaction on behalf of the Sanial Trust; rather, his primary purpose was to make quick payment to the Zgonina Insurance Trust in order to cover his own actions that were coming under scrutiny.

PAGE 36:

The check issued by Respondent from the Sanial Trust to the Zgonina Insurance Trust also included a payment of $18,010, which Respondent explained was repayment for a $15,000 trustee fee he received from the Zgonina Trust, plus interest. In 2002, however, he had characterized the $18,010 as repayment of a $15,000 promissory note, plus $3,000 interest. Whatever the purpose of the repayment, we find that Respondent's use of funds from the Sanial Trust to repay his own personal debt, without any apparent documentation of that fact for the trust or authority from the beneficiaries, was improper.

Based on the foregoing, we find that Respondent converted $281,453.58 from the Sanial Trust. We also find that his actions were dishonest in violation of Rule 8.4(a)(4). Our finding of dishonesty is based upon Respondent's lack of documentation for the purported investment, his obvious purpose in protecting himself, and his extreme reluctance to turn over information or provide an accounting to the Sanial beneficiaries, despite their repeated requests and the involvement of attorneys. His resistance to an

Filed July 9

https://www.iardc.org/HB_RB_Disp_Html.asp?id=11006

accounting indicates to us that he was attempting to conceal his actions.

### XVIII. Respondent is charged in Count V with breach of fiduciary duty

#### A. Evidence Considered

We consider the evidence summarized in section XVII.

#### B. Analysis and Conclusions

Having found that Respondent engaged in conversion and dishonest conduct, we find that he also breached his fiduciary duties of honesty and good faith. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009, 1013. In addition, by placing his own interests and the interests of the Zgonina Trust ahead of the interests of the Sanial beneficiaries, he breached his fiduciary duty of loyalty and his duty to avoid self-dealing.

PAGE 37:

### XIX. Respondent is charged in Count V with conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and conduct that tends to defeat the administration of justice or bring the legal profession into disrepute

#### A. Evidence Considered

We consider the evidence summarized in section XVII.

#### B. Analysis and Conclusions

Respondent's failure to disclose information to the Sanial beneficiaries resulted in a lawsuit being filed against him. The case was settled, but only after lengthy proceedings during which Respondent failed to abide by court orders and was found to be in contempt of court. We find that conduct to be prejudicial to the administration of justice in violation of Rule 8.4(a)(5).

We also find that Respondent's actions in converting funds and engaging in dishonest conduct tended to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

### Count VI

#### (Martingale property)

### XX. Respondent is charged in Count VI with conversion and failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property in violation of Rule 1.15(c)

#### A. Evidence Considered

#### The Martingale Transaction

Bonita Jozers and Frank Alamprese, husband and wife, have owned and managed commercial and industrial buildings since the mid 1990s. In April 2010 they learned an office building at 300 North Martingale Road in Schaumburg was for sale. The building was attractive because it was almost fully occupied and had an

Filed July 9                                                    https://www.iardc.org/HB_RB_Disp_Html.asp?id=11006

assumable mortgage. Jozers and Alamprese discussed the building with Jozers' mother, Nina Jozers, who was interested in investing in the building and having Jozers and Alamprese manage it. Alamprese contacted a real estate investor, Albert Rossini, and after touring the building, they discussed the formation of a

PAGE 38:

partnership to purchase the building. According to Jozers and Alamprese, the partnership would be comprised of Jozers' mother, who agreed to provide funds from a limited liability company known as Aljo, Rossini, and an unidentified group of investors. Jozers was acting as her mother's representative for the transaction pursuant to a power of attorney. (Tr. 552-62, 601-603, 629-31, 660-61, 666).

Jozers and Alamprese were not very familiar with Rossini. In early or mid-April they contacted Respondent, whose name had been given to them by Rossini, for confirmation that Rossini had the financial ability to make a large purchase. Jozers recalled being assured by Respondent that Rossini had access to large amounts of money, and that Respondent would be the attorney representing the group of buyers. Alamprese also understood that Respondent would be representing all of the purchasers. Neither believed Respondent would be a participant in the transaction other than as attorney. Jozers testified they never signed any agreement with Respondent. (Tr. 564-65, 602, 614, 632-34, 657, 669).

Jozers and Alambrese both recalled informing Respondent that their financial contribution would be coming from Jozers' mother, and that Jozers and her husband planned to manage the property. Although Alamprese talked to Respondent quite often, he acknowledged that Rossini was, to a degree, calling the shots as the deal moved forward. Alamprese stated he was relying on Rossini's and Respondent's experience in the real estate business to close the deal. (Tr. 566, 607, 634, 640, 657, 662-63).

Respondent testified his only role in the Martingale transaction was as a lawyer for Rossini, who he considered to be his client in the transaction. When the Martingale transaction was initiated, Respondent had been representing Rossini in real estate work for about one year. After he began working on the transaction, but before April 29, 2010, he became aware that Rossini had been convicted of a financial crime and had spent time in jail, but he was not aware

PAGE 39:

of the exact circumstances of Rossini's conviction. After discovering Rossini's criminal history, he continued to represent Rossini because closings were being completed without problems. At a sworn statement on April 22, 2010, Respondent stated he understood doing business with a person such as Rossini is not only dangerous but foolish, and he would be very careful about getting involved in a transaction. (Tr. 901-904, 988-89, 1020, 1054; Adm. Ex. 106).

Respondent testified that Alamprese set up a limited liability company known as Aljo, and had his own attorneys. Respondent was aware that Alamprese had filed bankruptcy in Florida and did not want his name to appear in connection with the transaction, but he did not know Alamprese was borrowing money from his mother-in-law until the transaction had progressed. Respondent denied ever meeting or speaking to Jozers' mother. Respondent stated that in addition to Rossini and the Alamprese family, other investors were involved in the Martingale deal at various times. (Tr. 995, 1003-1006, 1061).

Paul Jacknow, a real estate broker, testified he was contacted by Rossini in the spring of 2010 to represent a group interested in purchasing the Martingale office building, which had a listing price of $23,000,000.

When the purchasers, who intended to form an entity known as Hoya, LLC, decided to proceed, Jacknow negotiated a contract with the seller's broker. Jacknow considered himself to be the broker for the buyers and in that capacity wanted to draft the contract and hold the earnest money, but Respondent, who Jacknow identified as the attorney for the buyers, indicated he would handle those matters. Respondent gave no explanation as to why he wanted to hold the earnest money, and Jacknow assumed the funds would be deposited in a law firm escrow account. (Tr. 416-18, 422-26, 475-77).

### Deposit of $75,000

On April 29, 2010 Respondent sent an e-mail to Alamprese, with an attached letter from Rossini to Alamprese which stated, in part:

PAGE 40:

> You have brought the [300 North Martindale] Property to our attention for the purpose of our forming a real estate investment entity, including you as a participant, in the form of an Illinois limited liability company ("LLC") to acquire, own, lease and manage the Property.
>
> . . . .
>
> [I]t is our understanding that we have reached the following agreements with regard to the LLC:
>
>     1. The LLC will be formed between you and your designee, us, and a group of our investors. Each party will be a one-third (1/3) member of the LLC.
>
> . . . .
>
>     4. The LLC shall retain you and your designee to act as the manager and administrator of the Property for so long as the LLC shall own the Property, and shall pay an annual fee for your services of approximately $255,000 . . . .
>
> . . . .
>
> In exchange for your receiving a one-third interest in the LLC and the management of the property you will agree to deposit with our counsel, Thomas W. Murphy, the sum of $75,000 by wire transfer (the "*Deposit*") on or before 5:00 p.m. Thursday, April 29, 2010. The Deposit will be held until the closing of the purchase of the property or as we might otherwise agree. Upon closing the deposit shall represent your equity contribution to the LLC . . . . In the event that the LLC is unable to acquire the building within one hundred twenty (120) days of the date of this letter, the Deposit will be returned to you in full without any charge, offset or interest.

The letter included specific information for wiring the funds to the account of "Thomas W. Murphy, Esq." including an account number at Chase Bank. Respondent acknowledged that the account number provided was a personal account he held with his wife entitled "Thomas W. Murphy and Christine Murphy" ("the Chase account"). (Tr. 569-70, 635-36, 907-908; Adm. Exs 100, 103).

When Alamprese received the e-mail and letter, he showed it to Jozers. On April 29, 2010 Jozers deposited $75,000, which funds were provided by her mother, into Respondent's Chase account. Jozers understood the

funds were to be used for acquisition of a one-third interest in the LLC which was going to acquire the Martingale property. Based on her

PAGE 41:

knowledge that Respondent was the attorney handling the closing and that attorneys maintain escrow accounts for real estate transactions, she believed she was depositing the funds into an escrow account. Alamprese believed the funds were being deposited into an escrow account at Respondent's law firm, and would be held there and not used for anything else. Alamprese notified Respondent after the deposit was made. (Tr. 569-74, 612, 636-40, 668-69, 907; Adm. Ex. 98).

Respondent testified that when $75,000 was deposited into his Chase account on April 29, 2010, the money belonged to Rossini and Alamprese per an agreement between them. He was told by both individuals that the deposit was to be used for due diligence expenses or expenses that Rossini was incurring, and the two had agreed that Rossini could utilize and direct the funds. Respondent has no documents to confirm his understanding of the purpose of the deposit. He testified the funds were not to be held in escrow and, if that had been the case, the funds would have gone into his law firm account. Respondent recalled a conversation with Alamprese during which Alamprese acknowledged knowing that the $75,000 deposit would be utilized. (Tr. 990-91, 1061-66).

With respect to the $75,000 deposit, Respondent testified he acted at Rossini's direction and, with Rossini's permission, disbursed some of the money to himself for his own benefit because he was owed about $75,000 for money he had advanced to Rossini. On April 29, 2010, the date the funds were deposited into the Chase account, Respondent wrote a check from the account for $50,000 payable to cash. He stated Alamprese was aware of that withdrawal. The following day he wire-transferred $10,000 from the account to Rossini's wife, and wrote checks to cash for $13,000 and $9,981. Respondent testified the check for $9,981 was used to purchase a certified check, although that transaction is not reflected in his bank statements. He subsequently testified that the proceeds of all three checks written to "cash," each of which bears

PAGE 42:

his endorsement, were used to purchase cashier's checks that were given to Rossini, and each was written pursuant to Rossini's direction. He denied knowing the purpose of the checks, although he also claimed the money was for due diligence. (Tr. 909-11, 991-93, 1054-55, 1063-64, 1067; Adm. Exs. 103, 104).

Respondent's Chase bank account statement for the period April 21, 2010 through May 20, 2010 reflects that throughout the month additional funds were deposited in the account from Respondent's law firm and other sources, and numerous payments and withdrawals were made in addition to the ones noted. On April 29 2010, Respondent deposited a check for $20,000, which he stated was unrelated to the Martingale transaction, and on April 30, 2010 he deposited a cashier's check for $25,000. On April 30, 2010 he wrote a check for $25,000 to George Johnson of Stifel Nicolaus, and a check for $12,000 to Doug McNicoll for a loan repayment. He stated those checks came from his own personal funds. (Tr. 912-13, 1064-65; Adm. Exs. 103, 104).

### Deposit of $50,000

The purchase and sale agreement for the Martingale property was signed on May 12, 2010. The agreement identifies Hoya Realty Partners, LLC as the buyer, Respondent as attorney for the buyer, and it bears the

signature of Albert Rossini on behalf of the buyer. Respondent testified that Rossini was the only person involved in Hoya Realty Partners. He noted that at some point the purchasing entity was changed to 300 North Martingale Partners, but Hoya Properties was the general partner directing that entity. Respondent is also identified as the attorney for Hoya Realty Partners and 300 North Martingale Partners on other documents relating to the transaction, but he noted his representation of a company does not mean he represented all the stockholders of the company. (Tr. 427, 574-75, 640, 1035-38, 1043-47; Adm. Ex. 99).

PAGE 43:

The day after the sales agreement was signed, Jozers deposited another $50,000 into Respondent's Chase account pursuant to e-mails from Rossini stating that additional funds were needed because the bank was charging a fee to extend the original mortgage on the property. Jozers believed Respondent was copied on the e-mails. Alamprese recalled receiving the information primarily from Respondent and thought the deposit was for escrow in connection with a loan extension. Jozers transferred the funds from her mother's account, with her mother's knowledge. Jozers believed Respondent was holding the money in trust pending the extension of the loan, and that the funds would be returned to her mother. Alamprese notified Respondent when the deposit was made. (Tr. 575-78, 616-17, 641-42; Adm. Ex. 98).

Respondent recalled being notified of the deposit by Rossini and Alamprese. He denied knowing the reason why the funds were transferred or anything about the agreement between Alamprese and Rossini other than, as with the prior deposit, Rossini had the right to use the money. On the day he received the deposit, Respondent wrote a check on the Chase account for $25,000 to World Wide Realty, LLC to repay a personal debt he owed due to a mortgage foreclosure. He stated the $25,000 was owed to him by Rossini as part of a $75,000 debt. (Tr. 914-16, 1065-67; Adm. Ex. 104).

The following day Respondent issued a check to Rossini for $11,170, a check to John Suster for $3,580, a check to AGP Enterprises for $5,000 and a check to PLS Check Cashiers for $5,250. The latter three checks included the notation "Rossini" on the memo line and represented payments to currency exchanges for money owed by Rossini. Respondent acknowledged he had no written instructions from Rossini or other documents to support his withdrawals, and explained he received his directions verbally. Respondent testified that all the disbursements from the $50,000 deposit were made at Rossini's direction or with his permission.

PAGE 44:

Respondent noted he had other funds in his account but did not know what his balance was when he wrote the checks. (Tr. 914-18, 992, 1067; Adm. Ex. 104).

On June 4, 2010 a meeting was held at Respondent's office to discuss the details of the closing. In attendance were Respondent, Jozers, Alamprese, Rossini, Jacknow, as well as the seller, the seller's attorney, and the seller's broker. Respondent acknowledged he acted as the attorney for the buyers at the meeting and did not announce to anyone that he was only representing Rossini. Alamprese recalled speaking privately to Respondent after the meeting to obtain assurances about Rossini and his ability to raise money. Alamprese noted by that point the deal had changed from one involving an assumable mortgage to a due-on-sale closing. (Tr. 579, 644-45, 663-64, 1041-42)

In June and July Respondent corresponded with the seller's attorney in his capacity as attorney for the purchaser, and never stated in his correspondence that he was only representing Rossini. Respondent also communicated, verbally and by e-mail, with Alamprese and Jacknow. On June 17, 2010 Respondent

directed an e-mail to Alamprese and Rossini and attached a revised Limited Partnership Agreement to reflect Aljo's capital contribution of $75,000, and 33.3% interest, in 300 North Martingale Partners. (Tr. 933-34, 1003, 1036-42; Adm. Exs. 99, 100).

The sale of the Martingale property did not close in June or July for various reasons. When the date had to be rescheduled at the buyer's request, Jacknow sent an e-mail to Respondent and Rossini suggesting that the sellers might be reassured if earnest money were placed in escrow. Throughout the summer of 2010, Jacknow was corresponding with both Respondent and the parties to the transaction regarding the status of the sale and the reason for delays. Jacknow recalled the sellers being continually concerned with the postponements and the fact no earnest money had been deposited. Jacknow testified when he sent questions to

PAGE 45:

Respondent by e-mail, Respondent's responses were short and not helpful. He also attempted to reach Respondent by telephone numerous times but only talked to him on a few occasions. (Tr. 435-36, 439-40, 445, 448, 453, 456, 580, 645-46; Adm. Exs. 99, 100).

### Deposit of $150,000

In mid-August 2010 646, 580 Alamprese was advised by Respondent that funds needed to be set aside for a broker's commission, a deposit was necessary before the end of the day, and Respondent wanted to be informed as soon as the deposit was made. Alamprese then told Jozers about his conversation with Respondent. On August 20, 2010 Jozers transferred $150,000 from her mother's account, with her mother's consent, into Respondent's Chase account. Jozers understood the funds were to be held for the benefit of the transaction and would be returned to them. Jozers knew Respondent was at his bank waiting for the deposit and telephoned him as soon as she finished the transaction. She recalled during their conversation Respondent made a request for a loan of $60,000, without disclosing a reason, and promised to repay the loan within a day or two. Although Jozers was hesitant, she loaned Respondent the funds from her mother's account, and Respondent repaid the loan as promised. (Tr. 580-81, 584-86, 606, 613-14, 617-18, 646-49; Adm. Ex. 98).

Respondent acknowledged he was notified by Jozers on August 20, 2010 that another $150,000 had been deposited into his account, but stated he did not know the purpose of the transfer and was not involved in day-to-day conversations or meetings at the building. On the day the deposit was received, Respondent withdrew $57,540.89, with Rossini's permission, to purchase a cashier's check for Arthur Yackel. Respondent admitted he did not have personal funds in his account to cover that withdrawal, but stated his other assets were sufficient. Within the next few days he withdrew funds to purchase a $9,500 cashier's check for Art Feldman, a currency exchange owner to whom Rossini owed money, and a $5,000 cashier's check for

PAGE 46:

Rossini per Rossini's request. Respondent also withdrew $72,000 for Rossini's company Madison Mercantile Corp., which would manage the limited liability company in the Martingale transaction, and made miscellaneous withdrawals and payments totaling $7,382.34. With respect to the miscellaneous or household expenses, he stated those expenses were paid from his and his wife's paychecks. Respondent acknowledged he has no documents that reflect the purpose of the deposit or his authority from Rossini to make the payments. (Tr. 916, 926-28, 993-96, 1068-69; .Adm. Ex. 104).

Respondent denied asking Jozers for a short term loan of $60,000 on August 20, 2010, although his bank statements reflect a deposit of $60,000 into his account on August 20, 2010 from Jozers' mother's account, and he acknowledged writing a check to Jozers' mother for $60,000 on August 23, 2010. Respondent explained the money was not supposed to be in his account and he caused it to be returned to Jozers' mother. He denied spending any of the $60,000. (Tr. 928-30, 1059; Adm. Exs. 103, 104).

### Failure to Close Transaction and Attempts to Recover Funds

Paul Jacknow testified the proposed closing dates for the Martingale transaction came and went, and no hard earnest money was ever deposited. He recalled that his communications with the sellers diminished in the fall of 2010 because he had nothing to tell them. By the end of the year, he and the sellers had given up on the deal. During the time he was working to bring about the closing, Jacknow had no knowledge of any deposits into Respondent's bank account and had no knowledge that Respondent had any role in the Martingale transaction other than as the lawyer for the buyers. He acknowledged that a real estate deal is not considered a deal until the buyer makes a financial commitment by depositing earnest money into escrow. (Tr. 453-60; Adm. Ex. 99).

PAGE 47:

Respondent testified the Martingale deal failed because the investors learned, through Respondent's due-diligence investigation, that the mortgage had a due-on-sale clause. Although Respondent and the seller then attempted to restructure the deal in different ways, the investors were not happy with the risk. With respect to the checks that came into his account, he understood they were not to be held in trust. If the checks were to be held in trust, they would have been deposited into his law firm account. Respondent stated he had Rossini's permission to deposit the checks into his personal account because the money was going to be immediately disbursed. Respondent denied taking any fee from the Martingale deal. (Tr. 998-1001).

In the fall of 2010, Jozers contacted attorney Daniel Herzog because the money deposited with Respondent in connection with the Martingale property and a second property (as detailed in Count VII) had not been returned. According to Jozers, the only money intended to be invested was the original deposit of $75,000, and that amount was to be refunded if the sale was not consummated. The additional deposits were supposed to be refunded in a very short period of time. Jozers denied that she or her mother authorized Respondent or Rossini to use any of the funds deposited into his account for anything other than the real estate transactions. Similarly, Alamprese denied authorizing the use of any of the three deposits made by his wife for anything other than the purchase of the Martingale property. Alamprese understood if the Martingale purchase was not completed, the funds would be returned. Alamprese was never advised that Respondent was receiving a fee or expecting one, and was told he was not receiving a fee. (Tr. 591-93, 599, 615-19, 652-53, 679).

David Herzog, an Illinois attorney specializing in bankruptcy law and commercial litigation, testified that in or about November 2010 he was advised by Jozers that funds belonging to her mother had been deposited with Respondent as earnest money in connection

PAGE 48:

with a real estate transaction and Respondent had not returned the money. Herzog did not review any contracts for the purchase of the property in question. (Tr. 684, 686, 694).

On November 10, 2010 Herzog sent an e-mail and letter to Respondent on behalf of Jozers' mother

demanding the return of $358,000, which Herzog understood was being held in Respondent's escrow account. Herzog then spoke to Respondent, who stated he had to clear the return of funds with Rossini but promised the refund would occur the following week. Herzog recalled that Respondent acknowledged the funds belonged to Jozers, never denied his responsibility for returning the funds, and indicated the funds were in a client trust account. (Tr. 686-92, Adm. Ex. 98).

When Respondent did not return the funds, Herzog sent another letter on November 15, 2010, and Respondent responded with a promise that the funds would be returned very quickly. On November 24, 2010 Herzog sent a letter to the managing partner of Respondent's law firm because Herzog believed the funds were in the firm's trust fund account. He subsequently learned the firm was not holding the funds. Thereafter, Herzog had no further conversations with Respondent, and Jozers retained an attorney to file a civil lawsuit for recovery of the funds. (Tr. 690-93; Adm. Ex. 98).

On June 8, 2011 an action was filed against Respondent and Rossini on behalf of Jozers' mother for the return of funds. In February 2012 a settlement was reached whereby Respondent and Rossini agreed to pay a total of $400,000, in installments, to Jozers' mother. The settlement covered the funds deposited for both the Martingale property and a second property (as detailed in Count VII). As of October 24, 2012, the date of Jozers' testimony, Respondent had made only two $5,000 payments, and none in recent months. Rossini had agreed to repay Jozers' mother $10,000 every month and had paid her a total of $115,000, but was behind in his payments. (Tr. 594-98, 600-601, 626, 654; Adm. Ex. 102).

PAGE 49:

Respondent acknowledged he is obligated to repay $400,000 to Jozers' mother pursuant to their settlement agreement and stated he is currently making payments, but noted Rossini, who is also liable on the total amount, is making the bulk of the payments. Respondent feels obligated for the debt, at least the portion of the funds that Rossini let him use, and his goal is to ensure the debt is paid. He acknowledged that his payments to Jozers are dependent on his own financial solvency. As of November 4, 2012, he had paid approximately $20,000 and Rossini has paid approximately $150,000. Respondent has not initiated any lawsuit against Rossini to recover the payments made by Respondent. (Tr. 961, 1018-19, 1030-31, 1059).

## B. Analysis and Conclusions

Respondent is charged with misconduct relating to funds he received in connection with the anticipated purchase of the Martingale property. Bonita Jozers and her husband Frank Alamprese were interested in managing the property and brought in Jozers' mother to invest funds as one of the purchasers, along with Albert Rossini and others. Three separate deposits totaling $225,000 were deposited by Jozers into Respondent's bank account.

Before discussing those deposits, we address Respondent's suggestion that he represented only Rossini and Rossini's entities. We believe the evidence shows otherwise, as both Jozers and her husband testified they were advised by Respondent at the outset of the transaction that Respondent would be representing all of the purchasers. The April 29, 2010 letter setting forth the agreement between Rossini and Alamprese, which was transmitted to Alamprese by Respondent, made reference to Respondent as "our counsel." Respondent admitted he communicated with the sellers on behalf of all the purchasers and represented the purchasers at a meeting held on June 4, 2010. In determining whether an attorney-client relationship exists, the client's reasonable belief is a significant, if not controlling, factor. *In re Sax*, 03 CH 99, M.R. 22139 (Mar. 17 2008) (Review Bd. at 14). While typically both sides must consent to an

PAGE 50:

attorney-client relationship, consent by the attorney can be implied if the attorney accepts responsibility to perform the tasks at issue. *Sax*, 03 CH 99 (Review Bd. at 14). An attorney-client relationship does not depend on the amount of time the attorney spends with the client, payment of fees, or entry into a formal contract, and is appropriately found where the client reasonably believes the attorney is his or her attorney, the attorney performs functions supporting that belief, and the attorney does not act to disavow representation. *In re Gallo*, 07 CH 110, M.R. 25259 (May 18, 2012) (Hearing Bd. at 19).

While we believe Respondent was representing the entire group of buyers, we note that a finding of conversion is not dependent on an attorney-client relationship. *See In re Stewart*, 05 CH 120, M.R. 22284 (May 19, 2008) (attorney converted escrow funds held for non-clients in connection with loan transactions). Likewise, Rule 1.15(a) requires an attorney to hold property belonging to clients "or third persons" that is in the attorney's possession in connection with a representation separate from his own property

Jozers' first deposit of $75,000 was made pursuant to instructions in a letter forwarded to Frank Alamprese by Respondent. That letter clearly stated that $75,000 was to be deposited in Respondent's account in exchange for a one-third interest in the entity that would purchase the Martingale property, the funds were to be held until closing "or as we might otherwise agree," and if the transaction did not close, the deposit would be returned. Jozers was given instructions for depositing the funds into a Chase bank account for "Thomas Murphy, Esq." Unbeknownst to her, the Chase bank account belonged to Respondent and his wife, and was used for their personal purposes.

Respondent was clearly aware that the funds were intended as a capital contribution to the formation of the LLC and were to be returned if the transaction did not close, as he had forwarded the letter to Alamprese. Within a day of the deposit he expended the funds by writing

PAGE 51:

checks to cash and transferring funds to Rossini's wife. Respondent claimed he was acting at Rossini's direction, that Rossini had authority to direct the disposition of funds pursuant to an agreement with Alamprese, and Alamprese knew about the disposition of at least some of the funds. Other than a vague notion that the funds were used by Rossini for "due diligence," Respondent denied knowing how the funds were actually utilized. We did not receive any evidence that the money was used for the benefit of the Martingale transaction, and we do not give credit to Respondent's testimony.

Respondent's claim that he wrote checks at Rossini's direction and with Alamprese's knowledge was not supported by any other evidence. Jozers and Alamprese, both of whom were credible witnesses, denied authorizing use of the funds for anything other than the purchase of the property, and believed the money was being held in an escrow account. We find it highly improbable that they would consent to Respondent and/or Rossini using funds in a manner contrary to the designated purpose of the deposit, especially when the funds had been contributed by Jozers' mother and were to be refunded if the sale did not close. We also find it extremely unlikely that Jozers would knowingly deposit the funds into Respondent's personal account.

Jozers made two additional deposits into Respondent's account. On May 13, 2010 she deposited $50,000 to cover a fee the bank was charging for an extension of the existing loan on the property. Alamprese recalled receiving that information from Respondent. Jozers thought the information came from Rossini, but recalled Respondent being copied on e-mails. On August 20, 2010 Jozers deposited $150,000 into Respondent's

https://www.iardc.org/HB_RB_Disp_Html.asp?id=11006

account after her husband was told by Respondent that funds were needed to cover the brokers' commissions. As to both deposits, Alamprese and Jozers believed the funds were to be held in connection with the purchase of the property and if the transaction did not close, the funds would be returned to them.

PAGE 52:

Respondent disavowed knowledge of the purposes of the deposits and, as with the first deposit, claimed that his subsequent disposition of the funds was at the direction of Rossini, or with Rossini's permission. Shortly after both deposits were made, he used the funds by writing checks for the benefit of Rossini or for his own personal benefit, including payment of personal debts. As to the checks for Respondent's personal use, he maintained Rossini owed him approximately $75,000 and had approved the checks.

Again, we do not believe Respondent's position is credible. His statement that he was unaware of the purpose of the May 12 and August 20 deposits is contrary to Jozers' and Alamprese's testimony and inconsistent with the fact he was integrally involved in the Martingale transaction and communicating with the seller and brokers on a regular basis. Further, Respondent offered no documents or other evidence to support his claim that he was acting at the direction of Rossini, or that Rossini was authorized to direct the use of the funds. Indeed, it was clear from Jozers' and Alamprese's testimony that Rossini did not have that authority. Whether or not Rossini was giving directions to Respondent (and we heard no testimony from Rossini himself), the evidence shows that Respondent accepted funds for a specific purpose. His subsequent use of the funds for a different purpose, without authorization from the individuals who deposited the funds, was improper.

We heard testimony that Respondent was particularly anxious to receive the third deposit and he was waiting at the bank for notification. On that same day he purchased a cashier's check for Arthur Yackel who, as we saw in Count V, was a beneficiary of the Sanial Trust and had been making repeated requests to Respondent for distributions from the trust. Prior to August 20, 2010 Yackel had received a check from Respondent that was returned for insufficient funds, and had informed Respondent he was turning the matter over to an attorney. The fact that

PAGE 53:

Respondent was in a tight situation and in need of quick access to money is a circumstance we consider in assessing the validity of his explanations.

As to all three deposits, we find the funds were entrusted to Respondent for a specific purpose and by using those funds without proper authorization, he engaged in conversion. In addition he violated Rule 1.15(a) by directing that the funds be deposited into an account where he also deposited his personal funds. Failure to segregate Jozers' funds into a separate and identifiable account placed those funds at risk of being subject to claims by Respondent's own creditors.

**XXI. Respondent is charged in Count VI with engaging in dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).**

### A. Evidence Considered

We consider the evidence previously summarized in section XX.

### B. Analysis and Conclusions

We find that Respondent's actions were dishonest in violation of Rule 8.4(c). We have determined that he had to have been aware of the reasons the three deposits were made by Jozers, and have rejected his explanations for his expenditure of the funds. Further, we give weight to attorney Herzog's credible testimony regarding his contact with Respondent in November 2010, at which time Respondent stated he was holding funds belonging to Jozers and represented that the funds were in a client trust account. Respondent's 2010 acknowledgement to Herzog that he owed money to Jozers is contrary to his testimony at hearing that the funds were expended at Rossini's direction pursuant to Rossini's agreement with Alamprese. We conclude Respondent knew his use of the funds was improper, and adopted various strategies to either conceal his actions or place blame elsewhere.

PAGE 54:

**XXII. Respondent is charged in Count VI with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute.**

As in previous counts, we find that Respondent's conversion of funds tended to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

## Count VII

## (43rd Street property)

**XXIII. Respondent is charged in Count VII with conversion and failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property, in violation of Rule 1.15(a)**

### A. Evidence Considered

Count VII of the Complaint realleges the allegations of Count VI and therefore we consider the evidence as to that count along with the following evidence.

In September 2010 Bonita Jozers, Frank Alamprese, and Jozers' mother learned about an opportunity for Jozers and Alamprese to manage a five-story building at 1929 W. 43rd Street in Chicago. On September 8, 2010 Alamprese received an e-mail from Respondent with an attached letter agreement signed by Bert Rossini whose company, Madison Mercantile Corporation, was purchasing the 43rd Street building. The letter, which is addressed to Jozers' mother, explained the company's need to have up to $300,000 available and on deposit to show to its lender, and stated the funds "shall be held in Madison's attorney's account" and shall be repaid at closing along with an incentive fee of $200,000. The letter further stated if the transaction did not close by October 31, 2010, the funds on deposit would be returned. Respondent's signature appears on the last page of the letter with a statement that he acknowledged "the terms and provisions of the additional deposit of funds." (Tr. 587-88, 649-50; Adm. Ex. 100).

PAGE 55:

Jozers recalled that the amount stated in the letter was later modified and her mother agreed to loan $50,000 to Rossini's company, rather than $300,000, in exchange for an agreement that Jozers and Alamprese would manage the building and the funds would be returned at closing with an incentive fee of $33,000. Jozers deposited $50,000 into Respondent's Chase bank account on September 9, 2010. Alamprese notified Respondent after the deposit was made. (Tr. 589-90, 607, 619-21, 650, 656; Adm. Ex. 104).

Respondent acknowledged sending the September 8, 2010 e-mail with the letter signed by Rossini, but denied the letter set forth the terms of the $50,000 deposit. He pointed out the letter makes reference to a much higher amount and maintained the agreement related to a different part of the transaction. Respondent admitted $50,000 was deposited into his and his wife's bank account on September 9, 2010 in connection with the 43rd Street property, and on that same date he transferred $50,000 from his personal account to another account. Respondent could not recall any information about the account to which the funds were transferred, but he understood the funds were Rossini's to direct and stated the transfer was made at Rossini's direction. He did not believe the funds were to be held in trust, and denied keeping any of the $50,000 for himself. (Tr. 930-32, 997-98, 1001; Adm. Ex. 103).

Jozers denied that she or her mother authorized Respondent or Rossini to use any of the funds deposited into his account for anything other than the real estate transaction. Similarly, Alamprese denied authorizing anyone to use the deposit made by his wife for anything other than the purpose stated in the letter, and noted the funds were to be returned within a few days. Although the sale never closed, Respondent did not return the funds. (Tr. 591, 599, 621, 652-54).

Following the September 9, 2010 deposit, Alamprese attempted to contact Respondent on numerous occasions and left messages with Respondent's secretary, but Respondent did not

PAGE 56:

return the calls. Prior to that time, Respondent would either answer his phone or return calls quickly. Alamprese has not talked to Respondent since September 2010. (Tr. 651-52).

As detailed in Count VI, Jozer contacted an attorney and in 2011 a lawsuit was filed against Respondent and Rossini on behalf of Jozers' mother seeking the return of her funds. Thereafter a settlement was reached, whereby Respondent and Rossini agreed to repay $400,000 to Jozers' mother. Respondent stated he and Rossini together have paid $170,000. (Tr. 1019).

## B. Analysis and Conclusions

Our analysis relating to Count VII is similar to that of Count VI. In September 2010 Respondent sent an e-mail to Alamprese with a letter agreement, signed by Rossini, requesting that funds be placed on deposit with Respondent. The letter specifically stated the funds would be held in Respondent's account and would be returned along with an incentive fee when the transaction closed, or returned if the transaction did not close by a certain date. The day after receiving the e-mail, Jozers deposited $50,000 into Respondent's personal account at Chase Bank. On the same day the funds were deposited, Respondent transferred $50,000 out of his account and into another account. The evidence showed that neither Jozers, Jozers' mother, or Alamprese authorized Respondent or Rossini to use the funds deposited into his account for anything other than the real estate transaction.

We do not accept Respondent's testimony that the deposit was unrelated to the request in the letter he forwarded to Alamprese. Jozers testified otherwise, and the timing of the deposit supports the fact that it was made in response to the letter. Jozers' testimony that her mother agreed to a deposit of $50,000 with an incentive fee of $33,000, rather than a deposit of $300,000 with an incentive fee of $200,000, is entirely credible.

We also reject Respondent's statements that he did not believe the funds were to be held in trust and the funds were Rossini's to direct. Respondent's position and actions are directly

### Kelli Jones

Kelli Jones, president of Gordon Tech College Preparatory, testified Respondent has been a member of the board of Gordon Tech for at least eight to ten years and briefly served as interim president after Jones' predecessor died. Respondent currently serves as general counsel, has served as chairman of the finance committee, and has agreed to teach a class in business law on a pro bono basis. Respondent is trustworthy, honorable and knowledgeable, and rarely charges for any of his services. The allegations against Respondent, unless proven, do not change Kelly's opinion of him. (Tr. 945-51).

