UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 515 |
| v. | |
| | Judge John Z. Lee |
| ALBERT ROSSINI | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL AND MOTION FOR EVIDENTIARY HEARING IN CONNECTION WITH MOTION FOR NEW TRIAL**

Now comes the UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., and hereby respectfully submits this Response to the defendant's Motion for New Trial and Motion for Evidentiary Hearing in Connection with Motion for New Trial, Dkt. 448.

In 2004, following his second federal fraud conviction, the defendant filed a post-conviction motion seeking to undo that conviction by claiming that his attorney was ineffective. *United States v. Rossini*, 2004 WL 856549 (N.D. Ill. April 21, 2004) (attached hereto as Exhibit A). Judge Shadur firmly shut the door on the defendant, declaring, "[a]lthough this recidivist confidence man may [] have successfully swindled his many victims, he has not been similarly successful in conning other courts and the SEC, nor has he now succeeded in conning this Court." *Id.* at *2. Now, following his third federal fraud conviction, the defendant has gone back to the well,

1

claiming ineffective assistance and asking this Court to overturn the jurors' swift and decisive verdict following a nearly two-week trial.

Defendant's hodge-podge of complaints about counsel's performance amount to nothing more than *post-hoc* griping about his attorneys' reasonable strategic decisionmaking as they attempted to mount a defense in the face of overwhelming evidence of the defendant's guilt. Moreover, the evidence – which included testimony by 10 investors who lost millions with the defendant while receiving virtually nothing the defendant promised them, as well as voluminous documentary evidence showing that the defendant's entire "investment program" was a lie and that he personally negotiated $2.5 million of their money at currency exchanges – was so overwhelming that there is no likelihood of a different outcome even if trial counsel had done everything the defendant claims they should have. Just as Judge Shadur saw through the defendant's gambit 15 years ago, so should this Court deny the instant motion.

## I.    BACKGROUND

### A.    The Trial

The evidence at trial established that the defendant, along with co-defendants Babajan Khoshabe, Anthony Khoshabe, and Thomas Murphy, carried out a multi-year Ponzi scheme that defrauded investors of millions of dollars. The jury heard

2

testimony from nine individual investors and received the testimony of investor Janet Khoshaba by stipulation. These investors testified to the following common facts: [1]

The investors each gave the defendant money in exchange for the acquisition of a mortgage note for a Chicago-area apartment building in, or near, foreclosure. The defendant told some investors he already possessed the notes and told others he would use their money to obtain the notes. In either case, the defendant told each investor he would cause the foreclosure process for their properties to be completed and that at the end of that process, which would take a period of months, he would have the titles to the properties deeded in the investors' names. The defendant further told each investor that, while the foreclosure process was underway, he or others working with him would receive the rents from the buildings and forward them to the investors. The defendant also promised each investor that, in the event he was unable to obtain title to the properties, he would refund the investors' money within five days. Each investor received a document from the defendant called a "Guaranty Agreement," which documented each of these representations in writing.

For a number of months after investing, each investor received monthly checks from the defendant or one of his cohorts that they were told represented the rents

---

[1] Because of the number of investors and the similarities in their testimonies, this filing does not provide transcript citations for each individual instance in which each investor testified to a particular fact. Instead, the government has prepared and attached to this filing as Exhibit B, a detailed summary of each investor's testimony with transcript citations. For purposes of this summary, as well as other portions of this filing, the government will cite the trial transcript as "Tr. at __." Transcripts of other events, such as status hearings and recorded conversations, will be cited as "[DATE] Tr. at __"

collected from the investors' properties, with a management fee deducted. Concurrent with making these "rent" payments, the defendant or Babajan Khoshabe often provided investors with information on additional properties they could invest in. Many of the investors agreed to do so based upon the apparent initial success of the investments. Despite receiving "rent" checks consistently for, depending on the investor, two months to more than a year, the rent payments became irregular in mid-2012 and ceased altogether by November 2012. No investor ever received a satisfactory explanation from the defendant for the rent stoppage. The defendant promised the investors to refund their investment monies but, with the exception of Ibrahim Yousif, failed to do so. The defendant returned Ibrahim Yousif's investment money only after Yousif filed a complaint about the defendant with the Lincolnwood Police Department. Tr. 348-354. Eight of the ten testifying investors likewise never received the titles to any of the properties they had invested in. Ex. C, GX Chart 1. Robert Badalian and Vladamir Moghaddasi, for their part, only received titles to three out of the twenty properties they invested in. Ex. C, GX Chart 1.

In addition to the investors' testimony, the jury received dozens of exhibits, including official property records and emails from the defendant, that independently documented the defendant's abundant false representations to the investors during the scheme. Official property records from the Cook County Recorder of Deeds showed that, at the time he took each of the investors' funds, he had no recorded interest in any of the 57 mortgage notes for which he was soliciting investment

4

money.  *See generally*, Ex. C, GX Chart 1; Ex. C, GX CCRD 1, 3, 4, 5.  The records further showed that the defendant never obtained an interest in any of those 57 mortgage notes after he received the investors' funds.  Ex. C, GX Chart 1; Ex. C, GX CCRD 1, 3, 4, 5.  The records additionally revealed that, although the defendant eventually used the investors' funds to obtain the titles to six of the 57 of the properties, he did not do so by acquiring the mortgage notes and foreclosing on those six properties; he instead directly purchased them and then only turned over the titles to three of them, and then only after then investors began pressuring him about the rent stoppage.  Ex. C, GX Chart 1; Ex. C, GX CCRD 1; Tr. 76-78.  The defendant kept one of the remaining three properties for himself, used one as security for a mortgage, and transferred one to another individual.  Ex. C, GX Chart 1; Ex. C, GX CCRD 1; Tr. 85-86.

