# EXHIBIT B

## SUMMARY INVESTOR TESTIMONY

Robert Badalian

Robert Badalian is an Assyrian who emigrated from Iran and lives in San Jose, California. Tr. at 20. He belonged to an Assyrian church. Tr. 21. Babajan Khoshabe approached Badalian in the Spring of 2011 to invest in Chicago-area real estate. Tr. 21. Badalian knew Babajan through Badalian's friend and brother-in-law, Fred Khoshabe, who was Babajan's brother. Tr. 21-22. During Fred's daughter's graduation party Babajan first raised with Badalian the idea of investing in distressed properties in Chicago. Tr. 23. Babajan told Badalian that his company would be acquiring notes for properties going into foreclosure and asked whether Badalian might be interested in looking at some of them, to which Badalian agreed. Tr. 24.

In late May 2011, Badalian flew to Chicago. Tr. 24. Babajan introduced the defendant as Babajan's partner. Tr. 25. The defendant and Babajan explained that they were offering investment into distressed properties where the banks were offering the mortgage notes for sale, and that the defendant and Babajan would use the investors' money to purchase the notes and eventually obtain the deeds to the properties for the investors, unless the property owners bought the notes back, in which case the investors would get their money back. Tr. 27. They explained that the process would take a number of months. Tr. 25. Babajan drove Badalian past various properties that they were supposedly offering for investment. Tr. 25.

After Badalian returned to San Jose and expressed interest in some of the properties, the defendant sent Badalian fact sheets about the properties containing information, such as the rental income generated by each property and the expenses. Tr. 28-29, 31-32. The defendant or Babajan instructed that, in order to invest, Badalian had to send cashier's checks made out to the defendant, Babajan, and attorney Thomas Murphy, who Badalian was told would be handling the legal aspects of the process. Tr. 29, 32-33. Badalian invested in several properties he learned about through email communications with the defendant. Tr. 32.-36, 40-41.

In connection with these investments, the defendant gave Badalian a document called a guaranty agreement that purported to memorialize the understanding between the parties. Tr. 36-37. Badalian understood that the defendant and Babajan would use his money to acquire the notes and foreclosing on the properties, which would eventually result in the title to the properties being transferred to Badalian. Tr. 37. If the defendant and Babajan were not able to obtain the notes, Badalian's money would be returned to him. Tr. 37. Badalian further understood from the guaranty agreements and from communications with the defendant that Badalian would receive the rental income from the properties until the title was transferred to him, and that if the

defendant was not able to obtain the note and title Badalian's money would be returned to him. Tr. 41-43.  Within a month or two of investing, Badalian began receiving checks from Murphy that purported to be the rental income from the properties.  Tr. 44-45.  The defendant and Babajan had previously explained that Murphy would be handling the distribution of rents.  Tr. 46.

After Badalian's first investment, the defendant continued to send him information on additional properties, along with instructions on making additional investments.  Tr. 47-49, 51-52.  The defendant or Babajan at some point began directing Badalian to send one lump sum cashier's check for each investment to Murphy, rather than splitting the payment into three.  Tr. 49.  On one occasion, Badalian made his investment check out to Babjan.  Tr. 55.  Badalian invested in several more properties through February 2012 and continued to receive rent payments from Murphy.  Tr. 51-61.  In one instance, Badalian invested in a group of three properties that the defendant told him in writing was "100% percent rented."  Tr. 58.  In another instance, Badalian invested in a larger apartment building that Babajan drove him past during a January 2012 visit by Badalian.  Tr. 63.  Because Badalian told Babajan he did not have enough money to invest in the building, Babajan told the defendant that the defendant and Babajan would partner with Badalian to obtain the mortgage note.  Tr. 63.  During this January 2012 visit, Babajan drove Badalian past several of the properties he had invested in but was told he could not go inside.  Tr. 66.

Around January 2012, the defendant and Babajan told Badalian that they would now be handling the rents from the investment properties through a company called Reliant Management, which was run by Babajan's son, Anthony.  Tr. 66-67.  Badalian was told that Anthony would be collecting the rent and taking out a ten percent management fee.  Tr. 67.  Badalian then received rent checks from Reliant Management for a few months until the rent checks stopped around April 2012.  Tr. 67.  Badalian sent Anthony and Rossini email inquiries about the stoppage, and called Babajan.  Tr. 67-68.  Rossini eventually told Badalian there was a glitch in the process but that the checks would b coming.  Tr. 68.

