UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

AUG 22 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

v.

Case No. 15-CR-515-1

HON. JOHN Z. LEE

ALBERT ROSSINI,
            Defendant.

### DEFENDANT ROSSINI'S REPLY TO THE
### GOVERNMENT'S RESPONSE TO A MOTION FOR NEW TRIAL

NOW COMES Defendant Albert Rossini, Pro Se, and submits this
Reply to the Government's Response to Defendant's Motion for New
Trial and Evidentiary Hearing. In support thereof, Defendant states
as follows.

> I.  DEFENSE COUNSEL DID NOT PREPARE, COULD NOT
> COMPREHEND IN HASTE AT TRIAL, AND WAS INCAPABLE
> OF PROVIDING A COHERENT THEORY OF THE CASE

Defendant Rossini was introduced to attorney Thomas W. Murphy
("Murphy") in October 2007 through a transaction in which Murphy
represented Metal Networking LLC. Murphy was then a partner at the
law firm of Pedersen & Houpt and subsequently represented Rossini in
the purchase and sale of 1266 South Orchard, Montgomery, Illinois,
2806 East 76th, Chicago, Illinois, and 50 North Spring Street, Elgin,
Illinois. In early December 2010, at his Pedersen office, 161 N.Clark
Stree, Chicago, Murphy asked Defendant if he had an interest in
acquiring real estate short sales and defaulted notes secured by
mortgages on real estate.

Later in December 2010, Rossini formed a business venture ("venture")
with Anthony and Babajan Khoshabe, later joined by Fereidoon Khoshabe.

-1-

The Khoshabes had engaged in real estate transactions and operated a mortgage banking and brokerage office for 20-years.

This business venture was set up whereby Rossini would negotiate the acquisition of defaulted notes from banks and attorneys, including Murphy, who represented several banks including New Century Bank. Acquisition prices in the period were significantly below the outstanding loan balances and far below the value of the underlying properties. (See 3820 W. Adams, p. 18 herein). Through their connections, and the assistance and association with brokers, the Khoshabes were to raise capital. It was a perfectly lawful enterprise.

The goal of the venture was to acquire the defaulted notes or short sales mainly from Murphy, and then for Murphy's firm to foreclose on the defaulted notes after which the venture would own the properties and record title thereto.

The procedure for the venture, based on the advice of then attorney Murphy, was that after the Khoshabes received commitments for the loans from investors, 100% of the funds were sent to attorney Murphy. All funds were made payable to Murphy as attorney and agent. Murphy was to deposit the funds but segregate the amounts necessary to buy the defaulted mortgage loans with a $5,000 fee for himself and firm. Murphy would then forward the balance of the funds to Defendant, the Khoshabes and brokers.

The transactions were all structured whereby the capital raised from investors was then loaned to the venture through guaranty agreements. The amounts of these loans were significantly less than the fair market value of the underlying properties. Comparative Market Analysis (CMA) valuations were prepared by Devon Street Investments'

-2-

employees for each prospective purchase. The amount received from
investors was higher than the price Rossini had agreed to pay for
the notes or short sales, thereby providing a profit for Defendant
and the Khoshabes. This was a customary practice in the note and
short sale business, and it was fully understood by investors and
lenders. (See Exhibit_/___ attached and incorporated herein).

The Rossini/Khoshabe venture was per written agreement obligated
through the guarantees to pay interest on the loans at a rate equivalent
to the rentals collected for the subject properties, less a management
fee. Also per written agreement, the principal would be repaid in cash
or by delivery of the deed. There were no restrictions in the loan
documents as to the ability of the venture to use the proceeds of the
loans for any proper purpose. Murphy advised, originated and drafted
the guaranty agreement, sending them by facsimile or email for both
Rossini and the investors to sign. (See Exhibit_ _Z__ , Guaranty
Agreements, attached and incorporated herein).

There were nearly 20 successful transactions with Murphy. (See
Exhibit _3_ , attached and incorporated herein). On or about January 12,
2012, Murphy misled the venture by assuring and informing venturers
and investors that he was continuing to make the required acquisition
payments and pay the collected rents, but in fact, he stopped making
the payments to acquire the notes and diverted the proceeds to his
own use.

In reality, around October 2011, approximately the time Murphy
befriended Tamera Brown, he has stopped purchasing the notes and began
paying interest and rental payments to the venture (for disbursement

-3-

to investor/lenders) from investor funds meant for acquisition of notes, mortgages and short sales. This was not disclosed by Murphy. The venture and investors continued to rely on Murphy's expertise and prestige in the purchase of the discounted notes and short sales.

During Thanksgiving week, 2012, Murphy sent the venture $571,000 of checks. These checks represented four months cash flow that he had recieved from interest and rentals on notes and properties he had purportedly purchased, for which he did not have sufficient funds and consequently those checks bounced. Before the venture knew that the deposits were no good, Rossini and Fereidoon Khoshabe had remitted payments to the lenders adn those checks and ACH payments bounced (although paid by Chase Bank). Rossini then worked out an arrangement with Chase Bank to cover the bad checks with his own funds. Defendant used over $800,000 of his own funds to cover those checks and to try and satisfy the people who were actually defrauded by Murphy's misappropriations of the deposits. (Exhibit 4, attached)

The venture learned that Murphy had an affair that cost over $1,200,000, and they suspect this, together with money Murphy owed former clients Arthur Sanial Trust, Nina Jozers, World Wide Realty, LLC, and Prestige Realty Partners, was the source of Murphy's frauds. Rossini who is accused of benefiting from missing funds has on numerous occasions requested that the Khoshabes help repay some of the lenders with money that they had benefited by Murphy's actions. They have refused to do so.

Subsequent to finding out about Murphy's misappropriation of funds and his deceit in hiding them, Devon Street Investments sued Murphy in Cook County Circuit Court Chancery Division in an accounting lawsuit.                                    -4-

At the same time as filing the lawsuit in April 2013, each investor was informed of the Murphy situation. Communiques were made by Defendant Rossini, in writing and by phone. In good faith, Defendant said an accounting and malpractice lawsuit was the best way of recouping the investors money even though it was a long-shot because malpractice insurance usually does not cover theft or the fraud of an attorney. In response to the lawsuits, in the fall of 2013, Murphy began filing a series of fraudulent bankruptcy petitions to keep the venture and its investors at bay. Murphy also spoke with Rossini and attorney Glen Seiden about attempting to compensate venturers and investors with property and transactions he was working on closing with his short sale clients. (See Exhibit __5__, Murphy bankruptcy naming Devon Street Investments, Ltd. as a judgment creditor, attached and incorporated herein) (INCORPORATED IN EXHIBITS FILED 8/23/18).

Meanwhile, Defendant bought and made monthly payments to Mount Vernon Insurance Company and Seattle Specialty Insurance Company, through its broker, Evergreen Insurance Brokers of NYC. The venture insured the properties and mortgages for which Defendant had borrowed money from investors. In other words, Defendant insured, at substantial cost, what he believed to be legitimately purchased properties.

Separate from the investor transactions, the lawsuits against Murphy, and the substantial insurance payments made by Defendant on the properties was Defendant's own investment in the notes and mortgages from Murphy. Together with co-venturers, Defendant invested approximately $655,000 purchasing discounted notes and mortgages from Murphy. None of the paid-for mortgage notes were received from Murphy.

In summary, Rossini and the Khoshabes, as venturers, were in the

-5-

the business of acquiring real estate and discounted notes and mortgages by borrowing money from investor/lenders -- individuals who were familiar with this type of real estate transaction. The prices were agreed upon by the venturers and the investor/lenders, and then all the funds received were deposited with their attorney, Murphy. Murphy, as legal counsel, was expected to close on the acquisitions, pay himself a fee of $5,000 for each and remit the balance of the funds to the venturers, as their profit or commission. Investors such as Robert Badalian and Craig Shaffer were aware as to pricing of the acquisitions and amounts paid to the venturers. (EXHIBIT 6, ATTACHED) .

In all cases, the funds borrowed from investors exceeded the actual cost of the acquisitions, but the money loaned by investors was substantially below the fair market value of the collateral property. The loans did not have any restrictions as to use of the proceeds as long as invested and used in the normal course of the Defendant's business. After the acquisition of either the note or the property, Murphy would receive the rent or interest and then remit the cash flow to the venture, or in some cases, directly to the investor/lenders.

At Murphy's introductory request, Defendant prepared a sound business plan in light of the prevailing real estate market, put together a venture, with hard-working employees and independent brokers, researched property and mortgage possibilities, kept binders of search results and of transactions, regularly invested time, effort and expense in surveying properties, and at all times, concededly, strived to make money for the investors.

This is the Defendant's theory of the case which his trial counsels did not comprehend and were incapable of understanding due to their lack of preparation with the Defendant.

-6-

GOVERNMENT FALSEHOODS CONCERNING
POTENTIAL DEFENSE WITNESSES AND AGENT 302s

The government states that the Defendant's counsels'
performance was not constituttionally deficient. According to
the government, witnesses presented to counsel by the Defendant
were not new names. "On the contrary, defense counsel was
already aware through FBI reports produced in discovery of signifi-
cant negative information regarding witnesses." (Government response
Brief, pages 23-24). The government contends that the FBI 302
statements were sufficient for defense counsel to formulate their
opinions of the Defendant's case and strategy at trial.

Yet, without speaking to these witnesses, how would defense
counsel know whether the FBI 302 reports were an accurate repre-
sentation of the witness interviews?

An FBI 302 summary is not a transcript. A standard FBI
interview, such as with Meir Rotstein and Craig Shaffer works
as such. Tow or three FBI agents sit down with the person
to be interrogated, ask questions and listen to the answers with-
out tape recording or obtaining a certified transcript.
Instead after the interview, they then return to their

-7-

office and, based on their recollection and any notes they
may have taken during the interview, write up a summary of what
transpired.  Summaries are, in most cases, written hours later,
sometimes even the following day. (EXHIBIT 7, ATTACHED)

Judge Mark Wolf in United States v. Salemme, footnote 35,
quoting Edwin O. Guthman, who once served as press secretary to
Attorney General Robert Kennedy: "You can have a conversation
with an agent and when it is over he will send a memo to the files.
Any relation between the memo and what was said in the conversa-
tion may be purely coincidental.  You would think you were at
different meetings."

At best, it is extremely difficult for people to remember what
was said during an interview while making only an occasional note.
Of course, the greater the delay between the end of the interview
and the writing of the 302 report, the greater the possibility of
errors.

The 302 reoprt becomes the official record of what was said
during the interview.  Its importance can not be overstated.
FBI agents review their 302s prior to testifying at trial; federal
prosecutors rely upon it in examining (or cross-examining) a
witness.  Perhaps most importantly, defendants or witnesses who
contest what is written in a 302 often open themselves up to
charges of "making false statements or even perjury."

Despite the obvious flaws in the FBI's system of interviewing
and then later dictating the gist of the interviews, it appears
the Bureau harbors a gospel-like belief in the 302s.  An FBI agent
testifying at the 2002 trial of retired FBI agent John Connolly,

-8-

handler of Whitey Bolger, revealed there is a common expression among agents: "If it isn't in writing, it doesn't exist.

Of course, this implies that the 302 accurately contains all the important statements the witness made. But the potential for selectivity here is obvious. If the witness said he did not get a good look at the assailant, and the FBI agent does not include that in the 302, then no one on the prosecutor's team will believe he said it because it is not written down. With that in mind, the FBI agents' aphorism reads like a cynical inside joke. Why not establish a rule that all interviews be electronically recorded, as was the July 14, 2015 interview of Anthony Khoshabe?

It is important to note that these 302 statements were composed by agents Lyle Evans and Jody Blau, the same agents that interviewed Anthony Khoshabe on July 14 and 15, 2015. The Anthony Khoshabe interviews were suppressed by this Court when it found agents' statements were misleading. Also, in its response to Khoshabe's motion to suppress, the government "isolate[d] a number of excerpts from the conversation that it believes demonstrate Khoshabe's statements were voluntary." (Judge John Z. Lee, Order suppressing Anthony Khoshabe's July 2015 interviews).

InDefendant's case, agent reports included purported statements from interviews with Meir Rotstein and Craig Shaffer. These were similarly instances of the government's false, misleading and erroneous statements of fact concerning conduct by Defendant Rossini.

Here follows Defendant's account of those interviews, contra-dicted in writing by Meir Rotstein and court documentation in the 302 of Craig Shaffer.

Meir Rotstein states the government statement on page 24 of its response brief is false.

"Meir Rotstein told the FBI that: (1) he never saw the defendant close any transactions in the four years he worked with him."

Mr. Rotstein wrote to Defendant on July 9, and 10, 2019, that he hoped his interview was "tap" [taped] (as was Anthony Khoshabe's July 2015 interview). See emails from Meir Rotstein to Albert Rossini on July 20, 2019, attached and incorporated herein as Exhibit __8__ .

