EXHIBIT_____

Motions submitted by Defendant to Attorneys Adams and Frankel
in February, March and April, 2018

- Mailing receipts from Jerome Combs Detention Center

- Motion To Dismiss Indictment For Prosecutorial Misconduct

- Motion And Memorandum Of Law To Reject And Dismiss Government's
  Substitution Of Deliberate Indifference For Mens Rea

- Questions And Answers To Help Counsels Prepare For Trial

- Motion To Strike "Lulling Payments" Alleged By The Government
  In Its Pleadings And From The Record, And To Bar Same At Trial

- Defendant's Motion For Production By The Government Of Brady
  And Giglio Material

- Defendant's Motion And Memorandum Of Law To Strike And Dismiss
  Government's Allegation Of Nonexistent Property Sales From The
  Record, as Erroneous And False

- Motion For Judicial Admission Of ARDC Findings In Re Thomas Murphy

- Motion For Bill Of Particulars

**FILED**

SEP 0 6 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                          CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

Defendants.

Defendant Albert Rossini's Motion to Dismiss the Indictment for Prosecutorial Misconduct,

Memorandum of Law and Supplement in Support

Defendant Albert Rossini, pro se, respectfully submits this Motion and Memorandum of Law

with Supplement in Support thereof, to Dismiss the Indictment for Prosecutorial Misconduct,

before the Grand Jury and throughout the pendency of this cause, and to find as a matter of

law that the government's pleadings against Defendant alleging *inter alia* "non-existent

properties," "lulling," and intent were false and misleading, and known by the government to

be false, and further, Defendant states as follows:

1

An incomplete record and information, purposefully and intentionally presented by the government, show a fundamental abuse of prosecutorial authority. The government targeted Rossini and then provided a false narrative to find the basis for charging him, *nunc pro tunc.*

It took misconduct by the government that fatally tainted the independence of the grand jury to make that happen in this case.

While the factual underpinnings of this Motion, Memorandum of Law and Supplement are complex and necessarily detailed, Defendant's position regarding dismissal for prosecutorial misconduct affecting the grand jury's decision is simple and straightforward: this indictment should be dismissed due to fundamental patterns of government misconduct that prejudiced the grand jury proceedings.

1. The government withheld exculpatory evidence in its possession from the grand jury to pursue the government's false narrative and obtain an indictment of the Defendant.

2. The government made repeated false, misleading and erroneous statements of fact concerning conduct by Rossini to witnesses both before the grand jury and outside its presence that had the effect of unalterably influencing the testimony of key witnesses and influencing the grand jury in its consideration of the case.

3. The government engaged in other misconduct that violated Rossini's constitutional rights and used selective evidence before the grand jury. These actions of collective and cumulative misconduct pushed the grand jury to indict the defendant.

As a result of this governmental misconduct, the indictment was preordained, and the grand jury's limited, but critical, independence was compromised.

A. In August of 2014, Rossini became aware that FBI agents Lyle Evans, Jody Blau and Cook County Investigator Paul Martinez were interrogating former Devon Street Investments, Ltd. ("Devon Street") employees. In September 2014, Defendant's then-attorney, Glen Seiden, presented the agents with four boxes of documents prepared by Defendant for government review. This was a voluntary presentation of documents not in response to subpoena.

Included in these documents were copies of cashier checks and commission payments showing that Defendant Rossini and co-Defendant Babajan Khoshabe ("Babajan") had themselves invested over $955,000 to purchase mortgage notes from attorney Thomas W. Murphy ("Murphy") during 2011 and 2012. These were similar to the mortgage notes Devon Street Investors was purchasing from Murphy for its investors.

Also included in Defendant's records was a copy of a comprehensive fire, liability and building insurance policy for which Devon Street had contracted with Seattle Specialty Insurance Company. Included were copies of premium payments made by Rossini to the insurance company and a listing of all mortgage loan properties purchased from Murphy by Devon Street, Rossini and Babajan. There were copies of deeds of properties owned by Devon Street or related entities as well as the

3

quitclaims of properties Defendant transferred to investors. Included was a comprehensive Devon Street business plan.

There were Cook County lawsuits filed by Rossini, Babajan, and investor Craig Shaffer, CPA, against Murphy—who had been their attorney and for whose services they had paid Murphy and his law firm(s). There were numerous lawsuits filed in the Circuit Court of Cook County, including those brought by American Chartered Bank, Aurora Loan Servicing, and World Wide Realty LLC v. Thomas W. Murphy and Prestige Partners LLC (2013 L 50095). Another document was Murphy's 2008 quitclaim of his Kildeer residence, with lawsuits pending, to his wife. This information is also contained in Murphy's bankruptcy filings.

There was the ARDC Synopsis of Hearing Board Report and Recommendations regarding Thomas W. Murphy (Commission No. 2010 PR 00114, July 9, 2013); four Murphy chapter 7 bankruptcy petitions (13-B-03922, 13-B-45386, 14-B-00372, and 14-B-03922) in which he was represented by his partner attorney Jeffrey Deer; Murphy's sworn deposition before the U.S. Trustee attorney, per Rule 2004 (June 2, 2014); World Wide Realty LLC's Motion to Dismiss Murphy's chapter 7 Bankruptcy and to bar future such petitions; Murphy's Statement of Financial Affairs (submitted with his 2014 Bankruptcy Petition, but not with the three prior petitions which were dismissed); and his tax returns submitted in the bankruptcies, including his Schedule C for 2010, 2011, and 2012, filed as sole proprietor, and which included his title

4

company, Legal and Title Consultants and Insurance, which had an office in Indianapolis with Tamera Brown, but in the tax returns, Murphy's 70 W. Madison, Chicago office was listed.

The government (with)held Murphy's law firm personnel records; prior ARDC matters; Murphy correspondence; investigations of Murphy and his partner attorney Jeffrey Deer; the Tamera Brown investigation; real estate records; Secretary of State corporate and LLC records; Murphy's Florida arrest; Murphy's bankruptcy filings with Jeffrey Deer as his lawyer; sworn depositions before a government attorney; sworn affidavits, court pleadings and lawsuits; tax returns; cancelled checks; and Rossini's business plans.

From a review of these documents, it can be reasonably presumed that Murphy was the sole and capable schemer of investors, as well as a double-dealer of the investors and of his clients Devon Street, defendants Rossini and Babajan, and Craig Shaffer (Supplement, *infra*). The references and information related to the records Defendant produced to the government are more fully set out below.

A short time after Defendant Rossini produced his records to the government, attorney Glen Seiden met with AUSA Hoekstra, and presented copies of Rossini's liability insurance and premium payments. These showed that Rossini insured and paid the premiums for over 70 mortgage note properties that he legitimately purchased from Murphy.

5

On August 25, 2015, Defendant was arrested, along with Babajan, his son, Anthony Khoshabe, and Murphy on a multicount indictment alleging they fraudulently perpetrated a Ponzi scheme. At the August 28, 2015 bond hearing, Agent Evans admitted in questioning by attorney Seiden that the agents had not reviewed the documents presented to them in September 2014, but that they "would get around to it."

The government purposefully failed or intentionally omitted presenting Rossini's exculpatory evidence to the Grand Jury because it did not fit the government's false narrative that Rossini was selling "non-existent property." The government's refusal to present this exculpatory evidence to the Grand Jury was at best a reverse form of "willful blindness," and at worst, a deliberate targeting of the Defendant.  These documents, presented to agents in September 2014, 11 months prior to the indictment, were powerful evidence that Rossini and the Khoshabes lacked the requisite intent to defraud the investors. The government acted in bad faith by not presenting Defendant's payments for mortgage notes, insurance premiums, properties purchased by Defendant Rossini, monies paid to Murphy, NSF checks by Murphy to Rossini, Babajan, and Devon Street, and Rossini quitclaims of properties to investors in the normal course of Devon Street business.

B.  The government failed to present documentation in its possession to the grand jury, to Rossini or to the Court, concerning Murphy's serial, fraudulent, bankruptcies during 2013 and 2014.  Murphy's bankruptcies followed his issuance of NSF checks to Rossini and Babajan: $31,000 (Jan. 2013), $215,000 and $356,000 (Nov. 2012) for

6

rentals and interest to investors, Rossini and Babajan (contained in the Defendant's boxes).

In Murphy's Bankruptcy petitions, represented by attorney Jeffrey Deer, he repeatedly used fake social security numbers, presented income tax returns for 2010, 2011 and 2012 that grossly understated his income by over $1,000,000, and admitted in his Rule 2004 bankruptcy hearing before assistant U.S. Attorney Jeffrey Snell, representing the U.S. Trustee, to buying and "flipping" properties-- that rightfully belonged to Rossini, Babajan and their investors, all of whom paid Murphy for the properties.

In the June 2, 2014 deposition before AUSA Snell, Murphy made false, fraudulent and misleading statements regarding his purchase of 2015 N. Racine, Chicago. In a convoluted statement, Murphy testified that he had executed a purchase contract for the property on behalf of the 2015 N. Racine LLC and that he, Murphy, was sole owner of the limited liability company.

In reality, Murphy and Tamera Brown each owned 50% of the company and were purchasing the Racine property together just as they had purchased a condominium in Del Ray Beach, Florida together. In his testimony, Murphy stated that a non-paying tenant had occupied the property when in fact Ms. Brown lived in 2015 N. Racine. In answering Devon Street's interrogatories (re a civil case in Cook County) in early 2015, Ms. Brown stated to Devon Street attorney Richard Kruse that Murphy was supposed to live with her at the property but that "he

lied to me." Murphy admitted in the Rule 2004 hearing that he paid $10,000 per month "rent"
on the property but in other records, the accounting indicated $17,000 per month. Murphy
stated he may have paid as much as $60,000 earnest money for Racine. Justin Fox, the Racine
property seller, said Murphy deposited $600,000. (see the Supplement, *infra*, for the forensic
calculations).

The significance of this is twofold. First, Murphy had been depositing and hiding money with
Tamera Brown; the government at the August 28, 2015 bond hearing said that amount was
approximately $465,000. However, the records of payments contained in Rossini's boxes
showed the amount Murphy hid was closer to $1,200,000.

The government failed to present this information because it proved Defendant's narrative
that Murphy was solely responsible for the conversion of investor funds and double-dealing,
for his own pocket. He took the funds, as the government stated, but he did so either as his
own flat-out Ponzi, or double-dealing. Refer to the Supplement, *infra*, for details regarding
specific properties, which 1. Contradict the government's persistent false accusations and
pleadings that Rossini sold non-existent properties, and 2. Indicate that Murphy surreptitiously
sold properties to 3d parties which he had previously sold to Devon Street Investors, Rossini,
and Babajan.

8

The monies paid Murphy by investors and by Murphy's paying clients-- Devon Street, Rossini, and Babajan-- were converted and/or repaid with NSF checks by Murphy (contained In Rossini boxes; also *infra* in Supplement).

With the issuance to them by Murphy of sizeable NSF checks in Nov. 2012, Rossini and Babajan were alerted to a Murphy problem. They filed a Complaint for an Accounting from Murphy and his law firm in the Chancery Court of Cook County in April 2013. Murphy was forthcoming in that he signed agreed orders to turn over records, which he then did not. Thereafter, the California investors sued Murphy, he filed his bankruptcy cases and the Rossini and Babajan accounting lawsuit ceased.

The government's failure to present Murphy's perjury, tax evasion, career-long client conversions, real estate expertise and misappropriations, evasive LLC formations, habitual Ponzi practices, and falsely shifting the blame (in this and other causes) to Defendant Rossini during his sworn ARDC testimony and sworn Bankruptcy 2004 deposition testimony was calculated and malicious. Felons-- convenient culprits for the government and easy targets for predatory attorneys-- must in this instance, affirmatively reject the government's imputations. The fault lies in defendant Thomas W. Murphy who heretofore enjoyed an unexamined and unrestricted operation.

.

C.  The government failed to present the ARDC Synopsis of Hearing, Board Report and
    Recommendations filed in July 2013 that Murphy be disbarred for converting funds of Rossini
    investor Nina Jozers.

The Commission finding stated "[R]espondent's [Murphy] conversion of funds he was holding
for Jozers was deceitful. He acted in direct contravention to the terms spelled out in the
September 2010 letter he forwarded to Alamprese, and his explanations for his actions were
unconvincing. As stated with respect to Count VI, in the fall of 2010, Respondent acknowledged
to attorney Herzog that he was holding funds in his client trust account. His testimony at
hearing that the funds were intended for a purpose other than what was stated in the letter,
and that he was authorized by Rossini to transfer the funds, was not believable. We conclude,
therefore, that Respondent [Murphy] engaged in dishonesty, fraud, deceit, and
misrepresentation in violation of Rule 8.4(a)(4)." P. 57.

Again, the government did not present this information since it directly contradicted its central
theory that it was Rossini who concocted a scheme to bilk investors with Babajan as his
sidekick. Rossini dictated the what, how, where and when of the scheme to Murphy, directing
him as Rasputin did to the demented Tsarina and Tsar.

Murphy was a partner and high-level attorney at Pedersen & Houpt from 2006 to August 2011,
before that at Burke Warren from 2001 to 2006, and previously at Johnson and Bell. His clients
included the Chicago Archdiocese, the Congregation of the Resurrection Fathers, Gordon
Technical Institute and College Preparatory High School, Prospect Airport Services, New Century
Bank and many real estate companies and businesses, including Republic Title Insurance

Company. Rossini and Babajan's clients routinely "googled" Murphy, all of whom were reassured by his clientele. Murphy's google profile was kept pristine. But the record reveals that Agent Evans, in repeated manipulative questioning of witnesses, recommended selective googling—only of Rossini or Babajan. Neither Rossini nor Babajan had been students of the internet nor aware that one's reputation and problems could be "scrubbed" as had Murphy, conveniently, throughout his representation of Rossini, Babajan, Devon Street, and various sophisticated investors, and thereafter.

 

    D. The government consistently portrayed Rossini as selling "non-existent" properties. The agents had been presented with numerous documents in September 2014 by attorney Seiden detailing over 30 properties purchased by Rossini or related entities and many of which were quitclaimed to investors in settlement of Rossini's guarantees. (See Motion to Admit.)

--4126 W. Adams, Chicago quitclaimed to Robert Badalian in partial satisfaction of guaranty agreement (accepted by Badalian).

--4520 W. Jackson, Chicago quitclaimed to Vladimir Moghaddasi in partial satisfaction of guaranty agreement (accepted by Moghaddasi).

--3327 W. Monroe, Chicago quitclaimed to the Assyrian Evangelical Church of San Jose, CA, as partial satisfaction of guaranty (accepted).

---3 properties: 3820 W. Adams, Chicago; 4129 W. Adams, Chicago, and 4139 W. Adams, Chicago—each quitclaimed to Craig Shaffer as partial satisfaction of guaranty agreements (accepted).

11

--Assignments of contracts for the following three properties: 4135 W. Monroe, Chicago, 4654 W. Adams, Chicago, 5131 W. Crystal, Chicago, reassigned to Craig Shaffer as satisfaction of guaranty agreement (accepted).

--16 townhomes in Riverdale IL quitclaimed to Khodi Family Trust in August 2013 as partial satisfaction of guaranty agreements (rejected by Kathy Khodi).

--211 N. Kilbourne, Chicago—mortgage note purchased by Devon Street Investments from the Vertical Mortgage Funding Corp. Transferred to Beneta Badalian as partial satisfaction of guaranty agreement (rejected by Beneta Badalian).

The government failed to present this exculpatory evidence to the grand jury because it conflicted with the government's false and misleading narrative that Rossini was selling non-existent properties.

E. The government agents Evans, Blau and investigator Martinez stated to witnesses in and outside the Grand Jury that Rossini's payments to investors—as per Rossini's Guarantee Agreements—were "lulling payments." The government repeatedly stated, and alleged in its pleadings, that the payments were designed to lull investors into believing they were receiving money to which they were entitled, but the government did not believe they were so entitled. (See Supplement.)

Rossini believed the payments from Murphy were from property rentals and interest and therefore paid them out to investors. According to Judge Richard Posner in *U.S. v. Jaime Lopez*, No. 16-2269 (dissenting opinion, August 29, 2017): "[b]ut they were [not lulling]; the defendant's firm was contractually obligated to make the payments to investors. The district judge had acknowledged before the trial that terming a payment a 'lulling payment' was 'argumentative and had the potential to prejudicially influence the jury' if used in summary evidence." At trial in *Lopez*, the judge allowed the agent to repeat her fraud accusations more than a dozen times. But Judge Posner disagreed, saying this should not have been permitted "to offer such opinion testimony." The conclusion regarding intent was for the jury to make. But this was exactly what the government did in pursuing its false and misleading narrative in this case. Defendant Rossini was contractually obligated by the guarantees--drafted by his lawyer, Thomas W. Murphy. Rossini and Babajan paid for the services of the trusted law firm and lawyer for the preparation of the guarantees. When Murphy defrauded Rossini and Babajan of their invested money (see Supplement, *infra*), he rendered them unable to make good on the guarantees.

F.  The government violated Rossini's Sixth Amendment right to counsel.

In the Fall of 2013 and Spring 2014, Rossini and Theodore Netzky of Seiden Netzky Law Offices negotiated with Barnett Capital for a $3,000,000 loan. Rossini and Netzky had been approved by Barnett Capital, and Rossini paid a $10,000 fee to Barnett's lawyers, Levenfeld & Pearlstein.

Agents Evans and Blau interfered with the loan, and Barnett Capital did not close with Rossini and Netzky. The purpose of the loan was to pay Rossini's guarantees to investors. The government asserted that Rossini's guarantees were in furtherance of the fraud. Incredibly, the government then used the loan interference as part of its argument to remove Seiden Netzky as Rossini's attorneys.

Additionally, so far as the government's aggressive effort to disqualify Defendant's counsel, Seiden and Netzky, it taped a conversation between Candace Wells and Mark Werley. (Government records and bond hearing.). Candace had worked for Netzky for nearly 20 years, during the 80s and 90s, but thereafter remained a homemaker to care for her five children. In May 2014, Netzky requested that Rossini hire Candace part time to assist Rossini in buying and selling larger, commercial properties.

