ALBERT M. ROSSINI
#08043-424
Chicago MCC
71 W. Van Buren St.
Chicago IL 60605


May 15, 2020

The Honorable John Z. Lee
U.S. District Court for the
Northern District of Illinois
Chambers 2156
219 S. Dearborn St.
Chicago IL 60604

Re: U.S. v. Rossini, case no. 15 CR 515-1

Your Honor:

I am filing this letter and its Objections to Your Denial of my Motion for New Trial with the Clerk of the Court pursuant to the General Order of Chief Judge Rebecca Pallmeyer during the COVID lockdown.

<u>The Court's Erroneous Conclusions</u>

After reviewing your order and opinion denying my Motion for New Trial, or, in the Alternative, for an Evidentiary Hearing, I submit my objections to your Honor. The opinion was based on material inaccuracies, arising from this Court's admitted failure to having read my *pro se* Motions in Limine with Exhibits.

In limiting my defense, the Court was not impartial. The several remarks made by your Honor were that your opinion was fixed as to my lack of credibility. In other words, facts, affidavits, documents, and preparation for my defense was of little moment. This contention served to assist the Government's theory that I had not operated a viable real estate business, but lived off monies that a faint-hearted attorney, co-Defendant Thomas Murphy, disbursed at my direction from his escrow accounts which he held in his capacity as a high-powered lawyer in the prestigious firm of Pederson and Haupt. Your Honor was opposed to any deviation from this score.

The following facts and numbers, in support of my Objections, are not comprehensive, as space does not permit and because I was never once granted access to records of all transactions. What is presented below reveals the Government and the Court's distortions of my good-faith business. It was interrupted, without my knowledge or participation, by the sudden, staggering theft of all investor funds held by codefendant Thomas Murphy in his escrow accounts at his law firm(s).

**1**. Rossini purchase of properties:
Your opinion stated I only purchased six or seven properties, and only under pressure from investors. My purchases were for over 30 properties for investors in accordance with arms-length investor agreements. Nor did I deed some of the properties to investors immediately upon purchasing them due to the need for renovations prior to transfer (i.e., the Riverdale Townhomes to the Khodi Family Trust).

**2**. The evidence, by way of jail logs and the court file, indisputably proves that attorneys Joshua Adams and Scott Frankel did not spend "meaningful time" (an opinion expressed without merit by this Court) with me. They spent minimal, minutes-long time. Records from the Kankakee Jail, where I was first held, show they met with me 4 or 5 times, for between 15-20 minutes. They came with no notes and no documents; they brought nothing to review—whether notes, questions, witness names, queries about financial records, etc. Nor did they ever honor my repeated requests to send to me the relevant financial defense documents and discovery material. I never reviewed discovery material prior to trial because I had none. Neither Adams nor Frankel visited with me once I was transferred to the Chicago MCC on May 10, 2019, except for the one appearance by Adams, on the Sunday before the Monday trial (*read further below*).

**3**. I object to the Court having denied my right to work directly with court-appointed investigator, John Rea. Mr. Rea had been recommended by attorney Richard Kling. However, since he was not able to visit with me at the MCC, and the Court did not take into consideration the U.S. Bail Reform Act so far as a defendant preparing for trial, Mr. Rea did not have the benefit of my knowledge of the witnesses and of the events.

I was repeatedly stymied by the Court in preparing my case because of the obdurate focus on my credibility in order to bring around a swift conviction—*sans pro se* Motions in Limine, but tied to ineffective appointed counsel, failure of being given the opportunity to prepare for my defense and for trial, lack of a defense, failure to call an expert witness for my financial documents, failure to call a psychiatric expert to testify as to Thomas Murphy's independent initiatives, failure of appointed counsel to cross examine because of their unfamiliarity with the case, and my punitive detention.

Your Honor stated that Meir Rotstein's Affidavit was not credible since he worked for me, thus assuming, without hearing, that Mr. Rotstein was a lying affiant. Presumably, his Affidavit's credibility would have been greater had he been a confidential government source rather than a defense witness. Furthermore, I could have worked with more witnesses and affidavits had the Court not denied my request to work directly with an investigator.

