SM

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG 1 1 2021 

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States of America
Plaintiff

v.

Albert M. Rossini
Defendant

15 CR 515-1
Hon. John Z. Lee
District Court Judge

## DEFENDANT'S SENTENCING MEMORANDUM
## AND OBJECTIONS TO PRESENTENCE REPORT

### I. INTRODUCTION

Following a jury verdict of guilty and prior to sentencing, Defendant Albert Rossini ("Defendant" or

"Rossini") herein corrects portions of his Presentence Investigation Report (PSR) pursuant to Rule

32(c)(3)(D) of the Federal Rules of Criminal Procedure, as amended. Rule (c)(3)(D) requires the

correction of erroneous information in a federal offender's PSR. The Government's allegations, that

Defendant Rossini was responsible for a loss of $5,000,000 was neither specifically found by the jury

nor admitted by Defendant Rossini, and which Defendant specifically and factually refutes.

### II. <u>OBJECTION</u>: A Defendant Cannot be Sentenced on Materially False Information

The Courts have held that "a national penal system must have some concern for the probable accuracy

of this informational input in the sentencing process." *U.S. v. Weston*, 448 F2d 626 (9 Cir. 1971),

cert.denied, 404 U.S. 1061 (1972); *U.S. v. Rollins*, 544 F3d 820, 838 (7 Cir. 2008). See also *U.S. v.

McMahon*, 495 F3d 410, 426 (7 Cir. 2007).

Thus, when a trial court is confronted with inaccurate information in a PSR, and relies on the misleading information in formulating a sentence, the U.S. Supreme Court has held that the sentence must be vacated and remanded for further proceedings more consistent with the notions of fairness and due process of law. *Townsend v. Burke*, 334 U.S. 736 (1948). When fixing sentence, the court must rely on information that is reliable and accurate.

District Courts have become more sensitive to the requirements for disclosure of the PSR to both the defendant and defense counsel. The importance of such disclosure is to prevent inaccurate information from playing a role in sentencing. *U.S. v. Salinas*, 365 F3d 582, 587 (7 Cir. 2004). "A sentencing court demonstrates actual reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Id*. at 586, quoting *U.S. v. Tucker*, 404 U.S. 453, 447 (1972) and *Lechner v. Frank*, 341 F3d 635, 639 (7 Cir. 2003).

The Government and Probation facts regarding Defendant Rossini, and which have been presented to the Court for sentencing, are inaccurate and unreliable. Rossini's Memorandum, his Charts I, II and III, and his Exhibits, meet the burden that a defendant must clear.

In *U.S. v. Salinas*, the court said the defendant bears the burden of showing that facts are inaccurate or unreliable. A defendant does not satisfy this burden simply by a denial. "He must produce some evidence that calls the reliability or correctness of the alleged facts into question." *Id*. at 587-588. Though the judge may rely on the PSR, if the defendant has provided some evidence that calls the PSR's correctness into question, the burden shifts to the Government to demonstrate the accuracy of the information. *U.S. v. Mayo*, 593 F3d 603, 608 (7 Cir. 2010).

In conformance with the *Mayo* case, the Court must direct the Government that it must first sustain its burden of proof, and that burden should include confronting the facts and figures presented by Defendant Rossini.

<u>The Element of Bias</u>

Disparity and inequity have peppered Defendant's case. In one such instance, Defendant submitted the affidavit of Meir Rotstein. This was the affidavit of a married father of two adult sons. A hard-working senior, articulate, law-abiding, Israeli-born son of Holocaust survivors. The Court dismissed his affidavit as irrelevant because Mr. Rotstein "worked for you (Rossini)." This inflexible disposition was evident also in the Court's rejection of the Thomas Murphy ARDC findings (see Exhibit A; affirmed by the Illinois Supreme Court) that Murphy was lying when he blamed his escrow thefts on Albert Rossini. This Court has been determined, beyond peradventure, that Rossini would take the whole of the liability, the burden, and the guilt.

The Government's witnesses were respected without question, including, most unwisely, the plea-arranged, co-Defendant Thomas Murphy. This was evident in the Court's denial of Rossini's Motion for New Trial. Yet, during the pendency of this case, Murphy repeatedly violated his bond conditions,* but the Government looked the other way. Murphy was the Government's witness against target, Defendant Rossini.

*Defendant has not read the Murphy PSR and is not informed whether the factual incidents, as set forth herein, were included. Murphy testified for the Government, notwithstanding his violations (undisclosed by the Government). It was Rossini, detained from the outset, who bore the brunt of this Court's undisguised disfavor and custodial penalty.

3

1. Murphy alleged disabilities at his bond hearing that left him near-incapacitated. At that hearing, the Government disclosed that he was in possession of approximately $465,000 investor monies (as opposed to Defendant Rossini's zero).

2. Having the financial wherewithal, as the Government disclosed at the bond hearing, and his disabilities in apparent remission, Murphy traveled to Florida, with his girlfriend, Tamera Brown, residing at their new Florida condo, and where he was arrested for alcohol-implicated domestic battery.

3. Disabilities notwithstanding, and $465,000 of investor monies in his control, Murphy also purchased and engaged in trysts at the Hampton Inn, Skokie, and one of which rendezvous was with Tamera Brown who drove from Florida in their Mercedes.

4. The red herring. Murphy filed three consecutive Bankruptcy petitions. Undisclosed by the Government, the first petition was *handwritten* by Murphy himself. This handwritten petition was the first of the three. It was written and signed by Murphy and it contained the fraudulent social security number which would be repeated in the two subsequent computerized petitions. The Government prepared Murphy who testified that the skewed social security number --on a computer-typed Bankruptcy Petition entered into evidence-- was the error of his partner, then-attorney, Jeffrey Deer. The Government was acquainted with Deer, having briefly considered him for the role of witness against Rossini (*infra*, the arson plot, #6).

5. Thomas Murphy was deposed in his bankruptcy fraud before AUSA Snell. This was not disclosed to Defendant Rossini. The subject matter? The fraudulent social security numbers. Murphy's sworn statements in the fraud deposition contradicted what the Government directed of him in his subsequent testimony at Rossini's trial.

6. Murphy and Jeffrey Deer conspired in a false accusation that Rossini was the arsonist of Deer's Highland Park house where a molotov cocktail had been thrown while the family

was inside. Their putative motive was to eliminate Rossini's testimony in their separate

Cook County criminal cases involving...escrow funds. Deer's arson actually arose out of his

clients' demand for the return of escrow funds. Knowing all this, Deer and Murphy, their

lawyers and the Government cooperated in the plot-- to target Rossini as a violent felon.

The Government was as fixated on Jeffrey Deer as it was with Murphy in the effort to

convict Rossini in its concoction of a real estate scheme. The Government even added Deer

to its witness list. The plot fell flat. Yet, an arson *did* occur. A plot was in the works from the

night of the arson.  Deer telephoned Rossini that night and, as if an arson investigator had

been at the premises that very night, told Rossini there had been an arson, and wondering

where Defendant was. As Rossini was on intensive home-monitoring per Government

request, the phone call was monitored. Rossini had what is known as an "iron-clad alibi."

No one was ever charged with the arson. Not Deer. Not the thefted clients. And not two of

Deer's clients who were convicted arsonists. All this was known by the Government,

Murphy, and both Deer and Murphy's lawyers. Yet, this Court dismissed Defendant

Rossini's accusations, ruling in effect that the Government's removing Deer from the

witness list was tantamount to a constitutional cure.


Erroneous Government Calculations

FBI Forensic Accountant Sandie Prescott's trial testimony, the Government's and the PSR's

determinations of loss, restitution, victims, and Defendant Rossini's contributions to the loss are riddled

with inaccuracies. Ms. Prescott testified that Defendant received $2,550,000 and spent it on his own

needs. She further testified that Devon Street Investments (DSI) was "not a real company."


Her conclusions were predictably drawn so as to support the Government's charges.  But figures, if

thoroughly and objectively calculated, do not lie. If Defendant received $2,550.000 from the Murphy

5

scheme, then Devon was obviously not a non-existent company since Rossini did make recorded

payments of $5,942,731.70. Furthermore, Devon had to earn additional gross receipts of at least

$3,050,000 from its consulting and real estate sales—besides the $2,550,000 Ms. Prescott said

Defendant received in the "Murphy scam."

A defendant has a constitutional right to be sentenced on the basis of accurate information, see *U.S. v.*

*Rollins*, 544 F3d 820, 838 (7 Cir. 2008).  To establish a violation, a defendant must show the

information was false and the court relied on it.  *U.S. v. Walton*, 907 F3d 548, 552 (7 Cir. 2018).

