SM

Albert Rossini
#08043-424
Metropolitan Correctional Center
71 W. Van Buren St.
Chicago, Il. 60605

**FILED**

AUG 17 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

August 9, 2021

Clerk of U.S. District Court
Northern District of Illinois
219 S. Dearborn St.
Chicago, Il. 60604

RE: USA v. Rossini, 15CR515-1

Hon. Thomas Bruton;
        Enclosed are Exhibits to be filed in
conjunction with Defendant's Sentencing
Memorandum and Objections to Presentencing
Report, which is being sent in a separate
envelope. This is the 2ND of two Exhibit
envelopes.
        Thank you in advance for filing
these Exhibits and forwarding a copy to
Hon. John Z. Lee.

Respectfully submitted,
Albert Rossini

GROUP
EXHIBIT  15 CR 515-1  U.S. V. ROSSINI

IN RE THOMAS WILLIAM MURPHY

COMMISSION NO. 2010PR00114

SYNOPSIS OF HEARING BOARD REPORT

AND RECOMMENDATIONS, (JULY 2013)

*Filed July 9, 2013*

**In re Thomas William Murphy**
Attorney-Respondent

Commission No. 2010PR00114

**Synopsis of Hearing Board Report and Recommendation**
(July 2013)

The Administrator filed a seven-count Complaint against Respondent. Counts I through IV alleged Respondent served as attorney and trustee of the Zgonina Trust and engaged in misconduct with respect to the manner in which he handled assets of the trust. Count I alleged he used $15,000 of the trust funds for his own purposes, Count II alleged he wrote checks from the trust fund to his law firm in excess of the amount billed by his firm, and Counts III and IV alleged he invested trust funds in companies he represented and in which he had a financial stake.

Count V involved Respondent's duties and actions with respect to the Sanial Trust, and alleged he used approximately $281,000 from that trust to repay the Zgonina Trust. Counts VI and VII alleged misconduct relating to Respondent's handling of funds in two proposed real estate transactions.

The Hearing Board found that Respondent engaged in some of the misconduct alleged in Counts I through III, and all of the misconduct alleged in Counts V, VI and VII. Specifically, Respondent improperly took funds from the Zgonina Trust under the guise of a trustee's fee, breached his fiduciary duty to the trust by failing to provide invoices regarding work performed by his law firm, represented the trust when the representation conflicted with his own interests and that of another client, misused funds from the Sanial Trust, and misused funds he was holding in connection with two real estate transactions. The Hearing Board found that the charges of Count IV were not proved.

Considering the serious nature of the misconduct and the substantial amount of money that was converted, the Hearing Board recommended that Respondent be disbarred.

**BEFORE THE HEARING BOARD**
**OF THE**
**ILLINOIS ATTORNEY REGISTRATION**
**AND**
**DISCIPLINARY COMMISSION**

In the Matter of:

    **THOMAS WILLIAM MURPHY,**

    Attorney-Respondent,                  Commission No. 2010PR00114

    No. 1998404.

**REPORT AND RECOMMENDATION OF THE HEARING BOARD**

## INTRODUCTION

The hearing in this matter was held on October 23 and 24 and November 5, 2012 at the offices of the Attorney Registration and Disciplinary Commission ("ARDC") before a panel consisting of Henry T. Kelly, Chair, Adam J. Lysinski and David C. Rudd. The Administrator was represented by Marita C. Sullivan. Respondent Thomas William Murphy appeared and was represented by George C. Collins.

## PLEADINGS

### Complaint

On August 24, 2010 the Administrator filed a four-count Complaint against Respondent. A seven-count Amended Complaint was filed on April 12, 2012. Counts I through IV alleged Respondent served as attorney and trustee of the Zgonina trust and engaged in misconduct with respect to the manner in which he handled assets of the trust. Count V involved Respondent's duties and actions with respect to the Sanial Trust. Counts VI and VII alleged misconduct relating to Respondent's handling of funds in two proposed real estate transactions.

PAGE 2:

### Answer

On June 4, 2012 Respondent filed an answer to the Amended Complaint in which he admitted some of the factual allegations of the Complaint, denied other factual allegations, and denied engaging in any professional misconduct.

## ALLEGED MISCONDUCT

The Administrator charged the following misconduct: 1) conversion (Counts I, II, V-VII); 2) breach of fiduciary duty (Counts I-V); 3) conduct involving dishonesty, fraud deceit or misrepresentation in violation of Rule 8.4(a)(4) (Counts I - VII); 4) conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) (Counts I, II, V); 5) representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) (Counts III, IV); 6) representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b) (Counts III, IV); 7) failure to explain the implications of the common representation and the advantages and risks involved, when representation of multiple clients in a single matter is undertaken in violation of Rule 1.7(c) (Counts III, IV); 8) failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property, in violation of Rule 1.15(e); (VI, VII); 9) conduct that tends to defeat the administration of justice or bring the legal profession into disrepute (Counts I-VII).

## EVIDENCE

The Administrator called Donna Zgonina, Mitchell Goldsmith, Robert Tepper, Arthur Yackel, Ellen Makofsky, Bruce Klein, Mary Jane Houston, Paul Jacknow, Bonita Jozers, Frank Alamprese, David Herzog and Respondent as witnesses, and presented 105 exhibits that were

PAGE 3:

admitted into evidence. Respondent testified on his own behalf, called William Maddux, Thomas Hoffman,

Stephanie Denby, Michael Folan, Kelli Jones, and Lawrence Levin as witnesses, and presented one exhibit that was admitted into evidence.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In attorney disciplinary proceedings the Administrator has the burden of proving the charges of misconduct by clear and convincing evidence. *In re Ingersoll*, 186 Ill. 2d 163, 710 N.E.2d 390, 393 (1999). Clear and convincing evidence constitutes a high level of certainty, which is greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *People v. Williams*, 143 Ill. 2d 477, 577 N.E.2d 762 (1991).

### Count I

### ($15,000 check to Schwartz & Freeman from Zgonina Insurance Trust)

### Background and Admitted Facts

In or about 1978, Respondent met Casimir H. Zgonina ("Casimir"). At that time, Respondent began representing Casimir's company, Uni-Label & Tag, and also began representing Casimir and his family members in personal legal matters. In or about March 2000, Casimir was diagnosed with pancreatic cancer. (Ans. par. 1, 2; Tr. 97).

In or about early April 2000, Respondent, or another attorney under his direction, prepared documents necessary to create the Casimir H. Zgonina 2000 Insurance Trust ("Insurance Trust") and Casimir executed those documents. Under the terms of the Insurance Trust, Casimir designated the trust as the owner and beneficiary of various insurance policies on his life, made his wife Donna Jean Zgonina ("Zgonina") the sole income beneficiary, and named Respondent as sole trustee. The purpose of the Insurance Trust was to provide for Zgonina's care and support upon Casimir's death. (Ans. par. 3; Tr. 98-99, 1048; Adm. Ex. 1).

PAGE 4:

In or about May 2000, Respondent, or another attorney under his direction, drafted documents to amend the Casimir H. Zgonina Revocable Trust ("Revocable Trust"), which had been originally created on behalf of Casimir in 1989. On or about June 1, 2000, Casimir executed the "Amendment and Restatement of the Casimir H. Zgonina Revocable Trust." Under the terms of the amended Revocable Trust, upon Casimir's death Respondent would serve as successor co-trustee with Zgonina. Casimir designated Zgonina as the sole income beneficiary of the Revocable Trust. (Ans. par. 4; Tr. 99, 1048).

In or about May 2000, Respondent, or another attorney under his direction, drafted a last will and testament for Casimir. On or about June 1, 2000, Casimir executed the will. Under the terms of his will, Casimir named Respondent and Zgonina as co-executors. (Ans. par. 5; Tr. 100).

Casimir died on September 27, 2000. On or about October 25, 2000, Respondent filed a petition for probate of will and for letters testamentary in the Circuit Court of Cook County, requesting that Casimir's will be admitted to probate. At all relevant times, Respondent was the attorney for the Revocable Trust, the Insurance Trust, and Casimir's probate estate. (Ans. par. 6- 8; Tr. 100; Adm. Ex. 4).

**I. Respondent is charged in Count I with conversion and conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100

## A. Admitted Facts and Evidence Considered

Section 7.6 of the Zgonina Insurance Trust provides that "[a]ny trustee shall be entitled to reasonable compensation for services in administering and distributing the trust property, and to reimbursement for expenses." Donna Zgonina recalled meeting with Respondent on December 7, 2000 to endorse an insurance proceeds check, which Respondent planned to deposit into an account at Harris Bank. Zgonina denied that Respondent mentioned a trustee's fee at that

PAGE 5:

meeting, but at some point he may have mentioned that he was entitled to receive "a percentage." (Tr. 100-103, 145; Adm. Ex. 1).

On or about December 8, 2000, Respondent opened an account at Harris Bank entitled "Casimir H. Zgonina 2000 Insurance Trust" ("Harris account") and deposited $1,182,330.95 into the account. On or about December 8, 2000, he issued check number 002 on the Harris account payable to his law firm Schwartz & Freeman in the amount of $15,000. He then endorsed the check "Schwartz & Freeman by Thomas W. Murphy" and deposited the trust check into his own personal account he held with his wife at American National Bank entitled "Thomas W. Murphy and Christine Murphy." After depositing check 002, Respondent and/or his wife used the money for their own business or personal purposes. (Ans. par. 10-12; Adm. Ex. 1).

Respondent testified the $15,000 check was a payment to him for a trustee fee, and it was customary to receive checks for trustee's fees directly. He stated his law firm did not receive money for his work as a trustee, and he did not bill time for his work as a trustee. (Tr. 968, 1026, 1048-49).

Zgonina testified, and Respondent admitted, that Respondent never told her he was depositing $15,000 of the Insurance Trust funds into his and his wife's personal account, or that he was using those funds for their own business or personal purposes. Zgonina did not authorize Respondent to use any portion of the Insurance Trust funds for his or his wife's own business or personal purposes. (Ans. par. 13; Tr. 102-103).

In June 2002 Zgonina requested that Respondent resign as trustee of the Insurance Trust. On August 5, 2002 Respondent issued a check for $281,000 to the Insurance Trust from an unrelated trust for which he also served as trustee. In a follow-up letter to Zgonina's attorney Mitchell Goldsmith, Respondent explained that the check for $281,000 included payment on a $15,000 promissory note, along with interest of $3,010. At hearing Respondent testified that the

PAGE 6:

repayment of $18,010 was for the $15,000 trustee fee he had received, plus interest of $3,010. He stated he repaid the fee to Zgonina, with interest, as soon as he was asked to resign because he did not want any issues. Respondent noted there was no loss to the Zgonina Insurance Trust as a result of the trustee's fee. (Tr. 968-69, 1026-30; Adm. Exs. 32, 36, 39).

In January and March 2003, attorney Goldsmith requested specific documents from Respondent regarding his handling of the Insurance Trust, including an accounting, but received no response. Zgonina then retained attorney Robert Tepper to initiate proceedings to obtain trust documents and to determine what happened to the trust assets. In the fall of 2003 Tepper filed a lawsuit against Respondent alleging breach of fiduciary duty, and requesting an accounting and Respondent's removal as trustee. Tepper recalled a lengthy

period during which Respondent failed to comply with discovery requests and court orders pertaining to discovery, and noted that Respondent never did provide an accounting. (Tr. 55-56, 60-61, 64, 84-87, 140, 513-15; Adm. Exs. 41, 43).

Tepper eventually received information by issuing subpoenas to banks, a stockbroker, and law firms. He reviewed Respondent's billing records for services provided to the Zgonina estate from September 2000 to May 2001 as well as financial records of the Insurance Trust. With respect to the December 8, 2000 check for $15,000 written to Schwartz & Freeman and deposited into Respondent's personal account, Tepper stated the check did not correspond to any Schwartz & Freeman invoice. (Tr. 65, 71-76; Adm. Exs. 1, 2).

### B. Analysis and Conclusions

By its terms, the Zgonina Insurance Trust provided that the trustee was entitled to reasonable compensation for his services. Respondent, who served as trustee, claimed the $15,000 check he deposited into his account on December 8, 2000 was a fee for his services as trustee. Based on the evidence we reviewed, however, we do not find Respondent's claim to be

PAGE 7:

credible. First, no document substantiated his claim. We saw no invoice to the trust for his services, nor was there an invoice from his firm that matched that amount. Second, we received no evidence that Respondent, at the time he wrote and deposited the check for $15,000, had performed any services as trustee for the trust other than meeting with Zgonina and depositing an insurance proceeds check. Third, the fact Respondent wrote the check to Schwartz & Freeman is suspect since he specifically stated the bills from the law firm did not include his services as trustee. Further, he offered no explanation as to why the check was directed to the firm, yet not tendered to the firm. Last, and most telling, are Respondent's conflicting statements regarding the repayment of the $15,000. Respondent testified at hearing that a check he transmitted to Zgonina's attorney in August 2002 included repayment of the $15,000 trustee fee, plus $3,010 in interest. In an October 2002 letter to the attorney, however, he stated the payment of $18,010 was for a $15,000 promissory note, with interest of $3,010 on the note. There was no evidence of a promissory note.

The Supreme Court has defined conversion as "any unauthorized act, which deprives a man of his property permanently or for an indefinite time." *In re Rosin*, 156 Ill. 2d 202, 206, 620 N.E.2d 368 (1993). Since we do not accept Respondent's explanation that the check for $15,000 was compensation for his services as trustee, we find that he engaged in conversion by depositing the check into his own account and using the funds for his own purposes. In addition, given all the circumstances noted, we find Respondent engaged in dishonesty and deceit in violation of Rule 8.4(a)(4). Taking funds from the trust for his own purposes, without notification to the trust beneficiaries and under the guise of payment to his law firm, was clearly a dishonest act. His subsequent reluctance to turn over information or provide an accounting of the trust assets, despite repeated requests by Zgonina and her attorneys, further cements our conclusion.

PAGE 8:

## II. Respondent is charged in Count I with breach of fiduciary duty

### A. Evidence Considered

We consider the evidence previously summarized in section I.

### B. Analysis and Conclusions

As trustee of the Zgonina Insurance Trust, Respondent owed a fiduciary duty to the trust's beneficiaries and was obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith. *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1009, 932 N.E.2d 569 (1st Dist. 2010). A trustee must use care and diligence in the discharge of his duties, and must act honestly and with undivided loyalty to the trust. *Id.* at 1013. The duty to serve the interests of the beneficiaries with complete loyalty prohibits the trustee from dealing with trust property for his own benefit. *Home Federal Savings and Loan Association v. Zarkin*, 89 Ill. 2d 232, 239, 432 N.E.2d 841 (1982).[1] We find that Respondent, by converting trust funds to his own benefit and engaging in dishonest conduct, breached his fiduciary duties to the trust beneficiaries.

Even if we had found that the $15,000 check to Schwartz & Freeman was payment for a legitimate trustee's fee, we would find that Respondent breached his fiduciary duty by failing to properly document the fee with an invoice to the trust and a summary of his services.

**III. Respondent is charged in Count I with conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.**

### A. Evidence Considered

We consider the evidence previously summarized in section I.

### B. Analysis and Conclusions

We do not find that Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). That rule has been interpreted as requiring proof of actual

PAGE 9:

prejudice to the administration of justice, and the involvement of a tribunal. *In re Vrdolyak*, 137 Ill. 2d 407, 425, 560 N.E.2d 840 (1990); *In re Milks*, 09 CH 30, M.R. 25588 (Nov. 19, 2012) (Review Bd. at 11). The evidence in this case showed that the $15,000 was returned to the Insurance Trust, with interest, prior to the involvement of any tribunal.

We do find, however, that Respondent's unauthorized taking of $15,000 tends to defeat the administration of justice and bring the legal profession into disrepute. An attorney's conversion of funds "manifests a serious breach of trust, and tends to defeat the administration of justice and to bring the legal profession into disrepute." *In re Feldman*, 89 Ill. 2d 7, 11, 431 N.E.2d 388 (1982). *See also In re Lewis*, 118 Ill. 2d 357, 362-63, 515 N.E.2d 96 (1987) (conversion places the entire legal profession in disrepute).[2]

Count II

(Checks written to Schwartz & Freeman)

**IV. Respondent is charged in Count II with conversion and dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4).**

### A. Admitted Facts and Evidence Considered

Count II of the Complaint realleges the allegations of Count I and therefore we consider the evidence as to

Filed July 9

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100(

that Count along with the following admitted facts and evidence.

Between 1998 and May 2001, Respondent was a partner at the law firm Schwartz & Freeman in Chicago. Between September 27, 2000, and May 1, 2001, that firm issued invoices to the Casimir H. Zgonina estate totaling $23,416.50 and invoices to the Zgonina Insurance Trust totaling $6,307.00, for a total amount of $29,723.50. Respondent testified the bills covered his legal services as well as work provided by paralegals and other attorneys handling the probate of the estate, but did not include his work as trustee. He noted that Schwartz & Freeman had its own billing department, and he was not in charge of preparing bills sent out by the firm. (Tr. 981, 1049; Adm. Ex. 1).

PAGE 10:

Respondent acknowledged he was in charge of paying bills received by the Zgonina estate and the Insurance Trust. Between September 27, 2000, and May 1, 2001, he issued eight checks totaling $46,216.79 payable to Schwartz & Freeman from the funds of the Insurance Trust and Revocable Trust, and those checks were deposited into the law firm account. (A ninth check issued to Schwartz & Freeman during that time period in the amount of $15,000 was previously discussed in Count I). (Ans. par. 19; Tr. 981; Adm. Ex. 2).

Robert Tepper, the attorney who was subsequently retained by Donna Zgonina to obtain documents and information from Respondent regarding the Insurance Trust, testified that the invoices from Schwartz & Freeman did not match the payments made to the firm, and he could not find a corresponding bill for each payment that was made. Zgonina testified Respondent never told her he was disbursing funds from the Insurance Trust and Revocable Trust to Schwartz & Freeman in an amount greater than the invoices issued by that firm, and she denied authorizing Respondent to disburse funds to his law firm in an amount greater than the invoices. (Tr. 76-77, 140).

Respondent testified he did not knowingly overpay Schwartz & Freeman, and he did not believe the firm had been overpaid. He denied he would derive any advantage from an overpayment to the firm, but acknowledged that, as a partner of the firm, an increase in billed hours inured to his benefit. (Tr. 982, 1033; Adm. Ex. 106).

In 2001 Zgonina requested an accounting from Respondent. She was particularly interested in seeing any invoices and checks pertaining to the trust account, including any payments for attorneys' fees. In June and September 2001 she received information from Respondent regarding the investments held by the Insurance Trust, but her questions about checks written for fees from the Insurance Trust were not answered. In February 2003, Zgonina requested that Respondent provide an accounting of legal fees withdrawn from the trust, as well

PAGE 11:

as the 2001 trust tax return. She never received the accounting. (Tr. 109-12, 117-18, 138-39; Adm. Exs. 14, 18, 19, 42).

### B. Analysis and Conclusions

The evidence shows that Respondent, as trustee of the Zgonina Insurance Trust, issued eight checks to Schwartz & Freeman over a seven month period totaling $46,216.79. The invoices for legal services during that time period, however, totaled only $29,723.50, resulting in a difference of $16,493.29. Respondent offered no explanation for the discrepancy but denied knowingly overpaying his firm and denied that the

firm had been overpaid.

The Administrator did not allege that the surplus of $16,493.29 landed in Respondent's hands or that he used the money for his own purposes. In fact, no one disputed that Schwartz & Freeman received each of the eight checks and did not return any of the funds. We assume that the law firm, in its normal course of business, would have reconciled its collections with its billings and notified the client of any overpayment, yet we heard no evidence that any overpayment was detected or reported. As for the Administrator's argument that Respondent derived a benefit from bringing in an additional $16,000 to the firm, we did not receive enough evidence regarding his total billings or the firm's compensation structure to reach that conclusion.

We recognize that conversion can occur even if the attorney does not take the funds for his personal use or derive a benefit from the funds. *See In re Lenz*, 108 Ill. 2d 445, 484 N.E.2d 1093 (1985) (conversion found where attorney used funds in his client trust account to purchase a wheelchair-equipped van for a disabled client). In this case, however, we do not believe a sufficient showing was made that the funds were paid to the law firm in error. Therefore, we do not find that Respondent engaged in conversion. For the same reasons, we do not find that the

PAGE 12:

charge of conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4) was proved by clear and convincing evidence.

## V. Respondent is charged in Count II with breach of fiduciary duty

### A. Evidence Considered

We consider the evidence previously summarized in section IV.

### B. Analysis and Conclusions

Although we did not find that Respondent converted funds or engaged in dishonest conduct, we find he failed the trust beneficiaries in other respects. As trustee of the Insurance Trust, he had a fiduciary duty to administer the trust with good faith, fidelity, due care and diligence. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1013. We find he breached his fiduciary duty as trustee, as well as his fiduciary duty as attorney for Zgonina's estate and attorney for the trust, by failing to ensure that proper invoices were submitted for legal services and that payment was made based only on the invoices received. His lack of care in ensuring proper documentation not only jeopardized the assets of the trust, but caused difficulties for those who later were tasked with reconstructing his actions.

## VI. Respondent is charged in Count II with engaging in conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and engaging in conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.

### A. Evidence Considered

We consider the evidence previously summarized in section IV.

### B. Analysis and Conclusions

We do not find that Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). As stated previously, that rule requires proof of actual prejudice to the administration of justice, and the involvement of a tribunal. *Vrdolyak*, 137 Ill. 2d at 425; *Milks*, 09 CH 30 (Review Bd. at 11). Because the evidence was not sufficient to

PAGE 13:

establish that the payments to Schwartz & Freeman were made in error, we do not find Respondent's conduct resulted in any actual prejudice.

Further, while Respondent failed to act with due care, we do not find that his failure to ensure that payments were substantiated by invoices tended to defeat the administration of justice or bring the legal profession into disrepute.

## Count III

### (Loan from Zgonina Insurance Trust to M2 Industries)

**VII. Respondent is charged in Count III with breach of fiduciary duty**

#### A. Admitted Facts and Evidence Considered

Count III of the Complaint realleges the allegations of Counts I and II and therefore we consider the evidence as to those counts along with the following admitted facts and evidence.

