UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 15 CR 515 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| ALBERT ROSSINI | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for Northern District of Illinois, submits this sentencing memorandum concerning defendant Albert Rossini.   For the reasons set forth below, the government respectfully requests that this Court sentence Rossini to a term of imprisonment within the Advisory Sentencing Guidelines range of 210 to 262 months' imprisonment.

## I.    BACKGROUND

As outlined in the Government's Version of the Offense and Probation's Presentence Investigation Report (PSR ¶¶ 28 to 42), the evidence presented during Rossini's trial established that he led, organized, and carried out, along with co-defendants Babajan Khoshabe, Anthony Khoshabe, and Thomas Murphy, as well as several other witting and unwitting participants, a multi-year Ponzi scheme that defrauded investors of millions of dollars.   The jury heard nearly two weeks of evidence that included:   (1) testimony or stipulated testimony from 10 individual investors, as well as numerous property owners and bank witnesses, setting forth defendant's consistent pattern of taking money for real estate interests he did not

own; (2) hundreds of exhibits documenting defendant's many false representations to investors; (3) testimony from cooperating defendant Thomas Murphy, who admitted defendant's business was a scam; and (4) detailed financial analyses confirming the fraudulent nature of defendant's investment program and showing that defendant walked away with over $2.5 million, while virtually all of the investors lost their money.

More specifically, the evidence at trial proved that in 2011 and 2012, defendant, along with Babajan Khoshabe, solicited numerous members of two Assyrian churches to invest with defendant's company, Devon Street Investments. Defendant told investors their funds would be used towards the acquisition of mortgage notes on Chicago-area apartment buildings that were in, or near, foreclosure. Defendant told each investor he would cause the foreclosure process for their properties to be completed and that at the end of that process, which would take a period of months, he would have the titles to the properties deeded in the investors' names. The defendant further told each investor that, while the foreclosure process was underway, he or others working with him would receive the rents from the buildings and forward them to the investors. The defendant also promised each investor that, in the event he was unable to obtain title to the properties, he would refund the investors' money within five days. Each investor received a document from the defendant called a "Guaranty Agreement," which documented each of these representations in writing. Altogether, more than two dozen individuals and the

two churches themselves provided a total of more than $7,000,000 in investment money to defendant and his co-defendants.

For a number of months after investing, each investor received monthly checks from the defendant or one of his cohorts that they were told represented the rents collected from the investors' properties, with a management fee deducted. Concurrent with making these "rent" payments, defendant or Babajan Khoshabe often provided investors with information on additional properties they could invest in. Many of the investors agreed to do so based upon the apparent initial success of the investments. Despite receiving "rent" checks consistently for, depending on the investor, two months to more than a year, the rent payments became irregular in mid-2012 and ceased altogether by November 2012. No investor ever received a satisfactory explanation from the defendant for the rent stoppage. The defendant promised the investors to refund their investment monies but, with the exception of investor Ibrahim Yousif, failed to do so.[1] Eight of the 10 testifying investors likewise never received the titles to any of the properties they had invested in. GX Chart 1. Robert Badalian and Vladamir Moghaddasi, for their part, only received titles to three out of the 20 properties they invested in. GX Chart 1. Many of the investors had taken out loans or tapped retirement savings to invest, and the vast majority of investors each lost hundreds of thousands of dollars, despite being of relatively modest means. See generally, Ex. GX A at 5-10, 16-17.

---

[1] The defendant returned Ibrahim Yousif's investment money only after Yousif filed a complaint about the defendant with the Lincolnwood Police Department. Tr. 348-354.

To operate his supposed investment business, defendant enlisted several other participants – both witting and unwitting – including: Babajan Khoshabe, who recruited most of the Assyrian victims; Anthony Khoshabe, who served as the "property manager" for the investors' properties and forwarded the investors their "rent" payments; handyman Francisco Cisneros, who defendant paid to, among other things, perform cosmetic work on buildings defendant did not own so that investors would believe the buildings were good investments; attorney Thomas Murphy, who received and dispersed investor funds and drafted bogus legal documents for defendant; several other employees who performed services such as printing out information about properties that defendant would present to investors; and investors to whom defendant paid referral fees if they brought in new investors.

