UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA )

     Plaintiff, )

                  )    No. 15 CR 515

                  )

                  )

                         Honorable John Z. Lee

ALBERT ROSSINI

     Defendant.

## ROSSINI SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT

THERE EXIST TWO ESSENTIALLY SYNTHESIZED ISSUES OF RESOLUTION BASED ON THE TOTALITY OF CIRCUMSTANCES THAT PERMEATES THIS CASE, THAT BEING THE GOVERNMENT HAS FAILED TO EITHER PROVE THE REASONABLE SCOPE OF ROSSINI'S CONSPIRATORIAL FORESEEABILITY, AND/ OR ESTABLISHED A SPECIFIC SUFFICIENT ATTRIBUTABLE NEXUS TO HOLD ROSSINI CULPABLE FOR ALLEGED INHERRENT FINANACIALLY SPECULATIVE AND CONJECTURAL LOSSES

I

INTRODUCTION

*Background*

   Pursuant to the factual recitation chronicled and delineated within the Court's preamble in its order

denying Rossini's Motion For A New Trial the background information is as follows:l In August 2015, a

grand jury returned an indictment against Rossini and others alleging the operation of a Ponzi scheme that

1

defrauded investors of millions of dollars and charging numerous counts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. ECF No. 1. In June 2018, trial was held as to Rossini, and he was subsequently found guilty.

The Evidence at Trial

The government presented extensive evidence at trial regarding Rossini's involvement in the creation and operation of a scheme to defraud numerous investors. First, the jury heard testimony from nine individual investors and received the testimony of a tenth by stipulation. See Trial Tr., ECF Nos. 354-59, at 19-90, 131-74, 205-62, 282-99, 306-54, 365-91, 397-431, 466-536, 745-95, 863- 64. These investors testified that they gave Rossini money in return for the acquisition of mortgage notes for Chicago-area apartment buildings in or near foreclosure. Rossini stated to the investors that he or his company-Devon Street Investments-would complete the foreclosure process for the properties, at which point the investors would obtain the titles to the properties. See, e.g., id. at 215, 290, 315-16, 378-79, 401-02, 754-55. In the meantime, Rossini said, he and/or his partners would collect rents from the tenants at the buildings and forward the funds to the investors. See, e.g., id. at 41-43; 155-57, 215, 286, 290, 317, 378-79, 401, 754-55. He also promised the investors that he would refund their money in the event he was unable to obtain title to the properties. See, e.g., id. at 27, 37, 291, 402. Each investor received a "Guaranty Agreement" from Rossini that documented these representations. See, e.g., id. at 36-37; 144-45, 290, 321-22, 475-76, 757.

In addition to the testimony from investors and the documentary evidence, the jury heard testimony from Thomas Murphy, a co-schemer who had pleaded guilty to his involvement in the fraud. Murphy testified that, in 2011, he was an attorney who performed several services for Rossini in connection with the investment program, including incorporating business entities, Trial Tr. at 573-75, drafting documents Rossini could give investors, id. at 600-03, and receiving and dispersing the investors' funds at Rossini's direction, id. at 577, 582-84, 586-90, 596. Murphy added that Rossini sued him in 2013, claiming that Murphy had purloined investors' funds, only to confide in him later that the lawsuit was a sham designed to placate complaining investors. Id. at 645-48. Murphy also testified that, after Rossini filed the sham

lawsuit, Rossini secretly worked with Murphy to receive and disperse over $800,000 in additional funds from a specific investor. Id. at 652.

The trial testimony of Murphy revealed his orchestration, sophistication and expertise in effectuating this scheme, and conspiratorially and fraudulently through his leadership and organization amassing massive amounts of money, ultimately cooperating upon apprehension, thereby minimizing his role and magnifying magnify the role of Rossini for purposes of self-preservation.

## *Summary of The Issues*

There exist two essentially synthesized issues of resolution based on the totality of circumstances that permeates this case, that being the government has failed to either prove the reasonable scope of Rossini's conspiratorial foreseeability, and/ or established a specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative and conjectural losses. The government has failed to establish and prove that the criminal fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was within the reasonable scope of Rossini's conspiratorial foreseeability. The government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative and conjectural losses. Absent establishing and proving the predicate aforementioned, the imposition of any government initiated sentencing guideline, relevant conduct and enhancement application is not supportable.

*Predicate Rossini Sentencing Issue Resolution, Prerequisite For The Imposition Of Guideline, Enhancement Application*

## ISSUE  I

WHETHER THE GOVERNMENT HAS ESTABLISHED AND PROVEN THAT THE CRIMINAL FRAUDULENT CONDUCT PERPETRATED AND EXECUTED BY DISBARRED ATTORNEY THOMAS MURPHY ET AL, WAS WITHIN THE REASONABLE SCOPE OF ROSSINI'S CONSPIRATORIAL FORESEEABILITY

ISSUE II

WHETHER THE GOVERNMENT HAS ESTABLISHED A REASONABLE SPECIFIC
SUFFICIENT ATTRIBUTABLE NEXUS  TO HOLD ROSSINI CULPABLE FOR ALLEGED
INHERRENT FINANACIALLY SPECULATIVE AND CONJECTURAL LOSSES

  Rossini contends and the facts establish the government has failed to establish their burden relative to both

these propositions, notwithstanding the jury verdict. Regardless of  language, nomenclature, imprimatur or

iteration, the government continues to  advance  a failed  post trial unproven theory, that Rossini conspired

as leader and organizer with Murphy et al, to effectuate and perpetrate this financial fraud. Clearly, the jury

found Rossini guilty. However the jury did not resolve predicate issues for prerequisite  imposition of

relevant conduct and  enhancement application. The jury never determined leadership role, relevant

conduct or enhancement application based on the totality of circumstances. Specifically and more

importantly, the jury never resolved whether the government established and proved that the criminal

fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was within the

reasonable scope of Rossini's conspiratorial foreseeability; and whether the government established a

reasonable, specific, sufficient attributable nexus, to hold Rossini culpable for alleged inherent financially

speculative and conjectural losses. These issues must be proven at sentencing as a prerequisite for any

guideline imposition, i.e.  relevant conduct, leadership, organizer, and other enhancement application.


*Timeliness Of This Memorandum*


  Please be advised counsel has edited this document and removed any of  counsel's independent

commentary, analysis and  annotations, to the extent  they may have been in conflict with Rossini's

mandates, objectives, theories and his 47 page unilateral pro se filings of August 11, 2021  and any

thereafter. Rossini has communicated that counsel advance his pro se submissions.  Counsel's submission

has essentially been gutted based on ongoing 11th hour contradictory instructions from Rossini, and filed

contradictory instructions with the court relative to his pro se status. On the one hand, Rossini  has

4

instructed counsel to file documents and  then subsequently  in contradiction, mandated that counsel stand in accord with Rossini's pro se submissions and instructions. Counsel cannot be effective serving as Rossini's appointed counsel,  quasi standby  counsel, and law clerk,  all at the same time, while functioning under simultaneously contradictory instructions. Counsel advised both the court and government counsel, AUSA  John Mitchell yesterday,  of the circumstances  attributing to the delayed  filing of the Rossini's Sentencing Memorandum. Counsel  advised  both that he would be filing said motion by the close of business  yesterday, Thursday, August 26, 2021, and that he neither needed or would be requesting a continuance, but understood if the government would require said in order to response to the 11th hour submission of Rossini's  Sentencing Memorandum. Government's counsel indicated he would be ready to proceed to sentencing as scheduled, and counsel reiterated his position of being ready to proceed to sentencing as scheduled.

  Subsequent to counsel's communicated representations,   counsel received notice from his office late yesterday, that he received a short mailed letter from Rossini. This letter  further delayed this filing. It should be noted that  Counsel  visited with Rossini in-person at the MCC on Wednesday morning, August 25, 2021 and received approximately in excess of 50 pages from Rossini for  incorporation  with this filing, which  necessitated review. Accordingly, pursuant to this court's  prior order, counsel tendered memorandum documents to Rossini  personally  at the MCC, on August 16, 2021 and engaged in productive discussions relative to this memorandum followed by telephone  and letter communications. Subsequently, counsel  met with Rossini again  in-person at the MCC, on August 25, 2021 just to solidify measures.  Prior  communications and  correspondence, are not delineated herein, as those circumstances, information  and discussions have been previously addressed by the court.

