UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
OCT 07 2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 15 CR 515-1 |
| ) | HON. JOHN Z. LEE |
| ) | District Court Judge |
| ALBERT ROSSINI, ) | |
| Defendant. ) | |

## DEFENDANT ROSSINI'S SUPPLEMENTAL SENTENCING MEMORANDUM

Defendant Rossini's refusal to accept responsibility for guilt does not show a lack of remorse for what has befallen the victims. His actions during 2011 - 2013 in making payments to investors, and then after the investigation began, and even after indictment, in payments, transfers, and attempts to pay victims shows true remorse and concern for their plight. It is true that Defendant Rossini does not believe he is culpable. He has not sought to reframe the charges, rather he denies the charges. Yet, his payments and attempts to pay are not disingenuous such as defendants in the case who either cooperate with the government or at trial blame others and never intend to reimburse, nor do reimburse victims unless the assets

-1-

are pulled from them by the government and the Court.

Aside from the payments previously detailed in Defendant's Sentencing Memorandum and Objection to the Presentence Report, are several attempts to make payments to the victims that were thwarted by the government.

I. When Kathy Khodi unexpectedly rejected the Riverdale Townhome deeds, Rossini and Theodore Netzky of the Seiden Netzky Law Group negotiated with Barnett Capital of Northbrook, IL., for a $3,000,000 loan with the Riverdale Townhomes and other Devon Street Investment Ltd. ("DSI") properties as collateral. The loan was intended to pay Ms. Khodi and several at-risk investors together with money for DSI to continue business and pay the remaining investors from expected profits. The loan was approved by Barnett Capital. Netzky and Rossini had informed Barnett Capital representative, Daniel Sobelman, of Rossini's background, legal difficulties in Cook County and financial status. This information was given to Mr. Sobleman prior to the loan application. Rossini paid a $10,000 fee to Barnett Capital attorneys, Lavenfeld & Perlstein. Attorney Netzky was finalizing the loan and closing documents were prepared and delivered to Defendant and Attorney Netzky by Lavenfeld & Perlstein.

On information and belief, and reliably based upon Mr. Netzky's conversations with Mr. Sobleman, FBI agents interfered with the closing -- a business arrangement which would have made Ms. Khodi and several smaller, vulnerable investors, whole but would have

interfered with her proposed witness testimony for the government against Rossini. The government chose gamesmanship over obligation to victim and loss. This conduct should have been a subject of questioning at Rossini's trial. Further, Rossini's attorneys should have called Attorney Netzky, Barnett Capital employees, attorneys from Fidelity Title Company, Barbara Boiko and Ronald Osimani, lawyers at Lavenfeld & Perlstein, as well as FBI Agents for their testimony about the harassment coincident with loan negoatiations to resolve the Khodi and investor debts.

Attorneys Boiko and Osimani also spoke with bank foreclosure attorneys on behalf of Rossini and investors to recapture propertes they had purchased from Murphy. Attorneys Boiko and Osimani had knowledge of the lis pendens Rossini recorded in conjunction with DSI v. Thomas W. Murphy and the Cook County Accounting Lawsuit. Attorney Boiko also alerted Rossini that both an Ocwen Loan Servicing Bulk Sale package of properties and mortgages that Rossini had purchased for himself and Ms. Khodi had multiple irregularities and fraudulent conveyances by Ocwen, American Home Mortgage Corp., Chicago Loan Servicing Corp., and Commercial Mortgage Bank of Rockford. The price of these fraudulent Bulk Sale purchases was $395,000.

II. Cambridge Management, Inc.

Murphy and Rossini were codefendants in a Cook County criminal case instituted September 28, 2013 for the theft of Mrs. Nina Jozers funds. Mrs. Jozers' daughter, Beneta Alamprese had deposited $353,000 in Murphy's account in 2010. The conversion of several hundred thousand dollars led to Murphy's disbarment in May 2014 by the ARDC.

In testimony to the ARDC, Murphy blamed Rossini, stating the Defendant had directed Murphy in disbursing the funds. The Commission stated Murphy's testimony was not believable. The ARDC findings show Murphy had continuously, over a 20-year period converted various client moneys to pay money previously taken from clients -- in essence, an in-client Ponzi scheme. Rossini was dismissed from the State criminal proceeding in October 2015.

However, a year earlier, in May 2014 at Cook County Criminal Court, Murphy, Rossini, and attorney Glen Seiden discussed the possibility of Rossini purchasing or financing through his contacts from Murphy's clients. This would help Rossini repay his guarantees to investors. It was agreed at this meeting that transactions would be monitored by Seiden Netzky Law Group and any escrow funds would be held in Seiden trust accounts.

In June 2015, Murphy asked Defendant to finance the acquisition of Meadowlands Medical Center by Cambridge Management, Inc. Rossini's fees was to be approximately $2,500,000. Defendant knew of the Cambridge Principal Jason Mitan, Thomas Miner, and Barbara Kalinowski, and referred them to Seiden and Netzky. As per federal bond orders, Seiden informed Judge Gilbert and the government of Rossini having worked on Cambridge prior to the August 2015 federal indictment, and that he continued working on the transaction. The Cambridge principals had been informed as well as their lawyer Jeffrey Deer.

