```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,        ) Docket No. 15 CR 515-1
 4                                   )
                       Plaintiff,)
 5                                   )
                  vs.                )
 6                                   )
    ALBERT ROSSINI,                  ) Chicago, Illinois
 7                                   ) October 12, 2021
                       Defendant.) 3:09 o'clock p.m.
 8

 9           TRANSCRIPT OF PROCEEDINGS - SENTENCING
               BEFORE THE HONORABLE JOHN Z. LEE
10

11  APPEARANCES:

12
    For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
13                            United States Attorney
                              BY:  MR. JOHN D. MITCHELL
14                            219 S. Dearborn St., Suite 500
                              Chicago, Illinois  60604
15

16  For the Defendant:        LAW OFFICE OF CLARENCE BUTLER, JR.
                              BY:  CLARENCE BUTLER, JR.
17                            150 Michigan Avenue, Suite 2800
                              Chicago, Illinois  60601
18

19  Also Present:             MR. ZAKARY FREEZE, Probation

20
    Court Reporter:           MR. JOSEPH RICKHOFF
21                            Official Court Reporter
                              219 S. Dearborn St., Suite 2128
22                            Chicago, Illinois  60604
                              (312) 435-5562
23
              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
24
                      PROCEEDINGS RECORDED BY
25                   MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED BY COMPUTER
```

 1          (Proceedings had in open court:)

 2          THE CLERK:  15 CR 515, United States of America vs.

 3    Albert Rossini.  For sentencing.

 4          THE COURT:  Good afternoon.

 5          Who is appearing on behalf of the government, please?

 6          MR. MITCHELL:  Good afternoon, your Honor, John

 7    Mitchell on behalf of the United States.

 8          THE COURT:  Who is appearing on behalf of Mr.

 9    Rossini?

10          MR. BUTLER:  Good afternoon, your Honor, Clarence

11    Butler, Jr., on behalf of Mr. Rossini.

12          THE COURT:  All right.

13          Who is here from the Probation Office?

14          MR. FREEZE:  Judge, Zakary Freeze with the Probation

15    Office.

16          THE COURT:  So, this is how the sentencing is going

17    to go:  There have been numerous filings by defense, which is

18    fine because that's what I told you to do.  And the way we're

19    going to proceed is we're going to go through first the

20    Sentencing Guideline calculations that are proposed in the

21    Presentence Investigation Report.  We're going to go one

22    enhancement at a time.  I'm going to ask if there are any

23    objections to enhancements; I'm going to ask for argument;

24    and, then, I'll rule on each of the various enhancements, to

25    the extent there are any objections as we go along.

3

1    After that, I will ask the parties if there are any

2    objections to the factual findings in the Presentence

3    Investigation Report.  And, then, after that, I will determine

4    what the Sentencing Guideline calculation is.  Then I will

5    open up the floor to arguments as to the sentencing factors

6    under 18 U.S.C. Section 3535(a).

7    With regard to the defendant's arguments, to the

8    extent possible, I will first hear from counsel Mr. Butler;

9    and, then, in the event that Mr. Rossini wants to add anything

10   after speaking with Mr. Butler, he may do so.  That way I have

11   the complete views of the defense.

12   MR. BUTLER:  I don't mean to interrupt, your Honor.

13   I understand your procedure.  Just for purposes of judicial

14   economy, I just wanted to make the Court aware, based on the

15   confluence of motions that have been filed and based on the

16   fact that Mr. Rossini has filed motions in addition to what I

17   filed, I just wanted the Court to be aware that Mr. Rossini

18   intends to testify.  And if we allow Mr. Rossini to testify

19   first, he can make comments relative to, and the Court can

20   consider, those objections that he has for purposes of how you

21   wanted to address the Presentence Report, rather than have me

22   make an objection and then have Mr. Rossini subsequently add

23   what he would like to opine.

24   I'm not trying to in any way step on the Court's toes

25   or encroach your ability as to how this matter is going to

1    proceed.  But if Mr. Rossini can testify as a predicate, I

2    could then stand on Mr. Rossini's testimony as it relates to

3    each and every one of those items without further wasting the

4    Court's time.

5              THE COURT:  I see.

6              Mr. Mitchell, any objection to that, proceeding that

7    way?

8              I mean, I think that, basically, what I'm being told,

9    and what I can understand based upon reading all the

10   sentencing memoranda, is that Mr. Rossini disputes much of the

11   factual findings in the Presentence Investigation Report.

12   And, presumably, he wants to testify, to the extent he has any

13   admissible evidence with regard to those particular issues.

14             MR. MITCHELL:  I understand, your Honor.  As I noted

15   the last time we convened, my only concern, is just -- it's

16   only a matter, again, of judicial economy is just the idea

17   that my understanding of much of what Mr. Rossini wants to

18   raise has already been decided by a jury.

19             But with that said, your Honor, however the Court

20   wants to proceed, of course, is fine with the government.

21             THE COURT:  Okay.

22             Carmen, let's go ahead and swear in Mr. Rossini

23   first.

24        (Defendant sworn.)

25             THE COURT:  Have a seat, Mr. Rossini.

```
 1              Mr. Rossini, have you had an opportunity to review

 2    the Presentence Investigation Report?

 3              THE DEFENDANT:  I read parts of it, your Honor.  At

 4    the MCC, you're not allowed to have the Presentence Report.

 5    The prosecution has sent me a disc, and on and off I have been

 6    able to look at it.  And Mr. Butler has helped me along with

 7    it with, like, a transcript form of what their objections

 8    were -- or my objections what their statements are.

 9              MR. BUTLER:  If I may clarify, your Honor, I'd like

10    to add that I have gone through each and every page and each

11    and every paragraph with Mr. Rossini.  In fact, in some of my

12    submissions to the Court, I specifically referred to

13    delineated sections of the Presentence Report and, in fact,

14    provided a response, which included Mr. Rossini's responses as

15    he's related to me in going over each and every page of the

16    Presentence Report.

17              THE COURT:  All right.  Very good.

18              Off the record for a second.

19        (Discussion held off the record.)

20              THE COURT:  Back on the record.

21              So, I take it, Mr. Butler, for the record, that Mr.

22    Rossini does dispute a number of the factual findings in the

23    Presentence Investigation Report?

24              MR. BUTLER:  That is correct.

25              THE COURT:  And I understand that he wishes to
```

Rossini - direct

6

 1   testify today to set -- put into the record his account of the

 2   facts in this case?

 3          MR. BUTLER:  That is correct.

 4          THE COURT:  All right.  Very good.

 5          I'm going to have Mr. Rossini come up to the witness

 6   stand.

 7          Mr. Rossini, I remind you you are still under oath,

 8   sir.

 9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And you can take off your mask when

11   you're testifying.  Thank you.

12          You can take off your mask during questioning.

13          MR. BUTLER:  I'm fully vaccinated, your Honor.

14          THE COURT:  I'm sorry?

15          MR. BUTLER:  I'm fully vaccinated.

16          THE COURT:  You may proceed.

17        ALBERT M. ROSSINI, DEFENDANT HEREIN, PREVIOUSLY SWORN

18                        DIRECT EXAMINATION

19   BY MR. BUTLER:

20   Q.  State your name for the record, please.

21   A.  Albert M. Rossini.

22   Q.  Mr. Rossini, we've had an opportunity to go over the

23   Presentence Investigation Report and discuss all of the facts

24   in this case?

25   A.  Yes, Mr. Butler.

Rossini - direct

7

1   Q.  You submitted some motions to me that we've discussed, and

2  I've also submitted motions to you, along with motions to your

3  wife that she's also related to me, and we discussed them on

4  numerous occasions?

5  A.  Yes.

6  Q.  And regarding the Presentence Report, just for purposes of

7  judicial economy, I'd like to ask you some things about the

8  nature and character of the offense.

9       If you can tell us how you became involved in this

10  cause of action.  Could you explain that to the Judge, your

11  version of events?

12  A.  I met Thomas -- then-Attorney Thomas Murphy in -- when I

13  got out of the halfway house.  This was in --

14  Q.  Excuse me for interrupting, Mr. Rossini.  I wanted to make

15  a predicate question.

16  A.  Okay.

17  Q.  I've explained to you you have another case pending

18  before -- in this district court --

19  A.  I do.

20  Q.  -- before Judge Tharp?

21  A.  Yes.

22  Q.  And you realize that your testimony that you're offering

23  today could be utilized in that case?

24  A.  Correct.

25  Q.  You also are aware of the fact that your Honor has

Rossini - direct

8

1   presided over the trial that you participated in, along with

2   testimony, and he's reviewed reports relative to other people

3   that were involved in this case?

4   A.   Yes.

5   Q.   Okay.

6           And based on that, you are testifying knowing that?

7   A.   Yes, I am.

8   Q.   I'm sorry.  So, with that being said --

9           THE COURT:  Mr. Butler, if I could just add a couple

10  of things.

11          So, Mr. Rossini, just so the record is clear, you

12  understand, sir, that with regard to the other case before

13  Judge Tharp, that you have the right not to make any

14  statements that would be incriminating?  You understand that,

15  sir?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  And in testifying here today, it's

18  possible that you may be waiving some of those rights.

19          THE DEFENDANT:  I understand.

20          THE COURT:  And you've spoken to your counsel about

21  that; is that correct?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And it is your decision that you still

24  wish to testify today?

25          THE DEFENDANT:  Yes, your Honor.

Rossini - direct

9

1      THE COURT:  Go ahead.

2   BY MR. BUTLER:

3   Q.  And just one other issue, housekeeping matter.  We've also

4   discussed the possibility of bringing in witnesses for

5   sentencing, and that although we can subpoena witnesses and

6   put witnesses on the stand, we not necessarily can control

7   what they say on cross-examination?

8   A.  Correct.

9   Q.  And you understand that today we're proceeding with you

10  just as being the sole witness?

11  A.  Yes.

12  Q.  Okay.

13      I'm sorry.  So, now you can pick up with your answers

14  to how you became involved in this.

15  A.  I met Tom Murphy in late October 2007.  We ended up

16  completing a transaction.  He was representing buyers of a

17  property in Montgomery, Illinois, and his clients couldn't

18  complete the transactions.  I was approached by a realtor.

19  And I ended up helping him buy the property -- helping his

20  clients buy the property by providing a loan.

21      Shortly -- a couple years thereafter, Tom asked me if

22  I would be interested -- and it was right after the collapse

23  of the real estate market -- if I would be interested in

24  buying short sales on residential properties and rental

25  properties or if I would be interested in buying notes and

Rossini - direct

10

1   mortgages.  And I said yes.

2           So, the first transaction was in -- and I won't go

3   through all the transactions.  I'm just -- the first

4   transaction was purchasing a short sale on December 31st,

5   2010, a property at 3820 West Adams.  Went perfect.  No

6   problem at all.  Babajan Khoshabe supplied the investor.  We

7   bought the property.  The investor received the deed to the

8   property.  We received commissions.  And everything looked

9   great.

10          So, we proceeded from there.  And either we would

11  find the properties, Babajan and I, or Tom found properties

12  and brought to -- brought them to us.

13  Q.  Let me ask you this:  You have a master's degree, correct?

14  A.  No, not actually a master's degree.  I went to Syracuse

15  University undergrad; then I went into the Marine Corps; and,

16  then, I went to -- after I injured myself, I went to

17  Georgetown Law.

18  Q.  And did you complete Georgetown Law?

19  A.  No, I didn't.  I left Georgetown to join Merrill Lynch.

20  Q.  So, you've never been a lawyer?

21  A.  No.

22  Q.  And during the time that you were involved in this --

23  these financial transactions, was Thomas Murphy a lawyer?

24  A.  Yes.

25  Q.  Did you possess the same level of sophistication and

Rossini - direct

11

1   knowledge that Mr. Murphy did?

2   A.  In the law, no.

3   Q.  Okay.

4          Based on your involvement in this matter, who was the

5   leader or organizer of this entire financial situation?

6   A.  Tom handled the legal aspect, handled the talking to

7   attorneys, speaking to many of the banks.  I and Babajan would

8   go and value the properties.  Babajan would find the

9   investors -- for the most part, find the investors -- and,

10   then, I would end up negotiating the purchase price, figuring

11   out the value, et cetera.

12          So, Murphy was the one who handled all of the legal

13   and dictated which -- in which -- how we were going to handle

14   all of the legal aspects and the closing aspects.  We came up

15   with the money and decided upon do we want to buy that

16   property or not.