### Lawrence Levin

Lawrence Levin, a criminal defense attorney, met Respondent when Respondent was serving as a public defender. Levin testified Respondent has an excellent reputation for honesty, integrity, truth and veracity, and the disciplinary charges do not change his opinion. (Tr. 1023-1025).

### Prior Discipline

The Administrator reported that there are no prior orders or opinions imposing discipline upon Respondent.

### RECOMMENDATION

Having concluded Respondent engaged in misconduct, we must determine the appropriate discipline. In doing so, we consider the purpose of these proceedings, which is not to punish but rather to safeguard the public, maintain the integrity of the profession and protect the administration of justice from reproach. *In re Timpone*, 157 Ill. 2d 178, 623 N.E.2d 300 (1993). Attorney discipline also has a deterrent value in that it impresses upon others the repercussions of errors such as those committed by Respondent in the present case. *In re Discipio*, 163 Ill. 2d 515, 645 N.E.2d 906, 912 (1994).

PAGE 61.

In arriving at the appropriate discipline, we consider those circumstances which may mitigate and/or aggravate the misconduct. *In re Witt*, 145 Ill. 2d 380, 583 N.E.2d 526 (1991). In mitigation Respondent cooperated in these proceedings, has been licensed since 1977 with no prior discipline, and presented six witnesses, including two judges, who testified to his reputation for honesty. *See In re Clayter*, 78 Ill. 2d 276, 399 N.E.2d 1318 (1980). In addition, Respondent has served on the boards of educational and other institutions without receiving compensation.

In aggravation, we may consider any harm or risk of harm that was caused by Respondent's conduct. *See In re Saladino*, 71 Ill. 2d 263, 375 N.E.2d 102 (1978) (discipline should be "closely linked to the harm caused or the unreasonable risk created by the [attorney's] lack of care"). The beneficiaries of the Sanial estate and Nina Jozers were harmed financially by losing substantial sums of money and by incurring the expense and inconvenience of hiring attorneys to recoup the funds. *See In re Demuth*, 126 Ill. 2d 1, 14, 533 N.E.2d 867 (1988). As of the date of the hearing, Catherine Sanial and Nina Jozers still had not been fully compensated. Zgonina was harmed to a lesser extent since the Zgonina Insurance Trust was repaid for the amount personally taken by Respondent, as well as for the loan and equipment lease to M2. Still, like the Sanial beneficiaries, Zgonina endured distress and incurred legal fees in seeking an accounting from Respondent. Moreover, the only reason Zgonina was not harmed financially was because Respondent transferred money from the Sanial trust to cover his misconduct against the Zgonina Insurance Trust.

We also consider the fact that Respondent did not engage in an isolated instance of misconduct; rather his

actions reflect a pattern of misdeeds involving several different matters and spanning a considerable time period. *See In re Lewis*, 138 Ill. 2d 310, 562 N.E.2d 198 (1990); *In re Smith*, 168 Ill. 2d 269, 659 N.E.2d 896 (1995). Respondent's misconduct relating to the Zgonina and Sanial trusts occurred in the 2001 to 2002 time period, but efforts to

PAGE 62:

determine the extent of harm extended well beyond that time frame. Respondent then engaged in additional misconduct by converting the Jozer funds over a five month period in 2010.

We turn now to a determination of the appropriate sanction. The Administrator has urged us to recommend disbarment while Respondent's counsel, who faulted Respondent only for his poor investment strategies and failure to be careful, argued that a modest suspension would be appropriate.

We found that Respondent engaged in a variety of misconduct, including converting large sums of money in a dishonest manner, breaching his fiduciary duties, representing competing interests, and failing to safeguard funds. The total amount misappropriated by Respondent exceeded $600,000. The Supreme Court has emphasized that dishonest conversion of funds is particularly serious misconduct. *See In re Blank*, 145 Ill. 2d 534, 555, 585 N.E.2d 105 (1991); *In re Rotman*, 136 Ill. 2d 401, 423, 556 N.E.2d 243 (1990); *In re Stillo*, 68 Ill. 2d 49, 54, 368 N.E.2d 897 (1977). Given the nature and extent of the transgressions in this case and our review of relevant precedent, we agree with the Administrator that disbarment is appropriate.

In *In re Feldman*, 89 Ill. 2d 7, 431 N.E.2d 388 (1982), the attorney converted money from a client's estate to fund a personal real estate transaction. When the attorney could not repay the estate, he converted funds from another estate by forging his client's signature on nine checks. The Court noted that disbarment was "particularly warranted since the conversion and fraud involved were intentional and consisted of a series of improper acts over an extended period of time." *Feldman*, 89 Ill. 2d at 13. Mitigating circumstances in that case, including a lack of prior discipline and payment of restitution, were insufficient to overcome the improper conduct. We note that Feldman's act of taking money from one estate to repay another was similar to Respondent's conversion of Sanial Trust funds to pay off the Zgonina Trust, and his subsequent conversion of Jozer funds to pay a Sanial beneficiary.

PAGE 63:

The following cases, in which attorneys converted substantial sums of money and engaged in dishonest conduct, also resulted in disbarments. In *In re Levin*, 04 CH 133, M.R. 20236 (Sept. 26, 2005), the attorney converted $243,000 he was holding in escrow for a client. The misconduct took place over a four-year period, during which time he lied about the matter to his client and falsified bank records. The attorney had no prior discipline and made partial restitution. In *In re Menegas*, 03 CH 106, M.R. 21124 (Nov. 17, 2006) (Review Board's recommended discipline modified by Court) the attorney, who was holding funds in his client trust account in connection with a pending real estate transaction, converted $100,000 by making an unauthorized disbursement to his mortgage company to pay down the property owner's mortgage, and then converted another $300,000 by making unauthorized disbursements to himself and to his business. In addition to converting funds and acting dishonestly, the attorney breached his fiduciary duties as an escrow agent and engaged in improper conflicts of interest. The attorney in *In re Stewart*, 05 CH 120, M.R. 22284 (May 19, 2008) converted more than $200,000 in escrow funds relating to four separate business transactions, breached his fiduciary duties, failed to hold his personal funds separate from the escrow funds, and acted dishonestly. The attorney in *In re Haneberg*, 00 CH 22, M.R. 19673 (Nov. 17, 2004) controlled the assets of two elderly and infirm clients. He was disbarred for intentionally converting over $300,000

from one client and more than $700,000 from the other, breaching his fiduciary duties, overreaching the attorney/client relationship; engaging in conflicts of interest, and engaging in dishonest conduct.

Cases involving less serious misconduct and comparatively smaller dollar amounts are not persuasive to us. For example, in *In re Twohey*, 191 Ill. 2d 75, 727 N.E.2d 1028 (2000), the attorney was suspended for six months for inducing a client to make three loans totaling $40,000 to a corporate client that was experiencing financial difficulties. In *In re Crotty*, 00 CH 73, M.R.

PAGE 64:

17829 (Jan. 29, 2002), the attorney, while acting as trustee of a trust, made unauthorized loans totaling $52,347.30, failed to provide annual accountings, and failed to respond to inquiries from the trust beneficiaries. The attorney was suspended for five months, on consent, for breaching his fiduciary duties, failing to act with diligence, engaging in a conflict of interest, and failing to keep his client informed. The attorney did not engage in any dishonest conduct. In *In re McKenzie*, 2010PR160 (Review Board 2013) (appeal pending), the Review Board recommended a six month suspension where an attorney, while acting as trustee for a family trust, converted $93,700 from the trust and breached his fiduciary duty to the trust beneficiaries. No dishonest conduct was found.

We recognize the presence of mitigating circumstances in this case, notably Respondent's lack of prior discipline and the character witnesses who came forward on his behalf. We do not discount the testimony of those witnesses but, given the severity and number of instances of misconduct, we conclude that the mitigating evidence is simply not sufficient to preclude the harshest of sanctions.

Accordingly, we recommend that Respondent Thomas William Murphy be disbarred.

Respectfully Submitted.

Henry T. Kelly
Adam J. Lysinski
David C. Rudd

PAGE 65:

## CERTIFICATION

I, Kenneth G. Jablonski, Clerk of the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois and keeper of the records, hereby certifies that the foregoing is a true copy of the Report and Recommendation of the Hearing Board, approved by each Panel member, entered in the above entitled cause of record filed in my office on July 9, 2013.

Kenneth G. Jablonski, Clerk of the
Attorney Registration and Disciplinary
Commission of the Supreme Court of Illinois

---

[1] While Zarkin was superseded by a statutory amendment, the holdings regarding fiduciary duties and self-dealing have not been overruled. *See Slovick v. All American Bank of Chicago*, 163 Ill. App. 3d 741, 516

N.E.2d 947 (1st Dist. 1987).

[2] Although Supreme Court Rule 770 is not referenced in this charge, we note that the charge reflects language found in that Rule. In *In re Thomas*, 2012 IL 113035, para. 92, the Court held that Rule 770 is not itself a Rule of Professional Conduct and "one does not violate Rule 770." Although Thomas precludes charging a "violation" of Rule 770, there is still an open question of whether Thomas precludes charging an attorney under common law with engaging in conduct which "tends to defeat the administration of justice or bring the courts or the legal profession into disrepute." *See e.g. In re Terronez*, 2011PR00085 (Hearing Bd. at 19-21) (final disposition pending). Accordingly, we have addressed the merits of this charge in each count. We also note, however, that our ultimate recommendation in this case would not change even if we dismissed the charge pursuant to Thomas.

PAGE 57:

contrary to the language of the letter, which stated that the funds would be held in Respondent's account and would later be returned to Jozers' mother.

We find that Respondent, by allowing Jozers to deposit funds relating to a real estate transaction into his personal account, failed to hold property of clients or third persons separate from his own property in violation of Rule 1.15(a). He then converted the funds when he transferred the funds out of the account without proper authorization.

**XXIV. Respondent is charged in Count VII with engaging in dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).**

### A. Evidence Considered

We consider the evidence previously summarized in section XXIII.

### B. Analysis and Conclusions

We find that Respondent's conversion of the funds he was holding for Jozers was deceitful. He acted in direct contravention to the terms spelled out in the September 2010 letter he forwarded to Alamprese, and his explanations for his actions were unconvincing. As stated with respect to Count VI, in the fall of 2010 Respondent acknowledged to attorney Herzog that he was holding the funds in his client trust account. His testimony at hearing that the funds were intended for a purpose other than what was stated in the letter, and that he was authorized by Rossini to transfer the funds, was not believable. We conclude, therefore, that Respondent engaged in dishonesty, fraud, deceit and misrepresentation in violation of Rule 8.4(a)(4).

**XXV Respondent is charged in Count VII with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute**

### A. Evidence Considered

We consider the evidence previously summarized in section XXIII.

PAGE 58:

### B. Analysis and Conclusions

As noted previously, Respondent's dishonest conversion of funds tends to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

## ADDITIONAL EVIDENCE IN MITIGATION AND AGGRAVATION

### Robert Tepper

Robert Tepper, attorney for Donna Zgonina, testified that Zgonina's lawsuit against Respondent and two law firms 87-88 was settled for $375.000 sometime in 2011 78. 92 after several mediation sessions and considerable time spent by Tepper's firm to trace the assets of the Insurance Trust and prepare an accounting. 89 Tepper's law firm received legal fees of $100,000 for its initial representation of the trust, plus one-third of the settlement amount. 78-81 In 2009 Tepper sent a letter to the ARDC regarding Respondent's conduct. 66

### Donna Zgonina

Zgonina testified her share of the settlement did not cover what she paid in legal fees, the matter took over eleven years to resolve, and it was overwhelming. 142 During the time Respondent served as trustee, she never received any interest on any principal as a beneficiary of the trust. 173

### Respondent

Respondent served on the board of Weber High School for two years and on the board of Resurrection Retreat Center for four years, has been a trustee of the Weber Endowment Foundation since 2000, has been on the board of Gordon Tech High School since 2003 and served as the interim president for a short period of time. He was recently appointed by the Archdiocese of Chicago to serve on a board to oversee the finances and development of St.

PAGE 59:

Theresa's grammar school. He has not received any compensation for his involvement in the foregoing organizations. (Tr. 1015-16).

Respondent has coached grammar school and little league sports teams. (Tr. 1017).

### William D. Maddux

William Maddux, presiding judge of the law division of the Circuit Court of Cook County, has known Respondent since 1975 when Respondent was hired to work at Maddux' law firm. Maddux left the firm in 1979 but has kept track of Respondent's career. He believes Respondent has a reputation for being very honest and a person of high integrity. (Tr. 484-87).

### Thomas Hoffman

Thomas Hoffman, a judge of the Illinois Appellate Court and previously a circuit court judge, has known Respondent socially and as a lawyer since the mid-1970s, and believes he has an excellent reputation for honesty and integrity. The disciplinary complaint does not detract from his opinion at this juncture. (Tr. 545-46).

### Stephanie Denby

Stephanie Denby, an attorney specializing in estate planning and tax, worked with Respondent at the law firm of Burke, Warren, MacKay and Serritella, and consulted with him on some client matters. Denby stated that Respondent is an honest man and is known for his integrity. (Tr. 548-51).

### Michael Folan

Michael Folan is retired from the Secret Service, where he served as part of the President's detail for a number of years, and now works in private security. He met Respondent in or about 1991 in connection with an estate matter, and believes Respondent to be an honest man. He has not seen the disciplinary complaint against Respondent, but allegations of conversion would not change his opinion of Respondent. (Tr. 937-41).

PAGE 60:

EXHIBIT  12

IN RE Thomas W. Murphy Rule 2004
FEDERAL BANKRUPTCY DEPOSITION Before U.S. TRUSTEE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS MURPHY                              )
                                          )
        Debtor.                           )   No. 14 B 03922
                                          )


             The 2004 Examination of THOMAS MURPHY,

called as a witness herein, pursuant to Rule 2004 of

the Federal Bankruptcy Code and pursuant to the

Federal Rules of Civil Procedure pertaining to the

taking of depositions for the purpose of discovery,

before NICOLE ABBATE, CSR, within and for the State

of Illinois, at 219 South Dearborn Street, Room 802,

Chicago, Illinois, 60604, commencing at 10:10 a.m.,

on May 23, 2014.

2

1               A P P E A R A N C E S

2

3       OFFICE OF THE UNITED STATES TRUSTEE

4       219 South Dearborn Street

5       Room 802

6       Chicago, Illinois  60604

7       (312) 886-5785

8       By:   Mr. Jeffrey Snell,

9             Mr. Dean Harvalis,

10            Appeared on behalf of

11            The United States Trustee;

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2

3    WITNESS:                                      PAGE:

4    THOMAS W. MURPHY                                  3

5

6                    EXHIBITS MARKED

7     Exhibit 1                                        5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1   (Witness sworn.)

2                   MR. SNELL:  Thank you.  And your name

3   for the record, sir.

4                   THE WITNESS:  Thomas W. Murphy.

5                   MR. SNELL:  Thank you, Mr. Murphy.

6   And we are here for the Rule 2004 examination of

7   Thomas W. Murphy in bankruptcy case number 14-03922.

8   My name is Jeff Snell.  I'm with the Office of the

9   United States Trustee.  Also present here today from

10  the Office of The United States Trustee is Mr. Dean

11  Harvalis.

12                  Now, Mr. Murphy, we just received an

13  e-mail from Jeffrey W. Deer stating "This will

14  confirm that I will be filing a motion to withdraw my

15  appearance from Mr. Thomas Murphy from his Chapter 7

16  bankruptcy."

17                  Is this your intention to retain new

18  counsel?

19                  THE WITNESS:  Yes.

20                  MR. SNELL:  Is it your understanding

21  that Mr. Deer does not represent you in this case?

22                  THE WITNESS:  He said so yesterday.

23                  MR. SNELL:  That was a conversation

24  you had with Mr. Deer?

25                  THE WITNESS:  It was a telephone

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 252 of 441 PageID #:2897
Case 14-03922   Doc 60-2   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
B   Page 5 of 7

5

 1   conversation I had with Mr. Deer.  He said that

 2   because of certain sanction motions against him, it

 3   would be better that I not be represented by him and

 4   that he would be terminating any type of bankruptcy

 5   representation of any clients.

 6                  (Marked Exhibit 1 for ID.)

 7                  MR. SNELL:  Okay.  Mr. Murphy, I'll

 8   just provide you what I've marked as Exhibit 1, which

 9   is an April 23rd letter that was sent to Mr. Deer,

10   which you were cc'd on, at 70 West Madison Street,

11   Suite 1400, that continued this meeting previously --

12                  THE WITNESS:  Yes.

13                  MR. SNELL:  -- from April 25th to

14   today May 23rd for the purpose of permitting you time

15   to find replacement counsel.  Have you attempted to

16   find replacement counsel in the four weeks?

17                  THE WITNESS:  I will decide between

18   two different people within the next week.

19                  MR. SNELL:  Okay.  And then with that,

20   we will continue this examination to June 2nd, 2014,

21   at 1:00 o'clock p.m.

22                  MR. HARVALIS:  What day of the week is

23   that?

24                  MR. SNELL:  That is a Monday.  So it's

25   a week from this coming Monday.  June 2nd at 1:00

```
 1   p.m.  And with that, we'll go ahead and --
 2                 MR. HARVALIS:  Well, Mr. Murphy, does
 3   that date work for you?
 4                 THE WITNESS:  I think so.  But can I
 5   call you, Jeff, and let you know?  I mean, the
 6   time -- the date will work.  The question is is
 7   1:00 o'clock -- because I have hearings and things in
 8   the afternoon or meetings.  But I'm not sure what
 9   time that is.
10                 MR. HARVALIS:  Okay.
11                 THE WITNESS:  But I'll try and switch
12   things around so I can make it convenient.
13                 MR. SNELL:  Very well.  And if
14   1:00 o'clock doesn't work, that date is the only date
15   we have available, but we can be flexible on the
16   time.
17                 THE WITNESS:  That's fine.
18                 MR. SNELL:  So if you would prefer the
19   morning, just let us know in advance because we have
20   to let the court reporter know --
21                 THE WITNESS:  That's fine.  No
22   problem.
23                 MR. SNELL:  -- and line that up.
24                 MR. HARVALIS:  Mr. Murphy, so you're
25   aware, we expect new counsel that you select to be
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 254 of 441 PageID #:2899
Case 14-03922   Doc 60-2   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
B   Page 7 of 7

7

```
 1   able to honor that date because, from our end, we've

 2   continued this quite a bit.  So new counsel, if they

 3   cannot honor that date and they want to change it,

 4   they would have to contact Mr. Snell well in advance

 5   of that date.  I doubt that we would be flexible.

 6                  THE WITNESS:  Okay.

 7                  MR. HARVALIS:  But we will certainly

 8   discuss that.  But it's very imperative from our end

 9   that we proceed.  We've given you time to get counsel

10   because we think it's important that you be

11   represented.  But at some point we will, you know,

12   proceed as we think is appropriate.

13                  THE WITNESS:  Okay.  That's agreeable.

14                  MR. SNELL:  All right.  Well, thank

15   you.  And we'll just continue this then to June 2nd

16   at 1:00 p.m. unless we agree otherwise --

17                  THE WITNESS:  Correct.

18                  MR. SNELL:  -- to the time.  Thank

19   you.

20                  (Which were all the proceedings had in

21                  the above-entitled cause, May 23,

22                  2014, 10:10 a.m.)

23   I, NICOLE ABBATE, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
24   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.
25
```

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS MURPHY                     )
                                  )
        Debtor.                   )   No. 14 B 03922
                                  )


            The continued 2004 Examination of

THOMAS MURPHY, called as a witness herein, pursuant

to Rule 2004 of the Federal Bankruptcy Code and

pursuant to the Federal Rules of Civil Procedure

pertaining to the taking of depositions for the

purpose of discovery, before NICOLE ABBATE, CSR,

within and for the State of Illinois, at 219 South

Dearborn Street, Room 802, Chicago, Illinois, 60604,

commencing at 1:03 p.m., on June 2, 2014.

1                   A P P E A R A N C E S

2

3          OFFICE OF THE UNITED STATES TRUSTEE

4          219 South Dearborn Street

5          Room 802

6          Chicago, Illinois  60604

7          (312) 886-5785

8          By:   Mr. Jeffrey Snell,

9                Appeared on behalf of

10               The United States Trustee;

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                          (Witness sworn.)

2                  MR. SNELL:  Thank you, Mr. Murphy.

3    And today is June 2nd, 2014, and we are here for the

4    continued 2004 Examination of Mr. Thomas Murphy.  And

5    that examination is being conducted in bankruptcy

6    case number 14- 03922.  My name is Jeff Snell.  I'm

7    with the Office of the United States Trustee.

8                  And, Mr. Murphy, if you could just

9    please state and spell your name, for the record.

10                 THE WITNESS:  Thomas W. Murphy,

11   M-u-r-p-h-y.

12                 MR. SNELL:  Thank you, Mr. Murphy.

13   And, Mr. Murphy, do you have an identification card

14   with you today?

15                 THE WITNESS:  I do.

16                 (Document tendered.)

17                 MR. SNELL:  Thank you, Mr. Murphy.

18   And Mr. Murphy has tendered me his Illinois Driver's

19   License ending in 4008.  Thank you, Mr. Murphy.

20                 And, Mr. Murphy, when we continued the

21   examination from last week to today, that was because

22   Mr. Deer is no longer representing you in this

23   matter.  Will you be having replacement counsel

24   represent you after today?

25                 THE WITNESS:  I will.  Not today, no.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 258 of 441 PageID #:2903
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 4 of 60

4

1  He couldn't be here today.  But I will have a

2  replacement counsel.

3              MR. SNELL:  Well, now we've continued

4  this examination, this is the fourth time.

5              THE WITNESS:  We will go forward

6  today.  We can go forward.

7              MR. SNELL:  Your --

8              THE WITNESS:  I'm a lawyer.  I can

9  represent myself, at least for this purpose.

10             MR. SNELL:  Well, your replacement

11  counsel hasn't entered an appearance, has he?

12             THE WITNESS:  No.  No.

13             MR. SNELL:  Okay.  Well, because this

14  is now the fourth time we've scheduled this

15  examination, we will go forward.

16             THOMAS W. MURPHY, WITNESS, SWORN

17                      EXAMINATION

18  BY MR. SNELL:

19      Q    Mr. Murphy, where do you reside?

20      A    20940 Middleton Drive, Kildeer, Illinois.

21      Q    And what is the 70 West Madison Street

22  address?  Is that an office?

23      A    That is an office that I maintain, yes.

24      Q    Is there a business at that location?

25      A    It's called Madison Consulting.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 259 of 441 PageID #:2904
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 5 of 60

5

1      Q      What is your affiliation with Madison

2   Consulting?

3      A      I am the owner.

4      Q      What does it do?

5      A      It's newly-formed and it is involving real

6   estate.

7      Q      What does it do with respect to real

8   estate?

9      A      There are investors who will put up money

10   for purchase of real estate, and the real estate is

11   generally flipped right away.

12      Q      So it purchases and then sells real estate?

13      A      Correct.

14      Q      When did you form it?

15      A      That was formed a month and a half ago.

16      Q      Okay.  Mr. Murphy, are you married?

17      A      Yes.

18      Q      What is your wife's name?

19      A      Christine, with a C.

20      Q      Do you have any children?

21      A      Between us we have seven.

22      Q      And what is the span of their ages?

23      A      The youngest is 25 and the oldest, I

24   believe, is 36.

25      Q      Have you ever testified at a deposition or

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 260 of 441 PageID #:2905
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 6 of 60

6

1   a trial before?

2        A    Yes.

3        Q    Approximately how many times?

4        A    Approximately ten.

5        Q    Okay.  So you're familiar then with

6   depositions?

7        A    Yes.

8        Q    If at any point you don't understand my

9   questions, please just let me know and I'll try to

10   rephrase them.

11        A    Okay.

12        Q    And if at any point you would like to take

13   a break to use the restroom or get a water, just let

14   me know and we'll take a break.

15        A    Okay.

16        Q    I just ask that you finish answering the

17   question that's pending at that time.  Are there any

18   impairments such as medication, illness or anything

19   else that would impair your ability to understand

20   questions and answer them accurately?

21        A    No.

22        Q    Have you ever been convicted of a felony?

23        A    No.

24        Q    Are there felony charges pending against

25   you?

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 261 of 441 PageID #:2906
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 7 of 60

7

```
1        A    Yes.

2        Q    For what?

3        A    I believe it's conversion.

4        Q    Just one charge?

5        A    I think there are four charges in the

6   complaint.

7        Q    Is that state?

8        A    It is state, and it's Cook County criminal

9   court at 26th and California.

10       Q    Have you ever been held in contempt of

11  court?

12       A    Yes.

13       Q    How many times?

14       A    Once.

15       Q    What was the case?

16       A    It was a probate case in New York where I

17  was the executor and trustee.

18       Q    And when was that?

19       A    Three, four years ago.

20       Q    And has that contempt been purged?

21       A    Yes.

22       Q    How was it purged?

23       A    By agreement.

24       Q    Of the parties?

25       A    Yes.
```

 1       Q      And now your -- we just began to cover

 2    this.  Your current employer is called Madison

 3    Associates?  Madison Consulting.

 4       A      Madison Consulting.

 5       Q      And immediately prior to Madison

 6    Consulting, who was your employer?

 7       A      It was the Law Offices of Thomas Murphy.

 8       Q      And how long did you have the Law Offices

 9    of Thomas Murphy?

10       A      From about August of 2013 until May of this

11    year.

12       Q      Was the Law Office of Thomas Murphy

13    entirely you or was anyone else?

14       A      It was just me.

15       Q      And what type of law did you practice?

16       A      Real estate, corporate.

17       Q      And so the affairs of that law office have

18    now been wound up?

19       A      There are some pending matters, but for all

20    intents and purposes they're wound up.

21       Q      What kind of revenue did the Law Office of

22    Thomas Murphy have between August 13 and May of 2014?

23       A      May have reached somewhere between 8- and

24    $12,000 a month before expenses.

25       Q      And before August of 2013 when you had the

```
 1   Law Office of Thomas Murphy, who was your employer?
 2        A    I was of counsel to Berger Newmark &
 3   Fenchel.
 4        Q    And how long were you there?
 5        A    Three years, approximately.
 6        Q    So approximately 2010?
 7        A    Approximately 2010.
 8        Q    Any idea what time of year?  Spring, Fall?
 9        A    February.
10        Q    So as of counsel were you on a salary then
11   or was it just --
12        A    No, it was a draw against what I brought
13   in.  It was a capital income.
14        Q    And what were the ranges for annual
15   compensation from Berger Newmark & Fenchel?
16        A    It was around approximately $144,000 a
17   year, in that range.  Maybe more.
18        Q    Was that your only employer at the time?
19        A    Yes.
20        Q    Your only income source?
21        A    Yes.
22        Q    So prior to joining Berger Newmark &
23   Fenchel, what were your sources of income?
24        A    I was a partner at Pedersen & Houpt.
25        Q    And approximately what years?
```

1       A       2006 to 2010, I believe.

2       Q       Were you an equity partner?

3       A       No.  I was non-equity.  I didn't put up any

4   money.

5       Q       Did you share in the profits?

6       A       I got a salary and there may have been one

7   or two bonuses.  But I -- at this point, I can't

8   recall.

9       Q       And then prior to Pedersen & Houpt, where

10  were you?

11      A       I was an equity partner at Burke, Warren &

12  Serritella.

13      Q       B-u-r-k-e?

14      A       B-u-r-k-e, Warren, MacKay & Serritella.

15      Q       And how many years were you there?

16      A       Again, approximately four to five.

17      Q       So maybe 2001 to 2006, in that time frame?

18      A       Yeah.  That would be approximate.

19      Q       Okay.  Now what's your educational

20  background?

21      A       Where would you like me to start?

22      Q       Post high school.  So you got a bachelor's?

23      A       I got a bachelor's degree in accounting

24  from Georgetown University.  I graduated in 1974.

25  And I graduated from the John Marshall Law School in

1   1977.

2        Q        And upon graduation in 1977, you took the

3   Illinois bar?

4        A        Yes.

5        Q        And so what year were you licensed in

6   Illinois?

7        A        1977.

8        Q        Are you a member of any other bars?

9        A        Yes, the New York bar.

10       Q        And what year did you join that bar?

11       A        I believe it was 1984.

12       Q        And subsequent to your juris doctorate

13   degree, have you done any other education beyond

14   continuing legal education?

15       A        I took some graduate tax courses at John

16   Marshall, but I never completed them.

17       Q        And since beginning your legal practice in

18   1977, did you work in any areas besides real estate

19   and corporate law?

20       A        There was a period of time that I was

21   working for the public defender's office of Cook

22   County, so I was doing criminal appeals.  But,

23   generally, it is real estate and corporate law, yes.

24   I did some non-for-profit.  I represented some

25   religious organizations over the years.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 266 of 441 PageID #:2911
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 12 of 60

12

1        Q    How long were you with the public defender?

2        A    I started the public defender when I was in

3   law school and probably stayed on for another two

4   years after that.

5        Q    Have you ever assisted an entity with

6   filing for bankruptcy protection?

7        A    If it was, it's 20, 25 years ago.  So

8   nothing recently.

9        Q    Have you ever otherwise represented an

10  entity in interactions with the bankruptcy court?  So

11  a creditor or a party in interest or anything like

12  that?

13       A    I have had clients who have been involved

14  as creditors, but I've let other people in the firms

15  that I was with handle that.  I did not handle

16  anything directly myself.

17                 (Marked Exhibit 1 for ID.)

18  BY MR. SNELL:

19       Q    Okay.  And we marked this the last time.

20  Exhibit 1, which was the letter that moved the

21  examination from May 23rd to, I believe, April 25th.

22  And attached to that was the subpoena with rider.

23  And I wanted to just go through that rider as the

24  documents that were produced through Mr. Deer when

25  Mr. Deer was representing you.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 267 of 441 PageID #:2912
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 13 of 60

13

1       A    Okay.

2       Q    And first, the first document requested was

3   a copy of the credit report obtained after

4   January 1st, 2014.  We haven't received a copy of any

5   credit report.

6       A    I gave a copy to Mr. Deer.  I'll have to

7   get -- I'll see if I can pull up another copy.  I had

8   talked to him a week ago and he said he had one.

9   But -- and he told me he had supplied it.  But if

10  you're saying he didn't, I will get one for you.

11      Q    Well, I haven't received it.  So, yes, if

12  you could --

13      A    That's fine.

14      Q    -- obtain one and send it in.  And you

15  could just submit it, a paper copy to the office.  If

16  you could do that within a week, that would be great.

17      A    That would be fine.

18      Q    For copies of

19  financial/bank/investment/brokerage/retirement

20  monthly and quarterly statements, question two, we

21  received documents for an AXA EQUI-VEST IRA account?

22      A    Right.

23      Q    9368?

24      A    There were two EQUI accounts -- or AXA

25  accounts.  And then there was one with DSW (sic)

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 268 of 441 PageID #:2913
Case 14-03922    Doc 60-3    Filed 07/18/14    Entered 07/18/14 09:50:36    Desc Exhibit
C    Page 14 of 60

14

1  Scudder.

2      Q    I'm not sure if we got the DSW Scudder one.

3      A    I -- again, I printed those out myself and

4  I sent them to Mr. Deer. So you should have those.

5  But there wasn't -- for the period of time you're

6  looking for, I don't believe there was any

7  substantial amounts in those because I had taken all

8  the money out, as reflected on my tax returns, and

9  invested it in real estate or used it to pay debts

10  for real estate.

11      Q    Okay. So when you say substantial, I think

12  in the AXA, I think there was less than $1,000?

13      A    I think they were all less than $1,000. At

14  one point there was close to $1 million between the

15  three accounts.

16      Q    What point would that have been?

17      A    Prior to 2009, approximately.

18      Q    All right. And for the tax returns, we

19  received 2010, 2011 and 2012.

20      A    Correct.

21      Q    Has 2013 been filed?

22      A    No, it has not.

23      Q    Have you received an extension?

24      A    Yes.

25      Q    And then the last request was for copies of

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 269 of 441 PageID #:2914
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 15 of 60

15

1   automobile vehicle and property insurance policies in

2   which you had an interest directly or indirectly

3   since 2010.  And we didn't receive any insurance

4   information.

5       A    Again, I supplied that to Mr. Deer.  I will

6   get it for you.

7       Q    Okay.  Yeah.  If you could just make copies

8   of everything, I guess, is probably the most

9   comprehensive way to do this and then you just submit

10  it.

11      A    But you do have copies of my tax returns

12  already?

13              MR. SNELL:  We do have copies of the

14  tax returns.  They weren't the signed tax returns.

15  I'll just go ahead and mark them as Exhibit 2, the

16  2011 return that we received.  And as Exhibit 3, the

17  2012 return that we received.  So these are not the

18  signed copies but --

19              THE WITNESS:  I don't have signed

20  copies.  They're filed electronically.

21              (Marked Exhibits 2-3 for ID.)

22  BY MR. SNELL:

23      Q    Did you supply these to Mr. Deer?

24      A    Yes, I did.

25      Q    And where did you get them from?

| | | |
|---|---|---|
| 1 | A | My brother, who is my accountant. |
| 2 | Q | Okay.  So your brother is James Murphy? |
| 3 | A | Yes. |

4                    (Marked Exhibit 4 for ID.)

5  BY MR. SNELL:

6          Q     And I'll mark as Exhibit 4 just for clarity
7  purposes.  This is what we received that I thought
8  was perhaps --

9          A     This is a -- may I explain it to you?

10          Q     Please.

11          A     This is a car loan.  My wife has a 2010
12  Mariner.  So this is a car loan that is in her name
13  from the Bank of America.

14          Q     Right.  I wasn't sure whether this was
15  inadvertently supplied in place of insurance or...

16          A     No, it was supplied along with insurance.
17  And I believe the other one you're holding is a --

18          Q     Same one.

19          A     Oh, okay.

20          Q     Just my copy.

21          A     There should be another one.

22          Q     We didn't receive anything else.  So he
23  submitted it by e-mail.  So unless one of his e-mails
24  got returned or something.

25          A     Okay.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 271 of 441 PageID #:2916
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 17 of 60

17

1              (Marked Exhibit 5 for ID.)

2    BY MR. SNELL:

3        Q    Okay.  Now, I'll mark as Exhibit -- we're

4    at 5.

5        A    5, yes.

6        Q    As Exhibit 5, the petition that was filed

7    on February 7th, 2014, commencing this bankruptcy

8    case.  And what brought about this bankruptcy case

9    exactly?

10       A    A number of things, as I had some issues

11   with the Attorney Registration and Disciplinary

12   Commission.  I had parted ways with Berger Newmark &

13   Fenchel, so I was on my own.  I also had a number of

14   debts that I had related to real estate deals that I

15   had been involved in previously over the years, which

16   I was trying to pay off but they just became too much

17   to pay.  So my income as an attorney went down, and I

18   wasn't able to meet my obligations.

19       Q    Now, did you review these documents before

20   they were filed?

21       A    I gave Mr. Deer all of the information.

22   Did I see it before it was filed?  No.

23       Q    And now is that just with respect to

24   this -- because all that was filed was a petition and

25   this statement of financial affairs at docket one on

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 272 of 441 PageID #:2917
Case 14-03922    Doc 60-3    Filed 07/18/14    Entered 07/18/14 09:50:36    Desc Exhibit
C    Page 18 of 60

18

1   February 7th.

2       A    My understanding was he filed schedules

3   also.

4       Q    Not on the docket.

5       A    I thought he said he faxed me a copy or

6   e-mailed me a copy of the schedules.  But I will

7   check on that for you too.

8       Q    So did you sit down at any point and review

9   them with Mr. Deer and then sign a declaration?

10      A    No.  What I did was I gave him all the

11  information to complete everything and he told me

12  that he was going to get it filed.  And because he's

13  a friend of mine, he was going to pay the fee.

14      Q    The filing fee?

15      A    Yes.

16      Q    Did you pay him anything for this case?

17      A    No, I did not.

18      Q    Have you paid him anything for any

19  bankruptcy case?

20      A    No, I have not.

21              (Marked Exhibit 6 for ID.)

22  BY MR. SNELL:

23      Q    I'll mark as Exhibit 6 the bankruptcy

24  petition and schedules that were filed in bankruptcy

25  case 13-45386 on November 22nd, 2013.  And in this

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 273 of 441 PageID #:2918
Case 14-03922    Doc 60-3    Filed 07/18/14    Entered 07/18/14 09:50:36    Desc Exhibit
C    Page 19 of 60

19

1    case there were complete schedules and statement of

2    financial affairs filed.  Now, if you can turn to the

3    third page, it will say page 3 of 32 at the top.

4         A    Yes.

5         Q    Signature of debtor.  Is that your

6    signature?

7         A    No.

8         Q    Whose signature is that?

9         A    I believe Mr. Deer signed it on my behalf.

10        Q    Now, Mr. Deer didn't file it, though, did

11   he?

12        A    There were three petitions that were filed.

13   I filed the very first petition.  And I must have

14   screwed it up.  And then Mr. Deer filed a second

15   petition.  This one is marked as Exhibit 6.

16        Q    Right.  If you can turn to page 7 of 32 in

17   Exhibit 6.

18        A    Yes.

19        Q    Whose signature is that?

20        A    It's not my signature.

21        Q    Did you complete the debtor's education

22   course?

23        A    Yes.

24        Q    Where did do you that?

25        A    I did it on-line.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 274 of 441 PageID #:2919
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 20 of 60

20

1     Q     Okay.  Where were you when you took it?

2     A     At my office at 70 West Madison.

3     Q     How long have you had the office at 70 West

4   Madison?

5     A     I've had that since November of --

6   November, October -- November of 2013, I believe.

7   Actually now I take that back.  When I did the

8   on-line course, I was sharing space at 20 North

9   Wacker, Suite 910.  And I did obtain a certificate

10   for the on-line course, which I provided to Mr. Deer.

11     Q     Okay.  If you turn to the very back of this

12   Exhibit 6, page 32 of 32.

13     A     Yes.

14     Q     Is that your signature there?

15     A     It is not.

16     Q     So did you review these schedules before

17   they were filed?

18     A     I provided Mr. Deer with all of the

19   information, copies of invoices, copies of

20   statements, but, no, to be very honest with you, he

21   had been representing me in a number of matters and

22   he had a bunch of the information, and I supplied him

23   the ballots.

24     Q     And when you say copies of invoices, what

25   kind of invoices?

1          A    I had, you know, medical bills.  I mean,

2    bills and things like that that I still owed.  Loan

3    statements that I was liable for.  There were several

4    lawsuits that I had judgments against me for that he

5    was aware of and he had that information.

6          Q    And then what were the statements?

7          A    They would have been loan statements.

8                    (Marked Exhibit 7 for ID.)

9    BY MR. SNELL:

10         Q    Then, lastly, I will mark as Exhibit 7 the

11   petition that was filed on August 21st, 2013, which

12   is case number 13-33363.  And is this your writing on

13   that first page?

14         A    Yes, it is.

15         Q    Is all of it your writing?

16         A    Yes.

17         Q    So the address, everything up in the top

18   left corner, name, address?

19         A    Correct.

20         Q    And the Xs throughout the page, is that

21   your writing as well?

22         A    Yes.

23         Q    And then if we turn to page three of six,

24   is that your signature?

25         A    Yes, it is.

1          Q     And then if you turn to the individual

2     debtor's statement of compliance with credit

3     counseling requirement.  On page five of six, is that

4     your signature?

5          A     Yes, it is.

6          Q     Have you completed the credit counseling

7     before --

8          A     Yes.

9          Q     -- you took this?

10         A     Yes.

11         Q     And then on the back, page six of six, is

12    this your writing?

13         A     Yes, it is.

14         Q     What is this exactly?

15         A     I filed this bankruptcy myself with some

16    advice from Mr. Deer.  And when I filed it, I was

17    told that I had to list the name of one creditor.

18         Q     Just one?

19         A     Well, at that point when I filed it because

20    I wasn't filing schedules at that point.  So I did

21    file World Wide Realty as a creditor.

22         Q     How many creditors do you have?  Do you

23    have any estimate?

24         A     You know, to be very honest with you, I

25    have probably ten or 15 foreclosure suits.  I think

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 277 of 441 PageID #:2922
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 23 of 60

23

1   most of them are completed now.  But I must have --

2   again, an approximate number?

3        Q    Sure.

4        A    25 to 40.

5        Q    Any approximation as to total debt?

6        A    Well, that's hard to say.  And the reason I

7   say that is because the number of foreclosure cases,

8   they have not gone after personal liability.  So

9   there is a question of whether they can or they

10  can't.

11       Q    For a deficiency?

12       A    For a deficiency, yes.  Those were

13  investment properties.

14       Q    Well, assuming they did it for

15  deficiencies, do you have an estimate as to what kind

16  of debt we're talking about?

17       A    Over two and a half million dollars,

18  probably.  Maybe more.

19       Q    And what about without deficiencies?  Is it

20  just credit cards and things of that nature or

21  liquidated debts, judgments?

22       A    Probably a million or more.  Actually,

23  the -- you know, if you go on to the foreclosure

24  cases, it's probably close to 4 million, now that I

25  think of it.  But I just don't know, you know, where

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 278 of 441 PageID #:2923
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 24 of 60

24

1 | there might be liability for personal judgments.

2 |     Q    Now, why did the first two cases dismiss

3 | for noncompliance requirements?

4 |     A    I have no -- the first case got dismissed

5 | because I was following Mr. Deer's advice.  And he

6 | was going to help me with schedules, and I missed the

7 | date.  That's why it got dismissed.  I have no idea

8 | why the second case was dismissed because, as you can

9 | see, I provided him with information for the

10 | schedules and so forth.  I don't know.  But I was

11 | told when that one was dismissed, he was in court and

12 | the judge basically suggested dismiss it and file it

13 | again, and make sure you follow through on it.  But I

14 | was not in court, so I don't know the reason.

15 |     Q    Have you ever attended a 341 meeting of

16 | creditors?

17 |     A    No, I have not.  I believe that is supposed

18 | to be scheduled for June 12th.  I've been asking

19 | Mr. Deer.  He was going to send me the last notice he

20 | got, but I believe it's June 12th.

21 |     Q    So are you planning on attending that

22 | meeting?

23 |     A    Yes, absolutely.

24 |     Q    Now, there hasn't been a complete list of

25 | creditors filed in this case either.

1        A        I was told that he had filed it.  I --
2   again, I don't know.  I will have to check that out.

3        Q        Well, and the clerk's office is on the
4   seventh floor here.  So you could go down there and
5   they have computers with access to the cases.  You
6   can look it up.

7        A        Well, I believe you.  I believe you.  I
8   just have to get the information.  And my new counsel
9   will have to clean it up, I guess.

10       Q        Because right now the creditors don't have
11  notice of that meeting, so...

12       A        I know that there's at least one who has
13  followed this case.

14       Q        Well, there's several that have followed
15  it, to my understanding, because they have filed
16  things in it.  But it's a matter of -- that list of
17  creditors is what the clerk's office uses to give
18  notice of the bankruptcy to all your creditors so
19  that they know.

20       A        I'll have to check with that too.  I
21  apologize.  I thought all of this had been done.

22       Q        Okay.  We'll work off of Exhibit 6 here and
23  the schedules attached to it.  Beginning with
24  Schedule A, which is page 8 of 32, do you have any
25  interest in any real property?

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 280 of 441 PageID #:2925
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 26 of 60

26