The documentary evidence presented to the jury also included numerous written communications the defendant sent to investors in which he made blatantly false statements about the properties.  Despite having no actual interest in any of the properties or involvement in their management, the defendant sent "fact sheets" to the investors for each property purporting to detail the rental status of all the units in each building and the rental income the investor would receive.  *See, e.g.*, Ex. C, GX AwPithyou 5; GX Badalian 1; GX Younan 1.  Further, even though the defendant had no recorded interests in any of the mortgage notes, and despite the fact that none of the lenders reported ever communicating with the defendant about the notes, the

defendant gave each investor a "Guaranty Agreement" stating that he had obtained "written assignments of the right to acquire … the existing notes and mortgages from the lender[.]" Ex. C, GX Badalian 3; GX Younan 3. Through documents such as these, the jury learned of numerous instances in which defendant made plainly false statements to investors about material matters, such as the foreclosure status of the properties or negotiations he said he was having with the property owners. Although the volume of the defendant's documented false statements to investors is such that recounting all of them here would be impracticable, a few examples will illustrate the point:

- During an August 13, 2013, consensually recorded conversation that was played for the jury, the defendant specifically told Bishop Younan he had been communicating with the lender for the Church's property, North Community Bank. Ex. C, GX Younan Tr. at 2, 6, 18. Indeed, the defendant later emailed Bishop Younan a "Note Purchase Agreement" that the defendant had recorded with the Recorder of Deeds, which purported to be an agreement between North Community Bank and Devon Street to sell the mortgage note for $300,000 (the price paid by the Church). Ex. C, GX Younan 10. The defendant's recording included a "Memorandum" in which he claimed "[W]e are finalizing our agreement to purchase the note." *Id.* Each of these representations were directly contradicted by stipulated testimony by North Community Bank that it has no record of any communications with the defendant about the property.

- In a June 29, 2013, email the defendant wrote Vladimir Moghaddasi that 7941 N. Karlov was "in foreclosure with Bank of America's paperwork a real problem." Ex. C, GX Moghaddasi 17. He further wrote, "We are on this deal and I have spoken with the owner who is attempting to get the money to pay off the loan." Id. A month later, on July 27, 2013, the defendant wrote that "[t]he owner has stalled foreclosure with mediation but this will not last much longer." Ex. C, GX Moghaddasi 18. Another month later, on August 26, 2013, the defendant wrote that "[t]he owner of Karlov is almost ready to pack it in and settle with us for some money for the keys." Ex. C, GX Moghaddasi 19. Three months after that, on November 22, 2013, the defendant wrote to

6

Moghaddasi that he had had "some discussions with the bank and owner," and that "Mrs. Adic is willing to turn it over but now I need to get the okay from the Bank." Ex. C, GX. Moghaddasi 20. Each of these statements were directly contradicted by the property owner, Adis Alic, who testified that the defendant met with Alic in 2012 and claimed he could help Alic obtain a load modification, but that after 2-3 months, Alic instead obtained a loan modification directly from the lender, Bank of America, and had no further dealings with the defendant. Tr. 443-445, 448-450.

- Around January 17, 2012, in connection with Rev. Pityou's $160,000 investment in in the mortgage note on 5801 N. Richmond, the defendant provided Rev. Pithyou with an information sheet that represented, "[w]e are purchasing the note and mortgage" and that it would take "approximately 12 to 24 months to get the title; however, you will be paid the actual rentals collected on the property during this period." Ex. C, GX AwPithyou 5, GX AwPithyou 6. After investing, Rev. Pithyou in fact received several months of supposed "rent" payments for this property. Tr. 231, 243, 250, 256. These representations were contradicted by testimony from the property owner, Armando De La Cruz, who testified that although the property was in foreclosure on January 17, 2012, De La Cruz took out a new mortgage, which paid off the original mortgage and ended the foreclosure proceedings as of February 15, 2012. Tr. 559-561; Ex. C, GX CCRD 1. De La Cruz further testified that during the time period Rev. Pithyou was receiving "rent" payments from the defendant, De La Cruz was personally managing the building and collecting the rents and had no familiarity at all with the defendant or any of his cohorts. Tr. 560-561.

In addition to the investors' testimony and the documentary evidence, the jury heard testimony from defendant's co-schemer, Thomas Murphy, who pled guilty to his involvement in the fraud. Murphy explained that in 2011 he was an attorney who performed several services for the defendant in connection with his investment program, including incorporated business entities, Tr. 573-575, drafting documents the defendant could give investors, Tr. 600-603, and receiving and dispersing the investors' funds at the defendant's direction, Tr. 577, 582-584, 586-590, 596. In

particular, Murphy testified that he drafted the template "Guaranty Agreement" the defendant used with the investors, which incorporated specific language requested by the defendant, including the representation that the defendant had written assignments of the right to acquire the mortgage notes. Tr. 605-606. Murphy also testified that each time an investor gave the defendant a check, he gave it Murphy to be deposited into Murphy's personal checking account and dispersed it back to the defendant and his cohorts according to the defendant's specific instructions. Tr. 586-590. Murphy further testified that the defendant filed a lawsuit against Murphy in 2013 containing false allegations about the investors' funds and then told Murphy the lawsuit was a sham designed to placate the investors, who had been complaining. Tr. 645-648. Murphy also testified that, after the defendant filed the sham lawsuit against Murphy, the defendant surreptitiously worked with Murphy to receive and disperse over $800,000 in additional funds from investor Kathy Khodi. Tr. 652-657.