Badalian continued not to receive rent payments, and to complain to Rossini about this, into the Spring of 2013.  Tr. 70.  Around this time, Rossini told Badalian that Murphy had tied up the investors' money but that Rossini and Babajan were filing and account suit against Murphy.  Tr. 71.  Badalian and another investor, Raymond Baboaghli, flew to Chicago in June 2013 and met with Rossini and another lawyer, Richard Kruse, about the suit they had filed and was told they were filing liens to secure all the properties.  Tr. 72-73.

Around the same time, Badalian continued to communicate with Rossini about getting titles to his investment properties.  Tr. 74.  Through his own research into Cook County Assessor's

records, Badalian discovered that three of the properties had been recorded in the name of Rossini's company, even though they were supposed to have been assigned to Badalian under the guaranty agreements Rossini signed. Tr. 74-76. When Badalian confronted Rossini about this, Rossini claimed he would transfer the three titles to Badalian the next month, along with the back rents owed to Badalian. Tr. 76-77. Rossini ultimately transferred only one of those three titles to Badalian, and when Badalian traveled to Chicago to inspect that property he discovered that it had been gutted and abandoned and was not being rented at all. Tr. 76-78. During subsequent email communications with Badalian, Rossini told Badalian that the other two titles would be transferred to Badalian in August 2013, but they were not. Tr. 79-82. Badalian discovered through his research into property records, that Rossini had used at least one of the properties as security for a mortgage to another individual. Tr. 85-86. In total, Badalian invested with Rossini and Babajan in ten properties, received title to only one abandoned and gutted property, did not receive a refund of any of his investment money, and lost over $500,000. Tr. 89-90.

Valdimir Moghaddasi

Moghaddasi emigrated from Iran and lives in San Jose. Tr. 132. Moghaddasi is a board member of the Assyrian Church of the East. Tr. 133. In 2011, Mog's cousin and fellow church member, Fred Khoshabe, told Moghaddasi that Fred's cousin, Babajan and two partners were involved in an investment opportunity. Tr. 134. Fred presented the opportunity to the church board. Tr. 135. Fred explained that Babajan and his partners, Albert Rossini and Thomas Murphy, have connections that allow them to buy mortgage notes for properties in foreclosure from banks. Tr. 135. According to Fred, if the church invested, they would either get the title to the properties in 6-12 months or they would get their money back. Tr. 135. Fred presented the board with paperwork about a property that included a statement of the rental income the church would receive. Tr. 136. Moghaddasi felt comfortable with the investment because Fred had been on the board previously and had done real estate investing, Tr. 137. The church, via Moghaddasi, decided to invest in two properties and sent cashier's checks to Murphy at Fred's instruction. Tr. 138-141. In connection with the investment, the defendant sent a guaranty agreement by email summarizing the investment. Tr. 142-144. Moghaddasi understood that the defendant's company would acquire the notes to the properties, oversee a 6-18 month court process to obtain title for the church, and pay the church the properties' rental income in the meantime, with a guaranteed refund if they could not get the title. Tr. 144-145.

Following the church's initial investment, Moghaddasi began investing personally. Tr. 145. He received fact sheets for these properties that originated from the defendant and sent the defendant cashier's checks. Tr. 148-150. During the latter part of 2011, the church was receiving purported rental income from its investments, and in October 2011, the defendant actually conveyed the deed to one of the properties to the church, which gave Moghaddasi and the church confidence in the investment. Tr. 151.

In the spring of 2012, Moghaddasi traveled to Chicago. Tr. 152. the defendant and Babajan picked Moghaddasi up at the airport and drove him around to view the property he had invested in, as well as several additional properties. Tr. 152-154. The defendant and Babajan told Moghaddasi he could not see the inside of the properties because the neighborhood was bad, but Moghaddasi saw the outsides. Tr. 154-155. The last property they showed him was very nice and in a nice area. Tr. 155. The defendant and Babajan showed Moghaddasi a fact sheet about it and reassured him that he would get rents and eventually the title because of their connections and experience with the legal system. Tr. 155-157. Moghaddasi decided to invest in the nice property they showed him for $235,000. Tr. 157.