In fact, Mr. Rotstein introduced Rossini to Lior Corush the owner of 16 townhomes in Riverdale, Illinois in June, 2013. Defendant purchased the 16 townhomes from Mr. Corush in June, 2013. Rotstein assisted Rossini in negotiating the discounted mortgage and note being foreclosed by Verticle Mortgage Corporation of California in 2012. The note and mortgage were collateralized by 211 North Kilbourn, Chicago, Illinois. These are among only a few properties Rotstein is familiar with. Most importantly, he knows that Craig Shaffer purchased 3820 West Adams Street, Chicago, Illinois from the Defendant.

None of these official office and property transactions were mentioned in the 302s. The agents seemed disinterested, and also unfamiliar with the transactions invovled in the purchase of mortgages, notes and properties by the Defendant.

At page 25 of the government's response to Defendant, it is alleged:

"Craig Shaffer, see Mtn, at A-4, told the FBI that in 2011, he lost $70,000-80,000 investing with the defendant for the supposed purchase of a property on short sale. After giving this money, Mr. Shaffer received "rent" payments from the defendant for a limited period of time, which eventually

-10-

> stopped without explanation. Mr. Shaffer thereafter
> discovered that the transaction had never been completed
> and that he in fact did not own the property. Mr. Shaffer
> had no understanding of how the defendant could have paid
> him rents if the transaction had never occurred." (See
> government response brief page 25).

The government sets out "rents" in quotations, without its own

explanation or foundation. The government states the "rents"

were paid "for a limited time," and "supposed purchase of a property."

Such nebulous and unsupported statements should be stricken.

In fact, and contradicting the government's version, both

Craig Shaffer and the Defendant, jointly, sued Thomas Murphy's

short sale clients in 2014 and 2015, in the Circuit Court of Cook

County Chancery Division for turnover of several purchased-and-paid

for properties, including 4135 West Monroe Street, and 4654 West

Adams Street, Chicago, the properties described, although not

mentioned, from the government agents' 302 summaries. The agents'

302 summaries, that "Mr. Shaffer had no understanding of how the

defendant could have paid him rents if the transaction never

occurred," is another illogical allegation, where both Rossini

and Shaffer were represented in the lawsuit against Murphy's short

sale clients by attorney Richard L. Kruse.

The government's implacable grip on its version that Defendant

dealt in non-existent properties, e.g., Craig Shaffer, is disputed

by the facts and the record. The lawsuit continues to be prosecuted

on Mr. Shaffer behalf by the Seiden Netzky Law Group, LLC., and

the facts regarding the subject real estate in Cook County pleadings

have not been disputed.

A review of the Cook County Recorder of Deeds website would

reveal the Defendant, through his company, Devon Street Investments

-11-

or a related entity, purchased and quitclaimed the following properties to Craig Shaffer:

    3820 West Adams, Chicago, Illinois (12/31/10)
    4129 West Adams, Chicago, Illinois (2012)
    4139 West Adams, Chicago, Illinois (2012)

The omission of these facts, of Defendant's purchased and deeded properties, was either irrational or malicious. All rents paid to Mr. Shaffer by Defendant were paid to Defendant by Murphy. Murphy stated the payments to Defendant concerning Shaffer were rents collected by Murphy from his short sale clients, Alex Mysko and Stephanie Andre, and other properties Defendant and Mr. Shaffer had purchased from Murphy's short sale clients. Each of the properties Rossini quitclaimed to Shaffer were turned over to a management company and rents were paid directly to Shaffer, as Defendant directed CHA to do so.

Further, it bears repeating, that Defendant's appointed counsels, Adams and Frankel, failed to review any of his pro se pleadings, or to file their own or to incorporate Defendant's. Neither Adams nor Frankel took the opportunity to go online and find the publicly available information about the above three properties. Nor did they review the Recorder's website to see the recorded assignments Devon Street Investments had obtained for 4135 W. Monroe Street and 4654 West Adams, Chicago, the apparent subject of the FBI 302 summary of its interview with Mr. Shaffer. Certainly, appointed counsels did not review the Chancery Division lawsuits in Cook County Circuit Court brought by Defendant and Mr. Shaffer against Murphy's short sale clients regarding 4135 West Monroe Street and 4654 West Adams, again the apparent subject of the FBI 302 interview with Mr. Shaffer.

-12-

Defendant has been detained since July 28, 2017 (during which time Adams and Frankel made no effort to file for rehearing on the Revocation nor to correct the record regarding Defendant's trips, they having been admittedly unprepared for the government's motion). The detention prevented Defendant from controverting the government's case and correcting the errors because he had no access to documents or his files. Once the Seiden Netzky Law Group was disqualified from his case, Defendant had no access to any discovery in his case. Defendant requested Adams and Frankel send discovery documents and discs to him at the Jerome Combs Detention Center, Kankakee, but they never did do so.

### III.   DOCUMENTS NOT ADMITTED AT TRIAL

Defendant requested his lawyers contact Seiden Netzky Law Group to review documents that were at the SNLG offices, 333 S. Wabash, Suite 2700, Chicago, Illinois 60604.  They did not do so.  Included in these documents were copies of cashier's checks showing that the Defendants and the Khoshabes had invested over $655,000 to purchase discounted notes and mortgages from then attorney Thomas W. Murphy during 2011, 2012 and part of 2013.  These mortgages and notes were similar to the notes and mortgages that Devon Street Investments was purchasing from Murphy for its investors.

Also included in Defendant's records was a copy of a comprehensive fire, liability, and building insurance policy for which Devon Street Investments had contracted first with Mount Vernon Insurance and then with Seattle Specialty Insurance Company through its broker Sol Eisenstein of Evergreen Insurance Brokers in New York City.  Included were copies of premium payments made by the Defendant or Reliant Management, Anthony

-13-

Khoshabe's management company. Listed and insured were over 70 properties
that Defendant believed he and the investors had purchased from Murphy
with the mortgage notes. There were copies of deeds of properties
owned by Devon Street Investments or related companies, as well as
quitclaims of properties Defendant transferred to investors. There
were title policies, contracts, copies of the lawsuit documentation
that Defendant and Craig Shaffer had sued Murphy's short sale clients
for a turnover of properties. Defendant kept a detailed accounting of
each investor's investment, payments, "rents" or interest payments,
comparative market analysis of the properties, appraisals, and related
documentation. Included were letters to and from Murphy and brokers
describing the properties and the foreclosure lawsuits. These also
included Attorney Anthony Klytta's investigation on behalf of the
Defendant of each note, mortgage or short sale contract sold by Murphy
to the Defendant and his investors. Defendant retained Attorney
Klytta for this investigation in 2013.

From a review of these documents, the jury could have reasonably
presumed that Murphy was the sole and capable schemer of investors
as well as a double-dealer of the investors and Murphy's clients--
Devon Street Investments and Defendant Rossini, Craig Shaffer and
the Khoshabes. These references and documents were all provided to
Attorneys Adams and Frankel or Defendant instructed them to retrieve
them from the Seiden Netzky Law Group.

Defense attorneys Adams and Frankel purposefully failed or
intentionally omitted presenting my exculpatory evidence to the jury.
Presentation of this evidence by Defendant's attorneys would have
contradicted the government's false narrative that Defendant was

selling nonexistent properties, lulling investors with guarantees,
rents, promises of payments and lawsuits against Murphy. As it was,
the jury only heard the government's version while the Defendant's
version would have shown the jury that he lacked the requisite
intent to defraud the investors and that Thomas W. Murphy was the
sole schemer of investors.

### IV. INADEQUATE AND INEFFECTIVE CROSS-EXAMINATION OF GOVERNMENT WITNESSES DUE TO LACK OF PREPARATION

On May 29, 2018, Defendant asked his attorneys, Adams and
Frankel, to seek disclosures from the government relating to the expert
government witness, specifically forensic accountant Sandie Prescott.
Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

"Expert Witness. At the Defendant's request, the government shall
disclose to the defendant a written summary of testimony the
government intends to use under Rules 702, 703, or 705 of the
Federal Rules of Evidence during its case in chief at trial. The
summary provided under this subsection shall describe the witnesses,
opinions, the basis and reasons for those opinions, and the witness
qualifications."

Here, Defense counsels did not provide the Defendant with a list of
government witensses nor any other documentation regarding the govern-
ment's case-in-chief prior to trial, although Defendant repeatedly
requested these highly relevant matters to support his, and their,
preparedness for trial. Neither attorney prepared with a financial
expert witness on Defendant's behalf. Thus, the jury heard only one
version, that of the government.

Defendant demanded that his lawyers provide him with the data
upon which the FBI forensic accountant Prescott relied to formulate
her expert opinions. Neither of the attorneys had the vaguest concept

of the financial documents herein, because they had never bothered to review them with the Defendant. Attorney Frankel even disputed that a borrower had to sign a note at closing when executing a mortgage. He did not believe he had signed a note when he signed his own mortgage! It was after this meeting in the Courtroom holding cell that Defendant wrote the Court with his concerns that the appointed counsels were not competent, since they were not prepared, to defend him at trial.

There was no expert to testify for the Defendant as to the financial analysis, and, to Defendant's perspective, easily refute the FBI forensic accountant's inaccurate and erroneous conclusions. This was extremely prejudicial to the Defendant

Specifically, the Defendant sought answers to how Ms. Prescott determined the Defendant had been paid over $2,500,000 by investors. Accountant-witness Prescott did not testify to any of the Defendant's expenditures from this money, except to say that he lived off of it, as though Defendant spent the entire $2,500,000 on himself. This was not contradicted by his attorneys. Defendant had mailed a motion to admit documents, including his tax returns and accounting statements, to his attorneys on April 18, 2018 from JCDC in Kankakee. Defense counsel not only did not file it, they did not read it. In an email during trial, Adams happily said he believed it a success that he had been able to keep my tax returns and other relevant financial information from the jury. In effect, that counsels had been able to keep relevant and exculpatory information from the jury. See Exhibit 9 , attached and incorporated herein.

Defendant's attorney's failure to obtain and study this relevannt material of the forensic accountant prior to or at trial, and then be

-16-

themselves, clueless in the cross-examination of the forensic accountant, and further having failed to appoint a financial expert to testify on Defendant's behalf, violated his Sixth Amendment right of confrontation, and his right pursuant to Fed.R.Evid. 705: Disclosing the Facts or Data Underlying an Expert's Opinion.

Attorneys Adams and Frankel admitted to Attorney Richard Kling that they had not contacted any prospective witnesses on Defendant's behalf.

Defendant's lawyers lack of preparedness or familiarity with the documentation thus interfered with their ability to effectively cross-examine Ms. Prescott. It was essential that Defense counsels had advance knowledge of the supporting data to conduct an effective cross examination. Counsels never met with Defendant to discuss this testimony, never reviewed any documents whatsoever with the Defendant, and inferentially, never had documents in hand; consequently, their preparation and presentation was woefully inadequate and doomed the Defendant.

On May 9, 2018, in the Court's holding cell prior to a pretrial conference, Defendant requested his attorneys seek out an expert concerning the real estate mortgage market for the years in question. An expert would have provided testimony to give a context of the economic climate at the time that the investment and loans were made. A defense financial expert would conceivably have testified that Chicago experienced an unprecedented boom in the residential real estate market from 2001-2007. Between 2001-2007, 72% of all bank lending in Chicago was for real estate.

-17-

Then beginning in mid-2007 and through 2013, a catastrophic downturn occurred in the Chicago real estate market. Banks that made real estate loans during the 2001-2007 real estate boom generally did minimal underwriting. Their lending activity reflected an attitude that they could not lose on asset-based lending. These banks did not take into account the potential for a dramatic downturn in prices that occurred starting in mid-2007. Prices declined by 90% from 2006 highs in some market areas of Chicago. It was in this market climate that the Defendant sought to purchase real estate, short sales, and discounted notes and mortgages. The possibilty of rewards were great.

As an example, on December 31, 2010, Defendant Rossini purchased 3820 West Adams Street, Chicago through one of Murphy's short-sale clients. The owner, Realtor Catherine Scratch had a mortgage with Wells Fargo Bank in excess of $401,000. The closing was at Stewart Title Company where Defendant paid $37,500 for the property, and subsequently quitclaimed it to Craig Shaffer for $67,500. Section 8 rental income from the property was in excess of $30,000 per year.

This reality in the real estate market is what attracted investors and businessmen. Contrary to the government's narrative that Defendant only bought and sold nonexistent properties, the Defendant or his related companies purchased the following properties between December 31, 2010 and December 31, 2013:

| | |
|---|---|
| 3820 West Adams, Chicago | 5410 West Fulton, Chicago |
| 3327 West Monroe, Chicago | 1920 North Richmond, Chicago |
| 4033 West Adams, Chicago | 4321 South Marshfield, Chicago |
| 4037 West Adams, Chicago | 4457 South Princeton, Chicago |
| 4045 West Wilcox, Chicago | 8435 South Burley, Chicago |
| 4126 West Adams, Chicago | 16 Riverdale, IL town homes |
| 4129 West Adams, Chicago | 1 Riverdale, IL condominium |
| 4139 West Adams, Chicago | 13923 S. Michigan, Riverdale |
| 4520 West Jackson, Chicago | 35 property Bulk Sale Package |
| Note & Mortgage 211 Kilbourn | from Ocwen Loan Servicing |
| Chicago, IL. | |

This was aside from the notes and mortgages that Rossini, the Khoshabes and investors supposedly purchased from the attorney Thomas Murphy. Defense counsels inadequacy in not questioning Ms Prescott effectively and not detailing the properties Defendant had purchased left the jury with the mistaken belief that Rossini must have pocketed the money.