In conversation with the government's wired witness, Mark Werley, (id.) Candace was induced to discuss Rossini. Candace said she was introduced by Ted Netzky because he wanted her to both help Rossini and watch his investments in the Riverdale properties. Netzky told Candace, perhaps in a moment of puffery, that he had invested several hundred thousand in the Riverdale property and wanted her to keep track of how his investment was being handled, and to watch what Bert was doing.

The government knew, from its interference in 2013 with the Barnett Capital loan, above, that Netzky did not invest any money with Rossini in the Riverdale property, nor in any other property. He acted as his attorney of the Seiden Netzky firm.

14

As the government knew, Netzky did attempt to accommodate Rossini with the $3 million loan at Barnett to pay investors. He informed the people at Barnett that he hadn't invested any money, and this, the government knew. Yet, in its January or February 2016 filing, the government falsely asserted that Netzky had invested money, and that therefore he was conflicted in his representation of Rossini. The Seiden law firm pled that the government's allegations were untrue. Defendant Rossini waived the conflict, if one existed. Notwithstanding, this Court agreed with the government, and especially so far as to whether the Seiden Netzky firm were to receive a CJA appointment to act as Rossini's attorneys, and removed them from the case.

G. Agents Evans and Blau abused and intimidated witnesses, particularly those providing exculpatory evidence such as Pamela Sauer, Meir Rotstein, Lisa Rosen, Nubia Rendak and Daniel Ramirez, stating that the government considered them "part of the (Rossini) team," thereby intimidating them. The agents continuously asked witnesses whether they had "googled" Rossini and if they knew about Defendant's record. Meir Rotstein told agent Evans that the Defendant had served his time and deserved another chance. Evans answered "No, he does not."

It is evident from the record (and from verbal statements by the government to co-defendants) that agents inveigled witnesses to make purported claims that Rossini dispensed cash to investors through 3d parties--perhaps with the intention that a 302 agent statement would support the government's false narrative. In one instance, it was a custodial worker,

15

Francisco Cisneros. However, CPA Craig Shaffer had prepared Cisneros' tax returns (Rossini documents produced to the government prior to the grand jury). The written record— Cisneros' tax returns prepared and filed prior to the FBI investigation— directly contradicts a verbal statement he supposedly voluntarily delivered to an agent aggressively seeking to confirm laundering and Ponzi scheming by Rossini.

Agents continually followed Rossini's wife before and after his indictment, especially during her early morning jogs along Sheridan Road in Winnetka IL. Such invasive action in predawn hours of someone not a target is extraordinary.

Prior to Defendant and wife being forced to motel living during this case, federal agents rented the flat below theirs at 928 Elm in Winnetka. One of them continually maneuvered to enter the apartment to look around, and to falsely engage with Defendant's wife, suggesting that his "wife" would come to cook for Defendant and his wife. He offered that his "wife"—who appeared to be self-undernourished—was "a great cook."

It is directly contrary to the manner in which the government treated Tamera Brown and Murphy, even though they used the Hampton Inn, annexed to the motel where Rossini and his wife resided and where federal agents conducted all-night surveillance and questioned the motel employees about Defendant.

16

The surveillance of Mrs. Rossini only ended when she confronted a female agent one early morning in a Winnetka parking lot, asking the agent what she was doing. This conduct reflects the government's prejudice in the investigation.

H. Agents stated to witnesses such as Meir Rotstein that Devon Street's accounting lawsuit against Murphy filed in April 2013 in Cook County Circuit Court, was a sham to lull investors. According to the government, this was proof of Defendant's fraud even though the complaint was filed by attorney Richard Kruse, a 40-year member of the Illinois bar.

Misconduct has permeated this investigation from inception to the present. As detailed herein, the government repeatedly engaged in conduct that by any reasonable and objective measure improperly influenced the witnesses and the grand jury in its decision to indict Rossini.

Routinely providing witnesses with information about Rossini and Babajan's past conduct and supposed intent was misleading and based on the biased and uninformed conclusions of the government agents. Supplying neutral witnesses with supposed facts to manipulate them and the investigation is remarkable and reprehensible.

## ARGUMENT

As the prime statement in this field of the law has it, "While a prosecutor may strike hard blows, he is not at liberty to strike foul ones." *U.S. v. Turner*, 651 F.3d 743, 752 (7 Cir. 2011)

(quoting *Berger*, 295 U.S. at 88). This also pertains to FBI agents and Chicago police assigned to an investigation. This is true whether conducting an investigation or before a grand jury as it is at trial. Courts must enforce these limits. And, "[b]ased on the principles established by the Supreme Court, the Seventh Circuit has held that such "prejudice occurs when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful the decision to indict was free from that violation's considerable influence." *U.S. v. Brooks,* 125 F.3d 484, 498 (7 Cir. 1997).

By not submitting to the grand jury evidence of Rossini and Babajan purchasing mortgage notes from Murphy, and investing in the same instruments as their investors—all victims—the government failed to disclose and omitted exculpatory evidence to the grand jury in violation of Rossini and Babajan's constitutional rights.

The central question is whether the government misconduct threatened to overwhelm the grand jury's independence. The government cannot escape the consequence of its misconduct by arguing that each instance of misconduct must be weighed separately on the scale of prejudice—for example, that agent lies to Anthony Khoshabe and the subsequent suppression of his 1 ½ - hour interrogation was an isolated incident. In point of fact, the Court must consider the "cumulative effect" of the government's misconduct "in determining whether the grand jury's independent role in returning the indictment was usurped." *U.S. v. Turner*, 620 F.Supp. 525, 527-528 (D. Col. 1985) aff'd, 799 F.2d 627 (10 Cir. 1986).

SUPPLEMENT

The government presented a false narrative to the Grand Jury and then supplied only evidence that fit this narrative. An accurate theory of this case is one that should make sense of the existing facts and that fits the law and plausibility.

This Supplement was composed through a search of Murphy documents—many of which, were in the government's possession as a result of past and present investigations, and court matters. As Defendant is in detention, the process of collating the materials for the Court has been concededly protracted. During this time, Defendant made accurate calculations and drawn reasonable conclusions which the government failed to do prior to the Grand Jury, prior to Indictment and thereafter, and which Defendant herewith submits to the Court in support of his Motion and Memorandum.

The government's case is that Defendant Albert Rossini concocted the scheme to defraud investors supplied by Defendant Babajan Khoshabe ("Babajan") and used, directed and ordered attorney Thomas W. Murphy, a partner in five major law firms during a 30-year legal career, in the commission of this fraud.

As the record aptly reflects, Murphy's career has been littered with similar schemes, conversions, mendacity, accusations and financial casuistry. No "googling" would have discovered this, since Murphy "scrubbed" his profile assiduously. The government chose to

23

ignore the Murphy background and then wilfully failed to disclose his well-established patterns to Defendant and to the Court.

(a) Murphy's propensity to blame Rossini for Murphy's fraud, deceit, and dishonesty.
On pages 38-39 of the ARDC Synopsis of Findings, July 2013, Murphy discussed doing business with Rossini. "[a]fter he, [Murphy] began working on the [Martingale] transaction but before April 9, 2010, he [Murphy] became aware that Rossini had been convicted of a financial crime and had spent time in jail but was not aware of the exact circumstances of Rossini's conviction. After discovering Rossini's criminal history, he [Murphy] continued to represent Rossini because his closings were being completed without problems. At a sworn statement on April 22, 2010, [murphy] stated he understood doing business with a person such as Rossini is not only dangerous but foolish and he would be very careful about getting involved in a transaction."

On page 13 of the July 2013 ARDC finding, Murphy testified that he stopped acting as Ray Mobile and M2 Industries' lawyer in 2004. This was purposely deceptive. At Murphy's prior ARDC case, while he was with Johnson & Bell, which involved the young attorney he was training, Richard Perna, as well as attorney Jeffrey Deer, Ray Mobile testified on Murphy's behalf. Furthermore, Ray Mobile's M2 Industries had been insolvent and ceased operations in favor of a successor limited liability company, Metal Networking LLC, that Murphy set up for Ray Mobile.

Rossini met Murphy in October 2007 just as he was leaving federal halfway house, after completing a 41-month sentence for a fraud crime. Rossini arranged financing for the purchase of 1266 S. Orchard, Montgomery IL, a 9-acre property with a 78,000-square-foot manufacturing building for Mobile's Metal Networking LLC.

Defendant Rossini informed Murphy of his sentence and Murphy assured him it was not a problem. He said he was a partner in Prestige Partners Realty Group LLC in Glenview (see Bankruptcy Petition) with Harry Gio, a felon convicted of insurance fraud. Murphy stated he and his law firm gave Gio respectability and both business and banking connections.

(b) Murphy's use of client funds to perpetrate a Ponzi scheme.

M2 Industries was insolvent by 2004 and Murphy formed Metal Networking LLC for Ray Mobile. Mobile had filed a bankruptcy and owed income tax liability; therefore, Murphy organized Metal Networking with Mobile as the LLC manager but without membership interests. Mobile had sole control over company operations; interests were sold to investors who had no control over daily business activity.

Murphy represented investors Steve Shah and Dr. Mark Glazer in their $600,000 investment into Metal Networking LLC. (In the ARDC records, Murphy used part of the Shah and Glazer funds to pay Sanial Trust beneficiaries.). The ARDC findings show also that Murphy had loaned Ray Mobile $100,000 at the time of the earlier ARDC case with Johnson and Bell, at which Mobile testified on behalf of Murphy, but that the loan was never repaid by Mobile.

25

The July 2013 ARDC Synopsis of Findings specifically refers to this type of Murphy activity when it wrote about the Zgonina Insurance Trust and the Mobile-M2 Industries investment. "[a]t no time did [Murphy] advise [them] to seek independent legal advice…or the advantages and risk involved in the representation of both [clients] in the matter."

(c) Murphy converting money from one client to pay previous debts to another client.

According to the ARDC Synopsis of Findings, Murphy, late in the 1990s, served as trustee for the Sanial Trust and issued checks made payable to cash; they were deposited by Ray Mobile or M2 Industries. In 2001, Murphy began making loans from the Zgonina Insurance trust to M2 Industries. Murphy loaned $281,453.58 from the Zgonina Insurance Trust to M2 Industries. From 2002-2007, Murphy wrote checks for Prestige Partners to cash, and these were endorsed by Ray Mobile.

Donna Zgonina, beneficiary of the Casimir Zgonina 2000 Insurance Trust and her lawyer, Mitchell Goldsmith, had been pressing Murphy to account for funds and transactions he directed, as trustee of the Trust, to M2 Industries. Murphy issued a check on August 5, 2002 from a Sanial Trust bank account payable to the Casimir Zgonina Insurance Trust in the amount of $281,453.58. On or about the same date, Murphy endorsed the check "Casimir H. Zgonina 2000 Insurance Trust by Thomas W. Murphy, Trustee," and deposited it into an account he held on behalf of the Zgonina Insurance Trust.

26

In a letter dated August 7, 2002, Murphy advised attorney Goldsmith that transactions had been completed to obtain payment for the Zgonina insurance Trust; he did not turn over the records until October 9, 2002 when he forwarded to Goldsmith a binder with records relating to the Insurance Trust, including M2 transactions, along with a letter stating that $281,453.58 had been deposited into the Zgonina Insurance Trust bank account on August 5, 2002. "As a result of another entity's purchase of the trust's interest in the line of credit, lease and note."

At the ARDC hearing, both Arthur Yackel and Mary Hudson—Sanial Trust beneficiaries-- testified they were not informed that Murphy issued a check from a Sanial Trust account in the amount of $281,453.58 to the Casimir H. Zgonina Insurance Trust, and they did not authorize Murphy to make that payment. Based on the foregoing, the Commission found that Murphy converted $281,453.58 from the Sanial Trust to pay the Casimir Zgonina 2000 Insurance Trust the money it was owed by Ray Mobile and M2 Industries.

In October 2013, parallel to the ARDC disbarment proceeding, a Cook County criminal indictment was pending against Murphy and Rossini for Nina Jozers' monies (i.e., one of the ARDC matters). In October 2015, Rossini was dismissed from the criminal complaint and the State of Illinois held Rossini had not converted Nina Jozers' funds (as similarly held in the ARDC hearing where it was determined that, despite Murphy's testimony under oath and blaming Rossini, that Murphy had converted the Jozers' funds for his own use).

27

Government Conduct Following Rossini Dismissal from State Case, Oct. 2015

Immediately following Rossini's dismissal in October 2015, the federal government began and continued to follow, harass, and attempt to revoke Rossini's bond. If Rossini was revealing of his business dealings or his friends and associates, government agents would descend upon those contacts. They showed up unannounced at doorsteps, homes and offices, questioning them and specifically stating that Rossini "was laundering investor monies." See Defendant's Motion to Admit for detailed account of investor, Rossini, Babajan, and Devon Street monies, and for record and tax returns of custodial worker Francisco Cisneros and of Craig Shaffer, CPA.).

Among the agents' unwitting subjects in Oct. 2015 were the following:

---Candace Wells' home in Lake Geneva WI;

---Cambridge Management office in Northfield IL;

---Thomas Miner's apartment in Streeterville, Chicago;

---Jason Mitan's home in Highland Park;

---Richard Espe's home in Glencoe Il;

---Thomas and Nubia Rendak's apartment in Rogers Park, Chicago;

---Jacob Fine's house in Hawthorne Woods;

---Meir Rotstein's home in Skokie;

---Attorney Richard Kruse at his office, 3924 W. Devon, Lincolnwood IL.

No other conclusion can be made of the federal government's heated efforts following Rossini's dismissal in Murphy's Cook County criminal case in October 2015 except that it was a concerted effort to keep Rossini from earning a living even under the bond restrictions, or from renting a normal apartment instead of a motel room—the agents even went to interview the landlords for residences where Rossini had applied.

No other conclusion can be made of the federal government's heated efforts following Rossini's dismissal in Murphy's Cook County criminal case in October 2015 except that it was a bad-faith enabler of Murphy's pathology—his pattern of shifting blame, and in the last few career instances, shifting blame to Rossini. In Murphy's 2014 Bankruptcy deposition—from which attorney Jeffrey Deer withdrew his appearance because of a "sanctions" matter—Murphy testified under oath to a government attorney that Rossini owed him $30,000 and that he, Murphy, would never get it back because Rossini was "penniless." In point of fact, Murphy had written an NSF check in January 2013 to Rossini in the amount of $31,000.

The October 2015 scenario, of the government interfering in any way possible with Rossini contracts proceeded with all possible dispatch. Agent Evans stated to Devon Street investor Liam Ben David, in October 2015, "We know Bert (Defendant) did it. We just don't know how he did it." Thus, even though there was ample evidence, including the Government's many admissions, that Murphy took the money, somehow Defendant Rossini got the money from Murphy.

In a September 2015 court order of Judge Gilbert, the provisions included the following:

"Rossini could not sell, mortgage or defease any of the properties, mortgage notes, or liens that Rossini owned prior to August 25, 2015 without prior court approval."

Defendant alleges herein that the government ignored the specific language of the court order when, in October 2015, in regard to Defendant's three properties held with Liam Ben David, it conducted a mini swat team operation upon Defendant's showing of a property to prospective buyers.

In August 2012, Defendant had executed a mortgage to Liam Ben David on these three properties: 5410 W. Fulton, Chicago, 4045 W. Wilcox, Chicago, and 4037 W. Adams, Chicago, for a $275,000 loan. The loan was to be used for the purchase of a mortgage note for $150,000 on 2200 N. Kedzie, Chicago (to be owned jointly by Ben David and Defendant Rossini), and towards payment of $125,000 by Rossini to Robert Badalian and for partial payment on Rossini's guarantee. Attorneys for both parties—Ben David and Defendant Rossini—exchanged extensive emails and drew up the contracts and guarantees. Rossini's attorney was Thomas W. Murphy and his firm Berger Newmark.

In October 2015, and while Defendant was represented by attorney Glen Seiden, Defendant asked his property manager, Robert Allen, to meet *potential* buyers of the three properties at the Fulton Street location and to show them the properties. Defendant was under house arrest and Allen was familiar with the properties.

30

Attorney Seiden had informed Mr. Sephergyan, broker for all the buyers, that Rossini would need Magistrate Gilbert's approval before closing on a transaction. Attorney Seiden would present a motion before Judge Gilbert if there was a confirmed transaction.

On the date of showing, Allen met the buyers at the 5410 W. Fulton property. FBI agents, with the Chicago Police, arrived immediately, surrounded the building, and questioned the buyers about why they were there and whether they knew Defendant Rossini was indicted.

This was another sordid example of the government's unwarranted interference, preventing payment on a Rossini guarantee for an investor (Ben David)—whom the government would hope to reduce to the role of "victim."

Then, the government attempted to use "showing of property" as proof that Rossini was circumventing Judge Gilbert's order, as they did at the bond revocation in December 2015.

Yet, according to attorney Seiden, a seasoned lawyer of long-standing, in his legal opinion, Judge Gilbert's order did not state that Defendant Rossini could not place properties for sale, or obtain contracts to sell, or to place additional liens.

Another instance of Murphy blame and the Government's Knowledge:
In another post-October 2015 instance, in November 2015, an arson fire occurred at the home of Murphy's longtime colleague, attorney Jeffrey Deer. At the time, and still pending, attorney

31

Deer was under indictment in Cook County for forgery, perjury, interference with court orders, and money laundering.

The government in the herein case was made aware that Rossini would be testifying in the Murphy criminal case in Cook County from which he had been dismissed. The government attitude was nevertheless persistent about Rossini. It turned to investigate Rossini for his work with Cambridge Management, just as he was investigated with any business in which he became involved.

Murphy and Deer were under pressure to return $78,000 to Cambridge for a check that had been paid to Murphy and Deer. Then, Deer's house was suspiciously torched (details follow below). Murphy and Deer accused Rossini as the arsonist to investigating authorities.