**4**. The Court's opinion stated I used no more than $200,000 to purchase real estate on behalf of investors. This was markedly false, yet was given the Court's imprimatur. Had the Court reviewed the Motions in Limine and attended to the numbers and properties, it could have been rightly informed. The numbers do not lie.

| ADDRESS | PURCHASE AMOUNT |
|---|---|
| 3820 W. Adams | $ 95,000 |
| 3327 W. Monroe | 45,000 |
| 4037 W. Adams | 45,000 |
| 4045 W. Wilcox | 45,000 |
| 5410 W. Fulton | 69,000 |
| 4520 W. Jackson | 55,000 |
| 4126 W. Adams | 42,500 |
| 211 N. Kilbourn | 18,000 |
| 4129 W. Adams | 37,000 |
| 4139 W. Adams | 37,500 |
| 8435 S. Burley | 16,900 |
| 4321 S. Marshfield | 18,900 |
| 4457 S. Princeton | 95,000 |
| 1921 N. Richmond | 98,000 |
| 16 Riverdale Townhomes | 155,000 |
| **TOTAL** 30 Properties | $749,800 |

I then spent additional money renovating the aforementioned properties, receipts for which should have been in evidence.

| ADDRESS | PURCHASE AMOUNT |
|---|---|
| 4037 W. Adams | 70,435 |
| 4045 W. Wilcox | 20,997 |
| 5410 W. Fulton | 20,000 |
| 4520 W. Jackson | 20,000 |
| 4126 W. Adams | 4,924 |
| 8435 S. Burley | 2,000 |
| 4321 S. Marshfield | 8,817 |
| 4457 S. Princeton | 10,000 |
| 16 Riverdale Townhomes | 185,000 |
| **TOTAL** Renovation Expense | $342,171 |

5. The Court's opinion in denying my Motion for New Trial failed to accurately credit me with the money I paid to Thomas Murphy to purchase mortgage notes for my own account.

| ADDRESS | AMTS. PD BY ROSSINI FOR NOTES |
|---|---|
| 4946 W. Washington | $ 25,000 |
| 8009 Oakton | 52,500 |
| 8012 W. Main | 52,500 |

| | |
|---|---|
| 2742 Granville | 50,000 |
| 3337 N. Halsted | 50,000 |
| 2710 N. Artesian | 25,000 |
| 3941 W. Gladys | 17,500 |
| 5551 W. Congress | 50,000 |
| 1105 N. Damen | 52,500 |
| TOTAL | $374,500 |

The above addresses and numbers are as accurate as possible given that I have been denied access to my records and documents since the start of my detention. Additional purchase monies paid to Murphy for mortgage notes are not here included.

Both the Government and co-Defendant's charts misstated, or falsified, the sources and uses of funds. The Government's theory was that I directed Murphy's scheme and netted the largest amount of funds from victim-investors.

That theory, and the Court's opinion, misunderstands gross funds from net funds. A true charting of the use of funds would show the vast majority of the money paid to me, or received by me, was spent on **a)** paying investor guarantees; **b)** purchasing and renovating properties; **c)** investing in the same notes as investors, and **d)** operating Devon Street Investments, Ltd., and paying salaries in a legitimate business.

The same cannot be said of Thomas Murphy who withdrew a massive amount of escrow funds in his custody and control, on his own. He then spent the funds contemporaneously—without disclosure to me-- on a residence (in Chicago, separate from his marital residence) and in Florida; furniture, cars, businesses, hotel stays, and travel with Tamera Brown.

I operated a legitimate business calculated to show a profit and prosperity for my investors and myself. I was skilled in real estate investment, as were many of my investors. When I learned of Murphy's theft, I did all I could to attend to the investor checks returned NSF (because of his secret theft) and for an accounting from Murphy— to which Murphy agreed but with which he never complied. Federal agents interfered with every contract and client thereafter. Theirs were hardly acts intended to benefit investors and restore monies to them.