Defendant Rossini's listing of payments for the period 2011-2013 of approximately $5,900,000,

together with Ms. Prescott's statement that Rossini received $2,550,000, indicate the Government

review and investigation was cursory and not credible.

Rossini Documents Refuting Government Numbers

Defendant Rossini does not simply deny the Government's assertions. He submits documents that

refute the inaccuracies. (Chart I is attached to a separate filing of the Exhibits, but incorporated herein;

Charts II and III are attached and incorporated herein). The Court's attention is drawn to the bias

element, *supra*-- that Defendant was detained and prevented from any search and review of his own

records which were in storage, despite numerous requests to prepare for trial.

---Chart I lists investments by victims and disbursements by then-attorney, co-Defendant Thomas W.

Murphy, together with monies Murphy held in his attorney escrow account for purchase of notes,

mortgages and short sales.

---Chart II lists payments by Defendant Rossini and properties Defendant purchased and transferred to

investors in 2011, 2012, and 2013.

---Chart III lists Rossini credits against loss for the years 2011, 2012, and 2013.

Based upon Charts I, II and III—of Income, Payments and Property Transfers to victims, Defendant Rossini is not responsible for loss to victims or restitution.

### III. OBJECTION:  The PSR Finding that Thomas W. Murphy and Defendant acted in concert is false and without basis in fact or law.

Defendant was introduced to then-attorney Murphy in October 2007 through a transaction in which Murphy represented Metal Networking LLC. Murphy was then a partner with Pedersen & Houpt, and subsequently represented Defendant Rossini in the purchase and sale of 1266 S. Orchard Ave., Montgomery IL. In early December 2010, at Murphy's Pedersen law office, Murphy asked Defendant if he had an interest in acquiring real estate short sales and defaulted notes secured by mortgages on real estate.

Later that Dec. 2010, Defendant Rossini formed a business venture ("Venture") with Babajan and Anthony Khoshabe, which was joined by Fereidoon Khoshabe and Ibrahim Yousif. Ibrahim Yusif's accountant, Gus Bahrami, contributed investment advice. The Khoshabes were experienced in real estate transactions and operated a mortgage banking and brokerage company for over 20 years.

The Venture was set up whereby Rossini would negotiate the acquisition of short sales, defaulted notes from banks and attorneys representing banks and mortgage companies, including Murphy, who represented several banks, e.g., New Century Bank and American Chartered Bank.

Acquisition prices in the period were significantly below the outstanding loan balances and far below the value of the underlying properties. Through their connections and the association with brokers Fereidoon Khoshabe, Ibrahim Yousif and, on at least one occasion, Ashoor Pithyou, the Khoshabes

were able to raise capital. It was a lawful enterprise.

The Khoshabes and Rossini were in the business of acquiring real estate and discounted notes and mortgages by borrowing money from investors, lenders, and individuals experienced in these transactions. The investors were known by the Khoshabes. They spoke English but their native language was Aramaic or Farsi.

The prices were agreed upon by all, with the understanding that all funds were to be handled by then-attorney Thomas Murphy who would deposit their funds in his attorney escrow account. Murphy, as legal counsel, would close the acquisitions, pay himself and his firm a fee of at least $5,000/transaction, and at times, up to and in excess of $10,000, remitting the balance of the funds to Rossini, the Khoshabes, and brokers.

In all cases, the funds borrowed from investors exceeded the actual cost of the acquisitions, but the money invested or loaned by investors was substantially below the fair market value of the collateral property. The loans and/or investments did not have any restrictions as to the use of the proceeds as long as the investment was used in the normal course of the Defendant's business. After the acquisition of either the note or the property, Murphy would receive the rent or interest and then remit the cash flow to the Devon Management Co., DSI, or, directly to the investor lenders.

At all times, Defendant Rossini strove to make money for investors and to keep the business an effective performer. Defendant and his staff—contrary to the Court's disparagement of Meir Rotstein's affidavit, regularly invested time, effort, and expenses in surveying properties. Along with his hard-working employees and independent brokers, Rossini researched properties, mortgages, foreclosure documents, and court cases, kept comprehensive binders of search results, and subscribed to most of

8

the real estate search engines.

Thomas W. Murphy and the Funds

The procedure for the Venture, based on the advice and direction of then-attorney Murphy, was that after the Khoshabes received commitments for the loans from investors, 100% of the funds were to be delivered to Murphy to be placed in his attorney escrow fund. All funds were made payable to Thomas Murphy as "Attorney/Agent." Murphy's responsibility was to deposit the funds but to segregate the amounts necessary to buy the default mortgage loan,s with a fee of between $5,000 to $10,000, and occasionally more per transaction for himself and his law firm. Murphy would then forward the balance of the funds to Defendant, the Khoshabes, Yousif, Pithyou and other brokers.

Babajan Khoshabe, Anthony Khoshabe, Fereidoon Khoshabe, Ibrahim Yousif, and Ashoor Pithyou brought the investors. Babajan instructed the investors how to make out the cashier checks, i.e. payable to attorney Thomas L. Murphy. These were generally delivered at the office, 3924 W. Devon St, Lincolnwood. The accounts and files would be updated by Rossini and staff. Murphy would either pick up the checks at the Lincolnwood office or Rossini would deliver them to Murphy at his law office in Chicago.

Rossini, Khoshabes, and investors posted $5,476,100 in cash collateral with Murphy from December 31, 2010 to September 2013 under the terms of their agreement to secure purchase of properties and mortgage notes. Devon Street Investments was entitled to a return of the cash collateral not used to purchase the notes, mortgages or properties, for further payment to investors.

In most cases, Murphy would advise Rossini or Babajan how much the note would cost, and Rossini or Babajan would tell Murphy the commissions to be paid to them, and to Anthony, Fred, Ibrahim or other

brokers. However, Murphy was always in possession of the deposits for the note purchases themselves. Those were to be held in his attorney account pending his purchase of the note(s). He had total control of that portion of the money, approximately the sum of $5,476,100..

Structure of Transactions

The transactions were all structured whereby the capital raised by the Khoshabes from investors was then loaned to the Venture through guaranty agreements, i.e., contractual. The amounts of these loans were significantly less than the fair market value of the underlying properties. Comparative Market Analysis valuations were prepared by Devon Street Investment, Ltd. ("DSI") employees for each prospective purchase. The amounts received from investors was higher than the price Defendant had agreed to pay for the notes and short sales, thereby providing a profit for Defendant and the Khoshabes. This was a customary practice in the note and short sale business, and fully understood by investors and lenders.

The Venture was per written agreement obligating Defendant through the guarantees to pay interest on the loans at a rate equivalent to the rentals collected for the subject properties, less a management fee. Also, per written agreement, the principal would be repaid in cash or by delivery of the deed or note to the property.

There were no restrictions in the loan documents as to the ability of the Venture to use the proceeds of the loans for any proper purpose. Thomas Murphy advised, originated, and drafted the guaranty agreements sending them by facsimile or email for both Defendant and the investors to sign. His legal work came from Murphy at his law firm. His initiative came from his years of law practice. His clients included reputable and prominent institutions which he touted. There was no reason to doubt his expertise.

10

There were successful transactions with Murphy in 2011; his deceptions began on or about January 12, 2012. He told the Venturers and Fereidoon Khoshabe that he was making the required acquisition payments and the collected rents. In fact, he had stopped making the payments and diverting the proceeds to his own use.

Murphy's Independent Conversion of the Funds

The why and wherefore of Murphy's conversion of these monies to his own use was that, at some time in October 2011, Murphy became a client, and later, boyfriend, of Tamera Brown. He stopped purchasing notes and began paying interest and rental payments to the Venture (for disbursement to investor/lenders) from investor funds meant for acquisition of notes, mortgages, and short sales.

The money Murphy converted was never intended for anyone but himself and his new companion. No one knew. The Venture and investors continued to rely on Murphy's expertise and prestige in the purchase of discounted notes and short sales. Both Babajan and Fereidoon would remark that investors could view Murphy's professional resume online prior to making their investments. The Khoshabes spoke regularly with the investors.

The Government omitted an accounting of Murphy's independent expenditures, another defect in its findings, lending support to Defendant Rossini's charge of unreliability. Defendant Rossini traced at least $1,200,000 Murphy spent with Ms. Brown, including approximately $600,000 towards their aborted purchase of 2015 N. Racine, Chicago, in November and December 2012. This likely accounted for Murphy's insufficient funds checks, totaling $571,000, which he tendered to Devon Street Management. The money was also used by Murphy and Ms. Brown to purchase a condominium in Del Ray Beach, Florida.