#### Respondent's Relationship with Ray Mobile and M2

Respondent met Ray Mobile in or about the late 1980s and performed legal work for him between the time they met and 2004. Respondent testified he was not Mobile's main lawyer, but in a prior sworn statement he admitted he represented Mobile continually during that period of time and was Mobile's lawyer for whatever legal need arose. Although Respondent previously described Mobile as a friend, at hearing he characterized Mobile as a client and an acquaintance and stated he has not been to Mobile's home nor has Mobile been to his home. Respondent loaned Mobile $30,000 in the early 1990s for a stamp products business and received partial repayment of that loan. (Tr. 892-94, 899-900, 965-66; Adm. Ex. 106).

In or about the late 1990s, Ray Mobile formed a company, M2 Industries ("M2"), which was in the business of metal fabrication and metal stamping. Respondent incorporated M2, reviewed a lease for the company and may have performed some other minor work for M2, but has never held stock in the company. Respondent acknowledged he personally loaned $100,000

PAGE 14:

to M2 Industries and did not receive a promissory note from Mobile. On subsequent examination he stated that the $100,000 loan was made to Mobile, in increments, during the start-up phase of M2 and Mobile's prior stamp products company. (Tr. 892-96, 966-67, 1050).

Beginning in the late 1990s Respondent served as trustee for the Sanial Trust (as detailed more fully in Count V) and identified a series of checks he wrote on Sanial Trust accounts between June 1999 and October 2000. As to checks written to "cash," of which there were several, he assumed he gave those funds to M2 as an advance to cover payroll or some other expense. He also wrote two other checks directly to M2

from the Sanial Trust account. Regarding one check that was made payable to his law firm Schwartz & Freeman, Respondent acknowledged he deposited it into M2's bank account. (Tr. 870-73, 879-81; Adm. Exs. 93, 94).

### Loan and Equipment Lease from Zgonina Trust to M2

In January 2001, while Respondent was serving as trustee of the Zgonina Insurance Trust, the trust extended a line of credit to M2 Industries, pursuant to which it then loaned M2 $222,702.20 at an interest rate of 12% per annum. Respondent testified he structured the loan to M2 and believed it was secured by equipment and a personal guaranty. A January 31, 2001 custodial account agreement between the Zgonina Insurance Trust, as principal, and Visco, Inc., as custodian, makes reference to Visco being authorized to invest $250,000 in loan transactions on behalf of the trust and guaranteeing a 12% rate of return. Respondent testified in a prior deposition that his intention was to use Visco to monitor the line of credit to M2, but the agreement never took effect and Respondent monitored the payments and kept the records himself. (Ans. par. 28; Tr. 1049-50; Adm. Exs. 28, 105).

Respondent testified that no one was representing M2 for purposes of the loan other than himself. At the time of the purported loan, Respondent believed the investment was sound and he saw no indication that the company was failing, although he did acknowledge the company

PAGE 15:

had to sell its accounts receivables for cash flow purposes. Respondent did not advise Donna Zgonina of the investment or of his relationship with Mobile or M2 before he extended the line of credit from the trust, nor did he tell her he was still owed $100,000 from the owner on a prior loan. He denied that the loan from the Zgonina Insurance Trust to M2 was made because of his relationship to Mobile. (Ans. par. 28-29; Tr. 131, 896, 900-901, 982, 1050; Adm. Exs. 28, 105).

In or about January 2001, Respondent, on behalf of the Zgonina Insurance Trust, purchased three pieces of manufacturing equipment for a cost of $35,000 for purposes of leasing the equipment to M2 Industries. On or about January 23, 2001, Respondent, on behalf of the trust, executed an equipment lease agreement whereby M2 Industries was to pay the trust 260 weekly installments of $300 commencing in February 2001. At the time Respondent purchased the manufacturing equipment and executed the equipment lease, he did not advise Zgonina he was doing so. (Ans. par. 30-31; Adm. Ex. 27).

Respondent testified the Zgonina Insurance Trust agreement included many pages giving him power to make investments and, based on that agreement, the loan was a lawful investment for the trust and within his power as a trustee to make. He also believed he had power, under the trust, to buy equipment and lease it to M2. Article VII of the Zgonina Insurance Trust enumerates numerous powers given to the trustee, including the power to invest trust estates in business interests as shareholder, security holder, creditor or otherwise and to participate in the conduct of the business. (Tr. 978-79; Adm. Ex. 1).

At no time did Respondent advise Zgonina or Mobile to seek independent legal advice regarding the loan transaction or equipment lease. At no time did Respondent explain to either Zgonina or Mobile the implications of his representation of both of them in the loan transaction and equipment lease, or the advantages and risks involved in the representation of both Zgonina and Mobile in the matter. (Ans. par. 33, 34).

PAGE 16:

## Repayment on Loan and Equipment Lease

Respondent recalled that, for the most part, payments by M2 on the loan were kept up to date, but at times he contributed his own money to prevent any missed payments. In January 2002 he informed Zgonina by letter that "weekly payments on the equipment lease and line of credit continue to be deposited" into the Insurance Trust account, and he intended to have the trust "out of each of these investments in full on or about February 15, 2002." In February 2002 he sent her further information regarding payments that had been received. In August 2002 Respondent wrote a check on an unrelated trust account (as detailed more fully in Count V) to the Zgonina Insurance Trust for $281,000 to pay off the line of credit and equipment lease. (Tr. 130-32, 982-83; Adm. Exs. 26, 28, 36, 37, 105).

Zgonina's attorney, Mitchell Goldsmith, reviewed materials sent to him by Respondent in October 2002 and determined that the interest on the M2 loan had been paid in full for the period it was owned by the Zgonina Insurance Trust, despite some earlier arrearages, and the equipment leases had been paid off. He acknowledged that the amount of money in the trust matched the information that was provided by Respondent. He did not know whether the payments were actually made by M2 or whether they came from another source, but he assumed they came from M2 because it was the only entity on the notes. (Tr. 516-17, 520, 529-30, 541-42).

M2 Industries went out of business in 2004 or 2005. Respondent testified the company had solid customers and tremendous business but Mobile was not properly managing the finances. Respondent never received payment from Mobile or M2 for his personal loan of $100,000, and never took money from M2 ahead of the Insurance Trust. Based on figures provided by an accountant, Respondent understood the Zgonina Insurance Trust has been repaid in full and suffered no loss from the M2 investment. (Tr. 896-98, 967-68; Adm. Ex. 106).

PAGE 17:

Zgonina had no knowledge whether she lost any principal as a result of the loan to M2. (Tr. 159).

## B. Analysis and Conclusions

Respondent, on behalf of the Zgonina Insurance Trust, entered into a loan transaction and equipment lease with Ray Mobile's company, M2 Industries.

Respondent acknowledged he was the person who structured the loan arrangement. He pointed out that the Insurance Trust agreement gave him broad authority to make investments and, based on that authority, he believed the loan and equipment lease were proper transactions for the trust. We agree that the trust agreement gave Respondent the power to enter into such transactions. In his role as trustee and attorney for the trust, however, he had an overriding fiduciary duty to act with loyalty and fidelity. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009; *Home Fed. Savings & Loan Ass'n v. Zarkin*, 89 Ill. 2d at 239; *In re Winthrop*, 219 Ill. 2d 526, 848 N.E.2d 961 (2006).

We find that Respondent breached his fiduciary duties of loyalty and fidelity to the Insurance Trust when he entered into the loan and equipment lease with M2. He testified he believed the loan was secured by equipment and a personal guaranty, but there was no documentary evidence of a valid loan agreement, note or guaranty that would protect the interests of the trust or the beneficiaries. Further, prior to entering into the loan and equipment lease, he did not advise Zgonina of his substantial connections to Mobile and M2, which included a long-standing personal relationship with Mobile, legal representation of both M2 and

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100(

Mobile, and an outstanding personal loan of at least $100,000 to M2. The fact that Respondent arranged for the Insurance Trust to loan money to a company that was indebted to him for a substantial amount, with no protection for the trust, along with other questionable payments from

PAGE 18:

the Sanial Trust to M2 (as discussed below) is particularly disturbing as it signifies a person working in his own self-interest.

**VIII. Respondent is charged in Count III with representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) and representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b)**

### A. Evidence Considered

We consider the evidence previously summarized in section VII.

### B. Analysis and Conclusions

The Administrator charged several types of misconduct based upon the allegedly competing interests of the Zgonina Insurance Trust and Respondent and M2. We note at the outset that while Respondent appeared to be acting in his capacity as trustee of the Insurance Trust when he entered into the transactions with M2, in actuality he wore several hats with respect to the Zgonina estate and trusts. As to the transactions at issue, his roles as attorney and trustee were necessarily intertwined, as no other attorney was representing the trust for purposes of assessing the legal implications of the transactions.

With respect to M2, the evidence showed that Respondent was representing Ray Mobile, the founder of the company, during the relevant time period and had also performed legal work for M2, including incorporating the company. Respondent acknowledged that, with respect to the loan transaction and equipment lease, no other attorney was representing the interests of Mobile and M2. Although we did not hear testimony from Mobile, we believe the circumstances show that Respondent was representing Mobile and M2 at the time of the transaction.

Rule 1.7(a) provides that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship, and each client consents after disclosure.

PAGE 19:

In this case the financial interests of the Zgonina Insurance Trust and M2, one as the lender/lessor and the other as the borrower/lessee, were clearly adverse since both had an incentive to seek the best possible terms for the loan and lease. *See In re Demuth*, 126 Ill. 2d 1, 9, 533 N.E.2d 867 (1988) ("It is obvious that a lender and borrower have conflicting interests"). As noted previously, Respondent did not disclose the competing interests to Zgonina and no consent was given to the dual representation. With respect to the loan transaction and equipment lease, therefore, we find Respondent violated Rule 1.7(a).

Rule 1.7(b) states that a lawyer shall not represent a client if the representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after

Filed July 9

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100(

disclosure. Respondent's responsibilities and connections to M2 and Mobile, as well as his own financial interest as a creditor of M2, are all factors which could have materially limited his objective and independent representation of the Trust. As he did not disclose his conflicting interests to Zgonina or obtain her consent, we find that he violated Rule 1.7(b).

**IX. Respondent is charged in Count III with failing to explain the implications of the common representation and the advantages and risks involved, when representing multiple clients in a single matter in violation of Rule 1.7(c)**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

Respondent admitted he did not advise either Zgonina or Mobile to seek independent legal advice regarding the loan transaction or equipment lease, or explain to them the implications, advantages, or risks of his dual role. We find therefore that he violated Rule 1.7(c)

PAGE 20:

by representing multiple clients in a single matter and failing to explain the implications of the common representation and the advantages and risks involved.

In making the foregoing findings of misconduct, we emphasize that we are not faulting Respondent for his investment decisions as trustee or for the fact that M2 ultimately failed as a business. *See In re Bruckner* 00 CH 12, M.R. 17722 (Nov. 28, 2001) (trustee who acts within terms of trust instrument and does not act maliciously or in bad faith, is not subject to discipline for poor investment decisions). Rather, the misconduct stems from his service of two masters with competing interests and his failure to recognize or take protective action to ensure they were fully informed and received objective representation.

**X. Respondent is charged in Count III with engaging in dishonesty, deceit, fraud or misrepresentation in violation of Rule 8.4(a)(4)**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

While Respondent failed to recognize and address the competing interests of his clients, we do not view his conduct as deceitful. We accept his testimony that he believed M2 was performing well at the time he committed the Insurance Trust to the loan and equipment lease. In fact, we heard evidence that most payments on the loan and lease were made to the trust in a timely manner and, in the event M2 missed a payment, Respondent contributed the funds to the trust. Approximately eighteen months after the transaction, at a time when Respondent had not recouped any of his own personal investment in the company, he arranged for the Insurance Trust to be repaid in full. Based on the foregoing, we do not believe the Administrator proved by clear and convincing evidence that Respondent engaged in dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4).

Filed July 9

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100(

PAGE 21:

**XI. Respondent is charged in Count III with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute.**

### A. Evidence Considered

We consider the evidence summarized in section VII.

### B. Analysis and Conclusions

Ultimately the Zgonina Insurance Trust was repaid for the loan and equipment lease to M2. Therefore we do not find that Respondent's breach of fiduciary duty and representation of competing interests tended to defeat the administration of justice or bring the legal profession into disrepute.

### Count IV

### (Purchase of Stock in Virtual Sellers)

**XII. Respondent is charged in Count IV with breach of fiduciary duty**

### A. Admitted Facts and Evidence Considered

Count IV of the Complaint realleges the allegations of Counts I through III and therefore we consider the evidence as to those counts along with the following admitted facts and evidence.

In or about the late 1990s, Dennis Sinclair founded an internet e-commerce company known as Virtual Sellers, and then served as president of that company. Respondent testified he drafted a trust agreement for Sinclair at some point, but the agreement was never executed and Respondent was not paid for his time. In a prior sworn statement, Respondent stated he performed work for Sinclair during the time he worked for the law firm Burke Warren, which was from November 2000 to January 2006, but noted Sinclair was no longer with Virtual Sellers at the time. Respondent also reviewed a lease for Sinclair in connection with a facility that Virtual Sellers was interested in leasing. Respondent recalled that Burke Warren represented ·

PAGE 22:

Virtual Sellers prior to the time Respondent joined that firm. Respondent denied performing any legal work for the company. (Ans. par. 37; Tr. 984, 1013, Adm. Ex. 106).

Respondent made a personal investment in Virtual Sellers, a publicly traded company, or its predecessor by purchasing stock on several different occasions, including a $10,000 investment in the late 1990s. With respect to each purchase, he subsequently sold his shares at a gain. He testified that by March 30, 2001 he held no interest in Virtual Sellers, as he had sold his shares prior to that time. (Tr. 983-86, 1051).

Section 7.1 of the Zgonina Insurance Trust provides that the trustee shall have power to invest the trust estate in stocks of corporations. On or about March 30, 2001, Respondent issued check number 141 from an account at Bank One entitled "Casimir H. Zgonina 2000 Insurance Trust" to purchase stock in Virtual Sellers in the amount of $25,000. The $25,000 purchase price reflected the trust's purchase of 100,000 shares of stock at 25 cents per share. Respondent denied gaining anything from the trust's investment in Virtual Sellers, and denied that his work for Sinclair influenced his decision to purchase the stock on behalf

Filed July 9

of the trust. At the time he made the purchase, he thought the company was doing well. Sometime later, when he was no longer trustee of the Insurance Trust, the value of the stock sank to zero. (Tr. 172, 984-86, 1051; Adm. Exs. 1, 13, 19).

At the time the Zgonina Insurance Trust purchased $25,000 of stock in Virtual Sellers, Respondent did not advise Donna Zgonina of the purchase or that she should seek independent legal advice regarding the purchase. Zgonina testified she was never advised by Respondent that he owned stock in Virtual Sellers or that he had performed legal work for Sinclair. (Ans. par. 41, 42; Tr. 120).

PAGE 23:

## B. Analysis and Conclusions

Respondent's investment in Virtual Sellers on behalf of the Zgonina Insurance Trust was within the powers he was granted as trustee. As shown previously, however, even if Respondent was acting within the authority given to him as trustee, we must determine if he breached his overriding fiduciary duty to act with loyalty and fidelity with respect to the trust. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009; *Home Fed. Savings & Loan Ass'n v. Zarkin*, 89 Ill. 2d at 239; *Winthrop*, 219 Ill. 2d 526.

We heard evidence that Respondent, at one time, owned shares in Virtual Sellers. He testified, and the Administrator did not prove otherwise, that when he purchased shares of Virtual Sellers on behalf of the Zgonina Insurance Trust in March 2001, he had no personal interest or ownership in Virtual Sellers.

Likewise, we received no evidence that Virtual Sellers was a client of Respondent, or of Respondent's firm, at the time of the stock purchase in March 2001. Respondent testified he had drafted a trust agreement for Sinclair and performed other work for which he was never compensated, but the time frame of those representations was not clearly established. He also acknowledged that his law firm had done work for Virtual Sellers prior to his joining the firm, but we were not presented with any clear evidence of a continuing attorney/client relationship.

Because the Administrator did not prove Respondent had any ownership interest in Virtual Sellers or that he was representing the company or its founder at the time he purchased stock on behalf of the Zgonina Insurance Trust, we find he did not breach any fiduciary duty of loyalty or fidelity with respect to Zgonina or the trust.

PAGE 24:

**XIII. Respondent is charged in Count IV with representing a client where the representation of that client will be directly adverse to another client in violation of Rule 1.7(a) and representing a client where the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests in violation of Rule 1.7(b)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

We find these charges were not proved by clear and convincing evidence. Because no dual representation was established, we find Respondent did not represent a client where the representation of that client was

directly adverse to another client in violation of Rule 1.7(a).

We were not presented with clear and convincing evidence that Respondent, at the time he purchased stock in Virtual Sellers for the Zgonina Trust, was limited by any responsibilities to Virtual Sellers. He was not representing that company, nor did the evidence show that he had any allegiance to Sinclair or any personal stake in the transaction. Therefore we find he did not represent a client where the representation of that client may be materially limited by his responsibilities to another client or to a third person, or by his own interests in violation of Rule 1.7(b).

**XIV. Respondent is charged in Count IV with failing to explain the implications of the common representation and the advantages and risks involved, when representing multiple clients in a single matter in violation of Rule 1.7(c)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

Because Respondent was not representing multiple clients in a single matter, he did not have any obligation to explain the implications of any common representation or the advantages and risks involved, and therefore did not violate Rule 1.7(c).

PAGE 25:

**XV. Respondent is charged in Count IV with engaging in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

The evidence did not establish that Respondent's actions were dishonest in any way. He did not derive any profit from the trust's investment in Virtual Sellers, and he had valid reasons for purchasing the stock, that is, the gain he realized on his personal investment and his belief that the company was doing well. We find therefore that Respondent did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)

**XVI. Respondent is charged in Count IV with engaging in conduct that tends to defeat the administration of justice or bring the legal profession into disrepute.**

### A. Evidence Considered

We consider the evidence previously summarized in section XII.

### B. Analysis and Conclusions

We have found no breach of fiduciary duty or violation of any Professional Rule with respect to Respondent's purchase of shares of Virtual Sellers on behalf of the Insurance Trust. We believe his actions

were proper pursuant to the terms of the Insurance Trust, and therefore we do not find that his conduct tended to defeat the administration of justice or bring the courts or legal profession into disrepute

Having determined that there was a failure of proof as to the charges of Count IV, we recommend that those charges be dismissed.

PAGE 26:

## Count V

## (Payment from Sanial Trust to Zgonina Trust)

**XVII. Respondent is charged in Count V with conversion and dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4)**

Count V of the Complaint realleges the allegations of Counts I to IV and therefore we consider the evidence as to those Counts along with the following admitted facts and evidence.

### A. Admitted Facts and Evidence Considered

### Respondent's actions with respect to the Sanial Trust prior to August 2002

Between 1979 and 1990 Respondent drafted wills, and codicils thereto, for Arthur Sanial and his wife Mignon Sanial, who were residents of New York. On July 21, 1996, Mignon died. After bequests and distributions, Mignon's monetary assets, which totaled approximately $1,104,432, poured into a residuary trust ("Sanial Trust"), the terms of which provided that, upon Arthur's death, the assets of the trust were to be distributed to seven trust beneficiaries, all of whom were Sanial family members. On December 1, 1998, Arthur died. (Ans. par. 46, 47, 48; Tr. 231).

At all relevant times, Respondent served as the executor of both Mignon's estate and Arthur's estate, was the attorney for the respective estates, served as the trustee for the Sanial Trust, and was also the attorney for the Sanial Trust. Respondent was previously married to one of Arthur Sanial's granddaughters, who was a beneficiary of the Sanial Trust. (Ans. par. 49, 50; Tr. 236, 295-96, 853, 969).

Mary Jane Houston, a resident of New York, is one of two grandchildren of Arthur Sanial and is a beneficiary of the Sanial Trust. Prior to 2000 she asked Respondent for an accounting of the Sanial Trust, but did not receive one. Arthur Yackel, also of New York and the nephew of Arthur Sanial and a beneficiary of the Sanial Trust, testified he repeatedly contacted Respondent between 2000 and 2002 regarding the value of the Sanial Trust and the length of time it was

PAGE 27:

taking to probate Arthur Sanial's will, and made repeated requests for accountings. Yackel stated that Respondent had total control of the finances and never provided any information. (Tr. 230, 232, 240-43, 293-95, 297; Adm. Ex. 69).

As noted in Count III, between June 1999 and October 2000 Respondent wrote several checks on Sanial Trust accounts either to or for M2 Industries purportedly to cover the company's expenses, without advising the trust beneficiaries of those payments. He did not maintain a separate ledger for those payments, and testified he would have to review the checks to determine the total amount paid. On September 10, 2001 he

issued a check for $6,925.27 on a Sanial Trust account payable to the Zgonina Insurance Trust, with the notation "loan M2" on the memo line. Respondent acknowledged he did not open all of the bank statements and correspondence related to the Sanial Trust, but stated he generally knew what was in the trust accounts. (Tr. 870-73, 877-79, 883, 953-54, 1060; Adm. Exs. 47, 93, 94).

### Respondent's actions with respect to the Zgonina Insurance Trust prior to August 2002

In 2001 and early 2002 Donna Zgonina attempted to obtain from Respondent an accounting of transactions with respect to the Zgonina Insurance Trust, including checks written from the trust account. She received a list of the trust's holdings from Respondent in June 2001, a binder with information in September 2001, and then several letters with additional information, but she did not receive answers to all of her questions or sufficient explanations that she could understand. (Tr. 109-10, 117-18, 124-29, 131-33; Adm. Exs. 14, 18, 19, 21, 25, 26, 27).

With respect to the line of credit and equipment lease to M2 Industries (detailed in Count III), Zgonina acknowledged receiving information from Respondent in January and February 2002 regarding the status of payments. She testified she was not comfortable with the M2 investment and wondered why Respondent was loaning trust funds to that company without

PAGE 28:

discussing it with her, and without her approval, when her own company was in need of financial support. She acknowledged she did not ask Respondent about it or express her disapproval at that time. (Tr. 130-33, 162, 167, 173; Adm. Exs. 26-28).