Despite his representations to investors, defendant and his cohorts did not own, and did not use the investors' funds to acquire, mortgage notes. According to official property records from the Cook County Recorder of Deeds, at the time defendant took each of the investors' funds, he had no recorded interest in any of the 57 mortgage notes for which he was soliciting investment money. See generally, GX Chart 1; GX CCRD 1, 3, 4, 5. The records further show that the defendant never obtained an interest in any of those 57 mortgage notes after he received the investors' funds. GX Chart 1; GX CCRD 1, 3, 4, 5. And although the defendant eventually used the investors' funds to obtain the titles to six of the 57 of the properties, he did not do so by acquiring the mortgage notes and foreclosing on those six properties; he instead directly purchased them and then only turned over the titles to three of them,

4

and then only after then investors began pressuring him about the rent stoppage. GX Chart 1; GX CCRD 1; Tr. 76-78.   The defendant kept one of the remaining three properties for himself, used one as security for a mortgage, and transferred one to another individual.   GX Chart 1; GX CCRD 1; Tr. 85-86.

Despite having no actual interest in any of the properties or involvement in their management, defendant provided potential investors "fact sheets" for each property purporting to detail the rental status of all the units in each building and the rental income the investor would receive.   See, e.g., GX AwPithyou 5; GX Badalian 1; GX Younan 1.   Further, even though the defendant had no recorded interests in any of the mortgage notes, and despite the fact that none of the lenders reported ever communicating with the defendant about the notes, the defendant gave each investor a "Guaranty Agreement" stating that he had obtained "written assignments of the right to acquire … the existing notes and mortgages from the lender[.]" GX Badalian 3; GX Younan 3.   Documents such as these reflect numerous false statements that defendant made to investors about material matters, such as the foreclosure status of the properties or negotiations he said he was having with the property owners.

At trial, Thomas Murphy, who pled guilty and testified, confirmed and fleshed out the fraudulent nature of the Devon Street scheme.   Murphy explained that in 2011 he was an attorney who performed several services for the defendant in connection with his investment program, including incorporating business entities, Tr. 573-575, drafting documents the defendant could give investors, Tr. 600-603, and

receiving and dispersing the investors' funds at the defendant's direction, Tr. 577, 582-584, 586-590, 596.    In particular, Murphy testified that he drafted the template "Guaranty Agreement" the defendant used with the investors, which incorporated specific language requested by the defendant, including the representation that the defendant had written assignments of the right to acquire the mortgage notes.    Tr. 605-606.    Murphy also testified that each time an investor gave the defendant a check, defendant gave it to Murphy to be deposited into Murphy's personal checking account and dispersed back to the defendant and his cohorts according to the defendant's specific instructions.    Tr. 586-590.    Murphy further testified that the defendant filed a lawsuit against Murphy in 2013 containing false allegations about the investors' funds and then told Murphy the lawsuit was a sham designed to placate the investors, who had been complaining.    Tr. 645-648.    Murphy also testified that, after the defendant filed the sham lawsuit against Murphy, the defendant surreptitiously worked with Murphy to receive and disperse over $800,000 in additional funds from investor Kathy Khodi.    Tr. 652-657.

Finally, the jury received bank and currency exchange records and heard testimony from FBI forensic accountant Sandra Prescott, who performed a comprehensive financial analysis of this evidence.    The financial evidence revealed that, in total, investors gave the defendant more than $7 million.    Tr. 821. Although investors received back approximately $2.5 million in "rent" payments, there was no rental income coming into any of the relevant accounts, and all of the money paid to investors was actually just their own funds being paid back to them.