  Counsel  has fulfilled and complied with all the request of Rossini  in accordance with the *Canons of Professional Responsibility*  and has discussed, agreed and included all provisions, commentary and analysis  that  have been requested by Rossini, including purging counsel's submission in favor of Rossini's pro se filing. Counsel  has explored and discussed all the issues and is ready to proceed to sentencing. Counsel neither seeks,  nor is  requesting a continuance.  Counsel has eliminated and purged

segments of his submission to prevent duplicity, redundancy and oppos opposition, in favor of adopting Rossini preferred submissions for judicial economy purposes. Many of the arguments counsel and Rossini intended to submit where essentially duplicitous and Rossini and counsel were previously in accord as documented in Rossini's corroborative letter exhibit. Counsel is ready to proceed. In light of the raging and emerging Delta Variant and counsel's vulnerable risk factor susceptibility, counsel personally and recently met with Rossini at MCC, as well as engaging in telephone conversations, to effectuate concurrence relative to the submission of the memorandum. Accordingly, counsel will proceed on the submission of Rossini filings consistent and to the extent permissible pursuant to his professional responsibilities and adopts said as they have previously been e-filed by Rossini.

_____

Exhibit

Albert Rossini #08043-424
Metropolitan Correctional Center 71 W. Van Buren St.
Chicago, IL 60605
August 25, 2021

Hon. John Z. Lee
United States District Court 219 S. Dearborn St.
Chicago, IL 60604
Re: USA v. Rossini,
15 CR 515-1

Dear Judge Lee:

Since August 16, 2021 Status Hearing, Attorney Clarence Butler, Jr. and I have been working diligently in preparation for the Sentencing Hearing on August 27, 2021.

Unfortunately, with the consistent lockdowns and continued COVID-19 restrictions and protocols, together with being detained in a high security cell-floor, it has not been possible for me to provide Mr. Butler with the memorandums and documentation he has requested of me in a timely manner.

For these reasons, our filing to the Court have been delayed and my preparation to testify at sentencing or to confer beforehand with Mr. Butler as to government witnesses and defendant's witnesses has been slowed down.

Mr. Butler and I have been very conscientious in preparing since the August 16, 2021 status, yet the detention constraints due to COVID-19 restrictions and staff shortages at the MCC Chicago has led to further restrictions and lockdowns. It has severely compromised Defendant and Mr. Butler's preparation for the August 27, 2021 sentencing hearing. (Example: it took 3 hours of waiting after an August 17, 2021

attorney visit for a male correctional officer to be available for strip searching the Defendant to be able to return to his Unit).

Respectfully submitted,

Albert Rossini

_____

## BIOGRAPHICAL BACKGROUND

*Rossini's Life and History*

Rossini has been portrayed as a criminal, committing crimes across the American landscape, with no redeeming character. Yet, the Government showed no such expansive calumny against Thomas Murphy, whose escrow thefts from his attorney accounts were established by the ARDC as occurring over a period of 21 years. Although the Defendant was convicted in the Northern District of Illinois in 1995 and sentenced in 1997 and then again convicted in 2003 in the same district, the timing of these convictions are separated by the fact that the crimes were both committed in the early 1990s but were not discovered at the same time. Defendant did not commit two separate crimes in two separate decades, 1990 and 2000. He served the sentences for crimes committed within a couple years in the early 1990s in different decades because the crime for which he was indicted in January 2003 was not discovered until 1999. This portrays Defendant's history as more serious than reality would have it.

Rossini is unlike most defendants who appear for sentencing in this district in important respects. Born in Utica, N.Y. on September 11, 1948, he attended Utica College of Syracuse University from 1966 to 1970 earning a Bachelor of Arts degree with a history major and graduated cum laude. Defendant enlisted in the United States Marine Corps in his senior year of college. After graduation, he entered Marine Corps officer training at Quantico, Virginia. A herniation of the facie muscles of the lower left leg ended his military

career. Shortly thereafter, Defendant entered Georgetown University Law Center in Washington, D.C. Rossini moved to Kansas City to be close to his parents and joined Merrill Lynch and Co. 's mortgage insurance division.

After several years, he transferred to Merrill's brokerage company and worked there and at Oppenheimer & Co. until the mid-198Os, when he formed a mortgage trading firm in both Kansas City and Chicago. Defendant met his wife, attorney Brenda Szeja, in December 1985; they married in February 1986. They have been married for 35 years and have one son, Spencer, a lawyer in Portland, Oregon. Spencer attended the University of Colorado at Boulder and received his undergraduate degree, then attended the University of Chicago Law School for one year, post graduate courses before attending and graduating from Willamette Law School, Salem, Oregon. He is a member of both the Oregon and Washington State Bar Associations. Spencer worked in the Clackamas County (Oregon) Prosecutor's Office before joining a firm in Portland that specialized in bankruptcy law.

Defendant and wife also raised a niece, Mariana, whose family emigrated from Russia in the early 199Os. She graduated from American University in Washington, D.C. After an accounting career, she now has a family of her own in Texas. The Rossini's also raised a neighbor's son, Casey. The neighbor, a family friend, suffered from drug and alcohol addiction. As our son's closes friend, Casey was raised with and cared for by Defendant and his wife throughout his Winnetka IL schooling, and financially assisted through college at UIC. Both boys were well-traveled, religiously schooled, and participated in swimming, hockey, and golf. They became life guards.

Spencer was acknowledged by the Coast Guard for having braved the waves and saved a swimmer. Casey, a superior student, and college lifeguard instructor, is now with a high tech firm in Northern California. Defendant Rossini was chauffeur, guide, parent and guardian in every activity. Nor were these two boys the sole charges who came to the Rossini household when their families were in flux. Mrs. Rossini suffers from recurring breast cancer. The effects of both chemotherapy and radiation have damaged the bone in her jaw and the bones in her ankles and feet. She also is an insulin-taking diabetic, a disease

8

which she contracted with a later-age pregnancy. The costs have been prohibitive, and meeting the financial demands--while the Government availed itself of every effort to whittle Defendant Rossini's livelihood to penury and to impose his lengthy detention --- were borne by Defendant with great difficulty.

In sum, Defendant has led a productive and family-oriented life, a family which includes his 93-year-old mother-in-law in assisted living- whom Defendant was precluded from visiting because of the detention -- and his 98-year-old mother, two brothers, and cousins. There is every reason to believe he will continue to lead a productive and law-abiding life if released, to return to the care of his wife's chronic health problems, and to reestablish personal contact with his extended family.

<u>CHRONOLOGY</u>

*<u>Defendant Albert Rossini's Verbatim Version Of Events</u>*

I was introduced to attorney Thomas W. Murphy ("Murphy") in October 2007 through a transaction in which Murphy represented Metal Networking LLC. Murphy was then a partner at the law firm of Pedersen & Houpt and subsequently represented me in the purchase and sale of 1266 S. Orchard Ave, Montgomery, IL. In early December 2010, at his Pedersen office, 161 N. Clark St, Chicago, Murphy asked if I had an interest in acquiring real estate short sales and defaulted notes secured by mortgages on real estate.

Later in December 2010, I formed a business venture ("Venture") with Babajan and Anthony Khoshabe, later joined by Fereidoon Khoshabe and Ibrahim Yousif. The Khoshabes had engaged in real estate transactions and operated a mortgage banking and brokerage office for 20-years. This business venture was set up whereby I would negotiate the acquisition of defaulted notes from banks and attorneys including Murphy, who represented several banks, including New Century Bank. Acquisition prices in the period were significantly below the outstanding loan balances and far below the value of the underlying properties. Through their connections and the assistance and associate with brokers Fereidoon Khoshabe,

Ibrahim Yousif and on at least one occasion, Ashoor Pithyou, the Khoshabes were able to raise capital. It was a perfectly lawful enterprise.

The procedure for the venture, based on the advice of then attorney Murphy, was that after the Khoshabes received commitments for the loans from investors, 100% of the funds were sent to attorney Murphy. All funds were made payable to Thomas Murphy as "Attorney/Agent". Murphy was to deposit the funds but segregate the amounts necessary to buy the defaulted mortgage loans with a fee of between $5,000 and $10,000, and occasionally more, per transaction, for himself and his firm. Murphy would then forward the balance of the funds to me, the Khoshabes, and brokers such as Fereidoon Khoshabe, Ibrahim Yousif and Ashoor Pithyou.

The transactions were all structured whereby the capital raised from investors was then loaned to the venture through guaranty agreements. The amounts of these loans were significantly less than the fair market value of the underlying properties. Comparative market analysis ("CMA") valuations were prepared by Devon Street Investments' employees for each prospective purchase. The amount received from investors was higher than the price I had agreed to pay for the notes and short sales, thereby providing a profit for the Khoshabes and me. This was a customary practice in the note and short sale business, and it was fully understood by investors and lenders.