Immediately, agents Evans and Blau decended on Cambridge offices, informing them that Rossini was attempting to launder money he had stolen from investors. This created insurmountable

difficulties in completing the transaction. As with the Barnett Capital loan in 2013-2014, the government kept Rossini from paying the guarantees to investors.

In fact, each time the Defendant or his attorneys complied with Court orders to inform the government of details, personal information, business associates or friends, agents decended upon whatever name they were given in an effort to intimidate and contaminate. They did this with Barnett Capital, Cambridge Management, Meadowlands Medical Clinic, employees, Rossini's friend in Los Angeles, as well as lawyers.

III. <u>A Guideline sentence is unreasonable based on Rossini's age.</u>
Guideline sentences are presumed by the appellate court to be reasonable. In Defendant's case, a guideline sentence is a de facto life sentence. If the Defendant does not die in the next 15 years and the Court imposes the maximum guideline sentence, then he will be 88 years old when released. On the basis of existing medical knowledge we must assume that in all likelihood the Defendant will be dead before his prison term expires.

Federal imprisonment is expensive to the government, the average expense of maintaining a federal prisoner for a year is between $25,000 and $30,000. <u>Notice Bureau of Prisons</u>, 76 Fed. Reg. 57081 (Sept. 15, 2011), and the expense rises steeply with the prisoner's age because the medical component of a prisoner's expoense will rise with his age, especially if he is still alive in his mid-70s (not to mention his 80s). It has been estimated that an elderly prisoner costs the prison system between $60,000 and $70,000 a year. Kelly Porcella, <u>Note</u>, "The Past Coming Back To Haunt Them: The Prosecution And Sentencing Of Once Deadly But Now Elderly Criminals." 81 St. John's L. Rev. 369, 383 (2007). And, in Defendant's case, his pacemaker must be replaced within the next two to three years based on Biotronic and Thorek Hospital reports for MCC Chicago Medical Staff. In addition, federal prisons should not be made to double as old-age homes. See <u>United States v. Johnson</u>, 685 F.3d 660, 662 (7th Cir. 2012).

The question the Court naturally asks is with the Defendant accused of an additional crime while on pretrial release in this case, are there any set of circumstances that will prevent him from

-6-

further criminal acts? At this point, Defendant has been detained for 50-months. His wife is chronically ill with recurring cancer and severe diabetes, and without a caregiver. Social Security benefits, if not depleted by restitution, together with Medicare Medicaid and other benefits, will enable them to exist and live out their lives in a very modest retirement setting or nursing home-assisted living cetner. Over four years of detention has completely changed Rossini's view of what is necessary for his future.

The cost of imprisonment of an elderly prisoner, the unlikelihood of further recidivism by him, the modest incremental deterrent effect of a sentence longer than what he has already served through detention, and his wife's continued illnesses, should figure in the Court's decision.

Judge Richard Posner has famously written referring to bank robbers, that "[A] civilized society locks up people until age makes them harmless but it does not keep them in prison until they die." United States v. Jackson, 835 F.2d 1195, 1200 (7th Cir. 1987).

Section 3553(a) Analysis

1. Not all Section 3553(a) factors are equal. Only the §3553(a)(2) factors have the statutory requirement that the sentence be sufficient but not greater than necessary, to accomplish them. The portions of §3553(a) other than those contained in subparagraph 2 need only be "considered." A closer look at §3553(a)(2) factors also reveals that they are underlain by the four traditional "goals of penal sanctions that have been recognized as legitimate -- retribution,

deterrence, incapacitation, and rehabilitation." Graham v. Florida, 560 U.S. 48, 71 (2010). The Supreme Court has further stated, "[a] sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." Id. The Supreme Court has repeatedly recognized the need for sentence to be justified by these factors of retribution, deterrence, incapacitation, and rehabilitation. "The rationale for capital punishment, as for any punishment classically rests upon society's need to secure deterrence, incapacitation, retribution, or rehabilitation." Glossep v. Gross, ___ U.S. ___ (2015). Consequently, Defendant will focus on the application of retribution, deterrence and incapacitation to his sentence, considering that rehabilitation cannot support increased incarceration, Tapia v. United States, 564 U.S. 319 (2011).

2. Deterrence. Deterrence is both specific and general. It has been increasingly recognized that it is the certainly rather than the severity of punishment that achieves deterrence. Indeed in May 2016, the U.S. Department of Justice's National Institute of Justice published a fact sheet entitled Five Things About Deterrence which summarized the research that has been done on deterrence. Three of the five things are: (1) the certainty of being caught is vastly more powerful deterrent than the punishment; (2) sending an individual convicted of crime to prison isn't a very effective way of deterring crime; and (3) increasing the severity of punishment does little to deter crime. Thus, the arrests and conviction in this case have largely effected general deterrence as much as it can be. The Court regularly hears this deterrence argument from

the defense but that does not make it any less valid.