17   Q.  So, is it your opinion based on your involvement in this

18   that you were not the leader or organizer of this whole

19   financial situation?

20   A.  I was not the leader or organizer of any financial scam.

21   Q.  Okay.

22          Since this is going to involve some issues regarding

23   both relevant conduct and issues involving your health, let's

24   stop for a second as you go on, and tell your Honor about what

25   your present health condition is.

Rossini - direct

12

A.   In 2013, I had a pacemaker inserted because I have a

defective heart.  What I mean by -- what's meant by that is my

arteries are just fine.  The heart -- the upper and lower

heart do not beat together properly.  The lower heart is 89

percent pacemaker dependent.  And my heartbeat before they

inserted the pacemaker was about 21 or 22 beats a minute.

Q.   Would you describe that condition that you're presently

afflicted with as a life-threatening condition?

A.   If the pacemaker goes, I go.

Q.   And being confined, has that exacerbated your pacemaker

situation?

A.   Yes, it has, with the -- with the COVID pandemic because

the MCC has for the last 20, 22 months, whatever, basically

been on either lockdown or a modified lockdown status.  And

one of the things about the MCC now -- and I'm not knocking,

as many people have, you know, the services there, medical

services or any -- they've been excellent with me.

        But we've been locked down quite often because they

don't have enough COs.  I mean, I know that sounds crazy, but

it's true.  They do not have enough COs to watch out for all

the inmates.

Q.   How long have you been incarcerated?

A.   July 28th, 2017.  50 months.

Q.   And during that time, how often do you -- are you able to

go outside?

Rossini - direct

13

1   A.  At Kankakee, not -- never.  During the 10 months, 11

2   months at Kankakee, you don't go outside.

3   Q.  And when were you at Kankakee?

4   A.  I was in Kankakee from July 28th, 2017, until about either

5   May 9th or May 10th, 2018.

6   Q.  And where did you go after you left Kankakee?

7   A.  MCC.

8          At the MCC, you have the rooftop.  However, once the

9   pandemic hit, there's a confluence of the pandemic hit, so you

10  couldn't go out of your cell or your section if you were in a

11  dorm, and you couldn't go on the rooftop anyway because

12  they're renovating the rooftop.

13  Q.  So, what period of time and how long was the duration when

14  you were not able to go on the rooftop and you were confined

15  to your cell?

16  A.  Well, I went on the rooftop once a week from May 10th,

17  2018, until February 2020.  We were confined to cells or

18  sections in the dorm -- because I was in both at different

19  times -- from March 13th, I think, 2020, until about two

20  months ago.

21         But now, even though we are, basically, three floors

22  of the MCC are COVID vaccinated so that they're -- you have

23  open, you know, service -- or open service, when they don't

24  have enough COs, we're locked down.  We were locked down

25  Sunday.  We were locked down partially yesterday.  We were

Rossini - direct

14

1   locked down twice last week.  You know, two day -- one or two

2   days last week.  It's just the way it has to be.

3   Q.  So, let's go back to February of 2020.  Since February of

4   2020 until you were able, you said, a couple months ago to go

5   outside --

6   A.  No, not outside, just --

7   Q.  To go on the rooftop?

8   A.  No.  Just be able to go outside of the cell on a

9   consistent basis.

10  Q.  Okay.

11          So, to be clear, since February of 2020, when have

12  you been able or have you at any point been outside?

13  A.  No.  The only time I've ever seen the outside streets is

14  when this good marshal here would take me here.

15  Q.  How has that affected your health?

16  A.  I think myself and almost everybody that's of an advanced

17  age and even the young guys are -- it's hurt them.

18  Q.  And part of your sentencing includes you're requesting a

19  compassionate release based on your age.  How old are you?

20  A.  73.

21  Q.  And when did you turn 73?

22  A.  September 11th.

23  Q.  Now, being of age 73, having a heart condition and being

24  confined relative to this -- these pandemic situations, has

25  that affected you physically?

Rossini - direct

1    A.  Oh, yeah, definitely.  Definitely physically because, you

2    know, the other thing is with the -- and I don't know if I had

3    before the testing started COVID-19 or not.  A lot of the guys

4    did.  In our dorm, we had a hundred inmates and 68 tested

5    positive.  There's a dizziness, difficulty walking sometimes.

6    It's not just me.  Many of the guys.  But I have experienced

7    that definitely.

8    Q.  Did you have a sleep apnea problem?

9    A.  I never knew I did, but apparently Dr. Mohan thinks I do,

10   yeah.

11   Q.  Briefly describe what sleep apnea is.

12   A.  Waking up during the night.  I don't snore or at least I

13   haven't heard myself snore, but -- I'm sorry -- but they say

14   that I have sleep apnea.

15   Q.  Now, with COVID-19 being a respiratory disease and you

16   having sleep apnea, which does have a respiratory effect --

17   A.  Uh-huh.

18   Q.  -- how did the combination of those two things affect your

19   heart situation?

20   A.  Well, I'm worried about it, of course.  And the dizziness,

21   the worry about the pacemaker, it's been difficult.  It's

22   difficult breathing.

23   Q.  Now, since you've been confined, there's been the

24   emergence of what has been referred to as the Delta variant.

25   Has that variant caused any environmental problems while

Rossini - direct

16

1   you're in the MCC?

2   A.  You know, Mr. Butler, the inmates are worried about it.

3   Everybody is.  We don't know at this point whether it's going

4   to affect vaccinated people or not.  Yeah, I think it's put

5   everybody on edge at the institution.

6   Q.  Do you have any other health problems?

7   A.  Just the -- at this point, the heart and the sleep apnea

8   and sinus problems, dizziness, that kind of thing.

9   Q.  And with the confinement, given these pandemic situations,

10   that complicates your present situation?

11   A.  Of course.

12   Q.  Now, you have a wife named Brenda Rossini?

13   A.  Yes.

14   Q.  Okay.

15        As it relates to your compassionate release concerns

16   and petition, I'd like you to describe to the Court if you

17   have any family circumstances that are impacting you that

18   would also cause compelling circumstances?

19   A.  The biggest problem is my wife's health.  She has diabetes

20   where she has to take insulin shots several times a day.  She

21   has neurological problems where she falls down.  She's being

22   treated for it right now.  I've brought in the medical records

23   to leave with the Court.

24        So, it's a definite problem.  She has no one to care

25   for her when she has these problems.

Rossini - direct

17

Q.   Is your wife a breast cancer survivor?

A.   Yes.  I forgot -- I forgot about that.  She is.  And she

had surgery in 2010, chemotherapy, radiation.  She had it

again in 2016, where they caught it very quickly.  They said

she had excessive fibers.  And, so, she has to be tested every

six months.

Q.   Does she have any caretaker responsibilities for anyone

else?

A.   Yes.  Her mom.  Her mom Monica Szeja is 93.  She's at

Regency Nursing Home, and -- but it's difficult -- my wife

used to go every day, but now it's difficult for her to be

able to go because of her health.  And I used to go there just

about every day, every other day, just to check in on her --

on my mother-in-law.

Q.   Who is your wife or who would be your wife's primary

caretaker if you were not in custody?

A.   There is nobody here in town at all.  Our son lives in

Portland, Oregon.  He's an attorney.

Q.   And how has this case impacted your family, specifically

your son, as it relates to you being incarcerated?

A.   It's been difficult for him because, of course, he's seen

me through several incarcerations.  But this has been

difficult for him because his financial records were

subpoenaed when -- from college at Boulder.  His financial

records at Willamette Law School were subpoenaed.  So, it

Rossini - direct

1    impacted him from that standpoint where everybody knew what

2    was happening.

3            He graduated very well in his class.  He worked for

4    the Clackamas County Prosecutor's Office and now is in a firm

5    in Portland.

6    Q.  Did this cause -- in addition to familial embarrassment,

7    did it cause professional embarrassment for your son?

8    A.  Well, it took him about six months to get his license

9    because he had to go through special -- a special hearing

10   where they wanted to question him about me and, I guess, about

11   whether or not he was involved in my business, which he never

12   was.

13   Q.  And how does that impact you?  How do you feel about that?

14   A.  I feel very badly for him, and we don't speak.

15   Q.  Has that caused a change in your life based on those

16   circumstances?

17   A.  Well, when you have raised someone, you know, and then he

18   doesn't speak to you -- and I can understand it.  I mean, I

19   understand his situation.

20   Q.  And would you say that's somewhat of a casualty as it

21   relates to your involvement in this case?

22   A.  Definitely.

23   Q.  Now, did you have any other children?

24   A.  We had a boy that we raised and a niece that we raised

25   also.  The boy was the son of a very close friend of my wife

Rossini - direct

19

1    who had substance abuse problems.  She was going to lose him.

2    So, we took him to our house in Winnetka and raised him.  And

3    he's now out in northern California.  He's in the -- works for

4    a high-tech company out there.  Done very well for himself.

5          Our niece we raised.  She was -- came from Russia

6    when they had that big Russian refugee that came over right

7    after the fall of the Soviet Union.  And, so, we took her in

8    and raised her.  We put her through school and everything.

9    She became an accountant.  Went to American U., became an

10   accountant.  She's married with a family of her own and lives

11   in Texas now.

12   Q.  Now --

13   A.  But it's very difficult because they really don't want

14   to -- you know, they really have difficulty calling.

15   Q.  I'm going to ask you some more specifically about

16   enhancements and some other issues.  But before we do that, in

17   the event that you are released, what kind of plan would you

18   have in place in terms of utilizing your educational,

19   vocational skills and what would your plan be?

20   A.  Well, my plan had been, if it was allowed by the Court,

21   there were a number of properties that I still supposedly own.

22   It's hard to tell because I'm incarcerated.  So, I don't know

23   the -- my reason for saying that I apparently still own them

24   is because the sheriff comes consistently to the MCC serving

25   me with building code violations and other things.

Rossini - direct

20

1          So, the likelihood is that what I would want to do is

2     build affordable housing on those properties and then sell

3     them and have the money go to the investors.

4     Q.   Now, I know --

5     A.   The investors who -- the victims.

6     Q.   I know you have a dispute about some of the facts in this

7     case --

8     A.   Uh-huh.

9     Q.   -- but -- and I'll let you address that later, but as it

10    relates to the victims in this case, without going through all

11    the numbers and things that are alleged as it relates to the

12    execution of the scheme, did you at any time try to make good

13    by these victims and try to do anything in terms of

14    restitution?

15    A.   On a consistent basis.  I'm the only defendant in this

16    case who has.  I'm the only defendant who is willing to do so.

17    Q.   Can you describe and explain what steps that you took in

18    terms of restitution in this case?

19    A.   Well, whenever money came to me that was supposed to have

20    gone to the victims that -- whether it was from their money or

21    from real profits and real rental income, I forwarded that to

22    the victims pro rata, depending on what they were supposed to

23    receive based on the investment, if you want to call it a

24    scheme or the investment plan or whatever.  I'm not talking

25    about whether it was an illegal scheme or not.  We're just

Rossini - direct

1  talking about what I did from the standpoint of trying to get

2  them their money.

3         At first, I didn't realize that it was ill-begotten

4  money.  However, in November of 2012, Tom gave me a couple of

5  checks totalling 561,000 that was supposed to be -- that was

6  supposed to be money from rental and interest that the

7  investors were due for several months.  His checks bounced,

8  but we had already -- when I say we, Fred Khoshabe, Babajan's

9  brother, helped out from the standpoint he's a computer guru

10  and he sent out ACH payments, which are automatic debits and

11  credits, to -- debits from our account, my account, credits to

12  other people's accounts.

13         Tom's checks bounced.  I made good on them from the

14  money I had.  Whether it was true savings or investor money, I

15  went ahead and made good on all of that and, on a consistent

16  basis, made payments even up until -- not for every -- after

17  early 2013.  Not for every investor, but for the several

18  investors like Janet Khoshaba and Havanna Moshi.  The ones

19  that were really, that I felt, within the amount of money that

20  I had to help out those investors who were, you know, most

21  injured.

22  Q.  I won't go into all the details, but you did file a motion

23  that you filed, and I filed a different motion, and it

24  chronicled the chart that you prepared --

25  A.  Yes.

Rossini - direct

1   Q.  -- regarding restitution attempts that you made?

2   A.  Yes.

3   Q.  Let's go to the issue of targeting.  The government has

4   alleged that you targeted a certain community because of their

5   culture or based on the fact that you targeted them for some

6   reason that the government claims.