```
 1       A     None that hasn't been foreclosed on, no.

 2       Q     So all property you own has been completely

 3   foreclosed on or is in the process of being

 4   foreclosed on?

 5       A     I don't know the exact status of all the

 6   cases, but I believe, yes, that it's all -- any that

 7   has my name on it has been foreclosed on.

 8       Q     Well, do you have any ownership through

 9   somebody else's name?

10       A     No.

11       Q     Now, the 20940 Middleton Drive, Kildeer,

12   Illinois, whose property is that?

13       A     My wife's.

14       Q     And what does your wife do for a living?

15       A     She's an HR manager for a law firm.

16       Q     Which law firm?

17       A     Johnson & Bell.

18       Q     And has it always been held in her name?

19       A     No.  I think it was deeded -- I quitclaimed

20   the interest in 2007 to her.

21       Q     And was there a mortgage against the

22   property when that happened?

23       A     Yes.

24       Q     How much?

25       A     Originally it was $581,250.
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 281 of 441 PageID #:2926
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 27 of 60

27

```
 1        Q    And how much was it in 2007 when you
 2   quitclaimed it?
 3        A    It was in the 520 range, maybe a little bit
 4   higher.
 5        Q    When it was purchased?
 6        A    The house was purchased in 1995, refinanced
 7   in 2003 before that mortgage.
 8        Q    Is there a mortgage on the house at
 9   present?
10        A    Yes.
11        Q    Do you know the approximate amount?
12        A    500 -- A little over 500,000.
13        Q    Are you liable on that mortgage?
14        A    I am liable on that mortgage.  There's also
15   an equity line of credit for 116,000.
16        Q    And what was that equity line used for?
17        A    It was used for real estate investments.
18        Q    When was it drawn?
19        A    2004 through 2005.
20        Q    So was that then used by you for your real
21   estate investments or did your wife have separate
22   real estate investments?
23        A    No, she had no real estate investments
24   whatsoever.
25        Q    5551 through 5553 West Congress, Chicago,
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 282 of 441 PageID #:2927
Case 14-03922    Doc 60-3    Filed 07/18/14    Entered 07/18/14 09:50:36    Desc Exhibit
C    Page 28 of 60

28

1    Illinois, are you familiar with that?

2        A    No, not at all.

3        Q    What about 16621 Lismore Court, Tinley

4    Park?

5        A    No.

6        Q    7516 South Phillips Avenue, Chicago?

7        A    Yes.

8        Q    What's that?

9        A    That was a six-unit apartment building

10   which was purchased, and it was then converted to

11   condominiums.  They were going to be sold and the

12   property was broken into a number of times and

13   basically destroyed.

14       Q    So who owns the property?

15       A    Right now?

16       Q    Yes.

17       A    I have no idea.

18       Q    When were you involved with the property?

19       A    2007, 2008 maybe.

20       Q    And has your interest been terminated?

21       A    Yes.

22       Q    Do you know when and how?

23       A    It was foreclosed on, I believe, by

24   American Chartered Bank.

25       Q    Do you know when, approximately?

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 283 of 441 PageID #:2928
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 29 of 60

29

1        A     No, I'd have to look, Jeff.

2        Q     8926 North Greenwood Avenue, Unit 101, are

3   you familiar with that?

4        A     Not any property of mine.  That was an

5   office that was used by a Harry Gio, who was a

6   partner in Prestige Realty Partners that was -- we

7   were making a series of investments of real estate.

8        Q     His name is Harry Gio?

9        A     G-i-o.

10       Q     And he was a partner in what?  Prestige?

11       A     Prestige Realty Partners, LLC.

12       Q     Who were the other partners in that entity?

13       A     It was just he and I.  He had a group of

14   people who invested money, but no one else was a

15   member of that LLC.

16       Q     And what were the respective membership

17   interests?  Were they 50/50?

18       A     50/50.

19       Q     And is that business or entity still

20   operational?

21       A     No.

22       Q     When did it last have any income or

23   revenue?

24       A     Any revenue, probably 2009.

25       Q     4520 West Jackson Boulevard.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 284 of 441 PageID #:2929
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 30 of 60

30

1        A     Don't know anything about that one.

2        Q     1054 North Drake Avenue?

3        A     1054 North Drake was a two-unit building

4   that was purchased in my name through Prestige Realty

5   Partners, and it ended up being foreclosed on.

6        Q     And what was done with the two units?  Were

7   they rentals?

8        A     They were going to be turned into

9   condominiums.  And they were -- there was some

10  renovation going on.  And, again, it just was never

11  completed.  They were to be rented until they could

12  have been sold.

13       Q     712 Elmgate Drive, Glenview?

14       A     712 Elmgate Drive was a house in Glenview.

15  Again, purchased in my name.  We were going to resell

16  it.  It never got resold and it was foreclosed on.

17       Q     6126 South Ellis Avenue.

18       A     That was, again, an apartment building

19  which was turned into condominiums.  I believe there

20  were eight units.  I owned one of the units.  There

21  were other people who owned the units.  Again, it was

22  property that was broken into, damaged, and never

23  renovated and sold.  It's now -- I believe the

24  Community Reinvestment Group either bought it or they

25  were managing it and it's been sold.

1       Q       6023 South King Drive, Unit 25.

2       A       6023-25?

3       Q       Yes.  It's unit 25.

4       A       Again, that's a six-unit building.  I own

5    two of the units in that building.  They were held in

6    my name.  And, again, they were in foreclosure.

7    Actually one is foreclosed on.  I believe Chase Bank

8    has not foreclosed on the other.

9       Q       And it's in your name?

10      A       They were in my name, yes.

11      Q       Do you know, were they transferred to

12   somebody else's name at some point?

13      A       No.  These were, again, investments that

14   were managed by Prestige Realty Partners.

15      Q       Okay.

16      A       And all the ownership were in individual

17   names.  So I owned two units in that building.

18      Q       And so now that Prestige is not managing

19   them -- or is Prestige still managing the --

20      A       Prestige no longer exists.  None of the

21   properties that Prestige was involved in exist

22   anymore.

23      Q       So what happened to the title?  That's

24   still in your name?

25      A       I believe they're all foreclosed on.  Chase

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 286 of 441 PageID #:2931
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 32 of 60

32

1   Bank may still -- may not have taken title yet to one

2   of the units that was in my name at that building.

3        Q    Do you know what the unit number was for

4   that one?

5        A    I believe that -- I believe I had 1(S) and

6   1(N), which is 1 South and 1 North.  But to tell you

7   exactly which one it is, I don't know.

8        Q    Okay.  1753 North Trip Avenue.

9        A    1753 North Trip Avenue was a law office

10  that was owned by Berger Newmark & Fenchel.  And I

11  had no ownership interest in that building.

12       Q    2015 Racine Avenue.

13       A    It was a piece of property that I was

14  interested in purchasing, but I never purchased

15  because I could never get it financed.  So I had a

16  purchase contract on it, but never culminated.

17       Q    When did you have a purchase contract?

18  What year?

19       A    Actually it was in the name of an LLC,

20  but -- let's see.  This is 2014 to 2012.  Again, it

21  was a piece of property that if we -- if it was

22  purchased, it was going to be flipped.

23       Q    And what was the name of the entity that

24  you were going to purchase it under?

25       A    2015 Racine, LLC.

1      Q     And does that entity have any other

2    activities?

3      A     No.

4      Q     It was formed just for the purpose of

5    trying to purchase that --

6      A     Yes.

7      Q     -- property?  What is that property?  Is it

8    a rental building?

9      A     It was originally a three-unit apartment

10   building which was converted to a single family.

11   It's a gorgeous piece of property, but it was

12   overpriced.

13     Q     So did you ever get possession of it?

14     A     At one point we had a tenant living in

15   there, but it was a person that didn't pay any rent.

16   They were trying to purchase the property, so...

17     Q     So who were you going to be purchasing it

18   from?

19     A     Justin Fox and Ashley Fox.

20     Q     Did you know them prior to looking at this

21   property?

22     A     No, I did not.

23     Q     So they gave you possession of the property

24   when you were trying to get financing?

25     A     Well, it was rental at that point.  And

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 288 of 441 PageID #:2933
Case 14-03922    Doc 60-3    Filed 07/18/14    Entered 07/18/14 09:50:36    Desc Exhibit
C    Page 34 of 60

34

1  there was rent being paid for the person who was

2  living in there.

3      Q    Oh, you just found the tenant then?  Is

4  that...

5      A    Well, we had a couple of people who were

6  going to be living in there.  The person who was

7  supposed to help finance it was going to have an

8  ownership interest in it and it just never happened.

9  I ended up losing a good chunk of dough on it.

10     Q    How much did you lose on it?

11     A    $60,000.  Lost my deposit.

12     Q    So you placed a $60,000 deposit for the

13  purchase of property in 2012?

14     A    No, it was a $20,000 deposit.  And then in

15  order to get out of the -- any liability, I had to

16  pay funds.  So I paid a certain amount of money and

17  I'm -- off the top of my head, I don't remember what

18  it was.  But I paid Mr. Fox money to settle the

19  dispute.  He wanted to sue me.

20     Q    Liability relating to purchase contract

21  and --

22     A    Yes.

23     Q    -- performance?  What was going to be the

24  purchase price of the property?

25     A    It varied because we kept trying to

1   negotiate it.  And we were really talking about

2   flipping it.  It was about a million-eight, I

3   believe, in that -- in that area.  And we were hoping

4   to flip it for about 2.3.

5       Q    And were there any other members of the

6   2015 Racine, LLC?

7       A    No, it was basically me.  It never got off

8   the ground.

9       Q    So were there any other parties that were

10  purchasers under the purchase contract?

11      A    No.

12      Q    Who was the individual that was going to

13  move in that was providing financing or supposed to

14  provide --

15      A    Well, the individual that was going to

16  provide financing was a guy by the name of Bert

17  Rossini.  And he was going to divide -- we were going

18  to share in the profits if we could have flipped it.

19      Q    Have you worked with Mr. Rossini on

20  previous similar deals?

21      A    I've worked with Mr. Rossini on a number of

22  deals.  I don't work with him anymore.

23      Q    So are there any other properties?

24      A    There are a number of other properties that

25  have been foreclosed on.  I mean, I could get you a

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 290 of 441 PageID #:2935
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 36 of 60

36

1  list.  But, again, I supplied with Mr. Deer with a

2  whole list of all of the cases that were pending in

3  Cook County.  And, apparently, it hasn't made it to

4  any of these things that have been filed.  So -- but

5  there may be another six or seven pieces of property

6  or more.

7      Q    Okay.  If you could look at page 9 of 32

8  within Exhibit 6 here.  It's the Schedule B, which

9  calls for personal property.

10     A    Yes.

11     Q    I just want to run through some of these

12  items.

13     A    Sure.

14     Q    Cash on hand.  Do you have any cash?

15     A    A couple hundred dollars.

16     Q    What's the most amount of cash that you've

17  kept at your house or your office within the last two

18  years?

19     A    I usually have somewhere between 4- and

20  $600 in my pocket.  I have less than that right now.

21     Q    Checking and savings or other financial

22  accounts.

23     A    I have a checking account at Bank of

24  America which has got about a little over $600 in it.

25  I have the Law Offices of Thomas Murphy which has $25

1   in a savings account, $69 in a checking account.  And

2   I have $100 in an IOLTA account.

3       Q    Okay.  So those four accounts are all your

4   accounts?

5       A    Yes.

6       Q    And do you have any security deposits with

7   anyone?

8       A    No.

9       Q    What about for the office at 70 West

10  Madison?

11      A    I believe I have a $600 security deposit.

12      Q    What about jewelry, watches, anything like

13  that.

14      A    I have two watches.

15      Q    What kind?

16      A    They're Movados.

17      Q    Both of them?

18      A    Yes.

19      Q    Firearms?

20      A    No.

21      Q    Sporting equipment?

22      A    I have a set of golf clubs.

23      Q    What kind of golf clubs?

24      A    I have no idea.  They're awfully old.

25  They're aluminum shaft clubs --

1      Q     Oh, okay.

2      A     -- if that will tell you how old they are.

3      Q     Yeah, that was a while ago.  I'm a bit of a

4  golf enthusiast.  That's why I ask.

5            Now, do you have any IRA or anything

6  like that besides that --

7      A     I had three IRA accounts, which we've

8  covered before.  Those funds were taken out by me to

9  help pay the debts of Prestige Partners and keep the

10  business going.  So, as of right now I have nothing

11  in an IRA or a rollover account or anything.

12     Q     And have you had anything in an IRA or a

13  rollover account greater than $1,000 in the last two

14  years?

15     A     No.

16     Q     What about stock or interest in

17  incorporated and unincorporated businesses?

18     A     I have none at all.

19     Q     Okay.  Now, entities, that would include

20  entities like this 2015 Racine, LLC.

21     A     That's defunct.

22     Q     Okay.

23     A     It's been dissolved.

24     Q     So since, say, January 1st of 2012, any

25  similar ventures?

1        A       Madison Consulting is the only one, and I

2    put a hundred -- or whatever it costs to incorporate

3    it.

4        Q       Okay.  And where does Madison Consulting

5    get its operating capital to buy and sell properties?

6        A       From investors.  We have not bought and

7    sold any properties yet, just so you know.  We're

8    trying to.

9        Q       So there's just those two then since --

10       A       Right.

11       Q       -- since 2012?  Any kind of bonds or

12   anything?

13       A       No.

14       Q       Does anyone owe you money?

15       A       I have a claim against Berger Newmark.

16   They have a claim against me.  So in my mind, there's

17   like $10,000 that's owed me.  Whether or not I ever

18   get that or we work it out, I don't know.  And then

19   Mr. Rossini owes me approximately $30,000.

20       Q       30,000?

21       A       30- -- yeah, approximately 30.  But I'll

22   never see that either.

23       Q       And why do you say that?

24       A       Because he is virtually penniless, and he's

25   got a number of lawsuits against him for things that

1  he's done. And he's also charged in a criminal case

2  that we talked about before.

3       Q    Do you have any equitable or future

4  interests in life estates?

5       A    No.

6       Q    Do you have an interest in any trust?

7       A    No.

8       Q    Have you set up any trust in the last ten

9  years?

10      A    Well, for estate planning purposes there is

11  a trust. But all of the insurance policies that

12  would have been paid into it have either been

13  borrowed against or lapsed.

14      Q    And what trust is that?

15      A    I think it's the Thomas Murphy Family

16  Insurance Trust. And that was set up 2002, 2003.

17      Q    And how was that to work? I'm not really

18  familiar with -- I mean, I know people set them up.

19      A    Well, it was insurance policies. When I

20  died, the proceeds were supposed to go in there. It

21  provides for my wife, a marital trust/nonmarital

22  trust. So my wife is the primary beneficiary. And

23  then after her death, the seven kids are the

24  beneficiary.

25      Q    And so were those whole life policies then?

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 295 of 441 PageID #:2940
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 41 of 60

41

```
 1       A     They were whole life policies.

 2       Q     But they've all been borrowed against?

 3       A     Yes.

 4       Q     Who were they with?  What companies?

 5       A     I had three or four policies with AXA

 6  Equitable.  And I had one with ING.

 7       Q     When were they borrowed against last?

 8  Let's say most recently.

 9       A     Sometime in 2003.

10       Q     And the insurance trust was established in

11  2002?

12       A     Right.  But, again, it was only -- became

13  effective when I died.

14       Q     Right.  So then are there ongoing monthly

15  payments to those insurance policies.

16       A     There are, but I haven't been making them.

17       Q     When did you last make a payment towards

18  any of the policies?

19       A     There's one policy I'm supposed to be

20  paying $125 a month on.  I think the last payment may

21  have been in February.  I got a notice of lapse on

22  that policy that I have to pay 500-some dollars by

23  June, the middle of June, or it will lapse.

24       Q     Which company is that one?

25       A     It's AXA Equitable.
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 296 of 441 PageID #:2941
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 42 of 60

42

1        Q      And then aside from that, the most recent

2   payment.

3        A      Boy, it's been probably nine or ten months.

4        Q      Nine or ten months.  So ING, when did you

5   last make a payment to ING?

6        A      That would have been sometime in October or

7   November of last year.

8        Q      2013?

9        A      Yeah.

10       Q      So then you say there were three with AXA

11  Equitable?

12       A      Three or four.  I mean, but a number of

13  them have lapsed.

14       Q      Do you have paperwork for all of that?

15       A      In a box.  They're spread in boxes all over

16  the place.  I wasn't very good at keeping great

17  records.

18       Q      Well, if you can assemble the records just

19  at least with the policy numbers and the insurance,

20  the most recent statements.

21       A      Okay.

22       Q      And then the insurance trust.

23       A      Well, the insurance trust is just a

24  document that's been signed.

25       Q      Right.  Boats, motors and accessories?

Default

1          A     I have none.

2          Q     Automobiles, trucks, trailers and other

3     vehicles and accessories?

4          A     I have none.

5          Q     What do you drive?

6          A     I drive a 2009 Lincoln MKZ, which is in my

7     wife's name.  It has been from day one.

8          Q     I think that might have been what that

9     account statement was for?

10         A     No, that one was for a 2011 Mariner.

11         Q     Oh.

12         A     Which is an SUV.  There should have been a

13    Lincoln Automotive Credit statement.  Why don't you

14    turn that over, Jeff.

15         Q     Oh, okay.  I see what you're saying.  Yes,

16    that is a Lincoln Automotive.  Okay.  So there's two.

17    One on each side.

18         A     Yeah.

19         Q     Okay.  This is the 2009 Lincoln MKZ.

20         A     It's got almost 108,000 miles on it.

21         Q     So who makes the monthly payment?

22         A     My wife.

23         Q     From funds that are exclusively hers?

24         A     Yes.

25         Q     So do you have separate bank accounts?

```
 1        A     Yes.

 2        Q     And what about with the mortgage?  How is

 3   that?

 4        A     It hasn't been paid in 11 months.

 5        Q     By either you or your wife?

 6        A     No.

 7        Q     And then what other vehicles do you have in

 8   the household?

 9        A     None.

10        Q     Are you familiar with a 2011 Chevrolet

11   Colorado?

12        A     No.

13        Q     If you look at Exhibit 3, I believe it is,

14   the 2011 tax return.

15        A     Sure.

16        Q     On page two, the refund of $4,403 is going

17   to a bank account ending in 9389.  Whose account is

18   that?

19        A     I believe that was my brother's.

20        Q     And why was it going into his account?

21        A     Because I owed him money.

22        Q     And the same account is where the 2012 tax

23   return refund is going?

24        A     Right.  He was collecting for me and

25   applying it against debt that I owed him.
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 299 of 441 PageID #:2944
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C    Page 45 of 60

45

1      Q     How much do you owe your brother?

2      A     I owe 1500 and probably another $60,000.

3      Q     And what is that from?

4      A     Just because I was short of money and he

5   advanced me money.

6      Q     Continuing with Exhibit 6 on Schedule F,

7   which is page 18 of 32.

8      A     Okay.

9      Q     There's just one creditor listed, say 18 of

10  32 at the top.  That's inaccurate, I gather?

11     A     Oh, yeah.  World Wide Realty had a loan

12  that they gave to -- I signed for Prestige for

13  $200,000.  There's probably $100,000 owed on it.

14     Q     On the loan?

15     A     Yeah.

16     Q     But they have a judgment too, right?

17     A     They do have a judgment, yes.

18     Q     How much is their judgment for?

19     A     $200,000.

20     Q     Now, the statement of financial affairs

21  which starts on page 21, question one, income from

22  employment or operation of business.  That can't be

23  right.  It's checked none?

24     A     Well, at that point the sources of income

25  that I would have had were from the law offices, and

1   it was up and down.  So I -- you know, I did have

2   some income, yes.  Not a lot, because...

3       Q   Well, let's go through the 2011 tax return.

4   Is that --

5       A   Exhibit 2.

6       Q   Exhibit 2.  Okay.  So on this tax return it

7   looks like -- well, on Schedule B for ordinary

8   dividends there's Federal Asset Management

9   Consultants, $83.  What's that?

10      A   That is a corporation that I think I own

11  one share in.  And I owe them money, so whatever gets

12  distributed gets applied to a debt that I have there.

13      Q   How much do you owe them?

14      A   Well, that amount is in question, but it's

15  probably $200,000.

16      Q   And what is that from?

17      A   It's a loan.

18      Q   What was the loan used for?

19      A   Help pay expenses for Prestige.

20      Q   When was the loan drawn or taken?

21      A   2010, maybe.  Unfortunately, I tried to

22  keep Prestige alive or pay as many debts as possible,

23  but it just got way too much.

24      Q   How much is your share valued at?  Do you

25  know?

 1      A      Of?

 2      Q      Of Federal Asset Management Consultants.

 3      A      $10,000.  But they have a lien on that.

 4      Q      Who are the other shareholders that you're

 5 aware of?

 6      A      There's one Jeffrey Krol, K-r-o-l; Thomas

 7 Conrardy, C-o-n-r-a-r-d-y.  And then I don't know who

 8 the other ones are.  At one point I did, but I don't

 9 know.  They've changed.

10      Q      And what does Federal Asset Management

11 Consultants do?

12      A      It was formed -- oh, gosh, before 2000.

13 And what it was was it had a pool trust fund for

14 employee benefit plans.  Doctors put their pension

15 funds in it.  And Mr. Krol runs Federal Assets.  He

16 would make loans, real estate loans or loans to

17 individuals that he represented for a higher return.

18      Q      Is he an attorney?

19      A      No, he's an accountant.

20      Q      And then on the next page for Schedule C?

21      A      Uhm-hmm.

22      Q      It says Thomas W. Murphy, then the business

23 name, T.W. Murphy Legal Title Insurance Services?

24      A      That was Legal & Title Insurance.  At one

25 point I was writing title insurance for Republic

1  Title, where I would get payments.  But this is both

2  legal fees and other fees.

3      Q    Okay.  So this was when you were at Berger

4  and Newmark?

5      A    I was of counsel with Berger Newmark.  I

6  was not a partner.  So this was funds outside of

7  whatever I was bringing in there.

8      Q    Okay.  So that was my question.  So this

9  was in addition to whatever you were making from

10 Berger and Newmark?

11     A    Right.

12     Q    And then on the following page there's an

13 expense of $4,279 for business parking.  Is that for

14 the Lincoln MKZ?

15     A    No.  I had a monthly parking pass downtown.

16 And that would have been the total cost of parking.

17 And I don't -- there's more in that than parking, but

18 I'm not sure exactly what my brother put in there.

19     Q    So do you know which vehicle was placed

20 into service then in January 1st, 2009?

21     A    I was using the Lincoln for business.

22     Q    So then from Berger Newmark, would you get

23 a W-2 or a 1099?

24     A    1099.

25     Q    If you turn to the page that's marked as 14

1   at the bottom.   It's the income or loss from

2   partnerships and S corporations.

3        A     Yes.

4        Q     On lines 28C it says, at risk carryover.

5        A     Yes.

6        Q     What's that?

7        A     That's all losses from Prestige Realty and

8   other entities that I had.

9        Q     Okay.   I see the EIN is the same for

10  Prestige on line 28B and at risk carryover 28C.

11       A     Yes.

12       Q     So you said Harry Gio was your partner at

13  Prestige?

14       A     Yes.

15       Q     And it was 50/50?

16       A     Yes.   But at this point I was funding as

17  much of the expenses that I possibly could, and debt.

18       Q     What's Fascore Institutional?

19       A     Excuse me?

20       Q     Fascore Institutional?

21       A     Where are you looking at?

22       Q     On page 28.

23       A     That has to do with an alternative Fascore.

24  I have no idea, quite frankly.   Maybe that was one of

25  the titles of the pension funds or IRAs that I took

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 304 of 441 PageID #:2949
Case 14-03922 Doc 60-3 Filed 07/18/14 Entered 07/18/14 09:50:36 Desc Exhibit
C Page 50 of 60

50

1  money out of.

2       Q    Okay.

3       A    Because I withdrew everything I had.

4       Q    And then if you turn to page 31.

5       A    Yes.

6       Q    Form 1040, wages received and taxes

7  withheld, statement five.

8       A    Yes.

9       Q    Do you see that?  So Johnson & Bell, the

10  129,058.  Is that your wife's income?

11      A    Yes.

12      Q    None of that is yours?

13      A    No.

14      Q    And the Pedersen & Houpt, 63,781.  Is that

15  entirely yours?

16      A    That is entirely mine.

17      Q    So looking back on that, where would the

18  money from Berger Newmark be in 2011?  Because if the

19  Legal & Title --

20      A    You know what?  Now that I -- Pedersen

21  would have been -- Pedersen paid me money -- the --

22  it should be in schedule C.

23      Q    In the Legal & Title Services?

24      A    Yes.

25      Q    Included in that amount?

1       A       Yes.  It should be, yes.

2       Q       And then looking at, I think this is

3   Exhibit 3, the 2012.

4       A       Yes.  I believe so.  Let me just get it.

5   Yes, it is.

6       Q       And for 2012 on the Schedule C, the Legal

7   Title Insurance Services, or I guess Legal & Title

8   Insurance Services is revenue of 298,413.

9       A       Majority of which is Berger Newmark.

10      Q       Okay.  Approximately what percentage?  Are

11  we talking two-thirds or 90 percent?

12      A       To be very honest, I don't know.  It's

13  probably two-thirds, maybe a little bit more.

14      Q       And it looks like the co-counsel fees on

15  page nine were up to 80,000?

16      A       Right.

17      Q       What was that?

18      A       That would have been title insurance and

19  other expenses where I had referrals from other

20  lawyers or I split title fees with another lawyer.

21      Q       And so it looks like on Schedule E that

22  Prestige Realty Partners, LLC, was still going in

23  2012?

24      A       For tax purposes it is still going.  I

25  still have losses that will be applied in 2013 that

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 306 of 441 PageID #:2951
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 52 of 60

52

1   are carried over.   I mean, I've got a tremendous

2   amount of losses.   That's where most of my pension

3   money went.

4        Q     What's the total that you lost

5   approximately in Prestige?

6        A     22, somewhere in that range.

7        Q     Is Harry Gio active with the entity?

8        A     No.   The entity no longer exists.   I don't

9   know where Mr. Gio is.

10       Q     On Schedule C, the car and truck expenses,

11   it's statement eight, page 26.   It's 18,900 business

12   miles at 55 cents a mile for $10,490.   Is that for

13   you?

14       A     Yes.

15       Q     Now, going back to Exhibit 6, the statement

16   of financial affairs, question four which calls for

17   litigation or suits and administrative proceedings.

18   And it just has -- it looks like the case, it's one

19   other prior bankruptcy -- the case number from one of

20   the prior bankruptcy cases.   Now, Devon Street

21   Investments versus Thomas W. Murphy, 2013 CH 09502.

22   What's that?

23       A     That's a lawsuit that was brought by Burt

24   Rossini against me to account for transactions that

25   he said I was involved in.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 307 of 441 PageID #:2952
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 53 of 60

53

1      Q     So is that his entity?

2      A     It is his entity.

3      Q     What about Bayview Loan Services versus

4   Anthony Johnson, 2013 CH 20123?

5      A     I have no idea what that is.

6      Q     Nina Josers versus Thomas Murphy, 2013 L

7   000628.

8      A     That is a case involving real estate

9   investment that involves Mr. Rossini where

10  Ms. Josers' son-in-law allegedly gave money or his

11  working capital in a deal that never came to

12  fruition. And then we found out it was allegedly her

13  money, not his, and she filed lawsuit. She claimed I

14  was representing her interest and I should have been

15  holding all of the money in escrow. And that's what

16  the criminal case is about too.

17     Q     Now, James Bell versus Thomas Murphy. Is

18  that a personal injury case?

19     A     That's not me.

20     Q     A different Thomas Murphy?

21     A     Yes.

22     Q     Okay. And Robert Badallion versus Thomas

23  Murphy.

24     A     That is a case involving Mr. Rossini's

25  investors from California who, again, were claiming

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 308 of 441 PageID #:2953
Case 14-03922  Doc 60-3  Filed 07/18/14  Entered 07/18/14 09:50:36  Desc Exhibit
C  Page 54 of 60

54

```
 1   that I was their attorney and that I have to account

 2   to them for certain transactions which he did not end

 3   up completing, or he did -- or did not end up

 4   completing.