Finally, the jury received bank and currency exchange records and heard testimony from FBI forensic accountant Sandra Prescott, who performed a comprehensive financial analysis of this evidence. The financial evidence revealed that, in total, investors gave the defendant more than $7 million. Tr. 821. Although investors received back approximately $2.5 million in "rent" payments, there was no rental income coming into any of the relevant accounts, and all of the money paid to investors was actually just their own funds being paid back to them. Tr. 823. At the same time that the investors lost approximately $5 million, the defendant made at

least $2.55 million, of which the defendant negotiated approximately $2 million at currency exchanges. Tr. 823, 828; Ex. C, GX PC Currency Exchange. Babajan and Anthony Khoshabe made approximately $1.26 million from the scheme, while Murphy netted approximately $166,000. Tr. 824-826. Further, of the $7 million paid by investors, the defendant used only approximately $200,000 towards the acquisition of real estate. Tr. 824.

After hearing a week and a half of evidence, the jury returned guilty verdicts on all counts after approximately two hours of deliberating. Dkt. 346.

## B. Procedural History Relating to Defendant's Representation

Defendant has been through several attorneys since he was indicted on August 20, 2015. The defendant was initially represented by attorneys Glenn Seiden, Ted Netzky, and Brooke Stevens of the Seiden Netzky Law Group ("SNLG"). Dkt. 12, 13, 14. On February 26, 2016, SNLG moved to withdraw as counsel for the defendant, citing "irreconcilable differences" due to "an unreasonable financial burden on SNLG. Dkt. 125, at 2. On March 3, 2016, defense counsel indicated during an in-court hearing that SNLG may seek appointment under the Criminal Justice Act. Dkt. 127. On May 19, 2016, following briefing on the propriety of appointing SNLG under the CJA, in light of potential conflicts of interest, the Court granted SNLG's motion to withdraw and stated that it would appoint new counsel to represent the defendant. Dkt. 134, 149, 151, 160.

On May 24, 2016, Keri Ambrosio filed an appearance to represent the defendant pursuant to the Court's appointment under the CJA. Dkt. 161, 163. On March 9, 2017, Ambrosio moved to withdraw as counsel because of a "deteriorated" attorney-client relationship and "profound disagreement" over the resolution of the case. Dkt. 227, at 1. Ambrosio advised the Court of her belief that she could no longer continue in her representation "consistent with her ethical responsibilities and duties to [the defendant]." Dkt. 227, at 2. On March 16, 2017, the Court granted Ambrosio's motion to withdraw. Dkt. 237.

Also on March 16, 2017, attorney Joshua Adams filed his appearance and was subsequently appointed by the Court to represent the defendant in place of Ambrosio. Dkt. 236, 246. On July 10, 2016, Adams filed a motion for appointment of co-counsel, Dkt. 258, which the Court granted on July 20, 2016, Dkt. 263. The Court subsequently appointed attorney Scott Frankel as co-counsel to represent the defendant. Dkt. 268.

Adams and Frankel represented the defendant up through the conclusion of the trial. More than a month after he was convicted, on July 12, 2018, the defendant submitted to the Court a letter asking that the Court "please refrain from accepting any motions from my attorneys, Joshua Adams and Scott Frankel, as of this date excepting a motion to withdraw from representation in my case. Dkt. 361, at 1. On July 23, 2018, Adams and Frankel filed a motion to withdraw as counsel referencing the defendant's July 12 letter, as well as an additional statement by the defendant

on July 22, 2018, that he wanted new counsel. Dkt. 362, at 1. On August 23, 2018, the Court granted Adams' and Frankel's motion to withdraw. Dkt. 372. On September 12, 2018, the Court appointed defendant's current counsel and struck the defendant's *pro se* motions with leave to refile through counsel. Dkt. 380. On May 17, 2019, the defendant filed the instant motion through counsel seeking a new trial based on a claim that Adams and Frankel provided him ineffective assistance. Dkt. 448.

## II.    LEGAL STANDARDS

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[C]ourts have interpreted the rule to require a new trial in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). The Seventh Circuit typically reviews the denial of a motion for a new trial for abuse of discretion. *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017).

A defendant claiming ineffective assistance of counsel must show that counsel's representation fell below "an objective standard of reasonableness," thereby failing to function as the "'counsel' guaranteed the defendant by the Sixth

11

Amendment," and that the deficiencies in counsel's perform were prejudicial to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The Court's review of counsel's performance must be "highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The inquiry is then "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance" and counsel is "strongly presumed to have rendered adequate assistance. *Id.* at 690.

To be "prejudicial," the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "In weighing the effect of counsel's errors, the court must consider the totality of the evidence before the judge or jury. Consequently, a verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Mosley v. Atchison*, 689 F.3d 838, 850 (7th Cir. 2012) (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)).

## III. ARGUMENT

To support his claim that his attorneys provided constitutionally deficient representation, the defendant sets forth a scattershot list of alleged omissions by his attorneys. These complaints can be broken into three categories: (1) counsel's

12

purported failure to advise the defendant about his right to testify, Mtn. at 2; (2) counsel's general preparedness for trial and level of communication with the defendant, Mtn. at 2, 3, 8; and (3) counsel's failure to contact or call certain witnesses and introduce certain documents, Mtn. at 8.

Defendant's motion fails to acknowledge that many of his complaints are directly contradicted by the record, while others are simply reprisals of complaints that have previously been rejected by this Court. Regardless, the record shows that counsel's performance was well within the range of competent professional assistance. In any event, none of counsel's alleged omissions had any probability of affecting the outcome of the trial, in light of the overwhelming evidence supporting the jury's verdict. Nor has the defendant provided any reasonable justification for to further delay this case and expend more of this Court's resources on an evidentiary hearing.