Moghaddasi and the church received rent payments as promised well into 2012, but they eventually stopped in around June 2012. Tr. 158-160. Moghaddasi began communicating about the rent payments by email with the defendant, Fred, and Anthony Khoshabe, who was now in charge of rent distributions via Reliant Management. Tr. 160-161. Anthony told Moghaddasi the rents would be coming "any day." Tr. 163. Later, the defendant stated in an email that the rent distribution process was changing and it would just be a delay of a month in receiving the rents. Tr. 164. Around the same time, Moghaddasi invested $375,000 in one more property. Tr. 165. Shortly afterwards, Moghaddasi finally received title to the first property he had invested in. Tr. 166.

In approximately spring of 2013, Moghaddasi learned from the defendant and Babajan that they had filed a lawsuit against Murphy. Tr. 166-168. During the defendant's email communications with investors during this time, the defendant told Moghaddasi that he had placed liens on the properties, which the defendant stated would prevent anyone else from transferring the properties. Tr. 171. The defendant also made specific statements about the status of Moghaddasi's properties, including that they were still in foreclosure and that the owner of one of the properties, one "Ms. Adic," was willing to turn over the property to the defendant. Tr. 169-173. Moghaddasi never received the titles to these properties, nor any refunds and personally lost approximately $750,000. Tr. 173. The church, for its part, only received title to one property of the four it invested in and never received any refunds of its investment monies. Tr. 174.

Awiquam Pithyou

The Reverend Awiquam Pithyou emigrated from Iran and is a priest at the Assyrian Church of the East in Chicago. Tr. 206-207. Near the end of 2011, Rev. Pithyou was at a Christmas party at the residence of his parishioner and brother-in-law, Ibrahim Yousif, when he was introduced to Babajan. Tr. 208. During dinner, Babajan solicited Rev. Pithyou and Yousif to invest in foreclosed properties. Tr. 209-210. The following day, Rev. Pithyou and Yousif came to

Babajan's and the defendant's office on Devon Avenue in Chicago. Tr. 211. During this meeting, the defendant and Babajan showed Rev. Pithyou and Yousif documents pertaining to distressed two-flat buildings in Skokie. Tr. 212-217. The defendant and Babajan told Rev. Pithyou that they would receive rental income from the properties and would receive title to the properties in approximately six months. Tr. 215. Shortly after this first meeting, the defendant and Babajan drove Rev. Pithyou to view the outside of the buildings but told him that they could not see the insides because there were tenants. Tr. 217-218. The properties appeared to be in good condition and were in a good neighborhood. Tr. 218.

Approximately a week or two later, Rev. Pithyou decided to invest in these first two properties for a total of $105,000. Tr. 219-221. At defendant's and Babajan's instruction, Rev. Pithyou brought Babajan and the defendant a cashier's check payable to attorney Thomas Murphy and also signed a document Babajan and the defendant provided called a guaranty agreement, which the defendant also signed. Tr. 222-224, 270-271. Following this initial investment, the defendant and Babajan presented additional properties to Rev. Pithyou. Tr. 224-225. Within two-to-three weeks, Pithyou began to receive checks from Babajan that he was told were the rental income from his investment properties. Tr. 231. After beginning to receive the rental income, Rev. Pithyou decided, along with his son, to invest in additional properties. Tr. 234-237. They borrowed money from the bank in order to make some of these additional investments, while the original investments came from Rev. Pithyou's savings. Tr. 240-241. Later, Rev. Pithyou's wife also invested by taking out a loan from her 401(k). Tr. 255.

Rev. Pithyou regularly received rent checks signed by Murphy but tendered by Babajan for at least the next two months. Tr. 243. After that, the checks were signed by Babajan's son, Anthony, who ran a company called Reliant Management. Tr. 245-246. Anthony had an office across the hall from Babajan and began providing the checks to Rev. Pithyoiu. Tr. 247-248. When Rev. Pithyou picked up his first check from Anthony, he was concerned about the change in the distribution of rental income and asked Anthony whether everything was done legally, to which Anthony assured Rev. Pithyou that there was nothing for Rev. Pithyou to worry about. Tr. 249-250. Rev. Pithyou then received rent checks from Anthony for approximately four more months. Tr. 250.

Eventually, Rev. Pithyou's rent payments became delayed and then stopped altogether. Tr. 256. Rev. Pithyou began complaining about the payment stoppage and the failure to turn over title to the properties. Tr. 258. He eventually demanded that Babajan and the defendant return his money, which they agreed to do but never did. Tr. 258-262. In total, Rev. Pithyou and his family members invested approximately $435,000 with the defendant and Babajan, only received rent payments for six months, and never received titles to the properties nor a refund of investment funds. Tr. 262.