    2.    The timeline testified to by witness Robert Badalian as to when and under what circumstances he met Defendant was mistaken. Mr. Badalian visited Chicago at the request of his tax deed partner, codefendant Babajan Khoshabe, to review and assist Babajan in their previous purchase of several tax deeds in Markham, Illinois and those in and around 95th Street and Ewing Boulevard, Chicago. Defendant was introduced to Mr. Badalian during that June 2011 trip to Chicago. The guaranty agreement testified to by Mr. Badalian was originated not by Defendant Rossini nor to induce Mr. Badalian to purchase properties. It had been originated by Thomas Murphy in May 2011 in regard to Craig Shaffer's purchase of four properties form Murphy's short-sale clients, Alex Mysko and Stephanie Andre. Shaffer is currently suing Murphy and Mysko to recover the properties. Apparently Murphy forged Ms. Andre's signature on an assignment to 5131 West Crystal, Chicago, negating that property. Mr. Badalian's testimony as elicited by the government was factually incorrect, but manipulated so as to involve Defendant Rossini.

    3.    Babajan Khoshabe and Fereidoon Khoshabe, Babajan's brother, introduced Vladimir Moghaddassi to the Defendant. Defense counsels did not adequately examine Moghaddassi about the deed he received from Defendant Rossini for 4520 West Jackson Blvd, Chicago, including but not limited to the value of the property, rental income or disposition

by Moghaddassi. A comparative market analysis of a three unit apartment
building, renovated, in Garfield Park today is valued at $300,000.
Mr. Moghaddassi invested $105,000 with the Defendant for 4520 West
Jackson, Chicago. Had the attorneys familiarized themselves so far
as these relevant financial transactions, Defendant's participation
would have been in the course and routine of business.

4.   Witness Kathy Khodi was not asked by Defense counsels about
her receipt of deeds in October 2013 to 16 Riverdale, Illinois town
homes in which she had invested with Rossini. Although Ms. Khodi
rejected the deeds and instead requested a return of her investment,
the fact is she received the deeds that she had contracte for with
Rossini. The deeds were from Rockford Commercial Mortgage Company to
the Khodi Family Trust, as instructed by Ms. Khodi through emails
and delivered to her by Federal Express. Defendant's records include
this information and transactions, including the dated Federal Express
airbill and Cupertino, California destination receipt showing Ms. Khodi
received the deeds.

Defense counsels did not question the value of the sixteen town
homes as remodeled (approximately $45,000 per townhome) which was
an approximate valuation of $720,000. Ms. Khodi invested a total
of $410,000 in Riverdale, Illinois properties. This documentation
was all within the boxes of information given to the government in
September 2014 by Defendant's then attorney Glen Seiden, and was
available to the Defendant's trial counsels. Failure and wrongdoing
can be attributed to both the Defendant's appointed trial counsels,
aggravated by the government's intentional obfuscation in the testimony

elicited from witness Kathy Khodi.

5. Witness Adis Alic testified that he met Rossini in 2012 when he was being foreclosed on his property at 7941 Karlov, Skokie, Illinois. In fact, Alic was introduced to Rossini by Gorn Bozniak in 2014, not 2012. Mr. Alic and his brother-in-law asked Defendant to help them with the foreclosure modification on their property because Rossini had recorded a lis pendens on the property. The lis pendens being enforced by Rossini arose from another of Thomas Murphy's sham sales in that Murphy had purportedly sold Rossini and Vladimir Moghaddassi the discounted mortgage note for 7941 Karlov (this did not arise in the Moghaddassi direct or cross-examination). Rossini was in negotiations with Brian Tracy, Esq. of the Codilis Law Firm, the foreclosure bank's attorney. Alic and brother-in-law had also not paid Bank America's mortgage on a Christiana Street, Chicago two unit apartment building since 2008. Alic asked Defendant to help him with that building which although in arrears, not having paid the mortgage in six years, was not in foreclosure.

Witness Alic's entire testimony was riddled with misstatements which were intended by the government to show that Defendant attempted to defraud Alic. Alic's advertent "confusion" with the date of the first meeting with Defendant Rossini was apparently intended to show - it occurred at the same time Defendant allegedly defrauded investor Moghaddassi to invest in the Karlov note and mortgage.

Predictably, Defendant's counsels were oblivious to the materiality of Alic's incoherent narrative. Had they cross-examined Alic from the documents or conferred with the Defendant, they would have presented the above impeachment to the jury. Counsels mistakenly agreed to an incorrect stipulation concerning Adic's testimony. See Exhibit _10_ .

6.  Defendant's counsels stipulated to the supposed testimony of Janet Khoshaba who refused to testify as a givernment witness. The government stated that Ms. Khoshaba was too distraught to testify.  Had Ms. Khoshaba appeared as a government witness, hypothetically speaking, if defense counsel had been prepared, they would have elicited the following testimony on cross-examination:

(a).  Ms. Khoshaba invested $125,000 with Babajan Khoshabe and Defendant to purchase the discounted note for 7935 Karlov, Skokie, Illinois, then purportedly owned by investor Ibrahim Yousif, Babajan's brother-in-law.  In Juen 2012, investor Ashoor Pithyou, son of investor Bishop Awikwam Pithyou, and nephew of investor Ibrahim Yousif, brought Ms. Khoshaba to speak with Babajan at his office 3924 West Devon Street, Lincolnwood, Illinois; also the offices of Defendant Rossini.  Babajan wanted Ms. Khoshaba to repurchase Mr. Yousif's position in the note and mortgage of 7935 Karlov.  Mr. Yousif had previously argued with Babajan and wanted to end any financial ties.  Defendant did not speak to Ms. Khoshaba until after Babajan had negotiated and convinced her to participate in the investment.

(b).  Defendant made payments to Ms. Khoshaba after April 2013, at differing times and amounts through June 2015.  The source was from Defendant's earnings in short sales and consulting.

(c).  In 2014, Defendant and Ms. Khoshaba jointly offered to purchase a condominium in foreclosure in Ms. Khoshaba's building at Keating and Cleveland Street, Skokie.  The purchase was to be a short sale with Bank of America.  Ms. Khoshaba brought Defendant the foreclosure filing served on her condominium association.

The short sale contract could not be closed due to the owner having
abandoned the condominium and emigrating to Germany. All these
Khoshaba documents, with the exception of payments to Ms. Khoshaba
from September 2014 through June 2015, were provided to the
agents in September 2014 by Defendant's then attorney Glen Seiden.
Defendant's appointed counsels, Adams and Frankel, had the files
from June 2017, or could have obtained them from attorney Seiden
and the government. They did not attempt any collection or review
of the records, and the facts remained unknowable to them at
trial since they would not listen to the Defendant. Defense counsels
were no doubt willing to let the government get away with Ms.
Khoshaba's apparent illness. If counsels had been familiar with
the facts, they would have demanded medical information as to
Ms. Khoshaba's illness.

    7.    Witness Nastors Moshi is a resident of Phoenix, Arizona.
Mr. Moshi had invested with Devon Street Investments in discounted
notes and mortgages on several properties, including 8718 Kimball,
Skokie, Illinois. Mr. Moshi testified that Defendant attempted
to convince Moshi to send him money to purchase 8718 Kimball and
that the government informed him that Rossini did not have a contract
to purchase the property, a bold lie. In fact, documentation and
investigation of witnesses by defense counsels, especially Brian
Tracy, Esq. of Codilis, and Tasha Henderson. real estate broker for
Freddie Mac, with Keller Williams, would have revealed to the jury
that Defendant had a lis pendens on 8718 Kimball in May 2013, and
that both Mr. Tracy and Ms. Henderson had contacted Defendant to
either release the lis pendens or purchase 8718 Kimball in 2014.

Defendant obtained a contract to purchase 8718 Kimball from Freddie
Mac and requested that Mr. Moshi provide the funds needed to close.
The property was to be deeded to Mr. Moshi at closing. All these
documents appear in the Nastoris Moshi file but were ignored by the
Defendant's appointed counsel and therefore Mr. Moshi was not cross-
examined adequately.

9.    FBI agent Kelly Connors was not questioned about any documents,
payments, deeds, or other relevant evidence which was an especially
egregious omission by defense counsels, since Ms. Connors admitted
on the stand that she was unable to become familiar with the large
amount of documentation in the case. Agents Evans and Blau, the agents
that had questioned Anthony Khoshabe in July 2015, were not called as
government witnesses.

## V. IMPEACHMENT OF THOMAS MURPHY

In his initial pro se motion for new trial (August 2018), Defendant
detailed specifics of his attorneys ineffectiveness and inadequacies
in cross-examining codefendant Thomas W. Murphy. Some additional
points bear review.

The argument can be made that the Defendant's conviction rests to
a great extent upon the testimony of codefendant Thomas Murphy.
Murphy's credibility was for the jury to determine. If Murphy lied and
the jury before whom the case was tried knew that Murphy had lied about
these important questions, i.e., the reason and origination of the
guaranty agreements, the Cook County Circuit Court Accounting Lawsuit
and lis pendens, $571,000 of insufficient funds checks paid to Rossini,
$655,000 invested by Defendant and the Khoshabes to purchase notes and
mortgages from Murphy, hiding of money by Murphy with Tamera Brown

-24-

and significantly understating income, wrongfully accusing Rossini in the Nina Jozer's County 2013 criminal case, double-dealing with his short-sale clients, the jury might well have rejected his entire testimony, and the result would have been an acquittal.

A defendant, no matter who he is or what his station in life might be, is entitled to a trial upon truthful testimony. It would be grossly unfair to permit this Defendant's conviction to stand if it were established that the main witness against him was a liar and perjurer. The real issue for determination is whether a defendant [Murphy] called as a witness, can flout the law and lie about material and essential matters, procure a conviction of others, and then receive only a minimal term of imprisonment for the original offense and complete immunity for his alleged perjury.

However, defense counsels lack of proper preparation, unwillingness to present documentary evidence and completely inadequate cross-examination of codefendant Thomas Murphy seriously prejudiced Defendant Rossini before the jury. Due to his detention, Defendant was unable to ask the Court for an alternative counsel in a timely manner. With all due respect, hindsight shows this as well as the Court not granting Defendant's continuance to find alternative counsel who would prepare for trial, was an error.

Additional Errors By Defense Counsels:

It was error by counsel in refusing to present for consideration of the jury, although requested to do so by Defendant the following:

(a)   Documents and testimony relative to checks paid to Murphy by Defendant to purchase discounted notes and mortgages;

(b)   Insurance policies and paid premiums insuring properties,

-25-

notes, and mortgages Defendant and investors purchased from Murphy;

(c)    Documentation and testimony concerning the accounting lawsuit filed by Devon Street Investments, Ltd. versus Thomas Murphy in April 2013 in the Cook County Circuit Court Chancery Division including, but not limited to, agreed orders and answers of Tamera Brown to interrogatories;

(d)    Documentation and testimony concerning the lawsuit of Devon Street Investments, Ltd. and Craig Shaffer versus Alex Mysko, ICG Properties et al short-sale clients of Thomas Murphy. This concerned properties paid for by Devon Street Investments, Ltd. and Shaffer but not transferred by Murphy and his short-sale clients;

(e)    Refusing to permit the jury to receive the testimony of expert witness concerning the jury to review the properties purchased by Defendant that would have contradicted the government's false narrative that Rossini was selling non-existing properties;

(f)    Defense counsels erred in stipulating to false statements by prospective government witnesses including, but not limited to, Adis Alic, that was presented to the jury as fact.

Although presented with these documents months in advance of trial by the Defendant, his appointed counsels, Adams and Frankel, failed to review, to investigate these proven and adjudicated allegations against Murphy. In not preparing adequately, defense counsel allowed false statements to be presented, uncontradicted, to the jury.

## VI. DEFENDANT'S RIGHT TO TESTIFY

Defendant states affirmatively that the waiver of his right
to testify was secured by duress.  Prior to trial, the Defendant
informed the Court of his attorneys' unpreparedness for trial and
that going to trial with counsels Adams and Frankel would seriously
prejudice him.  The Court denied a continuance or appointment of
alternative counsel and Defendant's trial proceeded with unprepared
counsels.

Defendant had been transferred to the Chicago MCC from Jerome
Combs Detention Center ("JCDC") Kankakee, Illinois on May 10, 2018
in order that he be closer to his attorneys prior to trial.  Presumably
this was for trial preparation.  However, from May 9, 2018 until the
start of trial on June 4, 2018, Defendant saw his attorneys for only
a few minutes prior to the May 9, 2018 and May 29, 2018 Court
appearances, i.e. these "visits" were in the Court's holding cell
behind the courtroom.  His attorneys did not see or speak to the
Defendant in the 30 days prior to trial, except for these few minutes
in the Court holding cell on May 9 and 29, 2018.  There was no
preparation with the Defendant.  Counsels refused to tell the Defendant
on May 29, 2018 who the defense witnesses would be, only that, in the
words of Adams, they "had read everything and were speaking to everyone."
Adams and Frankel later admitted to Attorney Richard Kling that they
had not contacted any witnesses at any time.  Thus, they lied to
Defendant in yet another instance of the vacuum of their representation.
Defendant would have alerted the Court of counsels lack of preparation
had they been truthful to him in the Court holding cell prior to the
May 29, 2018 status hearing, rather than waiting until June 4, 2018.