The federal government's strategy was purposefully oblivious to Murphy's conduct, statements, background, and testimony because it had its false narrative from which it would not veer, notwithstanding the facts (U.S. v. Burnside, U.S. v. Stone, U.S. v. Caliendo). Its narrative, which bears repeating, is the one which convinced a Grand Jury to indict Rossini, without the government having looked at the records, and the one which inspired them to charge Rossini as the Macchiavellian schemer and/or launderer where former attorney Murphy suffered the domination of Rossini's directives to put investor money into his (Murphy's) pockets. In light of the Murphy history, the records (ignored, undisclosed or omitted by the government),

32

administrative judgments, and Rossini's comprehensive financial records, Murphy as hapless
Pangloss beggars believability.

I.    CAMBRIDGE MANAGEMENT INC.

Murphy and Rossini were codefendants in a Cook County criminal case instituted September
28, 2013 for the theft of Mrs. Nina Jozer's funds. Mrs. Jozer's daughter, Beneta Alamprese had
deposited $353,000 in Murphy's account in 2010. The conversion of several hundred thousand
dollars led to Murphy's disbarment in May 2014 by the ARDC. In testimony to the ARDC,
Murphy blamed Rossini, stating the Defendant had directed Murphy in disbursing the funds.
The Commission stated Murphy's testimony was not believable. The ARDC findings show
Murphy had continuously, over a 20-year period converted various client moneys to pay money
previously taken from clients—in essence, an in-client Ponzi scheme. Rossini was dismissed
from the State criminal proceedings in October 2015.

However, a year earlier, in May 2014 at Cook County Criminal Court, Murphy, Rossini and
attorney Glen Seiden discussed the possibility of Rossini purchasing or financing through his
contacts from Murphy's clients. This would help Rossini repay his guarantees to investors. It
was agreed at this meeting that transactions would be monitored by Seiden Netzky Law Group
and any escrow funds would be held in Seiden trust accounts.

In June 2015, Murphy asked Defendant to finance the acquisition of Meadowlands Medical
Center by Cambridge Management Inc. Rossini's fee was to be approximately $2,500,000.
Defendant knew of the Cambridge principals Jason Mitan, Thomas Miner and Barbara

Kalinowski, and referred them to attorneys Seiden and Netzky. As per federal bond orders, Seiden informed Judge Gilbert and the government of Rossini having worked on Cambridge prior to the August 2015 federal indictment, and that he continued working on the transaction. The Cambridge principals had been informed as well as their lawyer Jeffrey Deer.

Immediately, agents Evans and Blau descended on Cambridge offices, informing them that Rossini was attempting to launder money he had stolen from investors. This created insurmountable difficulties in completing the transaction. As with the Barnett Capital loan in 2013-2014, the government kept Rossini's guarantees from being paid to investors.

In fact, each time the Defendant or his attorneys complied with court orders to inform the government of details, personal information, business associates or friends, agents descended upon whatever name they were given in an effort to intimidate and contaminate.

II. Prior to indictment, Murphy informed Rossini that attorney Deer was desperate to close the Cambridge transaction because Deer had withdrawn several hundred thousand from the Deer-Stone Law Firm escrow account from a client's insurance settlement. Murphy stated that the client, a businessman, kept his business afloat by borrowing money from Russian businessmen. They were pressuring Deer for a return of their money. Murphy had not reported Deer per the *Himmel* case.

In November 2015, Deer called Defendant at 4 a.m. seeking a telephone number of a broker associated with Deer and Cambridge. Deer said his phone with contacts had been destroyed in

a fire at his home, around 11 p.m. the previous night. The garage and the Porsche parked
outside were unscathed. Several days later, Defendant received a call from Peter Poulos, a
broker-renovation specialist and Murphy client. Murphy and Deer were informing investigating
authorities, falsely, that Rossini was responsible for the suspicious fire at Deer's house. In his 4
a.m. phone call to Rossini, Deer informed Rossini that the contents of his house were insured
for over $550,000.

After the telephone call, Defendant contacted pretrial officer Justin Wiersema and related the
arson information. Officer Wiersema told Rossini to give any investigators his telephone
number since he knew exactly where Defendant was before, during and after the fire.
Interestingly, two of Jeffrey Deer's clients at the time of the arson had been previously
convicted of arson in the 1980s and served ten years in prison.

The government had this information in its possession but once again it did not follow this path
because it did not comport with the government's false narrative so far as Rossini was
concerned.

III.    Murphy failed to disclose in his Bankruptcy filings, sworn statements and deposition
        that he and Tamera Brown purchased a condominium at 5300 W. Atlantic Blvd., No.
        700, Del Ray Beach, Florida 33484. Furthermore, records of the mortgage holder are
        included in the Bankruptcy filings, but it is apparent that the government had no
        interest in the sum total of Murphy's purchases, income and assets. Instead, it
        looked away and spun the narrative that Rossini salted away investor millions --as
        government agents alleged to numerous witnesses in its fervid search for the cash or

35

in its shabby surveillance of Defendant's wife in their home, as well as in the early morning hours of her jogs.

In April 2014, while visiting with Ms. Brown in Del Ray, Murphy was arrested and charged with battering her in a barroom altercation. Subsequently, Tamera Brown telephoned attorney Richard Kruse with her interrogatory answers from the pending civil case against Murphy that she ended contact with Murphy after the battery.

However, in January 2016, Murphy had an assignation with Tamera Brown at the Hampton Inn in Skokie. Murphy was sprightly and upright as he crossed the parking lot to the hotel (annexed to the motel where Defendant was living and where federal agents were on all-night surveillance of Defendant and his wife.). Later, Ms. Brown departed the hotel in her BMW with Florida license plates. At his bond hearing in this case, Murphy alleged serial debilitating physical problems.

It is both interesting and disconcerting that the agents who continually followed Rossini and his wife were not tracking the activities of Murphy and Ms. Brown, especially when at the August 28, 2015 bond hearing, the government pointed out that Murphy had deposited $465,000 into accounts controlled by or with Ms. Brown. In addition, the September 2014 boxes of documents presented to government agents by Attorney Seiden listed an additional $1,500,000 that Murphy concealed with or for Ms. Brown.

Prior to his bankruptcies, in an effort to hide his activities, Murphy failed to make mortgage payments on his family residence at 209 Middleton, Kildeer IL (quitclaimed to his wife in

36

2008). In the June 2, 2014 Rule 2004 hearing, Murphy stated that he had not made

mortgage payments for 11 months. Deutsche Bank filed a foreclosure complaint in 2014.

Yet, he had made, according to Murphy's testimony, $60,000 in payments for 2015 N.

Racine during that period. The Racine property seller, Justin Fox, related it was $600,000.

Thus, Murphy made those payments for the Racine property, purchased the Del Ray Beach

condominium; paid rent at a McClurg Court apartment in Chicago, and made payments on a

late model BMW licensed in Florida.

The following chart shows a portion of the money which Murphy converted from Rossini,

Babajan, Devon Street and its investors.

| EXPENDITURES | MINIMUM | MAXIMUM |
|---|---|---|
| McClurg Court apt. | | |
| from 9/2011-4/2014 | | |
| (31 months @ $1500 | 46,500 | |
| 31 months @ $2000) | | 62,000 |
| Downpayment, 2015 N. Racine | 60,000 | 600,000 |
| Monthly payment 2015 N. Racine | 60,000 | 102,000 |
| Del Ray Beach Condo | 200,000 | 500,000 |
| BMW auto | 40,000 | 100,000 |
| Gov't. stated deposit to Brown | 465,000 | 465,000 |
| Gov't. stated amount Murphy wrote | | |
| to cash | 1,102,954.46 | 1,102,954.46 |
| Legal fees paid to Murphy by | | |

| Devon Street - $5000/transaction | 400,000 | 400,000 |
|---|---|---|
| TOTAL | 2,374,454.46 | 3,331,954.46 |

The money for which Murphy failed to account to Rossini, Babajan, Devon Street, and investors, of between $2,374,454.46 to $3,331,954.46, is direct evidence of his fraudulent intent and his alone. As per his documented custom and habit, Murphy took funds from one investor to pay another in order to cover missing funds.

The evidence of Murphy's expenditures and his testimony in the June 2, 2014 Rule 2004 Bankruptcy hearing are contradictory. Murphy said he made less than $200,000 gross income before expenses during 2011 and 2012. Yet from September 2011 through 2013, he spent a minimum of $1,974,454 on living expenses with Tamera Brown—not including his office expenses, payments to Sanial Trust and for his own family. These calculations were in the records had the government exercised a thoughtful investigation, before it targeted Rossini for indictment.

IV. Murphy maintained the illusion of legitimacy and success by using funds from newer investors to pay "returns" to Rossini, Babajan, Devon Street and its investors. Murphy advised and convinced Rossini to give Devon Street investors guarantees for their funds. Rossini understood the guarantees to be legitimate credit swaps.

38

Murphy himself either ran a Ponzi scheme, as he had done in prior Murphy-related cases, and/or he was double-dealing Rossini, Babajan, Devon Street, and investors. This is a notion unacceptable to the government because Rossini and Babajan are felons; the government was never at a loss for reminding the Court. Yet, are they not "fed with the same food, hurt with the same weapons, subject to the same diseases, healed by the same means, warmed and cooled by the same winter and summer...?"

Rossini and Babajan had a legitimate business model (Rossini's records turned over to government). They ploughed money to Murphy and hired employees in order to make the business a success. Murphy had a sizeable real estate practice. In many instances, Rossini bought many of the properties and, in other instances, Murphy bought them and flipped them as the attorney. These were real property transactions. The government's allegation that Rossini dealt in non-existent properties is patently false.

Murphy was also buying properties himself and selling to others, e.g., a pending Circuit Court of Cook County case of Craig Shaffer v. ICG Properties and Alex Misko (a Murphy client). Rossini and Babajan bought the subject property (3820 W. Adams, Chicago) with Craig Shaffer from Alex Misko and got title Dec. 31, 2010. In January, February and March of 2011, Shaffer, Rossini and Babajan paid for two more properties from Misko: 4135 W. Monroe, Chicago; and 4654 W. Adams, Chicago; and also purchased 5531 W. Crystal, Chicago, from Stephanie Andre, another Murphy client. For these latter three properties, Shaffer, Rossini and Babajan received no title. In the Stephanie Andre instance, she disputed the signature that appeared on the Assignment of Contract to Devon Street, telling attorney

Kruse that it was not hers, and that on seeing Murphy's signatures, she believed it was he who had signed her name to the Assignment. Thus, Rossini could not quitclaim to Shaffer as he had with other properties, because neither Murphy nor Misko turned over the titles. Rossini and Babajan received rentals from Murphy for the next two years, through Dec. 2012, but no titles. Where there had been a transfer of title (as with 4129 W. Adams, Chicago and 4139 W. Adams, Chicago), Rossini quitclaimed to Shaffer.

Murphy was paid $100,000 by Rossini and Babajan for a mortgage note to buy property in 2012. With this, and other such received monies, Murphy likely may have paid Rossini, Babajan Devon Street, and investors with monies he made buying property with Shaffer, Rossini and Babajan, and making money for himself in 2011, 2012 and 2013.

Rossini's guarantees to investors are analogous to credit default swaps, and legitimate. As set forth above in Defendant's Motion and Memorandum of Law, *U.S. v. Jaime Lopez*, No. 16-2269 (dissenting opinion, August 29, 2017), Judge Posner's opinion was that such guarantees leave the guarantor contractually bound. It is the functional equivalent of a credit default swap. There must be a negotiated time frame that determines legitimacy, and in this case, the following codification is applicable: 17 C.F.R. § 39.13(g)(2)(ii)), at (D) "[s]uch longer liquidation time as is appropriate based on the specific characteristics of a particular product or portfolio." See *Bloomberg L.P. vs. Commission FTC*, 949 F.Supp.105 (2013).

In all the instances cited herein, Rossini made every effort to make good on the guarantees until Murphy's NSF checks and litany of fraudulent activity, and then the government's

interference in transactions intended to make investors whole, worked to defeat Rossini's ability and contractual obligation.

In the Fall of 2015, following indictment, and having a close look at the real estate issues, attorney Richard Kruse filed suit against Alex Misko and Stephanie Andre, re 4135 W. Monroe, Chicago and 4654 W. Adams, Chicago. The Seller had been titled in an LLC formed in 2010; it was learned that the LLC was owned by Misko with Murphy as attorney.

In his Bankruptcy deposition, June 2, 2014, government attorney Snell asked Murphy about property at 5551 W. Congress, Chicago. Snell believed Murphy or an LLC owned it. Murphy answered "didn't know the property."

V.    Prestige Partners Realty Group, LLC

Big fraud schemes generally give rise to big prosecutions. They involve numerous transactions and a great many trial exhibits and witnesses (unlike, e.g., agent Evans 2008-2009 investigation and ultimate charging of Defendant Babajan Khoshabe in a mortgage fraud case. It involved one mortgage that resulted in a conviction with restitution and fine totaling $12,500.).

Prestige Partners LLC, a Murphy entity, operated between 2002-2007, in mortgages and bank loans involving over $22 million in losses (per Murphy's testimony in his Rule 2004 Bankruptcy deposition). How selective can the government be in ignoring Prestige Partners' large-scale mortgage fraud, investigated indifferently in 2013, and shifting its prosecution (and blame, as per Murphy's habit) to Defendants Rossini and Babajan?

In this case, the government's list of interviewees includes Bryn Perna (wife of the aforesaid attorney Richard Perna who became embroiled, as Murphy's trainee, in an ARDC hearing where Perna was blamed). Bryn Perna was American Chartered Bank's Executive VP overseeing foreclosures. Murphy had many foreclosure lawsuits with AMC.

In 2008, Defendant Rossini and his then-partner, Tzvi Weissman, attempted to purchase from Murphy 7952 S. Phillips St., Chicago, a multiunit building. Murphy's 2006 AMC loan was $1.8 million, far in excess of the property's appraised value of $600,000 in 2008—which value Murphy had misrepresented to AMC. The transaction could not close. AMC sued Rossini and Murphy for the $35,000 earnest money, and then placed a garnishment on Rossini's Scottrade account.

Murphy informed Defendant that the government was investigating Murphy's partner—the one, conveniently, with a criminal background-- Harry Gio, for mortgage fraud, but that neither Murphy nor Pedersen & Houpt—where he was a partner in those years—were under scrutiny. (Murphy's operation of Prestige is in the Bankruptcy Petition deposition, Murphy's 2014 financial disclosure forms, the World Wide Realty LLC's Motion to Dismiss Murphy's Bankruptcy [World Wide Realty LLC is included below as one of Murphy's "hard-money" financiers], Defendant's Motion to Admit and Motion to Take Judicial Notice).

Murphy testified in 2014 under oath before government attorney Snell that Prestige was a defunct business that dealt in buying and selling properties. Murphy and Prestige LLC, purchased apartment properties to convert to condominiums that were sold to buyers for substantially more than the cost or value of those properties This and the following information

42

is parsed from Murphy's bankruptcies, numerous civil cases involving Murphy, and a 2010 civil case in the Circuit Court of Cook County, American Chartered Bank N.A. vs. Thomas Murphy and Shorewood Partners (Defendant was Shorewood Partners. At some point, Murphy falsely represented to AMC that Shorewood Partners was going to provide the money for his debt. Neither Shorewood nor Defendant were ever involved with the loans. Notwithstanding, when Defendant's Scottrade account was withheld because of undisclosed government subpoenas and interference, Defendant learned his account had a garnishment levied in 2014 by AMC. (Defendant's Motion to Quash).

Sales were financed with mortgages based on property values that were inflated by Murphy. Buyers defaulted on the loans and the mortgages were foreclosed but by which time Murphy had got his profits from the deals made by selling the properties at inflated prices.

The higher the property value, the higher the loan; the higher the sales price, the larger the profit. In order to obtain loans for the highest possible property value, and reap the highest possible profit, Murphy misrepresented to lenders: about true buyers, the source of down payments, the value of the properties, the income and employment of buyers, whether buyers could occupy the properties, and whether properties owned by the buyers were being leased.

Murphy lied about the true owners of the properties to disguise the fact that Prestige was behind the transactions and was actually selling the properties to himself and Prestige. Unbeknownst to the lenders, Murphy recruited people with good credit scores to serve as straw buyers. He had some of them purchase several properties from him, using loans from different lenders, all of which were obtained within a short period of time so that each

43

successive lender would not find out about the other loans to that borrower. Once multiple loans or mortgages showed up on the buyer's credit report-- which typically took a few weeks-- it became difficult for that buyer to qualify for new loans. At that point, the buyer's usefulness to Murphy was at an end and he would recruit a new buyer in the course of running this business.

Murphy lied about the source of the down payments to cover up that he supplied—or Prestige did--most or all the money to the straw buyers.

Lenders want to know that money for a down payment actually comes from the buyer because a buyer who has a substantial stake in the property is considered a better credit risk. Murphy circumvented that safeguard in a variety of ways. He would give a borrower money to park in a bank account long enough for the lender to verify the money's presence, and then Murphy would take it back. He falsified HUD-1 settlement statements that were signed at closing to show "cash from borrower," though the money came from Murphy, Prestige, or an associate. He altered checks from bank accounts of straw buyers or altered the straw buyer's bank account statements. With most or all of the loans, the borrowers signed documents at closing falsely representing that they were supplying the down payment. The government investigating Harry Gio at Prestige's Glenview office in 2013 would have seen the expansive wooden table in use as an assembly of paperwork, cutting-and-pasting, and signing.

Only Murphy's inflated property values could circumvent lenders' loan-to-value requirements and increase the selling price. For example, a bank could make a loan for $200,000 under the

assumption that it was lending 80% on a property worth $250,000 when in reality the bank was lending 133% on a property worth only $150,000.

Murphy needed the cooperation of appraisers for which he paid (as he had but not disclosed in the Tzvi Weissman and Rossini transaction). (Historically in the real estate world, appraisers supported inflated valuations by cherry-picking inappropriate comparative sales; by concealing recent prior sales of the same property for far lower amounts, by including upgrades that had not actually been done, and by neglecting to report conditions that would depress property values, such as a property's proximity to railroad tracks or a landfill or its infestation with black mold.)