### The Court's Bias

I first address the Court's remark that there was no "need to read my materials because I had no credibility with the Court." That is the gravamen of this letter and my Objections-- that the facts were ignored by this Court before, during, and after trial. Furthermore, at no time did the Government's

conduct or false pleadings merit such presumptive judicial disapproval.

I offer at this point the Supreme Court case of *Faretta v. California*, 422 U.S, 806 (1975). Justice Stewart wrote for the Court:

> The language and spirit of the Sixth Amendment contemplate
> that counsel, like the other defense tools guaranteed by the
> Amendment, shall be *an aid to a willing defendant*-not
> an organ of the State interposed between an unwilling defendant
> and his right to defend himself personally.
> (*Id*, 821-832, emphasis added).

My several, weighty, researched, fact-and-law-based pretrial Motions in Limine were not read by this Court, nor set for briefing or hearing. The Motions, supported by exhibits containing legitimate facts, numbers, addresses, buildings, and investors, were not self-serving, refuting this Court's presumptions as to my non-credibility. No rulings were made and whatever was therein contained, remained subterranean. The Government was allowed to proceed to trial without limitations and to my detriment and continued detention.

Not only did the Court avoid my Motions in Limine, it likewise gave short shrift to the opinion of the Illinois Supreme Court so far as Defendant Thomas Murphy. The Illinois court upheld the ARDC's finding, after full hearing, that Thomas Murphy's blaming Albert Rossini for his escrow-dipping was a lie, i.e., a custom and habit he formed by himself, before having met me. Courts follow the principles of comity, but in this case that rule was ignored.

The Court also failed to acknowledge and apply the judgment of the Criminal Court in another Thomas Murphy escrow theft, in which he claimed that I was the cause. The Criminal Court dismissed me from his case.

The Thomas Murphy decisions in the Illinois courts were material to this federal case because they involved like-escrow-withdrawals with a like-defense that Albert Rossini directed Murphy to steal funds. These disciplinary and criminal incidents occurred at the same time as the herein case. Further, Thomas Murphy's diversions were attributable to his undisclosed relationship with Tamera Brown.

This Court allowed the Government to proceed with its false narrative from start to finish, and that included its false Revocation Motion against me. Revocation was an option the Government and the Court ignored though Murphy held investor monies -- $485,000—by the Government's estimate at his Bond hearing, and spent monies with Tamera and entertained at hotels during the pendency of the case.

My appointed counsels, Adams and Frankel failed to argue and failed to reset for a hearing on the facts in the Revocation…not based on my word, but on the receipts and

5

records in support of my having met all bond restrictions. Adams stated that the Government had failed to inform him of the hearing, or notice up the Revocation Motion, and that he, Adams, had been out of town—a frequent excuse when asked why he failed to visit and prepare with me at the MCC.

Perhaps at the time of the Revocation Motion, Adams and Frankel were already disinvested in my case, owing to Frankel's informal withdrawal because he was busy with his judicial campaign. After his loss, he returned. The disappearance and the informality of representation, in a complicated financial case, was inexcusable and constitutionally-violative neglect of the client, Albert Rossini.

Neither Adams nor Frankel reviewed my responses to the Revocation Motion. Thus I was again left to this Court's preconceived conclusions and unrestrained remarks about me.

I have been incarcerated ever since. Prior to the custodial detention-- unlike the negligible Government reaction to Murphy and his expenditure of investor cash during his release, it was I who was disported to electronic home monitoring—to the motels where I was consigned, as well as foreclosed of living wages or access to employment by the actions of the FBI, countenanced by this Court.

Adams and Frankel telephoned me at the Chicago MCC the Friday before trial, saying they were with the U.S. attorney, waiting for my plea. Imagine that. No preparation for a trial, just wheedling for a plea I was determined not to allow. This Court was informed of the plea negotiations between the U.S. Attorney and my appointed counsels, which took place without my participation, knowledge or consent. I was demanding trial.