During 2011 and 2012, Rossini bought and made monthly payments to Mt. Vernon Insurance Co. and the Seattle Specialty Insurance Co. through its New York City broker, Evergreen Insurance. The Venture thus insured the properties and mortgages for which the Venture had received money from investors. Defendant insured at substantial cost—up to $14,000/month.

## Theft of the Investor Funds

Thanksgiving week 2012, Murphy sent the Venture $571,000 in checks from his attorney business account. These checks represented four months cash flow that he had supposedly received from interest, rentals, and sales-- on notes and properties he purportedly purchased-- for which he did not have sufficient funds. Consequently, the checks sent by him bounced. Before the Venture knew that the checks were NSF, Defendant Rossini had remitted payments to lenders and investors. Those checks and ACH* payments bounced (although paid by Chase Bank). Defendant Rossini then worked out an arrangement with Chase Bank to cover the bad checks, which he did with his own funds. Rossini paid Murphy's overdrafts and satisfied the investors in December 2012. Defendant paid over $446,000 to cover the checks, ACH payments, attempting to satisfy the investors who had now lost their money.

Babajan and Defendant Rossini then learned of Murphy's affair with Tamera Brown and that he had spent over $1,200,00 (house, personal expenditures). Further, Murphy used the monies to obligations owed his former clients in his law practice: Arthur Sonial Trust, Casey Zagovnia Trust, Nina Jozers, Steven Shah, Mark Glazer, M.D., World Wide Realty, and Prestige Realty Partners. These personal, non-Venture, non-Rossini expenses were the reason for Murphy's conversions and frauds.

*ACH: An ACH payment was the bank's automatic debit from the sender's account and automatic deposit to the receiver's (payee's) account.

No matter how furiously the Government has beat its drum to prove what it erroneously charged in its Indictment, the proof was that this case was an attorney/escrow issue. The Government manipulated the scenario in order to support its false narrative. Defendant Rossini was charged as having devised and directed a scheme to defraud investors, for which he received $2,550,000 of the proceeds, and having amassed the investor monies, then bought no properties, using the money for his own benefit. This was the material charge in the Indictment which the Government conveniently altered at trial, alleging that Rossini did purchase some property but only for $200,000. This was contra existing law; an Indictment must serve as notice of the charges being brought against a Defendant. Then, to heighten the possibility of severe enhancements, the arson plot against Rossini evolved.

In arguendo, the fact that the jury found Defendant guilty of the charges does not allow the Government to again present findings that are patently erroneous and false, without basis in the facts and records duly produced to the Government by Rossini.

As Defendant has stated about Murphy's funds at the bond hearing, the Government advised the Court that Murphy deposited $465,000 into accounts controlled by Tamera Brown. This fact is not reported in the Government or PSR findings.

Rossini Recovery Attempts

On numerous occasions, Rossini requested that Babajan and Anthony help repay some of the investor/lenders with money they held from Murphy. At one meeting at the office of attorney Richard Kruse, with Defendant Rossini and Fereidoon Khoshabe, Babajan and Anthony refused to contribute "even one dollar" towards repayment of investors.

Subsequent to learning of Murphy's conversion, and his measures to keep the funds hidden, Devon

Street Investments, Ltd. ("DSI") filed an accounting suit against Murphy in Cook County Circuit Court, Chancery Division.

At the same time as the filing of the accounting suit, each investor was informed of the Murphy situation, in writing and by phone. Attorney Kruse advised Defendant Rossini and Babajan to file and record lis pendens on each property for which Murphy was to purchase the notes, mortgages or short sales in order that investors would be protected until the Venture received information as to whether they owned the notes, mortgages, or properties.

In response to the inquiries, the accounting lawsuit and the serial lis pendens, Thomas W. Murphy, representing himself, suggested settlement with Attorney Glen Seiden and Defendant Rossini, during which he represented he would compensate the Venturers and investors with property and from transactions in which he was involved.

Murphy stalled, reneged, and filed three fraudulent bankruptcy petitions. In his 2014 Bankruptcy Petition Schedule of Financial Affairs, Murphy would list DSI as having a foreclosure judgment against Murphy's Kildeer IL marital residence.

Rossini was never informed of Murphy's first, handwritten Petition nor about the subsequent Bankruptcy Fraud deposition. It was neither disclosed nor produced by the Government. It was found through an independent search while Defendant was in the opening days of his lengthy detention which this Court refused to curtail, thus preventing him from meaningful preparation in defense of the charges brought against him. (See Exhibits for Murphy Bankruptcy documents, his Schedule of Financial Affairs, World Wide Realty vs. Thomas W. Murphy motions, Bankruptcy fraud deposition brought by AUSA Snell, Rossini Motions to Dismiss, *inter alia*) (See also Exhibits of Rossini tax returns for the

relevant period vs. those of Thomas W. Murphy).

Rossini Investments, Expenses and Costs

In addition to the investor transactions, Defendant Rossini's lawsuits against Murphy, his monthly insurance payments, and his payment for construction and renovation, Defendant Rossini also invested personally in notes and mortgages from Murphy, relying on his expertise and his employment with a reputable law firm. Rossini invested $277,500 in purchasing discounted notes and mortgages from Murphy (see Exhibit C, in the separately filed Exhibits).

Calculating Loss: Credits

The Seventh Circuit has in the past analogized Ponzi scheme cases to fraudulent loan application cases. in *U.S.v. Holiusa*, 13 F3d 1043 (7 Cir. 1994), the court reversed the district court when it refused to give defendant credit for the amount of money defendant had repaid the victim in the course of such a scheme. The Court of Appeals held that the scheme itself contemplated a return of certain monies and analogized the situation to schemes where a pledge of assets is available to offset the amount of the loan fraudulently obtained.

Defendant is not deducting payments made to investors after the fraud was detected. All payments deducted or properties transferred were made prior to the fraud detection. Kathy Khodi transactions in 2013 were made with her full understanding of what had happened with Murphy and of Rossini's attempts to recoup funds through the accounting lawsuit and through Murphy's clients as per conversations with attorney Seiden. Payments Rossini made during 2014 and 2015 indicate acceptance of responsibility to the investors and is not an admission of guilt.

In calculating loss, the Guidelines specifically direct a court to such factors as the fair market value of

property, the cost of repairs, and to general factors, such as scope and duration of the offense and revenues generated by similar operations. U.S.S.G. Section 2B1.1, application note 3 (C). This Court should thus consider the reduction that resulted from the offense in the value of equity securities or other corporate assets. U.S.S.G. Section 2B1.1, application note 3(C)(v). These would be Rossini credits for payments and transfers made by him to investors.

Government Access to Information but Undisclosed to Rossini

Only transcripts of Murphy's testimony at the Khoshabe's trial were provided to Defendant Rossini, and these were given by Attorney Richard Kling. None of the other testimony, evidence, etc., wherein the Khoshabes blamed Rossini along with Murphy, was produced. These are critical to Rossini's preparation for sentencing.

Requests have fallen on deaf ears throughout the pendency of this case and Defendant's lengthy detention—constructively preventing him from preparing any part of his case. (Defendant's only participation, via the Government's unnoticed authorization, was having been whisked away from his MCC detention to the George Leighton Courthouse for the confrontation with the Government, the ASA assigned to the Jeffrey Deer case, and the Murphy and Deer lawyers, about the Deer arson). Also missing in production to Defendant Rossini was this exhibit: the complaint Anthony Khoshabe sent to the SEC in 2012 complaining about Rossini and Devon, unbeknownst to Rossini and his father, Babajan. Not this, nor any other Khoshabe exhibits were produced.

Defendant Rossini's Theory of the Case

In September, 2014, 11 months prior to the indictment, Rossini and attorney Glen Seiden voluntarily, without subpoena, presented to Government agents, Defendant's documents and records of payments, properties purchased and transferred to investors and/or sold. The Seiden Law Group helped prepare

Defendant's statement, presented to the Government in 2015. Defendant Rossini's records support incontrovertibly both his version and his accounting and contradict the Government and PSR findings.