Eventually Zgonina became dissatisfied with Respondent's lack of explanations and in May 2002 she retained a new attorney, Mitchell Goldsmith, to represent both the trust and her company. Goldsmith wanted to identify the assets and investments of the trust and determine if the investments could be liquidated. In reviewing information provided by Zgonina, he was particularly concerned about the loan and line of credit to M2 Industries. On May 9, 2002 Goldsmith sent a letter to Respondent requesting records of the trust and corporation, and asking him to resign as trustee of the trust and director of the corporation. (Tr. 133-34, 493-97; Adm. Ex. 29).

Goldsmith did not receive materials from Respondent, and repeated his request in letters dated May 29 and June 10, 2002. In June 2002 Zgonina sent a similar request to Respondent. On June 20, 2002 Respondent responded with a letter stating he was waiting for legal advice regarding his resignation as trustee but he made no mention of the documents pertaining to the trust. Goldsmith recalled sending another request for records in July 2000 and then speaking to Respondent by phone, at which time Respondent briefly outlined the private investments held by the trust, advised Goldsmith he was selling real estate in New York to get Zgonina out of the private transactions, and indicated he would turn over the trust files when the sale was accomplished in several weeks. Goldsmith testified he was pushing Respondent to get out of the M2 loan and equipment lease so the proceeds could be placed in safer investments. He was concerned about the creditworthiness of M2, the fact the company was in arrears as to some of the payments, and the fact the investment was not liquid. Goldsmith acknowledged he did not run a credit check on the company. (Tr. 135, 495-504, 508-509, 517, 520; Adm. Exs. 30-35).

PAGE 29:

### August 2002 Payment from Sanial Trust to Zgonina Trust

Filed July 9                                                                                    https://www.iardc.org/HB_RB_Disp_Html.asp?id=11006

On August 5, 2002 Respondent issued a check from a Sanial Trust bank account payable to the Zgonina Insurance Trust in the amount of $281,453.58. On or about that same date, Respondent endorsed the check "Casimir H. Zgonina 2000 Insurance Trust by Thomas W. Murphy, Trustee," and deposited it into an account he held on behalf of the Zgonina Insurance Trust. (Tr. Adm. Ex. 36).

In a letter of August 7, 2002 Respondent advised attorney Goldsmith that transactions had been completed to obtain payment for the Zgonina Insurance Trust's investment in a line of credit and equipment lease; the funds had been deposited into the Insurance Trust account; and an accounting would be provided within days. Goldsmith testified he was pleased to learn of the payment, but noted Respondent did not turn over records in August or September 2002, despite another request. (Tr. 506-508, 517, Adm. Exs. 37, 38).

On October 9, 2002, Respondent forwarded to Goldsmith a binder with records relating to the Insurance Trust, including the M2 transactions, along with a letter stating that $281,453.58 had been deposited into the Zgonina Insurance Trust bank account on August 5, 2002 "as a result of another entity's purchase of the trust's interest in the line of credit, lease and note." Respondent's letter broke down the amount received by the Insurance Trust as follows: $229,543.58 for the line of credit ($222,702.20 for principal and $6,841.38 interest); $33,900 for the equipment lease agreement ($30,000 for the machine and $3,900 for accrued lease payments); and $18,010 for a promissory note ($15,000 principal and $3,010 interest). Respondent acknowledged the latter amount was actually repayment of a $15,000 trustee's fee he had paid to himself from the Zgonina Insurance Trust. He stated he reimbursed the Sanial Trust for the $18,010 payment, and assumed the reimbursement would be reflected in the records

PAGE 30:

from his checking account and the Sanial Trust bank statements. (Tr. 508, 969, 1027-30, Adm. Exs. 39).

Arthur Yackel and Mary Houston each testified they were not informed that Respondent issued a check from a Sanial Trust account in the amount of $281,453.58 to the Zgonina Insurance Trust, and they did not authorize Respondent to make that payment. In August 2002 Houston believed the funds were safe somewhere and earning a small interest rate. She testified that her mother Catherine, with whom she maintained regular contact, never mentioned a check being issued from the Sanial Trust. (Tr. 241, 302-305).

Respondent acknowledged purchasing the M2 loan from the Zgonina Insurance Trust on behalf of the Sanial Trust with money from the Sanial Trust, and stated the investment was within his authority as trustee. Article VIII of Arthur Sanial's will reflects numerous powers were bestow upon the trustee, including the authority to sell and manage property of the trust estate, borrow money, invest the trust estate in stocks, securities, bonds, mortgages, or other types of enumerated assets, and purchase or invest in any business or business interest. (Tr. 978-79; Adm. Ex. 55).

Respondent recalled that at the time of the purchase, M2's business and client list were expanding and the company had substantial receivables. Although M2's cash flow was tight, Respondent believed the investment was a good one and had no reason to believe the company was in financial trouble. He noted that the trust agreement did not require him to provide notice to the beneficiaries or seek pre-approval for any investment. He believed if such a requirement existed, even large trust companies would decline to serve as trustees. Respondent acknowledged he did not advise the Sanial Trust beneficiaries of his relationship with Mobile or M2 before issuing the check for $281,000. He denied deriving any personal profit from the investment he made on behalf of the Sanial Trust. (Tr. 901, 974-75, 979-80, 986-88).

PAGE 31:

Respondent does not believe he converted $281,000 from the Sanial Trust and denied that his purchase of the M2 loan and equipment lease for the Sanial Trust was because Zgonina was questioning his conduct with respect to the Zgonina Insurance Trust. He noted the Zgonina Insurance Trust agreement gave him power to lend funds to M2 and to buy equipment for lease to M2, and the loan was generating monthly payments for the trust. (Tr. 973, 975, 978).

Sometime in or around 2004, M2 Industries went out of business. According to Respondent, the company ran into financial problems and could no longer sell its accounts receivable after a customer refused to pay for a tardy shipment. Respondent acknowledged that while the Sanial Trust had received about ten interest payments, it lost the investment of $281,000. He believes a record of interest payments exists, but he did not review the many boxes of Sanial trust records to locate it. (Tr. 896, 960-61, 976, 978, 987).

### Payments to Sanial Beneficiaries

Between 2003 and 2009 Arthur Yackel sent Respondent letters and e-mails with questions and concerns, but received no information regarding the status of the Sanial Trust. Yackel stated he was never advised as to what Respondent was doing with the trust assets or where they were being held. In 2004 Yackel visited the courthouse in Riverhead, New York and reviewed the Sanial estate file to try to obtain the information Respondent was not supplying. Yackel acknowledged receiving some distributions and, beginning in 2006, quarterly interest payments in amounts between $15,000 and $20,000, but noted that several of the checks for small distributions were returned for insufficient funds. Yackel was very frustrated and discouraged by Respondent's sloppiness and his unwillingness to provide information. (Tr. 244-63, 269-70, 274; Adm. Exs. 70-77, 81-83, 85-87).

In November and December 2009 Yackel's attorney, Ellen Makofsky, sent letters to Respondent and spoke to him regarding a distribution to Yackel and an accounting. Makofsky,

PAGE 32:

who practices in New York, testified that pursuant to the terms of the trust, distributions were at the discretion of the trustee but were to be made in the best interest of the beneficiary. She recalled that when she spoke to Respondent, he agreed Yackel's request for distribution met the criteria set forth in the agreement. Despite Makofsky's requests, Respondent did not make a distribution to Yackel or provide an accounting, but pursuant to a separate request by Makofsky, Respondent did make a distribution to Yackel's daughter. After December 2009, Makofsky provided no further services to Yackel or to his daughter. Yackel was billed for the letters Makofsky wrote to Respondent. (Tr. 281-89; Adm. Ex. 84).

In July 2010 Yackel sent a letter to Respondent expressing his frustration with Respondent's failure to make distributions, and advised Respondent that a new attorney was planning to forward the matter to the ARDC. Yackel then received a check for $57,271.98. When that check bounced, Respondent sent a replacement check in the amount of $57,540.89. Yackel testified he has no idea if he received his full distribution because he never knew the value of the trust, and he does not know if the trust investments suffered any losses because he did not know how the funds were invested. Yackel and his wife were disconcerted and upset by their dealings with Respondent. (Tr. 265-69, 273; Adm. Exs. 88-91).

Mary Jane Houston testified to similar difficulties in obtaining information and distributions from Respondent. Between 2002 and 2008 Houston, along with her husband, made multiple requests for accountings from Respondent regarding trust assets and distributions, but were not able to obtain the information requested. Houston recalled receiving some small distributions over the years, after begging for

them, and believed some of the checks came from Respondent's own account. She had no knowledge of the trust assets or activity, however, and assumed the funds were sitting quietly in a low interest account. When she requested that Respondent make a monthly distribution of $750 to her mother who had been diagnosed with

PAGE 33:

lymphoma, Respondent made three distributions and then stopped. (Tr. 298-301, 306-308, 310-13, 321, 323; Adm. Ex. 92).

In November 2010 Houston retained New York attorney Bruce Klein to pursue legal action against Respondent for distribution of the trust funds. Klein requested an accounting with specific information regarding trust assets, receipts, expenses and distributions. He recalled that Respondent supplied a spreadsheet and an estate tax return and made a distribution to Houston, but did not provide an accounting. On February 22, 2011 Klein filed a lawsuit in New York for a compulsory accounting. On August 1, 2011, after Respondent failed to file an appearance, failed to file an accounting as directed, and failed to appear in court to show cause why he should not be held in contempt, the court suspended his duties as trustee and executor and ordered him to provide an accounting. Respondent did not comply and a second contempt hearing was set for October 25, 2011, at which time Respondent again failed to appear. Thereafter, the parties reached a settlement agreement whereby Respondent agreed to pay $200,000 plus attorney's fees and Houston agreed not to take any enforcement action with respect to any court order. After the case was settled, the court entered an order holding Respondent in contempt, but Klein has not attempted to enforce that order. (Tr. 192-209, 222-23, 314; Adm. Exs. 54, 56-59, 62, 65, 66).

Klein testified he never saw any account statements or bank statements, but accepted the settlement amount based upon the estate tax return and the information Respondent did provide. He had no knowledge of whether Respondent ever converted funds or had funds in his possession, or whether the trust suffered losses over the years. He noted that after missing a couple of payments, Respondent paid the settlement amount and penalty fees by January 2012. Houston confirmed that she had received her final payment from Respondent. (Tr. 210, 217-18, 315, 322).

PAGE 34:

In February 2012 Klein's firm was engaged by Houston's mother, Catherine Sanial, who also was a beneficiary of the Sanial Trust and who was concerned about the trust assets and distributions. Klein sent a demand letter to Respondent in early March and the parties reached a settlement in May 2012 whereby Respondent agreed to pay $375,000 plus attorney's fees. Klein stated that Respondent has been making payments pursuant to a schedule. (Tr. 211-13; Adm. Ex. 67).

Respondent admitted he never provided the Sanial beneficiaries with an accounting detailing the source and use of proceeds in the trust, and acknowledged that none of the beneficiaries knew the trust lost money, including the $281,000 that was paid to the Zgonina Trust. In a prior deposition he acknowledged the beneficiaries did not know he was investing the trust assets, but at hearing he disagreed with that statement. (Tr. 955-56, 959-60; Adm. Ex. 109).

With respect to reimbursement to the beneficiaries of the Sanial Trust, Respondent testified that a trustee does not have an obligation to repay a trust if an investment by the trustee goes bad. When his bad investment resulted in a loss of money to the Sanial Trust, however, he felt a personal obligation to make the beneficiaries whole because the Sanials were his former relatives. Respondent has been using his personal

funds to repay the beneficiaries. (Tr. 970-71, 987-88, 1018).

Respondent testified he has made repayment as quickly as possible but noted that certain individuals were not entitled to an immediate distribution under the trust agreement. For example, Yackel's portion was to be held for life and Respondent had to obtain approval from his children to make the distribution. Respondent stated his former mother-in-law, Catherine Sanial, is the only beneficiary who has not been repaid in full but he is current in his payments of $10,000 per month plus interest. He acknowledged that Catherine's receipt of funds is dependent on his own financial solvency. (Tr. 970-72, 988, 1030-31).

PAGE 35:

Respondent described a trustee's job as a thankless one and noted he never received a fee as trustee of the Sanial Trust. (Tr. 1018, 979).

## B. Analysis and Conclusions

With respect to the charge of conversion, the evidence showed that during the summer of 2002 Respondent was under mounting pressure to resign as trustee of the Zgonina Insurance Trust, to provide an accounting of the trust's investments and disbursements, and to divest the trust of any investment or business dealings with M2. During that time period he was also serving as trustee of the Sanial Trust and in that capacity had full access to the funds held by that trust, with a history of little or no accountability to the beneficiaries. When Respondent needed funds for the Zgonina trust to cover the M2 transactions, he simply wrote a check from the Sanial Trust to the Zgonina Trust. The check, written for $281,453.58, included $263,443.58 to reimburse the Zgonina Trust for the M2 investments.

Respondent's explanation that he purchased the M2 loan and equipment lease as a legitimate investment for the Sanial Trust simply was not credible. While it is true that the Sanial trust agreement gave Respondent, as trustee, broad authority to make investments, we saw no evidence that the trust received anything in exchange for the funds expended. Respondent presented no documents to reflect Sanial's official purchase of the loan or equipment lease, such as an enforceable assignment of rights or a letter agreement between the trusts. We also saw no documentation of any payments made by M2 to the Sanial Trust after the purported purchase of the loan and equipment lease. We conclude that Respondent did not engage in a valid business transaction on behalf of the Sanial Trust; rather, his primary purpose was to make quick payment to the Zgonina Insurance Trust in order to cover his own actions that were coming under scrutiny.

PAGE 36:

The check issued by Respondent from the Sanial Trust to the Zgonina Insurance Trust also included a payment of $18,010, which Respondent explained was repayment for a $15,000 trustee fee he received from the Zgonina Trust, plus interest. In 2002, however, he had characterized the $18,010 as repayment of a $15,000 promissory note, plus $3,000 interest. Whatever the purpose of the repayment, we find that Respondent's use of funds from the Sanial Trust to repay his own personal debt, without any apparent documentation of that fact for the trust or authority from the beneficiaries, was improper.

Based on the foregoing, we find that Respondent converted $281,453.58 from the Sanial Trust. We also find that his actions were dishonest in violation of Rule 8.4(a)(4). Our finding of dishonesty is based upon Respondent's lack of documentation for the purported investment, his obvious purpose in protecting himself, and his extreme reluctance to turn over information or provide an accounting to the Sanial beneficiaries, despite their repeated requests and the involvement of attorneys. His resistance to an

accounting indicates to us that he was attempting to conceal his actions.

## XVIII. Respondent is charged in Count V with breach of fiduciary duty

### A. Evidence Considered

We consider the evidence summarized in section XVII.

### B. Analysis and Conclusions

Having found that Respondent engaged in conversion and dishonest conduct, we find that he also breached his fiduciary duties of honesty and good faith. *See Janowiak v. Tiesi*, 402 Ill. App. 3d at 1009, 1013. In addition, by placing his own interests and the interests of the Zgonina Trust ahead of the interests of the Sanial beneficiaries, he breached his fiduciary duty of loyalty and his duty to avoid self-dealing.

PAGE 37:

## XIX. Respondent is charged in Count V with conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) and conduct that tends to defeat the administration of justice or bring the legal profession into disrepute

### A. Evidence Considered

We consider the evidence summarized in section XVII.

### B. Analysis and Conclusions

Respondent's failure to disclose information to the Sanial beneficiaries resulted in a lawsuit being filed against him. The case was settled, but only after lengthy proceedings during which Respondent failed to abide by court orders and was found to be in contempt of court. We find that conduct to be prejudicial to the administration of justice in violation of Rule 8.4(a)(5).

We also find that Respondent's actions in converting funds and engaging in dishonest conduct tended to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

## Count VI

## (Martingale property)

## XX. Respondent is charged in Count VI with conversion and failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property in violation of Rule 1.15(c)

### A. Evidence Considered

### The Martingale Transaction

Bonita Jozers and Frank Alamprese, husband and wife, have owned and managed commercial and industrial buildings since the mid 1990s. In April 2010 they learned an office building at 300 North Martingale Road in Schaumburg was for sale. The building was attractive because it was almost fully occupied and had an

assumable mortgage. Jozers and Alamprese discussed the building with Jozers' mother, Nina Jozers, who was interested in investing in the building and having Jozers and Alamprese manage it. Alamprese contacted a real estate investor, Albert Rossini, and after touring the building, they discussed the formation of a

PAGE 38:

partnership to purchase the building. According to Jozers and Alamprese, the partnership would be comprised of Jozers' mother, who agreed to provide funds from a limited liability company known as Aljo, Rossini, and an unidentified group of investors. Jozers was acting as her mother's representative for the transaction pursuant to a power of attorney. (Tr. 552-62, 601-603, 629-31, 660-61, 666).

Jozers and Alamprese were not very familiar with Rossini. In early or mid-April they contacted Respondent, whose name had been given to them by Rossini, for confirmation that Rossini had the financial ability to make a large purchase. Jozers recalled being assured by Respondent that Rossini had access to large amounts of money, and that Respondent would be the attorney representing the group of buyers. Alamprese also understood that Respondent would be representing all of the purchasers. Neither believed Respondent would be a participant in the transaction other than as attorney. Jozers testified they never signed any agreement with Respondent. (Tr. 564-65, 602, 614, 632-34, 657, 669).

Jozers and Alambrese both recalled informing Respondent that their financial contribution would be coming from Jozers' mother, and that Jozers and her husband planned to manage the property. Although Alamprese talked to Respondent quite often, he acknowledged that Rossini was, to a degree, calling the shots as the deal moved forward. Alamprese stated he was relying on Rossini's and Respondent's experience in the real estate business to close the deal. (Tr. 566, 607, 634, 640, 657, 662-63).

Respondent testified his only role in the Martingale transaction was as a lawyer for Rossini, who he considered to be his client in the transaction. When the Martingale transaction was initiated, Respondent had been representing Rossini in real estate work for about one year. After he began working on the transaction, but before April 29, 2010, he became aware that Rossini had been convicted of a financial crime and had spent time in jail, but he was not aware

PAGE 39:

of the exact circumstances of Rossini's conviction. After discovering Rossini's criminal history, he continued to represent Rossini because closings were being completed without problems. At a sworn statement on April 22, 2010, Respondent stated he understood doing business with a person such as Rossini is not only dangerous but foolish, and he would be very careful about getting involved in a transaction. (Tr. 901-904, 988-89, 1020, 1054; Adm. Ex. 106).

Respondent testified that Alamprese set up a limited liability company known as Aljo, and had his own attorneys. Respondent was aware that Alamprese had filed bankruptcy in Florida and did not want his name to appear in connection with the transaction, but he did not know Alamprese was borrowing money from his mother-in-law until the transaction had progressed. Respondent denied ever meeting or speaking to Jozers' mother. Respondent stated that in addition to Rossini and the Alamprese family, other investors were involved in the Martingale deal at various times. (Tr. 995, 1003-1006, 1061).

Paul Jacknow, a real estate broker, testified he was contacted by Rossini in the spring of 2010 to represent a group interested in purchasing the Martingale office building, which had a listing price of $23,000,000.

When the purchasers, who intended to form an entity known as Hoya, LLC, decided to proceed, Jacknow negotiated a contract with the seller's broker. Jacknow considered himself to be the broker for the buyers and in that capacity wanted to draft the contract and hold the earnest money, but Respondent, who Jacknow identified as the attorney for the buyers, indicated he would handle those matters. Respondent gave no explanation as to why he wanted to hold the earnest money, and Jacknow assumed the funds would be deposited in a law firm escrow account. (Tr. 416-18, 422-26, 475-77).

### Deposit of $75,000

On April 29, 2010 Respondent sent an e-mail to Alamprese, with an attached letter from Rossini to Alamprese which stated, in part:

PAGE 40:

> You have brought the [300 North Martindale] Property to our attention for the purpose of our forming a real estate investment entity, including you as a participant, in the form of an Illinois limited liability company ("LLC") to acquire, own, lease and manage the Property.
>
> . . . .
>
> [I]t is our understanding that we have reached the following agreements with regard to the LLC:
>
> 1. The LLC will be formed between you and your designee, us, and a group of our investors. Each party will be a one-third (1/3) member of the LLC.
>
> . . . .
>
> 4. The LLC shall retain you and your designee to act as the manager and administrator of the Property for so long as the LLC shall own the Property, and shall pay an annual fee for your services of approximately $255,000 . . . .
>
> . . . .
>
> In exchange for your receiving a one-third interest in the LLC and the management of the property you will agree to deposit with our counsel, Thomas W. Murphy, the sum of $75,000 by wire transfer (the "*Deposit*") on or before 5:00 p.m. Thursday, April 29, 2010. The Deposit will be held until the closing of the purchase of the property or as we might otherwise agree. Upon closing the deposit shall represent your equity contribution to the LLC . . . . In the event that the LLC is unable to acquire the building within one hundred twenty (120) days of the date of this letter, the Deposit will be returned to you in full without any charge, offset or interest.

The letter included specific information for wiring the funds to the account of "Thomas W. Murphy, Esq." including an account number at Chase Bank. Respondent acknowledged that the account number provided was a personal account he held with his wife entitled "Thomas W. Murphy and Christine Murphy" ("the Chase account"). (Tr. 569-70, 635-36, 907-908; Adm. Exs 100, 103).

When Alamprese received the e-mail and letter, he showed it to Jozers. On April 29, 2010 Jozers deposited $75,000, which funds were provided by her mother, into Respondent's Chase account. Jozers understood the

funds were to be used for acquisition of a one-third interest in the LLC which was going to acquire the Martingale property. Based on her

PAGE 41:

knowledge that Respondent was the attorney handling the closing and that attorneys maintain escrow accounts for real estate transactions, she believed she was depositing the funds into an escrow account. Alamprese believed the funds were being deposited into an escrow account at Respondent's law firm, and would be held there and not used for anything else. Alamprese notified Respondent after the deposit was made. (Tr. 569-74, 612, 636-40, 668-69, 907; Adm. Ex. 98).