Tr. 823.  At the same time that the investors lost approximately $5 million, the defendant made at least $2.55 million, of which the defendant negotiated approximately $2 million at currency exchanges.  Tr. 823, 828; GX PC Currency Exchange.  Babajan and Anthony Khoshabe made approximately $1.26 million from the scheme, while Murphy netted approximately $166,000.  Tr. 824-826.  Further, of the $7 million paid by investors, the defendant used only approximately $200,000 towards the acquisition of real estate.  Tr. 824.

## II.  ADVISORY GUIDELINES CALCULATION

It is the government's position that the defendant's Advisory Guidelines range is 210 months to 262 months' imprisonment.

The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).  Pursuant to Guideline § 2B1.1(b)(1)(J), the offense level is increased by 18 levels because the loss amount of approximately $5,000,000 is greater than $3,500,000 and less than $9,500,000.  Pursuant to Guideline § 2B1.1(b)(2)(B), the offense level is increased by 2 levels because the offense involved substantial financial hardship to 10 or more victims.  Pursuant to Guideline § 2B1.1(b)(10)(C), the offense level is increased by 2 levels because the offense involved sophisticated means.  Pursuant to Guideline § 3A1.1(b)(1), the offense level is increased by 2 levels because the defendant knew or should have known that a victim of the offense was a vulnerable victim.[2]  Pursuant

---

[2] As correctly pointed out in the PSR, defendant knew—and in fact worked with co-defendant Babajan Khoshabe to target—victims in the Assyrian community who, based on their shared Assyrian heritage, were vulnerable to the fraud because they trusted the Khoshabes, and, by extension, the defendant. PSR ¶ 68.

to Guideline § 3B1.1, the offense level is increased by 4 levels because the defendant was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive. This results in a total offense level of 35.

As correctly stated in the PSR, the defendant has five criminal history points and a Criminal History Category of III. An offense level of 35, when combined with the criminal history category of III, results in an anticipated advisory Sentencing Guidelines range of 210 to 262 months of imprisonment.

### III.  ANALYSIS OF SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The government recommends a sentence within the Guidelines range of 210 to 262 months' imprisonment, followed by a term of three years of supervised release. For the reasons outlined below, this sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense Weigh in Favor of a Guidelines Sentence

It is an understatement to say that defendant committed a serious offense when he stole more than $5 million from more than 20 victims. Defendant assembled a team of shameless scam artists—including co-defendants Babajan Khoshabe, Anthony Khoshabe, and Thomas Murphy—who worked together to carry out the sophisticated fraud scheme. Defendant worked with his co-defendants to lure the victims with a pitch of a secure, risk-free investment. As detailed above, defendant told investors their funds would be used to acquire mortgage notes on Chicago-area apartment buildings that were in, or near, foreclosure. According to the defendant,

8

the victims would receive rent payments during the foreclosure process, and following foreclosure the victims would receive the title to the property. The entire pitch was a fabrication. Defendant gave the victims fake documents about buildings to which neither he nor his co-defendants nor the victims had any claim. Defendant even hired Francisco Cisneros, who stood outside the buildings and posed as a handyman who purportedly maintained the properties that, again, neither defendant nor his co-defendants nor the victims ever had any interest in or connection to.

During the scheme, defendant paid the victims monthly "rent payments" that were supposedly being paid by the tenants in the apartment buildings the victims were going to own at the conclusion of the foreclosure process. There were no buildings and there were no tenants; defendant was instead operating a Ponzi scheme, using the investors' own money to pay those fictitious rent payments. Defendant's "rent" payments gave the victims confidence that their investments were real, and encouraged the victims to invest more money and recruit their friends and family to do the same. After the defendant determined that he had milked the victims dry, he and his co-schemers stopped paying the fictitious "rent" payments and concocted a web of lies—and even a fake lawsuit filed in the Circuit Court of Cook County—to string along the victims and deter them from reporting the fraud scheme to the FBI. In the end, the victims lost more than $5 million, and the defendant walked away with more than $2.5 million of their money.