The venture was per written agreement obligated through the guarantees to pay interest on the loans at a rate equivalent to the rentals collected for the subject properties, less a management fee. Also per written agreement, the principal would be repaid in cash or by delivery of the deed or note to the property. There were restrictions in the loan documents as to the ability of the venture to use the proceeds of the loans for any proper purpose. Murphy advised, originated, and drafted the guaranty agreement, sending them by facsimile or email for both me and the investors to sign (Guaranty Agreement)

There were many successful transactions with Murphy. On or about January 12, 2012, Murphy misled the venture by assuring and informing venturers and investors that he was continuing to make the required acquisition payments and pay the collected rents, but in fact, he stopped making the payments to acquire

the notes and diverted the proceeds to his own use. In reality, around October 2011, approximately the time Murphy befriended Tamera Brown, he stopped purchasing the notes and began paying interest and rental payments to the venture (for disbursement to investor/lenders) from investor funds meant for acquisition of notes, mortgages, and short sales. This was not disclosed by Murphy. The venture and investors continued to rely on Murphy's expertise and prestige in the purchase of the discounted notes and short sales. During Thanksgiving week 2012, Murphy sent the venture $571,000 of checks. These checks represented four months cash flow that he had supposedly received from interest and rentals on notes and properties he had purportedly purchased, for which he did not have sufficient funds and consequently those checks bounced. Before the venture knew that the deposits were no good, Fereidoon Khoshabe and I had remitted payments to the lenders and those checks and ACH payments bounced (although paid by Chase Bank).

I then worked out an arrangement with Chase Bank to cover the bad checks with my own funds. I used over $800,000 of my own funds to cover those checks, ACH payments and attempt to satisfy the people who lost their money. Babajan and I learned that Murphy had an affair that cost over $1,200,000 and we suspect this, together with money Murphy owed former clients, Arthur Sanial Trust, Nina Jozers, World Wide Realty, LLC and Prestige Realty Partners was the source of Murphy's frauds. Although I am accused of benefiting from missing funds, I have on numerous occasions requested that the Khoshabes help repay some of the investor/lenders with money that they had benefited by Murphy's actions. to do so. They have refused.

Subsequent to finding out about Murphy's misappropriation of funds and his deceit in hiding them, Devon Street Investments sued Murphy in Cook County Circuit Court Chancery Division in an accounting lawsuit. At the same time as filing the lawsuit in April 2013, each investor was informed of the Murphy situation. Communiques were made by me in writing and by phone. In good faith, and after consulting Attorney Richard Kruse, I said an accounting and malpractice lawsuit was the best way of recouping the investors' money even though it was a long-shot because malpractice insurance usually does not cover theft or the fraud of an attorney. In response to the lawsuits, in the fall of 2013, Murphy began filing a series of

fraudulent bankruptcy petitioner to keep the venture and its investors at bay. Murphy also spoke with me and attorney Glen Seiden about attempting to compensate ventures and investors with property and transactions he was working on closing with his short sale clients (Murphy Bankruptcy naming Devon Street Investments, Ltd. as a judgment creditor.

During 2011 and 2012, Babajan and I bought and made monthly payments to Mount Vernon Insurance Company and the Seattle Specialty Insurance Company through its broker, Evergreen Insurance Brokers of NYC. The venture insured the properties and mortgages for which I had received money from investors. I insured at substantial cost (up to $14,000 per month) what I believed to be legitimately purchased properties. Separate from the investor transactions, the lawsuits against Murphy, and the substantial insurance payments and construction work made and paid for by me on the properties, was my own investment in the notes and mortgages from Murphy. Together with co-venturers I invested approximately $355,000 purchasing discounted notes and mortgages from Murphy. Babajan and Anthony also invested similar amounts. None of the paid for mortgage notes were received from Murphy

In summary, the Khoshabes and I were in the business of acquiring real estate and discounted notes and mortgages by borrowing money from investor/lenders, individuals who I believed were familiar with this type of real estate transaction. The prices were agreed upon by all involved, including the investors, and then all the funds were deposited with attorney Murphy. Murphy, as legal counsel, was expected to close the acquisitions, pay himself and his firm a fee of at least $5,000 and often up to and in excess of $10,000 per transaction, and remit the balance of the funds to me, the Khoshabes and brokers. In all cases, the funds borrowed from investors exceeded the actual cost of the acquisitions, but the money invested or loaned by investors was substantially below the fair market value of the collateral property. The loans, and or investments, did not have any restrictions as to use of the proceeds as long as invested adn used in the normal course of the Defendant's business. After the acquisition of either the note or the property, Murphy would receive the rent or interest and then remit the cash flow to the management companies or in some cases, directly to the investor/lenders.

At Murphy's introductory request, I prepared a sound business plan in light of the prevailing real estate market, put together a venture, with hard-working employees and independent brokers researched properties and mortgage possibilities, kept binders of search results and of the transactions, regularly invested time, effort, and expenses in surveying properties, and at all times, concededly, strived to make money for investors. I did not bring the clients to Sticky. Babajan Khoshabe, Anthony Khoshabe, Fereicoon Khoshabe, Ibrahim Yousif, and Ashoor Pithyou in at least one occasion brought secured the investors and in almost all cases, Babajan instructed the investors how to make out the cashier checks, and to overnight them to the 3924 W. Devon St, Lincolnwood address. Murphy would occasionally come to the office to pick up the checks or I would bring them to his office. In most cases, Murphy told me and or Babajan how much the note would cost, then I or Babajan would tell Murphy what commissions were to be paid to me, Babajan, Anthony, Fred, Ibrahim or other brokers. However, Murphy was always in possession of the deposits for the note purchases themselves. Those were to be held in his attorney account pending his purchase of the note(s). He had total control of that portion of the money, approximately $5,044,000. The chart exhibits detail the money Murphy received, and what was held by him for purchase of notes or properties. This is my theory of the case.

## *ANALYSIS*

Among the other acts of Defendant Thomas Murphy is the one seemingly distinct *from* his routine, unilateral real estate and financial schemes. However, Murphy simply resorted to a higher plane of blame, in which Defendant Murphy, with his partner Jeffrey Deer, and the Government's accommodation, over a lengthy period during the pendency this case. It began about the time of Defendant Rossini's dismissal from the Murphy case in state court, and his agreement to testify in both the Murphy case and the Deer case (in the latter, Rossini had entered a plea. Murphy and Deer decided to cast official suspicion on Rossini and link him to the *aggravated* arson (people in the residence) at Jeffrey Deer's home Nov. $5_1$ 2015. At some

point, Murphy and Deer knew that the fire was not accidental, but an aggravated arson. Unfortunately for Defendant Murphy *et al,* Rossini had round-the-clock home monitoring because, according to the Government, it was he who was a "danger to the community."

   Additionally, federal agents were unflagging in following Rossini and his wife. For some indefinable reason, the material deficiencies in the elements of the aggravated arson claims eluded the accusers. They persisted in the fabrication through and including the Government's Motion to Call Attorney Jeffrey Deer as a witness against Rossini ( subsequently withdrawn)  Liam Ben David , loss credit from collateral pledged to investor was $275,000

  When collateral is pledged or otherwise provided by the defendant, the judge should also credit the amount the victim has recovered at the time of sentencing from disposition of the collateral. If not yet disposed, the defendant gets credit based on the fair market value. U.S.S.G. Section 2B 1.1, application note 3(E)(ii) as indicated in Loan Documents of Defendant and Ben David.    In August 2012, investor Ben David loaned Defendant $275,000 for purchase of a note and mortgage on a property at 2200 North Kedzie, Chicago. Defendant pledged three properties for this loan with a loan agreement, note and mortgage which were all recorded in the Cook County Recorder's Office. The documents were prepared by Liam Ben David's attorney. The properties are: 4045 W. Wilcox, 4033-37 W. Adams, and 5410 W. Fulton, Chicago. The value of the properties far exceed the $275,000 loan by Ben David. Defendant told Ben David's lawyer at a subsequent bankruptcy hearing that he would cooperate in turning over the properties to Mr. Ben David and would not oppose the foreclosure. Mr. Ben David's attorney did not again contact the Defendant. Therefore, Defendant Rossini should receive credit for $275,000.