3. Specific Deterrence and Incapacitation. The Supreme Court has recognized that the likelihood that a defendant will engage in future criminal conduct is "a central factor that district courts must assess when imposing sentence." Pepper v. United States, 562 U.S. 476 (2011). Specific deterrence and incapacitation have the related goals of reducing recidivism. But they support incarceration only when there are sufficient indicia of likely future criminal conduct. It is not possible to state that at whatever age Defendant emerges from prison, he presents a serious threat of future criminality. Therefore, there is simply not a logical or penological basis for imposing further incarceration based on the justification that Defendant must be incarcerated in order to prevent future criminal conduct. Thus, Specific Deterrence and incapacitation do not provide support for incarceration.

4. Rehabilitation, of course cannot be used to justify incarceration of the Defendant. See Tapia v. United States, 564 U.S. 310 (2011).

5. Retribution is the final purpose of punishment recognized by the Supreme Court. Section 3553(a)(2)(A) reads, "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide for the offense." Cases such as Farmer and those cited above make clear that this is actually the sentencing purpose of retribution. As the Supreme Court states, retribution is a means for society to "express its condem

condemnation of the crime and to seek restoration of the moral imbalance caused by the offense." Farmer, 560 U.S. at 71. The challenge for the Court is how to apply the concept of retribution to the Defendant.

Retribution is meant as imposing harsh punishment and the actual meaning is "dispensing what i sdue or deserved." But it is importanttorrealize that retribution is often viewed as a form of vengeance. Some, such as Professor Martha Nussbaum, in a May 1, 2017 lecture which is available on the National Endowment for the Humanities entitled "Powerlessness and the Politics of Blame," she calls for invoking retribution as a mechanism for restoring the balance in society that the defendant has upset. So, how does this analysis apply to the Defendant?

It applies by asking what penalty is sufficient, but not greater than necessary to comport today with the purposes of punishment discussed above. Taking into account Defendant's age, the absence of serious injuries, or deaths in this case, the danger Defendant faces in prison from COVID-19, his defective heart condition supplemented by a pacemaker (lower heart is 89% pacemaker dependent and without an effectively working pacemaker beats at 22 beats per minute), and Defendant's life expectancy, together with his wife's medical and financial condition, all suggest to this Court that a Guideline sentence is wildly excessive. In short, keeping Defendant more than what he has already been detained, 50 months, would in the language of §3553(a) be greater than necessary under §3553(a)(2).

While the Seventh Circuit accords this Court discretion in assessing disparities in sentencing, it is nevertheless clear that none of the comparable defendants will receive anything remotely approaching a life sentence sought the Defendant.

Finally, there is no need for Defendant to unnecessarily contribute to the mass incarceration in the United States and the extra burden upon the Bureau of Prisons health facilities, as he will need to be consigned to a medical facility due to his heart condition. On March 13, 2014, in testimony before the Untied States Sentencing Commission, then Attonrey General Eric Holder stated, "certain types of cases result in too many Americans going to prison for too long, and at times for no truly good public safety reason. Although the United States comprises just five percent of the world's population, we incarcerate almost a quarter of the world's prisoners. One in 28 American children currently has a parent behind bars... This focused reliance on incarceration is not just financially unsustainable, it comes with human and moral costs that are impossible to calculate."

Respectfully submitted,

*[signature]*

Albert Rossini
Defendant
#08043-424
Metropolitan Correctional Center
71 W. Van Buren St.
Chicago, IL 60605

## CERTIFICATE OF SERVICE

Albert Rossini certifies that on September 23, 2021, he deposited both Defendant Rossini's Supplemental Sentencing Memorandum and Defendant Rossini's Request To Be Released From Restitution, in the MCC Chicago Legal Mail System, first class mail prepaid and addressed to the Clerk of the District Court For the Northern District of Illinois, 219 S. Dearborn St., Chicago, IL 60604.

Respectfully submitted,

*/s/ Albert Rossini*

Albert Rossini
Defendant
#08043-424
Metropolitan Correctional Center
71 W. Van Buren St.
Chicago, IL 60605

envelope

Albert Rossini
# 08043-424
Metropolitan Correctional Center
71 W. Van Buren St.
Chicago, Il. 60605

2021 OCT -7 AM 8:44

Legal Mail

Clerk of District Court
Northern District of Illinois
219 S. Dearborn St.
Chicago, Il. 60604




10/07/2021-29

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN ST., CHICAGO, IL 60605
The enclosed letter was processed through special mailing procedures for forwarding to you.
This letter has neither been opened nor inspected.

SEP 24 2021

If the writer raises a question or problem over which this facility has jurisdiction,
you may wish to return the material for further information or clarification.
If the writer encloses correspondence for forwarding to another addressee,
please return the enclosure to the above address.