7          Did you target anyone in this case?

8   A.  I targeted no one.  I did -- there were, I believe, two

9   investors that were not brought in by Babajan Khoshabe:

10  Ibrahim Yousif, Ashoor Pithyou or Anthony.

11         I knew none of these investors.  The only two

12  investors that I was involved in bringing in was Liam Ben

13  David and Oz Lebanon (phonetic).  And with them, I pledged

14  three properties.  Their lawyer in that case drew up all the

15  documents, and I put liens on three of the properties that

16  Devon Street Investments, my company, had title to.  The other

17  was -- I think that's just those two are.  I believe --

18  Q.  How did you --

19  A.  -- the rest were brought in by Babajan and the others.

20  Q.  Could you tell your Honor --

21  A.  I had no knowledge of who they were until their money came

22  in and I sat with them or talked to them on the phone after

23  they had invested.

24  Q.  Could you tell your Honor how you specifically became

25  acquainted with them?

Rossini - direct

23

1    A.   Through Babajan.  I knew Babajan for a number of years

2    beforehand.  He was in the mortgage business.  And when I told

3    Babajan, I said, Babajan, here's an opportunity for us to get

4    involved; Murphy says we can buy these short sales and

5    mortgages and notes.

6         And I liked that business.  Babajan liked that

7    business because he had been in that business with

8    Nationwide -- Nationwide Mortgage, I think, was the name of

9    it.

10   Q.   So, it's your contention that you basically had a business

11   relationship with him?

12   A.   Yes.

13   Q.   And culture had nothing to do with it?

14   A.   Culture had -- from my standpoint, had nothing to do with

15   it.  From his standpoint, that's who he knew to bring in as

16   investors.

17   Q.   The government's also stated that you took advantage of

18   Ms. Kling.  Could you --

19   A.   Sure.

20   Q.   -- describe to the Court the circumstances involving

21   Ms. Kling?

22   A.   I think it was 2009.  I'm not sure if it was '8 or '9.

23   But she was introduced to me by a client of Tom Murphy, a guy

24   named Alex Misko (phonetic) from ICG Properties.  Alex said

25   that Doris Kling's husband owned a house.  She and her husband

1    had gotten divorced.  The husband owned the house.  She and

2    her children were living in the house -- two daughters, I

3    think, were living in the house -- wanted to save the house

4    and would I have somebody that could buy it.

5           So, she deposited 60,000 with Tom Murphy in his

6    escrow or his -- I'm not sure if it went to Pedersen & Houpt's

7    escrow -- that's the firm he worked for, he was a partner in

8    -- or with his attorney-client or business account.  But

9    anyway, the money went to Tom, 60,000, which was going to be

10   the down payment.

11          We tried several different times to buy the property.

12   When I say we, I brought in different purchasers to buy the

13   property and that would let Ms. Kling lease the property from

14   the -- from them.  I'm sorry, I can't remember if it was

15   Harris Bank or which bank it was that had the mortgage.

16          In two situations, they would not allow her to be the

17   tenant.  Another situation -- because there's a short sale

18   incestuous nature that they won't allow.  And the third

19   situation, we just couldn't -- we couldn't perform on our end.

20   Then Murphy wired her the $60,000.

21   Q.  Did you try --

22   A.  So, she received back her money.  What she then did was

23   she sued me for mental anguish and a number of people that

24   were involved in the purchase, and a judgment came down

25   against me.  They believed it.  But dollar-wise, she got back

Rossini - direct

1    her 60,000.

2    Q.   Did you try to take advantage of Ms. Kling?

3    A.   No.  She, in fact -- I had her work for me so she could

4    make extra money.

5    Q.   What's your financial situation now?

6    A.   Pauperism.  It's -- I don't have any money at this point.

7    I had Social Security and -- but once you're convicted, 30

8    days after you're convicted, when the government applies to

9    have it stopped, they suspend it.  And that's what -- that's

10   what happened.  The money was going to my wife to help her

11   live.

12   Q.   And how is your wife doing presently?

13   A.   It's difficult for her.  If it wasn't for one or two very,

14   very close friends and -- you know, she would have very -- she

15   would -- it would be difficult.

16   Q.   Based on your compassionate release issues, do you feel

17   that as a 73-year-old with health problems and a pandemic

18   environment, that you're particularly vulnerable as you are

19   presently confined in federal custody?

20   A.   Yes.  Yes.  Of course.  The -- you know, the medical

21   situation out there in the country, and especially in the

22   prison system there is no such thing as social distancing.

23          Now, the good thing is, of course, I've got a -- I've

24   been vaccinated.  But then we also hear that the efficacy, you

25   know, is -- lessens each month.  So, nobody really knows at

Rossini - direct

1   this point.  If the CDC doesn't know, how is a prisoner to

2   know what's happening.

3   Q.  Now, you went to trial in this matter?

4   A.  Yes.

5   Q.  Do you feel going to trial was a denial of -- in your

6   mind, a denial of acceptance of responsibility or just

7   attempting to vindicate your rights as it related to the

8   charges that were lodged against you?

9   A.  I don't accept responsibility for the theft.  I do accept

10  responsibility for the loss.  They're two completely different

11  things.  I think I've shown an acceptance or remorse in paying

12  investors through the years.  And I know I'm looked upon as

13  somebody who supposedly took millions and millions of dollars.

14  But if you look at my chart, you know where the money went to.

15           I'm also looked at as a person who had no business.

16  But if you look at the chart and see the payments that were

17  made and the amount of money that Forensic Accountant Prescott

18  says I took, I paid out double or triple in that.  So, I must

19  have had a business.

20           But I feel responsible and accept responsibility for

21  the loss because I -- obviously, I should have been on top of

22  and realized -- as intelligent and sophisticated as I am, I

23  should have realized sooner what was happening.

24  Q.  But did you realize everything that Thomas Murphy was

25  doing?

Rossini - direct

1  A.  At the time, no.  Now, yes.

2  Q.  Based on the issues in the Presentence Report, as well as

3  your motion for compassionate release and your sentencing

4  memorandum, what is it that you would like to tell your Honor?

5  A.  I do feel remorse for the victims, of course.  I would

6  like to try to get them back their money.  I have paid out a

7  lot of money to the victims, most often probably their own

8  money.  But once I realized it, more and more.

9       Your Honor, I'm not going to admit guilt.  I feel I'm

10  not guilty.  And maybe I was reckless, but I certainly was not

11  guilty of fraud or any intent to defraud.  And I would like to

12  continue -- obviously, there's been a hiatus of about six

13  years in being able to compensate these victims, but I'm

14  totally willing to do that.  Have been and did from 2011, paid

15  them and, then, once I realized that they were victims in

16  2000- -- later in 2013, continued to do so.

17  Q.  Why do you think you should be released?

18  A.  When do I --

19  Q.  Why do you think you should be released?

20  A.  Oh.

21  Q.  Tell your Honor.

22  A.  I think I should be released.  I've done -- I've basically

23  completed with good time a five-year sentence at this point,

24  if it were a five-year sentence.  I think I can do more good

25  outside than in prison, although I have been helpful to many

1    inmates in the prison.

2           And I -- you know, there's been studies -- and I

3    don't need to bore the judge with the studies, but being

4    arrested and spending some time in prison or jail or

5    detention, or whatever we want to call it, often has the

6    same -- in fact, it probably does have the same effect as a

7    very long prison sentence, unless, of course, you're one of a

8    very small cast of criminals.

9    Q.   I know you're not a physician, but you know your body and

10   you know your medical condition.  As a 73-year-old with the

11   ailments that you're afflicted with, what do you think your

12   life expectancy is going to be?

13   A.   I'd like to say very long, but according to the Social

14   Security Administration, I think it's something like early

15   '80s or so.  Maybe it's less.  Several people have told -- you

16   know, the things I've read have said it's 77.  You know, it's

17   obvious that if I have a long prison sentence, it's a

18   possibility that it could be a de facto life sentence.  But --

19   Q.   Do you want to die in prison?

20   A.   No.

21   Q.   Do you want to spend the rest of your life in prison?

22   A.   No.

23   Q.   What do you think, based on being confined all these years

24   and talking with different people, what do your co-defendants

25   -- based on your knowledge, what do they expect to receive in

1   this case?

2   A.  I think probably everybody expects to receive less than

3   me.  I expect them to receive less than me because the

4   Judge -- the Court -- excuse me, your Honor -- always

5   postpones their sentencing until after mine.  So, I'm

6   presuming that I'm the litmus test, or whatever.

7   Q.  What, if anything else, would you like to say?

8   A.  I don't think Anthony and Babajan should receive any

9   sentence because I don't think they're guilty.  No matter what

10   they may have said in the trial, I don't think there is --

11   they're guilty.  I think Babajan is an incredibly greedy

12   person and I think Anthony is sort of unwitting, but I don't

13   think they committed any crime.  I don't.

14   Q.  I'd like to give you one more opportunity.  Anything else

15   that you would like to add as it relates to your PSR or your

16   compassionate release --

17   A.  Well --

18   Q.  -- petition?

19   A.  -- I -- I think that I've written, and you have, our

20   basic -- more than our basic understanding or belief -- not

21   understanding, but belief of what should be assessed.  I don't

22   believe that I should be assessed anything other than the very

23   base level.  But, of course, I understand how these situations

24   work.  I've been involved in them before in sentencing.

25         So, do I think I should be sentenced for the greatest

Rossini - cross

1   amount of the loss, sentenced for the victims, sentenced for

2   bringing in the victims, all those things?  No.

3           Are there victims that I feel bad about?  Every one

4   of them.

5   Q.  Do you stand on your written submissions as it relates to

6   the PSR --

7   A.  Yes.

8   Q.  -- and the compassionate release petition?

9   A.  Definitely.

10          MR. BUTLER:  I have nothing further, your Honor.

11          THE COURT:  Thank you.

12          Mr. Mitchell, anything?

13          MR. MITCHELL:  I'm just going to ask a few questions,

14   your Honor.

15                      CROSS-EXAMINATION

16   BY MR. MITCHELL:

17   Q.  Mr. Rossini, you have testified under oath today, correct?

18   A.  Correct.

19   Q.  And is it fair to say that you have a motive to try and

20   get the least possible sentence?  Is that fair?

21   A.  I think that's fair.

22   Q.  And you have -- this is not your first time in the -- in

23   this predicament, is that correct, in terms of having been

24   convicted of crimes and facing sentencing?

25   A.  This is the first time I'm innocent and that I'm being

Rossini - cross

1   sentenced, yes.

2   Q.  It's the first time you're innocent on being sentenced; is

3   that right?

4   A.  Yes.

5   Q.  You have several prior fraud convictions, right?

6   A.  Correct.

7   Q.  The fraud conviction from back in 1985, that involved

8   forgery; is that right?

9   A.  That's correct.

10  Q.  You were guilty of that crime; is that right?

11  A.  Yes.

12  Q.  You forged documents, lied; is that right?

13  A.  Yes.

14  Q.  You also have been indicted by four -- on four occasions

15  you've been indicted by grand juries in this building; is that

16  right?

17  A.  Yes.  I had to add them up.

18  Q.  Right.

19          So, you had been sentenced first in this building for

20  mail fraud back in 1991; is that right?

21  A.  Yes.

22  Q.  That was your first time?

23  A.  No, no.  1997.

24  Q.  You were indicted in?

25  A.  1995.

1  Q.  Pled guilty in 1995; is that right?

2  A.  Correct.

3  Q.  Sentenced in 1997; is that right?

4  A.  Correct.

5  Q.  That was the second fraud conviction, first federal fraud

6  conviction, correct?

7  A.  Correct.

8  Q.  Pled guilty and admitted to lying to victims in that case;

9  is that right?

10  A.  Yes.  It was institutions.

11  Q.  Second fraud -- federal fraud conviction, was from 2003

12  you pled guilty, in 2004 you were sentenced; is that right?

13  A.  Correct.

14  Q.  48 months you were sentenced to; is that right?

15  A.  Correct.

16  Q.  When you got out of prison following that, engaged in

17  another fraud; is that right?