 5       Q    Have you ever heard of Shorewood Trading

 6   Partners, LP?

 7       A    Yes.

 8       Q    What is it?

 9       A    Again, that was an entity that I was

10   involved in with Mr. Rossini.  He was using Shorewood

11   to invest in real estate.

12       Q    And what was your involvement in the

13   entity?  Did you have any ownership?

14       A    No, I did not.

15       Q    So what was your role?

16       A    I was an attorney.

17       Q    Did you set it up?

18       A    I did.

19       Q    Did you do anything for it after you

20   created the entity?

21       A    I did some work.  I drafted contracts,

22   agreements.  I got them a bank account at American

23   Chartered Bank.  I was a signer on that account.

24       Q    2112 through 2130 South Wolf Road, LLC?

25       A    Yes.  I was the manager of a real estate
```

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 309 of 441 PageID #:2954
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 55 of 60

55

1   entity for a client.  The client was Prospect Airport

2   Services, which does skycap and baggage handling and

3   all kinds of different stuff at 14 or 15 airports

4   throughout the country.  They bought a building which

5   housed their corporate offices and they set up an

6   LLC.  And they did not want anyone at the airport to

7   know that the individuals were the owners.  So I was

8   the manager of that LLC.  I did not have any equity

9   interest in it.  I have since resigned as manager.

10       Q     BRBK Investments, Incorporated.

11       A     Don't have -- oh, that was an entity, again

12   BR is Bert Rossini, BK is Babajan Khoshabe.  They set

13   up an entity.  I had no ownership interest in it.  I

14   set it up for them.

15       Q     Day at a Time Recovery Corporation.

16       A     That is a company that I set up for David

17   Guel, G-u-e-l, who is a -- or was a client of mine.

18   He owned houses in Blue Island, Illinois, where they

19   housed alcoholics that were recovering.

20       Q     Did you have any ownership in that?

21       A     No, I did not.

22       Q     Devon Street Management Company.

23       A     Again, that was a management company owned

24   by Bert Rossini.  I had no ownership interest in it.

25       Q     And when we're going through these when you

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 310 of 441 PageID #:2955
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 56 of 60

56

1  had no ownership interest in it, I'm going to assume

2  that you never had any ownership interest in it when

3  you say that unless you tell me otherwise?

4       A    Correct.

5       Q    Hoya Properties, Limited.

6       A    That was a real estate limited partnership

7  owned by Bert Rossini.  Again, used to contract to

8  purchase certain properties or -- and try to purchase

9  certain properties.  I had no ownership interest in

10 it at all.

11      Q    Market Makers Corporation?

12      A    Market Makers Corporation is a real estate

13 company owned by Thomas Guel.  I have no ownership

14 interest in that at all.

15      Q    RDS Mortgage Corporation.

16      A    RDS Mortgage Corporation is an entity owned

17 by Dennis and Scott Hutera, H-u-t-e-r-a.  They do

18 business in Downers Grove and they're mortgage

19 brokers.  And I have no ownership interest, never

20 had.

21      Q    Did you just set it up for them?

22      A    Yes, I did.

23      Q    Real Estate Modification, Incorporated?

24      A    That was an entity that was going to be

25 doing loan modifications.  Again, it was a Bert

1  Rossini entity.  Did not own any ownership interest

2  in it.

3      Q    Reliant Management, Incorporated.

4      A    That was a management company owned by

5  Anthony Khoshabe, K-h-o-s-a-b-e [sic], who was the

6  son of Babajan K-h-o-s-a-b-e, and a person that was

7  dealing with Bert Rossini.

8      Q    Rockford Commercial, Limited.

9      A    That was an entity owned by Mr. Rossini for

10  purposes of real estate and negotiating mortgages.

11             (Marked Exhibit 8 for ID.)

12  BY MR. SNELL:

13     Q    I'll mark as Exhibit 8 the statement of

14  social security filed.  And it's dated 8/21/2013.  It

15  was filed in the first case.  And is that your

16  signature?

17     A    Yes.

18     Q    And is this your writing on the document?

19     A    Yes.

20             (Marked Exhibit 9 for ID.)

21  BY MR. SNELL:

22     Q    And I'll mark as Exhibit 9, the statement

23  of social security filed in the second case.  It's

24  dated 11/22/2013.  Is that your signature?

25     A    No, it is not.

1      Q     And the first case was filed with this --
2   or, I'm sorry, no.  It was filed with the 130 South
3   Jefferson?

4      A     That was Mr. Deer's address.  He told me to
5   use that address.

6      Q     Do you use that address for other matters?
7      A     I originally used that address when I
8   leased the property at 70 West Madison for the
9   office.  They needed an address at that point, and I
10  was moving from 20 North Wacker, which was a space I
11  shared with Berger Newmark and another law firm.  So
12  I was basically subletting from the other law firm.
13  I didn't have an address that I could use for
14  business purposes at that time.

15     Q     And on Exhibit 8, this social security
16  number, last four 5408, is that your social security
17  number?

18     A     No, it's 5480.

19     Q     Why does it say 5408 on here?

20     A     I have no idea.  It's 5480 is my social
21  security number, the last four digits of my -- and
22  I'm not sure that those numbers are my numbers.

23     Q     What do you mean you're not sure they're
24  your numbers?

25     A     I mean, I signed this.  But, again, I was

1  over at Mr. Deer's office, and I see that the one

2  that he typed on Exhibit 9 has got the wrong social

3  security number.  My social -- last four of my social

4  are 5480.

5       Q    So you don't know why the wrong social

6  security number --

7       A    No, I do not.

8       Q    -- is on all these documents?

9       A    No, I do not.  I'm glad you pointed that

10  out because I didn't know that.  That's got to get

11  corrected.

12       Q    Have you had that occur with any of your

13  other affairs?

14       A    No.  Not to my knowledge.

15            MR. SNELL:  Okay.  Well, I think what

16  we'll do is we'll continue this examination without a

17  date so you can give me those records.  So I know if

18  I need to ask any more questions.

19            MR. MURPHY:  Okay.  That's fine.

20            MR. SNELL:  And if I don't, then we

21  won't resume.  And if I do, then I'll send you a

22  letter and we'll reschedule it.

23            MR. MURPHY:  Okay.  That's fine.  I'll

24  try to get you as much of this that I can next week.

25            MR. SNELL:  Fantastic.  Thank you.

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 314 of 441 PageID #:2959
Case 14-03922   Doc 60-3   Filed 07/18/14   Entered 07/18/14 09:50:36   Desc Exhibit
C   Page 60 of 60

60

1                    (Which were all the proceedings had in

2                    the above-entitled cause, June 2,

3                    2013, 1:03 p.m.)

4    I, NICOLE ABBATE, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
5    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Snell, Jeffrey (USTP)

From:          Jeff Deer <jwdeer@aol.com>
Sent:          Friday, May 23, 2014 10:07 AM
To:            Snell, Jeffrey (USTP)

This will confirm that I will be filing a motion to withdraw my appearance as attorney for Thomas Murphy from his ch 7 bankruptcy

Sent from my iPhone

EXHIBIT <u>13</u>

THOMAS W. MURPHY STATEMENT OF
FINANCIAL AFFAIRS IN 14-BR-03922

B7 (Official Form 7) (04/13)   Case 14-03922   Doc 95   Filed 09/16/14   Entered 09/16/14 14:39:18   Desc Main
Document   Page 1 of 7

## United States Bankruptcy Court
### Northern District of Illinois

**IN RE:**                                                             Case No. **14-03922**

**Murphy, Thomas W**                                                   Chapter **7**

Debtor(s)

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any persons in control of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101(2),(31).

---

### 1. Income from employment or operation of business

None ☐ State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

> AMOUNT   SOURCE
>   0.00   2013:  ($70,901.00);
>          2012:  ($271,324.00) and
>          2011:  ($223,129.00)

---

### 2. Income other than from employment or operation of business

None ☑ State the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

---

### 3. Payments to creditors
#### Complete a. or b., as appropriate, and c.

None ☑ *a. Individual or joint debtor(s) with primarily consumer debts:* List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

None ☑ *b. Debtor whose debts are not primarily consumer debts: List each payment or other transfer to any creditor made* within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $6,255.* If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

*\* Amount subject to adjustment on 4/01/16, and every three years thereafter with respect to cases commenced on or after the date of adjustment.*

None ☑ *c. All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

---

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None ☐ a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Devon Street Investments v. Thomas W. Murphy, 2013-CH-09502 | Complaint To Foreclose | In the Circuit Court of Cook County | judgment entered |
| Chicago Insurance Company v. Thomas W. Murphy, 2012-CH-07937 | Complaint | In the Circuit Court of Cook County | DISMISS ENTIRE CAUSE - PLAINTIFF |
| American Chartered Bank v. Thomas W. Murphy, 2009-CH-09015 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| American Bank Trust Company v. Thomas W. Murphy, 2009-CH-07402 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| American Chartered Bank v. Thomas W. Murphy, 2008-CH-32269 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| Aurora Loan Services v. Thomas W. Murphy, 2008-CH-21898 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| City of Chicago v. Thomas W. Murphy, 2009-M1-672549 | complaint | In the Circuit Court of Cook County | AFFIDAVIT FOR WAGE DEDUCTION FILED |
| City of Chicago v. Thomas W. Murphy, 2009-M1-655747 | complaint | In the Circuit Court of Cook County | CITATION DEFENDANT DISMISSED |
| City of Chicago v. Thomas W. Murphy, 2009-M1-400017 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2008-M1-667510 | Complaint | In the Circuit Court of Cook County | JUDGEMENT ON CITATION |
| City of Chicago v. Thomas W. Murphy, 2008-M1-400424 | Complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2008-M1-400186 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2007-M1-403087 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2005-M1-689135 | complaint | In the Circuit Court of Cook County | CAUSE DISPOSED UPON FILING |
| Nina Jozers v. Thomas W. Murphy, 2014 L 001285 | complaint | In the Circuit Court of Cook County | SUMMARY JUDGMENT - PLAINTIFF - CONTINUED |

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

Case 14-03922    Doc 95    Filed 09/16/14    Entered 09/16/14 14:39:18    Desc Main
Document    Page 3 of 7

| | Complaint | | | |
|---|---|---|---|---|
| Robert Badalian v. Thomas W. Murphy, 2013-L-013464 | Complaint | | In the Circuit Court of Cook County | CASE CONTINUED FOR CASE MANAGEMENT CONFERENCE - ALLOWED |
| Nina Jozers v. Thomas W. Murphy, 2013-L-011907 | complaint | | In the Circuit Court of Cook County | SUMMARY JUDGMENT - PLAINTIFF - CONTINUED |
| Nina Jozers v. Thomas W. Murphy, 2013-L-000628 | complaint | | In the Circuit Court of Cook County | DISPOSED AND RENUMBERED AS A NEW CASE-ALLOWED |
| Nina Jozers v. Thomas W. Murphy, 2011-L-005976 | complaint | | In the Circuit Court of Cook County | DEFENDANT MOTION TO DISMISS W/PREJUDICE - ALLOWED |
| American Chartered Bank v. Thomas W. Murphy, 2009-L-050275 | complaint | | In the Circuit Court of Cook County | JUDGMENT FOR PLAINTIFF |
| American Chartered Bank v. Thomas W. Murphy, 2008-L-007196 | complaint | | In the Circuit Court of Cook County | STRIKE OR WITHDRAW MOTION OR PETITION - ALLOWED |
| Associated Bank National v. Thomas W. Murphy, 2007-L-007800 | complaint | | In the Circuit Court of Cook County | STRIKE OR VACATE AN ORDER - ALLOWED |
| World Wide Realty LLC v. Thomas W. Murphy, 2014-L-050107 | complaint | | In the Circuit Court of Cook County | JUDGMENT ON CITATION |

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

None ☑ b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**5. Repossessions, foreclosures and returns**

None ☐ List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| **Debtor Is Uncertain** | | |

**6. Assignments and receiverships**

None ☑ a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and joint petition is not filed.)

None ☑ b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**7. Gifts**

None ☑ List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**8. Losses**

None ☑ List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

Label Matrix for local noticing
0752-1
Case 14-03922
Northern District of Illinois
Chicago
Mon Sep 22 18:44:49 CDT 2014

Cadles of Grassy Meadows
100 N Center Street
Newton Falls, OH 44444-1321

Deutsche Bank Trust Company Americas, as Tru
c/o Codilis and Associate, P.C.
15W030 North Frontage Road, Suite 100
Burr Ridge, IL 60527-6921

World Wide Realty, LLC
5300 W. Atlantic Ave.
Suite 700
DelRay Beach, FL 33484-8833

U.S. Bankruptcy Court
Eastern Division
219 S Dearborn
7th Floor
Chicago, IL 60604-1702

ARDC
Suite 1500
One Prudential Plaza
Chicago, IL 60601

ARDC
Suite 301
3161 West White Oaks Drive
Chicago, IL 62704-7407

ARDC
Suite 301
3161 West White Oaks Drive
Springfield, IL 62704-7407

American Bank Trust Company
C/O Guerard Kalina Butkus
301 South County Farm Road
Wheaton, IL 60187-4523

American Chartered Bank
C/O Brotschul Potts LLC
230 West Monroe, Suite 230
Chicago, IL 60606-4736

Amex
Po Box 297871
Fort Lauderdale, FL 33329-7871

Anthony G. Barone
635 Butterfield, Suite 145
Oakbrook, IL 60181-4026

Arg
11856 Balboa Boulevard
Granada Hills, CA 91344-2753

Associated Bank National
C/O Jones And Jacobs
77 West Washington Suite 2100
Chicago, IL 60602-2903

Aurora Loan Services
C/O Pierce And Associates
1 North Dearborn, Suite 1300
Chicago, IL 60602-4321
foreclosure
2 12

BLUE LADY INC
C/O NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-3800

Baker And Miller PC
Suite 500
29 North Wacker Drive
Chicago, IL 60606-3227

(p)BANK OF AMERICA
PO BOX 982238
EL PASO TX 79998-2238

Brotschul Potts LLC
230 West Monroe, Suite 230
Chicago, IL 60606-4736

Cadles of Grassy Meadows II, L.L.C.
100 North Center Street
Newton Falls, OH 44444-1321

CarMax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

Cash In Usa
Suite 157
11856 Balboa Blvd
Granada Hills, CA 91344-2753

Catherine Sanial
Box 117
East Setauket, NY 11733-0117

Chase
Po Box 15298
Wilmington, DE 19850-5298

Chase
Po Box 24696
Columbus, OH 43224-0696

Chicago Insurance Company
C/O Wilson And Ellin
1161 West Madison Street, Unit 3S
Chicago, IL 60607-2000

Citi
Po Box 6241
Sioux Falls, SD 57117-6241

City Of Chicago
Law Department
121 North Lasalle Street, Room 600
Chicago, IL 60602-1244

Corporation Counsel
Suite 800
30 North LaSalle
Chicago, IL 60602-3542

Daspin Aument LLP
227 West Monroe
Chicago, IL 60606-5018

Daspin Aument LLP
227 West Monroe Street
Chicago, IL 60606-5018

Devon Bank Documents
C/O Richard L Kruse
7337 North Lincoln Avenue
Lincolwood, IL 60712-1700

Discover Fin Svcs Llc
Po Box 15316
Wilmington, DE 19850-5316

(p)DISCOVER FINANCIAL SERVICES LLC
PO BOX 3025
NEW ALBANY OH 43054-3025

Dr. Vijay H. Vohra, MD
7447 W Talcott Ave Suite 222
Chicago, IL 60631-3713

Dsnb Macys
9111 Duke Blvd
Mason, OH 45040-8999

Federal Asset Management Consultants, Lt
Suite 810N
8700 West Bryn Mawr
Chicago, IL 60631-3522

Guerard Kalina Butkus
301 South County Farm Road
Wheaton, IL 60187-4523

(p)WACHOVIA BANK NA
MAC X2303-01A
1 HOME CAMPUS
1ST FLOOR
DES MOINES IA 50328-0001

Jones And Jacobs
77 West Washington Suite 2100
Chicago, IL 60602-2903

Kimball Lawrence Currency Exchange
3421 W Lawrence
Chicago, IL 60625-5103

Life Storage of HERMOSA
4500 West Grand Avenue
Chicago IL 60639-4726

Lino Rojas
C/O ARDC
1 Prudential Plaza, Suite 1500
Chicago, IL 60601

Main Street Business
C/O Robert Pollack
425 California Street
San Francisco, CA 94104-2102

Markoff And Krasny
Suite 550
29 North Wacker Drive
Chicago, IL 60606-2851

Merchants Credit Guide
223 W Jackson Blvd Ste 4
Chicago, IL 60606-6914

Murphy Thomas W
20940 Middleton Drive
Kildeer, IL  60047-8697

NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-2187

Nco Fin/99
Po Box 15636
Wilmington, DE 19850-5636

Nina Jozers
C/O Daspin Aument LLP
227 West Monroe
Chicago, IL 60606-5018

Nina Jozers
C/O Daspin Aument LLP
227 West Monroe Street
Chicago, IL 60606-5018

Ocwen Loan Servicing L
1661 Worthington R
West Palm Beac, FL 33409-6493

Peoples Engy
200 East Randolph
Chicago, IL 60601-6302

Pierce & Associates, P.C.
Bankruptcy Department
1 North Dearborn Street, Suite 1300
Chicago, IL 60602-4321

Pnc Bank Na
Po Box 3180
Pittsburgh, PA 15230-3180

Pnc Mortgage
3232 Nemark Dr
Miamisburg, OH 45342-5433

Real Time Resolutions
1750 Regal Row Ste N
Dallas, TX 75235-2289

Regus Office Systems
1750 Montgomery Street
San Francisco, CA 94111-1000

Richard L Kruse
7337 North Lincoln Avenue
Lincolwood, IL 60712-1700

Rick Nordmeyer
C/O ARDC
1 Prudential Plaza, Suite 1500
Chicago, IL 60601

Robert Badalian
C/O Schiff Gorman LLC
1 East Wacker Drive, Suite 2850
Chicago, IL 60601-1915

Schiff Gorman LLC
1 East Wacker Drive, Suite 2850
Chicago, IL 60601-1915

Talan And Ktsanes
Suite 512
223 West Jackson
Chicago, IL 60606-6904

Tamera Brown
505 North McClurg
Chicago, IL 60611-5420

Ted Gauza
140 S Dearborn, Suite 1610
Chicago, IL 60603-5299

Utam
c/o Ted Gauza
140 S Dearborn, Suite 1610
Chicago, IL 60603-5299

Wexler And Wexler
Suite 450
500 West Madison Street
Chicago, IL 60661-2767

Wheeler & Patel LLP
828 West Grace Street Unit 2
Chicago, IL 60613-5758

William T. Neary
U.S. Trustee, Region 11
219 S. Dearborn St, Suite 873
Chicago, Illinois 60604-2027

Wilson And Ellin
Unit 3S
1161 West Madison Street
Chicago, IL 60607-2000

World Wide Realty Llc
C/O Anthony G. Barone
635 Butterfield, Suite 145
Oakbrook, IL 60181-4026

Zurich North America
Box 66944
Chicago, IL 60666-0944

Jeffrey W Deer
Deer & Stone P C
130 S Jefferson Suite 370
Chicago, IL 60661-5762

Mark Steven Wheeler
Law Offices of Mark Steven Wheeler
828 W. Grace
Unit 2
Chicago, IL 60613-5758

Michael K Desmond
Figliulo & Silverman P C
10 S LaSalle Suite 3600
Chicago, IL 60603-1032

Patrick S Layng
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604-2027

Thomas W Murphy
70 West Madison Street
Chicago, IL 60602-4252

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bk Of Amer
Po Box 982235
El Paso, TX 79998

(d)Bk Of Amer
Po Box 982235
El Paso, TX 79998

Discoverbank
Po Box15316
Wilmington, DE 19850

(d)Discoverbank
Po Box15316
Wilmington, DE 19850

Homeq Servicing
Po Box 13716
Sacramento, CA 95853

(d)Homeq Servicing
Po Box 13716
Sacramento, CA 95853

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)ALJO II, LLC

(d)Ame
Po Box 297871
Fort Lauderdale, FL 33329-7871

(d)Arg
11856 Balboa Boulevard
Granada Hills, CA 91344-2753

(d)BLUE LADY INC
C/O NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-3800

(d)Carmax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

(d)Carmax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

(d)Cash In Usa
Suite 157
11856 Balboa Blvd
Granada Hills, CA 91344-2753

(d)Chase
Po Box 15298
Wilmington, DE 19850-5298

(d)Chase
Po Box 24696
Columbus, OH 43224-0696

(d)Citi
Po Box 6241
Sioux Falls, SD 57117-6241

(d)Discover Fin Svcs Llc
Po Box 15316
Wilmington, DE 19850-5316

(d)Dr. Vijay H. Vohra, MD
7447 W Talcott Ave Suite 222
Chicago, IL 60631-3713

(d)Dsnb Macys
9111 Duke Blvd
Mason, OH 45040-8999

(u)James Shaw

(d)Merchants Credit Guide
223 W Jackson Blvd Ste 4
Chicago, IL 60606-6914

(d)NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-2187

(d)Nco Fin/99
Po Box 15636
Wilmington, DE 19850-5636

(d)Ocwen Loan Servicing L
1661 Worthington R
West Palm Beac, FL 33409-6493

(d)Peoples Engy
200 East Randolph
Chicago, IL 60601-6302

(d)Pnc Bank Na
Po Box 3180
Pittsburgh, PA 15230-3180

(d)Pnc Mortgage
3232 Nemark Dr
Miamisburg, OH 45342-5433

(d)Real Time Resolutions
1750 Regal Row Ste N
Dallas, TX 75235-2289

(u)Umar Paracha

(u)Nina Jozers

End of Label Matrix
Mailable recipients    76
Bypassed recipients    24
Total                 100

EXHIBIT 14

U.S. TRUSTEE'S MOTION TO DISMISS
The Thomas W. Murphy BANKRUPTCY CASE NO. 14-BR03922

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 PROCEEDING |
| | ) | |
| THOMAS MURPHY, | ) | CASE NO. 14 B 03922 |
| | ) | |
| DEBTOR. | ) | HONORABLE DONALD R. CASSLING |

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on **Tuesday, July 29, 2014, at 9:30 a.m.**, I shall appear before the Honorable Donald R. Cassling, Bankruptcy Judge, Dirksen Federal Courthouse, 219 South Dearborn Street, Courtroom 619, Chicago, Illinois, or before any other Bankruptcy Judge who may be sitting in his place and shall present the **MOTION TO COMPEL DEBTOR TO COMPLY WITH 11 U.S.C § 521 AND BANKRUPTCY RULE 1007 AND FOR OTHER RELIEF** a copy of which is attached and is served on you.

/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn, Room 873
Chicago, Illinois 60604
(312) 886-0890

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: | )    CHAPTER 7 PROCEEDING |
| | ) |
| THOMAS MURPHY, | )    CASE NO. 14 B 03922 |
| | ) |
| DEBTOR. | )    HONORABLE DONALD R. CASSLING |

## MOTION TO COMPEL DEBTOR TO COMPLY WITH 11 U.S.C § 521 AND BANKRUPTCY RULE 1007 AND FOR OTHER RELIEF

NOW COMES PATRICK S. LAYNG, the United States Trustee for Region 11, by and through his attorney, Jeffrey S. Snell, and pursuant to 11 U.S.C. §§ 105, 521 and Fed. R. Bankr. P. 1007(a), hereby requests this Court enter an order compelling Thomas Murphy to (I) file a list with the Clerk of Court containing the names and addresses of his creditors and others as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and (II) file an amended Petition and Statement of Social Security Number that reflects the Number assigned to him by the Social Security Administration. In support of this request, the U.S. Trustee states to the Court as follows:

1.    This is a core proceeding concerning the administration of this estate pursuant to 28 U.S.C. § 157(b)(2)(A) which this Court may hear and determine pursuant to Internal Operating Procedure 15(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

2.    The Debtor, Thomas Murphy, filed his Voluntary Petition under Chapter 7 of the Bankruptcy Code on February 7, 2014.[1]

3.    Michael K. Desmond was appointed Chapter 7 Trustee.

---

[1] The Debtor filed the Voluntary Petition through attorney Jeffrey W. Deer. The U.S. Trustee has been advised by Mr. Deer that he no longer represents the Debtor in this bankruptcy case, *see Exhibit A*, and the Debtor confirmed the same at a Rule 2004 examination commenced May 23, 2014. *See Exhibit B*, p. 4.

4. To date, the Debtor has failed to file a List of Creditors, Schedules, or a completed Statement of Financial Affairs. In addition, the Debtor has failed to appear for the Meeting of Creditors originally scheduled for March 12, 2014, and continued several times thereafter.

5. In the instant case, as in the Debtor's prior two bankruptcy cases,[2] he has failed to file a complete and accurate list of creditors and other parties in interest as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1). In this case, the Debtor did not provide the Clerk of Court with the names and addresses of any creditors when he filed his Voluntary Petition. *See* BNC Certificate of Notice [Docket No. 6]. In his two prior cases, the Debtor provided the name of one creditor with his Voluntary Petitions.

6. The Debtor does not dispute that he has many creditors. On June 2, 2014, during a Rule 2004 examination conducted by the U.S. Trustee (the "Rule 2004 Examination"), the Debtor testified as follows:

Q How many creditors do you have? Do you have any estimate?

A You know, to be very honest with you, I have probably ten or 15 foreclosure suits. I think most of them are completed now. But I must have -- again, an approximate number?

Q Sure.

A 25 to 40.

Q Any approximation as to total debt?

A Well, that's hard to say. And the reason I say that is because the number of foreclosure cases, they have not gone after personal liability. So there is a question of whether they can or they can't.

Q For a deficiency?

---

[2] The Debtor's two prior cases were Case Numbers 13 B 45386 and 13 B 33363. Both cases were dismissed for the Debtor's failure to file required documents.

A       For a deficiency, yes. Those were investment properties.

Q       Well, assuming they did it for deficiencies, do you have an estimate as to what
        kind of debt we're talking about?

A       Over two and a half million dollars, probably. Maybe more.

Q       And what about without deficiencies? Is it just credit cards and things of that
        nature or liquidated debts, judgments?

A       Probably a million or more. Actually, the -- you know, if you go on to the
        foreclosure cases, it's probably close to 4 million, now that I think of it. But I just
        don't know, you know, where there might be liability for personal judgments.

*Exhibit C*, p. 22, line 22 – p. 24, line 1.

        7.      In this case, as in the Debtor's prior two cases, he used a Social Security Number

not assigned to him. During the Rule 2004 Examination, the Debtor acknowledged that his

Social Security Number ends in "5480," not "5408" as recited on the documents filed in each of

his three bankruptcy cases. The Debtor then testified that he wasn't previously aware that he had

used the wrong number:

Q       So you don't know why the wrong social security number --

A       No, I do not.

Q       -- is on all these documents?

A       No, I do not. I'm glad you pointed that out because I didn't know that. That's got
        to get corrected.

*Id.*, p. 59, lines 5 – 11. To date, the Debtor does not appear to have taken any corrective action.

        8.      Through using a Social Security Number not his own, and an address that is not

his home address,[3] the Debtor has managed to conceal his three bankruptcy filings from public

records searches (and, presumably, credit reporting agencies). This, coupled with the Debtor's

failure to file the list required by 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), has

_____

[3] The address listed on the Voluntary Petition is the Debtor's office address.

effectively concealed the existence of the three bankruptcy cases from many, if not most, of his creditors.

9.     On June 11, 2014, the U.S. Trustee filed a Complaint objecting to the Debtor's discharge under 11 U.S.C. § 727(a). *See Patrick S. Layng vs. Thomas Murphy*, 14 A 00372. The deadline for the Debtor to answer the Complaint has passed without the Debtor answering or otherwise pleading. The U.S. Trustee anticipates moving for default and judgment in the near future. The practical effect of a judgment denying the Debtor's discharge at this time is less than optimal, however. The denial of discharge would likely appear on *someone else's*[4] credit report and many, if not most, of the Debtor's creditors would not be aware of the bankruptcy, much less the denial of discharge.

10.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The U.S. Trustee submits that an order compelling the Debtor to comply with 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and to take corrective action with respect to the Social Security Number used in his Voluntary Petition, is necessary and critical.

---

[4] There is cause to believe that the Social Security Number used by the Debtor in his three bankruptcy cases is not an unused number, but, rather, is assigned to another individual.

WHEREFORE, the U.S. Trustee requests this Court enter an order:

(A) Requiring the Debtor to file, within seven (7) days, a list with the Clerk of Court

containing the names and addresses of the creditors and others as required under 11 U.S.C. §

521(a) and Fed. R. Bankr. P. 1007(a)(1);

(B) Requiring the Debtor to file, within seven (7) days, an amended Petition and

Statement of Social Security Number that reflects the Number assigned him by the Social

Security Administration;

(C) Requiring the Debtor to appear for a status hearing to determine whether he has

complied with the above, and, if not, to determine what coercive measures are necessary and

appropriate to obtain compliance; and

(D) Awarding any other and further relief as is just.

RESPECTFULLY SUBMITTED:

PATRICK S. LAYNG
UNITED STATES TRUSTEE

DATED: July 18, 2014

/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn, Room 873
Chicago, Illinois 60604
(312) 886-0890

## CERTIFICATE OF SERVICE

I, Jeffrey S. Snell, attorney, state that pursuant to Local Rule 9013-1(D) the above **Notice of Motion** and the appended **MOTION TO COMPEL DEBTOR TO COMPLY WITH 11 U.S.C § 521 AND BANKRUPTCY RULE 1007 AND FOR OTHER RELIEF** was filed on July 18, 2014, and served on all parties identified as Registrants on the service list below through the Court's Electronic Notice for Registrants and, as to all other parties on the service list below, I caused a copy to be sent via First Class Mail to the address(es) indicated before 5:00 p.m. on July 18, 2014.

/s/ Jeffrey S. Snell

## SERVICE LIST

### Registrants Served Through the Court's Electronic Notice:

- Anthony G. Barone   abarone@baronejenkins.com
- Jeffrey W Deer   jwdeer@aol.com, tonarlopez31@gmail.com
- Michael K Desmond   mkd.trustee@fslegal.com, ll.23@ecfcbis.com
- Vincent Frigo   vfrigo@daspinaument.com

Parties Served via First Class Mail:

Thomas Murphy
70 W. Madison Street
Suite 1400
Chicago, IL  60602

Thomas Murphy
20940 Middleton Dr.
Kildeer, IL  60047

they would remain, until and unless the plaintiffs took the necessary steps to have the matters returned to the "Individual Calendar" so as to proceed.

### *Defendant's Interests in Real and Personal Property*

52.    Upon information and belief, the Defendant maintains his residence at 20940 Middleton Drive, Kildeer, IL 60047 (the "Kildeer Property").

53.    Upon information and belief, Defendant executed a quit claim deed transferring his legal interest in the Kildeer Property to his wife, Christine Murphy, in or around January 2008.

54.    Upon information and belief, the Defendant has continued to reside at the Kildeer Property since executing the quit claim deed, and has contributed to the expenses relating to the property.

55.    Upon information and belief, the Defendant has caused personal property in which he possesses an interest to be held in the names of others, including a 2009 Lincoln MKZ automobile that Defendant drives.

56.    Upon information and belief, the Defendant has interests in financial accounts not disclosed in Case II Schedule B.

### *Defendant's 2011 and 2012 Income*

57.    According to Schedule C of Defendant's 2011 Federal Tax Return, Defendant earned gross income from his legal title insurance services business of $137,476 in 2011.

58.    Defendant and his wife, Christine Murphy, reported adjusted gross income of ($227,117) on their joint Form 1040 for 2011, and directed that their $4,403 refund be deposited into a checking account ending in 9389.

9

59.    According to Schedule C of Defendant's 2012 Federal Tax Return, Defendant earned gross income from his legal title insurance services business of \$298,413 in 2012.

60.    Defendant and his wife, Christine Murphy, reported adjusted gross income of (\$280,829) on their joint Form 1040 for 2012, and directed that their \$5,840 refund be deposited into a checking account ending in 9389.

## COUNT I - THE DEFENDANT KNOWINGLY AND FRAUDULENTLY MADE FALSE OATHS AND ACCOUNTS IN CASE I AND CASE II IN VIOLATION OF § 727(a)(4) AND HIS DISCHARGE IN THIS CASE SHOULD BE DENIED UNDER § 727(a)(7)

61.    U.S. Trustee realleges and incorporates herein the allegations contained in paragraphs 1 through 60.

62.    Section 727(a)(7) provides that the Court shall grant a debtor a discharge unless "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition..."

63.    Case I and Case II were filed within one year of the filing of the instant bankruptcy case, Case III.

64.    In his Case I Petition, the Defendant made false sworn statements concerning the last four digits of his Social Security Number and the identities of his creditors.

65.    In his Case I Statement of Social Security Number, the Defendant made false sworn statements concerning his Social Security Number.

66.    In his Case II Petition, the Defendant made false sworn statements concerning the last four digits of his Social Security Number and the identities of his creditors.

67.    The Case II Schedules A and B fail to disclose all of Defendant's property interests and constitute false sworn statements.

68.     The Case II SOFA is materially inaccurate as it, among other things, represents in
response to Question 1 that Defendant had no gross income in the two calendar years preceding
the bankruptcy filing, and lists only one of the several proceedings in which Defendant was
involved in response to Question 4.

WHEREFORE, the U.S. Trustee respectfully asks the Court to deny the Defendant's
discharge pursuant to § 727(a)(7) and for such other relief as is just.

## COUNT II – THE DEFENDANT HAS CONCEALED PROPERTY WITHIN ONE YEAR OF HIS BANKRUPTCY FILING WITH THE INTENT TO HINDER, DELAY, OR DEFRAUD A CREDITOR IN VIOLATION OF § 727(a)(2)(A)

69.     The U.S. Trustee realleges and incorporates herein the allegations contained in
paragraphs 1 through 68.

70.     Section 727(a)(2)(A) provides that a Court shall grant a debtor a discharge unless,
within one year of the petition date, the debtor, with intent to delay, hinder or defraud a creditor,
transfers, removes or conceals property.

71.     Within one year of his bankruptcy filing, the Defendant continued to conceal his
interests in real and personal property, including the Kildeer Property and the 2009 Lincoln
MKZ, with the intention of hindering and delaying his creditors.

WHEREFORE, the U.S. Trustee respectfully asks the Court to deny the Defendant's
discharge pursuant to § 727(a)(2)(A) and for such other relief as is just.

11

EXHIBIT _15_

WORLD WIDE REALTY, LLC MOTION TO DISMISS The Thomas W. Murphy BANKRUPTCY CASE No. 14-BR-03922

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In Re: | ) |
| | ) |
| | )    Case No. 14-03922 |
| THOMAS W. MURPHY, | ) |
| | )    Chapter 7 |
| Debtor. | ) |
| | )    Honorable Donald R Cassling |

## MOTION TO DISMISS CHAPTER 7 CASE AND TO BAR FUTURE PETITIONS

NOW COMES World Wide Realty, LLC ("World Wide"), a judgment creditor of the
Debtor, Thomas W. Murphy ("Murphy"), and pursuant to Title 11 of the United State Code
§707, 11 U.S.C. §707, Section 349, 11 U.S.C. §349, and Rules 1017 and 9014 of the Federal
Rules of Bankruptcy Procedure, moves this Honorable Court to dismiss Murphy's Chapter 7
bankruptcy proceeding for cause and with prejudice and to bar future Bankruptcy petitions. In
support, World Wide states as follows:

### INTRODUCTION

1.    By this Motion, World Wide seeks the dismissal of Murphy's Chapter 7
bankruptcy proceeding and a bar to Murphy filing future bankruptcy petitions due to Murphy's
bad faith and repeated abuse of the Bankruptcy Code. This is Murphy's third Chapter 7 filing in
the past six months. Each of Murphy's petitions have been filed on the eve of contempt
proceedings, or immediately following the issuance of writs of body attachment in World Wide's
state court collection action, wherein World Wide is seeking to collect a $199,160 judgment
against Murphy. The bad faith nature of Murphy's Chapter 7 Petition is further evidenced by
the fact Murphy's prior to two Chapter 7 proceedings were both dismissed after Murphy failed to

provide complete and accurate statements and schedules as required by Section 521(a). Murphy's current Petition similarly fails to attach the documents required under Section 521(a).

2.     Murphy's current Petition and the Statement of Financial Affairs attached thereto also willfully misrepresent Murphy's income and liabilities. Specifically, Murphy fails to disclose: (1) income he appeared to have earned as an attorney rendering legal services during 2011 and 2012, totaling $323,717; (2) income he appeared to have earned from a title insurance company he owned and operated during 2011 and 2012, totaling $337,558; and (3) World Wide's pending state court lawsuit wherein World Wide is seeking to collect its judgment of $199,160. Instead, Murphy certifies that he has earned no income in the past two years, has no lawsuits pending against him, and has only $0 to $50,000 in liabilities.

3.     Given the totality of the circumstances, it is apparent that Murphy is using the Bankruptcy Code in bad faith for the sole purpose of frustrating World Wide's attempt to collect its judgment against Murphy in its state court collection action. This proceeding should therefore be dismissed for cause pursuant to the Court's authority under 11 U.S.C. §707(b)(3)(A) and Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, and the Court should bar any future attempts by Murphy to file another petition under the Bankruptcy Code.