## A. Defendant's Decision Not to Testify

Defendant's claim that his attorneys failed to advise him regarding his right to testify, Mtn. at 2, is directly contradicted by the record. On June 11, 2018, the last day of the government's case-in-chief, the Court specifically raised the issue of whether defendant would be testifying. Tr. 856. Adams advised the Court, "I spoke with Mr. Rossini as late as yesterday afternoon. I went and visited him at the MCC for approximately an hour. We discussed whether or not he wishes to testify. And I spoke with him this morning at the break. It's Mr. Rossini's wish that he

unconditionally wishes to waive his right to testify in his own defense. We discussed the pros and cons, and that is his wish." Tr. 856-857. The Court then addressed the defendant directly and held the following colloquy:

| | |
|---|---|
| THE COURT: | Mr. Rossini, you understand that you have the right to testify in your own defense. |
| THE DEFENDANT: | Yes, your Honor. |
| THE COURT: | But you have decided to waive that right, is that correct? |
| THE DEFENDANT: | Correct, your Honor. |
| THE COURT: | And you have discussed your decision to waive that right with your attorneys? |
| THE DEFENDANT: | Yes. |
| THE COURT: | And is your decision to waive your right to testify made voluntarily, completely based upon your own free will? |
| THE DEFENDANT: | Yes, your Honor. |
| THE COURT: | And no one has pressured you in any way to make that decision, is that correct, sir? |
| THE DEFENDANT: | No. |
| THE COURT: | That's fine. So, Mr. Rossini, I just wanted to note that for the record. |
| THE DEFENDANT: | Yes, your Honor. |

Tr. 857-858.

14

The fact that defendant now seeks a new trial partly based on a claim that is directly contradicted by the record not only dooms his current claim on this point, it provides important context for evaluating all of this claims. Given his history of fraud convictions, and in light of the fact that he has been previously caught lying to the Court, his false claim that his attorneys failed to advise him about his decision not to testify should inform the Court's evaluation of all his claims – this defendant has earned a healthy skepticism from this Court. In any event, his attorneys' evident advice that he not testify was not objectively unreasonable – on the contrary, considering the previous convictions that would have been admissible against the defendant, and the myriad written or recorded false statements by him that were entered into evidence, it may have been objectively unreasonable to advise the defendant to testify.

### B.    Counsel's Preparation and Communications with the Defendant

The defendant advances a handful of complaints to the effect counsel was not sufficiently prepared for trial and did not adequately communicate with him. These complaints, which have already been raised before and rejected by the Court, continue to be meritless. The defendant initially made these claims against Adams and Frankel – by then his fifth and sixth attorneys on the case – in January 2018, approximately ten months after they were appointed and five months before the trial in this case. On January 2, 2018, the defendant submitted a letter to the Court stating that Adams was providing "ineffective or incompetent assistance" and asking

the Court to terminate his representation and appoint a new attorney. Dkt. 277, at 1. The defendant further asserted that Adams was "totally unprepared" for the defendant's earlier bond revocation hearing, had not responded to the defendant's letters, answered few of the defendant's calls, and only met with the defendant for 15 minutes at a time. Dkt. 277, at 2. The defendant reported that he could "continue for several pages and be more succinct but why bore you." *Id.*

On January 11, 2018, the Court addressed the defendant's letter during a status hearing at which the defendant was present. Dkt. 280; 1/11/18 Tr. at 3. In response to the Court's inquiry, Adams indicated that he and Frankel had reviewed the defendant's letter and further stated, "[W]e spoke with Mr. Rossini last week before court. After speaking with him, Mr. Rossini wishes to withdraw the letter." *Id.* Adams then stated that he wished the defendant to so state for the record. *Id.* at 3-4. The Court then held the following colloquy with the defendant:

> THE COURT: All right. Is that correct, Mr. Rossini? At this point you wish to withdraw that letter?
>
> DEFENDANT: Yes, Judge. We talked it out. And I think we are right on the same page.
>
> THE COURT: Okay. You understand, Mr. Rossini, that if you still wish for the Court to appoint alternative counsel for you, that is something that I would consider at this time?
>
> DEFENDANT: Sure. I do. Your Honor, I think we are going to be fine.

*Id.* at 4.

Adams and Frankel continued to represent the defendant between the January 11, 2018, colloquy and the scheduled trial date of June 4, 2018, including engaging in extensive pretrial litigation concerning motions *in limine* and severance issues. *See* Dkt. 284, 285, 286, 287, 288, 289, 292, 294, 296, 297, 298, 299, 318. On May 10, 2018, the Court held the pretrial conference, and on May 29, 2018, held the final pretrial status hearing. Dkt. 322, 332.

June 4, 2018, was the scheduled first day of the trial, and as the Court was concluding preliminary inquiries prior to the start of the trial, the defendant requested to orally address the Court. 6/4/2011 Tr. at 4-5. After the Court confirmed that the defendant was voluntarily going against his attorneys' advice by addressing the Court, the defendant stated: "I like my attorneys. I think they are very good attorneys. I have been in the MCC for four weeks, and I have not seen them once at the MCC. I think this is a fairly complicated case. And I don't feel that I have prepared with them. I've only seen them for 15 minutes or so after court. I believe they are good attorneys. However, at the same time, this is a complicated case. And I think I'm severely compromised." *Id.* at 5.