Albert Khamis

Albert Khamis was an Assyrian who came to the United States and owned and operated a small business for approximately 12 years before coming into contact with the defendant's investment program. Tr. 283-284. Khamis was first introduced to the defendant's investment business through his cousin, Ibrahim Yousif, from Chicago. Tr. 284. Yousif told Khamis that the defendant was working with Anthony Khoshabe and his father. Tr. 285-286. Yousif put Khamis in touch with the defendant, who explained to Khamis that his company would manage the rental buildings Khamis would invest in and pay him the rents collected, minus a management fee. Tr. 286. The defendant sent Khamis documents pertaining to a property on Washtenaw Street in Chicago. Tr. 286-287. The defendant explained the rental income and expenses for the property, and Khamis decided to invest $97,000. Tr. 288-289. The defendant sent Khamis a "guaranty agreement" and spoke to Khamis over the phone to explain that they would be buying a building in foreclosure and that Khamis would receive rents payments from the building for a time and would then become the owner. Tr. 290. The defendant further told Khamis that if the defendant's company did not secure the title to the building, he would receive a refund of his investment money. Tr. 291.

After investing, Khamis received rent checks in the mail from the defendant for several months until the checks became delayed and then ceased altogether. Tr. 295-296. Khamis spoke to both Babajan and the defendant about the rent stoppage. Tr. at 296-297. The defendant provided excuses for the missing payments, including claiming that Murphy had been late making a payment and that the defendant had an unspecified issue with Babajan. Tr. 297. During subsequent near weekly calls with the defendant, the defendant claimed that Murphy had taken the investors' money. Tr. 298-299.

Ibrahim Yousif

Ibrahim Yousif is an Assyrian refugee who came to the United States in 1979, along with his brother-in-law, Reverend Awiquam Pithyou. Tr. 307-308. Yousif was a member of an Assyrian church in Chicago that Rev. Pithyou founded. Tr. 308-309. In late 2011, Yousif hosted a Christmas party attended by Rev. Pithyou and Babajan Khoshabe, who was Yousif's ex-brother-in-law. Tr. 310-311. During the party, Babajan told Yousif and Rev. Pithyou about an investment opportunity involving mortgage notes. Tr. 311-312.

A day or two later, Yousif and Rev. Pithyou went to the defendant's Devon Street Investments office to learn more about the investment. Tr. 312-313. There, Babajan introduced the defendant, who told them he was selling great investments and offered to take them view some properties, which they agreed to do. Tr. 313. The defendant and Babajan drove Yousif and Rev.

Pithyou past some nice properties in Skokie but told them they could not go inside because the properties were fully rented with Section 8 tenants. Tr. 315. The defendant and Babajan explained that, if Yousif and Rev. Pithyou invested, they would obtain the note to the property and after several months would hold the deed as well. Tr. 315-316. In the meantime, they were told, they would receive the rental income from the properties. Tr. 317.

A short time after this initial meeting, Rev. Pithyou decided to invest, which gave Yousif confidence that it was a good investment. Tr. 318. Approximatley one week later, Babajan contacted Yousif about a different Skokie property. Tr. 319. During a follow-on meeting at the defendant's office, the defendant presented Yousif with an information sheet about the property that purported to list the income and expenses for the property. Tr. 320. The defendant also provided Yousif with a guaranty agreement and explained the investment. Tr. 321-322. Yousif agreed to invest $75,000.

After investing, Yousif quickly began receiving checks from Babajan purporting to be rental income from the property. Tr. 324, 327. Anthony Khoshabe also brought Yousif a $12,500 check that he said was a referral fee from him, Babajan, and the defendant because Rev. Pithyou had invested. Tr. 325-326. Based on the apparent success of the initial investment, Yousif decided to invest in two additional properties, which investments were also memorialized in guaranty agreements provided by the defendant. Tr. 328-333. Yousif, who was a prominent member of the church and a member of its governing board, also told many other members that this was a good investment. Tr. 336-337. The church itself ultimately decided to invest. Tr. 337. As more members invested, the defendant and Babajan gave Yousif additional referral fee checks. Tr. 339.

After a few months of receiving rent checks, the checks began coming from Reliant Management, which Anthony told Yousif was Anthony's new property management company. Tr. 342. Anthony then signed Yousif's rent checks, which had a management fee deducted from the total amount. Tr. 344.