Adams and Frankel's admission of their lies, as communicated
to Attorney Kling, is relevant evidence to support the conclusion
that the expectatio nfor Defendant to testify was coercive where
his attorneys were totally unprepared for trial, had not reviewed
with Defendant his testimony, had not interviewed or subponeaed
witnesses, had not reviewed the voluminous financial documents,
had not reviewed bank statements, Murphy Bankruptcy, corporate and
IRS filings of co-Defendant Thomas Murphy. To expect Defendant's
trial testimony in light of these grievous failures of his counsels,
would have elicited testimony that could have proved disastrous.

On Sunday afternoon, June 10, 2018, Adams visited Defendant for
the first and only time at the Chicago MCC. This was for the alleged
purpose of preparing Defendant's testimony. Adams brought a legal
pad and pen, nothing else---no documents, no exhibits, and no questions
for the Defendant, except "do you want to testify?"

Co-counsel Frankel, who absented himself from Defendant's case
during the pendency of his unsuccessful campaign for judgeship, without
having informed the Defendant, did not accompany Adams to the MCC.
Defendant asked Adams how he expected his to testify when he, Adams,
was not even familiar with the documentation and facts of the case.
Adams disputed this, but still he had no questions for the Defendant,
exept "do you want to testify?" It was Adams contention that he
needed to concentrate on closing arguments, not cross-examination of
government witnesses or Defendant's testimony. (See Exhibits of emails
between Adams and Defendant).

The Defendant was prejudiced by not testifying on his own behalf
since he was faced with a destructive representation by his appointed

-28-

counsels. In April 2018, Defendant mailed to attorney Adams, his pro se pretrial Motion to Admit Documents. Defendant instructed Adams to file the pleading with the Court. (see exhibits of motions sent to his attorneys by Defendant). Not only did Attorney Adams ignore the filing, he failed to inform the Defendant that he had not filed it, or that he had no intention of filing it, or perhaps, in the cause of zealous representation, Adams may have taken the opportunity to review the allegations and documents set forth in the Motion To Admit with Defendant. In point of fact, neither Adams nor Frankel ever filed the pretrial motions sent to them by Defendant, nor informed Defendant that they were not filing the motions.

Attorney Richard Kling has informed the Defendant that the only way the cashier's checks Defendant paid to Murphy for purchase of the notes and mortgages he bought, was if Defendant had testified about them. He advised the same applied to the substantial insurance premiums paid by Defendant to insure buildings he reasonably believed Murphy had purchased on behalf of the investors. Certainly this was so without any other witnesses testifying about the checks or insurance policies. Had the Motion To Admit been filed by either attorneys Adams or Frankel, this Court would have reviewed responsive pleadings related to the filing. Then, in procedural and substantive format, Defendant could have testified with clarity, so far as the admitted documents; Defendant would have been able to present his version of events, corroborated by contemporanous documentation. Whatever the government presented could have been contradicted by the Defendant and by the documents. (EXHIBIT II, ATTACHED) .

## ANALYSIS

The Sixth Amendment provides that "the accused shall enjoy the right to ... have the Assistance of Counsel for his defense."To demonstrate that his right to counsel was violated by ineffective assistance, Defendant must satisfy the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 688 (1984). First he must show that his counsel's performance was deficient because it "fell below an objective standard of reasonableness." Id. at 687-88. Second he must show the deficient performance prejudiced the defense,which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Defendant has established deficient performance under Strickland, by identifying acts and omissions by defense counsels that fell below an objective standard of reasonableness and they could not have been the result of professional judgment. Strickland, 466 U.S. at 688, 90. Defense counsels representation amounted to incompetence under "prevailing professional norms." Strickland, 466 U.S. at 690. Even eliminating the "distorting effects of hindsight," defense counsel's representation was appalling. Big fraud schemes give rise to big prosecutions. They ivolve numerous transactions and a treat many trial exhibits both on behalf of the government and for the defense. In Defendant's case, his attorneys spurned a defense entirely, without bothering to inform Defendant Client of their failure to present a defense. By hiding the lack of representation, they kept the Defendant from a timely request to continue the trial and have the Court appoint alternative counsel.

Defense counsels subpoenaed no witnesses, although Defendant supplied a stream of legitimate, defense supporting witnesses and

documentation. They did not investigate these witnesses to learn whether FBI 302 reports were an accurate summary of defense witness statements. An attorney's performance is deficient when a defendant provides the names of possible mitigation witnesses and the attorney does not determine for himself whether their testimony would be helpful. United States v. Simpson, 864 F.3d 830 (7th Cir. 2017). Simpson did not say an attorney fulfills his duty by reading and deferring to an FBI summary rather than interview a prospective witness to determine for himself whether the witness's testimony would be helfpful. There can be no support to treat as reasonable, a decision not to investigate any of the available defense witnesses. This is especially true after the Khoshabe suppression motion.

Counsel could not have known whether witnesses had any vulnerabilities without doing at least some investigation of the witnesses and testimony this could provide. There is also no indication counsel considered the effect all the witnesses might have had in combination, any individual weaknesses notwithstanding. Blackmon, 823 F.3d at1105, quoting Raygoza v. Hulick, 474 F.3d 958, 964 (7th Cir. 2007). "Additional disinterested and credible alibi witnesses could have made a significant difference in the viability of [Rossini's] defense....Blackmon, 823 F.3d at 1105. Nothing in the record shows that investigating those witnesses would have been 'fruitless or harmful.'" Blackmon, 823 F.3d at 1105 (quoting Campbell v. Reardon, 780 F.3d 752, 765 (7th Cir. 2015) (citing Strickland, 466 U.S. at 691) and the benefits could have been enormous."

As to Strickland's second prong, the testimony of Defendant's witnesses, documentary evidence and effective prepared cross-examination

of government witnesses would have impacted the trial's outcome. One witness might have been able to show Defendant's lack of intent to defraud investors, and all of them could have supported his claim that Defendant believed Murphy was purchasing notes and mortgages for Devon Street Investments, Ltd., Rossini and the investors.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." Mosely v. Atchison, 689 F.3d 838, 851 (7th Cir. 2012), quoting Strickland, 466 U.S. at 694. The issue is whether Defendant Rossini would have had a "reasonable chance" of acquittal absent counsel's errors. Stanley v. Bartley, 465 F.3d 810, 814 (7th Cir. 2006)(noting that "it needn't be a 50 percent or greater chance"). The existing verdict may now be overwhelmingly supported by the evidence presented because Defendant's attorneys presented NO evidence, NO defense, inadequate cross-examination due to a lack of preparation. There was ample evidence to contradict the government's narrative.

In order to establish prejudice, the Defendant does not have to prove actual innocence; he does not have to show that the counsel's errors more likely than not altered the outcome in his case. Harrington v. Richter, 562 U.S. 86, 111-112 (2011) quoting Strickland, 466 U.S. at 693, 697; Campbell, 780 F.3d at 769; Raygoza, 474 F.3d at 963. Defendant Rossini"must show only a reasonable likelihood that the outcome would have been different..." Richter, 562 U.S. at 112, citing Strickland, 466 U.S. at 693.

The government's case was that Defendant Rossini concocted the scheme to defraud investors. Defendant allegedly used, directed and ordered Murphy, a partner in five major Chicago law firms during a

35-year legal career, in the commission of the fraud.

Rossini's witnesses are unencumbered by previous convictions, they are credible and would have made a significant difference in providing the Defendant with a defense. Rossini's witnesses and documentary evidence would have shown that Murphy's career had been littered with similar schemes, conversions, mendacity, accusations, and financial casuistry. Both the government and defense counsels choice to ignore Murphy's previous Ponzi schemes, especially the $44 million scheme at Prestige Realty Partners, and then failed to disclose his well-established pattern of blaming others to the Court and the jury.

This was a material misrepresentation by the government and an egregious error by defense counsels. Defendant Rossini's witnesses and documentary evidence would have brought this into the open at trial. It would have made a difference in the outcome because it would have shown Murphy was capable of being the sole schemer in this investment fraud.

### CONCLUSION

### THE COURT SHOULD GRANT A NEW TRIAL
### TO AVOID A SERIOUS MISCARRIAGE OF JUSTICE

For all of the reasons detailed above, this Court is respectfully urged to grant a new trial or in the alternative, an evidentiary hearing to determine whether such a trial should be granted. The decision whether to grant a new trial under Fed.R.Crim.P. 33 rests in the Court's broad discretion.

This Court is permitted to weigh the evidence, determine the credibility of the witnesses and the Defendant's motion and exhibits

and need not view the evidence in a light most favorable to the
government. United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).
Defendant's documentation, proposed cross-examination, and proposed
defense witnesses put next to the erroneous 302s and witness misstate-
ments, must affect the veracity of the government's case.

This case truly presents a miscarriage of justice such that even
if the Court were to find that the evidence presented, viewed in a
light most favorable to the government, in some manner was sufficient
to sustain a conviction, a rational view of the credible evidence of
the Defendant mandates that Defendant has a reasonable chance of
convincing a jury he had not intention of defrauding investors.
Had defense counsels adequately cross-examined the government witnesses
and then presented a defense, a fair view of the evidence would support
a conclusion that Defendant Rossini was not criminally culpable.

Based on the foregoing arguments and authorities, those in
Defendant's original pro se Motion of August 2018, Attorney Richard
Kling's motion for a new trial, and the exhibits submitted, this
Honorable Court is respectfully urged to grant a new trial on each of
the convicted counts.

Respectfully submitted,

Albert Rossini
Defendant Pro Se
Fed. Reg. No. 08043-424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

## EXHIBIT 1

Defendant purchased 3820 West Adams Street, Chicago, Illinois
60624 from Catherine Scratch on December 31, 2010 for $37,500.
Defendant also paid short-sale broker ICG Properties/Alex Mysko
$5,000.

Craig Shaffer invested $67,500 with Defendant for purchase of
the property. Mr. Shaffer made a cachier's check payable to
Stewart Title Company for $37,500 representing the sale price;
$12,500 to Albert Rossini and $12,500 to Babajan Khoshabe for
defendants' profit in the transaction; and $5,000 to Alex Mysko/
ICG Properties as the short sale broker.

Ms. Scratch's mortgage amount as of December 31, 2010 was $401,000.
This was the amount the lender allowed to be canceled in the
short-sale of the property.

The value of the property at the time of sale, as per a
Comparative Market Analysis report was $110,000. Shortly after
Rossini transferred the property to Craig Shaffer in February 2011,
Mr. Shaffer received a purchase and sale contract for the subject
property in the amount of $108,000, although Mr. Shaffer did not
sell the property.

EXHIBIT ___2___

GUARANTY AGREEMENTS

## GUARANTY AGREEMENT

The undersigned, Albert Rossini ("Rossini"), hereby acknowledges that he has presented to Fereidoon Khoshabe and Armita Khoshabe ("Khoshabes")certain parcels of real property and/or notes and mortgages relating to real property for the Khoshabes to purchase. With respect to each such parcel of real property and/or notes and mortgages presented, Rossini acknowledges that he has obtained written assignments of the right to acquire each such parcel from the contract purchaser and/or the existing notes and mortgages from the lender and, based upon those written assignments, Rossini has asked the Khoshabes to advance funds to be used to purchase the property(ies) pursuant to the assignment(s). Rossini further acknowledges that the Khoshabes have advanced funds on several properties and has agreed that once a property is closed, the title to that property shall be deeded to the Khoshabes or as the Khoshabes shall direct, or in the case of the purchase of existing notes and mortgages, Rossini agrees that he will cause the foreclosure process to be completed and thereafter shall have the title to the property deeded to the Khoshabes or as the Khoshabes shall direct.

The Khoshabes agree that Rossini may use the funds advanced to buy the properties or purchase the notes and mortgages as long as Rossini agrees to pay to the Khoshabes the monthly equivalent of the rentals for the property on which funds have been advanced up to and including the month of closing and conveyance to the Khoshabes.