Murphy lied about a straw buyer's income on loan applications in order to qualify buyers for loans of the size they were seeking. Those lies in turn required lies about the buyer's income. As part of the lies, some borrowers got "promoted" on their loan applications. Murphy's associates would generate fake W2s and pay stubs, or they would answer phone calls posing as the borrower's employer. These particulars of Murphy mortgage and loan practices, for which he was serially sued, are in routine usage in mortgage fraud indictments brought by the government.

Murphy lied about the intended use of the properties in order to get better loan terms and interest rates available for owner-occupied properties. Lenders operate on the assumption that a borrower will be more motivated to make payments on his own home than on an investment property, which is why investment loans require higher interest rates and larger down payments. As for condos, some developments had restrictions on the percentage of units that

could be rented out, and many lenders would not lend on condo units if the complex owner-occupancy rate was below a certain level. Carrying out Murphy's instructions, straw buyers represented on loan applications that they intended to use the property as their primary residence, even though they were actually buying multiple properties and had no intention of moving in. Other buyers signed their names to blank applications, leaving Murphy to generate whatever false information was necessary to meet the lender's underwriting standards.

Murphy lied about whether residences that buyers already owned and occupied would be leased in order to cover up that the new properties would not be used as residences. And, the straw buyers who did disclose to lenders that they were buying properties for investment needed to show that the properties would produce enough rental income to cover the mortgage payments. Murphy met this need by generating fake lease contracts with nonexistent tenants (AMC lawsuits and motions; New Century Bank), or by inflating the income generated by properties that were actually rented.

Murphy's scheme needed many straw buyers. He recruited. He did so by pitching the model to people known through his family contacts at the Illinois Dept. of Transportation, Streets and Sanitation, Chicago Police and Chicago Firemen. The business model involved buying distressed - apartment buildings on Chicago's south side at a discount, renovating and furnishing them, renting them on lucrative short-term leases, and later, selling them for a profit.

Murphy told "investors" –the straw buyers—that they would not have to put up their own money into the deal—just to sign their name and have good credit. Murphy assured them that he and his associates would take care of mortgage payments, taxes, insurance, association fees,

and all other expenses, and that he would maintain the properties, lease and collect rents and then pay out to the straw buyers any excess rental income.

After the straw buyers purchased properties, they would sign quitclaim deeds, conveying the properties to Prestige. *Those quitclaim deeds were concealed from the lenders and not recorded* until Murphy was ready to resell. Murphy also obtained second mortgages or used the properties as cross-collateral for larger loans.

In order to get money needed for down payments and to purchase large apartment buildings at a discount, Murphy borrowed "hard money' –short term cash loans at double-digit interest rates –from wealthy acquaintances. His financiers included Jeff Kroll of Kroll Investigations, World Wide Realty LLC, and David Katz, from a New York hedge fund.

Murphy further carried out *his scheme* through his Indiana title company, held at some point in Indianapolis with Tamera Brown and later, per his Bankruptcy petitions, at his 70 W. Madison office. That title company would also have held an escrow fund.

The success of his scheme depended on these factors:

1. Purchasing apartment buildings at a significant discount;
2. Obtaining short-term "hard money" loans to purchase and renovate the apartment buildings so the units could be sold as condos;
3. Finding straw buyers willing to place their credit up for Prestige;
4. "Selling" the condos to straw buyers at a high enough price to pay the hard money loan, pay the straw buyers a premium at closing for their signature.

47

The only way Murphy could conceivably stay current on the existing mortgage loans was by using the incoming flow of sales proceeds to make the loan payments on units previously sold to straw buyers.

By November 2007 (the month Defendant first met Murphy), the national mortgage market was collapsing. Most subprime or substandard mortgage bankers collapsed and it became difficult to get mortgage approval for straw buyers.

Although buyers were required to have good credit scores, most lacked the assets to make down payments on properties. Most had difficulty making payments on a loan other than their existing primary residence, let alone on the multiple mortgages that were taken out in their names. In return for their part in the Murphy schemes, buyers were paid between $5000 to $10,000 for each loan transaction.

Some of the properties Murphy bought sat vacant, such as a home on Greenwood in Glenview, Illinois. After building it on a golf course lot for $1.4 million, Murphy used an inflated valuation to sell it to a straw buyer for $2.8 million.

Those lured in as straw buyers by Murphy were not the only ones injured. The neighborhoods where the properties were located suffered from depressed housing values because of the foreclosures that always followed the purchase.

Lenders such as American Chartered Bank began investigating after they noticed a high number of loan defaults; auditors uncovered falsified information and valuations.

Once again the Prestige and Murphy operation shows the government's unwillingness to disclose information where it refutes their false narrative of Defendant directing Murphy in how and when to commit fraud. Defendant did not meet Murphy until Nov. 2007. Murphy operated Prestige from 2002-2007. Prestige is relevant because it shows Murphy's scheming, sophistication and habitual pattern of paying old investors and bank loans with money from new investors and bank loans.

Prestige was a $22 million loss to banks and investors (per Murphy testimony at the 2014 Bankruptcy deposition; every one of the mortgages went into foreclosure. Neither Defendant nor Babajan were involved, especially since they didn't know Murphy at that time.

Murphy's 2014 Bankruptcy was dismissed with prejudice. The government took no action.

Instead, the government engaged proactively in willful ignorance and misconduct in order that charges lay against Defendant Rossini and Babajan, their prior convictions as proof that Thomas W. Murphy was led, a sacrificial lamb, luring investors to a Ponzi scheme.

It is generally understood that willful ignorance is equivalent to knowledge and that culpability presupposes a guilty mind. Is it reasonable to presume, or conjure as in this case, that Rossini and Babajan would pay Murphy hundreds of thousands of their own money to purchase mortgage notes for themselves if they knew the notes were fraudulent...giving Murphy thousands to let him steal from them? Oliver Wendell Holmes, Jr. stated "even a dog knows the difference between being stumbled over or being kicked." Common Law, No. 2, 1888.

So far as this case, and the indictment of Rossini and Babajan, It can be nothing else, to quote the fastidious forensic sleuth, Sherlock Holmes, that "When you exclude the impossible, whatever remains, however improbable, must be the truth."

WHEREFORE Defendant Albert Rossini, pro se, respectfully submits the herein Motion, Memorandum of Law and Supplement, and prays the Court dismiss the Indictment for Prosecutorial Misconduct and/or to find as a matter of law that the government's pleadings against Defendant alleging "non-existent Properties," "lulling," and intent were false and misleading and known by the government to be false and misleading, and for such other and further relief as this Court deems just and equitable.

BY:

_____

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL 60901

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.                          CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

      Defendants.

Defendant Albert Rossini's Motion and Memorandum of Law to Reject and Dismiss the

Government's Substitution of Deliberate Indifference for *Mens Rea*

Defendant Albert Rossini, pro se, respectfully submits this Motion and Memorandum of Law to Reject and Dismiss the Government's substitution of deliberate Indifference for *mens rea*, and in support of which, states as follows:

ARGUMENT

By substituting "deliberate indifference," as the Government promotes, for the statutory element of knowledge, this Court would contradict decades of Supreme Court *mens rea* jurisprudence, beginning with *Morissette v. United States*, 342 U.S. 246 (1952).

Second, *Global-tech Appliances Inc. v. SEB S.A.*, 563 U.S. 754 (2011) expressly rejected deliberate indifferences as a substitute for knowledge.

Third, downgrading knowledge to deliberate indifference would confer even greater discretion on federal prosecutors who already hold enormous power and violate separation of powers.

Fourth, a broad array of federal criminal statutes require proof of a defendant's knowledge. The Supreme Court has held that knowledge of facts constituting criminal conduct is central to criminal responsibility. The "central thought," the Court has declared, is that a person must be "blameworthy in mind" before he can be held accountable for a crime. *Morissette*, 342 U.S. at 252. This principle means "that a defendant generally must know the facts that make his conduct fit the definition of the offense," even if he does not know that the facts give rise to a crime." *Elonis v. United States*, 135 S.Ct. 2001, 2009 (2015) (quoting *Staples v. United States*, 511 U.S. 600, 608, n.3 (1994).

The "blameworthy in mind" principle is so fundamental that even when a criminal statute is silent on *mens rea*, the court generally applies the knowledge element. As the *Elonis* court explained, "'the fact that the statute does not specify any required mental state does not mean that none exists. We have repeatedly held that "mere omission from a criminal enactment of any mention of criminal intent should not be read as dispensing with it." *Elonis*, 135 S.Ct. at 2009 (quoting *Morissette*, 342 U.S. at 250); see, e.g., *Posters 'N Things v. United States*, 511 U.S. 513, 522 (1994) (holding drug paraphernalia statute to require knowledge); *United States v.*

2

*United States Gypsum Co.*, 438 U.S. 422, 438 ·1978) (reading an intent requirement into the Sherman Act).

In keeping with this approach, the Court in *Morissette* interpreted the federal theft statute (18 U.S.C. sec. 641) to require proof that the defendant knew the property at issue belonged to the government. 342 U.S. at 275-76. In *Staples,* the Court held that the statute prohibiting possession of a machine gun required proof that the defendant knew the firearm had automatic firing capability. And in *United States v. X-Citement Video*, 513 U.S. 64 (1994), the Court held that the statute prohibiting certain shipments of visual depictions of minors engaging in sex acts requires proof that the defendant knew that the person depicted was a minor. See. *Id*. at 78.

The aforesaid cases honor strictly the "blameworthy in mind" principle by reading knowledge into criminal statutes that do not expressly state that element. This Court should not dilute the express knowledge element to "deliberate indifference." That would conflict with decades of case law by the Supreme Court and fundamental principles of criminal responsibility.

The Government's position here conflicts with *Global-Tech Appliances, supra.* The Supreme Court recognized (over a dissent by Justice Kennedy) that willful blindness could satisfy a statutory knowledge requirement. But the Court distinguished willful blindness, which can equal knowledge, from "deliberate indifference," which cannot.

3

*Global-Tech* defined the elements of willful blindness as follows: "(1) the defendant must subjectively believe that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id*. at 769. The Court emphasized the defendant must take "deliberate actions" to avoid learning the key fact. "We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id*. at 769-70.

In *Global-Tech*, the Circuit Court required only "deliberate indifference": "[In] demanding only 'deliberate indifference' to that risk [that the disputed fact existed], the Federal Circuit's test does not require active efforts by an inducer to avoid knowing [the fact]." *Id*. at 770; see *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994), equating deliberate indifference and recklessness. As *Global-Tech* and *Farmer* show, "deliberate indifference" and "reckless indifference" are virtually identical for the statutory element of knowledge of falsity.

Replacing the requirement of knowledge with a watered-down "deliberate indifference" standard eliminates an essential layer of protection for ordinary citizens while transferring even greater power to federal prosecutors. See, e.g., *Yates v. United States*, 135 S.Ct. 1074, 1100-01 (2015) (J. Kagan dissenting, and discussing the "overcriminalization and excessive punishment in the U.S. Code" and noting that the statute at issue, by "giving prosecutors too much leverage" is "an emblem of a deeper pathology in the criminal code."); Stephen F. Smith,

4

Overcoming Overcriminalization, 102 *J. Crim. L. and Criminology*, 557 574 (2012) (discussing the importance of strong *mens rea* requirements in constraining prosecutorial discretion). As Justice Scalia stated, "Only someone who has worked in the field of law enforcement can fully appreciate the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (J. Scalia, dissenting). Under a recklessness standard, disputes currently resolved civilly would become criminally prosecutable, further augmenting a prosecutor's arsenal of potential charges.

Judicial downgrading of knowledge to deliberate indifference also violates the separation of powers. When "the judiciary substitutes a lesser mental state for statutorily prescribed knowledge, then it encroaches on the legislative prerogative of defining criminal conduct." Ira P. Robbins, "The Ostrich Instructions: Deliberate Ignorance as a Criminal *Mens Rea*," 81 *J.Crim. L. and Criminology*, 191, 194-95 (1990); see also *United States v. Wiltberger*, 18 U.S. (5 Wheat) 76, 93 (1820) ("It is the legislature, not the court, which is to define a crime and ordain its punishment."); Julie R. O'Sullivan, *Federal White Collar Crime*, sec. D, at 7 (6 Ed. 2016) ("If Congress meant to demand only recklessness, it could have and would have said so. Reading a statute that demands 'knowledge' to be satisfied by 'recklessness,' then, contravenes long-established distinctions in degrees of *mens rea* as well as congressional intent.").

A Court's substitution of deliberate indifference for knowledge, if allowed to stand, risks weakening the *mens rea* element in the broad array of federal criminal statutes requiring proof of knowledge. There is no principled basis for limiting the court's construction of the

"knowingly" element of fraud statutes. The Supreme Court has intervened repeatedly in the past to safeguard this "background assumption" of the criminal law, *Liparota v. United States*, 471 U.S. 419, 426 (1985). This Court should thus disregard the Government's unprincipled subordination of *mens rea* to deliberate indifference–"principled" being a descriptive in emphatic use in the *mens rea* cases and law reports in support of Defendant's Argument.

WHEREFORE Defendant Albert Rossini, pro se, respectfully submits the Motion and Memorandum of Law to Reject, Strike and Dismiss the Government's substitution of deliberate indifference for *mens rea*, and for such other and further relief as this Court deems just and equitable.

BY:

_____

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL  60901

**1. The why and wherefore of Murphy's origination of the "scheme."**

Apparently, a Ponzi scheme had been a modus operandi of Thomas W. Murphy from, at least, the early 1990s. Murphy "loaned" or invested over $2 million from the Casey Ciani Trust of which Murphy was the Administrator in the early 1990s to Ray Mobile of M-3 LLC, later Metal Networking LLC. When Mobile failed to pay back any of the money, Murphy "borrowed" funds from the Arthur Sanial Trust, of which he was also Administrator, to deposit to the Ciani Trust in order to continue making Trust payments from the Ciani Trust to beneficiaries, always trying to keep enough in the Sanial Trust to pay those beneficiaries.

In the last several years, I met former Murphy clients who stated Murphy would extract and/or convert their funds to repay the trusts.

- A. Specific clients were: Steve Shah of Lincolnwood IL; Mark Glazer, Highland Park IL. They deposited approximately $800,000 with Murphy of which at least half went to Mobile and the remainder to partially reimburse the Ciani and Sanial Trusts.
- B. The ARDC in its judgment of disbarment named Nina Jozers/Frank Alamprese as an example of his scheme in which Murphy diverted $250,000 deposited with him for a real estate transaction. Most of that money went to the Arthur Sanial Trust to make payments to its beneficiaries.
- C. In early 2000-2001, Murphy formed an LLC Prestige Realty Partners with his client Harry Gio, Glenview IL. Harry had spent several years in federal prison for setting up and operating a non-registered Illinois insurance company. Harry subsequently told me that he and Murphy did business because Murphy had an excellent reputation, he was very smart, and he also promised that as a client, Harry's past would be hidden by the name of Pedersen & Houpt where Murphy worked as a partner, according to Murphy. Murphy had very prominent clients (Prospect Airport Services, the Chicago Archdiocese, Congregation of the Fathers of the Resurrection, Gordon Tech High School, New Century Bank) Also Murphy said he had excellent banking relationships with American Chartered Bank and US. Bank.

  Prestige would find and purchase apartment buildings concentrating on southside buildings that were relatively cheap to purchase. Murphy would obtain the purchase and renovation loans, and do all the condo conversion legal work after a cosmetic renovation. Then Harry and Murphy would sell the condo units to "straw" buyers from the Illinois Dept. of Transportation, many of whom were introduced by John "Quarters" Boyle; the Secretary of State employees, police and firemen. The "straw" buyers would be paid $5000 each time they purchased a condo, plus receive a portion of each month's rent on the condo after Prestige made the monthly mortgage payments. However, monthly mortgage payments

1

could not be made by the rental payments since rental payments on the southside Chicago condos rarely exceeded $1500 per month while the mortgage principal for each condo often exceeded $300,000 or around $3,000 mortgage payment per month.

Consequently, Murphy and Harry needed to keep purchasing apartment buildings, renovating to make them condominium worthy and then sell off to "straw" buyers at a high enough price to pay off the original purchase and construction loan and have money remaining to make mortgage payments on previous condo conversion transactions. They needed "straw" buyers because only straw buyers were certain to qualify for the large mortgages that the inflated appraisals commanded. Also, straw buyers would not be slow to finalize a transaction the way a real buyer would.

In 2007 alone, Prestige paid approximately $3 million mortgage payments. However, by late 2007, most mortgage banks had either frozen their loans or had bankrupted due to the house price collapse. Consequently, Prestige was unable to make the mortgage payments nor make any monthly rental payments to "straw" buyers.

Harry Gio once showed me over a million dollars in checks Murphy had either made out to "Cash" or himself and then endorsed by Ray Mobile, all drawn on Prestige bank accounts. This was in addition to the money with drawn from Prestige bank accounts for deposit to the Ciani and Sanial Trusts to make beneficiary payments.

So , Murphy's actions with Prestige have a similarity to his actions with us. Pay previous investments with present and future transactions.

Harry Gio is located I Glenview and would probably be a witness if we wanted and/or needed him.

D.  Murphy worked at Johnson & Bell Law Offices in the 1980s and early 1990s He had two subordinate attorneys working and training under his direction: Jeffrey Deer and Jack Perna. An ARDC-like problem developed according to Jeff Deer and Murphy blamed Jack Perna Years later Ray Mobile told me the reason he never repaid any money to Murphy was because Mobile had testified o Murphy's behalf and that saved Murphy Regardless Murphy had to leave Johnson & Bell where his wife, Christine, had become director of Human Resources Years later, Jack's wife, Bryn Perna, became director of "bad loans" at American Charter Bank and sued Murphy for several million dollars in loan defaults.