That Friday, over the phone, Adams asked if I planned to testify. This late query inadvertently proved his failure to have prepared with me. Then, in an act that was either malicious or witless, he telephoned my wife to ask her to appear as a witness. Why would a defense lawyer, with a sense of duty, obligation and knowledge of the law, take such unethical advantage, and also fail to consult with his client?

So, Adams appeared, alone, at the MCC on the Sunday before trial. It was his first, late-stage attempt at preparation for trial the next day. He was accompanied by his empty legal pad. No documents, no list of witnesses, no list of exhibits, nothing.

Your Honor had ignored my requests to be released in order to prepare for my case. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Despite my entreaties, the Court was not disposed to release me to review the documents held in storage (due to the transitory motel life, while living in penury, as stated above).

Another egregious setback was experienced by me, at trial, and attributable to this Court having ignored my pretrial Motions. The Government permitted Thomas Murphy to

6

testify, falsely, about his three fraudulent bankruptcy petitions (also never brought up as grounds for Revocation). The first was handwritten, and the second two were typed. The fraudulent bankruptcy filings occurred during the pendency of this case. The fraud was identified and a hearing, under oath, was held by the U.S. Attorney in Bankruptcy, as to the matter of Murphy's altered social security numbers. Murphy did not testify at the Bankruptcy hearing that Attorney Jeffrey Deer had prepared his petitions. These federal filings, and the hearing and decision, were binding on this Court. Instead, those too went unheeded.

At my trial, Murphy then testified, contrary to what he had stated at his Bankruptcy hearing before the U.S. Attorney. Instead, he testified that his colleague, lawyer, and co-conspirator in the Highland Park arson matter, Jeffrey Deer, prepared the bankruptcy petition and inadvertently typed the wrong social security number. BUT, Murphy's first bankruptcy petition was handwritten, by him; the altering of the social security number, *ab initio*, was his doing, not Deer's. The handwritten Bankruptcy petition was not presented; a ruse, if ever there was one. The Government did not reveal this bait-and-switch, this perjury, to the Court. My appointed counsels were oblivious.

Your Honor denied my request for a trial continuance based on my explanation that Adams and Frankel were completely unready. Yet, following my conviction, the Court continued my case and sentencing, repeatedly, without notice, for weeks, as it awaited the Babajan and Anthony case, which promised Thomas Murphy's repeat testimony as to his forcible withdrawal of escrow funds at my direction.

What was plainly illegitimate was this Court permitting Murphy to again testify for the Government. What conclusion can be drawn except that the selected defendant with no credibility in the eyes of the presiding judge was estopped in the expectation of constitutional protection, whereas another defendant, whose astonishing incredibility did not disturb the Court, was elevated to material witness.

During the pendency of my case, Murphy and Deer, both represented by attorneys, concocted an arson/loan flim flam, one which was intended to point to me as the culprit with a predilection for violence and revenge.

The arson had been admitted by Deer when he telephoned the night of the fire. He told me there had been an arson fire at his Highland Park home. I wondered why he would call me to report it. Unfortunately for the best laid plans, I had been placed on electronic home monitoring by this Court, and that night, I was stationed in my motel home. I immediately telephoned the U.S. Probation Dept., and my credibility, and my physical presence in the motel, became a matter of Governmental record.

The Jeffery Deer money laundering case was pending in state court; the arson, a federal crime, was not charged by the Government. Luckily, Deer's garage and Porsche escaped damage. I was made aware of the goings-on after being writted out by the U.S. Marshal,

7

without benefit or notice to my appointed counsels Adams and Frankel. They never brought a motion on my behalf but my pro se Motions in Limine contained my version of the events.

The Government knew of the circumstances yet reacted with questionable motive. Jeffrey Deer was added to the Government's witness list in my case, but later withdrawn.

No revocation of bond was brought against Thomas Murphy though he was embroiled in the scheme and was familiar with the two convicted arsonists who were Deer's clients.