Rossini's records were also given to his subsequent court-appointed trial attorneys, Joshua Adams and Scott Frankel, prior to trial. They either did not review or did not comprehend the statements and records. They failed to prepare for trial with Rossini. Adams and Frankel did admit, to Professor Richard Kling, that they had not contacted, interviewed nor investigated any of Rossini's witnesses. What they did do "in preparation" was telephone Rossini at the MCC on the Friday before the Monday trial, to say they and the AUSAs were awaiting his plea.

Rossini Accounting Preparation

The chart information is drawn from Rossini's tax information and his accounting, completed contemporaneous with the transactions in 2011-2013. These few files he had in his possession prior to his arrest and custodial detention. At the first of his detention facilities, the Kankakee jail, Defendant Rossini, began to prepare the charts. The rest of his files and records have been in storage since the outset of this case. Contained therein are every check, money order, wire transfer, ACH payment or cash receipt.

The Government received copies of these files (now in storage) from attorney Seiden in September 2014, fully 11 months before the indictment. Apparently, Rossini's records escaped Government attention as indicated by the erroneous charges of the Indictment. The Government has omitted Rossini's records and evidence because they did not suit the Government's false narrative that he was the director of a conspiracy.

The indisputable fact is that Rossini is the only Defendant in this case who willingly returned money

17

and transferred property to the victims even prior to knowledge of an investigation. The Government and Probation's refusal to submit this record evidence to the Sentencing Court is, at best, a reverse form of "willful blindness," and at worst, a deliberate targeting of the Defendant.

Lulling Payments

Government agent Kelly Connors admitted at trial that she was unfamiliar with much of the Rossini financial documentation and stated it was "because there was so much of it." Thus, neither she nor FBI forensic accountant Prescott reviewed the detail of payments made by Rossini. Instead, they made the provocative, yet unsubstantiated, conclusion these were lulling payments. Such payments were "designed to lull investors into thinking they were receiving money to which they were entitled though they were not." However, Rossini was contractually obligated to make payments to the investors. He was complying with a contract.

Labeling a payment or a lis pendens as "lulling" was "argumentative and ha[d] the potential to prejudicially influence the jury and now the court if used in evidence. See *U.S. v. Lopez*, 870 F3d 573 (7 Cir. 2017) (2017 U.S. App. LEXIS 24) (Posner, J., dissenting).

Payments and lis pendens do not be definition equate with "lulling." Lis pendens were not recorded without a legitimate purpose by Rossini. They are a powerful tool used to put third parties on notice of a claim or interest. They are hardly deserving of a sentence enhancement. Defendant objects to the Government's specious definition.

Rossini Financial Loss Calculations

Defendant alleges that the Government and PSR's unreliability is founded on a series of material

misrepresentations made throughout the pendency of this case.* Submitted have been embellishments, diversions, and figures without calculable reliability (see, e.g. Rossini Charts I, II, III).

The Government's agent and accountant admitted to only a brief review of the accounting. The Government and the Court deprived Defendant Rossini of access to his business records and discovery—which would have verified fully his statements calculations in this Memorandum (and his other filed but avoided Motions) from the available documentation in storage.

The standards of an accountant's expertise is that the expert opinion is reliable and with basis in fact. This standard was not met by virtue of the accountant's own words at trial.

The base offense level for fraud offenses is seven if the defendant were convicted of an offense referenced in the fraud and deceit guideline, or if the conviction has a statutory maximum imprisonment term of 20 years or more (which encompasses mail, wire, and bank fraud) U.S.S.G.§2B1.1(a).

Credited against loss are monies returned or services rendered to the victim "before the offense was detected," which casts the loss as a "net loss" calculation. U.S.S.G.§2B1.1, application note 3(E)(1). When collateral was pledged or otherwise provided by the Defendant, the Court should credit the amount the victim recovered at the time of sentencing from the disposition of the collateral, or the Defendant should get credit based on the fair market value. U.S.S.G.§2B1.1, application note 3(E)(ii).

---

*Defendant Rossini filed multiple motions regarding the Government allegations of nonexistent properties, lulling payments and lis pendens. In no instance did the Court hold a hearing to determine the truth thereof. Further, the Indictment was fatally deficient in having charged Rossini with dealing in nonexistent properties, yet at trial, circuitously amending the charges.

Benefits received by the victim can, under certain circumstances, be used to offset the amount of loss. In *U.S. v. Spano*, 421 F3d 599 (7 Cir. 2005), the defendant defrauded the Town of Cicero through an insurance claims processing company that in the course of operating processed legitimate claims and made legitimate payments, incurring legitimate costs. "The loss to the Town on the legitimate claims was the difference between what it paid SRC to process them and what it would have paid a legitimate processor to process them." *Spano* at 607.

Rossini's credits against loss are contained in Chart III. The expenses incurred by him should be deducted from the loss figure in general, and not specific to any one individual investor.

Rossini and Khodi Transactions

The following is critical in understanding the Rossini-Khodi transactions in 2013. In his Motion for New Trial, and insofar as the ineffective representation by attorneys Adams and Frankel, Defendant Rossini alleged that he listed numerous witnesses in order to contradict Kathy Khodi's trial testimony.

Lior Coresh, a real estate investor, sold Rossini 16 Riverdale Townhomes in June 2013 and in which Ms. Khodi invested. The price was $126,000 plus real estate taxes of $19,000, totaling a closing amount of $155,000. For Defendant Rossini, Mr. Coresh would have testified as to the condition of the properties and the need for renovation, and the difficulties in complying with Riverdale Village's regulatory process when transferring property. Mr. Coresh had to pay Rossini the rents for several months after closing because recording of deeds required by Riverdale's "point-of-sale inspection" prior to the recording of deeds and Section 8 monthly rental transfers.

Attorney Anthony Klytta represented Rossini in closing the Riverdale purchase and matters before the Village of Riverdale. As a Rossini witness, he would have testified as to Rossini's attempts to transfer

Riverdale properties to Ms. Khodi, including execution of deeds to the Khodi Family Trust and overnighting them via FedEx to her Cupertino, CA home.

Ms. Khodi unexpectedly rejected the Riverdale Townhome deeds. Rossini, although not legally obliged to do so, negotiated with Attorney Theodore Netzky ("Netzky") at Barnett Capital of Northbrook IL, for a $3,000,000 loan, with the Riverdale Townhomes and other DSI properties as collateral. The loan was intended to pay Ms. Khodi and several other investors. The loan was approved by Barnett Capital. Netzky and Rossini had informed Barnett Capital representative, Daniel Sobelman, of Rossini's background, legal difficulties in Cook County and financial status. This information was given prior to the loan application. Rossini paid a $10,000 fee to Barnett Capital's attorneys, Lavenfeld & Perlstein. Attorney Netzky was finalizing the loan, and closing documents were prepared and delivered to Defendant and Attorney Netzky by Lavenfeld & Perlstein.

On information and belief, and reliably based upon Mr. Netzky's conversations with Mr. Sobelman, FBI agents interfered with the closing---a business arrangement which would have made Ms. Khodi whole but would have interfered with her proposed witness testimony for the Government against Rossini. The Government chose gamesmanship over obligation to victims and loss. This misconduct should have been a subject of questioning of the FBI agents. Further, Rossini's attorneys should have called Attorney Netzky, Barnett Capital employees and lawyers at Lavenfeld & Perlstein, for their testimony about the harassment coincident with loan negotiations to resolve the Khodi and investor debts.

Attorneys Barbara Boiko and Ronald Osimani, Fidelity Title Insurance agents, were also familiar with the Barnett Capital transaction. Attorneys in Ms. Boiko's firm spoke with bank foreclosure attorneys on behalf of Rossini and investors' behalf to recapture properties they had purchased from Murphy.

21

Attorneys Boiko and Osimani had knowledge of the lis pendens Rossini recorded in conjunction with DSI v. Thomas W. Murphy and the Cook County accounting lawsuit. Attorney Boiko also alerted Rossini that both an Ocwen Loan Servicing Bulk Sale package of properties and a Commercial Mortgage Bank of Rockford Bulk Sale package of properties and mortgages that Rossini purchased for himself and Ms. Khodi had multiple irregularities and fraudulent conveyances by Ocwen, American Home Mortgage Co., Chicago Loan Servicing Co., and Commercial Mortgage Bank. The price of these fraudulent Bulk Sale Purchases was $395,000.

Based upon the aforementioned, Rossini should be credited $832,000 from the loss incurred by Ms. Khodi plus the payments made to her. (See Chart II, p. 3 and Chart III, p2.).