Respondent testified that when $75,000 was deposited into his Chase account on April 29, 2010, the money belonged to Rossini and Alamprese per an agreement between them. He was told by both individuals that the deposit was to be used for due diligence expenses or expenses that Rossini was incurring, and the two had agreed that Rossini could utilize and direct the funds. Respondent has no documents to confirm his understanding of the purpose of the deposit. He testified the funds were not to be held in escrow and, if that had been the case, the funds would have gone into his law firm account. Respondent recalled a conversation with Alamprese during which Alamprese acknowledged knowing that the $75,000 deposit would be utilized. (Tr. 990-91, 1061-66).

With respect to the $75,000 deposit, Respondent testified he acted at Rossini's direction and, with Rossini's permission, disbursed some of the money to himself for his own benefit because he was owed about $75,000 for money he had advanced to Rossini. On April 29, 2010, the date the funds were deposited into the Chase account, Respondent wrote a check from the account for $50,000 payable to cash. He stated Alamprese was aware of that withdrawal. The following day he wire-transferred $10,000 from the account to Rossini's wife, and wrote checks to cash for $13,000 and $9,981. Respondent testified the check for $9,981 was used to purchase a certified check, although that transaction is not reflected in his bank statements. He subsequently testified that the proceeds of all three checks written to "cash," each of which bears

PAGE 42:

his endorsement, were used to purchase cashier's checks that were given to Rossini, and each was written pursuant to Rossini's direction. He denied knowing the purpose of the checks, although he also claimed the money was for due diligence. (Tr. 909-11, 991-93, 1054-55, 1063-64, 1067; Adm. Exs. 103, 104).

Respondent's Chase bank account statement for the period April 21, 2010 through May 20, 2010 reflects that throughout the month additional funds were deposited in the account from Respondent's law firm and other sources, and numerous payments and withdrawals were made in addition to the ones noted. On April 29 2010, Respondent deposited a check for $20,000, which he stated was unrelated to the Martingale transaction, and on April 30, 2010 he deposited a cashier's check for $25,000. On April 30, 2010 he wrote a check for $25,000 to George Johnson of Stifel Nicolaus, and a check for $12,000 to Doug McNicoll for a loan repayment. He stated those checks came from his own personal funds. (Tr. 912-13, 1064-65; Adm. Exs. 103, 104).

### Deposit of $50,000

The purchase and sale agreement for the Martingale property was signed on May 12, 2010. The agreement identifies Hoya Realty Partners, LLC as the buyer, Respondent as attorney for the buyer, and it bears the

signature of Albert Rossini on behalf of the buyer. Respondent testified that Rossini was the only person involved in Hoya Realty Partners. He noted that at some point the purchasing entity was changed to 300 North Martingale Partners, but Hoya Properties was the general partner directing that entity. Respondent is also identified as the attorney for Hoya Realty Partners and 300 North Martingale Partners on other documents relating to the transaction, but he noted his representation of a company does not mean he represented all the stockholders of the company. (Tr. 427, 574-75, 640, 1035-38, 1043-47; Adm. Ex. 99).

PAGE 43:

The day after the sales agreement was signed, Jozers deposited another $50,000 into Respondent's Chase account pursuant to e-mails from Rossini stating that additional funds were needed because the bank was charging a fee to extend the original mortgage on the property. Jozers believed Respondent was copied on the e-mails. Alamprese recalled receiving the information primarily from Respondent and thought the deposit was for escrow in connection with a loan extension. Jozers transferred the funds from her mother's account, with her mother's knowledge. Jozers believed Respondent was holding the money in trust pending the extension of the loan, and that the funds would be returned to her mother. Alamprese notified Respondent when the deposit was made. (Tr. 575-78, 616-17, 641-42; Adm. Ex. 98).

Respondent recalled being notified of the deposit by Rossini and Alamprese. He denied knowing the reason why the funds were transferred or anything about the agreement between Alamprese and Rossini other than, as with the prior deposit, Rossini had the right to use the money. On the day he received the deposit, Respondent wrote a check on the Chase account for $25,000 to World Wide Realty, LLC to repay a personal debt he owed due to a mortgage foreclosure. He stated the $25,000 was owed to him by Rossini as part of a $75,000 debt. (Tr. 914-16, 1065-67; Adm. Ex. 104).

The following day Respondent issued a check to Rossini for $11,170, a check to John Suster for $3,580, a check to AGP Enterprises for $5,000 and a check to PLS Check Cashiers for $5,250. The latter three checks included the notation "Rossini" on the memo line and represented payments to currency exchanges for money owed by Rossini. Respondent acknowledged he had no written instructions from Rossini or other documents to support his withdrawals, and explained he received his directions verbally. Respondent testified that all the disbursements from the $50,000 deposit were made at Rossini's direction or with his permission.

PAGE 44:

Respondent noted he had other funds in his account but did not know what his balance was when he wrote the checks. (Tr. 914-18, 992, 1067; Adm. Ex. 104).

On June 4, 2010 a meeting was held at Respondent's office to discuss the details of the closing. In attendance were Respondent, Jozers, Alamprese, Rossini, Jacknow, as well as the seller, the seller's attorney, and the seller's broker. Respondent acknowledged he acted as the attorney for the buyers at the meeting and did not announce to anyone that he was only representing Rossini. Alamprese recalled speaking privately to Respondent after the meeting to obtain assurances about Rossini and his ability to raise money. Alamprese noted by that point the deal had changed from one involving an assumable mortgage to a due-on-sale closing. (Tr. 579, 644-45, 663-64, 1041-42)

In June and July Respondent corresponded with the seller's attorney in his capacity as attorney for the purchaser, and never stated in his correspondence that he was only representing Rossini. Respondent also communicated, verbally and by e-mail, with Alamprese and Jacknow. On June 17, 2010 Respondent

directed an e-mail to Alamprese and Rossini and attached a revised Limited Partnership Agreement to reflect Aljo's capital contribution of $75,000, and 33.3% interest, in 300 North Martingale Partners. (Tr. 933-34, 1003, 1036-42; Adm. Exs. 99, 100).

The sale of the Martingale property did not close in June or July for various reasons. When the date had to be rescheduled at the buyer's request, Jacknow sent an e-mail to Respondent and Rossini suggesting that the sellers might be reassured if earnest money were placed in escrow. Throughout the summer of 2010, Jacknow was corresponding with both Respondent and the parties to the transaction regarding the status of the sale and the reason for delays. Jacknow recalled the sellers being continually concerned with the postponements and the fact no earnest money had been deposited. Jacknow testified when he sent questions to

PAGE 45:

Respondent by e-mail, Respondent's responses were short and not helpful. He also attempted to reach Respondent by telephone numerous times but only talked to him on a few occasions. (Tr. 435-36, 439-40, 445, 448, 453, 456, 580, 645-46; Adm. Exs. 99, 100).

### Deposit of $150,000

In mid-August 2010 646, 580 Alamprese was advised by Respondent that funds needed to be set aside for a broker's commission, a deposit was necessary before the end of the day, and Respondent wanted to be informed as soon as the deposit was made. Alamprese then told Jozers about his conversation with Respondent. On August 20, 2010 Jozers transferred $150,000 from her mother's account, with her mother's consent, into Respondent's Chase account. Jozers understood the funds were to be held for the benefit of the transaction and would be returned to them. Jozers knew Respondent was at his bank waiting for the deposit and telephoned him as soon as she finished the transaction. She recalled during their conversation Respondent made a request for a loan of $60,000, without disclosing a reason, and promised to repay the loan within a day or two. Although Jozers was hesitant, she loaned Respondent the funds from her mother's account, and Respondent repaid the loan as promised. (Tr. 580-81, 584-86, 606, 613-14, 617-18, 646-49; Adm. Ex. 98).

Respondent acknowledged he was notified by Jozers on August 20, 2010 that another $150,000 had been deposited into his account, but stated he did not know the purpose of the transfer and was not involved in day-to-day conversations or meetings at the building. On the day the deposit was received, Respondent withdrew $57,540.89, with Rossini's permission, to purchase a cashier's check for Arthur Yackel. Respondent admitted he did not have personal funds in his account to cover that withdrawal, but stated his other assets were sufficient. Within the next few days he withdrew funds to purchase a $9,500 cashier's check for Art Feldman, a currency exchange owner to whom Rossini owed money, and a $5,000 cashier's check for

PAGE 46:

Rossini per Rossini's request. Respondent also withdrew $72,000 for Rossini's company Madison Mercantile Corp., which would manage the limited liability company in the Martingale transaction, and made miscellaneous withdrawals and payments totaling $7,382.34. With respect to the miscellaneous or household expenses, he stated those expenses were paid from his and his wife's paychecks. Respondent acknowledged he has no documents that reflect the purpose of the deposit or his authority from Rossini to make the payments. (Tr. 916, 926-28, 993-96, 1068-69; .Adm. Ex. 104).

Respondent denied asking Jozers for a short term loan of $60,000 on August 20, 2010, although his bank statements reflect a deposit of $60,000 into his account on August 20, 2010 from Jozers' mother's account, and he acknowledged writing a check to Jozers' mother for $60,000 on August 23, 2010. Respondent explained the money was not supposed to be in his account and he caused it to be returned to Jozers' mother. He denied spending any of the $60,000. (Tr. 928-30, 1059; Adm. Exs. 103, 104).

## Failure to Close Transaction and Attempts to Recover Funds

Paul Jacknow testified the proposed closing dates for the Martingale transaction came and went, and no hard earnest money was ever deposited. He recalled that his communications with the sellers diminished in the fall of 2010 because he had nothing to tell them. By the end of the year, he and the sellers had given up on the deal. During the time he was working to bring about the closing, Jacknow had no knowledge of any deposits into Respondent's bank account and had no knowledge that Respondent had any role in the Martingale transaction other than as the lawyer for the buyers. He acknowledged that a real estate deal is not considered a deal until the buyer makes a financial commitment by depositing earnest money into escrow. (Tr. 453-60; Adm. Ex. 99).

PAGE 47:

Respondent testified the Martingale deal failed because the investors learned, through Respondent's due diligence investigation, that the mortgage had a due-on-sale clause. Although Respondent and the seller then attempted to restructure the deal in different ways, the investors were not happy with the risk. With respect to the checks that came into his account, he understood they were not to be held in trust. If the checks were to be held in trust, they would have been deposited into his law firm account. Respondent stated he had Rossini's permission to deposit the checks into his personal account because the money was going to be immediately disbursed. Respondent denied taking any fee from the Martingale deal. (Tr. 998-1001).

In the fall of 2010, Jozers contacted attorney Daniel Herzog because the money deposited with Respondent in connection with the Martingale property and a second property (as detailed in Count VII) had not been returned. According to Jozers, the only money intended to be invested was the original deposit of $75,000, and that amount was to be refunded if the sale was not consummated. The additional deposits were supposed to be refunded in a very short period of time. Jozers denied that she or her mother authorized Respondent or Rossini to use any of the funds deposited into his account for anything other than the real estate transactions. Similarly, Alamprese denied authorizing the use of any of the three deposits made by his wife for anything other than the purchase of the Martingale property. Alamprese understood if the Martingale purchase was not completed, the funds would be returned. Alamprese was never advised that Respondent was receiving a fee or expecting one, and was told he was not receiving a fee. (Tr. 591-93, 599, 615-19, 652-53, 679).

David Herzog, an Illinois attorney specializing in bankruptcy law and commercial litigation, testified that in or about November 2010 he was advised by Jozers that funds belonging to her mother had been deposited with Respondent as earnest money in connection

PAGE 48:

with a real estate transaction and Respondent had not returned the money. Herzog did not review any contracts for the purchase of the property in question. (Tr. 684, 686, 694).

On November 10, 2010 Herzog sent an e-mail and letter to Respondent on behalf of Jozers' mother

demanding the return of $358,000, which Herzog understood was being held in Respondent's escrow account. Herzog then spoke to Respondent, who stated he had to clear the return of funds with Rossini but promised the refund would occur the following week. Herzog recalled that Respondent acknowledged the funds belonged to Jozers, never denied his responsibility for returning the funds, and indicated the funds were in a client trust account. (Tr. 686-92, Adm. Ex. 98).

When Respondent did not return the funds, Herzog sent another letter on November 15, 2010, and Respondent responded with a promise that the funds would be returned very quickly. On November 24, 2010 Herzog sent a letter to the managing partner of Respondent's law firm because Herzog believed the funds were in the firm's trust fund account. He subsequently learned the firm was not holding the funds. Thereafter, Herzog had no further conversations with Respondent, and Jozers retained an attorney to file a civil lawsuit for recovery of the funds. (Tr. 690-93; Adm. Ex. 98).

On June 8, 2011 an action was filed against Respondent and Rossini on behalf of Jozers' mother for the return of funds. In February 2012 a settlement was reached whereby Respondent and Rossini agreed to pay a total of $400,000, in installments, to Jozers' mother. The settlement covered the funds deposited for both the Martingale property and a second property (as detailed in Count VII). As of October 24, 2012, the date of Jozers' testimony, Respondent had made only two $5,000 payments, and none in recent months. Rossini had agreed to repay Jozers' mother $10,000 every month and had paid her a total of $115,000, but was behind in his payments. (Tr. 594-98, 600-601, 626, 654; Adm. Ex. 102).

PAGE 49:

Respondent acknowledged he is obligated to repay $400,000 to Jozers' mother pursuant to their settlement agreement and stated he is currently making payments, but noted Rossini, who is also liable on the total amount, is making the bulk of the payments. Respondent feels obligated for the debt, at least the portion of the funds that Rossini let him use, and his goal is to ensure the debt is paid. He acknowledged that his payments to Jozers are dependent on his own financial solvency. As of November 4, 2012, he had paid approximately $20,000 and Rossini has paid approximately $150,000. Respondent has not initiated any lawsuit against Rossini to recover the payments made by Respondent. (Tr. 961, 1018-19, 1030-31, 1059).

## B. Analysis and Conclusions

Respondent is charged with misconduct relating to funds he received in connection with the anticipated purchase of the Martingale property. Bonita Jozers and her husband Frank Alamprese were interested in managing the property and brought in Jozers' mother to invest funds as one of the purchasers, along with Albert Rossini and others. Three separate deposits totaling $225,000 were deposited by Jozers into Respondent's bank account.

Before discussing those deposits, we address Respondent's suggestion that he represented only Rossini and Rossini's entities. We believe the evidence shows otherwise, as both Jozers and her husband testified they were advised by Respondent at the outset of the transaction that Respondent would be representing all of the purchasers. The April 29, 2010 letter setting forth the agreement between Rossini and Alamprese, which was transmitted to Alamprese by Respondent, made reference to Respondent as "our counsel." Respondent admitted he communicated with the sellers on behalf of all the purchasers and represented the purchasers at a meeting held on June 4, 2010. In determining whether an attorney-client relationship exists, the client's reasonable belief is a significant, if not controlling, factor. *In re Sax*, 03 CH 99, M.R. 22139 (Mar. 17 2008) (Review Bd. at 14). While typically both sides must consent to an

PAGE 50:

attorney-client relationship, consent by the attorney can be implied if the attorney accepts responsibility to perform the tasks at issue. *Sax*, 03 CH 99 (Review Bd. at 14). An attorney-client relationship does not depend on the amount of time the attorney spends with the client, payment of fees, or entry into a formal contract, and is appropriately found where the client reasonably believes the attorney is his or her attorney, the attorney performs functions supporting that belief, and the attorney does not act to disavow representation. *In re Gallo*, 07 CH 110, M.R. 25259 (May 18, 2012) (Hearing Bd. at 19).

While we believe Respondent was representing the entire group of buyers, we note that a finding of conversion is not dependent on an attorney-client relationship. *See In re Stewart*, 05 CH 120, M.R. 22284 (May 19, 2008) (attorney converted escrow funds held for non-clients in connection with loan transactions). Likewise, Rule 1.15(a) requires an attorney to hold property belonging to clients "or third persons" that is in the attorney's possession in connection with a representation separate from his own property

Jozers' first deposit of $75,000 was made pursuant to instructions in a letter forwarded to Frank Alamprese by Respondent. That letter clearly stated that $75,000 was to be deposited in Respondent's account in exchange for a one-third interest in the entity that would purchase the Martingale property, the funds were to be held until closing "or as we might otherwise agree," and if the transaction did not close, the deposit would be returned. Jozers was given instructions for depositing the funds into a Chase bank account for "Thomas Murphy, Esq." Unbeknownst to her, the Chase bank account belonged to Respondent and his wife, and was used for their personal purposes.

Respondent was clearly aware that the funds were intended as a capital contribution to the formation of the LLC and were to be returned if the transaction did not close, as he had forwarded the letter to Alamprese. Within a day of the deposit he expended the funds by writing

PAGE 51:

checks to cash and transferring funds to Rossini's wife. Respondent claimed he was acting at Rossini's direction, that Rossini had authority to direct the disposition of funds pursuant to an agreement with Alamprese, and Alamprese knew about the disposition of at least some of the funds. Other than a vague notion that the funds were used by Rossini for "due diligence," Respondent denied knowing how the funds were actually utilized. We did not receive any evidence that the money was used for the benefit of the Martingale transaction, and we do not give credit to Respondent's testimony.

Respondent's claim that he wrote checks at Rossini's direction and with Alamprese's knowledge was not supported by any other evidence. Jozers and Alamprese, both of whom were credible witnesses, denied authorizing use of the funds for anything other than the purchase of the property, and believed the money was being held in an escrow account. We find it highly improbable that they would consent to Respondent and/or Rossini using funds in a manner contrary to the designated purpose of the deposit, especially when the funds had been contributed by Jozers' mother and were to be refunded if the sale did not close. We also find it extremely unlikely that Jozers would knowingly deposit the funds into Respondent's personal account.

Jozers made two additional deposits into Respondent's account. On May 13, 2010 she deposited $50,000 to cover a fee the bank was charging for an extension of the existing loan on the property. Alamprese recalled receiving that information from Respondent. Jozers thought the information came from Rossini, but recalled Respondent being copied on e-mails. On August 20, 2010 Jozers deposited $150,000 into Respondent's

account after her husband was told by Respondent that funds were needed to cover the brokers' commissions. As to both deposits, Alamprese and Jozers believed the funds were to be held in connection with the purchase of the property and if the transaction did not close, the funds would be returned to them.

PAGE 52:

Respondent disavowed knowledge of the purposes of the deposits and, as with the first deposit, claimed that his subsequent disposition of the funds was at the direction of Rossini, or with Rossini's permission. Shortly after both deposits were made, he used the funds by writing checks for the benefit of Rossini or for his own personal benefit, including payment of personal debts. As to the checks for Respondent's personal use, he maintained Rossini owed him approximately $75,000 and had approved the checks.

Again, we do not believe Respondent's position is credible. His statement that he was unaware of the purpose of the May 12 and August 20 deposits is contrary to Jozers' and Alamprese's testimony and inconsistent with the fact he was integrally involved in the Martingale transaction and communicating with the seller and brokers on a regular basis. Further, Respondent offered no documents or other evidence to support his claim that he was acting at the direction of Rossini, or that Rossini was authorized to direct the use of the funds. Indeed, it was clear from Jozers' and Alamprese's testimony that Rossini did not have that authority. Whether or not Rossini was giving directions to Respondent (and we heard no testimony from Rossini himself), the evidence shows that Respondent accepted funds for a specific purpose. His subsequent use of the funds for a different purpose, without authorization from the individuals who deposited the funds, was improper.

We heard testimony that Respondent was particularly anxious to receive the third deposit and he was waiting at the bank for notification. On that same day he purchased a cashier's check for Arthur Yackel who, as we saw in Count V, was a beneficiary of the Sanial Trust and had been making repeated requests to Respondent for distributions from the trust. Prior to August 20, 2010 Yackel had received a check from Respondent that was returned for insufficient funds, and had informed Respondent he was turning the matter over to an attorney. The fact that

PAGE 53:

Respondent was in a tight situation and in need of quick access to money is a circumstance we consider in assessing the validity of his explanations.

As to all three deposits, we find the funds were entrusted to Respondent for a specific purpose and by using those funds without proper authorization, he engaged in conversion. In addition he violated Rule 1.15(a) by directing that the funds be deposited into an account where he also deposited his personal funds. Failure to segregate Jozers' funds into a separate and identifiable account placed those funds at risk of being subject to claims by Respondent's own creditors.

**XXI. Respondent is charged in Count VI with engaging in dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).**

### A. Evidence Considered

We consider the evidence previously summarized in section XX.

### B. Analysis and Conclusions

We find that Respondent's actions were dishonest in violation of Rule 8.4(c). We have determined that he had to have been aware of the reasons the three deposits were made by Jozers, and have rejected his explanations for his expenditure of the funds. Further, we give weight to attorney Herzog's credible testimony regarding his contact with Respondent in November 2010, at which time Respondent stated he was holding funds belonging to Jozers and represented that the funds were in a client trust account. Respondent's 2010 acknowledgement to Herzog that he owed money to Jozers is contrary to his testimony at hearing that the funds were expended at Rossini's direction pursuant to Rossini's agreement with Alamprese. We conclude Respondent knew his use of the funds was improper, and adopted various strategies to either conceal his actions or place blame elsewhere.

PAGE 54:

**XXII. Respondent is charged in Count VI with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute.**

As in previous counts, we find that Respondent's conversion of funds tended to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

## Count VII

### (43rd Street property)

**XXIII. Respondent is charged in Count VII with conversion and failure to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property, in violation of Rule 1.15(a)**

#### A. Evidence Considered

Count VII of the Complaint realleges the allegations of Count VI and therefore we consider the evidence as to that count along with the following evidence.

In September 2010 Bonita Jozers, Frank Alamprese, and Jozers' mother learned about an opportunity for Jozers and Alamprese to manage a five-story building at 1929 W. 43rd Street in Chicago. On September 8, 2010 Alamprese received an e-mail from Respondent with an attached letter agreement signed by Bert Rossini whose company, Madison Mercantile Corporation, was purchasing the 43rd Street building. The letter, which is addressed to Jozers' mother, explained the company's need to have up to $300,000 available and on deposit to show to its lender, and stated the funds "shall be held in Madison's attorney's account" and shall be repaid at closing along with an incentive fee of $200,000. The letter further stated if the transaction did not close by October 31, 2010, the funds on deposit would be returned. Respondent's signature appears on the last page of the letter with a statement that he acknowledged "the terms and provisions of the additional deposit of funds." (Tr. 587-88, 649-50; Adm. Ex. 100).