While all fraud schemes involving the theft of $5 million are serious crimes, the circumstances of the defendant's crime are particularly egregious and weigh in

favor of Guidelines sentence. First, defendant's victims included two Assyrian churches, clergy, and the members of those churches. Defendant, with the help of co-defendant Babajan Khoshabe, targeted Father Pithyou of St. Odisho Church of the East, an Assyrian Christian church in Chicago. The decision to target Father Pithyou as an anchor investor for the scheme was not a mistake. Defendant and his co-defendants knew that Father Pithyou was a respected voice in the St. Odisho community and that his investment would lead to additional investments from his parishioners. The plan worked, and Father Pithyou's investment encouraged other members of the Assyrian church community to invest. Defendant's premeditated decision to prey on the members of the close-knit Assyrian Church community is an aggravating circumstance that makes this fraud scheme appalling and weighs in favor of a Guidelines sentence.

Second, a particularly aggravating factor is that the defendant's Devon Street investment program was a fraud scheme from its inception. As the Court knows, most Ponzi schemes involve a legitimate business venture that turns into a fraud. Some unforeseen event occurs, and rather than disclose the event to the victims, the fraudster lies, in the hope of having time to make money to fix the problem. The situation snowballs, and what started out as a legitimate venture turns into a Ponzi scheme. But defendant's Devon Street investment program was never a legitimate operation; it was a fraud from the very beginning. The fact that defendant and his co-defendants defrauded investors from day one and never intended to do anything other than steal their money is a factor that makes defendant's scheme particularly serious,

10

and it weighs in favor of a sentence within the guidelines range of 210 to 262 months'
imprisonment.

Finally, the circumstances of the defendant's fraud scheme weigh in favor of a
Guidelines sentence because of the impact, both financial and emotional, that the
fraud had on the victims and their Assyrian community. Again, stealing $5 million
from victims in any case would be a serious crime. But the victims in this case
describe an important non-economic impact of the defendant's crimes. As
demonstrated by the letter from the Pithyou family and several other victims, the
defendant's scheme caused extreme emotional distress to the victims and damaged
the social fabric of the targeted Assyrian communities. This non-economic, emotional
harm is a circumstance of the offense that weighs in favor of a sentence within the
Guidelines range of 210 to 262 months' imprisonment.

**B.    A Guideline Sentence is Necessary to Account for the
        Defendant's History and Characteristics**

Defendant is an unparalleled and incorrigible scam artist, and his history and
characteristics weigh in favor of a Guidelines sentence of 210 to 262 months'
imprisonment.

As detailed in the government's version of the offense and the Presentence
Investigation Report, defendant has been involved in a continuous string of fraud
schemes since the 1980s, and in addition to several state felony convictions, this is
defendant's *third* federal fraud conviction. Defendant's decades-long run as a con-
artist and cheat began no later than 1985, when he negotiated a forged check in the

amount of $37,500. PSR ¶ 97. He was convicted of that felony fraud offense in 1987 and was sentenced to a suspended sentence of one to two years of imprisonment. *Id.*

In the 1990s, the defendant participated in a complicated investment fraud scheme that resulted in his first federal indictment in the Northern District of Illinois. PSR ¶ 98. In July 1997, Judge Manning sentenced defendant to 10.5 months of imprisonment. PSR ¶ 98.

In 2003, defendant was convicted of mail fraud in another federal fraud case in this district. PSR ¶ 99. In that case, defendant participated in a disturbing scheme in which he and his wife stole stock belonging to the estate of a deceased family friend, which had been entrusted to defendant's wife, who was then an attorney. *Id.* As part of the scheme, defendant filed an affidavit in a civil suit falsely alleging that the victim had consented to his disposal of the stock and was trying to cover up an extramarital affair. *Id.* At sentencing, Judge Shadur found that defendant had committed additional uncharged frauds (GX E at 25-26), obstructed justice (GX E at 10), and ultimately sentenced defendant to 48 months' imprisonment (PSR ¶ 99).