## ROSSINI'S CREDITS AGAINST LOSSES

*The Total Defense Exhibit Charts Submitted And Incorporated Herein, Delineate Expenditures And Refute The Presentence Investigation  Report's Respective  Contentions  Of  Both The Government And  probation*

<u>Delineated Expenditures-see Exhibit Charts</u>

Insurance Premiums Paid

Robert Allen Management

Pallidinetti Law Office

Richard Kruse Law Office

Klytta & Klytta Law Office

Boiko & Osimani

Money Paid By Defendant To Investor

Properties Returned to Moghaddasi & Badalian

Kathy Khodi Transfers of Riverdale Properties

Craig Shaffer Transfers of Properties

Liam Ben David collateral pledged for loan

Rossini payments to Murphy for Notes

Total Rossini Credits Against Investor Losses        $4,708,227.80


## <u>CALCULATING LOSSES</u>


   Calculating loss is a very fact-specific inquiry. the government bears the burden of proving the amount of

loss. United States v. Vivit, 214 F.3d 914 (7th Cir. 2000). The government must prove the loss by a

preponderance of the evidence. United States v. Hatchett, 31 F .3d 1411, 1418 (7th Cir. 1994 ). Broad

statement such as made by FBI Forensic Accountant Prescott or Agent Connors are not fact-specific but

statements meant to embellish the amounts used in sentencing the Defendant. In calculating loss, the

Guidelines direct the court to such factors as fair market value of the property, the cost of repairs, the

approximate number of victims multiplied by average loss, and general factors such as the scope and

duration of the offense, and revenues generated by similar operations. U.S.S.G. Section 2B1 .1, application

note 3(C). This extrapolation or averaging is not relevant here, as the Defendant's accounting is specific

and detailed. The Court is also directed to consider the reduction that resulted from the offense in the value of equity securities or other corporate assets. U.S.S.G. Section 2B1 .1, application note 3(C)(v).

### Rossini's Motion To Strike Government's Allegations Of Relevant Conduct Concerning Doris Kling And Nina Jozers Is Analogously Applicable To Other Co Defendants Regarding Relevant Conduct

The government's use of alleged information involving Doris Kling and Nina Jozers/Alamprese concerning the Defendant is not relevant conduct for purposes of Defendant's sentencing based upon (i) the facts and (ii) Seventh Circuit decisions.

*History of Defendant's Interactions with Kling and Jozers*

Doris Kling hired the Defendant to attempt and save her ex-husband's house within which she and her children continued living after her divorce. Mrs. Kling deposited $60,000 earnest money with Defendant who promptly gave it to attorney Thomas W. Murphy for placement in escrow. When Defendant, after almost a year of negotiations was unable to purchase the residence at short-sale prices, attorney Murphy returned the entire deposit of $60,000 to Mrs. Kling. She subsequently sued the Defendant for additional sums that she believed Defendant was responsible for such as living costs, new apartment or residence rental and emotional distress. Cotemporaneous with the Defendant's short sale negotiations for Mr. Kling's house, Mrs. Kling worked at Defendant's office at 3924 W. Devon St, Lincolnwood, IL as a short-sale negotiator and property finder.

The Cook County law suit against Defendant by Mrs. Kling was strictly a civil matter and filed after Mrs. Kling left her employment as a short sale negotiator. The fact remains that Mrs. Kling was repaid her entire escrow deposit of $60,000. She was not the victim of a crime by either attorney Murphy or the Defendant. If held to be the victim of Defendant then any civil lawsuit amount owed by in a civil case would qualify as relevant conduct. In fact, the United States Bankruptcy Court and Code would become irrelevant. Similarly, the Jozers/Alamprese case does not qualify as relevant conduct as it pertains to the Defendant.

The Attorney Registration and Disciplinary Commission Report is probative of this issue. Murphy and Defendant were codefendants in a Cook County criminal case instituted September 2013 for the theft of Mrs. Nina Jozers' funds. Mrs. Jozers daughter, Benita Alamprese, deposited approximately $353,000 to be used in the purchase of an office building at 300 Martingale, Schaumburg, Illinois by Defendant and Mr. Frank Alamprese, Mrs. Jozers son-in-law. The money was deposited by Mrs. Alamprese directly by her into the account of Thomas Murphy.

All interaction concerning the funds were between Mrs. Alamprese and attorney Murphy. Defendant believed that Mrs. Alamprese had deposited $300,000 to attorney Murphy's account until Defendant was informed by both Mr. Alamprese and confirmed by Murphy that attorney Murphy had borrowed an additional $53,000 from Mrs. Alamprese and her mother, Mrs. Jozers. Prior to the deposit of any money to attorney Murphy's account by Mrs. Alamprese on behalf of her mother, Defendant and Mr. Alamprese executed a letter for the use and repayment of $75,000 in moneys to be used in securing the Martingale building by Defendant. This amount was later increased by verbal agreement between Defendant and Mr. Alamprese up to $125,000. Defendant was to repay Mr. Alamprese/Nina Jozers this sum should Rossini/Alamprese be unable to consummate the building purchase. Defendant and Mr. Alamprese were unable to purchase the building as the Seller's existing mortgage with Goldman Sachs carried a "due on sales" clause. (A vital aspect of the purchase was to be Rossini/Alamprese assuming the Seller's mortgage).

Defendant repaid Mrs. Jozers the sum of $130,000. The conversion of the remaining Jozers' money on deposit with Mr. Murphy led to attorney Murphy's 2014 disbarment. In testimony before the ARDC, attorney Murphy blamed the Defendant, stating that he had been directed in the disbursements by the Defendant. The Commission found that Murphy's testimony was not believable. The ARDC findings were that Murphy had continuously over a 20-year period converted various client moneys to pay for previously pilfered client funds. In essence, an in-client Ponzi scheme. Defendant Rossini was dismissed from the Illinois State criminal charge while Murphy remained a defendant in the state of Illinois case.

*Relevant Conduct Analysis*

17

The Kling and Alamprese/Jozers matters are not relevant conduct for purposes of Defendant Rossini's sentencing. The Seventh Circuit has explained this in several decisions.

(i) In United States v. Ortiz, 431 F.3d 1035 (7th Cir. 2005), the defendant pled guilty to selling drugs to a government informant.

   The District Court added to relevant conduct drugs the defendant purchased ten months earlier from another drug dealer. The Seventh Circuit reversed, stressing among other things, the lack of temporal proximity, and noting that without temporal proximity there had to be a stronger showing on other factors, such as course of conduct, regularity and similarity. The mere fact that a drug defendant participated in other drug activities is not sufficient in and of itself to qualify the transactions as relevant conduct. Ortiz, 431 F.3d at 1040-41.

(ii) In United States v. Coffman, 94 F.3d 330 (7th Cir. 1996), the defendant was convicted of defrauding Smith Barney in a scheme that included a pledge of worthless stock. The fact that two years earlier, the defendant had bilked some purchasers using the same worthless stock did not make that earlier scheme relevant conduct: "[t]here was no more a common scheme, or the same course of conduct, than if the [defendant]had used the same gun to hold up two different people two years apart." Coffman, 94 F.3d at 337.

(iii) In United States v. Purham, 754 F.3d 441 (7th Cir. 2014), the court reversed the district court's finding of relevant conduct. Defendant was incarcerated for drug distribution activity in 2008, which he resumed when he was released in 2010. The district court included the 2008 drug activity as part of his relevant conduct. The court held first that the 2008 conduct was not part of the 2010 conduct because it lacked the strong relationship needed to show significant similarity, regularity and temporal proximity. Id., 754 F.3d at 414. The 2008 transactions involved much larger quantities of cocaine, and a stronger showing than usual of regularity and similarity was necessary with a temporal gap like this. The court rejected the government's offer that the schemes were part of a common plan because it involved different people. Id. 754 F.3d at 414.

Defendant Albert Rossini requests this Honorable Court strike and/or dismiss the government's allegations of relevant conduct  not only as to Doris Kling and Nina Jozers/Alamprese, but other co-defendants as well, as the arguments are analogous and applicable to other codefendants. Payments to investors as per guaranty agreements; Property transfers to investors and the value thereof; Renovation costs of properties transferred to investors; Evidence of Rossini's mortgage note investments; Evidence of Rossini's property purchases;  Insurance premium payments made by Rossini on properties; Rossini's payment for investors covering Murphy's $571,000 NSF checks to Devon Street Management for investors in November 2011;

II

The Presentence Investigation Report Is A Flawed Regurgitated Evolution Of The Government's Version Of The Offense, Disproportionately Misrepresentative Of Rossini's Conduct, In That It Neither Reflects The Criminal Fraudulent Conduct Perpetrated And Executed By Disbarred Attorney Murphy Et Al; Nor Establishes A Reasonable Sufficient Attributable Nexus To Hold Rossini Culpable For Speculative Losses

Accordingly, Rossini will delineate and address the flawed issues of contention seriatum:

2A.    *Presentence Investigation Report Analysis*

The following information is extracted from the Presentence Investigation Report.