18  A.  Which is the fraud?

19  Q.  Well, there's a bunch of them, but I'm referring to the

20  one that took place in 2012.  This one was a -- actually not a

21  federal fraud.  This one was a Cook County -- Circuit Court of

22  Cook County conviction; is that right?

23  A.  I don't think it was a fraud.  I thought it was a money

24  laundering charge.

25  Q.  Okay.  So, that was money laundering?

Rossini - cross

1    A.   Yes.

2    Q.   Then there was the indictment in this case, correct?

3    A.   An indictment, yes.

4    Q.   There was obviously a trial, and following a jury trial,

5    you were found guilty; is that right?

6    A.   I was found guilty.

7    Q.   While awaiting that trial, indicted for the fourth time by

8    a federal grand jury in this building; is that right?

9    A.   Correct.

10   Q.   You testified earlier about the issue of whether you were

11   a leader or organizer, which are phrases that are used in the

12   federal Guidelines.  Is that your understanding?

13   A.   Yes, it is.

14   Q.   When you testified about that, you testified in general

15   terms about who played what role in this fraud; is that right?

16   A.   No.  I don't -- I don't think you're characterizing --

17   well, possibly I didn't characterize it right.

18        I don't believe I played any role in a fraud

19   intentionally.  I believe that Tom Murphy was the

20   leader/organizer and sole perpetrator of the fraud.

21   Q.   You'd agree, though, that, first of all, you testified

22   that with respect to Babajan Khoshabe, one of your

23   co-defendants, you approached him and said something to the

24   effect of -- if I understood your testimony a few moments ago,

25   something to the effect of -- here's an opportunity for us; is

1   that right?

2   A.   Yes.

3   Q.   So, you approached Babajan and --

4   A.   I approached Babajan to show him that -- he and I had been

5   buying and selling properties.  And I approached him and told

6   him that Tom Murphy had called me and said that he had clients

7   who were in the short sale business and that bought and sold

8   foreclosed mortgage notes or mortgage notes -- mortgages and

9   notes that were in arrears.

10  Q.   My question, though, is:  Did Thomas Murphy approach

11  Babajan or did you approach Babajan to bring him into what

12  turned out to be an investment scam?

13  A.   It did turn out to be an investment scam by Tom Murphy.  I

14  approached Babajan.  Tom approached me.  I approached Babajan.

15  Did I approach him because I wanted to perpetrate an

16  investment scam?  That's the question.

17  Q.   That's not what I asked you.  What I asked you was who

18  approached who?

19  A.   I approached Babajan.

20  Q.   And in terms of -- are you familiar with someone named

21  Francisco Cisneros?

22  A.   Yes.  Francisco was a maintenance man.

23  Q.   Handyman who reported to you; is that right?

24  A.   He reported to me, Babajan and Anthony.

25  Q.   Reported to you, among others; is that right?

Rossini - cross

1   A.   Among others.

2   Q.   And his role was to maintain these properties that

3   purportedly were in the process?

4   A.   His role was to maintain 4037 Adams, which Devon Street

5   owned; 38 -- excuse me, sir, 3820 West Adams, which Craig

6   Shaffer owned, which I had purchased and then sold to Craig;

7   4045 Wilcox, 5410 Fulton, 4321 Marshfield; and 8435 Burling.

8   That was it from -- I owned each of those properties.

9   Q.   You directed Francisco Cisneros --

10  A.   To --

11  Q.   -- as to -- let me finish, please.

12  A.   Okay.

13  Q.   You directed Francisco Cisneros as to maintaining those

14  properties that you just listed; is that fair?

15  A.   Correct, yes.

16  Q.   During the course of what turned out to be a massive fraud

17  on these victims, you directed investors to send their

18  investment funds to Thomas Murphy; is that right?

19  A.   Babajan directed them to do that.  I never directed them.

20  Q.   Your testimony today under oath is that you never

21  directed --

22  A.   I --

23  Q.   Let me finish, please.

24  A.   Okay.

25  Q.   Your testimony today under oath is that you never directed

Rossini - cross

1   any of the victims in this case to direct their funds to

2   Thomas Murphy?

3   A.  I have to revise that.  I rarely directed victims.  I may

4   have directed from time to time a victim to send it to Murphy.

5   But it was normally Babajan who -- because he talked to them

6   in Farsi or in Aramaic.

7   Q.  In terms of once the funds from these victims went to

8   Thomas Murphy, you sent e-mails and communicated to Thomas

9   Murphy about what to do with those funds; is that right?

10  A.  Yes.

11  Q.  You received substantial amount of those funds; is that

12  right?

13  A.  Yes.

14  Q.  Didn't receive them by check; is that right?

15  A.  Normally by check, yes.

16  Q.  Received them by check?

17  A.  From Tom, yes.

18  Q.  You received them by wire transfer?

19  A.  Maybe once.

20  Q.  The bulk of the funds that you received --

21  A.  By check from Tom.

22          THE COURT:  Mr. Rossini, will you let him finish the

23  question.

24          THE WITNESS:  I'm sorry, your Honor.

25  BY MR. MITCHELL:

Rossini - cross

37

1   Q.  Money orders; isn't that right?

2   A.  No.

3   Q.  Did you ever receive funds by way of money order from

4   Thomas Murphy?

5   A.  Yes.  Not money orders, but cashier's checks.

6   Q.  Cashier's checks?

7   A.  Yes.

8   Q.  You then didn't negotiate those at a bank, did you?

9   A.  Sometimes deposited them to Chase.  Other times -- and the

10  bulk of the time -- probably at a currency exchange.

11  Q.  The bulk of the time at a currency exchange; is that

12  right?

13  A.  Correct.

14  Q.  You actually, in fact, of the money that was directed by

15  the victims in this case, you received in excess of $2 million

16  worth of those funds; is that right?

17  A.  According to FBI Forensic Accountant Prescott, 2,550,000.

18  Q.  And that's an accurate accounting; is that right?

19  A.  Probably if we talk about the total, I'm not sure if it's

20  an accurate accounting.  I know that I received 2,550,000, and

21  my chart shows how I spent it.

22  Q.  And you don't deny, though -- just to be clear, you don't

23  deny that you received in excess of $2 million of these victim

24  funds; is that right?

25  A.  For payment to investors, no, I don't deny that.  I deny

Rossini - cross

38

1    that I received 2,550,000 for myself.  Yes, I do deny that.

2    Q.  You acknowledge that you received more than $2 million of

3    investor funds.  Much of it was in the form of cashier's

4    checks; is that right?

5    A.  Correct.

6    Q.  Not checks.  Not traditional --

7    A.  Both.

8    Q.  -- bank checks?

9    A.  Both.

10    Q.  The bulk of it was in the form of cashier's checks; is

11    that right?

12    A.  I'm not -- Mr. Mitchell, I'm not trying to obfuscate.  If

13    you want me to present to the Court the checks -- the

14    cashier's checks and the personal checks, business checks --

15    of Thomas Murphy, I can do that.  I'm not sure if the bulk

16    was -- it was very close.  It may have been -- the bulk may

17    have been cashier's checks.  I can't answer that "Yes" or

18    "No."  I can get you the checks.

19    Q.  You signed the -- you're familiar with the phrase

20    "guarantee agreement," right?

21    A.  Yes.

22    Q.  And you signed those, correct?

23    A.  I did.

24    Q.  You just talked with investors, victims who demanded their

25    money back; is that right?

Rossini - cross

1   A.  Yes.

2   Q.  They went to you in an effort repeatedly to try and get

3   their money back; is that right?

4   A.  Yes.

5   Q.  You stated when you testified earlier, if I understood you

6   correctly, you said something to the effect of whenever money

7   came to me that was supposed to go to victims, I forwarded

8   that money to the victims.

9           Is that what you testified to?

10  A.  Yes.

11  Q.  That was not true, was it?

12  A.  Yes, it's true.  When money that was sent to me by Murphy

13  that was to go to the victims -- that was, Murphy would say

14  this money is for so-and-so and that money is for so-and-so --

15  I would send it to the victims.

16  Q.  I want to ask you about your -- some questions that you

17  testified about relating to your health.

18  A.  Uh-huh.

19  Q.  You testified you have a pacemaker; is that right?

20  A.  Yes.

21  Q.  Approximately when was that pacemaker --

22  A.  Labor Day weekend 2013, at Lake Forest Northwestern

23  Hospital.  Dr. William Benj (phonetic) was the cardiologist.

24  Q.  So, 2013; is that right?

25          That was approximately during the time that at least

Rossini - cross

1  part of this scheme was ongoing; is that right?

2  A.  Yes.

3  Q.  While you were awaiting trial in this case, you, again,

4  were indicted for a fourth time by a grand jury in this

5  building, correct?

6  A.  Yes.

7  Q.  And at that time, you had the pacemaker that was installed

8  in 2013 --

9  A.  Yes.

10  Q.  -- is that right?

11      The pacemaker didn't stop you from engaging in the

12  conduct that you now face sentencing for; is that right?

13  A.  Are you asking me if a pacemaker stopped me or did not

14  stop me from committing a financial fraud?  I don't believe I

15  committed a financial fraud, Mr. Mitchell.

16  Q.  Didn't -- the pacemaker did not impede your ability to --

17  A.  Work.

18  Q.  -- to work and to --

19  A.  No.

20      MR. BUTLER:  Objection, your Honor.  The fact that he

21  has a pacemaker, this is argumentative.  It does not have any

22  bearing on the facts in the PSR.  They're only relevant and

23  probative of his compassionate release.  To argue whether that

24  his pacemaker had anything to do with what's in the PSR is

25  irrelevant as it relates to the execution of some kind of

Rossini - redirect

41

1    scheme.

2              THE COURT:  I have wide latitude in considering

3    various factors, including the defendant's health and health

4    history.  So, the objection is overruled.

5    BY MR. MITCHELL:

6    Q.  The pacemaker was installed in 2013, as you testified,

7    correct?

8    A.  Yes, sir.

9    Q.  The conduct that is at issue in the pending case in front

10   of Judge Tharp, that happened well after that; is that right?

11   A.  2017.

12             MR. MITCHELL:  Your Honor, no further questions.

13             THE COURT:  Mr. Butler, anything else?

14             MR. BUTLER:  Just two quick questions, your Honor.

15                    REDIRECT EXAMINATION

16   BY MR. BUTLER:

17   Q.  You're not disputing any of the facts as it relates to

18   your criminal involvement and your criminal history that

19   Mr. Mitchell chronicled, are you?

20   A.  No.  I'm disputing this case.

21   Q.  Right.

22   A.  And I'm disputing the 2017 case before Judge Tharp.  The

23   previous, not at all.

24   Q.  I'm asking you now, as a 73-year-old, are you the same

25   person that committed those offenses previously?

Rossini - redirect

 1   A.  No.  After fi- -- four years of detention, I feel that

 2   I've changed quite a bit.

 3   Q.  Tell your Honor --

 4   A.  I'm not admitting -- I'm not admitting guilt, Mr. Butler,

 5   on the other -- on these two cases.  But, yes, I have changed

 6   a lot in my attitudes.

 7   Q.  Tell the Judge how and why you're a different person now,

 8   at 73 years old in the face of a pandemic, than you were when

 9   you committed these offenses?

10   A.  Well, being at the MCC and seeing the variety of different

11   inmates, detainees, et cetera, one time the head of SIA --

12   that's the internal affairs -- asked me how come people come

13   and talk to me all the time.  And I told him, I said in the

14   land of the blind, the one-eyed man is king, you know.  And,

15   unfortunately, so many of these poor guys have no education,

16   no real prospects other than what got them there.  And I do

17   have prospects.  I do have an education.  And it made me feel

18   that, you know, I really need to be circumspect about what I

19   do in the future.  Whether I believe I'm innocent of the case

20   before this Court or the case before Judge Tharp doesn't mean

21   I shouldn't be a little more circumspect in how I handle

22   things.