## PARTIES

4.     Murphy is an individual who filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on February 7, 2014. Murphy previously filed two petitions under Chapter 7 on August 21, 2013 and November 22, 2013, respectively, but both actions were dismissed due to Murphy's failure to file the documents required under Section 521 of the Bankruptcy Code.

2

5.      World Wide is an Illinois limited liability company and a judgment creditor of Murphy. World Wide obtained a judgment by confession against Murphy in the Circuit Court of Cook County on January 29, 2013. The total amount of World Wide's judgment against Murphy is $199,160. To date, Murphy has not satisfied any portion of World Wide's judgment and collection proceedings are still pending because Murphy has willfully and maliciously thwarted the collection process.

## JURISDICTION

6.      This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157.

7.      This Motion constitutes a core proceeding under 28 U.S.C. §157(b)(2)(A) and (J).

## FACTUAL BACKGROUND

A.      World Wide's State Court Collection Action.

8.      On January 23, 2013, World Wide filed a Complaint for Judgment by Confession against Murphy in the Circuit Court of Cook County, entitled *World Wide Realty, LLC v. Thomas Murphy*, which was originally given the case number 2013 L 50095. The Complaint was based on Murphy's default on a promissory note executed in favor of World Wide for the principal amount of $240,000, and Murphy's subsequent breach of the parties' settlement agreement. Attached hereto as Exhibit A is the affidavit of Colin W. Anderson, one of World Wide's attorneys, setting forth the details of World Wide's collection efforts and providing a comprehensive timeline of World Wide's state court collection action.

9.      On January 29, 2013, the Honorable Daniel T. Gillespie entered judgment against Murphy in the amount of $199,160.00. (See Judgment Order attached hereto as Exhibit B.).

3

10.    Thereafter, World Wide initiated supplementary proceedings to collect the judgment, and the action was transferred before the Honorable Alexander White in the Cook County Circuit Court's Law Division Tax & Miscellaneous Remedies Section.

11.    On March 18, 2013, World Wide issued Murphy a Citation to Discover Assets ("Citation"). Attached to the Citation is a document rider requiring Murphy to produce documents pertaining to his assets, including any documents relating to or describing any income Murphy earns or business he owns. (*See* Citation, attached hereto as Exhibit C).

12.    Despite several court orders to produce documents responsive to the rider, to date Murphy has failed to produce any documents other than his 2010, 2011, and 2012 federal tax returns and an Income and Assets Form. (Murphy's Income and Asset Form is attached hereto as Exhibit D; and Murphy's 2011 and 2012 Federal Tax Return are attached hereto as Exhibits E and F, respectively).

13.    Murphy has refused to produce any other financial documents that could show the source or location of his income and assets, including any bank statements. Murphy has also repeatedly failed to appear for a Citation examination despite several orders of the Circuit Court requiring him to appear in Court or at a location agreed upon by the parties' attorneys.

14.    As a result of Murphy's refusal to cooperate in the state court enforcement action, World Wide has been unable to ascertain the nature or location of Murphy's income or assets, and therefore has yet to collect any portion of its judgment.

15.    In attempt to compel Murphy's cooperation, the Circuit Court has issued four Rules to Show Cause against Murphy, as well as a body attachment for Murphy's arrest with a bond of $25,000.

4

16.     The first Rule to Show Cause was issued on May 15, 2013, after Murphy failed to appear for his Citation examination on April 25, 2013. (*See* May 15, 2013 Rule to Show Cause, attached hereto as Exhibit G).

17.     A second Rule to Show Cause was issued against Murphy on June 19, 2013, after Murphy failed to produce the documents responsive to the Citation rider. (*See* June 19, 2013 Rule to Show Cause, attached hereto as Exhibit H).

18.     On July 25, 2013, the Circuit Court once again ordered Murphy to present himself for a Citation examination and to produce documents responsive to the Citation rider. (*See* July 25, 2013 Order, attached hereto as Exhibit I). However, Murphy failed to present himself or provide any documents by the deadlines set forth in the July 25, 2013 Order.

19.     On August 15, 2013, the Circuit Court indicated that as a result of Murphy's repeated refusals to cooperate, it was inclined to proceed with a hearing on the two Rules to Show Cause issued against Murphy. However, Murphy's attorney of record, Jeffrey Deer, indicated that Murphy intended to file for Chapter 7 bankruptcy protection, and therefore requested a postponement of any contempt hearing. (Exhibit A, ¶9).

20.     The Circuit Court allowed a brief postponement. However, because Murphy's counsel could offer no explanation as to why Murphy failed to comply with the April 17, 2013, May 15, 2013, and July 25, 2013 Orders, the Circuit Court ordered Murphy to either tender proof of a bankruptcy filing by August 22, 2013, or file an affidavit showing cause why he should not be held in civil contempt. The Circuit Court's order provided that if Murphy failed to tender one of the two documents by August 22, 2013, he would face incarceration by the Cook County Sheriff. (*See* August 15, 2013 Order, attached hereto as Exhibit J).

5

B.      Murphy's First Chapter 7 Bankruptcy Petition.

21.      On August 21, 2013, Murphy filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois under the case number 13-33363.

22.      World Wide therefore ceased its collection efforts and placed its state court action on the bankruptcy stay calendar pending resolution of Murphy's bankruptcy proceedings.

23.      On September 17, 2013, Murphy's bankruptcy proceeding was dismissed as a result of Murphy's failure to timely file all the documents required by Section 521 of the Bankruptcy Code. (*See* 13 33363, Docket Entry No. 9).

24.      On October 3, 2013, World Wide presented a motion in the Circuit Court seeking to remove its collection proceeding case from the bankruptcy stay calendar. World Wide's motion was granted and its collection action was reassigned before Judge White under a new case number, 2013 L 50914. (*See* October 3, 2013 Order removing case from Bankruptcy Calendar, attached hereto as Exhibit K).

25.      Thereafter, Murphy was provided with notice that the collection action had been reinstated and was served with a copy of World Wide's Motion to Enforce the Citation, which was scheduled for presentment on November 6, 2013. (*See* October 7, 2013 Letter to Murphy's counsel of record, attached hereto as Exhibit L).

26.      Despite receiving notice, Murphy failed to appear for World Wide's Motion to Enforce the Citation. As such, a third Rule to Show Cause was issued against Murphy and the Circuit Court set all three pending Rules to Show Cause for hearing on November 20, 2013. (*See* November 6, 2013 Order and Rule to Show Cause, attached hereto as group Exhibit M). The

Circuit Court's order also required Murphy to appear in person at the November 20, 2013 hearing.

27.     At the November 20, 2013 hearing, neither Murphy nor his attorney appeared. The Circuit Court therefore entered an order holding Murphy in civil contempt and issued a writ of body attachment for Murphy's arrest with a bond of $25,000. (*See* Contempt Order, attached hereto as Exhibit N).

28.     Before placing the contempt order and body attachment with the Cook County Sheriff, World Wide provided Murphy's attorney with copies of the contempt order and advised that a body attachment had been issued for Murphy's arrest. (*See* November 22, 2013 Letter to Murphy's counsel, attached hereto as Exhibit O).

29.     Almost immediately upon receiving notice of the contempt order and body attachment, Murphy filed his second Chapter 7 Petition, under case number 13-45386. As a result, World Wide was once again forced to cease its collection efforts and place its collection action on the bankruptcy stay calendar.

C.     **Second Chapter 7 Bankruptcy Petition.**

30.     For his second Chapter 7 petition, Murphy alleged that his creditors ranged in number from 1 to 49 and that his liabilities could be estimated at $1 million to $10 million. However, in his Schedule of Creditors attached to his second petition, the only creditor identified by Murphy was World Wide. Likewise, the only liability listed in the Statistical Summary of Certain Liabilities and Related Data attached to his second petition was a $200,000 non-priority unsecured debt.

31.     In the Statement of Financial Affairs attached to Murphy's second petition, Murphy certified that he had earned no income from 2011 up to the commencement of his

7

Case: 1:15-cr-00515 Document #: 365 Filed: 08/07/18 Page 343 of 441 PageID #:2988

Case 14-03922    Doc 20    Filed 03/31/14    Entered 03/31/14 16:22:36    Desc Main
                          Document.    Page 8 of 15

Chapter 7 proceeding. (*See* Statement of Financial Affairs, 13-45386, Docket Entry No. 1, p. 21, ¶1).

32.    Murphy's Statement of Financial Affairs also alleged that he had not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶18).

33.    Further, Murphy's Statement of Financial Affairs alleged that he had no bookkeepers or accountants supervise or audit his books and records within two years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶19).

34.    On January 1, 2014, World Wide filed a motion to dismiss Murphy's second bankruptcy proceeding for his bad faith failure to disclose his income and liabilities and general abuse of the Bankruptcy Code.

35.    The United States Trustee also filed a motion to dismiss pursuant to 11 U.S.C. §521(a)(1), since Murphy once again failed to file all documents required by Section 521.

36.    Upon presentment of the two motions, the Honorable Timothy A. Barnes gave Murphy the option of either allowing his case to be dismissed pursuant to the U.S. Trustee's motion, with leave to refile, or enter into a briefing schedule to contest World Wide's motion to dismiss, which if granted could result in Murphy being barred from refiling for Chapter 7 relief.

37.    Murphy chose the former, and on January 21, 2014 Murphy's second Chapter 7 proceeding was dismissed.

38.    After the dismissal, World Wide once again moved the Circuit Court to remove its collection case from the bankruptcy stay calendar. After World Wide's motion was granted,

it filed a motion to enforce its citation and body attached against Murphy, scheduling it for presentment on February 10, 2014. (*See* Notice of Motion to Enforce Citation and Body Attachment, attached hereto as Exhibit P).

39.    Despite receiving notice of World Wide's motion, neither Murphy nor his attorney of record appeared on February 1, 2014, and as a result the Circuit Court once again held Murphy in contempt and issued a writ of body attachment with a bond of $25,000. (*See* February 10, 2014 Contempt Order, attached hereto as Exhibit Q).

40.    On February 13, 2014, World Wide gave Murphy notice of the February 10, 2014 contempt order and body attachment. After receiving the notice, Murphy's counsel advised World Wide for the first time that Murphy had filed yet another Chapter 7 Petition on February 7, 2014, under case number 14-03922. (*See* Email from Jeffrey Deer, attached hereto as Exhibit R).

41.    On March 18, 2014, the Circuit Court stayed enforcement of the Body Attachment.

**D.     Murphy's Third Chapter 7 Bankruptcy Petition.**

42.    For Murphy's current Chapter 7 petition, Murphy's counsel Jeffrey Deer certified that Murphy's alleged assets were estimated to range from $0 to $50,000, and his liabilities from $0 to $50,000. In the Statement of Financial Affairs (hereinafter, the "Statement") attached to the petition, Murphy certified that he earned no income in the past year. (*See* Statement, 14-03922, Docket Entry No. 1, p. 6, ¶1).

43.    Murphy also certified in the Statement that he had no lawsuits pending against him, making no mention of World Wide's state court action that was pending at the time and is still currently pending. (Statement, ¶4).

9

44.    As with Murphy's prior two petitions, Murphy's current petition fails to attach the documents required by Section 521, including a list of creditors, a schedule of assets and liabilities, a schedule of current income and current expenditures, a statement of the amount of monthly net income, and a statement disclosing any reasonably anticipated increase in income or expenditures.

45.    At no point in Murphy's current petition is World Wide identified as a creditor. Again, no part of World Wide's judgment against Murphy has been satisfied.

46.    On March 12, 2014, the meeting of creditors was held as scheduled. However, neither Murphy nor his attorney appeared at the meeting. (Exhibit A, ¶10).

**E.    Murphy's Federal Tax Returns.**

48.    During the course of World Wide's state court collection proceedings, Murphy produced his 2010, 2011, and 2012 federal income tax returns. Murphy's 2011 returns show a gross income of $192,839, which appears to be income derived in 2011 from Murphy's practice of law as an attorney. (*See* Exhibit E, p. 31). The 2011 returns also show business income of $98,667 apparently earned from Murphy's ownership of a title company named Legal Title Insurance Services. (*Id.* at p. 8).

49.    Murphy's 2012 federal income tax returns similarly show a gross income of $130,878 earned in 2012, presumably for legal services as an attorney. (*See* Exhibit F, p. 25). The 2012 returns also show business income of $200,082 earned presumably from his ownership of Legal Title Insurance Services. (*Id.* at p. 8).

50.    Murphy's current Chapter 7 Petition fails to disclose this income or these income sources.

## APPLICABLE LAW

51.    The purpose of the Bankruptcy Code is "to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying their debts." *In re Johnson*, 228 B.R. 663, 668 (Bankr. N.D. Ill. 1999).

52.    Section 707 of the Bankruptcy Code therefore empowers bankruptcy courts to dismiss a case if affording the debtor a bankruptcy discharge would be an abuse of the Chapter 7 provisions in the Bankruptcy Code. 11 U.S.C. §707(b)(1).    When considering whether discharging a debtor would be an abuse, the bankruptcy court shall consider whether the debtor filed his or her Chapter 7 petition in bad faith. 11 U.S.C. §707(b)(3)(A).

53.    A bad faith determination requires the court to consider the totality of the circumstances, and looks at factors such as whether the debtor has stated his debts and expenses accurately, whether he has made any fraudulent representation to mislead the bankruptcy court, or whether he has unfairly manipulated the Bankruptcy Code. *In re Johnson*, 228 B.R. at 669.

54.    A debtor's lack of candor in filing his bankruptcy schedules and Statement of Financial Affairs is sufficient for a finding of bad faith and the entry of an order dismissing the bankruptcy proceeding entirely. See *In re Stoller*, 351 B.R. 605, 621-622 (Bankr. N.D.Ill. 2006) (finding of bad faith warranted after the debtor had made false statements, provided misleading information, and omitted material facts in his petition, schedules, and Statement of Financial Affairs, which failed to identify the debtor's income, various businesses, and certain creditors).

55.    Courts may also consider other factors such as the timing of the filing of the petition, the debtor's motive for filing the petition, how the debtor's actions affect his creditors, and the debtor's treatment of creditors before and after his petition was filed. *In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005).

11

56.     With regards to timing, courts hold that a debtor's bankruptcy petition may be dismissed for bad faith where the debtor timed his filing in order to frustrate a creditor's state court enforcement action. *In re Eisen*, 14 F.3d 469 (9th Cir. 1994).

57.     After reviewing the totality of the circumstances, if the bankruptcy court concludes that a debtor's filing is not fundamentally fair to the debtor's creditors, or does not comply with the spirit of the Bankruptcy Code's provisions, the debtor's petition should be dismissed. *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).

58.     Additionally, where the bankruptcy court concludes that a debtor's petition was filed in bad faith or accompanied by egregious misconduct, contumacious actions, or abuse of the bankruptcy process, the imposition of a bar against filing another petition is warranted. *In re Garcia*, 479 B.R. 488, 494-95 (Bankr. N.D.Ind. 2012)

## ARGUMENT

I.    **MURPHY'S PETITION SHOULD BE DISMISSED DUE TO MURPHY'S MISREPRESENTATIONS REGARDING HIS ASSETS AND LIABILITIES.**

59.     In all three of his Chapter 7 petitions, Murphy has demonstrated an alarming lack of candor regarding his income and assets. All three petitions failed to disclose the income and sources of income identified in Murphy's federal tax returns, and all three petitions failed to attach complete and accurate schedules as required by Section 521.

60.     Murphy's Statement attached to his current petition alleges that he currently earns no income, and has earned no income for the two years preceding the current calendar year. However, Murphy's 2011 federal income taxes show a gross income of $192,839 for wages in 2011 and $98,667 in business income from Legal Title Insurance Services. (Exhibit D, pp. 8, 31). Similarly, Murphy's 2012 federal income tax returns show a gross income of $130,878

from wages and $200,082 in business income from Legal Title Insurance Services. (Exhibit E, pp. 8, 25).

61.     Murphy's representation in his Statement that he has not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding is also contradicted by his tax returns. Both Murphy's 2011 and 2012 returns show that Murphy was not only the proprietor of Legal Title Insurance Services, but that he earned substantial income from the operation of that business.

62.     In addition, Murphy's current petition fails entirely to identify World Wide as a creditor of Murphy, even though there can be no doubt that both Murphy and his attorney are aware of World Wide and its pending state court collection action. Significantly, in his Statement, Murphy certifies to the Court that he currently has no law suits pending against him.

63.     In light of this information, it is clear that Murphy has not stated his debts and income accurately, but in fact has made numerous false statements, provided misleading information, and omitted material facts in his petition and statement of financial affairs. As a result of this egregious misconduct, contumacious actions, and ultimate abuse of the bankruptcy process, a finding of bad faith is warranted and Murphy's petition should be dismissed with prejudice and with a bar to future filings.

## II.    MURPHY'S PETITION SHOULD BE DISMISSED BECAUSE IT WAS FILED IN ORDER TO FRUSTRATE WORLD WIDE'S COLLECTION PROCEEDINGS.

64.     The timing of Murphy's filing Chapter 7 petition also requires dismissal of these proceedings. All three of Murphy's Chapter 7 petitions have been filed on the eve of Murphy being held in civil contempt with respect to World Wide's collection proceedings in state court.

65.   Specifically, Murphy filed his first Chapter 7 petition on August 21, 2013, just one day before he was required to file an affidavit in World Wide's state court collection action showing cause why he should not be held in contempt and incarcerated. (Exhibit J).  Murphy filed his second Chapter 7 petition within hours of learning he had been held in contempt and a body attachment had been issued for his arrest with a $25,000 bond. (Exhibit O).

66.   Similarly, Murphy's current Chapter 7 petition was filed just one business day before World Wide was scheduled to present a motion in the Circuit Court to enforce its Citation and to enforce the November 20, 2013 body attachment. (Exhibit P).

67.   Murphy's successive bad faith bankruptcy petitions have caused World Wide to incur significant attorney fees and expenses in having to constantly stop and start its collection efforts on the eve of obtaining enforcement of its rights. Each time World Wide must cease collection based on Murphy's bankruptcy, only to again reinstate it before Judge White after Murphy's deficient bankruptcy petitions are dismissed.   During this time, Murphy has wrongfully gained an opportunity to dissipate his assets.

68.   Given the recurring theme and timing of each of Murphy's petitions, including the current petition, it is apparent Murphy is not an honest debtor seeking a fresh start.  Instead, Murphy is using the Bankruptcy Code to frustrate World Wide's attempt to collect its judgment in its state court collection action. Accordingly, the Court should find that Murphy's Chapter 7 petition was filed in bad faith.

WHEREFORE, World Wide Realty, LLC respectfully requests this Honorable Court enter an Order:

a.  Finding Murphy's Chapter 7 petition to have been filed in bad faith and dismissing Murphy's Chapter 7 proceeding for cause pursuant to 11 U.S.C. § 707(b)(3);

14

b. Enter an order barring Murphy from filing for future Chapter 7 relief; and

c. Granting such other relief as the Court deems to be just and equitable.

Respectfully Submitted,
**World Wide Realty, LLC**

By: /s/ Anthony G. Barone
One of World Wide Realty, LLC's Attorneys

Anthony G. Barone (ARDC #6196315)
Colin W. Anderson (ARDC #6298971)
Barone & Jenkins, P.C.
635 Butterfield Rd, Ste 145
Oakbrook Terrace, IL 60181
(630)472-0037

15

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In Re: | ) |
| | ) |
| | ) Case No. 13-45386 |
| THOMAS W. MURPHY, | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) Honorable Timothy A. Barnes |

### MOTION TO DISMISS CHAPTER 7 CASE

NOW COMES World Wide Realty, LLC ("WWR"), a judgment creditor of the Debtor, Thomas W. Murphy ("Murphy"), and pursuant to Title 11 of the United State Code §707, 11 U.S.C.A. §707, and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure, moves this Honorable Court to dismiss Murphy's Chapter 7 bankruptcy proceeding for cause and with prejudice. In support, WWR states as follows:

### INTRODUCTION

1. By this Motion, WWR seeks the dismissal of Murphy's Chapter 7 bankruptcy proceeding due to Murphy's bad faith failure to disclose required information in his Chapter 7 Petition and Statement of Financial Affairs. Specifically, despite having a duty to do so, Murphy failed to disclose: (1) income he earned rendering legal services during 2011 and 2012 totaling $323,717; (2) income he earned from a title insurance company he owned and operated during 2011 and 2012 totaling $337,558; (3) the names and identities of the accountants who prepared his federal income taxes for the years 2010 through 2012 and who have therefore conducted an audit of Murphy's books of accounts and records during the two years immediately preceding Murphy's bankruptcy filing; and (4) the names and identities of the creditors and/or claim holders which Murphy alleges comprise the $1 million to $10 million in liabilities Murphy

identified in his Chapter 7 Petition. WWR obtained this information from Murphy in its state court action wherein WWR is seeking to enforce a $199,160 judgment against Murphy.

2.  In addition to the above omissions, the bad faith nature of Murphy's Chapter 7 Petition is made evident by the timing and circumstances of Murphy's filing. Murphy filed his Chapter 7 Petition just two days after he was held in contempt of court in WWR's state court enforcement action and a body attachment with a $25,000 bond was issued for his arrest. Furthermore, Murphy filed for Chapter 7 bankruptcy protection in August of 2013 when the state court ordered he show cause for violating numerous court orders. Murphy's August Chapter 7 proceeding was dismissed, however, after Murphy failed to timely file the documents required under Section 521 of the Bankruptcy Code, which to date Murphy has yet to file in this proceeding.

3.  Given the totality of the circumstances, Murphy's intent is not to seek a fresh start under the Bankruptcy Code, but rather to frustrate WWR's state court collection action. Murphy's Petition was therefore made in bad faith, and as such this Court should dismiss Murphy's Chapter 7 proceeding for cause and with prejudice pursuant to the Court's authority under 11 U.S.C.A. §707(b)(3)(A) and Rule 1017(e) of the Federal Rules of Bankruptcy Procedure.

## PARTIES

4.  Murphy is an individual who filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on November 22, 2013. Murphy previously filed a petition under Chapter 7 on August 22, 2013, but that action was dismissed on September 17, 2013 due to Murphy's failure to file documents required under Section 521 of the Bankruptcy Code.

2

5.    WWR is an Illinois limited liability company and a judgment creditor of Murphy.

WWR obtained a judgment by confession against Murphy in the Circuit Court of Cook County

on January 29, 2013. (*See* Judgment Order, attached hereto as Exhibit A). The total amount of

WWR's judgment against Murphy is $199,160. To date, Murphy has not satisfied any portion of

WWR's judgment.

## JURISDICTION

6.    This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C.A §1334 and

28 U.S.C.A. §157.

7.    This Motion constitutes a core proceeding under 28 U.S.C.A. §157(b)(2)(A) and

(J).

## FACTUAL BACKGROUND

### WWR's State Court Collection Action

8.    On January 23, 2013, WWR filed a Complaint for Judgment by Confession

against Murphy in the Circuit Court of Cook County based on Murphy's default on a promissory

note executed in favor of WWR for the principal amount of $240,000, and Murphy's subsequent

breach of the parties' settlement agreement intended to resolve Murphy's default on the

promissory note. WWR's state court action was titled, *World Wide Realty, LLC v. Thomas

Murphy* and given the case number 2013 L 50095.

9.    On January 29, 2013, the Honorable Daniel T. Gillespie of the Circuit Court of

Cook County entered judgment against Murphy in the amount of $199,160.00. (Exhibit A).

10.   Thereafter, WWR initiated supplementary proceedings to collect the judgment,

and the action was transferred before the Honorable Alexander White in the Cook County Circuit

Court's Law Division Tax & Miscellaneous Remedies Section.

3

11.     On March 18, 2013, WWR issued Murphy a Citation to Discover Assets ("Citation").

12.     As a result of Murphy's refusal to cooperate in the state court action or the Citation, WWR has not collected any portion of its judgment and has been unable to ascertain the location and nature of Murphy's income and assets.

13.     Attached to the Citation is a document rider requiring Murphy to produce documents pertaining to his assets, including any documents relating to or describing any income Murphy earns or business he owns. (*See* Citation, attached hereto as Exhibit B).

14.     Despite several court orders to produce documents responsive to the rider, to date Murphy has failed to produce any documents other than his 2010, 2011, and 2012 federal tax returns and an Income and Assets Form. Murphy's Income and Asset Form is attached hereto as Exhibit C; and Murphy's 2011 and 2012 Federal Tax Return are attached hereto as Exhibit D and E, respectively). Murphy has refused to produce any bank statements or other financial documents that could show the source or location of any income or other assets.

15.     Murphy has also repeatedly failed to appear for a citation examination despite entering several orders requiring him to do so. (*See* April 17, 2013 Order, attached hereto as Exhibit F).

16.     As a result of Murphy's refusal to cooperate in the state court enforcement action, Judge White has been forced to issue three rules to show cause against Murphy. The first rule to show cause was issued on May 15, 2013, after Murphy failed to appear for his citation examination on April 25, 2013. (*See* May 15, 2013 Rule to Show Cause, attached hereto as Exhibit G).

4

17.   A second rule to show cause was issued against Murphy on June 19, 2013, after Murphy failed to produce the documents responsive to the Citation rider. (*See* June 19, 2013 Rule to Show Cause, attached hereto as Exhibit H).

18.   On July 25, 2013, Judge White once again ordered Murphy to present himself for a citation examination and to produce documents responsive to the Citation rider. (*See* July 25, 2013 Order, attached hereto as Exhibit I). However, Murphy failed to present himself or provide any documents by the deadlines set forth in the July 25, 2013 Order.

19.   On August 15, 2013, Judge White indicated that as a result of Murphy's repeated refusals to cooperate, he was inclined to proceed with a hearing on the two rules to show cause. However, Murphy's attorney of record in the state court action indicated that Murphy intended to file for Chapter 7 bankruptcy protection, and therefore requested a postponement of any contempt hearing.

20.   Because Murphy's counsel could offer no explanation as to why Murphy failed to comply with the April 17, 2013, May 15, 2013, and July 25, 2013 Orders, Judge White ordered Murphy to either tender proof of a bankruptcy filing by August 22, 2013, or file an affidavit showing cause why he should not be held in civil contempt. Judge White's order stipulated that if Murphy failed to tender one of the two documents August 22, 2013, he would face incarceration by the Cook County Sheriff. (*See* August 15, 2013 Order, attached hereto as Exhibit J).

21.   On August 21, 2013, Murphy filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois under the case number, 13-33363.

5

22.     WWR therefore ceased its collection efforts and placed its state court action on the bankruptcy stay calendar pending resolution of Murphy's bankruptcy proceedings. (*See* August 22, 2013 Order placing matter on the Bankruptcy Calendar, attached hereto as Exhibit K).

23.     On September 17, 2013, Murphy's bankruptcy proceeding was dismissed as a result of Murphy failing to timely file documents required by Section 521 of the Bankruptcy Code.

24.     On October 3, 2013, WWR presented a motion in its state court action to remove the case from the bankruptcy stay calendar. WWR's motion was granted and its collection action was reassigned before Judge White under a new case number, 2013 L 50914. (*See* October 3, 2013 Order removing case from Bankruptcy Calendar, attached hereto as Exhibit L).

25.     Thereafter, Murphy was provided with notice that the collection action had been reinstated and was served with a copy of WWR's Motion to Enforce the Citation, which was scheduled for presentment on November 6, 2013. (*See* October 7, 2013 Letter to Murphy's counsel of record, attached hereto as Exhibit M; and Notice of Motion, attached hereto as Exhibit N).

26.     Despite receiving notice, Murphy failed to appear for WWR's Motion to Enforce the Citation. As such, a third rule to show cause was issued against Murphy and Judge White set all 3 rules to show cause for hearing on November 20, 2013. (*See* November 6, 2013 Rule to Show Cause and Order, attached hereto as group Exhibit O). Judge White's order also required Murphy to appear in person at the November 20, 2013 hearing.

27.     At the November 20, 2013 hearing neither Murphy nor his attorney of record appeared. Judge White therefore entered an order holding Murphy in civil contempt and issued a

6

body attachment for Murphy's arrest with a bond of $25,000. (*See* Contempt Order, attached hereto as Exhibit P).

28.     Before placing the contempt order and body attachment with the Cook County Sheriff, WWR provided Murphy's attorney with copies of the contempt order and advised that a body attachment had been issued for Murphy's arrest. (*See* November 22, 2013 Letter to Murphy's counsel, attached hereto as Exhibit Q).

29.     Almost immediately upon receiving notice of the contempt order and body attachment, Murphy filed the instant Chapter 7 Petition. As a result, WWR was once again forced to cease its collection efforts and place its collection action on the bankruptcy stay calendar.

## Murphy's Chapter 7 Bankruptcy Petition

30.     In his Chapter 7 Petition, Murphy alleges that his creditors range in number from 1 to 49 and that his liabilities are currently estimated at $1 million to $10 million. However, in his Schedule of Creditors attached to his petition, the only creditor identified by Murphy is WWR, whom Murphy identifies as holding an unsecured non-priority debt of $200,000. Likewise, the only liability listed in Murphy's Statistical Summary of Certain Liabilities and Related Data is a $200,000 non-priority unsecured debt. In the Asset and Income Form Murphy provided to WWR in the state court collection action, he listed 21 creditors and/or liabilities. (Exhibit C).

31.     In the Statement of Financial Affairs attached to Murphy's Petition, Murphy represents that he has earned no income from 2011 up to the commencement of his Chapter 7 proceeding. (*See* Statement of Financial Affairs, ¶ 1).

7

32.    Murphy's Statement of Financial Affairs also alleges that he has not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶ 18).

33.    Further, Murphy's Statement of Financial Affairs alleges that he has had no bookkeepers or accountants supervise or audit his books and records within two years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶ 19).

### Murphy's Federal Tax Returns

34.    Murphy's 2011 federal income taxes, produced to WWR during its state court collection action along with Murphy's 2010 and 2012 federal income taxes, show that during 2011 Murphy earned a gross income of $198,839 providing legal services as an attorney and $98,667 from his ownership of a title company named, Legal Title Insurance Services. (Exhibit D).

35.    Murphy's 2012 federal income taxes show that during 2012 Murphy earned a gross income of $130,878 providing legal services as an attorney and $200,082 from his ownership of Legal Title Insurance Services. (Exhibit E).

36.    Both the 2011 and 2012 tax returns were prepared by James Murphy of John R. Waters & Company, a Certified Public Accounting firm located in Chicago, Illinois.   On information and belief, James Murphy audited Murphy's books and records when preparing Murphy's 2011 and 2012 tax returns.

### APPLICABLE LAW

8

37.     The purpose of the Bankruptcy Code is "to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying their debts." *In re Johnson*, 228 B.R. 663, 668 (Bankr. N.D. Ill. 1999).

38.     Section 707 of the Bankruptcy Code therefore empowers bankruptcy courts to dismiss a case if affording the debtor a bankruptcy discharge would be an abuse of the Chapter 7 provisions in the Bankruptcy Code. 11 U.S.C.A. §707(b)(1).   When considering whether discharging a debtor would be an abuse, the Bankruptcy Code provides that the bankruptcy court shall consider whether the debtor filed his or her Chapter 7 petition in bad faith. 11 U.S.C.A. §707(b)(3)(A).

39.     A bad faith determination requires the court to consider the totality of the circumstances and looks at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent representation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code. *In re Johnson*, 228 B.R. at 669.

40.     Other factors include the timing of the filing of the petition; the debtor's motive for filing the petition; how the debtor's actions affect his creditors; and the debtor's treatment of creditors before and after his petition was filed. *In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005).

41.     Additionally, the timing of a debtor's bankruptcy filing has been held by courts as a factor in determining whether a petition should be dismissed as a bad faith filing. *In re Eisen*, 14 F.3d 469 (9th Circuit, 1994). As such, a debtor's bankruptcy petition may be dismissed for bad faith where the debtor timed his filing in order to frustrate a creditor's state court enforcement action. *Id.*

42.    Similarly, a debtor's lack of candor in filing his bankruptcy schedules and Statement of Financial Affairs has been found to warrant a finding of bad faith and the entry of an order dismissing the bankruptcy proceeding entirely. *In re Stoller*, 351 B.R. 605, 621-622 (Bankr. N.D.Ill. 2006).

43.    After reviewing the totality of the circumstances, if the bankruptcy court concludes that a debtor's filing is not fundamentally fair to the debtor's creditors, or does not comply with the spirit of the Bankruptcy Code's provisions, the debtor's petition should be dismissed. *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).

44.    For example in *Stoller*, the court made a bad faith finding after the debtor had made false statements, provided misleading information, and omitted material facts in his petition, schedules, and Statement of Financial Affairs, which failed to identify the debtor's income, various businesses, and certain creditors. *Id.*