At this point, the Court held an *ex parte* hearing to address the defendant's complaints about counsel. *Id.* at 5-6. The Court first first turned to Adams, who stated that the defendant had "generally [] expressed confidence and willingness to go forward today." *Id.* at 6. Adams stated that he and Frankel had been "preparing diligently for several months now" and were "ready to go to trial." *Id.* Adams further

17

reported that they had seen the defendant the preceding Tuesday and that "it was our impression through Mr. Rossini's statements that all is well and we are ready to go…." *Id.* Adams also advised that the defendant "has not expressed a desire for us to go and see him at the MCC up until last night at 7:30." *Id.* Adams further noted that before the defendant was taken into custody, they had met with him "several times for several hours to discuss the case." *Id.* at 7. Adams additionally reported that the defendant had sent him "numerous communications through the mail … while he was at Kankakee regarding the case, forms of letters and documents. And I have reviewed all of those with Mr. Frankel. And I am prepared to go to trial." *Id.* At this point, Frankel added that he had traveled to Kankakee to discuss the case with the defendant at least twice. *Id.*

While acknowledging that he had indeed sent voluminous materials to his attorneys, the defendant stated that he had only spoken with them about Thomas Murphy as a witness but "there are other witnesses." *Id.* With respect to his attorneys visiting him in Kankakee, the defendant stated, "We've never had a session over a half hour at Kankakee." *Id.* at 8.

The Court then asked Adams whether he had reviewed the materials the defendant sent him, to which Adams responded, "Yes, Judge. Several times." *Id.* Adams added, "[H]is statement that we've only seen him for half an hour [at a] time is false." *Id.* at 9. The Court then turned to the defendant and stated:

> I am also concerned that we have had pretrial conferences. We have had numerous statuses. And now you are raising this on the -- rather than

18

> raising it before when we had the chance, we were here at status last week. I find it concerning that you are just raising it now when we are ready for -- to proceed on trial. Everyone is here. We have the members of the panel all ready to go. And so I am wondering why, if you are concerned about the degree of preparation between yourself and your attorneys with regard to today's trial, why you are waiting until now to bring it up.

*Id.*

In response, the defendant stated that he had written a letter to the Court that had not yet arrived. *Id.* After the Court noted that the defendant was present at a status hearing the week before, the defendant stated that he did not realize that his attorneys "didn't understand" the case until after the status hearing. *Id.* at 9-10. Following this, Adams advised the Court, "When we spoke to Mr. Rossini Tuesday [the last status hearing], … he had never indicated anything like he felt this way. In fact, he gave us, again, blatantly a vote of confidence in that he said, I'll see you Monday." *Id.* at 11.

At the conclusion of the colloquy, the Court made findings and ruled against the defendant:

> I've heard enough. I think that Mr. -- that having considered Mr. Rossini's statements and statements from the attorneys, we are going to go ahead and proceed with the trial today. I find that Mr. Rossini has had numerous occasions to raise this with me, as late as last week when we had the status hearing here. This case involves a lot of documents, a lot of documentary information that the attorneys have reviewed. His attorneys tell me that they have reviewed everything Mr. Rossini has sent them in terms of materials. And so at this point in time, given the fact that Mr. Rossini has had sufficient time to raise whatever concerns he had with his lawyers last week and at prior status hearings and not having done so, I just don't think that here in the morning of trial when we are about to impanel the jury is -- I think at this point

it's too late. So the attorneys expressed confidence that they are prepared. And so we are just going to proceed.
***
I think that we are just going to go ahead and proceed today in light of the history of this case, the number of statuses we have had, and all of the opportunities that Mr. Rossini and his lawyers have had to raise whatever issues that they had with regard to this case, or Mr. Rossini with the attorney representations. So we will proceed.

*Id.* at 11-12.


This procedural history demonstrates that the defendant's complaints about Adams and Frankel are nothing more than a strategic gambit initially aimed at delaying the trial and now aimed at undoing its results. The Court should reject these claims for all of the reasons the Court previously rejected them.

Additionally, the trial record reveals that counsel in fact were well prepared for trial. Not only did counsel file and litigate several motions *in limine* and proposed jury instructions and lodged appropriate objections during trial, counsel demonstrated a strong understanding of the case through their comprehensive cross-examinations of the government's witnesses and their advancement of a clear theory of defense, namely, that Thomas Murphy was the real mastermind behind the fraud and that the defendant was not a knowing participant in it. Defendant's after-the-fact claim that counsel should have called a forensic accountant for some unspecified purpose, Mtn. at 8, as well as his claim that counsel should have called Agents Evans and Blau as witnesses even though counsel made clear on the record they were able to bring forth the same facts through cross-examining Agent Connors, Tr. 856-858,

20

884-885, amount to nothing more than a complaint that the overwhelming evidence of defendant's guilt did not leave him a viable defense. The fact that the jury did not buy the best defense counsel could muster does not mean counsel was ineffective.

The record further shows that, in addition to being prepared for trial, defense counsel continued to communicate with defendant during trial. Following the conclusion of the government's case-in-chief, at a side bar at the end of the day on June 11, 2018, Frankel informed the Court that it expected to rest as well but asked until the start of the next trial day to finalize that decision "based on things Mr. Rossini wants us to look into." Tr. 894. The Court then brought the defendant up to the side bar, and Frankel repeated that the defense was seeking an extra day "to complete the possibility of this investigation," which Frankel described as a "late breaking matter." *Id.* At the government's request, Adams explained, "[t]here are checks Mr. Rossini wishes us to introduce related to other properties. And he wishes us to look into that, introduce those into evidence. … And if in our legal opinion they are relevant to the case, then we will move to introduce them on Wednesday." Tr. 894-895.