In mid-May 2012, the rent payments started coming in the form of money orders signed by the defendant. Tr. 345. Yousif became suspicious that something was not right and he began pressing the defendant for information about when he would be receiving the notes for his properties. Tr. 346. Yousif received several explanations from the defendant that he found unsatisfactory, which prompted him to call Rev. Pithyou and express his concern. Tr. 346-347. In response, within an hour, the defendant called Yousif and accused him a spreading rumors. Tr. 348. Yousif, in turn, reported the matter to the Lincolnwood Police Department. Tr. 348. Within a week, the defendant called Yousif to come to the defendant's office to sign some documents and receive a refund of his investment money, with the referral fees deducted. Tr.

348-350. To Yousif's knowledge, he was the only investor to receive a refund of his investment money. Tr. 354.

Nastors Moshi

Nastors Moshi is an Assyrian who came to the United States in 1972. Tr. 367. He was a small business owner over a span of more than two decades before retiring in Arizona. Tr. 366-368. In March 2012, Moshi learned from his cousin, Ibrahim Yousif, about an investment opportunity that Yousif's brother-in-law Babajan Khoshabe was selling. Tr. 368. After speaking with Yousif and Babjan, Moshi initially invested in two buildings in Chicago through the defendant's company, Devon Street Investments. Tr. 369-370. Moshi spoke with Babajan about the investments over the phone and received information sheets about the apartment buildings he was investing in that listed net rental income Moshi would receive. Tr. 371-372. Moshi also received a Guaranty Agreement for the properties signed by the defendant. Tr. 373.

After Moshi's initial investments, he dealt directly with the defendant and agreed to invest in three more properties. Tr. 374-375. In connection with these investments, the defendant sent Moshi information sheets about the properties and instructed him on where to direct his investment payments. Tr. 376-377. Moshi communicated with the defendant over the phone, and by fax and email. Tr. 377. The defendant provided Moshi with Guaranty Agreements and explained that, by investing, Moshi would eventually get title to the properties and in the meantime would receive the rental income from the properties. Tr. 378-379.

Moshi initially received rent payments as promised, but they eventually stopped, prompting Moshi to contact the defendant about the missing rent payments. Tr. 384. Initially, the defendant told Moshi the rents were only delayed but promised he would be receiving them. Tr. 384-385. In late 2012, the defendant provided Moshi an "Indemnification and Hold Harmless" agreement in which Moshi would be refunded 495,000 by October 31, 2012, and would keep his interest in one of the properties. Tr. 385-387. The defendant did not refund Moshi's money by October 31, 2012. Tr. 388. The defendant subsequently claimed that he was conducting a short sale of one of the buildings, which would allow him to repay Moshi. Tr. 391. The defendant in fact never paid Moshi any proceeds from a short sale. Tr. 391.

Ashoor Pithyou

Ashoor Pithyou is the son of Reverend Pithyou and came to the United States as a refugee in 1984. Tr. 398. In 2012, Ashoor learned that his father had become involved in a real estate investment program run by the defendant and Babajan. Tr. 399. Ashoor and his father attended a meeting with the defendant and Babajan where they explained that, upon investing in a property, investors would receive the rental income from the property and would receive title

within 12 months, or else would be refunded. Tr. 401-402. Ashoor became interested in investing himself and attended a meeting at the Devon Street office where the defendant and Babajan presented information on a particular property in Skokie. Tr. 402-403. Ashoor used $85,000 from the sale of his business to fund his investment, which was held in his father's name. Tr. 404. Ashoor began receiving rent payments as promised and was told by Babajan's son, Anthony Khoshabe, that his management company, Reliant Management, was taking care of matters such as building maintenance and finding renters for vacant units. Tr. 405.

In approximately May 2012, Ashoor went to view a property that his mother had invested in and found it to be in very poor condition. Tr. 415-416. Ashoor went to the Devon office and brought this to the attention of the defendant and Babajan, who assured Ashoor that the property was inhabited and they were collecting rent from the building. Tr. 416.