Rossini hereby guarantees to the Khoshabes that in the event that any one or more of the properties for which the Khoshabes have advanced funds are not closed and/or the notes and mortgages are not purchased from the lender and purchased pursuant to the assignment for that property

that Rossini shall be personally responsible to return any and all sums so advanced by the Khoshabes for that particular property and shall return such

01/30/2002  12:28    13122757408                                              PAGE  02

Page 2

Rossini Guaranty for Khoshabe

Dated: July 2l, 2011                              _____
                                                 Albert Rossini

Acknowledged and accepted this 25 day of July, 2011

_____
Fereidoon Khoshabe

_____
Armita Khoshabe

From:MI HOME REALTY/ LOANS          408 244 3318          12/08/2011 17:00 #055 P.001/002

p.1

## GUARANTY AGREEMENT

The undersigned, Albert Rossini ("Rossini") , hereby acknowledges that he has presented to Kathy Khodi ("Khodi") certain parcels of real property and/or notes and mortgages relating to real property for Khodi to purchase. With respect to each such parcel of real property and/or notes and mortgages presented, Rossini acknowledges that he has obtained written assignments of the right to acquire each such parcel from the contract purchaser and/or the existing notes and mortgages from the lender and, based upon those written assignments, Rossini has asked Khodi to advance funds to be used to purchase the property(ies) pursuant to the assignment(s). Rossini further acknowledges that Khodi has advanced funds on several properties and has agreed that once a property is closed, the title to that property shall be deeded to Khodi or as Khodi shall direct, or in the case of the purchase of existing notes and mortgages, Rossini agrees that he will cause the foreclosure process to be completed and thereafter shall have the title to the property deeded to Khodi or as Khodi shall direct.

Khodi agrees that Rossini may use the funds advanced as long as Rossini agrees to pay to Khodi the monthly equivalent of the rentals for the property on which funds have been advanced up to and including the month of closing and conveyance to Khodi.

Rossini hereby guarantees to Khodi that in the event that any one or more of the properties for which Khodi has advanced funds are not closed and purchased pursuant to the assignment for that property and/or the notes and mortgages are not purchased from the lender that Rossini shall be personally responsible to return any and all sums so advanced by Khodi for that particular property and shall return such funds within five (5) days after Rossini has determined that no closing will occur pursuant to the assignment.

Dated: December    8, 2011

_____
Albert Rossini

GOVERNMENT
EXHIBIT

KHODI 6

From:MI HOME REALTY/ LOANS        408 244 3318        12/08/2011 17:00 #055 P.002/002

p.2

Acknowledged and accepted this
____ day of _____, 2011

Kathy Khodl

EXHIBIT 3

Successful transactions by Defendant Rossini

Investments was Anthony Khoshabe and Devon Street; BRBK Investments was

Babajan Khoshabe and Bert Rossini

3941 W. Gladys, Chicago

5555-57 W. Congress, Chicago

4948 W. Washington, Chicago

4954 W. Lexington, Chicago

2710 N. Artesian, Chicago

1105 N. Damen, Chicago

3

2742 W. Granville, Chicago

3337 N. Halsted, Chicago

2200 N. Kedzie, Chicago

Properties Held by Devon Street or Related Entities as Security for Guarantees

8435 S. Burley, Chicago

4321 S. Marshfield, Chicago

4045 W. Wilcox, Chicago

4033 W. Adams, Chicago

4037 W. Adams, Chicago

3820 W. Adams, Chicago

4129 W. Adams, Chicago

4139 W. Adams, Chicago

4126 W. Adams, Chicago

4520 W. Jackson, Chicago

3327 W. Monroe, Chicago

5410 W. Fulton, Chicago

211 N. Kilbourne, Chicago (mortgage note)

7845 Kolmar, Skokie (Mechanic's lien)

4457 S. Princeton, Chicago

17 4-Bedroom, 1 ½ Bath Townhomes, Riverdale IL

2806 E. 76th Pl., Chicago – 9 units

1921 N. Richmond, Chicago – 3 units plus coach house

4

Additional property transactions

8.  4126 W. Adams, Chicago quitclaimed to Robert Badalian in partial satisfaction of guaranty agreement (and accepted by Badalian).

9.  4520 W. Jackson, Chicago quitclaimed to Vladimir Moghaddasi in partial settlement of guaranty agreement (accepted by Moghaddasi).

10. 3327 W. Monroe, Chicago quitclaimed to the Assyrian Evangelical Church of San Jose, CA, as partial satisfaction of guaranty agreement (accepted).

11. (3 properties) 3820 W. Adams, Chicago, 4129 W. Adams, Chicago, and 4139 W. Adams, Chicago—each quitclaimed to Craig Shaffer as partial satisfaction of guaranty agreement (accepted).

12. Assignments of contract for the following 3 properties: 4135 W. Monroe, Chicago, 4654 W. Adams, Chicago, 5131 W. Crystal, Chicago – Reassigned to Craig Shaffer as satisfaction of guaranty agreement (accepted).

13.  16 townhomes in Riverdale IL quitclaimed to Khodi Family Trust as partial satisfaction of guaranty agreements (rejected by Kathy Khodi).

14. 211 N. Kilbourne, Chicago—mortgage note purchased by Devon Street from the Verticle Mortgage Funding Corp. Transferred to Beneta Badalian as partial satisfaction of guaranty agreement (rejected by Beneta Badalian).

15. (3 properties) 4045 W. Wilcox, Chicago, 4037 W. Adams, Chicago, 5410 W. Fulton, Chicago—mortgaged to Liam Ben David. $150,000 paid to Defendant

Murphy for mortgage note on 2200 N. Kedzie, Chicago, and $125,000 returned to investors as payment on guaranty.

16. In addition, in September 2013, Defendant Rossini, in an effort to insure the additional Khodi Family Trust Investment, purchased 35 properties from Chicago Closing Services, Inc., an agent of Ocwen Loan Servicing Corp. This was under a Bulk Purchase Agreement. The addresses of these and the Riverdale properties are in the Defendant's storage locker.

EXHIBIT  4

In addition to approximately $200,000 deposited to Devon Street
Investments, Ltd. and Devon Street Management Ltd., Chase bank
accounts by Defendant to cover Murphy's nonsufficient funds
deposits in November 2012, Defendant paid the additional amounts
to investors to cover overdraft payments caused by Murphy's
$571,000 of insufficient funds checks

Rossini payments by check or money order made after Murphy's checks bounced:

| Name of Investor | Amount |
|---|---|
| Gus Bahramis & Ilias Bolos | 3,060.00 |
| Craig Shaffer | 56,250.00 |
| Albert Khamis | 3,663.00 |
| Havanna Moshi | 15,145.00 |
| Nastoris Moshi | 15,866.00 |
| KMI Enterprises, Inc. | 89,355.00 |
| Awikwam Pithyou | 24,782.50 |
| Katayoun Kazemi | 12,500.00 |
| Fereidoon Khoshabe | 10,000.00 |
| Janet Khoshaba | 18,820.00 |
| John Khoshaba | 9,062.00 |
| Anwar Michaels | 17,000.00 |
| Total Payments | 247,503.50 |

EXHIBIT __6__

The portion of each Investor/Lender's loan or investment to be
escrowed by Murphy in order to purchase notes and mortgages

| INVESTOR | ADDRESS | NOTE PAYMENT/COLLATERAL AMOUNT |
|---|---|---|
| Robert Badalian | 2442 W. Arthington | 25,000 |
| Robert Badalian | 2444 W. Arthington | 25,000 |
| Robert Badalian | 2446 W. Arthington | 25,000 |
| V. Moghaddasi | 2129 N. Sheffield | 60,000 |
| St. Oddisho | 3333 W. Berteau | 185,000 |
| A & K Khoshabe | 7410 N. Winchester | 70,000 |
| A.Pithyou | 5801 N. Richmond | 50,000 |
| R. Baboghll | 929 N. Lakeview | 60,000 |
| B. Lazar | 2007, 2043 W. Birchwood | 134,800 |
| J. Khoshaba | 4725 W. Drake | 45,000 |
| A.Pithyou | 4731 N. Monticello | 40,000 |
| A&F Khoshabe | 2459 W. Fillmore | 40,000 |
| I. Yousif | 8249 Knox | 30,500 |
| N. Moshi | 5424 N. Paulina | 50,000 |
| N. Moshi | 6443 N. Greenwood | 50,000 |
| A.Pithyou | 8143 Kilpatrick | 30,000 |
| M&M Khoshabe | 3152 W. Diversey | 85,000 |
| H. Moshi | 4844 Hull | 40,000 |
| N. Moshi | 5421 N. Artesian | 50,000 |
| KMI Enterprises | 7420 N. Artesian | 70,000 |
| F. Khoshabe | 7230 N. Hamilton | 50,000 |
| A. Khamis | 6425 N. Washtenaw | 45,000 |
| V. Moshi | 4209 Oakton | 30,000 |
| F. Khoshabe | 5621 N. Bernard | 40,000 |
| F. Khoshabe | 5749 N. Spaulding | 40,000 |
| K. Khodi | 3650 W. Polk | 50,000 |
| K. Khodi | 2323 W. Haddon | 95,000 |
| K. Khodi | 1321 N. Maplewood | 45,000 |

| | | |
|---|---|---|
| K. Khodi | Riverdale Package | 225,000 |
| K. Khodi | Rockford Package | 354,000 |
| D. Yousif | 6159 N. Hamilton | 45,000 |
| Assyrian Evangelical | 5725 N. Kimball | 40,000 |
| Assyrian Evangelical | 5757 W. Jackson | 40,000 |
| KMI Enterprises | 5721 N. Kimball | 75,000 |
| F. Moshi | 3340 N. Oakley | 135,000 |
| N. Moshi | 8718 Kimball | 51,500 |
| H.G. Electric | 8440 Kimball | 75,000 |
| V. Moshi | 4831 Lee St. | 40,000 |
| A.Pithyou | 9124 Lawlor | 40,000 |
| A.Pithyou | 9121 Lawlor | 40,000 |
| R. Badalian | 4126 W. Adams | 40,000 |
| V. Moghaddasi | 4520 W. Jackson | 50,000 |
| Assyrian Evangelical | 3327 W. Monroe | 50,000 |
| R. Baboghli | 3350 W. Monroe | 50,000 |
| Janet Khoshaba | 7935 Karlov | 115,000 |
| V. Moghaddasi | 7941 Karlov | 108,000 |
| R. Badalian | 4832 W. Montrose | 150,000 |
| Bolos-Bahramis | 2615 W. Rascher | 50,000 |
| Craig Shaffer | 3820 W. Adams | 37,500 |
| Craig Shaffer | 4129 W. Adams | 37,500 |
| Craig Shaffer | 4139 W. Adams | 37,500 |
| Craig Shaffer | 4135 W. Monroe | 50,000 |
| Craig Shaffer | 4654 W. Adams | 50,000 |
| Craig Shaffer | 5131 W. Crystal | 50,000 |
| Craig Shaffer | 5019 W. Adams | 50,000 |
| Craig Shaffer | 7845 Kolmar | 45,000 |
| R. Badalian | 4045 Wilcox | 45,000 |

| | | |
|---|---|---|
| Bonita Badalian | 5551 W. Jackson | 50,000 |
| Bonita Badalian | 211 N. Kilbourne | 50,000 |
| H. Hormozian | 5555 W. Jackson | 50,000 |
| H. Hormozian | 1418 Talman | 50,000 |
| A. Khoshabe | 3512 W. Shakespeare | 35,000 |
| Liam Ben David | 2200 N. Kedzie | 275,000 |
| B&K Investments | 2742 W. Granville | 100,000 |
| B&K Investments | 3337 N. Halsted | 100,000 |
| AD Investments | 3941 W. Gladys | 35,000 |
| AD Investments | 5551 W. Congress | 35,000 |
| AD Investments | 4019 W. Lexington | 30,000 |
| AD Investments | 3837 W. Wilcox | 20,000 |
| AD Investments | 3839 W. Wilcox | 20,500 |
| B&K Investments | 2710 N. Artesian | 50,000 |
| B&K Investments | 1105 N. Damen | 105,000 |
| B&K Investments | 4946 W. Washington | 50,000 |
| Assyrian Evangelical | 4019 W. Polk | 50,000 |

**$5,041,300**

EXHIBIT 7

FBI summary of Thomas Murphy statement on April 18, 2018 to Agent Jody Blau.

The summary was drafted on May 18, 2018.

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/21/2018

    On April 18, 2018 Thomas Murphy (previously interviewed) was interviewed under a continuing proffer agreement. The interview took place at the United States Attorney's Office located at 219 South Dearborn, Chicago, IL. Murphy was accompanied by his attorney Lawrence Levin. Also present for the interview was Special Agent Jody Blau, Special Agent Lyle Evans, Assistant United States Attorney Eric Hogstrom, and Assistant United States Attorney William Novak. The primary purpose of the interview was to review the factual statements contained in Murphy's plea agreement. After being advised of the identity of the interviewing Agents and the nature of the interview, Murphy provided the following information:

    Murphy advised that on April 13, 2018 he was contacted by John Eastman, who Murphy understands to be an attorney in California. Eastman contacted Murphy for the purpose of getting Murphy to file a release of lien on some properties located in California. Murphy advised that he has not been involved in any property transactions in California and did not file the liens; Murphy assumes that Rossini used Murphy's name, without consent, to file the liens. Murphy, through his attorney, provided interviewing agents with documents related to the California property liens; the documents are attached hereto.

    Murphy advised that he was recently served with a lawsuit filed by attorney Glenn Seiden. The lawsuit was filed in May of 2017; however, Murphy wasn't served until Sunday, April 15, 2018. The lawsuit involves Craig Shaffer. Murphy, through his attorney, provided interviewing agents with documents related to the lawsuit; the documents are attached hereto.