2

2. **Murphy's presentation to us of notes and mortgages. When, where, and who was present. Were there confirming emails of what had been discussed.**

Murphy initially brought up the idea of purchasing commercial notes and mortgages when Prestige Realty Partners, his company with Harry Gio, collapsed. His idea was for a new company to purchase the defaulting notes of Prestige with loans from the same banks that were foreclosing on Prestige. The idea did not succeed since the banks, especially American Charter, wanted to sue Murphy on his guarantees.

I used Murphy's idea with Dupage National Bank, owned by the McCracken family. President Kevin McCracken brought the idea up to FDIC inspectors since DuPage National was under a "cease and desist" order not to make further loans. The FDIC inspectors, according to McCracken, approved the idea since the new loan would just be, in essence, a transfer of "bad paper" into "good paper."

Several years later, in 2010, Murphy spoke to me about the bad condo loan portfolio at New Century Bank where he often acted as counsel. Murphy's idea was to purchase bulk loan portfolios at a discount. My partners and associates were already exploring this so Murphy's expanded bank contacts were very interesting to me and to my associates.

I had several meetings at Pedersen & Houpt with Murphy concerning the purchase process I then spoke to Babajan Khoshabe. Tszvika Wiessman, Meir Rotstein, attorney Anthony Klytta and others about purchasing the notes and mortgages at a discount, and reselling the notes at higher prices; modifying existing loans or foreclosing on the notes The concept was an excellent idea There are thousands of emails that I need to read prior to trail concerning business with Murphy.

3

**3. As an expert, what "due diligence" did I perform to verify the substance of Murphy's proposition? Paperwork and dates. Did I have prior experience with him in successful financial transactions of notes and mortgages?**

I read constantly on the purchase strategies for notes, mortgages, short sales and bank-owned properties. I read case studies of Merrill Lynch's sale of billions in foreclosed or delinquent notes and mortgages. Some of the books I read were: *A Failure of Capitalism* by Richard Posner, books by Nouriel Roubini and Meredith Whitney, together with many law review treatises about defaulted notes and mortgages. I am sophisticated from years as a stock broker, trader, and real estate investor. The central reasons I did business with Murphy was his expertise, Pedersen & Houpt's reputation and banking connections to transact notes and mortgages, and Murphy had completed some successful and lucrative transactions with me.

Purchase of 1206 S. Orchard Industrial Bldg. in Montgomery IL.

SBA loan for Metal Networking LLC.

Purchase of foreclosure from Eastern Savings Bank for property at 50 N. Spring St., Elgin IL.

2706 E. 76th Place, Chicago IL.

4. **Why did Murphy happen to come to me? Did he know I had Babajan sources? If so, how did he come to know it? Why was I anxious to get involved? Did we invest?**

A. Murphy constantly solicited me for business. He consistently asked me for referrals, transactions, investors, and he always brought up notes, mortgages and short sale purchases. Murphy told me he had several short sale brokers as clients and they had excellent banking connections to purchase notes, mortgages, and short sales: Alex Mysko, Ron Vergara of ICG Properties, Stephanie Andre of Leo Matthews Inc.

B. As we discussed this, Murphy persisted in finding investors and I said that Babajan would be a good partner because of 1. His vast knowledge of the mortgage business owning Nationwide Mortgage for 20 years, and 2. His connections in the Assyrian and Iranian community for investors

C. I was anxious to be involved because the loan brokerage business and mortgage origination business as in 2010 almost non-existent. Money was very difficult to make in the real estate business during 2009 and 2010. So, Murphy's idea of purchasing residential notes and mortgages was very enticing as a business After researching the regulations, I realized that not being a registered broker-dealer, we could not buy and sell residential notes and mortgages on one to four unit buildings. They were considered securities. But, we could buy and hold the notes and mortgages. Murphy and apparently other lawyers at Pedersen & Houpt concurred in my research and I have emails back and forth with Murphy discussing this issue. Murphy advised that Devon Street Investments, Ltd. be set up as the purchaser of the notes and mortgages with me as Devon's shareholder. With the help of Babajan and brokers, Devon would obtain investors as lenders to Devon for the purchase of the notes and mortgages Once purchased, Devon, using Murphy's firm, would foreclose on the notes and mortgages and upon obtaining title to the properties, the deeds would be transferred to the investor/lenders to pay off the loans used to purchase the notes and mortgages.

D. Babajan, Anthony Khoshabe, and I invested over $900,000 of money we made from the investor/lenders on flip profits with Murphy so that Murphy could buy for us the same type notes and mortgages he was purchasing for Devon with the investor/lenders' money. All the money Babajan, Anthony and I invested to buy notes and mortgages was from the profits we received from Murphy on the notes and mortgages.

5

5. **How did Murphy Know Babajan had a storehouse of contacts? Did Murphy target them as pigeons? Or were I and Babajan the ones he targeted?**

    A. I told Murphy about Babajan's contacts and after that he spoke with Babajan who confirmed that he had a great number of investors.

    B. Murphy rarely, if ever, spoke to the investor-lenders directly. He always spoke and corresponded with me, occasionally with Babajan, and sometimes with Fred Khoshabe. Murphy therefore directly targeted e and Babajan, occasionally Fred Khoshabe. However, indirectly, thorough Fred and Babajan Khoshabe, telling investors to "google" Murphy, Pedersen & Houpt and then Berger-Newmark, Murphy's firm from September 2011, indirectly targeted the investors. Until the 2014 ARDC judgment, Murphy had an exemplary google presence. In fact, Murphy had at least one person, Peter Poulos' son, "scrubbing" Murphy's online presence Peter Poulos told me this in 2015.

## 6. Were any of the investors experienced? English-speaking, sophisticated?

All spoke and read English. Many of the investors were very soph9isticated. Robert Badalian worked as an executive at a high tech firm. His wife was a Toshiba executive and sent us laptops. Beneta Badalian was an accountant. Vladimir Moghadassi was an executive vice president at Apple. Kathy Khodi managed Iranian money in the U.S. Raymond and Susan Babaghliu are real estate developers. Nastors Moshi owned a metal polishing plant in Phoenix, Arizona. Benvar Lazar was a doctor, defrocked for a sexual abuse complaint by a patient. Katayoun Kazemi was well-educated. Most were on the board of trustees of the San Jose Assyrian Evangelical Church.

Janet Khoshaba was a salesperson for stores selling tableware. Juliet Khoshaba worked in the HSBC Bank finance department. Arvikiram Pithyou was an Assyrian priest who had made money speculating on real estate. St. Odisho Church of the East was represented by a board of directors who made investment decisions according to its pastor Father Ninos.

The Chicago Moshi family was not sophisticated but had owned convenience and grocery stores in Chicago and in Arizona.

7

**7. Why would Murphy think we didn't know what he was up to? What were some of his come-ons or "lulling"? How many paid invoices do we have from Pedersen and did they itemize what was being paid for?**

As previously stated, one to four family mortgage notes were considered securities and could only be sold by a broker dealer. We were not broker dealers and could only purchase notes, but not sell them. I understood this both from Murphy's counseling and from a large Illinois investor Andy Lee. Andy advertised that he bought and sold notes (internet advertising) and was sanctioned by the Illinois Dept. of Professional Responsibility. I was visited by the same agent who investigated Andy and told him we had not sold one note. Attorney Glenn Seiden also spoke to the agent and the investigation was dropped.

A. I bring this up because it was the "lull" that Murphy used to "hold" the notes and mortgages he was supposedly purchasing for Devon Street and its investor-lenders in his escrow account—so that investor-lenders would have protection, and Devon, I nor Babajan could be blamed for impropriety. Consequently, Murphy kept all notes and mortgages, property deeds, tax bills and related documentation.

In 2010 and 2011, whenever we needed the documentation for a sale of the actual property, he was able to produce at closing. Examples are: 3327 W. Monroe, 4037 W. Adams, 8435 S. Burley, 4126 W. Adams, 5410 W. Fulton, 4045 W. Wilcox and 3820 W. Adams. Possibly it was luck that the initial transactions were successful and Murphy had not yet started scamming us or he had not yet met Tamara Brown (Sept. 2011), but transactions seemed to be progressing as they should.

One problem developed in May 2011 when Craig Shaffer sought the deeds to short sales he had invested in through Devon Street. I could not provide the deeds because I did not have them. I asked Murphy where the deeds were to 4135 W. Monroe, 4654 W. Adams and 5131 W. Crystal. Murphy explained that in the short sale process, the bank owning the mortgage that allowed a sale at reduced amount (short sale) would not consent to a further transfer of the sold property from the short sale buyer to another for 3 months to as much as one year, depending on the transaction terms. Each transaction was different. Murphy's client, short sale broker Alex Mysko, had purchased properties at short sale and Murphy and Pedersen & Houpt guaranteed transfer. Murphy said I could sign a guarantee to Shaffer and others that either they would receive the deed or a return of investment-loan. Murphy said Pedersen & Houpt stood behind this. It was also the affirmation Babajan required. Thereafter, with the Murphy assurance, Babajan search for the investor-lenders that Murphy requested.

I did not just take this for granted as I had handled the closing for 3820 W. Adams, Chicago. Craig and I attempted to sell the property to Mitch Isler and had to wait 90 days for Devon to receive title (which I did) and then an additional 90 days for transfer to Shaffer. At the requisite time, I transferred the property to Craig. Consequently, I spoke to underwriters at Stuart Title and they confirmed what Murphy said about short sale transfer time frames.

B.   Pedersen & Houpt, and later Murphy's firm of Berger Newmark, sent Devon Street
Investments Ltd. Its monthly invoices. I did not pay monthly but would pay every few
months as the invoices accumulated. At the same time, Murphy and his firms were paid
$5000 to $8000 for each mortgage note and short sale transaction they handled for Devon
Street. The billing statements were for work on litigation, building court and zoning cases,
composing of guarantees and secretary of state processing of corporate documents.

9.

**8. Has someone ever subpoenaed Murphy's timesheets for all the relevant periods and from all the relevant law firms?**

A. Devon Street, Babajan and I have not subpoenaed Murphy's timesheets from Pedersen & Houpt nor Berger Newmark.

B. In April 2013, Attorney Richard Kruse, representing Devon Street Investments Ltd, filed an Accounting Complaint in Cook County Chancery Court for an accounting and presentation of all notes, mortgages, rental and interest payments and collateral documents. Murphy signed an agreed order stating he would provide the material. Soon Murphy called and asked me to send him a copy of all rental and interest payments I had on file. Murphy knew, from visits to the Devon Street office that I kept good records on payments. Murphy told Attorney Kruse and me that he should have hired a secretary just to handle the Devon Street transactions—probably 100 transactions—over the last 3 years. Murphy admitted he was completely disorganized as to paperwork and would need additional time. He then filed a bankruptcy petition that stalled the proceedings.

C. California investors led by Robert Badalian filed a malpractice and fraud lawsuit in Cook County Law Div. in Fall 2013. Murphy continued the proceedings with serial bankruptcy filings and not providing much documentation in the filings.

D. I then hired Attorney Anthony Klytta to search the foreclosure suits for each property in which we had purchased the notes and mortgages. Attorney Klytta researched each file and made copies of the notes, mortgages and relevant materials.

**9. When did Murphy meet Babajan and if he hadn't, why? How would Babajan have trusted the verity of the transactions without having met him?**

A. Babajan met Murphy at our office, 3924 W. Devon St., Lincolnwood IL 60712 in 2009. In 2010, Murphy handled the closings of the Stein Las Cruces, New Mexico loan and a loan for Maria Marcellas, both organized by Babajan. Murphy also conferred with Babajan on the sale of two Babajan/Anthony Khoshabe owned properties in Burbank IL.

B. Babajan would not have trusted the verity of the transactions without having met and worked with Murphy on previous successful transactions. Babajan said he did not trust Murphy but trusted him while at either Pedersen or Berger Newmark. It was Babajan who wanted all cashier checks from investor-lenders to be made payable to "Thomas Murphy Attorney/Agent." Babajan believe this protected us in each transaction. He then wanted Murphy to send us payment for the "flip" profits, interest, etc. Babajan set it up so all payments went to Thomas Murphy, the attorney and holder of the escrow accounts through his firm.

C. In fact, Fred Khoshabe was the chief early proponent of payments going to Murphy. At the start, Babajan and I would have investors like Craig Shaffer and Robert Badalian make the cashier's checks for the price of the notes, mortgages and short sales payable to the title company involved. Then the flip profits payable to me and Babajan were paid to us by the investor-lender. The investor would know how much we were making per transaction. Fred Khoshabe did not want the investor-lenders to know how much we were making. That is why all checks from July 2011 were made payable to "Thomas Murphy, Attorney-Agent."

A

10. **When did Murphy meet with the investors? If not, why not? Why would you think it not proper to meet with them formally at the firm?**

A. Fred Khoshabe did not want investors from California to meet with Murphy when in Chicago. The California Assyrians were our initial group of investors and they were brought in by Fred. He wanted them to google Murphy and his firm(s), but he did not want them to have contact with Murphy. Fred was afraid the investors would 1. Find out how much money we were making and/or 2. Go around us and do business directly with Murphy and his firm(s). Babajan concurred with Fred's opinion, at least on the latter reasons.

B. I went along with Fred's stance to keep investors away from Murphy and his firm because the Assyrians, 95% of our investor-lenders, were controlled by Fred Khoshabe, Babajan and Babajan's brother-in-law, Abraham Yousif. When it came to an investor I brought, such as Hiam Ben David or Jeff Won, and Wally Ayish, I had them and their attorney deal directly with Murphy. I didn't see the need to keep investors from our lawyer because I did not believe they would circumvent us and deal with Murphy without us. I saw nothing wrong in the way Murphy was handling transactions, so why would I keep an investor's lawyer from speaking with Murphy. I was assuming lawyers for the various banks Murphy was negotiating note purchases were constantly in touch with him so why not the investors and their attorneys? The investors were sophisticated and keeping them from our attorney did not seem advantageous to me.

However, as to the Assyrians in California, Arizona and Chicago, they were controlled by Fred, Babajan and Abraham. If I wanted them to invest or lend, it had to be on the Khoshabe terms.

5

12.

11. **What did Babajan say and to whom, about these Investors**?

Babajan told me he had many investors willing to participate in foreclosures through notes, mortgages and short sales.

**Had they invested with him before**?

Several, such as Craig Shaffer, Robert Badalian, Abraham Yousif and Fred Khoshabe had invested with Babajan.

**Had he charged them exorbitant commissions before**?

I told Babajan that based on my conversations with Murphy in 2010 and 2011; Andy Lee in 2011; and the State of Illinois Professional Regulations Representative, and later verified by attorney Glen Seiden in April 2012, we could not sell notes as we were not broker-dealers. Therefore, we needed to state to investors the total price it would cost for Devon to purchase the notes and mortgages, legal fees, and our "flip profits." That was the amount the investors needed to loan us and upon Devon getting title to the property, they would be transferred to the investors as full payment of the loan(s). There are no regulations governing how much we could make per transaction as we were not selling notes and not broker-dealers. I do not know what Babajan had charged investors on transactions I was not involved in.

**Had they discussed prior investment matters with their attorneys**?

I do not know.

12. **It is hard to believe that the investors let go large sums of money without consulting attorneys. Certainly there must have been some who did and some attorneys who contacted Murphy. There must be corresponding paperwork.**

Attorneys for Jeff Wong and Hiam Ben David had extensive contact with Murphy concerning their transactions. Mark Stargis contacted Murphy on behalf of Anwar Michael. Both Babajan and I encouraged investors to have their attorneys contact Murphy, especially if they needed expanded guarantee documentation. There is documentation in the Wong, Ben David and Michael files.

13. **What was the paperwork drafted, by whom, where, when, and the details regarding the notes and mortgages and the investors' liabilities, earnings, commissions to 3d parties**?

Murphy composed all documentation and forwarded such to me for execution. He wrote all commission checks and flip profit checks. Babajan and I would instruct Murphy how much and to whom to write the commission and flip profit checks. Murphy kept the note purchase amount in order to purchase the notes from the different banks. Also, Murphy wrote the investor interest payment checks often to Reliant Management and Devon Street Management for further payment to investors or direct from Murphy to investors.

**Why did Murphy occasionally write investor interest and earnings checks to Reliant Management and Devon Street Management instead of always to investors?**

Fred Khoshabe wanted Anthony Khoshabe to set up Reliant Management Ltd. So that Anthony could earn an additional 5 to 10% management fee from each investor and also have money available to pay insurance premiums on the properties we were acquiring for the investors. After deducting the 5 to 10% management fee, Anthony would remit the remainder to the investors monthly.

**14. For Murphy to accumulate these packages of notes and mortgages that were bogus must have occurred in a time and place. Did he sit in his office and tabulate? Put into files? Add in secretarial correspondence? Add to his timesheets?**

Often, Babajan and I would review notes and mortgages being sold by various banks on sites such as Realty Trac, Loop Net, Debt X and Lisa Rosen oversaw a crew of workers constantly soliciting banks for notes and mortgages. We emailed to Murphy, or faxed to him, each note, mortgage or short sale we were interested in acquiring. Murphy would then contact the bank attorney to purchase the note or short sale.

At other times, Murphy had the direct contacts with the bank attorneys and would present transactions to me for approval. If Babajan and I liked the underlying property and note pricing, Babajan would call an investor or a broker to find an investor so Devon could purchase the note or short sale.

I kept a file of every property we asked Murphy to attempt to buy even if he was unsuccessful in purchasing the note or short sale. Murphy said he had all the notes, mortgages, deeds, for each consummated transaction. In May 2013, Murphy signed an Agreed Order with Attorney Richard Kruse in the Cook County Chancery accounting case, stating he would present to us the documentation on each transaction but he ever did so.

In fact, Murphy asked me to send him what accounting Anthony, Fred and I had so Murphy could match them to his "admittedly sloppy bookkeeping."