This criminal incident did not prevent Murphy's testimony at my trial nor for the trial of coDefendants Babajan and Anthony Khoshabe. Further, your Honor repeatedly interrupted and belabored defense attorney Cheronis' cross-examination of Thomas Murphy. This conduct indicated your determination to protect Murphy's unwarranted status as a credible witness for the Government, and to absolve him from what was his crime alone.

This Court's malign opinion of my credibility, and a desire for conviction, extended into the undisclosed Government efforts in my civil court cases and judgment enforcements. Civil attorney time, effort and fees grew as those cases were continued, without reason, alongside the federal proceedings—a subterfuge to hold the increasing amounts as a source for forfeiture..

After conviction, the civil forfeiture action was brought by the U.S. Attorney to unlawfully seize the monies awarded in state court, but which had not been paid because of the Government's persistent shadowing of the cases for its future forfeiture. This Court did not restrain the Government in those harassing ventures, with a judicial nod to keep all information undisclosed.

Among the many points restated here, and contained in the Motion for New Trial, were the allegations that my appointed counsels Adams and Frankel were ineffective in representing me.

In my opinion, having been in detention for these several years, this Court adjudged the two-- without hearing or evidence-- as having provided "meaningful counsel." This tact permitted the Court to focus, and remark, repeatedly, on my lack of credibility. It also avoided exposure to the facts and the law.

And if this Court might entertain an aside on the issue of credibility, I must add, as an expert in the halls of the MCC in the years spent in detention, Attorney Josh Adams' credibility among his appointed defendants, assuming a range of probability from zero to 10 — zero meaning zero probability, 10 meaning metaphysical certitude, Adam can boast of reaching the nadir of –zero. It is the ineffectively-represented, plea-pressed defendant whose considerations should matter to the Court.

In closing, I wish to state the condition of my health since I was taken into custody on the basis of the Government's false representations in its Revocation of Bond pleading.

I was detained because the Court doubted my credibility. My appointed lawyers did absolutely nothing to correct this erroneous presumption. The Court did not focus on details in the Babajan revocation hearing. He remains free, and was never on electronic home monitoring, nor did he have to move to a motel.

The Court never had to bother with any hearing for Thomas Murphy, whereas I was barred by government interference and harassment from any source of income—even though the Government's case was that I had stolen millions from investors. Thomas Murphy, with nearly a half a million remaining in his pockets, went on vacations, and in one, during the pendency of the case, was arrested for drunkenness and domestic assault. No Revocation of his Bond was filed by the Government and no punitive electronic home monitoring.

The health risk at the Chicago MCC, from the time I was taken into custody, age 69, has been enormous. I have had several hospital visits due to my heart and pacemaker, I have experienced repeated respiratory ailments, and at one time collapsed, unconscious, on a floor of the MCC. I was tested as COVID positive, quarantined until May 12, 2020, and been without a doctor's care or treatment the entire time I was quarantined. With family intercession, a doctor was called and I was examined the morning of May 12. The doctor examined me but believed I was COVID negative. However, he tested me with a COVID swab in order to gain a precise result, and it will not be forthcoming for another three days. I remain in quarantine.

Your Honor advised I take this case up to the Court of Appeals and "let them deal with it." Meanwhile, my request for an interlocutory appeal has been denied because I must first be sentenced. The errant, unconstitutional nature of my proceedings, the post-trial continuances without notice, the COVID lockdown, my precarious health, and an undue, unjustifiable detention have brought me to the filing of this Objection to your Denial of my Motion for a New Trial. I do so respectfully, but at the same time, I strongly disagree with the actions taken in my case and with the unequal justice dispensed.

Respectfully submitted,
**Albert M. Rossini**
Albert M. Rossini
08043-424

*albert m. Rossini*

ALBERT M. ROSSINI
08043-424
CHICAGO MCC
71 W. VAN BUREN ST.
CHICAGO IL 60605



CLERK OF THE DISTRICT COURT
CRIMINAL DIVISION
219 S. DEARBORN ST.
CHICAGO IL 60604