Liam Ben David: Loss Credit From Collateral Pledged to Investor     $275,000

When collateral is pledged or otherwise provided by a defendant, the judge must credit the amount the victim recovered at the time of sentencing from disposition of the collateral.  If not yet disposed, the defendant receives credit based on the fair market value.U.S.S.G.§2B1.1, application note 3(E)(ii), U.S.S.G.§2B1.1(a), (see also in Exhibits, Rossini and Liam Ben David loan documents).

In August 2012, investor Ben David loaned Defendant Rossini $275,000 for purchase of a note and mortgage on property at 2200 N. Kedzie, Chicago.  Rossini pledged three properties to Mr. Ben David as collateral for the loan with a loan agreement, note and mortgage, all recorded with the Cook County Recorder's Office.  The documents were prepared by Mr. Ben David's attorney. The properties are: 4045 W. Wilcox, 4033-37 W. Adams, and 5410 W. Fulton, Chicago.  The value of the properties far exceeded the $275,000 loan by Ben David.  Rossini agreed with Ben David's lawyer at a subsequent bankruptcy hearing that he would turn over the properties to Ben David and would not oppose foreclosure or assignment of interest.  Therefore, Defendant Rossini should receive credit for $275,000

toward the loss.

Law on Calculating Loss

Calculating loss is a very fact-specific inquiry. The government bears the burden of proving the amount of loss. *U.S.v. Vivit*, 214 F3d 914 (7 Cir. 2000). The government must prove the loss by a preponderance of the evidence. *U.S. v. Hatchett*, 31 F3d 1411, 1418 (7 Cir. 1994). Broad statements, such as made by FBI Forensic Accountant Prescott or Agent Connors, are not fact-specific but statements meant to embellish the amounts used in sentencing the Defendant.

In calculating loss, the Guidelines direct the court to such factors as fair market value of the property, the cost of repairs, the approximate number of victims multiplied by average loss, and general factors such as the scope and duration of the offense, and revenues generated by similar operations. U.S.S.G. Section 2B1.1, application note 3(C). This extrapolation or averaging is not relevant here, as the Defendant's accounting is specific and detailed. The Court is also directed to consider the reduction that resulted from the offense in the value of equity securities or other corporate assets. U.S.S.G. Section 2B1.1, application note 3(C)(v).

Vulnerable Victims and Sophisticated Means

Defendant knew little about the financial status of investors—excepting Liam Ben David-- prior to Babajan selling them the investment opportunity and receiving their funds. Only thereafter, was Rossini made aware of each investor's employment, financial acumen, and appetite for investment or risk adversity. Once alerted to the fraud and the hardship several investors suffered, Rossini continued to make payments from his own funds to several of the most vulnerable, including Janet Khoshaba, Havanna Moshi and Ilios Bolos. This was up to June or July 2015 for both Ms. Khoshaba and Ms. Moshi. Again, Defendant Rossini is the only defendant in this case who paid any money to the

investors from proceeds received by him. Although Defendant does not believe he should be held responsible for victims beyond what he has already contributed, based upon the Guideline 2B1.1(A), he should receive a maximum 2 level adjustment for victims.

Relevant Conduct Regarding Doris Kling and Nina Jozers

The Government's use of alleged information involving Doris Kling and Nina Jozers/Alamprese is not relevant conduct for purposes of Defendant's sentencing based upon (I) the facts, and (ii) Seventh Circuit decisions.

Rossini's interactions with Mrs. Kling and Mrs. Jozers dispute the Government's and PSR versions. Doris Kling hired Rossini to attempt to save her ex-husband's house where she and her children were living after the divorce. Mrs. Kling deposited $60,000 earnest money with Rossini. Rossini immediately turned it over to attorney Thomas Murphy for his escrow. When Rossini, after a year of negotiations was unable to purchase the residence at short-sale prices, Murphy returned the entire deposit of $60,000 to Mrs. Kling. She then sued Rossini for additional sums she believed were Rossini's responsibilities, including her living costs, a new apartment or rental residence, and emotional distress. All the while during Rossini's short-sale negotiations for Mrs. Kling's house, she worked at Rossini's office, 3924 W. Devon St., Lincolnwood IL as a short-sale sale negotiator and property finder.

The Cook County lawsuit against Rossini by Mrs. Kling was strictly a civil matter, filed after Mrs. Kling left her employment as a short-sale negotiator. The fact remains that Mrs. Kling was repaid her entire escrow deposit of $60,000. She was not the victim of a crime by either Murphy or Rossini. If held to be the victim of Defendant Rossini, then any civil case amount owed would qualify as relevant conduct. Further, the U.S. Bankruptcy Court and Code would become irrelevant.

Similarly, the Jozers/Alamprese case does not qualify as relevant conduct and as pertaining to Defendant Rossini.  See, also, the ARDC Report against Thomas Murphy, Exhibit A.).

Murphy and Rossini were co-Defendants in a Cook County criminal case filed September 2012 for the theft of Nina Jozers' funds. Mrs. Jozers' daughter, Benita Alamprese, deposited $353,000 to be used in the purchase of an office building at 300 Martingale, Schaumburg IL by Rossini and Frank Alamprese, Mrs. Jozers' son-in-law. The money was deposited by Mrs. Alamprese by her directly with attorney Thomas Murphy. All interaction concerning the funds were between Mrs. Alamprese and attorney Murphy. Rossini believed that Mrs. Alamprese had deposited $300,000 to Murphy's account. Later, Rossini was informed by both Mr. Alamprese and confirmed by Thomas Murphy that Murphy had borrowed an additional $53,000 from Mrs. Alamprese and her mother, Mrs. Jozers.

Prior to the deposit of any money to Murphy's account by Mrs. Alamprese on behalf of her mother, Rossini and Mr. Alamprese executed a letter of agreement for the use and repayment of $75,000 in securing the Martingale building by Rossini. This amount was later increased by agreement between the two to $125,000. Rossini was to repay Mr. Alamprese and Mrs. Jozers if Rossini and Alamprese were unable to close the building purchase.

Rossini and Alamprese were unable to purchase the Martingale building as the Seller's existing mortgage with Goldman Sachs carried a "due on sales" clause (a material aspect of the purchase was that Rossini/Alamprese assumed the Seller's mortgage). Rossini repaid Mrs. Jozers the sum of $130,000.

The conversion of the Jozers' money on deposit with Thomas Murphy led to his 2014 disbarment. In testimony before the ARDC, Murphy blamed Rossini, stating he, Murphy, had been directed in the

disbursements by Rossini (the same defense was proffered by Murphy in the herein case and accommodated by the Government in its Indictment narrative against Rossini and in Murphy's trial testimony against Rossini.). The ARDC Commission found that Murphy's sworn testimony was not believable, i.e., perjurious. The ARDC findings went further: Murphy had continuously, over a 20-year period, converted various client monies to pay for previously pilfered client escrow funds...in essence, his own Ponzi scheme. Rossini was dismissed from the Cook County criminal case; Murphy remains a defendant in that still pending case.

Relevant Conduct Analysis

The Kling and Alamprese/Jozers' matters are not relevant conduct for purposes of Rossini's sentencing. The Seventh Circuit is supportive.

1. In *U.S. v. Ortiz*, 431 F3d 1035 (7 Cir. 2005), the defendant pled guilty to selling drugs to a government informant. The District Court added to relevant conduct drugs the defendant purchased 10 months earlier from another drug dealer. The Seventh Circuit reversed, stressing among other things, the lack of temporal proximity, and noting that without temporal proximity, there had to be a stronger showing on other factors, such as course of conduct, regularity and similarity. The mere fact that a drug defendant participated in other drug activities was not sufficient, to qualify the transactions as relevant conduct. *Ortiz* at 1040-1041.

2. In *U.S. v. Coffman*, 94 F3d 330 (7 Cir. 1996), the defendant was convicted of defrauding Smith Barney in a scheme that included a pledge of worthless stock, The fact that two years earlier, the defendant had bilked some purchasers using the same worthless stock did not make that earlier conduct: "[t]here was no more a common scheme, or the same course of conduct, than if the [defendant] had used the same gun to hold up two different people two years apart." *Coffman* at 337.