PAGE 55:

Jozers recalled that the amount stated in the letter was later modified and her mother agreed to loan $50,000 to Rossini's company, rather than $300,000, in exchange for an agreement that Jozers and Alamprese would manage the building and the funds would be returned at closing with an incentive fee of $33,000. Jozers deposited $50,000 into Respondent's Chase bank account on September 9, 2010. Alamprese notified Respondent after the deposit was made. (Tr. 589-90, 607, 619-21, 650, 656; Adm. Ex. 104).

Respondent acknowledged sending the September 8, 2010 e-mail with the letter signed by Rossini, but denied the letter set forth the terms of the $50,000 deposit. He pointed out the letter makes reference to a much higher amount and maintained the agreement related to a different part of the transaction. Respondent admitted $50,000 was deposited into his and his wife's bank account on September 9, 2010 in connection with the 43rd Street property, and on that same date he transferred $50,000 from his personal account to another account. Respondent could not recall any information about the account to which the funds were transferred, but he understood the funds were Rossini's to direct and stated the transfer was made at Rossini's direction. He did not believe the funds were to be held in trust, and denied keeping any of the $50,000 for himself. (Tr. 930-32, 997-98, 1001; Adm. Ex. 103).

Jozers denied that she or her mother authorized Respondent or Rossini to use any of the funds deposited into his account for anything other than the real estate transaction. Similarly, Alamprese denied authorizing anyone to use the deposit made by his wife for anything other than the purpose stated in the letter, and noted the funds were to be returned within a few days. Although the sale never closed, Respondent did not return the funds. (Tr. 591, 599, 621, 652-54).

Following the September 9, 2010 deposit, Alamprese attempted to contact Respondent on numerous occasions and left messages with Respondent's secretary, but Respondent did not

PAGE 56:

return the calls. Prior to that time, Respondent would either answer his phone or return calls quickly. Alamprese has not talked to Respondent since September 2010. (Tr. 651-52).

As detailed in Count VI, Jozer contacted an attorney and in 2011 a lawsuit was filed against Respondent and Rossini on behalf of Jozers' mother seeking the return of her funds. Thereafter a settlement was reached, whereby Respondent and Rossini agreed to repay $400,000 to Jozers' mother. Respondent stated he and Rossini together have paid $170,000. (Tr. 1019).

### B. Analysis and Conclusions

Our analysis relating to Count VII is similar to that of Count VI. In September 2010 Respondent sent an e-mail to Alamprese with a letter agreement, signed by Rossini, requesting that funds be placed on deposit with Respondent. The letter specifically stated the funds would be held in Respondent's account and would be returned along with an incentive fee when the transaction closed, or returned if the transaction did not close by a certain date. The day after receiving the e-mail, Jozers deposited $50,000 into Respondent's personal account at Chase Bank. On the same day the funds were deposited, Respondent transferred $50,000 out of his account and into another account. The evidence showed that neither Jozers, Jozers' mother, or Alamprese authorized Respondent or Rossini to use the funds deposited into his account for anything other than the real estate transaction.

We do not accept Respondent's testimony that the deposit was unrelated to the request in the letter he forwarded to Alamprese. Jozers testified otherwise, and the timing of the deposit supports the fact that it was made in response to the letter. Jozers' testimony that her mother agreed to a deposit of $50,000 with an incentive fee of $33,000, rather than a deposit of $300,000 with an incentive fee of $200,000, is entirely credible.

We also reject Respondent's statements that he did not believe the funds were to be held in trust and the funds were Rossini's to direct. Respondent's position and actions are directly

PAGE 57:

contrary to the language of the letter, which stated that the funds would be held in Respondent's account and would later be returned to Jozers' mother.

We find that Respondent, by allowing Jozers to deposit funds relating to a real estate transaction into his personal account, failed to hold property of clients or third persons separate from his own property in violation of Rule 1.15(a). He then converted the funds when he transferred the funds out of the account without proper authorization.

**XXIV. Respondent is charged in Count VII with engaging in dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).**

### A. Evidence Considered

We consider the evidence previously summarized in section XXIII.

### B. Analysis and Conclusions

We find that Respondent's conversion of the funds he was holding for Jozers was deceitful. He acted in direct contravention to the terms spelled out in the September 2010 letter he forwarded to Alamprese, and his explanations for his actions were unconvincing. As stated with respect to Count VI, in the fall of 2010 Respondent acknowledged to attorney Herzog that he was holding the funds in his client trust account. His testimony at hearing that the funds were intended for a purpose other than what was stated in the letter, and that he was authorized by Rossini to transfer the funds, was not believable. We conclude, therefore, that Respondent engaged in dishonesty, fraud, deceit and misrepresentation in violation of Rule 8.4(a)(4).

**XXV Respondent is charged in Count VII with engaging in conduct that tends to defeat the administration of justice or to bring the legal profession into disrepute**

### A. Evidence Considered

We consider the evidence previously summarized in section XXIII.

PAGE 58:

### B. Analysis and Conclusions

As noted previously, Respondent's dishonest conversion of funds tends to defeat the administration of justice and bring the legal profession into disrepute. *See In re Feldman*, 89 Ill. 2d at 11.

### ADDITIONAL EVIDENCE IN MITIGATION AND AGGRAVATION

#### Robert Tepper

Robert Tepper, attorney for Donna Zgonina, testified that Zgonina's lawsuit against Respondent and two law firms 87-88 was settled for $375,000 sometime in 2011 78, 92 after several mediation sessions and considerable time spent by Tepper's firm to trace the assets of the Insurance Trust and prepare an accounting. 89 Tepper's law firm received legal fees of $100,000 for its initial representation of the trust, plus one-third of the settlement amount. 78-81 In 2009 Tepper sent a letter to the ARDC regarding Respondent's conduct. 66

### Donna Zgonina

Zgonina testified her share of the settlement did not cover what she paid in legal fees, the matter took over eleven years to resolve, and it was overwhelming. 142 During the time Respondent served as trustee, she never received any interest on any principal as a beneficiary of the trust. 173

### Respondent

Respondent served on the board of Weber High School for two years and on the board of Resurrection Retreat Center for four years, has been a trustee of the Weber Endowment Foundation since 2000, has been on the board of Gordon Tech High School since 2003 and served as the interim president for a short period of time. He was recently appointed by the Archdiocese of Chicago to serve on a board to oversee the finances and development of St.

PAGE 59:

Theresa's grammar school. He has not received any compensation for his involvement in the foregoing organizations. (Tr. 1015-16).

Respondent has coached grammar school and little league sports teams. (Tr. 1017).

### William D. Maddux

William Maddux, presiding judge of the law division of the Circuit Court of Cook County, has known Respondent since 1975 when Respondent was hired to work at Maddux' law firm. Maddux left the firm in 1979 but has kept track of Respondent's career. He believes Respondent has a reputation for being very honest and a person of high integrity. (Tr. 484-87).

### Thomas Hoffman

Thomas Hoffman, a judge of the Illinois Appellate Court and previously a circuit court judge, has known Respondent socially and as a lawyer since the mid-1970s, and believes he has an excellent reputation for honesty and integrity. The disciplinary complaint does not detract from his opinion at this juncture. (Tr. 545-46).

### Stephanie Denby

Stephanie Denby, an attorney specializing in estate planning and tax, worked with Respondent at the law firm of Burke, Warren, MacKay and Serritella, and consulted with him on some client matters. Denby stated that Respondent is an honest man and is known for his integrity. (Tr. 548-51).

### Michael Folan

Michael Folan is retired from the Secret Service, where he served as part of the President's detail for a number of years, and now works in private security. He met Respondent in or about 1991 in connection with an estate matter, and believes Respondent to be an honest man. He has not seen the disciplinary complaint against Respondent, but allegations of conversion would not change his opinion of Respondent. (Tr. 937-41).

PAGE 60:

### Kelli Jones

Kelli Jones, president of Gordon Tech College Preparatory, testified Respondent has been a member of the board of Gordon Tech for at least eight to ten years and briefly served as interim president after Jones' predecessor died. Respondent currently serves as general counsel, has served as chairman of the finance committee, and has agreed to teach a class in business law on a pro bono basis. Respondent is trustworthy, honorable and knowledgeable, and rarely charges for any of his services. The allegations against Respondent, unless proven, do not change Kelly's opinion of him. (Tr. 945-51).

### Lawrence Levin

Lawrence Levin, a criminal defense attorney, met Respondent when Respondent was serving as a public defender. Levin testified Respondent has an excellent reputation for honesty, integrity, truth and veracity, and the disciplinary charges do not change his opinion. (Tr. 1023-1025).

### Prior Discipline

The Administrator reported that there are no prior orders or opinions imposing discipline upon Respondent.

### RECOMMENDATION

Having concluded Respondent engaged in misconduct, we must determine the appropriate discipline. In doing so, we consider the purpose of these proceedings, which is not to punish but rather to safeguard the public, maintain the integrity of the profession and protect the administration of justice from reproach. *In re Timpone*, 157 Ill. 2d 178, 623 N.E.2d 300 (1993). Attorney discipline also has a deterrent value in that it impresses upon others the repercussions of errors such as those committed by Respondent in the present case. *In re Discipio*, 163 Ill. 2d 515, 645 N.E.2d 906, 912 (1994).

PAGE 61:

In arriving at the appropriate discipline, we consider those circumstances which may mitigate and/or aggravate the misconduct. *In re Witt*, 145 Ill. 2d 380, 583 N.E.2d 526 (1991). In mitigation Respondent cooperated in these proceedings, has been licensed since 1977 with no prior discipline, and presented six witnesses, including two judges, who testified to his reputation for honesty. *See In re Clayter*, 78 Ill. 2d 276, 399 N.E.2d 1318 (1980). In addition, Respondent has served on the boards of educational and other institutions without receiving compensation.

In aggravation, we may consider any harm or risk of harm that was caused by Respondent's conduct. *See In re Saladino*, 71 Ill. 2d 263, 375 N.E.2d 102 (1978) (discipline should be "closely linked to the harm caused or the unreasonable risk created by the [attorney's] lack of care"). The beneficiaries of the Sanial estate and Nina Jozers were harmed financially by losing substantial sums of money and by incurring the expense and inconvenience of hiring attorneys to recoup the funds. *See In re Demuth*, 126 Ill. 2d 1, 14, 533 N.E.2d 867 (1988). As of the date of the hearing, Catherine Sanial and Nina Jozers still had not been fully compensated. Zgonina was harmed to a lesser extent since the Zgonina Insurance Trust was repaid for the amount personally taken by Respondent, as well as for the loan and equipment lease to M2. Still, like the Sanial beneficiaries, Zgonina endured distress and incurred legal fees in seeking an accounting from Respondent. Moreover, the only reason Zgonina was not harmed financially was because Respondent transferred money from the Sanial trust to cover his misconduct against the Zgonina Insurance Trust.

We also consider the fact that Respondent did not engage in an isolated instance of misconduct; rather his

actions reflect a pattern of misdeeds involving several different matters and spanning a considerable time period. *See In re Lewis*, 138 Ill. 2d 310, 562 N.E.2d 198 (1990); *In re Smith*, 168 Ill. 2d 269, 659 N.E.2d 896 (1995). Respondent's misconduct relating to the Zgonina and Sanial trusts occurred in the 2001 to 2002 time period, but efforts to

PAGE 62:

determine the extent of harm extended well beyond that time frame. Respondent then engaged in additional misconduct by converting the Jozer funds over a five month period in 2010.

We turn now to a determination of the appropriate sanction. The Administrator has urged us to recommend disbarment while Respondent's counsel, who faulted Respondent only for his poor investment strategies and failure to be careful, argued that a modest suspension would be appropriate.

We found that Respondent engaged in a variety of misconduct, including converting large sums of money in a dishonest manner, breaching his fiduciary duties, representing competing interests, and failing to safeguard funds. The total amount misappropriated by Respondent exceeded $600,000. The Supreme Court has emphasized that dishonest conversion of funds is particularly serious misconduct. *See In re Blank*, 145 Ill. 2d 534, 555, 585 N.E.2d 105 (1991); *In re Rotman*, 136 Ill. 2d 401, 423, 556 N.E.2d 243 (1990); *In re Stillo*, 68 Ill. 2d 49, 54, 368 N.E.2d 897 (1977). Given the nature and extent of the transgressions in this case and our review of relevant precedent, we agree with the Administrator that disbarment is appropriate.

In *In re Feldman*, 89 Ill. 2d 7, 431 N.E.2d 388 (1982), the attorney converted money from a client's estate to fund a personal real estate transaction. When the attorney could not repay the estate, he converted funds from another estate by forging his client's signature on nine checks. The Court noted that disbarment was "particularly warranted since the conversion and fraud involved were intentional and consisted of a series of improper acts over an extended period of time." *Feldman*, 89 Ill. 2d at 13. Mitigating circumstances in that case, including a lack of prior discipline and payment of restitution, were insufficient to overcome the improper conduct. We note that Feldman's act of taking money from one estate to repay another was similar to Respondent's conversion of Sanial Trust funds to pay off the Zgonina Trust, and his subsequent conversion of Jozer funds to pay a Sanial beneficiary.

PAGE 63:

The following cases, in which attorneys converted substantial sums of money and engaged in dishonest conduct, also resulted in disbarments. In *In re Levin*, 04 CH 133, M.R. 20236 (Sept. 26, 2005), the attorney converted $243,000 he was holding in escrow for a client. The misconduct took place over a four-year period, during which time he lied about the matter to his client and falsified bank records. The attorney had no prior discipline and made partial restitution. In *In re Menegas*, 03 CH 106, M.R. 21124 (Nov. 17, 2006) (Review Board's recommended discipline modified by Court) the attorney, who was holding funds in his client trust account in connection with a pending real estate transaction, converted $100,000 by making an unauthorized disbursement to his mortgage company to pay down the property owner's mortgage, and then converted another $300,000 by making unauthorized disbursements to himself and to his business. In addition to converting funds and acting dishonestly, the attorney breached his fiduciary duties as an escrow agent and engaged in improper conflicts of interest. The attorney in *In re Stewart*, 05 CH 120, M.R. 22284 (May 19, 2008) converted more than $200,000 in escrow funds relating to four separate business transactions, breached his fiduciary duties, failed to hold his personal funds separate from the escrow funds, and acted dishonestly. The attorney in *In re Haneberg*, 00 CH 22, M.R. 19673 (Nov. 17, 2004) controlled the assets of two elderly and infirm clients. He was disbarred for intentionally converting over $300,000

Filed July 9

https://www.iardc.org/HB_RB_Disp_Html.asp?id=1100

from one client and more than $700,000 from the other, breaching his fiduciary duties, overreaching the attorney/client relationship; engaging in conflicts of interest, and engaging in dishonest conduct.

Cases involving less serious misconduct and comparatively smaller dollar amounts are not persuasive to us. For example, in *In re Twohey*, 191 Ill. 2d 75, 727 N.E.2d 1028 (2000), the attorney was suspended for six months for inducing a client to make three loans totaling $40,000 to a corporate client that was experiencing financial difficulties. In *In re Crotty*, 00 CH 73, M.R.

PAGE 64:

17829 (Jan. 29, 2002), the attorney, while acting as trustee of a trust, made unauthorized loans totaling $52,347.30, failed to provide annual accountings, and failed to respond to inquiries from the trust beneficiaries. The attorney was suspended for five months, on consent, for breaching his fiduciary duties, failing to act with diligence, engaging in a conflict of interest, and failing to keep his client informed. The attorney did not engage in any dishonest conduct. In *In re McKenzie*, 2010PR160 (Review Board 2013) (appeal pending), the Review Board recommended a six month suspension where an attorney, while acting as trustee for a family trust, converted $93,700 from the trust and breached his fiduciary duty to the trust beneficiaries. No dishonest conduct was found.

We recognize the presence of mitigating circumstances in this case, notably Respondent's lack of prior discipline and the character witnesses who came forward on his behalf. We do not discount the testimony of those witnesses but, given the severity and number of instances of misconduct, we conclude that the mitigating evidence is simply not sufficient to preclude the harshest of sanctions.

Accordingly, we recommend that Respondent Thomas William Murphy be disbarred.

Respectfully Submitted,

Henry T. Kelly
Adam J. Lysinski
David C. Rudd

PAGE 65:

## CERTIFICATION

I, Kenneth G. Jablonski, Clerk of the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois and keeper of the records, hereby certifies that the foregoing is a true copy of the Report and Recommendation of the Hearing Board, approved by each Panel member, entered in the above entitled cause of record filed in my office on July 9, 2013.

Kenneth G. Jablonski, Clerk of the
Attorney Registration and Disciplinary
Commission of the Supreme Court of Illinois

---

[1] While Zarkin was superseded by a statutory amendment, the holdings regarding fiduciary duties and self-dealing have not been overruled. *See Slovick v. All American Bank of Chicago*, 163 Ill. App. 3d 741, 516

Filed July 9

N.E.2d 947 (1st Dist. 1987).

2   Although Supreme Court Rule 770 is not referenced in this charge, we note that the charge reflects language found in that Rule.  In *In re Thomas*, 2012 IL 113035, para. 92, the Court held that Rule 770 is not itself a Rule of Professional Conduct and "one does not violate Rule 770."  Although Thomas precludes charging a "violation" of Rule 770, there is still an open question of whether Thomas precludes charging an attorney under common law with engaging in conduct which "tends to defeat the administration of justice or bring the courts or the legal profession into disrepute."  *See e.g. In re Terronez*, 2011PR00085 (Hearing Bd. at 19-21) (final disposition pending).  Accordingly, we have addressed the merits of this charge in each count.  We also note, however, that our ultimate recommendation in this case would not change even if we dismissed the charge pursuant to Thomas.

EXHIBIT - Group Exhibit - Murphy

MURPHY STATEMENT OF FINANCIAL AFFAIRS

U.S. TRUSTEE Motion

WORLD WIDE REALTY LLC Motion

B7 (Official Form 7) (04/13)  Case 14-03922   Doc 95   Filed 09/16/14   Entered 09/16/14 14:39:18   Desc Main
Document   Page 1 of 7

## United States Bankruptcy Court
## Northern District of Illinois

IN RE:                                                                Case No. **14-03922**

Murphy, Thomas W                                                      Chapter **7**

Debtor(s)

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any persons in control of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101(2),(31).

---

### 1. Income from employment or operation of business

None  State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business,
☐  including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this
case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that
maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the
beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing
under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a
joint petition is not filed.)

AMOUNT  SOURCE
0.00  2013: ($70,901.00);
2012: ($271,324.00) and
2011: ($223,129.00)

---

### 2. Income other than from employment or operation of business

None  State the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the
☑  **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse
separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless
the spouses are separated and a joint petition is not filed.)

---

### 3. Payments to creditors
*Complete a. or b., as appropriate, and c.*

None  *a. Individual or joint debtor(s) with primarily consumer debts:* List all payments on loans, installment purchases of goods or services, and other
☑  debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that
constitutes or is affected by such transfer is less than $600. Indicate with an asterisk (*) any payments that were made to a creditor on account of
a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit
counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint
petition is filed, unless the spouses are separated and a joint petition is not filed.)