Defendant was released from his imprisonment following Judge Shadur's sentence in 2007, and soon after he began working with co-defendant Thomas Murphy to engage in new fraud schemes. For example, in 2008, defendant and Thomas Murphy stole approximately $60,000 from victim Doris Kling in a fake escrow scheme that ultimately left Kling—a single mother—homeless. PSR ¶ 105; D.E. 303, at 5; Tr. 567-571; GX B. In 2010, defendant and co-defendant Murphy

used a similar fake escrow scheme to steal approximately $325,000 from two other victims, Nina Jozers and Frank Alamprese. The details of these and other fraud schemes perpetrated by defendant are included in the government's version of the offense and the PSR, and they are further illustrations of the defendant's long and unwavering commitment to lying and cheating victims out of money.[3]

### C. A Guidelines Sentence is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public from Future Crimes by this Defendant

A Guidelines sentence of between 210 to 262 months' imprisonment is also necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from future crimes by this Defendant.

While all of these are important factors for the Court to consider in this case, specific deterrence is particularly important and weighs in favor of a sentence within the Guidelines range of 210 to 262 months' imprisonment. Defendant is a once-in-a-generation crook who has been undeterred by any of his prior federal or state felony convictions and sentences. In addition to his actions—including his decades-long, unbroken string of fraudulent schemes—defendant's own words to Probation are strong evidence that he has been undeterred by this or any prior conviction or term of imprisonment. As detailed above, the defendant faces sentencing by this Court

---

[3] While he was out of custody awaiting trial in this case, defendant engaged in yet another fraud scheme and was indicted—for the fourth time—by a federal grand jury in the Northern District of Illinois. That case is captioned *United States v. Albert Rossini*, 17 CR 522 and is pending before Judge Tharp.

because he stole millions of dollars from two churches, a priest and his family, and numerous other victims through his operation of a sophisticated Ponzi scheme that was corrupt from its inception. Yet when asked what led to his conviction in this case, defendant said that he "believed he did nothing criminal and was not going to ask for forgiveness…" PSR ¶ 56.   In short, past indictments, convictions, and sentences have not in any way dissuaded defendant, and he requires a Guidelines sentence to deter him from engaging in additional criminal conduct in the future.

Perhaps the most important factor for the Court to consider when determining the appropriate sentence for this defendant is the need to protect the public from his future crimes. If the defendant is not incarcerated, he has in the past—and will continue in the future—to lie, cheat, scam and steal. When not incarcerated, the defendant devotes his days to identifying new victims, gaining their trust through lies, and doing whatever he can to steal their hard-earned money.   The only thing that will truly protect the public from defendant's future crimes is to incapacitate him with a sentence within the Guidelines range of 210 to 262 months' imprisonment.

**D.     The Need to Avoid Unwarranted Sentencing Disparities**

A sentence within the Guidelines in this case would also avoid unwarranted disparities with other defendants who are sentenced for fraud schemes in this district and across the United States.   While the Sentencing Guidelines are no longer mandatory, they do provide a measure of consistency to ensure that similarly situated defendants are treated equally.   In this case, if defendant were to receive a below-

14

Guidelines term of imprisonment, his sentence would be disproportionately more lenient than other defendants who are sentenced for similar offenses.

## IV.    SUPERVISED RELEASE

The government agrees with the Probation Office's recommendations regarding a three-year term of supervised release and the Proposed Conditions of Supervised Release set out in the PSR.

## V.    CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court impose a sentence within the Guidelines range of 210 to 262 months' imprisonment, followed by a term of supervised release of three years.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ John D. Mitchell*
JOHN D. MITCHELL
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300