*The Offense Conduct*

PSR 37.At trial, co-defendant Thomas Murphy, who pled guilty and testified,.. detailing the fraudulent nature of the Devon Street scheme. Murphy explained that in 2011 he was an attorney who performed several services for the defendant in connection with his investment program, including incorporating business entities, drafting documents the defendant could give investors, and receiving and dispersing the investors' funds at the defendant's direction. In particular, Murphy testified that he drafted the template " Guaranty Agreement" the defendant used with the investors, which incorporated specific language requested by the defendant, including the representation that the defendant had written assignments of the right to acquire the mortgage notes. Murphy also testified that each time an investor gave the defendant a check, the defendant gave it to Murphy to be deposited into Murphy's personal checking account and dispersed back to the defendant and his cohorts according to the defendant's specific instructions. Murphy further testified that the defendant filed a lawsuit against Murphy in 2013 containing false allegations about the investors' funds and then told Murphy the lawsuit was a sham designed to placate the investors, who had been complaining. Murphy also testified that, after the defendant filed the sham lawsuit against Murphy, the defendant surreptitiously worked with Murphy to receive and disperse over $800,000 in additional funds from investor Kathy Khodi.

PSR 38      On June 14, 2012, Defendant Rossini, Babajan Khoshabe, Anthony Khoshabe and Thomas W. Murphy, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email sent by Defendant Rossini in Illinois to Victim NM in Arizona, in violation of 18 U.S.C. U 343.

Counts 2 - 14

Loss /Gain

PSR 40 The jury received bank and currency exchange records and heard testimony from FBI forensic accountant Sandra Prescott, who performed a comprehensive financial analysis of this evidence. It is the government's position that the financial evidence revealed that, in total, investors gave Defendant Rossini more than $7 million. Although investors received back approximately $2.5 million in "rent" payments, there was no rental income coming into any of the relevant accounts, and all of the money paid to investors was actually just their own funds being paid back to them.

PSR 41At the same time that the investors lost approximately $5 million, Defendant Rossini made at least $2.55 million, of which he negotiated approximately $2 million at currency exchanges. Babajan and Anthony Khoshabe made approximately $1.26 million from the scheme, while Murphy netted approximately $166,000.

These contentions have been refuted by the submission of Rossini herein.

Offense Level Computation

PSR 57. The 2018 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG {IBI 11. Defendant Rossini was convicted of 14 counts charging him with violations of 18 U.S.C. y 341 and 1343. All 14 counts are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, the offense behavior was ongoing or continuous in nature, and the offense guideline is written to cover such behavior. USSG S3D1.2(d). However, the government neither proved or established that the criminal fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was within the reasonable scope of Rossini's conspiratorial foreseeability. The government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative

and conjectural losses. Absent establishing and proving the predicate aforementioned, the imposition of any government initiated sentencing guideline, relevant conduct and enhancement application is not supportable.

<u>Count Group 1</u>: Wire Fraud

PSR 58 Base Offense Level: The guideline for violation of 18 U.S.C. {1341 and 1343 is USSG {2B 1.1. Due to the statutory maximum terms of 20 years for violation of 18 U.S.C. 51343 (Counts 1, 2, 3, 6, 8, 9, 10, I l, 12, 13, and 14), the base offense level is 7. USSG 2B1.1 (a)(1)


PSR 59 Specific Offense Characteristics: Under USSG 2B 1.1 (b), the defendant's offense level must be increased by the applicable amount of loss. Subject to the exclusions in subdivision (D) (Exclusions from Loss), the guidelines define loss as the greater of the actual loss or intended loss. The Court need only make a reasonable estimate of the loss. Herein, Rossini has submitted charts and analysis making a reasonable estimate of the significantly lower calculated loss amount. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the Court's loss determination is entitled to appropriate deference. See 18 U.S.C. §3742(e) and (f). USSG VB l . l, comment. (n. (3)(C)). The estimate of the loss shall be based on available information. USSG 52B l . 1, comment. (n. 3(C)). Herein the Rossini submissions demonstrate that the criminal fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was not within the reasonable scope of Rossini's conspiratorial foreseeability, and therefore the exorbitant loss is not attributable to Rossini beyond his reasonable scope. The government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative and conjectural losses. Absent establishing and proving the predicate aforementioned, the imposition of any government initiated sentencing guideline, relevant conduct and

enhancement application is not supportable. Rossini has demonstrably proven the loss is substantially lower.

Herein Rossini has submitted sufficient refutation of the purported loss and demonstrated sufficient exclusions relative to subdivision D.

*PSR 60.*   Furthermore, it is Rossini's position that the offense level should not be increased by 18 levels, because the instant scheme did not cause an actual loss either established or proven to be attributable or within the reasonable foreseeable scope of Rossini to victim investors of approximately $5 million, which is more than $3,500,000 but less than $9,500,000. USSG 2B 1.1 The defense exhibit charts, analysis and recitations of Rossini refute an 18 level increase. Again, the criminal fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was not within the reasonable scope of Rossini's conspiratorial foreseeability. The government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative and conjectural losses, warranting an 18 level enhancement. Absent establishing and proving the predicate aforementioned, the imposition of any 18 level sentencing guideline, relevant conduct or enhancement application is not supportable.

PSR 62     Specific Offense Characteristics: It is Rossini's position that the offense level should not be increased by four levels pursuant to 2B I. 1 (b)(2)(B), because the government neither established or proved, nor did the jury find that at least seven victims -- six Devon Street investors and Doris Kling (See PART B. Other Criminal Conduct) suffered substantial financial hardship based on Rossini's reasonable scope.. The government alternatively argues that, absent five or more substantial hardship victims, the offense level should be increased by two levels pursuant to USSG 2B1. (b)(2)(A)(i), because the offense involved ten or more victims. Neither is applicable.  Once again, the criminal fraudulent conduct perpetrated and executed by disbarred attorney Thomas Murphy et al, was not

within the reasonable scope of Rossini's conspiratorial foreseeability to provide notice of five or more victims. Investors assume the risk associated with high stake ventures. Just because an investor loses money, does not make or render the unfortunate investor a victim. Nor does the loss transmute the imputation of perpetrator status to Rossini or either actual, constructive, or inquiry notice. The government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for alleged inherent financially speculative and conjectural losses. Absent establishing and proving the predicate aforementioned, the imposition of any government initiated sentencing guideline, relevant conduct and enhancement application is not supportable.

PSR 63    It is the probation office's assessment l) that the Doris Kling fraud does not constitute relevant conduct, thereby negating the operation of USSG 2B l . I (b)(2)(B), and 2) that the preponderance of the evidence demonstrates that the instant offense involved ten or more victims (i.e., Victims Nastors Moshi, Albert Khamis, Kathy Khodi, Awiquam Pithyou, Ashoor Pithyou, Marna Pithyou, Ibrahim Yousef, Janet Khoshaba, Robert Badalian, Vladamir Moghaddasi, St. Odisho's Church). Accordingly, the offense level should not be increased by two level, as the government has also failed to established a reasonable specific sufficient attributable nexus to hold Rossini culpable for Murphy's expertise and sophistication as a lawyer, in executing and perpetrating inherent financially speculative and conjectural losses. Absent establishing and proving the predicate aforementioned, the imposition of any government initiated sentencing guideline, relevant conduct and enhancement application is not supportable.   USS2B 1.1(b)(2)(A)(i).

PSR 64   Specific Offense Characteristics: USSG {2B 1.1 requires that the offense level be increased by two levels if the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means and that the offense level be increased to 12 if the resulting offense level is less than 12.