23           MR. BUTLER:  Thank you.

24           THE COURT:  Anything else, Mr. Mitchell?

25           MR. MITCHELL:  Nothing further, Judge.  Thank you.

43

```
 1                    THE COURT:  Thank you.

 2               You may step down, Mr. Rossini.  Thank you.

 3          (Witness excused.)

 4               THE COURT:  So, let's go through the Sentencing

 5     Guideline calculations, then.

 6               Like I said, I'm just going to -- well, first of all,

 7     Mr. Butler, I'm just going to go through those and you tell me

 8     whether or not there is an objection and the basis for your

 9     objection.

10               First, the Presentence Investigation Report

11     recommended a two-level -- let's start with the Base Offense

12     Level, which is the loss amount.  Under the Presentence

13     Investigation Report or as recommended by the Presentence

14     Investigation Report, the Presentence Investigation Report

15     finds a loss amount of more than $3.5 million and less than

16     $9.5 million.

17               Does defendant contest that?

18               MR. BUTLER:  Mr. Rossini does contest that, your

19     Honor.  We submitted a chart as it relates to the restitution

20     he provided, and we stand on that, along with the testimony of

21     Mr. Rossini.

22               But we do have an objection, yes.

23               THE COURT:  Okay.

24               Mr. Mitchell?

25               MR. MITCHELL:  Your Honor, during the course of the
```

1    defendant's trial, the government presented evidence,

2    including an exhibit, Government Exhibit Investor Funds, which

3    was attached to the government's version.  It outlines -- that

4    document, along with the testimony that was presented during

5    the trial, outlines that investors directed $7.3 million to

6    the defendant and his co-defendants, in that the defendants

7    received $2.5 million of those funds.

8           Based on Government Exhibit Investor Funds, the

9    government has certainly satisfied its burden by preponderance

10   of the evidence -- in fact, beyond a reasonable doubt -- that

11   the loss amount was in excess of three-and-a-half million

12   dollars, as correctly calculated by Probation.

13          THE COURT:  Any reply, Mr. Butler?

14          MR. BUTLER:  No, your Honor, other than the fact that

15   I wasn't trial counsel.  I did review the transcript.  I have

16   spoken with Mr. Rossini.  And I stand on our submission.  So,

17   nothing further.

18          THE COURT:  Thank you.

19          So, based upon my review of the documents submitted

20   by the government and after considering the documents

21   submitted by Mr. Rossini, and given the fact that I was the

22   judge that presided over Mr. Rossini's trial, I find that

23   there is ample evidence in the record to show by at least a

24   preponderance of the evidence that the fraudulent scheme at

25   issue and fraudulent scheme in which Mr. Rossini was involved

 1   resulted in approximately $5 million of losses by the

 2   individual investor, thereby triggering the one-level

 3   enhancement under Section 2B1.1(b)(1)(J) of the Sentencing

 4   Guidelines.

 5          So, let's then move to the next one, which is

 6   Sentencing Guidelines 2B1.1(b)(2)(B), which is that the

 7   offense at issue resulted in substantial financial hardship to

 8   ten or more victims.

 9          Mr. Butler, does Mr. Rossini contest that finding?

10          MR. BUTLER:  We do, your Honor.  We stand on the

11   testimony of Mr. Rossini, along with our court filings.

12          THE COURT:  Very good.

13          Mr. Mitchell?

14          MR. MITCHELL:  Your Honor, the defendant's testimony

15   didn't change the fact that there were in excess of ten

16   investors.  The PSR correctly outlines the number of

17   investors.

18          Mr. Rossini's testimony is that he didn't participate

19   in the fraud; that -- he states that co-defendant Murphy

20   deceived him, but doesn't really dispute the fact that there

21   are this number of victims.

22          And, so, based on that, certainly by a preponderance

23   of the evidence -- and, in fact, beyond a reasonable doubt --

24   that there were in excess of ten victims.

25          THE COURT:  With regard to Mr. Rossini's testimony

1    here before the Court today stating or attesting to the fact

2    that he was not involved in the fraudulent scheme and the

3    fraudulent conduct that forms the basis for the jury verdict

4    in this case that's against him, I find Mr. Rossini's -- I

5    give Mr. Rossini's testimony little to no weight for the

6    following reasons.

7          First of all, I find, given his history of fraud

8    convictions that go to his ability and willingness to be

9    honest and, added to that, the fact that Mr. Rossini himself

10   lied to this Court, lied to me while he was on pretrial

11   release claiming that he was visiting an ill mother in

12   California when, in fact, he was not, and also given the fact

13   that Mr. Rossini has all of the incentive in the world today

14   to manufacture or to recast his involvement in the scheme, and

15   finally, of course, given the jury verdict in this case that

16   found Mr. Rossini and his co-defendants guilty on all 14

17   counts of wire and mail fraud, for all of those reasons, I

18   find Mr. Rossini's testimony here not very credible at all and

19   I give it little to no weight.

20         Given that, I find that there is substantial evidence

21   in the record by a preponderance of the evidence at least that

22   the fraud perpetrated by Mr. Rossini and his co-defendants did

23   cause substantial financial hardship to ten or more victims in

24   this case.  There was certainly more than ten investors from

25   the two churches that invested in this scheme.  And there was

1   substantial testimony during the trial that many of them had

2   to basically invest their life savings.  Some of them borrowed

3   money to invest in this fraudulent scheme.

4           And, so, therefore, the Court finds that the

5   two-level enhancement under Section 2B1.1(b)(2)(B) is

6   appropriate.

7           Next, the Presentence Investigation Report also

8   proposed a two-level enhancement for the fact that the offense

9   involved sophisticated means.

10          Mr. Butler, does Mr. Rossini object to that

11  enhancement?

12          MR. BUTLER:  We do, your Honor.  And we'll stand on

13  his testimony and our submission.

14          THE COURT:  Mr. Mitchell, anything to add?

15          MR. MITCHELL:  Yes, your Honor.

16          The PSR correctly imposes this two-level enhancement

17  based on, among other things, the use of fake documents, of

18  these bogus guarantee agreements that the jury heard in detail

19  about; the Devon Street business itself was a bogus, fake

20  business; the use of Francisco Cisneros as a, quote-unquote,

21  handyman to maintain properties to which the defendant knew he

22  didn't have any connection; and, also, the payment of these

23  fake rent payments which were, in fact, Ponzi scheme payments.

24          All of that, in addition to the other evidence

25  presented at trial, confirms that the scheme involved

1  sophisticated means.

2          THE COURT:  All right.

3          Having reviewed the record in this case, I agree with

4  the proposal by the Probation Office in the Presentence

5  Investigation Report of a two-level enhancement under Section

6  2B1.1(b)(10)(C) that the offense involved sophisticated means.

7          As noted by the government here, the fraudulent

8  scheme involved the creation of false guarantee agreements,

9  fake factual sheets and financial prospectus, fake tours of

10  buildings that defendants did not own or had no interest in,

11  fake rental payments which, in fact, they were just Ponzi

12  scheme payments, as well as the sham lawsuit brought in 2013

13  by Mr. Rossini and Mr. Khoshabe against Mr. Murphy in order to

14  keep the investors at bay.

15          Those are just some of the examples of the

16  machinations that Mr. Rossini and his co-defendants went

17  through to carry out this fraud.  And, so, therefore, the

18  Court finds the two-level enhancement under 2B1.1(b)(10)(C) is

19  warranted certainly by a preponderance of the evidence in this

20  case.

21          The next one I want to talk about is the two-level

22  enhancement proposed by the government of Section 3A1.1(b)(1)

23  that Mr. Rossini knew or should have known that the victims of

24  the offense were vulnerable victims.

25          Mr. Mitchell, the government raised this, so I'll

1    first ask you to address this enhancement.

2            MR. MITCHELL:  Yes, your Honor.

3            The defendant knew -- and the government -- the

4    evidence at trial confirmed that the defendant knew -- that

5    the victims of this fraud scheme were members of the Assyrian

6    community who, based on their shared Assyrian heritage, were

7    vulnerable to the defendant's fraud, the fraud perpetrated by

8    the defendant and his co-defendants.

9            Specifically, your Honor, as will be highlighted in

10   the presentation of the 3553 factors, the defendant and his

11   co-defendants initially targeted the priest from St. Odisho

12   Church knowing that if they were able to convince the priest

13   to invest and he believed that the investment scheme was real

14   and profitable, then that would lead to still more

15   investments.  This was preying on not just the membership in

16   the Assyrian community or the Assyrian church, but the

17   connection that the head of this church, Father Pithyou, had

18   to the members of the church.

19           And based on all of that, your Honor, a two-level

20   enhancement is appropriate because the victims were, in fact,

21   vulnerable victims as defined under the Guidelines and because

22   of the defendant preying on that vulnerability.

23           THE COURT:  Mr. Butler, does defendant have an

24   objection to the two-level enhancement as proposed by the

25   government?

1          MR. BUTLER:  Yes, your Honor.

2          First of all, usually crime is usually locally based.

3    It's opportunistic and it's environmental.  People victimize

4    people within their proximity.

5          Now, in this instance, crime occurs in whatever

6    ethnic community it may be.  People perpetrate crimes against

7    other people of the same ethnicity.  That's unfortunate, but

8    that's reality.

9          So, in this instance, the government is putting the

10   cart before the horse.  I did review the trial transcript.  I

11   did review the PSR.  And unless I missed it, I didn't see any

12   specific evidence where the Assyrian community was targeted.

13         This was opportunistic.  Mr. Rossini had a prior

14   relationship with this individual.  And based on that prior

15   relationship, he exploited a relationship, not a community.

16   It didn't matter what the ethnicity of that person was.  It

17   didn't matter what the ethnicity of that person was.  If

18   you're a target, if you are a, quote-unquote, con man doing

19   something that's a Ponzi scheme or a pigeon drop, you target

20   someone.  And that person generically -- without saying he did

21   it in this instance, that person is just criminally referred

22   to as a mark.  And a mark does not bear any ethnicity other

23   than the imprimatur of opportunity.  And that's what happened

24   here because there's no evidence to prove that they were

25   targeted because of their culture.

1        THE COURT:  So, having reviewed the record, here I

2   agree with Mr. Rossini that the two-level enhancement under

3   Section 2A1.1(b)(1) should not apply to this case.  And that

4   is based upon the fact that the comment to that section

5   defines a vulnerable victim to mean an individual "who is

6   unusually vulnerable due to age, physical or mental condition,

7   or is otherwise particularly susceptible to the criminal

8   conduct."

9        Here, I recognize that many of the victims were part

10  of the Assyrian community and some of them were immigrants to

11  this country or, for some of them, English was not their first

12  language.  However, the ones that testified spoke English very

13  clearly, and some of them appeared to have owned their own

14  businesses or made other investments.  There's nothing in the

15  record, I find, that would warrant a finding that the victims

16  here were unusually vulnerable due to age, physical or mental

17  condition.  Accordingly, I am not going to apply the two-level

18  enhancement under Section 3A1.1(b)(1).

19       Let me correct something before we move on, and that

20  is the base -- the specific offense characterization based

21  upon the amount.  I think I erroneously may have said that is

22  an additional single point, and I was looking at the PSR.  In

23  fact, the Base Level is increased by 18 levels for the -- for

24  a case where the actual loss is more than $3.5 million but

25  less than $9.5 million.

```
1            All right.  Next, under the Sentencing Guideline

2   Section 3B1.3, whether Mr. Rossini abused a position of

3   private trust.

4            Mr. Butler, does Mr. Rossini contest that

5   enhancement?

6            MR. BUTLER:  We do.

7            THE COURT:  Okay.

8            Mr. Mitchell?

9            MR. MITCHELL:  Just one moment, your Honor.

10      (Brief pause.)

11            MR. MITCHELL:  Your Honor, that's actually not --

12   that's not an enhancement that we are -- the government is

13   seeking at this time.

14            THE COURT:  All right.  Very well.

15            And I agree with the government that Section 3B1.3

16   just is not applicable here.  I understand defendant did use

17   his company Devon Street Investments as a vehicle to persuade

18   victims to invest in the real estate deal, but those

19   transactions alone did not create a fiduciary relationship or

20   amount to such.

21            Here, there's insufficient evidence in the record to

22   show that defendant held himself out to be a certified

23   investment adviser or someone with particular licensing

24   related to real estate transactions of this kind.  And, so,

25   therefore, the Court finds Section 3B1.3 does not apply here.
```

1          Lastly, under Section 3B1.1, whether or not defendant

2    was an organizer or leader of criminal activity that involved

3    five or more participants.

4          I understand that Mr. Rossini addressed this in his

5    testimony.  And Mr. Rossini and Mr. Butler addressed it to

6    some extent in their sentencing submissions.

7          Mr. Butler, is there anything that you'd like to add

8    to that?

9          MR. BUTLER:  No, your Honor.

10          THE COURT:  Mr. Mitchell, is there anything that you

11    would like to add other than what the government has provided

12    me already?