## ARGUMENT

45.    Like the debtor in *Stoller*, Murphy has demonstrated an alarming lack of candor in his Petition, Schedules, and Statement of Financial Affairs, which, when coupled with Murphy's refusal to cooperate in WWR's state court collection action, warrants a finding of bad faith here and dismissal of Murphy's Chapter 7 proceedings for cause and with prejudice.

46.    Murphy's Statement of Financial Affairs alleges that he currently earns no income and has earned no income for the two years preceding the current calendar year. However, Murphy's 2011 federal income taxes show that during 2011 Murphy earned a gross income of $198,839 providing legal services as an attorney and $98,667 from his operation of Legal Title Insurance Services. (Exhibit D). Similarly, Murphy's 2012 federal income taxes show that

10

during 2012 Murphy earned a gross income of $130,878 providing legal services and $200,082 from Legal Title Insurance Services. (Exhibit E).

47.  The assertion that Murphy is not currently earning any income is also dubious, since the Assets and Income Form Murphy provided to WWR in its collection proceedings states that Murphy recently opened his own law practice. (Exhibit C).

48.  Murphy's representation in his Statement of Financial Affairs that he has not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding is also contradicted by his tax returns. Both Murphy's 2011 and 2012 returns show that Murphy was not only the proprietor of Legal Title Insurance Services, but that he earned substantial income from the operation of that business.

49.  The assertion in Murphy's Statement of Financial Affairs that he has had no bookkeepers or accountants supervise or audit his books and records within two years immediately preceding the commencement of his Chapter 7 proceeding is also suspect. Murphy's 2011 and 2012 tax returns state that they were both prepared by James Murphy of John R. Waters & Company, a Certified Public Accounting firm. Therefore, it is reasonable to assume that James Murphy conducted some review and audit of Murphy's books and records, contrary to Murphy's claim that he has no bookkeeper or accountant conduct any review or audit. As such, this assertion is also likely false.

50.  Murphy's Schedules of Creditors are also inaccurate. These Schedules identify WWR as Murphy's only creditor, whom Murphy lists as holding an unsecured claim of $200,000. This statement is inconsistent with Murphy's Petition, which states that he has liabilities ranging from $1 million to $10 million, as well as the Assets and Income Form

11

Murphy provided to WWR in the state court collection action, which lists upwards of upwards of 21 creditors and/or liabilities. (Exhibit C).

51.    In light of this information, it is clear that Murphy has not stated his debts and income accurately.

52.    Moreover, the timing of Murphy's filing Chapter 7 Petition, in addition to his August Chapter 7 filing, lead to the inescapable conclusion that Murphy timed his filing in order to frustrate WWR's state court enforcement action.

53.    Murphy filed his first Chapter 7 petition on August 21, 2013, just one day before he was required to file an affidavit in WWR's state court collection action showing cause why he should not be held in contempt and incarcerated. Similarly, Murphy filed his Chapter 7 Petition within hours of learning that he had been adjudicated in contempt and a body attachment had been issued for his arrest with a bond of $25,000.

54.    Murphy's conduct in this regards has been at WWR's significant expense. Not only has WWR been forced to incur attorney's fees to remove the state court action from the bankruptcy stay calendar and reinstate it before Judge White, but with each delay Murphy causes WWR also faces the likely prospect that any assets Murphy has which could be used towards its judgment are being dissipated and/or fraudulently concealed.

55.    Given the totality of these circumstances, it is apparent that Murphy is not an honest but unfortunate debtor in need of a fresh start, but is instead using the Bankruptcy Code in order to frustrate WWR's state court collection action.

## CONCLUSION

56.    For each of the foregoing reasons, Murphy's Chapter 7 petition was clearly filed in bad faith and should be dismissed for cause and with prejudice.

WHEREFORE, World Wide Realty, LLC respectfully requests this Honorable Court

enter an Order:

    a.  finding Murphy's Chapter 7 Bankruptcy to have been filed in bad faith;

    b.  dismissing Murphy's Chapter 7 Bankruptcy for cause and with prejudice to refiling

      for 1 year; and

    c.  granting such other relief as the Court deems to be just and equitable.


Respectfully Submitted,
**World Wide Realty, LLC**


By:   /s/ David M. Jenkins
       One of World Wide Realty, LLC's Attorneys


Anthony G. Barone (ARDC #6196315)
David M. Jenkins (ARDC #6211230)
Barone & Jenkins, P.C.
635 Butterfield Rd, Ste 145
Oakbrook Terrace, IL 60181
(630)472-0037

EXHIBIT 16

DEFENDANT'S QUESTION AND ANSWER
REPORT PREPARED FOR COUNSEL

### 1. The why and wherefore of Murphy's origination of the "scheme."

Apparently, a Ponzi scheme had been a modus operandi of Thomas W. Murphy from, at least, the early 1990s. Murphy "loaned" or invested over $2 million from the Casey Ciani Trust of which Murphy was the Administrator in the early 1990s to Ray Mobile of M-3 LLC, later Metal Networking LLC. When Mobile failed to pay back any of the money, Murphy "borrowed" funds from the Arthur Sanial Trust, of which he was also Administrator, to deposit to the Ciani Trust in order to continue making Trust payments from the Ciani Trust to beneficiaries, always trying to keep enough in the Sanial Trust to pay those beneficiaries.

In the last several years, I met former Murphy clients who stated Murphy would extract and/or convert their funds to repay the trusts.

A. Specific clients were: Steve Shah of Lincolnwood IL; Mark Glazer, Highland Park IL. They deposited approximately $800,000 with Murphy of which at least half went to Mobile and the remainder to partially reimburse the Ciani and Sanial Trusts.

B. The ARDC in its judgment of disbarment named Nina Jozers/Frank Alamprese as an example of his scheme in which Murphy diverted $250,000 deposited with him for a real estate transaction. Most of that money went to the Arthur Sanial Trust to make payments to its beneficiaries.

C. In early 2000-2001, Murphy formed an LLC Prestige Realty Partners with his client Harry Gio, Glenview IL. Harry had spent several years in federal prison for setting up and operating a non-registered Illinois insurance company. Harry subsequently told me that he and Murphy did business because Murphy had an excellent reputation, he was very smart, and he also promised that as a client, Harry's past would be hidden by the name of Pedersen & Houpt where Murphy worked as a partner, according to Murphy. Murphy had very prominent clients (Prospect Airport Services, the Chicago Archdiocese, Congregation of the Fathers of the Resurrection, Gordon Tech High School, New Century Bank) Also Murphy said he had excellent banking relationships with American Chartered Bank and US. Bank.

Prestige would find and purchase apartment buildings concentrating on southside buildings that were relatively cheap to purchase. Murphy would obtain the purchase and renovation loans, and do all the condo conversion legal work after a cosmetic renovation. Then Harry and Murphy would sell the condo units to "straw" buyers from the Illinois Dept. of Transportation, many of whom were introduced by John "Quarters" Boyle; the Secretary of State employees, police and firemen. The "straw" buyers would be paid $5000 each time they purchased a condo, plus receive a portion of each month's rent on the condo after Prestige made the monthly mortgage payments. However, monthly mortgage payments

could not be made by the rental payments since rental payments on the southside Chicago condos rarely exceeded $1500 per month while the mortgage principal for each condo often exceeded $300,000 or around $3,000 mortgage payment per month.

Consequently, Murphy and Harry needed to keep purchasing apartment buildings, renovating to make them condominium worthy and then sell off to "straw" buyers at a high enough price to pay off the original purchase and construction loan and have money remaining to make mortgage payments on previous condo conversion transactions. They needed "straw" buyers because only straw buyers were certain to qualify for the large mortgages that the inflated appraisals commanded. Also, straw buyers would not be slow to finalize a transaction the way a real buyer would.

In 2007 alone, Prestige paid approximately $3 million mortgage payments. However, by late 2007, most mortgage banks had either frozen their loans or had bankrupted due to the house price collapse. Consequently, Prestige was unable to make the mortgage payments nor make any monthly rental payments to "straw" buyers.

Harry Gio once showed me over a million dollars in checks Murphy had either made out to "Cash" or himself and then endorsed by Ray Mobile, all drawn on Prestige bank accounts. This was in addition to the money with drawn from Prestige bank accounts for deposit to the Ciani and Sanial Trusts to make beneficiary payments.

So , Murphy's actions with Prestige have a similarity to his actions with us. Pay previous investments with present and future transactions.

Harry Gio is located I Glenview and would probably be a witness if we wanted and/or needed him.

D. Murphy worked at Johnson & Bell Law Offices in the 1980s and early 1990s He had two subordinate attorneys working and training under his direction: Jeffrey Deer and Jack Perna. An ARDC-like problem developed according to Jeff Deer and Murphy blamed Jack Perna Years later Ray Mobile told me the reason he never repaid any money to Murphy was because Mobile had testified o Murphy's behalf and that saved Murphy Regardless Murphy had to leave Johnson & Bell where his wife, Christine, had become director of Human Resources Years later, Jack's wife, Bryn Perna, became director of "bad loans" at American Charter Bank and sued Murphy for several million dollars in loan defaults.

2

2. **Murphy's presentation to us of notes and mortgages. When, where, and who was present. Were there confirming emails of what had been discussed.**

Murphy initially brought up the idea of purchasing commercial notes and mortgages when Prestige Realty Partners, his company with Harry Gio, collapsed. His idea was for a new company to purchase the defaulting notes of Prestige with loans from the same banks that were foreclosing on Prestige. The idea did not succeed since the banks, especially American Charter, wanted to sue Murphy on his guarantees.

I used Murphy's idea with Dupage National Bank, owned by the McCracken family. President Kevin McCracken brought the idea up to FDIC inspectors since DuPage National was under a "cease and desist" order not to make further loans. The FDIC inspectors, according to McCracken, approved the idea since the new loan would just be, in essence, a transfer of "bad paper" into "good paper."

Several years later, in 2010, Murphy spoke to me about the bad condo loan portfolio at New Century Bank where he often acted as counsel. Murphy's idea was to purchase bulk loan portfolios at a discount. My partners and associates were already exploring this so Murphy's expanded bank contacts were very interesting to me and to my associates.

I had several meetings at Pedersen & Houpt with Murphy concerning the purchase process I then spoke to Babajan Khoshabe. Tszvika Wiessman, Meir Rotstein, attorney Anthony Klytta and others about purchasing the notes and mortgages at a discount, and reselling the notes at higher prices; modifying existing loans or foreclosing on the notes The concept was an excellent idea There are thousands of emails that I need to read prior to trail concerning business with Murphy.

3

**3. As an expert, what "due diligence" did I perform to verify the substance of Murphy's proposition? Paperwork and dates. Did I have prior experience with him in successful financial transactions of notes and mortgages?**

I read constantly on the purchase strategies for notes, mortgages, short sales and bank-owned properties. I read case studies of Merrill Lynch's sale of billions in foreclosed or delinquent notes and mortgages. Some of the books I read were: *A Failure of Capitalism* by Richard Posner, books by Nouriel Roubini and Meredith Whitney, together with many law review treatises about defaulted notes and mortgages. I am sophisticated from years as a stock broker, trader, and real estate investor. The central reasons I did business with Murphy was his expertise, Pedersen & Houpt's reputation and banking connections to transact notes and mortgages, and Murphy had completed some successful and lucrative transactions with me.

Purchase of 1206 S. Orchard Industrial Bldg. in Montgomery IL.

SBA loan for Metal Networking LLC.

Purchase of foreclosure from Eastern Savings Bank for property at 50 N. Spring St., Elgin IL.

2706 E. 76th Place, Chicago IL.

4

4. **Why did Murphy happen to come to me? Did he know I had Babajan sources? If so, how did he come to know it? Why was I anxious to get involved? Did we invest?**

A. Murphy constantly solicited me for business. He consistently asked me for referrals, transactions, investors, and he always brought up notes, mortgages and short sale purchases. Murphy told me he had several short sale brokers as clients and they had excellent banking connections to purchase notes, mortgages, and short sales: Alex Mysko, Ron Vergara of ICG Properties, Stephanie Andre of Leo Matthews Inc.

B. As we discussed this, Murphy persisted in finding investors and I said that Babajan would be a good partner because of 1. His vast knowledge of the mortgage business owning Nationwide Mortgage for 20 years, and 2. His connections in the Assyrian and Iranian community for investors

C. I was anxious to be involved because the loan brokerage business and mortgage origination business as in 2010 almost non-existent. Money was very difficult to make in the real estate business during 2009 and 2010. So, Murphy's idea of purchasing residential notes and mortgages was very enticing as a business After researching the regulations, I realized that not being a registered broker-dealer, we could not buy and sell residential notes and mortgages on one to four unit buildings. They were considered securities. But, we could buy and hold the notes and mortgages. Murphy and apparently other lawyers at Pedersen & Houpt concurred in my research and I have emails back and forth with Murphy discussing this issue. Murphy advised that Devon Street Investments, Ltd. be set up as the purchaser of the notes and mortgages with me as Devon's shareholder. With the help of Babajan and brokers, Devon would obtain investors as lenders to Devon for the purchase of the notes and mortgages Once purchased, Devon, using Murphy's firm, would foreclose on the notes and mortgages and upon obtaining title to the properties, the deeds would be transferred to the investor/lenders to pay off the loans used to purchase the notes and mortgages.

D. Babajan, Anthony Khoshabe, and I invested over $900,000 of money we made from the investor/lenders on flip profits with Murphy so that Murphy could buy for us the same type notes and mortgages he was purchasing for Devon with the investor/lenders' money. All the money Babajan, Anthony and I invested to buy notes and mortgages was from the profits we received from Murphy on the notes and mortgages.

5

**5. How did Murphy Know Babajan had a storehouse of contacts? Did Murphy target them as pigeons? Or were I and Babajan the ones he targeted?**

A. I told Murphy about Babajan's contacts and after that he spoke with Babajan who confirmed that he had a great number of investors.

B. Murphy rarely, if ever, spoke to the investor-lenders directly. He always spoke and corresponded with me, occasionally with Babajan, and sometimes with Fred Khoshabe. Murphy therefore directly targeted e and Babajan, occasionally Fred Khoshabe. However, indirectly, thorough Fred and Babajan Khoshabe, telling investors to "google" Murphy, Pedersen & Houpt and then Berger-Newmark, Murphy's firm from September 2011, indirectly targeted the investors. Until the 2014 ARDC judgment, Murphy had an exemplary google presence. In fact, Murphy had at least one person, Peter Poulos' son, "scrubbing" Murphy's online presence Peter Poulos told me this in 2015.

6. **Were any of the investors experienced? English-speaking, sophisticated?**

All spoke and read English. Many of the investors were very soph9isticated. Robert Badalian worked as an executive at a high tech firm. His wife was a Toshiba executive and sent us laptops. Beneta Badalian was an accountant. Vladimir Moghadassi was an executive vice president at Apple. Kathy Khodi managed Iranian money in the U.S. Raymond and Susan Babaghliu are real estate developers. Nastors Moshi owned a metal polishing plant in Phoenix, Arizona. Benvar Lazar was a doctor, defrocked for a sexual abuse complaint by a patient. Katayoun Kazemi was well-educated. Most were on the board of trustees of the San Jose Assyrian Evangelical Church.

Janet Khoshaba was a salesperson for stores selling tableware. Juliet Khoshaba worked in the HSBC Bank finance department. Arvikiram Pithyou was an Assyrian priest who had made money speculating on real estate. St. Odisho Church of the East was represented by a board of directors who made investment decisions according to its pastor Father Ninos.

The Chicago Moshi family was not sophisticated but had owned convenience and grocery stores in Chicago and in Arizona.

7

**7. Why would Murphy think we didn't know what he was up to? What were some of his come-ons or "lulling"? How many paid invoices do we have from Pedersen and did they itemize what was being paid for?**

As previously stated, one to four family mortgage notes were considered securities and could only be sold by a broker dealer. We were not broker dealers and could only purchase notes, but not sell them. I understood this both from Murphy's counseling and from a large Illinois investor Andy Lee. Andy advertised that he bought and sold notes (internet advertising) and was sanctioned by the Illinois Dept. of Professional Responsibility. I was visited by the same agent who investigated Andy and told him we had not sold one note. Attorney Glenn Seiden also spoke to the agent and the investigation was dropped.

A. I bring this up because it was the "lull" that Murphy used to "hold" the notes and mortgages he was supposedly purchasing for Devon Street and its investor-lenders in his escrow account—so that investor-lenders would have protection, and Devon, I nor Babajan could be blamed for impropriety. Consequently, Murphy kept all notes and mortgages, property deeds, tax bills and related documentation.

In 2010 and 2011, whenever we needed the documentation for a sale of the actual property, he was able to produce at closing. Examples are: 3327 W. Monroe, 4037 W. Adams, 8435 S. Burley, 4126 W. Adams, 5410 W. Fulton, 4045 W. Wilcox and 3820 W. Adams. Possibly it was luck that the initial transactions were successful and Murphy had not yet started scamming us or he had not yet met Tamara Brown (Sept. 2011), but transactions seemed to be progressing as they should.

One problem developed in May 2011 when Craig Shaffer sought the deeds to short sales he had invested in through Devon Street. I could not provide the deeds because I did not have them. I asked Murphy where the deeds were to 4135 W. Monroe, 4654 W. Adams and 5131 W. Crystal. Murphy explained that in the short sale process, the bank owning the mortgage that allowed a sale at reduced amount (short sale) would not consent to a further transfer of the sold property from the short sale buyer to another for 3 months to as much as one year, depending on the transaction terms. Each transaction was different. Murphy's client, short sale broker Alex Mysko, had purchased properties at short sale and Murphy and Pedersen & Houpt guaranteed transfer. Murphy said I could sign a guarantee to Shaffer and others that either they would receive the deed or a return of investment-loan. Murphy said Pedersen & Houpt stood behind this. It was also the affirmation Babajan required. Thereafter, with the Murphy assurance, Babajan search for the investor-lenders that Murphy requested.

I did not just take this for granted as I had handled the closing for 3820 W. Adams, Chicago. Craig and I attempted to sell the property to Mitch Isler and had to wait 90 days for Devon to receive title (which I did) and then an additional 90 days for transfer to Shaffer. At the requisite time, I transferred the property to Craig. Consequently, I spoke to underwriters at Stuart Title and they confirmed what Murphy said about short sale transfer time frames.

B.   Pedersen & Houpt, and later Murphy's firm of Berger Newmark, sent Devon Street Investments Ltd. Its monthly invoices. I did not pay monthly but would pay every few months as the invoices accumulated. At the same time, Murphy and his firms were paid $5000 to $8000 for each mortgage note and short sale transaction they handled for Devon Street. The billing statements were for work on litigation, building court and zoning cases, composing of guarantees and secretary of state processing of corporate documents.

9.

8. **Has someone ever subpoenaed Murphy's timesheets for all the relevant periods and from all the relevant law firms?**

A. Devon Street, Babajan and I have not subpoenaed Murphy's timesheets from Pedersen & Houpt nor Berger Newmark.

B. In April 2013, Attorney Richard Kruse, representing Devon Street Investments Ltd, filed an Accounting Complaint in Cook County Chancery Court for an accounting and presentation of all notes, mortgages, rental and interest payments and collateral documents. Murphy signed an agreed order stating he would provide the material. Soon Murphy called and asked me to send him a copy of all rental and interest payments I had on file. Murphy knew, from visits to the Devon Street office that I kept good records on payments. Murphy told Attorney Kruse and me that he should have hired a secretary just to handle the Devon Street transactions—probably 100 transactions—over the last 3 years. Murphy admitted he was completely disorganized as to paperwork and would need additional time. He then filed a bankruptcy petition that stalled the proceedings.

C. California investors led by Robert Badalian filed a malpractice and fraud lawsuit in Cook County Law Div. in Fall 2013. Murphy continued the proceedings with serial bankruptcy filings and not providing much documentation in the filings.

D. I then hired Attorney Anthony Klytta to search the foreclosure suits for each property in which we had purchased the notes and mortgages. Attorney Klytta researched each file and made copies of the notes, mortgages and relevant materials.

9. **When did Murphy meet Babajan and if he hadn't, why? How would Babajan have trusted the verity of the transactions without having met him?**

A. Babajan met Murphy at our office, 3924 W. Devon St., Lincolnwood IL 60712 in 2009. In 2010, Murphy handled the closings of the Stein Las Cruces, New Mexico loan and a loan for Maria Marcellas, both organized by Babajan. Murphy also conferred with Babajan on the sale of two Babajan/Anthony Khoshabe owned properties in Burbank IL.

B. Babajan would not have trusted the verity of the transactions without having met and worked with Murphy on previous successful transactions. Babajan said he did not trust Murphy but trusted him while at either Pedersen or Berger Newmark. It was Babajan who wanted all cashier checks from investor-lenders to be made payable to "Thomas Murphy Attorney/Agent." Babajan believe this protected us in each transaction. He then wanted Murphy to send us payment for the "flip" profits, interest, etc. Babajan set it up so all payments went to Thomas Murphy, the attorney and holder of the escrow accounts through his firm.

C. In fact, Fred Khoshabe was the chief early proponent of payments going to Murphy. At the start, Babajan and I would have investors like Craig Shaffer and Robert Badalian make the cashier's checks for the price of the notes, mortgages and short sales payable to the title company involved. Then the flip profits payable to me and Babajan were paid to us by the investor-lender. The investor would know how much we were making per transaction. Fred Khoshabe did not want the investor-lenders to know how much we were making. That is why all checks from July 2011 were made payable to "Thomas Murphy, Attorney-Agent."

**10. When did Murphy meet with the investors? If not, why not? Why would you think it not proper to meet with them formally at the firm?**

A. Fred Khoshabe did not want investors from California to meet with Murphy when in Chicago. The California Assyrians were our initial group of investors and they were brought in by Fred. He wanted them to google Murphy and his firm(s), but he did not want them to have contact with Murphy. Fred was afraid the investors would 1. Find out how much money we were making and/or 2. Go around us and do business directly with Murphy and his firm(s). Babajan concurred with Fred's opinion, at least on the latter reasons.

B. I went along with Fred's stance to keep investors away from Murphy and his firm because the Assyrians, 95% of our investor-lenders, were controlled by Fred Khoshabe, Babajan and Babajan's brother-in-law, Abraham Yousif. When it came to an investor I brought, such as Hiam Ben David or Jeff Won, and Wally Ayish, I had them and their attorney deal directly with Murphy. I didn't see the need to keep investors from our lawyer because I did not believe they would circumvent us and deal with Murphy without us. I saw nothing wrong in the way Murphy was handling transactions, so why would I keep an investor's lawyer from speaking with Murphy. I was assuming lawyers for the various banks Murphy was negotiating note purchases were constantly in touch with him so why not the investors and their attorneys? The investors were sophisticated and keeping them from our attorney did not seem advantageous to me.

However, as to the Assyrians in California, Arizona and Chicago, they were controlled by Fred, Babajan and Abraham. If I wanted them to invest or lend, it had to be on the Khoshabe terms.

11. **What did Babajan say and to whom, about these Investors**?

Babajan told me he had many investors willing to participate in foreclosures through notes, mortgages and short sales.

**Had they invested with him before**?

Several, such as Craig Shaffer, Robert Badalian, Abraham Yousif and Fred Khoshabe had invested with Babajan.

**Had he charged them exorbitant commissions before**?

I told Babajan that based on my conversations with Murphy in 2010 and 2011; Andy Lee in 2011; and the State of Illinois Professional Regulations Representative, and later verified by attorney Glen Seiden in April 2012, we could not sell notes as we were not broker-dealers. Therefore, we needed to state to investors the total price it would cost for Devon to purchase the notes and mortgages, legal fees, and our "flip profits." That was the amount the investors needed to loan us and upon Devon getting title to the property, they would be transferred to the investors as full payment of the loan(s). There are no regulations governing how much we could make per transaction as we were not selling notes and not broker-dealers. I do not know what Babajan had charged investors on transactions I was not involved in.

**Had they discussed prior investment matters with their attorneys**?

I do not know.

12. **It is hard to believe that the investors let go large sums of money without consulting attorneys. Certainly there must have been some who did and some attorneys who contacted Murphy. There must be corresponding paperwork.**

Attorneys for Jeff Wong and Hiam Ben David had extensive contact with Murphy concerning their transactions. Mark Stargis contacted Murphy on behalf of Anwar Michael. Both Babajan and I encouraged investors to have their attorneys contact Murphy, especially if they needed expanded guarantee documentation. There is documentation in the Wong, Ben David and Michael files.

13. **What was the paperwork drafted, by whom, where, when, and the details regarding the notes and mortgages and the investors' liabilities, earnings, commissions to 3d parties**?

Murphy composed all documentation and forwarded such to me for execution. He wrote all commission checks and flip profit checks. Babajan and I would instruct Murphy how much and to whom to write the commission and flip profit checks. Murphy kept the note purchase amount in order to purchase the notes from the different banks. Also, Murphy wrote the investor interest payment checks often to Reliant Management and Devon Street Management for further payment to investors or direct from Murphy to investors.

**Why did Murphy occasionally write investor interest and earnings checks to Reliant Management and Devon Street Management instead of always to investors**?

Fred Khoshabe wanted Anthony Khoshabe to set up Reliant Management Ltd. So that Anthony could earn an additional 5 to 10% management fee from each investor and also have money available to pay insurance premiums on the properties we were acquiring for the investors. After deducting the 5 to 10% management fee, Anthony would remit the remainder to the investors monthly.

**14. For Murphy to accumulate these packages of notes and mortgages that were bogus must have occurred in a time and place. Did he sit in his office and tabulate? Put into files? Add in secretarial correspondence? Add to his timesheets?**

Often, Babajan and I would review notes and mortgages being sold by various banks on sites such as Realty Trac, Loop Net, Debt X and Lisa Rosen oversaw a crew of workers constantly soliciting banks for notes and mortgages. We emailed to Murphy, or faxed to him, each note, mortgage or short sale we were interested in acquiring. Murphy would then contact the bank attorney to purchase the note or short sale.

At other times, Murphy had the direct contacts with the bank attorneys and would present transactions to me for approval. If Babajan and I liked the underlying property and note pricing, Babajan would call an investor or a broker to find an investor so Devon could purchase the note or short sale.

I kept a file of every property we asked Murphy to attempt to buy even if he was unsuccessful in purchasing the note or short sale. Murphy said he had all the notes, mortgages, deeds, for each consummated transaction. In May 2013, Murphy signed an Agreed Order with Attorney Richard Kruse in the Cook County Chancery accounting case, stating he would present to us the documentation on each transaction but he ever did so.

In fact, Murphy asked me to send him what accounting Anthony, Fred and I had so Murphy could match them to his "admittedly sloppy bookkeeping."

Murphy was paid $5,000 to $8,000 by us for each transaction that he closed. Murphy handled all the transactions in 2010 through August 2011 from the Pedersen & Houpt offices at 161 N. Clark St., Chicago. Starting in September 2011, Murphy worked and handled transactions from the Berger Newmark offices at both 70 W. Madison, Chicago or 1953 N. Tripp Ave., Chicago. He said he had all the documentation at the Berger Newmark offices on Tripp Avenue. Babajan visited the Berger Newmark offices at 1753 N. Tripp to meet, without warning, Murphy and his partners. Murphy was not there and the partner Babajan spoke to, Lynn Soto, knew nothing of the transactions.

15. **Who reviewed these documents with Investors**?

Babajan and I reviewed any documents presented by Murphy and our (Babajan and I) valuations with Fred Khoshabe for the California investors. Then Fred would present them with the documentation and explain further to them: Robert Badalian, Raymond Baboghli, Kathy Khodi, Assyrian Evangelical Church Board of Trustees, Henry Hormozian, Benver Lazar, Katayoun Kazemi, Vladimir Mogadassi, and Beneta Badalian.

Babajan and /or I would explain the documentation to other investors: Janet Khoshaba, John Khoshaba, Valentina Moshi, Fidel Moshi, Havanna Moshi, Abraham Yousef, Awiquam Pithyou, Stiodisho Church—Father Ninos, Slawomir Byrja, Liam Ben David, Anwar Michael, Nastors Moshi, Albert Khamis, Jeff Wong.

**Did Murphy ever deal with them individually**?

From time to time, but not often, Murphy would speak to an investor, but only when they called him. We did not encourage the investors to call Murphy but we did not discourage them when they asked. They all had his information from the internet and Fred, Babajan and I encouraged the investors to look up both his personal information and that of his firm.

**Did any Investor whatsoever have a family member of lawyer contact you or Murphy**?

Lawyers for Liam Ben David, Jeff Wong, and Anwar Michael contacted Murphy and worked out guaranty agreements with him on transactions and their details.

## 17. How was Money transacted? Did Murphy give them each the instructions as to whom checks were to be made payable for which notes and Mortgages?

Investors were told by Babajan or Fred Khoshabe—after Murphy told us the price of the notes. Babajan and I would determine the "flip price" to investors. Then we would confer with Fred Khoshabe for the California investors or with Abraham Yousif for money of the other investors before setting a final price. Then Fred would tell the California investors to prepare a cashier's check for the amount and send usually overnight to the Devon Street address. Fred would instruct the California investors to make the checks payable to Thomas Murphy, attorney and agent, with the property address and PIN on the ledger portion of the cashier's check. Murphy would either come to the Devon St. office to pick up the checks or I would drop them off at his office.

Every now and then, an investor would wire funds to Murphy's bank account. On those occasions, Babajan, Fred, or I would tell the investor Murphy's wiring instructions. Murphy gave wiring instructions himself to Liam Ben David's attorney.

### For what would be the commissions?

Once Murphy told me the not purchase price, Babajan and I would determine the "flip price" to investors. We would confer with Fred Khoshabe before deciding on how much each of us would be paid

for the transactions if it involved California investors, except Liam Ben David who was my customer. On Liam, Meir Rotstein and I would confer on the commission paid and to whom.

Babajan had the majority decision on other Assyrian investors and I decided commission amounts on transactions involving Slavomir Byrja.

### How could there not have been paperwork exchanges?

When purchasing a note, it was important to have the money on hand to complete the transaction as soon as the price was settled between Murphy and us (Babajan and me) and then Murphy and the relevant bank was buying from. So, in almost all cases, except bulk sale transactions, such as the North Community Bank portfolio, Rockford-Commercial Mortgage Bank portfolio, the Amcorp portfolio, and the Ocwen portfolio, we did not have time to withhold money—according to Murphy—before having the money available. This was actually reasonable, since we did not want to agree to the purchase of a bank note and not be able to close due to not having the money.

### How could the Bishop have done so without his Board approval?

The Boards of the Assyrian Evangelical Church of San Jose, St. Odisho Church of the East on Pulaski Ave., in Chicago, both had board approval prior to transactions. Awiquam Pithyou did not need approval investing personal funds.

### 18. What paperwork exists that shows you, or Murphy, advised investors to seek legal counsel, to review the "guarantee" verbiage, to review the amount of the commissions paid, and to review the feasibility of excellent returns on the notes and mortgages?

I do not believe there is anything—any paperwork—and maybe a few intermittent emails in which either Murphy or I advised investors to seek legal counsel to review the "guarantee" verbiage. However, as to these several investors: Liam Ben David, Jeff Wong, Kathy Khodi and Anwar Michael, their attorneys worked with Murphy in revising their particular guarantees. None of their attorneys questioned the pricing of the notes and mortgages as that was a business and not a legal decision or opinion; the same for the return on the notes and mortgages.

Babajan told his Assyrian investors on more than one occasion that if they wanted to get lawyers involved, they did not need to invest with us. He did not want the delay he believed was associated with lawyer involvement.

### 19. What was the correspondence with the insurers re premiums on these properties? Who suggested the insurers? Was correspondence sent to the firm or Murphy about regular payments of insurance premiums?

Babajan and I believed we need to insure each property we believed Murphy had purchased notes and mortgages for us. Typically a bank will force insurance on the property in foreclosures, even if it has to

16

pay the premiums, since normally a borrower in foreclosure will not have the money to do so. I believed we needed to do the same thing. We first started with a company from the western suburbs but when they had us pay premiums and we found they could not insure the properties, we complained to the Illinois Insurance Commissioner and received a return of some premiums (file in storage).