At the beginning of the next trial day, June 13, 2018, the Court inquired of defense counsel whether a resolution had been reached regarding the documents the defendant wanted them to introduce. Tr. 922. Adams then stated: "I'd like to make a record of that. I received some documents yesterday from Mr. Rossini's family regarding checks and other documents he wishes me to introduce into evidence. I've

spoken to Mr. Rossini about it and spoken to Mr. Frankel. And it's in our independent judgment and legal opinion that such documents would be harmful and detrimental to his case. And we think that it is best that we do not introduce them into evidence. I've spoken to Mr. Rossini about that, and I intend to rest. I just want to make sure -- make that on the record. I'd like Mr. Rossini to acknowledge he's heard that."  Tr. at 922-923.  The defendant then responded, "We had the conversation, your Honor." Shortly after this exchange, the defense rested and the case proceeded to closing arguments.  Tr. 924.

These exchanges not only refute the defendant's specific claims about counsel's failure to introduce exhibits offered by the defendant, they illustrate the broader theme that both before and during trial counsel was engaged in client communications and thoughtful, strategic decision making about the case.  This not only undercuts the defendant's claims about counsel's communications and preparation, it places counsel's performance squarely within the "wide range of reasonable professional assistance" which is protected from second-guessing by defendants who are unhappy with the outcomes of their trials.  *Strickland*, 466 U.S. at 690.

### C.    Counsel's Failure to Interview Witnesses

The defendant claims that his attorneys were ineffective because they did not interview and call an unspecified number of witnesses suggested by the defendant. Defendant's argument on this point fails on several accounts.  Not only is his claim

22

facially deficient because he has provided no affidavits or statements of any kind from the proposed witnesses, counsel was aware that these witnesses could at best provide neutral testimony, and at worst would have been harmful to the defendant's case. In any event, in light of the overwhelming evidence of the defendant's guilt, there is no reasonable probability that the alleged investigatory failures would have affected the outcome of the trial.

First, as detailed below, the defendant has provided failed to meet even a minimal burden to provide reliable information to support his claim regarding counsel's failure to interview witnesses. He has not provided affidavits or any other kind of statements from the witnesses themselves. Indeed, he has not even specified which witnesses he asked his attorneys to contact or when he made his requests. This alone dooms his claim. *See United States v. Ashimi*, 932 F.2d 643, 649 (1991) (in order to consider a claim of ineffective assistance based on allegedly deficient investigation, the court "must know what the attorney would have discovered after 'adequate' investigation") (citation omitted).

But even if one assumes the truth of the defendant's claims about these witnesses, and that the witnesses would have agreed to be interviewed, defendant's motion falls well short of establishing either deficient performance or prejudice under *Strickland*. Regarding the performance prong, defendant suggests that the mere fact that counsel declined to interview witnesses that defendant wanted them to interview is in itself sufficient to establish deficient performance. Mtn. at 10. This is simply

wrong.  The Court must instead conduct a multifaceted analysis:  "[w]hen counsel determines that investigation is unnecessary, his decision 'must be directly assessed for reasonableness *in all the circumstances,* applying *a heavy measure of deference to counsel's judgments.*'"  *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) (emphasis added); *accord United States v. Rutledge*, 230 F.3d 1041, 1050 (7th Cir. 2000) ("Whether a decision to forego more investigation is reasonable is analyzed from the perspective of counsel at the time of the decision and in light of all the circumstances.").  This analysis "depends on factors like counsel's overall diligence, the likely relevance of the witness's testimony, whether alternative ways of proving the point exist, and the strength of the government's case." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005).

Applying this framework to this case, it is evident that counsel's performance was not constitutionally deficient.  First, defendant's motion fails to acknowledge that the witnesses defendant presented to his attorneys were not new names.  On the contrary, defense counsel was already aware through the FBI reports produced in discovery of significant negative information regarding many of these supposedly exculpatory witnesses.  By way of example:

- Meir Rotstein, *see* Mtn. at 6, told the FBI that: (1) he never saw the defendant close any transactions in the four years he worked with him; (2) Rotstein's wife lent Rossini $16,000, and Rossini only ever repaid a small portion of that; (3) Rotstein was aware of several investors to whom Rossini promised titles to properties, plus a return, who never got what they had been promised and never got their money back; and (4) Rotstein observed angry investors regularly come to defendant's office to demand a return of their money.  *See* Ex. D.

24

- Craig Shaffer, *see* Mtn. at A-4, told the FBI that in 2011, he lost $70,000-80,000 investing with the defendant for the supposed purchase of a property on short sale. After giving the defendant his money, Mr. Shaffer received "rent" payments from the defendant for a limited period of time, which eventually stopped without explanation. Mr. Shaffer thereafter discovered that the transaction had never been completed and that he in fact did not own the property. Mr. Shaffer had no understanding of how the defendant could have paid him rents if the transaction had never occurred. *See* Ex. E.

- Lisa Rosen, Mtn. at 4, A-3, worked at the defendant's company for the entire time period charged in the indictment, and although Rosen on occasion attempted to negotiate note purchases from banks for the defendant, the defendant never actually closed a singled note purchase that she worked on. Rosen further does not know anyone who successfully obtained a note from the defendant. Rosen was further never aware of any arrangements the defendant had with banks to receive rent payments from distressed properties, and Rosen does not even believe that such an arrangement is possible. Additionally, on at least one occasion, Rosen witnessed an angry investor confront the defendant about returning the investor's money, after which the defendant commented that the defendant "doesn't mind going to jail." *See* Ex. F.

- Richard Kruse, Mtn. at A-4, was involved in filing the lawsuit that Murphy testified was a sham that Kruse would help execute by repeatedly seeking continuances from the court. Tr. at 645-647. Kruse was also a participant in the recorded conversation the jury heard in which the defendant lied to Bishop Younan about his communications with a lender. Tr. 779-792. Additionally, when the FBI sought to interview Kruse, he declined to be interviewed outside the presence of the defendant's then-criminal defense attorney. *See* Ex. G.