Initially Ashoor received rent checks for his own building from Anthony Khoshabe and Reliant Management. *Id.* In approximately May or June 2012, Ashoor's rent payments started coming from the defendant and Babajan in the form of money orders. Tr. 417. During this period, payments were delayed and eventually stopped altogether. Tr. 407. The defendant stopped answering Ashoor's calls, so Ashoor began communicating with the defendant about the rent payments by email. *Id.* During these email communications, Ashoor questioned why his rent payments were delayed in light of the defendant's statements to Ashoor that Ashoor's building was a Section 8, government-subsidized building with guaranteed rent. Tr. 419-421. The defendant claimed that the rents were only being delayed because Devon Street was changing to a direct deposit system. Tr. 421. The defendant and Babajan later told Ashoor that Devon's attorney, Thomas Murphy, was holding on to the rent money. *Id.* They further said that they were waiting for the outcome of the foreclosure proceedings Murphy was pursuing on the properties. Tr. 427. The defendant and Babajan ultimately set up a meeting with Murphy, Ashoor, and Reverend Pithyou, during which Murphy explained, with agreement from the defendant and Babajan, that the foreclosure process was slow because the property owners were fighting it in court. Tr. 428-429.

Ashoor received his last rent payment in late 2012. Tr. 429. Following this, the defendant claimed that Murphy was holding onto the investors' money and that the defendant and Babajan were suing Murphy. Tr. 430. Ashoor was never told of any outcome of this lawsuit and never received a refund or title to the building he invested in. Tr. 431.

Kathy Khodi

Kathy Khodi works in real estate in Cupertino, California, and invested with the defendant from 2011 to 2013. Tr. 466-467. Khodi was introduced to the defendant's company by two

individuals, including Babajan's brother, Fred Khoshabe, who had invested with Devon Street in distressed mortgage notes. Tr. 468-469. Fred said that the investment program was run by the defendant, Babajan Khoshabe, and his son, Anthony Khoshabe. Tr. 469. Fred explained that if she bought a note from Devon Street, she would be in the position of first lienholder for the property and would eventually get title to the property after the defendant foreclosed on the property on her behalf. Tr. 468. In the mean, Khodi was told, they would forward her the rents they collected from the buildings, minus a management fee. Tr. 469. Fred explained that he would personally make sales commissions for bringing in investors. Tr. 470. Fred provided a fact sheet for a note being offered by Devon Street that set forth the rental income and expenses for a building in Chicago. Tr. 472. Fred later emailed Khodi with instructions to send her investment check to the defendant at the Devon Street address. Tr. 474-475. After Khodi mailed her investment check to the defendant, Fred forwarded Khodi an email from Rossini that contained a Guaranty Agreement, signed by the defendant, that memorialized the terms of her investment. Tr. 475-476.

Shortly after investing, Khodi began receiving rent payments, which gave her confidence in the legitimacy of the investment. Tr. 478-479. Khodi decided to invest in two additional notes, which likewise involved sending a cashier's check to, and receiving Guaranty Agreements from, the defendant. Tr. 481-483. Following these additional investments, Khodi continued to receive rent payments for approximately 5-6 months, at which point they stopped. Tr. 484. When Khodi contacted Fred about the stoppage, Fred directed Khodi to the defendant. Tr. 484-485. Khodi had numerous phone conversations with the defendant over the next several months, during which the defendant provided various explanations for the rent stoppage. Tr. 487-488. Initially, the defendant stated that there was a backlog in processing the rents because of problems in the foreclosure process. Tr. 488-489. The defendant later claimed that Murphy had illegally sold the notes but that she was still the first lienholder. Tr. 489-490. In response to Khodi's inquiry about contacting law enforcement, the defendant explained that it would be better to go after Murphy civilly because they would not be able to recover their money if law enforcement got involved. Tr. 490. Ultimately, Rossini told Khodi that he had sued Murphy and that Murphy was cooperating with him. Tr. 491-492. In late 2012, the defendant also issued Khodi a one-time catch-up payment of some of her backed rents, which along with the lawsuit, assuaged some of Khodi's concerns. Tr. 492-493.

As the lawsuit against Murphy was pending, the defendant began to directly solicit Khodi for other investment opportunities. Tr. 493-494. After communicating with the defendant and receiving documents from him about a supposed mortgage note pool he was brokering the sale of through a company called Rockford Commercial Mortgage ("RCM"), Khodi decided to purchase the note pool. Tr. 496-497. The defendant told Khodi that she was buying the note pool from RCM, who would pay the defendant a commission. Tr. 497. The defendant did not disclose that RCM was his company and that he had set it up with Thomas Murphy. *Id.* Khodi agreed to wire $395,000 to RCM's bank account, with the expectation that the ownership of the notes in the

pool would immediately be transferred into the name of her family trust and she would begin receiving approximately $30,000 of monthly income. Tr. 497-498. Although Khodi did not immediately receive the titles or payments and raised concerns about this with the defendant, he was initially able to assuage her concerns. Tr. 498-499.