    Murphy provided interviewing agents with an Answer that he filed in a lawsuit that was brought against Murphy and Jeff Deer; the Answer was filed on July 12, 2017. The Answer is attached hereto. With respect to the transaction that is the subject of the lawsuit, Murphy explained that Murphy never controlled the money; Jeff Deer held the funds in Deer's client account. Murphy earned $10,000 consulting fee for his role in bringing a buyer into the transaction. Murphy stated that the earnest money for the transaction went into Deer's account located at Chase Bank.

| | | |
|---|---|---|
| Investigation on | 04/18/2018 | Chicago, Illinois, United States (In Person) |
| File # | 329A-CG-133780 | Date drafted    05/18/2018 |
| by | SA Jody Blau | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

329A-CG-133780

Continuation of FD-302 of (U) Proffer of Thomas Murphy _____ , On 04/18/2018 , Page 2 of 2

    Murphy advised that while working with Albert Rossini, but prior to the time that he helped form Reliant Management, and before Rossini brought in the church investors, Murphy helped find eight investors. Those investors deposited funds with Murphy; Rossini then instructed Murphy to disburse Babajan Khoshabe's "share" of the funds to Anthony Khoshabe, because Babajan didn't want the funds to be in his (Babajan's) name. Murphy stated that Babajan never contacted Murphy to complain about or question Murphy over paying Babajan's share to Anthony. Anthony never questioned Murphy about the reason he received the funds.

EXHIBIT __8__

MEIR ROTSTEIN

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

------------------------------------------------------------------------------------------------------------

FROM: Rotstein, Meir
TO: 08043424
SUBJECT: RE: Kling
DATE: 07/12/2019 12:36:03 AM

I don't know what the 302 is but I am assuming that its an official statement  they present to the court.
You are correct in your understanding that I was aware of real estate deals that you have done both with Craig on the west side
and with Lior Coresh in Blue Island.
I don't recall that the agents that came to see me declared the meeting as an official interview or that they asked my permission
to record the conversation we had.


ALBERT ROSSINI on 7/11/2019 8:36:47 AM wrote
Meir,
I think I understand what you are saying, that I am absolutely correct, but can you state it for me, whether I am correct or the
FBI agents' 302s are correct.
Thank you and have a cup of coffee for me.
Bert
-----Rotstein, Meir on 7/10/2019 11:51 AM wrote:

>

Absolutely correct, although I think that a note is a financial instrument not Real Estate.

ALBERT ROSSINI on 7/9/2019 6:36:32 PM wrote
What they said in the 302 was that in the four years you worked with me, you did not believe I closed on any properties. I told
Kling that you could not have said that because you were the person who introduced me to Lior Corush and we went to
Riverdale and looked at the area of the properties. That you knew I purchased the properties from Lior Corush. Therefore, it
was not possible that you said such a thing to the FBI agents.

Secondly, I told Kling, how could Meir say I did not buy any properties in four years when he introduced me to Liam Ben David
and I pledged three properties to Liam as security for a $275,000 mortgage to purchased something else from Murphy. The
properties I owned and mortgaged to Liam, with Liam's attorney handling the transaction were 4045 W. Wilcox, 4033 W. Adams
and 5410 W. Fulton. I told Kling that while you were not the broker on the purchase of those three properties, you certainly
knew that I had purchased them at one time and then used them for collateral for Liam. So, how would Meir have ever said that
in four years he did not know that I closed or purchased one property or note. Then I told Kling that you were the broker who
handled the purchase for me of the note with Victory or whatever the company was called in California for the purchase of the
note on 211 N. Kilbourn. So, as I told Kling, Meir would never say that in four years he had no knowledge of me purchasing
anything.
-----Rotstein, Meir on 7/9/2019 3:06 PM wrote:

>

I do not recall discussing closings with them, I do recall them asking me what I have done for you and I explained that I did
CMA's.
I do recall that person asking me why would I work for some one like you referring to your record.
They better have this on a tap (they never asked my permission to record).
To be fair I was never in any of your closings but I do remember you telling me about the different deals you closed and I even
went to check out some of those listings with you prior to you purchasing either by yourself or with Craig.

ALBERT ROSSINI on 7/8/2019 3:05:21 PM wrote
Meir,
I just had a horrible meeting with my lawyer Richard Kling.
He read excerpts of the government's response to my motion for new trial. In it, they quote you as saying that in four years you
never saw me close anything. They quoted other things, but that basically is the killer. I told Kling that it is not possible for you
to have said that. I told him that Meir was the person who introduced me to Lior Corush and I bought 16 townhomes from him
in 2013. I told Kling that I was uncertain what other closings you were the broker for or worked on, but that you knew I had
purchased 4045 W. Wilcox, 4033 W. Adams, and 5410 W. Fulton, among others.. But especially those since I put them up as
collateral to Liam Ben David's mortgage. So, Meir would not say that he had never seen me close a transaction.

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------------------------

FROM: Rotstein, Meir
TO: 08043424
SUBJECT: RE: Affidavit
DATE: 08/14/2019 04:06:09 PM

Hi Bert
Sorry for the delay in response, I finally got my computer up and running today.
As to the subject on hand...Although I am a Realtor associated with Shai Town Realty the work I have done for you was utilizing my knowledge in order to produce for you CMA's that will give you a real picture as to the value of the properties you are seeking to either buy or purchase the notes of.,
It is very important to make it absolutely clear that what ever compensation I received from you or your company was not a Real Estate commission but either a weekly salary or a token of appreciation bonus once in a while.
Any Real Estate deal would have gone through Shai Town and the best of my recollection the only time I acted as a Realtor on your behalf was when I listed and attempted to sell that 2 flat not to far from the White Socks stadium, an attempted that failed . The way its presented by the FBI that " I never saw you closing a deal" can be interpreted in several ways, In realty, as far as I can remember I was not physically present at any closings you did but I am very much aware of your ownership of several properties such as the Blue Island townhouses you bought from Lior (not to mention the remodeling disaster that you went through with it) or your 3 flat on the West side that I had Aharoni do the mold cleanup or the fact that you sold Craig some priorities that I delivered and picked up paper work for. I am also aware of the agreement you have with Liam assigning to him 3 properties you own agains your debt to him.
Looking forward to your response.
2 years....unbelievable.
Meir

ALBERT ROSSINI on 8/6/2019 4:20:57 PM wrote
Meir,
I just got an email from Brenda about your call. The thing that is important to me is what the FBI said about the first allegation, that you did not see me close anything in four years working with me. I am sure you did not say that, because it would not be possible for you to say such a thing. Based on the Riverdale properties and 3820 West Adams, Chicago that we viewed when we had Aroni, Shira's husband do the mold work so Craig could sell it (which he then decided not to sell). I am uncertain if you ever saw the properties I bought and mortgaged to Liam, but that does not have to be discussed in the affidavit. The statement about Ruthie or the angry investors is fine. I did not address that in the affidavit since it is true, (1) I owe Ruthie and (2) investors came to the office angry because I was the only one who would speak to them, no one else would either speak to them or pay them. No problem.. If there is something about being a licensed broker working at another office, no problem, just talk about how you were a broker that brought me properties and that you brought me Riverdale 16 townhomes from a seller you introduced to me and I purchased the properties. Also, if you don't want to speak about what work we did at the office, due to your brokerage, or any other reason, fine. The important thing is the FBI lie about you saying you did not see me close any properties in the four years you worked with me.

It is the statement about not seeing me close anything that cannot be true. So, you can change the affidavit, make it a short letter, I can change the affidavit, however, you want, but please email me back and tell me what is the problem.

Bert

EXHIBIT ___9___

Defendant Rossini, Devon Street Investments, Ltd. 1120S Tax
Return for 2012

531390

| Form **1120S** | | U.S. Income Tax Return for an S Corporation | | OMB No. 1545-0130 |
|---|---|---|---|---|

Department of the Treasury
Internal Revenue Service

▸ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▸ Information about Form 1120S and its separate instructions is at www.irs.gov/form1120s.

**2012**

For calendar year 2012 or tax year beginning JANUARY 1 , 2012, ending DECEMBER 31, 2012

**A** S election effective date

**B** Business activity code number (see instructions)

**C** Check if Sch. M-3 attached ☐

TYPE
OR
PRINT

Name
DEVON STREET INVESTMENTS LTD

Number, street, and room or suite no. If a P.O. box, see instructions.
3924 WEST DEVON STREET

City or town, state, and ZIP code
LINCOLNWOOD, IL 60712

**D** Employer identification number
45-2155017

**E** Date incorporated

**F** Total assets (see instructions)
$

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☒ Yes - ☐ No   If ☐Yes,☐attach Form 2553 if not already filed
**H** Check if: (1) ☐ Final return  (2) ☐ Name change   (3) ☐ Address change   (4) ☐ Amended return   (5) ☐ S election termination or revocation
**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . ▸

Caution. Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | | |
|---|---|---|---|---|---|
| **Income** | **1a** | Gross receipts or sales . . . . . . . . . . . . . . . . | 1a | 2,613,500 | 00 |
| | **b** | Returns and allowances . . . . . . . . . . . . . . . | 1b | | |
| | **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . | 1c | | |
| | **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . | 2 | | |
| | **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . | 3 | 2,613,500 | 00 |
| | **4** | Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . | 4 | | |
| | **5** | Other income (loss) (see instructions☐ attach statement) . . . . . . | 5 | | |
| | **6** | Total income (loss). Add lines 3 through 5 . . . . . . . . . ▸ | 6 | 2,613,500 | 00 |
| **Deductions (see instructions for limitations)** | **7** | Compensation of officers . . . . . . . . . . . . . . . | 7 | | |
| | **8** | Salaries and wages (less employment credits) . . . . . . . . . | 8 | | |
| | **9** | Repairs and maintenance . . . . . . . . . . . . . . . | 9 | | |
| | **10** | Bad debts . . . . . . . . . . . . . . . . . . . | 10 | | |
| | **11** | Rents . . . . . . . . . . . . . . . . . . . . | 11 | (6,200.) | 00 |
| | **12** | Taxes and licenses . . . . . . . . . . . . . . . . | 12 | | |
| | **13** | Interest . . . . . . . . . . . . . . . . . . . | 13 | 2,350,079 | 00 |
| | **14** | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . . . . | 14 | | |
| | **15** | Depletion (Do not deduct oil and gas depletion.) . . . . . . . . | 15 | | |
| | **16** | Advertising . . . . . . . . . . . . . . . . . . | 16 | | |
| | **17** | Pension, profit-sharing, etc., plans . . . . . . . . . . . . | 17 | | |
| | **18** | Employee benefit programs . . . . . . . . . . . . . . | 18 | | |
| | **19** | Other deductions (attach statement) . . . . . . . . . . . . | 19 | 539,837 | 43 |
| | **20** | Total deductions. Add lines 7 through 19 . . . . . . . . . ▸ | 20 | 2,896,126 | 43 |
| | **21** | Ordinary business income (loss). Subtract line 20 from line 6 . . . . | 21 | (382,636 | 43) |
| **Tax and Payments** | **22a** | Excess net passive income or LIFO recapture tax (see instructions) . . | 22a | | |
| | **b** | Tax from Schedule D (Form 1120S) . . . . . . . . . . | 22b | | |
| | **c** | Add lines 22a and 22b (see instructions for additional taxes) . . . . . . . . | 22c | | |
| | **23a** | 2012 estimated tax payments and 2011 overpayment credited to 2012 | 23a | | |
| | **b** | Tax deposited with Form 7004 . . . . . . . . . . | 23b | | |
| | **c** | Credit for federal tax paid on fuels (attach Form 4136) . . . . . | 23c | | |
| | **d** | Add lines 23a through 23c . . . . . . . . . . . . . . . . | 23d | | |
| | **24** | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . . ▸ ☐ | 24 | — 0 — | |
| | **25** | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed . . | 25 | — 0 — | |
| | **26** | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . | 26 | — 0 — | |
| | **27** | Enter amount from line 26 Credited to 2013 estimated tax ▸ | Refunded ▸ | 27 | — 0 — |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____    Date 18-5-14    Title PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)? ☐ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer☐s signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ▸ | | | Firm☐s EIN ▸ | |
| Firm☐ address ▸ | | | Phone no. | |

For Paperwork Reduction Act Notice, see separate instructions.   Cat. No. 11510H   Form **1120S** (2012)