Murphy was paid $5,000 to $8,000 by us for each transaction that he closed. Murphy handled all the transactions in 2010 through August 2011 from the Pedersen & Houpt offices at 161 N. Clark St., Chicago. Starting in September 2011, Murphy worked and handled transactions from the Berger Newmark offices at both 70 W. Madison, Chicago or 1953 N. Tripp Ave., Chicago. He said he had all the documentation at the Berger Newmark offices on Tripp Avenue. Babajan visited the Berger Newmark offices at 1753 N. Tripp to meet, without warning, Murphy and his partners. Murphy was not there and the partner Babajan spoke to, Lynn Soto, knew nothing of the transactions.

15. **Who reviewed these documents with Investors**?

Babajan and I reviewed any documents presented by Murphy and our (Babajan and I) valuations with Fred Khoshabe for the California investors. Then Fred would present them with the documentation and explain further to them: Robert Badalian, Raymond Baboghli, Kathy Khodi, Assyrian Evangelical Church Board of Trustees, Henry Hormozian, Benver Lazar, Katayoun Kazemi, Vladimir Mogadassi, and Beneta Badalian.

Babajan and /or I would explain the documentation to other investors: Janet Khoshaba, John Khoshaba, Valentina Moshi, Fidel Moshi, Havanna Moshi, Abraham Yousef, Awiquam Pithyou, Stiodisho Church— Father Ninos, Slawomir Byrja, Liam Ben David, Anwar Michael, Nastors Moshi, Albert Khamis, Jeff Wong.

### Did Murphy ever deal with them individually?

From time to time, but not often, Murphy would speak to an investor, but only when they called him. We did not encourage the investors to call Murphy but we did not discourage them when they asked. They all had his information from the internet and Fred, Babajan and I encouraged the investors to look up both his personal information and that of his firm.

### Did any Investor whatsoever have a family member of lawyer contact you or Murphy?

Lawyers for Liam Ben David, Jeff Wong, and Anwar Michael contacted Murphy and worked out guaranty agreements with him on transactions and their details.

### 17. How was Money transacted? Did Murphy give them each the instructions as to whom checks were to be made payable for which notes and Mortgages?

Investors were told by Babajan or Fred Khoshabe—after Murphy told us the price of the notes. Babajan and I would determine the "flip price" to investors. Then we would confer with Fred Khoshabe for the California investors or with Abraham Yousif for money of the other investors before setting a final price. Then Fred would tell the California investors to prepare a cashier's check for the amount and send usually overnight to the Devon Street address. Fred would instruct the California investors to make the checks payable to Thomas Murphy, attorney and agent, with the property address and PIN on the ledger portion of the cashier's check. Murphy would either come to the Devon St. office to pick up the checks or I would drop them off at his office.

Every now and then, an investor would wire funds to Murphy's bank account. On those occasions, Babajan, Fred, or I would tell the investor Murphy's wiring instructions. Murphy gave wiring instructions himself to Liam Ben David's attorney.

### For what would be the commissions?

Once Murphy told me the not purchase price, Babajan and I would determine the "flip price" to investors. We would confer with Fred Khoshabe before deciding on how much each of us would be paid

for the transactions if it involved California investors, except Liam Ben David who was my customer. On Liam, Meir Rotstein and I would confer on the commission paid and to whom.

Babajan had the majority decision on other Assyrian investors and I decided commission amounts on transactions involving Slavomir Byrja.

**How could there not have been paperwork exchanges?**

When purchasing a note, it was important to have the money on hand to complete the transaction as soon as the price was settled between Murphy and us (Babajan and me) and then Murphy and the relevant bank was buying from. So, in almost all cases, except bulk sale transactions, such as the North Community Bank portfolio, Rockford-Commercial Mortgage Bank portfolio, the Amcorp portfolio, and the Ocwen portfolio, we did not have time to withhold money—according to Murphy—before having the money available. This was actually reasonable, since we did not want to agree to the purchase of a bank note and not be able to close due to not having the money.

**How could the Bishop have done so without his Board approval?**

The Boards of the Assyrian Evangelical Church of San Jose, St. Odisho Church of the East on Pulaski Ave., in Chicago, both had board approval prior to transactions. Awiquam Pithyou did not need approval investing personal funds.

18. **What paperwork exists that shows you, or Murphy, advised investors to seek legal counsel, to review the "guarantee" verbiage, to review the amount of the commissions paid, and to review the feasibility of excellent returns on the notes and mortgages?**

I do not believe there is anything—any paperwork—and maybe a few intermittent emails in which either Murphy or I advised investors to seek legal counsel to review the "guarantee" verbiage. However, as to these several investors: Liam Ben David, Jeff Wong, Kathy Khodi and Anwar Michael, their attorneys worked with Murphy in revising their particular guarantees. None of their attorneys questioned the pricing of the notes and mortgages as that was a business and not a legal decision or opinion; the same for the return on the notes and mortgages.

Babajan told his Assyrian investors on more than one occasion that if they wanted to get lawyers involved, they did not need to invest with us. He did not want the delay he believed was associated with lawyer involvement.

19. **What was the correspondence with the insurers re premiums on these properties? Who suggested the insurers? Was correspondence sent to the firm or Murphy about regular payments of insurance premiums?**

Babajan and I believed we need to insure each property we believed Murphy had purchased notes and mortgages for us. Typically a bank will force insurance on the property in foreclosures, even if it has to

pay the premiums, since normally a borrower in foreclosure will not have the money to do so. I believed we needed to do the same thing. We first started with a company from the western suburbs but when they had us pay premiums and we found they could not insure the properties, we complained to the Illinois Insurance Commissioner and received a return of some premiums (file in storage).

Then Meir Rotstein referred us to Sol Eisenberg of Evergreen Insurance Brokers in NYC, an Orthodox group, very diligent and honest. They represented Seattle Specialty Insurance Company, an insurer specializing in lender insurance for properties where the insured was the note and mortgage holder. Our insurance premiums were $14,000 per month through 2012, about $6,000-$8000 per month from September 2011 through 2012 (about January 2012), but that was because we had not as many notes and mortgages and did not need to insure the underlying properties.

All correspondence with the insurance broker, Evergreen and Seattle Specialty Insurance Company was addressed to Devon Street Investments Ltd., 3924 W. Devon, Lincolnwood IL 60712 by regular mail and email. Devon and, occasionally, Reliant Management, paid all premiums.

20. **Why did Babajan and I pay for the insurance?**

I realized that most people in foreclosure do not pay or cannot pay their homeowner insurance premiums. Therefore the mortgage holder usually pays the premiums to protect its investment and charges it to the owner. Babajan and I believed we need to protect our investment and the investors by purchasing insurance on every property Murphy supposedly purchased notes for, as well as properties we had purchased outright.

In August 2011, I purchased with Assyrian Evangelical Church of San Jose investment, a short sale of 3327 W. Monroe, Chicago. After the requisite 90-day period, Devon Street quitclaimed the property to the Church. We transferred the State Farm Insurance to the Church. Our (the Church) investment to purchase and pay Babajan and my "flip profits" was $75,000. The building burned down, a total loss. State Farm paid the Church $225,000 plus $30,000 for demolition. IT was a good example of why Babajan and I wanted and paid for insurance.

**From what source did these payments come**?

We charged each investor between 5% management fee to the Churches and 10% management fee for all other investors. So, from the interest payments made to investors each month, we deducted 10% and used this to pay for insurance and maintenance costs such as Francisco Cisneros pay, security on the buildings, etc.

**Didn't the investors have to pay for insurance premiums**?

As stated, the investors paid out of the management fee deducted from interest paid to investors. However, often the premium would become due prior to the interest payments being received from Murphy. In those instances, Babajan and I paid the insurance premiums so as not to lose coverage.

21. **Were there separate accounts for the payments of investors' costs—such as premiums—or was it a completely mingled, informal and chaotic payment system**?

We tried to pay all costs from the 10% management fee deducted from investor interest payments. Often, this was not possible because the 10% management fee was not enough to offset costs. Then, Babajan and I would pay—usually me.

22. **On what date did you have an idea that Murphy had mingled investor monies for his own purposes? Did he also use your and Babajan's**?

In October 2012, Murphy said he and his father's ward, Tamera Brown, were buying a house at 2015 N. Racine, Chicago. Murphy's father had made him promise to take care of Tamera. It was, according to Murphy, his father's death bed request.

18

23. **Were your and Babajan's monies from the commissions? What is the reasoning that it was your earned monies**?

The money—mine and Babajan's—was from "flip profits" on each transaction, or commissions. Babajan and I believed the transactions with Murphy were bona fide. As per my guarantee agreements with investors, I (and Babajan, Fred and Anthony) could use the "flip profits" in advance of the conclusion and receipt of property ownership. If we did not receive the property ownership, then that money had to be returned to the investor for that particular transaction as in any other loan agreement. Murphy continuously relied upon this in our discussions of the transactions, payments and accounting practices.

24. **What communication or correspondence did you two have with the investors about the commissions? Any attorneys involved? Family members? Confirming emails?**

In 2010 and 2011, and until July 2011, when Fred Khoshabe became involved as a broker procuring investor money, Babajan and I would have investors such as Craig Shaffer and Robert Badalian make the note payment and attorney fees payable either to a title company or Murphy, and Babajan and my commissions separately to us. Fred, however, did not want his Assyrian California investors to know how much money he was making, so Fred and Babajan felt that under those circumstances all investor money should be payable to Thomas Murphy, attorney and agent, and Murphy would be instructed how to pay and to whom the "flip profits" or commissions would be paid, and how much to each.

**Did Murphy use my, Babajan and Anthony's money**?

Yes. We invested over $900,000 with Murphy to purchase notes and mortgages for us, the same as for the investors. We used "flip profits" or commissions to invest with Murphy. Some of the transactions were as follows:

3337 N. Halsted   3512 W. Shakespeare   3941 W. Gladys   2200 N. Kedzie   5551 W. Congress
3837 W. Wilcox   2710 N. Artesian   3839 W. Wilcox   1105 N. Damen   4846 W. Washington
2742 W. Granville   3152 W. Diversey

25. **Did you have an inkling when you first learned of Tamera Brown and the Racine property? What date was it that Francisco met her at her house? What assistance from his law firm did Murphy enlist in the purchase of the Racine property**?

Until October 2012, I did not know anything about Tamera Brown or her existence. At our bond hearing in late August 2015, the government in an effort to show Murphy had money stated that Murphy had deposited approximately $480,000 into Tamera's accounts. I believe this doesn't include money Murphy paid to Jason Fox, the Racine property owner.

Francisco met Tamera at the Racine property in late October or early November 2012 when he went there to paint several rooms.

I do not know what assistance Murphy received from his law firm in purchasing the property.

19

Murphy asked if I could send Francisco Cisneros to that address to paint several rooms. Murphy stated he was purchasing the property on Articles of Agreement. About the same time, Jason Fox, the property owner, called me and asked for a reference, saying Murphy was making a down payment of $600,000 and Fox wanted to be reassured that Murphy's clients would support him. The monthly payment was $17,000. I told Fox that Murphy had many top clients and should not be a problem. I believed Murphy, from past tax returns, made in excess of $500,000 per year and in the last two years had made an additional $500,000 in fees from just the notes and mortgages. So, the purchase did not seem like a poor investment, especially given the property and address.

In late November 2012, Murphy made two interest payments payable to Devon Street Management Company Ltd.—checks of $215,000 and $356,000. I deposited them to the Devon Management Chase Bank Account. Murphy's checks were drawn on his Chase Bank Private Account. Chase gave Devon $517,000 in available funds and Fred Khoshabe paid out several hundred thousand in interest payments to investors. In five days, Chase reversed the credit from Murphy's checks, leaving the management account with a negative $169,000. Devon Street Investments had accepted a transfer of $300,000 from Devon Street Management so I could pay investors who wanted interest payments to be made by checks rather that the ACH payments made by Fred Khoshabe from Devon Street Management. So, both accounts together were approximately $426,000 overdrawn.

Murphy told me he was under pressure because several banks and their law firms had not yet remitted payments to him for Devon Street. Murphy stated he should not yet have written the checks but that he would have the money in a couple days. He gave me replacement checks. These also bounced.

I told Babajan and Fred that we needed to cover the accounts but Fred was out of money from having invested all his profits with Murphy. Babajan refused to put up any money, so I took money from my savings accumulated from "flip profits," and covered the overdrafts so that the investors would be paid their interest.

Up to late November 2012 and December 2012, Murphy had written Babajan, me, Fred, Anthony and the investors many millions of dollars in checks and none had bounced—over $5,000,000. Nothing had ever gone wrong with the accounting, payments to investors or our "flip profits." As the checks bounced, I called Jason Fox, owner of 2015 Racine, Chicago, where Tamera was living and he stated Murphy had made the down payment and all was good with monthly $17,000 payments. At that point, I believed Murphy had used our investors' interest payments to make his down payment and monthly payments on the Articles of Agreement to purchase 2015 N. Racine. The question I asked Murphy was whether he had collected our interest and used it or whether payments were indeed delayed from banks and their law firms and receivers.

Murphy said the new payments for December and January were delayed, and his checks to Fox were paid unwittingly from interest he owed us and was holding in his bank account. He was also expecting large payments from Prospect Airport Services and the Congregation of the Resurrection Fathers—in excess of the checks he had written us and for the checks he had written Jason Fox. So, according to Murphy, it was a very great snafu but not something wrong with our business or a long-term problems for the investors or Murphy.

20.

26. **Why did Anthony and his cousin think there was reason to contact the SEC but Babajan and you did not?**

They were concerned that Anthony, Babajan and me had not received our notes from Murphy. The three of us had invested over $900,000 with Murphy to purchase notes and mortgages.

### What were you and Babajan doing at this juncture?

We began pressing Murphy for documentation in May 2012 because we wanted to find out what the status of each foreclosure lawsuit. Not because we believed Murphy was stealing our and investor money. Murphy said his office was in disarray and he needed to hire a secretary to do his work and bring everything up to date. He assured us he would do so. Murphy also met with Fred Khoshabe and Robert Badalian when they came to Chicago in June 2012, and assured them all was fine. Everyone believed Murphy. The interest was flowing. We received title to 4510 W. Jackson, 4126 W. Adams, 4045 W. Wilcox, and 5410 W. Fulton shortly thereafter, and this calmed us. Murphy had excellent secretarial at Pederson but none at Newmark.

### Did we ever contact Murphy's law firms?

In May 2012, an anonymous email was sent to Murphy's partners, Lynn Soto and Berger, stating that Devon Street Investments, Ltd. was having trouble delivering documentation to its investors. Murphy sent it to me and I sent it to Babajan and Fred Khoshabe. Shortly thereafter, we received the above-listed property deeds.

### How long were you receiving contemporaneous invoices from Murphy's firms?

We received invoices every month, but only with details of what other attorneys at the firm were doing for us, especially related to building code violations. Murphy's bills were paid from the $5,000-$8,000 he charged us per transaction. This included his negotiation with lenders, various law offices for banks, any documentation he prepared for us, court foreclosure work, etc.

28. **What have been the procedures to reduce Tamera's conversation to a transcript? Or, to subpoena her? Do you need her since the documents indicate that he spent the money on their new life and that his is pleading?**

Attorney Richard Kruse sent interrogatories to Tamera Brown in Florida. She responded by email to many of the questions and left her phone number in the event Attorney Kruse, or any of the other attorneys, wished to contact her. She was not complimentary to Murphy, but this was before we encountered her meeting Murphy at the Hampton Inn in Skokie IL.

WHERE ARE NOTES AND FIGURES FOR THE REVIEW OF DOCUMENTS WITH FRED KHOSHABE?

I have copies of everything sent to Fred Khoshabe for the California investors in my files, boxed in storage. Also, I sent many by email.


IF FRED KHOSHABE PRESENTED TO THE CHURCH BOARD, THERE MUST BE RECORDS OF THOSE CONVERSATIONS APPENDED TO TRUSTEE MEETINGS OF THE ASSYRIAN EVANGELICAL CHURCH OF SAN JOSE, CALIFORNIA.

Should we not subpoena those records? And, if in Assyrian or Aramaic, there should be a translation. Also, ask Gov. Perhaps they have but haven't shared.


MURPHY COMMUNIQUES WITH INVESTORS. WHAT DID HE SAY ABOUT WISHING TO SPEAK TO OR NOT WISHING TO SPEAK TO INVESTORS? DID MURPHY INCLUDE ANY ON HIS TIMESHEETS? DO THE INVESTORS REMEMBER SPEAKING TO ANY RECEPTIONISTS/SECRETARIES? WHY WERE THEY CALLING HIM, IF IN FACT THEY DID SO?

Murphy would have spoken to investors had they called him but he did not tell me any called; at least I do not remember it. There may be emails from Murphy to me concerning this. I do remember that Fred Khoshabe did not want California investors speaking to Murphy because he did not want them knowing how much he was making per transaction. Babajan and I never tried keeping investors from speaking or meeting with Murphy. Babajan and I believed it a plus if the investors looked up Murphy and his firm or spoke to him. I do not know if Murphy had contemporaneous records of conversations with investors. Most of Murphy's billing statements to me, Devon Street or related entities did not specify what he was working on, but they did specify when another lawyer from the firm was working on our file. I have billing statements in storage.


GUARANTEES AND AGREEMENTS WORKED ON WITH LAWYERS FOR LIAM BEN DAVID, JEFF WONG AND ANWAR MICHAEL: WERE THE AMENDED DOCUMENTS THEN TURNED OVER TO ME AND BABAJAN? WHO SIGNED THE GUARANTEES? HOW DID MURPHY TRANSMIT THE INFO TO ME AND BABAJAN AND WHEN? DID MURPHY COMMUNICATE WITH THEIR LAWYERS?

Murphy worked on all these agreements with the lawyers for each investor. There are email chains with each that I have. Once the documents were completed, I worked with Murphy on any changes and upon agreement executed the guarantees for each investor as President of Devon Street Investments, Ltd. Murphy transmitted the information to me by email.

WHY WOULD CHECKS BE MAILED TO THE DEVOT STREET OFFICE? WAS CORRESPONDENCE INCLUDED ALONG WITH THE CHECKS, AND, IF NOT, WHY NOT? DID I MAKE COPIES AND FILES FOR EACH? DID I WRITE TO EACH INVESTOR AS TO THE IMMEDIATE DELIVERY AND PROGRESS OF THEIR INVESTMENT WITH MURPHY?