26

3.  In *U.S. v. Purham*, 754 F3d 411 (7 Cir. 2014), the court reversed the district court's finding of relevant conduct. Defendant was incarcerated for drug distribution activity in 2008, which he resumed when he was released in 2010. The district court included the 2008 drug activity as part of his relevant conduct. The Seventh Circuit held first that the strong relationship needed to show significant similarity, regularity and temporal proximity. Id. at 414. The 2008 transactions involved much larger quantities of cocaine, and a stronger showing than usual of regularity and similarity was necessary with a temporal gap like the one at bar. The Seventh Circuit rejected the government's offer that the schemes were part of a common plan because it involved different people. *Id.*

Rossini Life and History

Defendant has been portrayed as a criminal, committing crimes across the American landscape, with no redeeming character. Yet, the Government showed no such expansive calumny against Thomas Murphy, whose escrow thefts from his attorney accounts were established by the ARDC as occurring over a period of 21 years.

The Court never failed to express its intolerance, misjudging or ignoring Defendant's motions or statements. Most recently, the Court's improper accord with attorney Clarence Butler, Jr's false accusations against his client, the Defendant, was lent without a hearing on the motions—even though Defendant had documented proof of attorney Butler's neglectful representation with one short conversation versus that of attorney Butler's false harangues against Defendant Rossini.

Although the Defendant was convicted in the Northern District of Illinois in 1995 and sentenced in 1997 and then again convicted in 2003 in the same district, the timing of these convictions are separated by the fact that the crimes were both committed in the early 1990s but were not discovered at

the same time. Defendant did not commit two separate crimes in two separate decades, 1990 and 2000.
He served the sentences for crimes committed within a couple years in the early 1990s-- in different
decades because the crime for which he was indicted in January 2003 was not discovered until 1999.
This portrays Defendant's history as more serious than reality would have it.

Defendant is unlike most defendants who appear for sentencing in this district in important respects.
Born in Utica, N.Y. on September 11, 1948, he attended Utica College of Syracuse University from
1966 to 1970 earning a Bachelor of Arts degree with a history major and graduated *cum laude*.

Defendant enlisted in the United States Marine Corps in his senior year of college. After graduation, he
entered Marine Corps officer training at Quantico, Virginia. A herniation of the facie muscles of the
lower left leg ended his military career. Shortly thereafter, Defendant entered Georgetown University
Law in Washington, D.C. Defendant moved to Kansas City to be close to his parents and joined
Merrill Lynch and Co.'s mortgage insurance division. After several years, he transferred to Merrill's
brokerage company and worked there and at Oppenheimer & Co until the mid-1980s, when he formed
a mortgage trading firm in both Kansas City and Chicago.

Defendant met his wife, attorney Brenda Szeja, in December 1985; they married in February 1986.
They have been married for 35 years and have one son, Spencer, a lawyer in Portland, Oregon.
Spencer attended the University of Colorado at Boulder and received his undergraduate degree, then
attended University of Chicago Law School for one year, post graduate courses before attending and
graduating from Willamette Law School, Salem, Oregon. He is a member of both the Oregon and
Washington State Bar Associations. Spencer worked in the Clackamass County (Oregon) Prosecutor's
Office before joining a firm in Portland that specialized in bankruptcy law.

Defendant and wife also raised a niece, Mariana, whose family emigrated from Russia in the early 1990s. She graduated from American University in Washington, D.C. After an accounting career, she now has a family of her own in Texas. The Rossini's also raised a neighbor's son, Casey. The neighbor, a family friend, suffered from drug and alcohol addiction. As our son's closest friend, Casey was raised with and cared for by Defendant and his wife throughout his Winnetka IL schooling, and financially assisted through college at UIC. Both boys were well-traveled, religiously schooled, and participated in swimming, hockey and golf. They became life guards. Spencer was acknowledged by the Coast Guard for having braved the waves and saved a swimmer. Casey, a superior student, and college lifeguard instructor, is now with a high tech firm in Northern California. Defendant Rossini was chauffeur, guide, parent and guardian in every activity. Nor were these two boys the sole charges who came to the Rossini household when their families were in flux.

Mrs. Rossini suffers from recurring breast cancer. The effects of both chemotherapy and radiation have damaged the bone in her jaw and the bones in her ankles and feet. She also is an insulin-taking diabetic, a disease which she contracted with a later-age pregnancy. The costs have been prohibitive, and meeting the financial demands—while the Government availed itself of every effort to whittle Defendant Rossini's livelihood to penury and to impose his lengthy detention-- were borne by the Defendant with great difficulty.

In sum, Defendant has led a productive and family-oriented life, a family which includes his 93-year-old mother-in-law in assisted living-- whom Defendant was precluded from visiting because of the detention-- and his 97-year-old mother, two brothers, and cousins. There is every reason to believe he will continue to lead a productive and law-abiding life if released, to return to the care of his wife's chronic health problems, and to reestablish personal contact with his extended family.

Conclusion at Law

This is not an argument about guilt, as the jury decided that issue on June 13, 2018. Now, it will

become a matter for the Seventh Circuit Court of Appeals. This Memorandum is a request of fairness

and reasonableness in sentencing.


The Government and Probation Department acted in bad faith by failing to present these expended

payments by Defendant:

- payments for mortgage notes
- insurance premiums paid on properties he purchased on his and investors behalf from Murphy
- properties purchased by Defendant Rossini
- monies paid to Murphy
- NSF checks by Murphy to Rossini and Devon street
- quitclaims of properties to investors
- collateral pledged to Liam Ben David
- other payments in the normal course of business.


The Defendant has met his burden to create "real doubt" about the veracity of information contained in

the PSR. See *U.S. v. Artley*, 489 F3d 813, 821 (7Cir. 2007) ("When the court relies on information

contained in the PSR at sentencing, it is the defendant's burden to show that the PSR is inaccurate or

unreliable."). Defendant has not merely denied the PSR's accuracy, but has submitted substantial

verifiable documentation to the Court contradicting both the Government and PSR's information. See

*U.S. v. Simmons*, 218 F3d 692, 695 (7 Cir. 2000) (mere denial of accuracy is not enough).


If the material has sufficient indicia of reliability then the defendant has the burden to create "real

doubt." *U.S. v. Maiden*, 606 F3d 337, 339 (7 Cir. 2010). Indicia of reliability may come from, among

other places, the presence of facts and details that are corroborated by or consistent with the evidence

or opportunity for cross-examination. *U.S. v. Harmon*, 721 F3d 877, 889 (7 Cir. 2013). Defendant

Rossini has provided this reliability to the Court both in this Memorandum and in the Exhibits filed

contemporaneously therewith.

It is the government's burden to present facts, i.e., documentation, not just FBI 302s that indicate the Defendant's production is incorrect. The Government cannot sustain its burden without affidavits or testimony by victims. Statements by investors and victims that they had not received payments or property transfers from Defendant Rossini would have been perjurious.

The Government cannot obtain sentencing adjustments simply by making accusations in the PSR or repeating error-filled version of events. In *U.S. v. Hines*, 449 F3d 808 (7 Cir. 2006), the judge applied an enhancement based on the allegation that the defendant used a fake identification card in the name of a real person. The government in that case did not back up the charge with proof, and the defendant orally and in writing objected to the adjustment. The court held the defendant's objections were sufficient to require the government to come forth with proof by a preponderance of the evidence that the adjustment applied.

Similarly, Rossini has presented evidence that, by any standard of proof, especially where victims, if called to testify, could not dispute the amount of payments or property transfers, the Government and PSR version is insufficient compared to the proof offered by Defendant.

The same standard applies to the number of victims, vulnerable victims, and the relatively new "substantial financial hardship" provision. The only victim known to the Defendant prior to investment was Liam Ben David and he was given security by the Defendant in a loan agreement, note, mortgage, and property as collateral for a $275,000 loan. These documents were prepared by Mr. Ben David's attorney, not the Defendant's lawyer.

Although the Government's burden of proof at sentencing may be light, it still must be based upon accurate facts. When contradicted by Defendant's credible evidence, the burden shifts to the Government to prove its facts by a preponderance of the evidence. The preponderance here has been met by Defendant Rossini. While the Defendant may not "merely deny," the Government cannot merely allege facts unsupported by evidence. See *Salinas*, *supra*.

The Supreme Court in *U.S. v. Booker*, 543 U.S. 220 (2005) held that under the Sixth Amendment, any facts that required an increase in sentence had to be presented to a jury and proved beyond a reasonable doubt. Practically, this meant that the judge could no longer enhance or upwardly adjust a sentence based on facts neither admitted by the defendant nor found beyond a reasonable doubt by the fact finder. *Booker* then obviated that concern in the second half of its opinion by excising two sections of the Sentencing Act, 18 U.S.C. Section 3553(b)(1) and Section 3742(e). *Booker*, 543 U.S. at 259. The first section required the judge to impose sentence under the guidelines; the second provided for heightened review of any sentence that fell outside the mandatory guideline range. In so doing, *Booker* rendered the Guidelines advisory, and provided for appellate review based on "reasonableness." *Booker*, 543 U.S. at 261-62.