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

None ☑ *b. Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $6,255.* If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

*\* Amount subject to adjustment on 4/01/16, and every three years thereafter with respect to cases commenced on or after the date of adjustment.*

None ☑ *c. All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None ☐ a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Devon Street Investments v. Thomas W. Murphy, 2013-CH-09502 | Complaint To Foreclose | In the Circuit Court of Cook County | judgment entered |
| Chicago Insurance Company v. Thomas W. Murphy, 2012-CH-07937 | Complaint | In the Circuit Court of Cook County | DISMISS ENTIRE CAUSE - PLAINTIFF |
| American Chartered Bank v. Thomas W. Murphy, 2009-CH-09015 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| American Bank Trust Company v. Thomas W. Murphy, 2009-CH-07402 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| American Chartered Bank v. Thomas W. Murphy, 2008-CH-32269 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| Aurora Loan Services v. Thomas W. Murphy, 2008-CH-21898 | complaint | In the Circuit Court of Cook County | ORDER FOR POSSESSION |
| City of Chicago v. Thomas W. Murphy, 2009-M1-672549 | complaint | In the Circuit Court of Cook County | AFFIDAVIT FOR WAGE DEDUCTION FILED |
| City of Chicago v. Thomas W. Murphy, 2009-M1-655747 | complaint | In the Circuit Court of Cook County | CITATION DEFENDANT DISMISSED |
| City of Chicago v. Thomas W. Murphy, 2009-M1-400017 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2008-M1-667510 | Complaint | In the Circuit Court of Cook County | JUDGEMENT ON CITATION |
| City of Chicago v. Thomas W. Murphy, 2008-M1-400424 | Complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2008-M1-400186 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2007-M1-403087 | complaint | In the Circuit Court of Cook County | DISMISS BY STIPULATION OR AGREEMENT |
| City of Chicago v. Thomas W. Murphy, 2005-M1-689135 | complaint | In the Circuit Court of Cook County | CAUSE DISPOSED UPON FILING |
| Nina Jozers v. Thomas W. Murphy, 2014 L 001285 | complaint | In the Circuit Court of Cook County | SUMMARY JUDGMENT - PLAINTIFF - CONTINUED |

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

Case 14-03922   Doc 95   Filed 09/16/14   Entered 09/16/14 14:39:18   Desc Main
Document   Page 3 of 7

| | | | |
|---|---|---|---|
| Robert Badalian v. Thomas W. Murphy, 2013-L-013464 | Complaint | In the Circuit Court of Cook County | CASE CONTINUED FOR CASE MANAGEMENT CONFERENCE - ALLOWED |
| Nina Jozers v. Thomas W. Murphy, 2013-L-011907 | complaint | In the Circuit Court of Cook County | SUMMARY JUDGMENT - PLAINTIFF - CONTINUED |
| Nina Jozers v. Thomas W. Murphy, 2013-L-000628 | complaint | In the Circuit Court of Cook County | DISPOSED AND RENUMBERED AS A NEW CASE-ALLOWED |
| Nina Jozers v. Thomas W. Murphy, 2011-L-005976 | complaint | In the Circuit Court of Cook County | DEFENDANT MOTION TO DISMISS W/PREJUDICE - ALLOWED |
| American Chartered Bank v. Thomas W. Murphy, 2009-L-050275 | complaint | In the Circuit Court of Cook County | JUDGMENT FOR PLAINTIFF |
| American Chartered Bank v. Thomas W. Murphy, 2008-L-007196 | complaint | In the Circuit Court of Cook County | STRIKE OR WITHDRAW MOTION OR PETITION - ALLOWED |
| Associated Bank National v. Thomas W. Murphy, 2007-L-007800 | complaint | In the Circuit Court of Cook County | STRIKE OR VACATE AN ORDER - ALLOWED |
| World Wide Realty LLC v. Thomas W. Murphy, 2014-L-050107 | complaint | In the Circuit Court of Cook County | JUDGMENT ON CITATION |

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

None ☑ b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**5. Repossessions, foreclosures and returns**

None List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Debtor Is Uncertain | | |

**6. Assignments and receiverships**

None ☑ a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

None ☑ b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**7. Gifts**

None ☑ List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**8. Losses**

None ☑ List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case**. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

Case 14-00372   Doc 11   Filed 09/22/14   Entered 09/22/14 22:54:18   Desc Main
Document   Page 3 of 9

Label Matrix for local noticing
0752-1
Case 14-03922
Northern District of Illinois
Chicago
Mon Sep 22 18:44:49 CDT 2014

Cadles of Grassy Meadows
100 N Center Street
Newton Falls, OH 44444-1321

Deutsche Bank Trust Company Americas, as Tru
c/o Codilis and Associates, P.C.
15W030 North Frontage Road, Suite 100
Burr Ridge, IL 60527-6921

World Wide Realty, LLC
5300 W. Atlantic Ave.
Suite 700
DelRay Beach, FL 33484-8833

U.S. Bankruptcy Court
Eastern Division
219 S Dearborn
7th Floor
Chicago, IL 60604-1702

ARDC
Suite 1500
One Prudential Plaza
Chicago, IL 60601

ARDC
Suite 301
3161 West White Oaks Drive
Chicago, IL 62704-7407

ARDC
Suite 301
3161 West White Oaks Drive
Springfield, IL 62704-7407

American Bank Trust Company
C/O Guerard Kalina Butkus
301 South County Farm Road
Wheaton, IL 60187-4523

American Chartered Bank
C/O Brotschul Potts LLC
230 West Monroe, Suite 230
Chicago, IL 60606-4736

Amex
Po Box 297871
Fort Lauderdale, FL 33329-7871

Anthony G. Barone
635 Butterfield, Suite 145
Oakbrook, IL 60181-4026

Arg
11856 Balboa Boulevard
Granada Hills, CA 91344-2753

Associated Bank National
C/O Jones And Jacobs
77 West Washington Suite 2100
Chicago, IL 60602-2903

Aurora Loan Services
C/O Pierce And Associates
1 North Dearborn, Suite 1300
Chicago, IL 60602-4321
foreclosure
2 12

BLUE LADY INC
C/O NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-3800

Baker And Miller PC
Suite 500
29 North Wacker Drive
Chicago, IL 60606-3227

(p)BANK OF AMERICA
PO BOX 982238
EL PASO TX 79998-2238

Brotschul Potts LLC
230 West Monroe, Suite 230
Chicago, IL 60606-4736

Cadles of Grassy Meadows II, L.L.C.
100 North Center Street
Newton Falls, OH 44444-1321

CarMax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

Cash In Usa
Suite 157
11856 Balboa Blvd
Granada Hills, CA 91344-2753

Catherine Sanial
Box 117
East Setauket, NY 11733-0117

Chase
Po Box 15298
Wilmington, DE 19850-5298

Chase
Po Box 24696
Columbus, OH 43224-0696

Chicago Insurance Company
C/O Wilson And Ellin
1161 West Madison Street, Unit 3S
Chicago, IL 60607-2000

Citi
Po Box 6241
Sioux Falls, SD 57117-6241

City Of Chicago
Law Department
121 North Lasalle Street, Room 600
Chicago, IL 60602-1244

Corporation Counsel
Suite 800
30 North LaSalle
Chicago, IL 60602-3542

Daspin Aument LLP
227 West Monroe
Chicago, IL 60606-5018

Daspin Aument LLP
227 West Monroe Street
Chicago, IL 60606-5018

Devon Bank Payments
C/O Richard L Kruse
7337 North Lincoln Avenue
Lincolwood, IL 60712-1700

Discover Fin Svcs Llc
Po Box 15316
Wilmington, DE 19850-5316


(p)DISCOVER FINANCIAL SERVICES LLC
PO BOX 3025
NEW ALBANY OH 43054-3025

Dr. Vijay H. Vohra, MD
7447 W Talcott Ave Suite 222
Chicago, IL 60631-3713

Dsnb Macys
9111 Duke Blvd
Mason, OH 45040-8999


Federal Asset Management Consultants, Lt
Suite 810N
8700 West Bryn Mawr
Chicago, IL 60631-3522

Guerard Kalina Butkus
301 South County Farm Road
Wheaton, IL 60187-4523

(p)WACHOVIA BANK NA
MAC X2303-01A
1 HOME CAMPUS
1ST FLOOR
DES MOINES IA 50328-0001


Jones And Jacobs
77 West Washington Suite 2100
Chicago, IL 60602-2903

Kimball Lawrence Currency Exchange
3421 W Lawrence
Chicago, IL 60625-5103

Life Storage of HERMOSA
4500 West Grand Avenue
Chicago IL 60639-4726


Lino Rojas
C/O ARDC
1 Prudential Plaza, Suite 1500
Chicago, IL 60601

Main Street Business
C/O Robert Pollack
425 California Street
San Francisco, CA 94104-2102

Markoff And Krasny
Suite 550
29 North Wacker Drive
Chicago, IL 60606-2851


Merchants Credit Guide
223 W Jackson Blvd Ste 4
Chicago, IL 60606-6914

Murphy Thomas W
20940 Middleton Drive
Kildeer, IL  60047-8697

NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-2187


Nco Fin/99
Po Box 15636
Wilmington, DE 19850-5636

Nina Jozers
C/O Daspin Aument LLP
227 West Monroe
Chicago, IL 60606-5018

Nina Jozers
C/O Daspin Aument LLP
227 West Monroe Street
Chicago, IL 60606-5018


Ocwen Loan Servicing L
1661 Worthington R
West Palm Beac, FL 33409-6493

Peoples Engy
200 East Randolph
Chicago, IL 60601-6302

Pierce & Associates, P.C.
Bankruptcy Department
1 North Dearborn Street, Suite 1300
Chicago, IL 60602-4321


Pnc Bank Na
Po Box 3180
Pittsburgh, PA 15230-3180

Pnc Mortgage
3232 Newmark Dr
Miamisburg, OH 45342-5433

Real Time Resolutions
1750 Regal Row Ste N
Dallas, TX 75235-2289


Regus Office Systems
1750 Montgomery Street
San Francisco, CA 94111-1000

Richard L Kruse
7337 North Lincoln Avenue
Lincolwood, IL 60712-1700

Rick Nordmeyer
C/O ARDC
1 Prudential Plaza, Suite 1500
Chicago, IL 60601

Robert Badalian
C/O Schiff Gorman LLC
1 East Wacker Drive, Suite 2850
Chicago, IL 60601-1915

Schiff Gorman LLC
1 East Wacker Drive, Suite 2850
Chicago, IL 60601-1915

Talan And Ktsanes
Suite 512
223 West Jackson
Chicago, IL 60606-6904

Tamera Brown
505 North McClurg
Chicago, IL 60611-5420

Ted Gauza
140 S Dearborn, Suite 1610
Chicago, IL 60603-5299

Utam
c/o Ted Gauza
140 S Dearborn, Suite 1610
Chicago, IL 60603-5299

Wexler And Wexler
Suite 450
500 West Madison Street
Chicago, IL 60661-2767

Wheeler & Patel LLP
828 West Grace Street Unit 2
Chicago, IL 60613-5758

William T. Neary
U.S. Trustee, Region 11
219 S. Dearborn St, Suite 873
Chicago, Illinois 60604-2027

Wilson And Ellin
Unit 3S
1161 West Madison Street
Chicago, IL 60607-2000

World Wide Realty Llc
C/O Anthony G. Barone
635 Butterfield, Suite 145
Oakbrook, IL 60181-4026

Zurich North America
Box 66944
Chicago, IL 60666-0944

Jeffrey W Deer
Deer & Stone P C
130 S Jefferson Suite 370
Chicago, IL 60661-5762

Mark Steven Wheeler
Law Offices of Mark Steven Wheeler
828 W. Grace
Unit 2
Chicago, IL 60613-5758

Michael K Desmond
Figliulo & Silverman P C
10 S LaSalle Suite 3600
Chicago, IL 60603-1032

Patrick S Layng
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604-2027

Thomas W Murphy
70 West Madison Street
Chicago, IL 60602-4252

---

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bk Of Amer
Po Box 982235
El Paso, TX 79998

(d)Bk Of Amer
Po Box 982235
El Paso, TX 79998

Discoverbank
Po Box15316
Wilmington, DE 19850

(d)Discoverbank
Po Box15316
Wilmington, DE 19850

Homeq Servicing
Po Box 13716
Sacramento, CA 95853

(d)Homeq Servicing
Po Box 13716
Sacramento, CA 95853

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

Case 14-00372   Doc 11   Filed 09/22/14   Entered 09/22/14 22:54:18   Desc Main
Document   Page 6 of 9

(u)ALJO II, LLC

(d)Amex
Po Box 297871
Fort Lauderdale, FL 33329-7871

(d)Arg
11856 Balboa Boulevard
Granada Hills, CA 91344-2753

(d)BLUE LADY INC
C/O NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-3800

(d)Carmax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

(d)Carmax Auto Finance
2040 Thalbro St
Richmond, VA 23230-3200

(d)Cash In Usa
Suite 157
11856 Balboa Blvd
Granada Hills, CA 91344-2753

(d)Chase
Po Box 15298
Wilmington, DE 19850-5298

(d)Chase
Po Box 24696
Columbus, OH 43224-0696

(d)Citi
Po Box 6241
Sioux Falls, SD 57117-6241

(d)Discover Fin Svcs Llc
Po Box 15316
Wilmington, DE 19850-5316

(d)Dr. Vijay H. Vohra, MD
7447 W Talcott Ave Suite 222
Chicago, IL 60631-3713

(d)Dsnb Macys
9111 Duke Blvd
Mason, OH 45040-8999

(u)James Shaw

(d)Merchants Credit Guide
223 W Jackson Blvd Ste 4
Chicago, IL 60606-6914

(d)NIGRO & WESTFALL
1793 BLOOMINGDALE RD
GLENDALE HT, IL 60139-2187

(d)Nco Fin/99
Po Box 15636
Wilmington, DE 19850-5636

(d)Ocwen Loan Servicing L
1661 Worthington R
West Palm Beac, FL 33409-6493

(d)Peoples Engy
200 East Randolph
Chicago, IL 60601-6302

(d)Pnc Bank Na
Po Box 3180
Pittsburgh, PA 15230-3180

(d)Pnc Mortgage
3232 Nemark Dr
Miamisburg, OH 45342-5433

(d)Real Time Resolutions
1750 Regal Row Ste N
Dallas, TX 75235-2289

(u)Umar Paracha

(u)Nina Jozers

End of Label Matrix
Mailable recipients    76
Bypassed recipients    24
Total                 100

58

1          Q    And the first case was filed with this --

2     or, I'm sorry, no.  It was filed with the 130 South

3     Jefferson?

4          A    That was Mr. Deer's address.  He told me to

5     use that address.

6          Q    Do you use that address for other matters?

7          A    I originally used that address when I

8     leased the property at 70 West Madison for the

9     office.  They needed an address at that point, and I

10    was moving from 20 North Wacker, which was a space I

11    shared with Berger Newmark and another law firm.  So

12    I was basically subletting from the other law firm.

13    I didn't have an address that I could use for

14    business purposes at that time.

15         Q    And on Exhibit 6, this social security

16    number, last four 5408, is that your social security

17    number?

18         A    No, it's 5480.

19         Q    Why does it say 5408 on here?

20         A    I have no idea.  It's 5480 is my social

21    security number, the last four digits of my -- and

22    I'm not sure that those numbers are my numbers.

23         Q    What do you mean you're not sure they're

24    your numbers?

25         A    I mean, I signed this.  But, again, I was

1   over at Mr. Deer's office, and I see that the one

2   that he typed on Exhibit 9 has got the wrong social

3   security number.  My social -- last four of my social

4   are 5480.

5       Q   So you don't know why the wrong social

6   security number --

7       A   No, I do not.

8       Q   -- is on all these documents?

9       A   No, I do not.  I'm glad you pointed that

10  out because I didn't know that.  That's got to get

11  corrected.

12      Q   Have you had that occur with any of your

13  other affairs?

14      A   No.  Not to my knowledge.

15          MR. SNELL:  Okay.  Well, I think what

16  we'll do is we'll continue this examination without a

17  date so you can give me those records.  So I know if

18  I need to ask any more questions.

19          MR. MURPHY:  Okay.  That's fine.

20          MR. SNELL:  And if I don't, then we

21  won't resume.  And if I do, then I'll send you a

22  letter and we'll reschedule it.

23          MR. MURPHY:  Okay.  That's fine.  I'll

24  try to get you as much of this that I can next week.

25          MR. SNELL:  Fantastic.  Thank you.

60

1                    (Which were all the proceedings had in

2               the above-entitled cause, June 2,

3               2013, 1:03 p.m.)

4   I, NICOLE ABBATE, DO HEREBY CERTIFY
    THAT THE FOREGOING IS A TRUE AND ACCURATE
5   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
    ENTITLED CAUSE.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------------------------------------------

DATE: 07/24/2018 12:36:10 PM

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: CHAPTER 7 PROCEEDING
THOMAS MURPHY,

CASE NO. 14 B 03922

DEBTOR.
HONORABLE DONALD R. CASSLING

NOTICE OF MOTION

PLEASE TAKE NOTICE that on
Tuesday, March 25, 2014, at 9:30 a.m., I shall appear
before the Honorable Donald R. Cassling, Bankruptcy Judge,
Dirksen Federal Courthouse, 219
South Dearborn Street, Courtroom 619,
Chicago, Illinois
or before any other Bankruptcy Judge who may be sitting in his place and shall present
Routine Motion for Rule 2004 Examination of the Debtor,
a copy of which is attached and served on you.

NOTE THAT THE PROPOSED ORDER
APPENDED TO THIS MOTION MAY
BE ENTERED BY THE JUDGE WITHOUT
PRESENTMENT IN OPEN COURT
UNLESS A PARTY IN INTEREST NOTIFIES THE JUDGE OF AN OBJECTION
THERETO PURSUANT TO
LOCAL RULE 9013-9(C).

/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn Street, Room 873
Chicago, Illinois 60604
(312) 886-0890
CERTIFICATE OF SERVICE
I, Jeffrey S. Snell, an attorney, state that pursuant to Local Rule 9013-1(D) the above
Notice of Routine Motion
and appended Routine Motion for Rule 2004 Examination of the Debtor
were filed on March 14, 2014, and served on all persons identified as Registrants on the service list below through the Court's
Electronic Notice for Registrants and, as to all other parties on the service list below,

I caused a copy to be sent First Class Mail, as indicated, before
5:00 p.m. on March 14, 2014.
/s/ Jeffrey S. Snell
Case 14-03922 Doc 9 Filed 03/14/14 Entered 03/14/14 11:57:35 Desc Main
Document Page 1 of 4

SERVICE LIST
Registrants Served Through the Court's Electronic Notice:
Jeffrey W Deer jwdeer@aol.com, tonarlopez31@gmail.com

TRULINCS  08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------------------------------

Michael K Desmond mkd.trustee@fslegal.com, IL23@ecfcbis.com

Parties Served via First Class Mail:
Thomas Murphy
70 W. Madison Street
Suite 1400
Chicago, IL 60602

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: ) CHAPTER 7 PROCEEDING
)
THOMAS MURPHY,
)
CASE NO. 14 B 03922
)
DEBTOR.
)
HONORABLE DONALD R. CASSLIN

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------------------------

DATE: 07/24/2018 02:51:27 PM

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: CHAPTER 7 PROCEEDING

THOMAS MURPHY,
CASE NO. 14 B 03922
DEBTOR.

HONORABLE DONALD R. CASSLING

MOTION TO COMPEL DEBTOR TO COMPLY WITH 11 U.S.C § 521 AND BANKRUPTCY RULE 1007 AND FOR OTHER RELIEF

NOW COMES PATRICK S. LAYNG, the United States Trustee for Region 11, by and through his attorney, Jeffrey S. Snell, and pursuant to 11 U.S.C. §§ 105, 521 and Fed. R. Bankr. P. 1007(a), hereby requests this Court enter an order compelling Thomas Murphy to (I) file a list with the Clerk of Court containing the names and addresses of his creditors and others as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and (II) file an amended Petition and Statement of Social Security Number that reflects the Number assigned to him by the Social Security Administration.

In support of this request, the U.S. Trustee states to the Court as follows:
1. This is a core proceeding concerning the administration of this estate pursuant to 28 U.S.C. § 157(b)(2)(A) which this Court may hear and determine pursuant to Internal Operating Procedure 15(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

2. The Debtor, Thomas Murphy, filed his Voluntary Petition under Chapter 7 of the Bankruptcy Code on February 7, 2014.(fn. 1)
3. Michael K. Desmond was appointed Chapter 7 Trustee.

FN. 1. The Debtor filed the Voluntary Petition through attorney Jeffrey W. Deer. The U.S. Trustee has been advised by Mr. Deer that he no longer represents the Debtor in this bankruptcy case, see Exhibit A, and the Debtor confirmed the same at a Rule 2004 examination commenced May 23,2014. See Exhibit B, p. 4.

4. To date, the Debtor has failed to file a List of Creditors, Schedules, or a completed Statement of Financial Affairs. In addition, the Debtor has failed to appear for the Meeting of Creditors originally scheduled for March 12, 2014, and continued several times thereafter.

5. In the instant case, as in the Debtor's prior two bankruptcy cases, (fn.2) he has failed to file a complete and accurate list of creditors and other parties in interest as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1). In this case, the Debtor did not provide the Clerk of Court with the names and addresses of any creditors when he filed his Voluntary Petition. See BNC Certificate of Notice. [6]. In his two prior cases, the Debtor provided the name of one creditor with his Voluntary Petitions.

6. The Debtor does not dispute that he has many creditors. On June 2, 2014, during a Rule 2004 examination conducted by the U.S. Trustee (the "Rule 2004 Examination"), the Debtor testified as follows:

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A
---------------------------------------------------------------------------------------------------------------------

Q How many creditors do you have? Do you have any estimate?
A You know, to be very honest with you, I have probably ten or 15 foreclosure suits. I think most of them are completed now. But I must have -- again, an approximate number?

Q Sure.
A 25 to 40.

Q Any approximation as to total debt?
A Well, that's hard to say. And the reason I say that is because the number of foreclosure cases, they have not gone after personal liability. So there is a question of whether they can or they can't.

Q For a deficiency?
A For a deficiency, yes. Those were investment properties.

Q Well, assuming they did it for deficiencies, do you have an estimate as to what kind of debt we're talking about?
A Over two and a half million dollars, probably. Maybe more.


FT. 2  The Debtor's two prior cases were Case Numbers 13 B 45386 and 13 B 33363. Both cases were dismissed for the Debtor's failure to file required documents.




Q And what about without deficiencies? Is it just credit cards and things of that nature or liquidated debts, judgments?
A Probably a million or more. Actually, the -- you know, if you go on to the foreclosure cases, it's probably close to 4 million, now that I think of it. But I just don't know, you know, where there might be liability for personal judgments. Exhibit C, p. 22, line 22  p. 24, line 1.

7. In this case, as in the Debtor's prior two cases, he used a Social Security Number not assigned to him. During the Rule 2004 Examination, the Debtor acknowledged that his Social Security Number ends in "5480," not "5408" as recited on the documents filed in each of his three bankruptcy cases. The Debtor then testified that he wasn't previously aware that he had used the wrong number:

Q So you don't know why the wrong social security number --
A No, I do not.

Q -- is on all these documents?
A No, I do not. I'm glad you pointed that out because I didn't know that. That's got to get corrected. Id., p. 59, lines 5  11. To date, the Debtor does not appear to have taken any corrective action.

8. Through using a Social Security Number not his own, and an address that is not his home address, (fn 3) the Debtor has managed to conceal his three bankruptcy filings from public records searches (and, presumably, credit reporting agencies). This, coupled with the Debtor's failure to file the list required by 11 U.S.C.§ 521(a) and Fed. R. Bankr. P. 1007(a)(1), has effectively concealed three bankruptcy cases from many, if not most, of his creditors.

9. On June 11, 2014, the U.S. Trustee filed a Complaint objecting to the Debtor's discharge under 11 U.S.C. § 727(a). See Patrick S. Layng vs. Thomas Murphy,  14 A 00372. The deadline for the Debtor to answer the Complaint has passed without the Debtor answering or otherwise pleading. The U.S. Trustee anticipates moving for default and judgment in the near future. The practical effect of a judgment denying the Debtor's discharge at this time is less than optimal, however. The denial of discharge would likely appear on someone else's (fn 4) credit report and many, if not most, of the Debtor's creditors would not be aware of the bankruptcy, much less the denial of discharge.

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------

FN. 3. The address listed on the Voluntary Petition is the Debtor's office address.

FN.4. There is cause to believe that the Social Security Number used by the Debtor in his three bankruptcy cases is not an unused number, but, rather, is assigned to another individual.

10. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The U.S. Trustee submits that an order compelling the Debtor to comply with 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and to take corrective action with respect to the Social Security Number used in his Voluntary Petition, is necessary and critical.