USSG 52B 1.1  For purposes of subsection, "sophisticated means"especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a tele-marketing scheme, locating the main office of the scheme in one Jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means. Accordingly, the offense level should not be increased  as the government has also failed to  established a reasonable specific sufficient attributable nexus to hold Rossini culpable for Murphy's expertise and sophistication  in orchestrating an formulating entities to perpetrate the fraud, as a lawyer executing and perpetrating inherent financially speculative and conjectural losses, .utilizing the "Guaranty Agreement," the "fact sheets," the laundering of investor rent checks. For these reasons, it is 'Rossini's position that the instant offense conduct constituted sophisticated means that it was: l) sufficiently complex or intricate pertaining to the execution and concealment of the instant scheme by Murphy.=

i)  Defendant Rossini and his co-defendants targeted victims from the Assyrian community, knowing that they were vulnerable to trust Rossini and codefendant Babajan Khoshabe, because Khoshabe was also an Assyrian immigrant. United States v. Grimes 173 F.3d 634, 638 (7th Cir. 1999) (citing United States v. Bengali, 1 1 F.3d 1207, 1212 (4th Cir. 1993) (recent immigrant from Eastern Europe, afraid to call the police). Rossini is not Assyrian and shared no culture or national background  resulting in a position of trust and or exploitive purposes, Accordingly, the offense level should not be increased.

ii)  The age of the victims. Nastors Moshi, for example, was 65 years old when Defendant Rossini defrauded him. The government notes that Awiquam Pithyou and Albert Khamis

were also both elderly at the time they were solicited to invest but does not provide their specific ages.

iii) The victims lacked sophistication. For example, Janet Khoshaba had little formal education and was not a sophisticated investor. The same is true of Reverend Awiquam Pithyou, who testified at both trials and was vulnerable not only because of his trust in Babajan, who was a fellow Assyrian immigrant, but also because of lack of sophistication. See United States v. Parolin, 239 F.3d 922, 927 (7th Cir. 2001) ("The 'vulnerable victim' sentencing enhancement is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal.")

PSR 70. Respectfully, it is the probation office's assessment that the government has not demonstrated by a preponderance of the evidence that this enhancement is applicable. Specifically, it is the probation office's assessment that, while some of the victims' ages and shared membership in an ethno-religious community may have made them more trusting of co-defendant Babajan Khoshabe and/or otherwise susceptible to the instant criminal conduct, the government has not demonstrated with specificity that these categories made the victims unusually susceptible on an individual basis. While the elderly victims in question were all presumably older than Nastors Moshi 's age of 65, there is no evidence that their age alone made them more susceptible. Therefore, two levels are not added. USSG 3AI. 1( b) (1) Rossini concurs in this application and believes these desperate  governmental attempts to link him via enhancements is emblematic of overreaching with regard to Rossini conduct.


ROSSINI RESPONSIVE  REFUTATION OF THE ABOVE  DELINEATED   RESPECTIVE POSITIONS OF THE GOVERNMENT  AND PROBATION RELATIVE  GUIDELINES  RELEVANT CONDUCT,  ENHANCEMENTS  AND LOSS  CALCULATION  APPLICATION


78 - 84 LEADER ORGANIZER ENHANCEMENT

Defendant objects to this enhancement as he did not enlist Thomas Murphy and Francisco Cisneros was a maintenance and handyman having no part enlisting investors or speaking to investors.

In support of his objection, Rossini states as follows.

There are four defendants charged in this case: Rossini, then-attorney Thomas W. Murphy ("Murphy"), Babajan Khoshabe ("Babajan") and Anthony Khoshabe ("Anthony"). Anthony should be discounted as an unwitting, unknowing, minor participant, if a participant at all in the criminal sense. Babajan proved to be an unreasonably greedy, to the point of Crassus-like avariciousness, but certainly not criminally liable, unless his hunger to grab and keep every dollar is criminal. This leaves Defendant and then attorney Murphy.

This information was composed through a previous search of Murphy documents -- many of which were in the government's possession as a result of past and present investigations and court matters. As Defendant is in detention, under constant lockdowns both because of the COVID crisis and due to a shortage of correctional officers, the process of collating the materials for the Court has been concededly protracted and incomplete.

The government's case is that Defendant Rossini concocted the scheme to defraud investors supplied by Babajan and used, directed and ordered then-attorney Murphy, a partner in five major law firms during a 30-year legal career, in the commission of this fraud. As the record aptly reflects, Murphy's career has been littered with similar schemes, conversions, mendacity, accusations and financial casuistry. No "googling" would have discovered this, since Murphy "scrubbed" his profile assiduously. The government and PSR has chosen to ignore Murphy's background and then willfully failed to disclose his well-established patterns to Defendant, the jury and the Court. To determine where leadership lies, Defendant presents this background to show Murphy's mode-of-operation.

(a). Murphy's propensity to blame Rossini for Murphy's fraud, deceit, and dishonesty: on page 38-39 of the ARDC Synopsis of Findings July 2013, Murphy discussed doing business with Rossini: "[a]fter he Murphy] began working on the [Martingale] transaction but before April 9, 2010, he [Murphy] became

aware that Rossini had been convicted of a financial crime and had spent time in jail but was not aware of the exact circumstances of Rossini's conviction. After discovering Rossini's criminal history, he [Murphy] continued to represent Rossini because his closings were being completed without problems. At a sworn statement on April 22, 2010, Murphy] stated he understood doing business with a person such as Rossini is not only dangerous but foolish and he would be very careful about getting involved in a transaction."

On page 13 of the July 2013 ARDC finding, Murphy testified that he stopped acting as Ray Mobile and M2 Industries' lawyer in 2004. This was purposefully deceptive. At Murphy's prior ARDC case, while he was at Johnson & Bell, which involved young attorney he was training, Richard Perna, as well as attorney Jeffrey Deer, Ray Mobile testified on Murphy's behalf. Furthermore, Ray Mobile's M2 Industries had been insolvent and ceased operations in favor of a successor limited liability company, Metal Networking, LLC, that Murphy set up for Ray Mobile.

Rossini met Murphy in late October or early November 2007, just as he was leaving federal halfway house, after completing a 48-month sentence for a fraud crime. Rossini arranged financing for the purchase of 1266 S. Orchard Avenue, Montgomery, IL, a 9-acre property with a 78,000 square-foot manufacturing building for Mobile's Metal Networking, LLC. Defendant Rossini informed Murphy of his sentence and Murphy assured him it was not a problem. He said he was a partner in Prestige Partners Realty Group, LLC in Glenview, Illinois (see Murphy 2013 and 2014 Bankruptcy Petitions) with Harry Gio, a felon convicted of insurance fraud. Murphy stated his law firm gave Gia respectability, business and banking connections together with the proper legal advice to keep him -- and presumably Rossini -- from further crimes.

Prestige Partners Realty Group and Murphy's prior Ponzi Contrast Rossini's prior convictions, Babajan's one prior conviction for mortgage fraud, involving one mortgage, the current Ponzi scheme and Thomas Murphy's history, especially with Prestige Partners Realty Group, an entity Murphy operated between 2002 to 2007/08. This involved between $22 to $44 million in losses (per Murphy's testimony in his Rule 2004 Bankruptcy deposition in June 2014 before AUSA Jeffrey Snell representing's U.S.. Trustee).

How selective can the government be in ignoring Prestige Partners large-scale mortgage fraud Ponzi scheme investigated indifferently and shifting its prosecution and blame, as per Murphy's habit, to Defendant Rossini and the Khoshabes.  In 2013 or 2014, Murphy told Defendant that the government was investigating Murphy's partner in Prestige, the one conveniently with a criminal background, Harry Gia, for mortgage fraud, but that neither Murphy nor Pedersen·& Houpt -- where he was a partner in those years -- were under scrutiny. (Murphy's operation of Prestige is in the Bankruptcy Petition deposition, Murphy's 2014 financial disclosure forms, the World Wide Realty LLC's Motion to Dismiss Murphy's bankruptcy [World Wide Realty is included below as one of Murphy's "hard-money" financiers], Defendant's Motion to Admit and Motion to Take Judicial Notice).

Murphy testified in 2014 under oath before government attorney Jeffrey Snell, that Prestige was a defunct business that dealt in buying and selling properties to convert to condominiums that were sold to buyers for substantially more than the cost or value of those properties. This and the following information is parsed from Murphy-bankruptcies, numerous civil cases involving Murphy basically in Cook County Circuit Court.   Sales were financed with mortgages based on property values that were inflated by Murphy. Buyers defaulted on the loans and the mortgages were foreclosed, but by which time Murphy had got his profits from the deals made by selling the properties at inflated prices.

The higher the property value, the higher the loans; the higher the higher the sales price, the larger the-profit. In order to obtain loans for the highest possible property value, and reap the highest possible profits, Murphy misrepresented to lenders; about true buyers, the source of down payments, the value of the properties, the income and employment of the buyers, whether buyers could or would occupy the properties, and whether properties owned by the buyers were being leased.   Murphy lied about the true owners of the properties to disguise the fact that Prestige was behind the transactions and was actually selling the properties to himself, Gia, and Prestige. Unbeknown to lenders, Murphy found people with good credit scores to serve as straw buyers. He had some of them purchase several properties from him, using loans from different lenders, all of which were obtained within a short period of time so that each successive lender would not find out about the other loans to that borrower.