13          MR. MITCHELL:  No, your Honor.  Just that for the

14    reasons stated in the sentencing memorandum submitted by the

15    government, the offense involved at least five participants

16    and the defendant was a leader or organizer of the fraudulent

17    scheme.

18          THE COURT:  So, based upon the record that was

19    presented during the trial and that's recapped here for

20    purposes of sentencing, I find that the government has proved

21    by a preponderance of the evidence at least that Mr. Rossini

22    was, in fact, the organizer and leader of the criminal

23    activity that involved himself, Thomas Murphy, Anthony

24    Khoshabe, Babajan Khoshabe, and Frank Cisneros.

25          Second, the record is full of instances where Mr.

1    Rossini was the one who took the primary role in coordinating

2    the transactions at issue, in pitching and selling the project

3    to potential investors, in communicating with investors and

4    responding to investor inquiries.  He directed the use and

5    distributions of the funds and filed the sham lawsuit against

6    Mr. Thomas Murphy to keep the investors at bay when they

7    complained.

8           For all of these reasons, the Court finds that the

9    four-level enhancement under Section 3B1.1 is warranted here.

10          So, given that --

11          MR. MITCHELL:  Your Honor, may I interject with

12   one --

13          THE COURT:  Yes.

14          MR. MITCHELL:  -- additional proposed enhancement?

15          Prior to today, the government was not seeking, and

16   the PSR had not recommended, an adjustment for obstruction of

17   justice.  Your Honor may have been getting to this, but I

18   wanted to make sure I interjected and propose that an

19   adjustment for obstruction of justice is wholly appropriate

20   based on the fraudulent testimony the defendant just provided

21   to the Court.  And I believe that the enhancement would be an

22   additional two levels.

23          Specifically, your Honor, just for the record, the

24   fraudulent testimony that the defendant just provided to the

25   Court included testimony that while the fraud was ongoing, the

1   defendant did not know that there was, in fact, a fraud and

2   testified that co-defendant Murphy was the one who was,

3   essentially, carrying out the fraud on his own and to a

4   certain extent defrauding the defendant, as well as the

5   victims.  That is completely contrary to the evidence that was

6   presented at trial.  It's contrary to the verdict from the

7   unanimous jury.  And based on all that, an adjustment for

8   obstruction of justice is appropriate.

9           MR. BUTLER:  Your Honor, that is not obstruction of

10  justice.  He has a different view of the evidence than the

11  government has.  If we were to follow the government's line of

12  thinking, then every appeal that would be filed in a case

13  would constitute obstruction of justice because it would be

14  contrary to a jury verdict.

15          So, Mr. Rossini took the stand.  He has a right to,

16  to do that.  But because the government has a different view

17  of his testimony, that does not constitute obstruction.

18  There's no factual specificity that the government can point

19  to that his testimony was perjurious.  He testified based on

20  his view of the evidence, and he gave his opinion relative to

21  his conduct.

22          Now, the fact that the government disagrees with that

23  is not obstruction.  That would have a chilling effect to

24  prevent any defendant in any courtroom from taking the stand

25  at sentencing or even allocution.

1          THE COURT:  With regard to the government's motion

2     for two-level enhancement under Section 3C1.1 for obstruction

3     or impeding the administration of justice, the Commentary or

4     the Application Notes to 3C1.1 states, one, that as -- one of

5     the examples of covered conduct as providing materially false

6     information to a judge or magistrate judge.

7          Here, I do find that Mr. Rossini, during his

8     testimony at sentencing, did provide me under oath with

9     materially false information for the reasons I have explained,

10    and perhaps I need to explain it a bit further and bit more

11    clearly.

12         So, Mr. Rossini's theory of the case is that it was

13    Mr. Murphy who was the architect of the fraudulent scheme and

14    it is Mr. Murphy who should bear all of the blame.  According

15    to Mr. Rossini, he himself did not know about the scheme at

16    all for some time, and when he did find out, that he did all

17    within his power to try to repay the investors; but it was

18    Mr. Murphy and the Khoshabes who were the ones who refused to

19    do so.

20         And, in fact, in his sentencing submissions, Mr.

21    Rossini goes so far as to say that even the FBI interfered

22    with his ability to try to make investors whole, referring to

23    his attempts to make Ms. Khodi, K-h-o-d-i, whole with another

24    transaction.  But he says that the FBI scotched that

25    transaction by interfering with it.

1        As I said, the Court finds Mr. Rossini's factual

2    account, as stated in his sentencing filings, as well as

3    today, to be wholly incredible.  I do not think -- I find that

4    his testimony and his account of the facts are not credible in

5    light of the record that was presented to the jury during the

6    jury trial in this case that I oversaw.

7        Furthermore, additional reasons that I give no weight

8    to Mr. Rossini's testimony include, as I noted before, his

9    prior history of fraud convictions, the fact that he's already

10   lied to this Court in the past while he was on pretrial

11   release, and his incentives for doing so now.

12       Mr. Rossini's theory of the case or his rendition of

13   what happened is also, as Mr. Mitchell pointed out, directly

14   contrary to the findings of the jury and the verdict that

15   found Mr. Rossini guilty on all 14 counts of wire and mail

16   fraud.

17       For those reasons, the Court does not give any weight

18   to Mr. Rossini's testimony here or his account of the events,

19   and the Court finds that a two-level enhancement under Section

20   3C1.1 is warranted in this case.

21       MR. BUTLER:  Just for the record, your Honor, we

22   object to the Court's finding relative to the obstruction.

23       THE COURT:  Very well.  So noted.

24       Mr. Butler, are there any other objections that you

25   want to put on the record with regard to the Sentencing

1  Guideline calculations?

2          MR. BUTLER:  No, your Honor.

3          THE COURT:  Are there any other objections you want

4  to place on the record with regard to the factual findings in

5  the PSR?

6          MR. BUTLER:  No, your Honor.  They've been stated in

7  court files.

8          THE COURT:  Okay.

9          How about the government?

10          MR. MITCHELL:  Nothing, your Honor.  Thank you.

11          THE COURT:  So, in light of that, with the two levels

12  for obstruction, the Court finds that the defendant's Total

13  Offense Level -- let me just make sure I get this right.

14      (Brief pause.)

15          THE COURT:  Can I ask the probation officer, on Page

16  19 of the PSR, the Total Offense Level is noted as being 35.

17          MR. FREEZE:  Yes, Judge.

18          THE COURT:  And yet, in the recommendation, the Total

19  Offense Level is noted as 37.  I believe that should be 35 in

20  the recommendation.

21          Is that not correct?

22          MR. FREEZE:  I believe, yes, Judge, it should be.

23          THE COURT:  Okay.  That's what was throwing me off.

24          MR. FREEZE:  I apologize, Judge.

25          THE COURT:  So, based upon all of that, I find that

1    Mr. Rossini's Total Offense Level is 35 and his criminal

2    history score is 4, resulting in a Criminal History Category

3    of III.

4           Counts 1 through 14 each carries a maximum term of

5    imprisonment of 20 years, a maximum term of supervised release

6    of three years, and a maximum fine of $250,000.

7           Therefore, the Guideline range in this case yields a

8    Guideline range of imprisonment of 210 to 262 months,

9    supervised release period of one to three years, and a fine of

10   between $40,000 and $400,000.

11          Is that what you have?

12          MR. FREEZE:  That's correct, Judge.  That's what I

13   have, as well.

14          THE COURT:  Mr. Mitchell, is that what you have?

15          MR. MITCHELL:  Yes, your Honor.  Based on your

16   findings, that's the calculation that I have, as well.

17          THE COURT:  Mr. Butler, based upon my findings -- I

18   understand that you have lodged --

19          MR. BUTLER:  Right.

20          THE COURT:  -- various objections, but is that

21   correct?

22          MR. BUTLER:  Yes, your Honor.  In fact, I have on

23   Page 37, under Paragraph 143, that it was based on an Offense

24   Level of 35 and not 37.

25          THE COURT:  All right.  Very good.

1          A special assessment also of $100 is mandatory for

2     each count, totalling a special assessment of $1,400.  And the

3     Court is required to impose restitution for the offense, as

4     well.

5          With regard to restitution, Mr. Mitchell, I know the

6     government provided Ms. Acevedo with a spreadsheet and a list

7     of restitution.  Is that provided in the PSR, as well, as part

8     of the government's --

9          MR. MITCHELL:  Just one moment, your Honor.  I want

10    to make sure that the restitution amount is -- it is, your

11    Honor.  In Paragraph 139, the restitution amount of $5,272,847

12    is the calculation that was proposed by the government and

13    adopted by Probation.

14          THE COURT:  That is not the same, though, as the one

15    in the most recent spreadsheet provided, right?  The most

16    recent spreadsheet has a lower level.  It has $5,204,305,

17    unless I'm mistaken.

18          MR. MITCHELL:  Just one moment, your Honor.  I'm just

19    going to make sure I have the right number.

20          THE COURT:  Certainly.

21          And, Mr. Butler, the names and the amounts were

22    provided as part of the trial; is that correct?

23          I just want to make sure that Mr. Rossini had prior

24    notice of the particulars with regard to the restitution

25    amounts.

1          (Brief pause.)

2               MR. BUTLER:  Your Honor, if I may?

3               THE COURT:  Hold on for a second.  Let's give

4     Mr. Mitchell a chance to look.

5               MR. MITCHELL:  Your Honor, I don't see the

6     spreadsheet attached to the PSR.  And, so, the number that I'm

7     working off from in terms of restitution is $5,272,847.

8               THE COURT:  All right.  Mr. Butler, what were you

9     going to say?

10              MR. BUTLER:  I have received other chart information

11    from Mr. Mitchell that I've discussed with Mr. Rossini.

12    Although Mr. Rossini disputes that, it's really immaterial and

13    irrelevant because Mr. Rossini is without funds and we've

14    calculated it based on restitution far below that.  So, it's

15    really a nullity.

16              Mr. Rossini has disputed it.  I've discussed it with

17    him.  I think Mr. Mitchell and I have exchanged information

18    before and during the history of this case.  So, that is no

19    surprise to us, that figure.  But we're so far apart, it

20    really doesn't matter.

21              THE COURT:  I understand.  Okay.

22              So, with regard to restitution, again, based upon the

23    testimony and evidence presented at trial, the Court finds

24    restitution to be $5,272,847.

25              With regard to the documents provided by Mr. Rossini

1    contesting that amount, I have reviewed them, and I do not

2    find them credible for the same reasons I do not find his

3    testimony at the hearing today to be credible.

4         So, that does it for the Sentencing Guideline range.

5    Let's then go to the other statutory sentencing factors.

6         In addition to the advisory Sentencing Guideline

7    range, I must consider the sentencing factors set forth in 18

8    U.S.C. Section 3553(a).  Those include, but are not limited

9    to, the nature and circumstances of the offense, as well as

10   history and characteristics of the defendant here, Mr.

11   Rossini.

12        I must also consider the need for any sentence

13   imposed to reflect various factors, including the seriousness

14   of the offense, the need to promote respect for the law, to

15   provide just punishment for the offense, to afford adequate

16   deterrence to criminal conduct, the need to protect the public

17   from further crimes of the defendant, and the need to provide

18   the defendant with any necessary educational or vocational

19   training, medical care, or other correctional treatment in the

20   most effective manner.

21        I must also consider the kinds of sentences available

22   and advisory Sentencing Guideline range that we just

23   discussed.  I must also consider the need to avoid unwarranted

24   sentencing disparities and the need to provide restitution to

25   any victims of the offense.

```
 1              All right.  So, as I said, I have reviewed the
 2    various sentencing submissions that were filed in this case.
 3    At this point, Mr. Butler, I give you the floor so that you
 4    can address whatever factors you believe are relevant to
 5    sentencing, as well as highlighting whatever issues that you
 6    would like to highlight on behalf of Mr. Rossini.  Then after
 7    you're done, if Mr. Rossini would like to add anything else in
 8    argument, that's fine.  Then we'll proceed with the government
 9    after that.
10              In the end, before I determine any sentence, Mr.
11    Rossini, of course, I'll give you an opportunity to address
12    the Court.
13              MR. BUTLER:  Your Honor, I submitted a motion --
14              THE COURT:  And you can take off your mask.
15              MR. BUTLER:  I'm sorry.
16              Your Honor, I submitted a motion that chronicles all
17    of those delineated factors, along with the motion that Mr.
18    Rossini submitted.  So, we will stand on that, along with the
19    testimony that Mr. Rossini provided regarding the
20    compassionate release factors and those involving his health
21    and the health of his wife.  So, we'll stand on that.
22              THE COURT:  All right.  Thank you, Mr. Butler.
23              Mr. Mitchell?
24              MR. MITCHELL:  Your Honor, I just wanted to highlight
25    perhaps for just a few minutes some of the points that we
```

1    raised in our sentencing memorandum.