Then Meir Rotstein referred us to Sol Eisenberg of Evergreen Insurance Brokers in NYC, an Orthodox group, very diligent and honest. They represented Seattle Specialty Insurance Company, an insurer specializing in lender insurance for properties where the insured was the note and mortgage holder. Our insurance premiums were $14,000 per month through 2012, about $6,000-$8000 per month from September 2011 through 2012 (about January 2012), but that was because we had not as many notes and mortgages and did not need to insure the underlying properties.

All correspondence with the insurance broker, Evergreen and Seattle Specialty Insurance Company was addressed to Devon Street Investments Ltd., 3924 W. Devon, Lincolnwood IL 60712 by regular mail and email. Devon and, occasionally, Reliant Management, paid all premiums.

17

20. **Why did Babajan and I pay for the insurance?**

I realized that most people in foreclosure do not pay or cannot pay their homeowner insurance premiums. Therefore the mortgage holder usually pays the premiums to protect its investment and charges it to the owner. Babajan and I believed we need to protect our investment and the investors by purchasing insurance on every property Murphy supposedly purchased notes for, as well as properties we had purchased outright.

In August 2011, I purchased with Assyrian Evangelical Church of San Jose investment, a short sale of 3327 W. Monroe, Chicago. After the requisite 90-day period, Devon Street quitclaimed the property to the Church. We transferred the State Farm Insurance to the Church. Our (the Church) investment to purchase and pay Babajan and my "flip profits" was $75,000. The building burned down, a total loss. State Farm paid the Church $225,000 plus $30,000 for demolition. IT was a good example of why Babajan and I wanted and paid for insurance.

**From what source did these payments come?**

We charged each investor between 5% management fee to the Churches and 10% management fee for all other investors. So, from the interest payments made to investors each month, we deducted 10% and used this to pay for insurance and maintenance costs such as Francisco Cisneros pay, security on the buildings, etc.

**Didn't the investors have to pay for insurance premiums?**

As stated, the investors paid out of the management fee deducted from interest paid to investors. However, often the premium would become due prior to the interest payments being received from Murphy. In those instances, Babajan and I paid the insurance premiums so as not to lose coverage.

21. **Were there separate accounts for the payments of investors' costs—such as premiums—or was it a completely mingled, informal and chaotic payment system?**

We tried to pay all costs from the 10% management fee deducted from investor interest payments. Often, this was not possible because the 10% management fee was not enough to offset costs. Then, Babajan and I would pay—usually me.

22. **On what date did you have an idea that Murphy had mingled investor monies for his own purposes? Did he also use your and Babajan's?**

In October 2012, Murphy said he and his father's ward, Tamera Brown, were buying a house at 2015 N. Racine, Chicago. Murphy's father had made him promise to take care of Tamera. It was, according to Murphy, his father's death bed request.

**23. Were your and Babajan's monies from the commissions? What is the reasoning that it was your earned monies?**

The money—mine and Babajan's—was from "flip profits" on each transaction, or commissions. Babajan and I believed the transactions with Murphy were bona fide. As per my guarantee agreements with investors, I (and Babajan, Fred and Anthony) could use the "flip profits" in advance of the conclusion and receipt of property ownership. If we did not receive the property ownership, then that money had to be returned to the investor for that particular transaction as in any other loan agreement. Murphy continuously relied upon this in our discussions of the transactions, payments and accounting practices.

**24. What communication or correspondence did you two have with the investors about the commissions? Any attorneys involved? Family members? Confirming emails?**

In 2010 and 2011, and until July 2011, when Fred Khoshabe became involved as a broker procuring investor money, Babajan and I would have investors such as Craig Shaffer and Robert Badalian make the note payment and attorney fees payable either to a title company or Murphy, and Babajan and my commissions separately to us. Fred, however, did not want his Assyrian California investors to know how much money he was making, so Fred and Babajan felt that under those circumstances all investor money should be payable to Thomas Murphy, attorney and agent, and Murphy would be instructed how to pay and to whom the "flip profits" or commissions would be paid, and how much to each.

**Did Murphy use my, Babajan and Anthony's money?**

Yes. We invested over $900,000 with Murphy to purchase notes and mortgages for us, the same as for the investors. We used "flip profits" or commissions to invest with Murphy. Some of the transactions were as follows:

3337 N. Halsted    3512 W. Shakespeare    3941 W. Gladys    2200 N. Kedzie    5551 W. Congress
3837 W. Wilcox    2710 N. Artesian    3839 W. Wilcox    1105 N. Damen    4846 W. Washington
2742 W. Granville    3152 W. Diversey

**25. Did you have an inkling when you first learned of Tamera Brown and the Racine property? What date was it that Francisco met her at her house? What assistance from his law firm did Murphy enlist in the purchase of the Racine property?**

Until October 2012, I did not know anything about Tamera Brown or her existence. At our bond hearing in late August 2015, the government in an effort to show Murphy had money stated that Murphy had deposited approximately $480,000 into Tamera's accounts. I believe this doesn't include money Murphy paid to Jason Fox, the Racine property owner.

Francisco met Tamera at the Racine property in late October or early November 2012 when he went there to paint several rooms.

I do not know what assistance Murphy received from his law firm in purchasing the property.

Murphy asked if I could send Francisco Cisneros to that address to paint several rooms. Murphy stated he was purchasing the property on Articles of Agreement. About the same time, Jason Fox, the property owner, called me and asked for a reference, saying Murphy was making a down payment of $600,000 and Fox wanted to be reassured that Murphy's clients would support him. The monthly payment was $17,000. I told Fox that Murphy had many top clients and should not be a problem. I believed Murphy, from past tax returns, made in excess of $500,000 per year and in the last two years had made an additional $500,000 in fees from just the notes and mortgages. So, the purchase did not seem like a poor investment, especially given the property and address.

In late November 2012, Murphy made two interest payments payable to Devon Street Management Company Ltd.—checks of $215,000 and $356,000. I deposited them to the Devon Management Chase Bank Account. Murphy's checks were drawn on his Chase Bank Private Account. Chase gave Devon $517,000 in available funds and Fred Khoshabe paid out several hundred thousand in interest payments to investors. In five days, Chase reversed the credit from Murphy's checks, leaving the management account with a negative $169,000. Devon Street Investments had accepted a transfer of $300,000 from Devon Street Management so I could pay investors who wanted interest payments to be made by checks rather that the ACH payments made by Fred Khoshabe from Devon Street Management. So, both accounts together were approximately $426,000 overdrawn.

Murphy told me he was under pressure because several banks and their law firms had not yet remitted payments to him for Devon Street. Murphy stated he should not yet have written the checks but that he would have the money in a couple days. He gave me replacement checks. These also bounced.

I told Babajan and Fred that we needed to cover the accounts but Fred was out of money from having invested all his profits with Murphy. Babajan refused to put up any money, so I took money from my savings accumulated from "flip profits," and covered the overdrafts so that the investors would be paid their interest.

Up to late November 2012 and December 2012, Murphy had written Babajan, me, Fred, Anthony and the investors many millions of dollars in checks and none had bounced—over $5,000,000. Nothing had ever gone wrong with the accounting, payments to investors or our "flip profits." As the checks bounced, I called Jason Fox, owner of 2015 Racine, Chicago, where Tamera was living and he stated Murphy had made the down payment and all was good with monthly $17,000 payments. At that point, I believed Murphy had used our investors' interest payments to make his down payment and monthly payments on the Articles of Agreement to purchase 2015 N. Racine. The question I asked Murphy was whether he had collected our interest and used it or whether payments were indeed delayed from banks and their law firms and receivers.

Murphy said the new payments for December and January were delayed, and his checks to Fox were paid unwittingly from interest he owed us and was holding in his bank account. He was also expecting large payments from Prospect Airport Services and the Congregation of the Resurrection Fathers—in excess of the checks he had written us and for the checks he had written Jason Fox. So, according to Murphy, it was a very great snafu but not something wrong with our business or a long-term problems for the investors or Murphy.

24

26. **Why did Anthony and his cousin think there was reason to contact the SEC but Babajan and you did not?**

They were concerned that Anthony, Babajan and me had not received our notes from Murphy. The three of us had invested over $900,000 with Murphy to purchase notes and mortgages.

**What were you and Babajan doing at this juncture?**

We began pressing Murphy for documentation in May 2012 because we wanted to find out what the status of each foreclosure lawsuit. Not because we believed Murphy was stealing our and investor money. Murphy said his office was in disarray and he needed to hire a secretary to do his work and bring everything up to date. He assured us he would do so. Murphy also met with Fred Khoshabe and Robert Badalian when they came to Chicago in June 2012, and assured them all was fine. Everyone believed Murphy. The interest was flowing. We received title to 4510 W. Jackson, 4126 W. Adams, 4045 W. Wilcox, and 5410 W. Fulton shortly thereafter, and this calmed us. Murphy had excellent secretarial at Pederson but none at Newmark.

**Did we ever contact Murphy's law firms?**

In May 2012, an anonymous email was sent to Murphy's partners, Lynn Soto and Berger, stating that Devon Street Investments, Ltd. was having trouble delivering documentation to its investors. Murphy sent it to me and I sent it to Babajan and Fred Khoshabe. Shortly thereafter, we received the above-listed property deeds.

**How long were you receiving contemporaneous invoices from Murphy's firms?**

We received invoices every month, but only with details of what other attorneys at the firm were doing for us, especially related to building code violations. Murphy's bills were paid from the $5,000-$8,000 he charged us per transaction. This included his negotiation with lenders, various law offices for banks, any documentation he prepared for us, court foreclosure work, etc.

28. **What have been the procedures to reduce Tamera's conversation to a transcript? Or, to subpoena her? Do you need her since the documents indicate that he spent the money on their new life and that his is pleading?**

Attorney Richard Kruse sent interrogatories to Tamera Brown in Florida. She responded by email to many of the questions and left her phone number in the event Attorney Kruse, or any of the other attorneys, wished to contact her. She was not complimentary to Murphy, but this was before we encountered her meeting Murphy at the Hampton Inn in Skokie IL.

WHERE ARE NOTES AND FIGURES FOR THE REVIEW OF DOCUMENTS WITH FRED KHOSHABE?

I have copies of everything sent to Fred Khoshabe for the California investors in my files, boxed in storage. Also, I sent many by email.


IF FRED KHOSHABE PRESENTED TO THE CHURCH BOARD, THERE MUST BE RECORDS OF THOSE CONVERSATIONS APPENDED TO TRUSTEE MEETINGS OF THE ASSYRIAN EVANGELICAL CHURCH OF SAN JOSE, CALIFORNIA.

Should we not subpoena those records? And, if in Assyrian or Aramaic, there should be a translation. Also, ask Gov. Perhaps they have but haven't shared.


MURPHY COMMUNIQUES WITH INVESTORS. WHAT DID HE SAY ABOUT WISHING TO SPEAK TO OR NOT WISHING TO SPEAK TO INVESTORS? DID MURPHY INCLUDE ANY ON HIS TIMESHEETS? DO THE INVESTORS REMEMBER SPEAKING TO ANY RECEPTIONISTS/SECRETARIES? WHY WERE THEY CALLING HIM, IF IN FACT THEY DID SO?

Murphy would have spoken to investors had they called him but he did not tell me any called; at least I do not remember it. There may be emails from Murphy to me concerning this. I do remember that Fred Khoshabe did not want California investors speaking to Murphy because he did not want them knowing how much he was making per transaction. Babajan and I never tried keeping investors from speaking or meeting with Murphy. Babajan and I believed it a plus if the investors looked up Murphy and his firm or spoke to him. I do not know if Murphy had contemporaneous records of conversations with investors. Most of Murphy's billing statements to me, Devon Street or related entities did not specify what he was working on, but they did specify when another lawyer from the firm was working on our file. I have billing statements in storage.


GUARANTEES AND AGREEMENTS WORKED ON WITH LAWYERS FOR LIAM BEN DAVID, JEFF WONG AND ANWAR MICHAEL: WERE THE AMENDED DOCUMENTS THEN TURNED OVER TO ME AND BABAJAN? WHO SIGNED THE GUARANTEES? HOW DID MURPHY TRANSMIT THE INFO TO ME AND BABAJAN AND WHEN? DID MURPHY COMMUNICATE WITH THEIR LAWYERS?

Murphy worked on all these agreements with the lawyers for each investor. There are email chains with each that I have. Once the documents were completed, I worked with Murphy on any changes and upon agreement executed the guarantees for each investor as President of Devon Street Investments, Ltd. Murphy transmitted the information to me by email.

WHY WOULD CHECKS BE MAILED TO THE DEVOT STREET OFFICE? WAS CORRESPONDENCE INCLUDED ALONG WITH THE CHECKS, AND, IF NOT, WHY NOT? DID I MAKE COPIES AND FILES FOR EACH? DID I WRITE TO EACH INVESTOR AS TO THE IMMEDIATE DELIVERY AND PROGRESS OF THEIR INVESTMENT WITH MURPHY?

Checks were mailed to the Devon Street Office at 3924 W. Devon St., Lincolnwood IL60712 because it's what Babajan and Fred Khoshabe wanted. It was efficient and a secure way for recordkeeping. I felt it best that we had copies of everything before turning the documents and checks to Murphy. We kept records of all money paid in and payments made to investors.

EMPHASIZE AND DISTINGUISH YOUR SUDDEN SHIFT TO PAYING INSURANCE PREMIUMS FOR YOUR PROPERTIES. FROM WHENCE THE PREMIUM MONEY? WAS THERE ANY CORRESPONDENCE OR COMPLAINTS ABOUT THE COMMISSIONS OR "FLIP PROFITS" AT ANY TIME?

Both Babajan and I believed it important to have insurance on all the properties covered by the guarantees and on our properties. Devon Street Management charged investors 5 to 10% for the paperwork, transmitted monthly and quarterly payments and any maintenance work. From that 5 to 10% of monthly and quarterly payments, we paid the insurance premiums. If there was a shortfall, Babajan and I would make the payments. We did not have any complaints about the commissions or "flip profits."

STRANGE THAT MURPHY DID NOT GIVE THOSE WIRING INSTRUCTIONS TO INVESTORS FOR HIS ACCOUNTS.

Babajan wanted cashier's checks made out by investors that stated made "payable to Thomas Murphy, Attorney and Agent" with his firm name on the ledger. We felt more protection in allowing Murphy to hold the cash collateral necessary to purchase the mortgage notes or short sales. Murphy had Liam Ben David wire to his account because it was part of a multiproperty mortgage.

HOW DID I AND BABAJAN REPRESENT OURSELVES TO INVESTORS—AS AGENTS?

We did not represent ourselves to investors as Murphy's agents. We said that we were purchasing discount mortgage notes—actually Devon Street Investments Ltd. Was the buyer with the investors loaning money to Devon Street under my guarantee.

WAS MURPHY'S WIRING INFORMATION A PEDERSEN ACCOUNT?

No, the account was Thomas Murphy's business account that he also used as his escrow account. Investors were not jittery about this method of payment as Murphy and his firm(s) were credible.

EXHIBIT _17_

DEFENDANT'S DIRECTIONS TO
ATTORNEYS ON JUNE 12, 2018 - EMAIL

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------------------------------------------

FROM: 08043424
TO: Adams, Josh
SUBJECT: Attorney/Client Privileged Information
DATE: 06/12/2018 09:25:13 AM


Josh:

Yesterday I was upset with Scott Frankel when he said it was the first he heard of the cashier checks to Murphy from me and the Khoshabes for purchase of notes and mortgages. It was obvious he had not read my statements and typed draft motions sent to him by me. That is the biggest reason for my anger.

Now, I want you to call as witnesses for me the forensic accountant Sandi Prescott(?) from the FBI. Either she is incompetent, which I doubt, or lying by omission, or the standard she could not recall, as did Agent Connors.
The FBI forensic accountant studied Murphy's bank accounts as well as mine and the Khoshabes. She had all the cashier checks deposited to Murphy's accounts and therefore she had a copy of the cashier checks from me and the Khoshabes to purchase the same type notes and mortgages that Murphy was supposed to purchase for our investors. It is critical that you bring this out. I don't want to hear Scott's statements about people on my side missing in action. The only people I should be relying on are my lawyers. I feel comfortable knowing you will do this for me.
(Also, Lyle Evans and Jodie Blau - FBI, had copies when Seiden's office gave them to the agents as they came to Seiden's office at 115 S. Lasalle in September 2014)

I want admitted the following:

1. Checks made payable to Murphy by me and the Khoshabes to purchase notes and mortgages for me and the Khoshabes.

2. Seiden also gave Hogstrom a copy of the insurance policies covering approximately 70 properties in which Murphy supposedly purchased notes and mortgages for me, the Khoshabes and our investors. The insurance companies were Mount Vernon Insurance and Seattle Specialty Insurance Company through broker Evergreen Insurance. The Khoshabes and I paid approximately $14,000 per month in insurance premiums at the high amount of the properties.

3. Murphy Rule 2004 Bankruptcy Hearing and deposition before Assistant U.S. Attorney Jeffrey Snell for the United States Bankruptcy Trustee. Murphy lied about his social security numbers, income during 2010 through 2013, certain debtors, etc. (I have a copy and will bring to court - sent to you several weeks ago and you used it to impeach Murphy).

4. Murphy 2014 Statement of Financial Affairs submitted in his Chapter 7 Bankruptcy case in which he includes as his first debtor, Devon Street Investments, Ltd. and states that Devon Street had a foreclosure judgment against Murphy. (I have a copy and will bring to court -I also sent to you several weeks ago).

5. United States Trustee attorney AUSA Jeffrey Snell motion to dismiss Murphy's Chapter 7 Bankruptcy Petition for falsehoods and failure to comply with the Rules (I have a copy and will bring to court - I also sent you a copy several weeks ago)

6. My accounting of payments to investors, and I will bring to court tomorrow.

7. Government (forensic accountant) information concerning breakdown of the amounts she said went to Murphy, also fine if she wants to bring a breakdown of money to me and the Khoshabes. Her answer to you about Craig Shaffer's money was too convenient that it was not lumped into the investor payments. She was either incompetent, obfuscating or lying about what composes the final numbers.

8. Copy of Murphy's bounced checks to Devon Street Management and Devon Street Investments in November, December and January 2012 and 2013. Look at the Devon Street Management bank account for November 2012 as I saw it in your binder with the checks recorded and shows they were returned for Insufficient funds. The amounts were $215,000, $390,000 or $359,000 and $31,000. It created an overdraft of at least $169,000 in the Management account which I covered when Murphy said that he was only having trouble with collecting from Lawyers and banks, but the money would come soon.

9. Seek out Murphy's legal background at Johnson Cusack & Bell, Burke Warren McKay and Pedersen & Houpt.

10. Murphy's Ponzi scheme with Prestige Realty Group, he brings up Prestige in the Rule 2004 deposition in bankruptcy court and says he lost $22 million (he never had $22 million of his own money). The banks lost between $22 - $60 million as Murphy was using straw buyers and then paying the mortgage payments from newer mortgages. Important to show his ponzi activities

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------------------------

besides the ARDC information.

11. Murphy and Deer accused me of arson on Deer's house but it was really Deer's clients or Russian loan sharks as Deer and Murphy had stolen hundreds of thousands in a client's settlement. It is the subject of a Deer 2015 ARDC complaint. I told Justin Wiersema about this. You or Frankel have had information about this for several months, I think we should explore it.

Look, we need all or most of these in the record, at least for appeal purposes; however, with these admitted into evidence and your sterling closing, I have a chance. Please, I want this included and I want you to call the forensic accountant and Lyle Evans if this is the way to get it done.

Call Harvey Waller on his cell phone (312) 919-9100 or his office phone about his documents. Since he is also a longtime Babajan lawyer, he may be ignoring us. But, he is also my lawyer on the civil matter and I signed a retainer agreement with him.

Sincerely,
Albert Rossini
08043-424

EXHIBIT _18_

CHECKS BY DEFENDANT AND KhoshABES
IN THE SAME FORMAT AS THOSE BY INVESTORS
THAT WERE SHOWN AS GOVERNMENT EXHIBITS.

# CHECKS AND PAYMENTS FROM
# BERT ROSSINI & BABAJAN KHOSHABE
# TO TOM MURPHY FOR NOTES

| | |
|---|---|
| 5551 W CONGRESS | $35,000 |
| 6337 N TALMAN | 30,000 |
| 5018 W QUINCY | 2,500 |
| 4946 W WASHINGTON | 32,000 |
| 3941 W GLADYS | 35,000 |
| 2710 N ARTESIAN | 50,000 |
| 6554 N MOZART | 40,000 |
| 1135 N DAMEN | 95,000 |
| 2742 W GRANVILLE | 102,500 |

AGRRTIG@AOL.COM.



CHASE ⬡

CASHIER'S CHECK

8137390239

Date 03/28/2012

Remitter ALBERT ROSSINI

Pay: THIRTY TWO THOUSAND FIVE HUNDRED DOLLARS AND 00 CENTS

Pay To The Order Of: THOMAS W MURPHY ATTORNEY/AGENT
PIN 17-06-400-014-0000  1135 N DAMEN
1135 N. DAMEN
CHICAGO, IL 60622

$ ********32,500.00 ***

Drawn JPMORGAN CHASE BANK, N.A.

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑃B137390239⑃ ⑃044000037⑃ 7586613596⑃



13-14-3774B  08-2005

**Bank of America** 🇺🇸  　　Cashier's Check　　No. **0631523**

Date: March 21, 2012

Pay to: THIRTY TWO THOUSAND

Remitter (Purchased By)

$**32,500.00**

Pay exactly THIRTY TWO THOUSAND FIVE HUNDRED DOLLARS AND 00 CENTS

VOID AFTER 90 DAYS

_Authorized Signature_

Bank of America N.A.
San Antonio, Texas

⑈0631523⑈ ⑆114000019⑇ 001641004043⑈

THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK    THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK



**CHASE** 🏦

282111107 NEW 01/08 8810004306

9194513221

Date 03/27/2012

Remitter ALBERT ROSSINI

Pay: FIFTEEN THOUSAND DOLLARS AND 00 CENTS

$ ********15,000.00 ***

Pay To The Order Of: THOMAS MURPHY, ATTORNEY/AGENT
PIN: 17064000140000
1135 N. DAMEN
CHICAGO, IL 60622

JPMORGAN CHASE BANK, N.A.
Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑉9194513221⑉ ⑈044000037⑈ 758661359⑉



**CHASE** 🏦

282111107 NEW 01/08 8810004306

9194513220

Date 03/27/2012

Remitter ANTHONY E. KHOSHABE

Pay: FIFTEEN THOUSAND DOLLARS AND 00 CENTS

$ ********15,000.00 ***

Pay To The Order Of: THOMAS MURPHY, ATTORNEY/AGENT
PIN: 17064000140000
1135 N. DAMEN
CHICAGO, IL 60622

JPMORGAN CHASE BANK, N.A.
Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑉9194513220⑉ ⑈044000037⑈ 758661359⑉



Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
**CASHIER'S CHECK**

**Customer Copy**

**9194513072**

03/08/2012

Illinois

Remitter **ALBERT ROSSINI**

Pay To The
Order Of   **THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**

$ *********40,000.00 ***

Drawer: **JPMORGAN CHASE BANK, N.A.**
**NON NEGOTIABLE**

TERMS
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

282111107 NEW 01/08 8810004305

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**CHASE**   **CASHIER'S CHECK**   HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**9194513072** 25-1/440

Remitter **ALBERT ROSSINI**

Date  03/08/2012

Pay:   FORTY THOUSAND DOLLARS AND 00 CENTS

Pay To The
Order Of   **THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**
2742 W. Granville
Chicago, IL 60659

$ *********40,000.00 ***

Drawer: **JPMORGAN CHASE BANK, N.A.**

*Michael Andrews*

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH



Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
**CASHIER'S CHECK**

**Customer Copy**

**9194513071**

03/08/2012

Illinois

Remitter **ANTHONY KHOSHABE**

$ \*\*\*\*\*\*\*\*\*40,000.00 \*\*\*

Pay To The
Order Of   **THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**

Drawer: **JPMORGAN CHASE BANK, N.A.**
**NON NEGOTIABLE**

**TERMS**
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

282111107 NEW 01/08 8810004305

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    **CASHIER'S CHECK**    HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**CHASE**

Remitter **ANTHONY KHOSHABE**

**9194513071** 25-1/440

Date   03/08/2012

Pay:   FORTY THOUSAND DOLLARS AND 00 CENTS

$ \*\*\*\*\*\*\*\*\*40,000.00 \*\*\*

Pay To The
Order Of   **THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**
2742 W. Grenville
Chicago, IL 60659

Drawer: **JPMORGAN CHASE BANK, N.A.**

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

CHECKS CASHED · CAMBIAMOS CHEQUES
FREE MONEY ORDERS · ALL BILLS PAID
VISA® PREPAID DEBIT CARDS

70-118 / 710



7201 N. CALIFORNIA AVE. · CHICAGO, IL 60645
TO VERIFY · CALL (773) 761-2899
Open 24 Hours · We Never Close
Abierto 24 Horas · Nunca Cerramos

REPUBLIC BANK
OAK BROOK, ILLINOIS

CC007

007005729

2·14·2012

DS 7005729

ALEERT ROSSINI

REMITTER

$5,000.00**

PAY TO THE ORDER OF  Thomas Murphy - Attorney/Agent

Deposit $ 2742 W. GRANVILLE, Chicago, IL 60659
GOOD until 3/20/12

NOTICE TO HOLDER: DRAWEE NOT LIABLE ON STOP PAYMENT.
· NO REPLACEMENT FOR 30 DAYS FROM PURCHASE. RE-ISSUE FEE APPLIES.
· PURCHASER AGREES TO INSERT NAME OF PAYEE AND IS SOLELY RESPONSIBLE FOR FAILURE TO DO SO.
NO REFUND WITHOUT YELLOW RECEIPT

NON-NEGOTIABLE



STATE REGULATED



PLS

70-118
710

7201 N. CALIFORNIA AVE. - CHICAGO, IL 60645
TO VERIFY - CALL (773) 761-2899

REPUBLIC BANK
OAK BROOK, ILLINOIS      CC007

Open 24 Hours - We Never Close
Abierto 24 Horas - Nunca Cerramos

3/8/2012  007010499

ALBERT ROSSINI
REMITTER

DS   7010499

PAY TO THE
ORDER OF   Thomas Murphy                    $7,500.00*****

SEVEN THOUSAND FIVE HUNDRED AND 007100 U.S. Dollars

WARNING: THIS DOCUMENT CONTAINS NUMEROUS SECURITY FEATURES. SEE VERIFICATION INSTRUCTIONS ON BACK.

2742 W. GRANVILLE, Chgo, IL 60659

⑈007010499⑈ ⑈071001180⑈ 958000084 7⑈

---

Bank of America Advantage

ANTHONY E KHOSHABE    06-08
6349 N KNOX AVE
CHICAGO IL 60646-4411

632

349719 &
5525

3/8/2012
Date

Pay Thomas Murphy, Attorney/Agent    $ 10000 —
to the order of
ten thousand    ²/₁₀₀ —    Dollars

Bank of America

Pin: 13-01-203-052-0000
Memo   2742 w. Granville
       Chicago IL 60659

⑈071000505⑈ 008605178725⑈063 2



7201 N. CALIFORNIA AVE. - CHICAGO, IL 60645
TO VERIFY - CALL (773) 761-5000
Open 24 Hours - We Never Close
Abierto 24 Horas - Nunca Cerramos

REPUBLIC BANK
OAK BROOK, ILLINOIS

CC007

007010499

3/8/2012

DS   7010499

ALBERT ROSSINI

PAY TO THE
ORDER OF   Thomas Murphy

SEVEN THOUSAND FIVE HUNDRED AND 00/100 U.S. Dollars          $7,500.00*****

WARNING: THIS DOCUMENT CONTAINS NUMEROUS SECURITY FEATURES. SEE VERIFICATION INSTRUCTIONS ON BACK.

2742 W. GRANVILLE, Chgo, IL 60659

"007010499"  ":071001180:  958000008L7"

---

ANTHONY E KHOSHABE          08-08
6340 N KNOX AVE
CHICAGO IL 60646-4411

632

3/8/2012                    Date

Pay   Thomas Morphy + Attorney/Agent
to the order of
ten thousand  %00                    $ 10000 -

Bank of America

Dollars

P.in: 13-01-203-052-000
Memo  2742 w. granville
      Chicago IL 60659

"071000505": 008605178725"0632

# CHASE ⬡

Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
## CASHIER'S CHECK

**Customer Copy**

**9194513071**

03/08/2012

Illinois

Remitter  ANTHONY KHOSHABE

Pay To The
Order Of
THOMAS MURPHY, ATTORNEY/AGENT
PIN # 13-01-208-032-0000

$ *********40,000.00 ***

Drawer: JPMORGAN CHASE BANK, N.A.
## NON NEGOTIABLE

TERMS
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

262111107 NEW 01/08 8810004308

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

# CHASE ⬡

CASHIER'S CHECK

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**9194513071**

Date   03/08/2012

Remitter  ANTHONY KHOSHABE

**Pay:**   FORTY THOUSAND DOLLARS AND 00 CENTS

Pay To The
Order Of
THOMAS MURPHY, ATTORNEY/AGENT
PIN # 13-01-208-032-0000
2742 W. Granville
Chicago, IL 60659

$ *********40,000.00 ***

Drawer: JPMORGAN CHASE BANK, N.A.

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

BRBK INVESTMENTS
PROPERTIES

| PROPERTY | PRICE | DATE | START | MONTHLY RENT | ANNUAL RENT |
|---|---|---|---|---|---|
| 3941 W. Gladys Chicago, IL 60624 | $35,000 | 8/27/11 | 9/1/11 | $5,100.00 | $61,200.00 |
| 4946 W. Washington Chicago, IL 60644 | $35,000 | 9/15/11 | 10/1/11 | $4,500.00 | $54,000.00 |
| 5551 W. Congress Chicago, IL 60644 | $40,000 | 10/20/11 | 11/1/11 | $6,800.00 | $81,600.00 |
| 5018 W. Quincy Chicago, IL 60644 | $17,500 | 11/27/11 | 12/1/11 | $3,900(50%) $1,950 | $23,400.00 |
| 2710 N. Artesian Chicago, IL 60647 | $50,000 | 11/20/11 | 11/21/11 | $6,700.00 | $80,400.00 |
| 6337 N. Talman Chicago, IL 60647 | $30,000 | 12/20/11 | 12/21/11 | $3,300.00 | $39,600.00 |
| 4305 Oakton Skokie, IL 60076 | $60,000 | 12/28/11 | 1/1/12 | $3,150(40%) $1,560.00 | $15,120.00 |
| 4731 Main Street Skokie, IL 60076 | $60,000 | 12/28/11 | 1/1/12 | $3,900(40%) $1,560.00 | $18,720.00 |
| 8346 Kimball Skokie, IL 60076 | $52,000 | 12/30/11 | 1/1/12 | $3,000(50%) $1,500.00 | $18,000.00 |
| 4914 Mulford Skokie, IL 60077 | $50,000 | 12/30/11 | 1/1/12 | $3,395(50%) $1,697.50 | $20,370.00 |
| 2200 N. Kedzie Chicago, IL 60647 | $40,000 | 1/14/12 | 1/15/12 | $9,975.00 | $119,700.00 |
| 4832 W. Montrose Chicago, IL 60641 | $140,000 | 2/12/12 | 2/13/12 | $16,725.00(50%) $8,362.50 | $100,350.00 |
| 2742 W. Granville Chicago, IL 60659 | $105,500 | 3/8/12 | 3/9/12 | $11,400.00 | $136,800.00 |
| 1135 N. Damen Chicago, IL 60622 | $ 95,000 | 3/28/12 | 4/1/12 | $10,150 | $121,800.00 |

These notes, mortgages and/or proprties are owned as tenants in common by Albert Rossini and Babajan Khoshabe.

Albert Rossini. 10/15/12

| | | | | | |
|---|---|---|---|---|---|
| 3337 N. Halsted<br>Chicago, IL 60657 | $ 85,000 | 4/25/12 | 4/25/12 | $10,575 | $126,900.00 |
| 6547 N. Mozart<br>Chicago, IL 60645 | $ 40,000 | 6/21/12 | 6/25/12 | $ 3,725 | $ 44,700.00 |
| 8249 Knox<br>Skokie, IL 60077 | $ - | (2/3 owned by BRBK—1/3 owned by Fred)<br>7/16/12 | 7/16/12 | $ 2,574 | $ 30,888.00 |
| 6159 N. Hamilton<br>Chicago, IL | $ - | (2/3 owned by BRBK-1/3 owned by Fred)<br>7/16/12 | 7/16/12 | $ 4,752 | $ 57,024.00 |
| TOTAL INVESTMENT<br>Our money: | $ 935,000.00<br>$ 555,500.00 | | | $96,181.00 | $1,154,172.00 |

These notes, mortgages and/or properties are owned as tenants in common by Albert Rossini and Babajan Khoshabe

By: _Albert Rossini_
Albert Rossini
October 15, 2012

By: _Babajan Khoshabe_
Babajan Khoshabe
October 15, 2012

NOTARY PUBLIC

My commission expires on _____

OFFICIAL SEAL
Takis Sarantos
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/16/2014

EXHIBIT  19

AGENTS EVANS AND BLAU
MAKE INTENTIONAL MISSTATEMENTS TO ANTHONY
Khoshabe

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
                            )
          Plaintiff,     )
                            )      15 CR 515-3
                            )
      v.                 )
                            )      Judge John Z. Lee
                            )
ANTHONY KHOSHABE,     )
                            )
         Defendant.    )

## MEMORANDUM OPINION AND ORDER

Defendant Anthony Khoshabe ("Khoshabe"), along with Albert Rossini, Babajan Khoshabe, and Thomas Murphy (collectively, "Defendants"), have been indicted on multiple counts of mail and wire fraud. The charges against them arise out of a purported scheme whereby the Defendants are alleged to have fraudulently induced various individuals to invest in nonexistent real estate interests. Khoshabe has moved to suppress certain statements he made to FBI agents on July 14, 2015, arguing the statements were given involuntarily. Because the totality of the circumstances indicates that Khoshabe was induced to make these statements by a false promise not to prosecute, the motion to suppress [181] is granted.

## Background

During the course of investigating the conduct charged in this case, government agents interviewed Khoshabe on two different occasions. Def.'s Mot. Suppress 2, ECF No. 181. First, FBI Special Agent Jody Blau and Special Agent Michael Gorman of the United States Department of Housing and Urban Development, Office of Inspector General (HUD-OIG), interviewed Khoshabe at his home on September 10, 2014. *Id.*; *see* Govt.'s Resp. Opp. Mot.

Suppress, Ex. A, ECF No. 191. According to the report from this meeting, Khoshabe spoke with the agents about his prior work as a property manager for Rossini, investments he made through Rossini, and the recruitment of investors by Rossini and Babajan Khoshabe, Anthony's father. *See generally* Govt.'s Resp., Ex. A.

Then, on July 15, 2015, Special Agent Blau, along with Special Agent Lyle Evans and Task Force Officer Paul Martinez, interviewed Khoshabe again. *Id.*, Ex. B. Khoshabe states that he was "approached by agents . . . outside of the building in which he lived." Def.'s Mot. Suppress at 2. According to the Government, the second interview "occurred in the lobby of defendant's condominium building." Govt.'s Resp. at 3. The conversation lasted approximately one hour and forty-three minutes. *Id.*

Central to Khoshabe's present motion are two questions he asked the agents at the onset of the interview. At approximately two minutes and forty seconds into the interview, after answering some initial questions, Khoshabe stops in midsentence and asks the agents, "Are you guys like, recording this or something?" Def.'s Reply, Anthony Khoshabe Ex.—Audio Recording, at 2:40–2:45.[1] One of the agents laughs and reassures Khoshabe, "No." *Id.* Immediately thereafter, Khoshabe asks:

Khoshabe: [W]ait I'm not gonna get like in trouble or anything?

Evans: No, we're here again. I mean you know from earlier that a lot of folks have complained about investing with [Rossini].

Khoshabe: Yeah.

Evans: Yeah, so that's what we're investigating.

---

[1]     This question and answer do not appear in the written transcript of the interview provided by the Government, but they are audible in the recording that Khoshabe provided with his reply. Of course, the Court is permitted to consider both the Government's written transcript and the audio recording regardless of their admissibility. *See* Fed. R. Evid. 104(a). And, in any event, the Government contends that there are no material facts in dispute for the purpose of this motion and do not contest that Khoshabe asked the question and was given the answer. Govt.'s Resp. at 15.

Khoshabe: Okay, cool.

Evans: We're just . . . on a fact[-]finding mission.

Khoshabe: Okay cool.

Govt.'s Resp., Ex. B, at 4:29–5:4. After receiving this assurance, Khoshabe proceeds to discuss a number of matters with the agents relating to the charged scheme.

Khoshabe now requests that the Court suppress all statements he made to the FBI agents on July 15, 2015, after this exchange.[2]

## Legal Standard

Under the Due Process Clauses of the Fifth and Fourteenth Amendments, the Court may admit a confession only if the accused made it voluntarily. *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998); *see Oregon v. Elstad*, 470 U.S. 298, 304 (1985). A confession is voluntary if "the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Dillon*, 150 F.3d at 757; *see also United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). The government bears the burden to establish by a preponderance of the evidence that a confession was voluntary. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