In light of the information defense counsel already knew about these witnesses, they were aware that re-interviewing them could only have two undesirable outcomes: either the witnesses would reaffirm significant negative information about the defendant, or they would contradict their earlier statements to the FBI. In either scenario, the witnesses would have been unusable for the defense, and it was entirely appropriate and reasonable for counsel not to interview them. *See United States v.*

*Rutledge*, 230, F.3d 1041, 1050 (7th Cir. 2000) (Interviewing witness with knowledge of defendant's criminal activity to get exculpatory information "would have been fruitless, and counsel's decision not to do so is objectively reasonable."). *See Campbell v. Reardon*, 780 F.3d 752, 765 (7th Cir. 2015) (quoting *Strickland*, 466 U.S. at 691) ("[W]hen counsel has 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenge as unreasonable.").

This is especially so in light of the late hour at which he appears to have raised these issues with his attorneys. Defendant's motion asserts that the defendant provided counsel with a "list of witnesses and contact[ed] them on multiple occasions about these potential witnesses. *Id.* at 4. Notably, the motion does not state *when* the defendant made these requests or whether the requests applied to all of the witnesses defendant has now named, or merely some subset. Regarding timing, as this Court has noted, the defendant had numerous opportunities to voice a complaint that counsel was refusing to interview exculpatory witnesses. By the government's count, between the time the defendant withdrew his initial complaint about counsel and the trial, five months passed and the Court held at least six hearings where the defendant was present. Dkt. 283, 293, 299, 316, 322, 332. Yet the defendant never voiced this witness-related complaint until after he was convicted. Indeed, the only reference in his motion to a timeframe for his alleged requests to counsel is the allegation that defendant's "slipped his attorneys notes" *during* trial. Mtn. at 3.

26

Significantly, during the June 4, 2018, *ex parte* hearing, the defendant suggested that at that point he had *not* discussed witnesses other than Murphy with his attorneys. 6/4/2018 Tr. at 7. In any event, it is telling that the defendant said nothing during the June 4 colloquy about counsel failing to contact witnesses. In light of the apparent fact that the defendant did not raise these witnesses with counsel until the eve of trial, their decision not to pursue interviews was all the more reasonable. *See Campbell*, 780 F.3d at 765 ("*Strickland* … 'permits counsel to make a reasonable decision that makes particular investigations unnecessary.' Resources are limited, and trial counsel must eventually shift from pretrial investigation to trial preparation.").

In considering the reasonableness of counsel's approach to the potential witnesses suggested by the defendant, it is also worth noting that the defendant's communications to counsel on this subject did not occur in a vacuum. The Court will recall that the defendant's bond was revoked in part because he lied to the Court (and to his attorneys) about the purposes of his travel to California while on bond. Dkt. 265, 271. Further, during the June 4, 2018, *ex parte* hearing, Adams advised the Court that the defendant's claims about the length of counsel's visits with him were false. 6/3/2018 Tr. at 9. Additionally, in one of the emails defendant himself attached to his motion, Adams told the defendant, "you tell us one thing in person and then take a different position in your letters." Mtn., Ex. 3. Thus, counsel's response to the defendant's last-minute demands claiming they must divert from trial preparation to

27

track down and interview witnesses based only on the defendant's say-so must be viewed context. From counsel's perspective, the defendant, in keeping with his history as a "recidivist confidence man," had given his them ample reason to take his demands with a grain of salt.

Finally, regarding prejudice, there is no probability – much less a reasonable one – that the outcome of the trial would have been different had counsel interviewed and called these witnesses. As noted above, many of these witnesses had provided the FBI negative information about the defendant and thus would have been affirmatively harmful to the defense. Further, several of the other witnesses on the defendant's list are attorneys as to whom the defendant has not waived privilege. In any event, although the supposed exculpatory value of these witnesses is not entirely clear, at most, the defendant appears to suggest that they could have established that the defendant engaged in some legitimate business. But even if true, this would not have changed the outcome of the trial, since a person engaged in legitimate business who also defrauds people is no less guilty of fraud by virtue of his lawful conduct. Indeed, as recounted above, the jury heard evidence that the defendant in fact turned over a handful of the properties to certain investors (though not all those that he acquired and not in the condition expected). Tr. 76-78, 174; Ex. C, GX Chart 1. The jury understandably did not find that this evidence overcame the number of lies he defendant told investors in exhibits in black-and-white, the sheer number of investors who each reported the same experiences losing their money with the defendant, and

the clear financial evidence showing the defendant and his cohorts simply pocketed the investors' money while sending them a small portion of their own money as "rent" payments. In light of the overwhelming evidence of defendant's guilty, it is inconceivable that the outcome of the trial would have been different even if the jury had heard the testimony that defendant claims his missing witnesses would have provided.

### D. Defendant Has Failed to Establish the Necessity of an Evidentiary Hearing.

As a fallback to directly granting his motion for a new trial, the defendant contends that that he has established a "reasonable ineffectiveness claim under *Strickland*, which entitles him to an evidentiary hearing to prove his allegation." Mtn. at 10-11. On the contrary, the Court is not required to indulge the defendant in his efforts to waste yet more of the Court's time with unsupported and groundless claims. He has offered nothing more in support of his motion than his own self-serving assertions, and there is no realistic scenario under which he could establish deficient performance or prejudice under *Strickland*. The Court should deny the request for an evidentiary hearing.