Shortly after the note pool investment, the defendant presented Khodi with another real estate transaction involving a group of townhomes in Riverdale, Illinois. Tr. 499. Khodi initially told the defendant she did not want to invest any more money with him, but he explained that this would not be an investment. Tr. 500. Instead, according to the defendant, Khodi would be directly purchasing the properties from another individual, with the defendant acting as the broker for the purchase. Tr. 500-501. After the defendant provided information about the rental income and expenses for the properties, she decided to purchase them. Tr. 501. At the defendant's instruction, Khodi wired $225,000 to the RCM account. Tr. 502. Khodi understood from the defendant that there would be 30-45 day closing period, after which the titles would be transferred to her. Tr. 503. Khodi anticipated receiving the titles by the end of August 2013. *Id.*

In the meantime, in approximately mid-August 2013, the defendant sent Khodi a $30,000 check that represented her first payment from the Rockford note pool. Tr. 519. When this check bounced, the defendant sent Khodi an email explaining that there was a "double endorsement" of two checks he had received from "the bankruptcy court," which caused his bank to hold those two checks for 14 days. Tr. 519. The defendant reassured Khodi that he had enough cash the cover the missing payment, and he in fact deposited $30,000 in money orders into her account, which gave her confidence in the legitimacy of the investment. *Id.*

During the same time period, the defendant sent Khodi another email in which he indicated that the Riverdale purchase had gone through and that he would receive the titles within a week, once the properties had passed a "village inspection." Tr. 520-521. In this email, the defendant also claimed that he now had the deed to the very first note Khodi purchased and that he had a buyer for another of the notes she had purchased. Tr. 522.

On August 20, 2013, the defendant sent Khodi an email attaching copies of what he claimed were the deeds to the Riverdale properties she had purchased. Tr. 523. The defendant claimed in this email that he would not be able to record the deeds until the properties had passed inspection, which was why he had not placed the deeds into the name of her family trust yet. *Id.*

During this same time period, the defendant called Khodi and told her she needed to pay for additional Riverdale properties. Tr. 503. The defendant had previously told Khodi there was another group of properties, but Khodi did not want to pay for more properties until she had title

to the first group. *Id.* When Khodi reiterated that she was waiting for the titles to the first group, the defendant's tone became very abrupt and he told her that she had said she would make the payment and insisting that she needed to do so. Tr. 504-505. This conversation made Khodi very uncomfortable and fearful, and she agreed to send additional funds for a second group of Riverdale townhomes. *Id.* Khodi wired this final payment to the defendant on around August 22, 2013, shortly after the defendant sent her the purported copies of the first set of Riverdale deeds. Tr. 523.

The defendant never turned over to Khodi the Riverdale deeds or any of the notes from the Rockford pool. Tr. 528. Khodi retained an attorney to pursue these things and also continued to communicate directly with the defendant. Tr. 528-529. Over the next several months, the defendant repeatedly promised in emails that he would return Khodi's investment funds to her by particular dates but never did so. Tr. 530-535. The defendant likewise never turned over any of the deeds to the three properties she originally invested in, nor did he ever refund her investments in those properties. Tr. 535. Khodi ultimately lost approximately $1.3 million with the defendant. *Id.*

Ninos Younan

Ninos Younan is the Bishop for the Chicago Diocese of the Ancient Church of the East, which is comprised primarily of Assyrian refugees from Iraq, Syria, and Turkey. Tr. 745. As Bishop, Younan oversaw the committee responsible for the Church's finances. Tr. 747-748. In 2012, Bishop Younan became aware that a member of the church, Ibrahim Yousif, and the senior priest of the church, Awiquam Pithyou, had become involved with an investment program. Tr. 748-749. Rev. Pithyou suggested that this program might be a good way for the church to alleviate financial burdens from earlier loans it had taken out. Tr. 749. Yousif and Rev. Pithyou then attended a meeting with the church board where they explained that Devon Street had acquired the bank notes for properties in foreclosure and were selling them to investors, who would receive rental income from the properties and would eventually take title to the properties. Tr. 749-750.