**Schedule K** Shareholders' Pro Rata Share Items

| | | | Total amount |
|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) . . . . . . | **1** | 376,436 | 43 |
| | 2 | Net rental real estate income (loss) (attach Form 8825) . . . . | **2** | |
| | 3a | Other gross rental income (loss) . . . . | 3a | 1,200 | 00 | | |
| | b | Expenses from other rental activities (attach statement) . . | 3b | -0- | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a . . | **3c** | 6,200 | 00 |
| | 4 | Interest income . . . . . . . . . . . . . . . . . | **4** | |
| | 5 | Dividends: a Ordinary dividends . . . . . . . . . . | **5a** | |
| | | b Qualified dividends . . . . . . . | 5b | | | |
| | 6 | Royalties . . . . . . . . . . . . . . . . . . | **6** | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) . . | **7** | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) . . | **8a** | |
| | b | Collectibles (28%) gain (loss) . . . . . . . . | 8b | | | |
| | c | Unrecaptured section 1250 gain (attach statement) . . . . | 8c | | | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) . . . . . | **9** | |
| | 10 | Other income (loss) (see instructions) . . Type ▶ | **10** | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) . . . . . . . | **11** | |
| | 12a | Charitable contributions . . . . . . . . . . . . . | **12a** | |
| | b | Investment interest expense . . . . . . . . . . . | **12b** | |
| | c | Section 59(e)(2) expenditures (1) Type ▶ ____ (2) Amount ▶ | **12c(2)** | |
| | d | Other deductions (see instructions) . . . Type ▶ | **12d** | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) . . . . . . . | **13a** | |
| | b | Low-income housing credit (other) . . . . . . . . . | **13b** | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) . . . | **13c** | |
| | d | Other rental real estate credits (see instructions) Type ▶ | **13d** | |
| | e | Other rental credits (see instructions) . . . Type ▶ | **13e** | |
| | f | Alcohol and cellulosic biofuel fuels credit (attach Form 6478) . . . . | **13f** | |
| | g | Other credits (see instructions) . . . . . Type ▶ | **13g** | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession ▶ | | |
| | b | Gross income from all sources . . . . . . . . . . | | |
| | c | Gross income sourced at shareholder level . . . . . . . | **14b** | |
| | | Foreign gross income sourced at corporate level | **14c** | |
| | d | Passive category . . . . . . . . . . . . . . | | |
| | e | General category . . . . . . . . . . . . . . | **14d** | |
| | f | Other (attach statement) . . . . . . . . . . . . | **14e** | |
| | | Deductions allocated and apportioned at shareholder level | **14f** | |
| | g | Interest expense . . . . . . . . . . . . . . . | | |
| | h | Other . . . . . . . . . . . . . . . . . . | **14g** | |
| | | Deductions allocated and apportioned at corporate level to foreign source income | **14h** | |
| | i | Passive category . . . . . . . . . . . . . . | | |
| | j | General category . . . . . . . . . . . . . . | **14i** | |
| | k | Other (attach statement) . . . . . . . . . . . . | **14j** | |
| | | Other information | **14k** | |
| | l | Total foreign taxes (check one): a ☐ Paid ☐ Accrued . . . | | |
| | m | Reduction in taxes available for credit (attach statement) . . . . | **14l** | - |
| | n | Other foreign tax information (attach statement) | **14m** | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment . . . . . . . . . | | |
| | b | Adjusted gain or loss . . . . . . . . . . . . . | **15a** | |
| | c | Depletion (other than oil and gas) . . . . . . . . . | **15b** | |
| | d | Oil, gas, and geothermal properties☐ gross income . . . . . | **15c** | |
| | e | Oil, gas, and geothermal properties☐ deductions . . . . . | **15d** | |
| | f | Other AMT items (attach statement) . . . . . . . . . | **15e** | |
| **Items Affecting Shareholder Basis** | 16a | Tax-exempt interest income . . . . . . . . . . . . | **15f** | |
| | b | Other tax-exempt income . . . . . . . . . . . . | **16a** | |
| | c | Nondeductible expenses . . . . . . . . . . . . | **16b** | |
| | d | Distributions (attach statement if required) (see instructions) . . . | **16c** | |
| | e | Repayment of loans from shareholders . . . . . . . . | **16d** | |
| | | | **16e** | |

Form **1120S** (2012)

T-1

DEVON STREET INVESTMENTS, LTD.
INTEREST PAYMENTS
2012

| NAME | INTEREST PAYMENTS |
|------|-------------------|
| KMI Enterprises | 32,730.00 |
| Katayoun Kazemi | 5,000.00 |
| AD Investments | 201,420.00 |
| Abraham Yousif | 40,008.00 |
| Punjab Investments | 25,300.00 |
| St. Odisho Church of the East | 37,152.50 |
| HG Electric/Carmel Builders | 19,775.00 |
| Nastoris Moshi | 77,173.45 |
| Albert Khamis | 28,082.70 |
| Vladimir Moghaddasi | 195,748.50 |
| Fereidoon Khoshabe | 157,795.03 |
| Benva Lazar | 36,331.67 |
| Awiquam Pithyou | 182,039.56 |
| Raymond Babaoghli | 31,961.65 |
| Robert Badalian | 200,322.95 |
| Beneta Badalian | 59,400.00 |
| Henry Hormozian | 25,617.29 |
| Bahramis-Bolos | 25,980.00 |
| Assyrian Evangelical Church of San Jose | 65,402.50 |
| Janet Khoshaba | 17,290.00 |
| Valentina & Fidel Moshi | 23,670.00 |
| Havanna Moshi | 23,438.00 |
| Fidel Moshi | 25,705.00 |
| John Khoshaba | 27,507.50 |
| Katayoun Khodi | 114,198.06 |
| Liam Ben David | 22,813.75 |
| Craig Shaffer | 186,045.00 |
| Anthony & Babajan Khoshabe | 70,874.22 |
| Anthony Khoshabe, Melita Khoshabe & Melinda Khoshabe | 49,196.10 |
| TOTAL | 2,007,978.00 |

EXHIBIT 10

Trial Stipulation of testimony by Adis Alic which was false and
agreed to by Defendant's counsels, Adams and Frankel

## STIPULATION #29

If called to testify, Adis Alic would testify that he is the owner of the property located at 7941 Karlov Avenue, Skokie, Illinois. Mr. Alic would further testify he has owned 7941 Karlov Avenue since approximately 2007. Mr. Alic would further testify that he defaulted on some mortgage payments in 2012, and ultimately obtained a loan modification with his lender. Mr. Alic would further testify that foreclosure proceedings were never initiated against 7941 Karlov Avenue. Mr. Alic would further testify that he met with Albert Rossini at his office at Devon Street Investments in 2012 and that Rossini offered to purchase 7941 Karlov. Mr. Alic would further testify that he did not go through with the sale to Rossini. Mr. Alic would further testify that he does not know Babajan Khoshabe or Thomas Murphy.

33

EXHIBIT 11

PAYMENTS MADE BY DEFENDANT ROSSINI
AND Khoshabes TO Purchase NOTES
FROM Murphy FOR Themselves
SEIDEN Email

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

-------------------------------------------------------------------------------------------------

FROM: Seiden, Glen
TO: 08043424
SUBJECT: note to atty
DATE: 07/03/2019 12:21:09 PM

This is what I sent to Kling and it is accurate:

Rich:

I received a note from Bert asking me to tell you that we had expected him to testify at this trial. We did. I was going to use his back ground to indicate he was smart enough to do things to avoid going back to jail and that because of his back ground Murphy always thought that he, Murphy, had a fall guy, which Bert did not know at the time.

I recognized the difficulty of having him take the stand, but he was the best to explain what the program was and why it was legal. He could further explain what steps he took to keep it legal too. We were preparing him to testify all along. I hope this helps. G

## BRBK INVESTMENTS
### PROPERTIES

| PROPERTY | PRICE | DATE | START | MONTHLY RENT | ANNUAL RENT |
|---|---|---|---|---|---|
| 3941 W. Gladys Chicago, IL 60624 | $35,000 | 8/27/11 | 9/1/11 | $5,100.00 | $61,200.00 |
| 4946 W. Washington Chicago, IL 60644 | $35,000 | 9/15/11 | 10/1/11 | $4,500.00 | $54,000.00 |
| 5551 W. Congress Chicago, IL 60644 | $40,000 | 10/20/11 | 11/1/11 | $6,800.00 | $81,600.00 |
| 5018 W. Quincy Chicago, IL 60644 | $17,500 | 11/27/11 | 12/1/11 | $3,900(50%) $1,950 | $23,400.00 |
| 2710 N. Artesian Chicago, IL 60647 | $50,000 | 11/20/11 | 11/21/11 | $6,700.00 | $80,400.00 |
| 6337 N. Talman Chicago, IL 60647 | $30,000 | 12/20/11 | 12/21/11 | $3,300.00 | $39,600.00 |
| 4305 Oakton Skokie, IL 60076 | $60,000 | 12/28/11 | 1/1/12 | $3,150(40%) $1,560.00 | $15,120.00 |
| 4731 Main Street Skokie, IL 60076 | $60,000 | 12/28/11 | 1/1/12 | $3,900(40%) $1,560.00 | $18,720.00 |
| 8346 Kimball Skokie, IL 60076 | $52,000 | 12/30/11 | 1/1/12 | $3,000(50%) $1,500.00 | $18,000.00 |
| 4914 Mulford Skokie, IL 60077 | $50,000 | 12/30/11 | 1/1/12 | $3,395(50%) $1,697.50 | $20,370.00 |
| 2200 N. Kedzie Chicago, IL 60647 | $40,000 | 1/14/12 | 1/15/12 | $9,975.00 | $119,700.00 |
| 4832 W. Montrose Chicago, IL 60641 | $140,000 | 2/12/12 | 2/13/12 | $16,725.00(50%) $8,362.50 | $100,350.00 |
| 2742 W. Granville Chicago, IL 60659 | $105,500 | 3/8/12 | 3/9/12 | $11,400.00 | $136,800.00 |
| 1135 N. Damen Chicago, IL 60622 | $ 95,000 | 3/28/12 | 4/1/12 | $10,150 | $121,800.00 |

These notes, mortgages and/or proprties are owned as tenants in common by Albert Rossini and Babajan Khoshabe.

Albert Rossini, 10/15/12

| 3337 N. Halsted Chicago, IL 60657 | $ 85,000 | 4/25/12 | 4/25/12 | $10,575 | $126,900.00 |
|---|---|---|---|---|---|
| 6547 N. Mozart Chicago, IL 60645 | $ 40,000 | 6/21/12 | 6/25/12 | $ 3,725 | $ 44,700.00 |
| 8249 Knox Skokie, IL 60077 | (2/3 owned by BRBK—1/3 owned by Fred) $ - | 7/16/12 | 7/16/12 | $ 2,574 | $ 30,888.00 |
| 6159 N. Hamilton Chicago, IL | (2/3 owned by BRBK-1/3 owned by Fred) $ - | 7/16/12 | 7/16/12 | $ 4,752 | $ 57,024.00 |
| TOTAL INVESTMENT Our money: | $ 935,000.00 $ 555,500.00 | | | $96,181.00 | $1,154,172.00 |

These notes, mortgages and/or properties are owned as tenants in common by Albert Rossini and Babajan Khoshabe

By: _[signature]_

Albert Rossini

October 15, 2012

By: _[signature]_

Babajan Khoshabe

October 15, 2012

_[signature]_

NOTARY PUBLIC

My commission expires on _____

OFFICIAL SEAL
Takis Sarantos
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/16/2014

**PLS**

70-118
710

7201 N. CALIFORNIA AVE. - CHICAGO, IL 60645
TO VERIFY - CALL (773) 761-2899
Open 24 Hours - We Never Close
Abierto 24 Horas - Nunca Cerramos

REPUBLIC BANK
OAK BROOK, ILLINOIS

CC007
007010499

3/8/2012

DS 7010499

ALBERT ROSSINI

PAY TO THE
ORDER OF   Thomas Murphy                    $7,500.00*****

SEVEN THOUSAND FIVE HUNDRED AND 00/100 U.S. Dollars

WARNING: THIS DOCUMENT CONTAINS NUMEROUS SECURITY FEATURES. SEE VERIFICATION INSTRUCTIONS ON BACK.