Checks were mailed to the Devon Street Office at 3924 W. Devon St., Lincolnwood IL60712 because it's what Babajan and Fred Khoshabe wanted. It was efficient and a secure way for recordkeeping. I felt it best that we had copies of everything before turning the documents and checks to Murphy. We kept records of all money paid in and payments made to investors.

EMPHASIZE AND DISTINGUISH YOUR SUDDEN SHIFT TO PAYING INSURANCE PREMIUMS FOR YOUR PROPERTIES. FROM WHENCE THE PREMIUM MONEY? WAS THERE ANY CORRESPONDENCE OR COMPLAINTS ABOUT THE COMMISSIONS OR "FLIP PROFITS" AT ANY TIME?

Both Babajan and I believed it important to have insurance on all the properties covered by the guarantees and on our properties. Devon Street Management charged investors 5 to 10% for the paperwork, transmitted monthly and quarterly payments and any maintenance work. From that 5 to 10% of monthly and quarterly payments, we paid the insurance premiums. If there was a shortfall, Babajan and I would make the payments. We did not have any complaints about the commissions or "flip profits."

STRANGE THAT MURPHY DID NOT GIVE THOSE WIRING INSTRUCTIONS TO INVESTORS FOR HIS ACCOUNTS.

Babajan wanted cashier's checks made out by investors that stated made "payable to Thomas Murphy, Attorney and Agent" with his firm name on the ledger. We felt more protection in allowing Murphy to hold the cash collateral necessary to purchase the mortgage notes or short sales. Murphy had Liam Ben David wire to his account because it was part of a multiproperty mortgage.

HOW DID I AND BABAJAN REPRESENT OURSELVES TO INVESTORS—AS AGENTS?

We did not represent ourselves to investors as Murphy's agents. We said that we were purchasing discount mortgage notes—actually Devon Street Investments Ltd. Was the buyer with the investors loaning money to Devon Street under my guarantee.

WAS MURPHY'S WIRING INFORMATION A PEDERSEN ACCOUNT?

No, the account was Thomas Murphy's business account that he also used as his escrow account. Investors were not jittery about this method of payment as Murphy and his firm(s) were credible.

24

MOTION TO STRIKE "LULLING PAYMENTS" ALLEGED BY THE GOVERNMENT IN ITS PLEADINGS
AND FROM THE RECORD, AND TO BAR SAME AT TRIAL

NOW COMES Defendant Albert Rossini and moves this Honorable Court to Strike the Government's
references to "lulling payments" from its pleadings and the record, and to bar said references of "lulling
payments" at trial, and in support therefor, Defendant states as follows:

1. The Government has indicted Defendant Rossini on multiple violations of mail and wire fraud
   and related financial offenses.
2. Rossini produced all records of his business, through his then-attorney Glen Seiden, to the
   government, and at Rossini's bond hearing, the government acknowledged receipt, but averred
   that they had not yet reviewed them.
3. Rossini began an investment company, Devon Street Investments, Ltd. In Nov. 2010. His
   business plan, prepared December 2010, proposed to borrow money in mortgage notes,
   mechanic's liens, and short sale properties in order that the investments would return both
   rental and interest income to himself and investors, as well as profits upon the sale of the
   properties.
4. In late 2012, the business plan stalled upon defendant Thomas W. Murphy (still a licensed
   attorney) bounced $571,000 in checks. At the time, Defendant Murphy was with the law firm of
   Berger Newmark and still had his business account. The NSF payments were the putative rental
   and interest income to compensate Rossini and his investors.
5. In late 2012, Devon Street Investments and Defendant Babajan Khoshabe were clients of
   Defendant Thomas W. Murphy.
6. In late 2012, Robert Badalian was among the investors also represented by Defendant Thomas
   W. Murphy.

1

7. Government agents Evans and Blau, together with State Task Force Investigator Martinez stated wo witness in and outside the Grand Jury that Rossini's payments to investors—as per Rossini's Guaranty Agreements—were "lulling payments."

8. The Government has repeatedly stated, and alleged in its pleadings, that the payments were designed to lull the investors into believing they were receiving money to which they were entitled, but that the Government did not believe they were so entitled.

9. According to Judge Richard Posner in U.S. v. Jaime Lopez, No. 16-2269 (dissenting opinion; Aug. 29, 2017): "[b]ut they were; the defendant's firm was contractually obligated to make the payments to its investors. The district judge had acknowledged before trial that terming a payment a 'lulling payment' was 'argumentative and had the potential to prejudicially influence the jury 'if used in summary evidence." At trial in *Lopez*, the judge allowed the agent to repeat her fraud accusations more than a dozen times. But Judge Posner disagreed, saying this should not have been permitted "to offer such opinion testimony." The conclusion regarding intent was the jury's to make. U.S. v. Marzano, 537 F.2d 257, 268 (7 Cir. 1976).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

        vs.                                CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*

        Defendants.


Defendant Albert Rossini's Motion for Production by the Government

of Brady and Giglio Material


NOW COMES Defendant Albert Rossini, pro se, and respectfully moves the Court for an order

directing the Government to turn over to Defendant all *Brady* and *Giglio* material, including its

Notes of Witness Interviews, and for an entry of sanctions against the Government for

knowingly withholding the said records and documents as well as for its pernicious, intentional

cooperation with attorney Jeffrey Deer and defendant Thomas W. Murphy in order that Deer

testify as to Deer and Murphy's claim that Defendant was an arsonist, and in support of which,

Defendant states as follows:

The Government has not turned over to Defendant Albert Rossini (Rossini), and should be so

ordered, all evidence in its possession, including, but not limited to, agent, police, fire

1

department investigative notes and collateral documents regarding an arson fire at the residence of attorney Jeffrey Deer (Deer), Highland Park IL, in November 2015. This demand includes all documents in the Government's possession relating to the attorney escrow and trust accounts of Thomas W. Murphy (Murphy), attorney Deer, and the law firm of Deer Stone & Maya, from January 1, 2014 through December 31, 2016. These are relevant to show that Deer had stolen money from his clients—thus the reasoning as to why his house, its insured contents, and two dogs, went up in smoke on Nov. 5, 2015. The client thefts were also part of an June 2015 ARDC case against Deer.

Nor has the Government turned over to Rossini its Thomas W. Murphy personnel records from the following law firms: Johnson Cusack & Bell, 1988-2001; Burke Warren & McKay, 2001-2006; Pedersen & Houpt, 2006-2011; Berger Newmark & Fenchel, 2011-2014. Nor has it produced records related to Thomas W. Murphy and Prestige Realty Partners LLC, which references appeared in the ARDC Synopsis of Facts, in Murphy's serial bankruptcy petitions, 2013-2014, and in Murphy's sworn testimony before the U.S. Attorney in his bankruptcy matter(s).

The Court must order the Government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

The Government's persistent theory, before the Grand Jury, before the Court, and in its pleadings, is the false narrative that Rossini sold non-existent properties. Further, the Government postulates Rossini concocted a scheme to bilk investors, mostly supplied by codefendant Babajan Khoshabe (Babajan), and then instructed, directed and ordered then-attorney Murphy in perpetrating the scheme.

2

However, Rossini has presented in his pleadings that he, Babajan, and codefendant Anthony

Khoshabe were likewise victims of Murphy's unilateral deceit and fraudulent behavior; they

were not parties to a scheme-- which was carried out solely by Murphy. He was gifted by way of

experience as reflected in his ARDC record, in the Prestige Realty LLC records, his bankruptcy

petitions and his sworn testimony before the U.S. Attorney in the bankruptcy matters

(Defendant Albert M. Rossini's Motion to Dismiss the Indictment for Prosecutorial Misconduct,

"Misconduct Motion", pp. 3-5, 7, 9, 25, 27, 35-38, 41-43).

Murphy's modus operandi over the past 30-years of his legal career was to engage in ponzi-like

activities and place the blame on others, particularly clients of disgraced repute, such as former

felons, or underling attorneys, or unwitting bankers. Murphy's inclination toward these

individuals is no less indefensible than a predator trolling the internet for victims. (see ARDC

Synopsis of Findings, July 9, 2013, In re Thomas W. Murphy).

The Government had reason to know of Murphy's activities, at least by way of its 2013-2014

investigation of his Prestige Realty Partners LLC or the recurrent ARDC beefs and lawsuits

against Murphy (Misconduct Motion). The Government had reason to know because Murphy's

law firms would have disclosed his personnel files. Unlike Defendant Rossini or Babajan, or the

investors herein, these records were refused them, and, as previously pled in Rossini's

Misconduct Motion (pp. 10-11), Murphy routinely "scrubbed" his Google profile.

Rossini is also a codefendant with attorney Deer in a Cook County, Illinois criminal case. On Oct.

25, 2015, Rossini pled guilty to money laundering in the Deer case; Deer awaits trial in Fall 2018

for attempting to manipulate the court system in posting a $400,000 cash bond in a drug case.

The events following Rossini's simultaneous dismissal on Oct. 25, 2015 from Murphy's state case, and his plea in the Deer state case, follow below and are included in Rossini's Misconduct Motion, pp. 28-32. Attorney Deer continues practicing law while awaiting trial in state court. Murphy is also awaiting trial in state court.

Murphy introduced Deer in 2011 to Rossini in order that he handle litigation. Deer was Murphy's understudy at Johnson & Cusack & Bell law firm in the 1990s. Deer also represented Murphy in Murphy's serial bankruptcy petitions in 2013 and 2014 and Murphy operates in Deer's office, per the information set forth in his sworn bankruptcy filings.

On information and belief, Murphy has cooperated with the Government in this cause, including the Government's investigation and targeting of Defendant as an arsonist. After Rossini presented his pro se motions, his attorney returned and informed him that Murphy decided against a plea of guilty since Rossini was detained and less of a cognizable threat. Thus, any information, especially Murphy's unabated falsehoods and deceitful conduct toward Rossini and partners is important, exculpatory evidence.

Defendant requests the Court, in considering this Motion to Produce, take exacting notice of Rossini's lack of representation or underrepresentation for the last several years. Rossini was placed on home confinement and then home detention with severe movement and financial restriction from August 25, 2015 through July 28, 2017, and detained at the Jerome Combs Detention Center from July 28, 2017 to the present. Most of Defendant's files have been unavailable to him.

Upon examination of the discovery available in the Government's ongoing investigation of the Defendant (ostensibly to solidify its theme that Rossini sold nonexistent property by lulling investors and dominating Murphy), Rossini believes there are instances where the Government failed to record witness statements, where the agents' and other law enforcement information conflicted with witness testimony, and that the Government knowingly failed to provide Rossini with these investigative records and documents.

By happenstance, Rossini learned that the Government's had knowledge of, and failed to disclose, the Murphy and Deer schemes to blame Rossini for a violent federal felony, following his dismissal from Murphy's state case on Oct. 25, 2015 and his plea in the Deer state case on Oct. 25, 2015. Rossini's testimony was anticipated at their state trials.

On Thursday, March 22, 2018, Defendant was transported by Cook County State's Attorney Police from Jerome Combs Detention Center, Kankakee IL to the Cook County Criminal Court at 26th and California, Chicago. Rossini appeared before the Honorable Arturo Maldonado regarding a probation revocation in People v. Jeffery Deer, due to the Defendant's federal pretrial detention. Assistant State's Attorney Thomas Simpson spoke to Rossini about Deer's anticipated trial in Fall 2018, in the presence of two Cook County State's Attorney police officers.

ASA Simpson said he had decided not to call Rossini as a witness in Deer's trial. Rossini inquired about the November 2015 fire that destroyed Deer's house and his two dogs, and if arson was confirmed. The fire occurred at 11 p.m. Deer and his family were still awake, and so escaped the flames. Two dogs left inside were killed. The garage and the Porsche parked outside were

unscathed, but Deer received insurance money for the remodeling. Deer's house contents were insured for $575,000.

ASA Simpson replied that he understood Rossini had a loan against Deer's residence—implying that Rossini was somehow involved because he had an economic interest in Deer's property. Rossini denied this Deer fantasy about a loan to him from Rossini. Rossini reminded ASA Simpson of the documents in the state's file regarding Deer and the disputed signatures he had affixed.

Rossini reminded Simpson of the conversations with Peter Poulos (Misconduct Motion, p. 35). Poulos, a Murphy and Deer client, said the two were blaming Rossini for the house fire to investigating detectives. (id) As set forth in Rossini's Misconduct Motion, the Murphy and Deer blame strategy, along with the Government agents' concerted efforts against Rossini, began in earnest post-October 25, 2015, when Rossini was dismissed from the Murphy state case and agreed to be a witness in the Deer state case.

The only reasonable inference that can be drawn is that the Government's conduct has been calculated and deceptive. How then can the Court countenance the Government's definition of who is a danger to the community? Its own conduct, on behalf of the people, and in furtherance of the justice system, has been dishonorable at the least. Its quixotic application of the pejorative accommodates the Government only as it sees fit.

Rossini has been hounded, accused, barred from a residence or from making a living and forced into detention and jail by the Government as a danger. Murphy—with a long-discredited past

6

and present of financial, corporate, and real estate misdealings, with years' long patterns of

escrow money fiddling and skimming, forgeries, fictitious illnesses, perjury, tax evasion, post-

Indictment trysts with his escort girlfriend whom the Government knew helped him hide

money and property in this case, and now an accessory before, during and/or after the Deer

house arson—the Government considers a benign subject?

Worse, the Government has not informed the Court, and only lately has Defendant learned, of

its fatuous decision to call attorney Deer as a witness against Defendant—to testify that Deer

loaned money to Rossini. Defendant avers the likelihood of such a financial exchange was as

ludicrous as the Government and Murphy/Deer accusing Rossini of the arson of Deer's house.

At the status on April 3, 2018, the Government wisely withdrew its intent to call Deer as a

witness. Nevertheless, its cooperation and participation with Deer and Murphy in the arson

angle is reprehensible.

ASA Simpson's conversation with Rossini demonstrated that the Government investigated

Rossini, regarding the arson at Deer's house, on information that could only have come from

Murphy and Deer. The Government never disclosed this information to Rossini.

In early August 2015, Murphy telephoned Rossini because he was concerned that the

Cambridge Management deal might not close. He said that Deer, representing Cambridge

Management in its attempt to purchase the Meadowlands Medical Center (see Rossini's first

Bond Revocation hearing before Magistrate Judge Gilbert, December 2015; see also

Misconduct Motion, pp. 28, 32-34), was under increasing pressure to reimburse a client's funds

that Deer had withdrawn from his attorney trust account. The amount was in the hundreds of

thousands. Deer's client (for whom the funds were held) owed money to Russian businessmen and he had promised to repay them from the settlement funds Deer had in his trust account.

Deer's reckless abandon with his trust accounts, from 2010 – 2015, were brought to light by the ARDC which filed a complaint against Attorney Jeffrey Wade Deer in June 2015, about two months' prior to Murphy's confidential information to Rossini. The ARDC complaint against Deer included the client accounts from which he took money, and also included reference to his client, "Ray's Mobile Service," a too-similar name of a Murphy client, Ray Mobile (Murphy's witness in an ARDC case some years prior to the disbarment proceeding; ARDC July 13, p.13; Misconduct Motion at pp.24-27).

In October 2015, Rossini was dismissed from the Murphy state case. In a written agreement, signed by Rossini, attorney Glen Seiden and ASA Simpson, it was stated that Murphy was responsible for the theft of his client, Nina Jozers' funds (approximately $353,000). Thereafter, in federal court, Murphy's attorney, Lawrence Wolf Levin, told attorney Seiden that he (Seiden) had "screwed" Levin. Within a month, Rossini was targeted by Murphy and Deer as the arsonist of Deer's house, i.e., Murphy and Deer knew the house fire was not accidental, but an arson.

After Oct. 25, 2015, the Government also increased its unremitting investigation of Rossini and followed his wife in their home, along her jogs, and at the needlepoint shop where she stitched with friends. In November 2015, the Deer house caught fire.

At 4 a.m. on that November (arson) morning, 2015, Deer telephoned Rossini stating his home had been destroyed by a late-night fire the previous evening and that he needed the telephone

8

number for "Thaddeus," a Deer client who had loaned Deer a million dollars. Deer said his phone had been destroyed in the fire so he no longer had his list of phone numbers.

Mr. Thaddeus, who is African-American, subsequently arrived at Rossini's office, and identified himself as "Jason Mitan" of Cambridge Management and wanted to inquire about the progress of the Cambridge-Meadowlands transaction. He said attorney Deer was to repay a loan to Mr. Thaddeus from Deer's attorney fees that included a "success fee" for completion of the sale. Thus, by November 2015, Deer owed two huge fees to demanding clients: a client who owed Russians, and also to Mr. Thaddeus.

Then, two more visitors came to Rossini's office about Cambridge (on which Rossini was working prior to indictment). These were Mr. Richards and "Pete the Greek." They were attorney Deer clients and "hard money" lenders to Deer's client, Cambridge Management. They inquired about the Cambridge/Meadowlands transaction because they also expected to be paid off from Deer's anticipated "success fee."

Interestingly, and unknown to ASA Simpson on March 22, 2018, nor apparently to the investigators, nor to Deer and Murphy, Mr. Richard and "Pete the Greek" had been clients of famed Chicago defense attorney Julius Lucius Echeles (Mrs. Rossini's employer/colleague during the 1970s-1990s). Mr. Richards and Pete the Greek were convicted years earlier of arson in a Northern District of Illinois federal court.

The real Jason Mitan, a Cambridge Management director, met with Rossini and attorney Glen Seiden and said that "Molotov-like cocktails" were thrown onto the roof and destroyed Deer's

9

house. Mitan and fellow directors, Barbara Kalinowski and Thomas Mitan, sought to disengage from Deer's representation. Rossini had referred them to attorneys Seiden and Netzky. As per federal bond orders, Seiden informed Judge Gilbert and the Government of Rossini having worked on Cambridge prior to the August 2015 federal indictment, and that he continued working on the transaction. The Cambridge principals had been informed as well. Notwithstanding, agents Evans and Blau descended on Cambridge offices informing them that Rossini was attempting to launder money he had stolen from investors.