The Supreme Court in *Booker* directed lower courts to continue to take the Guidelines into account when imposing sentence, as the Guidelines remained a factor identified by the statute. 18 U.S.C. Section 3553(a)(4). In *Rita v. U.S.*, 127 S.Ct. 2456 (2007), the Court cautioned that this does not mean the sentencing judge should give the Guidelines undue weight in relation to the other Section 3553 factors.

The *Rita* Court re-emphasized *Booker*'s mandate that the district court analyze the Section 3553(a) factors and consider any non-frivolous arguments presented for imposing a sentence outside the

recommended Guidelines range.

It is reversible error for the sentencing judge to apply a presumption that a Guideline sentence is reasonable. *Nelson v. U.S.*, 129 Sect. 890, 892 (2009). The bottom line is this: "[a]ny sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. A defendant can rebut this presumption by demonstrating that [his] sentence is unreasonable when measured against the factors set forth in Section 3553(a)." *U.S. v. Welch*, 429 F3d 702, 705 (7 Cir. 2005). See also, *U.S.v. Shrake*, 515 F3d 743, 747 (7 Cir. 2008) (guideline sentence can be upset when judge refused to entertain defendant's arguments or resorts to an irrational extra statutory consideration). A key question is whether the facts used to calculate the Guideline sentence are accurate, and here, the Government and PSR facts are inaccurate, incomplete, and unreliable.

The Government has taken an inapposite position re Thomas Murphy presumably because he was their witness. The Government alleged that Rossini directed a purportedly guileless Murphy. The PSR, on the other hand, determined from facts unknown, that Rossini and Murphy were in partnership...cooperating in business, or with his escrow clients.

Sentencing: Age; Time Served

Defendant has been admonished by the Court that sentencing is not the venue for argument of innocence, and that "the Seventh Circuit will do what the Seventh Circuit does." Notwithstanding, Defendant Rossini predicates his sentencing request as one made without a concession of guilt, and that he should not have been nor still serving time.

A maximum of 60 months imposition, with good time, would translate to serving 51 months; Defendant Rossini has served 49. With a 60-month sentence, one serves 51 months, and with halfway

house, 5-6 months; an inmate would be leaving at the 45-46- month mark. Defendant's detention falls beyond that mark.

The time served by Rossini at this point has been a 60-month sentence (5 years, pre-imposition of a penalty phase). Good time leaves Defendant with a sentence to serve of 51.5 months. He has served 49 months.

Respectfully submitted,

***Albert Rossini***
ALBERT ROSSINI
#08043-424
Chicago MCC
71 W. Van Buren St.
Chicago IL  60605

CHART II
Page 1

2011 2012 2013

| PAYEE/PAID TO | PAYOR | AMOUNT |
|---|---|---|
| Seiden Law | ALL on this page by ROSSINI | 621,411.99 |
| Klytta & Klytta Law | | 20,000.00 |
| Boiko & Osimani Law | | 25,000.00 |
| Deer Stone & Maya | | 32,500.00 |
| Circuit Court bond | | 30,000.00 |
| Circuit Court forfeiture | | 98,500.00 |
| Jozers Settlement | | 130,000.00 |
| Dental--Marinic, Bery, Hagen | | 62,306.75 |
| U/Col--Tuition | | 85,000.00 |
| U/Col—Rm.Board | | 29,950.00 |
| U/Chicago--Tuition | | 12,000.00 |
| Bad debt—Thomas Murphy | | 446,000.00 |
| 928 Elm rent | | 50,800.00 |
| 928 Elm cable, utilities | | 4,404.00 |
| Telephones | | 12,000.00 |
| 2012 Auto payments | | 5,532.00 |
| 2012 Auto purchases | | 20,000.00 |
| 2012 Travel | | 26,500.00 |
| NY Life Premiums | | 5,322.00 |
| Health Alliance/Blue Cross | | 6,700.00 |
| Brook Furniture Rental | | 7,431.60 |
| Autumn Green Assisted Living | | 30,000.00 |
| Books and subscriptions | | 3,738.27 |
| Contributions (synagogue) | | 1,455.00 |
| Optique contacts, eyeglasses | | 265.85 |
| Pharmacy payments | | 1,163.66 |
| Storage rental for 3924 Devon | | 6,700.00 |
| **TOTAL SUM** | | 1,213,100.40 |

CHART II
Page 2

2011 2012 2013

| PAYEE/PAID TO | PAYOR | AMOUNT |
|---|---|---|
| Office supplies | All on this page are Devon | 8,791.00 |
| Rent 3924 Devon (2011) | | 21,600.00 |
| Rent 3924 Devon (2012) | | 71,932.61 |
| Rent 3924 Devon (2013) | | 22,000.00 |
| Seminars | | 3,200.44 |
| Insurance Premiums (Seattle,AFC) | | 103,760.73 |
| Fed.Ex; Overnight postal | | 1,071.59 |
| EFax | | 717.20 |
| Dreamtown Realty | | 2,500.00 |
| ICG Properties (Option) | | 8,000.00 |
| ICG Properties (Option) | | 5,000.00 |
| Stephanie Andre (Option) | | 2,000.00 |
| Compaq Bank (Option) | | 3,400.00 |
| Robert Allen Mgmt. | | 4,400.00 |
| Walid Aiyesh (Refund) | | 100,000.00 |
| Palidinetti Law | | 20,000.00 |
| Gurindijet Purewal (Consult) | | 20,000.00 |
| Richard Kruse, attorney | | 5,000.00 |
| Furniture Doc/Bill Parsons | | 10,200.00 |
| Andre Paca Real Estate | | 15,000.99 |
| Clavelle Benjamin Security | | 25,000.00 |
| Ashoor Pithyou--Commissions | | 10,000.00 |
| **TOTAL SUM** | | 503,172.59 |

CHART II
Page 3

2011 2012 2013  INVESTOR/LENDER PAYMENTS

| PAYEE/PAID TO | PAYOR | AMOUNT |
|---|---|---|
| Ben David and Levanon | All on this page are Devon | 23,292.66 |
| Anthony and Babajan Khoshabe | | 41,375.00 |
| Robert Badalian | | 241,205.45 |
| Haim Gabi | | 21,325.00 |
| John Khoshaba | | 27,507.50 |
| Havanna Moshi | | 23,438.00 |
| Fidel Moshi | | 19,902.50 |
| Valentina Moshi | | 23,600.00 |
| Assyrian Evangelical | | 65,402.50 |
| Kathy Khodi | | 134,198.06 |
| Khodi Family Trust | | 34,237.60 |
| Janet Khoshaba | | 25,690.00 |
| Henry Hormozian | | 25,617.29 |
| Aniquam Pithyou | | 212,093.56 |
| Nastori Moshi | | 79,873.45 |
| Benua Laar | | 34,200.00 |
| Gus Baltramis and Ilias Bolos | | 25,980.00 |
| Albert Khamis | | 28,082.76 |
| Vladimir Moghaddasi | | 172,759.42 |
| Fereidoon Khoshabi | | 256,804.03 |
| St. Odisho | | 36,187.50 |
| Punjab Investments | | 41,000.00 |
| Katayoun Kazemi | | 5,000.00 |
| Ibrahim and Daniel Yousif | | 109,000.00 |
| Jerry Lewin | | 40,000.00 |
| KMI Enterprises | | 105,000.00 |
| Craig Shaffer | | 366,628.00 |
| Raymond Babaoghli | | 35,000.00 |
| **TOTAL SUM** | | 2,253,595.1 |

CHART II
Page 4

2011 2012 2013

| PAYEE/PAID TO | PAYOR | AMOUNT |
|---|---|---|
| Meir Rotstein | All on this page are Devon | 81,200.00 |
| Lisa Rosen | | 159,000.00 |
| Pamela Sauer | | 57,000.00 |
| Francisco Cisneros | | 52,000.00 |
| Mireya Ceopeda | | 25,800.00 |
| Daniel Ramirez | | 15,600.00 |
| Nubia Rendak | | 7,800.00 |
| Mikhail Rotstein | | 7,800.00 |
| Cortez Rhodes (Trucking) | | 22,000.00 |
| Aida Roldan | | 28,100.00 |
| Cecily Guidry | | 15,000.00 |
| Avi Gabi | | 5,600.00 |
| Danielle Gabi | | 2,500.00 |
| Nehama Morton | | 2,500.00 |
| Alan Peres | | 1,000.00 |
| James Dixon | | 3,600.00 |
| Richard Espe | | 12,500.00 |
| Casey Czarnecki | | 3,600.00 |
| Bernard Ellis Consulting | | 20,000.00 |
| Guy and Josh Stein | | 18,500.00 |
| Alexis Adame | | 5,000.00 |
| Julie Rittenberg | | 5,000.00 |
| **TOTAL SUM** | | 558,900.00 |
| | | |