WHEREFORE, the U.S. Trustee requests this Court enter an order:
(A) Requiring the Debtor to file, within seven (7) days, a list with the Clerk of Court containing the names and addresses of the creditors and others as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1);
(B) Requiring the Debtor to file, within seven (7) days, an amended Petition and Statement of Social Security Number that reflects the Number assigned him by the Social Security Administration;
(C) Requiring the Debtor to appear for a status hearing to determine whether he has complied with the above, and, if not, to determine what coercive measures are necessary and appropriate to obtain compliance; and
(D) Awarding any other and further relief as is just.
RESPECTFULLY SUBMITTED:
PATRICK S. LAYNG
UNITED STATES TRUSTEE
DATED: July 18, 2014
/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn, Room 873
Chicago, Illinois 60604
(312) 886-0890
Case 14-03922 Doc 60 Filed 07/18/14 Entered 07/18/14 Snell, Jeffrey (USTP)
From: Jeff Deer <jwdeer@aol.com>
Sent: Friday, May 23, 2014 10:07 AM
To: Snell, Jeffrey (USTP)
This will confirm that I will be filing a motion to withdraw my appearance as attorney for Thomas Murphy from his ch. 7 bankruptcy
Sent from my iPhone

## UNITED STATES BANKRUPTCY COURT
### For the Northern District of Illinois
### Eastern Division

|  |  |  |
|---|---|---|
| In re:  PATRICK S. LAYNG, | ) | |
| UNITED STATES TRUSTEE, | ) | In a Chapter 7 proceeding |
| Plaintiff, | ) | Docket No. 13 B 03922 |
| | ) | |
| | ) | Adversary No. 14 ap 372 |
| v. | ) | |
| | ) | |
| THOMAS W. MURPHY, | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | Judge Donald R. Cassling |
| Debtor. | ) | Chapter 7 Trustee Michael K. Desmond |

### NOTICE OF FILING

To:    Anthony G. Barone, *Via ECF*
       Michael K. Desmond, Esq., Trustee, *Via ECF*,
       Jeffrey W. Deer, Esq., *Via ECF*
       Jeffrey Snell, Esq. c/o Patrick Layng, Region 11 U.S. Trustee, *Via ECF*
       Vincent Frigo, *Via ECF*
       Christopher J Stasko, *Via ECF*
       Thomas W. Murphy, *Via First Class U.S. Mail*
       70 West Madison Street, Suite 1400
       Chicago, IL 60602

PLEASE TAKE NOTICE THAT ON THE 22nd day of September 2014, I filed the attached
**DEFENDANT'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION FOR
DEFAULT AND DEFAULT JUDGMENT** with the United States Bankruptcy Clerk located at
219 South Dearborn Street, Chicago, Illinois 60604.

/s/ Mark Steven Wheeler
MARK STEVEN WHEELER
Attorney for Debtor

### CERTIFICATION

I, Mark Steven Wheeler, an attorney, certify that a copy of this Notice and attached documents
were served upon Anthony G. Barone, Esq. Via ECF,  Vincent Frigo, Esq. Via ECF, Christopher
J. Stasko, Via ECF, Michael K. Desmond, Esq. Trustee Via ECF,  and Jeffrey Snell, Esq. Office
of the United States Trustee, via ECF, Jeffrey W. Deer, Esq Via ECF, and Thomas W. Murphy
via regular first class US  Mail, and the remaining parties set forth in the attached service list via
regular first class US  Mail above by depositing same in the United States mail at 828 W. Grace
Street, Unit 2,Chicago, IL 60613, First Class delivery, proper postage prepaid, this 22nnd day of
September 2014.

/s/ Mark Steven Wheeler
MARK STEVEN WHEELER
Attorney for Debtor

### UNITED STATES BANKRUPTCY COURT
**For the Northern District of Illinois**
**Eastern Division**

| | | |
|---|---|---|
| In re: PATRICK S. LAYNG, | ) | |
| UNITED STATES TRUSTEE, | ) | In a Chapter 7 proceeding |
| Plaintiff, | ) | Docket No. 13 B 03922 |
| | ) | |
| | ) | Adversary No. 14 ap 372 |
| v. | ) | |
| | ) | |
| THOMAS W. MURPHY, | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | Judge Donald R. Cassling |
| Debtor. | ) | Chapter 7 Trustee Michael K. Desmond |

## NOTICE OF FILING

To:    Anthony G. Barone, **_Via ECF_**
Michael K. Desmond, Esq., Trustee, **_Via ECF_**,
Jeffrey W. Deer, Esq., **_Via ECF_**
Jeffrey Snell, Esq. c/o Patrick Layng, Region 11 U.S. Trustee, **_Via ECF_**
Vincent Frigo, **_Via ECF_**
Christopher J Stasko, **_Via ECF_**
Thomas W. Murphy, **_Via First Class U.S. Mail_**
70 West Madison Street, Suite 1400
Chicago, IL 60602

PLEASE TAKE NOTICE THAT ON THE 22nd day of September 2014, I filed the attached
**DEFENDANT'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION FOR
DEFAULT AND DEFAULT JUDGMENT** with the United States Bankruptcy Clerk located at
219 South Dearborn Street, Chicago, Illinois 60604.

/s/ Mark Steven Wheeler
MARK STEVEN WHEELER
Attorney for Debtor

### CERTIFICATION

I, Mark Steven Wheeler, an attorney, certify that a copy of this Notice and attached documents
were served upon Anthony G. Barone, Esq. Via ECF,  Vincent Frigo, Esq. Via ECF, Christopher
J. Stasko, Via ECF, Michael K. Desmond, Esq. Trustee Via ECF,  and Jeffrey Snell, Esq. Office
of the United States Trustee, via ECF, Jeffrey W. Deer, Esq Via ECF, and Thomas W. Murphy
via regular first class US  Mail, and the remaining parties set forth in the attached service list via
regular first class US  Mail above by depositing same in the United States mail at 828 W. Grace
Street, Unit 2,Chicago, IL 60613, First Class delivery, proper postage prepaid, this 22nd day of
September 2014.

/s/ Mark Steven Wheeler
MARK STEVEN WHEELER
Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT
### For the Northern District of Illinois
### Eastern Division

In re:   PATRICK S. LAYNG,   )
      UNITED STATES TRUSTEE,   )
          Plaintiff,   )    In a Chapter 7 proceeding
              )    Docket No. 13 B  03922
              )
              )    Adversary No.  14 ap 372
          v.      )
              )
THOMAS W. MURPHY,   )
          Defendant,   )
              )
              )    Judge Donald R. Cassling
          Debtor.   )    Chapter 7 Trustee Michael K. Desmond

## NOTICE OF FILING

To:    Anthony G. Barone, *Via ECF*
      Michael K. Desmond, Esq., Trustee, *Via ECF*,
      Jeffrey W. Deer, Esq., *Via ECF*
      Jeffrey Snell, Esq. c/o Patrick Layng, Region 11 U.S. Trustee, *Via ECF*
      Vincent Frigo, *Via ECF*
      Christopher J Stasko, *Via ECF*
      Thomas W. Murphy, *Via First Class U.S. Mail*
      70 West Madison Street, Suite 1400
      Chicago, IL 60602

PLEASE TAKE NOTICE THAT ON THE 22nd day of September 2014, I filed the attached **DEFENDANT'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION FOR DEFAULT AND DEFAULT JUDGMENT** with the United States Bankruptcy Clerk located at 219 South Dearborn Street, Chicago, Illinois 60604.

                    /s/ Mark Steven Wheeler
                    MARK STEVEN WHEELER
                    Attorney for Debtor

## CERTIFICATION

I, Mark Steven Wheeler, an attorney, certify that a copy of this Notice and attached documents were served upon Anthony G. Barone, Esq. Via ECF, Vincent Frigo, Esq. Via ECF, Christopher J. Stasko, Via ECF, Michael K. Desmond, Esq. Trustee Via ECF, and Jeffrey Snell, Esq. Office of the United States Trustee, via ECF, Jeffrey W. Deer, Esq Via ECF, and Thomas W. Murphy via regular first class US Mail, and the remaining parties set forth in the attached service list via regular first class US  Mail above by depositing same in the United States mail at 828 W. Grace Street, Unit 2,Chicago, IL 60613, First Class delivery, proper postage prepaid, this 22nd day of September 2014.

                    /s/ Mark Steven Wheeler
                    MARK STEVEN WHEELER
                    Attorney for Debtor

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

---------------------------------------------------------------------------

DATE: 07/24/2018 12:36:10 PM

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: CHAPTER 7 PROCEEDING
THOMAS MURPHY,

CASE NO. 14 B 03922

DEBTOR.
HONORABLE DONALD R. CASSLING

NOTICE OF MOTION

PLEASE TAKE NOTICE that on
Tuesday, March 25, 2014, at 9:30 a.m., I shall appear
before the Honorable Donald R. Cassling, Bankruptcy Judge,
Dirksen Federal Courthouse, 219
South Dearborn Street, Courtroom 619,
Chicago, Illinois
or before any other Bankruptcy Judge who may be sitting in his place and shall present
Routine Motion for Rule 2004 Examination of the Debtor,
a copy of which is attached and served on you.

NOTE THAT THE PROPOSED ORDER
APPENDED TO THIS MOTION MAY
BE ENTERED BY THE JUDGE WITHOUT
PRESENTMENT IN OPEN COURT
UNLESS A PARTY IN INTEREST NOTIFIES THE JUDGE OF AN OBJECTION
THERETO PURSUANT TO
LOCAL RULE 9013-9(C).

/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn Street, Room 873
Chicago, Illinois 60604
(312) 886-0890
CERTIFICATE OF SERVICE
I, Jeffrey S. Snell, an attorney, state that pursuant to Local Rule 9013-1(D) the above
Notice of Routine Motion
and appended Routine Motion for Rule 2004 Examination of the Debtor
were filed on March 14, 2014, and served on all persons identified as Registrants on the service list below through the Court's
Electronic Notice for Registrants and, as to all other parties on the service list below,

I caused a copy to be sent First Class Mail, as indicated, before
5:00 p.m. on March 14, 2014.
/s/ Jeffrey S. Snell
Case 14-03922 Doc 9 Filed 03/14/14 Entered 03/14/14 11:57:35 Desc Main
Document Page 1 of 4

SERVICE LIST
Registrants Served Through the Court's Electronic Notice:
Jeffrey W Deer jwdeer@aol.com, tonarlopez31@gmail.com

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------------------------

Michael K Desmond mkd.trustee@fslegal.com, IL23@ecfcbis.com

Parties Served via First Class Mail:
Thomas Murphy
70 W. Madison Street
Suite 1400
Chicago, IL 60602

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: ) CHAPTER 7 PROCEEDING
)
THOMAS MURPHY,
)
CASE NO. 14 B 03922
)
DEBTOR.
)
HONORABLE DONALD R. CASSLIN

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------------------------

DATE: 07/24/2018 02:51:27 PM

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
IN RE: CHAPTER 7 PROCEEDING

THOMAS MURPHY,
CASE NO. 14 B 03922
DEBTOR.

HONORABLE DONALD R. CASSLING


MOTION TO COMPEL DEBTOR TO COMPLY WITH 11 U.S.C § 521 AND BANKRUPTCY RULE 1007 AND FOR OTHER RELIEF

NOW COMES PATRICK S. LAYNG, the United States Trustee for Region 11, by and
through his attorney, Jeffrey S. Snell, and pursuant to 11 U.S.C. §§ 105, 521 and Fed. R. Bankr.
P. 1007(a), hereby requests this Court enter an order compelling Thomas Murphy to (I) file a list
with the Clerk of Court containing the names and addresses of his creditors and others as
required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and (II) file an amended
Petition and Statement of Social Security Number that reflects the Number assigned to him by
the Social Security Administration.

In support of this request, the U.S. Trustee states to the Court as follows:
1. This is a core proceeding concerning the administration of this estate pursuant to
28 U.S.C. § 157(b)(2)(A) which this Court may hear and determine pursuant to Internal
Operating Procedure 15(a) and Local Rule 40.3.1(a) of the United States District Court for the
Northern District of Illinois.

2. The Debtor, Thomas Murphy, filed his Voluntary Petition under Chapter 7 of the
Bankruptcy Code on February 7, 2014.(fn. 1)
3. Michael K. Desmond was appointed Chapter 7 Trustee.

FN. 1. The Debtor filed the Voluntary Petition through attorney Jeffrey W. Deer. The U.S. Trustee has been advised by Mr. Deer
that he no longer represents the Debtor in this bankruptcy case,
see Exhibit A, and the Debtor confirmed the same at a Rule 2004 examination commenced May 23,2014. See Exhibit B, p. 4.


4. To date, the Debtor has failed to file a List of Creditors, Schedules, or a completed Statement of Financial Affairs. In addition,
the Debtor has failed to appear for the Meeting of Creditors originally scheduled for March 12, 2014, and continued several
times thereafter.

5. In the instant case, as in the Debtor's prior two bankruptcy cases, (fn.2) he has failed to file a complete and accurate list of
creditors and other parties in interest as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1). In this case, the
Debtor did not provide the Clerk of Court with the names and addresses of any creditors when he filed his Voluntary Petition.
See BNC Certificate of Notice. [6]. In his two prior cases, the Debtor provided the name of one creditor with his Voluntary
Petitions.

6. The Debtor does not dispute that he has many creditors. On June 2, 2014, during a
Rule 2004 examination conducted by the U.S. Trustee (the "Rule 2004 Examination"), the
Debtor testified as follows:

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

----------------------------------------------------------------------------------

Q  How many creditors do you have? Do you have any estimate?
A  You know, to be very honest with you, I have probably ten or 15 foreclosure suits. I think most of them are completed now. But I must have -- again, an approximate number?

Q  Sure.
A  25 to 40.

Q  Any approximation as to total debt?
A  Well, that's hard to say. And the reason I say that is because the number of foreclosure cases, they have not gone after personal liability. So there is a question of whether they can or they can't.

Q  For a deficiency?
A  For a deficiency, yes. Those were investment properties.

Q  Well, assuming they did it for deficiencies, do you have an estimate as to what kind of debt we're talking about?
A  Over two and a half million dollars, probably. Maybe more.


FT. 2  The Debtor's two prior cases were Case Numbers 13 B 45386 and 13 B 33363. Both cases were dismissed for the Debtor's failure to file required documents.


Q  And what about without deficiencies? Is it just credit cards and things of that nature or liquidated debts, judgments?
A  Probably a million or more. Actually, the -- you know, if you go on to the foreclosure cases, it's probably close to 4 million, now that I think of it. But I just don't know, you know, where there might be liability for personal judgments. Exhibit C, p. 22, line 22  p. 24, line 1.

7. In this case, as in the Debtor's prior two cases, he used a Social Security Number not assigned to him. During the Rule 2004 Examination, the Debtor acknowledged that his Social Security Number ends in "5480," not "5408" as recited on the documents filed in each of his three bankruptcy cases. The Debtor then testified that he wasn't previously aware that he had used the wrong number:

Q  So you don't know why the wrong social security number --
A  No, I do not.

Q  -- is on all these documents?
A  No, I do not. I'm glad you pointed that out because I didn't know that. That's got to get corrected. Id., p. 59, lines 5  11. To date, the Debtor does not appear to have taken any corrective action.

8. Through using a Social Security Number not his own, and an address that is not his home address, (fn 3) the Debtor has managed to conceal his three bankruptcy filings from public records searches (and, presumably, credit reporting agencies). This, coupled with the Debtor's
failure to file the list required by 11 U.S.C.§ 521(a) and Fed. R. Bankr. P. 1007(a)(1), has effectively concealed three bankruptcy cases from many, if not most, of his creditors.

9. On June 11, 2014, the U.S. Trustee filed a Complaint objecting to the Debtor's discharge under 11 U.S.C. § 727(a). See Patrick S. Layng vs. Thomas Murphy,  14 A 00372. The deadline for the Debtor to answer the Complaint has passed without the Debtor answering or otherwise pleading. The U.S. Trustee anticipates moving for default and judgment in the near future. The practical effect of a judgment denying the Debtor's discharge at this time is less than optimal, however. The denial of discharge would likely appear on someone else's (fn 4) credit report and many, if not most, of the Debtor's creditors would not be aware of the bankruptcy, much less the denial of discharge.

TRULINCS 08043424 - ROSSINI, ALBERT - Unit: CCC-H-A

--------------------------------------------------------------------------------

FN. 3. The address listed on the Voluntary Petition is the Debtor's office address.
FN.4. There is cause to believe that the Social Security Number used by the Debtor in his three bankruptcy cases is not an unused number, but, rather, is assigned to another individual.

10. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The U.S. Trustee submits that an order compelling the Debtor to comply with 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1), and to take corrective action with respect to the Social Security Number used in his Voluntary Petition, is necessary and critical.

WHEREFORE, the U.S. Trustee requests this Court enter an order:
(A) Requiring the Debtor to file, within seven (7) days, a list with the Clerk of Court containing the names and addresses of the creditors and others as required under 11 U.S.C. § 521(a) and Fed. R. Bankr. P. 1007(a)(1);
(B) Requiring the Debtor to file, within seven (7) days, an amended Petition and Statement of Social Security Number that reflects the Number assigned him by the Social Security Administration;
(C) Requiring the Debtor to appear for a status hearing to determine whether he has complied with the above, and, if not, to determine what coercive measures are necessary and appropriate to obtain compliance; and
(D) Awarding any other and further relief as is just.
RESPECTFULLY SUBMITTED:
PATRICK S. LAYNG
UNITED STATES TRUSTEE
DATED: July 18, 2014
/s/ Jeffrey S. Snell
Jeffrey S. Snell, Trial Attorney
United States Department of Justice
Office of the United States Trustee
219 South Dearborn, Room 873
Chicago, Illinois 60604
(312) 886-0890
Case 14-03922 Doc 60 Filed 07/18/14 Entered 07/18/14 Snell, Jeffrey (USTP)
From: Jeff Deer <jwdeer@aol.com>
Sent: Friday, May 23, 2014 10:07 AM
To: Snell, Jeffrey (USTP)
This will confirm that I will be filing a motion to withdraw my appearance as attorney for Thomas Murphy from his ch. 7 bankruptcy
Sent from my iPhone

## IN THE UNITED STATES BANKRUPTCY COURT
### For the Northern District of Illinois
### Eastern Division

|  |  |  |  |
|---|---|---|---|
| In re: | PATRICK S. LAYNG, | ) | |
|  | UNITED STATES TRUSTEE, | ) | In a Chapter 7 proceeding |
|  | Plaintiff, | ) | Docket No. 13 B  03922 |
|  |  | ) | |
|  |  | ) | Adversary No. 14 ap 372 |
|  | v. | ) | |
|  |  | ) | |
|  | THOMAS W. MURPHY, | ) | |
|  | Defendant, | ) | |
|  |  | ) | |
|  |  | ) | Judge Donald R. Cassling |
|  | Debtor. | ) | Chapter 7 Trustee Michael k. Desmond |

## DEFENDANT'S RESPONSE TO MOTION OF THE UNITED STATES TRUSTEE
## FOR DEFAULT AND DEFAULT JUDGMENT

NOW COMES Thomas W. Murphy, (hereafter, "Defendant"), by and through Mark Steven Wheeler, Esq. his attorney, and submits the attached DEFENDANT'S RESPONSE TO MOTION OF THE UNITED STATES TRUSTEE FOR DEFAULT AND DEFAULT JUDGMENT, and in support thereof, respectfully states as follows:

1.     This Court has jurisdiction to hear and determine this complaint under Title 28, Section

157(b)(2)(J) of the United States Code and Internal Operating Procedure 15(a) and Local

Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

*1.     Defendant admits each and every allegation contained in paragraph 1.*

2.     Debtor/Defendant, Thomas Murphy (the "Defendant" and/or "Debtor"), filed his

voluntary petition for relief under Chapter 7 of the Bankruptcy Code on February 7, 2014.

*2.     Defendant admits each and every allegation contained in paragraph 2.*

3.     On June 11, 2014, the U.S. Trustee filed the Adversary Complaint Objecting to

Debtor's Discharge ("the Complaint").

*3.     Defendant admits each and every allegation contained in paragraph 3.*

4.     Also on June 11, 2014, the U.S. Trustee caused the Complaint and Summons to

be served, by first class mail, upon the Debtor/Defendant at his address of record in the

bankruptcy case and upon his counsel of record in the bankruptcy case.1 The U.S. Trustee filed

the Summons Service Executed with this Court on June 11, 2014.

4.    *Defendant admits each and every allegation contained in paragraph 4.*

5.    Pursuant to Fed. R. Bankr. P. 7012(a), the Defendant had thirty (30) days from the

issuance of the Summons to answer or otherwise plead to the Complaint. That deadline was July

11, 2014. The Summons provided that a status hearing on the Complaint would be held on July

22, 2014.

5.    *Defendant admits each and every allegation contained in paragraph 5.*

6.    The Defendant has not answered or otherwise pled to the Complaint. The Plaintiff is the U.S.

Trustee and files this proceeding pursuant to the authority granted to him in Title 11, Section

727(c)(1) of the United States Code.

6.    *Defendant denies that he has not answered the Complaint as he filed his responsive pleading to*

*the Complaint on or about September 22, 2014 and admits each and every other allegation*

*contained in paragraph 6.*

7.    Attached hereto as Exhibit A is the undersigned's Statement Regarding the

Defendant's Non-Military Status.

7.    *Defendant admits each and every allegation contained in paragraph 7.*

8.    Based on the above, and pursuant to Fed. R. Bankr. P. 7055, the U.S. Trustee

hereby requests that the Debtor/Defendant be found in default, see Proposed Order 1, and that a

default judgment be entered against the Debtor/Defendant, see Proposed Order 2.

8.    *Defendant admits that a plain reading of FRBP 7055 allows the relief requested, however,*

*requests that the Court denies the Trustee's request for Default based on his response filed*

*September 22, 2014.*

9.    In accordance with 28 U.S.C. § 1746 the undersigned hereby certifies under

penalty of perjury that the above allegations are true and correct.

9.    *Defendant neither admits nor denies each and every allegation contained in paragraph 9.*

WHEREFORE, the Defendant respectfully requests that the Court denies the Trustee's

Request For Default and Default Judgment, and for such other relief as is equitable and just.