29

Once multiple loans or mortgages showed up on the buyer's credit report -- which typically took a few weeks -- it became difficult for that buyer to qualify for new loans. At that point, the buyer's usefulness to Murphy was at an end and he would recruit a new buyer in the course of running this business. Murphy lied about the source of the down payments to cover up that he supplied -- or Prestige did-- most or all the money to the straw buyers. Lenders want to know that money from a down payment actually comes from the buyer because a buyer who has a substantial stake in the property is considered a better credit risk. Murphy circumvented that safeguard in a variety of ways. He would give a borrower money to park in a bank account long enough for the lender to verify the money's presence and then Murphy would take it back. Murphy falsified HUD-1 settlement statements that were signed at closing to show "cash from buyer/borrowers," though the money came from Murphy, Prestige or an associate. He altered checks from bank accounts of straw buyers or altered straw buyer's bank account statements. With most or all of the loans, the borrowers signed documents at closing falsely representing that they were supplying the down payments.

The government investigating Gia at Prestige's Glenview office in 2013 would have seen the expansive wooden table in use as an assembly of paperwork, cutting and pasting and signing. (The information presented in this letter was corroborated to Rossini by Mr. Gia). Only Murphy's inflated property values could circumvent lenders' loan-to-value requirements and increase the selling price. For example, a bank could make a loan for $200,000 under the assumption that it was lending 80% on a property worth $250,000 when in reality the bank was lending 133% on a property worth only $150,000. Murphy needed the cooperation of appraisers for which he paid.

Murphy lied about a straw buyer's income on loan applications in order to qualify buyers for loans of the size they were seeking. Those lies in turn required lies about the buyers' income. As part of the lies, some borrowers got "promoted" on their loan applications. Murphy associates would generate fake W2's and pay stubs, or they would answer phone calls posing as borrowers' employers. The particulars of Murphy mortgage and loan practices, for which he was serially sued, are in routine usage in mortgage fraud indictments brought by the government, but not in the case of Prestige or then-attorney Murphy.

Murphy lied about the intended use of the properties in order to get better loan terms and interest rates available for "owner occupied" properties. Lenders operate on the assumption that a borrower will be more motivated to make payments on his own home than on an investment property, which is why investment loans require a higher interest rate and larger down payment.

Murphy lied about whether residences that buyers already owned occupied would be leased in order to cover-up that the new properties would not be used as residences. And the straw buyers who did disclose to lenders that they were buying properties for investment needed to show that the properties would produce enough rental income to cover the mortgage payments. Murphy met this need by generating fake lease contracts with nonexistent tenants (American Chartered Bank and New Century Bank Lawsuits), or by inflating the income generated by properties that were actually rented. Murphy's scheme needed many straw buyers. He recruited. He and partner did so by pitching the model to people known through his family contacts, the Illinois Department of Transportation, Cook County Streets and Sanitation, Chicago Police and Chicago Firemen.

The business model involved buying distressed apartment buildings mostly on Chicago's south side at a discount, renovating and furnishing them renting them on lucrative short term leases and later, selling them for a profit. Murphy told "investors" -- the straw buyers -- that they would not have to put up their own money into the deal -- just to sign their name and have good credit. Murphy assured them that he, his partner, and associates would guaranty payment of the mortgages, taxes, insurance, association fees, and all other expenses, and that he would maintain the properties, lease and collect rents, and then payout to the straw buyers any excess rental income. After straw buyers purchased the properties, they would sign quitclaim deeds, conveying the properties to Prestige in consideration for the guaranty and payments. These quitclaim deeds were concealed from the lenders and not recorded until Murphy was ready to resell. Murphy also obtained second mortgages or used the properties as cross-collateral for other larger loans.

The success of Murphy's Prestige scheme from 2002 - 2007/08 depended on these factors:

1. Purchasing apartment buildings at significant discount;

2.Obtaining short-term "hard money" loans to purchase and renovate the apartment buildings so the units could be sold as condos;

3.Finding straw buyers willing to place their own credit up for Prestige;

4."Selling" the condos to straw buyers at a high enough price to pay the hard money loan, pay the straw buyers a premium at closing for their signature, and continue to pay older mortgages with this new money. By November 2007, (approximately the time Defendant first met Murphy), the national mortgage market was collapsing. Most subprime or substandard mortgage banks collapsed and it became difficult to get a mortgage approved for straw buyers. Although buyers were required to have-good credit scores, most lacked the assets to make down payments on properties. Most had difficulties making payments on a loan other than their existing residences, let alone the multiple mortgages that were taken out in their names. In return for their part in the Murphy Prestige scheme, Mr. ~io told Rossini that straw buyers were paid between $5,000 to $10,000 for each loan transaction and guaranteed them against future transaction losses.

  Those lured in as straw buyers by Murphy were not the only ones injured. The neighborhoods where the properties were located suffered from depressed housing values because of the foreclosures that always followed the purchase. Once again, the Prestige/Murphy operation shows the government's unwillingness to disclose information where it refutes their false narrative of Defendant Rossini concocting them and directing Murphy in how and when to commit the fraud. Defendant did not meet Murphy until late October or early November 2007. Murphy operated Prestige from 2002 - 2007/08. Prestige is relevant because it shows definitively Murphy's scheming, sophistication, and habitual pattern of paying old investors and bank loans with money from new investors and bank loans.

  Prestige was a minimum $22 million and possibly as much as $44-million fraud loss to banks and investors (per Murphy testimony at the 2014 Bankruptcy deposition before AUSA Jeffrey Snell- Murphy stated he lost $22 million with Prestige); every one of the mortgages went into foreclosure. Neither Defendant nor the Khoshabes were involved, especially since they did not know Murphy at the time.

32

Instead, the government and PSR has engaged proactively in willful ignorance in order that charges and now enhancements lay against the Defendant. The government and PSR are using Rossini's prior convictions as proof that Thomas W. Murphy was led,- as a sacrificial lamb, luring investors to a Ponzi scheme. However, as Oliver Wendell Holmes, Jr. stated "even a dog knows the difference between being stumbled over or being kicked." Common Law, No.2, 1888. Murphy used the same Prestige concept in planning the 2011-2013 scheme that Rossini and the Khoshabes are ensnared.

n) 79 - 84 LEADERSHIP - AGGRAVATING ROLE

In United States v. Guyton, 36 F.3d 655 (7th Cir. 1994), the court stated that to qualify as a leader or organizer under U.S.S.G. §3B1.l(a), the defendant must have some control, direct or indirect; over at least four other participants in the offense. Guyton, 36 F.3d at 662. The Guidelines were since amended, so that now all that is required is that the defendant provide leadership and organization for a criminal enterprise comprised of five or more persons and actually control one or more of the participants. United States v. Zuno, 731 F.3d 718, 723 (7th Cir. 2013). Yet, there still must be five participants in the scheme.

A "participant" is someone actually involved in the criminal activity; it cannot be an unknowing outsider. See, e.g., Zuno, 731 F.3d at 723 (a participant is someone who could have been charged, even if only as an accessory but mere knowledge is insufficient); yet a participant even if-not charged must still be criminally responsible, meaning the participant could have been charged. See United States v. Pabey, 664 F.3d 1084, 1097 (7th Cir. 2011).

The government interjects handyman Francisco Cisneros as a participant-t-~attempt to-reach a threshold number; however, even understanding the "ham sandwich" idea of indictment, Cisneros could not have been held criminally responsible for handyman, maintenance and renovation work. The government must set forth exactly what criminal acts Cisneros committed on behalf of the "scheme, ' and why he was not indicted for those supposed criminal acts. Just naming people who worked at DSI as participants, witting or unwitting is not enough to climb to the level of participant based on Guyton, Zuno and Pabey.

Defendant has adequately shown what the supposed $2,550, 000 was spent on relative to alleged victims and the business of DSI, engaged in contemplated high risk ventures.