2         Your Honor, I know, is familiar -- very much

3    familiar -- with the evidence and facts in this case, having

4    presided over an approximately two-week trial; and following

5    that trial the defendant was found guilty of all of the wire

6    and mail fraud charges, including the indictment.

7         The defendant -- the nature and circumstances of the

8    offense, your Honor, weigh in favor of a Guideline sentence of

9    between 210 and 262 months of imprisonment.  The defendant --

10   the nature of the offense involved a fraud scheme, during

11   which the defendant and his co-defendants solicited $5

12   million -- approximately $5 million -- from at least 20

13   victims.

14        The defendant, contrary to what he testified to

15   today, was the one who assembled this team of scam artists:

16   Co-defendants Babajan Khoshabe, Anthony Khoshabe, and adding

17   to the team a crooked lawyer, co-defendant Thomas Murphy.

18   They all worked together, with defendant acting as the leader,

19   to defraud the numerous victims of the Assyrian community and

20   two Assyrian churches.

21        The defendant misrepresented, lied to these victims,

22   stating that their funds would be used to acquire notes in

23   foreclosure.  The defendant said that while the foreclosure

24   process was under way, while that process played out, the

25   purported tenants in the buildings would provide rents that

1    would go to the victims.

2          The defendant provided fake documents -- guarantee

3    agreements and other fraudulent documents -- that included a

4    personal guarantee that the defendant would provide repayment

5    of investor funds within five days.  All of that was part of

6    the fraud.  Defendant was the leader of this fraud, as your

7    Honor correctly determined when calculating the Guidelines.

8          And the rent payments did, in fact, come for several

9    months to these victims.  These rent payments, though, were

10   not, in fact, rent payments.  As your Honor knows, as the

11   evidence proved, they were just Ponzi scheme payments.  These

12   were payments of the victims' money, a portion of their money

13   back to the victims, to encourage them to make additional

14   investments, to encourage them to solicit new investments from

15   other members of the Assyrian community.  And it worked.  The

16   defendant was able to carry out this fraud for quite a while

17   and, again, raised $5 million from these more than 20 victims.

18         Eventually, though, the payments stopped when the

19   defendant -- when the scheme had run its course.  The

20   defendant continued on a web of lies.  Your Honor noted, and

21   we noted in our sentencing memorandum, and it was highlighted

22   during trial, that the defendant worked with his co-defendants

23   to initiate a fraudulent lawsuit to put off these victims.

24         That is the nature of the offense.  It weighs in

25   favor of a Guideline sentence of between 210 to 262 months of

1    imprisonment.  But, your Honor, the circumstances of the

2    offense are even more aggravating and weigh more heavily in

3    favor of a substantial sentence within the Guidelines.

4            Highlighting a few of the aggravating factors that

5    are relevant to assessing the circumstances of the offense,

6    the defendant engaged in a premeditated decision to prey on

7    the members of this close-knit Assyrian community, targeted

8    the priest of St. Odisho Church, Father Pithyou, knew that

9    gaining the priest's trust would lead to additional

10   investments from members of that church community.

11           And it worked.  The defendant, after preying -- along

12   with other co-defendants, preying on Father Pithyou, was able

13   to solicit investments from other victims similarly situated

14   in terms of their finances.  None of these victims were

15   terribly wealthy and trusted the defendant and his

16   co-defendants.  They ended up losing in some cases their life

17   savings.  And that's an aggravating factor.  It's a

18   circumstance of the offense your Honor can and should

19   consider.

20           Another factor, your Honor, is that the fact that

21   this was a fraud from the beginning.  I know your Honor has

22   had in front of him many fraud defendants in the past.  Most

23   frauds that your Honor has seen in the past most likely

24   involve a -- schemes that start out as a legitimate business

25   but morph into and turn into a fraud scheme.  There's a

1　legitimate business opportunity at the beginning, and it turns

2　into a fraud because something goes sideways and rather than

3　fess up, the defendant ends up telling lies and it just kind

4　of snowballs out of control.  That's not the case here.

5　　　　A really aggravating factor, a really aggravating

6　circumstance here is this was a fraud from the beginning.

7　There was never any truth of what the defendant and his

8　co-defendants were doing.  That, again, is a circumstance that

9　weighs in favor of a substantial sentence within the

10　Guidelines.

11　　　　Another circumstance of the offense, your Honor, is

12　the financial and non-financial impact that this fraud had on

13　the victims of the scheme.  You heard from the victims in

14　terms of victim impact statements and then numerous of these

15　victims testified during trial.  To sum up their experience,

16　it caused extreme distress to these victims.  It damaged the

17　fabric of this Assyrian community.  It caused them to look at

18　the world differently.

19　　　　These are religious folks who trusted each other and

20　had an implicit trust in fellow Assyrians, and the defendant

21　destroyed that.  The defendant and his co-defendants destroyed

22　that.  And that is a circumstance of the offense, your Honor,

23　that, again, is aggravating and weighs in favor of a

24　substantial sentence within the Guidelines range of 210 to 262

25　months.

1      Your Honor, the defendant's history and

2 characteristics are outlined in the government's sentencing

3 memo, as well as in the PSR.  But just to sum up, your Honor,

4 the defendant -- this is the defendant's fourth federal fraud

5 indictment.  It's an amazing feat.  The defendant has

6 previously been, and he has several other additional

7 non-federal, state and local fraud convictions.  One for money

8 laundering, as he was quick to point out when he testified

9 earlier today.

10      The defendant's history and characteristics paints a

11 picture of a once-in-a-generation scam artist.  It's why the

12 government is arguing forcefully for a substantial sentence in

13 this case within the Guidelines range, whereas in other fraud

14 cases perhaps a lower sentence would be appropriate.

15      The defendant, if nothing else, your Honor, during

16 today's testimony, the defendant proved that he still has it,

17 that he still has -- he has not lost a step.  That he, if

18 released, would once again engage in fraudulent conduct and

19 get right back to the conduct that led to all of the prior

20 fraud convictions, the charges in this case, and the charges

21 that are at issue in the case pending before Judge Tharp.

22      And, so, based on all of this, including the fact

23 that the defendant has -- was, again, engaging in fraudulent

24 conduct after the several prior felony convictions and federal

25 fraud indictments, the defendant's history and characteristics

1   weigh in favor of a sentence within the Guidelines range of

2   210 to 262 months' imprisonment.

3           The two factors -- the two final factors, your Honor,

4   that I want to highlight are the need for specific deterrence

5   and the need to protect the public.  They overlap with some of

6   the argument that I just made, but just to sum up, your Honor,

7   the defendant has given the Court no reason to believe that he

8   has been deterred from engaging in additional fraudulent

9   conduct if he were to be released.  He has proven today that

10  he is absolutely capable and willing to continue to lie to try

11  and get what he wants.  Today what he wants is to get released

12  from prison, to get a sentence that is not in line with the

13  seriousness of his conduct.  Tomorrow what he would want would

14  be to defraud additional victims, just as he's done for the

15  last several decades.

16          The other factor, your Honor, is protecting the

17  public.  This defendant is willing and able to continue to

18  defraud the public.  He's done it time and time again.  Judges

19  in this building have, to their credit, given him the benefit

20  of the doubt, and he has squandered those prior opportunities.

21          At this point, your Honor, facing his third federal

22  conviction, multiple prior other fraud convictions and a money

23  laundering conviction again, the defendant -- the public needs

24  to be protected from the defendant's future crimes.  And based

25  on all of these reasons, your Honor, the government requests a

1    sentence within the Guidelines range of 210 to 262 months.

2              THE COURT:  Mr. Butler, anything to add?

3              MR. BUTLER:  Your Honor, Mr. Rossini would like to

4    address the Court.

5              THE COURT:  I'll give him a chance --

6              MR. BUTLER:  But I'd like to state that the projected

7    recidivism speculation by counsel is really without any

8    factual basis.  Mr. Rossini is not the same person that he

9    was.  He's testified to that.  I'd like to defer to Mr.

10   Rossini -- Mr. Rossini's request to address the Court.

11             THE COURT:  All right.

12             Before we do that, Mr. Butler, does Mr. Rossini have

13   any objections to the proposed conditions of supervised

14   release?

15             MR. BUTLER:  No, your Honor.

16             THE COURT:  What about the government?

17             MR. MITCHELL:  No, your Honor.

18             THE COURT:  All right.

19             Mr. Butler, before I hear from Mr. Rossini, is there

20   anyone else present who wishes to be heard on his behalf?

21             MR. BUTLER:  No, your Honor.  We've discussed the

22   issue regarding sentencing witnesses, and we have no

23   witnesses.

24             THE COURT:  What about the government?

25             MR. MITCHELL:  Nothing from the government.  Thank

1    you, Judge.

2          THE COURT:  Mr. Rossini, do you want to come up to

3    the podium here.

4          You have the right to address the Court before I

5    determine your sentence.  You may waive that right after

6    speaking with your attorney.  But you certainly have the right

7    --

8          THE DEFENDANT:  Sure.

9          THE COURT:  -- to make a statement today.  Would you

10    like to do so?

11          THE DEFENDANT:  Yes, your Honor.

12          It's a very short statement because most of what I've

13    said you don't believe anyway.  So, all I can tell you is that

14    I'm not the same person I used to be, but that does not mean

15    that I admit in this case or in Judge Tharp's case that I was

16    guilty or am guilty.  I have been guilty in almost every other

17    instance.  But I won't admit it in this instance or in Judge

18    Tharp's.  And I have admitted it in the other instances.  So,

19    I've always pled guilty.  But I won't here.

20          However, I appreciate, you know, your feelings.  I

21    think you're wrong.  I object to them.  I don't think you're

22    being reasonable with me.  But you're the judge.

23          Thank you, your Honor.

24          THE COURT:  Thank you, Mr. Rossini.

25          All right.  I know it's late, but I'm going to ask

1    for everyone's indulgence.  We're going to take a five-minute

2    recess.

3        (Brief recess.)

4        THE COURT:  I've reviewed the Presentence

5    Investigation Report, the sentencing submissions that were

6    made by the parties.  I've considered the arguments of

7    counsel, the statements made by Mr. Rossini, and the various

8    exhibits and documents that he submitted to the Court.  I have

9    reviewed all of it.

10        In arriving at the sentence, I've considered a number

11   of factors.  I have considered the advisory Sentencing

12   Guideline range.

13        With regard to the nature and circumstances of the

14   offense, in or around September 2011 through November 2012,

15   Mr. Rossini, along with co-defendants Babajan Khoshabe,

16   Anthony Khoshabe and Thomas Murphy, engaged in a fraudulent

17   real estate scheme to defraud more than 20 individuals out of

18   more than $7 million.  As part of the scheme, Mr. Rossini

19   solicited monetary investments from these individuals,

20   promising them that their funds would be used to obtain title

21   to various multi-unit rental apartment buildings -- 57 in

22   all -- that were in foreclosure or were soon to be in

23   foreclosure.

24        Mr. Rossini told the individuals that he had been

25   assigned the rights to purchase the mortgage notes to these

1   buildings; that he would foreclose on the buildings based upon

2   those notes; and, that while the foreclosures were taking

3   place, the individual investors would receive the rental

4   income from the buildings and eventually the buildings

5   themselves.  In fact, when Mr. Rossini made these

6   representations to the investors, Mr. Rossini had no rights to

7   any of the buildings.  Instead, he used funds from new

8   investments to pay the supposed rents from the supposed other

9   properties to prior investors.

10         As the funds began to dry up, the investors stopped

11   receiving the rental payments.  And when they inquired about

12   their investments, Mr. Rossini promised to refund them all of

13   their investments.  But with the exception of one investor,

14   Mr. Rossini never repaid any of them.  As for the buildings,

15   Mr. Rossini did eventually obtain title to six of the 57

16   buildings, but he actually purchased those buildings outright

17   rather than through the foreclosure proceeding that he touted

18   to the investors.  And of the six, he only transferred the

19   title to three buildings to investors themselves.