There is no bright line test to determine whether a confession was given voluntarily. Instead, the Court must consider the "totality of the circumstances," including such factors as the presence and extent of coercive activity, the nature and duration of questioning, and the defendant's "age, intelligence, education, and experience with the criminal justice system." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997).

---

[2]    Khoshabe does not seek to suppress any statements made before this exchange nor presents any basis to do so.

3

Within this context, it has been said that "[t]rickery, deceit, even impersonation do not render a confession inadmissible," *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001), and "police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties," *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990). On the other hand, false promises by government agents can impede a defendant's ability to confess voluntarily. The Seventh Circuit has explained, "The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise had the unique potential to make a decision to speak irrational and the resulting confession unreliable." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). This is because a false promise can "destroy[] the information that [a defendant] require[s] for a rational choice." *Rutledge*, 900 F.2d at 1130.

This is not to say that all false promises by government agents are necessarily coercive. *See id.* at 1130–31 (finding statement that defendant's statements would "be helpful" to him was not coercive); *see also Villalpando*, 588 F.3d at 1129–30 (statements that detective would "go to bat" for defendant and "sit down" with the DEA to "work this out" were not coercive). But a promise by a government agent not to prosecute in exchange for a defendant's agreement to make additional statements can be sufficiently coercive to cross the line. *See United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009) ("An empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose."); *see also Kontny*, 238 F.3d at 818 ("We might have a more difficult case had Furnas gone further and promised the Kontnys they would not be prosecuted if they played ball with him, for that conceivably is the kind of false promise that might induce a rational person to rely."); *Rutledge*, 900 F.2d at 1129 ("If the officers, fully

4

intending to use anything Rutledge said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary.").

## Analysis

Less than three minutes into what would be a nearly two hour interview, Khoshabe stopped his exchange with the FBI agents on July 14, 2015, and asked whether the conversation was being recorded. The agents responded with an unequivocal "no." Khoshabe immediately followed that up by asking if his statements would get him "in trouble." Again, the agents responded "no." The agents explained that they were there to investigate "a lot of folks [who] have complained about investing with [Rossini]."

Taken together, Khoshabe's actions to stop the conversation and ask these questions clearly indicate his concern that any statements to the FBI agents might be used against him in a subsequent prosecution. Khoshabe wanted to know if the agents were recording his statements precisely because he was concerned that his statements would be used against him later.[3]   To make sure, Khoshabe asked the government agents point blank whether his statements would get him "in trouble." Only after he was assured that his statements would not get him in trouble and the agents were only investigating the complaints against Rossini did Khoshabe continue to speak with the agents. By promising Khoshabe that his statements would not get him in trouble in order to induce his continued cooperation, the conduct of the agents fits the mold of impermissible prosecutorial promises discussed by the Seventh Circuit in *Rutledge* and *Kontny*.

---

[3]    *See* Khoshabe Affidavit ¶ 10, ECF No. 189. The Government does not dispute the accuracy or truthfulness of this statement.

Additional exchanges during the interview support the conclusion that Khoshabe's statements were made involuntarily. For example, several portions of the interview indicate Khoshabe's belief—frequently affirmed by the agents—that the agents were seeking information solely for the purpose of investigating the other Defendants. For example, shortly after Special Agent Evans's initial remark that the agents were on a "fact-finding mission," he repeated that this was their purpose. *Id.* at 14:18–19; *see also id.* at 101:5–8 (reassuring Khoshabe that the agents' inquiry "[was] not a trick bag" and that they were "just [there] for the truth"). During a discussion of Khoshabe's tax return, Evans suggested that claiming certain income might be "concerning."[4] After Khoshabe objected, Evans reassured Khoshabe by stating, "No, I'm good, I'm looking out for you." Govt.'s Resp., Ex. B, at 23:8–13. Furthermore, at one juncture, Khoshabe offered to wear a wire on behalf of the agents and speak with Rossini. *Id.* at 74:19–21. The agents declined his offer, *id.* at 74:24, but later suggested that Khoshabe might take the stand as a witness against the other Defendants. *See id.* at 96:1–20. The interview concluded with the parties discussing another time for Khoshabe to sit down with the agents to further discuss the conduct of the other Defendants. *See generally id.* at 93:22–100:15.

Not only did the agents persist in framing the conversation as an investigation of the other Defendants, they insisted that Khoshabe provide them truthful information, warning him that he might get in trouble if he did not. *Id.* at 77:8–37, 98:22–23. In one notable example, Agent Blau implored Khoshabe to tell the truth: "[Y]ou have . . . [a] good life ahead of you and to mess up the rest of your life because of something [Albert] Rossini[,] and as much as you love your family[], even your dad may have been involved with . . . it would be a shame." *Id.* at 79:10–14. Thus, Khoshabe was left with the belief that, while the other Defendants might be in

---

[4]    The word "concerning" was noted as "IA" (presumably "inaudible") in the Government's transcript, but is plainly audible in the audio recording. Def.'s Reply, Audio Recording, at 16:26.

trouble, he could not get in trouble for his statements unless he lied. This left one rational course of action: talk to the agents and do so truthfully. Realigning Khoshabe's incentives in this way is precisely the result the Seventh Circuit warns against. *Villalpando*, 588 F.3d at 1128; *see also Dassey v. Dittmann*, No. 14-CV-1310, 2016 WL 4257386, at *34 (E.D. Wis. Aug. 12, 2016) (holding that statements should have been excluded where "[m]ore than merely assuring [the defendant] that he would *not* be punished if he admitted participating in the offenses, the investigators suggested to [the defendant] that he *would* be punished if he did not tell 'the truth'").

Two additional considerations bolster the conclusion that Khoshabe's statements should be excluded. First, the agents purposely arranged their meeting to occur in a non-adversarial setting, encouraging conversation. Govt.'s Resp., Ex. B, at 105:37–106:21 ("I know it's a very uncomfortable situation for the FBI to do this to you. I feel like this [] environment we've been in with the palm trees . . . is as laid back as it can get."). It is true that the non-custodial setting of the interview did not require *Miranda* warnings, and "good friend" tactics would not alone justify exclusion. *See Beckwith v. United States*, 425 U.S. 341, 342–43, 346–48 (1976). But the informal setting, in concert with the agents' assurances that the conversation was not being recorded and would not get Khoshabe in trouble and that they were investigating other individuals, distorted the options available to Khoshabe at the time of the interview.[5]

In response, the government points out that the admonishments by the Seventh Circuit in *Rutledge* and *Kontny* are only *dicta* and that the court has yet to actually find such prosecutorial

---

[5]     Although Khoshabe wondered whether he should bring a lawyer the next time when the agents wanted to go through documents, it is clear that the Government's assurances were such that Khoshabe did not feel that he needed a lawyer during the July 14 interview. Govt.'s Resp., Ex. B, at 93:22–40. In response to Khoshabe's question, Agent Evans responded, "That's your right as an American." *Id.* at 94:5. This later statement by Agent Evans, however, hardly mitigates the coercive circumstances present throughout the remainder of the interview.

7

promises to be sufficiently coercive to merit suppression. This is correct. But other circuits have.

In *United States v. Walton*, the defendant was suspected of illegal firearms trafficking. 10 F.3d 1024, 1026 (3d Cir. 1993). After an initial inspection of his home—which the defendant was led to believe was purely regulatory—the defendant contacted a government agent, seeking to talk with him "off the record." *Id.* at 1027. The agent and defendant knew each other personally. *Id.* At an early point in the conversation, the agent told the defendant, "'I've known you for a long time. If you want, you can tell us what happened off the cuff.'" *Id.* When the government later charged the defendant based on his statements, the defendant moved to suppress them. *Id.* The Third Circuit concluded that the agent's statement, viewed within the totality of the circumstances, warranted exclusion. *Id.* at 1032. In so doing, the court concluded that (1) the agent's statement was fairly construed as assuring the defendant that his statements would not be used against him; (2) the prior investigation of the defendant's home gave him reason to believe he was not the focus of a more serious criminal investigation; (3) the parties' prior relationship and the public setting of the conversation blunted the adversarial nature of the conversation; and (4) the defendant had had limited exposure to the criminal justice system. *Id.* at 1030–31.

In *United States v. Lall*, a police detective investigating a home robbery suspected the defendant, who resided in the home, of a different crime. 607 F.3d 1277, 1281 (11th Cir. 2010). The detective asked to enter the defendant's bedroom to "'try to collect any evidence that might help'" and "'develop any leads to who might have committed the home invasion robbery.'" *Id.* The detective further assured the defendant and his family that any information the defendant shared with the police "would not be used to prosecute him." *Id.* The defendant was later

prosecuted based on statements he made to the detective, and the defendant sought to suppress them. *Id.* at 1282. The Eleventh Circuit held that the defendant's statements were coerced, relying almost entirely on the detective's explicit assurance that the defendant would not be prosecuted. *Id.* at 1287.[6]

The Court finds the rationale offered by these circuits to be persuasive. As in those cases, by promising Khoshabe that his statements would not get him in trouble and making other statements throughout the July 14 interview, the government prevented Khoshabe from obtaining the information that he needed to make a rational choice before agreeing to continue the interview. As a result, any statements by Khoshabe after the initial exchange lack the requisite voluntariness and must be suppressed. This is precisely the circumstances that the Seventh Circuit warned of in *Rutledge* and *Kontny*.

None of the remaining arguments advanced by the Government persuade the Court otherwise. First, the Government argues that the agents did not make an explicit promise of immunity or leniency, and at best offered an ambiguous response to Defendant's suggestion of whether he would get in trouble. Govt.'s Resp. at 4. This argument, however, parses Defendant's statements and the agents' answers too narrowly. No court has held that a defendant must explicitly request immunity or leniency in order for a promise to be found coercive. The Court does not read the Seventh Circuit's requirement of a "solid offer of leniency," *Villalpando*, 588 F.3d at 1129, to require lay defendants to speak in such terms. *Lall*, 607 F.3d at 1287 (reasoning that "it is utterly unreasonable to expect any uncounseled layperson" to adhere to

---

[6]     The Fifth and Ninth Circuits have come to similar conclusions. *See Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (relying on law enforcement's statement to the defendant that "'[t]his [conversation] is for me and you. This is for me. Okay. This ain't for nobody else.'"); *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999) (focusing on a detective's statement to the defendant, "'Listen, what you tell us we can't use against you right now . . . . We'd just would like to know [sic].'").

"semantic technicalities" in communicating with law enforcement). Rather, it suffices that—as in this case—a reasonable person in the defendant's position would understand law enforcement to be offering not to use statements against the defendant or not to prosecute the defendant based on those statements.

The Government further contends that the agents' statement that Defendant would not get in trouble was a minor, "passing" exchange in the context of a nearly two-hour interview. Govt.'s Resp. at 7. This argument, however, ignores the fact that the exchange occurred at the beginning of the interview. Without the exchange, the rest of the interview would not have occurred.[7]   And while the Government is correct to point out that the agents' false representations should not be viewed alone in determining voluntariness, they are of particular importance to the inquiry because they shaped Khoshabe's understanding of the entire conversation. *See Villalpando*, 588 F.3d at 1128; *Walton*, 10 F.3d at 1030. Additionally, the Government argues that, viewed as a whole, Khoshabe's conversation with the agents evinces voluntariness. Govt.'s Resp. at 7–8. As discussed above, however, the Court disagrees and finds that the totality of the circumstances only bolsters the conclusion that the agents' actions were coercive.[8]

---

[7]     In its brief, the government quotes Khoshabe as asking, "I'm not gonna get like in trouble or anything?" Govt.'s Resp. at 6. But this is not correct. The entire question is: "Wait I'm not gonna get like in trouble or anything?" The "wait" is significant, because it indicates Khoshabe's reluctance to continue the interview unless he was assured that his statements would not be used against him later.

[8]     The Government isolates a number of excerpts from the conversation that it believes demonstrate Khoshabe's statements were voluntary. *Id.* None of these excerpts, however, persuades the Court that the agents communicated to Khoshabe that his statements could be used against him and he could be prosecuted based on them. Additionally, each excerpt is consistent with the Court's observations of the conversation as stated above: namely, that the agents framed their task as learning about what Khoshabe knew about the other Defendants' activities, and told Khoshabe he could get in trouble only if he did not tell the truth in speaking with them.

10

## Conclusion

For the foregoing reasons, the Court grants Khoshabe's motion to suppress [181].

**IT IS SO ORDERED.**                    **ENTERED: 2/28/17**

**JOHN Z. LEE**
**United States District Judge**

EXHIBIT 20 AND 21
Email Exchanges Between Rossini and
attorney Joshua Adams, June 12, 2018.

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

-------------------------------------------------------------------------------------------------------

FROM: 08043424
TO: Adams, Josh
SUBJECT: RE: RE: Attorney/Client Privileged Information
DATE: 06/12/2018 04:58:13 PM

Josh,

The money for these checks did come from the profits I and the Khoshabes were paid by Murphy. Do you not think that it shows we were attempting to purchase the same type notes and mortgages from Murphy that our investors were buying? I have gone this far with you and Scott and as you know I believe and still believe that, although you have done a very good job of cross examination, we were unprepared for this trial as we have no witnesses to put on, not Meir, Tony Klytta, etc. No one to buttress my position. However, that being said, I want you confident tomorrow. I am not confident without us putting on a robust defense, let alone no defense. That said, I want you confident and therefore decide how you wish to proceed knowing that I am unsafisfied with no defense.

Your closing will have to be a killer with no defense witnesses. God Bless us, one and all -- as Tiny Tim in A Christmas Carroll said.

Albert Rossini
-----Adams, Josh on 6/12/2018 2:51 PM wrote:

>

Bert,

At this stage in the trial, I should be focusing on the closing argument. You want me to prepare basically cross examination for the case agent and the financial analyist?
I think it is a very bad idea, from a strategy standpoint, to introduce these checks. So far, we have kept out evidence of the state court arrest, and the fact that funds were used for your bond. We have also kept out your tax information.
Both pieces of evidence would devistating to your case. Right now, they do not know about your state court case.
Despite this advice, if you still want me to try and admit these checks into evidence, I will turn them over to the government today.
However, if we do, and it is introduced, I believe the government will try and put on a rebuttal case to show these payments were in furtherance of the scheme.
Right now, we can argue Murphy acted on his own. if we introduce these checks, I don't see how we can make that same argument.

Lastly, we believe that if we introduce those checks, the government might be able to link the funds that were paid to Murphy to investor money, or at the least, give the appearance to the jury that it did. Again, it is our legal opinion that a strategy of introducing these checks would not be in your best interest, and would have the opposite effect.

ALBERT ROSSINI on 6/12/2018 10:51:31 AM wrote
Josh:
Yesterday I was upset with Scott Frankel when he said it was the first he heard of the cashier checks to Murphy from me and the Khoshabes for purchase of notes and mortgages. It was obvious he had not read my statements and typed draft motions sent to him by me. That is the biggest reason for my anger.

Now, I want you to call as witnesses for me the forensic accountant Sandi Prescott(?) from the FBI. Either she is incompetent, which I doubt, or lying by omission, or the standard she could not recall, as did Agent Connors.
The FBI forensic accountant studied Murphy's bank accounts as well as mine and the Khoshabes. She had all the cashier checks deposited to Murphy's accounts and therefore she had a copy of the cashier checks from me and the Khoshabes to purchase the same type notes and mortgages that Murphy was supposed to purchase for our investors. It is critical that you bring this out. I don't want to hear Scott's statements about people on my side missing in action. The only people I should be relying on are my lawyers. I feel comfortable knowing you will do this for me.
(Also, Lyle Evans and Jodie Blau - FBI, had copies when Seiden's office gave them to the agents as they came to Seiden's office at 115 S. Lasalle in September 2014)

I want admitted the following:

1. Checks made payable to Murphy by me and the Khoshabes to purchase notes and mortgages for me and the Khoshabes.

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

-------------------------------------------------------------------------------------------------

2. Seiden also gave Hogstrom a copy of the insurance policies covering approximately 70 properties in which Murphy supposedly purchased notes and mortgages for me, the Khoshabes and our investors. The insurance companies were Mount Vernon Insurance and Seattle Specialty Insurance Company through broker Evergreen Insurance. The Khoshabes and I paid approximately $14,000 per month in insurance premiums at the high amount of the properties.

3. Murphy Rule 2004 Bankruptcy Hearing and deposition before Assistant U.S. Attorney Jeffrey Snell for the United States Bankruptcy Trustee. Murphy lied about his social security numbers, income during 2010 through 2013, certain debtors, etc. (I have a copy and will bring to court - sent to you several weeks ago and you used it to impeach Murphy).

4. Murphy 2014 Statement of Financial Affairs submitted in his Chapter 7 Bankruptcy case in which he includes as his first debtor, Devon Street Investments, Ltd. and states that Devon Street had a foreclosure judgment against Murphy. (I have a copy and will bring to court -I also sent to you several weeks ago).

5. United States Trustee attorney AUSA Jeffrey Snell motion to dismiss Murphy's Chapter 7 Bankruptcy Petition for falsehoods and failure to comply with the Rules (I have a copy and will bring to court - I also sent you a copy several weeks ago)

6. My accounting of payments to investors, and I will bring to court tomorrow.

7. Government (forensic accountant) information concerning breakdown of the amounts she said went to Murphy, also fine if she wants to bring a breakdown of money to me and the Khoshabes. Her answer to you about Craig Shaffer's money was too convenient that it was not lumped into the investor payments. She was either incompetent, obfuscating or lying about what composes the final numbers.

8. Copy of Murphy's bounced checks to Devon Street Management and Devon Street Investments in November, December and January 2012 and 2013. Look at the Devon Street Management bank account for November 2012 as I saw it in your binder with the checks recorded and shows they were returned for Insufficient funds. The amounts were $215,000, $390,000 or $359,000 and $31,000. It created an overdraft of at least $169,000 in the Management account which I covered when Murphy said that he was only having trouble with collecting from Lawyers and banks, but the money would come soon.

9. Seek out Murphy's legal background at Johnson Cusack & Bell, Burke Warren McKay and Pedersen & Houpt.

10. Murphy's Ponzi scheme with Prestige Realty Group, he brings up Prestige in the Rule 2004 deposition in bankruptcy court and says he lost $22 million (he never had $22 million of his own money). The banks lost between $22 - $60 million as Murphy was using straw buyers and then paying the mortgage payments from newer mortgages. Important to show his ponzi activities besides the ARDC information.

11. Murphy and Deer accused me of arson on Deer's house but it was really Deer's clients or Russian loan sharks as Deer and Murphy had stolen hundreds of thousands in a client's settlement. It is the subject of a Deer 2015 ARDC complaint. I told Justin Wiersema about this. You or Frankel have had information about this for several months, I think we should explore it.

Look, we need all or most of these in the record, at least for appeal purposes; however, with these admitted into evidence and your sterling closing, I have a chance. Please, I want this included and I want you to call the forensic accountant and Lyle Evans if this is the way to get it done.

Call Harvey Waller on his cell phone (312) 919-9100 or his office phone about his documents. Since he is also a longtime Babajan lawyer, he may be ignoring us. But, he is also my lawyer on the civil matter and I signed a retainer agreement with him.

Sincerely,
Albert Rossini
08043-424

EXHIBIT 22

DSI AND DEFENDANT ROSSINI EXPENDITURES 2012

PAYMENTS BY ROSSINI OR DEVON IN 2012

| PERSON OR ENTITY PAID | BY ROSSINI OR DEVON | AMOUNT |
|---|---|---|
| Seiden Law Group | Rossini | 100,411.99 |
| Dental | Rossini | 47,306.25 |
| Tuition Room | Rossini | 34,000.00 |
| Room & Board | Rossini | 11,980.00 |
| Office Supplies | Devon | 8,791.02 |
| Rent | Devon | 71,932.61 |
| Civil Forfeiture | Rossini | 98,500.00 |
| Bad Debt | Rossini | 446,000.00 |
| 4321 S Marshfield Labor | Devon | 4,370.00 |
| 4321 S Marshfield Material | Devon | 4,447.14 |
| 4045 W Wilcox Labor | Devon | 5,944.14 |
| 4045 W Wilcox Material | Devon | 15,053.13 |
| 4126 W Adams Material | Devon | 4,924.76 |
| 4037 W Adams Material for Cisneros | Devon | 15,025.63 |
| 4037 W Adams Labor & Material for Corona | Devon | 38,430.29 |
| 4037 W Adams Labor for Cisneros | Devon | 12,055.00 |
| **SUBTOTAL** | **ROSSINI & DEVON** | **899,194.07** |
| Ben David & Levanon | Devon | 23,292.66 |
| A & B Khoshabe | Devon | 41,375.00 |
| Robert Badalian | Devon | 191,205.45 |
| Haim Gabi | Devon | 21,325.00 |
| John Khoshaba | Devon | 27,507.50 |
| Havanna Moshi | Devon | 23,438.00 |
| Assyrian Evangelical | Devon | 65,402.50 |
| Fidel Moshi | Devon | 19,902.50 |
| Valentina Moshi | Devon | 23,600.00 |
| Kathy Khodi | Devon | 114,198.06 |
| Kathy Khodi | Rossini | 34,237.60 |
| Janet Khoshaba | Devon | 18,690.00 |
| Henry Hormozian | Devon | 25,617.29 |
| Awiquam Pithyou | Devon | 182,093.56 |
| Ashoor Pithyou | Devon | 10,000.00 |
| Nastors Moshi | Devon | 79,873.45 |
| Benva Lazar | Devon | 34,200.00 |
| Gus Bahramis & Ilias Bolos | Devon | 25,980.00 |
| Albert Khamis | Devon | 28,082.76 |

| | | |
|---|---|---|
| Vladimir Moghaddasi | Devon | 135.987.00 |
| Vladimir Moghaddasi | Rossini | 36,772.42 |
| Fereidoon Khoshabe | Devon | 226,804.03 |
| St. Odisho | Devon | 36,187.50 |
| Punjab Investments | Devon | 40,000.00 |
| Katayoun Kazemi | Devon | 5,000.00 |
| Ibrahim & Daniel Yousif | Devon | 42,000.00 |
| Jerry Lewin | Devon | 40,000.00 |
| KMI Enterprises, Inc. | Devon | 105,185.00 |
| **SUBTOTAL** | **DEVON & ROSSINI** | **1,629,875.00** |

| | | |
|---|---|---|
| Leads, referrals and 1099 | | |
| Meir Rotstein | Devon | 66,200.00 |
| Lisa Rosen | Devon | 75,000.00 |
| Pamela Sauer | Devon | 47,000.00 |
| Francisco Cisneros | Devon | 52,000.00 |
| Mireya Cepeda | Devon | 20,800.00 |
| Daniel Ramirez | Devon | 15,600.00 |
| Nubia Rendak | Devon | 7,800.00 |
| Yael Gabi | Devon | 7,800.00 |
| Mikhail Rotstein | Devon | 7,800.00 |
| Cortez Rhodes | Devon | 22,000.00 |
| Aida Roldan | Devon | 20,600.00 |
| Cecily Guidry | Devon | 15,000.00 |
| Avi Gabi | Devon | 5,600.00 |
| Danielle Gabi | Devon | 2,500.00 |
| Nehama Morton | Devon | 2,500.00 |
| Alan Peres | Devon | 1,000.00 |
| James Dixon | Devon | 3,600.00 |
| Richard Espe | Devon | 10,000.00 |
| Casey Czarnecki | Devon | 3,600.00 |
| Bernard Ellis | Devon | 20,000.00 |
| Furniture Doc/Bill Parson | Devon | 10,200.00 |
| Guy Stein | Devon | 18,500.00 |
| | | |
| **SUBTOTAL** | Devon | **435,100.00** |

| | | |
|---|---|---|
| Office Supplies | Devon/Rossini | 8,791.02 |
| Dreamtown Realty | Devon | 2,500.00 |
| Comcast | Devon | 5,443.00 |
| AT&T Cellular for Office | Rossini | 13,233.46 |

| Klytta & Klytta Law Firm | Rossini | 10,000.00 |
|---|---|---|
| Life Insurance Premiums | Rossini | 5,322.00 |
| Brook Furniture Rental | Rossini | 7,431.60 |
| Books & Subscriptions | Rossini | 3,733.27 |
| Contributions | Rossini | 455.00 |
| Optique Contact Glasses | Rossini | 265.85 |
| Pharmaceutical Payments | Rossini | 1,163.66 |
| Blue Cross Blue Shield | Rossini | 1,000.00 |
| Health Alliance Premiums for Pre-existing Conditions | Rossini | 5,700.00 |
| Seminars & Immersions | Rossini | 3,200.44 |
| Fed Ex, Overnight U.S. Mail | Devon | 1,071.59 |
| Insurance Payments<br>  Specialty Insurance<br>  AFC Insurance<br>  Sani Insurance | Devon | 62,735.21<br>1,025.52 |
| EFAX | Devon | 717.20 |
|  |  |  |
| **SUBTOTAL** | **DEVON & ROSSINI** | **133,788.82** |

DENTAL BILLS PAID FOR BRENDA ROSSINI
DUE TO HER RADIATION TREATMENT
DENTAL BILLS PAID IN 2012

| | |
|---|---|
| Daniel Marinic, DDS | 38,980.00 |
| Paul Bery, Endodontics 6/26/12 | 950.00 |
| Paul Bery, Endodontics 6/29/12 | 950.00 |
| Paul Bery, Endodontics 8/9/12 | 210.25 |
| Paul Bery, Endodontics 8/2/12 | 850.00 |
| Paul Bery, Endodontics 8/2/12 | 850.00 |
| Chicago Oral & Maxillofacial 9/7/12 | 187.00 |
| Chicago Oral & Maxillofacial 9/7/12 | 4,329.00 |
| TOTAL | 47,306.25 |

DEVON STREET INVESTMENTS, LTD.
INTEREST PAYMENTS
2012

| NAME | INTEREST PAYMENTS |
|---|---|
| KMI Enterprises | 32,730.00 |
| Katayoun Kazemi | 5,000.00 |
| AD Investments | 201,420.00 |
| Abraham Yousif | 40,008.00 |
| Punjab Investments | 25,300.00 |
| St. Odisho Church of the East | 37,152.50 |
| HG Electric/Carmel Builders | 19,775.00 |
| Nastoris Moshi | 77,173.45 |
| Albert Khamis | 28,082.70 |
| Vladimir Moghaddasi | 195,748.50 |
| Fereidoon Khoshabe | 157,795.03 |
| Benva Lazar | 36,331.67 |
| Awiquam Pithyou | 182,039.56 |
| Raymond Babaoghli | 31,961.65 |
| Robert Badalian | 200,322.95 |
| Beneta Badalian | 59,400.00 |
| Henry Hormozian | 25,617.29 |
| Bahramis-Bolos | 25,980.00 |
| Assyrian Evangelical Church of San Jose | 65,402.50 |
| Janet Khoshaba | 17,290.00 |
| Valentina & Fidel Moshi | 23,670.00 |
| Havanna Moshi | 23,438.00 |
| Fidel Moshi | 25,705.00 |
| John Khoshaba | 27,507.50 |
| Katayoun Khodi | 114,198.06 |
| Liam Ben David | 22,813.75 |
| Craig Shaffer | 186,045.00 |
| Anthony & Babajan Khoshabe | 70,874.22 |
| Anthony Khoshabe, Melita Khoshabe & Melinda Khoshabe | 49,196.10 |
| TOTAL | 2,007,978.00 |

# ROSSINI PAYMENTS BY CHECK OR MONEY ORDER MADE AFTER MURPHY'S CHECKS BOUNCED

| Gus Bahramis & Ilios Bolos | $ 3,060.00 |
|---|---|
| Craig Shaffer | $ 56,250.00 |
| Albert Khamis | $ 3,663.00 |
| Havanna Moshi | $ 15,145.00 |
| Nastors Moshi | $ 15,866.00 |
| KMI Enterprises, Inc. | $ 57,355.00 |
| Awikwam Pithyou | $ 24,782.50 |
| Katayoun Kazemi | $ 12,500.00 |
| Janet Khoshaba | $ 18,820.00 |
| John Khoshaba | $ 9.062.00 |

## TOTAL PAYMENTS          $216,503.50

EXHIBIT 23

FEDERAL BUREAU INVESTIGATION
REPORT- MURPHY SUED BY CRAIG SHAFFER

FD-302 (Rev. 5-8-10)

-1 of 2 -

FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/21/2018

On April 18, 2018 Thomas Murphy (previously interviewed) was interviewed under a continuing proffer agreement. The interview took place at the United States Attorney's Office located at 219 South Dearborn, Chicago, IL. Murphy was accompanied by his attorney Lawrence Levin. Also present for the interview was Special Agent Jody Blau, Special Agent Lyle Evans, Assistant United States Attorney Eric Hogstrom, and Assistant United States Attorney William Novak. The primary purpose of the interview was to review the factual statements contained in Murphy's plea agreement. After being advised of the identity of the interviewing Agents and the nature of the interview, Murphy provided the following information:

Murphy advised that on April 13, 2018 he was contacted by John Eastman, who Murphy understands to be an attorney in California. Eastman contacted Murphy for the purpose of getting Murphy to file a release of lien on some properties located in California. Murphy advised that he has not been involved in any property transactions in California and did not file the liens; Murphy assumes that Rossini used Murphy's name, without consent, to file the liens. Murphy, through his attorney, provided interviewing agents with documents related to the California property liens; the documents are attached hereto.

Murphy advised that he was recently served with a lawsuit filed by attorney Glenn Seiden. The lawsuit was filed in May of 2017; however, ~~Murphy wasn't served until Sunday, April 15, 2018.~~ The lawsuit involves Craig Shaffer. Murphy, through his attorney, provided interviewing agents with documents related to the lawsuit; the documents are attached hereto.

Murphy provided interviewing agents with an Answer that he filed in a lawsuit that was brought against Murphy and Jeff Deer; the Answer was filed on July 12, 2017. The Answer is attached hereto. With respect to the transaction that is the subject of the lawsuit, Murphy explained that Murphy never controlled the money; Jeff Deer held the funds in Deer's client account. Murphy earned $10,000 consulting fee for his role in bringing a buyer into the transaction. Murphy stated that the earnest money for the transaction went into Deer's account located at Chase Bank.

| Investigation on | 04/18/2018 | at | Chicago, Illinois, United States (In Person) |
|---|---|---|---|

File # 329A-CG-133780

Date drafted    05/18/2018

by   SA Jody Blau

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

329A-CG-133780

Continuation of FD-302 of (U) Proffer of Thomas Murphy _____ , On 04/18/2018 , Page 2 of 2

Murphy advised that while working with Albert Rossini, but prior to the time that he helped form Reliant Management, and before Rossini brought in the church investors, Murphy helped find eight investors. Those investors deposited funds with Murphy; Rossini then instructed Murphy to disburse Babajan Khoshabe's "share" of the funds to Anthony Khoshabe, because Babajan didn't want the funds to be in his (Babajan's) name. Murphy stated that Babajan never contacted Murphy to complain about or question Murphy over paying Babajan's share to Anthony. Anthony never questioned Murphy about the reason he received the funds.

EXHIBIT 24

MURPHY STATEMENTS TO FBI
RE: GUARANTEE AGREEMENTS

FD-302 (Rev. 5-8-10)

-1 of 1-

FEDERAL BUREAU OF INVESTIGATION

Date of entry     06/01/2018

On May 29, 2018 Thomas Murphy, telephone number 773-612-0416, was interviewed at the United States Attorneys Office in Chicago under a continuing proffer agreement. Present for the interview was Special Agent Jody Blau, Assistant United States Attorney Eric Hogstrom, and Assistant United States Attorney William Novak. After being advised of the identity of the interviewing Agent and the nature of the interview, Murphy provided the following information:

Murphy was asked about the Guarantee Agreement that he created for Albert Rossini; Murphy explained that he (Murphy) had originally drafted a Note at Rossini's request; however, Rossini wanted the document changed. Rossini told Murphy what he wanted the new document to say, and so Murphy created the Guarantee Agreement. An initial draft of the Guarantee agreement contained terms that were more general in nature; Rossini told Murphy that he wanted the agreement to contain very specific terms and promises; Rossini explained to Murphy that he wanted the agreement to be very easy for the investor to understand. An example of one of the specific terms that Rossini wanted in the agreement was that the investor could request their money back at any time and Rossini would return it within a specified number of days.

Murphy was asked to review a number of checks related to the transactions involving Rossini. Murphy advised that the first three checks that came from Robert Badalian were made out to Republic Title; when Murphy asked Rossini why the checks were made out to Republic Title, Rossini said that Babajan Khoshabe told Badalian to make out the checks in that way.

Investigation on   05/29/2018   at  Chicago, Illinois, United States (In Person)

File #  329A-CG-133780
                                                                    Date drafted   06/01/2018

by  SA Jody Blau

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

ALBERT ROSSINI # 08043-424
METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
Chicago, IL. 60605



Legal Mail
PRISONER CORRESPONDENCE

OFFICE OF
CLERK OF THE U. S. DISTRICT COURT
United States CourtHouse
219 SOUTH DEARBORN STREET
Chicago, ILLINOIS 60604

RECEIVED
2018 AUG -7 AM 8:56

08/07/2018-35



METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to yo
This letter has neither been opened nor inspected. If the writer raises a question or proble
over which this facility has jurisdiction, you may wish to return the materiel for furth
information or clarification. If the writer encloses correspondence for forwarding to anoth
addressee, please return the enclosure to the above address.

Date: 08-02-2018

ALBERT ROSSINI #08093-424
METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
Chicago, IL. 60605

RECEIVED
2018 AUG -8 AM 10:19

08/08/2018-6

Legal Mail
PRISONER CORRESPONDENCE

#1 of 4
EXHIBITS 15-CR-575-1

OFFICE OF
CLERK OF THE U.S. DISTRICT COURT
United States courthouse
219 South Dearborn street
Chicago, ILLINOIS 60604
























METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Date: 08-03-2018

ALBERT ROSSINI # 08048...
METROPOLITAN CORRECTIONAL CENTER
71W. Van Buren
Chicago, Il 60605

       

      



RECEIVED
2018 AUG-7 AM 8:58
2018 AUG-7 AM 8:58

OFFICE of
Clerk of The U.S. District Court
United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

 

Legal Mail
Prisoner Correspondence

 

#2 of 4
Exhibits 15-CR-515-1



08/07/2018-55

 

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the materiel for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Date: 08-03-2018

ALBERT ROSSINI #08434341
METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN St.
CHICAGO, IL. 60605

08/07/2018-53

        

       



Legal Mail
Prisoner Correspondence
#3 of 4
EXHIBITS 15-CR-515-1

Office of
Clerk of the U.S. District Court
United States Courthouse
219 S. Dearborn Street
Chicago, IL. 60604



  

  

2018 AUG -7 AM 8: 58
RECEIVED

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the materiel for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Date: 08-03-2018

ALBERT ROSSINI #08043-424
METROPOLITAN CORRECTIONAL CENTER
71 W. Van Buren St.
Chicago, IL. 60605

      
      




RECEIVED
2018 AUG -7 AM 8:58

Legal Mail
Prisoner Correspondence
# 4 of 4

Exhibits 15 CR 515-1

Office of
Clerk of the U.S. District Court
United States Courthouse
219 South Dearborn Street
Chicago, IL. 60604

08/07/2018-47

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the materiel for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Date: 08-03-2018