First, defendant's argument appears to rest on an erroneous view of the law. Defendant claims that "[u]pon a defendant filing a timely motion for a new trial under Rule 33 claiming that trial counsel provided constitutionally ineffective assistance, a district court *must* order an evidentiary hearing." D. Mtn. at 11 (emphasis original). The government is at a loss to understand the origin of this remarkable legal

29

contention. The case that defendant cites, *United States v. Caguana*, 884 F.3d 681 (2018), states no such thing. Indeed, in *Caguana*, which did not even involve a claim of ineffective assistance, the court *affirmed* a district court's denial of a new trial motion. *Id.* at 690-692.

In any event, contrary to defendant's position, the law places the decision whether to hold an evidentiary hearing squarely within the district court's discretion. *United States v. Berg*, 714 F.3d 490, 501 (7th 2013). It is true that claims of ineffective assistance "often" require an evidentiary hearing because "they frequently allege facts that the record does not fully disclose." *Osagiede v. United States*, 864 F.3d 543 F.3d 399, 408 (7th Cir. 2008). That said, merely raising the specter of ineffective assistance does not entitle the defendant to an evidentiary hearing – "if there is no reason to suppose that a hearing would produce evidence justifying the grant of a new trial, there is no reason to hold a hearing." *United States v. Taglia*, 922 F.2d 413, 419 (7th 1991). Conservation of scarce judicial resources is an appropriate basis for refusing a demand for an evidentiary hearing. *See United States v. Osborne*, 931 F.2d 1139, 1164 (7th Cir. 1991) ("[T]he trial court properly exercised its discretion and good judgment when it refused to waste more of the court's valuable time to hold a special evidentiary hearing[.]").

The circumstances under which an evidentiary hearing would be appropriate are well illustrated by *United States v. Simpson*, 864 F.3d 830 (7th Cir. 2017), which the defendant cites. *Simpson* was a relatively simple drug case involving a handful

of witnesses. *Id.* at 832-833. The government's two cooperating witnesses had testified that they traveled with the defendant to St. Louis where the defendant purchased heroin, which the police later seized from the car in which all three were traveling. *Id.* at 832. After the defendant was convicted and obtained new counsel, he moved for a new trial claiming ineffective assistance, in part, based on his trial attorney's failure to interview and call three specific witnesses. *Id.* at 833. The witnesses that counsel failed to interview and call each submitted notarized letters to the Court detailing what would have been their exculpatory testimony: one would have testified that she heard one of cooperating witnesses say the defendant was "taking the rap" for him; a second would have testified that he heard the cooperating witnesses *both* say that the defendant was "taking the rap"; and the third would have testified that he had previously traveled with one of the cooperators and the defendant on trips to St. Louis, and that the cooperator had purchased heroin on those trips, but not the defendant. *Id.*

In spite of the clearly exculpatory nature of this potential testimony, the district court denied the motion without an evidentiary hearing based on its conclusion that the proposed testimony would not have been admissible, so the defendant could not establish prejudice. *Id.* The Seventh Circuit found that it was error not to hold a hearing because the district court's evidentiary analysis was flawed. *Id.* at 835. Not only had the district court acknowledged the testimony was admissible at least for impeachment purposes, the district court's analysis ignored

31

the fact that a hearing could have fleshed out whether hearsay exceptions could have rendered the testimony fully admissible. *Id.*

Whereas *Simpson* well illustrates the circumstances when an evidentiary hearing would be warranted, this case illustrates the circumstances when it is not. First, as noted above and in stark contrast to *Simpson*, here the defendant has not submitted any affidavits or any other kind of statement from his potential witnesses. This alone should defeat his request, since the Seventh Circuit has made clear that "evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Ashimi*, 932 F.2d at 650. Defendant has not only failed to provide statements from his witnesses (most of whom, incidentally, are lawyers or business people who should not be hard to track down), he has failed even to clearly identify which witnesses he is claiming he asked his attorneys to interview – or *when* he made any such request. Without this type of basic information, the Court can have "no reason to suppose that a hearing would produce evidence justifying the grant of a new trial, there is no reason to hold a hearing." *Taglia*, 922 F.2d at 419.

Second, unlike *Simpson*, even if every fact alleged in, or suggested by, the defendant's motion was assumed to be true, his ineffective assistance claim would still fail. *Simpson* was a simple case resting primarily on two cooperating witnesses

32

with very little, if any, independent corroboration, and the potential defense witnesses' testimony would have directly contradicted the entire theory of the government's case. This case, by contrast, is complex and involves 14 witnesses, dozens of documentary exhibits, and voluminous financial evidence, that together spelled out the defendant's fraud to the jury in unmistakable terms. At the same time, the evidence that defendant contends should have been presented at his trial is at best irrelevant to refuting the evidence of his guilt and at worst *inculpatory*, as set forth above. Moreover, given counsel's overall diligence in this case,[2] and in view of the great deference owed to trial counsel under *Strickland*, defendant's allegations fall well short of establishing that counsel acted outside the wide range of professional competence. In any event, the overwhelming evidence of defendant's guilt leaves no reasonable probability that the outcome of the trial would have been different if all of defendant's witnesses had been called and all of his exhibits had been entered.

---

[2] Even the defendant has acknowledged that Adams and Frankel are "very good attorneys." 6/4/2018 Tr. at 5.

## IV.    CONCLUSION

WHEREFORE, the government requests that the Court deny the defendant's motion for a new trial and for an evidentiary hearing in connection with his motion for a new trial.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    *s/ Erik Hogstrom*
       ERIK HOGSTROM
       Assistant U.S. Attorney
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 353-8709

Dated: June 21, 2019

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on June 21, 2019, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing ("ECF") pursuant to the district court's system as to ECF filers.


By:     *s/ Erik Hogstrom*
       ERIK HOGSTROM
       Assistant U.S. Attorney
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 697-4073

1