Following the initial meeting with the church board, Bishop Younan met the defendant, Babajan, and Yousif at the Devon Street office. Tr. 750-751 The defendant presented Bishop Younan with information regarding a specific property, including a purported statement of its income and expenses and the amount owed on the note. Tr. 752-754. The document defendant prepared further represented that it would take "6 to 12 months to get the title" and that the church would be paid "rentals" during that time period. Tr. 754-755. During Bishop Younan's conversation with the defendant about this property, the defendant told Bishop Younan that Devon Street owned the note and would sell it to the church for $300,000. Tr. 755.

The church decided to invest, and Bishop Younan provided the defendant a cashier's check. Tr. 756. The check was made payable to Thomas Murphy as attorney/agent, which the defendant instructed Bishop Younan to do because, according to the defendant, Murphy would place the funds in an attorney trust account. Tr. 756-757. The defendant also provided Bishop Younan with a guaranty agreement memorializing the church's "claim" on the property, its right to rents collected from the property, and its understanding that title would pass to the church at the end of the foreclosure proceedings. Tr. 757.

Following the church's investment, the defendant gave Bishop Younan a check from Reliant Management that purported to be the rental income from the church's property. Tr. 757-759. The defendant also provided an invoice reflecting that a management fee had been deducted because Reliant Management was taking care of the property. Tr. 760.

The defendant continued to provide rent payments to the church for approximately four months before the payments became delayed and then a rent check bounced, which the defendant blamed on a financial management error. Tr. 760-762. A subsequent check was post-dated, and the defendant claimed that they had to wait to deposit it until the bank had cleared the funds. Tr. 763. Eventually, the checks stopped altogether, and Bishop Younan demanded the church's money be returned. Tr. 762-763. The defendant had the church signed a "Release, Indemnification, and Hold Harmless Agreement" in which he agreed to return the church's funds and turn over the church's backed rents by February 15, 2013. Tr. 764-765. The defendant did not return the church's investment funds and gave Bishop Younan a check for the church's backed rents that subsequently bounced. Tr. 766, 771-772.

In conversations and email communications throughout April and May of 2013, the defendant told Bishop Younan that Murphy had taken the investors' money but that the defendant and Babajan had sued Murphy and filed liens that would protect the church's and the other investors' interests. Tr. 772-775. Later, the defendant showed Bishop Younan a document he had filed with the Cook County Recorder of Deeds claiming that the original note holder for the church's property, North Community Bank, had agreed in December 2012 to sell the note to Devon Street. Tr. 777-778. This was inconsistent with the defendant's statements at the time of the church's original investment that, as of May 2012, Devon Street was already in possession of the notes. Tr. 777-778.

In approximately the summer of 2013, Bishop Younan came into contact with the FBI and began to assist in its investigation of the Devon Street investment program. Tr. 778. On August 8, 2013, Bishop Younan participated, along with investor Ashoor Pithyou, in a consensually recorded meeting with the defendant and Attorney Richard Kruse. Tr. 779. During the recorded meeting, the defendant made several statements that were inconsistent with the defendant's

original explanation of the investment to Bishop Younan, including that: Devon may not even have had a right to the rents from the church's property, Tr. 783; Devon did not actually own the notes in the first place but the church may now be able to purchase the property from the bank, Tr. 784-785; and Devon was never intending to collect rents and the defendant now blamed Murphy for rents not being collected, Tr. 787. The defendant additionally told Bishop Younan that, even though Murphy had supposedly taken the church's money, they should not allege that a fraud had been committed because then they would not be able to recover any money from Murphy's malpractice insurer. Tr. 788-789. At several points during the recorded meeting, Bishop Younan also asked the defendant for the name of the person at the bank that the defendant claimed he had spoken with about the note to the church's property. Tr. 791. Even though the defendant told the Bishop he would provide that name at a later date, he never did. Tr. 791-792.

Ultimately, the church never received the title to the building, nor did it ever receive a refund of its investment money. Tr. 792.

Janet Khoshaba

Janet Khoshaba's testimony was admitted by stipulation. Tr. 863. Khoshaba was introduced to the defendant's investment program through Ashoor Pithyou, who told her that Devon Street's company was selling a mortgage note for a property in Skokie. *Id.* Khoshabe then met with the defendant in person and he explained the investment to her and received her cashier's check for $125,000. Tr. 864. The defendant also provided Khoshaba with a guaranty agreement for her investment. *Id.* Khoshabe received regular rents payments from the defendant for approximately three years, totaling approximately $16,746, but never received the note or title to the property and never received a refund of her investment money, despite demanding one from the defendant. *Id.*