2742 W. GRANVILLE, Chgo, IL 60659

"007010499" ":071001180": 9580000847"

---

Bank of America Advantage

ANTHONY E KHOSHABE   06-06
6349 N KNOX AVE
CHICAGO IL 60646-4411

632

3/8/2012
Date

Pay   Thomas Murphy, Attorney/Agent            $10000
to the order of

ten thousand    00/100            Dollars

**Bank of America**

Fin: 13-01-203-057-0000
Memo  2742 W. Granville
      Chicago IL 60659

"071000505": 008605178725"063"

CHECKS CASHED · CAMBIAMOS CHEQUES
FREE MONEY ORDERS · ALL BILLS PAID
VISA® PREPAID DEBIT CARDS

70-118
710



7201 N. CALIFORNIA AVE. · CHICAGO, IL 60645
TO VERIFY - CALL (773) 761-2899
Open 24 Hours - We Never Close
Abierto 24 Horas - Nunca Cerramos

REPUBLIC BANK
OAK BROOK, ILLINOIS

CC007

007005729

2·14·2012

DS 7005729

ALBERT ROSSINI

**$5,000.00**

REMITTER

PAY TO THE
ORDER OF    Thomas Murphy , Attorney/Agent
Deposit: 2742 W. Granville, Chicago, IL 60659
WOD until 3/20/12



NOTICE TO HOLDER: DRAWEE NOT LIABLE ON STOP PAYMENT.
· NO REPLACEMENT FOR 30 DAYS FROM PURCHASE. RE-ISSUE FEE APPLIES.
· PURCHASER AGREES TO INSERT NAME OF PAYEE AND IS SOLELY RESPONSIBLE FOR FAILURE TO DO SO.
NO REFUND WITHOUT YELLOW RECEIPT

STATE
REGULATED

**NON-NEGOTIABLE**



Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
**CASHIER'S CHECK**

**Customer Copy**

**9194513071**

03/08/2012

Illinois

Remitter **ANTHONY KHOSHABE**

$ *********40,000.00 ***

Pay To The Order Of
**THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**

Drawer: **JPMORGAN CHASE BANK, N.A.**

**NON NEGOTIABLE**

TERMS
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

282111107 NEW 01/08 8810004305

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK  **CASHIER'S CHECK**  HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK



**9194513071** 25-3/440

Date 03/08/2012

Remitter **ANTHONY KHOSHABE**

Pay: **FORTY THOUSAND DOLLARS AND 00 CENTS**

$ *********40,000.00 ***

Pay To The Order Of
**THOMAS MURPHY, ATTORNEY/AGENT**
**PIN # 13-01-208-032-0000**
2742 W. Greenville
Chicago, IL 60659

Drawer: **JPMORGAN CHASE BANK, N.A.**

Michael Andrews

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH



Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
**CASHIER'S CHECK**

**Customer Copy**

9194513072

03/08/2012

Illinois

Remitter  ALBERT ROSSINI

$ *********40,000.00 ***

Pay To The
Order Of

THOMAS MURPHY, ATTORNEY/AGENT
PIN # 13-01-208-032-0000

Drawer: JPMORGAN CHASE BANK, N.A.

**NON NEGOTIABLE**

KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

282111107 NEW 01/08 8810004305

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**CHASE**

**CASHIER'S CHECK**

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

9194513072 253/440

Date   03/08/2012

Remitter  ALBERT ROSSINI

Pay:  FORTY THOUSAND DOLLARS AND 00 CENTS

Pay To The
Order Of

THOMAS MURPHY, ATTORNEY/AGENT
PIN # 13-01-208-032-0000
2742 W. Granville
Chicago, IL 60659

$ *********40,000.00 ***

Drawer: JPMORGAN CHASE BANK, N.A.

Michael Andruss

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH



CHASE

Remitter ALBERT ROSSINI

9194513221

Date 03/27/2012

Pay FIFTEEN THOUSAND DOLLARS AND 00 CENTS

$ ********15,000.00 ***

Pay To The Order Of THOMAS MURPHY, ATTORNEY/AGENT
PIN:1706400014000
1135 N. Damen
Chicago, IL 60622

Drawer JPMORGAN CHASE BANK, N.A.

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑈9194513221⑈ ⑈044000037⑈ 758661359⑈



CHASE

Remitter ANTHONY E. KHOSHABE

9194513220

Date 03/27/2012

Pay FIFTEEN THOUSAND DOLLARS AND 00 CENTS

$ ********15,000.00 ***

Pay To The Order Of THOMAS MURPHY, ATTORNEY/AGENT
PIN:1706400014000
1135 N. Damen
Chicago, IL 60622

Drawer JPMORGAN CHASE BANK, N.A.

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑈9194513220⑈ ⑈044000037⑈ 758661359⑈



13-14-3774B 08-2005

**Bank of America**      **Cashier's Check**      No. **0631523**

⑆0631523⑆ ⑈114000019⑈ 0016410040043⑈

THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK • THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK



**CHASE ◯**

CASHIER'S CHECK

8137390239

Date 03/28/2012

Remitter ALBERT ROSSINI

Pay: THIRTY TWO THOUSAND FIVE HUNDRED DOLLARS AND 00 CENTS

Pay To The
Order Of
THOMAS W MURPHY ATTORNEY/AGENT
PIN 17-06-400-014-0000   1135 N DAMEN
1135 N. DAMEN
CHICAGO, IL 60622

$ ********32,500.00 ***

Drawer JPMORGAN CHASE BANK, N.A.

Michael A. Anderson

Senior Vice President
JPMorgan Chase Bank, N.A.
Columbus, OH

⑆813790239⑆ ⑆044000037⑆ 758661359⑈

EXHIBIT  17

Defendant requests the Court take notice of Exhibits filed by him
with the Clerk of the Court, Northern District Of Illinois on
August 23, 2018, Document(s) #373.

Including, but not limited to:

- Motion to Supplement Exhibits;
- Letters to Defense Attorneys Adams and Frankel from Defendant;
- Mailing receipts from Jerome Combs Detention Center for mail to
  attorneys Adams and Frankel from Defendant;
- Defendant Rossini's notes at trial to attorneys Adams and Frankel;
- Emails between Defendant and attorney Adams;
- Real Estate Transfer Ordinance of Village of Riverdale;
- Defendant Tax Returns

EXHIBIT  13

Notes made from Attorney Anthony Klytta's investigation of notes
and mortgages allegedly purchased by then attorney Thomas Murphy.
This is a summary of only a partial amount of the notes and
mortgages Murphy supposedly purchased for Rossini and investors.

INVESTOR REPORT
June 29, 2013

This week we received financial spread sheets from Tom Murphy. However, as Rich Kruse has stated to me, we cannot verify these spread sheets without a copy of the paid checks to see if they match up with what he has sent us. It is one thing to state that someone has been paid certain amounts but another thing to see the proof. The individual investor knows what he or she has been paid, and the broker knows the same; however, to offer it as proof to someone who does not know that another has been paid that money is wrong until proof of such is made and that can only be completed by reviewing the paid checks. We have subpoenaed these statements and Tom has stated to Rich that he would provide them prior to or at the July 8 court date. Rich was to meet with Tom again yesterday afternoon and I will have his update by Monday. In the meantime, I have below a synopsis of what Tom says he has paid out.

(Several Accounting Forms Sent By Separate Efax)


These are files that we have confirmed with the court, the banks' lawyers, the banks, and on occasion with the property owners. I have included only those where I have spoken to one of the above and only those properties that pertain to California investors or investors willing to have their investments disclosed. I am following through with these files and all of the others as Babajan has been going to court three times per week to check on each file. There will be a further update on July 3, 2013 on these and other files that we reach Monday and Tuesday.

2634 N. Francisco, Chicago, IL    Case dismissed, we have attempted to contact owner to get a copy of the loan modification and or settlement (F. Khoshabe)

5062 W. Congress, Chicago, IL, still in foreclosure. Owner occupies the ground floor. Section 8 has canceled rents due to the foreclosure. Once new leases are required, Section 8 has the option of canceling payments on properties in foreclosure if one of the units is owner occupied. (Moghaddasi)

5536 W Jackson, Chicago, IL, still in foreclosure on case management calendar which means it still in mediation. One unit is owner occupied and we are checking with Section 8 to see if they have canceled payments. (Assyrian Evangelical Church)

4731 Main Street, Skokie, IL, judgment obtained but not yet to judicial sale, owner occupied and Section 8 has canceled payments on second tenant (B Khoshabe, Rossini, F Khoshabe)

4946 W. Washington, Chicago, IL still in foreclosure but owner occupied. Section 8 has canceled payments due to owner occupied on one unit. (B Khoshabe, Rossini)

5749 N Spaulding, Chicago, IL, still in foreclosure in mediation, owner occupied on one unit. Was Washington Mutual loan assigned to Chase from the takeover. It appears from the foreclosure file that the assignments to Chase have been defective and that the owner is fighting under those circumstances. (F. Khoshabe)

8315 Keating, Skokie, IL, the bank is ready to get a judgment and is negotiating with me for the takeover. Owner occupied, (Benva)

5018 W. Quincy, Chicago, IL , non owner occupied. Checking on Section 8 rents.    Still in foreclosure (F B Khoshabe, F Khoshabe, Rossini)

4943 W Lexington, Chicago, IL, notice of judicial sale has been filed but a date not set. Judgment obtained. Section 8 has canceled  rents due to owner occupied.

3610 W. Lexington, Chicago, IL  still in foreclosure and owner occupied.  Section 8 has canceled rents due to owner occupied.   (Moghaddasi)

5531 W Jackson, Chicago, IL, in foreclosure, case management which is mediation at this point.  It is owner occupied and Section 8 has canceled rents on remaining tenants. (Ben eta Badalian)

4009 W. Polk, Chicago, IL, still in foreclosure, dispute on who owns the loan besides our rights on the loan.  This is non owner occupied so I am after Section 8 to try and collect the rents. (Assyrian Evangelical Church)

3340 N. Oakley, Chicago, IL, still in foreclosure with many liens including mechanic liens filed by the owner, a very difficult lawyer in Chicago.  Another private equity fund also has a lien on the building. We have our lis pendens filed and am following up on both the foreclosure and trying to negotiate with the owner. (Moghaddasi)

5511 W. Gladys, Chicago, IL,  order of sale confirmed.  Then the court had to compose an amended order of sale. There is a deficiency of $318,424 and I am negotiating with the former owner, bank and lawyers. (F. Khoshabe)

2043 W. Birchwood, Chicago, IL, in foreclosure and owner occupied.  Section 8 has canceled rents. I am close to being able to take this property over either because we have rights that cannot be circumvented or due to the owner being willing to complete a short sale with me. (Benva)

3236 W. Polk, Chicago, IL in foreclosure but the case is stalled due to liens by the USA (taxes), State of IL (taxes).  It is owner occupied and Section 8 has canceled rents. (F. Khoshabe)

1135 N. Damen, Chicago, IL , this is the first property that we have confirmed has been sold out from under us.  (Rossini, B  Khoshabe)

3837 W Wilcox, Chicago, IL, in foreclosure and owner occupied.  Section 8 has canceled rents. (B. Khoshabe)

6337 N. Talman, Chicago, IL.  Voluntary dismissal by the bank.  The owner has settled with the bank and I am attempting to find out the details. (B Khoshabe, Rossini)

3337 N Halsted, Chicago, IL  a judgment has been obtained however the owner has convinced the court to modify the judgment and give him time to work out a settlement, redeem or pay it off. (Rossini, B Khoshabe)

6554 N. Mozart, Chicago, IL, in foreclosure and owner occupied.  Owner has filed a motion to ask the court for more time to answer the motion for judgment. (F Khoshabe)

929 W. Lakeside, Chicago, IL; court agreed to dismiss the case in favor of a new filing. Usually there is just an amended filing rather than a dismissal. I have several calls into the law firm for the bank, the banker and I have spoken to the owner who is interested in a settlement. (Babaoghli)

2129 N Sheffield, Chicago, IL , order for judgment and receiver report. I am negotiating with the owner but have been unable last week to contact the bank rep. (Moghaddasi)

2742 W Granville, Chicago, IL, foreclosure on going. The owner has counterclaimed us and the bank, Urban Partnership Bank. (Rossini, B Khoshabe)

7941 Karlov, Skokie, Il in foreclosure with Bank of America's paperwork a real problem. We are on this deal and I have spoken with the owner who is attempting to get the money to pay off the loan. It appears that our worst case scenario is the we will recoup the money on this deal. (Moghaddasi)

2200 N Kedzie, Chicago, IL, dismissal by the bank. (Rossini, B Khoshabe)

6159 N Hamilton, Chicago, IL, in foreclosure with an order to appoint a new Receiver. (B Khohabe, F Khoshabe)

7410 N Winchester, Chicago, IL, in foreclosure, with the USA, State of Illinois and HUD liens on the property besides our lien. (B Khoshabe, F Khoshabe)

3512 W. Shakespeare, Chicago, IL, a judgment of foreclosure has been obtained and order of possession however, Cornerstone has gone bankrupt and we are awaiting the results (A Khoshabe)

4832 W Montrose, Chicago, IL, in foreclosure with a new Receiver being appointed. I know this Receiver and as soon as they get the keys we can inspect the building and get an updated report. (Rossini, B Khoshabe, Badalian)

211 N Kilbourn, Chicago, IL. We own the note, assigned to Beneta Badalian. I am hiring a new lawyer to prosecute the foreclosure case as Tom's firm never followed through. Section 8 has canceled the rents due to owner occupied on one unit of the three units. (Beneta Badalian)

## CERTIFICATE OF SERVICE

I, Albert Rossini, on August __19__ , 2019, deposited the attached Reply to the Government's Response to Defendant's Motion for New Trial by depositing it with the Corrections Officer handling the Chicago MCC Legal Mail System for Prisoners and Detainees, as per Federal Regulations.   The service list is as follows:

Clerk of the United States District Court
219 South Dearborn Street
Chicago, Illinois 60604

Hon. John Z. Lee
United States District Court
Room 1225
Chicago, Illinois 60604

United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

Respectfully submitted,

Albert Rossini, #08043-424
Defendant Pro Se
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

ALBERT ROSSINI #08043-424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, IL 60605

2019 AUG 22 AM 7:49




















Legal Mail
PRISONER Correspondence

Clerk of the Court
United States District Court
Northern District of Illinois
U.S. Courthouse
219 South Dearborn Street
Chicago, Illinois 60604







08/22/2019-20

-+METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the materiel for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Date:08-20-2019