Each time the Defendant, or his attorneys, complied with court orders to inform the Government of details, personal information, business associates or friends, agents descended upon whatever names they were given in an effort to intimidate and contaminate. But as to the Government's arson investigation of Rossini, they were mum. Were it not for ASA Simpson, Rossini would not have been informed.

The Government apparently assumed Rossini, while on home detention and under constant investigation by federal agents, was involved in the house fire because of accusations by Murphy and Deer (the ARDC recognized Murphy's modus operandi in blaming others; it had been Rossini's turn in the ARDC Synopsis of Findings, In re Thomas W. Murphy, July 9, 2013.).

The next day after the fire, a broker-associate, Peter Poulos, warned Defendant about Murphy and Deer's accusations (Misconduct Motion). Incredibly, as of the date of the fire, both Murphy and Deer themselves concluded the house fire was an arson and then blamed Rossini as the arsonist.

Defendant immediately informed pretrial office Justin Wiersema; Rossini was connected to electronic home monitoring—the certitude of which was apparently unknown to Murphy and Deer. Officer Wiersema instructed Defendant to direct any investigators who would question Rossini to call Wiersema, since he knew where Rossini was before, during and after the fire.

These allegations are significant because they show the Government's attempt to reinforce part of its false narrative that Rossini is a danger to the community. Also, it might well be a tact the Government entertains to discredit Rossini by raising the arson allegations at further proceedings or as "other-act" evidence.

Following ASA Simpson's conversation, and as luck and circumstance would have it, Rossini learned that another Murphy/Deer client, the owners of a shopping center at 63rd/Halsted, Chicago, also experienced a suspicious fire after several years of infighting. In 2014, prior to the Halsted fire, Rossini had tendered Murphy, acting as title and legal consultant for the sellers, a purchase contract for the shopping center to present to his clients. The lender, however, balked at the price and the deal fell through. Then came the fire that destroyed the 63/Halsted property.

From the conversation with ASA Simpson, Defendant Rossini can only presume that the Government knew Murphy was blaming Rossini for Deer's house fire of Nov. 5, 2015. At no time did the Government divulge this information to Rossini. Rossini learned from his returning attorney, two weeks' prior to the filing of the herein Motion, that the Government actually intended to use the arson pretext and to call Deer as a witness against Rossini.

11

Therefore, Defendant requests and demands that the Government produce the following:

1. All evidence, documents, statements, investigator notes and reports, and witnesses, in its possession concerning the investigation of the Deer residential fire in November 2015, including but not limited to insurance policies, cancelled checks, (front and back), loan documents, receipts, signatories, and results of handwriting experts;

2. Thomas Murphy, Jeffrey Deer, and Deer Stone & Maya escrow and attorney trust accounts for the period January 1, 2014 through December 2016.

3. All handwritten or other notes in the Government's possession of any interview or substantive statement provided to the Government, related to the Deer fire, including drafts of any final reports or memorandums of such interviews or substantive statements concerning the Deer residence fire and subsequent investigation or, in the alternative, to conduct an *in camera* review of these notes for evidence not disclosed to Rossini.

4. The name of any person who was interviewed by or gave a substantive statement to the Government in this case, and concerning the matters described herein, whom the Government has not already provided Rossini.

5. The Jeffrey Deer ARDC records from June 2015 to the present.

6. The complete and comprehensive Thomas W. Murphy personnel records from the following law firms: Johnson Cusack & Bell, 1988-2001; Burke Warren & McKay, 2001-2006; Pedersen &Houpt, 2006-2011; Berger Newmark & Fenchel, 2011-2014.

7. All handwritten or other notes in the Government's possession of any interview or substantive statement provided to the Government, and all its agent notes, related to

Thomas W. Murphy and Prestige Realty Partners LLC, including drafts of any final

reports or memorandums of interviews or substantive statements concerning Prestige

and subsequent investigations.

### Brady and Giglio violations

The information requested by Rossini, especially statements that include Murphy's unabated

falsehoods and deceitful conduct toward Rossini and partners is important, exculpatory

evidence.

Defendant Rossini requests that this Court enter an order directing the Government to comply

with its obligations under Brady v. Maryland, id. and Giglio, id. The motion is supported by

Defendant's independent discovery that the Government's disclosures omitted material,

exculpatory information, and that the Government failed to disclose the materials altogether.

The Seventh Circuit has said, "[i]n the typical reasonable due diligence case, the question is

whether defense counsel had access to the document containing the Brady material." Boss v.

Pierce, 263 F.3d 734, 741 (7 Cir. 2001). Here, the Defendant did not know the extent of the

Government investigation because he thought the idea of his being an arsonist beyond

incredulity. As the Seventh Circuit observed, it is an "untenabl[y]broad rule that any

information possessed by a defense witness must be considered available to the defense for

Brady purposes." Id. at 740. The "witness may be uncooperative or reluctant…"Id. (Murphy and

Deer fall into this category). "With regard to witnesses, "[b]ecause mind-reading is beyond the

abilities of even the most diligent attorney, such materials simply cannot be considered

13

available in the same way as a document." *Id*. at 741. Ultimately, the *Brady* rule is simple, "when the government obtains any exculpatory statement and fails to disclose that statement, the government proceeds at its own risk and places any resulting conviction in jeopardy." *U.S. v. Barraza Cazares*, 465 F.3d 327, 335 (8 Cir. 2006).

The Seventh Circuit has cast significant doubt on the continued vitality of its admissibility rule, stating that it was inclined to adopt the majority position, which extends *Brady* to evidence that may lead to the discovery of admissible evidence: "It is hard to find a principled basis for distinguishing inadmissible impeachment evidence and other inadmissible evidence that, if disclosed, would lead to the discovery of evidence reasonably likely to affect a trial's outcome." *U.S. v. Morales*, 746 F.3d 310, 315 (7 Cir. 2014).

Defendant Rossini further requests all the agent notes in this case, pursuant to *Brady*. See *U.S. v. Muhammad*, 120 F.3d 688, 699 (7 Cir. 1997). The government cannot seek to avoid its disclosure obligations by pointing to the volume of material it has provided. The number of reports, their pages, emails, and audios is meaningless when there is reason to believe that those reports are either not accurate or complete. (See the Government transcripts in Anthony Khoshabe's Motion to Suppress and Order).

Sanctions

As set out fully in Defendant's Motion to Dismiss the Indictment for Prosecutorial Misconduct, the Government's conduct in this case has been knowing, flagrant and malicious—in order to buttress a stilted premise against Rossini, and, for some unfathomable reason, sparing

14

defendant Thomas W. Murphy the calumny and detention he deserved for his habitual and established practice of defrauding clients. In this matter, Murphy concocted a scheme to defraud Rossini, the Khoshabes, and the investors, and then shifted the blame to candidates whom the Government would swallow hook, line and sinker.

The Government's knowledge is indisputable. See *U.S. v. Burnside*, 824 F.Supp.1215 (N.D. IL 1993) for a parallel instance of knowing prosecutorial misconduct. In *Burnside*, Judge Holderman held that federal prosecutor William Hogan engaged in numerous and egregious instances of misconduct, and knowingly concealed exculpatory evidence from the defense in violation of *Brady* and *Giglio*. He held there was "a silent agreement" between prosecutors and their witnesses: "lenience as to the illegal drug use in exchange for testimony helpful to the government." Lenience, or the "ostrich" defense, is likewise discernible in this case so far as the conduct of the Government towards witnesses on which it depended to prove the false allegations of its case against Defendant Rossini.

Conclusion

WHEREFORE, for the reasons stated, and supported by the facts and law, Defendant Albert Rossini respectfully requests that the Court grant his Motion to Produce, with a finding by the Court of the Government's violation of its obligation under *Brady* and Giglio, and that the Government produce the documents as aforesaid at p. 12-13, for entry of sanctions against the Government, and for such other and further relief as this Court deems just and equitable.

BY:

_____

Albert M. Rossini, Defendant pro se

Jerome Combs Center

3050 S. Justice Way

Kankakee IL  60901

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
        Plaintiff,
            vs.                                    CASE NO. 15 CR 515-1

ALBERT ROSSINI, *et al*
        Defendants.

Defendant Albert Rossini's Motion and Memorandum of Law
to Strike and Dismiss Government Allegations of Non-Existent Property Sales
from the Record, as Erroneous and False

NOW COMES Defendant Albert Rossini, pro se, and moves this Honorable Court to

strike from the record each and every allegation set forth by the Government so far as

Defendant's purported sales of non-existent properties, said statements and allegations

being patently erroneous and false and without basis in the facts and records duly

produced to the Government prior to indictment, and in support of which Defendant

states as follows:

As set forth in Defendant Albert Rossini's (Rossini) previously filed Motion to Dismiss

the Indictment for Prosecutorial Misconduct (Misconduct Motion), in September 2014,

11 months prior to indictment, Defendant and attorney Glen Seiden voluntarily presented

to Government agents, Defendant's documents and records of properties purchased and

sold.

1

These records were powerful evidence that Rossini and codefendants Babajan and Anthony Khoshabes lacked the requisite intent to defraud investors.

A short time after Defendant Rossini produced his records to the Government, attorney Seiden met with AUSA Hoekstra, and presented copies of Rossini's liability insurance and premium payments. These showed that Rossini insured and paid premiums for over 70 mortgage note properties he legitimately purchased from Defendant Thomas W. Murphy.

On August 25, 2015, Defendant was arrested, along with Babajan, his son, Anthony, and Murphy on a multicount indictment alleging they fraudulently perpetrated a Ponzi scheme with Defendant Thomas W. Murphy. At the August 28, 2015 bond hearing, Agent Evans admitted in questioning by attorney Seiden that the agents had not reviewed the documents presented to them in September 2014, but that they "would get around to it."

Thus, the Government purposefully failed or intentionally omitted presenting Rossini's exculpatory evidence to the Grand Jury because it did not fit the government's false narrative that Rossini was selling "non-existent property."

The government's refusal to present this exculpatory evidence to the Grand Jury was at best a reverse form of "willful blindness," and at worst, a deliberate targeting of the Defendant.

The government acted in bad faith by not presenting Defendant's payments for mortgage notes, insurance premiums, properties purchased by Defendant Rossini, monies paid to Murphy, NSF checks by Murphy to Rossini, Babajan, and Devon Street, and Rossini quitclaims of properties to investors in the normal course of Devon Street business.

Included in Rossini's production:

1  Investor cashier's checks payable to Thomas Murphy Attorney/Agent; his law firms Pedersen & Houpt or Berger Newmark included on the check ledger line. Also listed under Murphy's name were the property address and property index number. The check amounts included the mortgage note price, Murphy and Pedersen & Houpt or Berger Newmark fees, profits for Rossini, Babajan and brokers, together with the guaranty fee for Devon Street Investments Ltd.

2. The records related to Murphy's collection of the money to purchase the mortgage notes.

3. The amount of cash collateral that Murphy, Pedersen & Houpt or Berger Newmark held totalled $5,044,000.

4. Per calculations, produced to the Government, Devon Street borrowed a small portion of the total money invested to insure the risk of losses. Statistics indicated firmly that only a fraction of mortgage notes in foreclosure were modified or brought current by homeowners in foreclosure.

Defendant Thomas W. Murphy and his law firms Petersen & Houpt and Berger Newmark Possession and Escrow of Monies

3

Defendant Murphy and his firms held $5,044,000 for mortgage note purchases and were

obligated to return to Devon Street any money not used to purchase mortgage notes.

Therefore, only the portion paid to Rossini and Babajan and the brokers needed to be

insured. Devon Street sold properties, mortgage notes, or retained cash to cover a portion

of this amount.

In support of this business practice, Defendant Rossini refers the Court to this applicable

business practices' quotation: "The really beautiful part of the scheme was that

Demchak's team calculated that the SPV (special purpose vehicle) would need to sell

only a relatively small amount of notes to outside investors in order to raise the money to

insure all of that risk. Normally, the SPV would be expected to be 'fully funded,'

meaning that it would have to sell notes totaling the complete amount of risk that it was

insuring.

The J.P. Morgan team reckoned full funding just wasn't necessary; the number of

defaults would be so low that so much capital wouldn't even be needed for covering

losses." (From *Fool's Gold: The Inside Story of J.P. Morgan and How Wall Street Greed

Corrupted Its Bold Dream and Created a Financial Catastrophe*, by Gillian Tett [2009],

pp. 51-55). "Just to be safe, though, Demchak decided that the SPV would invest the

$700 million pot (from notes it sold) in AAA-rated Treasury bonds, so that if it were ever

needed, there would be no doubt the money would be there. That ultra safe investment

plan would also help assure investors that the scheme was sound." (p.55). J.P. Morgan

raised $9.7 billion from investors for this Special Purpose Vehicle, placing $700 million to cover its *guaranty (credit default swap)*.

As additional security, Rossini, often in partnership with either Babajan or Anthony, purchased similar mortgage notes through Defendant Thomas W. Murphy, so that, if needed, these extra mortgage notes could be liquefied to pay investor losses. Securities not used to pay guarantees would inure to the benefit of Rossini.

Notes Purchased by Defendant Rossini through Murphy

(AD Investments - Anthony Khoshabe and Devon Street; BRBK Investments - Babajan Khoshabe and Bert Rossini)

3941 W. Gladys, Chicago

5555-57 W. Congress, Chicago

4948 W. Washington, Chicago

4954 W. Lexington, Chicago

2710 N. Artesian, Chicago

1105 N. Damen, Chicago

2742 W. Granville, Chicago

3337 N. Halsted, Chicago

2200 N. Kedzie, Chicago

Properties Held by Devon Street or Related Entities as Security for Guarantees

Bulk Purchase Agreement. The addresses of these and the Riverdale properties are in the Defendant's storage locker.

WHEREFORE, Defendant Albert Rossini, pro se, respectfully requests this Honorable Court for a finding that Defendant bought and sold properties, and did so in the ordinary course of business; that the records in support thereto were produced to the Government voluntarily by Defendant 11 months prior to Indictment, and that Defendant's lawyer, Glen Seiden, met with the Government to review Defendant's paid insurance policies for the properties; that the Government failed, either intentionally or negligently, to review the files; that the Government failed to produce this exculpatory evidence to the Grand Jury; that the Government then alleged in the Indictment that Defendant engaged in a ponzi scheme of sales of non-existent properties; that the said allegations were erroneous and false and without basis in the facts; and for such other and further relief as this Court deems just and equitable.

BY:

_____

Albert M. Rossini, Defendant pro se

Jerome Combs Center
3050 S. Justice Way
Kankakee IL 60901

8

MOTION FOR JUDICIAL ADMISSION OF ARDC FINDINGS IN RE DEFENDANT THOMAS W. MURPHY

NOW COMES Defendant Albert Rossini and moves this Court for a judicial admission into the record of
the ARDC findings and judgment in the matter of Defendant Thomas W. Murphy and Nina Jozers, and in
support of which, states as follows:

1. The Attorney Registration and Disciplinary Commission of the State of Illinois (ARDC) held a full
   hearing, with witnesses and sworn testimony, regarding Defendant Thomas W. Murphy, and in
   Sept. 2014 disbarred him. A copy of the ARDC judgment is attached and incorporated herein as
   Exhibit A.

2. In the People of the State of Illinois v. Albert Rossini and Thomas W. Murphy, 2013 CR     , an
   agreement was reached between the People and Albert Rossini, on      , a copy of which is
   attached and incorporated herein as Exhibit B.

3. This Court should make these pleadings and orders part of the record, and make a judicial
   admission thereof for the reasons set forth at para. 3-4, *infra*.

4. In Thomas W. Murphy's sworn testimony before the ARDC, he stated that he had deposited his
   client, Nina Jozer's, funds to his business account and then transferred the money to Albert
   Rossini. The ARDC held that Murphy in point of fact converted the Jozer money for his own use.

5. The People of the State of Illinois v. Albert Rossini and Thomas W. Murphy is a 2013 Cook
   County criminal case derived from theft of Nina Jozer's money. Rossini was dismissed from this
   case in 2015 and an agreement stipulates that Thomas W. Murphy directed use of Jozer's funds
   for his own purposes.

6. This Court should include in the case pending against Defendant Albert Rossini relevant
   evidence that has probative value.

7. The record in the above two cases against Defendant Thomas W. Murphy shows Murphy's
   propensity to shift blame to Rossini as well as to proffer false testimony to the court.

## MOTION FOR BILL OF PARTICULARS

NOW COMES DEFENDANT Albert Rossini and moves this Honorable Court to order the Government to

provide a full and complete Bill of Particulars, and in support thereof states as follows:

The indictment is insufficiently detailed pursuant to Fed. R. Criminal Procedure 7(f), and the
following particulars should be provided to Defendant Rossini:

a. specificity regarding the acts alleged by Rossini, but not described in the indictment, so far as
"lulling" acts.

b. particulars regarding the alleged fraudulent representations made by Rossini;

c. particulars regarding the manner in which allegedly wrongful acts were carried out by Rossini;

d. particulars regarding how Rossini controlled and directed other defendants and how the
defendants functioned in the alleged fraud.

WHEREFORE, Defendant Albert Rossini moves this Court to enter an order for a Bill of Particulars
from the Government, as set forth above from a to d, and that said compliance be made within
30 days, and for such other and further relief as this Court deems just and equitable.

ALBERT ROSSINI #08043-424
METROPOLITAN CORRECTIONAL CENTER
71 WEST VAN BUREN STREET
Chicago, IL. 60605
















Legal Mail
Prisoner Correspondence

Clerk of the District Court
U.S. District Court
Northern District of Illinois
219 South Dearborn Street
Chicago, IL. 60604

RECEIVED

SEP 6 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



09/06/2019-22

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN STREET
CHICAGO, IL 60605

The enclosed letter was processed through special mailing procedures for forwarding to you. This letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

09-03-2019