CHART II
Page 5

2011  2012  2013  PROPERTIES PURCHASED

| ADDRESS | PURCHASER | AMOUNT |
|---|---|---|
| 3820 W. Adams | Devon | 37,500.00 |
| 3327 W. Monroe | Devon | 45,000.00 |
| 4037 W. Adams | Devon | 45,000.00 |
| 5410 W. Fulton | Devon | 69,000.00 |
| 4520 W. Jackson | Devon | 55,000.00 |
| 4126 W. Adams | Devon | 42,500.00 |
| 211 N. Kilbourn | Devon | 18,000.00 |
| 4129 W. Adams | Devon | 37,000.00 |
| 4139 W. Adams | Devon | 37,500.00 |
| 8435 S. Burleigh | Devon | 16,900.00 |
| 4321 S. Marshfield | Rossini | 18,900.00 |
| 4457 S. Princeton | Devon | 55,000.00 |
| 4045 W. Wilcox | Rossini | 45,000.00 |
| 16 Riverdale Townhomes | Devon | *155,000.00 |
| 13913 Michigan, Riverdale | Devon | 30,000.00 |
| 1921 N. Richmond | Devon | 98,000.00 |
| **TOTAL SUM** | | 804,800.00 |
| Purchases include real estate tax payments necessary to close transaction | | |
| *Includes $28,000 real estate tax payments necessary to close transaction | | |

CHART II
Page 6

2011 2012 2013  RENOVATION EXPENSES

| PAYEE/PAID TO | PAYOR | AMOUNT |
|---|---|---|
| 4321 S. Marshfield (material) | Rossini | 14,447.14 |
| 4321 S. Marshfield (labor) | Rossini | 24,370.00 |
| 4045 W. Wilcox (material) | Rossini | 15,053.00 |
| 4045 W. Wilcox (labor) | Rossini | 5,944.14 |
| 4126 W. Adams (material) | Devon | 4,924.76 |
| 4037 W. Adams (material) | Devon | 15,025.63 |
| 4037 W. Adams (Corona Construction) | Devon | 38,430.20 |
| 4037 W. Adams (Cisneros) | Devon | 12,055.00 |
| 8435 S. Burleigh (Tito George) | Devon | 2,500.00 |
| 8435 S. Burleigh (Cisneros) | Devon | 15,000.00 |
| Riverdale Townhomes | Devon | 185,000.00 |
| 3327 W. Monroe | Devon | 30,000.00 |
| 4457 S. Princeton | Devon | 30,000.00 |
| **TOTAL SUM** | | 331,663.82 |

CHART II
Page 7

2011 2012 2013
PAYMENTS TO MURPHY FOR ROSSINI PURCHASES OF NOTES/MORTGAGES

| ADDRESS | AMOUNT |
|---|---|
| 2742 W. Granville | 7,500 |
| 2742 W. Granville | 5,000 |
| 2742 W. Granville | 40,000 |
| 1135 N. Damen | 15,000 |
| 1135 N. Damen | 32,000 |
| 3337 N. Halsted | 42,500 |
| SUBTOTAL | 142,000 |
| Commissions paid to Purchase Notes from Murphy | 135,500 |
| **TOTAL SUM** | 277,500 |

CHART II
Page 8

ROSSINI PAYMENTS IN NORMAL COURSE OF BUSINESS, YEARS 2011, 2012, 2013.

| PAGE | DESCRIPTION | AMOUNT |
|---|---|---|
| 1 | Personal, Business | 1,213,100.40 |
| 2 | Personal, Business | 503,172.59 |
| 3 | Investor/Lender | 2,253,595.10 |
| 4 | Employee—1099 labor | 558,900.00 |
| 5 | Properties Purchased | 804,800.00 |
| 6 | Renovation Expenses | 331,663.82 |
| 7 | Notes Purchased from Murphy | 277,500.00 |
| | **TOTAL PAYMENTS** | 5,942.731.70 |

CHART III

2011  2012  2013

ROSSINI CREDITS AGAINST LOSS

The following expenses incurred by Defendant Rossini should be deducted from the loss figure in

general, and not specific to any one individual investor.

| | |
|---|---:|
| Insurance Premiums (Seattle Specialty Insurance Co., Mt. Vernon Insurance Co.) | $ 103,760.73 |
| Robert Allen Mgmt. | 44,000.00 |
| Pallidinetti Law Office | 20,000.00 |
| Attorney Richard Kruse | 5,000.00 |
| Klytta and Klytta Law Office | 20,000.00 |
| Boiko and Osimani Law Office | 25,000.00 |
| Money paid by Rossini to Investors | 2,253,595.00 |
| Property transferred to Moghadassi and Badalian* | 749,000.00 |
| Property credited to Craig Shaffer:** | 103,372.00 |
| Riverdale Property credited to Kathy Khodi*** | 832,000.00 |
| Property credited to Assyrian Evangelical | 225,000.00 |
| Liam Ben David collateral pledged for loan | 275,000.00 |
| Rossini payments to Murphy for Notes | 277,500.00 |
| **Total Rossini Credits Against Investor Losses** | **$4,933,227.80** |

| | |
|---|---:|
| *Value for Moghadassi and Badalian | |
| 4510 W. Jackson, Chicago (Moghadassi) | $410,000 |
| 4126 W. Adams, Chicago (Badalian) | 339,000 |
| Total Value to Moghadassi and Badalian | $749,000 |

| | |
|---|---:|
| **Value to Craig Shaffer | |
| 3820 W. Adams | $339,000 |
| 4129 W. Adams | 275,000 |
| 4139 W. Adams | $889,000 |

Additionally, so far as Craig Shaffer, he received cash payments of $366,628. He invested $470,000.

Therefore, Defendant should be credited $103,372 from real estate transfers; excess value in real estate

paid to Mr. Shaffer cannot be used to offset other investor losses. U.S.S.G.§2B1.1, application note

3(F)(iv).

CHART III
Page 2


***Value for Ms, Kathy Khodi

16 Riverdale Townhomes                    $832,000
quitclaimed to Khodi Family Trust, Sept. 2013,
subject to completion of renovation, but rejected
by Ms. Khodi, in violation of the Guaranty Agreement.

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America
                Plaintiff

                v.                                    15 CR 515-1
                                                      Hon. John Z. Lee
Albert M. Rossini                                     District Court Judge
                Defendant

<u>Notice of Filing</u>

TO:
Office of the U.S. Attorney
219 S. Dearborn St.
Chicago IL 60604

PLEASE TAKE NOTICE that Defendant Albert M. Rossini, pro se, that on Aug.9, 2021, he has filed
DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT, in the above-captioned case, pursuant to the Local Rules of the Court for
the Northern District of Illinois, a copy of which is hereby served upon you.

                                        ***Albert Rossini***


CERTIFICATE OF SERVICE
I certify that a copy of this Notice of Filing was sent on Aug. 7, 2021, by regular mail to the Office of
the U.S. Attorney, 219 S. Dearborn St., Chicago 60604 and to the Federal Probation Office, 230 S.
Dearborn St., Chicago 60604.

                                        ***Albert Rossini***


Albert Rossini
#08043-424
Chicago MCC
71 W. Van Buren St.
Chicago IL 60605





FOLD HERE

U.S. POSTAGE
$8.55
PM 1-Day
60093 0026
Date of sale
08/07/21
SSK 06 25Z
11486500
8834108071308I0

PLACE THIS LABEL TO THE LEFT OF THE POSTAGE

USPS TRACKING® NUMBER

9505 5065 8011 1219 1593 33

CLERK, CRIMINAL DIV, COURT FOR
NORTHERN DISTRICT OF ILLINOIS
219 S. DEARBORN ST,
CHICAGO IL 60604

RECEIVED

AUG 1 1 2021 MO

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

08/11/2021-1

ALBERT ROSSINI
08043-424
CHICAGO MCC
71 W. VAN BUREN ST.
CHICAGO IL 60605



Expected Delivery
08/09/2021