Respectfully submitted,

/s/ Mark Steven Wheeler
MARK STEVEN WHEELER
Attorney for Defendant

Mark Steven Wheeler, Esq.
828 W. Grace Street, Suite 2
Chicago, IL 60613
A.R.D.C. 6208514
P (773) 327-9790
F (773) 327-9791

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In Re:                )

                     )

                     )    Case No. 14-03922

    THOMAS W. MURPHY,     )

                     )    Chapter 7

       Debtor.         )

                     )    Honorable Donald R Cassling

## MOTION TO DISMISS CHAPTER 7 CASE AND TO BAR FUTURE PETITIONS

NOW COMES World Wide Realty, LLC ("World Wide"), a judgment creditor of the

Debtor, Thomas W. Murphy ("Murphy"), and pursuant to Title 11 of the United State Code

§707, 11 U.S.C. §707, Section 349, 11 U.S.C. §349, and Rules 1017 and 9014 of the Federal

Rules of Bankruptcy Procedure, moves this Honorable Court to dismiss Murphy's Chapter 7

bankruptcy proceeding for cause and with prejudice and to bar future Bankruptcy petitions. In

support, World Wide states as follows:

### INTRODUCTION

1.     By this Motion, World Wide seeks the dismissal of Murphy's Chapter 7

bankruptcy proceeding and a bar to Murphy filing future bankruptcy petitions due to Murphy's

bad faith and repeated abuse of the Bankruptcy Code. This is Murphy's third Chapter 7 filing in

the past six months. Each of Murphy's petitions have been filed on the eve of contempt

proceedings, or immediately following the issuance of writs of body attachment in World Wide's

state court collection action, wherein World Wide is seeking to collect a $199,160 judgment

against Murphy. The bad faith nature of Murphy's Chapter 7 Petition is further evidenced by

the fact Murphy's prior to two Chapter 7 proceedings were both dismissed after Murphy failed to

provide complete and accurate statements and schedules as required by Section 521(a). Murphy's current Petition similarly fails to attach the documents required under Section 521(a).

2.      Murphy's current Petition and the Statement of Financial Affairs attached thereto also willfully misrepresent Murphy's income and liabilities. Specifically, Murphy fails to disclose: (1) income he appeared to have earned as an attorney rendering legal services during 2011 and 2012, totaling $323,717; (2) income he appeared to have earned from a title insurance company he owned and operated during 2011 and 2012, totaling $337,558; and (3) World Wide's pending state court lawsuit wherein World Wide is seeking to collect its judgment of $199,160. Instead, Murphy certifies that he has earned no income in the past two years, has no lawsuits pending against him, and has only $0 to $50,000 in liabilities.

3.      Given the totality of the circumstances, it is apparent that Murphy is using the Bankruptcy Code in bad faith for the sole purpose of frustrating World Wide's attempt to collect its judgment against Murphy in its state court collection action. This proceeding should therefore be dismissed for cause pursuant to the Court's authority under 11 U.S.C. §707(b)(3)(A) and Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, and the Court should bar any future attempts by Murphy to file another petition under the Bankruptcy Code.

## PARTIES

4.      Murphy is an individual who filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on February 7, 2014. Murphy previously filed two petitions under Chapter 7 on August 21, 2013 and November 22, 2013, respectively, but both actions were dismissed due to Murphy's failure to file the documents required under Section 521 of the Bankruptcy Code.

5.    World Wide is an Illinois limited liability company and a judgment creditor of Murphy. World Wide obtained a judgment by confession against Murphy in the Circuit Court of Cook County on January 29, 2013. The total amount of World Wide's judgment against Murphy is $199,160. To date, Murphy has not satisfied any portion of World Wide's judgment and collection proceedings are still pending because Murphy has willfully and maliciously thwarted the collection process.

### JURISDICTION

6.    This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157.

7.    This Motion constitutes a core proceeding under 28 U.S.C. §157(b)(2)(A) and (J).

### FACTUAL BACKGROUND

A.    **World Wide's State Court Collection Action.**

8.    On January 23, 2013, World Wide filed a Complaint for Judgment by Confession against Murphy in the Circuit Court of Cook County, entitled *World Wide Realty, LLC v. Thomas Murphy*, which was originally given the case number 2013 L 50095. The Complaint was based on Murphy's default on a promissory note executed in favor of World Wide for the principal amount of $240,000, and Murphy's subsequent breach of the parties' settlement agreement. Attached hereto as Exhibit A is the affidavit of Colin W. Anderson, one of World Wide's attorneys, setting forth the details of World Wide's collection efforts and providing a comprehensive timeline of World Wide's state court collection action.

9.    On January 29, 2013, the Honorable Daniel T. Gillespie entered judgment against Murphy in the amount of $199,160.00. (See Judgment Order attached hereto as Exhibit B.).

10.     Thereafter, World Wide initiated supplementary proceedings to collect the judgment, and the action was transferred before the Honorable Alexander White in the Cook County Circuit Court's Law Division Tax & Miscellaneous Remedies Section.

11.     On March 18, 2013, World Wide issued Murphy a Citation to Discover Assets ("Citation"). Attached to the Citation is a document rider requiring Murphy to produce documents pertaining to his assets, including any documents relating to or describing any income Murphy earns or business he owns. (*See* Citation, attached hereto as Exhibit C).

12.     Despite several court orders to produce documents responsive to the rider, to date Murphy has failed to produce any documents other than his 2010, 2011, and 2012 federal tax returns and an Income and Assets Form. (Murphy's Income and Asset Form is attached hereto as Exhibit D; and Murphy's 2011 and 2012 Federal Tax Return are attached hereto as Exhibits E and F, respectively).

13.     Murphy has refused to produce any other financial documents that could show the source or location of his income and assets, including any bank statements. Murphy has also repeatedly failed to appear for a Citation examination despite several orders of the Circuit Court requiring him to appear in Court or at a location agreed upon by the parties' attorneys.

14.     As a result of Murphy's refusal to cooperate in the state court enforcement action, World Wide has been unable to ascertain the nature or location of Murphy's income or assets, and therefore has yet to collect any portion of its judgment.

15.     In attempt to compel Murphy's cooperation, the Circuit Court has issued four Rules to Show Cause against Murphy, as well as a body attachment for Murphy's arrest with a bond of $25,000.

16.    The first Rule to Show Cause was issued on May 15, 2013, after Murphy failed to appear for his Citation examination on April 25, 2013. (*See* May 15, 2013 Rule to Show Cause, attached hereto as Exhibit G).

17.    A second Rule to Show Cause was issued against Murphy on June 19, 2013, after Murphy failed to produce the documents responsive to the Citation rider. (*See* June 19, 2013 Rule to Show Cause, attached hereto as Exhibit H).

18.    On July 25, 2013, the Circuit Court once again ordered Murphy to present himself for a Citation examination and to produce documents responsive to the Citation rider. (*See* July 25, 2013 Order, attached hereto as Exhibit I). However, Murphy failed to present himself or provide any documents by the deadlines set forth in the July 25, 2013 Order.

19.    On August 15, 2013, the Circuit Court indicated that as a result of Murphy's repeated refusals to cooperate, it was inclined to proceed with a hearing on the two Rules to Show Cause issued against Murphy. However, Murphy's attorney of record, Jeffrey Deer, indicated that Murphy intended to file for Chapter 7 bankruptcy protection, and therefore requested a postponement of any contempt hearing. (Exhibit A, ¶9).

20.    The Circuit Court allowed a brief postponement. However, because Murphy's counsel could offer no explanation as to why Murphy failed to comply with the April 17, 2013, May 15, 2013, and July 25, 2013 Orders, the Circuit Court ordered Murphy to either tender proof of a bankruptcy filing by August 22, 2013, or file an affidavit showing cause why he should not be held in civil contempt. The Circuit Court's order provided that if Murphy failed to tender one of the two documents by August 22, 2013, he would face incarceration by the Cook County Sheriff. (*See* August 15, 2013 Order, attached hereto as Exhibit J).

**B.      Murphy's First Chapter 7 Bankruptcy Petition.**

21.      On August 21, 2013, Murphy filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois under the case number 13-33363.

22.      World Wide therefore ceased its collection efforts and placed its state court action on the bankruptcy stay calendar pending resolution of Murphy's bankruptcy proceedings.

23.      On September 17, 2013, Murphy's bankruptcy proceeding was dismissed as a result of Murphy's failure to timely file all the documents required by Section 521 of the Bankruptcy Code. (*See* 13 33363, Docket Entry No. 9).

24.      On October 3, 2013, World Wide presented a motion in the Circuit Court seeking to remove its collection proceeding case from the bankruptcy stay calendar. World Wide's motion was granted and its collection action was reassigned before Judge White under a new case number, 2013 L 50914. (*See* October 3, 2013 Order removing case from Bankruptcy Calendar, attached hereto as Exhibit K).

25.      Thereafter, Murphy was provided with notice that the collection action had been reinstated and was served with a copy of World Wide's Motion to Enforce the Citation, which was scheduled for presentment on November 6, 2013. (*See* October 7, 2013 Letter to Murphy's counsel of record, attached hereto as Exhibit L).

26.      Despite receiving notice, Murphy failed to appear for World Wide's Motion to Enforce the Citation. As such, a third Rule to Show Cause was issued against Murphy and the Circuit Court set all three pending Rules to Show Cause for hearing on November 20, 2013. (*See* November 6, 2013 Order and Rule to Show Cause, attached hereto as group Exhibit M). The

Circuit Court's order also required Murphy to appear in person at the November 20, 2013 hearing.

27.    At the November 20, 2013 hearing, neither Murphy nor his attorney appeared. The Circuit Court therefore entered an order holding Murphy in civil contempt and issued a writ of body attachment for Murphy's arrest with a bond of $25,000. (*See* Contempt Order, attached hereto as Exhibit N).

28.    Before placing the contempt order and body attachment with the Cook County Sheriff, World Wide provided Murphy's attorney with copies of the contempt order and advised that a body attachment had been issued for Murphy's arrest. (*See* November 22, 2013 Letter to Murphy's counsel, attached hereto as Exhibit O).

29.    Almost immediately upon receiving notice of the contempt order and body attachment, Murphy filed his second Chapter 7 Petition, under case number 13-45386. As a result, World Wide was once again forced to cease its collection efforts and place its collection action on the bankruptcy stay calendar.

C.    **Second Chapter 7 Bankruptcy Petition.**

30.    For his second Chapter 7 petition, Murphy alleged that his creditors ranged in number from 1 to 49 and that his liabilities could be estimated at $1 million to $10 million. However, in his Schedule of Creditors attached to his second petition, the only creditor identified by Murphy was World Wide. Likewise, the only liability listed in the Statistical Summary of Certain Liabilities and Related Data attached to his second petition was a $200,000 non-priority unsecured debt.

31.    In the Statement of Financial Affairs attached to Murphy's second petition, Murphy certified that he had earned no income from 2011 up to the commencement of his

Chapter 7 proceeding. (*See* Statement of Financial Affairs, 13-45386, Docket Entry No. 1, p. 21, ¶1).

32.    Murphy's Statement of Financial Affairs also alleged that he had not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶18).

33.    Further, Murphy's Statement of Financial Affairs alleged that he had no bookkeepers or accountants supervise or audit his books and records within two years immediately preceding the commencement of his Chapter 7 proceeding. (Statement of Financial Affairs, ¶19).

34.    On January 1, 2014, World Wide filed a motion to dismiss Murphy's second bankruptcy proceeding for his bad faith failure to disclose his income and liabilities and general abuse of the Bankruptcy Code.

35.    The United States Trustee also filed a motion to dismiss pursuant to 11 U.S.C. §521(a)(1), since Murphy once again failed to file all documents required by Section 521.

36.    Upon presentment of the two motions, the Honorable Timothy A. Barnes gave Murphy the option of either allowing his case to be dismissed pursuant to the U.S. Trustee's motion, with leave to refile, or enter into a briefing schedule to contest World Wide's motion to dismiss, which if granted could result in Murphy being barred from refiling for Chapter 7 relief.

37.    Murphy chose the former, and on January 21, 2014 Murphy's second Chapter 7 proceeding was dismissed.

38.    After the dismissal, World Wide once again moved the Circuit Court to remove its collection case from the bankruptcy stay calendar. After World Wide's motion was granted,

8

it filed a motion to enforce its citation and body attached against Murphy, scheduling it for presentment on February 10, 2014. (*See* Notice of Motion to Enforce Citation and Body Attachment, attached hereto as Exhibit P).

39.    Despite receiving notice of World Wide's motion, neither Murphy nor his attorney of record appeared on February 1, 2014, and as a result the Circuit Court once again held Murphy in contempt and issued a writ of body attachment with a bond of $25,000. (*See* February 10, 2014 Contempt Order, attached hereto as Exhibit Q).

40.    On February 13, 2014, World Wide gave Murphy notice of the February 10, 2014 contempt order and body attachment. After receiving the notice, Murphy's counsel advised World Wide for the first time that Murphy had filed yet another Chapter 7 Petition on February 7, 2014, under case number 14-03922. (*See* Email from Jeffrey Deer, attached hereto as Exhibit R).

41.    On March 18, 2014, the Circuit Court stayed enforcement of the Body Attachment.

**D.    Murphy's Third Chapter 7 Bankruptcy Petition.**

42.    For Murphy's current Chapter 7 petition, Murphy's counsel Jeffrey Deer certified that Murphy's alleged assets were estimated to range from $0 to $50,000, and his liabilities from $0 to $50,000. In the Statement of Financial Affairs (hereinafter, the "Statement") attached to the petition, Murphy certified that he earned no income in the past year. (*See* Statement, 14-03922, Docket Entry No. 1, p. 6, ¶1).

43.    Murphy also certified in the Statement that he had no lawsuits pending against him, making no mention of World Wide's state court action that was pending at the time and is still currently pending. (Statement, ¶4).

9

44.    As with Murphy's prior two petitions, Murphy's current petition fails to attach the documents required by Section 521, including a list of creditors, a schedule of assets and liabilities, a schedule of current income and current expenditures, a statement of the amount of monthly net income, and a statement disclosing any reasonably anticipated increase in income or expenditures.

45.    At no point in Murphy's current petition is World Wide identified as a creditor. Again, no part of World Wide's judgment against Murphy has been satisfied.

46.    On March 12, 2014, the meeting of creditors was held as scheduled. However, neither Murphy nor his attorney appeared at the meeting. (Exhibit A, ¶10).

**E.    Murphy's Federal Tax Returns.**

48.    During the course of World Wide's state court collection proceedings, Murphy produced his 2010, 2011, and 2012 federal income tax returns. Murphy's 2011 returns show a gross income of $192,839, which appears to be income derived in 2011 from Murphy's practice of law as an attorney. (*See* Exhibit E, p. 31). The 2011 returns also show business income of $98,667 apparently earned from Murphy's ownership of a title company named Legal Title Insurance Services. (*Id.* at p. 8).

49.    Murphy's 2012 federal income tax returns similarly show a gross income of $130,878 earned in 2012, presumably for legal services as an attorney. (*See* Exhibit F, p. 25). The 2012 returns also show business income of $200,082 earned presumably from his ownership of Legal Title Insurance Services. (*Id.* at p. 8).

50.    Murphy's current Chapter 7 Petition fails to disclose this income or these income sources.

10

## APPLICABLE LAW

51.   The purpose of the Bankruptcy Code is "to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying their debts." *In re Johnson*, 228 B.R. 663, 668 (Bankr. N.D. Ill. 1999).

52.   Section 707 of the Bankruptcy Code therefore empowers bankruptcy courts to dismiss a case if affording the debtor a bankruptcy discharge would be an abuse of the Chapter 7 provisions in the Bankruptcy Code. 11 U.S.C. §707(b)(1).   When considering whether discharging a debtor would be an abuse, the bankruptcy court shall consider whether the debtor filed his or her Chapter 7 petition in bad faith. 11 U.S.C. §707(b)(3)(A).

53.   A bad faith determination requires the court to consider the totality of the circumstances, and looks at factors such as whether the debtor has stated his debts and expenses accurately, whether he has made any fraudulent representation to mislead the bankruptcy court, or whether he has unfairly manipulated the Bankruptcy Code. *In re Johnson*, 228 B.R. at 669.

54.   A debtor's lack of candor in filing his bankruptcy schedules and Statement of Financial Affairs is sufficient for a finding of bad faith and the entry of an order dismissing the bankruptcy proceeding entirely. See *In re Stoller*, 351 B.R. 605, 621-622 (Bankr. N.D.Ill. 2006) (finding of bad faith warranted after the debtor had made false statements, provided misleading information, and omitted material facts in his petition, schedules, and Statement of Financial Affairs, which failed to identify the debtor's income, various businesses, and certain creditors).

55.   Courts may also consider other factors such as the timing of the filing of the petition, the debtor's motive for filing the petition, how the debtor's actions affect his creditors, and the debtor's treatment of creditors before and after his petition was filed. *In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005).

11

56.    With regards to timing, courts hold that a debtor's bankruptcy petition may be dismissed for bad faith where the debtor timed his filing in order to frustrate a creditor's state court enforcement action. *In re Eisen*, 14 F.3d 469 (9th Cir. 1994).

57.    After reviewing the totality of the circumstances, if the bankruptcy court concludes that a debtor's filing is not fundamentally fair to the debtor's creditors, or does not comply with the spirit of the Bankruptcy Code's provisions, the debtor's petition should be dismissed. *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).

58.    Additionally, where the bankruptcy court concludes that a debtor's petition was filed in bad faith or accompanied by egregious misconduct, contumacious actions, or abuse of the bankruptcy process, the imposition of a bar against filing another petition is warranted. *In re Garcia*, 479 B.R. 488, 494-95 (Bankr. N.D.Ind. 2012)

## ARGUMENT

## I.    MURPHY'S PETITION SHOULD BE DISMISSED DUE TO MURPHY'S MISREPRESENTATIONS REGARDING HIS ASSETS AND LIABILITIES.

59.    In all three of his Chapter 7 petitions, Murphy has demonstrated an alarming lack of candor regarding his income and assets. All three petitions failed to disclose the income and sources of income identified in Murphy's federal tax returns, and all three petitions failed to attach complete and accurate schedules as required by Section 521.

60.    Murphy's Statement attached to his current petition alleges that he currently earns no income, and has earned no income for the two years preceding the current calendar year. However, Murphy's 2011 federal income taxes show a gross income of $192,839 for wages in 2011 and $98,667 in business income from Legal Title Insurance Services. (Exhibit D, pp. 8, 31). Similarly, Murphy's 2012 federal income tax returns show a gross income of $130,878

from wages and $200,082 in business income from Legal Title Insurance Services. (Exhibit E, pp. 8, 25).

61.     Murphy's representation in his Statement that he has not served as an officer, director, partner, or managing executive of any corporation, partnership, or sole proprietorship within six years immediately preceding the commencement of his Chapter 7 proceeding is also contradicted by his tax returns. Both Murphy's 2011 and 2012 returns show that Murphy was not only the proprietor of Legal Title Insurance Services, but that he earned substantial income from the operation of that business.

62.     In addition, Murphy's current petition fails entirely to identify World Wide as a creditor of Murphy, even though there can be no doubt that both Murphy and his attorney are aware of World Wide and its pending state court collection action. Significantly, in his Statement, Murphy certifies to the Court that he currently has no law suits pending against him.

63.     In light of this information, it is clear that Murphy has not stated his debts and income accurately, but in fact has made numerous false statements, provided misleading information, and omitted material facts in his petition and statement of financial affairs. As a result of this egregious misconduct, contumacious actions, and ultimate abuse of the bankruptcy process, a finding of bad faith is warranted and Murphy's petition should be dismissed with prejudice and with a bar to future filings.

## II.   MURPHY'S PETITION SHOULD BE DISMISSED BECAUSE IT WAS FILED IN ORDER TO FRUSTRATE WORLD WIDE'S COLLECTION PROCEEDINGS.

64.     The timing of Murphy's filing Chapter 7 petition also requires dismissal of these proceedings. All three of Murphy's Chapter 7 petitions have been filed on the eve of Murphy being held in civil contempt with respect to World Wide's collection proceedings in state court.

13

65.    Specifically, Murphy filed his first Chapter 7 petition on August 21, 2013, just one day before he was required to file an affidavit in World Wide's state court collection action showing cause why he should not be held in contempt and incarcerated. (Exhibit J). Murphy filed his second Chapter 7 petition within hours of learning he had been held in contempt and a body attachment had been issued for his arrest with a $25,000 bond. (Exhibit O).

66.    Similarly, Murphy's current Chapter 7 petition was filed just one business day before World Wide was scheduled to present a motion in the Circuit Court to enforce its Citation and to enforce the November 20, 2013 body attachment. (Exhibit P).

67.    Murphy's successive bad faith bankruptcy petitions have caused World Wide to incur significant attorney fees and expenses in having to constantly stop and start its collection efforts on the eve of obtaining enforcement of its rights. Each time World Wide must cease collection based on Murphy's bankruptcy, only to again reinstate it before Judge White after Murphy's deficient bankruptcy petitions are dismissed. During this time, Murphy has wrongfully gained an opportunity to dissipate his assets.

68.    Given the recurring theme and timing of each of Murphy's petitions, including the current petition, it is apparent Murphy is not an honest debtor seeking a fresh start. Instead, Murphy is using the Bankruptcy Code to frustrate World Wide's attempt to collect its judgment in its state court collection action. Accordingly, the Court should find that Murphy's Chapter 7 petition was filed in bad faith.

WHEREFORE, World Wide Realty, LLC respectfully requests this Honorable Court enter an Order:

a.    Finding Murphy's Chapter 7 petition to have been filed in bad faith and dismissing Murphy's Chapter 7 proceeding for cause pursuant to 11 U.S.C. § 707(b)(3);

14

b.  Enter an order barring Murphy from filing for future Chapter 7 relief; and

c.  Granting such other relief as the Court deems to be just and equitable.

Respectfully Submitted,
**World Wide Realty, LLC**

By:    /s/ Anthony G. Barone
       One of World Wide Realty, LLC's Attorneys

Anthony G. Barone (ARDC #6196315)
Colin W. Anderson (ARDC #6298971)
Barone & Jenkins, P.C.
635 Butterfield Rd, Ste 145
Oakbrook Terrace, IL 60181
(630)472-0037

15

ALBERT Rossini
#08043-424
Metropolitan Correctional Center
71 W. Van Buren St.
Chicago, Il. 60605

Legal Mail

INSPECTED BY
U S MARSHALS
219 S DEARBORN
CHICAGO, ILLINOIS

08/17/2021-17

Clerk, U.S. District Court
Northern District of Illinois
219 South Dearborn St.
Chicago, Il. 60604

**RECEIVED**

AUG 17 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