CHART II

2011 2012 2013 PAYEE/PAID TO

| Seiden Law | ALL on this page by ROSSINI | 1,411.99 |
|---|---|---|
| Klytta & Klytta Law | | 20,000.00 |
| Boiko & Osimani Law | | 25,000.00 |
| Deer Stone & Maya | | 32,500.00 |
| Circuit Court bond | | 30,000.00 |
| Circuit Court forfeiture | | 98,500.00 |
| Jozers Settlement | | 130,000.00 |
| Dental--Marinic, Bery, Hagen | | 62,306.75 |
| U/Col--Tuition | | 85,000.00 |
| U/Col-Rm.Board | | 29,950.00 |
| U/Chicago--Tuition | | 12,000.00 |
| Bad debt-Thomas Murphy | | 446,000.00 |
| 928 Elm rent | | 50,800.00 |
| 928 Elm cable, utilities | | 4,404.00 |
| Telephones | | 12,000.00 |
| 2012 Auto payments | | 5,532.00 |
| 2012 Auto purchases | | 20,000.00 |
| 2012 Travel | | 26,500.00 |
| NY Life Premiums | | 5,322.00 |
| Health Alliance/Blue Cross | | 6,700.00 |
| Brook Furniture Rental | | 7,431.60 |
| Autumn Green Assisted Living | | 30,000.00 |
| Books and subscriptions | | 3,738.27 |
| Contributions (synagogue) | | 1,455.00 |
| Optique contacts, eyeglasses | | 265.85 |
| Pharmacy payments | | 1,163.66 |
| Storage rental for 3924 Devon | | 6,700.00 |
| **TOTAL SUM** | | 1,213,100.40 |

PAYOR

AMOUNT

CHART II

2011 2012 2013 PAYEE/PAID TO

| Office supplies | All on this page are Devon | 8,791.00 |
|---|---|---|
| Rent 3 924 Devon (2011) | | 21,600.00 |
| Rent 3924 Devon (2012) | | 71,932.61 |
| Rent 3924 Devon (2013) | | 22,000.00 |
| Seminars | | 3,200.44 |
| Insurance Premiums (Seattle,AFC) | | 103,760.73 |
| Fed.Ex; Overnight postal | | 1,071.59 |
| EFax | | 717.20 |
| Dreamtown Realty | | 2,500.00 |
| ICG Properties (Option) | | 8,000.00 |
| ICG Properties (Option) | | 5,000.00 |
| Stephanie Andre (Option) | | 2,000.00 |
| Compaq Bank (Option) | | 3,400.00 |
| Robert Allen Mgmt. | | 4,400.00 |
| Walid Aiyesh (Refund) | | 100,000.00 |
| Palidinetti Law | | 20,000.00 |
| Gurindijet Purewal (Consult) | | 20,000.00 |
| Richard Kruse, attorney | | 5,000.00 |
| Furniture Doc/Bill Parsons | | 10,200.00 |
| Andre Paca Real Estate | | 15,000.99 |
| Clavelle Benjamin Security | | 25,000.00 |
| Ashoor Pithyou--Commissions | | 10,000.00 |
| **TOTALSUM** | | 503,172.59 |

PAYOR

AMOUNT

CHART II Page

201120122013 INVESTOR/LENDER PAYMENTS

PAYEE/PAID TO

| Ben David and Levanon | All on this page are Devon | 23,292.66 |
|---|---|---|
| Anthony and Babajan Khoshabe | | 41,375.00 |
| Robert Badalian | | 241,205.45 |
| Haim Gabi | | 21,325.00 |
| John Khoshaba | | 27,507.50 |
| Havanna Moshi | | 23,438.00 |
| Fidel Moshi | | 19,902.50 |
| Valentina Moshi | | 23,600.00 |
| Assyrian Evangelical | | 65,402.50 |
| Kathy Khodi | | 134,198.06 |
| Khodi Family Trust | | 34,237.60 |
| Janet Khoshaba | | 25,690.00 |
| Henry Hormozian | | 25,617.29 |
| Aniquam Pithyou | | 212,093.56 |
| Nastori Moshi | | 79,873.45 |
| Benua Laar | | 34,200.00 |
| Gus Baltramis and Ilias Bolos | | 25,980.00 |
| Albert Khamis | | 28,082.76 |
| Vladimir Moghaddasi | | 172,759.42 |
| Fereidoon Khoshabi | | 256,804.03 |
| St. Odisho | | 36,187.50 |
| Punjab Investments | | 41,000.00 |
| Katayoun Kazemi | | 5,000.00 |
| Ibrahim and Daniel Yousif | | 109,000.00 |
| Jerry Lewin | | 40,000.00 |
| KMI Enterprises | | 105,000.00 |
| Craig Shaffer | | 366,628.00 |
| Raymond Babaoghli | | 35,000.00 |
| **TOTALSUM** | | 2,253,595.1 |

PAYOR

AMOUNT

2011 2012 2013 PAYEE/PAID TO

CHART II

PAYOR

| Meir Rotstein | All on this page are Devon | 81,200.00 |
|---|---|---|
| Lisa Rosen | | 159,000.00 |
| Pamela Sauer | | 57,000.00 |
| Francisco Cisneros | | 52,000.00 |
| Mireya Ceopeda | | 25,800.00 |
| Daniel Ramirez | | 15,600.00 |
| Nubia Rendak | | 7,800.00 |
| Mikhail Rotstein | | 7,800.00 |
| Cortez Rhodes (Trucking) | | 22,000.00 |
| Aida Roldan | | 28,100.00 |
| Cecily Guidry | | 15,000.00 |
| Avi Gabi | | 5,600.00 |
| Danielle Gabi | | 2,500.00 |
| Nehama Morton | | 2,500.00 |
| Alan Peres | | 1,000.00 |
| James Dixon | | 3,600.00 |
| Richard Espe | | 12,500.00 |
| Casey Czarnecki | | 3,600.00 |
| Bernard Ellis Consulting | | 20,000.00 |
| Guy and Josh Stein | | 18,500.00 |
| Alexis Adame | | 5,000.00 |
| Julie Rittenberg | | 5,000.00 |
| **TOTALSUM** | | 558,900.00 |
| | | |

AMOUNT

CHART II

2011 2012 2013 PROPERTIES PURCHASED

ADDRESS

| | | |
|---|---|---|
| 3 820 W. Adams | Devon | 37,500.00 |
| 3327 W. Monroe | Devon | 45,000.00 |
| 403 7 W. Adams | Devon | 45,000.00 |
| 5410 W. Fulton | Devon | 69,000.00 |
| 4520 W. Jackson | Devon | 55,000.00 |
| 4126 W. Adams | Devon | 42,500.00 |
| 211 N. Kilbourn | Devon | 18,000.00 |
| 4129 W. Adams | Devon | 37,000.00 |
| 4139 W. Adams | Devon | 37,500.00 |
| *843S* S. Burleigh | Devon | 16,900.00 |
| 4321 S. Marshfield | Rossini | 18,900.00 |
| 4457 S. Princeton | Devon | 55,000.00 |
| 4045 W. Wilcox | Rossini | 45,000.00 |
| 16 Riverdale Townhomes | Devon | * 155,000.00 |
| 13913 Michigan, Riverdale | Devon | 30,000.00 |
| 1921 N. Richmond | Devon | 98,000.00 |
| **TOTAL SUM** | | 804,800.00 |
| Purchases include real estate tax payments necessary to close transaction | | |
| *Includes $28,000 real estate tax payments necessary to close transaction | | |

PURCHASER

AMOUNT

CHART II

2011 2012 2013 RENOVATION EXPENSES

PAYEE/PAID TO

| | | |
|---|---|---|
| 4321 S. Marshfield (material) | Rossini | 14,447.14 |
| 4321 S. Marshfield (labor) | Rossini | 24,370.00 |
| 4045 W. Wilcox (material) | Rossini | 15,053.00 |
| 4045 W. Wilcox (labor) | Rossini | 5,944.14 |
| 4126 W. Adams (material) | Devon | 4,924.76 |
| 403 7 W. Adams (material) | Devon | 15,025.63 |
| 4037 W. Adams (Corona Construction) | Devon | 38,430.20 |
| 4037 W. Adams (Cisneros) | Devon | 12,055.00 |
| 8435 S. Burleigh (Tito George) | Devon | 2,500.00 |
| 8435 S. Burleigh (Cisneros) | Devon | 15,000.00 |
| Riverdale Townhomes | Devon | 185,000.00 |
| 3327 W. Monroe | Devon | 30,000.00 |
| 44 5 7 S. Princeton | Devon | 30,000.00 |
| **TOTALSUM** | | 331,663.82 |

PAYOR

AMOUNT

CHART II

2011 2012 2013

PAYMENTS TO MURPHY FOR ROSSINI PURCHASES OF NOTES/MORTGAGES

| 2742 W. Granville | 7,500 |
|---|---|
| 2742 W. Granville | 5,000 |
| 2742 W. Granville | 40,000 |
| 1135 N. Darnen | 15,000 |
| 1135 N. Darnen | 32,000 |
| 333 7 N. Halsted | 42,500 |
| SUBTOTAL | 142,000 |
| Commissions paid to Purchase Notes from Murphy | 135,500 |
| **TOTAL SUM** | 277,500 |

ADDRESS

AMOUNT

Respectfully submitted,
_s/ Clarence Butler Jr._

Clarence Butler Jr.. /Attorney for  Rossini
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
312-216-5102