20         To make their fraudulent ruse convincing, Mr. Rossini

21   and his co-defendants created false real estate documents and

22   went so far as to get an individual -- Francisco Cisneros --

23   to pose as a maintenance man when potential investors were

24   taken on tours of buildings that Mr. Rossini, in fact, did not

25   own.  And when investors started to complain en masse about

1    not receiving rental payments, Mr. Rossini blamed Mr. Murphy

2    and even filed a sham lawsuit against Mr. Murphy to give the

3    investors the impression that Mr. Rossini was taking actions

4    to get their investment funds back.

5           All told, the investors lost $5,272,847 on account of

6    the fraudulent scheme while Mr. Rossini made at least 2.5

7    million, of which he negotiated approximately 2 million at

8    various currency exchanges.

9           What is more, Mr. Rossini and his co-defendants

10   targeted individuals at two churches that was attended

11   primarily by families from the Assyrian community, including

12   targeting the priest of one of the churches.  And Mr. Rossini

13   and his co-schemers were well aware that these investors were

14   not wealthy individuals who were using a surplus of funds, but

15   many of them were using their life savings in order to fund

16   these investments.

17          Now, Mr. Rossini, as he testified and as he stated in

18   his papers, believes that and states that it's Mr. Murphy who

19   was behind the whole thing.  And Mr. Rossini, in fact, blames

20   everyone but himself.  According to Mr. Rossini, it was Murphy

21   who masterminded the fraud while he and the Khoshabes had no

22   idea at the beginning.  According to Mr. Rossini, it was

23   Murphy and the Khoshabes that prohibited him from repaying the

24   investors, and that it was even the FBI that thwarted his

25   efforts to repay the investor Ms. Khodi.

1       But as I noted previously, Mr. Rossini's account is

2    contradicted by the findings of the jury, who found him guilty

3    on all 14 counts of wire fraud and mail fraud.  And I find

4    that they're contradicted by the heavy weight of the evidence

5    the government presented in its case during the criminal

6    trial.

7       In the end, this was a vicious and calculated

8    fraudulent scheme.  It was complicated, caused individuals to

9    lose millions of dollars, and took place over many months.

10   Mr. Rossini and his co-defendants simply had no regard for the

11   pain and suffering that they were causing.  It is a serious

12   and troubling criminal scheme and warrants a substantial

13   sentence.

14       Turning to Mr. Rossini's history and characteristics,

15   first, with regard to his criminal history, as the government

16   points out, this is not Mr. Rossini's first conviction for

17   fraudulent activity.  In fact, he has a number of such prior

18   convictions.  For example, in 1986, Mr. Rossini was convicted

19   of forgery when in 1985 he altered and forged a bank check in

20   the amount of $37,500.

21       Then, in 1995, Mr. Rossini was convicted of

22   committing mail fraud in 1991 when he manipulated the price of

23   a company stock through purchases with worthless checks and

24   materially false statements that he sent to a broker and

25   investors.

1          And in 2003, Mr. Rossini pleaded guilty to mail fraud

2     again when he engaged in the unauthorized sale of stocks.

3          And more recently, in 2012, Mr. Rossini pleaded

4     guilty in a state court case for assisting an attorney in

5     making misrepresentations to the court regarding the source of

6     funds for a bond.

7          Mr. Rossini's criminal history portrays an individual

8     who regularly resorts to fraud and misrepresentations to get

9     what he wants, regardless of the consequences or the pain and

10    injury that those representations cause to others.  I also

11    note that his prior term of incarceration did nothing to deter

12    him from committing the conduct at issue here.

13         Accordingly, I find Mr. Rossini's criminal history to

14    be a significant aggravating factor in this case.

15         Turning to his personal background, Mr. Rossini was

16    born in Utica, New York, in 1943 and has earned his bachelor's

17    degree from Utica College at Syracuse University in 1970.  He

18    has been married to Brenda Rossini since December 1985 and has

19    a son Spencer, who is an attorney in Portland, Oregon.  By all

20    accounts, Mr. Rossini has been a devoted husband, a devoted

21    father and a devoted son.

22         Mrs. Rossini suffers from recurring breast cancer

23    that requires regular treatment, as well as other serious

24    health conditions.

25         Mr. Rossini is also close to his 93-year-old

1  mother-in-law and 97-year-old mother, as well as other

2  extended family members.

3          Turning to his medical conditions, Mr. Rossini is 73

4  years old and he has been detained at the Metropolitan

5  Correctional Center for the past five years.  He suffers from

6  a number of significant medical conditions, including needing

7  a pacemaker that requires regular maintenance and monitoring

8  and potential replacement.

9          Mr. Rossini has also shown the ability to maintain

10 lawful employment when he has been forced to do so, having

11 started and maintained a number of businesses.

12         I consider all of these facts with regard to Mr.

13 Rossini's personal history and medical history and family

14 history to be significant mitigating factors.  I am

15 particularly cognizant of the fact that at his advanced age,

16 there is a risk that a lengthy sentence might cause him to

17 spend the rest of his life in prison.

18         That said, his advanced years, I note, did not

19 preclude him from engaging in the fraudulent conduct that

20 forms the basis of the convictions in this case.  And I am

21 concerned that even though he is 73, that Mr. Rossini still

22 will be capable of taking advantage of members of the public,

23 should he be released.

24         I have also considered the fact that due to the

25 restrictions necessitated by the COVID-19 pandemic, that Mr.

1    Rossini's period of incarceration -- or period of detention,

2    rather -- has been significantly more difficult than it

3    otherwise would have been before the COVID pandemic.  And I

4    consider that to be a mitigating factor, as well.

5            Mr. Butler, are there any other arguments in

6    mitigation this I failed to address today?

7            MR. BUTLER:  No, your Honor.

8            THE COURT:  Mr. Rossini, you're clearly a very

9    intelligent, articulate and resourceful person.  You possess

10   many traits and skills that you could contribute to your

11   family and to your community.  After you serve your sentence,

12   it is up to you to make sure that you do so; that you

13   contribute to your community in a lawful manner, to your

14   family in a lawful manner.  Your family counts on you.

15           Also, Mr. Rossini, you're 73 years old.  The days of

16   committing the type of schemes and frauds that you have in the

17   past, they'll only add to the period of incarceration that

18   you've already spent, that you will under the sentence that I

19   impose upon you.  And it seems like a shame to me if you

20   continue to commit fraud when you get out and are found out

21   and convicted, that you spend any more time than you need to

22   and waste any more years of your life than you will need to

23   after you serve this sentence in prison.

24           I hope that you will use this sentence as a wake-up

25   call and commit yourself to being a productive member of

1    society once you are released.

2           Turning first to supervised release, based upon all

3    the factors that I discussed, as well as the other factors set

4    forth in 18 U.S.C. Section 3553(a), I hereby impose a period

5    of supervised release of three years.  As part of supervised

6    release, I hereby impose the conditions that are recommended

7    in the Presentence Investigation Report.  I believe that the

8    term of supervised release and the associated conditions are

9    necessary in order to facilitate Mr. Rossini's transition back

10   into society after the period of incarceration, to provide him

11   with necessary treatment if it remains necessary, and to

12   provide the Probation Office with the tools to supervise Mr.

13   Rossini in a meaningful manner.

14          Mr. Butler, you have the right to request me to read

15   each of the conditions into the record and to provide you with

16   a detailed reasoning for each condition or you may waive that

17   right on behalf of your client.

18          MR. BUTLER:  So waived.

19          THE COURT:  Very well.  The conditions as I've stated

20   will be so imposed.

21          Turning to the period of incarceration, the serious

22   nature of these offenses and defendant's history of fraudulent

23   conduct, as well as his complete lack of remorse, are serious

24   aggravating factors.  And I do not believe that a sentence of

25   time served as requested by the defense is sufficient to

1    impress upon Mr. Rossini a respect for the law, to deter him

2    and others from committing similar crimes or to protect the

3    public from further fraudulent actions committed by Mr.

4    Rossini.

5         That said, in light of the mitigating factors that

6    I've discussed -- in particular, his advanced age, his health

7    conditions, as well as his family support and background -- I

8    find that a Guideline sentence as recommended by the

9    government is greater than necessary to satisfy the purpose of

10   18 U.S.C. Section 3553(a).

11        Accordingly, based upon all the factors that I've

12   discussed, I hereby impose a term of incarceration of 132

13   months.  I find the sentence of 132 months is necessary to

14   impress upon Mr. Rossini a respect for the law, to provide

15   just punishment for this massive fraud, and to deter him and

16   others from committing similar crimes, as well as sufficient

17   to safeguard the public and satisfy the other purposes of 18

18   U.S.C. Section 3553(a).

19        For the record, even if I had not imposed the

20   two-level enhancement for obstruction of justice as requested

21   by the government, I still would have sentenced Mr. Rossini to

22   132 months of custody.

23        Restitution is ordered in the amount of $5,272,847 to

24   be paid jointly and severally with regard -- with respect to

25   his co-defendants Thomas Murphy, Anthony Khoshabe and Babajan

1   Khoshabe.  In light of the significant amount of restitution,

2   I'm waiving the fine.  However, I am not waiving interest on

3   the restitution, in light of the nature of the offense and its

4   impact upon the victims.  A special assessment is also imposed

5   in the amount of $1,400.

6           The Court finds that the sentence as I've stated is

7   sufficient, but not greater than necessary, to satisfy the

8   purposes of 18 U.S.C. Section 3553(a).

9           Mr. Butler, do you have any other legal objections to

10  the sentence, other than what you've already argued or Mr.

11  Rossini has already argued, or do you request any further

12  elaboration of my reasons under Section 3553(a)?

13          MR. BUTLER:  No, your Honor.

14          THE COURT:  How about the government?

15          MR. MITCHELL:  Nothing from the government.  Thank

16  you.

17          THE COURT:  The sentencing judgment will be so

18  entered.

19          Mr. Rossini, you have the right to appeal the

20  validity of your conviction and the sentence imposed.  Any

21  appeal must be filed within 14 calendar days of the entry of

22  the judgment of conviction.  If you cannot afford to appeal,

23  you have the right to apply for leave to appeal in forma

24  pauperis and the Clerk of the Court will prepare and file a

25  notice of appeal upon your request.

1          Mr. Butler, are there any requests for

2    recommendations?

3          MR. BUTLER:  Oxford, your Honor.

4          THE COURT:  I will recommend that the Bureau of

5    Prisons assign Mr. Rossini to an appropriate facility as close

6    to the Chicago area as possible.

7          Mr. Mitchell, is there anything else that I need to

8    address for the government today?

9          MR. MITCHELL:  Nothing for the government.  Thank

10   you, Judge.

11         THE COURT:  Mr. Butler, anything else for Mr.

12   Rossini?

13         MR. BUTLER:  Your Honor, Mr. Rossini would like a

14   request.  I'm not initiating this.  He's doing it -- this of

15   his own volition.

16         Go ahead.

17         THE DEFENDANT:  Your Honor, as you know, I have the

18   case with Judge Tharp.  And since Mr. Butler knows this case

19   very well, obviously, I would like you to make a

20   recommendation, if you can, to Judge Tharp to have the CJA

21   attorney in that case, who's actually done nothing at this

22   point -- I'm not saying he's done wrong; it's just there was

23   nothing to do -- to be replaced by Mr. Butler, if it's

24   possible.

25         THE COURT:  Mr. Rossini, you can raise that issue

1    with Judge Tharp.

2             THE DEFENDANT:  Okay.

3             THE COURT:  That's --

4             MR. BUTLER:  And, your Honor, I did not initiate that

5    or wasn't involved.

6             THE COURT:  Thank you, Mr. Butler.

7             I'm not going to dictate to Judge Tharp how he runs

8    his cases.

9             THE DEFENDANT:  Sure.

10            THE COURT:  You can raise it with him.

11            Anything else for Mr. Rossini?

12            MR. BUTLER:  No, your Honor.

13            THE COURT:  All right.  Very good.

14            MR. MITCHELL:  Thank you, Judge.

15            THE COURT:  We're adjourned.  Thank you.

16                        *     *     *     *     *

17

18   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
19

20
     /s/ Joseph Rickhoff                    January 6, 2022
21   Official Court Reporter

22

23

24

25